Hearing Date and Time: June 3, 2009, 10:00 a.m. (ET)
Response Deadline: May 26, 2009, 4:00 p.m. (ET)

JONES DAY
222 East 41st Street
New York, New York  10017
Telephone:  (212) 326-3939
Facsimile:  (212) 755-7306
Corinne Ball
Veerle Roovers

JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212
David G. Heiman

JONES DAY
1420 Peachtree Street, N.E.
Suite 800
Atlanta, Georgia  30309
Telephone:  (404) 521-3939
Facsimile:  (404) 581-8330
Jeffrey B. Ellman

Proposed Attorneys for Debtors
and Debtors in Possession

# UNITED STATES BANKRUPTCY COURT
# SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x
:
In re                            :    Chapter 11
:
Chrysler LLC *et al.*,         :    Case No. 09-50002 (AJG)
:
              Debtors.     :    (Jointly Administered)
:
-------------------------------------------------------------x

## NOTICE OF HEARING ON OMNIBUS MOTION OF DEBTORS
## AND DEBTORS IN POSSESSION FOR AN ORDER, PURSUANT
## TO SECTIONS 105, 365 AND 525 OF THE BANKRUPTCY CODE
## AND BANKRUPTCY RULE 6006, (A) AUTHORIZING THE REJECTION
## OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES WITH
## CERTAIN DOMESTIC DEALERS AND (B) GRANTING CERTAIN RELATED RELIEF

**PLEASE TAKE NOTICE THAT:**

1.       A hearing on the Omnibus Motion of Debtors and Debtors in Possession for an Order, Pursuant to Sections 105, 365 and 525 of the Bankruptcy Code and Bankruptcy Rule 6006, (A) Authorizing the Rejection of Executory Contracts and Unexpired Leases with Certain Domestic Dealers and (B) Granting Certain Related Relief (the "Motion") shall be held before the Honorable Arthur J. Gonzalez, United States Bankruptcy Judge, in Room 523 of the United States Bankruptcy Court, Alexander Hamilton Custom House, One Bowling Green, New York, New York 10004, on **June 3, 2009 at 10:00 a.m. (New York time)**.

2.       Objections, if any, to the relief sought in the Motion must be made in writing, with a hard copy to Chambers, conform to the Federal Rules of Bankruptcy Procedure and the Local Rules for the United States Bankruptcy Court for the Southern District of New York and be filed with the Bankruptcy Court and must be served in accordance with the Administrative Order, Pursuant to Bankruptcy Rule 1015(c), Establishing Case Management and Scheduling Procedures in these cases (Docket No. 661) (the "Case Management Order") so as to be actually received by the parties on the Special Service List and such parties upon whom the Motion was required to be served pursuant to the terms of the Case Management Order not later than **4:00 p.m. (New York time) on May 26, 2009** (the "Objection Deadline").

3.       If no objections are timely filed and served with respect to this Motion, the Debtors may, on or after the Objection Deadline, submit to the Court a final order substantially in the form attached to such Motion, which final order may be entered with no further notice or opportunity to be heard offered to any party.

4.       Copies of the Motion, the Case Management Order and the Special Service List may be obtained from the Court's website at http://ecf.nysb-mega.uscourts.gov or, free of charge, at www.chryslerrestructuring.com.

Dated:  May 14, 2009
        New York, New York

Respectfully submitted,


/s/ Corinne Ball
Corinne Ball
Veerle Roovers
JONES DAY
222 East 41st Street
New York, New York  10017
Telephone:  (212) 326-3939
Facsimile:  (212) 755-7306

David G. Heiman
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212

Jeffrey B. Ellman
JONES DAY
1420 Peachtree Street, N.E.
Suite 800
Atlanta, Georgia  30309
Telephone:  (404) 521-3939
Facsimile:  (404) 581-8330

PROPOSED ATTORNEYS FOR DEBTORS
AND DEBTORS IN POSSESSION

Hearing Date and Time:  **June 3, 2009, 10:00 a.m. (ET)**
Response Deadline:  **May 26, 2009, 4:00 p.m. (ET)**

---

**PARTIES RECEIVING THIS OMNIBUS MOTION SHOULD LOCATE THEIR
NAMES AND THEIR DEALERSHIP AGREEMENTS IN THE ATTACHED EXHIBIT A**

JONES DAY
222 East 41st Street
New York, New York  10017
Telephone:  (212) 326-3939
Facsimile:  (212) 755-7306
Corinne Ball

JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212
David G. Heiman

JONES DAY
1420 Peachtree Street, N.E.
Suite 800
Atlanta, Georgia  30309
Telephone:  (404) 521-3939
Facsimile:  (404) 581-8330
Jeffrey B. Ellman

Proposed Attorneys for Debtors
and Debtors in Possession

**IN THE UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

```
------------------------------------------------------- x
                                                        :
In re                                                   :   Chapter 11
                                                        :
Chrysler LLC, et al.,                                   :   Case No. 09-50002 (AJG)
                                                        :
                        Debtors.                        :   (Jointly Administered)
                                                        :
------------------------------------------------------- x
```

**OMNIBUS MOTION OF DEBTORS
AND DEBTORS IN POSSESSION FOR AN ORDER, PURSUANT
TO SECTIONS 105, 365 AND 525 OF THE BANKRUPTCY CODE
AND BANKRUPTCY RULE 6006, (A) AUTHORIZING THE REJECTION
OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES WITH
CERTAIN DOMESTIC DEALERS AND (B) GRANTING CERTAIN RELATED RELIEF**

ATI-2353079v29

TO THE HONORABLE ARTHUR J. GONZALEZ,
UNITED STATES BANKRUPTCY JUDGE:

Chrysler LLC ("Chrysler") and 24 of its domestic direct and indirect subsidiaries, as debtors and debtors in possession (collectively with Chrysler, the "Debtors") respectfully represent as follows:

### Background

1.    On April 30, 2009 (the "Petition Date"), the Debtors commenced their reorganization cases by filing voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  By an order of the Court (Docket No. 97), the Debtors' chapter 11 cases have been consolidated for procedural purposes only and are administered jointly.

2.    The Debtors are authorized to continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3.    The Debtors and their nondebtor direct and indirect subsidiaries (collectively, the "Chrysler Companies") comprise one of the world's largest manufacturers and distributors of automobiles and other vehicles, together with related parts and accessories.  On the Petition Date, the Chrysler Companies employed approximately 55,000 hourly and salaried employees worldwide, 70% of whom were based in the United States.  In addition, as of the Petition Date, the Debtors made payments for health care and related benefits to more than 105,000 retirees.

4.    For the 12 months ended December 31, 2008, the Chrysler Companies recorded revenue of more than $48.4 billion and had assets of approximately $39.3 billion and liabilities totaling $55.2 billion.

5.      Chrysler and its Debtor subsidiaries, Fiat S.p.A. ("Fiat") and New Chrysler (as defined below) have entered into a Master Transaction Agreement dated as of April 30, 2009 (collectively with other ancillary and supporting documents, the "Purchase Agreement"). Pursuant to the Purchase Agreement, among other things:  (a) Chrysler will transfer the majority of its operating assets to New CarCo Acquisition LLC ("New Chrysler"), a newly established Delaware limited liability company formed by Fiat; and (b) in exchange for those assets, New Chrysler will assume certain liabilities of Chrysler and pay to Chrysler $2 billion in cash (collectively with the other transactions contemplated by the Purchase Agreement, the "Fiat Transaction").

6.      With the support of the U.S. and Canadian governments, Fiat, the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, dealers, suppliers and other stakeholders, the Debtors commenced these cases to implement an expeditious sale process to implement the Fiat Transaction, or a similar transaction with a competing bidder, designed to maximize the value of the Debtors' operations and businesses for the benefit of their stakeholders.  Pending the proposed sale, the Debtors idled most operations as they conserve their resources, while at the same time ensuring that (a) the facilities are prepared to resume normal production schedules quickly upon the completion of a sale and (b) consumers are not impacted by the filing.

7.      A more detailed explanation of Chrysler's businesses and operations, and the events leading to the commencement of these cases, can be found in the Affidavit of Ronald E. Kolka (Docket No. 23) (the "Kolka Affidavit"), which was filed on the Petition Date and is incorporated herein by reference.

ATI-2353079v29

**Jurisdiction**

8. This Court has subject matter jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

**Preliminary Statement**[1]

9. Other than certain sales to the government, virtually all of the vehicles manufactured by the Debtors are sold to the U.S. general public through a network of authorized dealers (the "Domestic Dealer Network").  (See Grady Decl. at ¶ 6.)  Over the years, this Domestic Dealer Network grew to cover all 50 states, peaking at approximately 6,500 dealers in the mid-1960s, which has subsequently declined over time.  (Id.)  Although the Debtors' large and extensive Domestic Dealer Network provides increased outlets for the sale of the Debtors' products, its size and scope has created significant challenges as market conditions and demographic factors have changed over time.  (Id. at ¶ 10.)

10. For example, the Debtors' dealers compete not only with dealers selling the products of other Original Equipment Manufacturers ("OEMs"), such as Ford and Toyota, but also with each other in surrounding markets.  Some of the Debtors' dealers may have only one linemake (for example, Chrysler, Dodge or Jeep), while others have all three linemakes. Thus, a Chrysler-Jeep dealership may compete with a nearby Dodge dealership.  For example, a Chrysler dealer may sell Chrysler Town & Country minivans and a nearby Dodge dealer may sell Dodge Caravan minivans, which may compete for the same customers.  (Id. at ¶ 10.)

11. Over time, the market for new motor vehicles has changed dramatically. Numerous other competitors selling a wide variety of vehicles, including Toyota, Honda,

---

[1] In further support of this Motion, the Debtors hereby submit the Second Declaration of Peter M. Grady, attached hereto as Exhibit B and incorporated herein by reference (the "Grady Declaration").

Hyundai and Kia, have entered the market and captured a larger share of the automotive market. As a result, the larger Domestic Dealer Network has faced increasing financial pressures on profitability as the market share of the Debtors and other domestic OEMs declined over time in the face of increasing foreign competition.  With so many outlets available for the Debtors' products and more limited market share, many dealers' annual sales of vehicles (or "throughput") fell below targeted levels, limiting dealer profitability and the ability of many dealers to reinvest in the dealership and enhance the experience of consumers.  (Id. at ¶ 12.)

12.    In addition, as suburbs grew and the modern interstate system continued to evolve, longstanding dealerships no longer were in the best or growing locations.  Many rural locations also served a diminishing population of potential consumers.  Some dealership facilities became outdated.  Other locations faced declining traffic count and declining populations.  (Id. at ¶ 12.)

13.    By contrast, the newer OEMs selling competing vehicles, such as Toyota, Honda, Hyundai and others, did not enter the U.S. markets or did not significantly expand within U.S. markets until much later in time.  They did not have the legacy network dealers.  They began to assemble new networks with new and better locations in growing markets, with numerous models consolidated under a single roof, with more modern facilities, focused on large metropolitan areas.  (Id. at ¶ 13.)

14.    Over time, the throughput of the newer OEMs continued to grow while the throughput of the Debtors continued to decline.  On average, the dealers for several of the newer OEMs now have substantially higher throughput, resulting in better and more sustainable sales and profitability and providing greater resources for marketing, reinvesting in the business,

improving facilities and enhancing the consumer experience and customer service.  (Id. at ¶ 14.)[2]

In addition, such larger throughput supports substantially higher average profits for competitive

dealerships, enables competitors to often attract the more experienced and highly qualified

personnel from the Debtors' Domestic Dealer Network, and enables those dealers to offer extra

services and benefits that can improve customer satisfaction for the brands offered.  (Id. at ¶ 15.)

      15.    The Debtors' larger Domestic Dealer Network also substantially increases

expenses and inefficiencies in the distribution system, forcing the Debtors to spend additional

resources on training, new vehicle allocation personnel, processes, and procedures, oversight of

the Domestic Dealer Network, auditing and monitoring expenses for dealer operations, and all of

the other operational expenses that must be incurred to maintain, support, facilitate and oversee a

larger dealer network.  In addition, the numerous "partial line" dealerships in the Domestic

Dealer Network requires the continued production of overlapping models under different brands,

which further increases unnecessary costs and introduces substantial inefficiencies in the

distribution system.  In sum, the smaller, more efficient, more profitable dealer network for the

transplant OEMs has become a competitive disadvantage for the Domestic Dealer Network.

(Id. at ¶ 16.)

      16.    The Debtors have been actively addressing their dealer network issues for

a number of years.  As part of their ongoing business plans, the Debtors have engaged in a long

term process to rationalize their dealer network.  The goals of this effort included working with

---

[2]    In 2008, the Debtors sold approximately 1,000,000 new vehicles through approximately 3,298 dealers.  The average throughput for the Debtors' dealers was approximately 303 per dealer.  In 2008, Toyota sold approximately 1,604,952 new vehicles in the United States through approximately 1,242 dealers.  The average throughput for Toyota's dealers in the United States was approximately 1,292 per dealer.  In 2008, Honda sold approximately 1,255,411 new vehicles in the United States through approximately 1,030 dealers.  The average throughput for Honda's dealers in the United States was approximately 1,219 per dealer. (Grady Decl. at ¶ 14.)  Thus, the throughput for Toyota and Honda dealers is approximately 415% higher than the average throughput of the Debtors' dealers.  (Id. at ¶ 15.)

the dealers to consolidate all three of the Debtors' brands at each dealership and reshape the network to realign the retail outlets using the best dealers, in the best locations, with the best facilities. This process has been time-consuming and expensive as a result of a complex web of state laws (as defined more specifically below, the "Dealer Laws") that protect dealers and limit the ability of the Debtors to expeditiously terminate, relocate or consolidate dealerships.[3] Despite these obstacles, and at substantial cost, the Debtors have reduced their dealer network from approximately 4,320 dealers in 2001 to 3,181 as of the Petition Date. These efforts are ongoing. As part of their prepetition long-term viability plan (as further defined in the Kolka Affidavit, the "Viability Plan"), the Debtors identified the completion of their dealership rationalization efforts as one of the core initiatives. (Id. at ¶ 17.)

17.    As explained in detail in the Kolka Affidavit, consistent with their Viability Plan, the Debtors are seeking to obtain approval of and implement the Fiat Transaction or another transaction with a competing bidder to sell their assets on a going concern basis (any such transaction, a "Sale Transaction").[4] Recognizing the importance of completing a Sale Transaction as expeditiously as possible, the Court entered an order on May 7, 2009 (Docket No. 492) (the "Bid Procedures Order") approving a sale process culminating in a sale hearing to be conducted on May 27, 2009 to consider the Fiat Transaction or a competing transaction. A key component of the Fiat Transaction is the transfer to New Chrysler of a strong, well-positioned dealer network to continue selling Chrysler, Dodge and Jeep vehicles to consumers and to service these vehicles. (See id. at ¶ 18.)

---

[3]     These Dealer Laws began coming into effect in the 1980s.

[4]     The Fiat Transaction is described in greater detail a separate motion to approve this sale, or a similar sale to a competing bidder, filed by the Debtors on May 3, 2009 (Docket No. 190) (together with the supporting memoranda and affidavits, the "Sale Motion").

18.     To that end, the Fiat Transaction contemplates and, in fact, requires the acceleration of the Debtors' network rationalization.[5] This effort to strengthen the Domestic Dealer Network is a critical component of the proposed Fiat Transaction both to improve the viability of the Domestic Dealer Network and position New Chrysler for viability and long-term success. (Id.) Such effort also is expected to be important in any alternative Sale Transaction involving the Domestic Dealer Network. The consummation of such a sale, including the further rationalization of the Domestic Dealer Network, will materially benefit the Debtors' estates, maximize the value available to stakeholders and provide substantial benefits to the remaining dealers.

19.     As a result, the Debtors have determined, in a sound exercise of their business judgment and after an extensive analysis and consultation with New Chrysler, to exercise their right to reject 789 dealership agreements and related ancillary agreements, pursuant to section 365 of the Bankruptcy Code.

20.     Moreover, given (a) the complexity and urgency of the transactions involved, (b) the number of dealers and other parties impacted by this Motion, (c) the need for the Debtors to move quickly to implement the requested relief through affirmative actions in the marketplace and (d) the possibility of disputes regarding the impact of rejection on the implicated commercial relationships and related legal rights, the Debtors believe that it is essential for the Court to issue related rulings to ensure that the Debtors obtain the full and immediate benefit of rejection. There is little precedent for the bankruptcy of a major OEM, and

---

[5]     Pursuant to the Purchase Agreement and the Bid Procedures Order, New Chrysler has the right to identify which executory contracts and unexpired leases will be assumed by the Debtors and sold and assigned to New Chrysler as the purchaser. Consistent with the Viability Plan and business analyses described herein, New Chrysler has made a determination not to take an assignment of the agreements addressed by this Motion.

ATI-2353079v29

dealers and other parties impacted by rejection may not understand (or accept) its impact.  A

simple ruling that the applicable agreements are rejected, without also providing the clarity and

protections of the ancillary rulings and relief outlined in greater detail below, would leave the

Debtors, New Chrysler or other purchaser, the remaining dealers whose agreements are not being

rejected through this Motion (collectively, the "Remaining Dealers") and other interested parties

exposed to risk of material interference with the smooth and expeditious implementation of a

Sale Transaction.

21.    Such risk could be a severe impediment to the Debtors' efforts to

maximize value available for stakeholders.  To complete a successful Fiat Transaction or other

Sale Transaction involving the Domestic Dealer Network, the Debtors must minimize confusion

in the marketplace about the rights of the rejected dealers, and avoid any interference by these

rejected dealers in the operations of New Chrysler or another purchaser.  Thus, the Debtors seek

ancillary relief in support of rejection to minimize any risks caused by ongoing disputes or

uncertainty and to ensure that the benefits of the rejection are preserved to the fullest extent

possible.

### **Relief Requested**

22.    Pursuant to sections 105, 365 and 525 of the Bankruptcy Code and

Rule 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), the Debtors

hereby seek the entry of an order:

> (a)    authorizing them to reject, and approving the rejection, effective as of
> June 9, 2009, the following agreements (collectively, the "Rejected Dealer
> Agreements"):  (i) all Chrysler, Jeep, Dodge or Dodge Truck dealership
> agreements for the 789 dealers identified on the attached Exhibit A
> (collectively, the "Affected Dealers") at the dealership locations identified

ATI-2353079v29

on that Exhibit (collectively, the "Dealership Agreements");[6] and (ii) the ancillary agreements and leases related to such Affected Dealers and Rejected Dealer Agreements at the identified dealership locations (collectively, the "Ancillary Agreements");[7]

(b)     determining that any state and local statutes, rules and regulations of any kind or nature whatsoever, including without limitation the Dealer Statutes (as defined below) (collectively, "Dealer Laws"), are preempted by the Bankruptcy Code to the extent that they purport to, or could be interpreted or applied to, interfere with, undermine or impact the full and complete rejection of the Rejected Dealer Agreements;

(c)     determining that New Chrysler and all Remaining Dealers are "person[s] with whom [the Debtors have] been associated" within the meaning of section 525 of the Bankruptcy Code and therefore are entitled to the protections of section 525 of the Bankruptcy Code;

(d)     clarifying the scope of the Affected Dealers' claims, status and rights arising under or in any way related to the Dealer Laws and the Debtors' rejection of the Rejected Dealer Agreements (collectively, "Rejection Damages Claims");

(e)     approving procedures to provide the Debtors with swift and efficient means of seeking judicial intervention to assist them in resolving any disputes that might arise with Affected Dealers who engage in conduct inconsistent with the relief requested herein; and

(f)     waiving the limitations on omnibus motions to reject executory contracts and unexpired leases set forth in Bankruptcy Rule 6006(f)(6).

---

[6]     The Dealership Agreements include, without limitation, all Dealer Sales and Service Agreements and Direct Dealer Agreements entered into with each Affected Dealer and any amendments, modifications, supplements, addenda, restatements or exhibits to those agreements.  Designations on Exhibit A for "Lines" refer to the linemakes Chrysler ("C"), Jeep ("J") and Dodge ("D") or Dodge Truck ("T").

[7]     The Ancillary Agreements include, without limitation, software license agreements, data exchange and electronic commerce agreements, real property leases, Five Star dealer license agreements, options, sign leases, dealer improvement agreements, market action agreements, letters of intent and term sales agreements.  By this Motion, the Debtors seek to reject *all* Ancillary Agreements with the Affected Dealers that relate to the dealership locations on the attached Exhibit A, other than Site Control Agreements and similar agreements with Debtor Chrysler Realty Company LLC (collectively, the "Site Control Agreements").  If this Motion is granted, all Ancillary Agreement with an Affected Dealer at the dealership locations listed on Exhibit A (excluding any Site Control Agreements) will be rejected.  As used herein, the term "Ancillary Agreements" does not include any Site Control Agreements.

ATI-2353079v29

## Facts Relevant to This Motion

### *The Domestic Dealer Network and the Dealership Agreements*

23.     As noted above, the Debtors' Domestic Dealer Network was comprised of 3,181 dealers as of the Petition Date.  (See Grady Decl. at ¶ 6.)  Except with respect to a small number of dealerships not implicated by this Motion, all dealerships are independently owned.[8] (Id.)  Approximately 62% of the dealers in the Domestic Dealer Network are "full line" dealers, meaning they sell all three of the Debtors' brands:  Chrysler, Jeep and Dodge.  (Id. at ¶ 7.)  The remaining 38% of the dealers in the Domestic Dealer Network are "partial line" dealers, selling only one or a combination of two of the Debtors' brands.  (Id.)  The Domestic Dealership Network includes dealers in every U.S. state and in every major U.S. metropolitan area, as well as widespread coverage of secondary and rural markets.  (Id.)

24.     Other than certain sales to the government, virtually all of the vehicles manufactured by the Debtors are sold to the U.S. general public through the Domestic Dealer Network.  (Id. at ¶ 6.)  Despite the size and breadth of the Domestic Dealer Network, its sales volume, productivity and efficiency are not evenly distributed.  (Id. at ¶ 7.)  Approximately 25% of the Domestic Dealer Network accounts for approximately 50% of the Debtors' domestic sales. Further, just over 50% of the Domestic Dealer Network accounts for approximately 90% of the Debtors' domestic sales.  (Id.)

25.     Consistent with industry practice, and with the exception of a small percentage of dealers using older Direct Dealer Agreements, the Debtors have used a standard uniform dealership agreement (as modified from time to time) for all new domestic dealers

---

[8]     In particular, Debtor Chrysler Realty owned 14 active and seven inactive dealerships as of the Petition Date, referred to as "manufacturer investment dealerships" or "MIDs."

starting in approximately 1988.[9]  (Id. at ¶ 9.)  The Debtors enter into a separate dealership

agreement for each of the Debtors' linemakes that a dealer sells.  Thus, for example, a "full line"

dealer will have three dealership agreements:  one for Dodge/Dodge Truck, one for Jeep and one

for Chrysler.  (Id.)  The Debtor party to each of these agreements is Chrysler Motors LLC

("Chrysler Motors").  (Id.)

26.     The Dealership Agreements govern the terms under which (a) the Debtors

sell vehicles, parts and accessories to the dealers through Chrysler Motors; and (b) the dealers

sell and service the Debtors' products and provide related services to consumers.  The Dealership

Agreements also include other agreements and obligations between Chrysler Motors and the

dealers.

27.     In particular, under the standard form of Dealership Agreement, the dealer

counterparty agrees, among other things, to:  (a) promote energetically and sell aggressively the

Debtors' vehicles and related products and meet the dealer's Minimum Sales Responsibility

(as defined in the Dealership Agreement); (b) prepare vehicles for delivery to their purchasers;

(c) provide repair services for the Debtors' products; and (d) provide warranty service under the

Debtors' warranty programs.  For the linemakes applicable to each dealer, Chrysler Motors

agrees, among other things, to (a) use best efforts to fill the dealer's orders for vehicles, parts and

accessories; (b) ship vehicles, parts and accessories only according to the dealer's order;

(c) reimburse the dealer for certain warranty work; and (d) seek to advertise in the most effective

manner to develop public interest and confidence in its dealers and products.

---

[9]     Specifically, the form of agreement the Debtors have used since approximately 1988 is called, for each
applicable linemake, the Sales and Service Agreement.  From approximately the 1960s until the
development of the Sales and Service Agreement, the Debtors used a form of agreement called the Direct
Dealer Agreement.  As of the Petition Date, approximately 112 of the dealerships in the Domestic Dealer
Network continue to be governed under Direct Dealer Agreements.

28.    The Dealership Agreements have no fixed term.  Each Dealership

Agreement states that it is terminable by the dealer for any reason on not less than 30 days'

written notice, or by Chrysler Motors on not less than 60 days' written notice for, among other

things, the dealer's failure to perform certain of its undertakings and obligations under the

Dealership Agreement.  In addition, the Dealership Agreements provide that certain events cause

the automatic termination of the Dealership Agreement, such as (a) the death of the dealer, (b) a

dealer's attempted assignment of a Dealership Agreement without the Debtors' consent, (c) an

assignment by the dealer for the benefit of its creditors, (d) the insolvency of the dealer or the

preparation of a bankruptcy petition by or for the dealer and (e) the discontinuance by the

Debtors of the production or distribution of all vehicles supplied to the dealer under the

Dealership Agreement.  Such terminations also may be subject to certain state law restrictions or

requirements, including the Dealer Laws.

29.    In addition, ancillary to the Debtors' relationships with their dealers under

the Dealership Agreements, the Debtors and dealers typically enter into a series of Ancillary

Agreements to address such matters as software licensing and usage, signage, facility

improvements and other business matters.  Depending upon subject matter, some Ancillary

Agreements are form documents used for all dealers; others are unique to a particular dealer

counterparty.

### The Dealer Statutes and the Government Entities

30.    Many states regulate the relationship between new motor vehicle

manufacturers and dealers by way of motor vehicle dealer statutes (collectively, "Dealer

Statutes").  See, e.g., CAL. VEH. CODE §§ 3000, et seq.; MICH. COMP. LAWS §§ 445.1561, et seq.;

N.Y. VEH. & TRAF. LAW §§ 461, et seq.; O.C.G.A. §§ 10-1-620, et seq.  In general, Dealer

Statutes regulate what automotive manufacturers can do with regard to certain dealer networking

matters and regulate the terms of the manufacturer dealer relationship.  See, e.g., CAL. VEH. CODE §§ 3060-69; MICH. COMP. LAWS §§ 445.1573-78; N.Y. VEH. & TRAF. LAW §§ 463-67; O.C.G.A. §§ 10-1-651-68.  For example, Dealer Statutes often prescribe, among other things: (a) the circumstances under which a manufacturer may cancel, terminate, not renew or otherwise discontinue a dealer agreement; (b) the notice required by a manufacturer to cancel, terminate, not renew or discontinue a dealer agreement; and (c) additional obligations of the manufacturer in the event of a discontinuance of a dealer agreement.  See, e.g., CAL. VEH. CODE §§ 3060-61; MICH. COMP. LAWS §§ 445.1567-72; N.Y. VEH. & TRAF. LAW §§ 463(2)(d), (o-p), 466-67; O.C.G.A. §§ 10-1-651-53.

31.    In addition, many Dealer Statutes impose significant limitations on the power of automotive manufacturers to relocate their dealers or to establish new dealerships or modify existing dealerships over the objection of an affected dealer (collectively, "Dealers' Blocking Rights").  See, e.g., CAL. VEH. CODE §§ 3062-63 (providing that a new motor vehicle franchisor may not relocate an existing dealership or establish an additional dealership over the objections of franchisees in the market area without showing good cause); MICH. COMP. LAWS §§ 445.1576 (same); N.Y. VEH. & TRAF. LAW §§ 463(2)(cc) (same); O.C.G.A. § 10-1-664 (providing that superior court can grant the petition of an existing dealership to prohibit the establishment or relocation of a dealership in the applicable market area unless the franchisor proves that the existing dealership is not providing adequate representation of the applicable linemakes and establishes other requirements).

32.    In many states, new motor vehicle dealers may file "protests" or complaints with motor vehicle dealer boards or administrative agencies established by the states to oversee the regulation of automotive manufacturers and dealers.  Those administrative boards

ATI-2353079v29

typically are comprised of some combination of new or used dealers, consumers and other representatives appointed in accordance with state procedures.  In some states, the boards or administrative agencies also can act on their own to review or regulate conduct by automotive manufacturers and dealers or suspend the licenses of manufacturers or dealers to operate in the state.  These various state boards, administrative agencies and other government officials, regulators or authorities that address dealer issues, including by administering the Dealer Statutes, are referred to herein collectively as the "Government Entities."

***The Debtors' Prepetition Initiatives to Restructure The Domestic Dealer Network***

33.    In 2001, the Debtors initiated a program to:  (a) evaluate their dealership network and key locations; (b) identify the most desirable dealerships and dealership locations from the perspective of long term planning; and (c) streamline the Domestic Dealer Network to meet long term goals, including, among other things, the consolidation of the Debtors' brands at "partial line" dealers to make them "full line" dealers.  (See Grady Decl. at ¶ 20.)  This program has been renamed over the years and most recently has been called "Project Genesis."  (Id.)  The objectives of Project Genesis include brand consolidation, as well as reducing and reconfiguring the Domestic Dealer Network to achieve the goal of having a smaller and stronger network, with the best dealers, in the best locations, with the best facilities.  (Id. at ¶ 21.)  Although the overall size of the network would contract as a result of implementing Project Genesis, it is projected that dealers remaining in the network would become more profitable, generate greater capital to reinvest in the business, improve customer amenities and customer satisfaction and, ultimately, increase their sales over time to the benefit of the Debtors.  (Id.)  After a period of time, and substantially improved marketing and investments, overall sales in the reduced network are anticipated to grow beyond current sales levels within the existing network.  (Id.)

34.     Although Project Genesis primarily focused on dealers in metropolitan markets and key secondary markets (where, among other things, there had been less brand consolidation), the Debtors also have evaluated the remaining secondary and rural market dealers.  (Id. at ¶ 22.)  Based on this extensive and ongoing work, between 2001 and the Petition Date, the Debtors worked with dealers in a cooperative manner to reduce and consolidate the Domestic Dealer Network, within the limitations imposed by the Dealer Statutes and any existing agreements, in a continued effort to improve efficiency, strengthen individual dealers, elevate customer service and minimize costs.  (Id.)  The Debtors have been working diligently on Project Genesis and its predecessor programs for well over eight years and have spent more than $216 million implementing the objectives of the program.  (Id. at ¶ 23.)

35.     By the Petition Date, these efforts had achieved significant progress and resulted in the reduction of the Domestic Dealer Network from a peak of approximately 6,500 dealers in the mid-1960s to 3,181 as of the Petition Date.  (Id. at ¶ 6.)

***The Continued Application of the Principles of Project Genesis in
Connection with the Alliance Viability Plan and the Proposed Fiat Transaction***

36.     The objectives of Project Genesis and the underlying analyses of the Domestic Dealer Network have guided the Debtors in developing the Alliance Viability Plan (as referred to in the Kolka Affidavit)[10] and in working with New Chrysler on the terms of the Fiat Transaction to implement that plan.  (See Grady Decl. at ¶ 24.)  The long term viability and success of New Chrysler, and its willingness to consummate the Fiat Transactions, depends, among other things, on having a strong and vibrant dealer network consistent with the goals of

---

[10]     As explained in the Kolka Affidavit, the Alliance Viability Plan reflects the Debtors' written submission to the U.S. Treasury on February 17, 2009, setting forth Chrysler's plan to achieve and sustain long-term viability, energy efficiency, rationalization of costs and competitiveness in the U.S. marketplace, with the additional benefits of a strategic partnership with Fiat.  (See Kolka Affidavit at ¶¶ 29-41.)

Project Genesis.  (See id.)  Accordingly, in recent months, and since the Petition Date, the

Debtors, in cooperation with New Chrysler, have continued to refine their evaluation of dealers

under Project Genesis to model an anticipated dealership network for the Alliance Viability Plan

and for the proposed Fiat Transaction.  (See id.)

***The Debtors' Extensive Qualitative Assessment of Each Dealership***

37.    Project Genesis and the selection of dealerships to be included in the relief

sought in this Motion involved the evaluation of each dealership.  In particular, the Debtors

reviewed and analyzed numerous performance and planning factors for each dealership,

including, among other things:

> (a)    the dealer's —
>
>> (i)    brand affiliations;
>>
>> (ii)    raw sales volume;
>>
>> (iii)    sales performance relative to its Minimum Sales Responsibility;
>>
>> (iv)    location;
>>
>> (v)    type of market;
>>
>> (vi)    facilities;
>>
>> (vii)    customer service;
>>
>> (viii)    history of experience; and
>>
>> (ix)    market share;
>
> (b)    the planning potential for the dealership; and
>
> (c)    other factors.

(Id. at ¶ 26.)

38.    In addition, the Debtors are able to draw on external metrics including,

among other things:

ATI-2353079v29

(a)    new vehicle registration information for the Debtors' and other manufacturers' comparable products, indicating the location of new vehicle registrations within the market  and the location of registrations of new motor vehicles sold by each dealer;

(b)    demographic data including —

(i)    current population and household density;

(ii)    anticipated shift of population and household density; and

(iii)    average household income;

(c)    the average distance to the nearest dealer by manufacturer for each locality; and

(d)    competing manufacturers' market share within the locality.

(Id. at ¶ 27.)

39.    Using these analytical methods, the Debtors can create comprehensive statistical assessments of each dealer and make reasoned judgments regarding the optimal configuration for each market in the Domestic Dealer Network and the best means of implementing the goals of Project Genesis.  (Id. at ¶ 28.)  As discussed further below, as a result of this review — and drawing on their substantial past experience in evaluating the Domestic Dealer Network — the Debtors have determined, and New Chrysler likewise has concluded, that (a) the Domestic Dealer Network needs to be reduced and reconfigured in a targeted manner to strengthen the network and dealer profitability and to achieve optimal results for the dealers and consumers; and (b) rejection of the Rejected Dealer Agreements would directly assist in achieving those goals and implementing the Alliance Viability Plan.

40.    Based on both an objective and subjective evaluation, the Debtors have determined that the dealerships located in the markets at issue lack the operational, market, facility and linemake characteristics necessary to best contribute to the ongoing dealer network under current or future ownership.  New Chrysler has agreed with this approach and has

determined that it will not take an assignment of the Rejected Dealership Agreements.

Consistent with the Alliance Viability Plan and in support of the Fiat Transaction, the Debtors

have reached the business conclusion that the rejection of the Rejected Dealer Agreements

therefore is in the best interests of the Debtors' estates and creditors.  (Id. at ¶ 29.)

> 41.    Moreover, immediate rejection of these agreements is necessary and

appropriate to begin the work necessary to complete the transition to the smaller, more effective,

and more profitable dealer network, limit any ongoing postpetition obligations to the Affected

Dealers and minimize disruption upon the closing of the Fiat Transaction or other Sale

Transaction involving the sale of the Domestic Dealer Network.  (Id. at ¶ 29.)  In addition, any

delay in identifying the dealers to remain as part of the Domestic Dealer Network following the

sale would be extraordinarily detrimental to the Debtors' efforts to preserve the network pending

the sale.  (Id.)  The Debtors' dealers are facing unprecedented financial challenges in the current

economic environment, and further strain as a result of the Debtors' commencement of these

cases.  (Id. at ¶ 30.)  The best dealers with the best facilities and locations are being approached

regularly by other OEMs.  Others are actively considering other opportunities.  (Id.)  The

Debtors believe that it is essential under these circumstances to identify immediately the

Remaining Dealers that will comprise the Domestic Dealer Network following the sale to

provide them with a reason to continue to support the Debtors and the Debtors' products — as

they have for many years — in the face of these various challenges and pressures.  (Id.)[11]  Faced

with further uncertainly about whether they are part of the future plans of New Chrysler or

---

[11]    To that end, consistent with the Bidding Procedures Order and concurrently with the filing of this Motion,
the agreements with the Remaining Dealers for the remaining Chrysler, Jeep and Dodge dealership
locations have been identified in a separate filing as executory contracts and unexpired leases to be
assumed and assigned to New Chrysler upon the consummation of the Fiat Transaction.

ATI-2353079v29

another purchaser, key dealers may not take the steps needed to complete the transition to new

ownership.  (Id.)

## Basis for Relief Requested

### The Debtors Have the Right to Reject the Rejected Dealership
### Agreements and Have Exercised Sound Business Judgment in Seeking To Do So

42.    Section 365(a) of the Bankruptcy Code provides that a debtor, "subject to

the court's approval, may assume or reject any executory contract or unexpired lease."  11 U.S.C.

§ 365(a).  Each of the Rejected Dealer Agreements is an "executory contract" or an "unexpired

lease" within the meaning of section 365 of the Bankruptcy Code, subject to assumption or

rejection by the Debtors.[12]

43.    Courts routinely approve motions to assume, assume and assign or reject

executory contracts or unexpired leases upon a showing that the debtor's decision to take such

action will benefit the debtor's estate and is an exercise of sound business judgment.  See COR

Route 5 Co., LLC v. Penn Traffic Co. (In re Penn Traffic Co.), 524 F.3d 373, 382 (2d Cir. 2008)

(affirming the rejection of a construction and land sale contract, stating that section 365 "'permits

the trustee or debtor-in-possession, subject to the approval of the bankruptcy court, to go through

the inventory of executory contracts of the debtor and decide which ones it would be beneficial

to adhere to and which ones it would be beneficial to reject'") (quoting Orion Pictures Corp. v.

Showtime Networks, Inc. (In re Orion Pictures Corp.), 4 F.3d 1095, 1099 (2d Cir. 1993)); see

also NLRB v. Bildisco & Bildisco, 465 U.S. 513, 523 (1984) (stating that the traditional standard

applied by courts to authorize the rejection of an executory contract is that of "business

judgment"); In re Gucci, 193 B.R. 411, 415 (S.D.N.Y. 1996) ("A bankruptcy court reviewing a

---

[12]    To the extent that any Dealership Agreement or Ancillary Agreement already has expired or been
terminated or otherwise is not executory, it is included herein out of an abundance of caution.

trustee's decision to assume or reject an executory contract should apply its best 'business judgment' to determine if it would be beneficial or burdensome to the estate to assume it.").

44.    Courts generally will not second-guess a debtor's business judgment concerning the assumption or rejection of an executory contract or unexpired lease.  See In re Riodizio, Inc., 204 B.R. 417, 424 (Bankr. S.D.N.Y. 1997) ("[A] court will ordinarily defer to the business judgment of the debtor's management."); accord Phar Mor, Inc. v. Strouss Bldg. Assocs., 204 B.R. 948, 951-52 (Bankr. N.D. Ohio 1997) ("Whether an executory contract is 'favorable' or 'unfavorable' is left to the sound business judgment of the debtor. . . .  Courts should generally defer to a debtor's decision whether to reject an executory contract.").

45.    The "business judgment" test is not a strict standard; it merely requires a showing that either assumption or rejection of the executory contract or unexpired lease will benefit the debtor's estate.  See, e.g., Bregman v. Meehan (In re Meehan), 59 B.R. 380, 385 (E.D.N.Y. 1986) ("The business judgment test is a flexible one. . . .  The primary issue under the business judgment test is whether rejection of the contract would benefit general unsecured creditors."); In re Helm, 335 B.R. 528, 538 (Bankr. S.D.N.Y. 2006) ("To meet the business judgment test, the debtor in possession must establish that rejection will benefit the estate.") (internal citation omitted); Westbury Real Estate Ventures, Inc. v. Bradlees, Inc. (In re Bradlees Stores, Inc.), 194 B.R. 555, 558 n.1 (Bankr. S.D.N.Y. 1996) ("In reviewing a debtor's decision to assume or reject an executory contract, the court must examine the contract and circumstances and apply its best 'business judgment' to determine if the assumption or rejection would be beneficial or burdensome to the estate.")

46.    As noted above, the Debtors have devoted significant attention, analysis and resources over the years to the development and refinement of Project Genesis, which has

served as the blueprint for the rationalization of the Domestic Dealer Network.  Moreover, the

Debtors concluded that the continued implementation of these efforts is critical to the Debtors'

Alliance Viability Plan, which is now being pursued through the Fiat Transaction or other Sale

Transaction.  (See Grady Decl. at ¶¶ 18-19.)

> 47.    Consistent with the Debtors' extensive evaluation of the Domestic Dealer

Network, New Chrysler has determined that it will not take an assignment of the Rejected Dealer

Agreements.  Instead, following the consummation of the Fiat Transaction, the Remaining

Dealers would comprise a smaller dealer network — nearly 25% smaller than the network as of

the Petition Date — poised to fulfill the promise of Project Genesis.  Under these circumstances,

and because the Debtors have no use for the burdensome Rejected Dealership Agreements after

consummation of the Fiat Transaction or other Sale Transaction, the Debtors have determined in

their business judgment to reject the Rejected Dealership Agreements.  (See id. at ¶¶ 18-19;

¶¶ 24-25.)

> 48.    In addition, as described above, the Debtors have determined that the

rejection of the Rejected Dealer Agreements must be accomplished without delay.  Prompt

rejection will permit the Debtors to begin work to accomplish a smooth transition to the smaller

post-sale network and to minimize the risks of any disruption in connection with the

consummation of the Fiat Transaction or other Sale Transaction involving the sale of the

Domestic Dealer Network.  Prompt rejection also is necessary to bolster the Remaining Dealers

and to encourage them to persevere under difficult circumstances, thereby enhancing the ability

of the Debtors to preserve the Domestic Dealer Network pending the Sale Transaction.  By

contrast, the failure to reject the Rejected Dealership Agreements promptly could undermine

these initiatives.  Prompt rejection also eliminates the potential for the incurrence of unnecessary

administrative liabilities under the Rejection Dealership Agreements.  For all of these reasons,

immediate rejection of the Rejected Dealership Agreements pursuant to section 365 of the

Bankruptcy Code is appropriate.

**_Section 365 of the Bankruptcy Code Preempts Dealer Laws_**

49.      Outside of bankruptcy, Dealer Laws often place restrictions on the

termination of dealership agreements or other efforts to conclude or impinge upon the

commercial relationship between a vehicle manufacturer/distributor and its authorized dealer.

By contrast, a manufacturer/distributor that is a chapter 11 debtor has a right (and in fact an

obligation) under the federal Bankruptcy Code to either assume or reject its executory contracts,

including dealer agreements.  As such, the Dealer Laws are preempted by the Bankruptcy Code

to the extent that they purport to interfere with or undermine the Debtors' ability to reject

executory contracts or unexpired leases, including the proposed rejection of the Rejected Dealer

Agreements.

50.      A fundamental purpose of section 365 of the Bankruptcy Code is, among

other things, to enable a debtor to benefit from contracts that are beneficial to it and to reject

those contracts that are not, thereby maximizing the value of its estate.  <u>See</u>, <u>e.g.</u>, <u>In re</u>

<u>Bethlehem Steel Corp.</u>, 291 B.R. 260, 264 (Bankr. S.D.N.Y. 2003).  The Dealer Laws must not

be seen to impair these core bankruptcy rights that the Debtors possess under section 365 of the

Bankruptcy Code.  <u>See</u> <u>In re City of Vallejo</u>, 403 B.R. 72, 77 (Bankr. E.D. Cal. 2009) ("Congress

enacted section 365 to provide debtors the authority to reject contracts . . .  [t]his authority

preempts state law by virtue of the Bankruptcy Clause [and] the Supremacy Clause.");

<u>Volkswagen of Am., Inc. v. Dan Hixson Chevrolet Co. (In re Dan Hixson Chevrolet Co.)</u>,

12 B.R. 917, 923 (Bankr. N.D. Texas 1981) (holding that section 365 of the Bankruptcy Code

preempted a Texas law requiring a "good cause" hearing if a dealer protests a manufacturer's

attempted termination of a dealer agreement, because permitting the "good cause" proceeding to

continue might frustrate the purposes of federal bankruptcy law); In re Tom Stimus Chrysler-

Plymouth, Inc., 134 B.R. 676, 679 (Bankr. M.D. Fla. 1991) (holding that section 365 of the

Bankruptcy Code governs the assumption or rejection of a contract, even if the agreement

otherwise would have been terminated under Florida dealer laws).

> 51.    The Bankruptcy Clause of the United States Constitution grants Congress

the authority to establish a uniform federal law of bankruptcy.  U.S. CONST., Art. I, § 8.  The

Supremacy Clause of the United States Constitution mandates that such federal laws "shall be

the supreme Law of the Land; . . . [the] Laws of any State to the Contrary notwithstanding."

U.S. CONST., Art. VI.  Under the doctrine of preemption, "state laws that interfere with or are

contrary to federal law are preempted and are without effect pursuant to the Supremacy

Clause. . . ."  In re Loranger Mfg. Corp., 324 B.R. 575, 582 (Bankr. W.D. Pa. 2005);

Hillsborough County v. Automated Medical Labs, Inc., 471 U.S. 707, 712 (1985).  In particular,

federal law preempts state law in any of three situations:  (a) express preemption, (b) field

preemption and (c) conflict preemption.  In re Nickels Midway Pier, LLC, 332 B.R. 262, 273

(Bankr. D.N.J. 2005).

> 52.    Express preemption occurs "when there is an explicit statutory command

that state law be displaced."  Id.  Field preemption occurs when federal law "is sufficiently

comprehensive to warrant an inference that Congress 'left no room' for state regulation."  In re

Miles, 294 B.R. 756, 759 (B.A.P. 9th Cir. 2003).  Conflict preemption occurs if a state law

conflicts with a federal law such that "(1) it is impossible to comply with both state law and

federal law; or (2) the state law stands as an obstacle to the accomplishment and execution of the

-24-

full purposes and objectives of Congress." Nickels Midway Pier, 332 B.R. at 273. Here, both

field preemption and conflict preemption apply.

53.    Field preemption applies for three reasons. First, field preemption may be

inferred by the "comprehensive nature of the [Bankruptcy] Code." Nickels Midway Pier, 332

B.R. at 274. "The complex, detailed, and comprehensive provisions of the lengthy Bankruptcy

Code . . . demonstrate Congress's intent to create a whole system under federal control which is

designed to bring together and adjust all of the rights and duties of creditors and embarrassed

debtors alike." MSR Exploration, Ltd. V. Meridian Oil, Inc., 74 F.3d 910, 914 (9th Cir. 1996)

(further stating that it was "very unlikely that Congress intended to permit the superimposition of

state remedies on the many activities that might be undertaken in the management of the

bankruptcy process"). Second, field preemption is appropriate because Congress "expressed its

intent that bankruptcy matters be handled in a federal forum by placing bankruptcy jurisdiction

in the district courts." Id. at 913. Third, field preemption is necessary to promote a uniform

federal bankruptcy process. Id. at 914 (stating that field preemption arises when states interfere

"with the whole complex, reticulated bankruptcy process itself").

54.    Conflict preemption also applies. Courts consistently have held that any

state law that frustrates the full effectiveness of federal law is rendered invalid by the Supremacy

Clause, even if the state legislature had a valid purpose in passing the state law. Perez v.

Campbell, 402 U.S. 637, 649 (1971). The decision of Dan Hixson Chevrolet is directly

applicable here. In that case, the Bankruptcy Court for the Northern District of Texas held that a

Texas law providing a "good cause" hearing as a forum to protest the termination of a dealer

agreement would frustrate section 365 and the bankruptcy process. Dan Hixson Chevrolet,

12 B.R. at 923. The bankruptcy court held that because both the state and federal processes

ATI-2353079v29

would purport to decide the same issue — whether good cause existed to end the dealership

arrangement — the state law was preempted.  Id.  ("The duplicative regulatory powers created in

the state and federal law . . . would frustrate the purposes of federal bankruptcy laws and

therefore such [state] proceedings must bow to the Supremacy Clause of the U.S. Constitution.").

      55.    Applying the principles above, section 365 and the remainder of the

Bankruptcy Code fully occupy the field of inquiry concerning rejection of agreements in

bankruptcy and the consequences arising therefrom.  State Dealer Laws are fully preempted to

the extent that they purport to limit, restrict or impose any burdens or requirements on the

Debtors in connection with exercising their fundamental rights under section 365 of the

Bankruptcy Code to conclude their commercial relationships with the Affected Dealers through

rejection.  The Dealer Laws simply have no power to restrict or otherwise influence the Debtors'

ability to reject the Rejected Dealer Agreements.

      56.    Congress "did not intend to allow debtors to reject . . . contracts under

[section] 365(a) only to have the [nondebtor] turn around and enforce the Agreement just

rejected." Nickels Midway Pier, 332 B.R. at 274.  Allowing the Affected Dealers or

Government Entities to leverage the Dealer Laws to protest the rejection of the Rejected Dealer

Agreements or in any other way to attempt to evade the relief requested herein would be

tantamount to circumventing the Debtors' rights under section 365 in violation of the protections

of federal law afforded by the U.S. Constitution.  See Lubrizol Enters., Inc v. Richmond Metal

Finishers, Inc., 756 F.2d 1043, 1048 (4th Cir. 1985) ("allowing specific performance would

obviously undercut the core purpose of rejection under section 365(a), and that consequence

cannot therefore be read into congressional intent"); see also Dan Hixson Chevrolet, 12 B.R. at

923 (stating that by enacting section 365, Congress withdrew from all other courts the power to

decide the issue of whether a debtor may assume or reject a contract).  As such, the Court should

rule that Dealer Laws are preempted by the Bankruptcy Code and that the Affected Dealers and

Government Entities may not enforce Dealer Laws to limit or restrict the relief granted herein.

**Section 525 of the Bankruptcy Code Protects the Debtors,**
**New Chrysler (or Other Purchaser) and the Remaining Dealers from**
**Actions by Government Entities to Limit the Act or Effects of Rejection**

57.    Under the Bankruptcy Code, governmental units cannot discriminate in

licensing and related matters as a result of a debtor commencing a chapter 11 case or exercising

its rights therein.  In particular, section 525(a) of the Bankruptcy Code provides, in relevant part,

that:

> a governmental unit may not deny, revoke, suspend, or refuse to
> renew a license, permit, charter, franchise, or other similar grant to,
> condition such a grant to, discriminate with respect to such a grant
> against . . . a person that is or has been a debtor under this title . . . ,
> or another person with whom such . . . debtor has been associated,
> solely because such . . . debtor is or has been a debtor under this
> title.

11 U.S.C. § 525(a).  Section 525 thus prohibits the government from taking any action against

the Debtors under applicable nonbankruptcy law (such as, for example, under Dealer Laws) with

respect to licenses, permits, charters and similar grants if such action would interfere with the

Debtors' entitlement to the rights and protections of the Bankruptcy Code and, specifically, the

fresh start that it provides.  See In re Magnacom Wireless, LLC, 503 F.3d 984, 991 (9th Cir.

2007) (noting that a governmental unit's regulatory power to cancel licenses does not trump

section 525 of the Bankruptcy Code); Betty Owen Schools, 195 B.R. at 31 (stating that

"[s]ection 525(a) was enacted to prevent the government from frustrating the 'fresh start' policy

of the [Bankruptcy] Code"); Elsinore Shore Assocs. v. N.J. Division of Alcoholic Beverages

Control (In re Elsinore Shore Assocs.), 66 B.R. 708, 720 (Bankr. D.N.J. 1986) (stating that "a

governmental unit may not discriminate against an individual so as to frustrate the fresh start

ATI-2353079v29

policies of the bankruptcy code, simply because an individual has filed a petition under Title 11
of the Code").

58.     Although the Debtors plainly are protected by section 525 of the
Bankruptcy Code, New Chrysler (or other purchaser in a Sale Transaction) and the Remaining
Dealers qualify for protection as well, as "person[s] with whom [the Debtors have] been
associated."  See Betty Owen Schools, Inc. v. U.S. Dep't of Educ. (In re Betty Owen Schools,
Inc.), 195 B.R. 23, 29-30 (Bankr.  S.D.N.Y. 1996) (finding that the purchaser of a debtor's assets
had standing under section 525 of the Bankruptcy Code with respect to its application to the
government for certification to participate in a certain government loan program).

59.     Given the complexities, exigencies and importance of the transactions
contemplated by the Sale Motion, any interference by Government Entities — whether acting
*sua sponte* or at the behest of the Affected Dealers — could have a material adverse impact on
the Debtors' ability to complete a successful transition of the Debtors' businesses to New
Chrysler (or other purchaser) and maximize the value available to stakeholders.  To the extent
that any such interference by Government Entities, or by Affected Dealers acting through
mechanisms made available by Government Entities, is motivated by dissatisfaction with or
protests over the commencement of these cases or the rejections of the Rejected Dealer
Agreements, such interference would violate section 525 of the Bankruptcy Code because it
effectively would punish the Debtors for invoking the fundamental benefits, rights and
protections of the Bankruptcy Code.

60.     Thus, for example, a Government Entity cannot deny a license based on
Dealers' Blocking Rights that might have existed under Dealer Laws had one of the Affected
Dealers not been subject to rejection.  Section 525 of the Bankruptcy Code must be interpreted

here to preclude Government Entities from attempting to use licensure decisions or any other

regulatory authority to punish the Debtors, New Chrysler (or other purchaser) and the Remaining

Dealers for the relief requested in this Motion.  See FCC v. Nextwave Personal Commc'ns,

537 U.S. 293, 301 (2003) (holding that the FCC violated section 525 of the Bankruptcy Code in

cancelling a debtor's broadband personal communications services licenses where the debtor's

failure to make payments that were due as a result of its bankruptcy filing was a proximate cause

of the FCC's decision to cancel the licenses, even though the FCC could point to an ostensibly

valid, nonbankruptcy related regulatory motive for cancellation of the licenses).

***Rejection Gives Rise to a Nonpriority Prepetition Claim***

61.    Rejection of each of the Rejected Dealer Agreements constitutes a breach

of each such agreement "immediately before the date of the petition" and gives rise to a

dischargeable prepetition claim for damages arising out of the fictional breach.  See 11 U.S.C.

§ 365(g)(1).  Section 365(g) of the Bankruptcy Code provides, in relevant part, that:

> the rejection of an executory contract or unexpired lease of the
> debtor constitutes a breach of such contract or lease — (1) if such
> contract or lease has not been assumed under this section or under
> a plan confirmed under chapter 9, 11, 12 or 13 of this title,
> immediately before the date of the filing of the petition.

11 U.S.C. § 365(g).

62.    Rejection damages include all unperformed obligations that may be

reduced to the payment of money.  Section 101(5) of the Bankruptcy Code defines the term

"claim" as a "(A) right to payment, whether or not such right is reduced to judgment, liquidated,

unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable,

secured or unsecured; or (B) right to an equitable remedy for breach of performance if such

breach gives rise to a right to payment."  11 U.S.C. § 101(5)(B).  Accordingly, all of the Debtors'

unperformed obligations under the Rejected Dealer Agreements give rise to dischargeable

ATI-2353079v29

prepetition claims to the extent they constitute, or may be reduced to, dealer rights to payment of money from the Debtors.  See Ohio v. Kovacs, 469 U.S. 274, 282-83 (1985) (holding that a debtor's affirmative obligation to clean up a waste disposal site gave rise to a claim dischargeable in bankruptcy, because the debtor could render performance of the obligation only by the payment of money); Carpetland v. Udell (In re Udell), 18 F.3d 403, 407 (7th Cir. 1994) (stating that a right of foreclosure, for example, gives rise to a right to payment of proceeds of the sale of the house and, consequently, gives rise to a monetary claim); In re Printronics, Inc., 189 B.R. 995, 1001 (Bankr. N.D. Fla. 1995) (stating that "when state law permits a right to payment as an alternative to an equitable remedy, a claim exists which is dischargeable in bankruptcy").

63.      For the avoidance of doubt, rights and claims of the Affected Dealers that must be asserted only as Rejection Damages Claims include, without limitation, claims for: (a) the repurchase of unsold inventories of vehicles and parts; (b) payment assistance in connection with Affected Dealers' obligations to third parties; (c) payment of incentives, commissions or other compensation for having sold vehicles or parts; (d) alleged loss of future profits or other consequential damages; (e) payment of any amounts claimed to be due under any statutes governing the termination, nonrewnal, cancellation or discontinuance of the dealership agreements or franchise rights; and (f) alleged damages suffered as a result of the loss of rights and benefits under Dealer Laws.

***Rejection of the Rejected Dealer Agreements Concludes the Dealer Relationship; Full Enforcement of Rejection Is Crucial to the Success of the Sale Transaction***

64.      As described above, the rejection of the Rejected Dealer Agreements is a critical aspect of the Fiat Transaction and the success of these chapter 11 cases generally.  By rejecting the Rejected Dealer Agreements, the Debtors are concluding their commercial relationships with the Affected Dealers, and the Affected Dealers no longer should be able to

enforce their rights under these agreements.  Thus, due to rejection, the Affected Dealers no longer may serve as authorized dealers for the Debtors (or New Chrysler) following rejection, nor may they enforce other contractual rights except as a rejection damages claim (as described above).  Nevertheless, the Debtors anticipate that some of the Affected Dealers or Government Entities may be uncertain as to the effect of the rejection of the Rejected Dealer Agreements or may seek to bring claims that interfere with the orderly rejection of such agreements.  The Debtors seek through rejection of the Rejected Dealer Agreements to make a clean and complete break from their business relationships with the Affected Dealers.  As such, the Debtors desire — indeed, the ultimate success of the transactions contemplated in the Sale Motion mandates — that the Affected Dealers and Government Entities not mistakenly or purposefully take actions to undermine, contradict or otherwise impair the legal and practical effect of the rejections.

65.    Such post-rejection actions could take several forms, including but not limited to:  (a) retail sales and servicing of Chrysler branded vehicles and parts by an Affected Dealer as if it were still an authorized dealer; (b) the use and display of the Debtors' brand names, logos and other trademarks and servicemarks despite the rejection of these license rights; or (c) the petitioning to one or more Government Entities (or *sua sponte* conduct by such Government Entities) seeking enforcement, interpretation or application of the Dealer Laws in any manner that undermines the rejection of the Rejected Dealer Agreements, the Fiat Transaction (or other Sale Transaction) or the Debtors' efforts to administer these chapter 11 cases, generally.

66.    Under these circumstances, it is essential that the Court finds, in a manner that is clear, concise and easily understood by Affected Dealers, Government Entities and third parties, that the rejection of the Rejected Dealer Agreements, pursuant to section 365 of the

Bankruptcy Code, is a conclusion of the commercial relationship and cuts off the rights of the

Affected Dealers thereunder, except to the extent that the Affected Dealers may wish to pursue

rejection damages in this Court.  Likewise, the Order approving this Motion should provide a set

of prompt and certain procedures for addressing any situation that conflicts with, or otherwise

undermines, the rejection of the Rejected Dealer Agreements.

67.    First, the Debtors request that the Court find that, as a result of the

rejection of the Rejected Dealer Agreements, that (a) each Affected Dealer shall have no further

rights (direct, indirect, contractual or otherwise) to act as a new motor vehicle dealer of the

Debtors or otherwise act as an Authorized Dealer under the terms of any agreements with the

Debtors or of New Chrysler; and (b) each Affected Dealer's status as a new motor vehicle dealer

for Debtors or an Authorized Dealer of the Debtors with respect to these locations is hereby

deemed to be revoked, annulled and cancelled for all purposes.

68.    Second, the Debtors request that the Court find that, upon rejection, each

such Affected Dealer no longer is authorized, appointed or permitted (contractually or otherwise)

to, among other things:

(a)    undertake any advertising, sales, trades, repair or service of any Chrysler
branded products under the terms of the Rejected Dealer Agreements;

(b)    hold itself out to any third party as an Authorized Dealer of the Debtors or
of New Chrysler for any purpose;

(c)    display, distribute or otherwise use any signage, promotional or other
materials bearing or containing the Debtors' trademarks and service marks,
including, without limitation, company and vehicle make and model
names and logos;[13] and

---

[13]    Affected Dealers must stop using the Debtors' trademarks and servicemarks immediately after rejection
because the plain language of the Bankruptcy Code excludes trademarks and servicemarks from the
continued use protections of section 365(n) of the Bankruptcy Code.  Section 365(n) provides that a
licensee of "intellectual property" may elect to continue its use of the rejected license under certain
circumstance and limitations.  See 11 U.S.C. § 365(n).  The term "intellectual property," as defined by the

(d)     exercise or enforce any other rights, entitlements, privileges or status arising from or related to the Rejected Dealer Agreements or having been an Authorized Dealer of the Debtors, including any rights under Dealer Laws, other than through the assertion of Rejection Damages Claims in this Court.

69.     In addition, to enable the Debtors and this Court to address quickly and efficiently any Affected Dealer or Government Entity that engages in conduct inconsistent with any of the relief granted in an Order granting this Motion ("Unauthorized Conduct"), the Debtors propose the following procedures:

(a)     If any Affected Dealer or Government Entity undertakes alleged Unauthorized Conduct, the Debtors may, at any time after learning of the alleged Unauthorized Conduct:

(i)     file a Notice of Unauthorized Conduct, substantially in the form attached hereto as Exhibit C, identifying the Affected Dealer or Government Entity and relevant Rejected Dealer Agreement(s), setting forth the Debtors' belief that the Affected Dealer or Government Entity is in violation of the Order granting this Motion and the Bankruptcy Code, and describing the particular conduct of the Affected Dealer or Government Entity that the Debtors maintain constitutes Unauthorized Conduct; and

(ii)     seek the entry of an Order to Show Cause, substantially in the form attached hereto as Exhibit D, which shall require the Affected Dealer or Government Entity to appear before the Court within

---

(continued…)

Code, however, is limited to mean (a) trade secret; (b) invention, process, design, or plant; (c) patent application; (d) plant variety; (e) work of authorship; or (f) mask work. See 11 U.S.C. § 101(35A). The term does not include trademarks and servicemarks. Id.; see also In re HQ Global Holdings, Inc., 290 B.R. 507, 513 (Bankr. D. Del. 2003) ("Trade names, trademarks, and other proprietary marks are expressly excluded from the definition of 'intellectual property.'"); William L. Norton, Jr., NORTON BANKR. L. & PRAC. 2d § 39:57 (2002) (explaining that the Bankruptcy Code defines intellectual property broadly to protect virtually all types of rights other than trademarks); S. Rep. No. 505, 100th Cong., 2d Sess. (1988) (stating that continued use rights do not include trademark licenses).  Accordingly, once the Debtors reject the Affected Dealers' licenses to use the Debtors' trademarks and servicemarks under the Rejected Dealer Agreements, the Affected Dealers are left only with Rejection Damages Claims. See In re HQ Global Holdings, 290 B.R. at 513 (stating that rejection of a trademark license leaves the licensee with only a claim for rejection damages and the right to use the trademark ends upon rejection); Raima UK Ltd v. Centura Software Corp. (In re Centura Software Corp.), 281 B.R. 660, 673 (Bankr. N.D. Cal. 2002) (stating that after a rejection of a trademark license, the only recourse for the licensee is a claim for breach); In re Chipwich, Inc., 54 B.R. 427, 431 (Bankr. S.D.N.Y. 1985) (stating that the rejection by the debtor-licensor deprives the licensee of its right to further use of the trademark, resulting in a claim for damages).

five business days (a "<u>Show Cause Hearing</u>") to demonstrate why it should not be found to have willfully violated the order approved in connection with the Motion and the Bankruptcy Code.

(b)    Any Affected Dealer or Government Entity that is served with a Notice of Unauthorized Conduct and an Order to Show Cause but fails to appear for a Show Cause Hearing shall be deemed, without further notice or hearing, to be in contempt of the order approved in connection with this Motion and the Order to Show Cause and may be held liable for all demonstrated damages, fees and costs of the Debtors, and may be subject to additional sanctions, to the extent permitted by law.

### Requested Waiver of Bankruptcy Rule 6006(f)(6)

70.    There are 789 Affected Dealers and, including Ancillary Agreements, well over 1,000 Rejected Dealer Agreements for the dealership locations identified on Exhibit A. Bankruptcy Rule 6006(f)(6) provides that a motion to reject executory contracts "shall . . . be limited to no more than 100 executory contracts. . . ."  For several reasons, the Debtors respectfully submit that the 100 contract limitation imposed by Bankruptcy Rule 6006(f)(6) should not apply to this Motion, and the Debtors accordingly request that the Court waive Bankruptcy Rule 6006(f)(6) with respect to this Motion to the extent that it arguably may apply. First, all of the executory contracts implicated by this Motion are of the same type and purpose; <u>i.e.</u>, Dealership Agreements and related Ancillary Agreements.  They are form contracts that in most cases are substantially identical to each other.  Thus, although this is an "omnibus" motion addressing numerous agreements, the nature of these agreements, and in most cases their terms, are substantially similar (if not identical).

71.    Likewise, the Debtors' rationale for rejecting the Rejected Dealer Agreements, and the legal and factual support for these determinations, are uniform.  Indeed, as explained further herein, the proposed rejections are the result of the Debtors' efforts to conserve cash and pursue transactions that maximize value.  Third, consistent with Bankruptcy Rule 6006(f)(2), the Affected Dealers are listed on Exhibit A in alphabetical order by their

ATI-2353079v29

dealership names, making the list easy to navigate without the need to file multiple concurrent motions.  Even if the Debtors were to limit each motion to 100 Affected Dealers and all Rejected Dealer Agreements for those Affected Dealers,  numerous identical motions would be needed, which would be wasteful, confusing and difficult to administer.  Under these circumstances, the Debtors submit that including all of the Rejected Dealer Agreements in a single motion is the most efficient and otherwise appropriate course for the benefit not only of the Debtors, but also of the Court and the Affected Dealers themselves.  <u>See</u> Fed. R. Bankr. P. 6006 advisory committee's note (stating the drafting committee's intent that a court may order exceptions to Fed. R. Bankr. P. 6006(f) for an omnibus motion).

### <u>Notice</u>

72.    No trustee or examiner has been appointed in these chapter 11 cases. In accordance with the Administrative Order, Pursuant to Bankruptcy Rule 1015(c), Establishing Case Management and Scheduling Procedures (Docket No. 661) (the "<u>Case Management Order</u>"), entered on May 12, 2009, notice of this Motion has been given to (a) the parties identified on the General Service List and the Special Service List (as such terms are identified in the Case Management Order), (b) the Affected Dealers and (c) the Government Entities. The Debtors submit that no other or further notice need be provided.

### <u>No Prior Request</u>

73.    No prior request for the relief sought in this Motion has been made to this or any other Court.

WHEREFORE, the Debtors respectfully request that this Court:  (a) enter an order substantially in the form attached hereto as <u>Exhibit E</u>, granting the relief sought herein; and (b) grant such other and further relief to the Debtors as the Court may deem proper.

Dated:  May 14, 2009
New York, New York

Respectfully submitted,

/s/ Corinne Ball
Corinne Ball
Veerle Roovers
JONES DAY
222 East 41st Street
New York, New York  10017
Telephone:  (212) 326-3939
Facsimile:  (212) 755-7306

David G. Heiman
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212

Jeffrey B. Ellman
JONES DAY
1420 Peachtree Street, N.E.
Suite 800
Atlanta, Georgia  30309
Telephone:  (404) 521-3939
Facsimile:  (404) 581-8330

PROPOSED ATTORNEYS FOR DEBTORS
AND DEBTORS IN POSSESSION

ATI-2353079v29