# **EXHIBIT B**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
--------------------------------------------------------------x
                                            :
In re                                       :   Chapter 11
                                            :
Chrysler LLC, et al.,                       :   Case No. 09- 50002 (AJG)
                                            :
              Debtors.                      :   (Jointly Administered)
                                            :
-------------------------------------------------------------- x
```

## <u>SECOND DECLARATION OF PETER M. GRADY</u>

I, Peter M. Grady, make this Declaration under 28 U.S.C. § 1746 and state:

1.      I am the current Director of Dealer Operations for Chrysler Motors, LLC, which is a corporation organized under the laws of the state of Delaware, and one of the above-captioned debtors and debtors in possession (collectively, the "Debtors" or "Chrysler"). I have worked at Chrysler or an affiliate of Chrysler since 1987. I am older than 21 years of age and suffer no legal disability. I am competent to make this Declaration.

2.      I have worked with Chrysler's dealer network on the marketing and distribution of Chrysler vehicles for over 20 years. I have held a wide variety of positions at Chrysler, including Zone Manager or Assistant Zone Manager for Field Operations in Chicago, Memphis, Phoenix and New York; President of Chrysler Taiwan Ltd; Director of the Great Lakes Business Center; Director of Mid Atlantic Business Center; Director of Remarketing and Fleet Operations; and Director of Dealer Operations.

3.      As Director of Dealer Operations, I am familiar with the network of Chrysler, Dodge and Jeep dealers that sell and service Chrysler's vehicles in the United States (the "Domestic Dealer Network") and I am also familiar with Chrysler's international distribution

networks.  I have worked on the dealer programs described in this Declaration and performed the

dealer network analysis described below.  Except as otherwise indicated, my testimony in this

Declaration is based upon my personal knowledge, my review of business records or my

first-hand experience and knowledge acquired in the ordinary and regular course of Chrysler's

business as to the matters described in this Declaration.  If I were called upon to testify, I could

and would testify competently to the facts set forth in this Declaration.

4.      I earned my B.S. and B.A. degree in Management, Marketing and Finance

from John Carroll University in 1981.  Virtually my entire professional career has been with

Chrysler.  I started in 1984 as a district sales manager at American Motors Corporation, which

was later acquired by Chrysler in 1987.  I worked in a variety of positions in the Chicago zone

and served as Assistant Zone Manager for Memphis from 1994 to 1997.  In that capacity, I had

responsibilities for working with the dealers in my zone in the sale and service of Chrysler

vehicles.  Starting in 1997, I served as President of Chrysler Taiwan, Ltd., where I had

responsibility for overseeing the sales, service and distribution of Chrysler vehicles in Taiwan.

5.      In 2000, I became the Zone Manager of Phoenix and, in 2001, I became

the Zone Manager of New York.  As Zone Manager, I was responsible for working with Chrysler

dealers and managing the Chrysler dealer network in my zones.  In 2002, Chrysler restructured

its twenty-five zones into eight Business Centers and I became the Director of Great Lakes

Business Center.  In 2003, I became the Director of Mid-Atlantic Business Center.  In my

capacity as the Director of Business Centers, I had responsibility for the dealer network in the

sale and service of Chrysler vehicles.  From 2005 through January 2009, I was the Director of

Remarketing and Fleet Operations and, in that capacity, I supervised the marketing and

distribution of fleet sales, which includes the sale of vehicles to third party companies such as rental car companies.  In 2009, I began serving as the Director of Dealer Operations.

### *The Debtors' Domestic Dealer Network*

6.      Other than certain sales to the government, virtually all of the vehicles manufactured by Chrysler are sold to the U.S. general public through Chrysler's Domestic Dealer Network.  Over the years, this Domestic Dealer Network grew to cover all 50 states, peaking at approximately 6,500 dealers in the mid-1960's, which has subsequently declined over time.  As of April 30, 2009 (the "Petition Date"), the Domestic Dealer Network was comprised of 3,181 dealers.  Except with respect to a small number of dealerships, all the dealers are independently owned.[1]

7.      Approximately 62% of the dealers in the Domestic Dealer Network are "full line" dealers, meaning they sell all three of the Debtors' brands:  Chrysler, Jeep and Dodge. The remaining approximately 38% of the dealers in the Domestic Dealer Network are "partial line" dealers, selling only one or a combination of two of the Debtors' brands.  The Domestic Dealership Network includes dealers in every U.S. state and in every major U.S. metropolitan area, as well as widespread coverage of secondary and rural markets.

8.      Despite the size and breadth of the Domestic Dealer Network, the sales volume, productivity and efficiency of the dealer network is not evenly distributed. Approximately 25% of the Domestic Dealer Network accounts for approximately 50% of the Debtors' domestic sales.  Further, just over 50% of the Domestic Dealer Network accounts for approximately 90% of the Debtors' domestic sales.

---

[1]      Debtor Chrysler Realty owned 14 active and seven inactive dealerships as of the Petition Date, referred to as "manufacturer investment dealerships" or "MIDs."

***The Dealership Agreements***

9.       Consistent with industry practice, and with the exception of a small percentage of dealers using older Direct Dealer Agreements, the Debtors have used a standard uniform dealership agreement (as modified from time to time) for all new domestic dealers starting in approximately 1988.[2]  The Debtors enter into a separate dealership agreement for each of the Debtors' linemakes that a dealer sells.  Thus, for example, a "full line" dealer will have three dealership agreements:  one for Dodge/Dodge Truck, one for Jeep and one for Chrysler. The Debtor party to each of these agreements is Chrysler Motors LLC ("Chrysler Motors").

***The Challenges Confronting the Domestic Dealer Network***

10.       Although the Debtors' large and extensive Domestic Dealer Network provides increased outlets for the sale of the Debtors' products, its size and scope has created significant challenges as market conditions and demographic factors have changed over time. The Debtors' dealers compete not only with dealers selling the products of other Original Equipment Manufacturers ("OEM's"), such as Ford and Toyota, but also with each other in surrounding markets.  Some of the Debtors' dealers may have only one linemake (for example, Chrysler, Dodge or Jeep), while other dealers may have all three linemakes.  Thus, a Chrysler-Jeep dealership may compete with a nearby Dodge dealership.  For example, a Chrysler dealer may sell a Chrysler Town & Country minivan and a nearby Dodge dealer may sell the Dodge Caravan minivan, which may compete for the same customers.

---

[2]        Specifically, the form of agreement the Debtors have used since approximately 1988 is called, for each applicable linemake, the Sales and Service Agreement.  From approximately the 1960's until the development of the Sales and Service Agreement, the Debtors used a form of agreement called the Direct Dealer Agreement.  As of the Petition Date, approximately 112 of the dealerships in the Domestic Dealer Network continue to be governed under Direct Dealer Agreements.  (Copies of the form Dealer Sales and Service Agreement and the Direct Dealer Agreement are attached hereto as Exhibit A and Exhibit B, respectively.)

11.     Over time, the market for new motor vehicles has changed dramatically. Numerous other competitors selling a wide variety of vehicles, including Toyota, Honda, Hyundai and Kia, have entered the market and captured a larger share of the automotive market. As a result, the larger Domestic Dealer Network has faced increasing financial pressures on profitability as the market share of the Debtors and other domestic OEMs declined over time in the face of increasing foreign competition. With so many outlets available for the Debtors' products and more limited market share, many dealers' annual sales of vehicles (or throughput) fell below targeted levels, limiting dealer profitability and the ability of many dealers to reinvest in the dealership and enhance the experience of consumers.

12.     In addition, as suburbs grew and the modern interstate system continued to evolve, longstanding dealerships were no longer in the best or growing locations. Many rural locations also served a diminishing population of potential consumers. Some dealership facilities became outdated. Other locations faced declining traffic count and declining populations.

13.     By contrast, the newer OEMs selling competitive vehicles, such as Toyota, Honda, Hyundai and others, did not enter the U.S. markets or did not significantly expand within the U.S. markets until much later in time. They did not have the legacy network dealers. They  began to assemble new networks with new and better locations in growing markets, with numerous models consolidated under a single roof and with more modern facilities focused on large metropolitan areas.

14.     Over time, the throughput of the newer OEMs continued to grow while the throughput of the Debtors continued to decline. On average, the dealers for several of the newer OEMs now have substantially higher throughput, resulting in better and more sustainable sales

and profitability and providing greater resources for marketing, reinvesting in the business, improving facilities and enhancing the consumer experience and customer service. In 2008, Chrysler sold approximately 1,000,000 new vehicles through approximately 3,298 dealers. The average throughput for Chrysler dealers was approximately 303 per dealer. In 2008, Toyota sold approximately 1,604,952 new vehicles in the United States through approximately 1,242 dealers. The average throughput for Toyota's dealers in the United States was approximately 1,292 per dealer. In 2008, Honda sold approximately 1,255,411 new vehicles in the United States through approximately 1,030 dealers. The average throughput for Honda's dealers in the United States was 1,219 per dealer.

15. Thus, the throughput for Toyota and Honda dealers is approximately 415 percent higher than Chrysler's average throughput. Such larger throughput supports substantially higher average profits for competitive dealerships, enables those dealerships to invest additional resources in facilities and other operations, enables competitors to often attract the more experienced and highly qualified personnel from Chrysler's Domestic Dealer Network, provides additional resources to advertise products and services to customers, and enables those dealers to offer extra services and benefits that can improve customer satisfaction for the brands offered. The smaller, more efficient, more profitable dealer network for the transplant OEM's has become a competitive disadvantage for Chrysler's Domestic Dealer Network.

16. Chrysler's larger Domestic Dealer Network also substantially increases expenses and inefficiencies in the distribution system, forcing Chrysler to spend additional resources on training, new vehicle allocation personnel, processes, and procedures, oversight of the dealer network, auditing and monitoring expenses for dealer operations, and all of the other operational expenses that must be incurred to maintain, support, facilitate and oversee a larger

dealer network.  In addition, the numerous "partial line" dealerships in the Domestic Dealer Network requires the continued production of  overlapping models under different brands, which further increases unnecessary costs and introduces substantial inefficiencies in the distribution system.

### *The Debtors' Dealership Rationalization — Project Genesis*

17.     The Debtors have been actively addressing their dealer network issues for a number of years.  As part of the Debtors ongoing business plans,  the Debtors have engaged in a long term process to rationalize their dealer network.  The goals of this effort included working with the dealers to consolidate all three of the Debtors' brands at each dealership and reshape the network to realign the retail outlets using the best dealers, in the best locations, with the best facilities.  This process has been time-consuming and expensive as a result of a complex web of state laws that protect dealers and limit the ability of the Debtors to expeditiously terminate, relocate or consolidate dealerships.  Despite these obstacles, and at substantial cost, the Debtors have reduced their dealer network from approximately 4,320 dealers in 2001 to 3,188 as of Tuesday, April 28, 2009.  As part of their Viability Plan (as defined in other filings),  the Debtors have identified the completion of their dealership rationalization efforts as one of the core initiatives.

18.     Consistent with their Viability Plan, the Debtors are seeking to obtain approval of the Fiat Transaction as expeditiously as possible.  A key component of the Fiat Transaction is the transfer to New Chrysler of a strong, well-positioned dealer network to continue selling Chrysler, Dodge and Jeep vehicles to consumers and to service these vehicles. To that end, the Fiat Transaction contemplates and, in fact, requires the acceleration of the Debtors' network rationalization.  From a business perspective, this effort to strengthen the Domestic Dealer Network is a critical component of the proposed Fiat Transaction.

19.     As a result, the Debtors have determined that they need reject

789 dealership agreements and related ancillary agreements for the long-term health of the

Domestic Dealer Network and to further the objectives of the Debtors as described in this and

other declarations.  The rejection of these carefully selected dealership agreements will assist the

Debtors in achieving their goal of strengthening the Domestic Dealer Network in support of

long-term viability and ensuring the success of the Fiat Transaction.  In addition, the rejection of

these dealership agreements will help the Debtors rationalize the Domestic Dealer Network in a

manner that substantially improves overall operational efficiencies.  With a smaller network

consisting of more "full line" dealerships, the Debtors can also reduce redundancies and

inefficiencies in marketing, distribution, and production that results from overlapping models

offered under multiple linemakes.

20.     Chrysler has reviewed a substantial volume of data and carefully analyzed

the Domestic Dealer Network to arrive at its selection of the dealerships included in the Motion.

In 2001, the Debtors initiated a program to:  (a) evaluate their dealership network and key

locations; (b) identify the most desirable dealerships and dealership locations from the

perspective of long-term planning; and (c) streamline the Domestic Dealer Network to meet

long-term goals, including, among other things, the consolidation of the Debtors' brands at

"partial line" dealers to make them "full line" dealers.  This program has been re-named over the

years and most recently has been called "Project Genesis."

21.     The objectives of Project Genesis include brand consolidation, as well as

reducing and reconfiguring the Domestic Dealer Network to achieve the goal of having a smaller

and stronger network, with the best dealers, in the best locations, with the best facilities.

Although the overall size of the network would contract as a result of implementing Project

Genesis, it is projected that dealers remaining in the network would become more profitable, generate greater capital to reinvest in the business, improve customer amenities and customer satisfaction, attract experienced and highly qualified personnel, and, ultimately, increase their sales over time to the benefit of the Debtors.  After a period of time, and substantially improved marketing and investments, overall sales in the reduced network are anticipated to grow beyond current sales levels within the existing network.

22.     Although Project Genesis primarily focused on dealers in metropolitan markets and key secondary markets (where, among other things, there had been less brand consolidation), the Debtors also have evaluated the remaining secondary and rural market dealers.  Based on this extensive and ongoing work, between 2001 and the Petition Date, the Debtors worked with dealers in a cooperative manner to reduce and consolidate the Domestic Dealer Network, within the limitations imposed by the Dealer Statutes and any existing agreements, in a continued effort to improve efficiency, strengthen individual dealers, elevate customer service and minimize costs.

23.     The Debtors have been working diligently on Project Genesis and its predecessor programs for well over eight years and have spent more than $216 million implementing the objectives of the program.

### *The Dovetailing of Project Genesis with the Alliance Viability Plan*

24.     The objectives of Project Genesis and the underlying analyses of the Domestic Dealer Network have guided the Debtors in developing the Alliance Viability Plan and in working with New Chrysler on the terms of the Fiat Transaction to implement that plan.  The long-term viability and success of New Chrysler, and its willingness to consummate the Fiat Transaction, depends, among other things, on having a strong and vibrant dealer network consistent with the goals of Project Genesis.  Accordingly, in recent months, the Debtors, in

cooperation with New Chrysler, have continued to refine their evaluation of dealers under

Project Genesis to model an anticipated dealership network for the Alliance Viability Plan and

for the proposed Fiat Transaction.

25.     It is critical to the Viability Plan that the dealer network optimized quickly

so that New Chrysler can begin implementing the efficiencies, marketing strategies, production

plans, and model changes that go hand in hand with a smaller, more profitable Domestic Dealer

Network with more "full line" dealerships throughout the country.  The alternative would disrupt

and delay the goals of the Viability Plan and implementation of the changes needed to rationalize

the Domestic Dealer Network and obtain the efficiencies associated with those objectives.

***The Debtors' Extensive Qualitative Assessment of Each Dealership***

26.     Project Genesis and the selection of dealerships to be included in the relief

sought in the Motion involved the evaluation of each dealership.  In particular, the Debtors

reviewed and analyzed numerous performance and planning factors for each dealership,

including, among other things:

(a)     the dealer's —

(i)      brand affiliations;

(ii)     raw sales volume;

(iii)    sales performance relative to its Minimum Sales Responsibility;

(iv)     location;

(v)      type of market;

(vi)     facilities;

(vii)    customer service;

(viii)   history of experience; and

(ix)     market share;

    (b)    the planning potential for the dealership; and

    (c)    other factors.

27.    In addition, the Debtors are able to draw on external metrics including, among other things:

    (a)    new vehicle registration information for the Debtors' and other manufacturers' comparable products, indicating the location of new vehicle registrations within the market and the location of registrations of new motor vehicles sold by each dealer;

    (b)    demographic data including —

        (i)    current population and household density;

        (ii)    anticipated shift of population and household density; and

        (iii)    average household income;

    (c)    the average distance to the nearest dealer by manufacturer for each locality; and

    (d)    competing manufacturers' market share within the locality.

28.    Using these analytical methods, the Debtors can create comprehensive statistical assessments of each dealer and make reasoned judgments regarding the optimal configuration for each market in the Domestic Dealer Network and the best means of implementing the goals of Project Genesis.

29.    Consistent with the Alliance Viability Plan and in support of the Fiat Transaction, the Debtors have reached the business conclusion that rejection of the Rejected Dealer Agreements is in the best interests of the Debtors' restructuring efforts and estates. Moreover, the Debtors believe, in their business judgment, that immediate rejection of these agreements is necessary and appropriate to begin the work necessary to complete the transition to a smaller, more effective, and more profitable dealer network, limit any ongoing postpetition obligations to the Affected Dealers, and minimize disruption upon the closing of the Fiat

Transaction or other Sale Transaction involving the sale of the Domestic Dealer Network.  In addition, the Debtors believe that any delay in identifying the dealers to remain as part of the Domestic Dealer Network following the sale would be extraordinarily detrimental to the Debtors' efforts to preserve the network pending the sale.

30.     The Debtors' dealers are facing unprecedented financial challenges in the current economic environment, and will face further strain as a result of the Debtors' commencement of these cases.  The best dealers with the best facilities and locations are being approached regularly by other OEMs.  Others are actively considering other opportunities. The Debtors believe that it is essential under these circumstances to immediately identify the Remaining Dealers that will comprise the Domestic Dealer Network following the sale to provide them with a reason to continue to support the Debtors and the Debtors' products — as they have for many years — in the face of these various challenges and pressures.  Faced with further uncertainly about whether they are part of the future plans of New Chrysler, key dealers may not take the steps needed to complete the transition to new ownership.

31.     Thus, it is critical that the Domestic Dealer Network be reconfigured quickly to create a dealer network that improves the profitability of the best dealers in the best locations with the best facilities in the Domestic Dealer Network and encourages those dealers to remain committed to selling and servicing the Debtors' products and undertaking the substantial investments required to promote the long term growth of the market for Debtors' products, notwithstanding the current economic uncertainties that those dealers now face.

I declare under penalty of perjury that the foregoing statements are true and correct.

Dated: May 13, 2009

_____
Peter M. Grady

**EXHIBIT A**
**TO SECOND DECLARATION OF PETER M. GRADY**

# Chrysler Corporation

# Jeep.

# SALES AND SERVICE AGREEMENT

_____

(DEALER Firm Name and D/B/A, if applicable)

located at _____

(STREET)                                    (CITY)                          (STATE)

a(n) _____ hereinafter called DEALER, and Chrysler Corporation, a

(INDIVIDUAL, CORPORATION OR PARTNERSHIP)

Delaware corporation, hereinafter sometimes referred to as "CC" , have entered into this Chrysler Corporation Jeep Sales and Service Agreement, hereinafter referred to as "Agreement", the terms of which are as follows:

## INTRODUCTION

The purpose of the relationship established by this Agreement is to provide a means for the sale and service of specified Jeep vehicles and the sale of CC vehicle parts and accessories in a manner that will maximize customer satisfaction and be of benefit to DEALER and CC.

While the following provisions, each of which is material, set forth the undertakings of this relationship, the success of those undertakings rests on a recognition of the mutuality of interests of DEALER and CC, and a spirit of understanding and cooperation by both parties in the day to day performance of their respective functions. As a result of such considerations, CC has entered into this Agreement in reliance upon and has placed its trust in the personal abilities, expertise, knowledge and integrity of DEALER's principal owners and management personnel, which CC anticipates will enable DEALER to perform the personal services contemplated by this Agreement.

It is the mutual goal of this relationship to promote the sale and service of specified CC products by maintaining and advancing their excellence and reputation by earning, holding and furthering the public regard for CC and all CC dealers.

## 1  PRODUCTS COVERED

DEALER has the right to order and purchase from CC and to sell at retail only those specific models of CC vehicles, sometimes referred to as "specified CC vehicles," listed on the Motor Vehicle Addendum, attached hereto and incorporated herein by reference. CC may change the models of CC vehicles listed on the Motor Vehicle Addendum by furnishing DEALER a superseding Motor Vehicle Addendum. Such a superseding Motor Vehicle Addendum will not be deemed or construed to be an amendment to this Agreement.

## 2  DEALER'S MANAGEMENT

CC has entered into this Agreement relying on the active, substantial and continuing personal participation in the management of DEALER's organization by:

NAME                                                          POSITION

_____        _____

_____        _____

91J

DEALER represents and warrants that at least one of the above named individuals will be physically present at DEALER's facility (sometimes referred to as "Dealership Facilities") during most of its operating hours and will manage all of DEALER's business relating to the sale and service of CC products. DEALER shall not change the personnel holding the above described position(s) or the nature and extent of his/her/their management participation without the prior written approval of CC.

## 3    DEALER'S CAPITAL STOCK OR PARTNERSHIP INTEREST

If DEALER is a corporation or partnership, DEALER represents and agrees that the persons named below own beneficially the capital stock or partnership interest of DEALER in the percentages indicated below. DEALER warrants there will be no change affecting more than 50% of the ownership interest of DEALER, nor will there be any other change in the ownership interest of DEALER which may affect the managerial control of DEALER without CC's prior written approval.

| Name | Voting Stock | Non-Voting Stock | Partnership Interest | Active Yes/No |
|------|------|------|------|------|
| | _____ % | _____ % | _____ % | _____ |
| | _____ % | _____ % | _____ % | _____ |
| | _____ % | _____ % | _____ % | _____ |
| | _____ % | _____ % | _____ % | _____ |
| | _____ % | _____ % | _____ % | _____ |
| Total | _____ % | _____ % | _____ % | |

## 4    SALES   LOCALITY

DEALER shall have the non-exclusive right, subject to the provisions of this Agreement, to purchase from CC those new specified CC vehicles, vehicle parts, accessories and other CC products for resale at the DEALER's facilities and location described in the Dealership Facilities and Location Addendum, attached hereto and incorporated herein by reference. DEALER will actively and effectively sell and promote the retail sale of CC vehicles, vehicle parts and accessories in DEALER's Sales Locality. As used herein, "Sales Locality" shall mean the area designated in writing to DEALER by CC from time to time as the territory of DEALER's responsibility for the sale of CC vehicles, vehicle parts and accessories, although DEALER is free to sell said products to customers wherever they may be located. Said Sales Locality may be shared with other CC dealers of the same line-make as CC determines to be appropriate.

## 5    ADDITIONAL   TERMS AND   PROVISIONS

The additional terms and provisions set forth in the document entitled "Chrysler Corporation Sales and Service Agreement Additional Terms and Provisions" marked "Form 91 (J-E)," as may hereafter be amended from time to time, constitute a part of this Agreement with the same force and effect as if set forth at length herein, and the term "this Agreement" includes said additional terms and provisions.

## 6    FORMER   AGREEMENTS, REPRESENTATIONS   OR STATEMENTS

This Chrysler Corporation Jeep Sales and Service Agreement and other documents, (or their successors as specifically provided for herein) which are specifically incorporated herein by reference constitute the entire agreement between the parties relating to the purchase by DEALER of those new specified CC vehicles, parts and accessories from CC for resale; and it cancels and supersedes all earlier agreements, written or oral, between CC and DEALER relating to the purchase by DEALER of Jeep vehicles, parts and accessories, except for (a) amounts owing by CC to DEALER, such as payments for warranty service performed and incentive programs, or (b) amounts owing or which may be determined to be owed, as a result of an audit or investigation, by DEALER to CC due to DEALER's purchase from CC of vehicles, parts, accessories and other goods or services, or (c) amounts DEALER

owes to CC as a result of other extensions of credit by CC to DEALER. No representations or statements, other than those expressly set forth herein or those set forth in the applications for this Agreement submitted to CC by DEALER or DEALER's representatives, are made or relied upon by any party hereto in entering into this Agreement.

## 7   WAIVER AND MODIFICATION

No waiver, modification or change of any of the terms of this Agreement or change or erasure of any printed part of this Agreement or addition to it (except the filling in of blank spaces and lines) will be valid or binding on CC unless approved in writing by the President or a Vice President or the National Dealer Placement Manager of Chrysler Corporation.

## 8   AMENDMENT

DEALER and CC recognize that this Agreement does not have an expiration date and will continue in effect unless terminated under the limited circumstances set forth in Paragraph 28. DEALER and CC further recognize that the passage of time, changes in the industry, ways of doing business and other unforeseen circumstances may cause CC to determine that it should amend all Chrysler Corporation Jeep Sales and Service Agreements. Therefore, CC will have the right to amend this Agreement to the extent that CC deems advisable, provided that CC makes the same amendment in Chrysler Corporation Jeep Sales and Service Agreements generally. Each such amendment will be issued in a notice sent by certified mail or delivered in person to DEALER and signed by the President or a Vice President or the National Dealer Placement Manager of Chrysler Corporation. Thirty-five (35) days after mailing or delivery of such notice to DEALER, this Agreement will be deemed amended in the manner and to the extent set forth in the notice.

## 9   ARBITRATION

Any and all disputes arising out of or in connection with the interpretation, performance or non-performance of this Agreement or any and all disputes arising out of or in connection with transactions in any way related to this Agreement (including, but not limited to, the validity, scope and enforceability of this arbitration provision, or disputes under rights granted pursuant to the statutes of the state in which DEALER is licensed) shall be finally and completely resolved by arbitration pursuant to the arbitration laws of the United States of America as codified in Title 9 of the United States Code, §§ 1-14, under the Rules of Commercial Arbitration of the American Arbitration Association (hereinafter referred to as the "Rules") by a majority vote of a panel of three arbitrators. One arbitrator will be selected by DEALER (DEALER's arbitrator). One arbitrator will be selected by CC (CC's arbitrator). These arbitrators must be selected by the respective parties within ten (10) business days after receipt by either DEALER or CC of a written notification from the other party of a decision to arbitrate a dispute pursuant to this Agreement. Should either CC or DEALER fail to select an arbitrator within said ten-day period, the party who so fails to select an arbitrator will have its arbitrator selected by the American Arbitration Association upon the application of the other party. The third arbitrator must be an individual who is familiar with business transactions and be a licensed attorney admitted to the practice of law within the United States of America, or a judge. The third arbitrator will be selected by DEALER's and CC's arbitrators. If said arbitrators cannot agree on a third arbitrator within thirty (30) days from the date of the appointment of the last selected arbitrator, then either DEALER's or CC's arbitrator may apply to the American Arbitration Association to appoint said third arbitrator pursuant to the criteria set forth above. The arbitration panel shall conduct the proceedings pursuant to the then existing Rules.

Notwithstanding the foregoing, to the extent any provision of the Rules conflict with any provision of this Paragraph 9, the provisions of this Paragraph 9 will be controlling.

CC and DEALER agree to facilitate the arbitration by: (a) each party paying to the American Arbitration Association one-half (1/2) of the required deposit before the proceedings commence; (b) making available to one another and to the arbitration panel, for inspection and photocopying all documents, books and records, if determined by the arbitrator to be relevant to the dispute; (c) making available to one another and to the arbitration panel personnel directly or indirectly under their control, for testimony during hearings and prehearing proceedings if determined by the arbitration panel to be relevant to the dispute; (d) conducting arbitration hearings to the greatest extent possible on consecutive business days; and (e) strictly observing the time periods established by the Rules or by the arbitration panel for the submission of evidence and of briefs.

Unless otherwise agreed to by CC and DEALER, a stenographic record of the arbitration shall be made and a transcript thereof shall be ordered for each party, with each party paying one-half (1/2) of the total cost of such recording and transcription. The stenographer shall be state-certified, if certification is made by the state, and the party to whom it is most convenient shall be responsible for securing and notifying such stenographer of the time and place of the arbitration hearing(s).

If the arbitration provision is invoked when the dispute between the parties is either the legality of terminating this Agreement or of adding a new CC dealer of the same line-make or relocating an existing CC dealer of the same line-make, CC will stay the implementation of the decision to terminate this Agreement or add such new CC dealer or approve the relocation of an existing CC dealer of the same line-make until the decision of the arbitrator has been announced, providing DEALER does not in any way attempt to avoid the obligations of this Paragraph 9, in which case the decision at issue will be immediately implemented.

Except as limited hereby, the arbitration panel shall have all powers of law and equity, which it can lawfully assume, necessary to resolve the issues in dispute including, without limiting the generality of the foregoing, making awards of compensatory damages, issuing both prohibitory and mandatory orders in the nature of injunctions and compelling the production of documents and witnesses for pre-arbitration discovery and/or presentation at the arbitration hearing on the merits of the case. The arbitration panel shall not have legal or equitable authority to issue a mandatory or prohibitory order which: (a) extends or has effect beyond the subject matter of this Agreement, or (b) will govern the activities of either party for a period of more than two years; nor shall the arbitration panel have authority to award punitive, consequential or any damages whatsoever beyond or in addition to the compensatory damages allowed to be awarded under this Agreement.

The decision of the arbitration panel shall be in written form and shall include findings of fact and conclusions of law.

is the intent and desire of DEALER and CC to hereby and forever renounce and reject any and all recourse to litigation before any judicial or administrative forum and to accept the award of the arbitration panel as final and binding, subject to no judicial or administrative review, except on those grounds set forth in 9 USC § 10 and § 11. Judgment on the award and/or orders may be entered in any court having jurisdiction over the parties or their assets. In the final award and/or order, the arbitration panel shall divide all costs (other than attorney fees, which shall be borne by the party incurring such fees and other costs specifically provided for herein) incurred in conducting the arbitration in accordance with what the arbitration panel deems just and equitable under the circumstances. The fees of DEALER's arbitrator shall be paid by DEALER. The fees of CC's arbitrator shall be paid by CC.

## 10  SIGNATURE

This Agreement becomes valid only when signed by the President or a Vice President or the National Dealer Placement Manager of Chrysler Corporation and by a duly authorized officer or executive of DEALER if a corporation; or by one of the general partners of DEALER if a partnership; or by DEALER if an individual.

IN WITNESS WHEREOF, the parties hereto have signed this Agreement which is finally executed at

_____ , Michigan, in

triplicate, on _____

_____
(DEALER Firm Name and D/B/A, if applicable)

By _____
(Individual Duly Authorized to Sign)

_____
(Title)

### CHRYSLER CORPORATION

By _____

_____
(Title)

**EXHIBIT B**
**TO SECOND DECLARATION OF PETER M. GRADY**

# CHRYSLER

# DIRECT DEALER AGREEMENT

Agreement by and between _____

located at _____
          (Street)                     (City)                 (State)

a(n) _____ , below called DIRECT
           (Individual, Corporation or Partnership)

DEALER, and Chrysler Motors Corporation, a Delaware corporation, below called CHRYSLER.

## INTRODUCTION

The purpose of the relationship established by this agreement is to provide a means for the sale and service of Chrysler passenger cars and Chrysler passenger car parts and accessories in a manner that will best serve the interests of the retail customer and be of benefit to DIRECT DEALER and CHRYSLER.

While the undertakings of this relationship are set forth in the provisions that follow, their success rests on a recognition of the mutuality of interests of DIRECT DEALER and CHRYSLER, and a spirit of understanding and cooperation by both parties in the day to day performance of their respective functions.

It is the mutual goal of this relationship to promote the sale of Chrysler-products by maintaining and advancing their excellence and reputation and by earning, holding, and furthering the public regard for CHRYSLER and all Chrysler Dealers.

To achieve these purposes DIRECT DEALER and CHRYSLER agree as follows:

1.

## SALES LOCALITY

DIRECT DEALER will have the non-exclusive right, subject to the provisions of this agreement, to purchase from CHRYSLER for resale at retail (or to other authorized Chrysler dealers) new Chrysler passenger cars and Chrysler passenger car parts and accessories in the following Sales Locality:

---★---

2.

## DIRECT DEALER'S MANAGEMENT

CHRYSLER has entered into this agreement relying on the active, substantial and continuing personal participation in the management of DIRECT DEALER'S organization by

| NAME | POSITION |
| --- | --- |
| | |
| | |

3.

# DIRECT DEALER'S CAPITAL STOCK OR PARTNERSHIP INTEREST

If DIRECT DEALER is a corporation or partnership, DIRECT DEALER represents and agrees that the persons named below own beneficially, and will continue to own beneficially (except for transfers not effecting a change in majority control or interest) unless CHRYSLER agrees otherwise in writing, the capital stock or partnership interest of DIRECT DEALER in the percentages indicated below:

| NAME | VOTING STOCK | NON-VOTING STOCK | PARTNERSHIP INTEREST |
|---|---|---|---|
| _____ | ____% | ____% | ____% |
| _____ | ____% | ____% | ____% |
| _____ | ____% | ____% | ____% |
| _____ | ____% | ____% | ____% |
| Total (must amount to at least 90%) | ____% | ____% | ____% |

———————————————————— ★ ————————————————————

4.

# TERMS AND PROVISIONS

The Chrysler Direct Dealer Agreement Terms and Provisions marked "Form 57-C" constitutes a part of this agreement with the same force and effect as if set forth at length herein, and the term "this agreement" includes said Chrysler Direct Dealer Agreement Terms and Provisions.

5.

# FORMER AGREEMENTS AND WAIVER, MODIFICATION OR ASSIGNMENT OF THIS AGREEMENT

This Chrysler Direct Dealer Agreement, including the Chrysler Direct Dealer Agreement Terms and Provisions, Form 57-C, incorporated herein, is the entire agreement between the parties relating to the purchase by DIRECT DEALER of

new Chrysler passenger cars and Chrysler passenger car parts and accessories from CHRYSLER for resale, and it cancels and supersedes all earlier agreements, written or oral, between CHRYSLER or Chrysler Corporation and DIRECT DEALER relating to the purchase by DIRECT DEALER of Chrysler passenger cars and Chrysler passenger car parts and accessories.

No waiver, modification or change of any of the terms of this agreement or change or erasure of any printed part of this agreement or addition to it (except filling of blank spaces and lines) will be valid or binding on CHRYSLER unless approved in writing by the President or a Vice-President of Chrysler Motors Corporation.

DIRECT DEALER may not assign this agreement without the written consent of CHRYSLER, executed by the President or a Vice-President of Chrysler Motors Corporation.

CHRYSLER may assign this agreement only to Chrysler Corporation or any wholly owned subsidiary of Chrysler Corporation and will advise DIRECT DEALER of any such assignment by notice signed by the President or a Vice-President of Chrysler Motors Corporation and mailed to DIRECT DEALER.

Since this agreement does not have an expiration date and CHRYSLER may terminate it individually only as provided in Paragraph 21, and since circumstances may exist that CHRYSLER believes require amending all Chrysler Direct Dealer Agreements, CHRYSLER will have the right to amend this agreement to the extent that CHRYSLER deems advisable, provided that CHRYSLER makes the same amendment in Chrysler Direct Dealer Agreements gener-

ally. The amendment will be set out in a notice signed by the President or a Vice-President of Chrysler Motors Corporation. Thirty-five (35) days after delivery of the notice to DIRECT DEALER, this agreement will be deemed to be amended in the manner and to the extent set forth in the notice.

———————— ★ ————————

## 6.

## SIGNATURE

This agreement becomes valid on being signed by the President or a Vice-President of Chrysler Motors Corporation and by a duly authorized officer or executive of DIRECT DEALER if a corporation; or by one of the general partners of DIRECT DEALER if a partnership; or by DIRECT DEALER if an individual.

IN WITNESS WHEREOF, the parties hereto have signed this agreement which is finally executed at _____, _____

in duplicate, this _____ day of

_____, 19_____.

_____
(DIRECT DEALER - Firm Name)

By _____
(Individual Duly Authorized to Sign)

_____
(Title)

## CHRYSLER MOTORS CORPORATION

By _____

_____
(Title)

# CHRYSLER

## Direct
## Dealer Agreement

Terms and Provisions



| Paragraph | | Page |
|---|---|---|
| 7 | Selling, Service, Facilities and Capital | 1 |
| 8 | Advertising | 2 |
| 9 | Reports and Records | 3 |
| 10 | Orders | 3 |
| 11 | Delivery | 3 |
| 12 | Prices | 4 |
| 13 | Change in Price | 4 |
| 14 | Sale and Supply of Parts | 5 |
| 15 | Collection of Indebtedness | 5 |
| 16 | Title | 5 |
| 17 | Acceptance of Shipments | 6 |
| 18 | Claims for Shortage | 6 |
| 19 | Warranty | 6 |
| 20 | Change of Models, Parts and Accessories Declared Obsolete or Discontinued | 6 |
| 21 | Termination | 6 |
| 22 | Transactions after Termination | 8 |
| 23 | Disposition of Direct Dealer's Premises | 8 |
| 24 | Successors to Direct Dealer | 9 |
| 25 | Widow's Financial Interest | 10 |
| 26 | Use of the Name "Chrysler" | 11 |
| 27 | Direct Dealer Is Not Agent | 11 |
| 28 | Inability to Perform | 11 |
| 29 | Notices | 11 |
| 30 | Legal Interpretation | 12 |

# CHRYSLER

# Direct
# Dealer Agreement

## Terms and Provisions

The following terms and provisions apply to and are part of the foregoing Chrysler Direct Dealer Agreement:

---

## 7
### SELLING, SERVICE, FACILITIES AND CAPITAL

(a) Selling – DIRECT DEALER agrees to sell energetically at retail in the Sales Locality described in Paragraph 1 of this agreement Chrysler passenger cars and Chrysler passenger car parts and accessories. DIRECT DEALER agrees to sell at retail in such Sales Locality the number of new Chrysler passenger cars necessary to fulfill DIRECT DEALER'S Minimum Sales Responsibility, as defined below.

DIRECT DEALER'S Minimum Sales Responsibility will be determined as follows:

From time to time, but at least once a year, CHRYSLER will compute the ratio of the number of new Chrysler passenger cars registered in the most recent 12-month period for which registration figures are available in the CHRYSLER Sales Region in which DIRECT DEALER is located to the number of all new passenger cars so registered in that Region. The ratio thus obtained will be applied to the number of all new passenger cars registered during the same 12-month period in DIRECT DEALER'S Sales Locality. The resulting number (and the percentage share of market that such number represents for the Sales Locality) will be DIRECT DEALER'S Minimum Sales Responsibility for this same twelve (12) month period, subject to such adjustment as is described below.

Where appropriate, CHRYSLER will adjust DIRECT DEALER'S Minimum Sales Responsibility to take into account the availability of passenger cars, local conditions, revisions in DIRECT DEALER'S Sales Locality description, the recent trend in DIRECT DEALER'S sales performance and the other factors, if any, directly affecting sales opportunity.

If DIRECT DEALER'S Sales Locality is in a metropolitan or other market area where one or more other Chrysler dealers are located, DIRECT DEALER'S Minimum Sales Responsibility will be the number of new passenger cars DIRECT DEALER must sell in order to contribute DIRECT DEALER'S fair share to the minimum sales responsibility for all Chrysler dealers in the market area as a whole. The minimum sales responsibility for all Chrysler dealers in such market area as a whole will be determined by using the same general method described above in this Paragraph 7 and DIRECT DEALER'S fair share will be determined on the basis of recent trends in sales performance, availability of passenger cars, local conditions, revisions in DIRECT DEALER'S Sales Locality description, location of facilities, and the other factors, if any, directly affecting sales opportunity.

Sales figures used in these computations will be new passenger car registrations as reported by any recognized reporting organization.

To the extent that CHRYSLER for any reason, other than DIRECT DEALER'S failure to submit orders or arrange payment, delivers to DIRECT DEALER less than the number of new Chrysler passenger cars that represents DIRECT DEALER'S Minimum Sales Responsibility, defined above, DIRECT DEALER'S Minimum Sales Responsibility will be proportionately reduced.

**(b)** Service – DIRECT DEALER agrees to provide and maintain, for servicing Chrysler passenger cars, adequate facilities equipped with the basic tools common to the trade and with special tools and equipment peculiar to Chrysler products and necessary for properly and efficiently servicing and repairing Chrysler passenger cars; and to render prompt, efficient and courteous service to all owners of Chrysler passenger cars. DIRECT DEALER will perform all pre-delivery and make-ready services recommended by CHRYSLER on new Chrysler passenger cars DIRECT DEALER sells.

DIRECT DEALER agrees to supply to all purchasers from DIRECT DEALER of new Chrysler passenger cars a copy of Chrysler Corporation's then current new Chrysler passenger car warranty; to make such certifications and verifications of Chrysler owners' odometer readings, maintenance service performance, and other matters as may be required under the terms of the Chrysler passenger car warranty and as CHRYSLER may from time to time otherwise prescribe; and to provide to owners of Chrysler passenger cars all warranty service to which they may be entitled under the terms of such warranty in accordance with the policies and procedures set forth in CHRYSLER'S Warranty and Policy Procedure Manual and in bulletins and documents relating to warranty service that CHRYSLER may, from time to time, supply to Direct Dealers.

CHRYSLER will reimburse DIRECT DEALER for warranty service DIRECT DEALER performs in accordance with CHRYSLER'S policies and procedures described above. DIRECT DEALER agrees to comply with all such policies and procedures including, but not limited to, policies and procedures relating to the keeping of books and records respecting claims DIRECT DEALER may make for reimbursement for warranty service DIRECT DEALER performs. DIRECT DEALER agrees that CHRYSLER may inspect DIRECT DEALER'S books and records respecting any warranty service or other claims DIRECT DEALER may submit to CHRYSLER.

DIRECT DEALER will perform all warranty and other services hereunder as an independent contractor and not as the agent of CHRYSLER or Chrysler Corporation and will assume responsibility for, and hold them harmless from all claims (including, but not limited to, claims resulting from the negligent or willful acts or omissions of DIRECT DEALER) against either of them arising out of or in connection with, DIRECT DEALER'S performance of such service.

**(c)** Facilities and Capital – DIRECT DEALER agrees to maintain at DIRECT DEALER'S address as indicated in the opening paragraph of this agreement or at such other or additional locations as CHRYSLER approves in writing, a place or places of business including salesroom, service, and parts and accessories facilities relatively equivalent to those maintained by DIRECT DEALER'S principal competitors and to operate such place of business in the manner and during the hours usual in the trade in DIRECT DEALER'S Sales Locality.

CHRYSLER and DIRECT DEALER will determine from time to time, when appropriate, the amount of owned net working capital and net worth necessary for DIRECT DEALER successfully to carry out DIRECT DEALER'S undertakings in this agreement and DIRECT DEALER agrees to maintain such owned net working capital and net worth in the business.

---

# 8
## ADVERTISING

CHRYSLER, in promoting sale of its products by DIRECT DEALER and other Chrysler dealers, will seek to advertise in the most effective manner to develop public interest and confidence in its dealers and products.

DIRECT DEALER, in advertising in support of DIRECT DEALER'S selling and servicing Chrysler products, agrees to advertise only in a manner that will develop customer confidence in DIRECT

DEALER and Chrysler products, and will not use any advertising tending to mislead or deceive the public. DIRECT DEALER agrees to discontinue any advertising that CHRYSLER may reasonably find to be injurious to CHRYSLER'S business or likely to deceive the public.

---

# 9
## REPORTS AND RECORDS

DIRECT DEALER will submit to CHRYSLER for confidential use complete and accurate reports of sales and stocks of new and used passenger cars on hand and other reports, including monthly financial reports and operating statements, on such forms and at such times as CHRYSLER reasonably may request.

DIRECT DEALER will use and keep accurate and current at all times a uniform accounting system and will follow accounting practices, both satisfactory to CHRYSLER, that will enable CHRYSLER to develop comparative information, in order, among other things, to provide business management assistance to dealers for the mutual benefit of dealers and CHRYSLER. DIRECT DEALER agrees that CHRYSLER may for confidential use inspect DIRECT DEALER'S books and records for the purpose of determining whether they are kept in such manner that the data shown in them can be used in CHRYSLER'S business management assistance to dealers and for the purpose of verifying any invoices or other claims DIRECT DEALER may render to CHRYSLER.

---

# 10
## ORDERS

CHRYSLER agrees to ship Chrysler passenger cars and Chrysler passenger car parts and accessories to DIRECT DEALER only on DIRECT DEALER'S order.

DIRECT DEALER agrees to submit to CHRYSLER current orders for Chrysler passenger cars and Chrysler passenger car parts and accessories, and estimates of DIRECT DEALER'S future passenger car requirements at such times and for such periods as CHRYSLER reasonably may request for the mutual benefit of dealers and CHRYSLER. DIRECT DEALER will submit such orders and estimates on forms CHRYSLER provides. All orders are subject to acceptance by CHRYSLER, which may be in whole or in part. CHRYSLER will use its best efforts to fill accepted orders for Chrysler passenger cars and Chrysler passenger car parts and accessories; however, CHRYSLER will not be liable for delay or non-delivery of products ordered nor will anything in this agreement obligate CHRYSLER to deliver to DIRECT DEALER any particular number of new Chrysler passenger cars.

---

# 11
## DELIVERY

CHRYSLER may deliver passenger cars by rail, haulaway, boat, or any other means of transport, or deliver them for driveaway, endeavoring when exceptional circumstances arise and the cost is not increased to meet DIRECT DEALER'S preference as to mode of transportation. CHRYSLER may deliver passenger cars to a carrier that CHRYSLER selects, consigned to DIRECT DEALER at DIRECT DEALER'S place of business or consigned to the city or town where DIRECT DEALER'S place of business is located (or to the nearest practicable unloading point) "to CHRYSLER'S order, notify DIRECT DEALER", or may deliver them to DIRECT DEALER at the factory, or at any other point that CHRYSLER may establish.

CHRYSLER may deliver parts and accessories to DIRECT DEALER by delivering them to a carrier that CHRYSLER selects, consigned to the city or town where DIRECT DEALER'S place of business is located, or by delivering them to DIRECT DEALER at loading docks at Detroit, Michigan, or any other point that CHRYSLER may establish.

## 12
PRICES

CHRYSLER will notify DIRECT DEALER from time to time of the prices, charges and terms of purchase of products sold under this agreement and will charge DIRECT DEALER for such products according to the prices, charges and terms of purchase in effect at the date of shipment. CHRYSLER reserves the right, without prior notice, to change prices, charges and terms of purchase of all products sold under this agreement.

DIRECT DEALER will pay CHRYSLER for products sold under this agreement in lawful money of the United States in cash in advance, or on sight-draft against bill of lading or by such other method as CHRYSLER may approve in writing, with collection charges, if any, added.

If not included in the price, DIRECT DEALER also agrees to pay all excise or other taxes which may be levied on the products purchased hereunder or on the sale, shipment, ownership or use thereof. Further, DIRECT DEALER certifies as of the date of each purchase hereunder that all products purchased hereunder are purchased for resale.

## 13
CHANGE IN PRICE

CHRYSLER agrees that should it reduce the wholesale price at factory of any Chrysler passenger car (not including accessories and optional equipment) of a particular yearly model, line and body style then currently in production, CHRYSLER will refund to DIRECT DEALER in cash or by a credit against then current indebtedness for each new, unused and unsold Chrysler passenger car (not including demonstrators) of that particular model, line and body style that at the time of the reduction is in DIRECT DEALER'S stock or in transit to DIRECT DEALER, an amount equal to the difference between the reduced wholesale price and the wholesale price paid to CHRYSLER.

CHRYSLER agrees that if at the time a new yearly model is announced to the public, it announces a wholesale price of any Chrysler passenger car (not including accessories and optional equipment) of any particular body style and line of the new model below the wholesale price of a car of the same body style and line of the discontinued yearly model. CHRYSLER will refund to DIRECT DEALER in cash or by credit against then current indebtedness an amount equal to the difference between the reduced wholesale price and the wholesale price of the same body style and line of the discontinued yearly model for each new, unused and unsold Chrysler passenger car (not including demonstrators) of the particular body style and line of the discontinued yearly model that on the date the new yearly model is announced to the public is in DIRECT DEALER'S stock unless CHRYSLER determines that the line or particular body style of the new yearly model is so changed in size, design, equipment, specifications or price as, for all practical purposes, to make the line a new and different line or to make the particular body style a new and different body style of the same or a new and different line, provided, however, that in any case where items considered standard equipment on a car of the discontinued yearly model are not included as standard equipment on the corresponding car of the new model any wholesale price decrease resulting from the exclusion of such standard equipment will not be included in any refund under this Paragraph 13.

In order to qualify for a refund in either case set forth above, DIRECT DEALER must make a written claim, supported by adequate evidence, within thirty (30) days of the effective date of the reduction in price or announcement of new yearly model.

CHRYSLER, from time to time during each sales year, will review Chrysler dealers' passenger car stocks and rates of sales to determine the desirability of offering, in advance of the announcement to the public of new yearly models, incentive or other sales programs of direct payments, rebates or allowances paid to Direct Dealers designed to assist Chrysler Direct Dealers in maintaining orderly and

4

balanced rates of sale. If CHRYSLER determines, after such review, that conditions and passenger car stocks warrant such special assistance to DIRECT DEALER and other Chrysler dealers, CHRYSLER will institute such programs to assist DIRECT DEALER and other Chrysler dealers as CHRYSLER determines are proper and appropriate for the particular circumstances. CHRYSLER will inform DIRECT DEALER by written notice of the terms and conditions governing any such programs CHRYSLER may institute.

If CHRYSLER does not offer any such program in respect to a particular yearly model, and if fire, flood, strikes or other labor disputes, accident, war, riot, insurrection, acts of government, governmental regulation, or other circumstances have not substantially affected the availability of Chrysler passenger cars at the time of announcement to the public of new yearly models, CHRYSLER will pay to DIRECT DEALER an allowance, in an amount to be determined by CHRYSLER, for each new, unused, undamaged and unsold Chrysler passenger car ( including dealer-owned demonstrators) of the discontinued yearly model in DIRECT DEALER'S stock on the day of the announcement to the public of the new yearly model. The amount of any such allowance will be no less than five per cent (5%) of the then current factory retail price on such discontinued passenger cars (including factory installed accessories and optional equipment listed on confidential price bulletins).

In order to qualify for the allowance provided above, DIRECT DEALER must furnish CHRYSLER within thirty (30) days after CHRYSLER'S new model announcement to the public, such evidence of DIRECT DEALER'S qualification for payment as CHRYSLER may reasonably require.

If CHRYSLER increases the wholesale price on any Chrysler passenger car, DIRECT DEALER, by notice delivered to CHRYSLER within ten (10) days of such price increase, may cancel any orders for passenger cars affected by the price increase that DIRECT DEALER placed before receiving notice of the price increase and that are unfilled and unshipped at the time CHRYSLER receives notice of cancellation.

## 14
### SALE AND SUPPLY OF PARTS

DIRECT DEALER agrees not to represent, sell, offer for sale or use in repairing Chrysler passenger cars, as new Chrysler, Chrysler Parts or MOPAR parts, any part or parts unless such parts are manufactured or designed for or by CHRYSLER, Chrysler Parts or MOPAR and are identified as Chrysler, Chrysler Parts or MOPAR parts with the consent of CHRYSLER.

DIRECT DEALER at all times will keep on hand in DIRECT DEALER'S place of business the number and assortment of Chrysler, Chrysler Parts or MOPAR parts that CHRYSLER'S experience with similar dealers shows to be necessary to meet the service requirements of DIRECT DEALER'S Chrysler customers.

## 15
### COLLECTION OF INDEBTEDNESS

CHRYSLER may apply towards the payment of any amount due CHRYSLER from DIRECT DEALER any credit owing to DIRECT DEALER, and CHRYSLER at its option may collect any sums owing by DIRECT DEALER to CHRYSLER by making a separate draft or by including such sums in any draft covering the purchase of products sold under this agreement. DIRECT DEALER will pay with the amount of each draft all exchange and collection charges.

## 16
### TITLE

Title to products CHRYSLER sells to DIRECT DEALER hereunder will pass on delivery of the products to DIRECT DEALER, DIRECT DEALER'S agent, or the carrier. However, CHRYSLER retains a lien for payment on the products so sold until paid for in full, in cash. CHRYSLER will receive negotiable instruments only as conditional payment.

## 17
### ACCEPTANCE OF SHIPMENTS

If DIRECT DEALER requests diversion of passenger cars shipped to DIRECT DEALER or fails to pay on presentment any draft covering products that DIRECT DEALER has ordered, or fails to accept C.O.D. shipments of products DIRECT DEALER has ordered, CHRYSLER may divert the shipments, and charge DIRECT DEALER the demurrage, transport, storage and other expense arising by reason of any such diversion.

## 18
### CLAIMS FOR SHORTAGE

DIRECT DEALER must make written claim for a shortage in any shipment within twenty (20) days after receiving the shipment or, in event of complete loss of shipment, within three (3) months after date of shipment.

## 19
### WARRANTY

Chrysler Corporation's warranty on new Chrysler passenger cars, as in effect from time to time, will be as set forth in CHRYSLER'S Warranty and Policy Procedure Manual. CHRYSLER will supply sufficient copies of Chrysler Corporation's then current warranty to DIRECT DEALER to permit DIRECT DEALER, in accordance with DIRECT DEALER'S obligations under Paragraph 7 of this agreement, to provide a copy to each purchaser from DIRECT DEALER of a new Chrysler passenger car. Such warranty will be the only warranty made or deemed to have been made to any person by either CHRYSLER or Chrysler Corporation applicable to products sold under this agreement; it will be expressly in lieu of any other warranty, expressed or implied, including but not limited to, any implied warranty of merchantability or fitness for a particular purpose, and the remedies set forth in such warranty will be the only remedies avail-
able to any person with respect to products sold hereunder. Neither CHRYSLER nor Chrysler Corporation assumes or authorizes any other person to assume for either of them any other obligation or liability in regard to such products.

## 20
### CHANGE OF MODELS, PARTS AND ACCESSORIES DECLARED OBSOLETE OR DISCONTINUED

CHRYSLER at any time may discontinue any models, lines or body styles and may revise, change or modify their construction or classification. All orders will refer to models, lines and body styles in production at the time CHRYSLER receives the orders unless DIRECT DEALER specifies otherwise. CHRYSLER at any time may declare obsolete or discontinue any or all parts, accessories and other merchandise. CHRYSLER may act under this Paragraph 20 without notice and, except as set forth in Paragraph 13 of this agreement, without any obligation to DIRECT DEALER by reason of DIRECT DEALER'S previous purchases.

## 21
### TERMINATION

DIRECT DEALER may terminate this agreement on not less than thirty (30) days' written notice.

CHRYSLER may terminate this agreement on not less than ninety (90) days' written notice on (1) the failure of DIRECT DEALER to perform fully any of DIRECT DEALER'S undertakings and obligations in Paragraphs 7 through 10 and Paragraph 14 of this agreement, or (2) the death of any person listed in Paragraph 2 of this agreement, other than the death of DIRECT DEALER if he is an individual, or the failure of any such person so listed to continue his active and substantial participation in the management of DIRECT DEALER'S organization, or (3) a misrepresentation of or change in any of the ownership interests listed in Paragraph 3 of this agreement resulting in a trans-

fer of majority control or interest in the capital stock or partnership interest of DIRECT DEALER, unless CHRYSLER has given written approval to such change, or (4) a disagreement, dispute or controversy between or among principals, partners, managers, officers or stockholders of DIRECT DEALER that, in the opinion of CHRYSLER, may affect adversely the operation, management or business of DIRECT DEALER, or (5) the conviction of DIRECT DEALER, or a partner, principal stockholder, officer or manager of DIRECT DEALER of any crime that, in CHRYSLER'S opinion, may affect adversely the operation or business of DIRECT DEALER or the name, good will, or reputation of CHRYSLER, Chrysler products or DIRECT DEALER.

Termination by CHRYSLER will not be effective unless the President or a Vice-President of Chrysler Motors Corporation signs the notice.

Notwithstanding the provisions above, this agreement will terminate automatically without notice from either party on: (1) the death of DIRECT DEALER if he is an individual, or (2) an attempted assignment of this agreement by DIRECT DEALER without the written consent of CHRYSLER, or (3) an assignment by DIRECT DEALER for the benefit of creditors, or (4) the admitted insolvency of DIRECT DEALER or of any partner of DIRECT DEALER if it is a partnership, or (5) the institution of voluntary or involuntary proceedings by or against DIRECT DEALER in bankruptcy or under insolvency laws or for corporate reorganization, arrangement, receivership or dissolution.

Termination of this agreement will cancel all unfilled orders for passenger cars, parts and accessories.

CHRYSLER agrees to buy and DIRECT DEALER agrees to sell, free and clear of any liens and encumbrances, within ninety (90) days after the effective date of any termination under this Paragraph 21:

(a) All new, unused and unsold Chrysler passenger cars (not including demonstrators), in good condition, of the yearly model current at the effective date of termination that are then the property of and in the possession of DIRECT DEALER at the Direct Dealer net invoice prices current at the effective date of termination, except passenger cars built on DIRECT DEALER'S special order to other than Chrysler standard specifications, which special cars, together with all special equipment pertaining thereto that DIRECT DEALER previously specified, CHRYSLER may or may not purchase at CHRYSLER'S option.

(b) All new, unused and undamaged Chrysler parts that are priced in CHRYSLER'S then current parts price lists and that were purchased by DIRECT DEALER from CHRYSLER or Chrysler Corporation and are then the property of and in the possession of DIRECT DEALER, at the applicable prices (less maximum allowable discounts) therefor to DIRECT DEALER current at the effective date of termination, exclusive of transportation charges, plus an allowance of five per cent (5%) of such applicable prices (less maximum allowable discounts) for packing and crating by DIRECT DEALER and a credit for transportation charges paid by DIRECT DEALER in shipping such parts to the destination CHRYSLER designates, and less the cost of necessary refinishing, reconditioning or repackaging to restore the parts to their original salable condition. Prior to purchase by CHRYSLER, DIRECT DEALER will deliver the parts (tagged and inventoried) for inspection F.O.B. Factory or any other point CHRYSLER may designate.

(c) All new, unused and undamaged Chrysler accessories or accessories packages for the yearly model current at the effective date of termination, complete as supplied to and purchased by DIRECT DEALER from CHRYSLER or Chrysler Corporation during the twelve (12) months immediately preceding the effective date of termination and that are then the property of and in the possession of DIRECT DEALER at the applicable prices (less maximum allowable discounts) therefor to DIRECT DEALER current at the effective date of termination, exclusive of transportation charges, plus an allowance of five per cent (5%) of such

applicable prices (less maximum allowable discounts) for packing and crating by DIRECT DEALER and a credit for transportation charges paid by DIRECT DEALER in shipping such accessories to the destination CHRYSLER designates, and less the cost of necessary refinishing, reconditioning or repackaging such accessories or accessories packages to restore them to their original salable condition. Prior to purchase by CHRYSLER, DIRECT DEALER will deliver the accessories or accessories packages (tagged and inventoried) for inspection F.O.B. Factory or any other point CHRYSLER may designate.

**(d)** All signs of a type recommended by CHRYSLER belonging to DIRECT DEALER, showing the name "Chrysler", at a price to be agreed on by CHRYSLER and DIRECT DEALER.

**(e)** Special tools of a type recommended by CHRYSLER, adapted only to the servicing of Chrysler passenger cars and purchased by DIRECT DEALER during the thirty-six (36) months immediately preceding the effective date of termination at a price and under terms and conditions to be agreed on by CHRYSLER and DIRECT DEALER.

## 22
### TRANSACTIONS AFTER TERMINATION

After effective date of termination, if CHRYSLER accepts orders to fill retail orders DIRECT DEALER may have on hand, or otherwise transacts business related to the sale of Chrysler products with DIRECT DEALER, all such transactions will be governed by the same terms that this agreement provides, so far as those terms are applicable. Nevertheless, such acceptance of orders or other acts by CHRYSLER will not waive the termination, or renew this agreement.

## 23
### DISPOSITION OF DIRECT DEALER'S PREMISES

On termination of this agreement by CHRYSLER on ninety (90) days' written notice except when termination results from a person named in Paragraph 2 of this agreement ceasing to participate in the management of DIRECT DEALER, CHRYSLER agrees to take the following action respecting DIRECT DEALER'S premises as defined below (herein called the Premises), if DIRECT DEALER so requests:

**(a)** If, on DIRECT DEALER'S receipt of notice of termination, DIRECT DEALER owns the Premises:

CHRYSLER will assist DIRECT DEALER in effecting an orderly and equitable disposition of the Premises by a sale or lease. If necessary to effect such orderly and equitable disposition, CHRYSLER, at CHRYSLER'S option, within a reasonable time will lease the Premises from DIRECT DEALER for at least one (1) year or purchase the Premises, or cause them to be leased or purchased, on fair and equitable terms. In such event, DIRECT DEALER and CHRYSLER will agree on the value or rental value of the Premises for the purpose of either a sale or lease. If DIRECT DEALER and CHRYSLER are unable so to agree, each will appoint a disinterested qualified real estate appraiser and the two so appointed will agree on the value or rental value of the Premises, as the case may be. If the two appraisers are unable to agree they will select a third disinterested qualified real estate appraiser who will determine such value. The value or rental value so determined will be final and binding on both DIRECT DEALER and CHRYSLER. If an appraisal is necessary, DIRECT DEALER and CHRYSLER will share equally the cost of such appraisal.

**(b)** If, on DIRECT DEALER'S receipt of notice of termination, DIRECT DEALER is leasing the Premises:

CHRYSLER will assist DIRECT DEALER in effecting an orderly and equitable disposition of DIRECT DEALER'S leasehold interest in the Premises. If necessary to effect such disposition, CHRYSLER within a reasonable time will, at its option, for the remainder of the lease or for twelve (12) months, whichever period is shorter, (1) sub-

let the Premises from DIRECT DEALER, or (2) take an assignment of the lease of the Premises from DIRECT DEALER, or (3) pay DIRECT DEALER monthly or otherwise as the parties may agree the lower of the rental specified in the lease or the fair rental value of the Premises determined in the manner provided in (a) above, provided, however, that DIRECT DEALER may receive such payments under only one dealer agreement with Chrysler Motors Corporation or Chrysler Corporation.

(c) If DIRECT DEALER owns part of the Premises and leases part of them, section (a) above will apply to the part owned and section (b) above to the part leased.

CHRYSLER will have no obligation to DIRECT DEALER under this Paragraph 23, if, after receipt of notice of termination, (1) DIRECT DEALER in any way encumbers the Premises or DIRECT DEALER'S interest in them or takes any other action respecting the Premises that would adversely affect any of CHRYSLER'S obligations under this Paragraph 23, or performance thereof, or (2) DIRECT DEALER receives and refuses a bona fide offer to purchase, lease or sublet all or substantially all of the Premises at a price and on terms that CHRYSLER believes are fair, or (3) DIRECT DEALER'S lease of the Premises or part thereof is continued, renewed or extended by DIRECT DEALER'S act or failure to act, or (4) DIRECT DEALER fails or refuses to use DIRECT DEALER'S best efforts to sell, lease or sublease the Premises or to notify CHRYSLER of any offer to buy, lease or sublease the Premises; or if, after the effective date of termination of this agreement, (1) the Premises or part thereof are used or occupied by anyone for any purpose, or (2) DIRECT DEALER or any of the persons named in Paragraph 3 of this agreement is in the business of selling new or used motor vehicles in the Sales Locality referred to in this agreement or the general area surrounding it, or (3) DIRECT DEALER or any of the persons named in Paragraph 3 of this agreement occupies or could, in CHRYSLER'S opinion, occupy all or substantially all of the Premises for any business in which one or more of them engages.

"Premises" as used herein means the place or places of business in the Sales Locality (1) that DIRECT DEALER uses exclusively to carry out DIRECT DEALER'S obligations in selling and servicing new products under this agreement or jointly under this and any other agreement or agreements with Chrysler Motors Corporation on the date of DIRECT DEALER'S receipt of notice of termination and (2) that CHRYSLER and DIRECT DEALER have agreed in writing are to be covered by this Paragraph 23.

To receive CHRYSLER'S assistance as set forth in this Paragraph 23, DIRECT DEALER must have operated continuously as a Chrysler Direct Dealer for the twelve (12) months immediately preceding the effective date of termination and must give CHRYSLER written notice, within thirty (30) days after DIRECT DEALER'S receipt of the notice of termination of this agreement, of DIRECT DEALER'S request for such assistance. On receipt of such notice from DIRECT DEALER, CHRYSLER will begin to carry out whatever obligations CHRYSLER may have under this Paragraph 23. If under section (b) above CHRYSLER elects to make monthly payments, then DIRECT DEALER will make written application for them on such forms and at such times as CHRYSLER reasonably may require. If DIRECT DEALER requests assistance under this Paragraph 23, then CHRYSLER will have full access to DIRECT DEALER'S Premises and books and records pertaining to same at all reasonable times.

## 24
### SUCCESSORS TO DIRECT DEALER

On termination of this agreement by reason of the death of DIRECT DEALER if he is an individual, or on termination by CHRYSLER because of the death of any of the persons named in Paragraph 2 of this agreement if DIRECT DEALER is a partnership or corporation.

9

**(a)** CHRYSLER will, if DIRECT DEALER has so requested in writing delivered to CHRYSLER during the lifetime of such decedent, offer a Chrysler Direct Dealer Agreement, limited by appropriate amendment to a term of two (2) years, and subject to earlier termination as provided therein, to any person DIRECT DEALER has nominated in such written request to CHRYSLER as the person DIRECT DEALER desires to continue DIRECT DEALER'S business after such death, provided that such nominated person has demonstrated operating qualifications satisfactory to CHRYSLER in the course of active, substantial and continuing participation in the management of DIRECT DEALER'S organization, and possesses or is able to acquire within a reasonable time after such death, capital and facilities that are satisfactory to CHRYSLER, and will be able to exercise as much control over the operations and affairs of the dealership as the deceased exercised. At least ninety (90) days before the expiration of the two (2) year term referred to above CHRYSLER will determine whether or not the person granted the two (2) year Chrysler Direct Dealer Agreement possesses the qualifications, capital and facilities, based on performance during the period he had the Chrysler Direct Dealer Agreement, to qualify for the regular Chrysler Direct Dealer Agreement then in effect and if so, CHRYSLER will offer such Chrysler Direct Dealer Agreement to such person.

**(b)** CHRYSLER will, if DIRECT DEALER has not nominated a successor under this Paragraph 24 and has not named a person whose widow may hold a financial interest under Paragraph 25, review the qualifications of any remaining person named in Paragraph 2 of this agreement. If any such person possesses operating qualifications satisfactory to CHRYSLER and possesses or is able to acquire within a reasonable time facilities and capital necessary to qualify as a Chrysler Direct Dealer, CHRYSLER will offer such person a Chrysler Direct Dealer Agreement. If more than one such person qualifies, CHRYSLER will select the person or persons to whom the agreement will be offered.

## 25
### WIDOW'S FINANCIAL INTEREST

On termination of this agreement by reason of the death of DIRECT DEALER, if an individual, or on termination by CHRYSLER because of the death of any of the persons named in Paragraph 2 of this agreement if DIRECT DEALER is a partnership or corporation, the widow of the person who died may hold a financial interest in any successor dealership, provided that the following conditions are met:

**(a)** Prior to the death referred to above, DIRECT DEALER has delivered to CHRYSLER a notice in writing signed by all the persons named in Paragraph 2 of this agreement naming the deceased person (who must also be named in Paragraph 2 of this agreement) as the person whose widow may hold the financial interest. DIRECT DEALER may name only one such person but may, on written notice to CHRYSLER, signed as above, change the person named.

**(b)** Within sixty (60) days of the date of such death, the widow executes an agreement with the person or persons who will be named in paragraph 2 of the Chrysler Direct Dealer Agreement between CHRYSLER and the successor dealership and who must include the person, if any, CHRYSLER approved as a successor under Paragraph 24 of this agreement, in which the widow agrees not to participate in any way in the management or operation of the successor dealership.

Nothing contained herein will obligate CHRYSLER to enter into a sales agreement with the widow or any person not otherwise acceptable to CHRYSLER or require CHRYSLER to continue

this or any new sales agreement with the widow or any other person for any period of time beyond the time when CHRYSLER would have a right to terminate such an agreement in accordance with the terms thereof.

"Successor dealership" as used in this Paragraph 25 means a dealership (1) that qualifies for and enters into a Chrysler Direct Dealer Agreement with CHRYSLER, (2) that possesses and has the right to use the physical assets and organization that remain after the death first referred to in this Paragraph 25 and (3) in which the widow retains or acquires the financial interest as referred to above.

# 26
## USE OF THE NAME "CHRYSLER"

DIRECT DEALER may use the name "Chrysler" in DIRECT DEALER'S corporate, firm or trade name in a manner CHRYSLER approves in writing. DIRECT DEALER agrees to discontinue immediately use of the name "Chrysler" in DIRECT DEALER'S corporate, firm or trade name when CHRYSLER so requests in writing and to take such steps as may be necessary or appropriate, in CHRYSLER'S opinion, to change such corporate, firm or trade name so as to eliminate the word "Chrysler" therefrom.

On termination of this agreement, DIRECT DEALER will discontinue immediately using the name "Chrysler" in DIRECT DEALER'S corporate, firm or trade name or using any names or trademarks adopted or used by CHRYSLER and/or Chrysler Corporation and will take such steps as may be necessary or appropriate, in CHRYSLER'S opinion, to change such corporate, firm or trade name so as to eliminate the word "Chrysler" therefrom, and will discontinue using

any signs, stationery or advertising containing any of CHRYSLER'S and/or Chrysler Corporation's names, trademarks or insignia or anything else that might make it appear that DIRECT DEALER is an authorized dealer for Chrysler passenger cars or other Chrysler products.

# 27
## DIRECT DEALER IS NOT AGENT

This agreement does not create the relation of principal and agent between CHRYSLER and DIRECT DEALER, and under no circumstances is either party to be considered the agent of the other.

# 28
## INABILITY TO PERFORM

In addition to any other exemption from liability specifically provided for in this agreement, neither DIRECT DEALER nor CHRYSLER will be liable for failure to perform its part of this agreement when the failure is due to fire, flood, strikes or other labor disputes, accident, war, riot, insurrection, acts of government, governmental regulation or other circumstances beyond the control of the parties.

# 29
## NOTICES

Any notice required or permitted under this agreement must be in writing and will be sufficient if delivered personally, or deposited in a United States Post Office, postage prepaid, addressed, as appropriate, either to DIRECT DEALER at the place of business designated in this agreement, or at such other address as DIRECT DEALER may designate in writing to CHRYSLER, or to CHRYSLER, at P.O. Box 857, Detroit, Michigan — 48231, or such other address as CHRYSLER may designate in writing to DIRECT DEALER.

# 30

## LEGAL INTERPRETATION

This agreement will be interpreted and construed according to the laws of the State of Michigan. If it is found that any part of this agreement conflicts in any particular with any law of the United States or of any state in the United States having jurisdiction. such part will be of no force and effect in that political unit. division or subdivision in which it is not lawful or is not enforceable, and the agreement as to that political unit. division or subdivision. will be treated as if such part had not been inserted.