Hearing: June 3, 2009 at 11:00 a.m.
Objections Due: May 26, 2009 at 4:00 p.m.

SQUIRE, SANDERS & DEMPSEY, L.L.P.
1095 Avenue of the Americas, 31st Floor
New York, New York 10036
Phone: (212) 872-9800
Fax: (212) 872-9815
Stephen D. Lerner
slerner@ssd.com
Robert A. Wolf
rwolf@ssd.com

SQUIRE, SANDERS & DEMPSEY, L.L.P.
221 East Fourth Street, Suite 2900
Cincinnati, Ohio 45202
Phone: (513) 361-1200
Fax:  (513) 361-1201
Mark J. Ruehlmann (pro hac vice)
Amy L. Brown (pro hac vice)
Jeffrey A. Marks (pro hac vice)
Pierre H. Bergeron (pro hac vice)

Counsel to the Committee
of Chrysler Affected Dealers

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
                                                             :
In re:                                                       :        Chapter 11
                                                             :
CHRYSLER LLC., *et al.*,                                     :        Case No.: 09-50002 (AJG)
                                                             :
        Debtors.                                             :        (Jointly Administered)
-------------------------------------------------------------X

_____

**OBJECTION BY THE COMMITTEE OF CHRYSLER AFFECTED DEALERS TO OMNIBUS MOTION OF DEBTORS AND DEBTORS IN POSSESSION FOR AN ORDER, PURSUANT TO SECTIONS 105, 365, AND 525 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 6006, (A) AUTHORIZING REJECTION OF THE EXECUTORY CONTRACTS AND UNEXPIRED LEASES WITH CERTAIN DOMESTIC DEALERS AND (B) GRANTING CERTAIN RELATED RELIEF**

_____

TO THE HONORABLE ARTHUR J. GONZALEZ
UNITED STATES BANKRUPTCY JUDGE

The Committee of Chrysler Affected Dealers (the "Dealer Committee")[1], by and through its undersigned counsel, hereby files this objection (the "Objection") to the motion (the "Motion to Reject") (Doc. No. 780) of the above-captioned debtors and debtors in possession (collectively, "Chrysler" or "Debtors") seeking authority to reject executory contracts and unexpired leases with certain domestic dealers, and requesting prospective injunctions against Government Entities and the Affected Dealers. The Motion to Reject is related to the Debtors' motion ("Sale Motion") (Doc. No. 190) seeking authority to sell substantially all of their assets, free and clear of all liens and certain other claims and interests, to New CarCo Acquisition LLC ("New Chrysler"), pursuant to a Master Transaction Agreement, dated as of April 30, 2009 (the "MTA"), and certain related documents (the "Chrysler Restructuring Transaction").

The Objection of the Dealer Committee and the Affected Dealers is also supported by the following declarations, which were attached to the May 19, 2009 Objection of the Committee of Chrysler Affected Dealers to Motion of Debtors and Debtors in Possession for an Order Authorizing the Sale of Substantially All of the Debtors' Operating Assets and for Other Relief (Doc. No. 1045) (the "Sale Objection"): (1) Declaration of Robert Archer dated May 18, 2009 ("Archer Decl."); (2) Declaration of Homer Cutrubus dated May 18, 2009 ("Cutrubus Decl."); (3) Declaration of Gary L. Curry dated May 18, 2009 ("Curry Decl."); (4) Declaration of Nicholas

---

[1]  The Dealer Committee was formed to advance the mutual and collective interest of Chrysler's dealers that are the subject of the Motion to Reject.  Since the Dealer Committee's formation, approximately 340 of such dealers from 47 states have elected to participate with and support the Dealer Committee, and more are joining every day.  This Objection is being filed on behalf of the Dealer Committee and the dealers that have elected and that subsequently elect to join the Dealer Committee's efforts (collectively, the "Affected Dealers").  A current list of the Affected Dealers is attached as Exhibit A to this Objection and incorporated herein.

Parks dated May 18, 2009 ("Parks Decl.") (5) Declaration of Gerald Spitler dated May 18, 2009

("Spitler Decl."); (6) Declaration of Greg Taylor dated May 18, 2009 ("Taylor Decl."); (7)

Declaration of Wade D. Walker dated May 18, 2009 ("Walker Decl."); and (8) Declaration of

Guy Willey dated May 18, 2009 ("Willey Decl.") (all such declarations collectively, the

"Declarations").   The Dealer Committee incorporates by reference the Sale Objection, and in

support of the instant Objection, the Dealer Committee respectfully represents as follows:

### PRELIMINARY STATEMENT

1.      If granted, the Motion to Reject would devastate the Affected Dealers and set in

motion a domino effect of adverse and irreparable consequences.  It would: (1) destroy several

hundred independent businesses across the United States; (2) ruin the livelihoods of the owners

of these businesses, many of whom have operated their dealerships for decades, if not

generations; (3) cause the immediate loss of thousands of jobs at the Affected Dealers and

quickly reverberate in countless additional job losses at the vendors, suppliers and financers of

the Affected Dealers; (4) precipitate inevitable personal and business bankruptcies flowing from

the closing of the Affected Dealers; (5) reduce tax revenues by millions of dollars annually in the

states and communities where the Affected Dealers are located; (6) eliminate the significant civic

and charitable support that the Affected Dealers contribute to their neighborhoods and

communities; and (7) limit competition among the car-buying public, thereby harming

consumers.  It is impossible to overstate the irreparable harm and suffering that will be inflicted

on the Affected Dealers, their thousands of employees, and their employees' families by

Chrysler's requested relief.

2.      And to what end?  Maintaining the Affected Dealers *does not cost Chrysler*

*anything.*  By design, Chrysler requires all of its dealers to pay for *everything* – inventory, parts

and equipment, real estate, and salaries and benefits.  Keeping the Affected Dealers in business thereby does not harm Chrysler (and would certainly avert the harm to customer loyalty that the Motion to Reject will surely cause).  To the contrary, the primary source of revenue for Chrysler is its dealer network.

3.      When attempting to justify why it needs to consummate the unprecedented rejection of 789 dealer relationships, Chrysler retreats to vague generalities about making itself more efficient some day down the road.  That is a distant goal, which is of questionable certainty at best.  It certainly cannot justify the termination – on less than 30 days notice – of 789 franchises with all of the concomitant costs to the Affected Dealers, their employees, and their communities.  The combined relief sought in the Sale Motion and Motion to Reject is unnecessarily punitive without any corresponding or measurable benefit to Debtors' estates.

4.      Debtors freely admit the complexity, magnitude, and severe and wide-ranging repercussions of the contemplated rejections (Motion to Reject at ¶ 20), but they nevertheless invite this Court to reject 789 contracts based on nothing more than their conclusory statements that rejection of these contracts is an appropriate exercise of the Debtors' sound business judgment.

5.      Bankruptcy Rule 6006 provides that when a rejection request takes place outside of plan confirmation, such as here, those affected are entitled to the full scope of protections afforded to contested matters.  Such protections are vital and necessary in this case.  The prejudicial and harmful consequences to the Dealer Committee and Affected Dealers cannot be overstated.

## FACTUAL BACKGROUND

6.      On April 30, 2009 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of title 11, United States Code (the "Bankruptcy Code").

7.      On May 1, 2009, the Court entered an Order directing the joint administration of the Debtors' chapter 11 cases.  The Debtors' cases are consolidated for procedural purposes only.

8.      On May 14, 2009, the Debtors filed their Motion to Reject.  Attached as Exhibit A to the Motion to Reject is a schedule identifying 789 separate dealers (the "Dealers") whose franchise agreements the Debtors are seeking to reject.

9.      As a direct result of the Motion to Reject, the Affected Dealers are the subject of an unprecedented, wholesale mass franchise termination request that, if authorized by the Court, will result in the loss of tens of thousands of jobs.  Moreover, the requested dealer agreement rejection would be effective on June 9th, less than 30 days from the date the Motion to Reject was filed (notwithstanding Chrysler's alleged multi-year planning for such an eventuality).

10.     There are approximately 20,700 independent, franchised, new car automobile dealers in the U.S.  These dealers represent the largest retail segment in the U.S., with approximately $693 billion in revenues in 2007, while employing over 1.1 million people.  Casesa Shapiro Group, *The Franchised Automobile Dealer* at 2-3 (Nov. 26, 2008) (attached to Doc. No. 933) ("Casesa Report").  The U.S. dealers have $233.5 billion invested in their own businesses, more than the total industrial assets of any of the world's largest automobile manufacturers.  These dealers, in effect, deflect the financial risk from the manufacturers by putting their own capital at risk.  Additionally, these dealers comprise nearly 20% of all retail sales in the U.S., and, in total, pay billions annually in state and local income taxes.  *Id.*

11.     According to statistics compiled by the National Automobile Dealers Association ("NADA") for economic activity in the year 2007, new vehicle dealerships in the U.S. employed 1,114,500 people, with an average of 53 employees per dealership.  (*See* "*Driving the United States' Economy*," available at http://www.nada.org/NR/rdonlyres/E51CEDC3-E39D-4C70-AD75-3ACCB5685251/0/StateeconomiesAnnualContributions.pdf).     The average annual earnings of the new vehicle dealership employees was $48,339, and the average annual payroll per new vehicle dealership was $2.59 million.  *Id.*

12.     The Debtors' domestic dealer network (the "Dealer Network") is of vital importance to the Debtors' business.  The Dealer Network is a largely independent and self-financed business, separate and apart from the Debtors, and provides the critical cog in the distribution network between the assembly line and the ultimate consumer.  The average dealership has approximately $2.5 million invested in land, buildings, furniture, fixture and equipment, and an additional $4.9 million in new car inventory.  (Casesa Report at 4).  The distribution channels provided by the Dealer Network operate at "virtually **no cost** to the manufacturer." (*Id.* at 5 (emphasis added)).

13.     As of the Petition Date, the Dealer Network (all but a small fraction of which is independently owned) was comprised of 3,181 dealers employing over 140,000 people.  (Motion to Reject at ¶ 23).  The Dealer Network includes dealers in every state in the nation and in every major metropolitan area, as well as extensive coverage in secondary and rural markets.  (*Id.; see also* Motion of Debtors and Debtors in Possession for Interim and Final Orders Authorizing the Debtors to Honor or Pay Prepetition Obligations to or for the Benefit of Their Dealers and other Customers, and for Related Relief (Doc No. 27) (the "Prepetition Obligation Motion")).  The Debtors describe the Dealer Network as "the public face of their businesses."  (Prepetition

Obligation Motion at ¶ 19).  In light of the far-ranging depth and breadth of the Dealer Network and its many employees, the extraordinary relief requested by the Debtors will have extensive and severe repercussions among countless states, cities, communities and, ultimately, families.

14.     In support of their first day motions for relief, the Debtors filed the Declaration of James J. Arrigo (the "Arrigo Decl.").  Mr. Arrigo is the owner of two Chrysler-Dodge-Jeep dealerships in South Florida.  The Declaration of Mr. Arrigo, who also testified on behalf of the Debtors at the first day hearings, provided key, firsthand insight into the dire situation facing the Affected Dealers, including the following:

- "Chrysler's dealer network is a good example of the American entrepreneurial spirit.  The Chrysler dealers located throughout the United States represent a small group of business owners.  Although these small businesses have historically operated successful business operations, the dealerships are now in serious trouble and on the brink of collapse."  (Arrigo Decl. at ¶8).

- "Many Chrysler dealerships are in financial distress and the situation has deteriorated rapidly in recent weeks.  In my professional life, and over the past 30 years, this is the most dire situation I have ever seen in the car business." (*Id.* at ¶11).

- "These dealers were pillars of the local community, benefactors of local sports and charities and in some instances the community's largest employer and source of tax revenue."  (*Id.* at ¶12).

15.     The Debtors found it advantageous and expedient to rely on the Arrigo Declaration in portraying the "dire straits" of the Affected Dealers while seeking relief from this Court at the first day hearings on April 30 and May 3.  Such compunctions, however, were less than evident on May 13, 2009, when the Debtors unceremoniously mailed overnight UPS letters to 789 of their dealers, informing them that their dealership agreements will be rejected within less than 30 days (see, e.g., Correspondence attached as Exhibit A to the Declaration of Guy Willey) (the "Rejection Letter")).

16.     As set forth in the Rejection Letter, not only were the Affected Dealers notified that Chrysler would seek court approval for the rejection of their dealership agreements in less than 30 days, they were also informed of the following "transition" procedures being offered by the Debtors to help assuage the pain of the highly accelerated and unprecedented wholesale rejections:

- "As a result of its recent bankruptcy filing, Chrysler LLC **is unable to repurchase your new vehicle inventory**. However we will assist with the redistribution of as many of your eligible vehicles as possible, among the dealers remaining in the Chrysler network."

- "As a result of its recent bankruptcy filing, Chrysler LLC **is unable to repurchase your Mopar parts inventory.** However we will endeavor to match you with a dealer to consider purchase of your parts.  This redistribution will occur among the dealers remaining in the Chrysler network."

- "As a result of its recent bankruptcy filing, Chrysler LLC **is unable to repurchase your Essential/Special tools.**  However we will assist with the redistribution of as many of your Essential/Special tools as possible.  This redistribution will occur among the dealers remaining in the Chrysler network."

- "All warranty, MOPAR, Recall, Transportation and Chrysler Service Contract Claims must be submitted to Chrysler Motors LLC for payment within seven days of the expected court approved rejection date. . . Warranty repairs performed after the rejection date are not eligible for payment."

(Emphasis added).  If the dealers are indeed the "public face" of Debtors' business, the Affected Dealers represent the proverbial nose being cut off in a fury of bankruptcy-induced spite.  If Chrysler is authorized to reject the dealership agreements as part of its restructuring plan, the Affected Dealers will be saddled with countless millions of dollars of inventory and equipment that Chrysler refuses to repurchase (among other claims).  Deprived of any advance notice of the terminations, the Affected Dealers do not even have an opportunity to attempt to mitigate the dramatic nature of the harm befalling them.  Instead, Chrysler seems intent on dragging many of the Affected Dealers into bankruptcy with it.

17.     The "transition procedures" described above are particularly egregious in the light of Chrysler's actions prior to the Petition Date.  As set forth in the declarations, much of Affected Dealers' current inventory on hand was purchased in response to pressure from Chrysler to be a "team player", *i.e.* by purchasing additional stock for the "good of Chrysler" despite the prevailing economic conditions.  *See* Curry Decl. at ¶ 7; Parks Decl. at ¶ 9; Archer Decl. at ¶¶ 6-9; Taylor Decl. at ¶ 8; Walker Decl. at ¶ 7; Willey Decl. at ¶ 8; Spitler Decl. at ¶ 2. Should Chrysler be permitted to reject the dealership agreements, not only will the Affected Dealers be forced to liquidate their dealerships (including specialty tools and equipment purchased over the years at a cost of several hundreds of thousands of dollars) for pennies on the dollar, but the remaining inventory of vehicles will have to be sold as used cars without the benefit of Chrysler incentives.  Forcing the Affected Dealers to suffer this loss of value only compounds the injustice, particularly as many only agreed to purchase the additional inventory as an accommodation to Chrysler in the first place.  *Id.*

18.     In 2007, Chrysler's Dealer Network generated approximately $105 billion in revenue and spent $575 million on advertising.  (See, News Archive, "*Chrysler LLC Dealers Deliver Main Street Message to Washington*," Nov. 16, 2008).[2]  During the first nine months of 2008, Chrysler's Dealer Network invested $132 million of their own money solely to upgrade their U.S. facilities (often at Chrysler's behest).  (Id.)  Now, in less than a month, 789 members of that Dealer Network, the "public face of [the] business," will be effectively destroyed, with the inventory forcibly "redistributed" into the prevailing winds of their former competitors (who know that they will have to pay no more than firesale prices for the inventory) or worse, sold to the public as used cars, without warranties or incentives.

---

[2] http://www.chryslerllc.com/en/news/article/?lid=chrysler_deliver_message_washington&year=2008&month=11

19.     The Motion to Reject takes great pains to attempt to justify the rationale behind the wholesale rejection of the Affected Dealers; however, curiously enough, at no point is the justification broken down into actual costs to the Debtors and their estates.  Rather, the Motion to Reject relies upon a vague and nebulous description of unspecified oversight, auditing and monitoring duties which allegedly compel the Debtors to "spend additional resources." (See, Motion to Reject at ¶15).  Additionally, a thorough review of the Second Declaration of Peter M. Grady, filed in support of the Motion to Reject (the "Second Grady Decl."), yields no further enlightenment regarding the actual cost to the Debtors and their estates, again pointing to the need to devote unspecified "additional resources" to "processes, and procedures, oversight of the dealer network, auditing and monitoring expenses for dealer operations, and all of the other operational expenses that must be incurred to maintain, support, facilitate and oversee a larger dealer network."  (Second Grady Decl. at ¶16). In fact, it appears that the real impetus behind the rejections is to benefit certain creditors – dealers permitted to stay in business – at the expense of others, because these dealers will now have less competition to worry about.

20.     Although the Motion to Reject fails to adequately quantify the elusive "costs" and "burdens" that would inform the Debtor's business judgment in taking such drastic action, the Affected Dealers can explain the wholesale devastation being unleashed by the Debtors' actions.

21.     As the declarations attached to the Sale Objection explain, the Affected Dealers have invested significant resources (often at the specific request of Chrysler) into their dealerships.  For example, *as recently as April of 2009,* Chrysler urged Homer Cutrubus, owner of Dodge/Chrysler/Jeep franchises in Utah, to combine two of his facilities in Layton, Utah.  *See* Cutrubus Decl. at ¶¶ 4, 5.  Mr. Cutrubus resisted, but Chrysler kept pushing.  *Id.*    Indeed, Chrysler sent Mr. Cutrubus an e-mail regarding its "proposed plan to combine all franchises in

Layton and Odgen into one location" and asking "Are you our guy?" *Id.* at ¶ 5 and Ex. C to Cutrubus Decl. Being a team player, Mr. Cutrubus capitulated and consolidated the two facilities, at a cost of over $100,000. *Id.* at ¶ 6. Now, less than 2 months after employing its pressure tactics, Chrysler is seeking to reject Mr. Cutrubus' dealer agreements.

22.     Rogers Dodge, Inc. ("Rogers") -- a family owned franchise -- has invested over $6,000,000 into its Dodge dealership, including the construction of a new state-of-the-art facility designed by Dodge in 2006 that "was specifically designed to sell Dodge vehicles and is ill-suited for any other purpose." Parks Decl. at ¶ 3. *See also* Curry Decl. at ¶ 5 (invested over $3.3 million in Baytown Chrysler/Jeep/Dodge franchise).

23.     At Chrysler's request, Gerald Spitler -- owner of Buzz Leonard Chrysler-Jeep -- sold his Mitsubishi franchise at a cost of $200,000 so that he could become a free-standing Chrysler Jeep dealer. *See* Spitler Decl. at ¶ 2.

24.     Moreover, in the last several months, Chrysler pressured dealers to purchase additional, unneeded stock in an effort to keep Chrysler afloat. *See* Curry Decl. at ¶ 7 (currently has 150-160 new vehicles and $220,000 worth of parts); Parks Decl. at ¶ 9 (currently has 190 vehicles and $120,000 worth of parts); Archer Decl. at ¶¶ 6-9 (for three dealerships, currently has approximately 700 vehicles in stock and approximately $1.7 million in parts); Taylor Decl. at ¶ 8 (currently has 21 vehicles and over $36,000 in parts); Walker Decl. at ¶ 7 (seven vehicles and $60,000 worth of parts); Willey Decl. at ¶ 8 (currently has 78 vehicles and over $150,000 in parts); Spitler Decl. at ¶ 2. Yet, Chrysler is now refusing to purchase this inventory. *See, e.g.,* Ex. A to Archer Decl. If the dealer agreements are rejected, the Affected Dealers will be forced to sell their inventory of vehicles at huge loses as used cars without the benefit of the

manufacturers' warranties or sales incentives. *See* Curry Decl. at ¶ 7; Parks Decl. at ¶ 9; Archer Decl. at ¶ 9; Taylor Decl. at ¶ 8; Walker Decl. at ¶ 4; Willey at ¶ 8.

25.    As independently owned franchises, dealers have to alone bear the costs and expenses incurred by their dealerships, including those relating to land, showroom, inventory, personnel, training, employee benefits, maintenance, signage, advertisements, insurance and taxes. Taylor Decl. at ¶ 3; Parks Decl. at ¶ 4; Curry Decl. at ¶ 3; Archer Decl. at ¶ 3; Walker Decl. at ¶ 3; Willey at ¶ 3. These costs and expenses are not subsidized by Chrysler. *Id*.

26.    Because the dealerships were successful or because the dealers had made significant investments at Chrysler's request, the declarants were surprised to learn that Chrysler was asking to reject their dealer agreements. Archer Decl. at ¶ 4; Curry Decl. at ¶¶ 4, 5; Parks Decl. at ¶¶ 5-7; Spitler Decl. at ¶ 3; Taylor Decl. at ¶ 6; Willey Decl. at ¶¶ 4, 5.

27.    Chrysler's actions are simply unconscionable and cannot be justified by any conceivable notion of business judgment. Moreover, the extent to which the Affected Dealers, their employees, families and communities will be irreparably harmed dwarfs any imaginary benefit to Chrysler and its estate. If Chrysler can successfully reject its dealer agreements with the Affected Dealers, these dealers will suffer devastating losses, including being forced to liquidate assets at pennies on the dollar. *See* Curry Decl. at ¶ 5; Parks Decl. at ¶¶ 7, 8, 10; Spitler Decl. at ¶ 3; Taylor Decl. at ¶ 6; Willey Decl. at ¶ 8.

28.    An astounding number of employees will be adversely impacted. *See* Curry Decl. at ¶ 5 (employs 34 people); Archer Decl. at ¶ 5 (three dealerships employ over 250 people); Parks Decl. at ¶ 8 (employs 38 people); Cutrubus Decl. at ¶ 8 (in excess of 100 jobs are now at risk); Taylor Decl. at ¶ 7 (employs over 25 people).

12

29.    And, in many cases, the dealerships will likely be forced to close their doors and potentially file for bankruptcy.  *See* Curry Decl. at ¶ 5 ("Without a franchise, our investment of approximately $3.3 million will be worth almost nothing.  Liquidation expenses and loss of franchise will total in the millions and force us into bankruptcy."); Parks Decl. at ¶ 8 ("The loss of the Dodge franchise will force Rogers to shutter its doors . . ."); Taylor Decl. at 6 ("uncertain whether Taylor-Parker will be able to continue to pay its operational expenses or remain a viable business"); Walker Decl. at ¶ 4 ("Many rejected dealers will immediately go out of business.").

30.    If the Affected Dealers are forced to close their doors, such closures will not only impact the owners and employees of those dealerships, but also the communities where the Affected Dealers are located.  Many of these dealerships play a vital role in their communities, including supporting charitable organizations.  *See* Walker Decl. at ¶ 6; Taylor Decl. at ¶ 9.

## ARGUMENT

31.    Debtors' Motion to Reject should be denied for several reasons.  *First*, Debtors have not fulfilled their burden of establishing that all of the Affected Dealers' contracts should be rejected.  *Second*, the litany of state Dealer Laws, which are designed to protect dealers from adverse actions by parties such as Chrysler are enforceable in these chapter 11 cases, are not completely preempted as Debtors contend and still provide the Affected Dealers with much needed protection in light of the unfairness of the "transition procedures" set forth in the rejection notices.  *Third*, section 525 of the Bankruptcy Code does not permit Debtors to obtain a prospective injunction for the benefit of New Chrysler (or another hypothetical purchaser) and the non-rejected dealers against theoretical "interference" by unascertained "Government Entities" or the Affected Dealers.  *Fourth*, the Motion to Reject violates the Automobile Dealers' Day in Court Act, 15 U.S.C. § 1221, *et seq*. *Fifth,* the Motion to Reject is an inappropriate

vehicle to predetermine the classification of the Affected Dealers' claims, should the Motion to Reject be granted, and Debtors are, nevertheless, wrong about the nature of the claims that would result.

**I.      The Court Should Deny the Motion to Reject Because The Harm to the Affected Dealers Far Outweighs Any Claimed Benefit to the Estate.**

32.     Section 365(a) of the Bankruptcy Code permits debtors to assume or reject certain executory contracts or leases, subject to court approval.  To show entitlement to such relief, the debtor has the burden of proving (a) that the contract or lease is executory, and (b) that it can meet the standard for assumption or rejection.  *See, e.g., Cedar Rapids Meats, Inc. v. Hager (In re Cedar Rapids Meats, Inc.)*, 121 B.R. 562, 573 (Bankr. N.D. Iowa 1990) (debtor was required to demonstrate that agreement at issue was an executory contract and that the contract met the standards for rejection); *Mirant Corp. v. Potomac Elec. Power Co. (In re Mirant Corp.)*, 197 Fed. Appx. 285, 289 (5th Cir. 2006) (same).  The Affected Dealers do not dispute that the various dealership agreements are "executory contracts" for the purposes of section 365(a), but deny that Debtors have met their burden of establishing that they are entitled to reject the dealership agreements.

**A.      Debtors Cannot Satisfy the Strict Standard That Applies When Special Rights Are Involved.**

33.     As an initial matter, Chrysler assumes in the Motion to Reject that the standard for determining rejection under section 365 of the Bankruptcy Code is whether the rejection of the agreements with the Affected Dealers will benefit the Debtors' estates and is an exercise of sound business judgment by the Debtors (Motion to Reject at ¶¶ 19, 43).  Yet, Chrysler acknowledges that "[t]here is little precedent for the bankruptcy of a major" automobile

14

manufacturer.  (*Id.* at 8).  As such, the standard this Court should apply in determining whether to reject the agreements with the Affected Dealers is not as routine as Chrysler depicts.

34.    In *National Labor Relations Bd. v. Bildisco,* the Supreme Court held that the standard for determining the rejection of collective bargaining agreements should be stricter than the traditional "business judgment" standard, even though there was nothing in section 365 indicating that there should be a different standard for collective bargaining agreements. 465 U.S. 531, 523-24 (1984), *superseded by statute,* 11 U.S.C. § 1113.

35.    The Court found that because of the special nature of the rights created for workers by collective bargaining agreements, a bankruptcy court should not reject collective bargaining agreements unless the debtor can show that the collective bargaining agreement burdens the estate and that after careful scrutiny, the equities balance in favor of rejecting the contract.  465 U.S. at 525-26.  In fashioning this standard, the Court found that the bankruptcy court must balance the interests of the affected parties (including the debtor, creditors, and employees) and that in striking the balance, the court should consider both the type and the degree of hardship faced by each party.  *Id.* at 527.  Moreover, the Court stated that the bankruptcy court "must have great latitude to consider any type of evidence relevant to" the issue of rejection.  *Id.*

36.    Like the special rights created by collective bargaining agreements, the dealer agreements that the Debtors are seeking to reject create special rights for the Affected Dealers by virtue of the state Dealer Laws.  The Dealer Laws are specifically designed to protect the important rights of dealers in connection with, among other things, the termination of franchise agreements.  These laws recognize the imbalance in the bargaining power between automobile manufacturers and dealers, as well as the extreme hardship that dealers would incur if

15

automobile manufacturers were able to terminate franchise agreements at will without any further obligations.

37.      Given the special rights created for the dealers under the state Dealer Laws, this Court should apply a standard similar to that set forth in *Bildisco* to determine whether to reject the agreements with the Affected Dealers.   Debtors cannot meet their burden under *Bildisco* because, as described below, they cannot even meet the test for rejection applying the "business judgment" standard.   Indeed, it appears that there is no legitimate justification for the rejection transaction than simply the Debtors trying to exploit the section 365 process.

**B.       Under the Business Judgment Standard, Rejection is Not Appropriate as There is No Apparent Benefit to the Estate and the Dealers Would be Disproportionately Harmed or Even Destroyed if Rejection is Authorized.**

38.      Even if this Court applies the "business judgment" standard, the Debtors have not met their burden of proving that rejection is warranted.

39.      Motions to reject contracts under section 365(a) of the Bankruptcy Code are *not* rubber-stamped by bankruptcy courts as Debtors suggest.   Rather, a debtor's business judgment to reject a contract must undergo careful scrutiny to ensure that it will in fact be in the best interests of the unsecured creditors of the bankruptcy estate, and will not result in disproportionate harm to the non-debtor party to the contract.   *See, e.g., The Monarch Tool & Mfg. Co. v. Monarch Prod. Sales Corp. (In re Monarch Tool & Mfg. Co.)*, 114 B.R. 134, 137 (Bankr. S.D. Ohio 1990); *In re Petur U.S.A. Inst. Co., Inc.*, 35 B.R. 561, 563-64 (Bankr. W.D. Wash. 1983); *In re Midwest Polychem, Ltd.*, 61 B.R. 559, 562 (Bankr. N.D. Ill. 1986) (recognizing that judicial approval of contract rejection is not a "rubber stamp," balancing equities when assessing business judgment, and disallowing rejection that would not necessarily have benefited the debtor's unsecured creditors and could have "mortally wounded" the

16

counterparty). *See also In re Chipwich, Inc.*, 54 B.R. 427, 431 (Bankr. S.D.N.Y 1985) (authorizing rejection of two licensing agreements where there was no showing that the non-debtor would be "damaged disproportionately" and noting rejection would not force non-debtor out of business); *Robertson v. Pierce (In re Chi-Feng Huang)*, 23 B.R. 798, 801 (B.A.P. 9th Cir. 1982) (rejection involves a balancing of interests such that the court should refuse to authorize rejection where the non-debtor would be damaged disproportionately to the benefit to be derived by the general creditors); *Infosystems Tech., Inc. v. Logical Software, Inc.*, C.A. No. 87-0042, 1987 U.S. Dist. LEXIS 6285, at *2-4 (D. Mass. Jun. 25, 1987) (citing *Huang*, *Midwest Polychem*, *Chipwich*, and *Petur* in reversing bankruptcy court's authorization of rejection of distributorship agreement under "bad faith, whim, or caprice" standard, and ordering the court to consider whether rejection will benefit general unsecured creditors, which includes balancing of interests and whether disproportionate harm would result to non-debtor).

40.      In *Monarch Tool*, the debtor manufactured coin inserting mechanisms for vending machines, which were sold by distributors pursuant to exclusivity agreements.  114 B.R. at 135. The debtor sought to reject the distribution agreement with one of its distributors, claiming that it had insufficient funds to meet payroll and that if the contract was not rejected the debtor would be forced to liquidate.  *Id.*  In considering the motion, the court pointed out that "a Chapter 11 debtor's right to reject executory contracts is not unlimited."  *Id.* at 137.   Rather, "[d]isproportionate damage to the other party to the contract provides a ground for disapproving rejection." *Id.*  In disapproving the rejection, the court determined that this factor was paramount, in light of the exclusive distributorship arrangement:  "Quite simply, if rejection is permitted here, Distributor will be ruined." *Id.*

17

41.     Similarly, in *Petur*, the debtor sought to shed a 20-year license agreement granting the non-debtor the exclusive right to use, manufacture, assemble, and sell its products in Canada.  35 B.R. at 562.  The debtor claimed that the agreement was the single biggest cause of its financial problems and estimated that rejecting the agreement would enable it to reorganize and pay off its creditors within two years.  *Id.*  The court found that rejecting the contract based upon the non-profitability of the arrangement and the possibility of obtaining better profits constituted a proper exercise of business judgment.  *Id.* at 563.  Based upon "legal and equitable considerations," however, the court refused to authorize the rejection because it would force the non-debtor out of business:  "we are dealing with the actual ruination of an otherwise profitable, successful and ongoing business.  Equity will not permit such a result."  *Id.* at 563-64 (citing *Chi-Feng Huang*, 23 B.R. at 801).

42.     As in *Monarch* and *Petur*, rejection of the dealership agreements will put many of the dealerships on Chrysler's rejection list out of business.  (*See* Curry Decl. at ¶ 5; Parks Decl. at ¶ 8; Taylor Decl. at 6; Walker Decl. at ¶ 4).  For those dealerships with non-Chrysler brands to continue selling, the harm resulting from rejection will still disproportionately affect them.  Indeed, the rejection will result in a swift and permanent reduction of a large proportion of their sales.  Debtors cannot seriously contest the dire impact rejection will have on their dealerships, as shown by their failure to address it in the motion or the Second Grady Declaration.

43.     Rejection of contracts should also be disallowed where the estate cannot show that doing so will benefit the general unsecured creditors of the estate, as opposed to the debtor itself (or its equity holders).  *See Dunes Hotel Assoc. v. Hyatt Corp. (In re Dunes Hotel Assoc.)*, 194 B.R. 967 (Bankr. D.S.C. 1995).  In *Dunes*, the court found that one of the critical inquiries under the business judgment standard set forth in *Lubrizol* is whether the proposed rejection will

actually benefit the estate, *i.e.*, the unsecured creditors, or just the debtor itself. *Id.* at 988 ("the proper test under *Lubrizol* is whether the benefit of rejection is to the estate rather than the individual debtor."). After carefully considering this standard, the *Dunes* court held that rejection of the hotel lease with Hyatt would serve to benefit only the debtor and not the estate, due, in part, to the significant claims that would result for breach of the rejected contract.). *Id.* at 990-91. *See also In re Kong*, 162 B.R. 86, 96 (Bankr. E.D.N.Y. 1993) (declining to approve rejection where the debtors failed to present convincing evidence that rejecting the lease will benefit the debtors' estate in terms of benefitting the general creditors); *Control Data Corp. v. Zelman (In re Minges)*, 602 F.2d 38, 43-44 (2d Cir. 1979) (under analogous provision of Bankruptcy Act, reversing district court order approving rejection of lease and remanding because the record was insufficient to support finding that rejection would benefit general creditors of the estate and not just secured creditors).

44.    Here, as in *Minges* and *Dunes*, Debtors also failed to provide an explanation of how the unsecured creditors of the Estate will benefit by these rejections. Instead, Debtors acknowledge that these rejections will result in hundreds of claims for breach of contract by the rejected dealerships. (Motion to Reject, ¶¶ 61-63). As a consequence, the rejections would actually harm the Estate by diluting the already existing claims (and the effect is much worse once the claims are properly classified, as explained below, as administrative claims). At the depositions currently taking place, Chrysler witnesses acknowledged that Chrysler did not even attempt to calculate any alleged cost savings attributable to terminating the 789 dealers. The fact that Chrysler does not even pretend that the rejections will save money speaks volumes.

45.    Debtors' arguments that the rejections will aid New Chrysler are vague and unsupported by any concrete and verifiable evidence. Debtors assert that reducing the size of the

dealership network will reduce costs to New Chrysler because it will decrease inefficiencies in the distribution chain and strengthen the remaining dealers, thereby allowing them to enhance the Chrysler "consumer experience."  The only support for these sweeping claims is found in the Second Grady Declaration, which also contains nothing more than broad and conclusory statements, and is devoid of any specific economic analysis or studies.  For example, the Motion to Reject and Second Grady Declaration reference performance and planning factors applied in determining which dealerships to terminate, but they fail to provide that data and analysis.

46.     Therefore, Debtors have mustered no credible evidence that the rejections will actually help New Chrysler anytime in the foreseeable future.  And even if it were true that the rejections will ultimately benefit New Chrysler, under *Minges*, *Dunes*, and *Kong*, rejection would still not be warranted, because doing so would only serve to benefit an asset purchaser, rather than the unsecured creditors of the estate.

47.     Moreover, Debtors' rejection request fails to take into account the devastation inflicted on the counterparties to the contract.  This harm has been explained both in the Sale Objection, the supporting Declarations, and throughout this Objection.  The rejections simply cannot stand in light of the facts that: (1) the Affected Dealers do not cost Chrysler anything because they pay for all inventory, parts, employees, and real estate themselves; (2) the rejection does not benefit the Debtors, their estates or creditors; (3) the rejection will result in hundreds of millions of dollars in administrative expense claims compared with vastly lower administrative expense claims in the form of cure payments upon assumption and assignment to New Chrysler; (4) the rejection does not allow the Affected Dealers a reasonable time to wind down or to mitigate the harm to them; and (5) the rejection will cause a large number of the Affected Dealers to close their operations and terminate thousands of employees.

48.     Accordingly, Debtors have failed to demonstrate that they exercised sound business judgment in seeking to reject the dealership contracts and the Court should not deny the Motion to Reject.

### C. Debtors Have Not Met Their Burden of Showing that Each Contract with Each Dealer Meets the Standard for Rejection under Section 365

49.     In addition to all the foregoing reasons, rejection of the dealership agreements is not permissible because Debtors have not—and cannot—show that rejection is proper as to *each* of the Affected Dealers.  *See, e.g., Nickels Midway Pier, LLC v. Wild Waves, LLC (In re Nickels Midway Pier, LLC)*, 341 B.R. 486, 500-01 (Bankr. D.N.J. 2006) ("The Bankruptcy Court must also reconsider its ruling that rejection is in the best interests of the debtor's estate, and *analyze separately* whether rejection of the Lease or the oral contract for sale meets the standard of the business judgment rule.") (emphasis added) (aff'd in *In re Nickels Midway Pier, LLC*, 255 Fed. Appx. 633, 636-37 (3d Cir. 2007); *In re Oregon Corp.*, 05-857-HA, 2006 U.S. Dist LEXIS 10042, at *4 (D. Ore. Feb. 28, 2006) (agreements that are severable must be considered separately under section 365); *Jewell v. Beeler (In re Stanton)*, 248 B.R. 823, 830 (B.A.P. 9th Cir. 2000) (same) (citing *Pacific Express, Inc. v. Teknekron Infoswitch Corp. (In re Pacific Express, Inc.)*, 780 F.2d 1482, 1486 (9th Cir. 1986)).

50.     The same is true here, where there are 789 separate dealers, each with at least one dealership contract that Debtors seek to reject, as well as related contracts.  Despite having the burden to show rejection of each of these contracts is permitted under section 365, Debtors have made no effort do so.[3]  By Debtors' own admission, the alleged standard for determining which

---

[3] In order to meet its burden under section 365, Chrysler must establish with <u>specificity</u> the grounds that support its proposed rejection of <u>each</u> Affected Dealer's dealer agreement. Without waiving any of the Committee's or Affected Dealers' arguments, in the event that the Court determines that Chrysler has set forth a legitimate basis for rejection generally of dealership agreements of the Affected Dealers, the Committee requests that the Court afford a sufficient opportunity for each Affected Dealer who so chooses to present its own evidence to refute any specific evidence that

dealers would be assigned and which would be rejected is not formulaic or objective.  Rather, the specific metrics that might qualify one dealer to be assigned might cause another to be rejected. As underscored by many of the objections to the Motion to Reject by individual dealers and other dealer groups, Debtors cannot meet their burden.  For example, some dealers had their agreements rejected despite being certified "five star dealers" and top performers, which completely refutes Debtors' claimed basis for contract rejection.  To the extent that Chrysler contends some of the Affected Dealers are failing financially, it offers no reason why market forces should not be allowed to run their course.  A dealership on difficult financial footing should be allowed the opportunity to wind up as it sees fit, rather than liquidate all assets under a distressed sale scenario.

51.    As a result, without presenting evidence specific as to each Affected Dealer and the application of Chrysler's alleged standard for rejection, Debtors have not met their burden of showing that each agreement with an Affected Dealer meets the standard for rejection under section 365.

## II.    Chrysler Has Not Met its Burden of Demonstrating Complete Preemption of State Dealer Laws

52.    Chrysler argues that section 365 of Bankruptcy Code completely preempts all aspects of the Dealer Laws.  The burden to establish preemption is on Chrysler.  *Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238, 255 (1984) (the burden is on the party seeking preemption to prove that preemption applies) (superseded on other grounds); *Riden v. ICI Americas, Inc.*, 763 F. Supp. 1500, 1503 (W.D. Mo. 1991) ("The burden is on the moving party to prove that Congress intended to preempt state law.").  Chrysler has failed to meet this burden to prove that

---

Chrysler might proffer to support rejection of such Affected Dealer's agreement. Given the large number of Affected Dealers, providing an adequate opportunity may require a substantial amount of time and would appear unlikely to be capable of being accomodated at the June 3 hearing or on any one hearing date.

section 365 eliminates the statutory and regulatory laws that protect dealers, their employees, and their communities.

53.     Chrysler's preemption argument rests on a trio of cases that fail to address, let alone meaningfully support, the preemption sought here.  Chrysler relies largely on *Volkswagen of Am., Inc. v. Dan Hixson Chevrolet Co* (*In re Dan Hixson Chevrolet Co.*), 12 B.R. 917, 921 (Bankr. N.D. Tex. 1981).  But rather than ignore the Texas franchise law, however, the *Dan Hixson* court only stopped parallel proceedings before a Texas agency through the automatic stay. Though it ostensibly provided that section 365 preempted the Texas statute, the court recognized that it and the state agency had the same policies, objects, and powers.  *Id*. at 923.  "Preemption" in *Dan Hixson* meant no more than that the bankruptcy court would decide the issue, *not* that the Dealer Laws would be discarded.  Chrysler's other cases are even less persuasive.  *In re Tom Stimus Chrysler-Plymouth, Inc*., 134 B.R. 676, 678-79 (Bankr. M.D. Fla. 1991), said no "discussion" was necessary on preemption -- and thus can have no persuasive authority. Similarly, *In re City of Vallejo*, 403 B.R. 72 (Bankr. E.D. Cal. 2009), simply cites to section 365 and the Supremacy Clause rather than discuss the issue.  None of these cases addresses Chrysler's obligation to follow state law under 28 U.S.C. § 959.

54.     Chrysler presents no evidence of a Congressional intent to eliminate statutory protections required for field preemption.  *Silkwood*, 464 U.S. at 248 (field preemption occurs where "Congress evidences an intent to occupy a given field").  Indeed, the only evidence of intent is Congress' desire *not* to affect consumer protection laws that are very similar to the Dealer Laws.  H.R. Rep. No. 595, 95th Cong., 1st Sess. 343 (1977); reprinted in 1978 U.S. Code Cong. & Admin. News 5963, 6299 (consumer protection laws are exempt from the automatic stay).  Nor does Chrysler present a conflict with the "purposes and objectives of Congress"

necessary for conflict preemption. *Barnett Bank, N.A. v. Nelson*, 517 U.S. 25, 31 (1996). It claims instead that *any* limitation related to termination is preempted regardless of the effect on the dealers and their communities. Chrysler's desire for a painless bankruptcy (for itself) is insufficient to preempt applicable state law in a highly regulated industry.

55.    This thin showing does not establish that section 365 abrogates statutory obligations (like those under consumer protection laws) that are independent of any contract. Dealer Laws reflect deeply-rooted public policy and protect decades-long investments in brands and communities. *See, e.g., Britelink, Inc. v. Telecorp PCS, Inc*., 2004 U.S. Dist. LEXIS 29683, *23-25 (E.D. Ark. May 7, 2004) (franchise protections "reflect fundamental public policy decisions"); *Dayan v. McDonald's Corp*., 125 Ill. App. 3d 972, 992 (1984) (same). These laws are so important that willful violations are a felony in some states, *Electrical & Magneto Serv. Co. v. AMBAC Int'l Corp*., 941 F.2d 660, 663 (8th Cir. 1991), and many contain explicit anti-waiver clauses. *Gabana Gulf Distrib. v. Gap Int'l Sales, Inc*., 2006 U.S. Dist. LEXIS 59799, 19-20 (N.D. Cal. Aug. 14, 2006); Wis. Stat. 135.025(3); Rhode Island Gen. L. 35-5.1-14. The rejection of *contracts* under section 365 does not preempt a statutory scheme that, at least where rejection is concerned, renders the contracts largely irrelevant.

56.    By eliminating safeguards that *every* state has found to be necessary, preemption of the Dealer Laws would also vitiate the purpose of the Bankruptcy Code. Immediate termination of 789 dealerships will result in a cascade of hundreds of unnecessary bankruptcies for dealers and their suppliers, unemployment, and a waste of cars, tools, and inventory. Affected Dealers will lose millions to save Chrysler pennies. Such unnecessary waste contravenes the purpose of the Bankruptcy Code "to minimize a fiscal chaos and disruption, not to aggravate it." *In re Friarton Estates Corp*., 65 B.R. 586, 594 (Bankr. S.D.N.Y. 1986) (citation

omitted).  "Congress's purpose in enacting the Bankruptcy Act was not to mandate that every company be reorganized at all costs."  *Baker & Drake, Inc. v. Public Serv. Comm'n (In re Baker & Drake, Inc.)*, 35 F.3d 1348, 1354 (9th Cir. 1994).  Debtors have failed to meet their burden of showing that the Dealer Laws are preempted.

> **A.     Even if Some Provisions of Dealer Laws are Preempted, the Procedural Protections are Not Preempted**

57.     Even if section 365 preempts the Dealer Laws from preventing the contractual termination, it does not abrogate the independent statutory rights governing the procedures subsequent to termination.  The Dealer Laws set forth fair and equitable procedures to unwind a dealership after a termination has occurred, including the disposition of cars, accessories, and tools that are valuable to Chrysler but have little value for Affected Dealers.

58.     There is no conflict between procedures meant to ensure a fair termination and the Bankruptcy Code.  For example, in *Robinson v. Michigan Consol. Gas Co.*, 918 F.2d 579, 588 (6th Cir. 1990) (emphasis added), the Sixth Circuit refused to find preemption of state law *procedures* for termination of utility service, even though the Code allows for termination: "Although 11 U.S.C. § 366(b) does not stand in the way of utility termination in this case, ***it does not control the procedure by which such termination may occur.***  It does not, therefore, preempt state and municipal procedural regulations."  *See also In re Friarton Estates Corp.*, 65 B.R. at 594 (refusing to preempt New York City rent-control laws); *In re Kennise Diversified Corp.*, 34 B.R. at 245 ("The provisions of the Bankruptcy Code do not and are not intended to provide an automatic mechanism for relieving property owners of the unpleasant effects of valid local laws embodying police and regulatory provisions.").

59.     Among other things, Dealer Laws provide the procedural safeguard of 60 or 90 days notice before termination that allows dealers and employees time to order their affairs and

dispose of assets in an orderly fashion.    Most also impose buy-back requirements for

terminations with or without cause.  *See, e.g*., Conn. Gen. Stat. § 42-133f(c); Haw. Rev. Stat. §

482E-6(3); Md. Code Ann. Com. Law §11-1304; Mich. Comp. Laws § 445.1527(d); Wis. Stat.

Sec. 135.045.  This buy-back is especially important because the dealer can no longer sell new

cars as "new" and will no longer need many of the parts.  The laws also determine what kinds of

damages are available upon termination, such as for loss of goodwill, lost profits, and double or

treble damages.  *See, e.g*., Conn. Gen. Stat. §42-133 (g)(a); Haw. Rev. Stat. § 482E-6; Ill. Comp.

Stat. ch. 815, 705/26; Ind. Code Ann. §23-2-2.7-4, Iowa Code § 523H.6, 523H.13; Minn. Stat.

Ann. § 80C.17(3); Miss. Code Ann. § 75-24-57; Mo. Rev. Stat. § 407.410; Neb. Rev. Stat. § 87-

409; N.J. Stat. Ann. § 56:10-10; Ohio Rev. Code § 4517.65; Va. Code Ann. § 13.1-571; Wash.

Rev. Code Ann. § 19.100.190(3); Wis. Stat. § 135.06.  These procedures do not conflict with

section 365 -- the only conflict is with Chrysler's wish to close every Affected Dealers within

three weeks.

60.    Nor does preemption protect Chrysler from state laws that prohibit retaliation

against dealers when deciding which dealers to close.  *See, e.g., Ford Motor Credit Co. v.

Garner*, 688 F. Supp. 435, 445 (N.D. Ind. 1988) (franchisor must not retaliate when choosing

which franchisees to close).  State laws bar consideration of metrics that Chrysler appeared to

use when making its list, such as advertising, parts ordering, and carrying other lines.  *See* 63 P.S.

§ 818.12(6) (maker cannot tell a dealer to refrain from acquiring another dealership); Ark. Stat.

23-112-403(a)(1) (maker cannot coerce dealers into ordering parts or participate in advertising

programs); *see also* Hawaii Rev. Stat. § 482E-6(2)(C) and (H); Wash. Rev. Code §

19.100.180(2)(c) and (i); Iowa Code, Title XIII, § 523H.8.

**B.    Even if Some Provisions of Dealer Laws Would Otherwise Be Preempted, 11 U.S.C. § 959 Mandates that Debtors Comply with the State Laws**

61.    Regardless of the general preemptive reach of the Bankruptcy Code, Congress has refused to allow debtors to violate state law with impunity.  28 U.S.C. § 959 specifically orders debtors to operate "according to the requirements" of state law.  *Midlantic Nat'l Bank v. New Jersey Dep't of Environmental Protection*, 474 U.S. 494, 505 (1986) (section 959 shows "Congress did not intend for the Bankruptcy Code to pre-empt all state laws that otherwise constrain the exercise of a trustee's powers").  Section 959 curtails an overly aggressive use of the Bankruptcy Code (it is a *limitation* on the Code, after all) to run roughshod over state laws, and its power is at its apex when requiring debtors to comply with statutes based on public policy, such as consumer protection laws.  *In re White Crane Trading Co.*, 170 B.R. 694, 705 (Bankr. E.D. Cal. 1994) ("Since section 959(b) admits no exceptions, the court cannot carve out an exemption from state [consumer protection] law.").  As discussed above, state Dealer Laws embody some of the most important public policies of state law.

62.    In considering the reach of section 959, courts often look to the "police and regulatory power" exception under 11 U.S.C. § 362(b)(4).  *In re Friarton Estates Corp.*, 65 B.R. at 590 (considering both section 959 and 362 to resolve an "apparent conflict between state and federal law"); *In re Synergy Dev. Corp.*, 140 B.R. 958, 961 (Bankr. S.D.N.Y. 1992) (same).  Although limiting section 959 to the reach of section 362 would interpret it into redundancy, the illustration is helpful because "[c]onsumer protection is included in the ambit of the [state] government's police and regulatory powers" under § 362(b)(4).  *In re Synergy Dev. Corp.*, 140 B.R. at 961; H.R. Rep. No. 595, 95th Cong., 1st Sess. 343 (1977); reprinted in 1978 U.S. Code Cong. & Admin. News 5963, 6299 (same).  And consumer protection laws are parallel in many respects to the Dealer Laws.

27

63.     In both situations, a sophisticated, powerful party provides a non-negotiable form contract to a party with little bargaining power.  In response, state legislatures have enacted strong protections for both consumers and automobile dealers.  *Hal Artz Lincoln-Mercury, Inc. v. Ford Motor Co.*, 1992 Ohio App. LEXIS 4883, at *5 (Sept. 24, 1992) ("Against a backdrop of abusive and unfair franchise practices by the powerful automobile manufacturing industry, the federal government and many states enacted motor vehicle franchise legislation to protect motor vehicle dealers from such abuses and essentially change the balance of economic power between these enterprises."); *Shell Oil Co. v. Marinello*, 63 N.J. 402, 409 (1973) (franchise statute "reflects the legislative concern over long-standing abuses in the franchise relationship").  This strong public policy of giving dealers the same protections as consumers is the basis of an important regulatory scheme, whether recognized under section 959 or section 362.

64.     At a minimum, the mixed federal policies of the Bankruptcy Code and section 959 caution that this Court must balance Chrysler's interests with those of the states.  This is especially important because the state interest is so high -- ignoring state laws will affect tens of thousands of employees and their families and communities.

65.     Ironically, Chrysler's focus on closing the dealerships *immediately* violates the state laws that are most exempt from preemption.  The notice provisions in the Dealer Laws are purely regulatory.  They provide fairness and social order and cannot be preempted by the Bankruptcy Code.  Those statutes help employees find new jobs, avoid panic in small towns, prevent fire-sale liquidations, and allow time to re-tool (and secure funding) for a different business model.  *Electrical & Magneto Serv. Co.*, 941 F.2d at 664 ("the ninety-day notice requirement . . . represents fundamental public policy of Missouri"); *Britelink*, 2004 U.S. Dist. LEXIS 29683, 23-25 ("notice provisions" "reflect[] public policy which is fundamental under

these circumstances"). This is particularly relevant because Chrysler pressured the very same dealers that it intended to close down to buy new cars in the months leading up to bankruptcy.

### C.     The Federal Automobile Dealers' Day in Court Act Does Not Allow Preemption of the Dealer Laws

66.     The Court has further grounds for rejecting Debtors' preemption arguments under the Automobile Dealers' Day in Court Act, 15 U.S.C. § 1221, *et seq*. ("Dealers' Act"). Congress enacted the Dealers' Act as a remedial statute to redress the economic imbalance and unequal bargaining power between large automobile manufacturers and local dealerships, protecting dealers from unfair termination and other retaliatory and coercive practices. *See, e.g., In re Frank Meador Buick*, 13 B.R. 841, 844 (W.D. Va. 1981) ("The Dealers' Day in Court Act is a remedial statute aimed at curtailing coercive behavior by manufacturers in dealing with their franchise's dealers."); *Bronx Chrysler Plymouth, Inc. v. Chrysler Corp.*, 212 F. Supp. 2d 233, 239 (S.D.N.Y. 2002) ("ADDCA permits a car dealer to sue a manufacturer for its failure 'to act in good faith in performing or complying with any of the terms of the franchise, or in terminating, canceling or not renewing the franchise with [the] dealer.'") (quoting 15 U.S.C. § 1222); *Fox Motors, Inc. v. Mazda Dist. (Gulf), Inc.*, 806 F.2d 953, 959-60 (10th Cir. 1986) (affirming jury verdict that manufacturer had "crossed the line" between promoting competition among dealers and impermissibly causing termination). These are exactly the same concerns animating the state Dealer Laws.

67.     The Dealers' Act, which authorizes actions where manufacturers fail to act in good faith in "terminating, canceling, or not renewing" a franchise," is not preempted by anything in the Bankruptcy Code. 15 U.S.C. § 1222. Manufacturers must "act in a fair and equitable manner" without "coercion, intimidation, or threats of coercion or intimidation." 15

U.S.C. § 1221(e).  Many of the Affected Dealers may have claims under the Dealers' Act, which are independent of the contracts and which sound in tort (and are thus administrative claims).

III.  **Section 525 Does Not Permit Debtors to Obtain a Prospective Injunction on Behalf of New Chrysler and the Non-Rejected Dealers Against "Any Interference" By Unascertained Government Entities and the Affected Dealers**

68.     Debtors also seek a prospective injunction against "any interference" with New Chrysler by "Government Entities" and any other parties, including the Affected Dealers. Notwithstanding the fact that the relief sought by Debtors is hopelessly vague, it fails to comply with the requirements of Bankruptcy Rule 7001 that injunctive relief must be sought through an adversary proceeding.  Such relief in this context would accordingly violate fundamental due process by not providing these unidentified Government Entities and other affected parties with notice and an opportunity to be heard.  Further, Debtors lack standing to pursue a prospective injunction on behalf New Chrysler (or another hypothetical buyer) and the non-rejected dealers, and the Court lacks jurisdiction to entertain such a proceeding.  Even if Debtors could clear this myriad of procedural hurdles, it is doubtful that New Chrysler (or another hypothetical buyer) and the non-rejected dealers are even afforded protection on section 525 of the Bankruptcy Code.

A.     **Debtors May Not Obtain an Injunction under Section 525 Because Such Relief May Only be Sought as Part of an Adversary Proceeding**

69.     Bankruptcy Rule 7001 provides that a request for an injunction ***must*** be commenced by filing an ***adversary proceeding***.  An injunction cannot be obtained through a motion to reject executory contracts in the main case.  *See, e.g., Kish v. Verniero (In re Kish)*, 221 B.R. 118, 140 (Bankr. D.N.J. 1998) ("The court further notes that an action against a state official for declaratory or ***injunctive*** relief . . . to terminate an ongoing violation of bankruptcy law will presumably require an adversary proceeding.") (emphasis in original); *In re Martin*, 268 B.R. 168, 172 (Bankr. E.D. Ark. 2001) ("In order to ensure that due process and property rights

are preserved, Rule 7001 . . . requires that a request to obtain an injunction, or other equitable relief be filed as an adversary proceeding. . . .  Since, the debtor may not obtain an injunction by motion, the motion must be denied."); *In re Williston Oil Corp.*, 54 B.R. 10, 12 (Bankr. D.N.J. 1984) (Chapter 11 debtor in possession cannot obtain equitable relief moving state's environmental enforcement proceeding to Bankruptcy Court because Bankruptcy Rule 7001(7) requires that debtor file an adversary proceeding and debtor instead chose to make motion in main case); *In re Southern Inst. for Treatment and Evaluation, Inc.*, 217 B.R. 962, 964 (Bankr. S.D. Fla. 1998) (in action for relief under § 525 and other provisions, the court found that the debtor's failure to file an adversary proceeding precluded injunctive relief).  Because Debtors have simply tacked on their request under section 525 for an injunction against "any interference" with New Chrysler by Government Entities, Affected Dealers and other parties as part of their Motion to Reject in the main proceeding, and not by filing an adversary proceeding, the request should be denied.

70.     In addition to the fact that Rule 7001 precludes the requested relief, the Debtors' attempted end run around the due process rights of the unidentified Government Entities, Affected Dealers and other parties also precludes it.  It is well-established that an injunction may not apply to persons who are not parties to the proceeding.  *See, e.g., Chase Nat'l. Bank v. Norwalk*, 291 U.S. 431, 436-37 (1934) (finding injunction clearly erroneous where it extended to "all persons to whom notice of the injunction should come" because it purported to affect rights of those who had "not been adjudged according to law."); *United States v. Kirschenbaum*, 156 F.3d 784, 796 (7th Cir. 1998) (finding injunction that purported to enjoin a non-party to be void).  Accordingly, Debtors' request for an injunction under section 525 should be denied.

**B.      Debtors May Not Obtain an Injunction under Section 525 Because They Lack Standing to Assert the Rights of New Chrysler and the Non-Rejected Dealers and Because this Court Lacks Jurisdiction**

71.      Perhaps an even more fundamental flaw in the Debtors' request for a prospective injunction, is that they lack standing to assert claims of a hypothetical purchaser, and the Court lacks jurisdiction to protect such a purchaser from theoretical future violations of section 525(a).

72.      It is axiomatic that a debtor has no standing to pursue the rights of another party. *See, e.g., Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004) (general rule that a party must assert his own legal rights and interests can only be overcome by showing a "close relationship" with third-party *and* that the third-party is unable to pursue its own rights); *Raghavendra v. Trustees of Columbia Univ.*, 06 Civ 6841, 2008 U.S. Dist. LEXIS 51995, at *33-38 (S.D.N.Y. Jul. 7, 2008) (denying motion for preliminary injunction on behalf of unidentified third parties due to lack of standing and other deficiencies).   Thus, Debtors have no standing here to seek a prospective injunction for New Chrysler (or another hypothetical purchaser) and the non-terminated dealers.

73.      Even if New Chrysler (or another hypothetical purchaser) and the non-terminated dealers were to seek the injunction themselves, this Court would lack jurisdiction to entertain it because an injunction under section 525 is neither a core proceeding, nor a related proceeding. *Monaco v. Dept. of Educ. (In re County Schools, Inc.)*, 163 B.R. 424, 430-31 (Bankr. D. Conn. 1994).   In *County Schools*, the purchasers of a bankrupt school's assets, who were officers and owners of the bankrupt, brought an adversary proceeding under section 525(a) against the Department of Education to enjoin it from disqualifying them from participating in federal programs due to their affiliation with the debtor.   The court raised *sue sponte* the issue of its subject matter jurisdiction under 11 U.S.C. § 157.   It concluded that the proceeding was not a "core proceeding" because it was not integral to the administration of bankruptcy estate.   *Id.* at

430.  Nor was the proceeding "related" because its outcome would not affect the amount of property available for the creditors.  *Id.  See also Betty Owen Schools, Inc. v. Dept. of Educ. (In re Betty Owen Schools, Inc.)*, 195 B.R. 23, 29-30 (Bankr. S.D.N.Y. 1996) (in adversary proceeding under section 525 the court was constrained by jurisdictional limitations over non-debtor's claim and considered its motion only to the "limited extent" that non-debtor's motion was effected by the debtor's section 525 motion).

74.  The same is true here.  Theoretical "interference" by Government Entities or the Affected Dealers against New Chrysler (or another hypothetical buyer) and the non-terminated dealers will not affect the administration of the Debtors' estates, nor will it affect the amount of property available to the creditors of the Estate.  And unlike *Betty Owen*, New Chrysler (or another hypothetical buyer) and the non-terminated dealers cannot even seek adjudication of such a claim to a "limited extent," because Debtors do not themselves seek protection under section 525, as they will no longer be operating.  Accordingly, the Court lacks jurisdiction to hear such theoretical claims involving hypothetical parties.

**C.  Debtors are Not Entitled to Relief under Section 525 Because New Chrysler and the Non-Rejected Debtors are Not Covered by Section 525 and Because the Conduct debtors Seek to Enjoin is Not "Discrimination"**

75.  Notwithstanding the foregoing hurdles that Debtors cannot clear, New Chrysler (or another buyer) and the non-terminated dealers, as buyers of the Debtors' assets and former customers of Debtors, are not afforded protection under section 525 as parties "associated with" a debtor.  *See In re Draughon Training Inst., Inc.*, 119 B.R. 927, 933 (Bankr. W.D. La. 1990).  In *Draughon*, the debtor argued that the Department of Education's refusal to transfer the debtor's licenses, accreditation, and certification to the purchaser of its assets constituted discrimination under section 525(a).  The court found no violation of section 525 as to the debtor.  *Id.* at 933.

Moreover, the court held that "although § 525 also prohibits discriminatory treatment of one who has been associated with a debtor, ***this Court finds that this protection more properly extends to one who has been a co-owner, co-obligor, co-debtor, joint venturer, partner, agent, representative, or spouse of the debtor, rather than a transferee of the debtor***." *Id.* (emphasis added).

76.    Even substantively, the "interference" that Debtors seem to be seeking to prevent would *not* constitute "discrimination" under section 525. As the Supreme Court held, "section 525 means nothing more or less than that the failure to pay a dischargeable debt must alone be the proximate cause of the cancellation--the act or event that triggers the agency's decision to cancel, whatever the agency's ultimate motive in pulling the trigger may be." *FCC v. NextWave Pers. Communs. Inc*., 537 U.S. 293, 301-02 (2003).

77.    By contrast, actions by Government Entities that would result from Chrysler's decision to violate state regulations, is not discrimination for the failure to pay debts. For example, in *Yates v. District of Columbia (In re Yates)*, 2006 Bankr. LEXIS 4203, *20-23 (Bankr. D. Md. Nov. 3, 2006), the court allowed the District of Columbia to impose a surety bond requirement "to redress the Debtor's fraudulent and improper business practices in the District." Because the proximate cause of the action was the debtor's fraudulent activities, not the bankruptcy, section 525 could not apply. *Id*. Same would be true here, enforcement of the Dealers Laws by Government Entities against New Chrysler and/or the non-rejected dealerships would be the proximate cause of Chrysler's failure to pay debts, but rather would flow from the failure to comply the procedures mandated by the Dealer Laws.

78.      Accordingly, the Court should reject Debtors' improper attempt to prospectively

seek an injunction against Government Entities and Affected Dealers on behalf of New Chrysler

(or another hypothetical purchaser) and the non-terminated dealers.

**IV.    The Motion to Reject Should be Denied Because Debtors are Not Entitled to a
Declaration Regarding the Effect of the Requested Contract Rejection**

79.      Under the guise of a motion under section 365 of the Bankruptcy Code, Debtors

seek far-reaching and unprecedented relief, including:  (1) a declaration that all of the Debtors'

"unperformed obligations" under the rejected agreements give rise to dischargeable prepetition

damages claims (Motion to Reject at ¶¶ 61-63); and (2) a declaration that a rejection of the

agreements is the "conclusion of the commercial relationship and cuts off the rights of the

Affected Dealers thereunder, except to the extent that the Affected Dealers may wish to pursue

rejection damages in this Court." (Motion to Reject at ¶ 66).  As discussed above, an injunction

or declaratory judgment may be obtained only as part of adversary proceeding.  Further, this

relief cannot be obtained here because claims arising from breach of the Dealer Laws are entitled

to administrative priority, and because there is no legal basis to permit the Debtors to pre-

determine the priority of any and all claims that the Affected Dealers will undoubtedly incur as a

result of the contemplated rejections.[4]

80.      First, claims arising from the Dealer Laws must be accorded administrative

priority.  Under *Reading Co. v. Brown*, 391 U.S. 471, 484 (1968), claims "arising from acts

committed by the debtor in possession which give rise to tort liability are accorded

administrative expense status." *Houbigant, Inc. v. ACB Mercantile (In re Houbigant, Inc.)*, 188

---

[4] Notably, the Official Committee of Unsecured Creditors (the "Creditors Committee") supports the Dealer
Committee's argument.   In its Statement (Doc No. 1846), the Creditors Committee states:  "The Debtors have
sought to reject contracts and leases with orders that purport to specify the consequences of rejection.  **The law
provides no basis for this.  Upon rejection, a non-debtor party has or may have rights under applicable
bankruptcy and non-bankruptcy law, and the rejection order should not attempt to limit or abridge those
rights.**" Statement, Exhibit A at p. 3 (emphasis supplied).

B.R. 347, 356-57 (Bankr. S.D.N.Y. 1995).   And there is no question that violations of statutory

rights, including violations of the termination provisions of state dealer laws, are torts.  *Midwest*

*Great Dane Trailers v. Great Dane Ltd. Pshp.*, 977 F. Supp. 1386, 1395 (D. Minn. 1997)

(breaching a "statutory duty" regarding termination under a Minnesota dealer's statue was a tort);

*In re Charlesbank Laundry, Inc.*, 755 F.2d 200, 203 (1st Cir. 1985) ("an intentional act which

violates the law" should receive priority); *see also In re Caldor, Inc.*, 240 B.R. 180, 195 (Bankr.

S.D.N.Y. 1999) (rejecting administrative claim status because the debtor "simply breached a

contract" and did not "violate[] any state law").   While a breach of contract may normally be

deemed a prepetition claim, a debtor-in-possession's violation of a statutory duty under state law

is a tort that creates an administrative claim.

   81.   This result flows naturally from the post-filing decision of both Chrysler and New

Chrysler to attempt to operate the business without the Affected Dealers.   Such a violation of the

state Dealer Laws would merely be incidental to its long-term business decisions.  *Mass. Div. of*

*Empl. and Training v. Boston Reg'l Med. Ctr. (In re Boston Reg'l Med. Ctr.)*, 291 F.3d 111, 124-

25 (1st Cir. 2002) ("Payments in lieu are costs incident to operation of a business -- or, at least,

to operation of a nonprofit organization that has not chosen to make contributions.").   Chrysler

cannot escape the natural consequences of its economic decisions after filing.  *See, e.g., Texas v.*

*Lowe (In re H.L.S. Energy Co.)*, 151 F.3d 434, 438 n.4 (5th Cir. 1998) ("[T]he trustee likely

could have avoided the need to plug the wells by resuming production, but made a rational

economic calculation to cease production. Such a calculation, however, must include the cost of

plugging operations as a cost of ceasing production."); *see also In re White Crane Trading Co.*,

170 B.R. 694, 702 (Bankr. E.D. Cal. 1994) (a debtor-in-possession must "manage and operate

the debtor's property and business in compliance with state laws -- good, bad, and indifferent --

that apply outside of bankruptcy"). The planned dealer network restructuring in violation of state law if permitted, would result in tort liability by Chrysler to the Affected Dealers for which administrative expense priority will be accorded.

82. Moreover, there is no legal basis to permit the Debtors to pre-determine the priority of any and all claims the Affected Dealers will undoubtedly incur as a result of the contemplated rejections. Nor should they be permitted "for the avoidance of doubt" to shovel as many categories of claims as possible into a single category which "must be asserted only as Rejection Damages Claims." (Motion to Reject at ¶ 63). Indeed, in their Motion to Reject, Debtors ask this Court to declare that the following claims may only be asserted as damage claims in this Court.

- The repurchase of unsold inventories of vehicles and parts;

- Payment assistance in connection with Affected Dealers' obligations to third parties;

- Payment of incentives, commissions or other compensation for having sold vehicles or parts;

- Alleged loss of future profits or other consequential damages;

- Payment of any amounts claimed to be due under any statutes governing the termination, nonrenewal, cancellation or discontinuance of the dealership agreements or franchise rights; and

- Alleged damages suffered as a result of the loss of rights and benefits under Dealer Laws.

(Motion to Reject at ¶ 63).

83. Section 502(g) of the Bankruptcy Code provides that damages resulting from the rejection of an executory contract are treated as general unsecured claims. *See NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 531 (1984) (citing section 502(g) and holding "damages on the contract that result from the rejection of an executory contract, as noted, must be administered

through the bankruptcy and receive the priority provided general unsecured creditors."). Generally, creditors are entitled to file their claims, and the debtor is entitled to object to such claims, as they see fit. As with everything else in these cases, however, the Debtors are trying to move at light-speed and side-step established processes in seeking to pre-determine the priority of any and all claims the Affected Dealers may be entitled to assert in relation to the rejection of the Rejected Dealer Agreements. The Debtors will have ample opportunity to object to any claims filed by the Affected Dealers. There is no justification for seeking a determination at this juncture that might foreclose arguments that the Affected Dealers are entitled to assert relative to the priority of their claims at a later date.

84.    Moreover, the term "rejection damages" refers to damages resulting from the rejection of an executory contract. *See NLRB v. Bildisco & Bilsdisco*, 465 U.S. at 531. While the Debtors initially limit the "rejection damages" to unperformed obligations *under the proposed rejected dealer agreements*, they subsequently expand this category to include, among others,  rights to payment of *any* amounts claimed to be due under *any* statutes governing the termination, nonrenewal, cancellation or discontinuance of the dealership agreements or franchise rights. The Debtors cite to no case law in support of the proposition that rights to payment under such statutes constitute "damages" at all, let alone damages resulting from the rejection of the franchise agreements. There is simply no basis on which to justify pre-determining these claims as rejection damages claims.

85.    The Debtors also seek Court recognition that they "are concluding their commercial relationships with the Affected Dealers" and through rejection they are "mak[ing] a clean and complete break from their business relationships with the Affected Dealers." (Motion to Reject at ¶ 64). Notwithstanding such request, however, the Debtors then inexplicably take

the position that certain agreements (*i.e.,* the "Site Control Agreements") between Debtor Chrysler Realty Company LLC and the Affected Dealers will remain in effect. (Motion to Reject at ¶ 22 n.7). Of course, they do not attach any sample Site Control Agreements. Nor do they explain the content of the agreements or how the Debtors can conclude their business relationships with the Affected Dealers yet maintain rights under these agreements.

86.    In addition, the Debtors' request for a declaration that rejection "concludes the relationship" between the Affected Dealers and the Debtors (Motion to Reject at ¶ 64), likewise overreaches. Again, a declaratory judgment cannot be sought, let alone obtained, outside of an adversary proceeding and, in any case, the plain language of section 365(g) makes clear that the rejection of an executory contract constitutes only a pre-petition breach, not a termination or conclusion, of the contract (unless, of course, there is a basis for it to be an administrative claim as described above). 11 U.S.C. § 365(g).

87.    The Second Circuit, time and again, has made it abundantly clear that the rejection of an executory contract does not terminate the contract. *See Medical Malpractice Insurance Association v. Hirsch (In re Lavigne)*, 114 F.3d 379, 386 (2d Cir. 1997) ("If the contract has not been previously assumed, rejection of the debtor's executory contract constitutes a breach of the contract."); *COR Route 5 Co., LLC v. The Penn Traffic Company (In re The Penn Traffic Company, et al.)*, 524 F.3d 373, 378 (2d Cir. 2008) ("Rejection is in effect a decision to breach the contract or lease."). Rather, "rejection merely frees the estate from the obligation to perform; it does not make the contract disappear." *Lavigne*, 114 F.3d at 386-87 (quoting *In re The Drexel Burnham Lambert Group*, 138 B.R. 687, 703 (Bankr. S.D.N.Y. 1992)).

88.    Additionally, while the Bankruptcy Code treats rejection as a breach, it is state law that determines the rights of the parties to the contract and the effects of the breach.

*Id.* at 387 ("However, the Bankruptcy Code does not determine parties' rights regarding the contract and subsequent breach. To determine these rights, we must turn to state law."); *see also In re Drexel Burnham Lambert Group, Inc.*, 138 B.R. at 709 ("Consistent with bankruptcy law's general deference to state-law rights in or to specific property, rejection of a contract does not terminate such rights that arise from rejected contracts. Rejection is not itself an avoiding power.").

89.    Here, the proposed rejection of the dealer agreements will serve to breach, not terminate, the agreements. The effect of the breach will be to simply free the Debtors from their obligations to *perform under the agreements*. The rejection will neither terminate the agreements, nor eradicate the Debtors' obligations under relevant state laws that protect the Affected Dealers. Nor can the Court enter an order prohibiting the Affected Dealers from discussing (or seeking relief from) the Government Entities without running afoul of the First Amendment. Accordingly, the Motion to Reject should be denied.

## **MEMORANDUM OF LAW**

90.    The Dealer Committee submits that the points and authorities set forth above satisfy the requirements of Local Bankruptcy Rule for the Southern District of New York 9013-1(b).

WHEREFORE, the Committee of Chrysler Affected Dealers respectfully requests that the Court deny the Motion to Reject.

Respectfully submitted,

Dated: May 25, 2009

s/Stephen D. Lerner
Stephen D. Lerner
Robert A. Wolf
SQUIRE, SANDERS & DEMPSEY, L.L.P.
1095 Avenue of the Americas, 31st Floor
New York, New York 10036
Phone: (212) 872-9800
Fax: (212) 872-9815

Mark J. Ruehlmann (pro hac vice)
Amy L. Brown (pro hac vice)
Jeffrey A. Marks (pro hac vice)
Pierre H. Bergeron (pro hac vice)
SQUIRE, SANDERS & DEMPSEY, L.L.P.
221 East Fourth Street, Suite 2900
Cincinnati, Ohio 45202
Phone: (513) 361-1200
Fax: (513) 361-1201