UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

_____

|   |   |   |
|---|---|---|
| | : | |
| In re | : | Chapter 11 |
| | : | |
| CHRYSLER LLC, *et al.*, | : | Case No. 09 B 50002 (AJG) |
| | : | |
| Debtors. | : | (Jointly Administered) |
| | : | |

_____:

OPINION GRANTING DEBTORS' MOTION
SEEKING AUTHORITY TO SELL, PURSUANT TO 11 U.S.C. § 363,
SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS

Before the Court is a motion seeking authority to sell substantially all of the debtors'

operating assets, free and clear of liens, claims, interests and encumbrances to a successful

bidder and to authorize the assumption and assignment of certain executory contracts and

unexpired leases in connection with the sale, as well as certain other related relief.  The sale

transaction for which authorization is sought (the "Sale Transaction" or "Fiat Transaction") is

similar to that presented in other cases in which exigent circumstances warrant an expeditious

sale of assets prior to confirmation of a plan.  The fact that the U.S. government is the primary

source of funding does not alter the analysis under bankruptcy law.

*FACTS*[1]

On April 30, 2009 (the "Petition Date"), Chrysler LLC ("Chrysler") and 24 of its

domestic direct and indirect subsidiaries (collectively with Chrysler, the "Original Debtors")

filed for protection under title 11 of the United States Code (the "Bankruptcy Code").  On May

---

[1]The findings of fact and conclusions of law herein shall constitute the Court's findings of fact and
conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy
Rule 9014.  To the extent any finding of fact later shall be determined to be a conclusion of law, it shall be so
deemed, and to the extent any conclusion of law later shall be determined to be a finding of fact, it shall be so
deemed.  Further, modifications and amplifications of the findings of facts and conclusions of law herein may be
made in the final order approving the sale.

1, 2009, an Order was entered directing that the Original Debtors' cases be jointly administered for procedural purposes, pursuant to Rule 1015(a) of the Federal Rules of Bankruptcy Procedure. On May 19, 2009, Alpha Holding LP[2] ("Alpha" and with the Original Debtors, the "Debtors") filed a petition for relief under title 11 of the Bankruptcy Code.  On May 26, 2009, an order (the "Alpha Order") was entered directing the joint administration of Alpha's bankruptcy case with the cases of the Original Debtors.[3]  The Debtors continue to operate their respective businesses as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

On May 5, 2009, an Official Committee of Unsecured Creditors (the "Creditors' Committee") was formed.  By order, dated May 1, 2009, the Court approved the Debtors' motion to retain Capstone Advisory Group ("Capstone") to provide financial consulting and advisory services to the Debtors.  On May 20, 2009, subject to the submission of an agreed-upon order, the Court approved the retention of Greenhill & Co., LLC ("Greenhill"), as the Debtors' investment advisor.[4]

On May 14, 2009, the Debtors filed a motion seeking to reject executory contracts and unexpired leases affecting 789 domestic car dealerships.  The motion is currently scheduled to be heard on June 3, 2009.

The Debtors and their non-debtor direct and indirect subsidiaries (collectively, the "Chrysler Companies") comprise one of the largest manufacturers and distributors of

---

[2]Alpha is a holding company that conducts no business other than holding capital stock of Chrysler Canada Inc. and Chrysler Mexico Holding S.de R.L de C.V.

[3]In addition, the Alpha Order provided that, to the extent applicable, (a) any order that previously had been entered in the jointly administered Original Debtors' cases was applicable to Alpha, *nunc pro tunc*, to the date that Alpha filed its bankruptcy petition, and (b) that future orders entered in the Debtors cases would apply to Alpha.

[4]As of this date, an agreed-upon proposed order has not been submitted.

2

automobiles and other vehicles, together with related parts and accessories.  At the Petition Date, Chrysler had 32 manufacturing and assembly facilities and 24 parts depots worldwide; and in addition, at the Petition Date, it had a network of 3,200 independent dealerships in the United States, with 72% of Chrysler sales occurring in the United States.

Prior to the bankruptcy filing, Chrysler had a worldwide annual production of approximately 2 million vehicles under the Chrysler, Dodge and Jeep® brands.  The Debtors primary competitors are other major Original Equipment Manufacturers ("OEM's").  These include domestic OEM's: Ford Motor Company ("Ford") and General Motors Corporation ("GM"), as well as international OEM's that have assembly and/or manufacturing plants in the United States: Toyota Motor Corporation ("Toyota"), Nissan Motor Company ("Nissan"), Honda Motor Company ("Honda"), and Hyundai Motor Company ("Hyundai-Kia").

As of the Petition Date, the Chrysler Companies employed approximately 55,000 hourly and salaried workers, with approximately 70% or 38,500 of that workforce based in the United States.  Approximately 70% or 27,600 of the domestic workforce is covered by a collective bargaining agreement.  In addition, as of the Petition Date, the Debtors made payments for health care and related benefits to over 106,000 retirees.

For the twelve month period ending December 31, 2008, the revenue recorded for the Chrysler Companies was more than $48.5 billion, with assets of approximately $39.3 billion and liabilities of $55.2 billion.  For that same period, the net loss was $16.8 billion.

Chrysler's ultimate parent company is Chrysler Holding LLC ("Holding").  The owners of Holding are Cerberus Capital Management L.P. ("Cerberus") and Daimler AG ("Daimler").  As of the Petition Date, Cerberus or its affiliates held 80.1% of the membership interests in

Holding, and Daimler or its affiliates held 19.9% of its membership interests.

Pursuant to an Amended and Restated First Lien Credit Agreement dated as of November 29, 2007 (the "First Lien Credit Agreement")[5] a $10 billion term loan that matures on August 2, 2013 was made available to Chrysler.  JP Morgan Chase Bank N.A. is the administrative agent (the "Administrative Agent") under the First Lien Credit Agreement.  Chrysler's obligations under the First Lien Credit Agreement are secured by a security interest in and first lien on substantially all of Chrysler's assets.  In addition, those obligations are guaranteed by certain other Debtors.  The guarantees by these "other" Debtors are secured by a first priority lien on substantially all of such Debtors' respective assets.  On the Petition Date, Chrysler owed the first-lien prepetition lenders (the "First-Lien Lenders") approximately $6.9 billion under that term loan.

In addition, under a Second Lien Credit Agreement (the "Second Lien Credit Agreement"), Chrysler received a $2 billion term loan that is scheduled to mature on February 3, 2014.  The $2 billion loan is comprised of $1.5 billion from Daimler Financial, an affiliate of Daimler and $500 million from Madeleine LLC, an affiliate of Cerberus.  The Second Lien Credit Agreement provides that these second-lien prepetition lenders hold a second-priority security interest in the same collateral that secures the First Lien Credit Agreement.

In late 2008, Congress promulgated the Emergency Economic Stabilization Act of 2008 ("EESA") Pub. L. NO. 110-343, 122 State. 3765 (Oct. 3, 2008) (codified at 12 U.S.C. §§ 5201 *et seq*.), which established the Troubled Asset Relief Program ("TARP").  TARP authorizes the

---

[5]The First Lien Credit Agreement actually amended and restated an original first lien credit agreement that was issued on August 3, 2007.  Subsequently, on January 2, 2009, April 6, 2009, and April 24, 2009, the First Lien Credit Agreement was further amended.

Secretary of the Treasury to purchase troubled assets to restore confidence in the economy and stimulate the flow of credit.

Pursuant to a Loan and Security Agreement (the "TARP Loan Agreement"), dated as of December 31, 2008, Holding has borrowed $4 billion from the U.S. Treasury for general corporate and working capital, with a maturity of no later than January 2, 2012 (the "TARP Loan").[6] Holding has also provided the U.S. Treasury with a separate promissory note in the amount of $267 million that matures on January 2, 2012 (the "TARP Note" and, together with the TARP Loan, the "TARP Financing"). As security for the TARP Financing, the U.S. Treasury was granted a first-priority lien on all unencumbered assets and Chrysler's MOPAR[7] parts inventory, and a third-priority lien on other assets serving as collateral for obligations owed the first and second lien prepetition lenders.

As of the Petition Date, the Debtors estimate that they had approximately $5.34 billion outstanding debt with trade creditors, including domestic and foreign suppliers, shippers, warehousemen and customs brokers.

*Restructuring Efforts*

In early 2007, prior to filing for bankruptcy, Chrysler initiated an operational restructuring effort that initially met set targets through the first half of 2008. Part of that restructuring included a search for potential partners and strategic alliances that would impact its cost structure and allow it to expand into new products, market segments and geographic locations. Specifically, Chrysler sought a strategic partner with expertise in smaller, more fuel

---

[6]The government had the right to accelerate the entire amount due if Chrysler failed to submit a restructuring plan, or "viability plan," acceptable to the government by February 17, 2009.

[7]Since 1930, Chrysler has operated a vehicle parts division under the MOPAR brand.

efficient vehicles.  Chrysler also sought to increase its size and to have more of a global

presence.  To that end, in 2007 and 2008, Chrysler discussed and negotiated for potential

alliances with GM, Fiat S.p.A ("Fiat"), Nissan, Hyundai-Kia, Toyota, Volkswagen, Tata Motors,

GAZ Group, Magna International, Mitsubishi Motors, Honda, Beijing Automotive, Tempo

International Group, Hawtai Automobiles and Chery Automobile Co.

In the fall of 2008, a global credit crisis affecting the liquidity markets impacted the

availability of loans both to dealers and consumers, resulting in the erosion of consumer

confidence and a sharp drop in vehicle sales.  Chrysler was forced to use cash reserves to

compensate for the reduction in cash flow and the resulting losses.  The losses eliminated the

gains that Chrysler had made early in its restructuring effort.  Moreover, other OEM's were

impacted, forcing them to confront their own liquidity issues.

As a result, in late 2008, Chrysler and other entities sought assistance from the

government to obtain new financing to fund their operations to carry them through the liquidity

crunch.  In response, the TARP Financing was provided.  Chrysler sought $7 billion and they

were given $4 billion.  Pursuant to the terms of the loan, Chrysler was required to submit a plan

showing that it was able to achieve and sustain long-term viability, energy efficiency,

rationalization of costs and competitiveness in the U.S. marketplace (the "Viability Plan"),

which would indicate Chrysler's ability to repay the TARP Financing.

The Debtors used the $4 million TARP Loan to operate their business, including paying

vendors and other ordinary course payables, and to fund their effort to pursue the Viability Plan.

At the same time, Chrysler continued to pursue an alliance with Fiat; Chrysler considered Fiat to

be a good prospect because it viewed Fiat's products and distribution network as complementary

6

to those of Chrysler.

On January 16, 2009, Chrysler entered into a term sheet with Fiat for a strategic alliance (the "Fiat Alliance") pursuant to which Fiat would acquire 35% of the equity of Chrysler and would provide access to competitive fuel-efficient vehicle platforms, distribution capabilities in key growth markets and substantial cost-saving opportunities. The Fiat Alliance also would provide Chrysler with a distribution network outside of the North American region.

The Debtors viewed the Fiat Alliance as strengthening Chrysler for the long-term, thereby maximizing the value of the Debtors' enterprise for the benefit of all constituents, including U.S. taxpayers, employees, creditors, dealers and suppliers. The Fiat Alliance was conditioned on meeting other parts of the Viability Plan. The Debtors continued with their efforts to pursue the Viability Plan and obtain concessions from various stakeholders, including the International Union, United Automobile Aerospace and Agricultural Implement Workers of America (the "UAW"), secured lenders, dealers and suppliers.

On February 17, 2009, Chrysler provided to the U.S. Treasury a submission, which included three potential scenarios (a) a stand-alone restructuring of Chrysler (the "Stand-Alone Viability Plan") with concessions from all key constituents, some of which had already been agreed upon and some of which remained subject to ongoing negotiations; (b) a scenario showing positive synergies from the Fiat Alliance (the "Alliance Viability Plan"), which was Chrysler's preferred alternative and a focus of much of the submission; and (c) an orderly wind-down plan for the Debtors' operations if neither the Stand-Alone Viability Plan nor the Alliance Viability Plan could be achieved. The February 2009 Submission included the proposed concessions from all key stakeholder groups, equity holders, union and non-union employees

7

and retirees, first and second lien prepetition lenders, Chrysler Financial Services Americas LLC,[8] suppliers and dealers.  In addition, in the February 2009 Submission, Chrysler requested additional TARP funding of $5 billion by March 15, 2009 for working capital and other operating expenses.

On February 20, 2009, the President's Auto Task Force[9] (the "Task Force") was put in place to evaluate Chrysler's Viability Plan.  The Task Force retained a group of advisors, including investment bankers and a bankruptcy and restructuring attorney.  The Task Force entered into discussions with Chrysler and its advisors and other key stakeholders, and negotiated with all parties to obtain concessions and agreements.

On March 30, 2009, the Task Force advised Chrysler of the results of its evaluation, which was that Chrysler could emerge as a viable entity with an appropriate strategic partner, such as Fiat.  Further, subject to Chrysler meeting certain other aspects of the Viability Plan and obtaining additional concessions from key stakeholders, the U. S. Treasury indicated that it was prepared to provide additional capital to fund the Viability Plan, if it included a modified Fiat Alliance addressing certain concerns and goals of the U.S. government, and as long as the issues were resolved within 30 days.  Consistent with these goals, a revised term sheet for a Fiat Alliance was signed on March 29, 2009.  The U.S. government agreed to provide Chrysler's

---

[8]Chrysler Financial Services Americas LLC is a non-debtor affiliate of Chrysler, operating under a separate governance structure.  It was formerly Chrysler's car-financing arm, operating to fund vehicle purchases by Chrysler's dealers and end consumer.

[9]The members of the Task Force are top government officials: the Treasury Secretary, the National Economic Council Director, the Secretary of Transportation, the Secretary of Commerce, the Secretary of Labor, the Secretary of Energy, the Chair of the President's Council of Economic Advisers, the Director of the Office of Management and Budget, the Environmental Protection Agency Administrator and the Director of the White House Office of Energy and Climate Change.

working capital needs through April 30, 2009.

Efforts to meet the requirements for a Fiat Alliance and satisfy the concerns of the U.S. government continued. New CarCo Acquisition LLC (the "New Chrysler"), a newly established Delaware limited liability company, was formed by Fiat to serve as an alliance entity.[10] The parties negotiated for a new collective bargaining relationship between the UAW and New Chrysler that will establish, as of the closing date (the "Closing Date") of the sale, a new wage structure and work rules required to implement the Viability Plan. In addition, New Chrysler will enter into a new settlement (the "UAW Retiree Settlement") agreement relating to the settlement Agreement, dated March 30, 2008 (the "2008 Settlement Agreement") in the class action of *Int'l Union UAW, et al. v. Chrysler, LLC*, Case No. 07-CV-14310 (E.D. Mich.), which established a voluntary employees' beneficiary association ("VEBA") structure to fund legacy retiree health care obligations. Under the UAW Retiree Settlement, the 2008 Settlement Agreement would be modified and VEBA would be funded by a combination of a 55% equity interest in New Chrysler and a new $4.587 billion note. The U.S. government required that 50% of the funding for VEBA be in the form of equity of Chrysler.

Chrysler, Fiat and New Chrysler tentatively entered into a Master Transaction Agreement, dated as of April 30, 2009 (collectively with other ancillary and supporting documents (the "MTA"), pursuant to which (a) Chrysler will transfer substantially all of its operating assets to New Chrysler; and (b) in exchange for those assets, New Chrysler will assume certain liabilities of Chrysler and pay Chrysler $2 billion in cash. Prior to the Closing

---

[10]None of the Debtors' equity holders will receive an interest in New Chrysler. There will be a new CEO, among other management changes. Any prepetition creditor of the Debtors who will hold equity in New Chrysler will receive such interest on account of value that each provides to New Chrysler in its efforts to compete effectively in the auto industry.

Date, (a) Fiat will contribute to New Chrysler access to competitive fuel-efficient vehicle platforms, certain technology, distribution capabilities in key growth markets and substantial cost saving opportunities, and (b) New Chrysler will issue Membership Interests in New Chrysler, with 55% going to the VEBA, 8% to the U.S. Treasury and 2% to Export Development Canada.  After the conclusion of the Fiat Transaction, a subsidiary of Fiat will own 20% of the equity of New Chrysler, with the right to acquire up to an additional 31% of New Chrysler's Membership Interest under certain circumstances.[11]

In addition, the parties negotiated with the U.S. Treasury for financing related to the Sale Transaction.  The U.S. Treasury and Export Development Canada (together, the "Governmental Entities") agreed to provide the debtor-in-possession financing for 60 days in the amount of $4.96 billion.  Thereafter, the Governmental Entities agreed to provide a $6 billion senior secured financing facility to support New Chrysler's operations after the sale.

*Procedural History*

On May 1, 2009, at the first hearing before the Court in this case, the Debtors sought approval for expedited hearings for various motions, including a proposed motion they intended to file in which they would seek approval of bidding procedures and to schedule a hearing to consider the sale of the Debtors' assets.  At the May 1st hearing, the Debtors indicated that they would be filing that motion, together with a copy of the proposed bidding procedures, later that evening or the following morning.  Based upon that representation, the Court scheduled the

---

[11]Upon the closing of the sale, the Governmental Entities will hold 12.31% (the U.S. Treasury will hold 9.85% and Export Development Canada will hold 2.46%), VEBA will hold 67.69%, and Fiat will hold 20%.  Upon reaching certain milestones, Fiat's interest will increase to 35%, with the right to acquire an additional 16% by buying shares.  Fiat cannot get control of New Chrysler until the outstanding debts to the U.S. Treasury and Export Development Canada are paid in full.

10

hearing to consider bidding procedures for May 4, 2009 and the hearing to consider the sale of the Debtors' assets for May 21, 2009. In addition, certain objection deadlines were set. The referenced motion, however, was not filed until Sunday evening, May 3, 2009. Consequently, at the May 4th hearing, the Court adjourned consideration of the bidding procedures motion until May 5, 2009.

On May 5, 2009, the Court held a hearing (the "Bidding Procedures Hearing") to consider the bidding procedures. At the conclusion of that hearing, with certain modifications made at the Court's direction, the Court granted the request to approve the bidding procedures. An order to that effect, dated May 7, 2009 (the "Bidding Procedures Order"), was entered. In addition, at the Creditors' Committee request, the date for the hearing to consider the motion (the "Sale Motion") for the sale of the assets was re-scheduled for May 27, 2009, and certain objection deadlines were extended, as well.

On May 19, 2009, the Indiana State Teachers Retirement Fund, Indiana State Police Pension Trust, and Indiana Major Move Construction (the "Indiana Funds"), which oversee the investment of retirement assets for certain civil servants in the state of Indiana, filed an objection to the Sale Motion. The Indiana Funds hold approximately $42 million of the $6.9 billion in first priority secured claims, which represents less than 1% of the first-lien debt. In their objection, the Indiana Funds argue that pursuant to the Sale Motion, the First-Lien Lenders' collateral would be stripped and, in return, those lenders would be paid 29 cents on the dollar. The collateral would then be transferred to New Chrysler, where, according to the Indiana Funds, it would be worth significantly more than the money paid to the First-Lien Lenders. The Indiana Funds further argue that unsecured deficiency claims would not be paid while unsecured trade

11

debt would be paid in full. In addition, the Indiana Funds contend that their senior claims will be impaired while the Governmental Entities, as junior lienholders and VEBA and the UAW, as unsecured creditors, will receive value. The Indiana Funds also object to Fiat receiving a stake in New Chrysler for its grant of access to the "small car" technology without a cash contribution.

In addition, objections to the Sale Motion were filed by numerous Dealers, who had received notices that their dealership agreements were being rejected and, therefore, would not be assigned to New Chrysler. Attorneys General of certain states also filed objections to the Sale Motion regarding the rejection of the dealership agreements, taxing and local government issues, and issues arising under workers' compensation and consumer protection laws. Also, objections were filed by retirees, tort and consumer claimants, holders of mechanics and other liens, certain lessors and parties with cure, setoff or recoupment claims, as well as certain other miscellaneous objectors.

The Court conducted a 3-day evidentiary hearing on May 27th through 29th, 2009, (the "Sale Hearing") to consider the sale of substantially all of the Debtors' assets.[12]

*DISCUSSION*

Section 363(b) of the Bankruptcy Code provides, in relevant part, that after notice and a hearing, a trustee or debtor-in-possession[13] "may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b). In *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1066 (2d Cir. 1983), the Second Circuit was

---

[12]In addition to the value of the remaining assets of the estate not subject to the sale, the U.S. Treasury is providing an additional $260 million to the Debtor to facilitate the wind down of its operations and the filing of a plan.

[13]Pursuant to section 1107 of the Bankruptcy Code, subject to certain limitations, a debtor-in-possession has the rights, powers and duties of a trustee.

12

called upon to determine whether, pursuant to § 363(b) of the Bankruptcy Code, a major asset of

a bankruptcy estate could be sold "out of the ordinary course of business and prior to acceptance

and outside of any plan of reorganization."

The *Lionel* court reviewed the history of a court's administrative power to authorize asset

sales. Initially, in the context of a sale of estate assets prior to a liquidation, authorization for a

sale was granted when the asset was physically perishable, or liable to deteriorate or depreciate

in price and value. *Lionel*, 722 F.2d at 1067 (citing Sec. 25 of the Bankruptcy Act of 1867 (Act

of March 2, 1967, 14 Stat.517); General Bankruptcy Order No. XVIII(3), adopted by the

Supreme Court in 1898; General Order in Bankruptcy No. XVIII, 89 F. viii November 28, 1898);

*In re Pedlow*, 209 F. 841, 842 (2d Cir. 1913)). When reorganizations were introduced, a

procedural rule was promulgated, pursuant to which asset sales prior to reorganization could be

authorized "upon cause shown." *Id*. (citing the Chandler Act of 1938, § 116(3), 11 U.S.C. §

516(3), as applicable to ch. X and § 313(2), 11 U.S.C. § 713(2) as applicable to ch. XI; as well

as, Rules 10-607(b), 11-545 of the Rules of Bankruptcy Procedure applicable in Chapters X and

XI). Nevertheless, courts continued to view such sales as exceptional, and continued to require

that the proponent show that the assets were perishable or that there was an imminent danger that

the asset would deteriorate or depreciate substantially or rapidly in value if prompt action were

not taken, thereby jeopardizing the estate. *Id*. (citing *Frank v. Drinc-O-Matic, Inc*., 136 F.2d 906

(2d Cir. 1943); *In re Loewer's Gambrinus Brewery Co*., 141 F.2d 747, 748 (2d Cir. 1944)). If

this emergent need were shown, however, even sales of substantially all of a debtor's assets

could be authorized. *Id*. (citing *Loewers Gambrinus*, 141 F.2d at 748; *Patent Cereals v. Glynn*,

149 F.2d 711, 712-13 (2d Cir. 1945)). Moreover, if a "wasting asset" that could only deteriorate

13

in value were at issue, a quick sale would be appropriate. *Id*. at 1068 (citing *In re Sire Plan, Inc*.,

332 F.2d 497, 499 (2d Cir. 1964)).

The Bankruptcy Reform Act of 1978 introduced section 363(b), which does not constrain

a court with strict limitations on its ability to authorize the sale of estate assets. *Lionel*, 722 F.2d

at 1069. In analyzing section 363(b), the Second Circuit eschewed a literal interpretation which

would have permitted unfettered use, sale and leasing of estate property outside of the ordinary

course of a debtor's business. *Id*. at 1069-70. The Second Circuit viewed such an interpretation

as undermining "the congressional scheme" established for corporate reorganization. *Id*. at

1066. The court referenced the statutory safeguards included in the Bankruptcy Code that

provided for creditors and equity holders to have a vote on approval of a proposed plan of

reorganization after having been provided with meaningful information concerning such plan.

*Id*. at 1071. The measures to safeguard the rights of constituents include disclosure, solicitation,

voting, acceptance and confirmation of a plan of reorganization. Addressing the concerns of

equity holders, the *Lionel* court concluded that one of the purposes for inclusion of these

safeguards under the Bankruptcy Code was to allow for "a greater voice in reorganization plans"

for equity interests. *Id*. The court indicated certain of the salutary effects of the safeguards that

warranted protection, including that disclosure provided a "fairer" method for reorganization and

that the requirement for acceptance of the plan by a certain percentage of creditors and

stockholders for confirmation promoted negotiations by those parties and the debtor. *Id*. at 1070.

Thus, the court was concerned with adequately protecting the interests of creditors and investors.

Additionally, the court maintained that if § 363(b) had been intended to afford a court

unrestricted discretion to allow a sale, there would have been no need for the requirement of a

14

notice and hearing on the issue. *Id*. at 1069.

The *Lionel* court, however, also recognized the policy considerations that support affording a court the freedom to exercise its broad discretion to tailor orders to meet the particular circumstances presented. *Id*. at 1069. Thus, if a favorable business opportunity is presented that is only available if acted upon quickly, the court has to have the ability to authorize what is best for the estate. *Id*.

In *Lionel*, the Second Circuit established the standard for a court's determination of whether to authorize a § 363(b) sale "prior to acceptance and outside of any plan of reorganization." In that regard, the Second Circuit sought to strike a balance between a debtor's ability to sell assets and a constituent's right to an informed vote on confirmation of a plan.

The *Lionel* court concluded that there has to be some articulated business justification for the use, sale or lease of property outside of the ordinary course of business. *Id*. at 1070. Thus, a court rendering a section 363(b) determination must "expressly find from the evidence presented . . . a good business reason to grant such application." *Id*. at 1071. In making the determination, a court should consider all of the "salient factors pertaining to the proceeding" and "act to further the diverse interests of the debtor, creditors and equity holders." *Id*. The *Lionel* court then set forth a nonexclusive list to guide a court in its consideration of the issue:

- the proportionate value of the asset to the estate as a whole
- the amount of elapsed time since the filing
- the likelihood that a plan of reorganization will be proposed and confirmed in the near
  future
- the effect of the proposed disposition on future plans of reorganization
- the proceeds to be obtained from the disposition vis-a-vis any appraisals of the property
- which of the alternatives of use, sale or lease the proposal envisions

and the factor, which the *Lionel* court labeled as most important

15

- whether the asset is increasing or decreasing in value.

*Lionel*, 722 F.2d at 1071. In addition, a court must consider if those opposing the sale produced some evidence that the sale was not justified. *Id.* at 1071.

A debtor cannot enter into a transaction that "would amount to a *sub rosa* plan of reorganization" or an attempt to circumvent the chapter 11 requirements for confirmation of a plan of reorganization. *Motorola v Comm of Unsecured Creditors (In re Iridium Operating LLC)*, 278 F.3d 452, 466 (2d Cir. 2007) (citing *Pension Benefit Guar. Corp. v. Braniff Airways, Inc. (In re Braniff Airways, Inc)*, 700 F.2d 935, 940 (5th Cir. 1983). If, however, the transaction has "a proper business justification" which has potential to lead toward confirmation of a plan and is not to evade the plan confirmation process, the transaction may be authorized. *Id.* at 467.

A debtor may sell substantially all of its assets as a going concern and later submit a plan of liquidation providing for the distribution of the proceeds of the sale. *See Florida Dept. Of Revenue v. Piccadilly Cafeterias, Inc.*, 128 S. Ct. 2326, 2331 n.2 (2008). This strategy is employed, for example, when there is a need to preserve the going concern value because revenues are not sufficient to support the continued operation of the business and there are no viable sources for financing. *In re Decora Indus.*, No. 00-4459, 2002 WL 32332749, at *3 (D. Del. May 20, 2002). Recently several sales seeking to preserve going concern value have been approved in this district. *See e.g., In re Silicon Graphics, Inc.,* Case No. 09-11701 (MG), Dkt. No. 292*; In re BearingPoint, Inc.*, Case No. 09-10692 (REG); and *In re Lehman Brothers Holdings, Inc.*, Case No. 08-13555 (JMP), Dkt. No. 258.

Here, the Debtors have established a good business reason for the sale of their assets at the early stages of these cases. Notwithstanding the highly publicized and extensive efforts that

16

have been expended in the last two years to seek various alliances for Chrysler, the Fiat

Transaction is the only option that is currently viable. The only other alternative is the

immediate liquidation of the company. Further, the whole enterprise may be worth more than

the sum of its parts because of the synergy between Chrysler, which provides its network of

dealerships, its productions of larger cars, and Fiat, which provides the smaller car technology,

and the access to certain international markets. Indeed, because of the overriding concern of the

U.S. and Canadian governments to protect the public interest, the terms of the Fiat Transaction

present an opportunity that the marketplace alone could not offer, and that certainly exceeds the

liquidation value.

Moreover, the Debtors were forced to cease operations in order to conserve resources.

That action, however, was done with a view towards ensuring that the facilities were prepared to

resume normal production quickly after any sale, and that consumers were not impacted. Any

material delay would result in substantial costs in several areas, including the amounts required

to restart the operations, loss of skilled workers, loss of suppliers and dealers who could be

forced to go out of business in the interim, and the erosion of consumer confidence. In addition,

delay may vitiate several vital agreements negotiated amongst the Debtors and various

constituents. Thus, approval of the Debtors' proposed sale of assets is necessary to preserve

some portion of the going concern value of the Chrysler business and to maximize the value of

the Debtors' estates. Further, the procedures utilized by the Debtors to determine which

contracts would be assumed and assigned to the purchaser was a reasonable exercise of the

Debtors' business judgment.

The Governmental Entities, the funding sources for the Fiat Transaction, have

17

emphasized that the financing offered is contingent upon a sale closing quickly. Moreover, if a sale has not closed by June 15th, Fiat could withdraw its commitment.[14] Thus, the Debtors were confronted with either (a) a potential liquidation of their assets which would result in closing of plants and layoffs, impacting suppliers, dealers, workers and retirees, or (b) a government-backed purchase of the sale of their assets which allowed the purchaser to negotiate terms with suppliers, vendors, dealerships and workers to satisfy whatever obligations were owed to these constituencies.[15] The Debtors focused on maintaining the integrity of the operation and exercised their fiduciary duty by electing the only option available other than piecemeal liquidation. The International Union, the UAW, the Creditors' Committee and almost all other stakeholders support an expeditious sale of the assets. As subsequently discussed, the consummation of the Sale Transaction was conducted in good faith and at arms' length and is in the best interest of the Debtors' estates.

Moreover, the sale of assets is not a *sub rosa* plan of reorganization. The Debtors are receiving fair value for the assets being sold. Not one penny of value of the Debtors' assets is going to anyone other than the First-Lien Lenders. Capstone's Executive Director was the Debtors' valuation expert. This testimony, which is unrebutted, is that the $2 billion New Chrysler is paying for the Debtors' assets exceeds the value that the First-Lien Lenders could

---

[14]If regulatory approval is not received by June 15th, that date could be extended for 30 days as a matter of right.

[15]The Indiana Funds suggest that the Debtors had a third option. Based upon the U.S. government's substantial interest in preserving the automobile-industry jobs and retiree benefits, the intimation is that the government was bluffing when it indicated that it would walk away from exploring other options if the Fiat Transaction did not close quickly. The proposed third option is that the Debtors could have refused to accede to the government's terms in the hope that the government would capitulate and agree to consider other alternatives. The Court concludes that gambling on the possibility that the government was bluffing, and risking the potential for a lesser recovery in a resulting liquidation, would have been a breach of the Debtors' fiduciary duty. This was simply not a viable option.

recover in an immediate liquidation.  After the Bidding Procedures Hearing, the Debtors'

financial advisor, Capstone, revised its analysis and concluded that liquidation would generate

between zero and $1.2 billion.  The reduction in the high end of the range from the financial

advisor's previous calculation[16] reflected (a) a $930 million decrease in the Debtors' cash, (b) the

sale of cars over that period, which result in the current availability of potentially fewer asset

proceeds, and (c) the fact that two car lines were not profitable, which lines were then assessed at

liquidation value, rather than going concern value.  At the Sale Hearing, the financial advisor

indicated that the high end of the range has been further reduced because the Debtors have

already expended the $400 million cash collateral that was available on the filing date.

Therefore, on the high end of the range, an immediate liquidation would generate $800 million.

Thus, the First-Lien Lenders will receive a greater return under the proposed sale, which reflects

the going concern value, than under a  piecemeal liquidation.[17]

Further, the true test of value is the sale process itself.  In that regard, no bidder other

than Fiat came forward.  The First-Lien Lenders had numerous options under the Bankruptcy

Code: they could have refused to consent to the sale or, having consented, they could have

---

[16]In the previous calculation, the range was between zero and $2.6 billion.

[17]The Indiana Funds, and one other creditor, moved to strike the testimony of the Debtors' valuation
witness because he has a financial interest in the outcome of the case in that, under Capstone's retention agreement,
there is a $17 million transaction fee to be paid if this, or any other sale of substantially all of the Debtors' assets, is
consummated and the witness would receive a significant portion of that amount.  On the record, the Court denied
the motion to strike.  The testimony of the witness is consistent with the Court-authorized role of Capstone under the
retention agreement.  Moreover, these types of arrangements are typical in bankruptcy cases.  In addition, as the
Court noted at the Sale Hearing, the witness's financial interest goes to the weight of the evidence.  Moreover, the
movants did not object to the retention of Capstone which set forth the terms of the engagement.  Although they may
not have known the precise amount that the witness might receive, they were aware that he was an executive director
of Capstone and would likely have an interest in any fees earned.  Further, the Indiana Funds did not raise that issue
even though it was clear he would likely be testifying since he had testified on two previous occasions, as proposed
financial advisor, concerning valuation issues.

chosen to credit bid instead of agreeing to take cash.

After the conclusion of the Fiat Transaction, the Debtors will continue to administer their estates, including disposing of remaining assets and evaluating claims, contracts and leases. Thereafter, the Debtors will seek to confirm a plan that will provide for the distribution of assets in the Debtors' estates.  Thus, the classification of claims is independent of the sale process and the Debtors are not attempting to evade the plan confirmation procedures.

In support of their position that the proposed sale is a *sub rosa* plan, the Indiana Funds site to *Contrarian Funds, LLC v. Westpoint Stevens Inc. (In re Westpoint Stevens Inc.,* 333 B.R. 30, 51 (S.D.N.Y. 2005), which held that a bankruptcy court does not have authority under section 363 of the Bankruptcy Code "to impair the claim satisfaction rights of objecting creditors or to eliminate the replacement liens" as such action "would preempt or dictate the terms of a Chapter 11 plan." *Id*. at 52.

In the *Westpoint* case, the terms of the sale order allocated the sales proceeds between the first and second lien lenders, and directed that the distribution fully satisfied the underlying claims by terminating the lenders' security interest in those claims, thereby usurping the role of the confirmation process.  The *Westpoint* court, however, recognized that, pursuant to section 363, a bankruptcy court had authority to authorize a sale of assets in exchange for stock and the granting of replacement liens.  *Id*. at 51.

In the case at bar, there is no attempt to allocate the sale proceeds away from the First-Lien Lenders.  Rather, the security interest of the First-Lien Lenders will attach to the sale proceeds and there will be an immediate and indefeasible distribution of all of the $2 billion dollar cash sale price to the First-Lien Lenders, who are owed $6.9 billion.  As previously noted,

20

the $2 billion sale price exceeds the value in liquidation of $800 million, which is the only alternative available to the Debtors. The full value of the collateral will be distributed to the First-Lien Lenders. Moreover, the MTA does not dictate terms of a plan of reorganization.

Pursuant to section 365(a) of the Bankruptcy Code, a debtor-in-possession may assume executory contracts or unexpired leases and, pursuant to section 365(f), it may assign such contract or lease. As in any case, the potential purchaser, New Chrysler identified the assets it desired to purchase, which of necessity dictated the contracts that the Debtor would assume. *See In re G Survivor Corp.*, 171 B.R. 755, 759 (Bankr. S.D.N.Y. 1994) (finding that "the ability to designate which contracts it wished to have rejected was a valuable right, for which [the purchaser] bargained"); *In re Maxwell Newspapers, Inc.*, 981 F.2d 85, 90-91 (2d Cir. 1992) (finding, under the higher "good cause" standard of § 1113(c)(2), that it is permissible to reject a contract to make a sale more attractive to a buyer). Further, parties to contracts that are assumed in a bankruptcy case are entitled to cure payments and adequate assurance of future performance. 11 U.S.C. § 365(b). Therefore, it is recognized that such creditors may receive more favorable treatment than other creditors either in their class or a higher priority class. Nevertheless, such treatment is not considered a violation of the priority rules nor does it transform a sale of assets into a *sub rosa* plan.

Here, as part of the economic valuation of the transaction, New Chrysler indicated which of the Debtors' contracts it considered valuable to its future venture and directed that those be assumed and assigned to it. Obviously, the value that New Chrysler would agree to pay for the assets has to be impacted by the inclusion or exclusion of certain contracts. Fair value has been paid for the assets to be transferred. The purchaser has made a business decision as to which

contracts it desires to assume.  Indeed, other OEM's are engaged in cost-cutting efforts to

enhance their liquidity and are following similar strategies by rationalizing their dealership

networks.  In every bankruptcy case involving the sale of substantially all of a debtor's assets, a

purchaser may decide to assume certain contracts but not others.[18]  Moreover, the purchaser is

not accorded any less right because the purchase is funded by the government.

New Chrysler negotiated with various constituencies that are contributing and essential to

the new venture, including Fiat - contributing technology and expertise; the Governmental

Entities - contributing billions of dollars in funding; and Chrysler's employees - contributing a

skilled workforce with a more competitive cost structure.  In negotiating with those groups

essential to its viability, New Chrysler made certain agreements and provided ownership

interests in the new entity, which was neither a diversion of value from the Debtors' assets nor

an allocation of the proceeds from the sale of the Debtors' assets.  The allocation of ownership

interests in the new enterprise is irrelevant to the estates' economic interests.

In addition, the UAW, VEBA, and the Treasury are not receiving distributions on

account of their prepetition claims.  Rather, consideration to these entities is being provided

under separately-negotiated agreements with New Chrysler.  As discussed previously, New

Chrysler views the skilled workforce as essential to its future operations and, as a natural

consequence, has engaged in negotiations with their representative.  As part of those

negotiations, New Chrysler and the workers have reached agreement on terms for collective

---

[18]New Chrysler has determined that, to effectively carry on its business, it should take over certain other of
the Debtors' obligations.  Any such assumption of liability reflects the purchaser's business judgment, the effect of
which does not constitute a *sub rosa* plan because the obligation is negotiated directly with the counterparty.  Thus,
any of the obligations under those agreements are satisfied by New Chrysler and do not constitute a distribution of
proceeds from the Debtors' estates.

bargaining agreements with the UAW.  As part of those negotiations, the parties also agreed to modify the funding arrangements for VEBA, the trust which funds benefits for employees and retirees.[19]  That New Chrysler and the UAW have agreed to fund the VEBA with equity and a note is part of a bargained-for exchange between New Chrysler and the UAW.  The UAW states that it agreed to the UAW Retiree Settlement both as a condition to the UAW's amendment of their collective bargaining agreements and in settlement of potential claims for retiree benefit obligations against New Chrysler, as purported successor to the Debtors.  The UAW further states that its leadership would not have recommended that its members ratify the amended collective bargaining agreements unless New Chrysler agreed to fund the VEBA.  The consideration provided to New Chrysler by the UAW in exchange for New Chrysler's agreement to take over obligations under VEBA are unprecedented modifications to the collective bargaining agreement, including a six-year no-strike clause.  The consideration provided by New Chrysler in that exchange is not value which would otherwise inure to the benefit of the Debtors' estates.

Similarly, the Governmental Entities' receipt of an equity interest in New Chrysler is not based upon their prepetition claims against Old Chrysler.  Rather, it is an unrelated transaction that was negotiated between New Chrysler and the source of its funds - the Governmental Entities.  It reflects additional consideration to the Governmental Entities for making the $6.2 billion loan to New Chrysler to fund the purchase of Old Chrysler's business and its ongoing operations.  Further, the *sub rosa* objection of the Affected Dealers regarding the various

---

[19]The Debtors are neither assuming, nor assigning to New Chrysler, the 2008 Settlement Agreement among the Debtors, the UAW, and certain of Debtors' retirees.

settlements has no merit.  None of these settlement motions have an impact on the *sub rosa*

analysis.  Each settlement will be evaluated on its own merit.

*Sale of Assets Free and Clear of Liens and Interests Pursuant to Section 363(f)*

Having determined that the criteria of section 363(b) of the Bankruptcy Code has been

met because the proposed sale satisfies the *Lionel* standard established by the Second Circuit, the

Court must now consider whether the sale may be authorized free and clear of any liens and

interests of an entity other than the estate.  In considering this issue, the Court must determine

whether any of the elements of section 363(f) are satisfied.  Section 363(f) of the Bankruptcy

Code provides that

> The trustee may sell property under subsection (b) or (c) of this section free and
> clear of any interest in such property of an entity other than the estate, only if - -
> > (1) applicable nonbankruptcy law permits sale of such property
> > free and clear of such interest;
> > (2) such entity consents;
> > (3) such interest is a lien and the price at which such property is to
> > be sold is greater than the aggregate value of all liens on such
> > property;
> > (4) such interest is in bona fide dispute; or
> > (5) such entity could be compelled, in a legal or equitable
> > proceeding to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).  The Debtors maintain that section 363(f) authorizes the sale of the assets,

free and clear of the liens held by the Collateral Trustee pursuant to the First Lien Credit

Agreement because the holder of the liens, the Collateral Trustee, has consented.  The Indiana

Funds argue that the sale is not authorized under section 363(f) because they are parties in

interest and have not consented.

The Indiana Funds are parties to the First Lien Credit Agreement as assignees to a

portion of the debt.  As previously noted, Chrysler's obligation to repay the loans under the First

Lien Credit Agreement is secured by liens on most of its assets. Consequently, two additional documents are relevant: an Amended and Restated Collateral Trust Agreement, dated November 29, 2007 (as amended, the "CTA")[20], pursuant to which Wilmington Trust Company is the collateral trustee (the "Collateral Trustee"); and the Security Agreement, pursuant to which Chrysler grants a security interest in most of its assets, and the proceeds thereof, to the Collateral Trustee. *Security Agreement*, § 2(a). Thus, while the liens are for the benefit of the lenders under the First Lien Credit Agreement, the liens themselves were granted to and are held by the Collateral Trustee. *See CTA* at p.1.

Each lender under the First Lien Credit Agreement irrevocably designated the Administrative Agent to act as such lender's agent in exercising the powers delegated to the Administrative Agent and to be bound by its action. *First Lien Credit Agreement*, §§ 8.1, 8.4. The lenders, including the Indiana Funds, agreed to be bound by the Administrative Agents' action made at the request of lenders holding a majority of the indebtedness under the First Lien Credit Agreement (the "Required Lenders"). *Id*. at § 1.1 & § 8.4.

The commencement of the Debtors' bankruptcy cases was an event of default under the First Lien Credit Agreement, *Id*. at § 7(e)(i)(A). The CTA defines the Administrative Agent as the "Controlling Party" as long as the first and second secured obligations have not been paid. *CTA* § 1.1. Upon receipt of a "notice of event of default," the Collateral Trustee exercises the rights and remedies provided for in the CTA, and related security documents, "subject to the direction of the Controlling Party." *CTA* § 2.1(a). A notice of event of default is deemed to be

---

[20]Similar to the First Lien Credit Agreement, the CTA amended an original collateral trust agreement, dated August 3, 2007. In addition, the CTA was further amended and restated as of January 2, 2009. The subsequent amendments to the First Lien Credit Agreement and the CTA are not relevant to the discussion of the section 363(f) issue.

in effect whenever there is a bankruptcy filing. *CTA* § 2.1(b). While such notice of an event of default is in effect, the Collateral Trustee has power to take any Collateral Enforcement Actions permitted under the security documents or any action it "deems necessary to protect or preserve the Collateral and to realize upon the Collateral," including selling all or any of the Collateral. *CTA* §§ 2.2. & 2.3. A Collateral Enforcement Action is defined, with respect to any secured party, as exercising, instituting or maintaining or participating "in any action or proceeding with respect to, any rights or remedies with respect to any Collateral, including . . . exercising any other right or remedy under the Uniform Commercial Code or any applicable jurisdiction or under any Bankruptcy Law or other applicable law. *CTA* § 1.1.

Further, section 2.5(b) of the CTA provides that the Administrative Agent, as Controlling Party, has the right to direct, among other things, "the taking or the refraining from taking of any action authorized by this Collateral Trust Agreement or any Trust Security Document." Further, section 2.5(c) of the CTA provides, in relevant part:

> Whether or not any Insolvency Proceeding has been commenced by or against any of the [Chrysler parties to the CTA], no ... [secured party] shall do . . . any of the following without the consent of the Controlling Party; (i) take any Collateral Enforcement Action . . . or (ii) object to, contest or take any other action that is reasonably likely to hinder (1) any Collateral Enforcement Action initiated by the Collateral Trustee, (2) any release of Collateral permitted under Section 6.12, whether or not done in consultation with or with notice to such Secured Party or (3) any decision by the Controlling Party to forbear or refrain from bringing or pursuing any such Collateral Enforcement Action or to effect any such release.

Thus, section 2.5, concerning the exercise of powers, gives the Collateral Trustee the exclusive right to pursue all of the lenders' rights and remedies concerning the Collateral and, further, gives the Administrative Agent, as Controlling Party, the exclusive authority to direct the Collateral Trustee's action concerning the Collateral.

26

In accordance with the direction of the Administrative Agent, the Collateral Trustee, who is the holder of the liens, has consented to the Fiat Transaction. The right to consent to the sale of the Debtors' assets that constitute Collateral is a Collateral Enforcement Action. It is an exercise of a right pursuant to Bankruptcy Law concerning the Collateral. *CTA*, § 1.1. The Administrative Agent has received the concurrence of 92.5% of the outstanding principal amount of the loans under the First Lien Credit Agreement. Thus, the Administrative Agent has obtained the needed support of the Required Lenders. Consequently, pursuant to the CTA, the Administrative Agent properly directed the Collateral Trustee, who holds the liens, to consent to the section 363 sale of the Collateral. Moreover, the Administrative Agent acted as agent to the Indiana Funds and on their behalf. Thus, the Indiana Funds are bound by the Administrative Agent's action in that regard. *First Lien Credit Agreement*, §§ 8.1(a), 8.4. Therefore, the Administrative Agent's consent to the sale of the assets and its direction to the Collateral Trustee to consent, under section 363(f)(2) of the Bankruptcy Code, satisfies that section and allow for the purchased assets to be sold free and clear of the liens on the property held by the Collateral Trustee.

The Indiana Funds direct the Court's attention to section 9.1(a)(iii) of the First Lien Credit Agreement and argue that it requires the Administrative Agent to receive the consent of all Lenders before it can release collateral. The section referenced by the Indiana Funds, however, concerns waivers, amendments, supplements or modifications to the First Lien Credit Agreement and related documents. The transfer of the purchased assets to New Chrysler pursuant to section 363 of the Bankruptcy Code does not require any amendment, supplement or modification to the loan documents. *See In re GWLS Holdings, Inc.*, No. 08-12430, 2009 Bankr.

27

LEXIS 378 (Bankr. D. Del. Feb. 23, 2009) (concluding that a provision concerning waivers,
amendments, supplements or modifications after execution of certain related credit agreements
did not override the provision concerning the right of the lenders' agent to credit bid). *See also*
*Beal Sav. Bank v. Sommer*, 8 N.Y.3d 318 * 9-10 (N.Y. 2007) (concluding that provisions in a
syndicate loan arrangement requiring unanimous consent by participating lenders in order to
amend, modify or waive terms of related loan agreements did not preclude application of specific
provisions which accomplished the parties' agreed-upon intent for collective action through an
agent upon default by borrower).  The purpose of section 9.1(a)(iii) of the First Lien Credit
Agreement is to ensure that unless there is unanimous consent by all lenders under the related
loan agreements, the terms of those agreements cannot be altered in a manner that is inconsistent
with the terms originally agreed to by the parties. *See id.*  It does not concern collective action to
enforce rights as authorized under the agreed-upon specific provisions of the parties' loan
agreements.

Upon an Event of Default, the CTA expressly granted the Collateral Trustee the right to
sell any or all of the Collateral.  Thus, the loan documents authorized the Collateral Trustee to
consent to the sale without the need to amend or modify the loan documents.  Further, the
Administrative Agent and Collateral Trustee are operating under their exclusive authority to take
any Collateral Enforcement Action necessary to realize upon the Collateral.  Moreover, it is not a
"release" of collateral because the lien attaches to the proceeds of the sale, which remain as
collateral to secure the loan made by the Lenders.  Finally, even if the action were viewed as an
amendment to the loan documents, the prohibition against releasing collateral without the
consent of all lenders under section 9.1(iii) of the First Lien Credit Agreement, itself has an

28

exception where the action is otherwise provided for in the loan documents.  Here, the loan documents expressly provide for the Administrative Agent to direct the Collateral Trustee to take Enforcement Actions, including the sale of all or any of the Collateral.

The Court concludes that the purpose of the relevant provisions of the First Lien Credit Agreement, the CTA, and the Security Agreements is to have the Administrative Agent and Collateral Trustee act in the collective interest of the lenders.  Restricting enforcement to a single agent to engage in unified action for the interests of a group of lenders, based upon a majority vote, avoids chaos and prevents a single lender from being preferred over others.  *In re Enron Corp.*, 302 B.R. 463, 475 (Bankr. S.D.N.Y. 2003), *aff'd* 2005 U.S. Dist. LEXIS 2134 (S.D.N.Y. Feb. 14, 2005).  Pursuant to the CTA, the Indiana Funds are bound by the Administrative Agent's direction to the Collateral Trustee to consent to the sale of its collateral free and clear of liens and other interests in exchange for the $2 billion cash payment.

Finally, with respect to the consenting First-Lien Lenders, the Indiana Funds question their independence in entering into the compromise to allow the sale of the assets free and clear of the lien.  Inasmuch as certain of the individual-consenting lenders were recipients of government loans under the TARP program, the objecting lenders seek to portray the TARP-recipient lenders as being intimidated by the government.  A compromise that is not based upon business considerations, including an assessment of litigation risks, would raise issues regarding the Administrative Agent's obligations, if any to the Indiana Funds, under the agreement. Clearly, that issue is not before this Court.

The Indiana Funds seem to be asking that, if the Court finds that they are bound under the governance provisions of the First Lien Credit Agreement, the Court should nullify the consent

29

given because it was brought about by undue pressure by the U.S. government on the TARP-recipient lenders, who voted to give consent to the transaction before the Court.

In the first instance, it is not clear that this Court would even have jurisdiction over this inter-creditor dispute.  However, the suggestion that the TARP-recipient lenders have been pressured to the point that they would breach their fiduciary duty and capitulate to the settlements presented is without any evidentiary support.  It is mere speculation and without merit.

The Indiana Funds contracted away their right to act inconsistently with the determination of the Required Lenders.  In that regard, if they did not want to waive such rights, they should not have invested in an investment with such restrictions.  The fact that they do not like the outcome is not a basis to ignore the governance provisions of the relevant agreements.

The First-Lien Lenders had limited options: demand a liquidation of the collateral, negotiate with the only available source of funding, i.e., the Governmental Entities, or provide funding to sustain the Debtors on a stand-alone basis.  The First-Lien Lenders, operating under their governance structure, decided to concentrate their efforts on negotiating with the only available source of funding, the Governmental Entities, and to accept their proposal.

*Government as an Entity Funding a Sale Transaction*

The decision of the U.S. Treasury and Export Development Canada to fund the Fiat Transaction is a political issue that is motivated, in part, by non-economic considerations.  The Governmental Entities have made the determination that it is in their respective national interests to save the automobile industry, in the same way that the U.S. Treasury concluded that it was in the national interest to protect financial institutions.  Many of the jobs in the automobile industry

30

that are being preserved would have been lost, as is the case in many struggling industries, if the government did not see them as part of an industry necessary to be preserved in the national interest.

The underlying argument of many of those opposing the transaction is not against the Government Entities' involvement. Rather, it is the desire to have the Governmental Entities protect every constituency within the auto industry from economic loss, and not to limit the protection to those interests that the government perceives as being essential to the survival of a successful "New Chrysler." For example, any dealership rejection that is approved will cause hardship to the particular dealership involved but may well be necessary if New Chrysler is to survive. These are the kinds of economic decisions that have to be made in every bankruptcy case.

The extent to which a governmental entity should be involved in protecting certain industries is a political decision, and the Court does not express a view as to the Governmental Entities' involvement here. Rather, the Court observes that these are the dynamics within which this case is presented to the Court. The economic reality is that no one was willing to lend other than the Governmental Entities. Further, in the current economic climate, the only alternative would be an immediate liquidation, which the evidence has shown would not bring a higher return to creditors.

Moreover, the fact that an entity that is providing the funding may have the capacity to provide more funds or to assume more risk does not enable a bankruptcy court to require it to do so. A court's role is to either grant or deny the relief sought based upon the record before it, not to interject itself into the business judgment of the entity funding the transaction, even if that

31

lender is the government.

*Debtors' Fiduciary Duty*[21]

The Debtors' compliance with their fiduciary duty has been put at issue.  First, it is suggested that the Debtors failed to fulfill their fiduciary obligations because they did not directly participate in the negotiations between the First-Lien Lenders and the Governmental Entities funding the Fiat Transaction.  In addition, certain objectors question the Debtors' decision not to pursue certain other restructuring proposals that the objectors contend presented better going concern or enterprise value.

The Debtors were prepared to participate in any negotiations.  The First-Lien Lenders formed a steering Committee (the "Steering Committee") to negotiate with the Governmental Entities.  The evidence established that, notwithstanding the Debtors offer to be involved in the negotiations, neither the Steering Committee nor the Governments sought the Debtors' involvement.

With respect to the pursuit of other proposals, the evidence shows that the Debtors engaged in an 18-month worldwide search to seek potential alliance partners.  They discussed and negotiated with numerous domestic and international OEM's.  However, no other bidder stepped forward.  Inasmuch as Fiat was the only OEM that was prepared to enter into an alliance, the Board of Managers (the "Board") was faced with either accepting the Fiat Transaction or liquidating.  The Board reviewed the fairness opinion prepared by Greenhill, as well as the liquidation analysis prepared by Capstone, and concluded that the Fiat Transaction

---

[21]At the Sale Hearing, the issue concerning admission of Debtors' Exhibit 57 was taken under advisement. The Court finds that the document is relevant to allegations regarding the fiduciary duty of the Debtors' management.  Further, it is not protected by Fed. R. Evid. 408 because it is not being admitted to establish the value of the collateral for purposes of this proceeding.

was a better alternative to liquidation.

Moreover, the funding provided by the Governmental Entities here has been the sole source of any debt or equity funding and, as such, the Governmental Entities are the lenders of last resort. Consequently, the Debtors are limited to pursuing only those proposals that the Governmental Entities view as viable, regardless of the Debtors' view of a particular approach. Thus, whether one is considering a stand-alone restructuring or other option, absent the consent of the entity that will provide capital to fund the effort, any perceived "going concern value" or "enterprise value" cannot be realized.

At the Sale Hearing references were made to the assessment by the Independent Managers on the Board, at different stages of the restructuring effort, concerning various other proposals. Those analyses, however, were all made on the assumption that financing could be obtained for the particular structure. As one Independent Manager testified, the Independent Managers' determination, concerning the Greenhill proposal, was made assuming that there was financing.

The record establishes that, at every turn, the Debtors pursued options they believed were in their best interest and in the best interest of all their constituencies. To suggest that the Debtors should have pursed proposals that could not have been consummated because of lack of funding, is to suggest that the Debtors should have breached their fiduciary duty. The Debtors consistently believed in, and pursued, their Stand-Alone Viability Plan as the option they considered to have the greatest enterprise value. That view was not shared by anyone who was willing and able to finance such proposal. In the absence of funding for it, the Debtors were precluded from pursuing it. Further, no other potential alliance partner came forward who would

33

be willing to contribute funds for any other partnership venture. Regardless of their view of the
viability of their preferred option, once the Governmental Entities rejected the Debtors' Stand-
Alone Viability Plan, and in the absence of an alliance partner willing to contribute to another
proposed venture, the Debtors' options were limited. They could either liquidate on a piecemeal
basis or accept the Governmental Entities' terms, and assist that process to preserve as much
value as possible.

The absence of other entities coming forward to fund any transaction highlights the risk
presented to distressed companies that are situated similarly to Chrysler. Accompanying that
risk is the lender's ability to dictate many of the key terms upon which any funding will occur.[22]
The hard-fought "take it or leave it" approach that often drives the outcome of this type of
negotiation is troubling to some, but such is the harsh reality of the marketplace. Here, the
Governmental Entities, as lenders of last resort, are dictating the terms upon which they will
fund the transaction, thereby leaving the Debtors with few options. Nevertheless, the usual
marketplace dynamics play out and the Court applies the same bankruptcy law analysis.
Moreover, the Debtors' CEO testified that the demands from the Governmental Entities were not
greater than that presented by other lenders, and in some aspects were not as onerous.

*Good Faith Purchaser*

Section 363(m) of the Bankruptcy Code provides, in relevant part, that

> The reversal or modification on appeal of an authorization under [section
> 363] of a sale or lease of property does not affect the validity of a sale or lease
> under such authorization to an entity that purchased or leased such property in
> good faith, whether or not such entity knew of the pendency of the appeal, unless
> such authorization and such sale or lease were stayed pending appeal.

---

[22]The Auto Task Force employed the tactics of many "lenders of last resort," including dictating certain of
the terms of the deal such as what assets and obligations they were willing to fund in any Sale Transaction.

11 U.S.C. § 363(m).  Thus, absent a stay pending appeal, a finding that a purchaser acted in good

faith protects the finality of a sale that has been authorized even if it is reversed on appeal.

A purchaser's good faith "is shown by the integrity of his conduct during the course of

the sale proceedings." *In re Gucci*, 126 F.3d 380, 390 (2d Cir. 1997) (quoting *In re Rock

Industries Machinery Corp.*, 572 F.2d 1195, 1198) (other citations omitted).  A good faith

finding is precluded if fraud, collusion or attempts "to take grossly unfair advantage of other

bidders" are present.  *Gucci*, 126 F.3d at 390.

The Indiana Funds argue that a good faith finding is inappropriate because the U.S.

Treasury is improperly controlling the Debtors; the U.S. Treasury does not have authority to

enter into these transactions;[23] and it is on both sides of the transaction because it is controlling

both the Debtors and New Chrysler.  The Indiana Funds assert that government pressure to

---

[23]Contemporaneous with the entry of this Opinion, the Court has entered a separate Opinion and Order
Regarding Emergency Economic Stabilization Act of 2008 and Troubled Asset Relief Program, dated June 1, 2009,
in which it determined that, although the Indiana Funds have a right to be heard in this contested matter under
section 1109(a) of the Bankruptcy Code, they do not have standing under EESA to challenge the U.S. Treasury's use
of the TARP funds.

Further, The issue of waiver of the Indiana Funds' right to challenge the U.S. Treasury's actions under
EESA and TARP was not properly presented before the Court as there was no briefing on the issue, and the issue
was raised after the Indiana Funds had argued their objection.  However, certain facts are before the Court that are
relevant to the waiver issue.  The Indiana Funds maintain that, because they were looking for a safe vehicle in which
to invest, they chose a secured note with a comparatively low interest rate.  That statement as to investment strategy
appears inconsistent with the facts at the time of the investment.  By the time the Indiana Funds made their
investment, it was a distressed debt investment.  The Indiana Funds paid 43¢ on the dollar for their investment.  As a
result, the effective rate of interest was, at least, twice the stated rate, inasmuch as interest was paid on the face value
of the participation and not on the amount that they paid for the notes.  Further, the record reflects that after Chrysler
received the TARP Financing in January 2009, it continued to make interest payments to the Indiana Funds and New
Chrysler, but premise most of their other arguments and development of the record by maintaining that more TARP
funds should have gone to them.  In essence, their position is that the U.S. Treasury's alleged unlawful acts did not
benefit them enough; therefore, they object.

35

consummate the Fiat Transaction, exerted through threats to withhold debtor-in-possession

financing or financing to New Chrysler, caused the Debtors to reverse their business judgment

regarding the Stand-Alone Viability Plan.  The Indiana Funds contend that, as a result, the U.S.

Treasury is an "insider" of the Debtors' and the Debtors are an "instrument" of the U.S.

Treasury.

       As previously discussed, there had been extensive marketing of the Debtors and their

assets for approximately two years in a highly publicized setting.  Any entity that had the

resources and interest in either acquiring the Debtors or engaging in a strategic partnership with

the Debtors had the opportunity to perform due diligence.  The Debtors discussed and negotiated

with other OEM's, concerning the potential for a strategic partnership for the benefit of both

parties to any such alliance.  The Fiat Transaction was the only alternative available, and better

option, to liquidation.

       Further, the terms of the Fiat Transaction was finalized only after months of intense,

good-faith negotiations.  As was more fully discussed in the section concerning the Debtors'

fiduciary duty, the ordinary marketplace dynamic played out with respect to the lenders and

whatever ability they had to dictate terms.  The fact that the lenders of last resort happened to be

Governmental Entities did not alter that dynamic.  The Governmental Entities did not preclude

other entities from participating or negotiating, they merely set forth the terms that they required

to provide financing and the parties were either amenable to them or not.  Finally, as noted, the

Governmental Entities had no obligation to fund the transaction and Chrysler and Fiat were free

to walk away from the negotiations..

       Nor did the Governmental Entities control the Debtors in that regard or become

36

"insiders" of the Debtors. *See In re KDI Holdings, Inc.*, 277 B.R. 493, 511 (Bankr. S.D.N.Y. 1999) (concluding that a lender does not control a debtor when it offers advice to its management, "even where the lender threatens to withhold future loans should the advice not be taken"). The U.S. Treasury, as lender, merely conditioned its lending to the Debtors and to New Chrysler on the consummation of the Sale Transaction. In the same way that potential-partner OEM's could elect not to accede to such terms and refuse to purchase the assets, the Debtors were free to reject the funding offer. The Debtors, however, indicated that had they done so, they would have had to liquidate. Thus, the Debtors exercised their own business judgment under the circumstances, as then presented, and determined to consummate the Fiat Transaction rather than liquidate. The fact that the Debtors initially preferred the Stand-Alone Viability Plan is irrelevant to the determination it made in its business judgment, once it realized that there was no funding for the Stand-Alone Viability Plan. Nor is it relevant to consideration of the Sale Transaction currently before the Court given that without the Governmental Entities' funding, there is no funding from any source for such an alternative.

Thus, the Governmental Entities, as lenders, are neither controlling the Debtors nor New Chrysler and, therefore, are not on both sides of the Sale Transaction before the Court. There is no fraud or collusion and the Governmental Entities have authority to enter into this transaction.[24] Further, there are no allegations regarding Fiat's conduct in this transaction that would raise any issue as to the purchaser's good faith. Thus, New Chrysler is a good faith purchaser pursuant to § 363(m) of the Bankruptcy Code.

---

[24]Regardless of whether the U.S. Treasury was authorized to use TARP funds to provide the funding for the transaction before the Court, the integrity of the process was not harmed in any way. Specifically, the record supports the finding that the U.S. Treasury based its involvement on a reasonable interpretation of the authority under which it acted and there was no harm to any party as a result of source of the funding.

*Sale Process, Including Bidding Procedures*

Prior to their filing for bankruptcy protection, there had been extensive marketing of the Debtors and their assets for approximately two years.  That marketing took place in the context of the high profile setting of the federal government's involvement in the process.  By the time of the Bidding Procedures Hearing, viable potential purchasers with any interest already had obtained relevant information or due diligence.  The evidence elicited at the Bidding Procedures Hearing established that the Debtors had investigated various alternative synergies, sharing relevant information with other participants in the industry.  The only parties willing to step forward to provide financing for the purchase of the Debtors' assets, in the form of the Fiat Transaction, were the Governmental Entities, which had determined that the auto industry should be preserved in furtherance of each nation's economic interest.  The Governmental Entities loaned the Debtors at least $4 billion prepetition, and nearly $5 billion postpetition, all of which is a secured debt obligation of the Debtors.  The only other available alternative was immediate liquidation.  At this point, the total secured debt of the Debtors exceeds $16 billion.

At the Bidding Procedures Hearing, opposition was voiced to the terms required to be accepted by any competing bidder.  The structure of the contract, as proposed, reflected the fact that any likely purchaser would be involved in or intend to operate in the auto industry.  Therefore, it was determined that a contract with that framework would aid in an orderly bidding process.  The Court, however, expressed certain concerns regarding the limitations imposed on alternative purchase proposals.  In response, at the Bidding Procedures Hearing, the Debtors acknowledged their fiduciary duty to consider any other proposals that were presented in the context of advancing the best interest of the Debtors' estates.  Moreover, language was included

in the Bidding Procedures Order reflecting the Debtors' fiduciary duty to consider any

alternative proposals.[25]  In addition, it was observed that any viable bidder would be a

sophisticated party with the knowledge and capability to bring their offer and position to the

attention of the relevant parties and the Court.

Thus, the Court concluded that the bidding procedures, as approved, provided another

opportunity for any interested bidder to come forward, and also provided a safeguard to test the

value offered.  The Court further concluded that the bidding procedures would encourage

bidding from any interested party with the wherewithal and interest to consummate a purchase

transaction to ensure that the highest and best offer was attained.  Further, the Court concluded

that the bidding procedures were appropriate and necessary.

*Due Process*

Based upon the need for relief on an expedited basis to prevent the erosion of the going

concern value of the Debtors' assets, the Court determined that shortened notice was proper for

the Bidding Procedures Hearing.  The same concern applies to the Sale Hearing.[26]  The notice of

the Sale Motion was provided to all necessary parties pursuant to the procedures established by

this Court.  One day after the Bidding Procedures Order was entered, the Debtors mailed notice

of the Sale Motion, including that the proposed sale contemplated the assumption and

---

[25]In Section VIII of the Bidding Procedures, attached as Exhibit "A" to the Bidding Procedures Order, language was added to indicate that a "Qualified Bid" included not only bids that met the previously set forth requirements but, in addition, any bid that "after consultation with the Creditors' Committee, the U.S. Treasury and the UAW, [was] determined by the Debtors in the exercise of their fiduciary duties to be a Qualified Bid."

[26]Regarding the Indiana Funds' Motion to Strike Last-Minute Declarations, filed on May 27, 2009 (the "Motion to Strike"), oral motions were made at the Sale Hearing by the Indiana Funds concerning certain of those declarations.  The Court denied the oral motions because it held that the use of the declarations was consistent with the Court's ruling in a telephonic conference conducted prior to the commencement of the Sale Hearing.  The Indiana Funds had a full and lengthy opportunity to cross-examine all the witnesses, including those whose declarations were filed.  Accordingly, the Motion to Strike was denied.

assignment of various contracts.  Notice of the Sale Transaction was published in the national

editions of USA Today, the Wall Street Journal and the New York Times, as well as the

worldwide edition of the Financial Times.  Moreover, even prior to the bankruptcy filing, the

circumstances of these Debtors were under scrutiny and the events leading up to the filing,

including the proposal for the sale of the assets was highly publicized.  Under the exigent

circumstances, the Court determines that notice of the Sale Hearing is proper and adequate.

*Additional Objections*

Certain other issues were raised in the objections filed.  The objections fall into seven

general categories: (1) retirees and separated employees, (2) dealers, (3) tort and consumer

objections, (4) state and local government objections, (5) supplier and production-related

objections, (6) cure and assumption objections, and (7) miscellaneous objections.  Many of the

objections have been resolved by the Debtors and the objector, including by the modification of

relevant language in the final order, or withdrawn by the objector.  The objections in category (6)

which have not been withdrawn object to the cure amount or other terms proposed by the

Debtors in connection with the assumption and assignment of an executory contract or unexpired

lease and, therefore, have been preserved and deferred to the Cure Amount Hearings currently

scheduled for June 4, 2009, and June 23, 2009.  Accordingly, the objections as to those issues in

category (6) are not discussed herein; objections touching upon notice and due process issues in

category (6) are overruled but addressed by the relevant sections of this Opinion.  Additionally,

objections related to issues discussed elsewhere in this Opinion are not reiterated here.

Category (1) consists of retirees and separated employees who are represented by the

UAW and those who are not.  Some of these objections sought clarification as to which plans

40

would be assumed and assigned by the Debtors and which would be rejected. The Debtors have since filed a list specifying this information, and in that respect the objections are partially resolved. The objecting retirees represented by the UAW objected to the modification of retiree benefits under the settlement agreement between New Chrysler and the UAW, but those objections are overruled because the UAW was the objectors' authorized representative under section 1114, and the modifications were negotiated in good faith pursuant to that section. The objecting retirees not represented by the UAW whose benefits are adversely impacted may have unsecured claims against the Debtors' estates, but the purchased assets are sold free and clear of those potential unsecured claims. For those reasons, their objections to the Sale Motion are overruled. Further, the Court finds that if the Sale Motion were not approved, which would likely result in the Debtors' liquidation, there would likely be no value to distribute any retirees, all of whom would be unsecured creditors. Other objections in this category touch upon notice and due process issues, all of which are overruled as to those issues but addressed by the relevant sections of this Opinion.

Category (2) consists in large part of dealers whose Dealer Agreements are proposed to be rejected by Debtors pursuant to section 365. To the extent an objection raises a *bona fide* dispute related to that issue, the objection as to that issue has been preserved and deferred to the Rejection Hearing on June 3, 2009, at 11:00 a.m., but the objection is otherwise overruled. Other dealer objectors question the process for assumption and assignment of the Dealer Agreements, but this objection is overruled as untimely because that process was approved in the Bidding Procedures Order. Other dealer objectors argue that the Debtors' providing designation rights to New Chrysler to finalize assumption decisions post-closing is improper. This objection

41

is overruled because similar procedures have been approved in this district and elsewhere and this Court finds that the analysis set forth in *Ames* fully supports the Debtors' position herein. *See*, *e.g.*, *In re Ames Dep't Stores, Inc.*, 287 B.R. 112, 115 (Bankr. S.D.N.Y. 2002). Objectors arguing that the purchased assets are subject to setoff or recoupment rights may have unsecured claims against Debtors' estates, but the purchased assets are sold free and clear of those potential unsecured claims. Additionally, the Court notes that the objectors' rights are contractual and not an "interest" that attaches to the Debtors' property, notwithstanding any suggestion or implication that state dealer statutes create such an "interest," and, therefore, objections raising that issue are overruled. Other objections in this category touch upon notice and due process issues, as well as contend that the Sale Transaction is a *sub rosa* plan, all of which are overruled as to those issues but addressed by the relevant sections of this Opinion.

Category (3) consists of tort and consumer objections. Those objections relating to lemon law and warranty claims have been resolved by the modification of relevant language in the Fale order. An objection (ECF Docket No. 1231) was raised regarding an environmental claim, but the property to which the claim related is no longer owned by the Debtors and the objection is therefore overruled. Various objections were raised related to property damage claims and personal injury and wrongful death claims, including those which have not yet occurred. Some of these objectors argue that their claims are not "interests in property" such that the purchased assets can be sold free and clear of them. However, the leading case on this issue, *In re Trans World Airlines, Inc.*, 322 F.3d 283 (3d Cir. 2003) ("*TWA*"), makes clear that such tort claims are interests in property such that they are extinguished by a free and clear sale under section 363(f)(5) and are therefore extinguished by the Sale Transaction. *See id.* at 289,

42

293.  The Court follows *TWA* and overrules the objections premised on this argument.  Even so, *in personam* claims, including any potential state successor or transferee liability claims against New Chrysler, as well as *in rem* interests, are encompassed by section 363(f) and are therefore extinguished by the Sale Transaction.  *See*, *e.g.*, *In re White Motor Credit Corp.*, 75 B.R. 944, 949 (Bankr. N.D. Ohio 1987); *In re All Am. Of Ashburn, Inc.*, 56 B.R. 186, 190 (Bankr. N.D. Ga. 1986).  The Court also overrules the objections premised on this argument.

Additionally, objections in this category touching upon notice and due process issues, particularly with respect to potential future tort claimants, are overruled as to those issues because, as discussed elsewhere in this Opinion, notice of the proposed sale was published in newspapers with very wide circulation.  The Supreme Court has held that publication of notice in such newspapers provides sufficient notice to claimants "whose interests or whereabouts could not with due diligence be ascertained."  *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 317 (1950).  Accordingly, as demonstrated by the objections themselves, the interests of tort claimants, including potential future tort claimants, have been presented to the Court, and the objections raised by or on behalf of such claimants are overruled.

Other objections in this category are premised on the argument that a free and clear sale would be fundamentally unfair, inequitable, or in bad faith.  The policy underlying section 363(f) is to allow a purchaser to assume only the liabilities that promote its commercial interests.  *See*, *e.g.*, *In re New England Fish Co.*, 19 B.R. 323, 328-29 (Bankr. W.D. Wash. 1982); *White Motor Credit*, 75 B.R. at 951.  Accordingly, objections premised on this argument are overruled.  An objection in this category raised the Takings Clause of the Fifth Amendment, but this objection is overruled because the objector holds an unsecured claim, rather than a lien in some collateral

43

that is property of the estate, which is a necessary prerequisite to a Fifth Amendment Takings

Clause claim in the bankruptcy context.  *See U.S. v. Security Industrial Bank*, 459 U.S. 70

(1982).  The same objection also raised the issue of the break-up fee being excessive, but this

objection is overruled as untimely because that fee was approved in the Bidding Procedures

Order and is not implicated since the assets are being sold to the original bidder.  Another

objection related to an asbestos claim raised both the failure to comply with section 524(g) and

that the Sale Transaction improperly provides for the release of third parties, but this objection is

overruled as to both issues because section 524(g) is inapplicable to a free and clear sale under

section 363 and the Sale Transaction does not contain releases of third parties.  Such claims can

still be asserted against the Debtors' estate.  Other objections in this category which contend that

the Sale Transaction is a *sub rosa* plan are overruled as to that issue but are addressed by the

relevant sections of this Opinion.

Category (4) consists of state and local government objections related to taxes and

workers' compensation.  All of these objections have been withdrawn or resolved by relevant

language in the final order.  An objection by the State of Michigan related to taxes which are or

may become subject to a tax lien has been resolved by the deposit of designated funds in a

dedicated escrow account.

Category (5) consists of supplier and production-related objections.  All of the objections

related to statutory liens, setoff and/or recoupment rights, and the assumption or rejection of

unexpired leases have been withdrawn or resolved by relevant language in the final order.

Specifically, various parties objected to the sale to the extent it proposes to extinguish or impair

rights of setoff, recoupment, subrogation, indemnity, defenses to performance under the

44

particular agreement, and any valid statutory or possessory liens such as the liens of mechanics' liens, marine cargo liens, construction liens or the liens of carriers, workers, repairers, shippers, toolers, molders or any similar liens.  The Debtors have agreed to include language in the final preserving such rights.  Further, since such rights will not be extinguished by the sale under section 363(f), there is no need to provide adequate protection to those parties under section 362(e) or section 361.  An objection by several parties (ECF Docket No. 1187), most of which have withdrawn the objection, related to information regarding the assets to be sold is overruled. Such information has been provided by the Debtors.  To the extent any objection in this category which has not been withdrawn raises an objection related to the assumption and assignment or rejection of an executory contract or unexpired lease, including cure amounts, the objection as to that issue has been preserved and deferred to the Cure Amount Hearings and the Rejection Hearing.  Other objections in this category touch upon notice and due process issues, all of which are overruled as to those issues but addressed by the relevant sections of this Opinion.

Category (7) consists of miscellaneous objections.  The objections of the Non-TARP Lenders and the Indiana Funds are overruled but discussed elsewhere in this Opinion.  The objection of Jonathan Lee Riches d/b/a Irving Picard is overruled because there is no basis for the objection.  The objection of Wilmington Trust Company has been resolved by relevant language in the final order.  The objections of Chrysler Financial have been resolved by relevant language in the final order.  The objection of Automobile Plant GAZ is overruled as to the notice and due process issues, which are addressed by the relevant sections of this Opinion, and, to the extent it raises a *bona fide* dispute relating to the assumption and assignment or rejection of an executory contract, including cure amount, the objection as to that issue has been preserved and

45

deferred to the Cure Amount Hearings or Rejection Hearing, as the case may be.

*CONCLUSION*

The Court after having given due consideration, among other things, to the factors set

forth in *Lionel*, the Court finds that all relevant standards have been established to grant the relief

requested.  Further, the Court finds that the Sale Transaction is not a *sub rosa* plan; the Debtors

did not breach their fiduciary duty regarding the Sale Transaction; the assets in the Sale

Transaction are sold free and clear of liens, claims, interests, and encumbrances pursuant to

section 363(f); and the protections of a good faith purchaser pursuant to section 363(m) shall

apply.

46

The Sale Motion is granted in its entirety and entry into and performance under and in respect of the Purchase Agreement and the Sale Transaction is approved.[27]  All objections, if any, to the Sale Motion or the relief requested therein that have not been withdrawn, waived, or settled as announced to the Court at the Sale Hearing or by stipulation filed with the Court, and all reservation of rights included therein, are hereby overruled, except as expressly provided in the final order.

Accordingly, the relief sought in the Sale Motion is granted.  A final order will be entered consistent with this Opinion.

Dated: New York, New York
         May 31, 2009

                                  **s/Arthur J. Gonzalez**
                                  UNITED STATES BANKRUPTCY COURT

---

[27] The Rule 6004 relief requested by the Debtors will be addressed in the final order or by a separate order.