UNITED STATES BANKRUPTCY COURT                          FOR PUBLICATION
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------- x
                                                     :
In re                                                :    Chapter 11
                                                     :
Old Carco LLC                                        :    Case No. 09-50002 (AJG)
(f/k/a Chrysler LLC), *et al.*,                      :
                                                     :    (Jointly Administered)
                              Debtors.               :
                                                     :
---------------------------------------------------- x

## OPINION REGARDING AUTHORIZATION OF REJECTION OF ALL EXECUTORY CONTRACTS AND UNEXPIRED LEASES WITH CERTAIN DOMESTIC DEALERS AND GRANTING CERTAIN RELATED RELIEF

In an order (the "Order")[1] dated June 9, 2009, the Bankruptcy Court granted the omnibus

motion of Chrysler LLC, now known as Old Carco LLC, ("Chrysler") and certain of its affiliates,

as debtors and debtors in possession (collectively with Chrysler, the "Debtors"), for an Order,

Pursuant to Sections 105, 365 and 525[2] of the Bankruptcy Code and Bankruptcy Rule 6006, (A)

Authorizing the Rejection of All Executory Contracts and Unexpired Leases With Certain

Domestic Dealers and (B) Granting Certain Related Relief (the "Motion"),[3] filed on May 14,

2009.

An evidentiary hearing was held before the Court on June 4, 2009, at which 15 witnesses

testified at the hearing and an additional approximately 66 witnesses presented testimony by

proferred declaration.  At the close of the presentation of evidence on that date, the hearing was

continued to June 9, 2009, at which legal arguments were presented.  Several of the Debtors'

employees, including Peter M. Grady ("Grady"), Director of Dealer Operations for Chrysler

---

[1] In the Order, the Court stated that it would issue an opinion (the "Opinion") regarding the Motion (as defined *infra*), addressing, among other things, the Objections (as defined *infra*) raised by the various parties.
[2] The request that relief under § 525 of the Bankruptcy Code be granted in the Order was no longer sought in connection therewith.
[3] Capitalized terms not otherwise defined herein have the meanings given to them in the Motion.

Motors, LLC, have made declarations to the Court, participated in depositions, and offered live testimony in various hearings regarding the Motion and its subject matter.  The Debtors designated certain of this evidence into the record.[4]  Over two hundred objections, statements, correspondence, and other responses (collectively with all supplements, amendments, and joinders thereto, the "Objections," or in the singular, the "Objection") were filed in response to the Motion.  The Committee of Chrysler Affected Dealers (the "CCAD") and other parties also designated certain evidence into the record.  Additionally, the Debtors filed a consolidated reply (the "Reply") in response to the Objections.

The facts and circumstances of the Debtors' bankruptcy case have been extensively set forth in *In re Chrysler LLC*, 405 B.R. 84 (Bankr. S.D.N.Y. 2009) and are incorporated, as further expanded upon by additional findings of fact relevant to the Motion, herein.

## DISCUSSION

**Business Judgment Standard**

The Supreme Court has observed that the "fundamental purpose of reorganization is to prevent a debtor from going into liquidation, with an attendant loss of jobs and possible misuse of economic resources. . . . [T]he authority to reject an executory contract is vital to the basic purpose to a Chapter 11 reorganization, because rejection can release the debtor's estate from burdensome obligations that can impede a successful reorganization."  *NLRB v. Bildisco and Bildisco*, 465 U.S. 513, 528, 104 S. Ct. 1188, 1197 (1984).  In this case, substantially all of the

---

[4] An objection by an Affected Dealer was raised at the June 9, 2009 hearing regarding the admission of evidence from prior hearings.  The testimony and deposition designations (and counter-designations) were filed by the Debtors and certain Affected Dealers (as defined *infra*) prior to the June 9, 2009, hearing.  Debtor also moved into evidence declarations that had been moved into evidence at prior hearings as well.  The Affected Dealer making the objection argued in substance that such evidence was not susceptible to judicial notice, citing *Global Network Communications v. City of New York*, 458 F.3d 150, 157 (2d Cir. 2006), but the Debtors did not ask the Court to take judicial notice of the testimony and deposition designations (and counter-designations) and declarations.  Rather, the Debtors moved, without objection, the aforementioned into evidence, and it was admitted by the Court.  Thereafter, Grady was available for cross-examination at the June 4, 2009 hearing, but no request was made to cross-examine him.  Therefore, the evidence at issue is properly before the Court.

Debtors' assets were sold pursuant to § 363, which is to be followed by a plan of reorganization setting forth, *inter alia*, a distribution scheme for the Debtors' estates, but that does not change the relevant analysis herein. *See infra* citations to *In re G Survivor Corp.*, 171 B.R. 755, 759 (Bankr. S.D.N.Y. 1994).

The business judgment standard is employed by courts in determining whether to permit a debtor to assume or reject a contract. *See In re Penn Traffic Co.*, 524 F.3d 373, 383 (2d Cir. 2008) (citing *In re Orion Pictures Corp.*, 4 F.3d 1095, 1098 (2d Cir. 1993)). This standard "presupposes that the estate will . . . reject contracts whose performance would benefit the counterparty at the expense of the estate." *Penn Traffic*, 524 F.3d at 383; *see also G Survivor Corp.*, 171 B.R. at 758 (noting that "the court for the most part must only determine that the rejection will likely benefit the estate" (citation omitted)). "Generally, absent a showing of bad faith, or an abuse of business discretion, the debtor's business judgment will not be altered." *G Survivor*, 171 B.R. at 757. Moreover, the business judgment standard "as applied to a bankrupt's decision to reject an executory contract because of perceived business advantage requires that the decision be accepted by courts unless it is shown that the bankrupt's decision was one taken in bad faith or in gross abuse of the bankruptcy retained business discretion." *Id.* at 758 (quoting *In re Richmond Metal Finishers, Inc.*, 756 F.2d 1043, 1047 (4th Cir. 1985)). A motion to assume or reject "should be considered a summary proceeding, intended to efficiently review the trustee's or debtor's decision to adhere to or reject a particular contract in the course of the swift administration of the bankruptcy estate. It is not the time or place for prolonged discovery or a lengthy trial with disputed issues." *Orion*, 4 F.3d at 1098-99.[5]

---

[5] One bankruptcy court commented on the policy reasons behind § 365 not long after the Bankruptcy Code was enacted: "[C]ourt approval under [§] 365(a) . . . except in extraordinary situations, should be granted as a matter of course. To begin, the rule places responsibility for administering the estate with the trustee [or debtor-in-possession], not the court, and therefore furthers the policy of judicial independence considered vital by the authors

Nevertheless, some of the Objections implore the Court either to apply a heightened standard because of the existence of state statutes designed to protect automobile dealers and franchisees (the "Dealer Statutes," or in the singular, the "Dealer Statute")[6] or to balance the equities by considering the harm to those impacted by the rejections, including the communities in which the dealers (the "Affected Dealers," or in the singular, the "Affected Dealer") with rejected dealer and site control agreements (collectively the "Rejected Agreements," or in the singular, the "Rejected Agreement") operate.  Under the business judgment standard, "the effect of rejection on other entities is not a material fact to be weighed."  *In re Wheeling-Pittsburgh Steel Corp.*, 72 B.R. 845, 848 (Bankr. W.D. Pa. 1987), but under a heightened standard or a balancing of the equities, such effect would be a fact to be weighed.

Many of the Affected Dealers cite *Bildisco*, 465 U.S. at 523-24, where the Supreme Court held that the rejection of collective-bargaining agreements was subject to a somewhat stricter standard than business judgment even though there was no such indication in section 365(a).  *See id.*  The Supreme Court agreed with all of the Courts of Appeals that had considered that issue, concluding that Congress intended a higher standard than business judgment for rejection of collective-bargaining agreements because of, *inter alia*, the "special nature of a collective-bargaining contract, and the consequent 'law of the shop' which it creates."  *Id.* at 524, 526 (citations omitted) (further noting "national labor policies of avoiding labor strife and encouraging collective bargaining" under the National Labor Relations Act ("NLRA")).  The

_____

(continued…)

of the [Bankruptcy] Code.  Second, this rule expedites the administration of estates, another goal of the Bankruptcy Reform Act.  Third, the rule encourages rehabilitation by permitting the replacement of marginal with profitable business arrangements."  *In re Summit Land Co.*, 13 B.R. 310, 315 (Bankr. Utah 1981) (footnote omitted).

[6] The Motion referred to the Dealer Statutes as such, but the Order referred to them as the "Dealer Laws."  Their definitions are identical and any reference in this Opinion to the Dealer Statutes corresponds to any reference in the Order to the Dealer Laws, and vice versa.

4

Supreme Court therefore adopted the test articulated by two Courts of Appeals under which the debtor would be permitted to reject a collective-bargaining agreement if the debtor could show that the collective-bargaining agreement burdened the estate, and that, after careful scrutiny, the equities balanced in favor of rejecting the labor contract. *See id.* at 526. Even in this context, the Supreme Court delineated the boundaries of such balancing: "the Bankruptcy Court must focus on the ultimate goal of Chapter 11 when considering these equities. The Bankruptcy Code does not authorize free-wheeling consideration of every conceivable equity, but rather only how the equities relate to the success of the reorganization." *Id.* at 527.[7]

The heightened standard articulated in *Bildisco* has been called the "public interest standard." *See In re Pilgrim's Pride Corp.*, 403 B.R. 413, 421 fn.19 (Bankr. N.D. Tex. 2009). The Fifth Circuit applied this standard in *Mirant*, 378 F.3d at 525, concluding that "the business judgment normally applicable to rejection motions is more deferential than the public interest standard applicable in FERC [Federal Energy Regulatory Commission] proceedings to alter the terms of a contract within its jurisdiction. Use of the business judgment standard would be inappropriate in this case because it would not account for the public interest inherent in the transmission and sale of electricity." *Id.* (noting the purpose of FERC's power under the Federal Power Act ("FPA") as being the "protection of the public interest, as distinguished from the private interests of the utilities" (quoting *Fed. Power Comm'n v. Sierra Pac. Power Co.*, 350 U.S. 348, 355, 76 S. Ct. 368 (1956)); *but see In re Calpine Corp.*, 337 B.R. 27, 36 (S.D.N.Y. 2006) (holding, contrary to *Mirant*'s holding, that the court lacked jurisdiction to authorize rejection of certain power agreements because doing so would directly interfere with FERC's

---

[7] "Congress overruled *Bildisco*'s rejection standard for collective-bargaining agreements by passing 11 U.S.C. § 1113 to control the rejection of those agreements." *In re Mirant Corp.*, 378 F.3d 511, 524-25 (5th Cir. 2004) (citing *Am. Flint Glass Workers Union v. Anchor Resolution Corp.*, 197 F.3d 76, 82 (3d Cir. 1999)).

jurisdiction over various aspects of wholesale energy contracts, even though rejection constituted breach rather than modification or termination of the power agreements).

Critically, both the *Bildisco* and *Mirant* courts found that a heightened standard for contract rejection was warranted because the authority to reject under § 365(a) conflicted with the policies designed to protect the national public interest underlying other federal regulatory schemes. In this case, though, while policies designed to protect the public interest may, in part, underlie the Dealer Statutes, those statutes have been enacted by *state legislatures*, not Congress, and by their very terms protect the public interest of their respective states rather than the national public interest. Further, the fundamental interests sought to be protected by these state legislatures are the economic interests of local businesses and customer convenience and costs. Although some Dealer Statutes articulate a public safety concern in such enactments, the public safety issues raised by the closing of dealerships do not create an imminent threat to health or safety. *See infra* discussion of *Midlantic Nat'l Bank v. New Jersey Dep't of Envtl. Prot.*, 474 U.S. 494, 106 S. Ct. 755 (1986).

Some of the Affected Dealers point to the Automobile Dealers Day in Court Act ("ADDCA"), 15 U.S.C. §§ 1221, *et seq.*, as evidence of a Congressional intent to protect the national public interest by allowing dealers to bring a federal cause of action for monetary damages against manufacturers who fail to act in good faith in, *inter alia*, terminating, canceling, or not renewing the dealer's franchise. *See* 15 U.S.C. § 1222; *see also id.* § 1221 (defining good faith as "the duty . . . to act in a fair and equitable manner . . . so as to guarantee the one party freedom from coercion, intimidation, or threats of coercion or intimidation from the other party"). Plainly, the protections provided under the ADDCA are at most coextensive with rather than in conflict with the rejection power under § 365. Under the business judgment standard,

6

"[a] debtor's decision to reject an executory contract must be summarily affirmed unless it is the product of 'bad faith, or whim or caprice.'" *In re Trans World Airlines, Inc.*, 261 B.R. 103, 121 (Bankr. D. Del. 2001) (quoting *Wheeling-Pittsburgh*, 72 B.R. at 849-50). The duty of good faith under the ADDCA is thus embodied by the requirement that a debtor's decision to reject a contract not be in bad faith. Additionally, the monetary damages remedy for violating the ADDCA merely adds a complementary federal cause of action to the remedy for rejection under § 365(g), wherein rejection gives rise to a breach of contract claim against the debtor's estate, the amount of which is determined according to state law. *See In re Lavigne*, 114 F.3d 379, 387 (2d Cir. 1997). As discussed *infra*, the rights and remedies under the Dealer Statutes, such as mandatory waiting or notice periods and buy-back requirements, are more expansive than those under the ADDCA. Had Congress considered it in the national public interest to provide such substantive protections to dealers, it could have done so by amendment to the ADDCA or § 365 itself, or by a separate statute.

This observation is consistent with the *Pilgrim's Pride* court's observation that it was "unwilling to hold that a higher standard for rejection must be met any time another federal law is implicated by the contract to be rejected. Not every act of Congress that may touch a debtor's contract will require the court to consider public policy or other extraneous requirements of federal law in determining whether that contract may be rejected." *Pilgrim's Pride*, 403 B.R. at 424-25. Indeed, the Affected Dealers point to no language in the ADDCA requiring such considerations. Similarly, the *Pilgrim's Pride* court declined to apply the "public interest standard" in a case involving potential violations of the federal Packers and Stockyards Act ("PSA") in the contract rejection context because the court could not find language in the PSA requiring such public policy considerations. *See Pilgrim's Pride*, 403 B.R. at 424-25.

7

The *Pilgrim's Pride* court identified an additional scenario beyond inconsistency with a federal statute or encroachment on the turf of a federal regulator where it may be appropriate to apply a higher standard than business judgment to contract rejection:  local laws designed to protect public health or safety.  *See Pilgrim's Pride*, 403 B.R. at 424 & fn.26 (citing *Midlantic*, 474 U.S. 494).  Many Affected Dealers raised this very issue in the context of federal preemption, arguing that § 365 did not preempt the Dealer Statutes because they were enacted to protect public safety.  While the Court continues discussion of this issue in its discussion of federal preemption *infra*, the Court notes that local laws designed to protect public health or safety, without imminent harm present, do not give rise to application of a heightened standard for contract rejection.[8]  Further, because the ADDCA does not give rise to such application of a "public interest standard," the Court applies the business judgment standard rather than a "public interest standard" here.

A related argument made by some of the Affected Dealers is that the Court should "balance the equities."  Any discussion of equity balancing must begin with the Supreme Court's admonition in *Bildisco* that "[t]he Bankruptcy Code does not authorize free-wheeling consideration of every conceivable equity, but rather only how the equities relate to the success of the reorganization."  *Bildisco,* 465 U.S. at 527.  Instead of focusing on the success of the reorganization, the Affected Dealers direct the Court's attention to the harm the rejections inflict upon them.

---

[8] As further discussed *infra*, the Dealer Statutes have a limited connection to public safety.  The vast majority of Dealer Statutes concern solely commercial issues affecting the dealers and their customers and communities.  A number of Dealer Statutes mention "highway safety" and even then it is in the context of convenient vehicle servicing.  Thus, the health and safety of the public are not threatened by rejection.  *See Pilgrim's Pride*, 403 B.R. at 425.  Further, taking the public safety argument, as articulated by certain Affected Dealers, to its logical conclusion, driving outside the range of one's local Affected Dealer would be a threat to one's safety.  This is simply not the case.  The fact that one may have to drive further for service or transport a car further for service is a matter of convenience and not one of public safety.  Moreover, there is nothing in the Debtors' dealer rationalization program, as further discussed *infra*, that would create a public safety issue.

The Affected Dealers cite *In re Monarch Tool & Mfg. Co.*, 114 B.R. 134, 137 (Bankr. S.D. Ohio 1990) for the proposition that "[d]isproportionate damage to the other party to the contract provides a ground for disapproving rejection." *Id.* at 137 (citations omitted). However, in disapproving the rejection of an exclusive distributorship agreement, the *Monarch* court found that this factor was "reinforced by other consequential facts" such that the court could not find rejection of the contract would improve the debtor's fortunes or benefit general unsecured creditors. Thus, even though the distributor would be "ruined" by its contract being rejected, the *Monarch* court did not hold that rejection was impermissible based on that factor alone but rather based on its evaluation of the rejection's lack of beneficial impact on the debtor's reorganization.

Critically, it was not within the ambit of *Monarch*'s holding that a court may disapprove the rejection of a contract when rejection would "ruin" the counterparty despite the rejection benefiting the estate.[9] Moreover, in a case cited by both the *Petur* court and the Affected Dealers for a supposed "disproportionate damage" test, the court there addressed such interest-balancing only in relation to the benefit derived by unsecured creditors, with such benefit representing the primary criteria for rejection under the business judgment standard. *See In re Chi-Feng Huang*, 23 B.R. 798, 801 (B.A.P. 9th Cir. 1982) (citing *In re Minges*, 602 F.2d 38, 43-44 (2d Cir. 1979)). In fact, the Bankruptcy Appellate Panel specifically found that the trial court erred by relying on "fairness" rather than the business judgment standard in disapproving the trustee's rejection decision. *See Chi-Feng*, 23 B.R. at 800. In fact, these cases involve circumstances under which

---

[9] The Affected Dealers also cite another case in which rejection was disallowed where the counterparty to an exclusive agreement would be "ruined" by rejection of the contract. *See In re Petur U.S.A. Instrument Co., Inc.*, 35 B.R. 561 (Bankr. W.D. Wash. 1983). While the Affected Dealers cite other cases for the proposition that rejection may be disallowed when rejection "disproportionately damages" the counterparty as opposed to benefiting the estate or general unsecured creditors, *Petur* represents the outer limit of this strand of jurisprudence. The *Petur* court relied on "equity" to disallow rejection even though the court concluded that the debtor properly exercised its business judgment and that rejection could create additional profits and aid in reorganization. *See Petur*, 35 B.R. at 563. The *Petur* court nonetheless buttressed its conclusion by considering other facts relevant to the debtor's reorganization and whether such profits were likely to materialize. The Court respectfully disagrees with the *Petur* analysis. Also, additional facts present in *Monarch* and *Petur* further distinguish those cases from this case.

9

the business judgment standard either failed to be met or failed to be properly applied by the bankruptcy court.

However, the Affected Dealers argue that the Court should not allow the Debtors to reject the contracts because the Debtors cannot show that rejection will benefit the estate, particularly its unsecured creditors.  The Affected Dealers cite *In re Dunes Hotel Assocs.*, 194 B.R. 967, 988 (Bankr. D. S.C. 1995) for the proposition that "there must be a showing that the rejection will benefit the estate or creditor, but certainly more than merely benefiting the debtor itself or its equity holders." *Id.* (citations omitted).  As discussed *infra*, the Debtors make a persuasive showing that rejection will benefit their estates.[10]  Although couched in "benefit to the estate" language, the thrust of the Affected Dealers' argument implies that the Debtors fail to show that the Rejected Agreements are "burdensome" to the estate (*i.e.*, that continued performance of the Rejected Agreements results in an actual loss to the estate, *see In re Stable Mews Assocs., Inc.*, 41 B.R. 594, 596 (Bankr. S.D.N.Y. 1984)), because the Affected Dealers argue that they cost the Debtors nothing.[11]  "Burdensome property" is not the relevant test under the business judgment standard, which provides "considerably more flexibility" and "requires only that the trustee demonstrate that rejection of the executory contract will benefit the estate." *Stable Mews*, 41 B.R. at 596 (citations omitted) (noting that the "great weight of modern authority applies the business judgment test" (citations omitted)).

The Court is sympathetic to the impact of the rejections on the dealers and their customers and communities, but such sympathy does not permit the Court to deviate from well-established law and "balance the equities" instead of applying the business judgment standard.

---

[10] The Affected Dealers also argue that the Debtors impermissibly considered the benefit to New Chrysler in their rejection decisions, but a "debtor may reject a contract to make itself more attractive to a buyer."  *G Survivor*, 171 B.R. at 759 (citing *In re Maxwell Newspapers, Inc.*, 981 F.2d 85 (2d Cir. 1992)).

[11] *See infra* fn.13.

10

The *Pilgrim's Pride* court explained this dilemma inherent in the chapter 11 process by returning to the notion of a "public policy exception" to the business judgment standard:

> While the impact of rejection on the [counterparties'] community may be significant, that is not an uncommon result of the cut-backs that typically accompany a restructuring in chapter 11. Whether through contract rejections or plant closings, contraction of a debtor's business will often have a harmful effect for one or more local economies. If the bankruptcy court must second-guess every choice by a trustee or debtor in possession that may economically harm any given locale, the business judgment rule applicable to contract rejection and many other decisions in the chapter 11 process will be swallowed by a public policy exception. *Pilgrim's Pride*, 403 B.R. at 425.

Other courts have held that absent Congressional authority, such as through a separate section of the Bankruptcy Code (*e.g.*, § 1113) or a specific carve-out within § 365 itself, the court is not free to deviate from the business judgment standard and weigh the effect of rejection on debtor's counterparty or the counterparty's customers. *See Wheeling-Pittsburgh*, 72 B.R. at 847-48 (citations omitted).

Accordingly, the scope of the Court's inquiry is limited. Under the business judgment standard, the Court must determine whether rejection will benefit the Debtors' estates. As part of this determination, the Court must determine whether the Debtors made their decisions rationally. *See Pilgrim's Pride*, 403 B.R. at 427. Irrational bases of decision-making include racial and gender discrimination and retaliatory animus. *See id.* at 428. Such bases are antithetical to sound business judgment and demonstrate "bad faith, or whim or caprice." *Wheeling-Pittsburgh*, 72 B.R. at 849-50. However, "whether the debtor is making the best or even a good business decision is not a material issue of fact under the business judgment test." *Id.* at 849.

11

**Application of the Business Judgment Standard**

The Debtors exercised sound business judgment in rejecting the Affected Dealers'

contracts. Rejection of the contracts pursuant to § 365(a) continued and accelerated the Debtors'

efforts to rationalize their dealership network. Beginning in 2001, the Debtors initiated a

program with three goals: evaluate their dealership network and key locations; identify the most

desirable dealerships and dealership locations from the perspective of long-term planning; and

streamline their domestic dealership network to meet long-term goals, including, among other

things, the consolidation of the Debtors' brands at "partial line" dealers to make them "full line"

dealers."[12] The Debtors re-named this program over the years, and most recently it has been

called "Project Genesis."

Project Genesis and its predecessors were launched in response to significant changes in

the American automobile industry, particularly the entry of transplant Original Equipment

Manufacturers ("OEMs") such as Toyota, Honda, and Hyundai into the American market. The

Debtors' dealers have had to compete with these OEMs, the American OEMs, General Motors

and Ford, and each other. The transplant OEMs established much smaller dealership networks

with new and better locations and facilities in growing markets, and recently they have sold

considerably more vehicles annually than the Debtors. As a result, the Debtors' dealers'

"throughput" (*i.e.*, annual sales of vehicles) was but a fraction of some of the transplant OEMs'

throughput. Meanwhile, the Debtors have had to contend with legacy network dealers, many of

which were no longer in the best or growing locations, served a diminishing population of

potential customers, or operated out of outdated facilities.

---

[12] A "partial line" dealer only sells one or two of the Debtors' brands, such as Chrysler or Jeep. A "full line" dealer
sells all three of the Debtors' brands, Chrysler, Jeep, and Dodge.

The Debtors determined that to compete in the automobile marketplace, they would need to streamline their domestic dealership network, specifically through rationalization of dealerships that they determined would not improve their competitive position going forward. The Debtors identified numerous advantages of having a smaller dealership network, including better and more sustainable sales and profitability for each dealer, which in turn would provide greater resources for marketing, reinvesting in the business, improving facilities, enhancing the customer experience and customer service, and keeping and attracting more experienced and highly qualified personnel to work at the dealerships. Even though the overall size of the network would decrease, the Debtors estimated that the greater sales and profitably at the remaining dealerships would eventually result in greater sales for the network overall. A smaller dealership network is expected to concentrate profits such that more capital improvements will be made to a dealership facility, thereby attracting more customers and providing customers with a better experience. A smaller dealership network would also enable the Debtors to reduce expenses and inefficiencies in the distribution system, including reducing costs spent on training, new vehicle allocation personnel, processes, and procedures, dealership network oversight, auditing, and monitoring, and additional operational support functions. Consolidation of "partial line" dealerships would eliminate redundancies and inefficiencies in the dealership network.[13] As previously mentioned, these initial business judgments predated the Debtors' bankruptcy cases by many years, and between 2001 and the filing of the bankruptcy cases, the Debtors reduced their dealership network by over 1100 dealers.

As part of the Debtors' Viability Plan (as defined in *Chrysler*, 405 B.R. 84), the Debtors determined that completion of dealership rationalization was one of their main objectives. The

---

[13] These cost-savings stand in contrast to the Affected Dealers' oft-repeated contention that the dealers cost the Debtors nothing. Nevertheless, cost-savings is not the relevant test under the business judgment standard, *see supra* fn.11 and accompanying text.

13

Debtors further determined that to consummate the Fiat Transaction (as defined in *Chrysler*, 405 B.R. 84), they needed to transfer a strong, well-positioned dealership network to the purchaser. In *Chrysler*, 405 B.R. 84, __, the Court concluded that the Fiat Transaction was the only viable option for the Debtors, with the only other alternative being immediate liquidation. *See id.* at __. The Court further concluded that the procedures utilized by the Debtors to determine which contracts would be assumed and assigned to the purchaser was a reasonable exercise of the Debtors' business judgment. *See id.* at __.

The procedures utilized by the Debtors were substantially similar to those used prior to the bankruptcy cases in Project Genesis.[14]  The Debtors evaluated each dealership, reviewing and analyzing numerous performance and planning factors for each dealership.[15]  The Debtors also drew on external metrics, including new vehicle registration information, demographic data, average distance to the nearest dealer for each locality, and competing manufacturers' market share within the locality.[16]  The Debtors used these factors to create comprehensive statistical assessments of each dealer and make judgments regarding the optimal configuration for each market in the domestic dealer network and the best means of implementing the goals of Project Genesis, as described *supra*.  Once the Debtors decided to pursue the Fiat Transaction, the Debtors also worked with Fiat and New Chrysler to model an anticipated dealership network for

---

[14] According to the Debtors, although Project Genesis primarily focused on dealers in metropolitan markets and key secondary markets (where, among other things, there had been less brand consolidation), the Debtors also evaluated the remaining secondary and rural market dealers.  According to the Debtors, prior to the bankruptcy they worked with dealers in a cooperative manner to reduce and consolidate the domestic dealer network, within the limitations imposed by the Dealer Statutes and any existing agreements.  Further, Project Genesis and its predecessor programs have resulted in an expenditure by the Debtors of over $216 million.

[15] The factors included, among other things, (a) the dealer's (i) brand affiliations; (ii) raw sales volume; (iii) sales performance relative to its Minimum Sales Responsibility ("MSR"); (iv) location; (v) type of market; (vi) facilities; (vii) customer service; (viii) history of experience; and (ix) market share; (b) the planning potential for the dealership; and (c) other factors.

[16] New vehicle registration information included such information for the Debtors' and other OEMs' comparable products, indicating the location of new vehicle registrations within the market and the location of registrations of new motor vehicles sold by each dealer.  Demographic data included (i) current population and household density; (ii) anticipated shift of population and household density; and (iii) average household income.

14

the Alliance Viability Plan (as defined in *Chrysler*, 405 B.R. 84), including by refining their evaluation of dealers under the procedures just described.[17]

In their business judgment, the Debtors determined that rejection of the Rejected Agreements was in the best interest of their restructuring efforts and estates. Based on a subjective and objective evaluation, the Debtors determined that the dealerships to be rejected lacked the operational, market, facility, and linemake characteristics necessary to best contribute to the ongoing dealer network under either current or future ownership. New Chrysler agreed with the Debtors' approach. The Debtors determined, and New Chrysler agreed,[18] that rejection of the Rejected Agreements was necessary and appropriate for implementing the Alliance Viability Plan by enabling the Debtors to consummate the Fiat Transaction and transfer to New Chrysler a smaller, more effective, and more profitable dealer network without disruption while limiting the Debtors' potential postpetition obligations to the Affected Dealers. The Debtors also determined that any delay in making rejection decisions could allow the best dealers or their personnel to be poached by other OEMs, thus reducing the value of the Debtors' assets, specifically its dealership network, pending sale to New Chrysler.

Further, funding for the Affected Dealers under the Debtors' debtor-in-possession budget expired on June 9, 2009. Up to and including that date, the Debtors continued to pay all prepetition and postpetition incentives and warranty obligations to the Affected Dealers. Following that date, the debtor-in-possession budget decreased by 25% for such obligations,

---

[17] The Fiat executive, Alfredo Altavilla ("Altavilla"), who testified at the Sale Hearing (as defined in *Chrysler*, 405 B.R. 84) testified that Fiat did not participate in the selection of individual dealers for rejection but that it was made aware of and agreed with the Debtors' selection methodology and criteria. Altavilla further testified that New Chrysler would have used the same methodology because the Debtors used the same methodology as Fiat used in Europe for restructuring their dealership network.

[18] Altavilla testified that it did not make a material difference whether the restructuring of the dealership network occurred before or after the closing of the Fiat Transaction. However, as discussed *infra* fn.19, 20 and accompanying text, the debtor-in-possession budget anticipated a 25% reduction in the number of dealerships as of June 9, 2009. The Debtors accordingly exercised their business judgment within the constraints imposed by the debtor-in-possession judgment.

reflecting the anticipated rejection of agreements constituting 25% of the Debtors' dealership network.[19]  Therefore, if the dealership network were not reduced, the Debtors would be out of compliance with their budget.  As a result, if the lenders did not authorize additional funds under the budget, funds set aside for the wind-down of the Debtors' estates would have to be used to cover such expenses.

As previously stated, the Court has already concluded that the procedures utilized by the Debtors to determine which contracts would be assumed and assigned to New Chrysler was a reasonable exercise of the Debtors' business judgment.  *See Chrysler*, 405 B.R. at __.  The decision-making process used by the Debtors was rational and an exercise of sound business judgment.  While the Court does not disturb that conclusion herein, the Court expands upon it by further concluding that rejection benefits the Debtors' estates.  The Court also finds that no evidence has been presented to the Court showing that the Debtors made their individual rejection decisions irrationally, such that the rejections demonstrate bad faith or whim or caprice.  Despite intimations of racial and gender discrimination and retaliatory animus, the Court finds that the Affected Dealers making such intimations have not supported them with evidence such as to warrant the Court overturning the Debtors' business judgment.  The Court further notes that the scope of its inquiry regarding the business judgment standard for purposes of rejection does not include an evaluation of whether the Debtors made the *best or even a good* business decision but merely that the decision was made in an exercise of the Debtors' business judgment.

---

[19]  The Court notes that it is immaterial that the debtor-in-possession lender also provided financing for the Fiat Transaction.  The Court approved the debtor-in-possession budget, and the Debtors were obligated to stay within its constraints.  The Court further notes that the Debtors developed a program to assist in the repurchase and reallocation of the Affected Dealers' inventory in a manner designed to maximize the value achieved by the Affected Dealers.  This program has been partially subsidized by the Debtors, and on June 9, 2009, the Debtors' counsel represented that as of that date 97% of Affected Dealers were participating in the program.

With respect to benefiting their estates, the Debtors exercised sound business judgment in rejecting the Rejected Agreements. Following the closing of the Fiat Transaction, the Debtors would no longer be in the car manufacturing business. On the day prior to the legal arguments, June 8, 2009, the closing of the Fiat Transaction was stayed by the Supreme Court. On the following evening, June 9, 2009, the stay was lifted, and the Fiat Transaction closed the next day, June 10, 2009. Moreover, the Fiat Transaction involved the transfer of certain of the Debtors' property, including their trademarks, to New Chrysler, such that the Debtors' would not even have the right to "authorize" the Affected Dealers to continue doing, *e.g.*, warranty work under the Debtors' name after the Fiat Transaction closed. Rejection thus benefits the estate by removing the burden of postpetition performance under these contracts and instead giving the Affected Dealers claims against the Debtors' estates. Certain Affected Dealers argue that they may have claims against the estates that would be characterized as administrative claims and limited to unsecured claims under § 502(g). This issue is not before the Court and will be addressed if raised in the context of any such administrative claim request. However, the argument that the Debtors' actions related to the rejection process would result in an administrative claim does not alter the conclusion that rejection of the Rejected Agreements benefits the Debtors' estates.

Further, there is no doubt that the acceleration of dealership rationalization benefited New Chrysler by enabling it to avoid the costs attendant to such reduction if it took place outside bankruptcy. Yet this does not undermine the Debtors' need to reduce dealerships to be in line with its budget and fulfill its commitments to its lenders.[20] Moreover, as previously discussed, the alternative to the Fiat Transaction was immediate liquidation. It is immaterial whether Fiat

---

[20] The Debtors' prepetition loan from the Governmental Entities (as defined in *Chrysler*, 405 B.R. 85) was conditioned, in part, on dealer network rationalization, and the budget for the Debtors' postpetition debtor-in-possession loan was based, in part, upon such rationalization. *See supra* fn.19 and accompanying text.

17

required the Debtors to reject the number of agreements it rejected.[21]  Dealership rationalization

was a component of the Alliance Viability Plan, and the Debtors were obligated to accelerate this

program, as stated above, to fulfill their commitment to their lenders.

Many of the Affected Dealers have argued that the Debtors' specific application of their

rejection decisions was not appropriate or in bad faith.  Affected Dealers arguing that the

Debtors' application of rejection decision was not appropriate primarily asserted that the Debtors

erred in rejecting their agreements while assuming and assigning agreements with other dealers

in the same market.  The Affected Dealers asserted that those other dealers lagged behind them

according to one or more of the Debtors' metrics.  However, the Debtors have stated that they

conducted a subjective and objective evaluation of each dealership, including by balancing

objective quantitative and qualitative metrics.  Therefore, whether one dealer lagged behind an

Affected Dealer according to one or more of these metrics is immaterial because the Debtors in

their business judgment had the discretion to determine that another factor or consideration was

more important under the circumstances in its evaluation of that market or the network as a

whole.[22]  The Debtors have also stated that rationalization was a cumulative network-centric

process, rather than a process focused on "targeting" individual dealers.  Accordingly, a decision

on an individual dealer may well have come down to a strategic decision with respect to the

---

[21] Altavilla testified that although Fiat did not indicate the size of the restructuring of the dealership network, the number of dealers involved in the restructuring came out of the application of the Debtors' selection methodology. Altavilla also responded affirmatively to a question regarding whether a dealership network needed to be restructured for the Fiat Transaction to close, stating that a "restructuring needs to occur."

[22] Some of the Affected Dealers made much of a certain customer survey regarding the sale of new vehicles.  Under that survey the Debtors' dealerships outranked Toyota and other transplant OEMs.  It was argued, then, that trying to emulate the dealership networks of Toyota and other transplant OEMs would be a mistake and lead to less sales. The survey presented dealt with the customer/dealer relationship at the time of sale and did not include the customer/dealer relationship regarding, *e.g.*, warranty service.  However, regardless of where the Debtors' dealers ranked in the sales survey, or any other survey, it is an inescapable fact that the dealership networks of Toyota and other transplant OEMs have been very successful and have over the years taken a considerable amount of the market share away from the American OEMs, including the Debtors.  Therefore, the sales survey does not provide any basis to find that the Debtors' efforts to emulate the transplant OEMs' dealership networks was not a proper exercise of their business judgment.

whole network, and the business judgment standard would be rendered irrelevant if the Court stepped in to second guess such a decision.

In his extensive testimony, declarations, and depositions, Grady has given the Court no reason to second guess the decisions made by the Debtors.  Moreover, testimony by some of the Affected Dealers at the Sale Hearing shows that the Debtors' decision to rationalize their dealership network was a sound exercise of business judgment.  These Affected Dealers agreed that, *inter alia*, there were too many dealers in their markets, there were economies of scale and efficiencies in having all three brands under one roof, and there would likely be increased sales if there were fewer dealers.  These Affected Dealers instead asserted that the Debtors erred in rejecting their agreements because, *e.g.*, they were highly ranked or had won awards (in addition to surpassing competitors in their markets according to one or more of the Debtors' metrics). This testimony in no way rebuts the Debtors' exercise of their business judgment.  These Affected Dealers presented no evidence to show that the Debtors' rejection decisions as applied to them were irrational.  They merely disagree with the specific decision, having agreed that rationalization of the dealer network as a whole was necessary.  Without any such evidence, the Court has no basis for overturning the Debtors' business judgment.

The bad faith assertions largely fall in two categories.  The first category concerns rejection decisions purportedly made in relation to dealers' acquiescence to or denial of the Debtors' prepetition requests to purchase additional inventory or upgrade facilities.  Some of the dealers who denied the Debtors' requests contend that the Debtors' rejection decisions were based on retaliatory animus.  The second category concerns rejection decisions purportedly made based on racial and gender discrimination.  The Court does not find it necessary to elaborate at

length on these assertions here because those making the assertions present no evidence

connecting the Debtors' purported prepetition conduct with their rejection decisions.

Some of the Affected Dealers allege that the Debtors' personnel threatened retribution if

they did not take additional inventory, sometimes even beyond their capacity.  Such purported

statements are hearsay and unsupported by evidence, and the Court may not circumstantially

infer that the Debtors followed through on such statements by rejecting contracts.  Only evidence

directly implicating the purported statements as being the cause of the rejection decision would

permit the Court to find bad faith and overturn the Debtors' business judgment.  Further, there is

no evidence that dealers who did not take additional inventory were uniformly rejected.

Evidence of such a pattern of conduct would have been relevant evidence to support the

retribution argument.  Similarly, during the Sale Hearing, Grady was asked why two dealers who

had been labeled "litigious" in emails, including regarding one of whom an email said it was

"not a performance issue," were rejected.  In both cases, Grady explained that there were strong

dealers nearby.  The Court finds Grady's testimony credible and finds that the evidence

presented by the Affected Dealers does not prove that the rejection decisions were made in bad

faith rather than in an exercise of business judgment.[23]

The assertions related to racial and gender discrimination are conclusory.  Although some

of the Affected Dealers alleging racial discrimination present statistics showing the impact of

rejections on minority-owned dealerships, they present no evidence that the rejection decisions

took such ownership into account.  In fact, the statistical breakdown itself shows that some

minority groups were impacted less than other minority groups and less than dealers overall.

---

[23] These emails were introduced at the Sale Hearing.  The admission of each email was objected to based upon
hearsay grounds.  Following the Sale Hearing, discovery, including depositions, took place.  Thereafter, no attempt
was made to address the evidentiary objection regarding these emails so as to have them considered for purposes of
the Motion.

Among the factors the Debtors considered were whether markets had growing populations or populations likely to grow.  Such is a legitimate basis for exercising business judgment and does not represent a pretext for eliminating minority-owned dealerships.  Simply, these Affected Dealers cannot show any pattern outside of the criteria set forth by the Debtors that would allow the Court to conclude otherwise.  As for the allegation that Chrysler rejected a female dealer because she was not part of the "good ole boys network," that Affected Dealer presented no evidence for the allegation except to state that it was the only possible explanation for the rejection of her agreement.  The Court may not overturn the Debtors' business judgment based on such unsubstantiated allegations.

**Federal Preemption**

Many of the Objections are premised on the argument that Bankruptcy Code does not preempt the Dealer Statutes.  As previously mentioned, the Dealer Statutes are nonbankruptcy statutes enacted by state legislatures to protect local automobile dealers from certain commercial conduct, including fraud, coercion, and intimidation, by automobile manufacturers.  The Dealer Statutes also set forth the rights and remedies of dealers under such statutes.  Relevant to this case are the rights and remedies related to termination of dealership agreements.[24]  Rights include statutory waiting and notice periods for wind-downs and buy-back requirements for terminations with or without cause.  Remedies include specific types of damages and

---

[24] Although the Debtors seek to reject the Rejected Agreements, some of the Affected Dealers argue that the Debtors are constructively terminating those agreements, thus giving rise to the preemption issue.  The Debtors argue that because they are only seeking to reject the Rejected Agreements and not terminate them, the rejections are not subject to the Dealer Statutes.  *See* 2 NORTON BANKR. L. & PRACT. 3d § 46:23 (footnote omitted) ("Rejection of a contract or unexpired lease, while constituting a breach of contract, does not terminate the contract or lease" except in the narrow situations set out in subsections (h) and (i) of § 365, which are not relevant here).  However, the Debtors argue that to the extent any of the Dealer Statutes could be construed to prevent rejection, such laws are preempted.  The Debtors further argue that while the Dealer Statutes may limit the Debtors' ability to "terminate" the dealer agreements outside of bankruptcy, the Bankruptcy Code preempts the operation of the Dealer Statutes to prevent rejection within bankruptcy by virtue of field preemption and conflict preemption.  Therefore, the issue of whether the Bankruptcy Code preempts the Dealer Statutes is squarely before the Court.

commencement of legal or administrative proceedings.  Consistent with the Order, the Court concludes that the Dealer Statutes are preempted by § 365 with respect to rejection of the Rejected Agreements.  Of course, as with contract rejections in general, damages are still calculated according to state law.

The Supremacy Clause, U.S. Const., art. VI, cl. 2, invalidates state laws that "interfere with, or are contrary to," federal law.  *Hillsborough County v. Automated Med. Labs., Inc.*, 471 U.S. 707, 712, 105 S. Ct. 2371, 2375 (1985) (quoting *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 211 (1824)).  Federal law preempts state law when there is an express statement of Congress to that effect, a comprehensive scheme of federal law is enacted that shows Congress's intent to occupy the whole field in that area, or the federal law directly conflicts with the state law.  *See Hillsborough*, 471 U.S. at 713 (citations omitted).  Because there is no express statement of Congress that the Dealer Statutes are to be preempted by the Bankruptcy Code, the Court's preemption analysis focuses on the latter two types of preemption, field preemption and conflict preemption.

The Supreme Court has held that "Congress' intent to pre-empt all state law in a particular area may be inferred where the scheme of federal regulation is sufficiently comprehensive to make reasonable the inference that Congress 'left no room' for supplementary state regulation," *Hillsborough*, 471 U.S. at 713 (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S. Ct. 1146, 1152 (1947)), and "[p]re-emption of a whole field also will be inferred where the field is one in which 'the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject," *Hillsborough*, 471 U.S. at 413 (quoting *Rice*, 331 U.S. at 230, and citing *Hines v. Davidowitz*, 312 U.S. 52, 61 S. Ct. 399 (1941)).

22

The Debtors argue that field preemption applies for three reasons: first, the comprehensive nature of the Bankruptcy Code; second, the placing of bankruptcy jurisdiction within federal courts; and third, the necessity of promoting a uniform bankruptcy process. Essentially, the Debtors argue that the Bankruptcy Code leaves no room for supplementary state regulation (*i.e.*, the Dealer Statutes) or precludes enforcement of the Dealer Statutes as to the Rejected Agreements.

The Affected Dealers argue in substance that the "field" the Debtors contend is occupied by the Bankruptcy Code permits certain exceptions, such that the Bankruptcy Code does not occupy the whole "field" with respect to the Dealer Statutes. The Affected Dealers analogize the Dealer Statutes to statutory obligations under consumer protection laws, which they argue are independent of any contract and thus not preempted by § 365. The Affected Dealers argue that the exemption of state or local enforcement of purportedly analogous consumer protection laws from the § 362 automatic stay demonstrates that Congress intended that the Bankruptcy Code *not* affect such laws. Had this been the case for the rejection of executory contracts, though, Congress could have similarly carved out such an exception in § 365 itself. The Affected Dealers give the Court no reason to create such an exception on its own and the Court declines to second guess Congress by doing so. Further, the Court notes that § 362(b)(4) exception addresses the right of a state or locality to take action. The issue that arises in the rejection context is the right of the debtor to no longer perform under a contract. It is that right, "to no longer perform," and the consequences therefrom, that would be in direct conflict with a state statute that would require continued performance by a debtor that is being preempted.

Moreover, the House Report, H.R. Rep. No. 595, 95th Cong., 1st Sess. (1977); H.R. 8200, cited by the CCAD mentions consumer protection laws within the broader category of

enforcement of state and local governments' police or regulatory powers.  "Even though such

laws and ordinances may otherwise be valid as an exercise of the state's police power and carry a

heavy presumption against preemption, they must yield if they conflict with the bankruptcy

laws." *Stable Mews*, 41 B.R. at 598 (citing, *inter alia*, *A Framework for Preemption Analysis*, 88

Yale L.J. 363, 380-81 (1978); *Perez v. Campbell*, 402 U.S. 637, 649, 91 S. Ct. 1704, 1711

(1971)).  Nevertheless, several of the Affected Dealers cite cases from this bankruptcy court, as

well as 28 U.S.C. § 959(b), for their argument that the Bankruptcy Code does not preempt all

state and local laws related to police or regulatory powers.  The cases are distinguishable on the

facts and the law, and 28 U.S.C. § 959(b) does not aid in the preemption analysis.

The Affected Dealers cite *In re Kennise Diversified Corp.*, 34 B.R. 237, 245 (Bankr.

S.D.N.Y. 1983), for the proposition that the "provisions of the Bankruptcy Code do not and are

not intended to provide an automatic mechanism for relieving property owners of the unpleasant

effects of valid local laws embodying police and regulatory provisions." *Id.* (citation omitted).

However, *Kennise* addresses the automatic stay and turnover of property rather than the rejection

of contracts.  As previously discussed, the automatic stay has a specific exception for

enforcement of state and local governments' police and regulatory powers.  *See* § 362(b)(4).

*Kennise* explains that this exception is to be narrowly interpreted, *see Kennise*, 34 B.R. at 242,

and cites another case for the further explanation that the stay exception is limited to police

powers "urgently needed to protect public health and welfare." *Id.* (citing *In re IDH Realty, Inc.*,

16 B.R. 55 (Bankr. E.D.N.Y. 1981)).[25]

In another case decided by the same judge a few years after *Kennise*, the court found that

a debtor-lessor could not reject the leases of rent-controlled tenant-lessees in order to re-let the

---

[25] Two additional cases cited by some of the Affected Dealers, *In re Synergy Dev. Corp.*, 140 B.R. 958 (Bankr.
S.D.N.Y. 1992) and *In re Beker Indus. Corp.*, 57 B.R. 611 (Bankr. S.D.N.Y. 1986), both addressed action by states
in the automatic stay context and are thus not relevant to the issues before the Court.

24

apartments at higher rents.  *See In re Friarton Estates Corp.*, 65 B.R. 586 (Bankr. S.D.N.Y.

1986).  The court reasoned that, *inter alia*, the tenant-lessees were protected by § 365(h), which

allowed them to remain in possession of the property for the balance of the lease term and any

renewal or extension of the term that was enforceable by the lessee under "applicable

nonbankruptcy law."  *See Friarton*, 65 B.R. at 593 (quoting § 365(h)).  In that case, New York

City's rent-control laws were the applicable nonbankruptcy law at issue, and, in contrast to this

case, the debtor's rejection power was specifically subordinated to local law by the language of §

365(h) and its reference to "applicable nonbankruptcy law."  *See Resolution Trust Corp. v.*

*Diamond*, 18 F.3d 111, 122 (2d Cir. 1994) (noting that the express deference to "applicable

nonbankruptcy law" in the Bankruptcy Code saves from rejection lease renewal rights

enforceable under rent-control), *vacated and remanded on other grounds sub nom. Solomon v.*

*Resolution Trust Corp.*, 513 U.S. 801, 115 S. Ct. 43 (1994), *on remand*, 45 F.3d 665 (2d Cir.

1995).  As previously discussed, no such "subordination" exists in § 365 which is applicable to

the Rejected Agreements.[26]

Requiring the trustee to provide essential services, including by seeking specific

performance of that obligation in a nonbankruptcy proceeding commenced pursuant to 28 U.S.C.

§ 959(b), would be at odds with the express statutory policy of § 365(h) and create a disparity

---

[26] Although the *Friarton* court rejected the holding in *Stable Mews* to the extent *Friarton* differed from it, *see Friarton*, 65 B.R. at 593 fn.3, the reasoning, if not the result, in the two decisions may be harmonized.  The *Friarton* court stated that 28 U.S.C. § 959(b) obligated the debtor-in-possession to work under the same requirements of law with respect to the operation of its real property that it would be if it were not a debtor-in-possession.  *Friarton*, 65 B.R. at 590.  Because the very language of § 365(h) entitled the tenant-lessees to remain in possession under the rent-control laws (i.e., the "applicable nonbankruptcy law"), the *Friarton* court held that the tenant-lessees could enforce the rights attendant to such possession by commencing a nonbankruptcy proceeding against the debtor-in-possession pursuant to 28 U.S.C. § 959.  *See Friarton*, 65 B.R. at 593.

In *Stable Mews*, the court held that the trustee, who took over operating a commercial rental building for the debtor-in-possession, was not required to provide essential services to the tenant-lessees whose leases he had rejected.  *See Stable Mews*, 41 B.R. at 599.  The tenant-lessees' right to possession of their apartments derived solely from § 365(h) and not any specific nonbankruptcy law protecting the tenant-lessees, but this right could not infringe upon the trustee's right to reject the leases regardless of the condition of the premises at the time of rejection.  *See id.* at 597.

not intended by Congress in its enactment of 28 U.S.C. § 959(b). *See id.* at 599 (citing *Palmer v. Webster & Atlas Nat'l Bank of Boston*, 312 U.S. 156, 163, 61 S. Ct. 542, 547 (1941)). Thus, the trustee would not be able to reap the benefits of his right to reject the leases while the tenant-lessees would still be protected by § 365(h).

By contrast, 28 U.S.C. § 959(b) "embodies a Congressional intention to prevent bankruptcy trustees from using the authority of the federal courts to immunize themselves from state regulation of their business operations. . . . An ongoing business should not receive unfair competitive advantages merely because it seeks to reorganize itself under Chapter 11 of the Bankruptcy Code." *Stable Mews*, 41 B.R. at 598-99 (citing *Butner v. United States*, 440 U.S. 48, 99 S. Ct. 914 (1979); *Palmer*, 312 U.S. at 163). Accordingly, the debtor-in-possession's bankruptcy in *Friarton* would have given him a competitive advantage over fellow owners of rent-controlled buildings but for the tenant-lessees' ability to enforce "applicable nonbankruptcy law" (*i.e.*, the rent-control laws and rights thereunder).[27] However, the tenant-lessees in *Friarton* could only use 28 U.S.C. § 959(b) to enforce such laws because the right to possession enforceable by "applicable nonbankruptcy law" (*i.e.*, the rent-control laws and rights thereunder) prevented the debtor-in-possession from rejecting the leases (and evicting the tenant-lessees) in the first place.[28]

---

[27] While some of the Affected Dealers cite *In re White Crane Trading Co., Inc.,* 170 B.R. 694 (Bankr. E.D. Cal. 1994) for the proposition that "[s]ince section 959(b) admits no exceptions, the court cannot carve out an exemption from state law," *id.* at 705, they fail to place it in the proper context. The court in that case held that 28 U.S.C. § 959(b) "prohibits the use of bankruptcy as a ruse to circumvent applicable state consumer protection laws by those who continue to operate in the marketplace." *Id.* at 698. There has been no allegation that the Debtors' bankruptcy is a ruse to circumvent the Dealer Statutes by a car manufacturer continuing to operate in the marketplace.

[28] The right to possession of *Stable Mews*' non-rent-controlled tenant-lessees was not enforceable by the rent-control laws or any other "applicable nonbankruptcy law." Therefore, the trustee was able to reject the leases under § 365(a) while the tenant-lessees were limited to their rights (*i.e.*, staying in possession of the rental units) and remedies (*i.e.*, setting-off damages from the trustee's breach against rent reserved in the lease) under § 365(h). *See Stable Mews*, 41 B.R. at 597. The tenant-lessees could not use 28 U.S.C. § 959(b) to enforce a right they did not have under applicable nonbankruptcy law by compelling the trustee to perform an obligation from which he was relieved when he rejected the leases. *See Stable Mews*, 41 B.R. at 600-01; *but see Saravia v. 1736 18th St., N.W.,*

In this light, *Friarton* stands not so much for preemption as it does for reading § 365 and 28 U.S.C. § 959(b) holistically.  The rent-control laws did not preempt the right to reject but rather could be read in concert with an express provision of § 365 (*i.e.*, subsection (h)) without conflict.  Accordingly, 28 U.S.C. § 959(b) provided a statutory mechanism enabling their enforcement.  Because no such laws were enforceable by the tenant-lessees in *Stable Mews*, the use of 28 U.S.C. § 959(b) to compel the trustee's performance would have impermissibly forestalled his right to reject under § 365(a) by subjecting the trustee to obligations from which he was relieved.[29]  The contrast is even starker in this case, where the Affected Dealers are unable to cite any subsection of § 365 by which applicable nonbankruptcy law (*i.e.*, the Dealer Statutes) would limit the Debtors' rejection power.  Section 365(h) demonstrates a clear direction from Congress that applicable nonbankruptcy law be considered with respect to possession, *inter alia*, under a lease.  This factor alone distinguishes the residential and commercial lease cases from the preemption issues before the Court as to the Rejected Agreements.

The Affected Dealers also approach 28 U.S.C. § 959(b) by citing *Midlantic*, 474 U.S. at 505 for the Supreme Court's holding that "Congress did not intend for the Bankruptcy Code to pre-empt all state laws that otherwise constrain the exercise of a trustee's powers."  *Id.* at 505.  The Court begins by noting two critical distinctions between *Midlantic* and this case.  First,

---

(continued…)

*Ltd. P'ship*, 844 F.2d 823, 827 (D.C. Cir. 1988) (holding that rejection of leases by a debtor-landlord only released the debtor from the contractual obligations under the leases, not the local statutory obligations of all landlords).  *Saravia* relied on *Friarton* for support, but both *Saravia* and *Friarton* addressed residential buildings, while *Stable Mews* addressed a commercial building, which is more closely analogous to the facts in this case.

[29] The *Stable Mews* court further concluded that "Congress, in balancing the rights of debtor-in-possession landlords with those of tenants through § 365(h) of the Code, did not intend for that balance to be disturbed by the general prohibitions of 28 U.S.C. § 959(b).  Particularly is this so in this case where the general policy of permitting trustees to rid themselves of further executory obligations has been long engrained in bankruptcy law and policy and, most importantly, where the policy of even competition sought to be advanced by the general prohibition will not be markedly disturbed."  *Stable Mews*, 41 B.R. at 600.  The *Stable Mews* court had previously noted that the Bankruptcy Code's setoff remedy under § 365(h) paralleled the state law remedy for a landlord's discontinuation of services but that the remedy of specific performance was preempted.

27

*Midlantic* addressed the trustee's power to abandon property contaminated with toxic waste under § 554. Immediately prior to the statement just quoted, the Supreme Court observed that 28 U.S.C. § 959(b) did not directly apply to abandonment under § 554 and "therefore does not de-limit the precise conditions on an abandonment." *Id.* at 505. Likewise, 28 U.S.C. § 959(b) does not de-limit the precise conditions on contract rejection. Second, while the State and City of New York objected to the abandonment because it would threaten the public's health and safety, there were also Congressional enactments expressing concern over the impact of toxic waste on public health. *Id.* at 505-06. As previously discussed, there is no such Congressional concern over public health or safety expressed in the ADDCA.

However, *Midlantic* primarily addresses the abandonment power with respect to state and local laws, and on this point, the difference between state and local laws regarding toxic waste and the Dealer Statutes is pronounced. The danger to health and safety resulting from the trustee's abandonment in *Midlantic* was "imminent." *Midlantic*, 474 U.S. at 499 fn.3; *compare*, *e.g.*, *supra* fn.8. Accordingly, although the Supreme Court did not "reach[ ] the question whether certain state laws imposing conditions on abandonment may be so onerous as to interfere with the bankruptcy adjudication itself," *id.* at 507, the Supreme Court held that a "trustee may not abandon property in contravention of a state statute or regulation that is reasonably designed to protect the public health or safety from identified hazards." *Id.* In a related footnote, the Supreme Court noted that this exception to the abandonment power under § 554 was a "narrow one" and that the abandonment power was "not to be fettered by laws or regulations not reasonably calculated to protect the public health or safety from *imminent and identifiable harm*." *Id.* at 507 fn.9 (emphasis added).

28

The instant case is thus distinguishable from *Midlantic* because even if the Court were to accept the Affected Dealers' argument that the Dealer Statutes are designed to protect the public health or safety (and the vast majority of the Dealer Statutes make no mention of either), the Affected Dealers have not shown any imminent and identifiable harm from a dealership closing. *See*, *e.g.*, *In re St. Lawrence Corp.*, 239 B.R. 720, 724 (Bankr. D. N.J. 1999) (allowing abandonment notwithstanding a state environment law because, *inter alia*, there was no proof of "imminent and identifiable harm"). In fact, the main "hazard" identified by the Affected Dealers as being addressed by the Dealer Statutes is lack of ready access to a dealership for servicing. As previously mentioned, taking this public safety argument to its logical conclusion, driving outside the range of one's Affected Dealer would be a threat to one's safety. Such premise is unwarranted, and it highlights the issue at hand is one of consumer convenience and costs and the protection of local businesses, rather than a concern over public safety.

Further, if one were to accept the premise as presented it would imply that the transplant OEMs' dealership networks create public safety issues because they have smaller dealership networks serving larger geographical areas. As noted previously, nothing in the dealer network rationalization program or the networks it seeks to emulate reveal that dealer proximity for purposes of warranty and other services is not reasonably accessible.[30] In sum, the Dealer Statutes, as well as the ADDCA, are concerned with protecting economic or commercial interests and are thus preempted by the Bankruptcy Code notwithstanding 28 U.S.C. § 959(b). *See In re Baker & Drake, Inc.*, 35 F.3d 1348, 1353 (9th Cir. 1994) (noting that "federal

---

[30] At the June 9, 2009 hearing, an argument was presented in which one of the Affected Dealers stated that the rationalization program would leave a certain county in California without a dealership and create a public safety issue. Apparently in support of that argument, a local council in that county passed an ordinance in which a public safety concern was raised because many of their police cars were manufactured by the Debtors. The argument is based on the same unwarranted premise that having to seek warranty and other services from a dealer at a greater distance from the customer than that customer's Affected Dealer would create a public safety issue. The Court reiterates that this is an argument based on convenience, not public safety.

bankruptcy preemption is more likely . . . where a state statute is concerned with economic

regulation rather than with protecting the public health and safety").[31]

Moreover, returning the language of *Midlantic* itself, the Supreme Court specifically

stated that it did not reach the question of "whether certain state laws imposing conditions on

abandonment may be so onerous as to interfere with the bankruptcy adjudication itself."

*Midlantic*, 474 U.S. at 507. The Supreme Court's statement raises the second type of preemption

at issue in this case, conflict preemption. State law may be displaced under conflict preemption

when it is physically impossible to comply with both the state and federal law or when state law

"stands as an obstacle to the accomplishment and execution of the full purposes and objectives of

Congress." *See Orson, Inc. v. Miramax Film Corp.*, 189 F.3d 377, 381-82 (3d Cir. 1999) (citing

*Pacific Gas & Elec. Co. v. Energy Res. Conservation and Dev. Comm'n*, 461 U.S. 190, 204, 103

S. Ct. 1713 (1983) and quoting *Jones v. Rath Packing Co.*, 430 U.S. 519, 525, 97 S. Ct. 1305

(1977)). Such is the case even if a state legislature had some purpose in mind in passing its law

other than one of frustration. *See In re Dan Hixson Chevrolet Co.*, 12 B.R. 917, 923 (Bankr.

N.D. Tex. 1981) (citing *Perez*, 402 U.S. 637).

In concluding that § 365 preempted the Texas Motor Vehicle Code's "good cause"

hearing requirement, the court in *Dan Hixson* demonstrated how a typical Dealer Statute

frustrated the Bankruptcy Code's purpose. Under § 365, the bankruptcy court could have

permitted the debtor to assume and cure an executory contract it had breached with a nondebtor

counterparty, while at the same time the Texas Motor Vehicle Commission could have permitted

the contract's termination if it found the nondebtor had "good cause" to terminate. *Dan Hixson*,

---

[31] At the June 9, 2009 hearing, an argument was presented in which one of the Affected Dealers cited *In re G. Heileman Brewing Co., Inc.*, 128 B.R. 876 (Bankr. S.D.N.Y. 1991), in regard to preemption. That case is inapposite because the court there held that under the 21st Amendment to the Constitution, a certain Oregon statute preempted § 365. No such Amendment or Article of the Constitution is implicated by the Dealer Statutes at issue here.

12 B.R. at 924.  Because of this conflict, the bankruptcy court's jurisdiction preempted the state commission's jurisdiction under the Supremacy Clause and could have held the nondebtor in contempt for termination notwithstanding the state commission's "good cause" finding.  *Id.* Likewise, if the bankruptcy court did not permit assumption and cure, the good cause hearing would be rendered unnecessary and moot.  *Id.*  In another case addressing a conflict between the Bankruptcy Code and certain of a state's Dealer Statutes, the bankruptcy court held that § 365 allowed the debtor to assume an executory contract even though it would have been terminated under Florida law.  *See In re Tom Stimus Chrysler-Plymouth, Inc.*, 134 B.R. 676, 679 (Bankr. M.D. Fla. 1991).

More generally, a bankruptcy court recently held that "Congress enacted [§] 365 to provide debtors the authority to reject executory contracts.  This authority preempts state law by virtue of the Supremacy Clause [and] the Bankruptcy Clause."  *In re City of Vallejo*, 403 B.R. 72, 77 (Bankr. E.D. Cal. 2009).  "Where a state law 'unduly impede[s] the operation of federal bankruptcy policy, the state law [will] have to yield.'"  *Id.* (quoting *Perez*, 402 U.S. at 649).[32] Specifically and by no means exclusively, statutory notice or waiting periods of, *e.g.*, 60 or 90 days before termination clearly frustrate § 365's purpose to allow a debtor to reject a contract as soon as the debtor has the court's permission (and there is no waiting period under the Bankruptcy Rules).  Buy-back requirements also frustrate § 365's purpose to free a debtor of obligations once the debtor has rejected the contract.  Good cause hearings frustrate § 365's purpose of giving a bankruptcy court the authority to determine whether a contract may be

---

[32] Returning briefly to 28 U.S.C. § 959(b), state law protections cannot be used to negate the Debtors' rejection powers under § 365.  "The requirement that the debtor in possession continue to operate *according to* state law requirements imposed on the debtor in possession (i.e., § 959(b)) does not imply that its powers under the Code are *subject to* the state law protections."  *In re PSA, Inc.*, 335 B.R. 580, 587 (Bankr. D. Del. 2005) (emphasis in original).  Some of the Affected Dealers in substance argue that the Bankruptcy Code's rejection powers are subject to state law.  This is not the law.  Such argument either flatly ignores the Supremacy Clause or subordinates the Supremacy Clause to a statute (*i.e.*, 28 U.S.C. § 959(b)).

assumed or rejected.[33]  Strict limitations on grounds for nonperformance frustrate § 365's

purpose of allowing a debtor to exercise its business judgment and reject contracts when the

debtor determines rejection benefits the estate.[34]  So-called "blocking rights," which impose

limitations on the power of automobile manufacturers to relocate dealers or establish new

dealerships or modify existing dealerships over a dealer's objection, frustrate § 365's purpose of

giving a debtor the power to decide which contracts it will assume and assign or reject by

allowing other dealers to restrict that power.

Some of the Affected Dealers argue that the Debtors seek injunctive relief in the Motion

and that an adversary proceeding is therefore required.  As noted *supra* fn.2, the Debtors' request

that relief under § 525 of the Bankruptcy Code be granted in the Order was no longer sought in

connection therewith.  Therefore, the main source of the Objections regarding injunctive or

declaratory relief was removed.  The remaining relief requested by the Debtors does not seek

injunctive relief.[35]  Further, to the extent that injunctive relief against an OEM is available under

the Dealer Statutes, that relief is preempted by the Debtors' power to reject under § 365.[36]  Such

preemption does not represent the Court's granting injunctive relief on independent grounds but

---

[33] "Termination procedures" and related obligations frustrate § 365's purpose of giving a bankruptcy court the
authority to determine whether a contract may be assumed or rejected while also frustrating § 365's purpose to free a
debtor of obligations once the debtor has rejected the contract.  Section 366 is specifically designed for utilities, and
it is not relevant to this case that courts have found that state and local regulations regarding procedures for
termination are not preempted.  *See, e.g., Robinson v. Michigan Consol. Gas Co.*, 918 F.2d 579, 588 (6th Cir. 1990).
Any such argument is not analogous to and far afield of the issue of whether the Dealer Statutes are preempted.
[34] Additionally, some of the Affected Dealers argue that certain of the criteria the Debtors used in making their
rationalization determinations were impermissible metrics under certain Dealer Statutes.  To the extent such metrics
are impermissible under certain Dealer Statutes, they are preempted because they frustrate § 365's purpose of
allowing a debtor to exercise its business judgment and evaluate and reject contracts when the debtor determines
rejection benefits the estate.
[35] The only exception in which the Debtors sought injunctive relief related to the consequence of an Affected
Dealer's failure to file a timely and proper damages or administrative claim.  The only objection to that provision of
the Order was the inclusion of the word "proper."  The nature of the relief sought was not controverted.
[36] At the June 9, 2009 hearing, an Affected Dealer raised on objection regarding the Debtors' ability to have certain
equitable relief available under a Dealer Statute discharged, citing *Gouveia v. Tazbir*, 37 F.3d 295 (7th Cir. 1994)
and *Matter of Udell*, 18 F.3d 403 (7th Cir. 1994) for support.  The Court notes that discharge is not before the Court,
but reiterates that to the extent any Dealer Statute provides equitable relief that impacts the Debtors' right under §
365 to reject a contract, such law is preempted.

simply prevents interference with the Debtors' right to reject the agreements at issue.[37]  Thus, no adversary proceeding is required.

**Procedural Issues**

The Affected Dealers raised various procedural arguments regarding the rejection process.  These Objections largely fall in two categories:  first, whether due process and discovery rights have been adequate; and second, whether consideration of each agreement individually is required and whether waiver of Rule 6006(f)(6)'s limitation is proper.

In the first category, many of the Affected Dealers argue that they did not receive full due process or discovery rights, specifically that notice of the Motion was unduly short or that notwithstanding notice of the Motion, they did not receive notice of the Sale Hearing, where their rights would purportedly be adjudicated.  The Court concludes that notice of the Motion and opportunity to be heard was adequate because it complied with applicable rules and case law.  "An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections."  *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314, 70 S. Ct. 652 (1950).

The Motion was filed on May 14, 2009, and served that day by overnight delivery.  The hearing on the Motion was originally scheduled for June 3, 2009, more than 20 days after the Motion was filed.  Twenty days is more than what is required under the Case Management Order (ECF No. 661), which require 14 days notice for matters to be heard at an omnibus hearing, or the Local Rules, which require 10 days notice for contract rejection motions.  *See* Local Rule

---

[37] The Court notes that the Order's reference to the "impact" of rejection under the Bankruptcy Code is a restatement of the law of preemption, as described above.

6006-1 (referencing time limits set forth in Local Rule 9006-1(b)).  Additionally, Rule 2002 does

not list contract rejection motions among the types of relief requiring 20- or 25-days' notice.

The objection deadline was May 26, 2009, and while the Court received over 200 objections,

many of the Affected Dealers filed Objections long before that deadline so they could object to

the Fiat Transaction itself.

 With respect to the Fiat Transaction, the Bidding Procedures Order (ECF No. 492)

required that the sale notice (the "Sale Notice"), which was attached as an exhibit thereto, be

served within two business days after entry of the Bidding Procedures Order.  It is not disputed

that the Debtors fulfilled this requirement.  The Sale Notice, which was served on May 11, 2009,

notified parties that an order approving the sale, if the sale were approved, would authorize the

assumption and assignment of various executory contracts and unexpired leases.  The Bidding

Procedures Order, which was annexed to the sale notice, provided the timeframe for when the

Debtors were required to notify those dealers whose agreements were to be assumed and

assigned.[38]  It is not disputed that the Debtors fulfilled this requirement.

 The Bidding Procedures Order also provided that the purchaser could request that the

Debtor designate (or consent to the Debtor designating) additional executory contracts or

unexpired leases for 30 days after the closing, providing a mechanism for the Debtors to correct

any errors in the application of their rationalization methodology.[39]  The Bidding Procedures

Order also provided the date of the Sale Hearing and related objection deadline.  The argument

by some of the Affected Dealers that they were unaware that the Sale Hearing could affect them

---

[38] No appeal of that order was taken.
[39] After the Sale Hearing concluded on May 29, 2009, New Chrysler on June 2, 2009 waived its right to seek the designation of additional contracts or leases.  That document was filed by the Debtors on June 3, 2009 (ECF No. 3478).  There is no indication that when this provision was discussed at the Sale Hearing or any other hearing the Debtors were aware that New Chrysler would waive its right under that provision, nor is there any indication in the record that New Chrysler had made that determination prior to the conclusion of the Sale Hearing.

is undermined by the large number of Objections filed by Affected Dealers to the Fiat

Transaction itself, wherein those Affected Dealers challenged the Fiat Transaction on many of

the same grounds discussed in this Opinion.  *See*, *e.g.*, *Advantage Healthplan, Inc. v. Potter*, 391

B.R. 521, 553 (D. D.C. 2008) (finding that a party who had sufficient actual notice of a

settlement and hearing and filed an objection was not denied due process).  Some of those

Affected Dealers testified at the Sale Hearing and then had the additional opportunity to press

their Objections at the hearing on the Motion.  Additionally, it was not improper for the Sale

Hearing to be held before the hearing on the Motion.  *See G Survivor*, 171 B.R. at 759 (holding

that a rejection motion returnable after the sale was proper so long as the rejection passed the

business judgment test and the contracts to be rejected were designated prior to court approval of

the sale contract).

The Debtors have also provided discovery to parties who have requested it.  In fact, the

Debtors represent that no Affected Dealer who has actually attempted to obtain discovery from

the Debtors has gone ignored or empty-handed by the Debtors.  The Debtors represent that they

have produced nearly 350,000 pages of documents and made 13 witnesses available for

deposition.  The Court notes that many of the Affected Dealers deposed and cross-examined

certain of these witnesses.  It is not clear what additional information the Affected Dealers that

are objecting to discovery are seeking that would be relevant to the Court's decision on the

Motion.  In any event, due process was not offended by whatever, if any, shortcomings in

discovery there may have been.  *See Batagiannis v. West Lafayette Cmty. Sch. Corp.*, 454 F.3d

738, 742 (noting that a civil litigant's "complaints about a lack of pre-hearing discovery assume

that there is such an entitlement, which there isn't.  There is no constitutional right to discovery

even in criminal prosecutions") (citing *Wardius v. Oregon*, 412 U.S. 470, 93 S. Ct. 2208 (1973)).

In the second category, some of the Affected Dealers argue that each of the 789 Rejected Agreements must be considered individually.  The Affected Dealers cite *In re Nickels Midway Pier*, LLC, 341 B.R. 486, 500-01, (D. N.J. 2006), for the proposition that the bankruptcy court must "analyze separately" whether rejection is in the best interests of the estate and meets the business judgment standard.  *See id.* at 501.  *Nickels Midway* is inapposite for a number of reasons, not the least of which being that the court first had to determine whether an agreement between two parties consisted of two independent, divisible components of the agreement, either of which may have given rise to different protections under certain subsections of § 365 not relevant here.  *Nickels Midway* also addressed an agreement between two parties, not multiple agreements involving many parties in which one party to the agreements remained constant.  *Nickels Midway* therefore does not require separate analysis of each Rejected Agreement by the Court.  Indeed, other cases the Affected Dealers cite also address a court's analysis of agreements that may be severable or divisible rather than a court's analysis of agreements that were undeniably separate in the first place, as is the case here.

Additionally, the argument that each agreement must be considered individually is belied by Rule 6006(f)(6).  That rule states that "[a] motion to reject . . . multiple executory contracts or unexpired leases that are not between the same parties shall: . . . (6) be limited to no more than 100 executory contracts or unexpired leases."  It would defeat the purpose of the rule if a debtor were allowed to "join requests for authority to reject multiple executory contracts or unexpired leases in one motion," Rule 6006(e), but the court were then required to consider each agreement contained in the motion separately.  In this case, the Debtors sought a waiver for the limitation in Rule 6006(f)(6), and the Court granted the waiver in the Order.  Although some of the Affected

36

Dealers cite the 2007 Advisory Committee Note[40] explaining the 2007 amendments to Rule

6006, in which subsections (e), (f), and (g) were added, the Affected Dealers fail to account for

the ability of the court to order "otherwise."  Specifically, the 2007 Advisory Committee Note to

Rule 6006 states that "[a]n omnibus motion to assume, assign, or reject multiple executory

contracts and unexpired leases must comply with the procedural requirements set forth in

subdivision (f) of the rule, unless the court orders otherwise.  These requirements are intended to

ensure that the nondebtor parties to the contracts and leases receive effective notice of the

motion."  10 COLLIER ON BANKRUPTCY ¶ 6006 App. 6006[6] (15th ed. rev. 2009).[41]  As

previously discussed, notice regarding the Motion was adequate and satisfied due process, and

no Affected Dealer has asserted that he could not find his name on any list of Affected Dealers.

    None of the Affected Dealers argued that they did not immediately realize their names

were on the lists attached to the Motion because of the number of dealers listed.  The issues

raised as to the adequacy of notice had nothing to do with the number of dealers listed.  Instead

some of the Affected Dealers focused on the time between receiving notice of the rejection and

the Sale Hearing because they contend it was not until they received the notice of rejection did

they realize that the sale motion would impact their dealerships.  As such, these Objections are

better characterized as objecting to the sufficiency of notice for the Sale Hearing.  However, as

---

[40] Courts often look to the Advisory Committee Notes for interpretive guidance.  *See, e.g., In re Worcester*, 811 F.2d 1224, 1227 (9th Cir. 1987) (relying on the Advisory Committee Notes for clarity as to a rule's application); *In re Crouthamel Potato Chip Co.*, 786 F.2d 141, 145 (3d Cir. 1986) (referencing the Advisory Committee Notes for a rule's purpose); *United Consumers Club, Inc. v. Bledsoe*, 441 F. Supp.2d 967, 985 (N.D. Ind. 2006) (citing Advisory Committee Notes); *In re Levine*, 287 B.R. 683, 701 (Bankr. E.D. Mich. 2002) (using the Advisory Committee Notes to "clear up [an] ambiguity").

[41] At the June 9, 2009 hearing, an argument was presented in which one of the Affected Dealers cited *Pfohl Brothers Landfill Site Steering Comm. v. Allied Waste Systems, Inc.*, 255 F. Supp.2d 134 (W.D.N.Y. 2003) for the proposition that "shall" indicates that an action is mandatory.  See id. at 151.  *Pfohl* is inapposite because it discussed the construction of a statute, not a rule, and specifically made reference to the fact that the word "may" was "legislated." The Bankruptcy Rules are developed by the Advisory Committee and accepted by Congress, and unlike legislative histories, which may be consulted for statutory interpretation only in certain circumstances, the Advisory Committee Notes are often read in conjunction with the Rules for interpretive purposes.  *See supra* fn.40.

previously discussed, that contention is not consistent with the notice required and provided under the Bidding Procedures Order.

Under the circumstances of this case, the Court found it appropriate to order "otherwise" and permit more than 100 agreements to be rejected through one motion. All of the Rejected Agreements were substantially similar, all of the Rejected Agreements were subject to a single comprehensive analysis by the Debtors, and all of them were being rejected and not assigned to New Chrysler.[42] As such, the waiver in the Order helps achieve what the 1983 Advisory Committee Notes deemed the "objective of 'expeditious and economical administration' of cases under the [Bankruptcy] Code [which] has frequently been recognized by the courts to be 'a chief purpose of the bankruptcy laws.'" 9 COLLIER ON BANKRUPTCY ¶ 1001 App. 1001[1] (15th ed. rev. 2009) (citing *Katchen v. Landy*, 382 U.S. 323, 328 (1966); *Bailey v. Glover*, 88 U.S. (21 Wall.) 342, 346-47 (1874); *Ex parte City Bank of New Orleans*, 44 U.S. (3 How.) 292, 312-14, 320-22 (1845)); *see also In re Harris*, 464 F.3d 263, 271 (2d Cir. 2006) (quoting *In re CPDC Inc.*, 221 F.3d 693, 699-700 (5th Cir. 2000) (noting that "the primary goal of courts as enforcers of the bankruptcy rules should be to ensure the swift and efficient resolution of disputes pertaining to the distribution of the bankruptcy estate")). Moreover, while the Court understands the concern of certain Affected Dealers regarding compliance with the Rule 6006(f)(6) limitation, the Court notes that it would not have advanced the process by requiring the Debtors to file eight separate motions requesting the same relief. Notice was timely and proper.

---

[42] *See, e.g.*, *Pilgrim's Pride*, 403 B.R. at 418 fn.8 (ruling on a motion to reject the contracts of 26 counterparties in one order, even though seven of the counterparties had not joined an objection when the court initially ruled that the contracts of 19 counterparties would be ruled on in one order, because "as a practical matter" the counterparties filing the objection were "not distinguishable" from the counterparties who did not join the objection).

**Additional Objections**

Additional Objections were raised by few of the Affected Dealers.  The Objections related to federal antitrust law are without merit.  There is no evidence that the Debtors and New Chrysler engaged in any sort of "conspiracy" to "artificially driv[e] up the prices of new vehicles through lowered competition."  In fact, the Debtors have stated that one of the purposes of the rationalization program was increasing sales and profits at dealers whose agreements were not rationalized, including prior to the bankruptcy in Project Genesis.  In their business judgment, the Debtors determined that this would make their dealership network as a whole more competitive with other OEMs' dealership networks in today's marketplace.  Such determination is not inconsistent with the antirust laws, which were enacted for "the protection of competition, not competitors" and "restrain mergers only to the extent that such combinations may tend to lessen competition."  *Brown Shoe Co. v. United States*, 370 U.S. 294, 320, 82 S. Ct. 1502 (1962). The Debtors' dealership rationalization program was designed to *increase* competition across the automobile industry by putting them on stronger footing.  There is no evidence whatsoever that the rationalization program was undertaken to restrain trade or commerce in violation of the Sherman Act.  *See* 15 U.S.C. § 1.

There is also no evidence that the Debtors contracted, combined, or conspired with Fiat to do so.  The Debtors stated that they shared their rationalization methodology with Fiat, and Altavilla, Fiat's executive, testified that Fiat agreed with that methodology.  There is no evidence that "competitively sensitive information" regarding any specific dealer was exchanged between the Debtors and Fiat at any point.  To the extent Fiat agreed with Debtors on which agreements would be rejected and which would be assumed and assigned to New Chrysler, Altavilla testified that the number of dealers to be rejected came from the Debtors' application of the methodology

to which Fiat had agreed.  Moreover, on May 14, 2009, the Federal Trade Commission ("FTC")

terminated early the statutory waiting period under the Hart-Scott-Rodino Act (the "HSR Act"),

indicating that neither the FTC nor the Department of Justice Antitrust Division intends to take

any enforcement action with respect to the Fiat Transaction, including for any so-called "gun-

jumping."  On the contrary, there is no private right of action for such a violation in the HSR

Act.  See 15 U.S.C. § 18a(g).

       The Objection that the rejection constitutes a violation of the Takings Clause of the Fifth

Amendment is without merit because the Rejected Agreement was a contract between the

Affected Dealer and the Debtors.  A lien in some collateral that is property of the estate is a

necessary prerequisite to a Fifth Amendment Takings Clause claim in the bankruptcy context.

*See Chrysler*, 405 B.R. at __ (citing *United States v. Security Industrial Bank*, 459 U.S. 70, 103

S. Ct. 407 (1982)).  The Objections that § 365(n) entitles the Affected Dealers to retain their

rights with respect to the Chrysler trademarks and continue using them post-rejection are also

without merit.  Section 365(n) only allows such retention of rights and continued usage if the

executory contract is one under which "the debtor is a licensor of a right to intellectual property."

Section 365(n).  Trademarks are not "intellectual property" under the Bankruptcy Code.  *See* §

101(35A); *see also In re Chipwich, Inc.*, 54 B.R. 427, 431 (Bankr. S.D.N.Y. 1985) (stating that

rejection of licenses by licensor deprives licensee of right to use trademark but licensee has

allowable claim for damages for breach of contract).  Similarly, the Objection that the rejection

constitutes a violation of the First Amendment because the Affected Dealers may no longer use

the Chrysler name in, *e.g.*, newspaper advertisements is without merit and far afield.

       Lastly, the Objections that the Debtors violated certain Affected Dealer-debtors'

automatic stays by rejecting their agreements are without merit.  The Debtors were not required

40

to seek relief from the automatic stay in another debtor's bankruptcy case before exercising their

right to reject a contract with that debtor in this case.  *See In re Sun City Investments, Inc.*, 89

B.R. 245, 249 (finding that a debtor need not move for relief from the automatic stay prior to

filing a motion to reject an executory contract with another debtor).  While relevant authority, *In*

*re Computer Commc'ns, Inc.*, 824 F.2d 725 (9th Cir. 1987), indicates that the unilateral

termination by one debtor of a contract with another debtor violates the automatic stay of the

second debtor, *see id.* at 728, rejection is not termination.  *See* 2 NORTON BANKR. L. & PRACT. 3d

§ 46:23 (footnote omitted) ("Rejection of a contract or unexpired lease, while constituting a

breach of contract, does not terminate the contract or lease").  As such, rejection is a fundamental

right of a debtor "not to perform" its contractual obligations.  From such rejection, depending on

the nature of the contract, certain consequences flow to the debtor and its nondebtor

counterparty.[43]

Moreover, another bankruptcy court in one of the Affected Dealer-debtors' bankruptcy

cases denied that Affected Dealer's emergency contempt motion against the Debtors for the

alleged stay violation.  *See* Unreported Order in *In re Dave Croft Motors, Inc.*, Case No. 08-

32084 (Bankr. S.D. Ill. May 29, 2009) ("The Emergency Motion for Contempt for Chrysler

LLC's Violation of the Automatic Stay filed by the Debtor, on May 26, 2009, is DENIED; and, .

. . Nothing in this Court's Order is intended to delay proceedings in the bankruptcy of Chrysler,

LLC, in the Southern District of New York, in Case No. 09-50002.").  Accordingly, the issue of

---

[43] In one of the Affected Dealer-debtors' bankruptcy cases, *In re Prebul Jeep, Inc.*, Case No. 09-10838 (Bankr. E.D. Tenn. 2008), that Affected Dealer moved for an order of contempt against the Debtors for violation of the automatic stay.  That Affected Dealer so moved on June 10, 2009, with a hearing on the motion scheduled for July 16, 2009. However, that Affected Dealer raised the issue of violation of the automatic stay in an Objection filed with this Court on May 29, 2009, and this Court overruled that Objection in the Order on June 9, 2009, along with the other Objections not otherwise resolved in the Order.

whether the Debtors violated that Affected Dealer's automatic stay is precluded by *res judicata* because the issue was adjudicated by the other court.[44]

## CONCLUSION

The Court concludes that the Debtors exercised sound business judgment in rejecting the Rejected Agreements and that such rejection benefited the Debtors' estates. The Court further concludes that such rejection is appropriate and necessary based on the evidentiary record and the arguments made by the parties and that such rejection is warranted and permissible under §§ 105, 365, and Rule 6006. The Court finds that to the extent that any Dealer Statutes conflict with the terms of the Order or the impact of such rejection under the Bankruptcy Code and applicable case law, such laws are preempted by the Bankruptcy Code, pursuant to the Supremacy Clause of the United States Constitution. The Court further finds that a waiver of the limitation in Rule 6006(f)(6) is warranted and permissible.

---

[44] The Court notes that counsel for that Affected Dealer failed to disclose this fact when he presented arguments to the Court at the June 9, 2009 hearing. Further, although that Affected Dealer cited *In re Miller*, 397 F.3d 726 (9th Cir. 2005) for the proposition that one bankruptcy court's action against a debtor with a bankruptcy case pending before another bankruptcy court constitutes a violation of the automatic stay and is void, *see id.* at 732-33, *Miller* is distinguishable because in that case the first debtor sought attorney's fees (*i.e.*, monetary damages) from the second debtor. In this case, the Debtors are exercising their right "not to perform" their contractual obligations.

This Court shall retain jurisdiction to resolve all matters relating to the implementation, enforcement, and interpretation of the Order.  Without limiting the foregoing, the Court also shall retain jurisdiction with respect to the Order and the Rejected Agreements over (a) any actions by the Affected Dealers against the Debtors or the property of their estates, including, without limitation, any actions in violation of the automatic stay under § 362; and (b) any rejection damages claims or other claims alleged against the Debtors' estates, stemming from, or in any way related to, the rejection of the Rejected Agreements, or any objections or defenses thereto.  Matters concerning the nature, characterization, priority, or any other aspect of such claims, including damages, related to the rejection of the Rejected Agreements shall be heard by the Court at the hearings regarding such claims and damages and are not decided herein.


Dated: New York, New York
            June 19, 2009

                                        **/s/ Arthur J. Gonzalez**
                                        UNITED STATES BANKRUPTCY JUDGE