Hearing Date and Time:  November 12, 2009 at 9:30 a.m., E.T.
Objection Deadline:  November 5, 2009 at 4:00 p.m., E.T.

JONES DAY
222 East 41st Street
New York, New York  10017
Telephone:  (212) 326-3939
Facsimile:  (212) 755-7306
Corinne Ball
Veerle Roovers

JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212
David G. Heiman

JONES DAY
1420 Peachtree Street, N.E.
Suite 800
Atlanta, Georgia  30309
Telephone:  (404) 521-3939
Facsimile:  (404) 581-8330
Jeffrey B. Ellman

Attorneys for Debtors
and Debtors in Possession

# UNITED STATES BANKRUPTCY COURT
# SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------x
                                        :
In re                                   :    Chapter 11
                                        :
Old Carco LLC                           :    Case No. 09-50002 (AJG)
(f/k/a Chrysler LLC), *et al.*,[1]      :
                                        :    (Jointly Administered)
                        Debtors.        :
                                        x
---------------------------------------------------------

## NOTICE OF HEARING ON MOTION OF DEBTORS AND DEBTORS IN POSSESSION, PURSUANT TO SECTIONS 105 AND 363 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULES 2002 AND 6004, FOR AN ORDER AUTHORIZING THE SALE OF NEWARK, DELAWARE ASSEMBLY PLANT FREE AND CLEAR OF ALL LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES

---

[1]    A second amended list of the Debtors, their addresses and tax identification numbers is located on the docket for Case No. 09-50002 (AJG) (Docket No. 3945) and can also be found at www.chryslerrestructuring.com.

**PLEASE TAKE NOTICE OF THE FOLLOWING:**

1.        A hearing to consider the Motion of Debtors and Debtors in Possession, Pursuant to Sections 105 and 163 of the Bankruptcy Code and Bankruptcy Rules 2002 and 6004, for an Order Authorizing the Sale of Newark, Delaware Assembly Plant Free and Clear of All Liens, Claims, Interests and Encumbrances (the "Motion"), filed by the above-captioned debtors and debtors in possession (the "Debtors"), shall be held before the Honorable Arthur J. Gonzalez, United States Bankruptcy Judge, in Room 523 of the United States Bankruptcy Court, Alexander Hamilton Custom House, One Bowling Green, New York, New York 10004, on **November 12, 2009, at 9:30 a.m. (New York time).**

2.        Objections, if any, to the relief sought in the Motion must be made in writing, with a hard copy to Chambers, conform to the Federal Rules of Bankruptcy Procedure and the Local Rules for the United States Bankruptcy Court for the Southern District of New York and be filed with the Bankruptcy Court and must be served in accordance with the Administrative Order, Pursuant to Bankruptcy Rule 1015(c), Establishing Case Management and Scheduling Procedures (Docket No. 661) (the "Case Management Order"), so as to be actually received by the parties on the Special Service List (as defined in the Case Management Order) and the parties to the leases of non-residential real property sought to be affected not later than **4:00 p.m. (New York time) on November 5, 2009** (the "Objection Deadline").

3.        If no objections are timely filed and served with respect to the Motion, the Debtors may, on or after the Objection Deadline, submit to the Court an order substantially in the form attached to the Motion, which order shall be submitted and may be entered with no further notice or opportunity to be heard offered to any party.

        4.       Copies of the Motion, the Case Management Order and the Special

Service List may be obtained from the Court's website at http://ecf.nysb-mega.uscourts.gov or,

free of charge, at www.chryslerrestructuring.com.

Dated:  October 23, 2009              Respectfully submitted,
       New York, New York

       /s/ Corinne Ball
       Corinne Ball
       Veerle Roovers
       JONES DAY
       222 East 41st Street
       New York, New York  10017
       Telephone:  (212) 326-3939
       Facsimile:  (212) 755-7306

       David G. Heiman
       JONES DAY
       North Point
       901 Lakeside Avenue
       Cleveland, Ohio  44114
       Telephone:  (216) 586-3939
       Facsimile:  (216) 579-0212

       Jeffrey B. Ellman
       JONES DAY
       1420 Peachtree Street, N.E.
       Suite 800
       Atlanta, Georgia  30309
       Telephone:  (404) 521-3939
       Facsimile:  (404) 581-8330

       ATTORNEYS FOR DEBTORS AND
       DEBTORS IN POSSESSION

JONES DAY
222 East 41st Street
New York, New York  10017
Telephone:  (212) 326-3939
Facsimile:  (212) 755-7306
Corinne Ball
Veerle Roovers

JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212
David G. Heiman

JONES DAY
1420 Peachtree Street, N.E.
Suite 800
Atlanta, Georgia  30309
Telephone:  (404) 581-3939
Facsimile:  (404) 581-8330
Jeffrey B. Ellman

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

```
-------------------------------------------------------------x
                                        :
In re                                   :   Chapter 11
                                        :
Old Carco LLC                           :   Case No. 09-50002 (AJG)
(f/k/a Chrysler LLC), et al.,           :
                                        :   (Jointly Administered)
                        Debtors.        :
                                        :
-------------------------------------------------------------x
```

**MOTION OF DEBTORS AND DEBTORS IN POSSESSION, PURSUANT
TO SECTIONS 105 AND 363 OF THE BANKRUPTCY CODE AND
BANKRUPTCY RULES 2002 AND 6004, FOR AN ORDER AUTHORIZING
THE SALE OF NEWARK, DELAWARE ASSEMBLY PLANT FREE
AND CLEAR OF ALL LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES**

TO THE HONORABLE ARTHUR J. GONZALEZ,
UNITED STATES BANKRUPTCY JUDGE:

Old Carco LLC f/k/a Chrysler LLC ("Old Carco") and its affiliated debtors and debtors in possession (collectively with Old Carco, the "Debtors") respectfully represent as follows:

### Background

1.       On April 30, 2009 (the "Petition Date"), Old Carco and 24 of its affiliated Debtors commenced their reorganization cases by filing voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  On May 19, 2009, Debtor Alpha Holding LP commenced its reorganization case by filing a voluntary petition under chapter 11 of the Bankruptcy Code.  By orders of the Court (Docket Nos. 97 and 2188), the Debtors' chapter 11 cases have been consolidated for procedural purposes only and are being administered jointly.

2.       The Debtors are authorized to continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3.       On May 5, 2009, the Office of the United States Trustee for the Southern District of New York appointed an official committee of unsecured creditors, pursuant to section 1102 of the Bankruptcy Code.

4.       As of the Petition Date, the Debtors and their nondebtor direct and indirect subsidiaries (collectively, the "Old Carco Companies") comprised one of the world's largest manufacturers and distributors of automobiles and other vehicles, together with related parts and accessories.  On the Petition Date, the Old Carco Companies employed approximately 55,000 hourly and salaried employees worldwide, 70% of whom were based in the United States.

5.      For the 12 months ended December 31, 2008, the Old Carco Companies recorded revenue of more than $48.4 billion and had assets of approximately $39.3 billion and liabilities totaling $55.2 billion.

6.      In connection with the commencement of these cases, Old Carco and its Debtor subsidiaries, Fiat S.p.A. ("Fiat") and New Chrysler (as defined below) entered into a Master Transaction Agreement dated as of April 30, 2009 (as amended and collectively with other ancillary and supporting documents, the "MTA").  The MTA provided, among other things, that:  (a) Old Carco would transfer the majority of its operating assets to New CarCo Acquisition LLC n/k/a Chrysler Group LLC ("New Chrysler"), a newly established Delaware limited liability company formed by Fiat; and (b) in exchange for those assets, New Chrysler would assume certain of the Debtors' liabilities and pay to Old Carco $2 billion in cash (collectively with the other transactions contemplated by the MTA, the "Fiat Transaction").  On May 3, 2009, the Original Debtors filed a motion to approve the Fiat Transaction or a similar transaction with a competing bidder (Docket No. 190).

7.      On May 31, 2009, this Court issued:  (a) an Opinion Granting the Debtors' Motion Seeking Authority to Sell, Pursuant to § 363, Substantially All of the Debtors' Assets (Docket No. 3073) (the "Sale Opinion"); and (b) an Opinion and Order Regarding Emergency Economic Stabilization Act of 2008 and Troubled Asset Relief Program (Docket Nos. 3074 and 3229) (together with the Sale Opinion, the "Opinions").  On June 1, 2009 and consistent with the Sale Opinion, this Court entered an Order authorizing the Fiat Transaction (Docket No. 3232) (the "Sale Order").  On June 5, 2009, the United States Court of Appeals for the Second Circuit affirmed the Opinions and the Sale Order.  Consistent with the Sale Order, the Fiat Transaction was consummated on June 10, 2009 (the "Closing").

**Jurisdiction**

8.      This Court has subject matter jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

**Relief Requested**

9.      The Debtors have executed a purchase agreement (together with the exhibits thereto, the "Purchase Agreement") for the sale of their Newark, Delaware assembly plant (as further defined in the Purchase Agreement, the "Property") to the University of Delaware or an acquisition vehicle created by the University of Delaware (either such entity, the "Buyer").  A copy of the Purchase Agreement is attached hereto as Exhibit A.  A declaration of Peter C. Chadwick of Capstone Advisors (the "Chadwick Declaration") describing the marketing process for the Property and the Debtors' decision to enter into the Purchase Agreement is attached hereto as Exhibit B.  A copy of the notice the Debtors intend to publish concerning the sale (the "Publication Notice") is attached hereto as Exhibit C.  By this Motion, pursuant to sections 105 and 363 of the Bankruptcy Code and Rules 2002 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), the Debtors seek the entry of an order in substantially the form attached hereto as Exhibit D (the "Sale Order") authorizing the sale of the Property to the Buyer, free and clear of liens, claims, interests and encumbrances.

**Facts Relevant to This Motion**

*The Property*

10.      The Property consists of two parcels totaling 271 acres located in New Castle County in the State of Delaware and includes a manufacturing facility and a parts distribution facility.  See Chadwick Declaration at ¶ 4.  In conjunction with their restructuring of

operations prior to the Petition Date, the Debtors shut down production at the Property at the end of 2008.  See id.

11.     The Property was pledged as collateral to secure the Debtors' obligations under the Amended and Restated First Lien Credit Agreement, dated as of August 3, 2007 (as amended or modified, the "First Lien Credit Agreement"), by and among Carco Intermediate Holdco II LLC, Old Carco, the lenders' party thereto (collectively, the "First Lien Lenders") and JP Morgan Chase N.A., in its capacity as administrative agent (the "First Lien Agent").  The carrying costs associated with the Property are substantial and are estimated on an annual basis to be in excess of $5,000,000.  See id. at ¶ 5.  These costs currently are being borne by New Chrysler under the Transition Services Agreement, dated June 10, 2009, between New Chrysler and Old Carco (the "TSA") entered into in connection with the Fiat Transaction, but New Chrysler's obligation to pay these expenses currently expires on October 31, 2009.[1]  See id.

*The Marketing of the Property*

12.     Since May 2008, the Debtors have been utilizing UGL Equis Corporation ("Equis") to market the Property.  See id. at ¶ 6.  As part of Equis' marketing efforts, Equis contacted numerous investor groups concerning their interest in the Property.  See id.  In addition to Equis' extensive marketing campaign, the Debtors' intention to close the Property was publicly announced prior to the plant's closing and widely covered in the Delaware press at that time.  See id.

13.     Due to the collapse of the financing markets and the general deterioration of the economy in the United States, the potential pool of buyers for large industrial facilities, such as the Property, diminished significantly.  See id. at ¶ 7.  Nevertheless, both prior to and

---

[1]     The October 31, 2009 expiration of the TSA is provided for by the amendment to the TSA approved by the Court on October 9, 2009 (Docket No. 5738).

subsequent to the Petition Date, Equis was contacted by multiple parties interested in the

Property. See id. Subsequent to the Petition Date, and after discussion with each party that

continued to express an interest in the Property, the Debtors requested the submission of letters

of intent representing the best offer from each of such parties for the Property by August 6, 2009

(the "Offer Deadline"). See id. The only party that submitted a firm offer by the Offer Deadline

was the Buyer. See id. While some other parties have continued to express an interest in the

Property since the Offer Deadline, no other party has submitted a firm offer. See id.

14.     The written offer submitted by the Buyer formed the basis for subsequent

extensive discussions that led to the Purchase Agreement. See id. at ¶ 8. The Debtors believe

that the terms and conditions of the Purchase Agreement are favorable to their estates and

represent the highest and best offer for the Property under the circumstances for the following

reasons. See id. First, the Buyer has committed funding for the transaction and is willing to

close on an expedited basis. See id. Second, the timely consummation of the transactions under

the Purchase Agreement will allow the Debtors to avoid incurring the substantial carrying costs

associated with the Property, while bringing in significant cash that (after payment of closing

costs) can be used to reduce the claims of the First Lien Lenders under the First Lien Credit

Agreement. See id. Third, pursuant to the Purchase Agreement, the Buyer is assuming

responsibility for the remediation of certain environmental issues on the Property, which

otherwise could impose obligations on the Debtors. See id. Fourth, while other parties have

continued to express interest in the Property, no party has actually come forward with a higher

and better offer (taking into account ability to close promptly and no financing contingency,

among other things). See id.

15.    After 18 months of marketing the Property, the Buyer remains the only party that has come forward with a firm offer and no financing contingency.  See id. at ¶ 9. Accordingly, the Debtors do not believe that a further marketing process would be reasonably likely to bring in a higher offer sufficient to offset the carrying costs and other expenses associated with such a strategy.[2]  See id.

16.    Throughout their negotiations with the Buyer, the Debtors have been in ongoing discussions with the First Lien Agent regarding both the Buyer's proposal for and other expressions of interest in the Property, which is entirely encumbered by the First Lien Lenders' liens.  See id. at ¶ 10.  The First Lien Agent has indicated that the First Lien Lenders have consented to the private sale of the Property to the Buyer.  See id.

17.    In addition, because the Debtors' postpetition lenders, whose liens on the Property are junior to the liens supporting the loans under the First Lien Credit Agreement, are currently unwilling to fund the Debtors' efforts to liquidate the First Lien Lenders' collateral, the Debtors sought and obtained a commitment from the First Lien Lenders to fund a private sale of the Property.  See id. at ¶ 11.  The First Lien Lenders have not agreed to fund the costs associated with a more extended marketing and overbid process.  See id.  As a result, the Debtors do not have a consensual agreement to fund the carrying costs or sales process associated with an extended sale process for the Property.  See id.

---

[2]    Moreover, given that the Buyer has broad eminent domain rights under Delaware law (See Del. Code. Ann. Tit. 14 § 5114 (2009)) and has publicly indicated a willingness to use such rights to acquire the Property, the Debtors, while not taking a position on the validity or viability of such rights, anticipate that other potential purchasers may be reluctant to take the risk that the Buyer would seek to use its eminent domain rights to secure the Property from any other successful purchaser.

*The Purchase Agreement for the Property*

18.    The principal terms of the Purchase Agreement are summarized below:[3]

| Acquired Assets | The real property described on Exhibit A to the Purchase Agreement and all associated improvements. |
|---|---|
| Excluded Assets | The sale will not include any personalty owned by New Chrysler specified on Exhibit B to the Purchase Agreement that is to be removed prior to the closing. |
| Purchase Price | $24,250,000 |
| Deposit | $2,000,000 |
| Closing Conditions | The sale is conditioned on entry of the Sale Order and the receipt of an ALTA Owner's Policy of Title Insurance insuring fee simple title and subject only to the Permitted Liens (as such term is defined in the Purchase Agreement). |
| Remediation | The Buyer, at its sole cost and expense, will conduct a remediation of the Property according to a remediation plan approved by the Delaware Department of Natural Resources and Environmental Controls and as set forth in the Purchase Agreement. |
| Decomissioning | Prior to the Closing, the decommissioning work specified on Exhibit E to the Purchase Agreement shall be completed.  To secure the performance of this work, the parties shall enter into an escrow agreement in the form attached to the Purchase Agreement as Exhibit F for the escrowing of $500,000 for a 75-day period to reimburse Buyer for any decommissioning work which is not completed. |
| Environmental Liabilities | The Buyer shall take title to the real property on an "as is," "where is" basis and subject to any currently existing environmental liabilities on the Property. |
| Closing Costs | The parties shall split any title-agency fees and transfer costs.  The Buyer shall pay all expenses associated with a title policy and with recording of a deed for the property. |

---

[3]    This chart is intended for summary purposes only and in the event of any inconsistency between this summary and the Purchase Agreement, the Purchase Agreement shall govern.

*Notice of the Proposed Sale*

19.     In accordance with the Administrative Order, pursuant to Bankruptcy Rule 1015(c), Establishing Case Management and Scheduling Procedures (Docket No. 661), the Debtors will provide notice of the proposed sale of the Newark Property by serving this Motion on the following parties:  (a) counsel to the Creditors' Committee; (b) counsel to the First Lien Agent; (c) counsel to the Debtors' postpetition lenders; (d) any party who has asserted a lien in the Property that is shown in the title commitment that has been obtained for the Property; (e) any party who has expressed an interest to the Debtors or Equis in purchasing the Property; (f) parties who have filed requests for notices in these cases; (g) the Internal Revenue Service; (h) the U.S. Environmental Protection Agency; and (i) the Attorney General for the State of Delaware.  In addition, the Debtors will publish the Publication Notice in the *Philadelphia Inquirer* and the *Delaware News Journal* as soon as practicable after the filing of this Motion to provide notice of the sale of the Property in the area where it is located.  The Debtors submit that providing notice of the sale in this manner is reasonable and will adequately apprise interested parties of the sale of the Property, while avoiding the costs associated with having the Debtors serve this Motion who are not likely to be directly impacted by the sale of the Newark Property.

## Extraordinary Provision Under the Guidelines

20.     The following items in the Purchase Agreement and the Sale Order which may be considered extraordinary under the Guidelines for the Conduct of Asset Sales (General Order M-331):

(a)     Private Sale.  As described above, the Purchase Agreement and Sale Order contemplate the private sale of the Property.  As described elsewhere in this Motion, the Debtors believe that a private sale is appropriate under the circumstances.  In addition, the Purchase Agreement contains a "fiduciary out" provision which provides that the Debtors are able to "respond to any inquiries or offers with respect to the direct or indirect sale, transfer or other disposition, in one or more transactions, by one or more persons or entities (other than to

Purchaser and its Affiliates and representatives), of all or a portion of the Property whether by sale of the Property or otherwise, including any proposals or offers for any transactions arising under a plan of liquidation that provides for the sale of all or a portion of the Property (an "Alternative Transaction") and perform any and all other acts related thereto that are required under the Bankruptcy Code or other applicable law or are appropriate to fulfill [the Debtors'] fiduciary duties, including, without limitation, supplying information relating to the Property to prospective purchasers and serving the Sale Motion as set forth in Section 8(c) herein. See Purchase Agreement at § 8(a).

(b)    Findings Concerning Successor Liability. The proposed form of Sale Order contains provisions limiting the Buyer's successor liability. Because (a) the Property has not been operating for almost a year, (b) the Property is one parcel of real estate out of the Debtors' many remaining assets and (c) the Buyer will not be continuing the Debtors' business, the Debtors believe that a finding that the sale can be made free and clear of successor liability claims in the Sale Order complies with applicable principles of sales free and clear of successor liability claims pursuant to section 363(f) of the Bankruptcy Code. In addition, the Debtors are providing notice of the proposed sale through the Publication Notice.

(c)    Waiver of Bankruptcy Rule 6004(h) Stay. The proposed form of Sale Order seeks a waiver of the 10-day stay imposed under Bankruptcy Rule 6004(h). As described above, the Debtors are exposed to significant monthly carrying costs for the Property after October 31, 2009 when New Chrysler's obligation to reimburse these costs expires. The Debtors submit that relief from this rule is appropriate under the circumstances to minimize the carrying costs which will be incurred after October 31, 2009.

## **Argument**

*Approval of the Sale of the Property is Appropriate*
*and in the Best Interests of the Debtors' Estates and Creditors*

21.    Under section 363 of the Bankruptcy Code, a debtor in possession may sell property of its estate outside of the ordinary course of its business, subject to the approval of the court after notice and a hearing. See 11 U.S.C. § 363(b)(1). Section 363 of the Bankruptcy Code does not set forth a standard for determining when it is appropriate for a court to authorize the sale or disposition of a debtor's assets prior to confirmation of a plan. However, courts in the Second Circuit have found that the decision to sell assets outside the ordinary course of business should be based upon the sound business judgment of the debtor and where that judgment has a

reasonable basis, that judgment should ordinarily be deferred to by a court in determining whether to approve a proposed transaction.  See Indiana State Police Pension Trust v. Chrysler LLC (In re Chrysler LLC), 2009 U.S. App. Lexis 17441 at *22-23 (2d Cir. Aug. 5, 2009) (noting that even a sale of substantially all of the assets of a debtor can be made under section 363(b) of the Bankruptcy Code if there is a "good business reason"); Licensing By Paolo, Inc. v. Sinatra (In re Gucci), 126 F.3d 380, 387 (2d Cir. 1997) ("A sale of a substantial part of a Chapter 11 estate may be conducted if a good business reason exists to support it."); Comm. of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983); In re Chateaugay Corp., 973 F.2d 141, 143 (2d Cir. 1992); Stephens Indus. v. McClung, 789 F.2d 386, 390 (6th Cir. 1986) ("bankruptcy court can authorize a sale of all [of] a Chapter 11 debtor's assets under [section] 363(b)(1) when a sound business purpose dictates such action."); Comm. of Asbestos-Related Litigants v. Johns-Manville Corp. (In re Johns-Manville Corp.), 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) ("Where the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct.").

22.    Courts typically consider the following four factors in determining whether a proposed sale satisfies this standard:  (a) whether a sound business justification exists for the sale, (b) whether adequate and reasonable notice of the sale was given to interested parties, (c) whether the sale will produce a fair and reasonable price for the property and (d) whether the parties have acted in good faith.  See, e.g., In re Weatherly Frozen Food Group, Inc., 149 B.R. 480, 483 (Bankr. N.D. Ohio 1992); In re Delaware & Hudson Ry. Co., 124 B.R. 169, 176 (D. Del. 1991).

23.    Here, each of the four factors have been satisfied.  First, even before the
Debtors sold their operating assets in the Fiat Transaction, the Property was an excess facility not
being used by the Debtors.  Selling the Property now allows the Debtors to (a) promptly
monetize this asset for the benefit of their creditors, (b) avoid incurring the possible carrying
costs associated with this asset after the expiration of New Chrysler's obligation to pay these
costs under the TSA and (c) avoid the costs associated with the remediation efforts being taken
by the Buyer under the Purchase Agreement.

24.    Second, as discussed in paragraph 19 of this Motion, the Debtors will
provide adequate and reasonable notice of the proposed sale of the Property by both the mailing
of this motion and the publication of the Publication Notice.  See, e.g., Folger Adam Security
Inc. v. DeMatteis/MacGregor, 209 F.3d 252, 265 (3d Cir. 2000) (stating that notice is sufficient
if it includes "the time and place of any public sale, the terms and conditions of any private sale,
states the time for filing objections and, if real estate is being sold, provides a general description
of the property"); In re WBQ Partnership, 189 B.R. 97, 103 (Bankr. E.D. Va. 1995) ("'notice is
sufficient if it includes the terms and conditions of the sale, if it states the time for filing
objections, and if the estate is selling real estate, it generally describes the property'") (quoting In
re Karpe, 84 B.R. 926, 929 (Bankr. M.D. Pa. 1988)).

25.    Third, as described above and in the Chadwick Declaration, the Property
has been thoroughly marketed.  While many section 363 sales are conducted under competitive
bidding procedures, there is no requirement in section 363 of the Bankruptcy Code to do so.  In
fact, Bankruptcy Rule 6004(f) specifically contemplates private sales with the statement that
"[a]ll sales not in the ordinary course of business may be by private sale or by public auction."

26. Courts have noted that private sales are appropriate under section 363 in certain circumstances. See In re Bakalis, 220 B.R. 525, 531 (Bankr. E.D.N.Y. 1998) ("Unlike judicial sales under the Bankruptcy Act, the sale of estate property under the Bankruptcy Code is conducted by a trustee, who has ample discretion to conduct public or private sales of estate property."); Penn Mut. Life Ins. Co. v. Woodscape Ltd. P'ship (In re Woodscape Ltd. P'ship), 134 B.R. 165, 174 (Bankr. D. Md. 1991) (noting that, with respect sales of estate property pursuant to section 363 of the Bankruptcy Code, "[t]here is no prohibition against a private sale . . . and there is no requirement that the sale be by public auction"). Accordingly, courts in this District have approved private sales of assets when they think the general standards for approval under section 363 of the Bankruptcy Code are satisfied. See, e.g., In re Wellman, Inc., Case No. 08-10595 (SMB) (Bankr. S.D.N.Y. Oct. 6, 2009) (order approving the sales of one of the debtors' facilities' by private sale, not subject to higher and better offers); In re Delta Air Lines, Inc., Case No. 05-17923 (PCB) (Bankr. S.D.N.Y. Nov. 29, 2005) (order authorizing the sale of certain aircraft by private sale and stating that "no auction was necessary with respect to sale of the [a]ircraft").

27. Given (a) the thorough marketing of the Property over an extended period of time, (b) the lack of any other firm offer, (c) the significant cash purchase price being offered by the Buyer, (d) the environmental remediation being conducted by Buyer and (e) the potential overhang of the Buyer's asserted eminent domain rights, the Debtors believe that it is unlikely that an overbid process will generate higher and better offers for the Property. Moreover, because of the substantial carrying costs for the Property that will be incurred once New Chrysler ceases to pay these costs under the TSA at the end of October, conducting even an expedited overbid process on the Property would impose significant carrying costs on the Debtors' estates.

In addition, the First Lien Lenders, as the primary economic stakeholder in this transaction, have not indicated that they would pay the costs associated with a more extended sale process.  Nor do the Debtors have any other source to fund such an extended process.  By contrast, selling the Property by a private sale will allow the Debtors to collect significant proceeds while avoiding the possibility of significant unfunded costs being incurred.  Finally, the Purchase Agreement contains a fiduciary out so that if a party comes forward prior to the hearing on this Motion with a higher and better offer, the Debtors can pursue that opportunity to the extent required by their fiduciary duties.

28.     As to the fourth factor, the Debtors and the Buyer are proceeding in good faith.  The Buyer is not an insider of the Debtors and the transaction was negotiated in good faith and only entered into after protracted negotiations.

29.     For all of these reasons, the sale of the Property as requested herein should therefore be approved.

*Sale of the Property Free and Clear of Liens, Claims and Encumbrances*

30.     Pursuant to section 363(f) of the Bankruptcy Code, a debtor in possession may sell property "free and clear of any interest in such property of an entity other than the estate" if any one of the following conditions is satisfied:

(1) applicable nonbankruptcy law permits the sale of such property free and clear of such interest;

(2)  such entity consents;

(3)  such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(4)  such interest is in bona fide dispute; or

(5)  such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).  Under Second Circuit law, a debtor can broadly sell assets free of claims that relate to their historical usage by the Debtors.  See Chrysler, 2009 U.S. App. Lexis 17441 at *40-53.  In addition, a court may authorize the sale of a debtor's assets free and clear of any liens, claims or encumbrances under section 105 of the Bankruptcy Code.  See Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (In re White Motor Credit Corp.), 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987) ("Authority to conduct such sales [free and clear of liens] is within the court's equitable powers when necessary to carry out the provisions of Title 11.").

        31.    The Debtors believe that, in each case, one or more the standards in section 365(f) will be satisfied to permit the Property to be sold free and clear of any liens, claims or encumbrances.  The First Lien Lenders have consented to the sale of the Property free and clear of their liens under the First Lien Credit Agreement.  The Debtors propose that these liens and any other liens, claims, interests and encumbrances asserted against the assets be transferred, and attach, to the sale proceeds, except to the extent that the Buyer agrees to take title to such assets subject to such liens.  All liens on the assets will be satisfied or will attach to the proceeds of the sale of the assets with the same force, effect and priority as such liens have on the assets, subject to the rights and defenses, if any, of the Debtor and any party in interest with respect thereto.  Furthermore, the Debtors will place the proceeds of the sale in a segregated account so as to prevent them from being commingled with other funds of these estates.  In addition, if a holder of a lien, claim or encumbrance receives notice of this Motion and does not object within the prescribed time period, the Debtors submit that such holder may be deemed to have consented to the proposed sale.  Accordingly, the Debtor submits that the sale of assets free and clear of liens, claims, interests and encumbrances satisfies the statutory prerequisites of section 363(f) of the Bankruptcy Code.

*Waiver of 10-Day Stay Under Bankruptcy Rule 6004(h)*

32.    Pursuant to Bankruptcy Rule 6004(h), unless the court orders otherwise, all orders authorizing the sale of property pursuant to section 363 of the Bankruptcy Code are automatically stayed for 10 days after entry of such order.  See Fed. R. Bankr. P. 6004(h).  The purpose of Bankruptcy Rule 6004(h) is to provide sufficient time for an objecting party to appeal before the order is implemented.  See Advisory Committee Notes to Fed. R. Bankr. P. 6004(h). As noted above, the Debtors are exposed to significant carrying costs for the Property once New Chrysler's obligation to pay these expenses under the TSA expires on October 31, 2009. Waiving the 10-day stay under Bankruptcy Rule 6004(h) is necessary to permit the Debtors to minimize these costs by closing the proposed Sale Transaction as soon as possible after the entry of the Sale Order.

### Payment of Brokerage Commissions to Equis

33.    As mentioned above, Equis has acted as broker for the Property.  On August 27, 2009, the Court entered its Order, Pursuant to Sections 327(a) and 328(a) of the Bankruptcy Code, Bankruptcy Rule 2014(a) and Local Bankruptcy Rule 2014-1, Authorizing Debtors and Debtors in Possession to Employ and Retain UGL Equis Corporation as Real Estate Brokers to the Debtors, *Nunc Pro Tunc* to the Petition Date (Docket No. 5328) (the "Equis Order").  In accordance with the provisions of the Equis Order, the Debtors propose to pay to Equis the commission of 2.25% of the purchase price for the Property it would be entitled to under its service agreement with the Debtors at the closing of the sale of the Newark Property.

### Notice

34.    No trustee or examiner has been appointed in these chapter 11 cases.  In accordance with the Administrative Order, Pursuant to Bankruptcy Rule 1015(c), Establishing Case Management and Scheduling Procedures (Docket No. 661) (the "Case Management

Order"), entered on May 12, 2009, notice of this Motion has been given to the parties identified

on the General Service List and the Special Service List (as such terms are identified in the Case

Management Order).  Notice of the proposed sale of the Newark Property will also be provided

by serving the Sale Motion and publication of in the manner described in paragraph 19.  The

Debtors submit that no other or further notice need be provided.

## **Prior Request**

35.    No prior request for the relief sought in this Motion has been made to this

or any other Court.

WHEREFORE, the Debtors respectfully request that this Court: (i) enter the Sale

Order in substantially the form attached hereto as <u>Exhibit D</u>; and (ii) grant such other and further

relief to the Debtors as the Court may deem proper.

Dated: October 23, 2009
      New York, New York

Respectfully submitted,

_____

Corinne Ball
Veerle Roovers
JONES DAY
222 East 41st Street
New York, New York  10017
Telephone:  (212) 326-3939
Facsimile:  (212) 755-7306

David G. Heiman
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212

Jeffrey B. Ellman
JONES DAY
1420 Peachtree Street, N.E.
Suite 800
Atlanta, Georgia  30309
Telephone:  (404) 581-3939
Facsimile:  (404) 581-8330

ATTORNEYS FOR DEBTORS AND
DEBTORS IN POSSESSION

# EXHIBIT A

**[Purchase Agreement]**

# AGREEMENT OF PURCHASE AND SALE

THIS AGREEMENT OF PURCHASE AND SALE (this "Agreement"), is dated as of October 23, 2009 (the "Agreement Date"), between OLD CARCO LLC (f/k/a Chrysler LLC) and OLD CARCO MOTORS LLC (f/k/a Chrysler Motors LLC), each a Delaware limited liability company (collectively and individually, as the context permits, "Seller"), and UNIVERSITY OF DELAWARE, a Delaware corporation ("Purchaser").

## RECITALS

WHEREAS, Seller filed a voluntarily petition for relief under chapter 11 of the U.S. Bankruptcy Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), which case is administered under Case No. 09-50002 (AJG) (the "Bankruptcy Proceeding").

WHEREAS, Seller desires to sell, and Purchaser desires to purchase, certain property located in County of New Castle, State of Delaware, of which Seller is the owner (the "Transaction").

NOW, THEREFORE, in consideration of the foregoing premises, the mutual covenants hereinafter set forth and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.    Purchase and Sale of Property; No Assumption of Seller's Liabilities.

(a)    Seller hereby agrees to sell and convey to Purchaser, and Purchaser agrees to purchase from Seller, approximately 271 acres of real property located in County of New Castle, State of Delaware, commonly known as the Newark Assembly Plant and MOPAR parts distribution center, and more specifically described on Exhibit A attached hereto and incorporated by reference herein (the "Land"), together with all of Seller's right, title and interest, if any, in and to (i) all appurtenances, improvements, easements, railroad agreements and rights-of-way incident thereto; (ii) all intangible property (collectively, the "Intangible Property") pertaining to the Land and/or the improvements, including, without limitation, to the extent transferable, (a) warranties and guaranties, (b) governmental permits, approvals, licenses and consents, and (c) maintenance records, maintenance protocols, operating/maintenance manuals, plans and studies; and (iii) all personalty, trade fixtures and equipment currently located on the Land (collectively, the "Equipment") but specifically excluding from the Equipment the personalty, trade fixtures and equipment owned by Chrysler Group LLC ("Chrysler") and identified on Exhibit B attached hereto (the "Chrysler Equipment"), which Chrysler Equipment shall be removed prior to the Closing Date (collectively, the "Property").

(b)    Purchaser has no right to purchase, and Seller has no obligation to sell, less than all of the Property, it being the express agreement and understanding of the Purchaser and Seller that, as a material inducement to Seller and Purchaser to enter into this Agreement, Purchaser has agreed to purchase, and Seller has agreed to sell, all of the Property in accordance with the terms and conditions hereof.

(c)    Except as expressly provided to the contrary in this Agreement, Buyer shall not assume any duties or liabilities of Seller.

2.    <u>Purchase Price; Deposit</u>. The purchase price for the Property shall be TWENTY FOUR MILLION TWO HUNDRED FIFTY THOUSAND DOLLARS ($24,250,000.00) (the "<u>Purchase Price</u>"). The Purchase Price shall be payable as follows:

(a)    A total of TWO MILLION AND NO/100 DOLLARS ($2,000,000.00) in cash as a deposit (the "<u>Deposit</u>") payable to Saul Ewing LLP as agent for the Title Company (as defined below), as escrow agent, on the Agreement Date. The parties shall enter into the Title Company's standard escrow agreement ("<u>Title Company Escrow Agreement</u>") on or before payment of the Deposit to the Title Company. The Deposit shall be held in an interest-bearing account, with interest accruing on the Deposit and credited and distributed as part of the Deposit as provided herein or in the Title Company Escrow Agreement. The Deposit shall be non-refundable to Purchaser (except as otherwise expressly set forth in this Agreement) and earned by Seller at the time it is made and shall be applied toward the Purchase Price upon the closing of the transaction contemplated by this Agreement ("<u>Closing</u>"). The Title Company shall deliver the Deposit in accordance with the provisions of this Agreement and the Title Company Escrow Agreement. In case of any conflict, the terms of this Agreement shall control.

(b)    The balance of the Purchase Price in immediately available funds at Closing.

3.    <u>Title Commitment</u>.

(a)    Purchaser acknowledges it has obtained, at its sole expense, a commitment (the "<u>Commitment</u>") from Lawyers Title Insurance Corporation (the "<u>Title Company</u>"). Purchaser has approved the Commitment (other than any liens that the Property will be sold free and clear of, pursuant to the Sale Order, as that term is defined below) as of the Agreement Date, *provided, however*, that Purchaser shall be permitted to object to any encumbrance or defect in title that is properly recorded in the real property records of New Castle County, Delaware on or after the Agreement Date excluding those matters created, suffered or permitted by, at the request of or through Purchaser ("<u>Post Agreement Date Objections</u>"). Within five business days after receipt of Purchaser's Post Agreement Date Objections, Seller shall notify Purchaser if Seller is unable or unwilling to remove any such Post Agreement Date Encumbrances on or prior to the Closing Date (as defined below) at Seller's sole cost ("<u>Seller's Title Notice</u>"). If Seller is unable or unwilling to cure any such objections, Purchaser shall have the option, to notify Seller within five business days of Seller's notice to terminate this Agreement in which case the Deposit shall be promptly returned to Purchaser. If Purchaser fails to timely respond to such Seller's Title Notice, Purchaser shall be deemed to have waived such exceptions and shall be required to proceed with Closing without diminution in the Purchase Price. From and after the Agreement Date until the earlier of Closing or the termination hereof, Seller shall not take any action, or fail to take any action, that would cause title to the Property to be subject to any title exceptions, other than the Permitted Liens. For the avoidance of doubt, the Property shall be conveyed to Purchaser free and clear of any and all monetary liens and encumbrances.

(b)     Those title exceptions that Purchaser does not disapprove of above, as well as (i) any exceptions included in the Commitment that were recorded prior to the Agreement Date (it being understood that the Sale Order will provide that the Property will be sold free and clear of any monetary liens disclosed by the Commitment); (ii) real estate taxes for the year of Closing that are not yet due and payable; (iii) matters created, suffered or permitted by, at the request of or through Purchaser; (iv) roads, highways and other public rights of way, (v) zoning, land use and other governmental laws, rules and regulations; (vi) any matters that would be shown by an accurate survey of the Property; (vii) any liens or other matters dismissed by bankruptcy court orders; and (viii) the Title Company's so-called "standard exceptions" shall be "<u>Permitted Liens</u>."

4.     <u>Title and Closing</u>.

(a)     <u>Closing</u>.  The Closing shall occur on the later of (i) the tenth day after the entry of the Sale Order (as defined in Section 8(d)(ii) herein) or (ii) the second business thereafter on which the Sale Order shall no longer be subject to an appeal or a stay of its effectiveness but in no event prior to November 23, 2009; or on an earlier or later date established by mutual agreement of the parties (the "<u>Closing Date</u>").  The Closing shall take place at 10:00 a.m. on the Closing Date, in the offices of the Title Company, or at such other time and place as may be mutually agreed upon by Seller and Purchaser.  Neither party shall be required to close unless all conditions to the obligations of such party have been satisfied or waived.  If all conditions to the obligations of both parties have not been satisfied or waived on or before December 1, 2009, either party may, so long as it is not in default hereunder, terminate this Agreement, the Deposit (and interest thereon) shall be returned to Purchaser, and neither party shall have any liability to the other except for such matters as survive termination hereof. Possession of the Property shall be delivered to Purchaser at Closing.

(b)     <u>Seller's Deliveries</u>.  On or before the Closing Date, Seller shall deposit or shall cause to be deposited with the Title Company:

(i)     a quitclaim deed(s) conveying fee simple title to the Property to Purchaser subject only to the Permitted Liens (the "<u>Deed</u>");

(ii)     a quitclaim bill of sale conveying title to all of the Equipment and Intangible Property;

(iii) an affidavit as required by Section 1445 of the Internal Revenue Code of 1986 (the "<u>Code</u>") certifying that Seller is not a "foreign person" as defined in the Code;

(iv) such organizational and authorizing documents of Seller as shall be reasonably required by the Title Company and Purchaser to evidence Seller's authority to consummate the transactions contemplated by this Agreement;

(v) keys and locks to the Property;

(vi) an affidavit in the form attached hereto as <u>Exhibit C</u>;

(vii) letters or other evidence of termination of all contracts pertaining to the Property, including, but not limited to, management contracts, construction contracts, service contracts, equipment leases and maintenance contracts;

(viii) to the extent required to be signed by a Seller of real property in Delaware, appropriate transfer tax affidavits in connection with recordation of the Deed;

(ix) without limiting any rights, obligations or remedies of any parties to the Transition Services Agreement dated as of June 10, 2009 (as amended, the "TSA"; as used herein, unless otherwise defined, capitalized terms shall have their meaning as defined in the TSA), by and between Old Carco LLC and Chrysler Group LLC, an assignment by Seller to Purchaser, to inure to the benefit of Purchaser and any future owner of the Property, of all obligations of NewCo with respect to the Property, or any portion thereof, including, without limitation, the obligations for Phase Out and Deactivation, the remedies contained in Section 7.5 of the TSA or to otherwise comply with Sections 7.2 and 7.8 of the TSA, which assignment shall provide for notice to NewCo; and

(x) such other instruments and documents which shall be reasonably necessary in connection with the transaction contemplated herein and which do not impose, create, or potentially create any liability or expense upon Seller not expressly required under this Agreement (collectively, "Seller's Closing Deliveries"). All of Seller's Closing Deliveries shall be in form and content as reasonably approved by Purchaser.

(c)     Conditions to Closing.

(i)    Purchaser's obligation to purchase the Property is expressly conditioned upon each of the following:

(A)    Seller delivering to the Title Company Seller's Closing Deliveries, and, to the extent available, in the possession of Seller and to the knowledge of Seller applicable to the Property, originals of, and if not available, copies of, all Intangible Property;

(B)    Timely performance of each obligation, covenant and delivery required of Seller;

(C)    Purchaser shall receive from the Title Company an ALTA Owner's Policy of Title Insurance insuring fee simple title to the Property in Purchaser, subject only to the Permitted Liens (the "Title Policy");

(D)    The Sale Order shall have been entered by the Bankruptcy Court and that order shall not have been reversed or vacated or subject to a stay of its effectiveness; and

(E)  The Amendment No. 1 to Transition Services Agreement shall have been approved by the Bankruptcy Court pursuant to Seller's Notice of Presentment of Stipulation and Agreed Order Approving Amendment to Transition Services Agreement Between Debtor Old Carco LLC and Chrysler Group LLC.

(ii)  Seller's obligation to sell is expressly conditioned upon each of the following:

(A)  Timely performance of each obligation, covenant and delivery required of Purchaser;

(B)  On or before the Closing Date, Purchaser shall deposit with the Title Company the remaining balance of the Purchase Price in immediately available funds; and

(C)  The Sale Order shall have been entered by the Bankruptcy Court and that order shall not have been reversed or vacated or subject to a stay of its effectiveness.

(d)  The Title Company is hereby instructed that when it has received confirmation that the conditions above have been satisfied and is in a position to otherwise close this transaction as contemplated hereby, the Title Company shall (i) deliver and record the Deed, and (ii) deliver to Seller the Purchase Price, net of any adjustments and prorations required hereby. This Agreement, together with the Title Company Escrow Agreement, shall serve as the escrow instructions for the Title Company.

(e)  At Closing, Seller shall pay the following costs out of the proceeds from the sale:

(i)  Any fees incurred in connection with the removal of any unpermitted exceptions with respect to the Property (other than those exceptions that are being addressed pursuant to the Sale Order);

(ii)  One-half of the cost of any escrow fee; and

(iii)  One-half of any city, state or county transfer tax or fee payable on or in connection with the sale and/or conveyance of the Property.

(f)  At Closing, the Purchaser shall pay the following costs:

(i)  The cost of recording the Deed;

(ii)  The cost of the Title Policy, the cost of any endorsements to the Title Policy and one-half of the cost of any escrow fee; and

(iii)   One-half of any city, state or county tax or fee payable on or in connection with the sale and/or conveyance of the Property.

(g)   All real property taxes and assessments, water and sewer charges shall be prorated as of the Closing Date.  Said prorations shall be effected at the Closing with appropriate adjustments on the basis of the latest available tax bills or other applicable statements and shall be deemed final.  As to real estate taxes (including without limitation school and city taxes), Purchaser shall be given a credit at Closing equal to:  (i) Seller's pro-rata share of such taxes applicable to time periods on and prior to the Closing Date, plus (ii) all penalties and interest (accrued through the Closing Date) as may then be assessed or due and owing on all such taxes.  For the avoidance of doubt, all penalties and interest (accrued through the Closing Date) shall be credited to Purchaser, the same not being pro-rated.  Purchaser shall therefore take the Property at Closing subject to all outstanding (whether current or delinquent) real estate taxes and all penalties and interest associated therewith.

(h)   As for utilities, Seller shall endeavor to obtain meter readings on the day before the Closing Date, and if such readings are obtained, there shall be no proration of such items and Seller shall pay at Closing out of the proceeds of the sale the bills therefor for the period to the day preceding the Closing, and Purchaser shall pay the bills therefor for the period subsequent thereto.  If the utility company will not issue separate bills, Purchaser will receive a credit against the Purchase Price for Seller's portion and will pay the entire bill prior to delinquency after Closing.

5.   Property Deactivation.  Prior to the Closing, the work identified on Exhibit E (the "Decommissioning Work") shall have been completed in accordance with all applicable laws and regulations; provided, however, that the satisfactory performance of such work shall not be a condition precedent to Closing, notwithstanding the provisions of Section 4(c)(i)(B) above.  In order to secure the timely performance of such work and to reimburse Purchaser in the event such work is not timely and properly performed, the amount of FIVE HUNDRED THOUSAND DOLLARS ($500,000.00) (the "Escrowed Funds") shall be set aside from the Purchase Price at Closing and held in escrow pursuant to the terms of the escrow agreement attached as Exhibit F, (the "Escrow Holdback Agreement"), the terms of which are incorporated by reference into this Agreement as if fully set forth herein.  Except for the rights of Purchaser to disbursements of the Escrowed Funds as provided by the Escrow Holdback Agreement, Purchaser shall have no claims against Seller or any other Debtor or Debtor in Possession in the Bankruptcy Proceeding in connection with the Decommissioning Work, for completion of the Decommissioning Work, or for failure of the Decommissioning Work to have been completed, either prior to or at any time after the Closing.  The parties hereto shall execute and deliver to one another the Escrow Holdback Agreement as a condition of Closing.

6.   Environmental Cleanup.  Purchaser, at its sole cost and expense, shall complete an environmental remediation on the Property in accordance with all applicable Environmental Laws, provided, however, that Purchaser shall have no duty to Seller to investigate or remediate beyond the boundary of the Land; and provided further that Purchaser shall have no responsibility for injury to, destruction of or loss of natural resources (including, without limitation, costs of pre-assessment actions, assessment, restoration, rehabilitation, replacement, mitigation, compensation or loss of use) (the "Remediation").  Purchaser shall complete such

Remediation as approved by the Delaware Department of Natural Resources and Environmental Controls ("DNREC") and, upon completion of such Remediation shall deliver to Seller a copy of the Certificate of Completion of Remedy issued by the DNREC. Seller shall have no obligations or liability to Purchaser for the Remediation. As used in this Agreement, (a) "Environmental Laws" shall mean all governmental regulations now in effect pertaining to Hazardous Substances, workplace or public health and safety, or protection of the environment, including, but not limited to, the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (42 U.S.C. §§ 9601, *et seq.*), the Hazardous Substances Transportation Act (49 U.S.C. §§ 1802, *et seq.*), the Resource Conservation and Recovery Act (42 U.S.C. §§ 6901, *et seq.*), as amended by the Hazardous and Solid Wastes Amendments of 1984, the Water Pollution Control Act (33 U.S.C. §§ 1251, *et seq.*), the Safe Drinking Water Act (42 U.S.C. §§ 300f, *et seq.*), the Clean Water Act (33 U.S.C. §§ 1321, *et seq.*), the Clean Air Act (42 U.S.C. §§ 7401, *et seq.*), the Solid Waste Disposal Act (42 U.S.C. §§ 6901, *et seq.*), the Toxic Substances Control Act (15 U.S.C. §§ 2601, *et seq.*), the Emergency Planning and Community Right-to-Know Act of 1986 (42 U.S.C. §§ 11001, *et seq.*), the Radon Gas and Indoor Air Quality Research Act of 1986 (42 U.S.C. §§ 7401, *et seq.*), the National Environmental Policy Act (42 U.S.C. §§ 4321, *et seq.*), the Superfund Amendment Reauthorization Act of 1986 (42 U.S.C. §§ 9601, *et seq.*) and the Occupational Safety and Health Act (29 U.S.C. §§ 651, *et seq.*), the Delaware Hazardous Substance Clean-up Act (7 Del. C. §9101 et. seq.), the Delaware Underground Storage Tank Act (7. Del. C. §7401 et. seq.), and the Jeffrey Davis Aboveground Storage Tank Act (7 Del. C. §7401A et. seq.); and (b) "Hazardous Substance" and "Hazardous Substances" shall mean, as the case may be, any waste, substance, pollutant, contaminant or material, including, but not limited to, any substances or materials defined as or included within the definition of "hazardous substances," "hazardous wastes," "hazardous materials," or "toxic substances" under any Environmental Laws, and including, but not limited to, asbestos, polychlorinated biphenyls, petroleum and petroleum based products.

7.     Physical Condition of the Premises.

(a)     PURCHASER EXPRESSLY AGREES TO ACCEPT THE PROPERTY "AS IS" AND "WHERE IS" AND SELLER SHALL, UNDER NO CIRCUMSTANCES, BE DEEMED TO HAVE MADE, AND SELLER HEREBY DISCLAIMS, ANY REPRESENTATION OR WARRANTY, EITHER EXPRESS OR IMPLIED, AS TO ANY MATTER WHATSOEVER, INCLUDING, WITHOUT LIMITATION, THE CONDITION OF THE PROPERTY, ANY ENVIRONMENTAL CONDITION OF THE PROPERTY (INCLUDING, WITHOUT LIMITATION, THE PRESENCE OF ANY POLLUTANT OR CONTAMINANT, INCLUDING ANY HAZARDOUS SUBSTANCE IN, ON OR UNDER THE PROPERTY), AND THE ADEQUACY, SUITABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE OF THE PROPERTY OR ANY PART THEREOF. SELLER SHALL NOT BE LIABLE TO PURCHASER, ITS AGENTS OR ASSIGNS FOR ANY INCIDENTAL OR CONSEQUENTIAL DAMAGES, INCLUDING, WITHOUT LIMITATION, BUSINESS INTERRUPTION OCCASIONED BY OR ARISING IN CONNECTION WITH THE CONDITION OR ANY ALLEGED CONDITION OF THE PROPERTY, INCLUDING, WITHOUT LIMITATION, LIABILITY ARISING OUT OF ANY ENVIRONMENTAL CONDITION WITH RESPECT TO THE PROPERTY. NOTWITHSTANDING THE PROVISIONS OF SECTION 7(b) BELOW, PURCHASER AGREES TO RELEASE SELLER FROM AND AGAINST ANY AND ALL CLAIMS

AGAINST SELLER ARISING ON OR AFTER THE CLOSING CONCERNING THE ENVIRONMENTAL CONDITION OF THE PROPERTY AND COVENANTS NOT TO SUE SELLER, ANY DEBTOR OR DEBTOR-IN-POSSESSION IN THE BANKRUPTCY PROCEEDING, OR ANY OF THEIR RESPECTIVE EMPLOYEES, DIRECTORS, OFFICERS, OR AGENTS OR JOIN SELLER, ANY DEBTOR OR DEBTOR-IN-POSSESSION IN THE BANKRUPTCY PROCEEDING, OR ANY OF THEIR RESPECTIVE EMPLOYEES, DIRECTORS, OFFICERS, OR AGENTS, IN ANY ACTION CONCERNING THE ENVIRONMENTAL CONDITION OF THE PROPERTY.    THE FOREGOING RELEASE AND COVENANT SHALL RUN WITH THE PROPERTY AND BIND SUBSEQUENT PURCHASERS THEREOF AND THE DEED WILL INCLUDE A REFERENCE THERETO PUTTING ANY FUTURE PURCHASERS OF THE PROPERTY ON NOTICE THEREOF.

(b)    Purchaser's obligations under this Agreement, including those set forth in paragraph 6 ("Environmental Clean-up") and Seller's associated disclaimers in paragraph 7(a) ("Physical Condition of the Premises") are limited to the Property only.    Other than the Remediation, Purchaser does not assume and expressly disclaims any other known or unknown liability of any prior owner of the Property or other person associated with the Property and does not release such persons (excluding the Seller as provided in Section 7(a) above) against any such liability. By way of illustration, but not limitation, Purchaser shall have no obligation under this Agreement to conduct an off-Land investigation or remediation to address hazardous substances including those that may have originated, migrated or leached from the Land, nor shall Purchaser be liable for injury to, destruction of or loss of natural resources (including without limitation costs of pre-assessment actions, assessment, restoration, rehabilitation, replacement, mitigation, compensation or loss of use), or for liability under statute, common law or otherwise with respect to injury or death or damage to person or property arising from or related to the past or present condition of the Property including its environmental condition and/or its current or historic operations.

8.    Bankruptcy Court Matters.

(a)    This Agreement is subject to approval by the Bankruptcy Court.  From the Agreement Date (and any prior time) until the hearing to approve the Sale Order, Seller shall be permitted to, and to cause their respective representatives and Affiliates (as defined in Section 14(a) herein) to, respond to any inquiries or offers with respect to the direct or indirect sale, transfer or other disposition, in one or more transactions, by one or more persons or entities (other than to Purchaser and its Affiliates and representatives), of all or a portion of the Property whether by sale of the Property or otherwise, including any proposals or offers for any transactions arising under a plan of liquidation that provides for the sale of all or a portion of the Property (an "Alternative Transaction") and perform any and all other acts related thereto that are required under the Bankruptcy Code or other applicable law or are appropriate to fulfill Seller's fiduciary duties, including, without limitation, supplying information relating to the Property to prospective purchasers and serving the Sale Motion as set forth in Section 8(c) herein.

(b)    Purchaser agrees that it will promptly take such actions as are reasonably requested by Seller to assist in demonstrating that Purchaser is a "good faith"

purchaser under Section 363(m) of the Bankruptcy Code.

(c)    Upon execution of this Agreement by all parties hereto, Seller will promptly file with the Bankruptcy Court a motion (the "Sale Motion") seeking Court approval of a private sale of the Property to Purchaser pursuant to this Agreement, notices and proposed orders, to the extent amended as of the date hereof each in form and substance reasonably satisfactory to Buyer seeking the Bankruptcy Court's issuance of the Sale Order attached hereto as Exhibit D (the "Sale Order").

Seller shall serve a copy of the Sale Motion on: (i) all entities known to assert any interest in or lien upon the Property (including all holders of liens against the Property as identified by the Commitment); (ii) all parties that are entitled to notice under Bankruptcy Rule 2002; (iii) the attorneys general of all states in which the Property is located; (iv) the Office of the United States Trustee; (v) all entities that expressed to the Seller an interest in purchasing the Property; (vi) any party appearing in the Bankruptcy Cases and claiming a secured interest in the Property; or any party known to the Seller and claiming a secured interest in the Property; and (vi) any and all other parties directed by the Court.

(d)    Seller shall use its commercially reasonable efforts to provide Buyer with copies of all motions, applications and supporting papers prepared by or on behalf of the Seller (including forms of orders and notices to interested parties) directly relating to the Property or this Agreement at least two (2) Business Days, unless the exigencies of time prevent the period from being that long, prior to the filing thereof in the Bankruptcy Cases so as to allow Buyer to provide reasonable comments for incorporation into same; except that the Sale Motion (including forms of orders and notices to interested parties) shall be provided to Buyer at least three (3) Business Days prior to its filing.

The Sale Order, to the extent permitted under the Bankruptcy Code or other applicable law, shall be binding upon and shall govern the acts of all entities, including, but not limited to, any subsequently appointed chapter 11 or chapter 7 trustee of Seller, all taxing authorities, filing agents, filing officers, title agents, title companies, recorders and/or registrars of mortgages, recorders and/or registrars of deeds, administrative agencies, governmental agencies or departments, secretaries of state, federal, state and local officials and all other persons and entities who may be required by operation of law, the duties of their office or contract, to accept, file register or otherwise record or release any documents or instruments, or who may be required to report or insure as to title or state of title in or to the Property or any part thereof.

(e)    Best Efforts.  Upon the terms and subject to the conditions of this Agreement, each of the parties hereto shall use best reasonable efforts to take, or cause to be taken, all action, and to do, or cause to be done, all things necessary, proper or advisable consistent with applicable legal requirements to consummate and make effective in the most expeditious manner practicable the transactions contemplated hereby.  Without limiting the foregoing, Seller shall use its best reasonable efforts to obtain the Sale Order on or prior to, November 23, 2009 and, upon entry, cause it not to be (i) vacated, stayed or reversed or (ii) (except with the express written consent of the Buyer, or as would not be adverse to Buyer in any material respect) amended, supplemented or otherwise modified.

(f)    Definitions.    "Sale Order" shall be an order or orders of the Bankruptcy Court, in form and substance acceptable to Purchaser and Seller approving this Agreement and all of the terms and conditions hereof, and approving and authorizing Seller to consummate the transactions contemplated hereby. Without limiting the generality of the foregoing, such order shall find and provide, among other things, that (a) the Property sold to Purchaser pursuant to this Agreement shall be transferred to Purchaser free and clear of all liens, claims and encumbrances (other than any Permitted Liens) ("Liens"), with such Liens to attach to the net proceeds from the sale of the Property to the same validity, force and effect, and in the same order of priority, which such liens now have against the Property or the proceeds, subject to any rights, claims and defenses Seller or its estate, as applicable. may possess with respect thereto; (ii) Purchaser has acted in "good faith" within the meaning of section 363(m) of the Bankruptcy Code; (iii) this Agreement was negotiated, proposed and entered into by the parties without collusion, in good faith and from arm's length bargaining positions; (iv) the Bankruptcy Court shall retain jurisdiction to resolve any controversy or claim arising out of or relating to this Agreement; and (v) this Agreement and the transactions contemplated hereby may be specifically enforced (including, without limitation, by Purchaser) against and binding upon, and not subject to rejection or avoidance by, Seller, any chapter 7 or chapter 11 trustee of Seller, or any other person.

9.    [Intentionally Deleted.]

10.    Default; Liquidated Damages.  Purchaser and Seller acknowledge that it would be extremely impracticable and difficult to ascertain the actual damages that would be suffered by Seller if Purchaser fails to consummate the purchase and sale contemplated herein for any reason other than (a) Seller's failure, refusal or inability to perform any of Seller's covenants and agreements hereunder, (b) Purchaser's termination of this Agreement as permitted under this Agreement or (c) the failure of the conditions to Purchaser's obligation to close hereunder. Purchaser and Seller have considered carefully the loss to Seller occasioned by taking the Property off the market as a consequence of the negotiation and execution of this Agreement; the personal expenses of Seller incurred in connection with the preparation of this Agreement and Seller's performance hereunder; and the other damages, general and special, that Purchaser and Seller realize and recognize Seller will sustain, but which Seller cannot at this time calculate with absolute certainty.  Based on all those considerations, Purchaser and Seller have agreed that the damage to Seller would reasonably be estimated to be an amount equal to the Deposit.

ACCORDINGLY, IF ALL CONDITIONS PRECEDENT TO PURCHASER'S OBLIGATION TO CONSUMMATE THE TRANSACTIONS HEREIN CONTEMPLATED HAVE BEEN WAIVED BY PURCHASER (IN ITS SOLE DISCRETION) IN ACCORDANCE WITH THE TERMS HEREIN OR SATISFIED, IF SELLER HAS PERFORMED ITS COVENANTS AND AGREEMENTS HEREUNDER AND PURCHASER HAS NOT TERMINATED THIS AGREEMENT AS PERMITTED HEREUNDER, BUT PURCHASER HAS BREACHED ITS COVENANTS AND AGREEMENTS HEREUNDER AND HAS FAILED, REFUSED OR IS UNABLE TO CONSUMMATE THE PURCHASE AND SALE CONTEMPLATED HEREIN BY THE CLOSING DATE, THEN SELLER SHALL BE ENTITLED TO THE DEPOSIT, THE DEPOSIT SHALL BE DEEMED FULL AND COMPLETE LIQUIDATED DAMAGES AND NO PARTY TO THIS AGREEMENT SHALL HAVE ANY LIABILITY TO ANY OTHER PARTY TO THIS AGREEMENT, EXCEPT FOR

THE PAYMENT OF THE DEPOSIT TO SELLER; AND THIS AGREEMENT SHALL BE DEEMED NULL, VOID AND OF NO FURTHER FORCE AND EFFECT.

PURCHASER'S SOLE AND EXCLUSIVE REMEDIES FOR ANY BREACH OF THIS AGREEMENT BY SELLER SHALL BE (i) THE RETURN OF THE DEPOSIT; OR (ii) IF ALL CONDITIONS PRECEDENT TO SELLER'S OBLIGATION TO CONSUMMATE THE TRANSACTIONS HEREIN CONTEMPLATED HAVE BEEN WAIVED BY SELLER (IN ITS SOLE DISCRETION) IN ACCORDANCE WITH THE TERMS HEREIN OR SATISFIED, IF PURCHASER HAS PERFORMED ITS COVENANTS AND AGREEMENTS HEREUNDER AND SELLER HAS NOT TERMINATED THIS AGREEMENT AS PERMITTED HEREUNDER, BUT SELLER HAS BREACHED ITS COVENANTS AND AGREEMENTS HEREUNDER AND HAS FAILED OR REFUSED TO CONSUMMATE THE PURCHASE AND SALE CONTEMPLATED HEREIN BY THE CLOSING DATE, THEN PURCHASER SHALL BE ENTITLED, SUBJECT TO THE ENTRY OF THE SALE ORDER AND THAT ORDER NOT BEING REVERSED, MODIFIED, VACATED OR SUBJECT TO A STAY OF ITS EFFECTIVENESS, TO SEEK SPECIFIC PERFORMANCE OF THIS AGREEMENT. SELLER SHALL HAVE NO OTHER LIABILITY TO PURCHASER IF THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT ARE NOT CONSUMMATED.

11.    <u>Brokerage Charges</u>.  Seller and Purchaser respectively represent, each to the other, that no real estate broker has been dealt with in regard to this transaction other than UGL-Equis Corporation (the "<u>Broker</u>").  Each party agrees to indemnify and hold the other harmless from and against any and all claims for brokerage commissions arising from any other broker utilized by such party and all related expenses including, without limitation, reasonable attorneys' fees and expenses.  Seller shall pay Broker a sale commission in the amount of two and 25/100 percent (2.25%) of the Purchase Price (the "<u>Commission</u>"), which Commission is all that is owed Broker and shall be due only if the transaction contemplated hereunder closes and fee simple title is transferred from Seller to Purchaser.

12.    <u>Notices</u>.  All notices or other communications made pursuant hereto shall be in writing and shall be deemed properly delivered, given or served if sent by (i) nationally recognized overnight express courier service; or (ii) electronic mail with electronic proof of delivery, to the parties at the following addresses:

> Seller:    Brian Aronson
> Capstone Advisory Group, LLC
> Park 80 West, Plaza I, Plaza Level
> Saddle Brook, New Jersey 07663
> baronson@capstoneag.com
>
> With a copy to:
>
> William Herzberger, Esq.
> Jones Day
> 901 Lakeside Avenue
> Cleveland, Ohio 44114-1190

wherzberger@jonesday.com

and:

Jeffrey B. Ellman, Esq.
Jones Day
1420 Peachtree Street, N.E.
Suite 800
Atlanta, Georgia  30309-3053
jbellman@jonesday.com

Purchaser:    Scott R. Douglass
University of Delaware
122 Hullihen Hall
Newark, Delaware  19716-0160

With a copy to:

William E. Manning, Esq.
Saul Ewing LLP
222 Delaware Avenue
Suite 1200, P.O. Box 1266
Wilmington, Delaware  19899
wmanning@saul.com

All notices shall be deemed received one business day after it is sent if sent pursuant to subparagraph (i) above, or on receipt if sent via electronic mail.  Either party may change its address for the purposes of this section by giving ten days prior written notice of such change to the other party in the manner provided in this section.

13.    <u>Purchaser's Representations</u>.  Purchaser hereby represents and warrants to Seller that Purchaser has the full power and authority to enter into this Agreement and to perform the obligations of Purchaser hereunder, and no further consent or approval is required in order for this Agreement to constitute the legal, valid and binding obligation of Purchaser.

14.    <u>Seller's Representations</u>.  Subject to the entry of the Sale Order and that order not being reversed, modified, vacated or subject to a stay of its effectiveness, Seller hereby represents and warrants to Purchaser that Seller has the full power and authority to enter into this Agreement and to perform the obligations of Seller hereunder, and, no further consent or approval is required in order for this Agreement to constitute the legal, valid and binding obligation of Seller.

15.    <u>Miscellaneous</u>.

(a)    <u>Assignment</u>.  Neither party may assign this Agreement without the prior written consent of the other party, except that, without the prior consent of the Seller, Purchaser shall have the right to assign this Agreement to any one or more persons, partnerships, corporations or other entities who or which are Affiliates as long as Purchaser remains primarily liable hereunder; *provided, however,* that in any such event, Purchaser shall execute a guarantee in favor of, and in form and substance acceptable to, Seller guaranteeing the obligations under this Agreement that survive Closing, including any indemnities of Purchaser contained herein on a going forward basis.  As used in this Agreement, the term "<u>Affiliate</u>" shall mean any person or entity that is Controlled By (as defined below) or Affiliated With (as defined below) Purchaser.  As used in this subsection, the term (a) "<u>Controlled By</u>" means the possession, directly or indirectly through one or more intermediaries, of the power to direct or cause the direction of the management and policies of person or an entity; and (b) "<u>Affiliated With</u>" means the status of direct or indirect common ownership or management with Purchaser.  Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of the successors and assigns of the parties hereto.

(b)    <u>Entire Agreement</u>.  The parties expressly acknowledge that this Agreement contains the entire agreement of the parties hereto with respect to the Property and supersedes and rescinds any prior arrangements, agreements or understandings, written or oral between the parties (including their predecessors in interest) with respect thereto.  No other agreement, statement or promise made by either party hereto that is not contained herein shall be binding or valid.

(c)    <u>Amendments</u>.  This Agreement may only be amended by a written document signed by each of the parties hereto, which document shall make specific reference to this Agreement.

(d)    <u>Further Documents</u>.  Each party will, whenever and as often as it shall be reasonably requested by the other party, execute, acknowledge and deliver, or cause to be executed, acknowledged and delivered, such further instruments and documents, including escrow instructions, as may be necessary to carry out the terms and conditions of this Agreement and to complete the sale, conveyance and transfer herein contemplated and shall do any and all other acts as many be reasonably requested to carry out the intent and purpose of this Agreement.

(e)    <u>Severability</u>.  Should any part, term or provision of this Agreement or any document required herein to be executed or delivered at the Closing be declared invalid, void or unenforceable, all remaining parts, terms and provisions hereof shall remain in full force and effect and shall in no way be invalidated, impaired or affected thereby, *provided* that the purposes and intent of this Agreement may still be achieved.

(f)    <u>Time of Essence</u>.  Except as otherwise specifically provided in this Agreement, time is of the essence of this Agreement and each and every provision hereof.

(g)   Applicable Law; Jurisdiction.   The laws of the State of Delaware, without regard to principles of conflicts of laws, will govern this Agreement and its subject matter, construction and the determination of any rights, duties or remedies of the parties arising out of or relating to this Agreement, its subject matter or any of the transactions contemplated by this Agreement, except in such matters as are governed by the Bankruptcy Code. Without limiting any party's right to appeal any Order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes that may arise or result from, or be connected with, this Agreement, any breach or default hereunder or the transactions contemplated hereby; and (ii) any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties hereby consent to and submit to the exclusive jurisdiction and venue of the Bankruptcy Court with respect to such matters. The parties agree that any process, summons, notice or document sent by U.S. registered or certified mail addressed to a party, with a copy to the notice parties in Section 12 above, shall be effective service of process for any action, suit or proceeding brought against it in the Bankruptcy Court. The parties irrevocably and unconditionally waive any objection to the laying of venue of any such suit, action or proceeding brought in the Bankruptcy Court and any claim that any such suit, action or proceeding brought in the Bankruptcy Court has been brought in an inconvenient forum. The parties agree that a final judgment in any such suit, action or proceeding brought in the Bankruptcy Court shall be conclusive and binding upon the parties and may be enforced in any other courts to whose jurisdiction a party is or may be subject, by suit upon such judgment.

(h)   Time Periods.   If the time for the performance of any obligation under this Agreement expires on a Saturday, Sunday or U.S. federal legal holiday, the time for performance shall be extended to the next succeeding day which is not a Saturday, Sunday or U.S. federal legal holiday.

(i)   Counterparts.   This document may be executed in any number of counterparts, each of which shall be deemed an original, and all such counterparts shall together constitute one and the same document.

(j)   Access.   Purchaser may inspect, test, and survey the Property at any reasonable times at any times during the term of this Agreement. Seller shall reasonably cooperate with Purchaser in coordinating its inspection and testing of the Property, as well as transitioning ownership, operation and maintenance of the Property. Purchaser acknowledges that Seller has no employees that are familiar with or have any operational knowledge of the Property, but that Seller shall use its commercially reasonable efforts to coordinate on-site meetings as soon as practicable after the Agreement Date with Chrysler employees that may have such knowledge to (i) facilitate the transitioning of the ownership, operation and maintenance of the Property and (ii) collect for review and copying by the Purchaser the Intangible Property. In the event that the transaction contemplated hereby does not close by the Closing Date for any reason and/or this Agreement is terminated in accordance with the terms hereof, Purchaser shall immediately return to Seller any and all Intangible Property (including copies thereof) in the possession of Purchaser. Prior to providing access to the Property, Purchaser shall deliver to Seller proof of comprehensive general liability insurance satisfactory in form and content to Seller in its reasonable

discretion, and Purchaser shall maintain such insurance through Closing. Purchaser shall restore the Property to its condition existing immediately prior to Purchaser's inspection thereof, and Purchaser shall be liable for all damage or injury to any person or property resulting from, relating to or arising out of any such inspection, whether occasioned by the acts of Purchaser or any of its employees, agents, representatives or contractors, and Purchaser shall indemnify and hold harmless Seller and its agents, employees, officers, directors, affiliates and asset managers from any liability resulting therefrom. This indemnification by Purchaser shall survive the Closing or the termination of this Agreement, as applicable.

      (k)     <u>Ongoing Operation</u>. Seller hereby agrees that from the date hereof until the earlier to occur of termination of this Agreement, or the Closing,

      (i)     Seller will maintain in full force and effect fire and extended coverage insurance upon the Property and public liability insurance with respect to damage or injury to persons or property occurring on the Property in such amounts as is maintained by Seller on the date of this Agreement.

      (ii)     Seller will not knowingly use or occupy, or allow the use or occupancy of, the Property in any manner which violates applicable laws or other governmental requirements or which constitutes waste or a public or private nuisance or which makes void, voidable or cancelable, or increases the premium of, any insurance then in force with respect thereto.

      (iii)     Seller will advise Purchaser promptly of any litigation, arbitration or administrative hearing or governmental investigation or notice concerning or affecting the Property of which Seller has actual knowledge or notice.

      (l)     <u>Casualty</u>. Seller assumes all risks and liability for damage to or injury occurring to the Property by fire, storm, accident, or any other casualty or cause until the Closing has been consummated. If the Property, or any part thereof, suffers any Material Damage, Purchaser, at its option, may either at or prior to Closing (a) terminate this Agreement and receive a refund of the Deposit, or (b) consummate the Closing, in which latter event all of Seller's right, title and interest in and to the proceeds of any insurance covering such Material Damage, shall be assigned (or credited if proceeds were paid) to Purchaser at the Closing. For the purposes of this subparagraph (l), Material Damage shall mean any damage to all or any portion of the Property occurring after the Agreement Date that, in Purchaser's reasonable judgment, materially increases the cost or extent of Purchaser's Remediation, the cost of Purchaser's planned demolition of the improvements on the Property, or the cost of Purchaser's environmental insurance.

**(Remainder of page left intentionally blank)**

IN WITNESS WHEREOF, Purchaser and Seller have executed this Agreement as of the day and year first above written.

Seller:

OLD CARCO LLC, a Delaware limited liability                                      company

By:_____ *R. E. Kolka* _____ (Seal)
Name:
Title:
Date:

OLD CARCO MOTORS, LLC, a Delaware limited liability company

By:_____ *R. E. Kolka* _____ (Seal)
Name:
Title:
Date:

Purchaser:

UNIVERSITY OF DELAWARE

By:_____ *Scott R D* _____ (Seal)
Name:
Title:
Date:

## Exhibit A

Legal Description of the Property

Parcel 1: 550 S. College Avenue:

Legal Description for property situate in the City of Newark, New Castle County, State of Delaware, known as the CHRYSLER LLC, Newark Assembly Plant;

Beginning at a capped rebar set on the southwesterly side of Delaware Route 896, also known as South College Avenue, at varying widths, a common corner of the property herein being described and other lands of CHRYSLER MOTORS, LLC, Parts Division, and being further located from the intersection formed by the westerly side of Delaware Route No. 896, extended into the southerly side of the lands of Pennsylvania Lines, L.L.C., by the following five (5) courses and distances: 1) South 05° 27′ 37″ East, 429.70′ to a point; 2) South 08° 39′ 13″ West, 253 54′ to a point of curvature; 3) by a curve to the left having a radius of 320.00′, an arc length of 72.61′ to a point of tangency; 4) South 04° 20′ 47″ East, 212.71′ to a point; and 5) South 21° 30′ 57″, East 20.01′;

Thence from the point and place of Beginning, along the southwesterly and westerly sides of Delaware Route No. 896, by the following seven (7) courses and distances: 1) South 21° 30′ 57″ East, 70.12′ to a point; 2) by a curve to the right having a radius of 40.00′, an arc length of 53.40′ (53.37′ record) (chord equivalent: South 43° 45′ 57″ East, 49.52′) to a capped rebar set; 3) South 05° 27′ 37″ East, 9.96′ to a capped rebar set; 4) South 12° 53′ 30″ East, 115.97′ to a capped rebar set; 5) South 05° 27′ 37″ East, 785.00′ to a capped rebar set; 6) South 03° 04′ 14″ West, 101.12′ to a capped rebar set; and 7) South 05° 27′ 37″ East, 473.22′ to a capped rebar set at a corner for the land, a point in the line of lands of Ambax Properties, L.L.C.;

Thence leaving the westerly side of Delaware Route 896 along a division line of lands of Ambax Properties, L.L.C., Ambax, Inc. and Southgate Realty Associates, South 67° 55′ 30″ West, 704.56′ to a concrete monument found at a corner for the same;

Thence along a division line of lands of Southgate Realty Associates, South 23° 54′ 58″ East, 576.47′ to a capped rebar set at a corner for the same;

Thence, still along lands of Southgate Realty Associates, in part, passing over a concrete monument found at 70.88′, and along a division line for lands of Five T Associates, L.L.C., lands of Greenville International Associates and lands of BPG Hotel Partners IV, L.L.C., South 45° 11′ 17″ West, 622.60′ to a rail monument reset, at a corner for the same;

Thence along the line of lands of BPG Hotel Partners IV, L.L.C., in part, running through a run, South 36° 21′ 55″ East, 186.21′ to a drill hole set in a stone at a corner on the northerly side of Delaware Route No. 4, also known as Newark Connector, at varying widths, said point also being on a Denial of Access Line;

Thence leaving the line of land of BPG Hotel Partners IV, L.L.C., along the northerly and northeasterly sides of Delaware Route No. 4, also known as Newark Connector, by the following twelve (12) courses and distances: 1) South 45° 08′ 08″ West, 18.37′ to a capped rebar set; 2) South 87° 13′ 19″ West, 181.05′ to a concrete monument found; 3) South 84° 44′ 03″ West, 170.07′ to a capped rebar set at a point of termination of the Denial of Access Line; 4) continuing along Delaware Route No. 4 with free access, South 86° 35′ 54″ West, 188.59′ to a concrete monument found; 5) and then continuing with said Denial of Access Line, South 88° 59′ 15″ West, 428.04′ to a railroad spike found; 6) North 84° 19′ 02″ West, 586.18′ to a concrete monument found; 7) North 72° 11′ 22″ West, 390.43′ to a capped rebar set; 8) North 70° 04′ 31″ West, 546.70′ to a drill hole set in the concrete base of a fence post; 9) North 72° 11′ 13″ West, 550.44′ to a drill hole set in the concrete base of a fence post; 10) North 65° 34′ 52″ West, 518.15′ to a capped rebar set; 11) North 60° 46′ 12″ West, 319.09′ to a concrete monument found; and

12) North 57° 45' 17" West, 153.08' to a concrete monument found at a corner of lands of the State of Delaware;

Thence leaving the northeasterly side of Delaware Route No. 4 along a division line of lands of the State of Delaware, North 34° 02' 48" West, 752.78' to a concrete monument found at a common corner for the same and lands of Pennsylvania Lines, L.L.C.

Thence leaving the line of lands of the State of Delaware, along a division line of Pennsylvania Lines, L.L.C., by the following two (2) courses and distances: 1) North 58° 28' 50" East, 2140.27' to a capped rebar set; and 2) North 68° 26' 45" East, 1491.91' to a capped rebar set at a corner of lands of CHRYSLER MOTORS LLC, Parts Division;

Thence along the land of CHRYSLER MOTORS, LLC, Parts Division, by the following two (2) courses and distances: 1) South 21° 36' 51" East, 836.21' to a fence post; and 2) North 68° 25' 02" East, 1403.22' to the point and place of Beginning.

Parcel 2: One Mopar Drive:

All that certain lot, piece or parcel of land, situated in the City of Newark, New Castle County, State of Delaware, being known as Chrysler Corporation Newark Assembly Plant, Chrysler Parts Depot as shown on the Subdivision Plan for lands of the Chrysler Corporation of record in the Recorder of Deeds in and for New Castle County, State of Delaware, on Microfilm Number 5769 and being more particularly described as :

Beginning at a point on the Westerly right-of-way line of State Route 896, also known as South College Avenue (70 feet wide), said point being a common corner with the Southerly line of lands now or formerly of Delaware Power & Light Company, said point being further located South 05° 27' 37" East, 23.57 feet from the intersection of the Westerly line of State Route 896 extended, with the Southerly line of lands now or formerly of Philadelphia, Baltimore & Washington Railroad Company;

thence for the Chrysler Corporation Parts Depot, South 05° 27'37" East, 935.48 feet, along the former Westerly right-of-way line of State Route 896 (70 feet wide);

thence along other lands of Chrysler Corporation, the following two (2) courses and distances:

(1) South 68° 25' 02" West, 1476.11 feet; and
(2) North 21° 36' 51" West, 836.21 feet;

thence along the Southerly line of lands now or formerly of Philadelphia, Baltimore and Washington Railroad Company the following three (3) courses and distances:

(1) North 68° 26' 45" East, 1396.40 feet,
(2) North 10° 22' 55" West, 87.66 feet, and
(3) North 68° 26' 45" East, 308.65 feet;

thence along lands now or formerly of Delmarva Power & Light Company, the following two (2) courses and distances:

(1) South 05° 27' 37" East, 17.80 feet, and
(2) North 84° 32' 23" East, 20.00 feet to the Place of Beginning.

EXCEPTING THEREFROM all that certain tract, piece or parcel of land situated in the City of Newark, Pencader Hundred, New Castle County, State of Delaware, being a portion of the Right of Way required for the construction of a public facility known as the Newark Commuter Rail Station, said tract being a part of New Castle County Tax Parcel No. 18-036.00-002 and being more particularly described as follows, to wit:

BEGINNING at a point formed by the intersection of the existing Westerly Right-of-Way line of State Route 896, also known as South College Avenue (width varies), with the division line between these lands of Chrysler Corporation, aid point located opposite State Route 896 survey and construction centerline station 465+66.21 and 109.96 feet left, measured at a right angle to the survey and construction centerline, as shown and noted on Right-of-Way Sheet No. 5 of the plans for the Department of Transportation, Division of Highways, Contract No. 84-001-01;

thence from said Point of Beginning along these lands and lands now or formerly of Chrysler Corporation, the following two (2) described bearings and distances:

(1) North 21° 29' 51" West, 722.23 feet, and
(2) North 51° 14' 44" West, 73.53 feet,

thence along these lands and the Southerly Right-of-Way line of lands now or formerly of the National Railroad Passenger Corporation the following three (3) described bearings and distances:

(1) North 68° 26' 45" East, 18.89 feet,
(2) North 10° 22' 55" West, 87.66 feet, and
(3) North 68° 26' 45" East, 308.65 feet;

thence along these lands and the land now or formerly of Delmarva Power & Light Company the following two (2) described bearings and distances:

(1) South 05° 27' 37" East, 17.80 feet, and
(2) North 84° 32' 23" East, 20.00 feet,

thence along the Westerly Right-of-Way line of State Route 896, the following four (4) described bearings and distances:

(1) South 05° 27' 37" East, 406.12 feet,
(2) South 08° 39' 13" West, 253.54 feet,
(3) 72.61 feet along the arc of a circular curve having a radius of 320.00 feet, the chord of said arc bearing South 02° 09' 13" West, 72.45 feet, and
(4) South 04° 20' 47" East, 181.95 feet to the first described point and Place of Beginning.

ALSO EXCEPTING THEREFROM all that certain tract, piece or parcel of land situated in the City of Newark, New Castle County, State of Delaware, being a portion of the Right of Way required for the reconstruction of a public road leading from Route 4 to Amtrack, known as Route 896 and South College Avenue, said tract being more particularly described as:

Beginning at a point formed by the intersection of the existing Westerly right-of-way line of Route 896 with the new Westerly right-of-way line of Route 896, said point being located opposite station 470+60.50 and 51.99 feet distant to the left, measured at a right angle to the construction centerline of Route 896, as shown and noted on Sheet No 5 of the Division of Highways Right-of-Way Plans for Contract No 84-001-01;

thence along said existing Westerly right-of-way line of Route 896, South 05° 27' 37" East, 529.37 feet, thence South 68° 25' 02" West, 72.89 feet to a point located on the new Westerly right-of-way line of Route 896; thence thereby, the following four (4) courses and distances:

(1) North 21° 30' 57" West 20.02 feet to a point located opposite Station 465+35.46 and 110.56 feet distant to the left,
(2) North 04° 20' 47" West, 212.71 feet to a point of curvature located opposite Station 467+48.13 and 106.43 feet distant to the left,
(3) In a Northeasterly direction, curving to the right along the arc of a circle having a radius of 320.00 feet, an arc length of 72.61 feet, the chord of said arc bearing North 02° 09' 13" East, 72.45 feet to a point of tangency located opposite Station 468+19.94 and 96.83 feet distant to the left, and

(4) North 08° 39' 13" East, 253.54 feet to the first described point and Place of Beginning.

EXCEPTING THEREOUT AND THEREFROM all that certain, lot, piece or parcel of land as contained in a Deed between Chrysler Corporation and the State of Delaware dated June 15, 1990 and recorded in the Office as aforesaid in Deed Book 1052, Page 276.

FURTHER EXCEPTING THEREOUT AND THEREFROM all that certain, lot, piece or parcel of land as contained in a Deed between Chrysler Corporation and the State of Delaware dated May 23, 1980 and recorded in the Office as aforesaid in Deed Book R-110, Page 318.

## Exhibit B

1.    The "Paint Shop" as referred to in Section 2.06(f) of the Company Disclosure Letter as defined in Master Transaction Agreement among Fiat S.p.A., New Carco Acquisition LLC, Chrysler LLC and other sellers identified therein, dated April 30, 2009 (the "MTA"), described as PP&E (as defined in the MTA).

2.    All Purchased Inventory, as defined in section 2.06(i) of the MTA.

**Exhibit C**

## LAWYERS TITLE INSURANCE CORPORATION
## OWNERS AFFIDAVIT

STATE OF DELAWARE             :
                              :ss
COUNTY OF NEW CASTLE          :

                              PROPERTY:   Tax Parcel Nos. 18-036.00-002
                                                          18-039.00-002
                                          Chrysler Plant, Newark, DE
                              COMMITMENT NO: _____
                              (the "Commitment")

ON THIS ____ day of _____, 2009, before me personally appeared the undersigned, _____, _____ of OLD CARCO LLC (f/k/a Chrysler LLC) and OLD CARCO MOTORS LLC (f/k/a Chrysler Motors LLC), each a Delaware limited liability company (collectively, "Owners"), who being duly sworn according to law and intending to be legally bound, deposes and says:

1.     That the undersigned Authorized Person of the Owners is authorized to execute this affidavit and has the ability to execute all instruments necessary to convey the Property pursuant to the Limited Liability Company Agreements.

2.     That the conveyance of the Property has been duly authorized by the Owners.

3.     That, to the knowledge of the undersigned and except (i) as shown in the Commitment or as would be disclosed by an accurate survey of the property and (ii) for the rights of Chrysler Group LLC pursuant to the terms of that certain Transition Services Agreement dated as of June 10, 2009, as amended, there are no unrecorded leases or occupancy agreements affecting the Property, or other parties in possession.

4.     That there has not been any construction, repairs, alterations or improvements made, ordered or contracted to be made by the Owners on or to the Property, nor materials ordered by the Owners therefore within the last one-hundred eighty (180) days which has not been paid for; nor are there any fixtures ordered or installed by the Owners and attached to the Property which have not been paid for in full; and that there are no outstanding or disputed claims for any such work or item.

THIS AFFIDAVIT is made for the purpose of aiding Lawyers Title Insurance Corporation (the "Company") in determining the marketability and/or insurability of title to the property, and to induce said Company to issue its policies of title insurance, and the affiant avers the foregoing statements are true and correct to the best of its knowledge and belief.

OLD CARCO LLC,

_____    By:_____(Seal)
Witness                                                    Name:
                                                               Title:

OLD CARCO MOTORS LLC,

_____    By:_____(Seal)
Witness                                                    Name:
                                                               Title:

STATE OF DELAWARE                    :
                                                  :ss.
COUNTY OF NEW CASTLE            :

    This Instrument was acknowledged before me on _____, 2009, by _____ _____, _____ of Old Carco LLC, a Delaware limited liability company, party to this Instrument of Writing.

                                          _____
                                          Notary Public
                                          Name typed:
                                          My commission expires:

STATE OF DELAWARE                    :
                                                  :ss.
COUNTY OF NEW CASTLE            :

    This Instrument was acknowledged before me on _____, 2009, by _____ _____, _____ of Old Carco Motors, LLC, a Delaware limited liability company, party to this Instrument of Writing.

                                          _____
                                          Notary Public
                                          Name typed:
                                          My commission expires:

**Exhibit D**

Sale Order

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x
                              :

In re                          :

Old Carco LLC           :   Chapter 11
(f/k/a Chrysler LLC), *et al.*,[1]   :   Case No. 09-50002 (AJG)
                      :   (Jointly Administered)
          Debtors.     :
                      :
------------------------------------------------------------x

## ORDER AUTHORIZING DEBTORS TO SELL NEWARK, DELAWARE ASSEMBLY PLANT FREE AND CLEAR OF ALL LIENS, CLAIMS AND ENCUMBRANCES AND GRANTING RELATED RELIEF

This matter coming before the Court on the motion, dated October 23, 2009 (the "Sale

Motion"), filed by the above-captioned debtors and debtors in possession (collectively,

the "Debtors") for the entry of an order pursuant to sections 105 and 363 of the United States

Bankruptcy Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"), and Rules 2002, 6004 and

9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rules 2002-1,

6004-1 and 9006-1(b) of the local Bankruptcy Rules for the United States Bankruptcy Court for

the Southern District of New York:  (i) authorizing and approving the entry by Debtors Old

Carco LLC (f/k/a Chrysler LLC) and Old Carco Motors LLC (f/k/a Chrysler Motors LLC)

(together, the "Selling Debtors") into that certain Agreement of Purchase and Sale, dated as of

October 23, 2009, between The University of Delaware or its designee, 1743 Holdings LLC (in

either case, the "Buyer"), and the Selling Debtors (together with the exhibits thereto,

the "Agreement") in the form attached hereto as Exhibit 1, whereby the Selling Debtors have

agreed to sell to the Buyer the property formerly known as the Newark Assembly Plant (as

---

[1]    Capitalized terms used but not defined herein shall have the meanings given to such terms in the Agreement.

further defined in the Agreement, the "Property"); (ii) authorizing and approving the sale of the

Property by the Selling Debtors free and clear of all mortgages, security interests, conditional

sale or other retention agreements, pledges, liens (as that term is defined in section 101(37) of the

Bankruptcy Code), claims (as that term is defined in section 101(5) of the Bankruptcy Code),

obligations, guaranties, debts, obligations, rights, contractual commitments, interests, judgments,

demands, easements, charges, encumbrances, defects, options, rights of first refusal,

Encumbrances (as such term is defined in the Agreement), Liens (as such term is defined in the

Agreement) and restrictions of any kind or nature whether imposed by agreement, understanding,

law, equity or otherwise (collectively, "Interests"), other than certain liabilities that are expressly

assumed under the Agreement (collectively, "Assumed Liabilities"); and (iii) granting certain

related relief; the Court having conducted a hearing on the Sale Motion on November 12, 2009

(the "Sale Hearing") at which time all interested parties were offered an opportunity to be heard

with respect to the Sale Motion; the Court having reviewed and considered, among other

things, the Sale Motion and the exhibits thereto, including the declaration of Peter C. Chadwick

in support of the proposed sale of the Property, the Agreement and the arguments of counsel

made, and the evidence proffered or adduced, at the Sale Hearing;

I.    **FINDINGS OF FACT:**

IT IS HEREBY FOUND, DETERMINED AND CONCLUDED THAT:[2]

### Jurisdiction, Final Order and Statutory Predicates

A.    The findings and conclusions set forth herein constitute the Court's findings of

fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this

proceeding pursuant to Bankruptcy Rule 9014.

---

[2]    To the extent any of the following findings of fact constitute conclusions of law, they are adopted
as such.  See Fed. R. Bankr. P. 7052.

- 2 -

B.      The Court has jurisdiction over this matter and over the property of the Debtors,

including the Property to be sold, transferred or conveyed pursuant to the Agreement, and the

Debtors' estates pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding

pursuant to 28 U.S.C. § 157(b)(2).  Venue of this case and the Sale Motion in this district is

proper pursuant to 28 U.S.C. §§ 1408 and 1409.

C.      This Order constitutes a final order within the meaning of 28 U.S.C. § 158(a).

Notwithstanding Bankruptcy Rule 6004(h), the parties may consummate the transactions

provided for under the terms and conditions of the Agreement immediately upon entry of this

Order.

### Notice of the Sale Motion

D.      As evidenced by the affidavits of service and publication filed with the Court:

(1) proper, timely, adequate and sufficient notice of the Sale Motion and the Sale Hearing have

been provided under the particular circumstances by the mailing of the Sale Motion and the

publication of the Publication Notice; and (2) no other or further notice of the Sale Motion, or of

the entry of this Order is necessary or shall be required.

### Good Faith

E.      The Buyer is a buyer in good faith, as that term is used in the Bankruptcy Code

and court decisions thereunder, and is entitled to the protections of section 363(m) of the

Bankruptcy Code.  The Agreement was negotiated and entered into in good faith, based upon

arm's length bargaining, and without collusion or fraud of any kind.

### Business Judgment

F.      Prior to the Petition Date, the Debtors retained UGL Equis Corporation ("Equis")

to act as broker for the Property.  Equis has been actively marketing the Property since May 2008

and has contacted numerous potential buyers as part of this process.  After the Petition Date,

- 3 -

the Debtors requested that each known potential buyer then expressing an interest in the Property submit its highest and best offer by August 6, 2009 (the "Offer Deadline"). The Buyer was the only party that submitted a firm offer for the Property by the Offer Deadline, and (despite some expressions of interest) no other firm offers have been submitted by any party since the Offer Deadline. As a result, the Buyer's offer for the Property is the highest and best firm offer for the Property and constitutes full and adequate consideration and reasonably equivalent value for the Property. Moreover, the terms and conditions proposed by the Buyer were favorable to the Debtors, reflected access to committed financing and indicated that the Buyer was ready to consummate a purchase of the Property without delay.

      G.    The Property is fully encumbered by, among others, the liens securing the Debtors' obligations under the Amended and Restated First Lien Credit Agreement, dated as of August 3, 2007 (as amended or modified, the "First Lien Credit Agreement"), by and among Carco Intermediate Holdco II LLC, Old Carco, the lenders party thereto (collectively, the "First Lien Lenders") and JPMorgan Chase, N.A., in its capacity as administrative agent (the "First Lien Agent"). There are substantial carrying costs for property taxes, utilities, security and other expenses associated with the Property. These costs currently are borne by Chrysler Group LLC f/k/a New CarCo Acquisition LLC ("New Chrysler") under the Transition Services Agreement, dated June 10, 2009, between New Chrysler and Old Carco. Because New Chrysler's obligation to pay these costs currently expires as of October 31, 2009, the Debtors may be forced to bear the entirety of these carrying costs in the near future. The Debtors' postpetition lenders, whose liens on the Property are junior to the liens supporting the loans under the First Lien Credit Agreement, are not currently funding any of the expenses associated with the sale of the

Property. These costs instead currently are being funded by the First Lien Lenders as the parties with the primary economic stake in the sale of the Property.

H.    The Debtors have reviewed the sale process for the Property with the First Lien Agent, including indications of interest received from other parties after the Offer Deadline and other relevant facts. Having been fully informed on these matters, the First Lien Agent has indicated to the Debtors that the First Lien Lenders (1) consent to the sale of the Property under the terms of the Agreement; (2) consent to the consummation of the sale of the Property to Purchaser without an auction to avoid any delay and costs associated therewith, including the potential diminution of sale proceeds due to carrying costs; and (b) agree to fund the expenses associated with the private sale of the Property to Purchaser.

I.    The decision of the Debtors to enter into the Agreement, which provides for the private sale of the Property to the Buyer, represents a sound business judgment of the Debtors. Among other things, the Debtors have determined in their business judgment that, under the current circumstances, the benefits of consummating a prompt private sale of the Property on the terms and conditions embodied in the Agreement outweigh any potential benefits of conducting a further marketing and overbid process for the Property, particularly where the Debtors have fully marketed the Property over an extended period of time and have no agreement to fund the costs that would be incurred by the Debtors' estates in connection with a further marketing process. Accordingly, under the circumstances, the private sale of the Property on the terms and conditions set forth in the Agreement maximizes the value of the Property for the Debtors' estates.

### Validity of Transfer

J.    Prior to the transactions contemplated under the Agreement, the Property is the property of the Debtors' estates and title thereto is vested in the Debtors' estates.

- 5 -

COI-1428196v14

K.    The Selling Debtors have full power and authority to execute the Agreement and all other documents contemplated thereby, and the sale of the Property has been duly and validly authorized by all necessary corporate authority by the Selling Debtors to consummate the transactions contemplated by the Agreement. No consents or approvals, other than as may be expressly provided for in the Agreement, are required by the Selling Debtors to consummate such transactions.

### Section 363(f) of the Bankruptcy Code is Satisfied

L.    Except as may otherwise be provided in the Agreement or this Order, the Selling Debtors shall sell the Property free and clear of all Interests of any kind or nature whatsoever because, in each case, one or more of the standards set forth in section 363(f) of the Bankruptcy Code has been satisfied. The First Lien Lenders have consented to the proposed sale of the Property hereunder, pursuant to section 363(f)(2) of the Bankruptcy Code. Moreover, other holders of Interests who did not object, or who withdrew their objections, to the sale of the Property and the Sale Motion are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code. Those holders of Interests who did object fall within one or more of the other subsections of section 363(f) of the Bankruptcy Code and are adequately protected by having their Interests, if any, attach to the proceeds of the sale of the Property.

### No Successor Liability

M.    The transactions contemplated under the Agreement do not amount to a consolidation, merger or *de facto* merger of the Buyer and any of the Debtors, there is no substantial continuity between the Buyer and the Debtors, there is no continuity of enterprise between the Debtors and the Buyer, the Buyer is not a mere continuation of the Debtors or the Debtors' estates and the Buyer does not constitute a successor to the Debtors or to the Debtors' estates.

- 6 -

N.    Except as expressly set forth in the Agreement or this Order, the transfer of the Property to the Buyer shall not subject the Buyer or any of its affiliates or subsidiaries to any liability by reason of such transfer under (1) the laws of the United States, any state, territory or possession thereof, or the District of Columbia, based in whole or part on, directly or indirectly, including without limitation, any theory of antitrust, environmental, products liability, successor or transferee liability, labor law, *de facto* merger or substantial continuity; or (2) any employment contract, understanding or agreement, including, without limitation, collective bargaining agreements, employee pension plans or employee welfare or benefit plans.

### Retention of Jurisdiction

O.    It is necessary and appropriate for the Court to retain jurisdiction to, among other things, interpret and enforce the terms and provisions of this Order and the Agreement, and to adjudicate, if necessary, any and all disputes relating in any way to the transactions provided for under the terms and conditions of the Agreement.

## II.    CONCLUSIONS OF LAW:

NOW, THEREFORE, BASED UPON ALL OF THE FOREGOING, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:

1.    The relief requested in the Sale Motion is granted in its entirety, subject to the terms and conditions contained herein.

### Approval of Sale

2.    The Agreement (including all exhibits affixed thereto) and the transactions contemplated thereby are hereby approved.  Pursuant to sections 105 and 363 of the Bankruptcy Code, the Selling Debtors are authorized to perform their obligations under the Agreement.

3.    The Buyer is hereby granted and is entitled to all of the protections provided to a good faith buyer under section 363(m) of the Bankruptcy Code.

- 7 -

COI-1428196v14

4.    The Selling Debtors shall be, and hereby are, authorized and directed to fully assume, perform under, consummate and implement the terms of the Agreement together with any and all additional instruments and documents that may be necessary or desirable to implement and effectuate the terms of the Agreement, this Order and the sale of the Property contemplated thereby including, without limitation, the execution of any deeds, assignments and other instruments of transfer, and to take all further actions as may reasonably be requested by the Buyer for the purpose of assigning, transferring, granting, conveying and conferring to the Buyer, or reducing to possession any or all of the Property, as may be necessary or appropriate to the performance of the Selling Debtors' obligations as contemplated by the Agreement, without any further corporate action by the Selling Debtors or orders of this Court. The Buyer shall have no obligation to proceed with the Closing of the Agreement until all conditions precedent to its obligations to do so under the Agreement have been met, satisfied or waived.

5.    The sale of the Property and the consideration provided by the Buyer under the Agreement is fair and reasonable and shall be deemed for all purposes to constitute a transfer for reasonably equivalent value and fair consideration under the Bankruptcy Code and any other applicable law.

6.    Effective as of the Closing, the sale of the Property by the Selling Debtors to the Buyer shall constitute a legal, valid and effective transfer of the Property notwithstanding any requirement for approval or consent by any person and shall vest Buyer with all right, title and interest of the Debtors in and to the Property.

### Transfer of Property Free and Clear

7.    Pursuant to sections 105 and 363 of the Bankruptcy Code, except to the extent specifically provided otherwise in the Agreement or this Order, the sale of the Property shall vest Buyer with all right, title and interest in and to the Property free and clear of any and all

- 8 -

Interests, with all such Interests and any other liabilities and claims to attach only to the net proceeds of the sale with the same priority, validity, force and effect, if any, as they now have in or against the Property, subject to all claims and defenses the Debtors may possess with respect thereto. Following the Closing Date, no holder of any Interest in the Property shall interfere with the Buyer's use and enjoyment of the Property based on or related to such Interest.

8.    To the greatest extent permitted under applicable law, the Buyer shall be authorized, as of the Closing Date, to operate under any license, permit, registration and governmental authorization or approval of the Selling Debtors with respect to the Property, and all such licenses, permits, registrations and governmental authorizations and approvals are deemed to have been, and hereby are, directed to be transferred to the Buyer as of the Closing Date.

9.    On or before the Closing Date, all parties holding Interests of any kind are authorized and directed to execute such documents and take all other actions as may be necessary to release any Interests of any kind against the Property, as such Interests may have been recorded or may otherwise exist. If any person or entity that has filed financing statements or other documents or agreements evidencing any Interests in or against the Property shall not have delivered to the Selling Debtors prior to the Closing after request therefor, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction or releases of all such Interests that the person or entity has with respect to the Property, the Selling Debtors are hereby authorized to execute and file such statements, instruments, releases and other documents on behalf of the person or entity with respect to such Property prior to the Closing, and the Buyer is authorized to execute and file such documents after the Closing.

- 9 -

COI-1428196v14

10.    Except as expressly provided otherwise in the Agreement or this Order, the Buyer

is not a "successor" to the Debtors or their estates by reason of any theory of law or equity, and

the Buyer, its affiliates and subsidiaries shall not assume, nor be deemed to assume, nor in any

way be responsible for any liability or obligation of any of the Debtors and/or their estates

including, but not limited to, any successor liability or similar liability.  Except as expressly

provided otherwise in the Agreement or this Order, neither the purchase of the Property by the

Buyer, nor the fact that the Buyer or its affiliates or subsidiaries are using any of the Property

previously operated by the Debtors, will cause the Buyer or any of its affiliates or subsidiaries to

be deemed a successor in any respect to the Debtors' businesses within the meaning of any

foreign, federal, state or local revenue, pension, the Employee Retirement Income Security Act,

tax, labor, employment, environmental or other law, rule or regulation (including, without

limitation, filing requirements under any such laws, rules or regulations), or under any products

liability law or doctrine with respect to the Debtors' liability under such law, rule or regulation or

doctrine, or under any product warranty liability law or doctrine with respect to the Debtors'

liability under such law, rule or regulation or doctrine, and the Buyer, its affiliates and

subsidiaries shall have no liability or obligation on account of any of the foregoing.

11.    Except to the extent expressly provided otherwise in the Agreement or this Order,

pursuant to sections 105 and 363 of the Bankruptcy Code, all persons and entities, including, but

not limited to, all debt security holders; equity security holders; the Debtors' employees or

former employees; governmental, tax and regulatory authorities; lenders; parties to or

beneficiaries under any benefit plan; any claimant asserting a products liability claim; trade and

other creditors asserting or holding an Interest of any kind or nature whatsoever against, in or

with respect to any of the Debtors or the Property (whether legal or equitable, secured or

COI-1428196v14

unsecured, matured or unmatured, contingent or non-contingent, senior or subordinated), arising under or out of, in connection with, or in any way relating to the Debtors, the Property, the operation of the Debtors' businesses prior to the Closing Date or the transfer of the Property to the Buyer, shall be forever barred, estopped and permanently enjoined from asserting, prosecuting or otherwise pursuing such Interest or other liability against the Buyer or any of its affiliates or subsidiaries. For the avoidance of doubt, the foregoing shall not prevent the Debtors or their successors or permitted assigns from pursuing claims, if any, against the Buyer and/or its successors and assigns in and only in accordance with the terms of the Agreement.

12.    Nothing in this Order or the Agreement releases, nullifies, or enjoins the enforcement of any liability to a governmental unit under environmental statutes or regulations (or any associated liabilities for penalties, damages, cost recovery or injunctive relief) that any entity would be subject to as the owner or operator of property after the date of entry of this Order. Notwithstanding the foregoing sentence, nothing in this Order shall be interpreted to deem the Purchaser as the successor to the Debtors under any state law successor liability doctrine with respect to any liabilities under environmental statutes or regulations for penalties for days of violation prior to entry of this Order or for liabilities relating to off-site disposal of wastes by the Debtors prior to entry of this Order. Nothing in this paragraph should be construed to create for any governmental unit any substantive right that does not already exist under law.

13.    Except as expressly provided otherwise in the Agreement or this Order, all persons or entities, presently or on or after the Closing Date, in possession of some or all of the Property are directed to surrender possession of the Property to the Buyer on the Closing Date or at such time thereafter as the Buyer may request.

- 11 -

**Additional Provisions**

14.     Equis acted as broker for the sale of the Property and is entitled to a commission for this service under the Order, Pursuant to Sections 327(a) and 328(a) of the Bankruptcy Code, Bankruptcy Rule 2014(a) and Local Bankruptcy Rule 2014-1, Authorizing Debtors and Debtors in Possession to Employ and Retain UGL Equis Corporation as Real Estate Brokers to the Debtors, *Nunc Pro Tunc* to the Petition Date (Docket No. 5328) (the "Equis Order"). In accordance with the provisions of the Equis Order, the Debtors are hereby authorized to pay to Equis, solely out of the sale proceeds of the Property, the commission earned pursuant to the terms of the Services Agreement between the Debtors and Equis.

15.     Subject to the terms of the Agreement, the Agreement may be modified, amended or supplemented by agreement of the Selling Debtors and the Buyer without further action or order of the Court; *provided, however,* that any such modification, amendment or supplement does not materially change the terms of the Agreement or modify the express terms of this Sale Order.

16.     The failure specifically to include any particular provisions of the Agreement or any related Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court, the Selling Debtors and the Buyer that the Agreement and any related agreements are authorized and approved in their entirety with such amendments thereto as may be made by the parties in accordance with this Order prior to the Closing. To the extent that any provisions of this Order conflict with the terms and conditions of the Agreement, the terms and conditions of this Order shall govern and control.

17.     This Order and the Agreement shall be binding upon and govern the acts of all Persons and entities, including, without limitation, the Debtors and the Buyer, their respective successors and permitted assigns, including, without limitation, any trustee hereinafter appointed

- 12 -

for the Debtors' estates, all creditors of any Debtor (whether known or unknown), filing agents, filing officers, title agents, recording agencies, secretaries of state and all other persons and entities who may be required by operation of law, the duties of their office or contract to accept, file, register or otherwise record or release any documents or instruments or who may be required to report or insure any title in or to the Property. Each and every federal, state and local governmental agency, unit or department are hereby directed to accept this Order as sole and sufficient evidence of the transfer of title of the Property to the Buyer, and such agency, unit or department may rely upon this Order in consummating the transactions contemplated by the Agreement.

18.    This Order may be recorded by the Buyer in any registry or government office.

19.    As provided by Bankruptcy Rule 6004(h) this Order shall be effective immediately upon entry.

20.    This Court retains jurisdiction to interpret, implement and enforce the terms and provisions of this Sale Order, including to compel delivery of the Property, to protect the Buyer against any Interest and to enter any orders under sections 105 or 363 (or other applicable provisions) of the Bankruptcy Code necessary or appropriate to transfer the Property to the Buyer.

Dated: November ____, 2009
        New York, New York

_____
UNITED STATES BANKRUPTCY JUDGE

**Exhibit E**

Decommissioning Work

Shutting down machinery to a safe status.
Removal of hazardous materials and hazardous waste generated by Chrysler's operations.
Proper disposal of all hazardous waste and regulated waste materials excluding asbestos abatement and removal or disposal of PCB-containing equipment.
Completion of the recovery and disposal of any residual hazardous waste materials or hazardous raw materials or waste or raw materials, the disposal of which is regulated beyond requirements for ordinary household waste  remaining in the facility (within the wastewater treatment plant or process equipment, piping, tanks, pits, vaults, spray booths, etc.).
Completion of the emptying (not removal) of underground and above ground storage tank systems and associated piping, as required by applicable regulations.

CLI-1731681v28

**<u>Exhibit F</u>**

Escrow Agreement

## ESCROW AGREEMENT

This Escrow Agreement ("Escrow Agreement"), made as of the _____ day of_____,
2009, among **Old Carco LLC** and **Old Carco Motors LLC** (collectively, the "Seller"),
**University of Delaware** (the "Purchaser") and Saul Ewing LLP (the "Escrow Agent").

## WITNESETH:

**WHEREAS**, pursuant to that certain Agreement of Purchase and Sale, dated October 23,
2009, between Seller and Purchaser (as same may have been amended, the "Purchase
Agreement"), Seller agreed to sell to Purchaser and Purchaser agreed to purchase from Seller the
Property (as defined in the Purchase Agreement); and

**WHEREAS**, the parties are entering into this Escrow Agreement pursuant to Section 5
of the Purchase Agreement, pursuant to which the sum of Five Hundred Thousand Dollars
($500,000.00) (together with any undisbursed interest thereon, the "Escrow Fund") is to be
deposited into escrow out of the purchase price delivered by Purchaser pursuant to the Purchase
Agreement and held in order to secure, according to the terms hereof, the performance of certain
decommissioning activities at the Property as provided below. This Escrow Agreement shall
serve as Exhibit F to the Purchase Agreement.

**NOW, THEREFORE**, in consideration of Ten and No/100 ($10.00) Dollars and other
good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged,
Seller, Purchaser and Escrow Agent hereby agree as follows:

1.        Escrow Agent hereby acknowledges that the sum of Five Hundred Thousand
Dollars ($500,000), which was deducted from the Purchase Price, has been delivered to and
received by Escrow Agent as the Escrow Fund and Escrow Agent agrees to hold the Escrow
Fund and disburse it in accordance with the terms of this Escrow Agreement.

2.        (a)       As provided in the Purchase Agreement, it was intended by the parties that
certain work identified on Exhibit E of the Purchase Agreement (the "Decommissioning Work")
shall have been completed, in accordance with all applicable laws and regulations, on or prior to
the date hereof. The Escrow Fund shall be held in an interest-bearing account in a bank and an
account selected by Escrow Agent and approved by Seller and Purchaser. Seller shall furnish
Escrow Agent with a taxpayer identification number and certification required by the bank for
that account and any other documents required by the bank; provided, however, that the party to
whom the Escrowed Funds are disbursed hereunder shall be responsible for paying the allocable
amount of taxes on any interest earned on the Escrow Funds so disbursed. The obligations in
this paragraph shall survive the disbursement of the Escrow Fund. All interest earned on the
Escrow Fund shall be included in the Escrow Fund and disbursed in the same manner as the
principal portion of the Escrow Fund.

(b)       Purchaser has commenced or will hereafter commence to inspect the
Property in order to confirm that the Decommissioning Work has been completed as required by
the Purchase Agreement. Purchaser shall have a period of seventy five (75) days, commencing
on _____, 2009, to notify Seller, with a copy to Escrow Agent, in writing, of any instances
in which Purchaser believes that the Decommissioning Work has not been fully and finally
completed and shall present Seller and Escrow Agent with a description of the deficiency and an
estimated cost of completion (the "Deficiency Notice"). All notices shall be made to the

CLI-1752084v6

addresses and in the manner as provided by Section 12 of the Purchase Agreement (provided that the address for the Escrow Agent shall be as set forth below under the Escrow Agent's signature). Within five (5) days of the Seller's receipt of a Deficiency Notice, Seller may elect either to (i) cure or cause the cure of the noted deficiency, (ii) challenge Purchaser's claim that any deficiency exists, or (iii) not challenge the Deficiency Notice, and shall notify Purchaser of its election within such period. In the event that Seller makes no election, Seller shall be deemed to have elected item (iii), above (i.e., not to challenge the Deficiency Notice). In the event Seller elects, or is deemed to have elected, not to challenge the Deficiency Notice, Purchaser may proceed to resolve the noted deficiency as provided in subparagraph (c) below and, upon completion, shall present an invoice or other reasonable documentation of expense incurred ("Invoices") to Seller and the Escrow Agent. In the event that Seller elects to undertake, or cause to be undertaken, the completion of the noted deficiency (it being understood that in no event does Seller have any, nor shall Seller be deemed to have ever had any, obligation to undertake any such completion), (i) Seller shall have a period of up to thirty (30) days (provided, however, if such failure is not susceptible to cure within such thirty (30) days, such period shall extend for so long as it takes to cure provided that such cure has been commenced and is diligently being prosecuted) to complete, or cause the completion of, such deficiency (and the seventy five day period shall be tolled only with respect to the specific noted deficiency for such thirty (30) days) and (ii) Purchaser shall re-assign to Seller Purchaser's rights against Chrysler under the TSA with respect to the deficiency. Notwithstanding anything herein to the contrary, nothing herein shall be deemed to release or waive any rights assigned to Purchaser by Seller at Closing; provided, however, that to the extent that Purchaser at anytime hereafter recovers any amounts from Chrysler relating to any deficiencies that Purchaser is ultimately reimbursed for out of the Escrow Fund, such amounts shall be returned to Seller (net of reasonable collection costs) and Purchaser agrees to re-assign to Seller, at Seller's request, any such claims against Chrysler to the extent Purchaser elects not to pursue Chrysler in connection therewith. Either the Seller's or the Purchaser's election to cure any deficiencies, or cause any deficiencies to be cured, shall be entirely discretionary and the curing party may at any point, and for any reason or no reason, abandon any such undertaking that it has elected, regardless of the condition of any such work undertaken; provided, however, that if Seller undertakes to perform, or cause to be performed, any such work and thereafter abandons it or fails to complete it or cause it to be completed, Purchaser shall have the right to then re-object thereto and avail itself of the remedies hereunder to complete the work itself and claim under the Escrow Fund as provided herein.

(c)     To the extent Invoices submitted to Seller and Escrow Agent are for work not challenged by Seller in the manner set forth in subsection (b) next above, Escrow Agent shall promptly pay, without further demand, such Invoices (but not in excess of an amount equal to 110% of the estimated cost of completion as set forth in Seller's original Deficiency Notice).

(d)     In the event Seller timely disputes a Deficiency Notice (a "Disputed Deficiency Claim"), the Escrow Agent shall only make payments from the Escrow Fund on account of such Disputed Deficiency Claim by either (i) joint written instructions by the Seller and the Purchaser to the Escrow Agent or (ii) a final non-appealable order of the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") in Seller's chapter 11 case.

(e)     The remainder of the Escrow Fund not claimed by Purchaser for completing the Decommissioning Work shall be delivered to Seller by Escrow Agent by a date that is the later of (i) the seventy-fifth (75th) day following the date hereof (subject to any tolling

provided for in Section 2(b) above), (ii) the payment of the last invoice submitted by Purchaser under the terms of this Section or (iii) the resolution by the Bankruptcy Court of all disputed payments pursuant to the terms of this Section.

3.     Escrow Agent shall not commingle the Escrow Fund with other funds.

4.     In the event that a dispute shall arise as to the disposition of the Escrow Fund or any other funds held hereunder in escrow, Escrow Agent shall have the right, at its option, to either hold the same or deposit the same with the Bankruptcy Court pending a final non-appealable decision of such court, and Escrow Agent shall be entitled to rely upon the decision of such court and shall be reimbursed for any legal expenses so incurred out of the Escrow Fund.

5.     Escrow Agent shall have no liability whatsoever arising out of or in connection with its activity as Escrow Agent provided that it does not act in bad faith, with gross negligence or in willful disregard of the terms of this Escrow Agreement.

6.     Escrow Agent shall be entitled to rely upon any judgment, certification, demand or other writing delivered to it hereunder without being required to determine the authenticity or the correctness of any fact stated therein, the propriety or validity thereof, or the jurisdiction of a court issuing any such judgment.  Escrow Agent may act in reliance upon (i) any instrument or signature believed to be genuine and duly authorized, and (ii) advice of counsel in reference to any matter or matters connected therewith.

7.     This Escrow Agreement shall be governed by and construed in accordance with the laws of the State of Delaware.  All disputes regarding this agreement shall be resolved by the Bankruptcy Court.  All of the parties to this Escrow Agreement consent to the jurisdiction of the Bankruptcy Court to resolve any disputes regarding this agreement.

8.     This Escrow Agreement shall be binding upon and inure to the benefit of Seller, Purchaser, Escrow Agent and their respective successors, assigns and legal representatives.

9.     This Escrow Agreement sets forth the entire understanding of the parties with respect to the subject matter hereof and shall not be modified or amended without the express written consent of the parties hereto.  To the extent that the provisions of this Escrow Agreement conflict with the provisions of the Purchase Agreement, the Purchase Agreement shall govern.

10.     Except as defined herein, all capitalized terms used in this Escrow Agreement shall have the meanings given to such terms in the Purchase Agreement.

11.     This Escrow Agreement may be executed in separate counterparts, which, together, shall constitute one and the same fully executed agreement.

12.     Saul Ewing LLP shall remain free to represent the Purchaser notwithstanding Saul Ewing LLP's service as Escrow Agent under the Agreement or the Purchase Agreement.

**IN WITNESS WHEREOF**, this Escrow Agreement has been duly executed as of the date above written.

**PURCHASER:**

UNIVERSITY OF DELAWARE

By:_____(Seal)
        Name:
        Title:

**SELLER:**

OLD CARCO LLC

By:_____(Seal)
        Name:
        Title:

OLD CARCO MOTORS LLC

By:_____(Seal)
        Name:
        Title:

**ESCROW AGENT:**

SAUL EWING LLP

By:_____(Seal)
        Name:
        Title:

Notice Address:

    Saul Ewing LLP
    William E. Manning, Esq.
    222 Delaware Avenue
    Suite 1200, P.O. Box 1266
    Wilmington, Delaware  19899
    Telephone:  (302) 421-6868
    Facsimile:  (302) 421-5865
    E-mail:  wmanning@saul.com

## EXHIBIT B

**[Chadwick Declaration]**

JONES DAY
222 East 41st Street
New York, New York  10017
Telephone:  (212) 326-3939
Facsimile:  (212) 755-7306
Corinne Ball
Veerle Roovers

JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212
David G. Heiman

JONES DAY
1420 Peachtree Street, N.E.
Suite 800
Atlanta, Georgia  30309
Telephone:  (404) 581-3939
Facsimile:  (404) 581-8330
Jeffrey B. Ellman

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-------------------------------------------------------------x
                                    :
In re                               :   Chapter 11
                                    :
Old Carco LLC                       :   Case No. 09-50002 (AJG)
(f/k/a Chrysler LLC), et al.,       :
                                    :   (Jointly Administered)
                        Debtors.    :
                                    :
-------------------------------------------------------------x
```

**DECLARATION OF PETER C. CHADWICK IN SUPPORT OF MOTION OF
DEBTORS AND DEBTORS IN POSSESSION, PURSUANT TO SECTIONS 105 AND 363
OF THE BANKRUPTCY CODE AND BANKRUPTCY RULES 2002 AND 6004, FOR AN
ORDER AUTHORIZING THE SALE OF NEWARK, DELAWARE ASSEMBLY PLANT
FREE AND CLEAR OF ALL LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES**

I, Peter C. Chadwick, make this declaration pursuant to 28 U.S.C. § 1746 and

state as follows:

1.      I am an executive director with Capstone Advisory Group, LLC ("Capstone"), financial advisor to the above-captioned debtors and debtors in possession (collectively, the "Debtors").  I submit this Declaration in support of the Motion of Debtors and Debtors in Possession, Pursuant to Sections 105 and 363 of the Bankruptcy Code and Bankruptcy Rules 2002 and 6005 for an Order Authorizing the Sale of Newark, Delaware Assembly Plant Free and Clear of All Liens, Claims, Interests and Encumbrances (the "Motion").[1]

2.      Except as otherwise indicated, all statements in this Declaration are based upon my personal knowledge, my review of relevant documents or my opinion based upon my experience.  If I were called upon to testify, I could and would testify to each of the facts set forth herein.

3.      In my position at Capstone, my responsibilities include advising the Debtors with respect to the sale and disposition of the Debtors' various assets, including the Property.  In connection with these responsibilities, I am familiar with the Property, the Debtors' decision  to sell the Property and the Debtors' marketing program for the Property.

4.      The Property consists of two parcels totaling 271 acres located in New Castle County in the State of Delaware and includes a manufacturing facility and a parts distribution facility.  In conjunction with their restructuring of operations prior to the Petition Date, the Debtors shut down production at the Property at the end of 2008.

5.      The Property has substantial carrying costs in the form of taxes, utilities, security and other expenses.  The carrying costs associated with the Property are substantial and are estimated on an annual basis to be in excess of $5,000,000.  These costs currently are borne

---

[1]      Capitalized terms not otherwise defined herein have the meaning given to them in the Motion.

by New Chrysler under the Transition Services Agreement, dated June 10, 2009, between New Chrysler and Old Carco (the "TSA").  Because New Chrysler's obligation to pay these costs currently expires as of October 31, 2009, the Debtors may be forced to bear the entirety of these costs in the near future.[2]

6.    Since May 2008, the Debtors have been utilizing UGL Equis Corporation ("Equis") to market the Property.  As part of Equis' marketing efforts, Equis contacted numerous investor groups concerning their interest in the Property.  In addition to Equis's extensive marketing campaign, the Debtors' intention to close the Property was publicly announced prior to the plant's closing and widely covered in the Delaware press at that time.

7.    Due to the collapse of the financing markets and the general deterioration of the economy in the United States, the potential pool of buyers for large industrial facilities, such as the Property, diminished significantly.  Nevertheless, both prior to and subsequent to the Petition Date, Equis was contacted by multiple parties interested in the Property.  Subsequent to the Petition Date, and after discussion with each party that continued to express an interest in the Property, the Debtors requested the submission of letters of intent representing the best offer from each of such parties for the Property by August 6, 2009 (the "Offer Deadline").  The only party that submitted a firm offer by the Offer Deadline was the Buyer.  While some other parties have continued to express an interest in the Property since the Offer Deadline, no other party has submitted a firm offer.

8.    The written offer submitted by the Buyer formed the basis for subsequent extensive discussions that led to the Purchase Agreement.  The Debtors believe that the terms and conditions of the Purchase Agreement are favorable to their estates and represent the highest

---

[2]    The October 31, 2009 expiration of the TSA is provided for by the amendment to the TSA approved by the Court on October 9, 2009 (Docket No. 5738).

and best offer for the Property under the circumstances for the following reasons.  <u>First</u>, the Buyer has committed funding for the transaction and is willing to close on an expedited basis.  <u>Second</u>, the timely consummation of the transactions under the Purchase Agreement will allow the Debtors to avoid incurring the substantial carrying costs associated with the Property, while bringing in significant cash that (after payment of closing costs) can be used to reduce the claims of the First Lien Lenders under the First Lien Credit Agreement.  <u>Third</u>, pursuant to the Purchase Agreement, the Buyer is assuming responsibility for the remediation of certain environmental issues on the Property, which otherwise could impose obligations on the Debtors.  <u>Fourth</u>, while other parties have continued to express interest in the Property, no party has actually come forward with a higher and better offer (taking into account ability to close promptly and no financing contingency, among other things).

9.      After 18 months of marketing the Property, the Buyer remains the only party that has come forward with a firm offer and no financing contingency.  Accordingly, the Debtors do not believe that a further marketing process would be reasonably likely to bring in a higher offer sufficient to offset the carrying costs and other expenses associated with such a strategy.

10.      Throughout their negotiations with the Buyer, the Debtors have been in ongoing discussion with the First Lien Agent regarding both the Buyer's proposal for and other expressions of interest in the Property, which is entirely encumbered by the First Lien Lenders' liens, and other expressions of interest in the Property.  The First Lien Agent has indicated that the First Lien Lenders have consented to the private sale of the Property to the Buyer.

11.      In addition, because the Debtors' postpetition lenders, whose liens on the Property are junior to the liens supporting the loans under the First Lien Credit Agreement, are

unwilling to fund the Debtors' efforts to liquidate the First Lien Lenders' collateral, the Debtors

sought and obtained a commitment from the First Lien Lenders to fund a private sale of the

Property.  The First Lien Lenders have not agreed to fund the costs associated with a more

extended marketing and overbid process.  As a result, the Debtors do not have a consensual

agreement to fund the carrying costs or sales process associated with an extended sale process

for the Property.

I declare under penalty of perjury under the laws of the United States of America

that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated:  October 16, 2009

Peter C. Chadwick
Executive Director
Capstone Advisory Group, LLC

# **EXHIBIT C**

## **[Publication Notice]**

JONES DAY
222 East 41st Street
New York, New York  10017
Telephone:  (212) 326-3939
Facsimile:  (212) 755-7306
Corinne Ball
Veerle Roovers

JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212
David G. Heiman

JONES DAY
1420 Peachtree Street, N.E.
Suite 800
Atlanta, Georgia  30309
Telephone:  (404) 581-3939
Facsimile:  (404) 581-8330
Jeffrey B. Ellman

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-------------------------------------------------------------x
                                          :
In re                                     :   Chapter 11
                                          :
Old Carco LLC                             :   Case No. 09-50002 (AJG)
(f/k/a Chrysler LLC), et al.,             :
                                          :   (Jointly Administered)
                         Debtors.         :
                                          :
-------------------------------------------------------------x
```

**NOTICE OF PROPOSED SALE OF NEWARK, DELAWARE ASSEMBLY PLANT**
**FREE AND CLEAR OF ALL LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES**

**PLEASE TAKE NOTICE OF THE FOLLOWING:**

        1.      On October 23, 2009, the above-captioned debtors and debtors in
possession (collectively, the "Debtors") filed a motion (the "Sale Motion") with the United States
Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") seeking
authority to sell their Newark, Delaware assembly plant (the "Property") to the University of
Delaware (or its designee) (the "Buyer") free and clear of all liens, claims, interests and

encumbrances.  AMONG OTHER THINGS, THE PROPERTY IS BEING SOLD FREE AND CLEAR OF ANY SUCCESSOR LIABILITY CLAIMS.

2.      A copy of the Purchase Agreement (as such term is defined in the Sale Motion) and the Sale Motion may be obtained by (a) sending a written request to counsel to the Debtors, Jones Day, 901 Lakeside Avenue, Cleveland, Ohio 44114-1190, Facsimile: (216) 579-0212 (Attn: Carl E. Black, Esq.) or (b) accessing the website of the Debtors' claims and noticing agent, Epiq Bankruptcy Solutions, LLC, at http://www.chryslerrestructuring.com/ (the "Epiq Website").

3.      A hearing to approve the sale of the Property to the Buyer has been scheduled for November 12, 2009 at 9:30 a.m., New York time (the "Sale Hearing").

4.      OBJECTIONS TO THE RELIEF REQUESTED IN THE SALE MOTION, INCLUDING THE DEBTORS' REQUEST TO APPROVE THE SALE OF THE PROPERTY FREE AND CLEAR OF ALL LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES TO THE PURCHASER (EACH, AN "OBJECTION"), MUST BE MADE IN WRITING, FILED WITH THE BANKRUPTCY COURT, AND SERVED SO AS TO BE ACTUALLY RECEIVED BY 4:00 P.M., NEW YORK TIME ON NOVEMBER 5, 2009.

5.      ANY OBJECTIONS MUST BE FILED WITH THE COURT AND TIMELY SERVED IN ACCORDANCE WITH PARAGRAPH 4 ABOVE on all parties specified to be served in the Administrative Order, Pursuant to Bankruptcy Rule 1015(c), Establishing Case Management and Scheduling Procedures (Docket No. 661) (the "Case Management Order").  A copy of the Case Management Order is available on the Epiq Website.

6.      This Notice is subject to the full terms and conditions of the Sale Motion, the Purchase Agreement and the Sale Order (which shall control in the event of any conflict). The Debtors encourage parties in interest to review such documents in their entirety and consult an attorney if they have questions or want advice.

COI-1428660v3

Dated: October 23, 2009          <u>Respectfully submitted,</u>
      New York, New York

<u>/s/  Corinne Ball                              </u>
Corinne Ball
Veerle Roovers
JONES DAY
222 East 41st Street
New York, New York  10017
Telephone:  (212) 326-3939
Facsimile:  (212) 755-7306

David G. Heiman
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212

Jeffrey B. Ellman
JONES DAY
1420 Peachtree Street, N.E.
Suite 800
Atlanta, Georgia  30309
Telephone:  (404) 581-3939
Facsimile:  (404) 581-8330

ATTORNEYS FOR DEBTORS AND
DEBTORS IN POSSESSION

COI-1428660v3

**<u>Exhibit D</u>**

**[Proposed Sale Order]**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x
                                :

In re                                :

                                :

Old Carco LLC                     :     Chapter 11
(f/k/a Chrysler LLC), *et al.*,[1]        :     Case No. 09-50002 (AJG)

                Debtors.       :     (Jointly Administered)

                                :

                                :

-------------------------------------------------------------x

**ORDER AUTHORIZING DEBTORS TO SELL NEWARK,**
**DELAWARE ASSEMBLY PLANT FREE AND CLEAR OF ALL**
**LIENS, CLAIMS AND ENCUMBRANCES AND GRANTING RELATED RELIEF**

      This matter coming before the Court on the motion, dated October 23, 2009 (the "Sale

Motion"), filed by the above-captioned debtors and debtors in possession (collectively,

the "Debtors") for the entry of an order pursuant to sections 105 and 363 of the United States

Bankruptcy Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"), and Rules 2002, 6004 and

9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rules 2002-1,

6004-1 and 9006-1(b) of the local Bankruptcy Rules for the United States Bankruptcy Court for

the Southern District of New York:  (i) authorizing and approving the entry by Debtors Old

Carco LLC (f/k/a Chrysler LLC) and Old Carco Motors LLC (f/k/a Chrysler Motors LLC)

(together, the "Selling Debtors") into that certain Agreement of Purchase and Sale, dated as of

October 23, 2009, between The University of Delaware or its designee, 1743 Holdings LLC (in

either case, the "Buyer"), and the Selling Debtors (together with the exhibits thereto,

the "Agreement") in the form attached hereto as Exhibit 1, whereby the Selling Debtors have

agreed to sell to the Buyer the property formerly known as the Newark Assembly Plant (as

---

     [1]    Capitalized terms used but not defined herein shall have the meanings given to such terms in the Agreement.

further defined in the Agreement, the "Property"); (ii) authorizing and approving the sale of the

Property by the Selling Debtors free and clear of all mortgages, security interests, conditional

sale or other retention agreements, pledges, liens (as that term is defined in section 101(37) of the

Bankruptcy Code), claims (as that term is defined in section 101(5) of the Bankruptcy Code),

obligations, guaranties, debts, obligations, rights, contractual commitments, interests, judgments,

demands, easements, charges, encumbrances, defects, options, rights of first refusal,

Encumbrances (as such term is defined in the Agreement), Liens (as such term is defined in the

Agreement) and restrictions of any kind or nature whether imposed by agreement, understanding,

law, equity or otherwise (collectively, "Interests"), other than certain liabilities that are expressly

assumed under the Agreement (collectively, "Assumed Liabilities"); and (iii) granting certain

related relief; the Court having conducted a hearing on the Sale Motion on November 12, 2009

(the "Sale Hearing") at which time all interested parties were offered an opportunity to be heard

with respect to the Sale Motion; the Court having reviewed and considered, among other

things, the Sale Motion and the exhibits thereto, including the declaration of Peter C. Chadwick

in support of the proposed sale of the Property, the Agreement and the arguments of counsel

made, and the evidence proffered or adduced, at the Sale Hearing;

## I.    FINDINGS OF FACT:

IT IS HEREBY FOUND, DETERMINED AND CONCLUDED THAT:[2]

### Jurisdiction, Final Order and Statutory Predicates

A.    The findings and conclusions set forth herein constitute the Court's findings of

fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this

proceeding pursuant to Bankruptcy Rule 9014.

---

[2]    To the extent any of the following findings of fact constitute conclusions of law, they are adopted
as such.  See Fed. R. Bankr. P. 7052.

- 2 -

B.      The Court has jurisdiction over this matter and over the property of the Debtors,

including the Property to be sold, transferred or conveyed pursuant to the Agreement, and the

Debtors' estates pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding

pursuant to 28 U.S.C. § 157(b)(2).  Venue of this case and the Sale Motion in this district is

proper pursuant to 28 U.S.C. §§ 1408 and 1409.

C.      This Order constitutes a final order within the meaning of 28 U.S.C. § 158(a).

Notwithstanding Bankruptcy Rule 6004(h), the parties may consummate the transactions

provided for under the terms and conditions of the Agreement immediately upon entry of this

Order.

## Notice of the Sale Motion

D.      As evidenced by the affidavits of service and publication filed with the Court:

(1) proper, timely, adequate and sufficient notice of the Sale Motion and the Sale Hearing have

been provided under the particular circumstances by the mailing of the Sale Motion and the

publication of the Publication Notice; and (2) no other or further notice of the Sale Motion, or of

the entry of this Order is necessary or shall be required.

## Good Faith

E.      The Buyer is a buyer in good faith, as that term is used in the Bankruptcy Code

and court decisions thereunder, and is entitled to the protections of section 363(m) of the

Bankruptcy Code.  The Agreement was negotiated and entered into in good faith, based upon

arm's length bargaining, and without collusion or fraud of any kind.

## Business Judgment

F.      Prior to the Petition Date, the Debtors retained UGL Equis Corporation ("Equis")

to act as broker for the Property.  Equis has been actively marketing the Property since May 2008

and has contacted numerous potential buyers as part of this process.  After the Petition Date,

- 3 -

the Debtors requested that each known potential buyer then expressing an interest in the Property submit its highest and best offer by August 6, 2009 (the "Offer Deadline").  The Buyer was the only party that submitted a firm offer for the Property by the Offer Deadline, and (despite some expressions of interest) no other firm offers have been submitted by any party since the Offer Deadline.  As a result, the Buyer's offer for the Property is the highest and best firm offer for the Property and constitutes full and adequate consideration and reasonably equivalent value for the Property.  Moreover, the terms and conditions proposed by the Buyer were favorable to the Debtors, reflected access to committed financing and indicated that the Buyer was ready to consummate a purchase of the Property without delay.

G.      The Property is fully encumbered by, among others, the liens securing the Debtors' obligations under the Amended and Restated First Lien Credit Agreement, dated as of August 3, 2007 (as amended or modified, the "First Lien Credit Agreement"), by and among Carco Intermediate Holdco II LLC, Old Carco, the lenders party thereto (collectively, the "First Lien Lenders") and JPMorgan Chase, N.A., in its capacity as administrative agent (the "First Lien Agent").  There are substantial carrying costs for property taxes, utilities, security and other expenses associated with the Property.  These costs currently are borne by Chrysler Group LLC f/k/a New CarCo Acquisition LLC ("New Chrysler") under the Transition Services Agreement, dated June 10, 2009, between New Chrysler and Old Carco.  Because New Chrysler's obligation to pay these costs currently expires as of October 31, 2009, the Debtors may be forced to bear the entirety of these carrying costs in the near future.  The Debtors' postpetition lenders, whose liens on the Property are junior to the liens supporting the loans under the First Lien Credit Agreement, are not currently funding any of the expenses associated with the sale of the

Property.  These costs instead currently are being funded by the First Lien Lenders as the parties with the primary economic stake in the sale of the Property.

H.    The Debtors have reviewed the sale process for the Property with the First Lien Agent, including indications of interest received from other parties after the Offer Deadline and other relevant facts.  Having been fully informed on these matters, the First Lien Agent has indicated to the Debtors that the First Lien Lenders (1) consent to the sale of the Property under the terms of the Agreement; (2) consent to the consummation of the sale of the Property to Purchaser without an auction to avoid any delay and costs associated therewith, including the potential diminution of sale proceeds due to carrying costs; and (b) agree to fund the expenses associated with the private sale of the Property to Purchaser.

I.    The decision of the Debtors to enter into the Agreement, which provides for the private sale of the Property to the Buyer, represents a sound business judgment of the Debtors. Among other things, the Debtors have determined in their business judgment that, under the current circumstances, the benefits of consummating a prompt private sale of the Property on the terms and conditions embodied in the Agreement outweigh any potential benefits of conducting a further marketing and overbid process for the Property, particularly where the Debtors have fully marketed the Property over an extended period of time and have no agreement to fund the costs that would be incurred by the Debtors' estates in connection with a further marketing process.  Accordingly, under the circumstances, the private sale of the Property on the terms and conditions set forth in the Agreement maximizes the value of the Property for the Debtors' estates.

## Validity of Transfer

J.    Prior to the transactions contemplated under the Agreement, the Property is the property of the Debtors' estates and title thereto is vested in the Debtors' estates.

- 5 -

K.    The Selling Debtors have full power and authority to execute the Agreement and all other documents contemplated thereby, and the sale of the Property has been duly and validly authorized by all necessary corporate authority by the Selling Debtors to consummate the transactions contemplated by the Agreement.  No consents or approvals, other than as may be expressly provided for in the Agreement, are required by the Selling Debtors to consummate such transactions.

## Section 363(f) of the Bankruptcy Code is Satisfied

L.    Except as may otherwise be provided in the Agreement or this Order, the Selling Debtors shall sell the Property free and clear of all Interests of any kind or nature whatsoever because, in each case, one or more of the standards set forth in section 363(f) of the Bankruptcy Code has been satisfied.  The First Lien Lenders have consented to the proposed sale of the Property hereunder, pursuant to section 363(f)(2) of the Bankruptcy Code.  Moreover, other holders of Interests who did not object, or who withdrew their objections, to the sale of the Property and the Sale Motion are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code.  Those holders of Interests who did object fall within one or more of the other subsections of section 363(f) of the Bankruptcy Code and are adequately protected by having their Interests, if any, attach to the proceeds of the sale of the Property.

## No Successor Liability

M.    The transactions contemplated under the Agreement do not amount to a consolidation, merger or *de facto* merger of the Buyer and any of the Debtors, there is no substantial continuity between the Buyer and the Debtors, there is no continuity of enterprise between the Debtors and the Buyer, the Buyer is not a mere continuation of the Debtors or the Debtors' estates and the Buyer does not constitute a successor to the Debtors or to the Debtors' estates.

- 6 -

N.       Except as expressly set forth in the Agreement or this Order, the transfer of the

Property to the Buyer shall not subject the Buyer or any of its affiliates or subsidiaries to any

liability by reason of such transfer under (1) the laws of the United States, any state, territory or

possession thereof, or the District of Columbia, based in whole or part on, directly or indirectly,

including without limitation, any theory of antitrust, environmental, products liability, successor

or transferee liability, labor law, *de facto* merger or substantial continuity; or (2) any

employment contract, understanding or agreement, including, without limitation, collective

bargaining agreements, employee pension plans or employee welfare or benefit plans.

### Retention of Jurisdiction

O.       It is necessary and appropriate for the Court to retain jurisdiction to, among other

things, interpret and enforce the terms and provisions of this Order and the Agreement, and to

adjudicate, if necessary, any and all disputes relating in any way to the transactions provided for

under the terms and conditions of the Agreement.

## II.       CONCLUSIONS OF LAW:

NOW, THEREFORE, BASED UPON ALL OF THE FOREGOING, IT IS HEREBY

ORDERED, ADJUDGED AND DECREED THAT:

1.       The relief requested in the Sale Motion is granted in its entirety, subject to the

terms and conditions contained herein.

### Approval of Sale

2.       The Agreement (including all exhibits affixed thereto) and the transactions

contemplated thereby are hereby approved.  Pursuant to sections 105 and 363 of the Bankruptcy

Code, the Selling Debtors are authorized to perform their obligations under the Agreement.

3.       The Buyer is hereby granted and is entitled to all of the protections provided to a

good faith buyer under section 363(m) of the Bankruptcy Code.

- 7 -

4.      The Selling Debtors shall be, and hereby are, authorized and directed to fully

assume, perform under, consummate and implement the terms of the Agreement together with

any and all additional instruments and documents that may be necessary or desirable to

implement and effectuate the terms of the Agreement, this Order and the sale of the Property

contemplated thereby including, without limitation, the execution of any deeds, assignments and

other instruments of transfer, and to take all further actions as may reasonably be requested by

the Buyer for the purpose of assigning, transferring, granting, conveying and conferring to the

Buyer, or reducing to possession any or all of the Property, as may be necessary or appropriate to

the performance of the Selling Debtors' obligations as contemplated by the Agreement, without

any further corporate action by the Selling Debtors or orders of this Court.  The Buyer shall have

no obligation to proceed with the Closing of the Agreement until all conditions precedent to its

obligations to do so under the Agreement have been met, satisfied or waived.

5.      The sale of the Property and the consideration provided by the Buyer under the

Agreement is fair and reasonable and shall be deemed for all purposes to constitute a transfer for

reasonably equivalent value and fair consideration under the Bankruptcy Code and any other

applicable law.

6.      Effective as of the Closing, the sale of the Property by the Selling Debtors to the

Buyer shall constitute a legal, valid and effective transfer of the Property notwithstanding any

requirement for approval or consent by any person and shall vest Buyer with all right, title and

interest of the Debtors in and to the Property.

### **Transfer of Property Free and Clear**

7.      Pursuant to sections 105 and 363 of the Bankruptcy Code, except to the extent

specifically provided otherwise in the Agreement or this Order, the sale of the Property shall vest

Buyer with all right, title and interest in and to the Property free and clear of any and all

- 8 -

Interests, with all such Interests and any other liabilities and claims to attach only to the net

proceeds of the sale with the same priority, validity, force and effect, if any, as they now have in

or against the Property, subject to all claims and defenses the Debtors may possess with respect

thereto.  Following the Closing Date, no holder of any Interest in the Property shall interfere with

the Buyer's use and enjoyment of the Property based on or related to such Interest.

8.      To the greatest extent permitted under applicable law, the Buyer shall be

authorized, as of the Closing Date, to operate under any license, permit, registration and

governmental authorization or approval of the Selling Debtors with respect to the Property, and

all such licenses, permits, registrations and governmental authorizations and approvals are

deemed to have been, and hereby are, directed to be transferred to the Buyer as of the Closing

Date.

9.      On or before the Closing Date, all parties holding Interests of any kind are

authorized and directed to execute such documents and take all other actions as may be

necessary to release any Interests of any kind against the Property, as such Interests may have

been recorded or may otherwise exist.  If any person or entity that has filed financing statements

or other documents or agreements evidencing any Interests in or against the Property shall not

have delivered to the Selling Debtors prior to the Closing after request therefor, in proper form

for filing and executed by the appropriate parties, termination statements, instruments of

satisfaction or releases of all such Interests that the person or entity has with respect to the

Property, the Selling Debtors are hereby authorized to execute and file such statements,

instruments, releases and other documents on behalf of the person or entity with respect to such

Property prior to the Closing, and the Buyer is authorized to execute and file such documents

after the Closing.

10.     Except as expressly provided otherwise in the Agreement or this Order, the Buyer is not a "successor" to the Debtors or their estates by reason of any theory of law or equity, and the Buyer, its affiliates and subsidiaries shall not assume, nor be deemed to assume, nor in any way be responsible for any liability or obligation of any of the Debtors and/or their estates including, but not limited to, any successor liability or similar liability.  Except as expressly provided otherwise in the Agreement or this Order, neither the purchase of the Property by the Buyer, nor the fact that the Buyer or its affiliates or subsidiaries are using any of the Property previously operated by the Debtors, will cause the Buyer or any of its affiliates or subsidiaries to be deemed a successor in any respect to the Debtors' businesses within the meaning of any foreign, federal, state or local revenue, pension, the Employee Retirement Income Security Act, tax, labor, employment, environmental or other law, rule or regulation (including, without limitation, filing requirements under any such laws, rules or regulations), or under any products liability law or doctrine with respect to the Debtors' liability under such law, rule or regulation or doctrine, or under any product warranty liability law or doctrine with respect to the Debtors' liability under such law, rule or regulation or doctrine, and the Buyer, its affiliates and subsidiaries shall have no liability or obligation on account of any of the foregoing.

11.     Except to the extent expressly provided otherwise in the Agreement or this Order, pursuant to sections 105 and 363 of the Bankruptcy Code, all persons and entities, including, but not limited to, all debt security holders; equity security holders; the Debtors' employees or former employees; governmental, tax and regulatory authorities; lenders; parties to or beneficiaries under any benefit plan; any claimant asserting a products liability claim; trade and other creditors asserting or holding an Interest of any kind or nature whatsoever against, in or with respect to any of the Debtors or the Property (whether legal or equitable, secured or

- 10 -

unsecured, matured or unmatured, contingent or non-contingent, senior or subordinated), arising

under or out of, in connection with, or in any way relating to the Debtors, the Property, the

operation of the Debtors' businesses prior to the Closing Date or the transfer of the Property to

the Buyer, shall be forever barred, estopped and permanently enjoined from asserting,

prosecuting or otherwise pursuing such Interest or other liability against the Buyer or any of its

affiliates or subsidiaries.  For the avoidance of doubt, the foregoing shall not prevent the Debtors

or their successors or permitted assigns from pursuing claims, if any, against the Buyer and/or its

successors and assigns in and only in accordance with the terms of the Agreement.

12.    Nothing in this Order or the Agreement releases, nullifies, or enjoins the

enforcement of any liability to a governmental unit under environmental statutes or regulations

(or any associated liabilities for penalties, damages, cost recovery or injunctive relief) that any

entity would be subject to as the owner or operator of property after the date of entry of this

Order.  Notwithstanding the foregoing sentence, nothing in this Order shall be interpreted to

deem the Purchaser as the successor to the Debtors under any state law successor liability

doctrine with respect to any liabilities under environmental statutes or regulations for penalties

for days of violation prior to entry of this Order or for liabilities relating to off-site disposal of

wastes by the Debtors prior to entry of this Order.  Nothing in this paragraph should be construed

to create for any governmental unit any substantive right that does not already exist under law.

13.    Except as expressly provided otherwise in the Agreement or this Order, all

persons or entities, presently or on or after the Closing Date, in possession of some or all of the

Property are directed to surrender possession of the Property to the Buyer on the Closing Date or

at such time thereafter as the Buyer may request.

- 11 -

## **Additional Provisions**

14.     Equis acted as broker for the sale of the Property and is entitled to a commission for this service under the Order, Pursuant to Sections 327(a) and 328(a) of the Bankruptcy Code, Bankruptcy Rule 2014(a) and Local Bankruptcy Rule 2014-1, Authorizing Debtors and Debtors in Possession to Employ and Retain UGL Equis Corporation as Real Estate Brokers to the Debtors, *Nunc Pro Tunc* to the Petition Date (Docket No. 5328) (the "Equis Order").  In accordance with the provisions of the Equis Order, the Debtors are hereby authorized to pay to Equis, solely out of the sale proceeds of the Property, the commission earned pursuant to the terms of the Services Agreement between the Debtors and Equis.

15.     Subject to the terms of the Agreement, the Agreement may be modified, amended or supplemented by agreement of the Selling Debtors and the Buyer without further action or order of the Court; *provided, however,* that any such modification, amendment or supplement does not materially change the terms of the Agreement or modify the express terms of this Sale Order.

16.     The failure specifically to include any particular provisions of the Agreement or any related Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court, the Selling Debtors and the Buyer that the Agreement and any related agreements are authorized and approved in their entirety with such amendments thereto as may be made by the parties in accordance with this Order prior to the Closing.  To the extent that any provisions of this Order conflict with the terms and conditions of the Agreement, the terms and conditions of this Order shall govern and control.

17.     This Order and the Agreement shall be binding upon and govern the acts of all Persons and entities, including, without limitation, the Debtors and the Buyer, their respective successors and permitted assigns, including, without limitation, any trustee hereinafter appointed

- 12 -

for the Debtors' estates, all creditors of any Debtor (whether known or unknown), filing agents,

filing officers, title agents, recording agencies, secretaries of state and all other persons and

entities who may be required by operation of law, the duties of their office or contract to accept,

file, register or otherwise record or release any documents or instruments or who may be

required to report or insure any title in or to the Property.  Each and every federal, state and local

governmental agency, unit or department are hereby directed to accept this Order as sole and

sufficient evidence of the transfer of title of the Property to the Buyer, and such agency, unit or

department may rely upon this Order in consummating the transactions contemplated by the

Agreement.

       18.     This Order may be recorded by the Buyer in any registry or government office.

       19.     As provided by Bankruptcy Rule 6004(h) this Order shall be effective

immediately upon entry.

       20.     This Court retains jurisdiction to interpret, implement and enforce the terms and

provisions of this Sale Order, including to compel delivery of the Property, to protect the Buyer

against any Interest and to enter any orders under sections 105 or 363 (or other applicable

provisions) of the Bankruptcy Code necessary or appropriate to transfer the Property to the

Buyer.

Dated: November____, 2009
      New York, New York

                                      _____
                                        UNITED STATES BANKRUPTCY JUDGE

- 13 -