UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

_____
                                            :
In re                                       :        Chapter 11
                                            :
OLD CARCO LLC, f/k/a CHRYSLER LLC, *et al*., :      Case No. 09 B 50002 (AJG)
                                            :
                            Debtors.        :        (Jointly Administered)
                                            :
_____:

OPINION DENYING MOTION OF THE 23 AFFECTED DEALERS
FOR ALLOWANCE OF ADMINISTRATIVE EXPENSES
PURSUANT TO 11 U.S.C. §§ 503(b) AND 507(a)(2)


APPEARANCES:


ROBINSON BROG LEINWAND GREENE
        GENOVESE & GLUCK P.C.
Counsel for the 23 Affected Dealers
New York, New York

        By:    Russell P. McCrory, Esq.
               Fred B. Ringel, Esq.
               Robert R. Leinwand, Esq.
               A. Mitchell Greene, Esq.
               Robert M. Sasloff, Esq.


JONES DAY
Counsel for the Debtors
New York, New York

        By:    Corinne Ball, Esq.

    -and -

Atlanta, Georgia

        By:    Jeffrey B. Ellman, Esq.

ARTHUR J. GONZALEZ
UNITED STATES BANKRUPTCY JUDGE

Before the Court is a motion seeking administrative expense priority for damages sustained by certain domestic automobile dealers as a result of the Debtors' rejection of executory sales and service agreements with those dealers.

The Court concludes that any claims for damages sustained by the dealers stem from the rejection of the pre-petition executory contracts. Therefore, those claims are pre-petition general unsecured claims not entitled to administrative expense priority.

*FACTS*

On April 30, 2009, Old Carco LLC (f/k/a Chrysler LLC) and 24 of its domestic direct and indirect subsidiaries[1] (collectively with Chrysler LLC, the "Debtors") filed for protection under title 11 of the United States Code (the "Bankruptcy Code"). The Debtors' cases are being jointly administered for procedural purposes, pursuant to Rule 1015(a) of the Federal Rules of Bankruptcy Procedure. On May 5, 2009, an Official Committee of Unsecured Creditors (the "Creditors' Committee") was formed.

On June 1, 2009, an order was entered, pursuant to section 363 of the Bankruptcy Code, granting the Debtors' motion to approve the sale of substantially all of the Debtors' operating assets. Thereafter, on June 9, 2009, an order was entered authorizing the Debtors, pursuant to sections 105 and 365 of the Bankruptcy Code, to reject executory contracts and unexpired leases, including 789 sales and service agreements with domestic car dealerships. On June 10, 2009, the sale of the Debtors' assets closed.

---

[1] On May 19, 2009, an additional affiliate of Chrysler LLC filed a petition for relief under title 11 of the Bankruptcy Code.

2

Twenty three of the dealers (the "Affected Dealers"), whose sales and service agreements (the "Dealer Agreements") were rejected, filed a motion seeking administrative expense priority, pursuant to sections 503(b)(1) and 507(a)(2) of the Bankruptcy Code, for their claims against the estates that have resulted from the rejection of those Dealer Agreements. The Debtors oppose the Affected Dealers' motion. A hearing on this matter was held before the Court on November 19, 2009.

*Parties' Contentions*

While acknowledging that damages arising from the rejection of a pre-petition contract ordinarily are pre-petition unsecured claims, the Affected Dealers argue that special considerations relevant here warrant administrative priority treatment for these claims. Specifically, the Affected Dealers contend that because the state in which each Affected Dealer is located has enacted a comprehensive regulatory scheme (the "Dealer Laws") pursuant to its respective police powers, which scheme was intended to address public health and safety and general economic welfare, and because 28 U.S.C. § 959(b) requires a debtor to operate its business in accordance with the requirements of state law, the Debtors were required to operate their business in accordance with the Dealer Laws. Thus, the Affected Dealers argue that they are seeking administrative priority for violations of state statutory obligations imposed upon automobile manufacturers and, as such, are not seeking administrative priority for contractual damage claims.

In addition, the Affected Dealers argue that they are seeking administrative priority for their claims under a line of cases that hold that actual and necessary costs warranting administrative priority include costs ordinarily incident to the operation of a business. The

Affected Dealers assert that it is ordinarily incident to an automobile manufacturer's business to comply with state Dealer Laws.

The Debtors oppose the Affected Dealers' motion and argue that section 365 is intended to assist a debtor in freeing itself of burdensome contractual obligations. The Debtors maintain that for the power of rejection under section 365 of the Bankruptcy Code to be effective, federal bankruptcy law establishes the priority of any claim that stems from rejection, and the Bankruptcy Code expressly provides that rejection damage claims are pre-petition claims.

The Debtors disagree with the Affected Dealers' characterization that these are not rejection damage claims but statutory claims. Accordingly, the Debtors maintain that these claims only arise by virtue of the Dealer Agreements. The Dealer Laws only afford rights to entities that are parties to such a contract; therefore, the Debtors assert that the claims are not independent of the contracts. The Debtors urge that the claims here arise out of the rejection of each such contract and that, as such, the claims are rejection damage claims.

The Debtors further argue that they did not violate any state law by virtue of their rejection of the Dealer Agreements because they were authorized by Section 365, with Court approval, to reject those contracts. The Debtors maintain that to the extent that a state law conflicts with their entitlement under federal bankruptcy law to reject burdensome contracts, those state laws are preempted.

Even apart from the preemption of the state laws, the Debtors contend that 28 U.S.C. § 959(b) only applies to an ongoing business, as does the line of cases concerned with costs ordinarily incident to the operation of a business. The Debtors assert that from the start of these bankruptcy cases, it was clear that the Debtors were ceasing business operations in anticipation

4

of selling their operating assets.  The Debtors note that from the commencement of the cases, the

Debtors' intent was to liquidate the assets and make a distribution to creditors.  At or prior to the

commencement of the cases, the Debtors idled most operations pending the sale of the Debtors'

assets to the purchaser.  The Debtors ceased all manufacturing operations and only held the

business enterprise intact until a sale of the assets could be concluded.

In addition, the Debtors argue that the Affected Dealers' claims only seek to effectuate

their private economic interests and rights under the Dealer Laws, not any interest the states may

have in protecting public health and safety, and especially not any interest in avoiding an

imminent threat to public health and safety.

*DISCUSSION*

*Rejection of Executory Contracts and Unexpired Leases*

With certain limitations not relevant here, section 365(a) of the Bankruptcy Code

provides that

> the trustee, subject to the court's approval, may assume or reject any executory contract
> or unexpired leases of the debtor.

11 U.S.C. § 365(a).

Thus, a debtor is afforded a statutory right to reject an executory contract or unexpired

lease.  *See In re Ames Dept. Stores, Inc.*, 306 B.R. 43, 51 (Bankr. S.D.N.Y. 2004).  Moreover,

pursuant to section 365(g) of the Bankruptcy Code, a debtor's rejection of an executory contract

or unexpired lease "constitutes a breach of such contract or lease . . . immediately before the date

of the filing of the petition."  11 U.S.C. § 365(g).[2]

---

[2]In addition, section 502(g) of the Bankruptcy Code provides, in relevant part, that

[a] claim arising from the rejection, under section 365 of this title . . . , of an executory contract or

5

As noted by the *Ames* court, "[a] rejection is a court-authorized breach of an executory contract." *Ames*, 306 B.R. at 51. In exercising its business judgment, a debtor may deem it desirable to relieve itself of the duty of continuing to perform on a burdensome contract, and any claim arising from such rejection is treated as a pre-petition claim for breach of contract. *See Ames*, 306 B.R. at 51.

"Rejection does not change the substantive rights of the parties to the contract or lease, but merely means that the bankruptcy estate itself will not become a party to it." Andrew, EXECUTORY CONTRACTS IN BANKRUPTCY: UNDERSTANDING "REJECTION," 59 U. Colo. L.R. 845, 848 (1988). While rejection "frees the estate from the obligation to perform; it does not make the contract disappear." *Med. Malpractice Ins. Assoc. v. Hirsch ( In re Lavigne),* 114 F.3d 379, 387 (2d Cir.1997) (quoting *In re Drexel Burnham Lambert Group Inc.,* 138 B.R. 687, 703 (Bankr. S.D.N.Y. 1992)). Thus, rejection does not affect contract or lease liabilities. *See* Andrew, REJECTION, 59 U. Colo. L.R. at 849. A debtor's liabilities under a contract or lease remain "intact to form the basis of a claim" against the bankruptcy estate. *Id.* at 888. The effect of rejection is that the *estate* does not become obligated on the contract or lease, it does not affect a *debtor's* obligations, which continue and which form the basis of the non-debtor's claim. *Id.* at 889. Thus, rejection is the equivalent of electing not to assume a contract or lease. *Id.* at 849. A rejected contract or lease is treated as abandoned and not a part of the bankruptcy estate. *See In re Ciena Capital LLC*, 2009 WL 2905759 *5 (Bankr. S.D.N.Y. 2009).

The purpose of treating a rejection as a pre-petition breach is to allow the non-debtor

---

unexpired lease of the debtor that has not been assumed shall be determined . . . the same as if such claim had arisen before the date of the filing of the petition.

party to have a claim against the debtor.  *See Lavigne,* 114 F.3d at 387.  The Bankruptcy Code, however, specifically provides that such claim against the estate is treated as a pre-petition claim, thereby affording it general unsecured status.  11 U.S.C. § 365(g).

By rejecting a contract or lease, a debtor is granted the opportunity to be relieved of burdensome obligations.  *See Ames*, 306 B.R. at 52.  Any continued performance on such obligations would be detrimental to an estate's other creditors.  *Id*.  Thus, a debtor is allowed "to avoid the incurrence of additional administrative expenses which lack a corresponding benefit to the estate."  *Id.*

A debtor's statutory right to reject cannot be qualified by requirements not set forth in the Bankruptcy Code itself.  *See Ames*, 306 B.R. at 51.  Nor can a debtor be forced to comply with burdensome contractual obligations that may have formed "part of the rationale for rejection in the first place."  *Id*.  As expressed by the *Ames* court

> the ability to reject burdensome post-petition obligations is one of the most fundamental rights of a trustee or debtor-in-possession (and thus the creditor body generally) under the Bankruptcy Code.  It would frustrate the entire purpose of rejection if, in order to reject and thereby be relieved of a burdensome executory contract, the debtor were required, as a condition to doing so, to comply with one of the very aspects of the agreement that is burdensome.

*Id*. at 52.[3]

When a debtor *assumes* a contract or lease, it is required to cure any defaults.  *Id.*  However, requiring a cure of defaults to *reject* a contract or lease would eliminate the Bankruptcy Code benefits provided to a debtor in allowing it to reject burdensome executory

---

[3]As discussed subsequently, some courts afford special consideration to situations where an imminent identifiable hazard affecting public health and safety is present.  In such circumstances, there may be an exception to the rule that a debtor in possession is not obligated to perform following a rejection.  However, even that exception requiring performance would be a temporary measure that ceases to apply when the hazard can be otherwise addressed.

contracts and unexpired leases.  *Id*.

Where a claim is based upon an obligation that stems from a rejected pre-petition contract, encumbering a debtor with a "post-petition obligation would seriously undercut the entire purpose of the rejection process." *Ames*, 306 B.R. at 60.  Requiring administrative priority for "obligations that were first undertaken pre-petition is exactly what the rejection provisions are supposed to avoid." *Id*.

With respect to the Affected Dealers' assertion that one must look to state law to determine the rights arising under the contract and the subsequent breach thereof, it is correct that the parties are left with the remedies available outside of bankruptcy law, *see In re Ciena Capital LLC*, 2009 WL 2905759 at *5, and state law determines the consequences of the breach. *See Lavigne*, 114 F.3d at 387.  However, while the state Dealer Laws determine the consequences of a rejection-induced breach, those laws do not determine the priority of a related claim.  The Dealer Laws will be considered to determine what claims the Affected Dealers have against the Debtors for breach of the Dealer Agreements.  Nevertheless, as with all of the Debtors' other breaches of obligations, the determination of any such claim's priority is the exclusive province of the federal bankruptcy law, which expressly accords a contractual rejection damage claim the status of a pre-petition claim.  *See* 11 U.S.C. § 365(g).  The Court agrees with the Debtors that affording rejection claims administrative priority would effectively eliminate the purpose behind providing a debtor with the power to reject a contract.  The Debtors correctly assert that there is no need for a "special rejection power" if a debtor is forced, nevertheless, to bear administrative liability when it breaches an agreement post-petition.

The Affected Dealers seek to elevate the priority of their claims in contravention of the

express statutory grant under section 365(g).  As noted previously, a rejected contract is treated as abandoned and not a part of the bankruptcy estate.  Indeed, absent the Bankruptcy Code provisions affording their claims pre-petition unsecured status against the estate, in most instances, holders of claims arising from a rejected contract would not have any viable recourse to monetize their claims.  This is because after the rejection, *i.e.*, after the estate has decided not to assume the contract and the obligations arising thereunder, the holder of a claim would not be able to assert the claim against the estate.  By enacting section 365(g) of the Bankruptcy Code, Congress afforded such claimants an opportunity that they would not otherwise have to assert a claim against the bankruptcy estate.  By seeking to elevate the priority of this express grant bestowed by Congress when it sought to avoid the harsh consequences of a rejection, the Affected Dealers seek a priority for their claims beyond that which was envisioned by Congress.

Pursuant to section 365 of the Bankruptcy Code, the Court authorized the Debtors to reject the Dealer Agreements.  *See In re Old Car Co LLC*, 406 B.R. 180, 212 (Bankr. S.D.N.Y. 2009).  The Court has already determined that the Dealer Laws were preempted to the extent that those laws would prohibit or limit the Debtors' right to reject the burdensome contracts.  *See Id*. at 199-206.  If the Debtors were required to comply with the Dealer Laws, such requirement would eliminate the relief that the Debtors obtained from their entitlement under the Bankruptcy Code to reject those contracts.  Thus, with the Dealer Laws having been preempted to effectuate the rejection, arguments that the Debtors violated the Dealer Laws are inapposite.  The claims asserted by the Affected Dealers stem from the rejection of the Dealer Agreements, which the Bankruptcy Code categorizes as pre-petition claims.

There are instances in which another federal policy may conflict with and take

precedence over the rejection entitlement, as is the case in certain situations concerning environmental issues.[4]  Absent such other overriding federal policy, regardless of whether a debtor is reorganizing or liquidating, a claim stemming from its court-approved rejection, pursuant to section 365 of the Bankruptcy Code, of a contract is a pre-petition claim.

To recapitulate, the Affected Dealers assert that, notwithstanding the rejection of the contracts, the claims are entitled to administrative priority pursuant to either (i) 28 U.S.C. § 959(b), which requires a trustee or debtor-in-possession to manage or operate its business in compliance with state law, or (ii) a line of cases that accord administrative priority to certain obligations incident to the operation of a debtor's business.  For their part, the Debtors contend that even if the Court's determination - that the state Dealer Laws were preempted for the purpose of effecting the rejection of the Dealer Agreements - were not dispositive of the issue, the claims do not warrant administrative priority status under either (i) the traditional criteria for administrative priority, (ii) application of 28 U.S.C. § 959(b), or (iii) any case law exceptions to the traditional administrative expense priority standard that allow administrative priority.

The Court agrees that its prior determination that the state Dealer Laws were preempted for the purpose of effectuating the rejection of the Dealer Agreements is dispositive of the matter.  Nevertheless, for completeness, the Court will address the parties' contentions concerning the criteria for administrative expense priority, including the case law addressing exceptions thereto and 28 U.S.C. § 959(b).

*Administrative Expense Priority*

---

[4]The governmental interest in environmental protection is addressed more fully in the following section concerning the criteria for administrative expense priority.

*Traditional Criteria*

Section 503(b)(1)(A) of the Bankruptcy Code provides a priority for "the actual, necessary costs and expenses of preserving the estate . . . for services rendered after the commencement of the case." Pursuant to section 507(a)(1) of the Bankruptcy Code, these expenses for administering the estate are afforded a first priority. Thus, expenses incurred by the debtor-in-possession during the reorganization effort are afforded a first priority. *See In re Jartran*, 732 F.2d 584, 586 (7th Cir. 1984).

This priority is based upon the premise that the operation of the business by a debtor-in-possession benefits pre-petition creditors; therefore, any claims that result from that operation are entitled to payment prior to payment to "creditors for whose benefit the continued operation of the business was allowed." *Cramer v. Mammoth Mart, Inc. (In re Mammoth Mart, Inc.)*, 536 F.2d 950, 954 (1st Cir. 1976). Although *Mammoth Mart* was decided under the former Bankruptcy Act, its analysis remains applicable under the Bankruptcy Code. *See In re Drexel Burnham Lambert Group Inc.*, 134 B.R. 482, 489 (Bankr. S.D.N.Y. 1991).

Administrative expenses are afforded this priority to facilitate the reorganization effort by encouraging third parties, who might otherwise be reluctant to deal with a debtor-in-possession, to transact such business. *See Amalgamated Ins. Fund. v. McFarlin's Inc.*, 789 F.2d 98, 101 (2d Cir. 1986) (citing *Mammoth Mart*, 536 F.2d at 954). Absent this incentive, third parties would refrain from dealing with the debtor-in-possession, thereby inhibiting the reorganization effort and harming pre-petition creditors. *Id.*

Nevertheless, in light of the bankruptcy goal of providing equal distribution of a debtor's assets to all creditors, "statutory priorities, such as those resulting from administrative expense

11

treatment, are narrowly construed." *Ames*, 306 B.R. at 54 (citing *Amalgamated Ins. Fund*, 789

F.2d at 101). Strictly construing the terms "actual" and "necessary" minimizes administrative

expense claims, thereby preserving the estate for the benefit of all creditors. *See Drexel*, 134

B.R. at 488. If claims not intended to have priority were afforded such, the value of the priority

for those creditors Congress intended to prefer would be diluted. *See Mammoth Mart*, 536 F.2d

at 953. It is important to note that any dispute between a provider of goods or services and the

solvent recipient for such goods or services based upon an ordinary contract becomes, once the

recipient becomes a debtor in bankruptcy, a contest among the debtor's creditors to share in the

distribution of the debtor's assets. *See General American Transportation Corp. v. Martin (In re*

*Mid Region Petroleum, Inc.)*, 1 F.3d 1130, 1133 (10th Cir. 1993). Any priority given to one

creditor is effected to the detriment of other creditors. *See In re Patient Education Media, Inc.*,

221 B.R. 97, 101 (Bankr. S.D.N.Y. 1998).

> Ordinarily, an expense will be accorded administrative status
> 1) if it arises out of a transaction between the creditor and the bankrupt's trustee or
> debtor-in-possession; and
> 2) only to the extent that the consideration supporting the claimant's right to payment
> was both supplied to and beneficial to the debtor-in-possession in the operation of the
> business.

*Amalgamated Ins. Fund*, 789 F.2 at 101; *see also Mammoth Mart*, 536 F.2d at 954.

The services performed by the claimant must have been "induced" by the debtor-in-

possession, not the pre-petition debtor. *See Jartran, Inc.*, 732 F.2d at 587 (citing *Mammoth*

*Mart*, 536 F.2d at 587). Considering inducement by the debtor-in-possession to be a crucial

element comports with the policy reason for allowing the priority, which is to encourage third

parties to supply the debtor-in-possession with goods and services with the goal of achieving a

reorganization to benefit all creditors. *See Jartran Inc.*, 732 F.2d at 588, 590. Thus, benefit to

12

the debtor-in-possession alone, without its having induced the performance, is not sufficient to warrant entitlement to an administrative claim priority, as it would contradict this policy reason for allowing the priority.  *See Jartran, Inc.*, 732 F.2d at 590.

Where a "debtor-in-possession elects to continue to receive benefits from the other party to an executory contract pending a decision to assume or reject the contract, the debtor-in-possession is obligated to pay for the reasonable value of those services." *Patient Education Media*, 221 B.R. at 101 (quoting *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 531, 104 S. Ct. 1188, 1199, 79 L. Ed.2d 482 (1984)); *see also In re Continental Airlines, Inc.*, 146 B.R. 520, 526 (Bankr. D.De. 1992).  Therefore, the claims of third parties who are induced to supply goods or services to a debtor-in-possession pursuant to a contract that has not been rejected are afforded administrative priority to the extent that the consideration supporting the claim was supplied during the reorganization.  *See Jartran, Inc.*, 732 F.2d at 588.  The claimant has the burden of establishing entitlement to the priority.  *See Drexel*, 134 B.R. at 489.

### The Reading Line of Cases

An exception to the requirement that there be an actual benefit to the estate before a claim can be accorded administrative priority has developed in the context of torts committed by the trustee or debtor-in-possession during the course of a chapter 11 proceeding.  *See  In re Puerto Rican Food Corp.*, 41 B.R. 565, 572-73 (Bankr. E.D.N.Y. 1984) (citing *Reading Co. v. Brown*, 391 U.S. 471, 482, 88 S. Ct. 1759, 1765, 20 L. Ed.2d 751 (1968)) (other citations omitted).

In *Reading*, which concerned an arrangement under Chapter XI of the Bankruptcy Act, the Supreme Court reasoned that if a party were injured by negligence in the operation of an

13

"insolvent business thrust upon it by operation of law," it was "fairer" to compensate the injured party upon whom the arrangement had been imposed before compensating those for whose benefit the arrangement was being effected. *See Reading*, 391 U.S. at 478-79, 88 S. Ct. at 1763-64. Thus, the Supreme Court held that a tort arising during the arrangement is treated as an "actual and necessary expense[ ]" of the estate. *Id*. at 482, 88 S. Ct. at 1765. The concept has since been applied in chapter 11 reorganization cases under the Bankruptcy Code. *See Puerto Rico Food Corp*, 41 B.R. at 572-73 (citing cases). The justification is that it is "more natural and just" to compensate those who were injured by the operation of the business during the reorganization effort ahead of those for whose benefit the business was allowed to continue to operate. *Reading*, 391 U.S. at 482, 88 S. Ct. at 1765. Thus, "costs ordinarily incident to operation of a business" can be afforded administrative priority. *Reading Co.*, 391 U.S. at 483, 88 S.Ct. at 1766.

In *Spunt v. Charlesbank Laundry, Inc. (In re Charlesbank Laundry, Inc.)*, 755 F.2d 200, 202-03 (1st Cir. 1985), the fairness rationale of *Reading* was extended to a debtor-in-possession's intentional act that violated the law, where the estate's actions injured innocent parties. In *Charlesbank Laundry*, a temporary injunction was issued that enjoined the operation of a laundry in violation of a zoning ordinance, which operation would create a public nuisance. *Id*. at 201. The *Charlesbank Laundry* court granted administrative expense priority to a compensatory civil fine that was levied because of the debtor-in-possession's violation of the temporary injunction. *Id*. at 202-03. The *Charlesbank Laundry* court noted that

> [i]f fairness dictates that a tort claim based on negligence should be paid ahead of pre-reorganization claims, the *a fortiori*, an intentional act which violates the laws and damages others should be so treated.

14

*Id.* at 203.

In addition, courts have accorded administrative priority to certain claims to further the goal of environmental protection. *See Alabama Surface Mining. Comm. v. C. Michael Stilson (In re N.P. Mining Co., Inc.)* 963 F.2d 1449, 1457-59 (11th Cir. 1992) (discussing cases). In that regard, a trustee's effort "to marshall and distribute" estate assets is subject to the governmental interest in public health and safety. *Id. at* 1457 (citing *Midlantic Nat'l Bank v. New Jersey Dept. of Environmental Protection*, 474 U.S. 494, 501-02, 106 S. Ct. 755, 759-60, 88 L. Ed.2d 859 (1986)). Thus, administrative priority has been accorded for the post-petition costs incurred for prompt cleanup of health hazards. *Id.* (citing *Lancaster v. Tennessee (In re Wall Tube & Metal Prods. Co.)*, 831 F.2d 118, 123 (6th Cir. 1987)). Allowing an administrative priority for a state's clean-up costs associated with an ongoing health hazard was deemed necessary to ensure that the bankruptcy estate complied with state law and "to protect the health and safety of a potentially endangered public." *Id*. at 1457-58 (citing *Wall Tube*, 831 F.2d at 124).

### 28 U.S.C. § 959(b)

As noted above, there is a federal policy concern with ensuring compliance by trustees with state law, and 28 U.S.C. § 959(b) provides, in relevant part, that

> [A] trustee . . . appointed in any cause pending in any court of the United States, including a debtor in possession, shall manage and operate the property in his possession as such trustee . . . according to the requirements of the valid laws of the State in which such property is situated, in the same manner that the owner or possessor would be bound to do if in possession thereof.

The *N.P. Mining* case concerned the strip-mining business, which is highly regulated due to environmental concerns that affect public health and safety. The *N.P. Mining* court noted that because an entity operating a business similar to that of the debtor's outside of bankruptcy would

be required to pay fines for failure to abate violations of environmental laws, "the policy of

section 959(b) that state law govern the actions of a trustee mandates that [such] fines be paid"

by an entity operating under bankruptcy protection. *See N.P. Mining*, 963 F.2d at 1458. Thus,

"[w]hen a trustee or debtor-in-possession operates a bankruptcy estate, compliance with state

law should be considered an administrative expense." *Id*. The policy is enforced to preclude

affording a bankruptcy estate "an unfair advantage over non-bankrupt competitors." *Id*.

Several courts have concluded that 28 U.S.C. § 959(b) does not apply when a business is

not operating and its assets are being liquidated. *See N.P. Mining*, 963 F.2d at 1460 (citing

cases). Indeed, the plain language of section 959(b) provides that a trustee or debtor-in-

possession *"shall manage and operate the property"* in compliance with state law. Moreover,

the focus of section 959(b) is preventing an unfair advantage for businesses under the protection

of bankruptcy as against their non-bankrupt competitors. *Id*. at 1458. Thus, the *N.P. Mining*

court concluded that once a trustee or debtor-in-possession ceases business operations, section

959(b) does not apply. *Id*. at 1460. Moreover, the *N.P. Mining* court also concluded that once

business operations ceased, the language employed in *Reading* no longer applied. *Id*. Thus,

once a trustee is not "operating" the estate,

> neither the policy of 28 U.S.C. § 959(b) that a trustee "manage and operate a
> property" in compliance with state law nor the language of *Reading* that "costs
> incident to operation of a business" is implicated.

*Id*.

In *N.P. Mining*, while the trustee had ceased all mining operations, the trustee continued

to administer a coal-brokering contract. *Id*. Nevertheless, the *N.P. Mining* court concluded that

although the trustee's administration was not entirely inactive, the continuance of the coal-

16

brokering contract was an effort to protect an estate asset for future distribution to creditors. *Id.* The court viewed it as merely a way to maintain the status quo. *Id.* at 1461. The *N.P. Mining* court quoted Judge Learned Hand's interpretation of 28 U.S.C. § 125, the predecessor section to 28 U.S.C. § 959, to the effect that

> [m]erely to hold matters in the status quo; to mark time, as it were; to do only
> what is necessary to hold the assets intact; such activities are not a continuance of
> the business.

*Id.* at 1460 (quoting *Vass v. Conron Bros. Co.*, 59 F.2d 969, 971 (2d Cir. 1932)). Similarly, costs "incurred when a trustee is merely maintaining an estate for later distribution of assets cannot be considered 'costs ordinarily incident to the *operation* of a business.'" *Id.* at 1460-1461.

As previously noted, the Affected Dealers acknowledge that their claims do not meet the traditional criteria of "actual and necessary" costs of administering the estate. The Affected Dealers argue, however, that the Debtors were obligated to comply with the requirements of the Dealer Laws. As such, the Affected Dealers maintain that their claims are entitled to administrative priority, under the *Reading* line of cases, as costs associated with failure to comply with the Dealer Laws, which constitute costs incident to the operation of a business; or pursuant to 28 U.S.C. § 959(b), as costs associated with failure to manage and operate the business in compliance with state law.

The Affected Dealers further argue that the automobile industry is a statutorily protected and regulated industry. The Affected Dealers assert that each state has invoked its police power to implement its respective Dealer Law to regulate the manufacturer-dealer relationship, and that the Affected Dealers are advancing each state's interest in regulating that industry.

The Affected Dealers maintain that certain states provide that if an automobile

17

manufacturer terminates a dealership franchise agreement without good cause, it must

compensate the dealer for the loss sustained as a result of that termination.  In addition, some

states require that automobile manufacturers provide a dealer with "termination assistance" in

the form of repurchasing inventory parts and special tools, and in some cases, providing the

value for one-year rental of the dealership facility.  Thus, the Affected Dealers maintain that

their claims should be afforded administrative priority status, under the *Reading* line of cases, as

a cost incident to the operation of a manufacturer's business and, under 28 U.S.C. § 959(b), as a

cost associated with managing and operating a business in compliance with state law.

The Debtors argue that neither the *Reading* line of cases nor 28 U.S.C. § 959(b) have any

application to the priority of a rejection damage claim.  The Debtors maintain that there was no

violation of the Dealer Laws because the Debtors exercised a right afforded them under the

Bankruptcy Code, with Court approval, to reject the Dealer Agreements.  The Debtors contend

that, even if sections 365(g) and 502(g) of the Bankruptcy Code were not dispositive of the

status of these rejection damage claims as pre-petition, unsecured claims, the Affected Dealers'

arguments concerning the *Reading* line of cases and 28 U.S.C. § 959(b) are flawed.

The Debtors argue that the *Reading* line of cases is inapplicable because the reasoning of

those cases is relevant only if one or more of the following elements are present: a debtor's

negligence, a debtor's intentional misconduct, or injury to an innocent third party with no prior

relationship to the debtor.  The Debtors maintain that there was neither negligence nor

misconduct because their rejection of the Dealer Agreements was a valid and good faith exercise

of their right to reject contracts, as found previously by this Court in approving the Debtors'

rejection of the Dealer Agreements.  Moreover, the Debtors note that the Affected Dealers were

18

not third parties with no prior relationship to the Debtors, inasmuch as they were the counterparties to the rejected pre-petition contracts. The Debtors contend that although the costs were incurred post-petition, they stem from a pre-petition relationship. The Debtors maintain that the *Reading* exception does not include a right to payment emanating from a pre-petition contract with a debtor.

In addition, the Debtors argue that the Affected Dealers are not trying to advance the state's governmental interest in public health and safety, as was present in the environmental cases that followed the reasoning of *Reading*. The Debtors assert that, in the instant case, no ongoing potential health hazard is present. Rather, the Affected Dealers are merely trying to enforce their private economic interests and rights under the Dealer Laws – the same type of economic interest as that held by every other creditor with a claim based upon a breach of a pre-petition contract.

The Debtors also assert that the *Reading* line of cases and 28 U.S.C. § 959(b) only apply to a debtor's ongoing business operations. Here, however, the Debtors ceased production and operations as an automobile manufacturer upon filing of the petitions. The Debtors directed their efforts to maintaining the status quo until the conclusion of a sale of substantially all of the assets to a purchaser, which occurred within several weeks of the filing. Indeed, prior to the rejection of the Dealer Agreements, the Court approved the Debtors' request to sell substantially all of its operating assets, and the sale closed one day after the rejection. The Debtors assert that this Court has already concluded that the Dealer Laws constitute primarily economic regulation as applied to the dealers and are not intended to protect the health and safety of the general public. Moreover, the Debtors contend that when confronted with claims premised upon a law

19

that invokes a state's police power to protect heath and safety, courts limit the availability of administrative expense priority for such claims only to instances where there is an "imminent and identifiable hazard," which is not present in this case.

The Court concludes that the traditional standard for an administrative priority as set forth in *Mammoth Mart* is not met because the services were neither induced by the debtor-in-possession nor beneficial to the estate.[5]  Further, the Court previously approved the Debtors' rejection of the Dealer Agreements as a valid and good faith exercise of the Debtors' rights under the Bankruptcy Code.  The Court also found, previously, that to the extent the state laws interfered with the Debtors' right to reject the Dealer Laws, those state laws were preempted. The Debtors were entitled, under section 365 of the Bankruptcy Code, to reject the burdensome contracts.  In light of the preemption of the Dealer Laws, arguments concerning violation of such

---

[5]Prior to the day before the Hearing, the Affected Dealers had consistently asserted that they acknowledged that the traditional standard for an administrative expense priority set forth in *Mammoth Mart* had not been met. However, on the day before the Hearing, the Affected Dealers submitted a supplemental memorandum detailing their displeasure with a certain program promulgated to repurchase parts inventory from the former dealers at a discounted price and to reallocate such items to the continued dealers.  The sales and service agreements of those continued dealers have been assumed and assigned to the purchaser of the Debtors' assets.  In addition, the asset purchaser would also participate in purchasing parts inventory at that same discounted price.  The Affected Dealers now argue that this reallocation program benefits the Debtors' estates at their expense because it strengthens the dealer network that was assumed and assigned to the purchaser, which network was part of the consideration given to the purchaser in the sale of the Debtors' assets.  The Affected Dealers complain that the purchase price for the inventory is greatly discounted.

The Debtors note that the reallocation program is voluntary and that the Debtors merely function as middlemen or facilitators to assist the former dealers in selling their inventory and to mitigate damages asserted against the estates.  The Debtors assert that they are not purchasing the inventory, nor do they benefit from any perceived benefit to the dealer network because that network was assigned to the asset purchaser.

The Affected Dealers have the burden of establishing their entitlement to an administrative claim.  The Court concludes that they have not established it.  The Debtors' estates did not get the discounted parts inventory. The Affected Dealers were fully compensated for whatever benefit the estate received in the form of mitigation of damage claims against the Debtors' estates.  Any reduction in the amount of damages asserted against the Debtors' estates due to the purchase of inventory from the former dealers results from the former dealers receiving payment for that amount of the claim, which damage amount they otherwise would have asserted against the Debtors' estates. As the Affected Dealers receive payment for any purchase of inventory, they cannot claim that the Debtors benefit at their expense.  Moreover, any other benefit alleged is too remote to support entitlement to an administrative claim priority.

laws are inapposite to the analysis here.  Therefore, the Affected Dealers arguments concerning

violations of the state laws – as evidencing the type of negligence or intentional misconduct that

has led some courts to afford administrative priority to a creditor's claim – are not relevant.

Moreover, the Affected Dealers were counterparties to the Dealer Agreements and, therefore,

were not unrelated third parties affected by the Debtors' actions.  Instead, they had a pre-petition

contractual relationship with the Debtors and their claims stem from the breach of those very

contracts.

In the Opinion approving the rejection of the Dealer Agreements, this Court concluded

that the Dealer Laws constitute primarily commercial and economic regulation as applied to the

dealers and are not intended to protect the health and safety of the general public.  *See Old

Carco*, 406 B.R. at 204.  As such, here the Affected Dealers are attempting to advance their

private interests and rights under the state Dealer Laws, as opposed to an effort to advance a

state's interest in protecting the health and safety of the general public.  Even less is there any

imminent and identifiable hazard presented.  *Id*. at 190, 204.  Therefore, the analysis of the cases

that extended the *Reading* rationale to situations involving environmental hazards is not

applicable.  The Dealer Laws afford the Affected Dealers certain rights by virtue of the pre-

petition contracts that the dealers entered into with the Debtors.  The claims are not independent

of those contracts and stem from the breaches of those pre-petition contracts.  The Affected

Dealers are merely advancing their own economic interests similar to any other creditor who has

a claim based upon a breach of a pre-petition contract.

Moreover, even if the general purpose of the Dealer Laws include some concern for

public health and safety, in the present case, there is no allegation of an imminent and

21

identifiable hazard.  In *Old Carco*, 406 B.R. at 191, this Court declined to apply a heightened

standard for the rejection of dealer agreements in the absence of an imminent identifiable harm.

In its analysis, the Court cited to *Midlantic*, in which the Supreme Court noted that although a

trustee was precluded from abandoning property, pursuant to Bankruptcy Code section 554, if

such abandonment violated a state law designed to protect public health and safety, any such

exception to the abandonment power was to be construed narrowly and only applied where the

law at issue was "reasonably calculated to protect the public health or safety from imminent and

identifiable harm."  *Old Carco*, 406 B.R. at 204 (citing, *Midlantic*, at 474 U.S. at 507 fn.9, 106

S.Ct. 755.  Similarly, an imminent and identifiable hazard would be a prerequisite to affording

administrative expense priority to a claim based upon a breach of a related obligation.  The

Bankruptcy Code expressly provides that claims based upon breaches of pre-petition contracts

are pre-petition claims, which are not entitled to administrative priority.  The rationale of the

*Reading* line of cases does not justify affording these claims administrative priority.

Further, the justification for requiring a trustee or debtor-in-possession to comply with

costs incident to and incurred in the operation of a business is to preclude the estate's business

from obtaining an unfair advantage over a competing business.  Here, as set forth in the

Affidavit, dated April 30, 2009 (the "Kolka Affidavit") of Ronald E. Kolka, in support of First

Day Pleadings, the Debtors ceased manufacturing operations upon the filing of their petitions

and were in liquidation from the first day of the case.  *See* Kolka Affidavit ¶ 89.  Therefore, the

unfair advantage rationale does not apply.  As the *N.P. Mining* court concluded, these

circumstances implicate "neither the policy of 28 U.S.C. § 959(b) that a trustee 'manage and

operate a property' in compliance with state law nor the language of *Reading* that 'costs incident

22

to operation of a business' [are entitled to administrative priority]." *N.P. Mining*, 963 F.2d at 1460. The Affected Dealers' claims stem from the rejection, and resulting breach, of the Dealer Agreements. The claims are not entitled to administrative expense priority.

The Affected Dealers also reference the fact that the actual rejection occurred on June 9, 2009, one day prior to the closing of the sale of the assets on June 10, 2009, thereby implying that the expense was a post-petition expense that occurred while the Debtors were still "operating" the business. However, as previously noted, the Debtors effectively ceased all manufacturing operations at the commencement of these cases with a view to liquidating the estate for a distribution to creditors. Thus, similar to the analysis of the *N.P. Mining* court, whatever minimal activity continued for that one day was effected to maintain the status quo and hold the assets intact until their sale was concluded. *See* Kolka Affidavit at ¶ 89 (noting that, pending the sale of the assets to the purchaser, the Debtors had "idled most operations as it conserves its resources, while at the same time ensuring that (a) the facilities are prepared to resume normal production schedules quickly upon the completion of a sale and (b) consumers are not impacted by the filing"). It was not the continuation of an automobile manufacturer's business.

The Affected Dealers also cite to *H.L.S. Energy Co., Inc.*, 151 F.3d 434, 438-39 (5th Cir. 1998), in which the court accorded administrative expense status to a claim based upon costs incurred by the state to plug unproductive oil wells as required by state law. The Affected Dealers assert that the claim was afforded administrative expense priority notwithstanding the fact that the debtor did not own the wells and merely leased the operating interest in the wells. *Id*. at 436. The Affected Dealers also note that because the case was converted to chapter 7, the

priority was afforded despite the fact that the operating-interest leases likely were ultimately deemed rejected, pursuant to section 365(d)(1) of the Bankruptcy Code.[6]

Relying on 28 U.S.C. § 959(b), the *H.L.S. Energy* court concluded that the trustee was obligated to comply with state law. *Id*. at 438. The *H.L.S. Energy* court asserted that in calculating the cost of ceasing operations, the debtor was required to include the cost of plugging the inactive wells. *Id*. at 438 n.4.

The *H.L.S. Energy* case, however, is distinguishable because it was decided in the context of the strong public policy favoring environmental protection, which precludes a trustee from abandoning property in contravention of a state law reasonably designed to protect public health or safety. *See Midlantic*, 474 U.S. at 506-07, 106 S. Ct. at 762. Thus, the *H.L.S. Energy* debtor was prohibited by *Midlantic* from abandoning its lease operating interests in the wells. There is no similar public policy precluding an automobile manufacturer in bankruptcy from abandoning its business operations. Here, the state is not petitioning the Court to address environmental concerns.

The Court has already concluded that, pursuant to federal bankruptcy law, the Debtors may reject the burdensome Dealer Agreements. *See Old Car Co LLC*, 406 B.R. at 212. The Court further concludes that any related claim arising out of that rejection is a pre-petition claim under the express terms of section 365(g) of the Bankruptcy Code. Moreover, the Court

---

[6]In support of this assertion, the Affected Dealers cite to page 12 of the appellant's brief before the Fifth Circuit, *see* Appellant's Brief, 1997 WL 33487203 at *12 (filed December 4, 1997), where the appellant states that the operating agreement at issue was never assumed by *H.L.S. Energy* and further states that, *to the extent* that the operating agreement was an executory contract, it was rejected under section 365(d)(1) of the Bankruptcy Code. The appellant, however, does not affirmatively state that the agreement at issue was executory. Nor is there any discussion by the Fifth Circuit of the executory nature of the operating agreement or of the implications of section 365(d)(1).

concludes that the facts presented do not implicate either the *Reading* line of cases or 28 U.S.C. § 959(b).

*Incentives and Warranties*

In their motion, the Affected Dealers also sought payment, as administrative priority claims, of all unpaid warranty and sales-incentive payments earned through June 10, 2009.  The Debtors note that the warranty payment obligations were assumed by the entity that purchased the Debtors' assets.  The Debtors acknowledge that any properly documented sales-incentive claims are entitled to administrative expense priority; however, the Debtors assert that all such valid payments have been made.  Given the nature of the disagreement, the parties are directed to confer to attempt to resolve any discrepancies concerning the amount due for sales-incentive payments.  If the parties cannot reach an agreement, the Court will conduct a hearing (the "Sales Incentives Hearing") to determine whether there are any outstanding amounts due for sales-incentive payments.

*CONCLUSION*

The Court concludes that the Affected Dealers' claims stemming from the rejection, and resulting breach, of the Dealer Agreements are not entitled to administrative expense priority. Rather, any such claim is a pre-petition general unsecured claim pursuant to section 365(g) of the Bankruptcy Code.  To the extent that the Dealer Laws would otherwise eliminate the benefit to the Debtors, pursuant to the Bankruptcy Code, of rejecting the Dealer Agreements, those laws have been preempted.

Further, in their motion, the Affected Dealers seek to advance their private economic interests and rights under the Dealer Laws, not any interest that the states may have in protecting

public health and safety.  Moreover, there is no threat of an imminent danger to public health and safety, as may be present in situations involving environmental concerns.  As such, no federal policy is at issue that would override the federal bankruptcy policy of allowing a debtor to reject a burdensome contract.

Apart from preemption of the state laws, which undermine the Debtors' ability to reject burdensome contracts, the circumstances herein do not implicate the policy of 28 U.S.C. § 959(b) concerning a trustee managing and operating a business in compliance with state law because the Debtors were not conducting an ongoing business.  Nor is the language of the *Reading* line of cases concerning "costs incident to operation of a business" implicated.

The Debtors are to submit a proposed order, consistent with this Opinion.  Prior to submitting the proposed order, the Debtors should contact Chambers to obtain a date for the Sales Incentives Hearing, and a reference to such hearing date shall be included in the proposed order.


Dated: New York, New York
       January 5, 2010


                              **s/Arthur J. Gonzalez**
                              UNITED STATES BANKRUPTCY COURT