UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---

In re : Chapter 11

OLD CARCO LLC, f/k/a CHRYSLER LLC, *et al*., : Case No. 09 B 50002 (AJG)

              Debtors. : (Jointly Administered)

---

OPINION DENYING MOTION OF RAMIREZ CHRYSLER JEEP DODGE, INC.
FOR ALLOWANCE OF ADMINISTRATIVE EXPENSES
PURSUANT TO 11 U.S.C. §§ 503(b)(1) AND 507(a)(2)


APPEARANCES:

HUGHES, WATTERS, ASKANASE, L.L.P.
Counsel for Ramirez Chrysler Jeep Dodge, Inc.
Houston, Texas

    By:    Wayne Kitchens, Esq.
            Heather McIntyre, Esq.

JONES DAY
Counsel for the Debtors
New York, New York

    By:    Corinne Ball, Esq.

  -and -

Atlanta, Georgia

    By:    Jeffrey B. Ellman, Esq.


ARTHUR J. GONZALEZ
UNITED STATES BANKRUPTCY JUDGE

Before the Court is a motion seeking administrative expense priority for damages sustained by an automobile dealer as a result of the voluntary termination by the dealer of its sales and service agreements with the automobile manufacturer.

The Court concludes that any claim for damages sustained by the dealer stems from the applicable pre-petition executory contracts. Therefore, any such claim is a pre-petition general unsecured claim not entitled to administrative expense priority.

*FACTS*

On April 30, 2009, Old Carco LLC f/k/a Chrysler LLC and 24 of its domestic direct and indirect subsidiaries, including Old Carco Motors LLC f/k/a Chrysler Motors LLC ("Chrysler Motors")[1] (collectively, the "Debtors") filed for protection under title 11 of the United States Code (the "Bankruptcy Code"). The Debtors' cases are being jointly administered for procedural purposes, pursuant to Rule 1015(a) of the Federal Rules of Bankruptcy Procedure. On May 5, 2009, an Official Committee of Unsecured Creditors (the "Creditors' Committee") was formed.

On June 1, 2009, an order was entered, pursuant to section 363 of the Bankruptcy Code, granting the Debtors' motion to approve the sale of substantially all of the Debtors' operating assets. Thereafter, on June 9, 2009, an order was entered authorizing the Debtors, pursuant to sections 105 and 365 of the Bankruptcy Code, to reject executory contracts and unexpired leases, including 789 sales and service agreements with domestic car dealerships. The sales and servicing agreements at issue in the instant matter were not included among the 789 rejected agreements. On June 10, 2009, the sale of the Debtors' assets closed.

---

[1] On May 19, 2009, an additional affiliate of Chrysler LLC filed a petition for relief under title 11 of the Bankruptcy Code.

Prior to the filing by the Debtors for bankruptcy protection, Ramirez Chrysler Jeep Dodge, Inc. (the "Dealer") operated as a dealer for each of the Debtors' three separate lines of automobiles. In 2002, the Dealer entered into separate sales and servicing agreements (the "Dealer Agreements")[2] with Chrysler Motors for each of those lines of automobiles. Paragraph 28(a) of each of the separate Dealer Agreements provided that the Dealer could "terminate this Agreement on not less than 30 days written notice." Each Dealer Agreement also provided that, for certain delineated reasons, Chrysler Motors could terminate the Dealer Agreement on 60 days' notice. Although Chrysler Motor's right to terminate was limited to certain situations, the Dealer's right to terminate was not restricted, other than with respect to the requirement that it provide at least 30 days' notice. The Dealer Agreements also provided that within ninety days of any effective termination under paragraph 28 of the applicable Dealer Agreement, Chrysler Motors would buy, and the dealer would sell, among other things, vehicle inventory and automobile parts, signs, tools, and equipment (the "Repurchase Obligations").

On March 31, 2009, the Dealer sent a Notice of Termination of Dealer Sales and Service Agreement by Ramirez Chrysler Jeep Dodge, Inc. (the "Termination Notice"). In the Termination Notice, the Dealer expressly referenced its claim based upon Chrysler Motor's Repurchase Obligations.

In response to the Termination Notice, Chrysler Motors sent a letter, dated May 4, 2009, to the Dealer acknowledging the termination and stating that such termination was "effective April 30, 2009." In the letter, Chrysler Motors also acknowledged that the termination imposed

---

[2] The Dealer Agreements incorporated certain terms and conditions contained in the Chrysler Corporation Sales and Service Agreement Additional Terms and Conditions.

certain Repurchase Obligations upon it. In addition, Chrysler Motors sought certain details concerning the vehicles subject to the Repurchase Obligations. The Dealer replied by sending an e-mail, dated May 15, 2009, with a chart attached providing information concerning the vehicles.[3]

On August 27, 2009, the Dealer filed a motion in these bankruptcy cases seeking administrative expense priority, pursuant to sections 503(b)(1) and 507(a)(2) of the Bankruptcy Code, for its claim for $1,310,060 allegedly arising from the Repurchase Obligations. The Debtors oppose the Dealer's motion. A hearing on this matter was held before the Court on October 22, 2009.

*Parties' Contentions*

The Dealer argues that it is entitled to an administrative expense priority for its claim arising from the termination of the Dealer Agreements and the resulting Repurchase Obligations imposed on Chrysler Motors by the Dealer Agreements. Initially, the Dealer asserted that the claim was entitled to priority under traditional administrative expense priority standards, arguing that the Dealer bestowed a benefit upon the estates. First, the Dealer alleged that it conferred a benefit upon the estates by voluntarily terminating the Dealer Agreements and sparing the estates the cost of having to reject the Dealer Agreements in the Debtors' administration of those estates. In addition, the Dealer argued that the estates received a separate benefit because the Dealer worked diligently to continue to sell inventory to reduce the Debtors' Repurchase

---

[3] At the time of the May 15, 2009 e-mail, the amount of vehicle inventory for which the Dealer was asserting a claim was $1,879,963. Since that date, the Dealer has sold various portions of the automobile inventory to other dealers. At the time it filed its motion on August 27, 2009, the Dealer alleged that the vehicle inventory claim had been reduced to $810,060. In addition, as of August 27, 2009, the Dealer asserts that its claim for the Repurchase Obligations related to automobile parts, signs, tools, and equipment is approximately $500,000, resulting in a total alleged claim of approximately $1,310,060.

4

Obligations. The Dealer also argued that the vehicles were property of the Debtors' estates, which estates were benefitted when the Dealer preserved such property.

Subsequently, the Dealer asserted that its claim is entitled to administrative priority pursuant to either (i) 28 U.S.C. § 959(b), which requires a trustee or debtor-in-possession to manage or operate its business in compliance with state law, or (ii) a line of cases that accord administrative priority to certain obligations incident to the operation of a debtor's business. In support of this argument the Dealer argues that because the state in which the dealership is located has enacted a comprehensive regulatory scheme (the "Dealer Law") pursuant to its police powers, which scheme was intended to address the disparity in bargaining power between automobile manufacturers and dealers, and because 28 U.S.C. § 959(b) requires a debtor to operate its business in accordance with the requirements of state law, the Debtors were required to operate their business in accordance with the Dealer Law. In addition, the Dealer cites a line of cases that hold that actual and necessary costs warranting administrative priority include costs ordinarily incident to the operation of a business. The Dealer asserts that it is ordinarily incident to an automobile manufacturer's business to comply with state dealer laws.

The Debtors argue that the origin of the Repurchase Obligation claim is the parties' entry into the Dealer Agreements in 2002. The Debtors assert that the terms of the Dealer Agreements provided for the Repurchase Obligations to occur upon the subsequent termination of such agreements. The Debtors contend that when a debtor-in-possession has post-petition termination obligations under a pre-petition contract or lease, such obligations are generally found to be pre-petition obligations even if the right to payment arises post-petition. As such, the Debtors assert that the claim is a pre-petition claim, which is accorded general unsecured status.

The Debtors further argue that even if the Repurchase Obligations were deemed to have arisen upon termination, that termination occurred pre-petition. According to the Debtors, even if the termination date itself is relevant, such date occurred either on March 30, 2009, when the Dealer sent the Termination Notice, or on April 29, 2009, when the 30 day period after the notice lapsed, or at the latest, April 30, 2009, the date that Chrysler Motors - in its May 4, 2009 letter - acknowledged as the termination date. Inasmuch as the Debtors filed for bankruptcy in the afternoon of April 30, 2009, the Debtors assert that all of those periods occurred pre-petition.

In addition, the Debtors assert that the inventory at issue is not property of the estates as evidenced by the repurchase requirements contained in the Dealer Agreements. The Debtors assert that if the Debtors owned the property, there would not be a requirement for them to "repurchase" such property. Moreover, the Debtors observe that if the property were the Debtors' property as asserted by the Dealer, the Dealer's exercise of control over such property would have violated the automatic stay imposed by section 362 of the Bankruptcy Code. The Debtors also assert that, in the context of their having rejected 789 contracts, any incremental cost associated with addressing the rejection of these few additional leases would have been nominal.

The Debtors contend that the claim does not warrant administrative priority status under either (i) the traditional criteria for administrative priority, (ii) application of 28 U.S.C. § 959(b), or (iii) any case law exceptions to the traditional administrative expense priority standard that allow administrative priority.

The Debtors maintain that 28 U.S.C. § 959(b) only applies to an ongoing business, as does the line of cases concerned with costs ordinarily incident to the operation of a business.

The Debtors assert that from the start of these bankruptcy cases, it was clear that the Debtors were ceasing business operations in anticipation of selling their operating assets. The Debtors note that from the commencement of the cases, the Debtors' intent was to liquidate the assets and make a distribution to creditors. At or prior to the commencement of the cases, the Debtors idled most operations pending the sale of the Debtors' assets to the purchaser. The Debtors ceased all manufacturing operations and only held the business enterprise intact until a sale of the assets could be concluded.

In addition, the Debtors argue that the Dealer's claim only seeks to effectuate its private economic interests and rights under the Dealer Law, not any interest the state may have in protecting public health and safety, and especially not any interest in avoiding an imminent threat to public health and safety.

## DISCUSSION

### Administrative Expense Priority

#### Traditional Criteria

Section 503(b)(1)(A) of the Bankruptcy Code provides a priority for "the actual, necessary costs and expenses of preserving the estate . . . for services rendered after the commencement of the case." Pursuant to section 507(a)(1) of the Bankruptcy Code, these expenses for administering the estate are afforded a first priority. Thus, expenses incurred by the debtor-in-possession during the reorganization effort are afforded a first priority. *See In re Jartran*, 732 F.2d 584, 586 (7th Cir. 1984).

This priority is based upon the premise that the operation of the business by a debtor-in-possession benefits pre-petition creditors; therefore, any claims that result from that operation

are entitled to payment prior to payment to "creditors for whose benefit the continued operation of the business was allowed." *Cramer v. Mammoth Mart, Inc. (In re Mammoth Mart, Inc.)*, 536 F.2d 950, 954 (1st Cir. 1976). Although *Mammoth Mart* was decided under the former Bankruptcy Act, its analysis remains applicable under the Bankruptcy Code. *See In re Drexel Burnham Lambert Group Inc.*, 134 B.R. 482, 489 (Bankr. S.D.N.Y. 1991).

Administrative expenses are afforded this priority to facilitate the reorganization effort by encouraging third parties, who might otherwise be reluctant to deal with a debtor-in-possession, to transact such business. *See Amalgamated Ins. Fund v. McFarlin's Inc.*, 789 F.2d 98, 101 (2d Cir. 1986) (citing *Mammoth Mart*, 536 F.2d at 954). Absent this incentive, third parties would refrain from dealing with the debtor-in-possession, thereby inhibiting the reorganization effort and harming pre-petition creditors. *Id.*

Nevertheless, in light of the bankruptcy goal of providing equal distribution of a debtor's assets to all creditors, "statutory priorities, such as those resulting from administrative expense treatment, are narrowly construed." *Ames*, 306 B.R. at 54 (citing *Amalgamated Ins. Fund*, 789 F.2d at 101). Strictly construing the terms "actual" and "necessary" minimizes administrative expense claims, thereby preserving the estate for the benefit of all creditors. *See Drexel*, 134 B.R. at 488. If claims not intended to have priority were afforded such, the value of the priority for those creditors Congress intended to prefer would be diluted. *See Mammoth Mart*, 536 F.2d at 953. It is important to note that any dispute between a provider of goods or services and the solvent recipient for such goods or services based upon an ordinary contract becomes, once the recipient becomes a debtor in bankruptcy, a contest among the debtor's creditors to share in the distribution of the debtor's assets. *See General American Transportation Corp. v. Martin (In re*

*Mid Region Petroleum, Inc.)*, 1 F.3d 1130, 1133 (10th Cir. 1993). Any priority given to one creditor is effected to the detriment of other creditors. *See In re Patient Education Media, Inc.*, 221 B.R. 97, 101 (Bankr. S.D.N.Y. 1998).

> Ordinarily, an expense will be accorded administrative status
>
> 1) if it arises out of a transaction between the creditor and the bankrupt's trustee or debtor-in-possession; and
> 2) only to the extent that the consideration supporting the claimant's right to payment was both supplied to and beneficial to the debtor-in-possession in the operation of the business.

*Amalgamated Ins. Fund*, 789 F.2 at 101; *see also Mammoth Mart*, 536 F.2d at 954.

The services performed by the claimant must have been "induced" by the debtor-in-possession, not the pre-petition debtor. *See Jartran, Inc.*, 732 F.2d at 587 (citing *Mammoth Mart*, 536 F.2d at 587). Considering inducement by the debtor-in-possession to be a crucial element comports with the policy reason for allowing the priority, which is to encourage third parties to supply the debtor-in-possession with goods and services with the goal of achieving a reorganization to benefit all creditors. *See Jartran Inc.*, 732 F.2d at 588, 590. Thus, benefit to the debtor-in-possession alone, without its having induced the performance, is not sufficient to warrant entitlement to an administrative claim priority, as it would contradict this policy reason for allowing the priority. *See Jartran, Inc.*, 732 F.2d at 590.

Where a "debtor-in-possession elects to continue to receive benefits from the other party to an executory contract pending a decision to assume or reject the contract, the debtor-in-possession is obligated to pay for the reasonable value of those services." *Patient Education Media*, 221 B.R. at 101 (quoting *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 531, 104 S. Ct. 1188, 1199, 79 L. Ed.2d 482 (1984)); *see also In re Continental Airlines, Inc.*, 146 B.R. 520, 526

9

(Bankr. D.De. 1992). Therefore, the claims of third parties who are induced to supply goods or services to a debtor-in-possession pursuant to a contract that has not been rejected are afforded administrative priority to the extent that the consideration supporting the claim was supplied during the reorganization. *See Jartran, Inc.*, 732 F.2d at 588. The claimant has the burden of establishing entitlement to the priority. *See Drexel*, 134 B.R. at 489.

Priority, however, is not afforded a claim merely because the right to payment arises post-petition. *See Amalgamated Ins. Fund*, 789 B.R. at 101. Thus, where there is a pre-petition contract or lease, and the consideration supporting the claim is supplied pre-petition, court have determined that those claims are not entitled to administrative priority, even if the right to payment arises post-petition. *See Amalgamated Ins. Fund*, 789 B.R. at 101-104 (holding that a required lump sum payment, imposed as liability to withdraw from a multi-employer pension fund, is not entitled to administrative priority even where the payment was due post-petition because the consideration supporting the withdrawal liability is the past (pre-petition) labor of the covered employee).

*The Reading Line of Cases*

An exception to the requirement that there be an actual benefit to the estate before a claim can be accorded administrative priority has developed in the context of torts committed by the trustee or debtor-in-possession during the course of a chapter 11 proceeding. *See In re Puerto Rican Food Corp.*, 41 B.R. 565, 572-73 (Bankr. E.D.N.Y. 1984) (citing *Reading Co. v. Brown*, 391 U.S. 471, 482, 88 S. Ct. 1759, 1765, 20 L. Ed.2d 751 (1968)) (other citations omitted).

In *Reading*, which concerned an arrangement under Chapter XI of the Bankruptcy Act,

the Supreme Court reasoned that if a party were injured by negligence in the operation of an "insolvent business thrust upon it by operation of law," it was "fairer" to compensate the injured party upon whom the arrangement had been imposed before compensating those for whose benefit the arrangement was being effected. *See Reading*, 391 U.S. at 478-79, 88 S. Ct. at 1763-64. Thus, the Supreme Court held that a tort arising during the arrangement is treated as an "actual and necessary expense[ ]" of the estate. *Id*. at 482, 88 S. Ct. at 1765. The concept has since been applied in chapter 11 reorganization cases under the Bankruptcy Code. *See Puerto Rico Food Corp*, 41 B.R. at 572-73 (citing cases). The justification is that it is "more natural and just" to compensate those who were injured by the operation of the business during the reorganization effort ahead of those for whose benefit the business was allowed to continue to operate. *Reading*, 391 U.S. at 482, 88 S. Ct. at 1765. Thus, "costs ordinarily incident to operation of a business" can be afforded administrative priority. *Reading Co*., 391 U.S. at 483, 88 S.Ct. at 1766.

In *Spunt v. Charlesbank Laundry, Inc. (In re Charlesbank Laundry, Inc.)*, 755 F.2d 200, 202-03 (1st Cir. 1985), the fairness rationale of *Reading* was extended to a debtor-in-possession's intentional act that violated the law, where the estate's actions injured innocent parties. In *Charlesbank Laundry*, a temporary injunction was issued that enjoined the operation of a laundry in violation of a zoning ordinance, which operation would create a public nuisance. *Id*. at 201. The *Charlesbank Laundry* court granted administrative expense priority to a compensatory civil fine that was levied because of the debtor-in-possession's violation of the temporary injunction. *Id*. at 202-03. The *Charlesbank Laundry* court noted that

> [i]f fairness dictates that a tort claim based on negligence should be paid ahead of pre-reorganization claims, the *a fortiori*, an intentional act which violates the laws

and damages others should be so treated.

*Id.* at 203.

In addition, courts have accorded administrative priority to certain claims to further the goal of environmental protection. *See Alabama Surface Mining. Comm. v. C. Michael Stilson (In re N.P. Mining Co., Inc.)* 963 F.2d 1449, 1457-59 (11th Cir. 1992) (discussing cases). In that regard, a trustee's effort "to marshall and distribute" estate assets is subject to the governmental interest in public health and safety. *Id. at* 1457 (citing *Midlantic Nat'l Bank v. New Jersey Dept. of Environmental Protection*, 474 U.S. 494, 501-02, 106 S. Ct. 755, 759-60, 88 L. Ed.2d 859 (1986)). Thus, administrative priority has been accorded for the post-petition costs incurred for prompt cleanup of health hazards. *Id.* (citing *Lancaster v. Tennessee (In re Wall Tube & Metal Prods. Co.)*, 831 F.2d 118, 123 (6th Cir. 1987)). Allowing an administrative priority for a state's clean-up costs associated with an ongoing health hazard was deemed necessary to ensure that the bankruptcy estate complied with state law and "to protect the health and safety of a potentially endangered public." *Id*. at 1457-58 (citing *Wall Tube*, 831 F.2d at 124).

*28 U.S.C. § 959(b)*

There is a federal policy concern with ensuring compliance by trustees with state law, and 28 U.S.C. § 959(b) provides, in relevant part, that

> [A] trustee . . . appointed in any cause pending in any court of the United States, including a debtor in possession, shall manage and operate the property in his possession as such trustee . . . according to the requirements of the valid laws of the State in which such property is situated, in the same manner that the owner or possessor would be bound to do if in possession thereof.

The *N.P. Mining* case concerned the strip-mining business, which is highly regulated due to environmental concerns that affect public health and safety. The *N.P. Mining* court noted that

because an entity operating a business similar to that of the debtor's outside of bankruptcy would be required to pay fines for failure to abate violations of environmental laws, "the policy of section 959(b) that state law govern the actions of a trustee mandates that [such] fines be paid" by an entity operating under bankruptcy protection. *See N.P. Mining*, 963 F.2d at 1458. Thus, "[w]hen a trustee or debtor-in-possession operates a bankruptcy estate, compliance with state law should be considered an administrative expense." *Id*. The policy is enforced to preclude affording a bankruptcy estate "an unfair advantage over non-bankrupt competitors." *Id*.

Several courts have concluded that 28 U.S.C. § 959(b) does not apply when a business is not operating and its assets are being liquidated. *See N.P. Mining*, 963 F.2d at 1460 (citing cases). Indeed, the plain language of section 959(b) provides that a trustee or debtor-in-possession "*shall manage and operate the property*" in compliance with state law. Moreover, the focus of section 959(b) is preventing an unfair advantage for businesses under the protection of bankruptcy as against their non-bankrupt competitors. *Id*. at 1458. Thus, the *N.P. Mining* court concluded that once a trustee or debtor-in-possession ceases business operations, section 959(b) does not apply. *Id*. at 1460. Moreover, the *N.P. Mining* court also concluded that once business operations ceased, the language employed in *Reading* no longer applied. *Id*. Thus, once a trustee is not "operating" the estate,

> neither the policy of 28 U.S.C. § 959(b) that a trustee "manage and operate a property" in compliance with state law nor the language of *Reading* that "costs incident to operation of a business" is implicated.

*Id*.

In *N.P. Mining*, while the trustee had ceased all mining operations, the trustee continued to administer a coal-brokering contract. *Id*. Nevertheless, the *N.P. Mining* court concluded that

13

although the trustee's administration was not entirely inactive, the continuance of the coal-brokering contract was an effort to protect an estate asset for future distribution to creditors. *Id*. The court viewed it as merely a way to maintain the status quo. *Id*. at 1461. The *N.P. Mining* court quoted Judge Learned Hand's interpretation of 28 U.S.C. § 125, the predecessor section to 28 U.S.C. § 959, to the effect that

> [m]erely to hold matters in the status quo; to mark time, as it were; to do only what is necessary to hold the assets intact; such activities are not a continuance of the business.

*Id*. at 1460 (quoting *Vass v. Conron Bros. Co.*, 59 F.2d 969, 971 (2d Cir. 1932)). Similarly, costs "incurred when a trustee is merely maintaining an estate for later distribution of assets cannot be considered 'costs ordinarily incident to the *operation* of a business.'" *Id*. at 1460-1461.

*Applying Law to the Dealer's Claim*

The Dealer's claim arises out of the terms of the pre-petition Dealer Agreements. The claim does not arise from a transaction between the Dealer and the Debtors. Further, the Dealer did not provide any benefit to the Debtors' estates. The Debtors correctly assert that the Dealer had an obligation to continue to sell inventory to mitigate damages against the estates and, in addition, that the Dealer itself benefitted from any such sales. Whatever benefit the Debtors' estates received in terms of a reduction of the Repurchase Obligations, the Dealer was fully compensated as it received payment in that amount. Moreover, the Dealer was preserving its own property, not the Debtors' property; otherwise, the Debtors would not have had an obligation to "repurchase" such property. Indeed, paragraph 29(a) of each Dealer Agreement provides that Chrysler Motors' Repurchase Obligations applied to vehicles that were "purchased" by the Dealer from Chrysler Motors and "that are on the effective date of

termination the property of . . . Dealer."[4] In addition, if the property at issue were the Debtors' property, the Dealer would have been subject to the section 362 automatic stay. Nor was any meaningful benefit conferred upon the estates as a result of the elimination of the obligation to reject the contract.

The traditional standard for administrative claim priority as set forth in *Mammoth Mart* is not met because the claim did not arise out of a transaction between the Dealer and the Debtors; nor was a benefit conferred upon the estates in the operation of their businesses.

The Dealer argues that the Debtors did induce performance by the Dealer because the Debtors required the Dealer to respond to their inquiry and provide detail concerning the inventory subject to the Repurchase Obligations. The Debtors' request for such detail, however, merely reflected the basic fact that a claim for damages under a contract would normally need to be substantiated with relevant details. No inducement of the type contemplated in *Mammoth Mart* was implicated.

The Debtors did not receive any benefit from the Dealer "pending a decision to assume or reject the contract." In fact, by sending the Termination Notice, the Dealer set into motion its contractual right to terminate the contract. As the Debtors note, once the Dealer sent the Termination Notice, all that remained for the termination to be effective was the passage of time. There were no meaningful obligations to perform.

The Court recognizes that the Dealer has a claim against the Debtors based upon the Repurchase Obligations contained in Dealer Agreements and relevant state law. However,

---

[4] Paragraphs 29(b) and 29(c) of the Dealer Agreements concerning the Repurchase Obligation for parts and accessories, respectively, have similar references. In addition, paragraph 29(d) references signs "belonging to Dealer," and paragraph 29(e) references tools "purchased by Dealer."

15

because that claim arises out of the pre-petition contracts, and because no cognizable benefit was conferred on the Debtors' estates in connection therewith, any such claim is a pre-petition general unsecured claim.

The Court agrees with the premise that had the Debtors continued in business, they may have been subject to a continuing obligation under state law to perform the Repurchase Obligations. The Court concludes, however, that the facts presented do not implicate either the *Reading* line of cases or 28 U.S.C. § 959(b). As set forth in the cases cited in *In re Old Carco, LLC,* (Slip Op. No. 09-50002 January 5, 2010) ___ B.R. ___ (Bankr. S.D.N.Y. 2010), the reasoning of the *Reading* line of cases has been applied in the context of a debtor's negligence, a debtor's intentional misconduct, or injury to an innocent third party with no prior relationship to the debtor. There is no allegation that the Debtors were negligent or that they committed an intentional tort. Further, in the instant case, the Dealer was not an unrelated third party adversely affected by the Debtors' actions. Instead, it had a pre-petition contractual relationship with the Debtors and its claim stems from the breach of the very contracts that engendered that relationship. Although the due date for payment of the Repurchase Obligations may occur post-petition, the obligations stem from a pre-petition relationship. The *Reading* exception does not include a right to payment emanating from a pre-petition contract with a debtor. The Court reiterates that the Dealer is allowed a claim against the Debtors' estates for any entitlement it may have to payment of the Reimbursement Obligations. That claim, however, is a general unsecured claim, similar to that of other claimants who have claims against the Debtors arising from the breach of a pre-petition contract.

Following *Reading*, courts have accorded administrative priority to certain claims to

16

further the goal of environmental protection. *See N.P. Mining*, 963 F.2d at 1457-59 (discussing cases). In that regard, a trustee's effort "to marshall and distribute" estate assets is subject to the governmental interest in public health and safety. *Id. at* 1457 (citing *Midlantic Nat'l Bank v. New Jersey Dept. of Environmental Protection*, 474 U.S. 494, 501-02, 106 S. Ct. 755, 759-60, 88 L. Ed.2d 859 (1986)). Thus, administrative priority has been accorded for the post-petition costs incurred for prompt cleanup of health hazards. *Id.* (citing *Lancaster v. Tennessee (In re Wall Tube & Metal Prods. Co.)*, 831 F.2d 118, 123 (6th Cir. 1987)). Allowing an administrative priority for a state's clean-up costs associated with an ongoing health hazard was deemed necessary to ensure that the bankruptcy estate complied with state law and "to protect the health and safety of a potentially endangered public." *Id*. at 1457-58 (citing *Wall Tube*, 831 F.2d at 124).

In the Opinion approving the rejection of the sales and servicing agreements entered into between Chrysler Motors and other dealers, this Court concluded that state laws governing the relationship between automobile manufacturers and dealers constitute primarily commercial and economic regulation as applied to the dealers and are not intended to protect the health and safety of the general public. *See Old Carco*, 406 B.R. at 204. As such, here the Dealer is attempting to advance its private interests and rights under the Dealer Law, as opposed to an effort to advance a state's interest in protecting the health and safety of the general public. Therefore, the analysis of the cases that extended the *Reading* rationale to situations involving environmental hazards is not applicable. The Dealer Law afford the Dealer certain rights by virtue of the pre-petition contracts that the Dealer entered into with the Debtors. The claim is not independent of those contracts and stem from the breaches of those pre-petition contracts.

17

The Dealer is merely advancing its own economic interests similar to those interests of any other creditor who has a claim based upon a breach of a pre-petition contract.

Moreover, even if the general purpose of the Dealer Law includes some concern for public health and safety, in the present case, there is no allegation of an imminent and identifiable hazard. In *Old Carco*, 406 B.R. at 191, this Court declined to apply a heightened standard for the rejection of dealer agreements in the absence of an imminent identifiable harm. In its analysis, the Court cited to *Midlantic*, in which the Supreme Court noted that although a trustee was precluded from abandoning property, pursuant to Bankruptcy Code section 554, if such abandonment violated a state law designed to protect public health and safety, any such exception to the abandonment power was to be construed narrowly and only applied where the law at issue was "reasonably calculated to protect the public health or safety from imminent and identifiable harm." *Old Carco*, 406 B.R. at 204 (citing, *Midlantic*, at 474 U.S. at 507 fn.9, 106 S.Ct. 755). Similarly, an imminent and identifiable hazard would be a prerequisite to affording administrative expense priority to a claim based upon a breach of a related obligation The Bankruptcy Code expressly provides that claims based upon breaches of pre-petition contracts are pre-petition claims, which are not entitled to administrative priority. The rationale of the *Reading* line of cases does not justify affording the Dealer's claim administrative priority.

As this Court held in *In re Old Carco, LLC*, (Slip Op. No. 09-50002 January 5, 2010) ___ B.R. ___ (Bankr. S.D.N.Y. 2010), the analysis of the *Reading* line of cases and 28 U.S.C. § 959(b) apply in the context of a debtor's ongoing business operations. Here, however, the Debtors ceased production and operations as an automobile manufacturer upon filing of the petitions. The Debtors directed their efforts to maintaining the status quo until the conclusion of

a sale of substantially all of the assets to a purchaser, which occurred within several weeks of the filing.

Further, the justification for requiring a trustee or debtor-in-possession to comply with costs incident to and incurred in the operation of a business is to preclude the estate's business from obtaining an unfair advantage over a competing business. Here, as set forth in the Affidavit, dated April 30, 2009 (the "Kolka Affidavit") of Ronald E. Kolka, in support of First Day Pleadings, the Debtors ceased manufacturing operations upon the filing of their petitions and were in liquidation from the first day of the case. *See* Kolka Affidavit ¶ 89. Therefore, the unfair advantage rationale does not apply. As the *N.P. Mining* court concluded, these circumstances implicate "neither the policy of 28 U.S.C. § 959(b) that a trustee 'manage and operate a property' in compliance with state law nor the language of *Reading* that 'costs incident to operation of a business' [are entitled to administrative priority]." *N.P. Mining*, 963 F.2d at 1460. The Dealer's claim stems from the pre-petition Dealer Agreements. The claim is not entitled to administrative expense priority.

## *CONCLUSION*

Any claim that the Dealer has against the Debtors' estates based upon the Repurchase Obligations arises out of the pre-petition Dealer Agreements. Inasmuch as any such claim arises out of the pre-petition contracts, and because no benefit was conferred on the Debtors' estates, that claim is a pre-petition general unsecured claim that is, therefore, not entitled to administrative expense priority.

The rationale of the *Reading* line of cases does not justify affording this claim administrative priority. Further, the circumstances herein do not implicate the policy of 28

U.S.C. § 959(b) concerning a trustee managing and operating a business in compliance with state law because the Debtors were not conducting an ongoing business. Nor is the language of the *Reading* line of cases concerning "costs incident to operation of a business" implicated.

The Debtors are to submit a proposed order, consistent with this Opinion.

Dated: New York, New York
January 5, 2010

**s/Arthur J. Gonzalez**
UNITED STATES BANKRUPTCY COURT
