**UNITED STATES BANKRUPTCY COURT**                FOR PUBLICATION
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------
                                                :
In re                                           :        Chapter 11
                                                :
     Old CarCo LLC                             :
     (f/k/a Chrysler LLC), *et al.*,[1]         :
                                                :        Case No. 09-50002 (AJG)
                                                :
          Debtors.                     :        (Confirmed Case)
                                                :
--------------------------------------------------------

## OPINION CONCERNING TAX CLAIM OBJECTION

**A P P E A R A N C E S :**

JONES DAY
Counsel for Old Carco Liquidation Trust
New York, New York

     By:  Corinne Ball, Esq.
           Veerle Roovers, Esq.

     -and-

Atlanta, Georgia

     By:  Jeffrey B. Ellman, Esq.

FISCAL OFFICER OF SUMMIT COUNTY
Counsel for Fiscal Officer of Summit County
Akron, Ohio

     By:  Regina M. VanVorous, Esq.

---

[1] A second amended list of the Debtors is located on the docket for Case No. 09-50002 (AJG) (ECF. No. 3945).  Among other things, the list reflects changes to names of certain debtors following the closing of the sale of assets to Chrysler Group LLC pursuant to this Court's order dated June 1, 2009 (ECF. No. 3232).

**ARTHUR J. GONZALEZ**
**Chief United States Bankruptcy Judge**

Before the Court is the Amended Objection of Old Carco Liquidation Trust

Seeking to Disallow or, in the Alternative, to Reclassify the Tax Claims of John A.

Donofrio, Summit County Fiscal Officer, filed on May 12, 2010 (ECF No. 7023) (the

"Amended Objection"), to which the Summit County Fiscal Officer (the "Fiscal Officer")

responded on May 25, 2010 by filing the Response to Old Carco Liquidation Trust's

Objection to Claims of John A. Donofrio, Summit County Fiscal Officer (ECF No. 7096)

(the "Amended Response").  The primary issue presented is whether the Fiscal Officer

asserts valid claims based upon an alleged breach of two tax exemption agreements

entered into by the parties.  If these claims are valid, the secondary issue is whether the

claims constitute priority tax claims under section 507(a)(8) of title 11 of the United

States Code (the "Bankruptcy Code").

The Court finds that the alleged breach occurred in June 2010 as a result of the

closing of the Plant.  The 1999 Agreement[2] expired by its terms prior to the alleged

breach in June 2010.  Because the 1999 Agreement was not in force at the time of the

alleged breach, the 1999 Agreement Claim[3] should be disallowed and expunged.  With

respect to the 2000 Agreement,[4] the "change to economic conditions" clause in that

agreement excused performance by Old Carco; accordingly, the 2000 Agreement Claim[5]

should also be disallowed and expunged.  Alternatively, even if Old Carco's alleged

breach of the 2000 Agreement were not excused, the Court finds that the alleged breach

is non-material in that Old Carco has substantially complied with its obligations under

---

[2] The 1999 Agreement is defined *infra* p. 4.
[3] The 1999 Agreement Claim is defined *infra* p. 11.
[4] The 2000 Agreement is defined *infra* p. 6.
[5] The 2000 Agreement Claim is defined *infra* p. 11.

that agreement. Thus, under this alternative, Summit County would be entitled only to damages corresponding to the period of the tax exemption subsequent to the alleged breach. However, because Summit County had completely phased-out its personal property taxes prior to the alleged breach in June 2010, no amount would be due corresponding to the remaining term of the 2000 Agreement.[6] Finally, even if the Court were to allow the 2000 Agreement Claim, in whole or in part, the Court finds the claim would not be a tax and, therefore, would not be entitled to priority under section 507(a)(8) of the Bankruptcy Code. The claim would instead be reclassified as a general unsecured claim.[7]

## I. Jurisdiction

This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334 and Article VIII of the Plan. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## II. Background

On April 30, 2009 (the "Petition Date"), Old Carco LLC (f/k/a Chrysler LLC) ("Old Carco") and twenty-four of its affiliated debtors and debtors in possession (the "Original Debtors") filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. On May 19, 2009, Alpha Holding LP (together with the Original

---

[6] An alternative method of calculating the amount of damages would be to apply the percentage of the contract that remained against the total amount of taxes exempted. Here, the remaining six months of the ten-year (120-month) contract term is five percent. Five percent of $4,223,862, the 2000 Agreement Claim, is $211,193.10.

[7] General unsecured creditors are not entitled to a distribution under the Plan (as defined *infra* note 13) unless certain conditions are satisfied. (*See* Plan 39 § V(E)(3)(a) ("Unless the Class 3A Voting Condition is satisfied and the Available Net Daimler Proceeds exceed the Minimum Distribution Threshold, no distributions will be made to holders of Allowed General Unsecured Claims.").) Therefore, if the 2000 Agreement Claim were reclassified as an unsecured claim, Summit County would not receive anything on account of its claim unless such conditions were satisfied. This would apply with equal force to the 1999 Agreement Claim if it were found to be valid.

Debtors, the "Debtors") also filed a voluntary petition under chapter 11 of the Bankruptcy Code. The Debtors' chapter 11 cases have been consolidated for procedural purposes and are being administered jointly by the May 1, 2009 and May 26, 2009 orders of the Court. (ECF Nos. 97, 2188.)

Approximately ten years before the Petition Date, Old Carco,[8] the City of Twinsburg, Ohio ("Twinsburg") and the County of Summit, Ohio ("Summit County," and together with Old Carco and Twinsburg, the "Parties"), entered into two tax exemption agreements relating to the Twinsburg stamping plant (the "Plant").[9] On June 21, 1999, the Parties entered into the first Summit County Enterprise Zone Agreement (the "1999 Agreement"). (Stip. 2 ¶ 1.) Under the 1999 Agreement, which, by its express terms would be governed by and construed in accordance with Ohio law, the Parties agreed that, in exchange for Old Carco investing in machinery and equipment in the Plant as well as for exercising "reasonable efforts" (Stip. 2 ¶ 2) to retain a number of full-time positions at the Plant, Twinsburg and Summit County would grant a fifty-percent tax exemption (the "Exemption") "for eligible new tangible personal property acquired in conjunction with the Project."[10] (Amend. Obj. Ex. A, 1999 Agreement 5 ¶ 5. *Accord* Stip. 2 ¶ 2.)

---

[8] For the sake of convenience, this opinion references the name "Old Carco" for both the prepetition and postpetition Chrysler LLC entity.

[9] Based on the TIRC Meeting Documents (as defined *infra* p. 9), which the Parties stipulated they could rely upon and which were admissible evidence, the Parties, prior to entering into the tax exemption agreements at issue, had entered into tax exemption agreements in earlier years. Specifically, four agreements had previously been entered into by the Parties since 1993, and Old Carco had received approximately $14 million in "forgone taxes." (Mins. of TIRC Mtg. 4-5.)

[10] At the hearing, counsel to the Trust (as defined *infra* note 13) observed that the tax exemption agreements do not explicitly state when Old Carco must exert "reasonable efforts" to retain the specified number of employees, nor do the tax exemption agreements state the length of time the employees must be retained. (Amend. Obj. Claim Hr'g Tr. 28:13-16, Sept. 16, 2010.) However, given that the Tax Exemption Agreements reference estimated payroll projections relating to these employee positions on a yearly basis (*see* 1999 Agreement 4 ¶ 2; 2000 Agreement 3 ¶ 2), it appears that the obligation to exert reasonable efforts to retain the specified number of employees would also be on a yearly basis.

The Exemption was granted pursuant to section 5709.63 or section 5709.632 of the Ohio Code and applied to "eligible new tangible personal property acquired in conjunction with the Project" (1999 Agreement ¶ 5) over a period of ten years beginning "the first tax year for which the tangible personal property would first be taxable were that property not exempted from taxation." (*Id.*) In the Stipulation of Facts Related to Claim Numbers 28465 and 28466, Filed By John A. Donofrio, Summit County Fiscal Officer, which was so ordered by the Court on September 9, 2010 (the "Stipulation") (ECF No. 7450), the Parties stipulated that Old Carco first claimed the Exemption provided for under the 1999 Agreement in the year 2000. (Stip. 2 ¶ 3.)

Under the 1999 Agreement, paragraph one provided that Old Carco would "make investments in stamping presses and ancillary equipment, conveyor and ancillary equipment, crane, assembly and ancillary equipment and other miscellaneous equipment related to the Project." (1999 Agreement 3 ¶ 1. *Accord* Stip. 2 ¶ 2.) The same paragraph also provided that Old Carco's intent was to invest approximately $150,000,000 "plus or minus 10% in the Project." (1999 Agreement 3 ¶ 1.) Furthermore, paragraph two of the 1999 Agreement provided that Old Carco would "use reasonable efforts to retain 465 full-time equivalent positions at the Plant . . . ." (1999 Agreement 3 ¶ 2. *Accord* Stip. 2 ¶ 2.)

Paragraph six of the 1999 Agreement also required payment of an annual administrative fee to Summit County, and provided that the Parties agreed Old Carco would pay "an annual fee equal to the greater of one percent of the dollar value of incentives offered under the [A]greement or five hundred dollars . . . [and] not

5

exceed[ing] [t]wo [t]housand [f]ive hundred [d]ollars . . . ."  (1999 Agreement 6 ¶ 6.
*Accord* Stip. 4 ¶ 20.)

Should Old Carco "materially fail[] to fulfill its obligations under [the]
Agreement," the City of Twinsburg and Summit County "may terminate or modify the
exemptions from taxation granted under [the] Agreement and may require the repayment
of the amount of taxes that would have been payable had the property not been exempted
from taxation under [the] Agreement."  (1999 Agreement 7 ¶ 10.)

Twinsburg and Summit County also agreed to "perform such acts as are
reasonably necessary or appropriate to . . . maintain exemptions from taxation granted
under [the] Agreement."  (*Id.* at 6-7 ¶ 8.)

On December 15, 2000, the Parties entered into a second Enterprise Zone
Agreement (the "2000 Agreement" and, together with the 1999 Agreement, the "Tax
Exemption Agreements").  (Stip. 2 ¶ 6.)

The 2000 Agreement contained similar terms as the 1999 Agreement and, as
stated by the Parties in the Stipulation, it provided that:

> [I]n exchange for Old Carco's project . . . to invest approximately
> $127,200,000 more in certain machinery and equipment to be used at the
> . . . Plant and to use reasonable efforts to maintain 291 full-time
> employment positions at the . . . Plant in connection with the 2000 Project,
> Old Carco would be entitled to a 50 percent Ohio personal property tax
> exemption for a ten-year period on eligible new tangible personal property
> utilized in conjunction with the 2000 Project.

(Stip. 2-3 ¶ 7.  *Accord* Amend. Obj. Ex. B, 2000 Agreement 2 ¶ 1, 3 ¶ 2, 4 ¶ 5.)

The Parties stipulated that Old Carco "first claimed the ten-year tax exemption
provided for under the 2000 Agreement in the year 2001."  (Stip. 3 ¶ 8.)  The 2000
Agreement, which would also be governed by and construed in accordance with Ohio law

(2000 Agreement 7 ¶ 16(B)), similarly provided for:  (a) an annual administrative fee "equal to the greater of one percent of the dollar value of incentives . . . or five hundred dollars . . . [and] not exceed[ing] . . . $2,500.00."  (2000 Agreement 4 ¶ 6; *accord* Stip. 4 ¶ 20); (b) a provision allowing Twinsburg and Summit County, in the event of a material breach by Old Carco, to "terminate or modify the exemptions from taxation . . . and . . . [to] require the repayment of the amount of taxes that would have been payable had the property not been exempted from taxation under th[e] [A]greement" (2000 Agreement 5 ¶ 10); and (c) a promise by Twinsburg and Summit County to "perform such acts as are reasonabl[y] necessary or appropriate to . . . maintain exemptions from taxation granted under [the] Agreement."  (*Id.* at ¶ 8.)

Both Tax Exemption Agreements contain a provision enumerating circumstances when Old Carco would not be considered in default.  Specifically, paragraph 17(F) of the 1999 Agreement and paragraph 16(F) of the 2000 Agreement provide:

> [Old Carco] shall not be considered . . . in default in the performance of its obligations under this agreement as a result of any cause beyond its reasonable control, including but not limited to severe and unusual weather, acts of God, or explosion, riot, acts of civil disobedience or sabotage, change to economic conditions and productivity and technological changes, power failures or shortages, restraint by court order or order of public authority, action or omission by any government agency, labor strikes or other labor disturbances.

(1999 Agreement 11 ¶ 17(F); 2000 Agreement 7-8 ¶ 16(F).)

In June 2005, the Ohio state legislature (the "Ohio Legislature") amended section 5711.22 of the Ohio Revised Code (the "Personal Property Tax Law") governing the percentage of true value of personal property that is subject to personal property tax assessment in Ohio state, "phas[ing ]out the personal property tax by gradually reducing the percentage of personal property true value to be listed and assessed."  (Stip. 4 ¶¶ 16,

17.) Paragraph 18 of the Stipulation contains a description of the relevant portion of the

amended Personal Property Tax Law as follows:

> [P]ersonal property is to be listed and assessed tax at the following
> percentages of true value:  (a) for tax year 2005, 25 percent of true value;
> (b) for tax year 2006, 18-3/4 percent of true value; (c) for tax year 2007,
> 12-1/2 percent of true value; (d) for tax year 2008, 6-1/4 percent of true
> value; and (e) for tax year 2009 and each tax year thereafter, zero percent
> of true value.

(*Id.* at 4 ¶ 18.  *Accord* Amend. Resp., Ex. 4, Ohio Rev. Code Ann. § 5711.22(G)(1)-(5)
(West 2010).)

On April 30, 2009, subsequent to the Petition Date and in connection with the

filing of the chapter 11 cases, the Debtors, Fiat S.p.A. ("Fiat"), and New CarCo

Acquisition LLC n/k/a Chrysler Group LLC ("New Chrysler"), entered into a Master

Transaction Agreement (as amended, and collectively with other ancillary and supporting

documents, the "MTA").  Under the MTA, Old Carco agreed to transfer the majority of

its operating assets to New Chrysler, and in exchange for those assets, New Chrysler

would assume certain of the Debtors' liabilities and pay to Old Carco $2 billion in cash

(collectively with the other transactions contemplated by the MTA, the "Fiat

Transaction").

On May 31, 2009, the Court issued the Opinion Granting Debtors' Motion

Seeking Authority to Sell, Pursuant to 11 U.S.C. § 363, Substantially All of the Debtors'

Assets (the "Fiat Transaction Opinion") (ECF No. 3073) as well as the Opinion and

Order Regarding Emergency Economic Stabilization Act of 2008 and Troubled Asset

Relief Program (ECF Nos. 3074, 3229).

On June 1, 2009, consistent with the Fiat Transaction Opinion, the Court entered

the Order (I) Authorizing the Sale of Substantially All of the Debtors' Assets Free and

Clear of All Liens, Claims, Interests[,] and Encumbrances, (II) Authorizing the

Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in

Connection Therewith and Related Procedures[,] and (III) Granting Related Relief (ECF

No. 3232) (the "Fiat Transaction Order").  On June 10, 2009, pursuant to the Fiat

Transaction Order, the Fiat Transaction was consummated.  Although the Plant was not

sold to New Chrysler as part of the Fiat Transaction, it was licensed to New Chrysler and

continued to operate after the Fiat Transaction closed.  (Amend. Obj. Claim Hr'g Tr.

24:11-17, Sept. 16, 2010.)  Under that license, it remained open an additional year,

closing in June 2010.  (*See* Stip. 3 ¶ 13.)

On June 9, 2009, the Twinsburg Tax Incentive Review Council (the "TIRC") held

its annual meeting (the "TIRC Annual Meeting") to consider, among other things, the

performance of Old Carco and other companies that are parties to enterprise zone

agreements with Twinsburg and Summit County.  The Stipulation provides that the

notice, agenda, and minutes of the TIRC Annual Meeting (the "TIRC Meeting

Documents") contained in Exhibit Six of the Amended Response could be relied upon by

the Parties and are admissible before the Court for the specified purposes in the

Stipulation, to the extent that they do not limit or modify the terms of the Stipulation.

(Stip. 3 ¶ 15.)

According to the TIRC Meeting Documents, regarding Old Carco's compliance

with the 1999 Agreement and based on the information provided by Old Carco:

> [T]he company has made an actual investment in tangible personal
> property of $110,293,618.  For calendar year 2008, the company reported
> a total payroll of $ 103,074,250 ([Tax Exemption Agreements] combined).
> The company reports having 1,665 full-time positions ([Tax Exemption
> Agreements] combined).

> The company previously met its commitment regarding tangible personal property (2007). The company did not provide a breakdown of employees for each individual . . . agreement but combining reported numbers, the company appears to have exceeded its commitments regarding full-time positions, as well as total payroll.

(Amend. Resp. Ex. 6, TIRC Mtg. Docs., Mins. of TIRC Mtg. 3.)

Further, according to the TIRC Meeting Documents, regarding Old Carco's compliance with the 2000 Agreement and based on the information provided by Old Carco:

> [T]he company has made an actual investment in tangible personal property of $ 139,265,597. For calendar year 2008, the company reported a total payroll of $ 103,074,250 ([Tax Exemption Agreements] combined). The company reports having 1,665 full-time positions ([Tax Exemption Agreements] combined).
>
> The company exceeded its commitment regarding tangible personal property. The company did not provide a breakdown of employees for each individual . . . agreement but combining reported numbers, the company appears to have exceeded its commitments regarding full-time positions, as well as total payroll.

(Mins. of TIRC Mtg. 4.) The Meeting Documents also reveal that as of 2009, 602 full-time employees were employed by Old Carco, compared to the 756 full-time employees Old Carco had agreed to retain under the Tax Exemption Agreements. (*See id.* at 5; Tr. 34:1-3.)

Furthermore, in anticipation of the impending sale of the Plant, the TIRC members at the TIRC Annual Meeting discussed whether the sale would give rise to a legal remedy, with one council member stating that "when the machinery starts leaving the facility, the [2000] Agreement will then become violated, at which [time] action can be taken." (Mins. of TIRC Mtg. 5.) Notably, another attendee observed that "as of December 31, 2008, the Agreements are in compliance with the Ohio Revised Code."

10

(*Id.*)  Finally, the TIRC members at the TIRC Annual Meeting agreed to "[c]ontinue the [2000] . . . Agreement until a violation would occur such as machinery leaving the building, and then a special TIRC meeting [would] be called by this body."  (*Id.*)[11]

On August 24, 2009, the council of Summit County (the "Summit County Council") unanimously adopted a resolution accepting the TIRC recommendations to continue the Tax Exemption Agreements because Old Carco "*fully* met all of the requirements . . . ."  (*See* Amend. Resp., Ex. 7, Resolution No. 2009-300 § 1.)  (Emphasis supplied.)

On October 19, 2009, less than two months after the Summit County Council had resolved that Old Carco fully complied with the Tax Exemption Agreements, the Fiscal Officer, on behalf of Summit County, filed proof of claim number 28465, asserting a priority tax claim of $3,736,928 under section 507(a)(8) of the Bankruptcy Code (the "1999 Agreement Claim"); and proof of claim number 28466, asserting a priority tax claim of $4,223,862 (the "2000 Agreement Claim," and together with the 1999 Agreement Claim, the "Claims").  Both amounts relate to the aggregate realized personal property tax savings to Old Carco under the Tax Exemption Agreements.  (*See* Stip. 2 ¶ 4, 3 ¶ 9.)

On November 19, 2009, the Court entered the Order, Pursuant to Sections 105 and 502 of the Bankruptcy Code and Bankruptcy Rules 2002, 3007, 9006, 9014[,] and 9019, (I) Granting Relief From Certain Limitations of Bankruptcy Rule 3007 and (II) Establishing Procedures for Objecting to and Settling Claims (the "Claims Procedure Order") (ECF No. 5980).

---

[11] Regarding the 1999 Agreement, the TIRC also recommended that Summit County "[c]ontinue the . . . Agreement until a violation would occur such as machinery leaving the building, and then a special TIRC meeting [would] be called . . . ."  (Mins. of TIRC Mtg. 4.)

On March 4, 2010, the Debtors filed the Debtors' and Debtors in Possession's Twelfth Omnibus Objection Seeking to Reclassify Certain Claims (the "Claim Objection") (ECF No. 6546), to which the Fiscal Officer filed a response on March 23, 2010 (the "Response") (ECF No. 6687).

On March 11, 2010, the Court entered the Order Authorizing Debtors to Sell Twinsburg, Ohio Stamping Plant Free and Clear of All Liens, Claims[,] and Encumbrances and Granting Related Relief (the "Plant Sale Order"). (ECF No. 6585; Stip. 3 ¶ 11.) Attached as Exhibit A of the Plant Sale Order was the Agreement of Purchase and Sale dated March 10, 2010, in which Maynards Industries (1991) Inc., a Delaware corporation, was the designated purchaser of the Plant. (*See* ECF No. 6585.)

On April 15, 2010, the Court entered the Order Granting Debtors' and Debtors in Possession's Twelfth Omnibus Objection Seeking to Reclassify Certain Claims, in which the Court, among other things, ordered the adjournment of the Claim Objection with respect to the 1999 Agreement Claim and the 2000 Agreement Claim. (ECF No. 6804.)

On May 12, 2010, the Debtors filed the Amended Objection, to which the Fiscal Officer responded on May 25, 2010 by filing the Amended Response.

As noted previously, the Plant remained open until June 2010. (Stip. 3 ¶ 13.) On June 1, 2010, the full-time positions relating to the 1999 Agreement and the 2000 Agreement were terminated. (*Id.* at ¶ 14.) In connection with the Plant closing, New Chrysler offered special benefits programs to eligible union-represented employees. (J. Suppl. Subm'n 2, ECF No. 7908.) Depending on the program chosen, union employees were offered amounts ranging from approximately $50,000 to $115,000, which are amounts in excess of what the employees were entitled to as retirees, and were offered

relocation opportunities. (*Id.* at 2-4.) Non-union employees could also relocate to other open jobs, but were not otherwise eligible for the special benefits offered to union employees. (*Id.* at 5.) In addition, non-union employees could have received additional benefits that were negotiated on a case-by-case basis. (*Id.*)

On September 8, 2010, the Debtors filed the Reply in Support of Amended Objection of Old Carco Liquidation Trust Seeking to Disallow or, in the Alternative, to Reclassify the Tax Claims of John A. Donofrio, Summit County Fiscal Officer (ECF No. 7449) (the "Reply").

On September 9, 2010, the Court signed the Stipulation, which, by its terms, could be used for, inter alia, any hearings on the Claims.

On September 16, 2010, the Court held a hearing (the "Hearing").[12]

In response to the Court's request for a submission setting forth the employment severance benefits that were available upon the closing of the Plant, the Parties on June 20, 2011 filed the Second Stipulation of Facts Related to Claim Numbers 28465 and 28466, Filed by John A. Donofrio, Summit County Fiscal Officer (the "Joint Supplemental Submission"). (ECF No. 7908.)

---

[12] The Parties did not request an evidentiary hearing. The facts considered by the Court are those facts contained in the Stipulation and the TIRC Meeting Documents, neither of which the Parties place in dispute and which they agree are admissible evidence. Further, in ruling on the issues raised, the Court also considered the facts contained in the Fiat Transaction Opinion and the Kolka Affidavit, as defined *infra* p. 16. The Fiscal Officer does not dispute the facts in the Fiat Transaction Opinion and the Kolka Affidavit, which are referenced in the Amended Objection and during the Hearing. Nor are there any assertions of fact by the Fiscal Officer that are inconsistent with any of the facts found by the Court in the Fiat Transaction Opinion. However, the Fiscal Officer does dispute the Trust's conclusion that the consequences of the "change to economic conditions" were beyond the reasonable control of Old Carco.

### III. Arguments

***Old Carco Liquidation Trust***[13]

Old Carco Liquidation Trust (the "Trust") argues that the Claims should be disallowed because the Fiscal Officer has no valid claim for damages under the Tax Exemption Agreements.  First, the Trust asserts that the purpose of the Tax Exemption Agreements was frustrated.  (Amend. Obj. 8-10 ¶¶ 16-19.)  In conjunction with this argument, the Trust asserts that the Tax Exemption Agreements have terminated and Summit County has substantially received the benefits for which it had bargained under the 2000 Agreement.  (*Id.* at 11-13 ¶¶ 20-24.)  Second, the Trust argues that, even if the Tax Exemption Agreements had not terminated, the Debtors did not breach the Tax Exemption Agreements because of the clause "change to economic conditions."  (*Id.* at 13-15 ¶¶ 25-27.)  Third, the Trust argues that, if the Claims were allowed, they should be reclassified as general unsecured non-priority claims because they are not taxes and do not fall under section 507(a)(8) of the Bankruptcy Code.  (*Id.* at 15-17 ¶¶ 29-33.)  This section sets forth the substance of these three arguments in turn.

First, the Trust argues that the purpose of the Tax Exemption Agreements was frustrated due to the phaseout of the personal property taxes contemplated under the Tax Exemption Agreements pursuant to section 5711.22(G)(5) of the Ohio Revised Code (the "Ohio Code").  According to the Trust, the "purpose in entering into the [Tax Exemption]

---

[13] On April 23, 2010, the Court entered the Order Confirming Second Amended Joint Plan of Liquidation of Debtors and Debtors in Possession, as Modified (ECF No. 6875), to which was attached as Annex I the Second Amended Joint Plan of Liquidation of Debtors and Debtors in Possession, as Modified, and which order was further modified by order of the Court dated April 28, 2010 (ECF No. 6923) (together with all exhibits, the "Plan").  Under the Plan, Old Carco Liquidation Trust, as successor in interest to the Debtors, has the authority to, among other things, "review and/or reconcile Claims, object to Claims not Allowed prior to the Effective Date and resolve such objections as set forth in Article VI . . . ." (Plan 20 § IV(B)(3)(a)(viii)); and "to File, settle, compromise, withdraw or litigate to judgment objections to Claims . . . ." (*Id.* at 42 § VI(B)(2)(b).)

Agreements was to gain a competitive economic advantage by obtaining partial relief from Ohio personal property taxes." (*Id.* at 10 ¶ 19.)  The phaseout and resulting frustration of purpose relieved the Debtors from performing; thus, the Debtors have no liability under the Tax Exemption Agreements.

In footnote six of the Amended Objection, the Trust notes that while some cases have stated in dicta that Ohio courts do not widely accept the doctrine of frustration of purpose, none of the cases actually rejects the doctrine, "and [the Ohio courts] cite only to cases that recognize the doctrine, albeit while finding the doctrine to be inapplicable on the particular facts at issue." (*Id.* ¶ 18 n.6.)

Further, the Trust asserts that the 1999 Agreement terminated in 2009, arguing that based on the Stipulation, Old Carco first claimed the Exemption under the 1999 Agreement in the year 2000. (*Id.* at 11 ¶ 20; Tr. 25:7-14; Reply 6 ¶ 8.)  Because the Exemption was claimed in 2000, the 1999 Agreement expired in 2009, its tenth year, and Summit County "received 100% of its bargained-for benefit under the 1999 Agreement." (Amend. Obj. 11 ¶ 20; Tr. 25:12-15.)  Regarding the 2000 Agreement, the Trust argues that the Debtors had substantially performed under the agreement and notes that the agreement was scheduled to expire on December 31, 2010.  Assuming that the Debtors breached the 2000 Agreement by closing the Plant in June 2010, according to the Trust, "[f]or approximately 95% of the term of the 2000 Agreement, the Debtors upheld their end of the bargain at the Plant" (Amend. Obj. 11 ¶ 21; Tr. 25:22-24) and any alleged breach of the 2000 Agreement would be immaterial (Reply 6 ¶ 8).  Moreover, the Trust referenced the TIRC Meeting Documents in which TIRC members concluded that Old Carco "exceeded its commitment." (Tr. 26:15-27:3, citing Mins. of TIRC Mtg. 4, 3.)

Thus, the Trust concludes that the Fiscal Officer had no basis for calculating the more than four million dollars in damages based on the full ten-year term of the 2000 Agreement.[14]  Consequently, Summit County should have no claim at all, because the amount of abated tax for the remaining half of 2010, based on the zero percent tax rate, is zero.  (Reply 8 ¶ 10.)

Second, assuming that the Tax Exemption Agreements have not terminated, the Trust asserts that the Debtors were not in breach because paragraph 17(F) of the 1999 Agreement and paragraph 16(F) of the 2000 Agreement "expressly state that the [D]ebtors cannot be considered in . . . default of the contract[] as a result of circumstances beyond their reasonable control, including specifically changes to economic conditions."  (Tr. 29:12-15.)  In support of this assertion, the Trust cites to the Affidavit of Ronald E. Kolka in Support of First Day Pleadings (the "Kolka Affidavit") (ECF No. 23) and the Court's findings of fact in *In re Chrysler LLC*, 405 B.R. 84 (Bankr. S.D.N.Y. 2009) (ECF No. 3073).  In *In re Chrysler LLC*, the Court found, inter alia, that for the twelve-month period ending on December 31, 2008, the Debtors recorded a net loss of $16.8 billion, confronted severe liquidity issues as a result of the 2008 financial crisis (the "Financial Crisis"), and obtained emergency financial assistance from the U.S. government.  *In re Chrysler LLC*, 405 B.R. at 89-90.  The Trust, citing to the facts leading to the Debtors' bankruptcy filing and subsequent sale of substantially all of their assets as matters of public record, emphasizes that, under these circumstances, the plain

---

[14] The Trust refers to the amount of alleged damages under the 2000 Agreement as $3,736,928 in a later section of the Amended Objection.  (*See* Amend. Obj. 11 ¶ 21.)  However, as indicated on page 11 of this opinion, the amount of alleged damages under the 2000 Agreement, as per the proof of claim, was $4,223,862.  The amount of $3,736,928 may refer to the 1999 Agreement Claim because that amount corresponds to "[t]he aggregate realized personal property tax savings to Old Carco under the 1999 Agreement . . . ."  (Stip. 2 ¶ 4.)

16

language of the Tax Exemption Agreements exempts the Debtors from default. (Amend. Obj. 14-15 ¶ 27; Tr. 29:19-30:7.)

Third, assuming the validity of the Claims, the Trust argues that the Claims are general unsecured non-priority claims because the Claims are not taxes and do not fall under section 507(a)(8) of the Bankruptcy Code. (Amend. Obj. 15 ¶ 29.) The Trust sets forth three reasons for its assertion.

The Trust first focuses on its interpretation of the contractual provisions, arguing that the Claims are "repayments of the amount of taxes" but are not themselves taxes. The Trust points to the provisions in the Tax Exemption Agreements concerning breach, noting that they "provide only that, in the event of a material breach, Summit County 'may require the *repayment* of the *amount* of taxes that would have been payable had the property not been exempted from taxation under this Agreement.'" (*Id.* at 15-16 ¶ 29 (quoting Tax Exemption Agreements ¶ 10).)

The Trust points to the Ohio Code to support its argument that had the Tax Exemption Agreements imposed a lien on the amount of abated tax, such lien would be "a generic mortgage interest in real property or a security interest in goods, not a tax lien." (Amend. Obj. 17 ¶ 31; Reply 9 ¶ 13 n.7.)

According to the Trust's interpretation of section 5709.631(B) of the Ohio Code, tax abatement agreements - such as the one entered by the Parties - must include certain default language. (Amend. Obj. 16 ¶ 30.) If the agreement includes a provision requiring repayment of an amount equal to abated taxes, which is the case in the tenth paragraph of the Tax Exemption Agreements, it *may* also include language authorizing the counties to secure the obligation with a lien on the property. (*Id.*) Had such lien language been

17

included in the Tax Exemption Agreements, the imposed lien "would be in the nature of a generic mortgage interest in real property or a security interest in goods." (Amend. Obj. 17 ¶ 31.) The Trust argues that under the enabling statute, "the obligation to pay an amount equal to abated taxes is not secured automatically by a lien as it would be if the obligation were a true tax rather than mere damages flowing from a breach of contract." (*Id.* at 16-17 ¶ 31.)

Finally, the Trust cites *City of Dayton v. Cloud*, 285 N.E.2d 42 (Ohio 1972), which, according to the Trust's interpretation of the case, "determine[ed] that a payment-in-lieu-of-tax received by a governmental unit under a contract was a contract payment, not a tax payment." (*Id.* at 17 ¶ 32.) The Trust argues that, following *Dayton*, "[e]ven if the contract requires a payment that is calculated based on what a tax liability would have been, the liability is still one arising from the contract as opposed to tax statutes." (*Id.*)

### The Fiscal Officer[15]

In the Amended Response, the Fiscal Officer sets forth several arguments addressing the Trust's Amended Objection. First, the Fiscal Officer argues that the Claims under the Tax Exemption Agreements are valid and should be allowed because the Tax Exemption Agreements are still in effect and the doctrine of "frustration of purpose" does not apply. (Amend. Resp. 3-6.) In conjunction with this argument, the Fiscal Officer asserts that the Tax Exemption Agreements have not run their course and Summit County did not receive substantially all of its bargained-for benefit. (Amend.

---

[15] As the Court discusses in greater detail *infra* pp. 25-26, the 1999 Agreement expired by its terms prior to the Plant closing, which was the alleged breach. Therefore, the 1999 Agreement Claim should be disallowed and expunged. Hence, the arguments of the Fiscal Officer relating to both Tax Exemption Agreements are relevant only to the 2000 Agreement. If, however, the 1999 Agreement were found to have expired on December 31, 2010, the Court's findings and legal conclusions with respect to the 2000 Agreement would be applicable to the 1999 Agreement.

Resp. 6-8.)  Second, the Fiscal Officer asserts that the Plant closing was an event of

default under the Tax Exemption Agreements and was not exempted under the "change

to economic conditions" clause.  (Amend. Resp. 8.)  However, during the Hearing,

counsel to the Fiscal Officer asserted that the initial breach of the Tax Exemption

Agreements was the failure to retain a certain number of employees at the Plant, and not

the Plant closing.  (Tr. 32:22-33:3.)  Third, the Fiscal Officer argues that the Claims

should not be reclassified as general unsecured non-priority claims because the amounts

are entitled to priority tax status under section 507(a)(8) of the Bankruptcy Code.[16]

(Amend. Resp. 9-10.)  This section sets forth the substance of these three arguments in

turn.

First, the Fiscal Officer argues that the sale of the Plant and its subsequent closing

constituted a fundamental failure of Old Carco to fulfill its obligations under the Tax

Exemption Agreements.  (Amend. Resp. 3.)  During the Hearing, counsel to the Fiscal

Officer referred to the TIRC Meeting Documents, arguing that the initial breach of the

Tax Exemption Agreements was the failure to retain a specific number of employees (Tr.

32:22-23), and noting that Old Carco had only 602 employees retained as of the TIRC

Annual Meeting, while the Tax Exemption Agreements specifically required a total of

756 employees.  (Tr. 32:24-33:2.)  Further, the Fiscal Officer asserts the validity of the

Tax Exemption Agreements, citing to Old Carco's personal property tax returns (Amend.

---

[16] During the Hearing, counsel to the Fiscal Officer presented an alternative to the initial argument asserting priority status to the Claims under section 507(a)(8).  Counsel to the Fiscal Officer argued that the Claims are entitled to priority under section 507(c), which accords priority status to erroneous refunds of a governmental unit.  (Tr. 36:7-11.)  Although the argument was belatedly raised and is untimely, counsel to the Trust did not object to its introduction during the Hearing.  Therefore, the Court will consider the argument.  However, having considered the argument, the Court finds that counsel to the Fiscal Officer provided no basis for the argument that amounts based on a previously granted tax exemption, and which amounts later become the basis for claims under the circumstances governing this case, should be deemed a refund erroneously granted.

Resp. 7, citing Exs. 10, 11) and its actions demonstrating recognition that the Tax

Exemption Agreements had value because of Old Carco's payment of the annual

administrative fee required for both Tax Exemption Agreements.[17]  (Amend. Resp. 5, 6.)

Additionally, the Fiscal Officer disputes the application of the frustration of purpose

doctrine, arguing that the doctrine has not been accepted in Ohio.  (Amend. Resp. 6.)

Counsel to the Fiscal Officer also argued during the Hearing that Old Carco could have

renegotiated the Tax Exemption Agreements, such as negotiating a reduction in real

estate tax, had it perceived that it was no longer receiving the benefit of its bargain.  (Tr.

33:11-16.)

    Second, the Fiscal Officer disputes the applicability of the "change to economic

conditions" clause.  (Amend. Resp. 8.)  At the Hearing, counsel to the Fiscal Officer

argued that Old Carco's bankruptcy filing was within the reasonable control of the

company, and while counsel acknowledged the existence of the Financial Crisis, counsel

asserted that Old Carco "should have established how and why [it] had to file [while Ford

Motor Company did not]."  (Tr. 36:2-3.)  Further, in the Amended Response, the Fiscal

Officer emphasizes that "[b]ad business decisions which result in adverse changes to the

economic condition of that business . . . lead[ing] to the filing of a bankruptcy petition,

---

[17] The Fiscal Officer argues in the Amended Response that because Old Carco paid the annual
administrative fees relating to the year 2009 on February 1, 2010, such fact demonstrates that Old Carco
did not consider the Tax Exemption Agreements valueless as of that date.  (Amend. Resp. 5.)  In the Reply,
the Trust argues that:  (a) *New Chrysler*, and not Old Carco, paid the administrative fees; (b) the fact that
*New Chrysler* voluntarily paid the administrative fees is irrelevant to the issue of the expiration dates of the
Tax Exemption Agreements; and (c) to the extent that the voluntary payment by *New Chrysler* is relevant,
the amount paid for each agreement, which was the minimum permissible fee, shows that Old Carco was
receiving a de minimus benefit from the agreements, if at all.  (Reply 3-4 ¶ 4.)

First, the Fiscal Officer does not dispute that the Tax Exemption Agreements were considered extant as of
the TIRC Annual Meeting on June 9, 2009 and the Summit County Council resolution on August 24, 2009.
Second, the payment of the administrative fees for the 2009 taxable year does not support a finding that the
1999 Agreement was extant in 2010.  It simply shows an amount was due under that agreement for the year
2009 and was paid in 2010.  Thus, the payment in 2010 for the 2009 taxable year is not inconsistent with
the Court's finding that the 1999 Agreement remained in effect until December 31, 2009.

can be within the reasonable control of th[at] business." (Amend. Resp. 8.)  Moreover,

during the Hearing, counsel to the Fiscal Officer argued "that a lot of how those

economic conditions affected various car companies was determined on [*sic*] the way

those car companies *were run*, and *had been* set up." (Tr. 34:22-25.) (Emphasis

supplied.)

Finally, asserting that "Summit County rests its claim[s] upon the clear terms of

the [Tax Exemption] Agreements as taxes" (Amend. Resp. 9), the Fiscal Officer observes

that the Tax Exemption Agreements "do[] not state that the repayment is a damage

provision and do[] not speak of damages.  It speaks of taxes." (*Id.*)  Responding to the

Trust's argument regarding the lien issue, the Fiscal Officer points out that "[t]he right to

place a lien upon the exempted property is not in the Agreements and is not required

language in enterprise zone agreements." (*Id.*)  The Fiscal Officer does not dispute the

Trust's discussion of section 5709.63 of the Ohio Code, which section allows the

imposition of a lien upon the exempted property, other than by arguing that the failure of

Summit County to include such lien language does not change the nature of the claim

from a tax to a damage claim.

The Fiscal Officer clarifies that Summit County is not basing the priority status of

its claims on the fact that it is a governmental unit.  (*Id.*)  According to the Fiscal Officer,

*Dayton* is inapposite as "the Supreme Court of Ohio specifically found that a[n] urban

renewal service payment did not qualify as a tax, because the revenue raised by the fee

would not be used for the direct support of the government for the administration of the

law or for the payment of public expenses." (*Id.* at 9-10).  Here, in contrast, the Fiscal

Officer argues that the Claims are taxes because as with any other personal property tax,

the amounts collected would be used "for the direct support of the county for [the]

administration of law or to pay public expenses as allowed by law" (*id.* at 10) and are,

therefore, entitled to priority status under section 507(a)(8) of the Bankruptcy Code.

## IV. Analysis

As noted, Old Carco and Summit County are parties to the Tax Exemption

Agreements.  The Exemption was granted pursuant to section 5709.63 or section

5709.632 of the Ohio Code and applied to "eligible tangible personal property acquired in

conjunction with the [p]roject" over a period of ten years beginning "the first tax year for

which the tangible personal property would first be taxable were that property not

exempted from taxation."  (1999 Agreement ¶ 5; 2000 Agreement ¶ 5.)

The 1999 Agreement provided that Old Carco would invest in specified

machinery.  (1999 Agreement 3 ¶ 1.  *Accord* Stip. 2 ¶ 2.)  The agreement also stated Old

Carco's intent to invest approximately $150,000,000 "plus or minus 10% in the Project."

(1999 Agreement 3 ¶ 1.)  Furthermore, the 1999 Agreement provided that Old Carco

would "use reasonable efforts to retain 465 full-time equivalent positions at the Plant . . .

."  (1999 Agreement 3 ¶ 2.  *Accord* Stip. 2 ¶ 2.)

The 2000 Agreement also contains a list of equipment in which Old Carco

promises to invest and provides that Old Carco "intends to invest approximately

$127,200,000 plus or minus 10% in the [p]roject."  (2000 Agreement ¶ 1.)  In paragraph

two of the 2000 Agreement, Old Carco promised to "use reasonable efforts to retain 291

full-time equivalent positions at the Plant . . . ."  (*Id.* at ¶ 2.)

The Parties stipulated that under the Tax Exemption Agreements, Old Carco

would be entitled to the Exemption for a ten-year period and that the Exemption under

the 1999 Agreement was first claimed in the year 2000 (Stip. 2 ¶¶ 2, 3), while the

Exemption under the 2000 Agreement was first claimed in the year 2001 (*id.* 3 ¶ 8).

***Alleged Breach Occurred as Result of Plant Closing***

The Fiscal Officer argues in the Amended Response that the sale of the Plant and

its subsequent closing in June 2010 constituted a fundamental failure of Old Carco to

fulfill its obligations.  (Amend. Resp. 3.)  During the Hearing, however, counsel to the

Fiscal Officer argued that the initial breach of the Tax Exemption Agreements was the

failure to retain a specified number of employees (Tr. 32:22-23), noting that while the

Tax Exemption Agreements required a combined number of 756 employees, as of the

TIRC Annual Meeting on June 9, 2009, Old Carco had retained only 602 employees.

(Tr. 32:24-33:2.)[18]

Counsel to the Trust responded to the argument by objecting to the assertion that

Old Carco was in breach of the Tax Exemption Agreements in June 2009 by arguing that

the TIRC Meeting Documents reveal compliance at that time.  (*See* Tr. 36:17-25.)

Therefore, the Court will consider the argument raised during the Hearing that the initial

breach occurred in June 2009 due to the failure to maintain the specified number of

employees.

Section 5709.631(B)(7) of the Ohio Code, which enumerates the provisions that

must be contained in tax incentive agreements entered into by a county, provides that a

county may terminate or modify the exemption if the other contracting party "materially

fails to fulfill its obligations under [the] agreement," and excludes from its provision the

failure to retain the specified number of employees.  Ohio Rev. Code § 5709.631(B)(7)

---

[18] As a preliminary matter, the Court notes that the argument raised by the Fiscal Officer during the
Hearing that the initial breach occurred in June 2009 was untimely.  However, counsel to the Trust did not
object to the Court's consideration of the issue.  Therefore, the Court will consider the argument.

(West 2010).  This latter contingency is instead addressed in subsection (B)(12), which

provides that should the number of employees fall below seventy-five percent of the

number of employee positions estimated to be "created or retained" during any three-year

period, the breaching party "shall repay" the amount of taxes previously exempted during

that three-year period.  *Id.* § 5709.631(B)(12).  A county could also "terminate or modify

the exemptions from taxation granted under [the] agreement."  *Id.*  The stated percentage

and the three-year period, which are the thresholds for determining a material breach with

respect to the retention of employees under the statute, are not included in the Tax

Exemption Agreements.  The omission of such thresholds evidences the Parties' intent to

treat the failure to retain the specified number of employees as a subsection (B)(7)

default.  By their terms, the Tax Exemption Agreements obligate Old Carco to use

reasonable efforts to maintain the specified number of employees.  Therefore, absent

reasonable efforts, a material drop in employee numbers would be a failure of that

obligation.  The Court does not need to reach the materiality of such failure.  As noted

below, the Fiscal Officer failed to establish a breach of the obligation to exert *reasonable

efforts* to retain the specified number of employees.

     Subject to certain exceptions such as "a waiver," "legal excuse," or "legal

justification," "a breach of contract is always a non-performance of duty under a

contract."  *Tait v. N. Am. Equitable Life Assur. Co.*, 194 N.E.2d 456, 460-61 (Ohio Com.

Pl. 1963) (internal quotation marks omitted).  Here, to establish the alleged initial breach,

the Fiscal Officer had to show *both* (a) the lack of reasonable efforts by Old Carco to

retain the specified number of employees, *and* (b) the failure of Old Carco to retain such

specified number.  During the Hearing, however, counsel to the Fiscal Officer focused

only on the failure of Old Carco to retain the combined number of 756 employees under both Tax Exemption Agreements, without arguing that Old Carco failed to use reasonable efforts to retain the specified number; nor did counsel to the Fiscal Officer point to *specific* conduct on the part of Old Carco to show that it did not use such reasonable efforts.  (*See* Tr. 32:24-33:3.)  Therefore, the Court finds the Fiscal Officer failed to establish a breach of the 2000 Agreement based upon a failure to use reasonable efforts to retain the specified number of employees under that agreement.

Moreover, even if the burden is on Old Carco to show as an affirmative defense that it used reasonable efforts to retain the specified number of employees, the Court finds that Old Carco met that burden by pointing to the record in *In re Chrysler LLC*, 405 B.R. at 89-92 and the Kolka Affidavit.  As more fully discussed *infra* pp. 34-38, the record supports a finding that Old Carco exerted reasonable efforts to ensure compliance with all its obligations, including those obligations regarding the number of employees.

Therefore, the alleged breach did not occur in June 2009 due to the failure to retain the specified number of employees because the Fiscal Officer did not demonstrate that Old Carco failed to use reasonable efforts to retain the specified number of employees.  Rather, the alleged breach occurred - consistent with the Fiscal Officer's original argument and the Summit County Council resolution - in June 2010 as a result of the Plant closing because that is the time the employees were terminated and the machinery and equipment were no longer in use.

### Old Carco Has Fully Complied with the 1999 Agreement

Having established that the alleged breach occurred in June 2010 as a result of the Plant closing, the Court must ascertain when the 1999 Agreement expired.  If the 1999

Agreement expired by its own terms prior to the alleged breach in June 2010, then Old Carco has fully complied with the 1999 Agreement.

The Trust argues that "the ten-year term of the 1999 Agreement expired on December 31, 2009." (Amend. Obj. 11 ¶ 20.) The Fiscal Officer in the Amended Response counters that because the 1999 Agreement was effective in 2001, and because the Exemption was first claimed in 2001, the agreement would expire on December 31, 2010. (*See* Amend. Resp. 7.) However, attached as Exhibit Ten to the Amended Response is the personal property tax return of Old Carco for the 2007 taxable year, which followed the calendar year ending on December 31, 2007 (the "2007 Personal Property Tax Return"). The 2007 Personal Property Tax Return indicates that the agreement was effective beginning January 1, 2000, and that the period of the Exemption was for ten years. (Amend. Resp., Ex. 10, Return of Exempt Personal Property Located in an Enterprise Zone or Hazardous Substance Reclamation Area 29.) The Fiscal Officer's own exhibit contradicts his argument that the 1999 Agreement was effective beginning in 2001. Contrary to the Fiscal Officer's argument, the Court finds that the 1999 Agreement was in force throughout the following years: 2000, the first year that the Exemption was claimed; 2001, its second year; 2002, its third year; 2003, its fourth year; 2004, its fifth year; 2005, its sixth year; 2006, its seventh year; 2007, its eighth year; 2008, its ninth year; and expired on December 31, 2009, at the end of its tenth year.

Therefore, the 1999 Agreement expired by its terms on December 31, 2009, prior to the alleged breach in June 2010. Because the 1999 Agreement was no longer in force prior to the Plant closing, Old Carco could not have breached the terms of the 1999 Agreement by closing the Plant after the agreement had expired.

***"Change to Economic Conditions" Clause Excuses Default in Performance under
2000 Agreement***

As noted, because Old Carco has fully complied with its obligations under the
1999 Agreement, the breach at issue relates only to the 2000 Agreement. The Fiscal
Officer argues that the Exemption was first claimed under the 2000 Agreement in 2001
and that the 2000 Agreement expires at "the end of 2011." (Amend. Resp. 7.) Contrary
to the Fiscal Officer's argument, however, the 2000 Agreement expired on December 31,
2010. The Parties stipulated that Old Carco "first claimed the ten-year tax exemption
provided for under the 2000 Agreement in the year 2001" (Stip. 3 ¶ 8) and that the
Exemption was for a ten-year period. (*Id.* ¶ 7.) Therefore, the 2000 Agreement was in
force throughout the following years: 2001, its first year; 2002, its second year; 2003, its
third year; 2004, its fourth year; 2005, its fifth year; 2006, its sixth year; 2007, its seventh
year; 2008, its eighth year; 2009, its ninth year; and, would have expired on December
31, 2010, at the end of its tenth year. Hence, the Court will consider the arguments of the
Parties as applying to the alleged breach of the 2000 Agreement in June 2010 -
approximately six months before its expiration.

The Trust argues that the Debtors were not in breach of the Tax Exemption
Agreements because paragraph 17(F) of the 1999 Agreement and paragraph 16(F) of the
2000 Agreement "expressly state that the [D]ebtors cannot be considered in . . . default of
the contract[] as a result of circumstances beyond their reasonable control, including
specifically changes to economic conditions." (Tr. 29:12-15.) In support of this
assertion, the Trust cites to the Kolka Affidavit and the Court's findings of fact in *In re
Chrysler LLC*, 405 B.R. at 89-92, which recount the facts leading to the Debtors'
bankruptcy filing and subsequent sale of substantially all of their assets. The Trust

emphasizes that, under the circumstances outlined in such documents, the plain language

of the Tax Exemption Agreements exempts the Debtors from default.  (Amend. Obj. 14-

15 ¶ 27; Tr. 29:19-30:7.)

The Fiscal Officer argues two main points.  First, the Fiscal Officer contends that

a bankruptcy filing is not an excusing event under the Tax Exemption Agreements.[19]

(Amend. Resp. 8.)  Second, the Fiscal Officer argues that the breach, referring to the

Plant closing, was within Old Carco's reasonable control.  (*See id.*)  In conjunction with

this argument, the Fiscal Officer points to the fact that Ford Motor Company ("Ford") did

not file for bankruptcy.  (*Id.*)  The Fiscal Officer also contends that *how* the Financial

Crisis affected Old Carco was within its reasonable control.  (*See* Tr. 34:22-35:4.)[20]

While Ohio law governs the 2000 Agreement, no reported Ohio decision

interprets a force majeure clause similar to the one contained in the 2000 Agreement,

which specifically excuses a default caused by circumstances outside of Old Carco's

"reasonable control," including, but not limited to, a "change to economic conditions."[21]

---

[19] The Fiscal Officer misconstrues the Trust's argument by asserting that a bankruptcy filing is not an excusing event.  The Trust does not argue that Old Carco's filing is an excusing event, but points to the record, which includes the bankruptcy filing, to demonstrate that the change in economic conditions and the "extraordinary conditions" (Tr. 29:20) surrounding the filing of Old Carco's bankruptcy, and the sale of the Plant and its closing, were beyond Old Carco's reasonable control.  (Tr. 29:23-30:7.)  The Trust also does not argue that the bankruptcy filing itself establishes a change in economic conditions beyond Old Carco's reasonable control.  Rather, the Trust argues that Old Carco's filing is an *effect* of the financial crisis; therefore, the financial crisis is the excusing event.

[20] "MS. VANVOROUS: . . . I guess our point is that a lot of how those economic conditions affected various car companies was determined on [*sic*] the way those car companies were run, and had been set up. And Chrysler obviously could not sustain itself during those economic conditions, and they needed to file bankruptcy.  Other companies did not. *Clearly, that's within the control of the company as to how those economic conditions affected them.*"  (Emphasis supplied.)

[21] As noted, paragraph 16(F) of the 2000 Agreement provides:

[Old Carco] shall not be considered . . . in default in the performance of its obligations under this agreement as a result of any cause beyond its reasonable control, including but not limited to severe and unusual weather, acts of God, or explosion, riot, acts of civil disobedience or sabotage, change to economic conditions and productivity and technological changes, power failures or shortages, restraint by court order or order of

28

A review of Ohio decisions interpreting force majeure clauses and considering impossibility of performance due to a change in economic conditions reveals that, as a general rule, financial difficulty does not excuse the defaulting party's performance.  *See, e.g.*, *Stand Energy Corp. v. Cinergy Servs., Inc.*, 760 N.E.2d 453 (Ohio Ct. App. 2001) (holding that worsening economic conditions do not qualify as a force majeure that would excuse economic hardship where the force majeure clause at issue is silent as to economic conditions); *Dunaj v. Glassmeyer*, 580 N.E.2d 98 (Ohio Com. Pl. 1990) (finding that bad economic conditions do not qualify as force majeure where the force majeure clause at issue is silent on economic conditions).  However, where a force majeure clause explicitly includes the event alleged to have prevented performance, such performance will be excused.  *Kel Kim Corp. v. Cent. Mkts., Inc.*, 519 N.E.2d 295, 296 (N.Y. 1987).  The requirement that the event must be expressly identified in the force majeure clause in order to excuse performance is "especially true where the event relied upon to avoid performance is a market fluctuation."  *United States v. Panhandle E. Corp.*, 693 F. Supp. 88, 96 (D. Del. 1988).  Therefore, while courts will not presume that a change in economic conditions constitutes an excuse for nonperformance, this does not preclude the parties from negotiating for such an excuse.  Express inclusion of the clause "change to economic conditions" as an excusing event in the 2000 Agreement evidences the intention of the Parties to use a broader force majeure concept.

Based on the terms of the 2000 Agreement, the "change to economic conditions" clause will only excuse Old Carco's breach under that agreement if:  (a) the Plant closing

---

public authority, action or omission by any government agency, labor strikes or other labor disturbances.

(2000 Agreement 7-8 ¶ 16(F).)

was caused by a change in economic conditions; and (b) such change in economic

conditions was beyond Old Carco's reasonable control.

In order to determine whether the Plant closing was caused by a "change to

economic conditions," the Court must first define the phrase.  While no definition of a

"change to economic conditions" is provided, either in the Tax Exemption Agreements or

in legal resources, it is clear that the Financial Crisis constitutes such a change.  As this

Court previously determined in *In re Chrysler LLC*, 405 B.R. at 89-90, the Debtors

experienced severe adverse changes in economic conditions.  The Kolka Affidavit shows

a massive degeneration in the U.S. automotive industry, including, inter alia, a drop in the

seasonally adjusted annual rate of car sales ("SAAR") from 15.6 million units in January

2008 to 9.8 million units in January 2009, a thirty-seven percent decline to a twenty-six

year low.  (Kolka Aff. 24 ¶ 55, April 30, 2009, ECF No. 23.)  It also shows the failure of

numerous financial institutions and the unavailability of credit on which Old Carco had

relied for years.  (*Id.* 23-24 ¶ 53-54.)  *See also In re Lehman Bros. Hldgs. Inc.*, 445 B.R.

143, 153, 155 (Bankr. S.D.N.Y. 2011) ("[The financial markets experienced] unrivaled

worldwide financial distress bordering on panic. . . . unlike anything ever experienced

since the dawn of the age of electronic trading and globally connected markets . . . .").

The determination of whether the Financial Crisis, which the Court has identified

as the event within the meaning of the "change to economic conditions" clause,

ultimately caused the Plant closing may be determined by examining the events leading

to the Debtors' bankruptcy filing as well as the sale of the Plant and its subsequent

closing.  As noted below, the effects of the Financial Crisis on Old Carco led to the

chapter 11 filing, the section 363 sale, the licensing of the Plant to New Chrysler, the

expiration of the licensing agreement between New Chrylser and Old Carco, and, due to the substantial carrying costs associated with the Plant, its eventual court-approved sale. Therefore, the record is clear that the Plant closing was caused by a change in economic conditions.

Regarding the reasonable control element of the force majeure clause, the Trust points to both the Fiat Transaction Opinion and the Kolka Affidavit to demonstrate the existence of a change in economic conditions and the "extraordinary conditions" (Tr. 29:20) surrounding the filing of Old Carco's bankruptcy and the sale of the Plant and its closing. According to the Trust, the events set forth in both the Fiat Transaction Opinion and the Kolka Affidavit support the argument that the bankruptcy filing and the alleged breach were beyond the reasonable control of Old Carco. (Tr. 29:23-30:7.) On the other hand, as noted, the Fiscal Officer argues that the Plant closing was not beyond Old Carco's reasonable control (Amend. Resp. 8) and that *how* the Financial Crisis affected Old Carco was within its reasonable control. (*See* Tr. 34:22-35:4.)

In evaluating whether the "reasonable control" element of force majeure clauses has been met, courts consider two related notions:

> First, a party may not affirmatively cause the event that prevents his performance. The rationale behind this requirement is obvious. If a contractor were able to escape his responsibilities merely by causing an excusing event to occur, he would have no effective "obligation to perform." [Citations omitted.]

> The second aspect of reasonable control is more subtle. Some courts will not allow a party to rely on an excusing event if he could have taken reasonable steps to prevent it. [Citations omitted.] The rationale behind this requirement is that the force majeure did not actually prevent performance if a party could reasonably have prevented the event from occurring. The party has prevented performance and, again, breached his good faith obligation to perform by failing to exercise reasonable diligence. [Citations omitted.]

*Nissho-Iwai Co. v. Occidental Crude Sales, Inc.*, 729 F.2d 1530, 1540 (5th Cir. 1984).

Regarding the first notion of "reasonable control," Old Carco, as acknowledged by counsel to the Fiscal Officer,[22] did not actually cause the change in economic conditions.

Regarding the second notion of "reasonable control," Old Carco must show its "diligence in taking reasonable steps to ensure performance." *Nissho-Iwai Co.*, 729 F.2d at 1540 (citing *Oosten v. Hay Haulers Dairy Emps. & Helpers Union*, 291 P.2d 17, 21 (Cal. 1955)). *See also Gulf Oil Corp. v. Fed. Energy Reg. Comm'n*, 706 F.2d 444, 454 (3d Circ. 1983) (concluding that the party in breach of a warranty contract "must show that it tried to overcome the results of the events' occurrences by doing everything within its control to prevent or to minimize the event's [*sic*] occurrence[s] and [their] effects"); *Chemetron Corp. v. McLouth Steel Corp.*, 381 F. Supp. 245, 257 (N.D. Ill. 1974) (applying a similar "due diligence" standard to the defense of impracticability of performance).

Two cases, *Hoosier* and *Chemetron*, inform the Court's analysis; in determining whether the alleged breach in each case was excused, both cases (a) assessed the significance of the force majeure event, and (b) analyzed the conduct of the defendant surrounding such event. In *Hoosier*, the court considered the nature, scope, and predictability of the excusing event, the Financial Crisis. *Hoosier Energy Rural Elec. Coop. v. John Hancock Life Ins. Co.*, 588 F. Supp. 2d 919, 924, 932 (S.D. Ind. 2008). The court rejected the non-breaching party's arguments that the Financial Crisis was

---

[22] "THE COURT:  So you think Chrysler's responsible for the slowdown in the economy itself?
  MS. VANVOROUS:  No, your Honor."  (Tr. 35:7-9.)

foreseeable and that the alleged breaching party could have protected itself better from

the crisis:

> [T]he credit crisis facing the world's economies in recent months is
> unprecedented and was not foretold by the world's preeminent economic
> experts. The crisis certainly was not anticipated . . . when the deal
> between [the parties] was being finalized. Restrospect will not assist [the
> non-breaching party] here, nor will an assertion that it was Hoosier
> Energy's responsibility to prepare for and guard against any imaginable
> commercial calamity. After all, "foreseeable" is different from
> "conceivable."

*Id.*

In *Chemetron*, the court observed that there was an inadequate showing that the

excusing event - explosions of a compressor - was beyond the defendant's reasonable

control. *Chemetron Corp.*, 381 F. Supp. at 256. Unlike the force majeure event in

*Hoosier*, the explosions described in *Chemetron* and the effects on the defendant's supply

capabilities were nowhere near as devastating as the Financial Crisis, *see id.*, and, here,

its effect on the U.S. automotive industry. In addition, here, as noted, the Parties do not

dispute that the Financial Crisis was beyond Old Carco's reasonable control.

Moreover, the defendant in *Chemetron* placed itself in a position of vulnerability

to the force majeure event, rendering it unable to meet its supply obligations when the

explosions occurred. *Id.* The defendant had removed from production liquid oxygen

compressors in certain years, had taken out equipment for repairs, and had failed to

replace such equipment, which actions reduced the defendant's production capacity, and

which affected the defendant's ability to perform its obligations once the damaged

compressor was placed out of service. *Id.* In contrast, the alleged breaching party in

*Hoosier* did not place itself in a position of vulnerability to the force majeure event. *See*

*Hoosier*, 588 F. Supp. 2d at 924-26. Upon the drop in the swap provider's credit rating

because of the Financial Crisis, the alleged breaching party immediately took steps to try to replace the existing swap provider with one that met the credit conditions of its agreements. *Id.* Therefore, unlike *Chemetron*, where the alleged breaching party's conduct aggravated the effects of the force majeure event, in *Hoosier*, the alleged breaching party took remedial steps to prevent the breach of its obligation. Similarly, here, and as recounted below, there is no indication that Old Carco, during the period leading up to the Financial Crisis, did anything other than try to improve its financial condition.[23] In contrast to the conduct in *Chemetron*, which exacerbated the effects of the force majeure event, Old Carco recognized its vulnerability to a continued loss of market share and took steps in 2007 to address those concerns. It did not, as the defendant did in *Chemetron*, continue to take actions that increased its vulnerability; instead, Old Carco, recognizing its problems, took steps to improve its financial condition.

In 2007, prior to the Petition Date, Old Carco initiated an operational restructuring effort (the "Transformation Plan") and pursued potential alliances with various automobile manufacturers. *In re Chrylser*, 405 B.R. at 90. (*Accord* Kolka Aff. 19-23 ¶¶ 42-52.) The Transformation Plan was an aggressive restructuring effort that was designed to: "(a) address declining economic and market conditions and competitive industry dynamics and (b) fundamentally transform Chrysler's businesses to better align them with consumers' changing needs and desires, including for more fuel-efficient cars." (Kolka Aff. 19 ¶ 42.) *Accord In re Chrysler LLC*, 405 B.R. at 90. The Transformation Plan "initially met set targets through the first half of 2008." *In re*

---

[23] The Parties entered into the Tax Exemption Agreements in 1999 and 2000 when Old Carco, as well as other U.S. automobile manufacturers, were already experiencing a decline in market share. For example, "sizable legacy costs" was one of the factors that contributed to the gradual loss in market share of Old Carco. (*See* Kolka Aff. 18 ¶ 39.)

*Chrysler LLC*, 405 B.R. at 90. (*Accord* Kolka Aff. 21 ¶ 46.) The 2008 business plan that set the financial targets of Old Carco was the result of a process that was thorough and time consuming. (Kolka Aff. 21 ¶ 47.) The business planning process was an "iterative" one involving the entire company and culminated in a high-level management decision. (Kolka Aff. 22 ¶¶ 47-49.) As a result, Old Carco aggressively pared down its product offerings to "a durable core." (Kolka Aff. ¶ 50.)

In 2007 and 2008, with the goal of increasing its size and ensuring a more global presence, Old Carco negotiated and pursued potential alliances with GM, Fiat, Nissan, Hyundai-Kia, Toyota, Volkwagen, Tata Motors, GAZ Group, Magna International, Mitsubishi Motors, Honda, Beijing Automotive, Tempo International Group, Hawtai Automobiles, and Chery Automobile Co. *In re Chrysler LLC*, 405 B.R. at 90. (*Accord* Kolka Aff. 23 ¶ 52.)

"In the fall of 2008, a global credit crisis affecting the liquidity markets impacted the availability of loans both to dealers and consumers, resulting in the erosion of consumer confidence and a sharp drop in vehicle sales." *In re Chrysler LLC*, 405 B.R. at 90. (*Accord* Kolka Aff. 23-25 ¶¶ 53-57.) The sharp drop in vehicle sales accelerated the depletion of Old Carco's cash and resulted in severe liquidity issues. (Kolka Aff. 25-26 ¶ 58.) *In re Chrysler LLC*, 405 B.R. at 90. The Court must focus on Old Carco's conduct at this point and must consider whether Old Carco took reasonable steps to ensure performance by acting to mitigate the impact of the crisis on the company.

In late 2008, Old Carco, along with other entities, turned to the government to obtain new financing and, Old Carco, in particular, applied for an aggregate amount of $7 billion. *In re Chrysler LLC*, 405 B.R. at 90; (Kolka Aff. 26-28 ¶ 59-64.) The

government subsequently provided TARP Financing[24] and granted Old Carco four billion

dollars. *In re Chrysler LLC*, 405 B.R. at 90. (*Accord* Kolka Aff. 29 ¶¶ 67, 68.)

The TARP Loan Agreement, in which the U.S. Treasury, as lender, provided Old

Carco with a three-year loan of four billion dollars for general corporate and working

capital purposes, required Old Carco to: (a) submit a Viability Plan demonstrating its

ability to achieve and sustain, inter alia, long-term viability, energy efficiency, and

competitiveness in the U.S. marketplace; (b) include within such Viability Plan its ability

to repay the TARP Financing; and (c) subject to a March 31, 2009 deadline, submit a

written certification and report detailing the progress made in implementing the Viability

Plan. (Kolka Aff. ¶¶ 68-69.) *Accord In re Chrysler LLC*, 405 B.R. at 90. Old Carco

used the TARP Loan to, inter alia, operate its business and fund its efforts to pursue the

Viability Plan. *In re Chrysler LLC*, 405 B.R. at 90. (*Accord* Kolka Aff. 30 ¶ 70.)

Concurrently, Old Carco pursued other strategic alliances and "intensified its ongoing

efforts to secure a global strategic alliance with Fiat." (Kolka Aff. ¶ 72.) *Accord In re

Chrysler LLC*, 405 B.R. at 90. Old Carco later entered into the Fiat Alliance, which was

conditioned on achieving other aspects of Old Carco's Viability Plan. *In re Chrysler

LLC*, 405 B.R. at 91. (*Accord* Kolka Aff. 31 ¶¶ 73-74.) Thus, Old Carco pursued the

Viability Plan either as an alternative to, or in conjunction with, the Fiat Alliance. (Kolka

Aff. 31-32 ¶ 72.) *Accord In re Chrysler LLC*, 405 B.R. at 91. From the period of early

2009 until the Petition Date, no other viable alternative to the Fiat Alliance presented

itself to Old Carco. (Kolka Aff. 32 ¶ 76.)

---

[24] Capitalized terms otherwise undefined have the same meaning as provided under the Fiat Transaction Opinion and the Kolka Affidavit.

On February 17, 2009, Old Carco presented its February 2009 Submission to the Treasury, which provided for three possible scenarios: (a) the Stand-Alone Viability Plan; (b) the Alliance Viability Plan; and (c) an orderly wind-down plan for Old Carco's operations if neither the Stand-Alone Viability Plan nor the Alliance Viability Plan could be achieved. *In re Chrysler LLC*, 405 B.R. at 91. (*Accord* Kolka Aff. 33 ¶ 79.) Old Carco continued to negotiate with its stakeholders after the February 2009 Submission. (Kolka Aff. 35 ¶ 82.) *See also In re Chrysler LLC*, 405 B.R. at 91.

On March 30, 2009, the President's Auto Task Force, which was put in place to evaluate Old Carco's Viability Plan, advised Old Carco that it could emerge as a viable entity with Fiat as a strategic partner. *In re Chrysler LLC*, 405 B.R. at 91. (*Accord* Kolka Aff. 36 ¶ 84.) Subject to certain conditions, the U.S. Treasury "was prepared to provide additional capital to fund the Viability Plan, if [the Viability Plan] included a modified Fiat Alliance addressing certain concerns and goals of the U.S. government, as long as the issues were resolved within 30 days." *In re Chrysler LLC*, 405 B.R. at 91. (*Accord* Kolka Aff. ¶ 84.) In compliance with these conditions, Old Carco signed a revised term sheet for the Fiat Alliance and, as a result, the U.S. government agreed to provide Old Carco's working capital needs through April 30, 2009. *In re Chrysler LLC*, 405 B.R. at 91. (*Accord* Kolka Aff. 37 ¶ 85.) With the thirty-day deadline set, Old Carco poured more resources into pursuing the Fiat Alliance and the stakeholder concessions necessary to consummate the transaction. (Kolka Aff. ¶ 86.) *Accord In re Chrysler LLC*, 405 B.R. at 91-92. Old Carco, Fiat, and New Chrysler then entered into the MTA supported by the U.S. government. *In re Chrysler LLC*, 405 B.R. at 92. (*Accord* Kolka Aff. 38 ¶ 88.) Subsequently, Old Carco commenced the chapter 11 filings in order "to

implement an expeditious sale process to implement the Fiat Transaction," which was

designed to maximize the value of its operations and businesses for the benefit of

stakeholders. (Kolka Aff. ¶ 89.)

In addition, Old Carco negotiated with the U.S. Treasury for financing relating to

the sale of its assets. *In re Chrysler LLC*, 405 B.R. at 92. The Governmental Entities

agreed to provide debtor in possession financing for sixty days in the amount of $4.96

billion. *Id.* Subsequently, the Governmental Entities agreed to provide a six billion

dollar senior secured financing facility to support New Chrysler's operations after the

sale. *Id.*

The record shows that, for at least two years prior to the Financial Crisis, and

immediately thereafter, Old Carco took steps to address its loss in market share and any

structural problems it may have had. In response to the Financial Crisis, which severely

affected Old Carco's liquidity and required it to obtain emergency financing from the

U.S. Treasury, Old Carco actively pursued strategic alliances. This culminated in the Fiat

Transaction and the section 363 sale. The alternatives explored and the efforts

undertaken by Old Carco to remain viable including, inter alia, the Stand-Alone Viability

Plan, the Alliance Viability Plan, and the chapter 11 filing to implement the Fiat

Transaction, are sufficient to demonstrate that Old Carco exerted reasonable efforts to

remain a viable business and to perform its obligations.

Further, the determination by New Chrysler not to continue operations at the Plant

was simply a business decision of New Chrysler based on its anticipated production

needs. The substantial carrying costs associated with the Plant would have rendered Old

Carco's retention of the Plant impossible, or at the least, unreasonably expensive. In the

Plant Sale Order, the Court explained the primary reason for the sale of the Plant:

"[S]ubstantial carrying costs for property taxes, utilities, security[,] and other expenses

associated with the Property" would revert to the Debtors upon the expiration of the

licensing agreement, and as a result, the Debtors would have to bear such substantial

carrying costs.  (*See* Plant Sale Order 5 ¶ H) (ECF No. 6585).  Absent a continuation of

the license agreement with New Chrysler or some other similar arrangement, Old Carco,

having no business to conduct at the Plant, and in the process of liquidating all its

remaining assets, was left without any alternative except to close the Plant.

Moreover, a consideration of the state of the automotive industry shows that two

out of the three major U.S. automobile manufacturers had filed for bankruptcy.  (*See e.g.*,

*In re Motors Liquidation Co.*, Case No. 09-50026, Vol. Pet., June 1, 2009, ECF No. 1.)

In order to establish that Old Carco was in control of how it was positioned upon the

occurrence of the Financial Crisis, the Fiscal Officer points to the fact that while Old

Carco had filed for bankruptcy, Ford did not.  (*See* Amend. Resp. 8.)  The Fiscal

Officer's argument regarding Ford is simple:  Ford weathered the crisis without having to

sell its business, therefore, in spite of the change in economic circumstances, Old Carco,

by better preparing itself, would have been able to meet its obligations.  Therefore, Old

Carco's inability to fulfill its obligation under the agreements was within its reasonable

control and was not excused under the force majeure clause.  The Fiscal Officer's

argument suggests that all companies within an industry should be able to respond to

changes to economic conditions in the same manner.  And to the extent one entity in an

industry could meet its contractual obligations following the occurrence of a change in

economic circumstances, all other entities in that industry would not be able to invoke as

a defense a force majeure provision with a "change to economic conditions" clause.  This proposition is not supported by any analyses, case law, principle of law, or any other legal underpinning.  Moreover, on these facts, and as noted, where two out of the three major U.S. automobile manufacturers have filed for bankruptcy, the Fiscal Officer sets as the standard the financial condition of Ford versus the financial condition of Old Carco and General Motors Corporation ("GM").[25]  And while the Fiscal Officer generally points to the bad decisions of Old Carco's management (*see* Amend. Resp. 8; Tr. 34:22-25), he does not point to a particular management decision or series of decisions that caused Old Carco's vulnerability to the Financial Crisis, ultimately leading to the closing of the Plant.  Neither did the Fiscal Officer reference decisions of Old Carco that may have differed from business decisions made by GM and Ford.

Further, the Fiscal Officer's reference to Ford assumes, had Ford had the same contract as Old Carco, that Ford would have continued to perform under such contract as opposed to seeking relief under the "change to economic conditions" clause if it determined that the Plant was no longer needed.  What Ford may have done under similar circumstances is pure speculation and provides no evidentiary value in determining whether the "change to economic conditions" clause in the force majeure provision of the contract excuses performance.

Therefore, the record supports the finding that:  (a) the Plant closing was caused by a change in economic conditions; and (b) such change in economic conditions was beyond Old Carco's control, Old Carco having demonstrated that it exerted reasonable efforts to remain a viable business, perform its obligations, and retain the Plant.  The

---

[25] Numerous supply companies within the industry also filed for bankruptcy protection during the years at issue.  *See e.g.*, Stephen Taub, *Dana Joins Auto-Parts Bankruptcy List*, CFO (Mar. 3, 2006), http://www.cfo.com/article.cfm/5591638?f=related.

Court finds that the ability of Old Carco to remain a viable automobile manufacturer once the Financial Crisis struck was not within its reasonable control. Therefore, the Plant closing in June 2010 does not constitute an event of default under paragraph 16(F) of the 2000 Agreement.[26]

### Old Carco Has Substantially Complied with Its Obligations Under the 2000 Agreement

Even if Old Carco's alleged breach of the 2000 Agreement were not excused, the Court finds that the alleged breach is non-material in that Old Carco has substantially complied with its obligations under that agreement. Thus, under this alternative, Summit County would only be entitled to damages corresponding to the period of the Exemption subsequent to the alleged breach. However, because Summit County had completely phased-out its personal property taxes prior to the Plant closing, no amount would be due corresponding to the remaining term of the 2000 Agreement.[27]

Under the substantial performance doctrine, "mere nominal, trifling, or technical departures are not sufficient to break a contract, and . . . slight departures, omissions and inadvertences should be disregarded." *Kichler's, Inc. v. Persinger*, 265 N.E.2d 319, 321 (Ohio Ct. App. 1970) (citation omitted). *Accord Ohio Farmers' Ins. Co. v. Cochran*, 135 N.E. 537, 539 (Ohio 1922) (applying the doctrine of substantial performance to hold in favor of the insured, and ruling that the insurance company had waived the formal sixty-

---

[26] There is no doubt that many decision and policy makers inside and outside of the U.S. automobile industry share the blame for the decades-long deterioration of the industry's dominance in the U.S. car market. *See e.g.*, *4 Foreign Carmakers Post U.S. Sales Gains; Domestic Companies Show June Declines*, Chi. Trib., July 4, 2000, at N3. However, the issue before the Court focuses on the reasonable control of Old Carco within the later stages of that deterioration while efforts were underway to address Old Carco's loss in market share. This decades-long deterioration does not make the change in economic circumstances such as the Financial Crisis an event over which Old Carco had reasonable control.

[27] *See supra* note 6 for an alternative method of calculating the amount of damages by applying the percentage of the contract that remained against the total amount of taxes exempted. Moreover, even if an amount were due under that alternative, the Court would still reclassify the 2000 Agreement Claim as a general unsecured claim under the final alternative argument discussed *infra* pp. 50-61.

day notice requirement by its acts and conduct); *Connor & Murphy, Ltd. v. Applewood*

*Vill. Homeowners' Ass'n.*, No. CA2007-09-213, 2009-Ohio-1447, at ¶ 59 (quoting *Ohio*

*Farmers' Ins.*, 135 N.E. at 537); *Ehrhardt v. Hamilton Fan & Blower Co.*, Nos. C-

850265, C-850266, 1986 Ohio App. LEXIS 5985, at *14 (Ohio Ct. App. Mar. 19, 1986)

("A party is in substantial compliance with its promises only when its deviations are

'nominal,' 'trifling,' 'technical,' 'slight,' . . . and consistent with 'an honest effort to

perform.'") (Citations omitted.)  *See also Jacob & Youngs v. Kent*, 129 N.E. 889, 890

(N.Y. 1921) (discussing the doctrine of substantial compliance and holding that the

installation of the wrong brand of pipe in carrying out the builder's obligation under a

contract for the construction of a country home is an insignificant defect).  The doctrine

also provides that:

> where a contract requires numerous performances by one or more of its parties, a party's breach of a single term thereof does not discharge the non-breaching party's obligations under the remainder of the contract *unless performance of that single term is essential to the purpose of the agreement*.

*O'Brien v. Ohio State Univ.*, No. 06AP-946, 2007-Ohio-4833, at ¶ 46 (citation omitted), *juris. declined*, No. 2007-2047, 2008-Ohio-565 (Ohio 2008).  *Accord Connor & Murphy, Ltd.*, 2009-Ohio-1447, at ¶ 59.

For the doctrine to apply, "the part unperformed must not destroy the value or purpose of

the contract."  *Hansel v. Creative Concrete & Masonry Constr. Co.*, 772 N.E.2d 138, 141

(Ohio Ct. App. 2002) (citations omitted).

Under the 2000 Agreement, Old Carco promised "to invest approximately

$127,200,000 more in certain machinery and equipment to be used at the . . . [P]lant and

to use reasonable efforts to maintain 291 full-time employment positions at the . . . Plant .

. . ."  (Stip. 2 ¶ 7.)

The TIRC Meeting Documents demonstrate that Old Carco has substantially performed under the 2000 Agreement. (*See* Mins. of TIRC Mtg. 4.) As of the date of the TIRC Annual Meeting, Old Carco had invested $139,265,597 in tangible personal property. (*Id.*) Thus, under the 2000 Agreement, Old Carco had made approximately 122% of the required capital investment.[28] With respect to Old Carco's compliance with its obligation to retain 291 full-time employees, as of calendar year 2008, Old Carco reported retaining 1,665 full-time employees without itemizing which employees corresponded to either of the Tax Exemption Agreements. (*Id.*) This shows an excess of 909 employees in total over the combined requirement of 756 as of the 2008 calendar year. As of the date of the TIRC Annual Meeting, however, the number of employees retained dropped to 602, and again, Old Carco did not itemize which number of employees corresponded to either of the Tax Exemption Agreements. (*Id.* at 5.)

A party's material breach of a contract "defeats the essential purpose of the contract or makes it impossible for the other party to perform." *O'Brien*, 2007-Ohio-4833, at ¶ 56 (internal quotation marks and citation omitted). If a party is in material breach of the contract, then such party cannot be said to have substantially performed. *See id.* In analyzing whether a party's breach of contract was material, the Ohio Court of Appeals has used a "five-prong test" derived from section 241 of the *Restatement (Second) of Contracts (1981)*, describing the test as "prevailing law" and as a "more precise analysis" for determining the existence of a material breach than an examination of whether the failure to perform defeats the essential purpose of the contract. *O'Brien*,

---

[28] The actual investment of $139,265,597 divided by $114,480,000, the low estimate of the required capital investment of $127,200,000, equals 122%.

2007-Ohio-4833, at ¶ 60 (citing *Kersh v. Montgomery Dev. Ctr.*, 519 N.E.2d 665, 668

(Ohio Ct. App. 1987)).  Specifically, the Ohio Court of Appeals discussed the following:

> (a) the extent to which the injured party will be deprived of the benefit
> which he reasonably expected;
>
> (b) the extent to which the injured party can be adequately compensated
> for the part of that benefit of which he will be deprived;
>
> (c) the extent to which the party failing to perform . . . will suffer
> forfeiture;
>
> (d) the likelihood that the party failing to perform . . . will cure his failure,
> taking account of all the circumstances including any reasonable
> [adequate] assurances; [and]
>
> (e) the extent to which the behavior of the party failing to perform . . .
> comports with standards of good faith and fair dealing.

*O'Brien*, 2007-Ohio-4833, at ¶ 60.

First, regarding the extent to which Summit County would be deprived of its

reasonably expected benefits, Summit County expected Old Carco to invest in specified

machinery that would meet certain threshold amounts, as well as to "use reasonable

efforts to maintain" (Stip. 2 ¶ 7) a threshold number of full-time employees under the

2000 Agreement.  Moreover, Summit County expected Old Carco to comply with these

obligations for ten years.  In exchange for these benefits, Summit County granted Old

Carco the Exemption.  As noted, the Court finds that, consistent with the terms of the

2000 Agreement and the Stipulation, the 2000 Agreement expired on December 31,

2010, rather than December 31, 2011.  Therefore, Old Carco had complied with the 2000

Agreement for at least nine-and-a-half years of the ten-year term.  Hence, Summit

County has received at least ninety-five percent of its reasonably expected benefits under

the 2000 Agreement.  Thus, the prong that considers the extent to which Summit County

would be deprived of its reasonably expected benefits favors Old Carco.

Second, regarding the extent to which Old Carco could compensate Summit

County for failing to perform under the 2000 Agreement, the injury to Summit County is

economic and quantifiable.  If the alleged injury is non-economic, then the non-breaching

party cannot be fully compensated, and the breach may be characterized as material.  *See

O'Brien*, 2007-Ohio-4833, at ¶ 71 ("[B]ecause [defendant] OSU's injuries were mostly

non-economic, it was not possible to fully compensate them.  Although this factor weighs

in favor of OSU, the fact that the actual injuries attributed to [plaintiff] O'Brien's conduct

were insubstantial de-emphasizes the need to be fully compensated.").  The injured

party's difficulty in proving with "sufficient certainty" the amount of the loss affects the

adequacy of compensation.  *Restatement (Second) of Contracts* § 241 (1981).

Here, the economic damages as a result of the breach would equal the tax savings

corresponding to the remaining six months of the Exemption subsequent to the June 2010

breach.  However, since the relevant personal property tax was phased-out "as of, and for,

tax year 2009" (Stip. 4 ¶ 19), there would be no amount due for the remaining period of

the 2000 Agreement.[29]

Moreover, although the economic damage as a result of the failure to retain the

291 employees was not quantified by the Parties, such damage is quantifiable.  The 2000

Agreement provides for an estimated yearly payroll projection of $22,290,000.60

attributable to the retained positions at the Plant.  (2000 Agreement 3 ¶ 2.)  While it is

unclear whether the estimated payroll projection refers to the payroll of the 291

employees that Old Carco promised to exert reasonable efforts to retain or to the

---

[29] *See supra* notes 6 and 27.

combined payroll of the current employees and the 291 employees (*see id.*), it is clear

that the amount of the loss resulting from the unemployment of the 291 employees may

be established with sufficient certainty.[30]  Further, as noted, New Chrysler offered union

employees amounts ranging from approximately $50,000 to $115,000, which are

amounts in excess of what the employees were entitled to receive as retirees in

connection with the Plant closing.  (J. Suppl. Subm'n 2-4.)  Certain benefits were also

available to non-union employees.  (*Id.* at 5.)  The amounts ranging from approximately

$50,000 to $115,000 that were offered to union employees[31] offset the economic injury

suffered by Summit County and its citizens, which injury is quantifiable at a high amount

of $38,298.97 - half of each employee's annual salary - and which corresponds to the

remaining six months of the 2000 Agreement.[32]  The alleged injury to Summit County is

quantifiable and, given the goals of Summit County in entering into the Tax Exemption

Agreements - the employment of members of its community and the economic benefit of

higher employment - the economic injury resulting from the non-attainment of such goals

was likely offset by the amounts offered to the employees as part of their special benefits

package.  Therefore, the prong that considers the extent to which Old Carco could

compensate Summit County for failing to perform under the 2000 Agreement favors Old

Carco.

---

[30] If the estimated payroll projection of $22,290,000.60 refers to the 291 employees, then each employee was estimated to receive $76,597.94 annually.  Given these numbers, the economic damage resulting from the failure to retain the aforementioned employees for the remaining six months of the 2000 Agreement is $38,298.97, which is half of each employee's annual salary.  However, it is not clear whether the $22,290,000.60 projection is based upon a greater number of employees at the Plant than the 291 employee requirement under the 2000 Agreement.  Even if the estimated payroll projection refers to a greater number of employees, the amounts offered to union employees would appear to offset the economic injury suffered by Summit County and its citizens.

[31] The Court presumes that majority of the employees in the Plant were union-represented employees.

[32] *See supra* note 30.

Third, regarding the extent to which Old Carco, the party failing to perform, would suffer forfeiture if such failure to perform were treated as material, Old Carco would suffer substantial forfeiture while Summit County would receive a windfall. A finding that the party failing to perform would suffer substantial forfeiture should its breach be regarded as material supports the conclusion that the breach of the non-performing party is not material. *See Waste Mgmt., Inc. v. Rice Danis Indus.*, 257 F. Supp. 2d 1076, 1085 (S.D. Ohio 2003) (finding that a conclusion that defendant's breach was material would not cause defendant to suffer the forfeiture of a right it otherwise would have had, and, ultimately, finding that defendant was in material breach of its agreement). *Accord Restatement (Second) of Contracts* § 241 (1981) ("[T]he failure is more likely to be regarded as material if such preparation or performance as has taken place can be returned to and salvaged by the party failing to perform or tender, and less likely to be regarded as material if it cannot."). If the breach were treated as material, on the one hand, Old Carco would have invested substantial amounts in machinery and equipment as well as retained the specified number of employees for at least nine-and-a-half years, and it would still be required to repay the entire amount of taxes previously exempted. Further, the annual administrative fee that Old Carco was obligated to pay for each year that the 2000 Agreement was effective (*see* Stip. 4 ¶ 20) arguably may not be refundable or be used as a credit against the amount of tax exempted.[33] Summit County, on the other hand, for at least nine-and-a-half-years, would have received the benefits of the capital investment, the employment of members of its community, the annual administrative fee, and it would still be entitled to the full amount of the taxes previously

---

[33] The administrative fee would not have been payable absent an exemption. (*See* 2000 Agreement 4 ¶ 6; Stip. 4 ¶ 20.)

exempted.  Therefore, Old Carco would suffer substantial forfeiture if its alleged failure to comply with the 2000 Agreement were treated as material.  Thus, the prong that considers the extent to which Old Carco would suffer forfeiture if its failure to perform were treated as material favors Old Carco.

Fourth, regarding the likelihood of Old Carco curing its alleged breach of the 2000 Agreement, taking into account all of the circumstances and Old Carco's bankruptcy filing, there is no possibility of a cure because the Plant has closed and the positions have been eliminated.  The likelihood of a cure supports a finding that the breach is not material.  *Restatement (Second) of Contracts* § 241 (1981) ("The fact that the injured party already has some security for the other party's performance argues against a determination that the failure is material.").  This factor weighs in favor of Summit County.  However, as noted, when the alleged breach occurred in June 2010, Summit County had already completely phased-out its personal property tax.  Under this reasoning, there would be no amount due for the remaining period of the 2000 Agreement.[34]

Moreover, any economic injury due to the termination of the employees was offset by the amounts offered to the employees as part of their special benefits package.  This finding diminishes the significance of the fourth prong in light of the circumstances and the Court accords the fourth prong less weight.

Fifth, regarding the extent to which the behavior of Old Carco comports with standards of good faith and fair dealing, and bearing in mind that "there is an implied duty of good faith in every contract" *O'Brien*, 2007-Ohio-4833, at ¶ 62, there is no assertion that Old Carco acted in any manner other than in good faith.  Further, as noted,

---

[34] *See supra* notes 6 and 27.

throughout the period at issue, Old Carco exerted efforts to comply with its obligations.

Moreover, the determination by New Chrysler not to continue operations at the Plant was

not caused by any action or omission of Old Carco.  Given Old Carco's fulfillment of the

terms of its bargain for nine-and-a-half years under the 2000 Agreement, the Court finds

that Old Carco has complied with the terms of the 2000 Agreement in good faith.  Thus,

the prong that considers the extent to which the behavior of Old Carco comports with

standards of good faith and fair dealing favors Old Carco.

Therefore, having weighed the factors under the "five-prong test" for the

existence of a material breach, the Court concludes that any alleged breach of the 2000

Agreement is non-material in that Old Carco has substantially complied with its

obligations.

Ordinarily, contract damages are based on the injured party's "expectation

interest" and are aimed at "giv[ing] him the benefit of his bargain by awarding him a sum

of money that will, to the extent possible, put him in as good a position as he would have

been in had the contract been performed." *Restatement (Second) of Contracts* § 347

(1981).  Under the doctrine of substantial compliance, "the substantially performing party

may be required to pay damages to compensate the other party for the incomplete

performance."  6 Hon. Michael M. Baylson et al., *Bus. & Com. Litig. Fed. Cts.* § 68:27

(Robert L. Haig, ed., 2d ed. 2010) (citing 17A *Am. Jur.* 2d *Contracts* §§ 611-620).  The

doctrine "will support a recovery of the contract price less allowance for defects in

performance or damages for failure to strictly comply with the contract." *Hansel*, 772

N.E.2d at 141 (citations omitted).  Because Old Carco has only substantially complied

with the 2000 Agreement, the Fiscal Officer would be entitled to collect that portion of

the taxes corresponding to the period of the Exemption subsequent to the alleged June 2010 breach. The Stipulation provides that "the phase-out of Ohio personal property tax was complete as of, and for, tax year 2009." (Stip. 4 ¶ 19.) The Stipulation also provides that "for tax year 2009 and each tax year thereafter, [personal property is to be listed and assessed tax at] zero percent of true value." (*Id.* at ¶ 18.) Therefore, even if the Fiscal Officer could collect a portion of the taxes previously exempted corresponding to the remaining six months that the 2000 Agreement remained in effect, given the tax phase-out, such amount would be zero based on the zero-percent tax rate. Since the amount of damages would be zero under the 2000 Agreement, the Court would grant the Debtor's request to disallow the 2000 Agreement Claim on the basis of the substantial performance doctrine.[35]

### The 2000 Agreement Claim Is Not a Tax under Section 507(a)(8)

The Trust argues that, even if the Court were to find that the Claims are valid, the Claims are general unsecured non-priority claims because they are not taxes under the clear terms of the Tax Exemption Agreements and do not fall under section 507(a)(8) of the Bankruptcy Code. The Trust argues that the Claims are not taxes because the Tax Exemption Agreements only refer to a repayment of the *amount* of taxes, rather than specifically characterizing the amounts as taxes.

The Trust also argues that, had the Tax Exemption Agreements included language imposing a lien on the amount of abated tax, as was authorized under the enabling statute, such lien would be "a generic mortgage interest in real property or a security interest in goods, not a tax lien." (Amend. Obj. 16-17 ¶ 31; Reply 9 ¶ 13 n.7.) This contention

---

[35] *See supra* notes 6 and 27.

therefore supports the argument that any claim under the agreements is for damages and is not a tax.

The Fiscal Officer counters that the Claims are taxes because, inter alia, as with any other personal property tax, the amounts collected would be used for public purposes and are, therefore, entitled to priority status under section 507(a)(8) of the Bankruptcy Code. Additionally, the Fiscal Officer argues that the fact that the Tax Exemption Agreements do not provide for Summit County to receive a lien to secure repayment of the taxes does not change the nature of the Claims from a tax to a damage claim.

There is no dispute that, absent the Tax Exemption Agreements, the amounts due under the Personal Property Tax Law would be characterized as a tax. The issue is whether damages flowing from a material breach of a tax exemption agreement based on the amount of taxes previously exempted should be characterized as a tax and subject to priority tax status under section 507(a)(8) of the Bankruptcy Code.

"The role of courts in examining contracts is to ascertain the intent of the parties." *City of St. Marys v. Auglaize Cnty. Bd. of Comm'rs*, 115 Ohio St. 3d 387, 2007-Ohio-5026, 875 N.E.2d 561, at ¶ 18. The court presumes that the parties' intent is contained in the language they chose to use in their contract. *Graham v. Drydock Coal Co.*, 667 N.E.2d 949, 952 (Ohio 1996). "Where the terms in a contract are not ambiguous, courts are constrained to apply the plain language of the contract." *City of St. Marys*, 2007-Ohio-5026, at ¶ 18 (citation omitted). Contract language is ambiguous "only where its meaning cannot be determined from the four corners of the agreement or where the language is susceptible of two or more reasonable interpretations." *Savedoff v. Access Grp., Inc.*, 524 F.3d 754, 763 (6th Cir. 2008) (citations and internal quotation marks

omitted) (applying Ohio law).  The ambiguity must be "apparent on the face of the

contract."  *Id.* (citation and internal quotation marks omitted).  Where contract language

is susceptible of two interpretations, that interpretation "which makes a rational and

probable agreement must be preferred."  *Graham*, 667 N.E.2d at 954.  If the terms of a

contract are ambiguous "or when circumstances surrounding the agreement give the plain

language special meaning[,]" a court may ascertain the parties' intent based on extrinsic

evidence.  *Savedoff*, 524 F.3d at 763 (citations and internal quotation marks omitted).  If,

however, the terms of a contract are silent as to a particular matter, the parties must fill in

any gaps with good faith and courts should not "formulate a new contract for the parties."

*Id.* at 764 (citations and internal quotation marks omitted).

As correctly pointed out by the Trust, the Tax Exemption Agreements "sound[] in

contract" (Tr. 32:5) because, as provided under paragraph 10 of the Tax Exemption

Agreements, the repayment of the amount of taxes would be a consequence of any

potential material breach.  The Tax Exemption Agreements themselves do not

specifically characterize the repayment of the amount of taxes as a tax, nor has the Fiscal

Officer provided any statutory authority for labeling the amount of taxes previously

exempt as a tax, other than concluding that the agreements "speak[] of taxes."  (Amend.

Resp. 9.)  Because the Tax Exemption Agreements do not characterize the repayment of

the amount of taxes as a tax, and because the repayment of such amount would be a

consequence of any potential material breach, the interpretation yielding a rational and

probable result is that such amount is properly characterized as a contract damage claim.

Further, the legislative grant of tax exemptions, if containing the essential

elements of a contract, is a contract within the purview of the contract clause of the

Federal Constitution and of similar provisions in state constitutions.  *See New Jersey v. Wilson*, 11 U.S. 164, 165-67 (1812), *cited in* A. W. Gans, *Tax Exemptions & the Contract Clause*, 173 A.L.R. 15 § 3 (originally published 1948) (Westlaw 2011).  *Accord Jefferson Branch Bank v. Skelly*, 66 U.S. 436, 441-42 (1861).  "A contract is (1) an agreement, (2) with consideration (i.e., quid pro quo), (3) between two or more parties, . . . (4) to do or not to do a particular thing."  *O'Brien*, 2007-Ohio-4833, at ¶ 44 (citing *Powell v. Grant Med. Ctr.*, 771 N.E.2d 874, 881, at ¶ 27 (Ohio Ct. App. 2002) (quoting in turn *Nilavar v. Osborn*, 738 N.E.2d 1271, 1281 (Ohio Ct. App. 2000) (quoting in turn *Lawler v. Burt*, 7 Ohio St. 340, 350 (Ohio 1857)))).  The 2000 Agreement between Summit County and Old Carco satisfies the abovementioned agreement requirement.  In consideration of the economic benefits Summit County would derive from Old Carco's investment in machinery and equipment in the Plant, as well as the reasonable efforts exerted for the retention of the specified number of employees, Summit County would provide the Exemption for ten years.  In consideration of the Exemption, Old Carco would, for ten years, make the required investments and use reasonable efforts to retain the required number of employees.  Therefore, the 2000 Agreement Claim is based on a breach of contract provision that constitutes a contract damage claim.

Regarding the lien issue, the Court notes that the Fiscal Officer misconstrues the Trust's argument.  The Trust's argument is not that a lien should be imposed, but that, had a lien actually been imposed, an examination of the enabling statute reveals that such lien would not be a tax lien but would operate in the same manner as a security interest in goods.  According to the Trust, Summit County's inability to secure the Claims with tax liens supports the fact that the Claims are not taxes.  This assertion is not addressed by

the Fiscal Officer.  Moreover, such assertion supports the conclusion that if the Ohio

Legislature had considered the repayment of the amount of taxes in the event of a

material breach as a tax itself, then the Ohio Legislature would have enabled a county to

provide for the benefits of a tax lien to secure the repayment.  On the contrary, rather than

providing the protection of a tax lien, the Ohio Legislature, in the enabling statute,

provided the protection of a commercial lien to secure the repayment of the amount of

taxes.

   The Court is persuaded by the Trust's argument.  Where contract language is

susceptible of two interpretations, that interpretation "which makes a rational and

probable agreement must be preferred."  *Graham*, 667 N.E.2d at 954 (citation and

internal quotation marks omitted).  Here, in view of the enabling statute, it is reasonable

to conclude that the 2000 Agreement Claim is a simple breach of contract claim.  First,

according to section 5709.631(B)(12) of the Ohio Code, the 2000 Agreement may

include, in the event of a material breach as provided for in section 5709.631(B)(7) of the

Ohio Code, a provision for "the repayment of the amount of taxes that would have been

payable had the property not been exempted from taxation under [the 2000 Agreement]."

Ohio Rev. Code Ann. § 5709.631(B)(12) (West 2010).  Second, if the 2000 Agreement

contains a provision for repayment of the amount of taxes, then Summit County *may*

include language "secur[ing] repayment of such taxes by a lien on the exempted property

in the amount required to be paid."  *Id.*  Third, "[s]uch a lien . . . shall attach, and may be

perfected, collected, and enforced, *in the same manner as a security interest in goods*

*under Chapter 1309[] of the [Ohio] Revised Code*, and shall otherwise have the *same*

*force and effect as such a security interest*."  *Id.*  (Emphasis supplied.)  Moreover, if the

54

Ohio Legislature had intended for the repayment of the amount of taxes previously exempted to be considered a tax, then it would be consistent with that intent to allow for the imposition of a tax lien in the event of a material breach, as well as the corresponding benefits and remedies accorded to a tax. However, rather than allowing the parties to enter into an agreement that would impose a tax lien, the Ohio Legislature specifically provided that the lien imposed on the exempted property would have "the same force and effect" of a "security interest in goods under Chapter 1309[] of the [Ohio] Revised Code." *Id.*

There are substantial differences between a tax lien imposed under chapter 5719 of title 57 of the Ohio Code ("Chapter 5719") and a lien imposed under chapter 1309 of title 13 of the Ohio Code ("Chapter 1309"). Under Chapter 5719, taxes levied against personal property and charged on a tax duplicate[36] are a lien on the *real property* of the taxpayer charged with such taxes, from the date of the filing of the notice of such lien. Ohio Rev. Code Ann. § 5719.01 (West 2011). The lien imposed is a "blanket notice type lien[,]" and there is no need to describe particular real property in order to effect the lien of delinquent personal property taxes. Kenton L. Kuehnle & Jack S. Levey, *Baldwin's Ohio Prac. Real Est.* § 12:1 (West Supp. 2010-2011). Specific publication requirements must be met to properly perfect the lien, otherwise, the lien is invalid. *Crown Pipe & Foundry, Inc. v. Davis*, 167 N.E.2d 390, 394 (Ohio Com. Pl. 1960).

Chapter 5719 also empowers the county treasurer, when the taxpayer's personal property taxes are past due and unpaid, to seize or distrain the goods and chattels of such taxpayer that are located in the county and to sell such goods and chattels, subject to

---

[36] "Tax duplicates" are prepared by the county auditor and are duplicates of the tax list containing a list of the general personal and classified property taxes that remain unpaid. *See* Ohio Rev. Code Ann. § 5719.04(A) (West 2011).

specific publication requirements.  Ohio Rev. Code Ann. § 5719.081 (West 2011).  If the

county treasurer cannot collect the personal property taxes by distraint, section 5719.082

provides for a remedy in which the county treasurer may have the court of common pleas

of the respective county enter a "rule" that has the force and effect of a judgment against

the taxpayer for payment of such taxes.  *Id.* § 5719.082.  Concurrently, the county

treasurer must bring a civil action against the taxpayer for the recovery of unpaid

personal property taxes, and such remedy is in addition to any other remedy provided by

law for the collection of taxes, such as entering into a delinquent tax contract with the

taxpayer for payment of the full amount of taxes in installments.  *Id.* §§ 5719.05,

5719.08.

Chapter 1309 on secured transactions, which adopts the provisions of Revised

Article 9 of the Uniform Commercial Code, provides for (i) the attachment of the security

interest to the collateral, *id.* § 1309.203, in contrast to a lien on the real property of the

taxpayer, in the case of a tax lien;[37] (ii) the perfection of such security interest in the

collateral, which generally requires the filing of a financing statement, *id.* § 1309.310(A),

unless, inter alia, the secured party has taken possession of the collateral, *see id.* §

1309.313(A); and (iii) the rights of a secured party after default, *id.* §§ 1309.601-.628.

Among other remedies, the secured party may, after default:  (a) "reduce a claim to

judgment, foreclose, or otherwise enforce the claim, security interest . . . by any available

judicial procedure . . ."  *id.* § 1309.601(A)(1); (b) "take possession of the collateral" or

---

[37] Attachment also gives the secured party the rights to proceeds of the collateral upon the sale or
disposition of such collateral as provided in section 1309.315.  Ohio Rev. Code Ann. § 1309.203(F) (West
2011).  Section 1309.315 on the secured party's rights on the disposition of the collateral and in the
proceeds provides that the security interest:  (i) continues in collateral notwithstanding sale or disposition of
such collateral unless the secured party authorizes sale or disposition free of such security interest; and (ii)
attaches to the identifiable proceeds of the collateral.  *Id.* § 1309.315(A)(1), (2).

"render equipment unusable and dispose of [such] collateral on a debtor's premises" *id.* §
1309.609(A), both judicially and extra-judicially, provided that, in the latter case, the
secured creditor "acts without breach of the peace" *id.* § 1309.609(B); and (c) sell, lease,
license, or otherwise dispose of collateral, *id.* § 1309.610(A), in a commercially
reasonable manner, *id.* § 1309.610(B), and subject to notice requirements under sections
1309.611 and 1309.613.

Further, while the sections relating to the 2000 Agreement are logically contained
in title 57 on Taxation of the Ohio Code, section 5709.631(B)(12) language relating to
the lien that could be imposed on the exempt property specifically refers to chapter 1309,
which is contained in title 13 of the Ohio Code on Commercial Transactions. This fact
evidences the intent of the Ohio Legislature, with respect to the imposition of a lien, to
provide for remedies under the Ohio Uniform Commercial Code rather than under title 57
on Taxation.

The substantial differences between the remedies available to the taxing authority
for the collection of unpaid taxes under Chapter 5719 and those available to the secured
creditor with a security interest in goods under Chapter 1309 support the assertion that,
had the Ohio Legislature considered the repayment of the amount of exempted taxes as a
tax, then the Ohio Legislature would have granted the local authority the power to accord
broader rights to the county treasurer, such as those provided in Chapter 5719, including,
inter alia, the power to impose a blanket notice type line, the power to collect personal
property taxes by distraint, and the power to bring a civil action for the recovery of
unpaid personal property taxes. However, section 5709.631(B)(12) of the Ohio Code
permits the inclusion of a provision for "the repayment of the amount of taxes that would

have been payable had the property not been exempted from taxation under [the 2000

Agreement,]" in the event of a material breach, and empowers local authority to secure

repayment with a lien in the character of a security interest in goods, rather than a tax

lien, *id.* § 5709.631(B)(12).  The enactment of section 5709.631(B)(12) demonstrates the

intent of the Ohio Legislature to treat any repayment of the amount subject of the

Exemption as a contract damage claim rather than a tax claim.

    To support the argument that the Claims are taxes, the Fiscal Officer emphasizes

that the repayment of the previously exempted taxes would be used for public purposes.

However, the Fiscal Officer overstates the analysis when he argues that any amount

collected that is used as a source for payment of public expenses is a tax.  As discussed

below, the Court agrees that while it is correct to state that taxes are collected for public

purposes, it is incorrect to state that all funds collected for public purposes are necessarily

taxes.

    "Whether an obligation is a 'tax' for bankruptcy purposes is a question of federal

law determined independently of whether or not it is denominated as such in the statute

from which it arises."  *City of New York v. Feiring*, 313 U.S. 283, 285 (1941), *cited in In

re Albert Lindley Lee Memorial Hosp.*, 428 B.R. 283, 288 (Bankr. N.D.N.Y. 2010).

When interpreting the priorities established under section 507 of the Bankruptcy Code,

the objective of affording equal distribution among similar creditors must be borne in

mind and priority status must be accorded only when "clearly authorized by Congress."

*Howard Delivery Serv., Inc. v. Zurich Am. Ins. Co.*, 547 U.S. 651, 655 (2006).  In the

context of the Bankruptcy Code, the Supreme Court has defined taxes as including "those

pecuniary burdens laid upon individuals or their property, regardless of their consent, for

the purpose of defraying the expenses of government or of undertakings authorized by

it." *Feiring*, 313 U.S. at 285, *quoted in Yoder v. Ohio Bureau of Workers' Comp.* (*In re*

*Suburban Motor Freight, Inc.*), 998 F.2d 338, 339 (6th Cir. 1993) ("*Suburban I*").

In *Suburban I*, the Sixth Circuit discussed the four elements (the "Lorber

Elements") set forth in a Ninth Circuit case. *Suburban I*, 998 F.2d at 340 (discussing

*Cnty. Sanitation Dist. No. 2 of L.A. Cnty. v. Lorber Indus. of Cal. Inc.* (*In re Lorber*

*Indus. of Cal.*), 675 F.2d 1062 (9th Cir. 1982)). The *Lorber* court held that to qualify as a

tax for priority purposes, the debt must be:

> (a) An involuntary pecuniary burden, regardless of name, laid upon
> individuals or property;
> (b) Imposed by, or under the authority of the legislature;
> (c) For public purposes, including the purposes of defraying expenses of
> government or undertakings authorized by it; [and]
> (d) Under the police or taxing power of the state.

675 F.2d at 1066.

*Suburban I* criticized the Lorber Elements, and the "public purposes" prong, in

particular, as being too broad. *See Suburban I*, 998 F.2d at 341. In its critique, the court

in *Suburban I* noted that, "all money collected by the Government goes toward defraying

its expenses, and is used for public purposes. The threat of the *Lorber* reasoning . . . is

that the Government automatically wins priority for all money any debtor owes it,

regardless of the nature of the payments." *Id.* In addition, the *Suburban I* court observed

that "overemphasis on the 'public purposes' element will eliminate all distinction

between 'taxes' and 'fees' or other money owed the Government, enabling the

Government to prevail consistently against private creditors with arguably equal claims."

*Id.* According to *Suburban I*, while it is accurate to state that "all taxes are collected for

public purposes," *id.* at 342, it is incorrect to state that "all funds collected for public

purposes are taxes" *id.*  In a later case involving the same parties, the Sixth Circuit noted

that while the Lorber Elements had to be satisfied in order to accord a claim priority tax

status, its prior *Suburban I* decision raised two additional concerns:  (a) equal treatment

to similarly situated entities (the "universality requirement"); and (b) consideration of

whether priority treatment accorded to a government claim disadvantages private

creditors with similar claims.  *Ohio Bureau of Workers' Comp. v. Yoder* (*In re Suburban

Motor Freight, Inc.*), 36 F.3d 484, 488 (6th Cir. 1994) ("*Suburban II*").  Further, in

*Suburban II*, the Sixth Circuit noted that "[w]hether an obligation is a tax within the

meaning of the Bankruptcy Code is determined by federal law."  *Id.* at 487 (citations

omitted).

　　　　After the *Suburban* cases, the Supreme Court had occasion to address the issue of

tax priority further in *United States v. Reorganized CF & I Fabricators of Utah, Inc.*, 518

U.S. 213 (1996).  In *Reorganized CF & I*, the Supreme Court considered whether an

underfunded pension liability was an excise tax, and therefore subject to priority under

the Bankruptcy Code.  *Id.* at 215, 216.  In denying priority status, the Supreme Court

observed that in prior cases before it, "the Court looked behind the label placed on the

exaction and rested its answer directly on the operation of the provision using the term in

question."  *Id.* at 220.  After conducting a "functional examination" of the relevant

statutory provision, *id.* at 224-26, the Supreme Court concluded that the provision on

which the claim was based served a "patently punitive function" *id.* at 226, and "must be

treated as imposing a penalty, not authorizing a tax."  *Id.*

　　　　As noted, the 2000 Agreement itself is a contract, and, if the Court were to extend

the "functional examination" adopted by the Supreme Court in *Reorganized CF & I*, 518

U.S. at 224-26, analysis of paragraph 10 of the 2000 Agreement yields the conclusion that "*repayment* of the amount of taxes" may be required only if Old Carco first materially breaches the 2000 Agreement.  (2000 Agreement ¶ 10 (emphasis supplied).) If, following *Reorganized CF & I*, the Court looks at "the operation of the provision using the term in question," *id.* at 220, then the Court can only conclude that the 2000 Agreement Claim is a damage claim that arises under contract law.

Thus, the 2000 Agreement Claim is based on a breach of contract provision that constitutes a simple damage claim and would not be entitled to priority under the Bankruptcy Code.[38]

## V. Conclusion

The alleged breach occurred in June 2010 as a result of the closing of the Plant. The 1999 Agreement expired by its terms prior to the alleged breach in June 2010. Because there was no contract in force at the time of the alleged breach, the 1999 Agreement Claim should be disallowed and expunged.  However, if the 1999 Agreement were found to have expired on December 31, 2010, the Court's findings with respect to the 2000 Agreement would be wholly applicable to the 1999 Agreement.  With respect to the 2000 Agreement, the "change to economic conditions" clause in that agreement excused performance by Old Carco; accordingly, the 2000 Agreement Claim should also be disallowed and expunged.  Alternatively, even if Old Carco's alleged breach of the 2000 Agreement were not excused, the Court finds that the alleged breach is non-material

---

[38] The Trust further argues that, if the Claims were characterized as property taxes instead of damages based on a breach of contract, priority treatment only applies to the property tax "last payable without penalty after one year before the date of the filing of the petition[.]"  (Reply 9-10 ¶ 14 (quoting 11 U.S.C. § 507(a)(8)(B).)  The Fiscal Officer does not respond to this issue either in the Amended Response or during the Hearing.  Because the Court finds that the 2000 Agreement Claim is not a tax under the final alternative argument, the Court does not reach the issue of which portion of the property tax is entitled to priority tax status.

in that Old Carco has substantially complied with its obligations under that agreement.

Thus, under this alternative, Summit County would be entitled only to damages

corresponding to the period of the Exemption subsequent to the alleged breach.

However, because Summit County had completely phased-out its personal property taxes

prior to the alleged breach in June 2010, no amount would be due corresponding to the

remaining term of the 2000 Agreement.[39]  Finally, even if the Court were to allow the

2000 Agreement Claim, in whole or in part, the claim would not be a tax and, therefore,

would not be entitled to priority under section 507(a)(8) of the Bankruptcy Code.  The

claim would instead be reclassified as a general unsecured claim.[40]

      For the foregoing reasons, the Trust's Amended Objection is granted.  Counsel for

the Trust is to settle an order consistent with this opinion.


Dated:  New York, New York
      July 25, 2011


                          **s/Arthur J. Gonzalez**
                          ARTHUR J. GONZALEZ
                          CHIEF UNITED STATES BANKRUPTCY JUDGE

---

[39] *See supra* note 6.
[40] *See supra* note 7.