UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

_____

|  |  |  |
|---|---|---|
| In re | : | Chapter 11 |
|  | : |  |
| OLD CARCO LLC | : | Case No. 09-50002 (AJG) |
| (f/k/a CHRYSLER LLC), *et al.*, | : | Confirmed Cases |
|  | : |  |
| Debtors. | : |  |
|  | : |  |

_____

OPINION (I) DISALLOWING AND EXPUNGING (A) DUPLICATE CLAIM NUMBERS 27949, 27951, 28551 AND 28552 OF DYNASTY INTERNATIONAL LLC, AND (B) CLAIM NUMBER 28553 OF BRUCE M. ABRAHAMSON; AND (II) RECLASSIFYING SURVIVING CLAIM NUMBER 28554 OF BRUCE M. ABRAHAMSON

In the matter before the Court, the Old Carco Liquidation Trust (the "Trust"), as successor in interest to Old Carco LLC f/k/a Chrysler LLC ("Old Carco") and its affiliated debtors and debtors in possession (collectively with Old Carco, the "Debtors") objects to certain proofs of claim seeking administrative expense priority filed by Dynasty International LLC ("Dynasty") and Bruce M. Abrahamson ("Abrahamson" or "Claimant"). Specifically, the Trust seeks the disallowance and expungement in their entirety of all but one of the proofs of claim, as duplicative of the remaining claim. In addition, the Trust seeks to have the remaining claim reclassified as an unsecured claim, for later determination, if necessary, of its validity and amount.

*Procedural Background*

On April 30, 2009 (the "Petition Date"), Old Carco and certain of its domestic direct and indirect subsidiaries (the "Original Debtors") filed for protection under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). On May 19, 2009, an additional affiliate filed a petition for relief under title 11. Pursuant to orders entered by the Court, the Debtors' cases were jointly administered for procedural purposes, in accordance with Rule 1015(a) of the

Federal Rules of Bankruptcy Procedure. On May 5, 2009, an Official Committee of Unsecured Creditors (the "Creditors' Committee") was formed. By order, dated August 6, 2009, certain deadlines were set for filing claims against the Debtors' estates. The deadline to assert pre-petition claims was set as September 28, 2009. The last date set for filing any claims arising from or relating to the rejection of an executory contract and unexpired lease, as well as other claims related to such rejected agreement, including administrative claims under section 503(b) of the Bankruptcy Code, was set as the later of (a) September 28, 2009, or (b) a date that was 30 days after entry of the order rejecting the relevant contract or lease. On November 19, 2009, the Court entered an order (the "Claim Procedures Order") setting forth, among other things, procedures for settling and objecting to claims. On April 23, 2010, an order confirming the Second Amended Joint Plan of Liquidation of Debtors and Debtors in Possession, as Modified (the "Debtors' Plan"), was entered on the docket of the jointly administered cases. The Debtors' Plan became effective on April 30, 2010. Pursuant to the Debtors' Plan, a Liquidation Trust (the "Trust") was formed.

*The Leased Premises*

Prior to the Petition Date, pursuant to a lease, dated October 10, 1972 (the "Lease"), one of the Debtors, Chrysler Realty Corporation ("CRC"), leased certain premises (the Premises") located in Indiana from the Claimant's predecessors in interest, his parents. The Lease term was for twenty-five years commencing in October 1972 and ending in September, 1997. The Lease contained five options to renew, each for an additional five-year term. CRC had availed itself of the first three renewal options and, as of the Petition Date, the Lease was set to expire in September 2012 and had two remaining five-year renewal options. The Lease specified that the

Premises were to be used "primarily for the unrestricted use as an automobile sales and service establishment . . or for any other lawful purposes." The Lease permitted CRC to sublet or assign the premises [Lease ¶ 7], and CRC availed itself of that privilege, at no relevant time occupying the Premises.

During the period relevant to this matter, in accordance with ¶ 7 of the Lease,[1] which permitted CRC to sublet "to a franchised dealer of Chrysler products," CRC sublet the Premises to a dealership, Thomas Dodge Chrysler Jeep of Highland, Inc. (the "Subtenant").

The Lease contained a clause entitled "Covenants to Repair and Take Care of Premises, which required that the

> Tenant shall make all repairs necessary to keep the demised premises and the buildings and appurtenances situated thereon in as good order and condition as when delivered to it except exterior and structure repairs, repairs to the roof, and such other repairs as may be necessary by reason of ordinary wear and tear which Landlord shall make.

Lease ¶ 4.

*Pre-Petition Lawsuit*

Also prior to the Petition Date, in 2006, Abrahamson commenced a lawsuit (the "Pre-Petition Lawsuit") in an Illinois state court against CRC and other parties, alleging that the defendants were responsible for severe and intentional damages to the Premises. After the defendants in the Pre-Petition Lawsuit removed the action to the United States District Court for the Northern District of Illinois, Abrahamson amended the complaint and, among other things,

---

[1] Paragraph 7 of the Lease, entitled Assignment and Subletting provided that
Tenant shall not assign this lease or sublet the premises without the written consent of the Landlord, such consent not to be unreasonably withheld, except such assignment or subletting be to a corporation then owned or controlled by the Tenant or to Chrysler Corporation or to a corporation owned or controlled by Chrysler Corporation or to any subsidiary of Chrysler Corporation or to a franchised dealer of Chrysler products, or to any other financially responsible party.

added the Subtenant as a defendant. During the course of this litigation, on January 31, 2007, CRC and Abrahamson entered into a tolling agreement (the "Standstill Agreement"), pursuant to which CRC would not make further repairs to the Premises and Abrahamson would not request any additional repairs be made to the Premises until further agreement of the parties. The following year, the Illinois District Court granted an oral motion made by Abrahamson at a hearing it conducted on April 8, 2008, for dismissal, without prejudice, of the Pre-Petition Lawsuit.

*Duplicative Claims*

Prior to Confirmation of the Debtors' Plan, Abrahamson and Dynasty filed numerous proofs of claim, some against Old Carco and some against CRC. All of the proofs of claim filed by Abrahamson and Dynasty rely upon sections 503(b) and 507(1)(2) of the Bankruptcy Code to seek administrative priority for the identical amount, and all of the proofs of claim are based upon identical damage claims related to the Premises.

The Debtors filed an Objection, dated April 9, 2010, pursuant to sections 105 and 502 of the Bankruptcy Code, Federal Rule of Bankruptcy Procedure 3007 and the Claim Procedures Order entered in these cases, seeking to disallow, as duplicative, proof of claim numbers 27949, 27951, 28551, and 28552 (the "Dynasty Claims"), filed by Dynasty; and proof of claim number 28553 (together with the Dynasty Claims, the "Duplicative Claims"), filed by Abrahamson.[2] In addition, in the Objection, the Debtors sought to have Abrahamson's proof of claim number 28554 reclassified as a general unsecured, nonpriority claim. As successor to the Debtors, the

---

[2]As the result of a previous omnibus objection filed by the Debtors, the Court entered an order, dated January 21, 2010, disallowing and expunging two additional duplicative proofs of claim filed by Abrahamson (proof of claim numbers 27950 and 27952).

Trust has continued to prosecute the Objection.

The confirmation of the Debtors' Plan, as relevant here, resulted in the consolidation of all of the Debtors' estates for distribution purposes, thereby eliminating the need for claims to be asserted against multiple Debtors. Abrahamson has not contested that the filed proofs of claim are identical, nor has he set forth any reason for not disallowing and expunging any duplicative claims. As such, the Duplicative Claims are disallowed and expunged.

*Request for Administrative Priority*

In the remaining proof of claim, number 28554, against CRC, the Claimant seeks administrative priority for its claim based upon alleged damages to the Premises. Although the damages asserted in the proof of claim appear to reflect the damages that the Claimant sought in the Pre-Petition Lawsuit, the Claimant asserts that there was additional damage to the Premises post-petition. The Claimant, however, does not indicate what portion of the alleged damages he seeks to allocate to the post-petition period.

As noted, the Trust objects to the request for administrative status for the claim, arguing that the Claimant has not established a basis for administrative priority for his claim. As such, the Trust maintains that proof of claim number 28554 should be reclassified as a general unsecured, nonpriority claim, subject to future determination of its proper amount, if any, pursuant to section 502 of the Bankruptcy Code.

*Administrative Expense Priority*

Traditional Criteria

Section 503(b)(1)(A) of the Bankruptcy Code provides a priority for "the actual, necessary costs and expenses of preserving the estate . . . for services rendered after the

5

commencement of the case." Pursuant to section 507(a)(2) of the Bankruptcy Code, these expenses for administering the estate are afforded a second priority.

> Ordinarily, an expense will be accorded administrative status
>
> 1) if it arises out of a transaction between the creditor and the bankrupt's trustee or debtor-in-possession; and
> 2) only to the extent that the consideration supporting the claimant's right to payment was both supplied to and beneficial to the debtor-in-possession in the operation of the business.

*Amalgamated Ins. Fund v. McFarlin's Inc.*, 789 F.2d 98, 101 (2d Cir. 1986), *see also Cramer v. Mammoth Mart, Inc. (In re Mammoth Mart, Inc.)*, 536 F.2d 950, 954 (1st Cir. 1976).

The services performed by the claimant must have been "induced" by the debtor-in-possession, not the pre-petition debtor. *See In re Old Carco LLC*, 424 B.R. 633, 642 (Bankr. S.D.N.Y. 2010 (citations omitted). Where a "debtor-in-possession elects to continue to receive benefits from the other party to an executory contract pending a decision to assume or reject the contract, the debtor-in-possession is obligated to pay for the reasonable value of those services." *Id.* Therefore, the claims of third parties who are induced to supply goods or services to a debtor-in-possession pursuant to a contract that has not been rejected are afforded administrative priority to the extent that the consideration supporting the claim was supplied during the reorganization. *Id.* The claimant has the burden of establishing entitlement to the priority. *See In re Drexel Burnham Lambert Group Inc.*, 134 B.R. 482, 489 (Bankr. S.D.N.Y. 1991*).*

Priority, however, is not afforded a claim merely because the right to payment arises post-petition. *See Amalgamated Ins. Fund*, 789 B.R. at 101. Thus, where there is a pre-petition contract or lease, and the consideration supporting the claim is supplied pre-petition, courts have determined that those claims are not entitled to administrative priority, even if the right to

6

payment arises post-petition. *See e.g., Amalgamated Ins. Fund*, 789 B.R. at 101-104 (holding that a required lump sum payment, imposed as liability to withdraw from a multi-employer pension fund, is not entitled to administrative priority even where the payment was due post-petition because the consideration supporting the withdrawal liability is the past (pre-petition) labor of the covered employee).

Moreover, in light of the bankruptcy goal of providing equal distribution of a debtor's assets to all creditors, "statutory priorities, such as those resulting from administrative expense treatment, are narrowly construed." *In re Ames Dept. Stores, Inc.*, 306 B.R. 43, 54 (Bankr. S.D.N.Y. 2004) (citing *Amalgamated Ins. Fund*, 789 F.2d at 101). Strictly construing the terms "actual" and "necessary" minimizes administrative expense claims, thereby preserving the estate for the benefit of all creditors. *See Drexel*, 134 B.R. at 488.

The *Reading Co*. Line of Cases

An exception to the requirement that there be an actual benefit to the estate before a claim can be accorded administrative priority has developed in the context of torts committed by the trustee or debtor-in-possession during the course of a chapter 11 proceeding. *See In re Puerto Rican Food Corp.*, 41 B.R. 565, 572-73 (Bankr. E.D.N.Y. 1984) (citing *Reading Co. v. Brown*, 391 U.S. 471, 482, 88 S. Ct. 1759, 1765, 20 L. Ed.2d 751 (1968)) (other citations omitted). In addition, courts have accorded administrative priority to certain claims to further the goal of environmental protection. *See Alabama Surface Mining. Comm. v. C. Michael Stilson (In re N.P. Mining Co., Inc.)* 963 F.2d 1449, 1457-59 (11th Cir. 1992) (discussing cases).

*Rejection of Lease*

On the Petition Date, the Debtors filed a motion (the "Rejection Motion") seeking to reject a number of leases effective as of the Petition Date, including the Lease. The Original Debtors served notice of the Rejection Motion at the last known address reflected in their records for the owner of the Premises. By order, dated May 20, 2009 (the "Rejection Order"), the Court approved the rejection of the Lease.

Section 365(a) of the Bankruptcy Code affords a debtor the statutory right to reject an unexpired lease, thereby relieving a debtor of the duty of continuing to perform on a burdensome contract. *In re Old Carco LLC*, 424 B.R. 633, 638 (Bankr. S.D.N.Y. 2010) (citations omitted). Further, any claim resulting from the rejection is treated as a pre-petition claim, and afforded general unsecured status. *Id.* at 639; 11 U.S.C. § 365(g).

Section 365(d)(3) of the Bankruptcy Code requires a trustee or debtor-in-possession to timely perform any obligations under an unexpired nonresidential lease "from and after the order for relief . . . until such lease is assumed or rejected." 11 U.S.C. § 365(d)(3). Here, however, the Court approved the Debtors' rejection of the Lease effective as of the Petition Date. Therefore, there is no post-petition, pre-rejection period.

Moreover, the Debtor did not occupy the Premises as it had been subleased to a franchise dealer. Once a debtor rejects a lease in which it is both a lessee under the primary lease and lessor under a sublease, that debtor cannot be liable for administrative expenses arising pursuant to such lease post-rejection. *Doral Commerce Park, Ltd. v. Teleglobe Communications Corp. (In re Teleglobe Communications Corp)*, 304 B.R. 79, 84 (D. Del. 2004) (*citing*, *Chatlos Systems, Inc v. Kaplan*, 147 B.R. 96 (D. De. 1992). The notice provided to a primary landlord of

8

a debtor-tenant's rejection of a lease places the primary landlord in control of the property with respect to the subtenant. *Chatlos* 147 B.R. at 100 (*citing In re United Cigar Stores*, 86 F.2d 629 (2d Cir. 1936). The *Chatlos* court reasoned that because the debtor-tenant had rejected the primary lease, it no longer had any "statutory, contractual or possessory rights in the property to enable it to evict the subtenant and, therefore, once the landlord under the primary lease receives notice of the order rejecting the primary lease, the debtor-tenant has "done everything possible to surrender the premises to [the landlord]." *Chatlos* 147 B.R. at 100. Upon the rejection of the primary lease concerning certain property by a debtor-tenant who is also a sublessor of that property, and absent an agreement between the primary landlord and the subtenant that provides otherwise, the relationship between the primary landlord and the subtenant would be determined by the law of state where the property is located. As such, the debtor-tenant's bankruptcy estate no longer has any "meaningful interest in the ultimate disposition of the Premises." *In re Dial-A-Tire, Inc.*, 78 B.R. 13, (Bankr. W.D.N.Y. 1987).

The Debtors sought to reject the Lease immediately upon filing the petitions and were granted that relief within 20 days of the Petition Date. There are no allegations to suggest that, since May 20, 2009, the Debtors did not act under the reasonable assumption that the Lease had been rejected as of the Petition Date. Therefore, once the Lease was rejected, tenant-sublessor CRC surrendered the Premises to the Claimant. After surrender of the Lease, there is no basis for a post-petition administrative claim against the Debtors. Any claims based upon alleged damages to the Premises after the rejection would appear to be against the Sublessor under state law.

In addition, any claim based upon damages to the Premises occurring pre-petition,

including those asserted in the Pre-Petition Lawsuit, as well as any damages resulting from the breach of the lease upon its rejection are not entitled to administrative priority. Rather, any such claims would be classified as non-priority, general unsecured claims.

The Claimant argues that the claim is entitled to administrative priority, nonetheless, because CRC benefitted by its rejection of the primary lease. First, the Claimant asserts that the Debtors benefitted post-petition from two pre-petition events: (i) entering into the Standstill Agreement in 2007 related to the Pre-Petition Lawsuit, and (ii) exercising the third renewal option in 2007, pursuant to the Lease. Although both of these events occurred pre-petition, the Claimant argues that the Debtors continued to reap the benefits of those two events post-petition because the Standstill Agreement allowed CRC to continue with its possessory interest in the Premises and the renewal afforded CRC the opportunity to continue to lease the Premises until September 2012.

Whatever benefits the Debtors derived from the two pre-petition events of entering into the Standstill Agreement and exercising the renewal option ceased once the Debtors rejected the Lease. Had CRC's rejection of the Lease been subsequent to the Petition Date, CRC would have been obligated for timely payments under the terms of the Lease until the rejection, thereby providing payment for any post-petition benefits received. Once the Lease is rejected, however, any claims based upon damages resulting from the breach of the Lease are not entitled to administrative priority.

Next, the Claimant argues that the Debtors benefitted from any continued use post-

petition by the Subtenant because the Subtenant was a Chrysler franchise dealer.[3]  As such, the Claimant contends that any use of the Premises by the Subtenant for the purpose of having Chrysler vehicles delivered to the property or prepared and stored there was in furtherance of the Debtors' business and therefore benefitted the Debtors' estates.

The Court previously determined that "the Debtors ceased production and operations as an automobile manufacturer upon the filing of the petitions . . . [and had] directed their efforts to maintaining the status quo until the conclusion of a sale of substantially all of the assets to a purchaser, which occurred within several weeks of the filing." *In re Old Carco LLC*, 424 B.R. 633, 646 (Bankr. S.D.N.Y. 2010).  The Claimant merely makes a conclusory assertion that the Debtors' vehicles were delivered and prepared at the Premises without further factual enhancement.  The Claimant does not even set forth any facts to support the contention that the Subtenant was operating a franchise on the Premises post-petition.[4]  Moreover, even if the Subtenant were operating a franchise at that location, absent any allegations that the Debtors operated that franchise or controlled it, any benefit to the Debtors would be too remote to confer administrative priority for a claim based upon alleged post-petition damage to the Premises, which at all relevant times would have been in the possession and control of the Subtenant, a non-debtor third-party.

---

[3] While the Claimant at one point asserted that CRC continued to occupy the property post-petition as tenant, presumably because he referred to the Subtenant's employees as on-site employees or agents of the Debtors; at other times, the Claimant asserted that it was the Subtenant that operated out of the Premises.  Further, in earlier pleadings filed with the Court, the Claimant argued that the Debtors could not have properly rejected the Lease as it was not a "routine dealership lease" because at the time of the rejection in 2009, according to the Claimant, the Premises had been vacant since 2007.

[4] The only fact that the Claimant presents concerning the post-petition period is his statement that he became aware sometime in late July 2009 that the Premises had been abandoned, at which time he inspected the Premises and saw extensive damage.  Thus, he has not presented any facts that would allow for a determination of when either the Subtenant vacated or any damage may have occurred.

The Claimant also argues that the Debtors benefitted because they filed a counterclaim against the Subtenant in the Pre-Petition Lawsuit seeking to compel reimbursement from the Subtenant to the extent the Debtors were found liable in the underlying action. The Claimant argues that the Debtors benefitted in that regard because the Debtors coerced such reimbursement by withholding the franchise dealer's receivables.

The Debtors, however, would only receive reimbursement for damages that they were required to pay to the Claimant, or for any expenses incurred, and there would be no net benefit to the Debtors. In any event, all of these claims relate to pre-petition activity and are not entitled to administrative priority.[5]

The Claimant makes numerous references to *Saddleback Valley Community Church v. El Toro Materials Co., Inc.*, 504 F.3d 978 (9th Cir. 2007), as supporting his position. The *El Toro* case, however, is inapposite as it concerned whether the cap on rejection damages pursuant to section 502(b)(6) of the Bankruptcy Code applied to damages that did not necessarily result from the rejection of the lease. The *El Toro* court specifically noted that it was not addressing the issue of the priority of the claim. *Id*. at 981 n.5 (noting that "[p]rioritization of the claim is a separate issue from determining the amount of the claim that will be permitted).

Finally, not having shown any benefit to the Debtors' estates that would warrant granting an administrative priority to his claim, the Claimant makes an effort to have his claim

---

[5] It appears that the Claimant is suggesting that any period during which the Subtenant remained operating on the Premises post-petition benefitted the Debtors because the Debtors would have had a source from which to offset any amounts due them. The alleged benefit is too remote. Moreover, the Claimant would have been compensated for any such benefit by receipt of timely payment of the rent. Prior to rejection of the Lease, the Debtors would have been obligated to make such timely rental payments. After the Lease was rejected, any claims for the Subtenant's continued occupation of the Premises would be between the Claimant and the Subtenant under state law.

categorized as a post-petition tort claim similar to those granted priority under the *Reading Co.* line of cases. The Claimant contends that there was intentional damage inflicted on the Premises post-petition. The Claimant asserts that this intentional damage was in retaliation for the filing of the Pre-Petition Lawsuit.

There has not been any plausible showing that the Debtors occupied the Premises Post-Petition to warrant an evidentiary hearing concerning the issue. Pursuant to Court order, the Debtors rejected the Lease effective the Petition Date. As a consequence of the sublease between CRC and the Subtenant, that rejection operated as a surrender of the Premises to the Claimant. Thereafter, absent any agreement between the Claimant and the Subtenant, their relationship was governed by state law.

Moreover, the Claimant has made no effort to distinguish the alleged pre-petition and post-petition damage - he has not specified or even alleged, what portion of the damage should be allocated to the post-petition period. Further, the Claimant does not set forth any facts to support his contention that the Debtors caused the damage or to tie the alleged damages to the post-petition period. Although the Claimant makes the conclusory assertion that the Debtors inflicted post-petition damage, he only makes allegations concerning the Subtenant's presence on the Premises, and his references to employees and agents of the Debtors are also to the Subtenants' personnel. The Claimant has not alleged any facts to support his contention that the Debtors caused any post-petition damage. The Claimant has the burden of establishing entitlement to administrative priority. The Claimant has neither established that entitlement nor alleged sufficient facts to warrant an evidentiary hearing on the issue.

*Notice*

The Claimant argues that he did not receive proper notice concerning the rejection of the Lease. The Debtors contend that they sent notice to the last known address for the landlord of the premises as reflected in their records. In support of the propriety of their notice, the Debtors refer to one of the Claimant's exhibits, which was the letter-confirmation that CRC sent to the Claimant in 2007 exercising the renewal option. That letter was addressed to Abrahmason and Dynasty Management Group at the same street address as utilized for noticing of the Rejection Motion. However, although the notice of the Rejection Motion was sent to that street address, it was actually addressed to Abrahamson's parents, his predecessors in interest concerning the Premises. As reflected in the letter exercising the renewal option, Abrahamson and Dynasty Management Company used that same street address to receive correspondence when the renewal was effected. The Court notes that it appears that had the Debtors used Abrahamson's name on the notice, they still would have used that same street address.

The Debtors argue that, in any event, Abrahamson was aware of the Rejection Motion at least as early as March 2010, when he referenced that pleading in a submission to the Court filed that month and never argued before that he had not received notice concerning the Rejection Motion, or sought reconsideration of the Rejection Order. The Debtors contend that the Rejection Order is final, that it is too late for reconsideration of it, and that a response to a claim objection is not a procedurally appropriate vehicle for raising a collateral attack on the Rejection Order. The Debtors also note that pursuant to section 365(d)(4) of the Bankruptcy Code, inasmuch as the Lease was never assumed, it would have been deemed rejected, in any event, 120 days after the filing.

The Rejection Order was entered on May 20, 2009 and is now final and unappealable. The appropriate vehicle for seeking to vacate the Rejection Order based upon improper notice would have been a timely motion pursuant to rule 60(b) of the Federal Rules of Civil Procedure. Here, the Claimant was aware of the entry of the Rejection Motion, at least as early as March 2010, when he filed a pleading objecting to the confirmation of the Debtors' Plan. In that submission, the Claimant specifically referenced docket entry no. 75 of the Debtors' cases, which is the Rejection Motion. Although the Claimant was aware of the Rejection Motion, at least as early as March 2010, it was not until the following year, in his May 2011 opposition to the Debtors' objection to his seeking administrative priority for his claim, that the Claimant first asserted that he had not received any notice concerning the Debtors' intent to reject the Lease. This was two years after the Rejection Order was entered and over one-year after he acknowledged the docket entry of the Rejection Motion. An opposition to a claims objection motion is not the proper vehicle by which to challenge a final order. Further, based upon the facts, it is too late for the Claimant to seek to vacate the Rejection Order premised upon the alleged lack of notice. Even if the initial notice to the Claimant concerning the rejection of the Lease was not adequate, the Claimant neglected to challenge the propriety of the notice of the Rejection Motion through available procedural mechanisms for more than a year after confirming knowledge of the Rejection Motion.

Moreover, as a matter of law, even absent the rejection, inasmuch as the Lease was never assumed, the Lease would have been deemed rejected as a matter of law, pursuant to section 365(d)(4)(i) of the Bankruptcy Code, which provides, in relevant part, that

> an unexpired lease of nonresidential real property under which the debtor is the
> lessee shall be deemed rejected, and the trustee shall immediately surrender that

> nonresidential real property to the lessor, if the trustee does not assume or reject the unexpired lease by the earlier of –
> (i) the date that is 120 days after the order for relief

11 U.S.C. § 365(d)(4)(i). Therefore, even if the Lease was not properly rejected under the rejection order, it would have been deemed rejected 120 days after the order for relief.[6]

The only issue before the Court is whether the Claim No. 52884 should be accorded administrative priority status. By that claim, the Claimant only seeks payment for the alleged damages to the Premises.

Even accepting the premise of a 120-day post-petition period, the Claimant has not presented any facts to support his conclusory assertion that there was any damages to the Premises post-petition. To the contrary, the Claimant maintains that he has no knowledge concerning the occupancy of the Premises until he was informed that it was abandoned in late July 2009. The Claimant, who has the burden to establish entitlement to an administrative priority for his claim, has not presented any facts to plausibly allege that there was any intentional damage to the Premises post-petition. Further, any claim against the Debtors related to damages to the Premises occurring pre-petition is properly categorized as a pre-petition, non-priority, general unsecured claim. As such, even if the Lease were deemed rejected 120-days after the date of the filing, the Claimant has not plausibly alleged that the claim for damages to the Premises is entitled to an administrative priority.[7] Absent plausible allegations concerning

---

[6] Moreover, prior to the Lease having been deemed rejected under section 365(d)(4)(i) even if the Claimant had timely moved for reconsideration of the Rejection Order, the Claimant has not presented any argument to contest the propriety of the Debtors' determination to reject the Lease. Under the circumstances, the only issue remaining would have been the effective date of the rejection.

[7] Although a post-petition, pre-rejection period would require timely performance of lease obligations during that time frame, the Claimant's proof of claim does not assert or adequately allege any such claims.

post-petition damage to the Premises, an evidentiary hearing is not warranted.

*Conclusion*

The Duplicative Claims are disallowed and expunged.

The remaining claim, Claim No. 28554, does not arise out of a post-petition transaction with any of the Debtors as debtors-in-possession. In addition, any right to payment based upon Claim No. 28554 is not supported by any consideration that was supplied to the Debtors as debtors-in-possession. Therefore, Claim No. 28554 is not entitled to an administrative priority. Further, the Claimant has not set forth any specific and plausible allegations to attribute the alleged damages to the Premises to the post-petition period that would support administrative priority for Claim No. 28554.

The Trust is to settle an order consistent with this Opinion.


Dated: New York, New York
      October 7, 2011

                                 **s/Arthur J. Gonzalez**
                                 CHIEF UNITED STATES BANKRUPTCY JUDGE