UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------X

| | | |
|---|---|---|
| In re: | : | |
| | : | Chapter 11 |
| OLD CARCO LLC | : | |
| (f/k/a CHRYSLER LLC), *et al.*, | : | Case No. 09-50002 (SMB) |
| | : | |
| Debtors. | : | (Jointly Administered) |

-------------------------------------------------------------X

## MEMORANDUM DECISION AND ORDER
## REGARDING EXPERIENCE RATINGS

**A P P E A R A N C E S :**

SULLIVAN & CROMWELL LLP
*Attorneys for Chrysler Group LLC (n/k/a FCA US LLC)*
125 Broad Street
New York, NY 10004

  Brian D. Glueckstein, Esq.
  Mark U. Schneiderman, Esq.
  Mark S. Geiger, Esq.
    Of Counsel

LISA MADIGAN
Illinois Attorney General
*Attorney for Illinois Department of Employment Security*
100 W. Randolph Street
Chicago, IL 60601

  James D. Newbold
  Assistant Attorney General
    Of Counsel

GREGORY F. ZOELLER
Indiana Attorney General
*Attorney for Indiana Department of Workforce Development*
302 W. Washington Street, IGCS Fifth Floor
Indianapolis, IN 46204

  Maricel E.V. Skiles
  Heather Crockett
  Assistant Attorneys General
    Of Counsel

**STUART M. BERNSTEIN**
**United States Bankruptcy Judge:**

By order dated December 1, 2014, the District Court remanded this matter to this Court

to interpret the *Sale Order*[1] pursuant to which the debtors (collectively, "Old Chrysler") sold

substantially all of their assets to their Purchaser ("New Chrysler").  *See In re Old Carco LLC*,

No. 14-CV-2225 (JMF), 2014 WL 6790781 (S.D.N.Y. Dec. 1, 2014) ("*Chrysler II*").

Specifically, the Court was directed to decide whether the *Sale Order* prohibited Michigan,

Indiana and Illinois from using Old Chrysler's Experience Rating, defined below, in computing

New Chrysler's unemployment insurance tax rate.  The Court received supplemental memoranda

from the parties.[2]  Michigan subsequently settled with New Chrysler, (*see Stipulation to Dismiss*

*Only Michigan Unemployment Insurance Agency*, dated May 5, 2015 (ECF Doc. # 8395)),

leaving only Indiana and Illinois, which this opinion will refer to collectively as the "States."

---

[1]      *Order (I) Authorizing the Sale of Substantially all of the Debtors' Assets Free and Clear of All Liens, Claims, Interests and Encumbrances, (II) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection Therewith and Related Procedures and (III) Granting Related Relief*, dated June 1, 2009 ("*Sale Order*") (ECF Doc. # 3232.)

[2]      *See Supplemental Memorandum in Further Support of Chrysler Group's (n/k/a FCA US LLC) Motion for Enforcement of the Court's Order (I) Authorizing the Sale of Substantially all of the Debtors' Assets Free and Clear of All Liens, Claims, Interests and Encumbrances, (II) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection Therewith and Related Procedures and (III) Granting Related Relief*, dated Jan. 16, 2015 ("*New Chrysler Memo*") (ECF Doc. # 8362); *Supplemental Memorandum in Further Support of Indiana Department Of Workforce Development's Objection to Chrysler Group LLC's Motion for Enforcement of the Court's Order (I) Authorizing the Sale of Substantially All of the Debtors' Assets Free and Clear of All Liens, Claims, Interests and Encumbrances, (II) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection Therewith and Related Procedures and (III) Granting Related Relief*, dated Jan. 30, 2015 ("*Indiana Memo*") (ECF Doc. # 8367); *Supplemental Memorandum of Illinois Department of Employment Security on the Legal Issues Raised in the Motion to Enforce the Sale Order Related to Section 363(f) of the Bankruptcy Code*, filed Jan. 30, 2015 ("*Illinois Memo*") (ECF Doc. # 8368); and *Chrysler Group LLC's (n/k/a FCA US LLC) Supplemental Omnibus Reply In Further Support Of Chrysler Group's Motion For Enforcement of the Court's Order (I) Authorizing the Sale of Substantially All of the Debtors' Assets Free and Clear of All Liens, Claims, Interests and Encumbrances, (II) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection Therewith and Related Procedures and (III) Granting Related Relief*, dated Feb. 6, 2015 ("*New Chrysler Reply*") (ECF Doc. # 8372).

Michigan also submitted a supplemental memorandum, (*see* ECF Doc. # 8366), but as noted in the succeeding text, thereafter settled with New Chrysler.  Accordingly, the Court has limited this opinion to the issues raised by Indiana and Illinois.

For the reasons that follow, the Court concludes that the *Sale Order* bars the States from

using Old Chrysler's Experience Rating to compute New Chrysler's unemployment insurance

tax rate unless the "police and regulatory" exception in paragraph 23 of the *Sale Order* negates

that prohibition. Paragraph 23 is ambiguous, and there appears to be extrinsic evidence that will

aid the Court's interpretation. Accordingly, the Court will schedule a trial to determine the

meaning of the "police and regulatory" exception.

## BACKGROUND

The background to this contested matter is set forth at length in the Court's prior

decision, *In re Old Carco LLC*, 505 B.R. 151 (Bankr. S.D.N.Y. 2014) ("*Chrysler I*"), *vacated &*

*remanded*, No. 14-CV-2225 (JMF), 2014 WL 6790781 (S.D.N.Y. Dec. 1, 2014) ("*Chrysler II*").

The Court assumes familiarity with that decision, and highlights the facts germane to this

opinion.

**A.     The *Sale Order***

On June 1, 2009, the Bankruptcy Court signed the *Sale Order* approving the sale of

substantially all of Old Chrysler's assets to New Chrysler. The *Sale Order* contained several

provisions indicating that the transfer was free and clear of claims and interests in the assets and

successor liability, and that neither the Purchasers nor the Purchased Assets would be liable for

any Claims, other than Assumed Liabilities, or any Claims based on successor liability. [3] The

---

[3]     *Sale Order* at ¶ 9 stated in pertinent part:

> . . . The Purchased Assets shall be transferred to the Purchaser, and upon consummation of the
> Purchase Agreement, such transfer (a) shall be a valid, legal, binding and effective transfer; (b)
> shall vest the Purchaser with all right, title and interest of the Debtors in the Purchased Assets; and
> (c) shall be free and clear of all Claims except for Assumed Liabilities with all such Claims to
> attach to the proceeds of the Sale Transaction. . . .

> *Sale Order* at ¶ 35 stated in pertinent part:

*Sale Order* included a finding of fact that the Purchaser would not have entered into the Purchase Agreement and would not consummate the transaction unless the purchase was "free and clear" of all Claims other than Assumed Liabilities.  (*Sale Order* at ¶ AA.)

"Claims," as used in the *Sale Order*, was a defined term.  It included "liens, claims (as such term is defined by section 101(5) of the Bankruptcy Code), liabilities, encumbrances, rights, remedies, restrictions and *interests* and encumbrances of any kind or nature whatsoever whether arising before or after the Petition Date . . . including all claims or rights based on any successor

---

Except for the Assumed Liabilities. . . ., none of the Purchaser, its successors or assigns or any of their respective affiliates shall have any liability for any Claim that (a) arose prior to the Closing Date. . . .  The Purchaser shall not be deemed, as a result of any action taken in connection with the Purchase Agreement or any of the transactions or documents ancillary thereto or contemplated thereby or the acquisition of the Purchased Assets, to: (a) be a legal successor, *or otherwise be deemed a successor to the Debtors* (other than with respect to any obligations arising under the Assumed Agreements from and after the Closing). . . . Without limiting the foregoing, *the Purchaser shall not have any successor, derivative or vicarious liabilities of any kind or character for any Claims, including, but not limited to, on any theory of successor or transferee liability*, *de facto* merger or continuity, environmental, labor and employment, products or antitrust liability, whether known or unknown as of the Closing, now existing or hereafter arising, asserted or unasserted, fixed or contingent, liquidated or unliquidated.

(Emphasis added.)

> *Sale Order* at ¶ 39 stated in pertinent part:
>
> > Except for the applicable Assumed Liabilities, *the Purchaser shall not have any liability or other obligation of the Debtors or their affiliates arising under or related to the Purchased Assets. Without limiting the generality of the foregoing,* and except as otherwise specifically provided herein or in the Purchase Agreement, the Purchaser shall . . . have no successor or vicarious liabilities of any kind or character . . . whether known or unknown as of the Closing, now existing or hereafter arising . . . with respect to the Debtors or their affiliates or any obligations of the Debtors or their affiliates arising prior to the Closing, *including, but not limited to, liabilities on account of any taxes* arising, accruing or payable under, out of, in connection with, or in any way *relating to the operation of the Purchased Assets prior to the Closing of the Sale Transaction.*

(Emphasis added.)  The Master Transaction Agreement ("MTA"), (ECF Doc. # 5988-1), approved by the *Sale Order*, (*Sale Order* at ¶ 4), expressly excluded liabilities "except as otherwise provided herein and other than Taxes relating to the Purchased Assets for taxable periods (or portions thereof) beginning after the Closing Date, all Liabilities for Taxes of any Selling Group Member."  (MTA at ¶ 2.09(f).)  The MTA defined "Taxes" to include assessments of unemployment insurance taxes imposed by any state or federal authority. (MTA, Definitions Addendum.)

4

or transferee liability." (*Sale Order* at pp. 1-2.) (Emphasis added.) Thus, "Claims" was not limited to "claims" as defined in Bankruptcy Code § 101(5), and included interests.

The *Sale Order* included a broad injunction against efforts to enforce any Claims (other than Assumed Liabilities) against the Purchaser or the Purchased Assets:

> Except as provided in the Purchase Agreement, all persons and entities (and their respective successors and assigns), including, *but not limited to . . . governmental, tax and regulatory authorities . . .* holding Claims… arising under or out of, in connection with, or in any way relating to, the Debtors, the Purchased Assets, the operation of the Business prior to Closing or the transfer of the Purchased Assets to the Purchaser, are hereby forever barred, estopped and permanently enjoined from asserting such Claims against the Purchaser, its successors or assigns, its property or the Purchased Assets. No such persons or entities shall assert against the Purchaser or their successors in interest any Claim arising from, related to or in connection with the ownership, sale or operation of any Asset prior to the Closing, except for Assumed Liabilities.

(*Sale Order* at ¶ 12.) (Emphasis added.)

The *Sale Order* incorporated exceptions to its free and clear and successor liability provisions. Paragraph 44 excluded liabilities to a governmental unit under environmental statutes or regulations to which the owner or operator of the property would be subject after the date of the entry of the *Sale Order*.[4] In addition, paragraph 23 excluded certain "police and regulatory" liabilities:

---

[4]     *Sale Order* at ¶ 44 stated:

> Nothing in this Sale Order or the Purchase Agreement releases, nullifies, or enjoins the enforcement of any liability to a governmental unit under environmental statutes or regulations (or any associated liabilities for penalties, damages, cost recovery or injunctive relief) that any entity would be subject to as the owner or operator of property after the date of entry of this Sale Order. Notwithstanding the foregoing sentence, nothing in this Sale Order shall be interpreted to deem the Purchaser as the successor to the Debtors under any state law successor liability doctrine with respect to any liabilities under environmental statutes or regulations for penalties for days of violation prior to entry of this Sale Order or for liabilities relating to off-site disposal of wastes by the Debtors prior to entry of this Sale Order. Nothing in this paragraph should be construed to create for any governmental unit any substantive right that does not already exist under law.

> Nothing in this Sale Order or in the Purchase Agreement releases, nullifies or enjoins the enforcement of any liability to a governmental unit under police and regulatory statutes or regulations that any entity would be subject to as the owner or operator of property after the date of entry of this Sale Order.

(*Sale Order* at ¶ 23.)

**B.    New Chrysler's Unemployment Insurance Taxes**

Employers within a state must pay unemployment insurance taxes to that state at a rate computed in accordance with a formula developed by the state. The computation of the tax rate attempts to match the predicted amount of unemployment benefits to be paid in the coming year with the funding necessary to pay those benefits. The rate is based, in part, on the employer's historical claims paying experience, generally reaching back three years. Thus, the greater the number of past unemployment insurance benefits paid to discharged workers during the reach back period, the higher the tax obligation going forward.

This historical component is referred to as the "Experience Rating." New employers with no Experience Rating enjoy relatively low contribution rates. If, however, the new employer is deemed a "successor" to an old employer, the old employer's Experience Rating will be "transferred" to the new employer and used by the state in computing the new employer's unemployment insurance tax rate. The use of the predecessor's Experience Rating may result in higher contribution rates and greater tax liability.

Following the sale and transfer of the assets, New Chrysler registered as an employer in several states, including Illinois and Indiana. It completed forms indicating that it had acquired and was continuing the business of Old Chrysler. (*See Indiana Memo*, Ex. 1; *Objection of Illinois Department of Employment Security to Motion of Chrysler Group LLC for Enforcement of Sale Order [Dkt. No. 3232]*, filed Nov. 21, 2013 ("*Illinois Original Objection*"), Ex. B (ECF

6

Doc. # 8247).)  Based on the information in the forms, Indiana and Illinois determined that New

Chrysler was a successor to Old Chrysler, (*Indiana Memo*, Ex. 3; *see Illinois Original Objection*,

Ex. C), and used Old Chrysler's Experience Rating to compute New Chrysler's unemployment

insurance tax rate.  This rate was substantially higher than the new employer rate.

The States determined the tax rate each year for several years using the Old Chrysler

Experience Rating, and New Chrysler paid the taxes at those rates.  Although New Chrysler

challenged the rate assessments on various grounds during this period, it did not raise the *Sale*

*Order* as a prohibition on the use of Old Chrysler's Experience Rating until 2013.  In that year,

New Chrysler challenged the rate determination at the administrative level in both States

contending that the *Sale Order* barred the use of Old Chrysler's Experience Rating.  On January

6, 2015, Illinois denied New Chrysler's protest for the years 2009 – 2013 based on its failure to

timely protest the original rate determinations.  New Chrysler filed a statutory protest of the

denials.  (*Illinois Memo* at 7.)  New Chrysler's protest and request for relief remains pending in

Indiana.  (*See Indiana Memo* at 2.)

## C.    The Prior Litigation

In addition to challenging the assessments before the States' administrative agencies,

Chrysler sought relief in this Court.  In October 2013, it filed a motion to enforce the *Sale Order*

and enjoin the States from using Old Chrysler's Experience Rating.  (*Motion for Enforcement of*

*the Court's Order (I) Authorizing the Sale of Substantially All of the Debtors' Assets Free and*

*Clear of All Liens, Claims, Interests and Encumbrances, (II) Authorizing the Assumption and*

*Assignment of Certain Executory Contracts and Unexpired Leases in Connection Therewith and*

*Related Procedures and (III) Granting Related Relief,* dated Oct. 18, 2013 ("*Enforcement*

*Motion*") (ECF Doc. # 8218).)  In *Chrysler I*, the Court concluded that the Tax Injunction Act,

7

28 U.S.C. § 1341, deprived the Court of subject matter jurisdiction to provide the declaratory and

injunctive relief sought by New Chrysler.

The District Court reversed in *Chrysler II*. The States had received actual notice of the

earlier proceedings culminating in the *Sale Order*. *Chrysler II*, 2014 WL 6790781, at *4. The

*Sale Order* was, therefore, *res judicata*, and the Court's jurisdiction to issue (and hence, enforce)

the *Sale Order* was not subject to collateral attack by the States. *Id.* at 5. The District Court

remanded the matter to this Court, and following the remand, the Court advised the parties that it

would first address whether the terms of the *Sale Order* precluded the States from using Old

Chrysler's Experience Rating to compute New Chrysler's unemployment insurance tax

contribution rate. In the event it ruled in favor of New Chrysler, it would then consider the

States' other arguments.

## DISCUSSION

### A.    Standard Governing the Motion

The *Enforcement Motion* calls for the interpretation of the *Sale Order*. The *Sale Order*

was negotiated by the parties to the sale with input from other parties in interest, and New

Chrysler conceded at oral argument that it was subject to interpretation in accordance with the

rules governing the interpretation of contracts. (Transcript of 7-14-15 Oral Argument ("Tr."), at

47:18-49:5 (ECF Doc. # 8434).) The *Sale Order* did not include a governing law provision, but

the MTA stated that it was governed by New York law. (MTA § 11.08.) Given the relationship

between the MTA and the *Sale Order*, and the fact that the *Sale Order* was approved by a New

York bankruptcy court, I will apply New York law.

When asked to interpret contractual language, the question is "whether the contract is unambiguous with respect to the question disputed by the parties." *Law Debenture Trust Co. of New York v. Maverick Tube Corp.*, 595 F.3d 458, 465 (2d Cir. 2010) (quoting *Int'l Multifoods Corp. v. Commercial Union Ins. Co.*, 309 F.3d 76, 83 (2d Cir. 2002)).  Ambiguity presents a question of law.  *Maverick Tube*, 595 F.3d at 466.  A contract is ambiguous if it "could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Int'l Multifoods*, 309 F.3d at 83 (internal quotation marks omitted); *accord Cont'l Ins. Co. v. Atlantic Cas. Ins. Co.*, 603 F.3d 169, 180 (2d Cir. 2010); *Maverick Tube*, 595 F.3d at 466.  An agreement is not ambiguous if it has a definite and precise meaning, and unambiguous language does not become ambiguous because a party urges a different interpretation that strains the language beyond its ordinary meaning.  *Maverick Tube*, 595 F.3d at 467.

Where the dispute concerns a provision of the contract, the Court must consider the contract "as a whole to ensure that undue emphasis is not placed upon particular words and phrases." *Bailey v. Fish & Neave*, 868 N.E.2d 956, 959 (N.Y. 2007); *accord Maverick Tube*, 595 F.3d at 467.  Furthermore, "[e]ven where some ambiguity lurks in the language of the contract, a court may still construe the contract, if it can do so without reference to extrinsic circumstances or evidence." *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 148 (2d Cir. 1993).  Finally, if there is no extrinsic evidence that will assist the Court in interpreting an ambiguous contract, the Court can decide its meaning as a matter of law.  *Topps Co. v. Cadbury Stani S.A.I.C.*, 526 F.3d 63, 68 (2d Cir. 2008) ("To the extent the moving party's case hinges on ambiguous contract language, summary judgment may be granted only if the ambiguities may be

resolved through extrinsic evidence that is itself capable of only one interpretation, or where there is no extrinsic evidence that would support a resolution of these ambiguities in favor of the nonmoving party's case."); *Revson v. Cinque & Cinque, P.C.*, 221 F.3d 59, 66 (2d Cir. 2000) ("[T]he the meaning of even an ambiguous contract is also to be decided by the court if there is no extrinsic evidence as to the agreement's meaning.")

**B:      Bankruptcy Code § 363(f)**

The *Sale Order* authorized the transfer of the Purchased Assets free and clear of "Claims," a defined term that included "interests." Thus, the threshold question raised by the *Enforcement Motion* is whether Old Chrysler's Experience Rating was an "interest" in the Purchased Assets that was cut off by the *Sale Order*. A trustee (and hence, a debtor in possession) may sell property in certain circumstances "free and clear of any interest in such property of an entity other than the estate." 11 U.S.C. § 363(f).[5] The Bankruptcy Code does not define "interest in such property." *Indiana State Police Pension Trust v. Chrysler LLC (In re Chrysler LLC),* 576 F.3d 108, 124 (2d Cir. 2009), *granting cert. & vacating judgment,* 130 S. Ct. 1015 (2009); *Precision Indus., Inc. v. Qualitech Steel SBQ, LLC,* 327 F.3d 537, 545 (7th Cir. 2003); *United Mine Workers of Am. 1992 Benefit Plan v. Leckie Smokeless Coal Co. (In re Leckie Smokeless Coal)*, 99 F.3d 573, 581 (4th Cir. 1996). Nor does the *Sale Order.*

The phrase "interest in such property" used in § 363(f) was initially interpreted narrowly, but its scope is now interpreted more broadly to effectuate the purposes of the Bankruptcy Code.[6]

---

[5]      Illinois contends that Old Chrysler did not satisfy any of the five conditions under § 363(f) necessary to sell its assets free and clear. (*Illinois Memo* at 15.) The argument is an improper collateral attack on the *Sale Order* that should have been raised before the *Sale Order* was entered and became final.

[6]      The general policy of chapter 11 is to maximize the value of the bankruptcy estate. *Toibb v. Radloff,* 501 U.S. 157, 163 (1991). An expansive interpretation of "interest in property" that can be cut off by a "free and clear" order under Bankruptcy Code § 363(f) promotes that policy by, *inter alia*, maximizing the assets that are being sold.

In *Mich. Emp't Sec. Comm'n* v. *Wolverine Radio Co. (In re Wolverine Radio Co.)*, 930 F.2d

1132 (6th Cir. 1991), the States' main authority, the Sixth Circuit Court of Appeals held that the

confirmed plan did not pre-empt state law, *id.* at 1146-47, and that an Experience Rating was not

an "interest" that was extinguished by a "free and clear" sale under Bankruptcy Code § 363(f).

*Id.* at 1147.  The latter conclusion was informed by the Court's determination that "interests" in §

363 were limited to *in rem* interests that attach to property ownership and place a cloud on title.

*Wolverine*, 930 F.2d at 1147 & n.23.

    Several years later, the Fourth Circuit's *Leckie* decision cast doubt on the *Wolverine*

Court's conclusion.  There, several debtors, coal mine operators, were obligated under the Coal

Act, 26 U.S.C. §§ 9701, *et seq.*, to contribute to plans that paid benefits to retirees.  In each case,

the amount of the premiums was based upon the benefits payable to the debtor's own retirees and

to retirees of operators that were no longer in business.  An operator's "related persons" were

jointly and severally liable for the operator's premiums, and "related persons" included the

operator's successors.  *Leckie*, 99 F.3d at 576-77.

    After the debtors filed chapter 11 petitions, they sought to sell their assets "free and

clear" of the debtors' liabilities for future premium payments.  The benefit plans opposed the

relief.  *Id.* at 577.  The debtors prevailed in the lower courts on different theories, and the Fourth

Circuit consolidated the appeals.  *Id.* at 578-79.  Addressing Bankruptcy Code § 363(f), the

Court initially observed that although the Bankruptcy Code did not define the types of "interests"

encompassed by the statute, Congress did not indicate that it intended to limit "interests" to *in*

---

*Douglas v. Stamco,* 363 F. App'x 100, 102–03 (2d Cir. 2010) ("[T]o the extent that the 'free and clear' nature of the
sale (as provided for in the Asset Purchase Agreement ('APA') and § 363(f)) was a crucial inducement in the sale's
successful transaction, it is evident that the potential chilling effect of allowing a tort claim subsequent to the sale
would run counter to a core aim of the Bankruptcy Code, which is to maximize the value of the assets and thereby
maximize potential recovery to the creditors.") (footnote omitted).

*rem* interests, and the Court declined to adopt such a restrictive reading of the section. *Id.* at 582.

It concluded that the benefit plans' right to collect future premiums constituted an interest in the

assets that were being transferred. *Id.* The Court based its conclusion on the relationship

between the benefit plans' right to collect premiums and the use to which the debtors put their

assets:

> Those rights are grounded, at least in part, in the fact that those very assets have
> been employed for coal-mining purposes: if Appellees had never elected to put
> their assets to use in the coal-mining industry, and had taken up business in an
> altogether different area, the Plan and Fund would have no right to seek premium
> payments from them.  Because there is therefore a relationship between (1) the
> Fund's and Plan' rights to demand premium payments from Appellees and (2) the
> use to which Appellees put their assets, we find that the Fund and Plan have
> interests in those assets within the meaning of section 363(f).

*Id.*[7]

The Third Circuit subsequently considered the meaning of "interests" as used in

Bankruptcy Code § 363(f) in *In re Trans World Airlines, Inc.*, 322 F.3d 283, 289–90 (3d Cir.

2003).  There, TWA sold its assets to American Airlines ("American") free and clear of

successor liability.  Prior to the sale, TWA had issued travel vouchers to female flight attendants

in settlement of a class action alleging claims of sex discrimination that allowed them or their

families to fly for free.  In addition, employment discrimination claims were pending against

TWA before the EEOC and state agencies.  *Id.* at 285-86.  After it filed for chapter 11, TWA

sold its assets to American pursuant to § 363(f) over the objection of the class and the EEOC.

The sale order stated that the transfer would be free and clear of successor liability and enjoined

all persons from enforcing successor liability claims against American.  *Id.* at 286-87.

---

[7]      The Court distinguished *Wolverine* on three bases: the Sixth Circuit's conclusion that the debtor's
Experience Rating was not an "interest in property" within the meaning of § 363(f), none of the five conditions
under § 363(f) had been met and the successor's tax liability arose only as a result of its own post-petition
employment of workers. *Leckie*, 99 F.3d at 586 n.17.

The issue before the Third Circuit was whether the travel voucher program and the EEOC charges were "interests in property" cut off by the sale order. *Id.* at 288. The Court observed that while some courts narrowly interpreted "interests in property" to mean *in rem* interests, "the trend seems to be toward a more expansive reading of 'interests in property' which 'encompasses other obligations that may flow from ownership of the property.'" *Id.* at 288-89 (quoting 3 COLLIER ON BANKRUPTCY ¶ 363.06[1]). Adopting the analysis applied in *Leckie*, the Court concluded that the claims under the travel voucher program and before the EEOC were "interests in property":

> Here the Airlines correctly assert that the Travel Voucher and EEOC claims at issue had the same relationship to TWA's assets in the § 363(f) sale, as the employee benefits did to the debtors' assets in *Leckie*. *In each case it was the assets of the debtor which gave rise to the claims. Had TWA not invested in airline assets, which required the employment of the EEOC claimants, those successor liability claims would not have arisen. Furthermore, TWA's investment in commercial aviation is inextricably linked to its employment of the Knox-Schillinger claimants as flight attendants, and its ability to distribute travel vouchers as part of the settlement agreement.* While the interests of the EEOC and the Knox-Schillinger class in the assets of TWA's bankruptcy estate are not interests in property in the sense that they are not *in rem* interests, the reasoning of *Leckie* and *Folger Adam* suggests that they are interests in property within the meaning of section 363(f) in the sense that they arise from the property being sold.

*Id.* at 289-90 (emphasis added). The *TWA* Court did not mention much less discuss *Wolverine*.

The Second Circuit addressed the issue in the Chrysler bankruptcy. Numerous parties in interest had objected to the proposed *Sale Order*. An *ad hoc* group argued that the "free and clear" language did not cut off pre-sale product liability claims because personal injury claims were not "interests in property" under Bankruptcy Code § 363(f). *Chrysler*, 576 F.3d at 123-24. Rejecting the objection, the Second Circuit adopted the test applied by the *Leckie* and *TWA* Courts:

13

We agree with *TWA* and *Leckie* that the term "any interest in property" encompasses those claims that "arise from the property being sold." *See TWA,* 322 F.3d at 290. By analogy to *Leckie* (in which the relevant business was coal mining), "[appellants'] rights are grounded, at least in part, in the fact that [Old Chrysler's] very assets have been employed for [automobile production] purposes: if Appellees had never elected to put their assets to use in the [automobile] industry, and had taken up business in an altogether different area, [appellants] would have no right to seek [damages]." *Leckie,* 99 F.3d at 582.

*Id.* at 126. The Court concluded:

The possibility of transferring assets free and clear of existing tort liability was a critical inducement to the Sale. As in *TWA*, "a sale of the assets of [Old Chrysler] at the expense of preserving successor liability claims was necessary in order to preserve some [55],000 jobs, ... and to provide funding for employee-related liabilities, including retirement benefits [for more than 106,000 retirees]." *TWA*, 322 F.3d at 293; see also Sale Opinion at 3.

It is the transfer of Old Chrysler's tangible and intellectual property to New Chrysler that could lead to successor liability (where applicable under state law) in the absence of the Sale Order's liability provisions. Because appellants' claims arose from Old Chrysler's property, § 363(f) permitted the bankruptcy court to authorize the Sale free and clear of appellants' interest in the property.

*Id.* The *Chrysler* opinion also ignored *Wolverine.*

The foregoing authorities support the conclusion that Old Chrysler's Experience Rating is an "interest in property." The States' rights to use Old Chrysler's Experience Rating arises from New Chrysler's acquisition of its assets and the continuation of its business. Had New Chrysler started the same business from scratch with new assets, the States could not use Old Chrysler's Experience Rating to compute its tax rate. Furthermore, New Chrysler's increased liability is directly related to Old Chrysler's discharge of persons it employed in its business; these discharged employees never worked for New Chrysler. Finally, as the Second Circuit observed, the "free and clear" transfer of the Purchased Assets was a critical inducement to a sale that preserved 55,000 jobs and provided funds to pay retirement benefits to more than 106,000 retirees. *See id.*

14

The Court's conclusion is consistent with a series of decisions rendered in 2013 on this very issue. They expressly or implicitly rejected *Wolverine* and ruled that the debtor's Experience Rating was an "interest in property" under Bankruptcy Code § 363(f) that was cut off by a sale order provision transferring the assets "free and clear" of "interests" and successor liability. *Massachusetts Dep't of Unemployment Assistance v. OPK Biotech, LLC* (*In re PBBPC, Inc.*), 484 B.R. 860, 869-70 (B.A.P. 1st Cir. 2013); *In re Tougher Indus., Inc.*, No. 06-12960, 2013 WL 1276501, at *6-8 (Bankr. N.D.N.Y. Mar. 27, 2013); *In re USA Fleet Inc.*, 496 B.R. 79, 87-89 (Bankr. E.D.N.Y. 2013); *Ouray Sportswear, LLC v. Indus. Claim Appeals Office*, No. 13CA0341, 2013 WL 5761067, at *3-4 (Colo. App. Oct. 24, 2013).

Having concluded that Old Chrysler's Experience Rating was an "interest in property," the next question is whether the *Sale Order* unambiguously transferred the Purchased Assets "free and clear" of the States' right to use it. The answer is plainly yes. After defining "Claims" to include "interests," and except for the Assumed Liabilities, the *Sale Order* states in various places and in various ways that the transfer will be "free and clear" of Claims and successor liabilities. (*Sale Order* at ¶ 9 ("The Purchased Assets shall be transferred . . . free and clear of all Claims except for Assumed Liabilities. . . ."); ¶ 12 ("governmental, tax and regulatory authorities . . . holding Claims . . . are. . . barred. . . from asserting such Claims against the Purchaser. . . ."); ¶ 35 (the Purchaser shall not have any liability for any Claim and shall not be deemed a successor to the Debtors or have successor liability for any Claim).[8]

---

[8]    New Chrysler also cited paragraph 39 of the *Sale Order* and the definition of "taxes" in the MTA as further authority. Under MTA § 2.09(f), post-closing taxes were not Excluded Liabilities, so the broad definition of "taxes" in the Addendum, (*see* MTA at 92), which includes unemployment insurance, does not help Chrysler. Furthermore, paragraph 39 of the *Sale Order* deals with "obligations of the Debtors" and "claims" against the Debtors, but does not mention "Claims." (*Sale Order* at ¶ 39 ("[T]he Purchaser shall not be liable for any claims against the Debtors or any of their predecessors or affiliates.").) While this clause is followed by broader language, it may be amplifying the types of "obligations" and "claims" to which it applies. The paragraph is ambiguous, but it

The *Sale Order* also specifically provides that New Chrysler shall not be deemed a successor "as a result of any action taken in connection with the Purchase Agreement or any of the transactions or documents ancillary thereto or contemplated thereby or the acquisition of the Purchased Assets."  (*Sale Order* at ¶ 35.)  The determination by the States that New Chrysler was a successor to Old Chrysler as a result of the acquisition of Old Chrysler's assets and the continuation of its business in the States contravened this provision.

Furthermore, the successor liability provisions in the *Sale Order* bar claims against New Chrysler that arose from the purchase even if those claims could not have been asserted against Old Chrysler.  *In re Old Carco LLC (f/k/a Chrysler LLC)*, No. 09 Civ. 8875 (CM), 2010 WL 9461648 (S.D.N.Y. July 2, 2010), *aff'd sub nom. Boucher Imports, Inc. v. Quaden Motors, Inc. (In re Old Carco)*, 438 F. App'x. 30 (2d Cir. 2011) is directly on point.  As part of the sale, the Court authorized Old Chrysler to reject certain franchise or dealership contracts with Chrysler dealers (the "*Rejection Order*").  *Id.* at *1.  Certain dealers then invoked state dealership laws to compel New Chrysler to continue their dealerships.  In response, New Chrysler sought an order enforcing the *Sale Order* and *Rejection Order* and enjoining the dealers' efforts.  The resulting *Enforcement Order* held that the state dealership laws were barred by the Court's earlier orders. *Id.*

On appeal, the dealers contended, *inter alia*, that the *Enforcement Order* erred in concluding that their claims were essentially successor/transferee liability claims barred by the Sale Order because "successor liability" was limited to claims that could have been brought against Old Chrysler and their claims under the dealer protection statutes could never have been

---

is unnecessary to resolve the ambiguity because the other cited provisions of the *Sale Order* unambiguously cut off the use of Old Chrysler's Experience Rating.

asserted against Old Chrysler. *Id.* at *15. After quoting from paragraph 35 of the *Sale Order*, which unambiguously immunized New Chrysler from successor liability, District Judge McMahon phrased the question in the following way: "whether the rights the dealers seek to assert—rights to resurrect franchise agreements with New CarCo—can be considered successor liability claims if the dealers could not have demanded post-rejection franchise agreements from the Debtors." *Id.*

The District Court concluded that the dealers' state law rights to the continuation of their dealerships with New Chrysler were successor liability claims. Successor liability has two requirements: (1) a direct relationship between the one primarily liable and the successor, and (2) "the blameworthy behavior or status of the primarily liable person must be established as a prerequisite to recovery against the secondarily liable person." *Id.* at *16 (citing and quoting *R.C.M. Exec. Gallery Corp. v. Rols Capital Co.,* 901 F.Supp. 630, 636 (S.D.N.Y. 1995)). New Chrysler purchased substantially all of Old Chrysler's assets, and there was a direct relationship between the two. *Id.* In addition, Old Chrysler had entered into and terminated the dealership agreements; New Chrysler was not a party to the terminated dealership agreements and did not otherwise have a relationship with the dealers. *Id.* Hence, the dealers' claims satisfied the elements of successor liability.

Finally, the District Court rejected the dealers' argument that New Chrysler had created its own liability by purchasing Old Chrysler's assets:

> Had Chrysler gone into some business other than automobiles, or not rejected the dealers' agreements in the first place, the dealers would have no claims under the state statutes now. New CarCo only became liable for its nonfeasance (*i.e.*, its failure to resurrect the dealers' agreements) because of Chrysler's actions; it did not create this liability. The Court can find no principled basis on which to distinguish this variety of successor liability from any other—the Debtors entered into, and then breached, agreements with the dealers in the first place. The Sale

17

> Order plainly barred precisely this theory of recovery insofar as it prohibits
> liability against New CarCo "of *any* kind or character ... on *any* theory of
> successor or transferee liability," other than with respect to assumed contracts.
> (Sale Order ¶ 35 (emphasis added).)

*Id.*

Although the facts of the present dispute are different, the conclusion that the District Court reached applies equally to this case. The same direct relationship exists between Old Chrysler and New Chrysler; the latter purchased the former's assets. In addition, New Chrysler's increased liability for unemployment insurance taxes based on the States' use of Old Chrysler's Experience Rating results from the blameworthy behavior of Old Chrysler, which discharged the employees whose claims form the basis of the Experience Rating. New Chrysler did not do anything to create its increased liability. At bottom, the "transfer of an employer's contribution rate to a successor asset purchaser is really an attempt to recover the money that the predecessor employer would have paid if it had continued in business." *PBBPC*, 484 B.R. at 869.

Accordingly, the *Sale Order* unambiguously extinguishes the States' right to apply Old Chrysler's Experience Rating to New Chrysler or collect increased taxes from New Chrysler as a result of Old Chrysler's discharge of its employees. In fact, Indiana agrees. Although it argued in its submissions that the Experience Rating is not an "interest in property" based primarily on the holding in *Wolverine*, it conceded during oral argument that under the current state of the law the "free and clear" provisions of the Sale Order extinguished its right to use Old Chrysler's Experience Rating to compute New Chrysler's employment taxes. During Indiana's argument, the following colloquy with the Court took place:

> THE COURT: If the sale order would enter today and the sale is free and clear of
> interest, would it cut off Indiana's right to use Old Chrysler's experience rating
> for the purpose of determining the unemployment tax of New Chrysler?

18

MS. CROCKETT [Indiana Assistant Attorney General]: We believe that the current case law would read that way, yes.

(Tr. at 34:20-25.)

When Illinois took its turn, it conceded that the definition of "Claim" included an "interest in property" that might cut off the right to use the Experience Rating unless the "police and regulatory" exception in paragraph 23 applied or Illinois prevailed on its other defenses:

MR. NEWBOLD [Illinois Assistant Attorney General]: In reading the definition of a "claim" it does include an interest. My view or my perspective on this is that if Your Honor were to conclude that an interest in property includes an experience rating, that but for paragraph 23 and the affirmative defenses, that it would come within the provision of the order.

(Tr. at 39:8-13.)

## C.     The States' Opposition

The States make two arguments why the *Sale Order* does not bar the use of Old Chrysler's Experience Rating even if the Experience Rating is construed to be an "interest in property" within the meaning of Bankruptcy Code § 363(f).

### 1.     Retroactivity

Indiana (but not Illinois) contends that case law may be applied retroactively in limited circumstances and the three-part test established in *Chevron Oil Co. v. Huson*, 404 U.S. 97 (1971) bars this Court from applying the 2013 decisions to conclude that the Experience Rating is an "interest in property." *Chevron Oil* concerned which statute of limitations governed a personal injury claim arising from an incident on an oil rig in the Gulf of Mexico off the coast of Louisiana – general admiralty law or the law of the adjacent state. When the lawsuit was filed, a line of federal decisions had ruled that general admiralty law governed, and the defendant did not question the timeliness of the suit. *Id.* at 98-99. While the lawsuit was pending, the Supreme

19

Court decided *Rodrigue v. Aetna Cas. & Sur. Co.*, 395 U.S. 352 (1969), which held that

admiralty law did not apply.  Instead, the statute of limitations of the adjacent state governed.

Relying on *Rodrigue*, the District Court ruled that Louisiana's one-year statute of limitations

barred the action and granted summary judgment to the defendant.  *Id.* at 99.

The issue before the Supreme Court was whether the *Rodrigue* decision should apply

retroactively to bar the plaintiff's claim that appeared to be timely under existing law when it

was commenced.  *Id.* at 100.  The Court identified three factors to consider when deciding

whether a judicial decision should apply retroactively to a pending case: (1) "the decision to be

applied nonretroactively must establish a new principle of law, either by overruling clear past

precedent on which litigants may have relied,. . . or by deciding an issue of first impression

whose resolution was not clearly foreshadowed," (2) the court must "weigh the merits and

demerits in each case by looking to the prior history of the rule in question, its purpose and

effect, and whether retrospective operation will further or retard its operation," and (3) the court

must weigh "the inequity imposed by retroactive application, for [w]here a decision of this Court

could produce substantial inequitable results if applied retroactively, there is ample basis in our

cases for avoiding the injustice or hardship by a holding of nonretroactivity."  *Id.* at 106-07

(internal citations and quotation marks omitted).  Applying these factors, the Supreme Court

ruled that it would not give retroactive effect to *Rodrigue* because it overruled a long line of

precedent, the change was not foreseeable when the plaintiff commenced the suit and the most he

could have done was to rely on the existing law, and retroactive application of *Rodrigues* would

deprive the plaintiff of a remedy and produce an inequitable result.  *Id.* at 107-08.  Indiana

primarily argues that it relied on *Wolverine*, the only decision at the time to address Experience

Ratings, which had concluded that an Experience Rating was not an interest within the meaning

20

of Bankruptcy Code § 363(f), it could not foresee the 2013 change in the law and the Court

should apply the law as it existed in 2009.  (*Indiana Memo* at 5-6, 11-12.)

*Chevron Oil* has been undercut and to some extent overruled by more recent Supreme

Court jurisprudence.  In *James B. Beam Distilling Co. v. Georgia*, 501 U.S. 529 (1991), the

Supreme Court addressed the right to a refund for taxes paid under an unconstitutional taxing

scheme.  The Supreme Court had ruled several years earlier in *Bacchus Imps., Ltd. v. Dias,* 468

U.S. 263 (1984) that the Commerce Clause prohibited Hawaii from imposing an excise tax on

imported alcoholic beverages at a higher rate than state law imposed on locally produced

alcoholic beverages.  After *Bacchus*, the petitioner ("Beam") challenged a similar discriminatory

tax imposed under Georgia law and sought to recover taxes paid in the past.  Relying on the

*Chevron Oil* analysis, the Georgia state court refused to apply *Bacchus* retroactively.  *Id.* at 532-

534.

Reversing the Georgia Supreme Court, the United States Supreme Court ruled that the

principle of equality, "that similarly situated litigants should be treated the same," and *stare*

*decisis* prevail over any claim based on *Chevron Oil, id.* at 540; *accord Harper v. Virginia Dep't*

*of Taxation*, 509 U.S. 86, 98 (1993), and the individual equities of the case or the party's reliance

on the old rule are irrelevant:

> To this extent, our decision here does limit the possible applications of the
> *Chevron Oil* analysis, however irrelevant *Chevron Oil* may otherwise be to this
> case.  Because the rejection of modified prospectivity precludes retroactive
> application of a new rule to some litigants when it is not applied to others, the
> *Chevron Oil* test cannot determine the choice of law by relying on the equities of
> the particular case."

*Beam*, 501 U.S. at 543; *accord Harper*, 509 U.S. at 95 n.9.  In short, "when the Court has applied

a rule of law to the litigants in one case it must do so with respect to all others not barred by

procedural requirements or res judicata." *Beam*, 501 U.S. at 544[9]; *Harper*, 509 U.S. at 97

("When this Court applies a rule of federal law to the parties before it, that rule is the controlling

interpretation of federal law and must be given full retroactive effect in all cases still open on

direct review and as to all events, regardless of whether such events predate or postdate our

announcement of the rule.").

Indiana's reliance on *Chevron Oil* and its contention that retroactivity is applied in

limited circumstances are wrong; retroactivity is the rule, not the exception.  Here, the Court has

not finally decided whether Old Chrysler's Experience Rating is an "interest" or any dispute

between the parties in which it might have been raised.  Hence, principles of finality do not bar

consideration of the issue in the context of the *Enforcement Motion*.  Furthermore, Indiana's

reliance on *Wolverine* and the individual inequities it will allegedly suffer are irrelevant for

purposes of determining the retroactive application of post-*Sale Order* law.

Even under *Chevron Oil*, Indiana fails to make a case against retroactivity.  The 2013

decisions by other, lower courts are not controlling and did not overrule clear precedent; rather,

Indiana took its chances relying on *Wolverine*.  The *Wolverine* Court limited "interests in

property" to *in rem* interests.  But in *Leckie*, decided in 1996, and *TWA*, decided in 2003, the

Courts rejected that limitation and ruled that § 363(f) interests included obligations that arose

from the ownership of the property that was sold.  The Second Circuit reached the same

conclusion in *Chrysler* based on the reasoning in *Leckie* and *TWA*.  The interpretation of interests

to include Experience Ratings in the 2013 decisions did not come out of the blue, and Indiana's

---

[9]        The Supreme Court added that a court could consider "the equitable and reliance interests of parties absent
but similarly situated," and the "individual equities when deciding remedial issues in particular cases."  *Beam*, 501
U.S. at 543-44.

reliance on the continuing vitality of *Wolverine* was a risky decision. *See Chrysler II*, 2014 WL
6790781, at *5 (*Wolverine* was never binding law in this Circuit, and accordingly, the States
"cannot hang their hat on that case in making the definitive assertion that 'the Sale Order did not
contemplate the inclusion of experience ratings as interests'") (quoting Indiana's brief at 9).

Finally, Indiana's argument ignores the jurisprudential principles that attend the
interpretation of statutes. When a court "construes a statute, it is explaining its understanding of
what the statute has meant continuously since the date when it became law," and a court has no
authority to depart from that meaning. *Rivers v. Roadway Express, Inc.*, 511 U.S. 298, 313 n.12
(1994). The Court's conclusion that "interests" under Bankruptcy Code § 363(f) include Old
Chrysler's Experience Rating, like the similar decisions rendered in 2013, simply declares the
statute's meaning as of its effective date.[10]

### 2.    Paragraph 23 of the *Sale Order*

The States' main opposition focuses on paragraph 23 of the *Sale Order*, which creates an
exception to the "free and clear" provisions:

> Nothing in this Sale Order or in the Purchase Agreement releases, nullifies or
> enjoins the enforcement of any liability to a governmental unit under police and
> regulatory statutes or regulations that any entity would be subject to as the owner
> or operator of property after the date of entry of this Sale Order.

(*Sale Order* at ¶ 23.) The States contend that the exception applies to the use of Old Chrysler's
Experience Rating. New Chrysler responds that paragraph 23 was intended to except only the
enforcement of environmental statutes and regulations.

---

[10]    Indiana cites *Boucher Imports, Inc. v. Quaden Motors, Inc. ( In re Old Carco)*, 438 F. App'x 30 (2d Cir.
2011) as an example of a case that interpreted *Sale Order* "as it was written in 2009." (*Indiana Memo* at 12.)
*Boucher* affirmed District Judge McMahon's decision discussed in the preceding text. Indiana's reliance on the
Second Circuit's summary order is perplexing. The meaning of the *Sale Order* was obviously determined as of the
time it was written and entered in 2009. Here, the Court has interpreted § 363(f) as it was written and enacted in
1978.

The term "police power" refers to "[t]he inherent and plenary power of a sovereign to make all laws necessary and proper to preserve the public security, order, health, morality, and justice." BLACK'S LAW DICTIONARY 1345 (10th ed. 2014); *accord Metro. Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 756 (1985) ("The States traditionally have had great latitude under their police powers to legislate as to the protection of the lives, limbs, health, comfort, and quiet of all persons.") (internal quotation marks and citations omitted). The enactment and enforcement of unemployment insurance and similar programs generally reflects the sovereign's exercise of its police powers even though such programs are funded by taxing employers. *United States v. Silk*, 331 U.S. 704, 710-11 (1947) (discussing the Social Security Act); *Warehouse Indem. Corp. v. Arizona Dep't of Econ. Sec.*, 627 P.2d 235, 238 (Ariz. Ct. App. 1981) (unemployment tax contribution law that transferred former employer's experience rating to successor was remedial legislation, and all provisions including taxing provisions, should be construed liberally to effectuate the legislative purpose); *see generally* 3A NORMAN SINGER, SUTHERLAND STATUTORY CONSTRUCTION § 74:7, at 1072 (7th ed. 2014) ("SUTHERLAND").

Here, the States' declarations of public policy say that their unemployment compensation laws were enacted "to lessen the menace to the health, safety and morals of the people of Illinois, and to encourage stabilization of employment, compulsory unemployment insurance upon a statewide scale," 820 ILL. COMP. STAT. 405/100 (2015); *accord* IND. CODE § 22-4-1-1 (2015), and as "a proper exercise of the police powers of the state." IND. CODE § 22-4-1-1. In addition, the Illinois Supreme Court has ruled that the unemployment compensation law is a police power act that should be liberally construed to help protect workers from the consequences of unemployment. *Ray-Schools-Chicago, Inc. v. Cummins*, 146 N.E.2d 42, 46 (Ill. 1957); *Ross v. Cummins*, 131 N.E.2d 521, 523 (Ill. 1956); *see Jack Bradley, Inc. v. Dep't of Emp't Sec.*, 585

24

N.E.2d 123, 129 (Ill. 1991) ("[T]he Unemployment Compensation Act is not a taxing act, but is one passed to alleviate the perils of unemployment under the police powers of the State, and should receive a liberal construction." (quoting *Eutectic Welding Alloys Corp. v. Rauch*, 115 N.E.2d 898, 901 (1953)).

On the other hand, and notwithstanding the Indiana legislature's declaration of public policy, the Indiana Supreme Court has held that the unemployment insurance laws were enacted pursuant to the state's taxing power rather than its police power. *Besozzi v. Indiana Emp't Sec. Bd.*, 146 N.E.2d 100, 105 (Ind. 1957). In reaching its conclusion, the Indiana Court observed that the declaration of public policy in the earlier version of the laws under consideration was a preamble that was not controlling and, instead, the nature of the statute must be determined by the operational effect of the law. *Id.* at 103-04; *see* 1A SUTHERLAND § 20:3, at 122-125 ("When considering the purpose of the legislation, purposes stated in the preamble are entitled to weight, although they are not conclusive. In general, statements regarding the scope or purpose of an act that appear in the preamble may aid the construction of doubtful clauses, but they cannot control the substantive provisions of the statute. The preamble of a legislative act is not part of the law, and it cannot be used to discern the legislature's intent if no doubt exists as to a statute's meaning.") (footnotes omitted).

The phrase "police and regulatory power" also appears in various parts of the Bankruptcy Code and Judicial Code. *See* 11 U.S.C. § 107(c)(2) (granting access to "protected" information "to an entity acting pursuant to the police or regulatory power of a domestic governmental unit"); 11 U.S.C. § 362(b)(4) (granting an exception to the automatic stay "to enforce such governmental unit's or organization's police and regulatory power, including the enforcement of a judgment other than a money judgment, obtained in an action or proceeding by the

governmental unit to enforce such governmental unit's or organization's police or regulatory

power"); 11 U.S.C. § 1519(d) (prohibiting the Court in a chapter 15 case from enjoining "a

police or regulatory act of a governmental unit, including a criminal action or proceeding"); 11

U.S.C. § 1521(d) (same); 28 U.S.C. § 1452(a) (prohibiting removal of a claim or cause of action

"by a governmental unit to enforce such governmental unit's police or regulatory power").

     The Bankruptcy Code does not define the term, but the legislative history to the

exception to the automatic stay states:

> Paragraph (4) excepts commencement or continuation of actions and proceedings
> by governmental units to enforce police or regulatory powers. Thus, where a
> governmental unit is suing a debtor to prevent or stop violation of fraud,
> environmental protection, consumer protection, safety, or similar police or
> regulatory laws, or attempting to fix damages for violation of such a law, the
> action or proceeding is not stayed under the automatic stay.

H.R. Rep No. 95-595 at 343 (1977); S. Rep. No. 95-989, at 52 (1978).  The sponsors of the

Bankruptcy Reform Act added that the phrase was intended to be given a narrow construction to

permit governmental units to protect the public health and safety but not to protect a

governmental unit's pecuniary interest in property of the debtor or its estate.  124 CONG. REC.

H11092 (daily ed. Sept. 28, 1978); S17409 CONG. REC. 17409 (daily ed. Oct 6, 1978) (remarks

of Rep. Edwards and Sen. DeConcini).

     The States argue that the "police and regulatory" exception should be interpreted in

accordance with state law (which would doom Indiana's argument), but the *Sale Order* must be

interpreted in accordance with general principles of contract law, and the Court must determine

the meaning the parties intended when they included the phrase in the *Sale Order*.  The States'

interpretation that it applies to the computation of New Chrysler's unemployment tax liability is

reasonable given the traditional view of unemployment insurance programs.  Furthermore, the

States' right to use Old Chrysler's Experience Rating to compute New Chrysler's contribution tax rate arises from Old Chrysler's ownership and operation of the property purchased from Old Chrysler.

New Chrysler's interpretation, which limits the exception to environmental statutes and regulations, is also reasonable.  Paragraph 23 applies to liabilities as the "owner or operator" of property, a phrase commonly found in the environmental laws, *see*, *e.g.*, 42 U.S.C. § 9607(a) (ascribing liability to the "owner and operator of a vessel or a facility" for the release of "a hazardous substance"); 33 U.S.C. § 1317(d) ("It shall be unlawful for any owner or operator of any source to operate any source in violation of any such effluent standard or prohibition or pretreatment standard."); 40 C.F.R. § 52.21(r)(1) (2014) ("Any owner or operator who constructs or operates a source or modification not in accordance with the application submitted pursuant to this section . . . shall be subject to appropriate enforcement action."), and included in paragraph 44 of the *Sale Order*, which specifically addresses environmental liabilities.  The States argue, in this regard, that since paragraph 44 of the *Sale Order* already addressed exceptions for environmental statutes and regulations, paragraph 23 should be interpreted to mean something else.  Redundancy, however, is the rule rather than the exception in the *Sale Order*,[11] and I do not necessarily draw the inference that the States argue I should.

Finally, New Chrysler has informed the Court that "the DOJ requested the inclusion of paragraph 23, and the Debtors and Chrysler Group agreed to the DOJ's request the day before the final Sale Order was presented to the Court."  (*New Chrysler Reply* at ¶ 29; *see* Tr. at 19:4-18.)  Given the ambiguity in paragraph 23, extrinsic evidence regarding the reason for its

---

[11]     For example, the notion that New Chrysler's assets were being transferred free and clear of successor liability, or that the Purchaser and its successors would not be responsible for those liabilities of Old Chrysler, is repeated with some variation numerous times.  (*See Sale Order* at ¶¶ Z, BB, 12, 13, 30, 35, 38, 39, 42, 44.)

inclusion and its intended purpose would assist the Court in determining its meaning, and the

Court will conduct an evidentiary hearing to resolve the ambiguity in paragraph 23.

Accordingly, the parties are directed to contact chambers to arrange a conference.  Prior

to the conference, the parties should confer regarding a discovery schedule on the narrow issue

that is presented, and if possible, submit a proposed consent order to the Court.

So ordered.

Dated: New York, New York
       October 8, 2015

/s/ *Stuart M. Bernstein*
STUART M. BERNSTEIN
United States Bankruptcy Judge