# EXHIBIT 1

Exhibit 1
Page 5 of 106

Division of Corporations - Filing                                              Page 1 of 1

---

Delaware.gov  |  Text Only                              Governor | General Assembly | Courts | Elected Officials | State Agencies

---

**Department of State: Division of Corporations**

Allowable Characters

| | |
|---|---|
| **HOME** | Frequently Asked Questions  View Search Results |
| About Agency | |
| Secretary's Letter | |
| Newsroom | |
| Frequent Questions | **Entity Details** |
| Related Links | |
| Contact Us | |
| Office Location | THIS IS NOT A STATEMENT OF GOOD STANDING |

| | | | |
|---|---|---|---|
| File Number: | 4681266 | Incorporation Date / Formation Date: | 4/28/2009 (mm/dd/yyyy) |
| Entity Name: | FCA US LLC | | |
| Entity Kind: | Limited Liability Company | Entity Type: | General |
| Residency: | Domestic | State: | DELAWARE |

**REGISTERED AGENT INFORMATION**

| | |
|---|---|
| Name: | THE CORPORATION TRUST COMPANY |
| Address: | CORPORATION TRUST CENTER 1209 ORANGE ST |
| City: | WILMINGTON | County: | New Castle |
| State: | DE | Postal Code: | 19801 |
| Phone: | 302-658-7581 |

Additional Information is available for a fee. You can retrieve Status for a fee of $10.00 or more detailed information including current franchise tax assessment, current filing history and more for a fee of $20.00.

Would you like ○ Status ○ Status,Tax & History Information  [Submit]

[Back to Entity Search]

---

For help on a particular field click on the Field Tag to take you to the help area.

site map  |  privacy  |  about this site  |  contact us  |  translate  |  delaware.gov

**SERVICES**
Pay Taxes
File UCC's
Delaware Laws Online
Name Reservation
Entity Search
Status
Validate Certificate
Customer Service Survey

**INFORMATION**
Corporate Forms
Corporate Fees
UCC Forms and Fees
Taxes
Expedited Services
Service of Process
Registered Agents
GetCorporate Status
Submitting a Request
How to Form a New Business Entity
Certifications, Apostilles & Authentication of Documents

https://icis.corp.delaware.gov/Ecorp/EntitySearch/NameSearch.aspx                5/26/2016

Exhibit 1
Page 6 of 106

# EXHIBIT 2

Exhibit 2
Page 7 of 106

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x

|  |  |  |
|---|---|---|
| In re | : | Chapter 11 |
|  | : |  |
| Chrysler LLC, *et al.*, | : | Case No. 09-50002 (AJG) |
|  | : |  |
| Debtors. | : | (Jointly Administered) |
|  | : |  |

-------------------------------------------------------------x

### ORDER (I) AUTHORIZING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES, (II) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES IN CONNECTION THEREWITH AND RELATED PROCEDURES AND (III) GRANTING RELATED RELIEF

       This matter coming before the Court on the motions, dated May 3, 2009 and

May 22, 2009 (Docket Nos. 190 and 1742) (collectively, the "Sale Motion")[1] filed by the above-

captioned debtors and debtors in possession (collectively, the "Debtors") for entry of an order

(the "Sale Order"), pursuant to sections 105, 363 and 365 of the United States Bankruptcy Code,

11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"), Rules 2002, 6004, 6006, 9008 and 9014 of

the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rules 2002-1, 6004-1,

6006-1 and 9006-1(b) of the Local Bankruptcy Rules for the United States Bankruptcy Court for

the Southern District of New York: (i) authorizing and approving the entry into, performance

under and terms and conditions of the Master Transaction Agreement, dated as of April 30, 2009

(collectively with all related agreements, documents or instruments and all exhibits, schedules

and addenda to any of the foregoing, and as amended, the "Purchase Agreement"), substantially

---

[1]    Unless otherwise stated, all capitalized terms not defined herein shall have the meanings given to them in the Sale Motion and the Bidding Procedures Order (as defined below).

NYI-4178439v24

Exhibit 2
Page 8 of 106

in the form attached hereto as <u>Exhibit A</u> (without all of its voluminous exhibits), between and among Fiat S.p.A. ("<u>Fiat</u>"), New CarCo Acquisition, LLC (the "<u>Purchaser</u>"), a Delaware limited liability company formed by Fiat, and the Debtors,[2] whereby the Debtors have agreed to sell, and the Purchaser has agreed to purchase the "<u>Purchased Assets</u>" (as such term is defined in Section 2.06 of the Purchase Agreement), which Purchased Assets include, without limitation, the Assumed Agreements (as defined below), substantially all of the Debtors' tangible, intangible and operating assets related to the research, design, manufacturing, production, assembly and distribution of passenger cars, trucks and other vehicles (including prototypes) under brand names that include Chrysler, Jeep® or Dodge (the "<u>Business</u>"), certain of the facilities related thereto and all rights, intellectual property, trade secrets, customer lists, domain names, books and records, software and other assets used in or necessary to the operation of the Business or related thereto to the Purchaser (collectively, and including all actions taken or required to be taken in connection with the implementation and consummation of the Purchase Agreement, the "<u>Sale Transaction</u>"); (ii) authorizing and approving the sale by the Debtors of the Purchased Assets, free and clear of liens, claims (as such term is defined by section 101(5) of the Bankruptcy Code), liabilities, encumbrances, rights, remedies, restrictions and interests and encumbrances of any kind or nature whatsoever whether arising before or after the Petition

---

[2]     The following Debtors are "Sellers" under the Purchase Agreement: Alpha Holding, LP ("<u>Alpha</u>"), Chrysler, LLC; Chrysler Aviation Inc.; Chrysler Dutch Holding LLC; Chrysler Dutch Investment LLC; Chrysler Dutch Operating Group LLC; Chrysler Institute of Engineering; Chrysler International Corporation; Chrysler International Limited, L.L.C.; Chrysler International Services, S.A.; Chrysler Motors LLC; Chrysler Realty Company LLC; Chrysler Service Contracts Florida, Inc.; Chrysler Service Contracts Inc.; Chrysler Technologies Middle East Ltd.; Chrysler Transport Inc.; Chrysler Vans LLC; DCC 929, Inc.; Dealer Capital, Inc.; Global Electric Motorcars, LLC; NEV Mobile Service, LLC; NEV Service, LLC; Peapod Mobility LLC; TPF Asset, LLC; TPF Note, LLC; and Utility Assets LLC.

Exhibit 2
Page 9 of 106

Date,[3] whether at law or in equity, including all claims or rights based on any successor or transferee liability, all environmental claims, all change in control provisions, all rights to object or consent to the effectiveness of the transfer of the Purchased Assets to the Purchaser or to be excused from accepting performance by the Purchaser or performing for the benefit of the Purchaser under any Assumed Agreement and all rights at law or in equity (collectively, "Claims") (other than certain liabilities that are expressly assumed or created by the Purchaser, as set forth in the Purchase Agreement or as described herein (collectively, the "Assumed Liabilities")); (iii) authorizing the assumption and assignment to the Purchaser of certain executory contracts and unexpired leases of the Debtors (collectively, the "Assumed Agreements") in accordance with the Contract Procedures set forth in the Bidding Procedures Order, the Purchase Agreement and this Sale Order; (iv) authorizing and approving the entry into, performance under and terms and conditions of the UAW Retiree Settlement Agreement (as defined herein); and (v) granting other related relief; the Court having conducted a hearing on the Sale Motion on May 27, 2009 through May 29, 2009 (collectively, the "Sale Hearing") at which time all interested parties were offered an opportunity to be heard with respect to the Sale Motion; the Court having reviewed and considered, among other things, (i) the Sale Motion and the exhibits thereto, (ii) the Purchase Agreement attached hereto as Exhibit A, (iii) this Court's prior order (Docket No. 492), dated May 8, 2009 (the "Bidding Procedures Order") approving competitive bidding procedures for the Purchased Assets (the "Bidding Procedures"), (iv) all objections to the Sale Transaction filed in accordance with the Bidding Procedures Order or raised on the record at the Sale Hearing, (v) Memorandum of Law in Support of Sale Motion

---

[3]   As used herein, "Petition Date" refers to (a) April 30, 2009 for all of the Debtors other than Alpha and (b) May 19, 2009 for Alpha.

Exhibit 2
Page 10 of 106

(Docket No. 191), (vi) Supplemental Memorandum of Law in Support of Sale Motion (Docket

No. 2130), (vii) the Consolidated Reply to Objections to the Sale Motion (Docket Nos. 2155 and

2565), (viii) the Statement of the United States Department of the Treasury in Support of the

Commencement of Chrysler LLC's Chapter 11 Case (Docket No. 69), (ix) the Statement of the

Official Committee of Unsecured Creditors in Support of Debtors Motion for Order Authorizing

the Sale of Substantially All of the Debtors' Assets Free and Clear of Liens, Claims, Interests and

Encumbrances (the "Creditors' Committee Statement"), and the related Memorandum of Law

(Docket No. 1846 and 2147); (x) the Response to Various Objections Relating to Successor

Liability Issues (Docket No. 2111); (xi) the Response of International Union, United

Automobile, Aerospace and Agricultural Implement Workers of America to Motion of the

Debtors and Debtors in Possession for an Order Authorizing the Sale of Substantially All of the

Debtors' Operating Assets and Other Relief (Docket No. 2085); (xii) the Supplemental Statement

of the International Union, United Automobile, Aerospace, and Agricultural Implement Workers

Union of America, AFL-CIO in Support of Motion of the Debtors and Debtors in Possession for

an Order Authorizing the Sale of Substantially All of the Debtors' Operating Assets and Other

Relief and Response to Individual Retiree Statements Concerning Approval of UAW Retiree

Settlement Agreement (Docket No. 2094) and (xiii) the arguments of counsel made, and the

evidence proffered or adduced, at the Sale Hearing; and it appearing that due notice of the Sale

Motion and the Bidding Procedures Order has been provided in accordance with the Bidding

Procedures Order and that the relief requested in the Sale Motion is in the best interests of the

Debtors, their estates and creditors and other parties in interest; and upon the record of the Sale

Hearing and these cases; and after due deliberation thereon; and good and sufficient cause

Exhibit 2
Page 11 of 106

appearing therefore, including for the reasons set forth in the Court's Opinion dated May 31,

2009 (Docket No. 3073);

**IT IS HEREBY FOUND AND DETERMINED THAT:**

### THE DEBTORS AND THESE CASES

        A.      As of the Petition Date and for a period of more than a year before the

commencement of these chapter 11 cases, the Debtors worked with financial advisors and with

their various constituencies to try to raise capital or implement a viable transaction that would

allow them to continue the Debtors' operations.  (See DX 20; May 27, 2009 Hearing Tr.

(Testimony of Tom Lasorda); May 28, 2009 Hearing Tr. (Testimony of Robert Nardelli);

Deposition of Scott Garberding, May 24, 2009, Exhibit 2, at 87-92).  The Debtors presented

credible evidence that, as of the Petition Date, they had explored strategic alternatives for

the Business over an extended period of time and had communicated with more than 15 parties

about possible sales, mergers, combinations and alternatives regarding debt or equity capital

investments or financing and had prepared standalone business plans in the event that strategic

alternatives did not materialize or were insufficient.  (See Id.).  The Sale Transaction is the result

of the Debtors' extensive efforts.

### JURISDICTION, FINAL ORDER AND STATUTORY PREDICATES

        B.      This Court has jurisdiction over the Sale Motion, the Sale Transaction and

the Purchase Agreements pursuant to 28 U.S.C. §§ 157(b)(1) and 1334(a), and this matter is a

core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (N) and (O).  Venue of these cases and

the Sale Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.  Debtor Peapod

Mobility LLC ("Peapod") is a New York limited liability company.  Debtor Chrysler Realty

Company LLC ("Chrysler Realty") is the owner of certain valuable real property located on

Exhibit 2
Page 12 of 106

11th Avenue in New York, New York. Debtor Chrysler is the direct or indirect parent of

Peapod, Chrysler Realty and each of the other Debtors.

        C.      This Sale Order constitutes a final and appealable order within the

meaning of 28 U.S.C. § 158(a). Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), the

Court expressly finds that there is no just reason for delay in the implementation of this Sale

Order, and expressly directs entry of judgment as set forth herein.

        D.      The statutory predicates for the relief sought in the Sale Motion and

granted in this Sale Order include, without limitation, sections 105(a), 363(b), (f) and (m) and

365(a), (b) and (f) of the Bankruptcy Code, and Bankruptcy Rules 2002, 6004 and 6006.

### JUDICIAL NOTICE

        E.      Pursuant to Federal Rule of Evidence 201(c), incorporated into these

proceedings pursuant to Bankruptcy Rule 9017, the Court takes judicial notice of the

(1) March 30, 2009 Remarks by the President of the United States on the American Automotive

Industry; (2) April 30, 2009 Remarks by the President of the United States on the Auto Industry;

and (3) the fact of the publication of the Notice of Proposed Sale of Substantially All of the

Debtors' Assets Free and Clear of Liens, Claims, Interests and Encumbrances and Final Sale

Hearing Related Thereto in the national editions of *The New York Times* on May 12, 2009, *The*

*Wall Street Journal* on May 12, 2009 and *USA Today* on May 13, 2009, and the worldwide

edition of *The Financial Times* on May 13, 2009. (See DX 8; DX 18; DX 19).

### SOUND BUSINESS PURPOSE

        F.      The Debtors seek to convey the Purchased Assets, including those related

to the research, design, manufacture (at 16 domestic manufacturing facilities), assembly (at

seven domestic assembly plants) and wholesale distribution of passenger cars and trucks under

Exhibit 2
Page 13 of 106

the brand names Chrysler, Jeep® and Dodge, all of which are subject to Claims, including those held by the Debtors' prepetition secured lenders. (See DX 64, at §2.06).

       G.      In the second half of 2008, Chrysler began to experience an "unprecedented" loss of cash (See May 28, 2009 Hearing Tr. (Testimony of Robert Nardelli)). Currently, the Debtors are losing over $100 million dollars per day. (See Deposition of Matthew Feldman, May 26, 2009, at 65:18-66:5). Unless the Sale Transaction is approved without delay, the Debtors' assets will continue to erode, and they will be forced to liquidate in the near term. (See May 28, 2009 Hearing Tr. (Testimony of Robert Nardelli); Deposition of Frank Ewasyshyn, May 24, 2009, at Exhibit 1, at 7-29)).

       H.      The Debtors have demonstrated, and the Purchase Agreement reflects, both (1) good, sufficient and sound business purposes and justifications for the immediate approval of the Purchase Agreement and the Sale Transaction (May 28, 2009 Hearing Tr. (Testimony James Chapman); May 28, 2009 Hearing Tr. (Testimony of Robert Nardelli)); and (2) compelling circumstances for the approval of the Purchase Agreement and the Sale Transaction outside of the ordinary course of the Debtors' business pursuant to section 363(b) of the Bankruptcy Code prior to, and outside of, a plan of reorganization in that, among other things, the Debtors' estates will suffer immediate and irreparable harm if the relief requested in the Sale Motion is not granted on an expedited basis (See May 28, 2009 Hearing Tr. (Testimony of Alfredo Altavilla); May 28, 2009 Hearing Tr. (Testimony of Robert Nardelli); Deposition of Scott Garberding, May 24, 2009, Exhibit 2, at 9-27; Deposition of Frank Ewasyshyn, May 24, 2009, Exhibit 1, at 8-29). In light of the exigent circumstances of these chapter 11 cases and the risk of deterioration in the going concern value of the Purchased Assets pending the proposed Sale Transaction, time is of the essence in (a) consummating the Sale Transaction, (b) preserving

Exhibit 2
Page 14 of 106

the viability of the Debtors' businesses as going concerns and (c) minimizing the widespread and

adverse economic consequences for the Debtors' estates, their creditors, employees, retirees, the

automotive industry and the broader economy that would be threatened by protracted

proceedings in these chapter 11 cases.  (See DX 13; DX 14; May 27, 2009 Hearing Tr.

(Testimony of Thomas Lasorda); May 28, 2009 Hearing Tr. (Testimony of Ronald Nardelli);

May 27, 2009 Hearing Tr. (Testimony of Alfredo Altavilla); May 28, 2009 Hearing Tr.

(Testimony of James Chapman); Deposition Tr. of Ronald Bloom, at 65; see generally DX 20).

   I.  The consummation of the Sale Transaction outside of a plan of

reorganization pursuant to the Purchase Agreement neither impermissibly restructures the rights

of the Debtors' creditors nor impermissibly dictates the terms of a liquidating plan of

reorganization for the Debtors.  The Sale Transaction does not constitute a *sub rosa* plan of

reorganization.  (See DX 4; DX 5; DX 10; May 27, 2009 Hearing Tr. (Testimony of Robert

Manzo)).

   J.  Entry of an order approving the Purchase Agreement and all the

provisions thereof is a necessary condition precedent to the Purchaser's consummation of the

Sale Transaction, as set forth in the Purchase Agreement.  (See DX 64, at § 8.02(q)).

   K.  The Purchase Agreement was not entered into, and none of the Debtors,

the Purchaser or the Purchaser's present or contemplated owners, have entered into the Purchase

Agreement or propose to consummate the Sale Transaction, for the purpose of hindering,

delaying or defrauding the Debtors' present or future creditors.  None of the Debtors,

the Purchaser nor the Purchaser's present or contemplated owners is entering into the Purchase

Agreement, or proposing to consummate the Sale Transaction, fraudulently for the purpose of

statutory and common law fraudulent conveyance and fraudulent transfer claims whether under

Exhibit 2
Page 15 of 106

the Bankruptcy Code or under the laws of the United States, any state, territory, possession
thereof, or the District of Columbia or any other applicable jurisdiction with laws substantially
similar to the foregoing.  (See DX 5; DX 6; DX 10; May 27, 2009 Hearing Tr. (Testimony of
Altavilla)).

**HIGHEST AND BEST OFFER**

L.      On May 8, 2009, this Court entered the Bidding Procedures Order
approving Bidding Procedures for the Purchased Assets.  The Bidding Procedures provided a
full, fair and reasonable opportunity for any entity to make an offer to purchase the Purchased
Assets.  No additional Qualifying Bids for the Purchased Assets were received by the Debtors.
Therefore, the Purchaser's bid, as reflected in the Purchase Agreement, is the only Qualified Bid
for the Purchased Assets and was designated as the Successful Bid pursuant to the Bidding
Procedures Order (Docket No. 492).  Likewise, no party came forward at the Sale Hearing with a
bid or offer.  As such, no Auction was conducted, and the Purchaser's bid, as reflected in the
Purchase Agreement, was presented to the Court as the Successful Bid. (See May 27, 2009
Hearing Tr. (Testimony of Robert Manzo)).

M.      As demonstrated by the testimony and other evidence proffered or
adduced prior to or at the Sale Hearing, and in light of the exigent circumstances presented and
emergency nature of the relief requested (1) the Debtors have adequately marketed the Purchased
Assets (See May 27, 2009 Hearing Tr. (Testimony of Thomas Lasorda); May 28, 2009 Hearing
Tr. (Testimony of Robert Nardelli); Deposition of Scott Garberding, May 24, 2009, Exhibit 2, at
87-92)); (2) the Purchased Assets are deteriorating rapidly in value and there are good business
reasons to sell these assets outside of a plan of reorganization (See May 28, 2009 Hearing Tr.
(Testimony of Robert Nardelli); Deposition of Frank Ewasyshyn, May 24, 2009, at Exhibit 1, at
7-29; Deposition of Matthew Feldman, May 26, 2009, at 65:21-66:5)); (3) the consideration

Exhibit 2
Page 16 of 106

provided for in the Purchase Agreement constitutes the highest or otherwise best offer for the

Purchased Assets and provides fair and reasonable consideration for the Purchased Assets (See

May 27, 2009 Hearing Tr. (Testimony of Robert Manzo); May 28, 2009 Hearing Tr. (Testimony

of Robert Nardelli)); (4) the Sale Transaction, as a transfer of deteriorating assets, is an

extraordinary, non-market transaction, the consideration for which exceeds what would have

been obtainable in a transaction subject to ordinary market forces (See Deposition of Ronald

Bloom, May 26, 2009, at 65:4-66:10); (5) the Sale Transaction is the only alternative to

liquidation available to the Debtors (See May 28, 2009 Hearing Tr. (Testimony of Robert

Nardelli); (6) if the Sale Transaction is not approved and consummated, the Debtors will have

no alternative but to cease operations and liquidate (See May 28, 2009 Hearing Tr. (Testimony

of Robert Nardelli)); (7) the Sale Transaction will provide a greater recovery for the Debtors'

creditors than would be provided by any other practical available alternative, including, without

limitation, liquidation whether under chapter 11 or chapter 7 of the Bankruptcy Code (See DX;

May 27, 2009 Hearing Tr. (Testimony of Robert Manzo)); (8) no other party or group of parties

has offered to purchase the Purchased Assets for greater economic value to the Debtors or their

estates (See May 27, 2009 Hearing Tr. (Testimony of Robert Manzo); May 27, 2009 Hearing Tr.

(Testimony of Thomas Lasorda); May 28, 2009 Hearing Tr. (Testimony of Robert Nardelli));

(9) the consideration to be paid by the Purchaser under the Purchase Agreement exceeds the

liquidation value of the Purchased Assets (See May 27, 2009 Hearing Tr. (Testimony of Robert

Manzo)) and (10) the consideration to be paid by the Purchaser under the Purchase Agreement

constitutes reasonably equivalent value and fair consideration (as those terms may be defined in

each of the Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act and

section 548 of the Bankruptcy Code) under the Bankruptcy Code and under the laws of the

Exhibit 2
Page 17 of 106

United States, any state, territory or possession thereof or the District of Columbia, or any other applicable jurisdiction with laws substantially similar to the foregoing. (See DX 14; DX 15; May 28, 2009 Hearing Tr. (Testimony of James Chapman); May 28, 2009 Hearing Tr. (Testimony of Robert Nardelli)). The Debtors' determination that the Purchase Agreement constitutes the highest and best offer for the Purchased Assets constitutes a valid and sound exercise of the Debtors' business judgment. (See May 27, 2009 Hearing Tr. (Testimony of Thomas Lasorda); May 28, 2009 Hearing Tr. (Testimony of James Chapman); May 28, 2009 Hearing Tr. (Testimony of Robert Nardelli)).

        N.     Neither the Purchaser nor Fiat have furnished the Debtors with a good faith deposit in connection with the Purchase Agreement. The Debtors submit that in light of the extensive prepetition negotiations culminating in the various complex agreements with the Debtors, the United States Department of the Treasury (the "U.S. Treasury"), the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (the "UAW") and other stakeholders, as well as Fiat's substantial investment of time and resources, the Purchaser's and Fiat's commitment to consummate the Fiat Transaction is clear without the need to provide a good faith deposit. See May 27, 2009 Hearing Tr. (Testimony of Alfredo Altavilla); May 28, 2009 (Testimony of David Curson); May 28, 2009 (Testimony of Robert Nardelli); May 28, 2009 (Testimony of James Chapman); Deposition of Matthew Feldman, May 26, 2009, at 37:21-39:1)).

### BEST INTEREST OF CREDITORS

        O.     Approval of the Purchase Agreement and the consummation of the Sale Transaction with the Purchaser at this time is in the best interests of the Debtors, their estates, creditors, employees, retirees and other parties in interest. (See DX 6; Creditors' Committee Statement, at ¶ 2, Docket No. 1846; May 28, 2009 Hearing Tr. (Testimony of David Curson)).

NYI-4178439v24

-11-

Exhibit 2
Page 18 of 106

## DESCRIPTION OF THE PURCHASER AND THE PURCHASER'S GOOD FAITH

P.      The Purchaser is a newly formed Delaware limited liability company that as of the date of the Sale Hearing, is a wholly-owned subsidiary of Fiat. The Purchaser is not an "insider" of any of the Debtors, as that term is defined by section 101(31) of the Bankruptcy Code. (See DX 64, at Art. IV-A).

Q.      Upon the closing of the Sale Transaction (the "Closing"), (1) Fiat will contribute to the Purchaser certain valuable technology and management expertise, (2) the U.S. Treasury and Export Development Canada ("EDC") will lend the Purchaser approximately $8 billion in new financing and (3) the UAW Retiree Settlement Agreement, the entry into which is a condition to the UAW CBA (as defined below) and its assumption and assignment to Purchaser, will become effective. Following the making of the foregoing contributions to the Purchaser, Fiat, the VEBA (as defined below), the U.S. Treasury and EDC, through 7169931 Canada Inc., will hold 100% of the equity in the Purchaser. (DX 3; DX 64, Exhibit J, K).

R.      The Purchaser is a person with whom the Debtors are associated within the meaning of section 525 of the Bankruptcy Code.

S.      The Purchase Agreement and each of the transactions contemplated therein were negotiated, proposed and entered into by the Debtors and the Purchaser in good faith, without collusion and from arm's-length bargaining positions. The Purchaser has proceeded in good faith in all respects in connection with this proceeding, is a "good faith purchaser" within the meaning of section 363(m) of the Bankruptcy Code and, as such, is entitled to all the protections afforded thereby. None of the Debtors, the Purchaser nor the Purchaser's present or contemplated owners have engaged in any conduct that (1) would cause or permit the Purchase Agreement or any of the transactions contemplated thereby to be avoided; (2) would tend to hinder, delay or defraud creditors; or (3) impose costs and damages under section 363(n)

NYI-4178439v24                                      -12-

Exhibit 2
Page 19 of 106

of the Bankruptcy Code. (See May 27, 2009 Hearing Tr. (Testimony of Alfredo Altavilla);

May 27, 2009 (Testimony of Robert Manzo); May 28, 2009 Hearing Tr. (Testimony of David

Curson); May 28, 2009 Hearing Tr. (Testimony of Robert Nardelli); Deposition of Matthew

Feldman, May 26, 2009, at 37:21-39:1; Deposition Tr. of Ronald Bloom, at 87).

NOTICE OF THE SALE MOTION, AND THE CURE AMOUNTS

   T. As evidenced by the affidavits and certificates of service filed with the

Court, in light of the exigent circumstances of these cases and the wasting nature of the Debtors'

temporarily idled facilities and assets and based upon the representations of counsel at the Sale

Hearing and the testimony of the Debtors' claims and noticing agent, the Court finds that:

(1) proper, timely, adequate and sufficient notice of the Sale Motion, the Bidding Procedures

Order, the Sale Hearing and the UAW Retiree Settlement Agreement has been provided by

the Debtors in accordance with the Bidding Procedures Order; (2) such notice, and the form and

manner thereof, was good, sufficient, reasonable and appropriate under the exigent

circumstances prevailing in these chapter 11 cases; and (3) no other or further notice of the Sale

Motion, the Sale Transaction, the Bidding Procedures, the Sale Hearing or the UAW Retiree

Settlement Agreement is or shall be required. (See DX 7; May 27, 2009 Hearing Tr. (Testimony

of Daniel McElhinney)). In light of the need to grant the relief requested in the Sale Motion on

an expedited basis to avoid any erosion in the going concern value of the Purchased Assets, a

reasonable opportunity to object or be heard with respect to the Sale Motion and the relief

requested therein has been afforded to all interested persons and entities, including, but not

limited to, the following:

    (i) counsel to the Official Committees of Unsecured Creditors appointed in
these chapter 11 cases under section 1102 of the Bankruptcy Code (the "Creditors
Committee");

Exhibit 2
Page 20 of 106

(ii)     the U.S. Treasury, a prepetition lender and the provider of the debtor in possession financing approved by this Court on a final basis on May 20, 2009 (the "DIP Financing Facility")"), outside counsel to the U.S. Treasury and the Acting United States Attorney for the Southern District of New York;

(iii)    counsel to EDC, a lender under the DIP Financing Facility;

(iv)    counsel to the UAW;

(v)     counsel to the Purchaser;

(vi)    counsel to the administrative agent and collateral agent for the Debtors' prepetition secured First Lien Lenders (as defined below);

(vii)   counsel to Cerberus;

(viii)  counsel to Daimler;

(ix)    parties who, in the past year, have expressed in writing to the Debtors an interest in acquiring the Purchased Assets;

(x)     nondebtor parties (collectively, the "Non-Debtor Counterparties") to the Assumed Agreements;

(xi)    all parties who are known or reasonably believed to have asserted a lien, encumbrance, claim or other interest in the Purchased Assets or who are reflected as secured parties in lien searches conducted by the Debtors;

(xii)   the Securities and Exchange Commission;

(xiii)  the Internal Revenue Service;

(xiv)   all applicable state attorneys general, local environmental enforcement agencies and local regulatory authorities;

(xv)    all applicable state and local taxing authorities;

(xvi)   the Office of the United States Trustee for the Southern District of New York;

(xvii)  the Federal Trade Commission;

(xviii) the United States Attorney General/Antitrust Division of Department of Justice;

(xix)   the Environmental Protection Agency;

(xx)    the United States Attorney;

NYI-4178439v24                          -14-

Exhibit 2
Page 21 of 106

(xxi)    the Pension Benefit Guaranty Corporation;

(xxii)    applicable foreign regulatory authorities in non-U.S. countries in which the Debtors do business;

(xxiii)    all parties that filed objections to the Sale Motion;

(xxiv)    all entities that have requested notice in these chapter 11 cases under Bankruptcy Rule 2002;

(xxv)    the Debtors' retirees and surviving spouses represented by the UAW, including the members of the "Class" as defined in the UAW Retiree Settlement Agreement;

(xxvi)    all employees of the Debtors;

(xxvii)    all dealers with current agreements for the sale or leasing of Chrysler, Jeep or Dodge brand vehicles;

(xxviii)    any other party identified on the creditor matrix in these cases.

(See DX 7).

U.    Additionally, the Debtors published notice of the Sale Transaction in the national editions of *USA Today*, *The Wall Street Journal* and *The New York Times*, as well as the worldwide edition of *The Financial Times*. (See DX 8). With regard to parties who have claims against the Debtors, but whose identities are not reasonably ascertainable by the Debtors (including, but not limited to, parties with potential contingent warranty claims against the Debtors), the Court finds that such publication notice was sufficient and reasonably calculated under the circumstances to reach such parties.

V.    In accordance with the Contract Procedures as set forth in the Bidding Procedures Order, the Debtors have provided notice or shall provide notice (an "Assignment Notice") of their intent to assume and assign the Assumed Agreements and of the related proposed amounts ("Cure Costs") to cure prepetition and postpetition defaults under Assumed Agreements with each such Non-Debtor Counterparty. See Notices of Filing of Schedules of Designated Agreements (DX 16; DX 62; DX 63; Deposition of Scott Garberding, May 24, 2009,

NYI-4178439v24                              -15-

Exhibit 2
Page 22 of 106

Exhibit 1). The service and provision of the Assignment Notices that were served in accordance with the Bidding Procedures Order, was good, sufficient and appropriate under the circumstances and no further notice need be given with respect to the Cure Costs for the Assumed Agreements described by the Assignment Notices and the assumption and assignment of the Assumed Agreements. (See Affidavits of Service (Docket Nos. 1041, 1996, 1997, 1998, 2003, 2004, 2016, 2017, 2018, 2019, 2020, 2022, 2023, 2025, 2026, 2027, 2028, 2029, 2030, 2081 and 2108). All Non-Debtor Counterparties to the Assumed Agreements have had an opportunity to object to both the Cure Costs listed in the Assignment Notices and the assumption and assignment of the Assumed Agreements (including objections related to the adequate assurance of future performance and objections based on whether applicable law excuses the Non-Debtor Counterparty from accepting performance by, or rendering performance to, the Purchaser for purposes of section 365(c)(1) of the Bankruptcy Code). With respect to executory contracts or unexpired leases that are designated by the Debtors as Assumed Agreements pursuant to the Contract Procedures and Section 2.10 of the Purchase Agreement and for which responses to Assignment Notices are due after the entry of this Sale Order, the Contract Procedures provide all Non-Debtor Counterparties to such Assumed Agreements with the opportunity to object to both the Cure Costs identified in any Assignment Notice delivered to any such Non-Debtor Counterparty and the assumption and assignment of the applicable Assumed Agreement (including objections related to the adequate assurance of future performance and objections based on whether applicable law excuses the Non-Debtor Counterparty from accepting performance by, or rendering performance to, the Purchaser for purposes of section 365(c)(1) of the Bankruptcy Code).

Exhibit 2
Page 23 of 106

## SECTION 363(F) REQUIREMENTS MET FOR FREE AND CLEAR SALE

W.     The Debtors may sell the Purchased Assets free and clear of all Claims
because, in each case where a Claim is not an Assumed Liability, one or more of the standards
set forth in section 363(f)(1)-(5) of the Bankruptcy Code have been satisfied.  Except as provided
in this Sale Order, the assumption and assignment of each of the Assumed Agreements is also
free and clear of all Claims other than the payment of the Cure Costs.

X.     The Debtors are the sole and lawful owners of the Purchased Assets and
no other person has any ownership right title or interest therein.  The Debtors' non-Debtor
affiliates have acknowledged and agreed to the sale and, as required by and in accordance with
the Transition Services Agreement, transferred any legal, equitable or beneficial right, title or
interest they may have in or to the Purchased Assets to the Purchaser.  (See DX 64).

Y.     The transfer of Purchased Assets constituting "Collateral" as defined
under that certain Second Amended and Restated Collateral Trust Agreement (the "CTA"), dated
as of January 2, 2009, among, _inter alia_, certain of the Debtors and their subsidiaries, JPMorgan
Chase Bank, N.A. as both First Priority Agent ("First Priority Agent") and Second Priority
Agent, the U.S. Treasury as Third Priority Agent and Wilmington Trust Company as Collateral
Trustee (the "Collateral Trustee") has been consented to for purposes of section 363(f)(2) of the
Bankruptcy Code, subject to and in accordance with that certain Consent to Sale and Liquidation
of Collateral delivered by the First Priority Agent as "Controlling Party" under the CTA to the
Debtors (the "First Priority Consent"), subject to the terms of the First Priority Consent,
including, without limitation, to the indefeasible payment by the Purchaser immediately upon the
sale of the Purchased Assets of $2 billion in immediately available funds to the First Priority
Agent to be applied as set forth in the First Priority Consent.  The First Priority Consent binds all

NYI-4178439v24                                    -17-

Exhibit 2
Page 24 of 106

parties holding debt under the First Lien Credit Agreement in their capacity as such (collectively, the "First Lien Lenders"). (See DX 55; DX 57).

        Z.     In addition, those holders of Claims who did object fall within one or more of the other subsections of sections 363(f) and 365 of the Bankruptcy Code as (1) the consideration received in exchange for the Purchased Assets is greater than the aggregate value of all liens on the Purchased Assets (See May 27, 2009 Hearing Tr. (Testimony of Robert Manzo)), (2) there is a *bona fide* dispute with respect to certain of the Claims asserted (e.g., claims of certain dealers relating to the proposed rejection of their dealership agreements) (See May 28, 2009 Hearing Tr. (Testimony of Peter Grady); May 27, 2009 Hearing Tr. (Testimony of Alfredo Altavilla)); or (3) such holders could be compelled in a legal or equitable proceeding to accept a money satisfaction of their Claims.  The transfer of the Purchased Assets to the Purchaser under the Purchase Agreement will be a legal, valid and effective transfer of all of the legal, equitable and beneficial right, title and interest in and to the Purchased Assets free and clear of all Claims that are not Assumed Liabilities (including, specifically and without limitation, any products liability claims, environmental liabilities, employee benefit plans and any successor liability claims), except as otherwise provided in this Sale Order.  All holders of Claims are adequately protected — and the Sale Transaction thus satisfies section 363(e) of the Bankruptcy Code — by having their Claims, if any, attach to the proceeds of the Sale Transaction ultimately attributable to the property against which they have a Claim or other specifically dedicated funds, in the same order of priority and with the same validity, force and effect that such Claim holder had prior to the Sale Transaction, subject to any rights, claims and defenses of the Debtors or their estates, as applicable, or as otherwise provided herein.

Exhibit 2
Page 25 of 106

AA.     The Purchaser would not have entered into the Purchase Agreement and
would not consummate the Sale Transaction, thus adversely affecting the Debtors, their estates,
creditors, employees, retirees and other parties in interest if the sale of the Purchased Assets was
not free and clear of all Claims other than Assumed Liabilities, or if the Purchaser would, or in
the future could, be liable for any such Claims, including, without limitation and as applicable,
certain liabilities (collectively, the "Excluded Liabilities") that expressly are not assumed by the
Purchaser, as set forth in the Purchase Agreement or in this Sale Order.  The Purchaser asserts
that it will not consummate the Sale Transaction unless the Purchase Agreement specifically
provides and this Court specifically orders that none of the Purchaser, its affiliates, their present
or contemplated members or shareholders (other than the Debtors as the holder of equity in
Purchaser), or the Purchased Assets will have any liability whatsoever with respect to, or be
required to satisfy in any manner, whether at law or in equity, whether by payment, setoff or
otherwise, directly or indirectly, (a) any Claim other than (x) an Assumed Liability or (y) a
Claim against any "Purchased Company" (as such term is defined in the Purchase Agreement) or
(b) any successor liability for any of the Debtors.  (See May 27, 2009 Hearing Tr. (Testimony of
Alfredo Altavilla)).

BB.     Without limiting the generality of the foregoing, the Purchase Agreement
provides the Debtors with reasonably equivalent value and fair consideration (as those terms are
defined in the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act and
the Bankruptcy Code), and was not entered into for the purpose or, nor does it have the effect of,
hindering, delaying or defrauding creditors of any of the Debtors under any applicable laws.
Except for the Assumed Liabilities, the Sale Transaction shall not impose or result in the
imposition of any liability or responsibility on Purchaser or its affiliates, successors or assigns or

NYI-4178439v24                                      -19-

Exhibit 2
Page 26 of 106

any of their respective assets (including the Purchased Assets), and the transfer of the Purchased
Assets to the Purchaser does not and will not subject the Purchaser or its affiliates, successors or
assigns or any of their respective assets (including the Purchased Assets), to any liability for any
Claims, including, without limitation, for any successor liability or any products liability for the
sale of any vehicles by the Debtors or their predecessors or affiliates, except as expressly
identified as an Assumed Liability.

### ASSUMPTION AND ASSIGNMENT OF THE ASSUMED AGREEMENTS

    CC.    The assumption and assignment of the Assumed Agreements are integral
to the Purchase Agreement, are in the best interests of the Debtors and their estates and represent
the reasonable exercise of the Debtors' sound business judgment.  (See May 27, 2009 Hearing
Tr. (Testimony of Alfredo Altavilla); May 28, 2009 Hearing Tr. (Testimony of David Curson);
May 28, 2009 Hearing Tr. (Testimony of Peter Grady); May 27, 2009 Hearing Tr. (Testimony of
Thomas Lasorda); May 28, 2009 Hearing Tr. (Testimony of Robert Nardelli); May 28, 2009
Hearing Tr. (Testimony of James Chapman)).

    DD.    With respect to each of the Assumed Agreements, the Debtors have met
all requirements of section 365(b) of the Bankruptcy Code.  Further, the Purchaser has provided
all necessary adequate assurance of future performance under the Assumed Agreements in
satisfaction of sections 365(b) and 365(f) of the Bankruptcy Code.  (See May 27, 2009 Hearing
Tr. (Testimony of Alfredo Altavilla)).  Accordingly, the Assumed Agreements can be assumed
by the Debtors and assigned to the Purchaser, as provided for in the Contract Procedures set forth
in the Bidding Procedures Order, the Sale Motion and the Purchase Agreement.  The Contract
Procedures are fair, appropriate and effective and, upon the payment by the Purchaser of all Cure
Costs (which costs are the sole obligation of the Purchaser under the Purchase Agreement) and
the payment of such other obligations assumed pursuant to this Sale Order and approval of the

NYI-4178439v24

Exhibit 2
Page 27 of 106

assumption and assignment for a particular Assumed Agreement thereunder, the Debtors shall be forever released from any and all liability under the Assumed Agreement.

    EE.    The Purchaser has acknowledged that it will be required to comply with the National Traffic and Motor Vehicle Safety Act, as amended and recodified ("NTMVSA"), as applicable to the business of the Purchaser after the Closing Date. In addition, the Purchaser has agreed to assume as Assumed Liabilities under the Purchase Agreement and this Sale Order the Debtors' notification, remedy and other obligations under 49 U.S.C. §§ 30116 through 30120 of the NTMVSA relating to vehicles manufactured by the Debtors prior to the Closing Date that have a defect related to motor vehicle safety or do not to comply with applicable motor vehicle safety standards prescribed under the NTMVSA. The Purchaser shall not otherwise be liable for any failure by the Debtors to comply with the provisions of the NTMVSA.

    FF.    For the avoidance of doubt, and notwithstanding anything else in this Sale Order to the contrary:

- the Debtors are neither assuming nor assigning to the Purchaser the settlement agreement (the "2008 Settlement Agreement") between the Debtors, the UAW and certain of the Debtors' retirees, dated March 31, 2008, which was approved by the United States District Court for the Eastern District of Michigan on July 31, 2008, in the class action of *Int'l Union, UAW, et al. v. Chrysler, LLC*, Case No. 07-CV-14310 (E.D. Mich. filed Oct. 11, 2007) and established, among other things, an independent Voluntary Employee Beneficiary Association (the "VEBA") that would become responsible for retiree health care on behalf of current and future UAW retirees of the Debtors and their surviving spouses and eligible dependents (the "*English* Case VEBA") (DX 4; May 28, 2009 Hearing Tr. (Testimony of David Curson));

- the 2007 Chrysler-UAW National Agreement, including (1) the Production, Maintenance and Parts National Agreement, (2) the Engineering Office & Clerical National Agreement, (3) the Toledo Assembly Plant/Jeep Unit, Local 12 Agreement, (4) Daimler Chrysler Financial Services North America, LLC (Farmington) and (5) Daimler Chrysler Financial Services North America, LLC (Detroit), and all appendices, memoranda of understanding, supplemental agreements, local agreements and benefit plans, as modified effective April 30, 2009 (the "UAW CBA"), shall be assumed by the Debtors and assigned to the Purchaser pursuant to this Sale Order and section 365 of the Bankruptcy

Exhibit 2
Page 28 of 106

Code. Assumption and assignment of the UAW CBA is integral to the Sale Transaction and the Purchase Agreement, is in the best interests of the Debtors and their estates, creditors, employees and retirees and represent the reasonable exercise of the Debtors' sound business judgment (See May 28, 2009 Hearing Tr. (Testimony of David Curson));

- the UAW, as the exclusive collective bargaining representative of employees of the Purchaser and the "authorized representative" of UAW-represented retirees of the Debtors under section 1114(c) of the Bankruptcy Code, and the Purchaser engaged in good faith negotiations in conjunction with the Sale Transaction regarding the funding of retiree health benefits within the meaning of section 1114(a) of the Bankruptcy Code. Conditioned upon the consummation of the Sale Transaction and the assumption and assignment of the UAW CBA, the UAW and the Purchaser have entered into a Retiree Settlement Agreement (the "UAW Retiree Settlement Agreement"), which, among other things, provides for the financing by the Purchaser of modified retiree health care obligations for the Class and Covered Group (as defined in the UAW Retiree Settlement Agreement) through contributions by the Purchaser to the *English* Case VEBA. The Debtors, the Purchaser and the UAW specifically intend that their actions in connection with the UAW Retiree Settlement Agreement and related undertakings incorporate the compromise of certain claims and rights and shall be deemed to satisfy the requirements of 29 U.S.C. § 186(c)(2) (See DX 4; May 28, 2009 Hearing Tr. (Testimony of David Curson)); and

- the Debtors' sponsorship of the Internal Existing VEBA (as defined in the UAW Retiree Settlement Agreement) shall be transferred to the Purchaser under the Purchase Agreement (See DX 64, at § 6.08).

### VALIDITY OF THE TRANSFER

GG.    As of the closing of the Sale Transaction (the "Closing"), the transfer of

the Purchased Assets to the Purchaser will be a legal, valid and effective transfer of the

Purchased Assets, and will vest the Purchaser with all right, title and interest of the Debtors in

and to the Purchased Assets, free and clear of all Claims other than Assumed Liabilities.

HH.    With the entry of this Sale Order, the Debtors (1) have full corporate

power and authority to execute the Purchase Agreement and all other documents contemplated

thereby, and the Sale Transaction has been duly and validly authorized by all necessary corporate

action of the Debtors; (2) have all of the corporate power and authority necessary to consummate

the transactions contemplated by the Purchase Agreement; (3) have taken all actions necessary to

NYI-4178439v24                                                   -22-

Exhibit 2
Page 29 of 106

authorize and approve the Purchase Agreement and the consummation by the Debtors of the
transactions contemplated thereby; and (4) upon entry of this Sale Order, need no consents or
approvals, other than those expressly provided for in the Purchase Agreement, which may be
waived by the Purchaser, to consummate such transactions.  (See DX 38; DX 64 at Art. IV-A).

    II.      To the extent that the right, title and interest of the Debtors in and to any
of the Purchased Assets ultimately is transferred to the Purchaser after the Closing pursuant to a
plan of reorganization confirmed in these chapter 11 cases, such transfer shall be deemed a
transfer pursuant to section 1146 of the Bankruptcy Code and shall not be taxed under any law
imposing a stamp, transfer or any other similar tax.

### PERSONALLY IDENTIFIABLE INFORMATION

    JJ.      The Debtors currently maintain certain privacy policies that govern the use
of "personally identifiable information" (as such term is defined by section 101(41A) of the
Bankruptcy Code) in the operation of their businesses.  The Debtors propose to sell certain assets
containing personally identifiable information in a manner that is not in compliance with their
current existing privacy policies.  As such, in the Bidding Procedures Order, the Court directed
the U.S. Trustee to promptly appoint a consumer privacy ombudsman in accordance with
section 332 of the Bankruptcy Code, and Alan Chapell, CIPP (the "Privacy Ombudsman") was
appointed as a consumer privacy ombudsman under section 332 of the Bankruptcy Code on
May 11, 2009 (Docket No. 594).  The Privacy Ombudsman is a disinterested person as required
by section 332(a) of the Bankruptcy Code.  The Privacy Ombudsman filed his report with the
Court on May 28, 2009 (Docket No. 2790) (the "Ombudsman Report") and presented his report
at the Sale Hearing, and the Ombudsman Report has been reviewed and considered by the Court.
The Court has given due consideration to the (1) facts, (2) exigent circumstances surrounding
and (3) the conditions of the sale of personally identifiable information in connection with the

Exhibit 2
Page 30 of 106

Sale Transaction, including as set forth in the Ombudsman Report.  No showing has been made

that the sale of personally identifiable information in connection with the Sale Transaction

violates applicable non-bankruptcy law, and the Court concludes that such sale is appropriate in

conjunction with the Sale Transaction.

**NOW THEREFORE, IT IS HEREBY**
**ORDERED, ADJUDGED, AND DECREED THAT:**

GENERAL PROVISIONS

1.      The Sale Motion is granted in its entirety and entry into and performance

under and in respect of the Purchase Agreement and the Sale Transaction is approved, as set

forth in this Sale Order.

2.      The findings of fact and conclusions of law set forth in the Court's

Opinion, dated May 31, 2009 (Docket No. 3073), as supplemented by the findings of fact stated

above and conclusions of law stated herein shall constitute this Court's findings of fact and

conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding

pursuant to Bankruptcy Rule 9014.  To the extent any finding of fact later shall be determined to

be a conclusion of law, it shall be so deemed, and to the extent any conclusion of law later shall

be determined to be a finding of fact, it shall be so deemed.

3.      All objections, if any, to the Sale Motion or the relief requested therein

that have not been withdrawn, waived or settled as announced to the Court at the Sale Hearing or

by stipulation filed with the Court, and all reservations of rights included therein, are hereby

overruled on the merits with prejudice, except as expressly provided herein.  Attached hereto as

Exhibit B is a summary schedule of filed objections and the treatment of each.

NYI-4178439v24                              -24-

Exhibit 2
Page 31 of 106

## APPROVAL OF THE PURCHASE AGREEMENT

4.      The Purchase Agreement, all transactions contemplated therein and all of the terms and conditions thereof are hereby approved, subject to the terms and conditions of this Sale Order to the extent of any express conflict herewith.  In the event of any direct conflict between the terms and conditions of the Purchase Agreement and those of this Sale Order as in effect at the Closing Date, the terms and conditions of this Sale Order shall govern, provided that no change to this Sale Order made after the Closing Date without the consent of the Purchaser shall affect the rights or obligations of the Purchaser arising out of or relating to the Purchase Agreement in any manner.

5.      Pursuant to sections 105, 363 and 365 of the Bankruptcy Code, the Debtors are authorized and directed to perform their obligations under and comply with the terms of the Purchase Agreement and consummate the Sale Transaction, pursuant to and in accordance with the terms and conditions of the Purchase Agreement and this Sale Order.

6.      The Debtors, as well as their affiliates, officers, employees and agents, are authorized and directed to execute and deliver, and empowered to perform under, consummate and implement, the Purchase Agreement, in substantially the same form as the Purchase Agreement attached hereto as Exhibit A, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the Purchase Agreement and to take all further actions and execute such other documents as may be (a) reasonably requested by the Purchaser for the purpose of assigning, transferring, granting, conveying and conferring to the Purchaser, or reducing to possession, the Purchased Assets (including, but not limited to, all necessary transition services to be provided to the Purchaser by the Debtors), (b) necessary or appropriate to the performance of the obligations contemplated by the Purchase Agreement and (c) as may be reasonably requested by Purchaser to implement the Purchase Agreement and

Exhibit 2
Page 32 of 106

consummate the Sale Transaction in accordance with the terms thereof, all without further order

of the Court.

        7.     This Sale Order and the Purchase Agreement shall be binding in all

respects upon the Purchaser, the Debtors, their affiliates, any trustees appointed in the Debtors'

cases (whether under chapter 11 or chapter 7 of the Bankruptcy Code), all creditors (whether

known or unknown) of any Debtors, all interested parties and their successors and assigns,

including, but not limited to, any party asserting a Claim and any Non-Debtor Counterparty to

the Assumed Agreements. Nothing contained in any chapter 11 plan confirmed in these

bankruptcy cases or the order confirming any such chapter 11 plan shall conflict with or derogate

from the provisions of the Purchase Agreement or this Sale Order, and to the extent of any

conflict or derogation between this Sale Order or the Purchase Agreement and such future plan

or order, the terms of this Sale Order and the Purchase Agreement shall control to the extent of

such conflict or derogation.

        8.     All amounts, if any, to be paid by Debtors' pursuant to the Purchase

Agreement shall constitute administrative expenses pursuant to sections 503(b) and 507(a)(1) of

the Bankruptcy Code and shall be due and payable if and when any Debtors' obligations arise

under the Purchase Agreement without further order of the Court.

### TRANSFER OF PURCHASED ASSETS FREE AND CLEAR

        9.     Pursuant to sections 105(a) and 363(f) of the Bankruptcy Code,

the Debtors are authorized and directed to transfer the Purchased Assets in accordance with the

terms of the Purchase Agreement. The Purchased Assets shall be transferred to the Purchaser,

and upon consummation of the Purchase Agreement, such transfer (a) shall be a valid, legal,

binding and effective transfer; (b) shall vest the Purchaser with all right, title and interest of

the Debtors in the Purchased Assets; and (c) shall be free and clear of all Claims except for

NYI-4178439v24                -26-

Exhibit 2
Page 33 of 106

Assumed Liabilities with all such Claims to attach to the proceeds of the Sale Transaction ultimately attributable to the Purchased Assets against or in which such Claims are asserted, or other specifically dedicated funds, in the order of their priority, with the same validity, force and effect which they now have as against the Purchased Assets, subject to any rights, claims and defenses the Debtors or their estates, as applicable, may possess with respect thereto.

10.     In connection with the transfer of the Purchased Assets to the Purchaser (a) the Debtors are authorized and directed to execute, deliver and perform their obligations under the First Priority Consent, including by indefeasibly paying, or causing the indefeasible payment of, immediately upon consummation of such transfer of the Purchased Assets, $2 billion in immediately available funds to the First Priority Agent to be applied as set forth in the First Priority Consent; and (b) Wilmington Trust Company as Collateral Trustee under the CTA is authorized and directed to comply with the Direction Letter dated as of May 27, 2009 delivered to it by the First Priority Agent as "Controlling Party" under the CTA, including by executing and delivering such documents as are necessary to permit the transfer of the Purchased Assets free and clear of liens on the Purchased Assets held by Wilmington Trust Company as Collateral Trustee under the CTA.

11.     Notwithstanding paragraph 15 below or anything to the contrary in this Sale Order or the Purchase Agreement, (a) any Purchased Asset that is subject to any mechanics', carriers', workers', repairers', shippers', marine cargo, construction, toolers', molders' or similar lien or any statutory lien on real and personal property for property taxes not yet due shall continue to be subject to such lien after the Closing Date if and to the extent that such lien (i) is valid, perfected and enforceable as of the Petition Date (or becomes valid, perfected and enforceable after the Petition Date as permitted by section 546(b) or 362(b)(18) of the

NYI-4178439v24                    -27-

Exhibit 2
Page 34 of 106

Bankruptcy Code), (ii) could not be avoided by any Debtor under sections 544 to 549, inclusive,

of the Bankruptcy Code or otherwise, were the Closing not to occur; and (iii) the Purchased

Asset subject to such lien could not be sold free and clear of such lien under applicable non-

bankruptcy law, and (b) any Liability as of the Closing Date that is secured by a lien described in

clause (a) above (such lien, a "Continuing Lien") that is not otherwise an Assumed Liability shall

constitute an Assumed Liability with respect to which there shall be no recourse to the Purchaser

or any property of the Purchaser other than recourse to the property subject to such Continuing

Lien. The Purchased Assets are sold free and clear of any reclamation rights; *provided, however,*

that nothing, in this Sale Order or the Purchase Agreement shall in any way impair the right of

any claimant against the Debtors with respect to any alleged reclamation right to the extent such

reclamation right is not subject to the prior rights of a holder of a security interest in the goods or

proceeds with respect to which such reclamation right is alleged, or impair the ability of a

claimant to seek adequate protection against the Debtors with respect to any such alleged

reclamation right.  Further, nothing in this Sale Order or the Purchase Agreement shall prejudice

any rights, defenses, objections or counterclaims that the Debtors, the Purchaser,

the U.S. Treasury, EDC, the Creditors' Committee or any other party in interest may have with

respect to the validity or priority of such asserted liens or rights, or the type (or amount), if any,

of required adequate protection.

          12.     Except as otherwise provided in the Purchase Agreement, all persons and

entities (and their respective successors and assigns), including, but not limited to, all debt

security holders, equity security holders, affiliates, governmental, tax and regulatory authorities,

lenders, customers, dealers, employees, trade creditors, litigation claimants and other creditors,

holding Claims (whether legal or equitable, secured or unsecured, known or unknown, matured

-28-

Exhibit 2
Page 35 of 106

or unmatured, contingent or non-contingent, liquidated or unliquidated, senior or subordinated) except for Assumed Liabilities or Claims against any Purchased Company, arising under or out of, in connection with, or in any way relating to, the Debtors, the Purchased Assets, the operation of the Business prior to Closing or the transfer of the Purchased Assets to the Purchaser, are hereby forever barred, estopped and permanently enjoined from asserting such Claims against the Purchaser, its successors or assigns, its property or the Purchased Assets. No such persons or entities shall assert against the Purchaser or their successors in interest any Claim arising from, related to or in connection with the ownership, sale or operation of any Asset prior to the Closing, except for Assumed Liabilities.

13.     This Sale Order (a) shall be effective as a determination that, as of the Closing, (i) no Claims other than (x) Assumed Liabilities relating to the Purchased Assets or (y) Claims against any Purchased Company, will be assertable against the Purchaser, its affiliates, successors or assigns or any of their respective assets (including the Purchased Assets), (ii) the Purchased Assets shall have been transferred to the Purchaser free and clear of all Claims and (iii) the conveyances described herein have been effected; and (b) is and shall be binding upon and govern the acts of all entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, registrars of patents, trademarks or other intellectual property, administrative agencies, governmental departments, secretaries of state, federal and local officials and all other persons and entities who may be required by operation of law, the duties of their office or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any lease; and each of the foregoing persons and entities is hereby directed to accept for filing any and all of the documents and

Exhibit 2
Page 36 of 106

instruments necessary and appropriate to consummate the transactions contemplated by the

Purchase Agreement.

14. If any person or entity that has filed financing statements, mortgages,

mechanic's liens, *lis pendens* or other documents or agreements evidencing Claims against or in

the Debtors or the Purchased Assets shall not have delivered to the Debtors prior to the Closing

of the Sale Transaction, in proper form for filing and executed by the appropriate parties,

termination statements, instruments of satisfaction, releases of all interests that the person or

entity has with respect to the Debtors or the Purchased Assets or otherwise, then only with regard

to Purchased Assets that are purchased by the Purchaser pursuant to the Purchase Agreement and

this Sale Order (a) the Debtors are hereby authorized and directed to execute and file such

statements, instruments, releases and other documents on behalf of the person or entity with

respect to the Purchased Assets; and (b) the Purchaser is hereby authorized to file, register or

otherwise record a certified copy of this Sale Order, which, once filed, registered or otherwise

recorded, shall constitute conclusive evidence of the release of all Claims against the applicable

Purchased Assets other than the Assumed Liabilities. This Sale Order is deemed to be in

recordable form sufficient to be placed in the filing or recording system of each and every

federal, state, or local government agency, department or office.

15. All persons or entities in possession of some or all of the Purchased Assets

are directed to surrender possession of such Purchased Assets to the Purchaser or its respective

designees at the time of the Closing of the Sale Transaction.

16. Following the Closing of the Sale Transaction, no holder of any Claim

shall interfere with the Purchaser's title to or use and enjoyment of the Purchased Assets based

Exhibit 2
Page 37 of 106

on or related to any such Claim, or based on any actions the Debtors may take in their chapter 11 cases.

17.     All persons and entities are prohibited and enjoined from taking any action to adversely affect or interfere with the ability of the Debtors to transfer the Purchased Assets to the Purchaser in accordance with the Purchase Agreement and this Sale Order.

18.     To the extent provided by section 525 of the Bankruptcy Code, no governmental unit may revoke or suspend any permit or license relating to the operation of the Purchased Assets sold, transferred or conveyed to the Purchaser on account of the filing or pendency of these chapter 11 cases or the consummation of the Sale Transaction contemplated by the Purchase Agreement.

19.     Notwithstanding anything else contained herein or in the Purchase Agreement, in connection with the purchase of the Debtors' brands and related Purchased Assets, the Purchaser, from and after the Closing, will recognize, honor and pay liabilities under Lemon Laws for additional repairs, refunds, partial refunds (monetary damages) or replacement of a defective vehicle (including reasonable attorneys' fees, if any, required to be paid under such Lemon Laws and necessarily incurred in obtaining those remedies), and for any regulatory obligations under such Lemon Laws arising now, including but not limited to cases resolved prepetition or in the future, on vehicles manufactured by the Debtors in the five years prior to the Closing (without extending any statute of limitations provided under such Lemon Laws), but in any event not including punitive, exemplary, special, consequential or multiple damages or penalties and not including any claims for personal injury or other consequential damages that may be asserted in relationship to such vehicles under the Lemon Laws. As used herein, "Lemon Law" means a federal or state statute, including, but not limited to, claims under the Magnuson-

Exhibit 2
Page 38 of 106

Moss Warranty Act based on or in conjunction with a state breach of warranty claim, requiring a manufacturer to provide a consumer remedy when the manufacturer is unable to conform the vehicle to the warranty after a reasonable number of attempts as defined in the applicable statute. In connection with the foregoing, the Purchaser has agreed to continue addressing Lemon Law claims (to the extent that they are Assumed Liabilities) using the same or substantially similar procedural mechanisms previously utilized by the Debtors.

20.     The Purchased Owned Real Property and PP&E (as such terms are defined in the Purchase Agreement) that, as of the Closing, are subject to existing statutory liens or any liens that may be created or perfected in accordance with section 362(b)(18) of the Bankruptcy Code shall be transferred to the Purchaser subject to (a) any applicable property taxes for the tax year 2009 (collectively, the "2009 Property Taxes") owed to state and local taxing authorities in the United States (collectively, the "Relevant Taxing Authorities") and (b) any liens related to such 2009 Property Taxes. The 2009 Property Taxes shall be paid by the Purchaser; however, as between the Purchaser and the Debtors such 2009 Property Taxes shall be prorated as of the Closing Date and settled upon receipt of the relevant property tax bills. The Relevant Taxing Authorities shall bill their 2009 Property Taxes to the Purchaser in the ordinary course, not as an expedited or jeopardy assessment.

21.     The Debtors shall deposit designated funds in the amount of $63 million in a dedicated escrow account (the "Tax Escrow") to satisfy sales and use taxes, Michigan business taxes and other taxes owed to the Relevant Taxing Authorities in respect of any of the Debtors (including predecessors of the Debtors) and not covered by paragraph 20 above, to the extent such taxes are (a) secured taxes or may become secured by liens that may be created or perfected in accordance with section 362(b)(18) of the Bankruptcy Code or (b) of the nature authorized to

NYI-4178439v24                                    -32-

Exhibit 2
Page 39 of 106

be paid under the Order, Pursuant to Sections 105(a), 363(b), 507(a) and 541 of the Bankruptcy

Code, Authorizing the Debtors and Debtors in Possession to Pay Certain Prepetition Taxes

(Docket No. 355) to the extent such taxes were or may be asserted or assessed against

individuals (collectively, the "Additional Taxes"). Any Claims for Additional Taxes shall attach

to, and be satisfied from, the Tax Escrow.

        22.     (a)     Notwithstanding any contrary provision of this Sale Order or the

Purchase Agreement, the 61 Vehicles, as described and defined in the response of Wilmington

Trust Company to the Sale Motion (Docket No. 1188), will be treated as Excluded Assets that

will not be transferred to the Purchaser.

              (b)     Pursuant to sections 105(a), 363 and 365 of the Bankruptcy Code,

the Debtors' assumption and assignment to the Purchaser of all of the Debtors' right, title and

interest in or under the Debtors' guaranteed depreciation program agreement and ancillary

agreements related thereto (collectively, the "GDP Agreement") with Dollar Thrifty Automotive

Group, Inc. and its affiliates (collectively, "DTAG") are hereby approved, and all requirements

of section 365 of the Bankruptcy Code are hereby deemed satisfied as of the date of, and

effective only upon, the Closing of the Sale Transaction. DTAG has consented to such

assumption and assignment and agrees that, subject to payment of Cure Costs, such assumption

and assignment shall not constitute an event of default thereunder or permit the termination

thereof. The Debtors and DTAG shall confer in good faith to determine the amount of the Cure

Costs to be paid under the GDP Agreement. If the Debtors and DTAG are unable to reach a

resolution of such cure cost amount, either of such parties may apply to the Court for an order,

upon notice and a hearing, determining the correct Cure Cost amount.

Exhibit 2
Page 40 of 106

(c)     All obligations of Chrysler LLC under the GMAC MAFA Term Sheet (the "GMAC Term Sheet") attached to the Purchase Agreement as Exhibit A, or if executed, the definitive GMAC Master Autofinance Agreement, which agreement shall be substantially on the same terms as the GMAC Term Sheet or the Annexes thereto, as well as any intellectual property licensing agreements entered into connection therewith and all the other agreements that are specified in the GMAC Term Sheet, including, without limitation, one or more repurchase agreements with substantially the same terms as set forth in Annex D to Exhibit A of the Purchase Agreement (collectively with the GMAC Term Sheet, the "GMAC MAFA Documents") shall be assigned by the Debtors to the Purchaser, and the Purchaser shall be deemed to have assumed the GMAC MAFA Documents, pursuant to this Sale Order and the Bidding Procedures Order, and each non-Debtor party to the GMAC MAFA Documents shall be deemed to have consented to such assumption and assignment.  Assumption and assignment of the GMAC MAFA Documents are integral to the Sale Transaction and the Purchase Agreement, are in the best interests of the Debtors and their estates, creditors, employees and retirees and represent the reasonable exercise of the Debtors' sound business judgment.

(d)     At the Purchaser's written election, to be made by notice to Chrysler Financial Services Americas LLC ("Chrysler Financial") no later than June 12, 2009, or such other date as the Purchaser and Chrysler Financial may agree, either: (i) (A) the vehicles related to unperformed or partially unperformed repurchase obligations arising from or related to agreements between the Debtors and dealers whose dealerships were terminated prepetition, or arising from or related to prepetition agreements between Chrysler Financial and the Debtors (collectively, the "Repurchased Vehicles"), and (B) the vehicles commonly referred to by Chrysler Financial and the Debtors as "conversion vehicles" that are currently in the possession

NYI-4178439v24                                    -34-

Exhibit 2
Page 41 of 106

Case 1:16-cv-09123-WHP  Document 27  Filed 09/27/16  Page 38 of 102

of entities that convert such vehicles into "conversion vehicles" (together with Repurchased

Vehicles, the "Conversion and Repurchased Vehicles"), will be treated as "Excluded Assets" that

will not be transferred to the Purchaser; or (ii) will be treated as Purchased Assets and the alleged

liens in favor of Chrysler Financial or its affiliates on the Conversion and Repurchased Vehicles

will be Continuing Liens to the extent they meet the requirements of subparagraphs 11(a)(i)

through (iii) above.

(e)     Chrysler Financial and its affiliates object to the sale to the

Purchaser of any insurance policy, surety bond or related indemnity arrangement to the extent

that it (i) is an executory contract to extend a financial accommodation or a personal services

contract and therefore not assumable and assignable to the Purchaser pursuant to section

365(c)(1) or (c)(2) of the Bankruptcy Code or (ii) is property the sale of which is not permitted

under state or contract law and that entitles Chrysler Financial and its affiliates to adequate

protection pursuant to section 363(e) of the Bankruptcy Code or that may not be sold free and

clear of the interests of Chrysler Financial and its affiliates pursuant to section 363(f) of the

Bankruptcy Code.  The parties reserve all rights (including, without limitation, any rights under

the Contract Procedures and, in the case of the Purchaser, any rights against the Debtors pursuant

to Sections 2.11 and 2.12 of the Purchase Agreement) and agree that no such policy, bond or

arrangement shall be deemed to be transferred to Purchaser and that no liens, rights of setoff,

equitable subrogation or equitable lien arising in favor of Chrysler Insurance Company, as

insurer or surety, as against any Debtor's estate shall be terminated, diminished or affected by

reason of any provision of the Purchase Agreement or this Sale Order until such objections are

resolved by the Court.

NYI-4178439v24

-35-

Exhibit 2
Page 42 of 106

23.    Nothing in this Sale Order or in the Purchase Agreement releases, nullifies

or enjoins the enforcement of any liability to a governmental unit under police and regulatory

statutes or regulations that any entity would be subject to as the owner or operator of property

after the date of entry of this Sale Order.

### APPROVAL OF UAW RETIREE SETTLEMENT AGREEMENT

24.    The UAW Retiree Settlement Agreement, all transactions contemplated

therein and all of the terms and conditions thereof are fair, reasonable and in the best interests of

the retirees and are hereby approved.  The Debtors, the Purchaser and the UAW are authorized to

perform their obligations under, or in connection with, the implementation of the UAW Retiree

Settlement Agreement and comply with the terms of the UAW Retiree Settlement Agreement

pursuant to and in accordance with the terms and conditions of the UAW Retiree Settlement

Agreement and this Sale Order.  The Trust Amendments are hereby approved and the *English

Case* VEBA Trust Agreement is reformed accordingly (as such terms are defined in the UAW

Retiree Settlement Agreement).

### ASSUMPTION AND ASSIGNMENT OF ASSUMED AGREEMENTS

25.    Pursuant to sections 105(a), 363 and 365 of the Bankruptcy Code, and in

accordance with the Contract Procedures, the Debtors' assumption and assignment or other

transfer to the Purchaser of all of the Debtors' right, title and interest in or under the Assumed

Agreements are hereby approved, with only such exceptions as Purchaser may agree in writing,

and all requirements of section 365 of the Bankruptcy Code are hereby deemed satisfied.  For the

avoidance of doubt, subject to the Contract Procedures (including the resolution of any Section

365 Objection and the issuance of a Confirmation Notice, as set forth in the Bidding Procedures

Order), the Debtors shall be deemed to have assumed and assigned each of the Assumed

Agreements as of the date of and effective only upon the Closing of the Sale Transaction and,

NYI-4178439v24

-36-

Exhibit 2
Page 43 of 106

absent such Closing, each of the Assumed Agreements shall neither be deemed assumed nor

assigned and shall in all respects be subject to subsequent assumption or rejection by the Debtors

under the Bankruptcy Code.

26.     Except as provided herein, the Debtors are hereby authorized in

accordance with sections 105(a) and 365 of the Bankruptcy Code and the Contract Procedures to

assume and assign, sell and otherwise transfer the Assumed Agreements of all of the Debtors'

right, title or interest therein or thereunder to the Purchaser free and clear of all Claims, and to

execute and deliver to the Purchaser such documents or other instruments as may be necessary to

assign and transfer the Assumed Agreements to the Purchasers.

27.     In accordance with the Contract Procedures, the Assumed Agreements

shall be transferred to, and remain in full force and effect for the benefit of, the Purchaser in

accordance with their respective terms, notwithstanding any provision in any such Assumed

Agreement (including those of the type described in sections 365(e)(1) and (f) of the Bankruptcy

Code) that prohibits, restricts or conditions such assignment or transfer.  There shall be no rent

accelerations, assignment fees, penalties, increases or any other fees charged to the Purchaser or

the Debtors as a result of the assumption or assignment of the Assumed Agreements.  No

Assumed Agreement may be terminated, or the rights of any party modified in any respect,

including pursuant to any "change of control" clause, by any other party thereto as a result of the

transactions contemplated by the Purchase Agreement.

28.     To the extent that the Purchaser exercises its right to exclude any Assumed

Agreement from the Sale Transaction prior to the applicable Agreement Assumption Date, such

Assumed Agreement shall (a) be deemed never to have been assumed by the Debtors or assigned

Exhibit 2
Page 44 of 106

to the Purchaser and (b) remain subject to assumption, rejection or assignment by the Debtors at any time in the future.

29.     Except as may be otherwise agreed to by the parties to an Assumed Agreement, the Cure Costs under the Assumed Agreements shall be paid by the Purchaser as soon as practicable and in no event later than ten days after the later of (a) the Closing of the Sale Transaction or (b) following the date on which such Assumed Agreement is deemed assumed and assigned in accordance with the Contract Procedures.  With respect to Disputed Cure Costs, the Purchaser shall reserve sufficient funds to pay the full amount of any Disputed Cure Costs related to the Sale Transaction until such time as there is a resolution among the parties or a final order of this Court determining the correct Cure Costs.  In addition to the Cure Costs (but without duplication), the Purchaser will assume and pay, in the ordinary course of business and as they come due, all amounts for goods delivered and services provided prepetition for which payment was not due as of the Petition Date and for postpetition goods delivered and services provided to the Debtors under each Assumed Agreement to the extent due and payable and not otherwise paid by the Debtors.

30.     Payment of the Cure Costs shall be a full satisfaction of any and all defaults under the Assumed Agreements, whether monetary or non-monetary, and upon payment of the Cure Costs any default of the Debtors thereunder shall have been irrevocably cured.  Upon the assumption and assignment of an Assumed Agreement under the Contract Procedures, the Debtors shall be released from any liability whatsoever arising under the Assumed Agreements and the Cure Costs and ongoing obligations under the Assumed Agreement shall be solely the obligation of the Purchaser.  Except as otherwise provided in this Sale Order, each Non-Debtor Counterparty to an Assumed Agreement hereby is forever barred, estopped and

Exhibit 2
Page 45 of 106

permanently enjoined from asserting against the Debtors or the Purchaser, their successors or

assigns or the property of any of them, any default existing as of the date of the assumption of

the Assumed Agreement.

     31.    The failure of the Debtors or the Purchaser to enforce at any time one or

more terms or conditions of any Assumed Agreement shall not be a waiver of such terms or

conditions, or of the Debtors' and the Purchaser's rights to enforce every term and condition of

the Assumed Agreements.

     32.    Upon the Agreement Assumption Date (or such earlier date as set forth in

the Contract Procedures), the Purchaser shall be fully and irrevocably vested with all right, title

and interest of the Debtors under the Assumed Agreements.

     33.    The assignments of each of the Assumed Agreements are made in good

faith under sections 363(b) and (m) of the Bankruptcy Code.

     34.    In connection with the foregoing and consistent with the Contract

Procedures, the Purchaser and the Creditors' Committee have agreed to the following: (a) no

later than the second calendar day after the initial Section 365 Objection Deadline, the Purchaser

will serve Confirmation Notices on the applicable Non-Debtor Counterparties; (b) no later than

the second calendar day after the initial Section 365 Hearing, the Purchaser will serve additional

Confirmation Notices on the applicable Non-Debtor Counterparties; (c) the Purchaser and the

Creditors' Committee acknowledge that, if the Closing occurs prior to June 12, 2009, the terms

of the Contract Procedures provide that the Assurance Letter procedure will not apply; and

(d) paragraph 20 of the Bidding Procedures Order is clarified to provide that all Designated

Agreements (rather than all contracts) that have not become Confirmed Contracts as of the

Closing Date shall constitute "Excluded Contracts" for purposes of the Purchase Agreement

Exhibit 2
Page 46 of 106

(without any requirement to update the Company Disclosure Letter) unless such Designated

Agreements subsequently become Confirmed Contracts in accordance with the Contract

Procedures.  The failure of the Purchaser to deliver a Confirmation Notice with respect to any

Non-Debtor Counterparty as contemplated in clause (a) and (b) of this paragraph 34, whether

because the parties have not agreed to Cure Costs or otherwise, shall not preclude the ability of

the Purchaser to deliver a Confirmation Notice to such Non-Debtor Counterparty after such time

and prior to the "Final Designation Date" (as defined in the Bidding Procedures Order).

<u>**ADDITIONAL PROVISIONS**</u>

35.     Except for the Assumed Liabilities expressly set forth in the Purchase

Agreement or described therein or Claims against any Purchased Company, none of the

Purchaser, its successors or assigns or any of their respective affiliates shall have any liability for

any Claim that (a) arose prior to the Closing Date, (b) relates to the production of vehicles prior

to the Closing Date or (c) otherwise is assertable against the Debtors or is related to the

Purchased Assets prior to the Closing Date.  The Purchaser shall not be deemed, as a result of

any action taken in connection with the Purchase Agreement or any of the transactions or

documents ancillary thereto or contemplated thereby or the acquisition of the Purchased Assets,

to:  (a) be a legal successor, or otherwise be deemed a successor to the Debtors (other than with

respect to any obligations arising under the Assumed Agreements from and after the Closing);

(b) have, *de facto* or otherwise, merged with or into the Debtors; or (c) be a mere continuation or

substantial continuation of the Debtors or the enterprise of the Debtors.  Without limiting the

foregoing, the Purchaser shall not have any successor, derivative or vicarious liabilities of any

kind or character for any Claims, including, but not limited to, on any theory of successor or

transferee liability, *de facto* merger or continuity, environmental, labor and employment,

Exhibit 2
Page 47 of 106

products or antitrust liability, whether known or unknown as of the Closing, now existing or hereafter arising, asserted or unasserted, fixed or contingent, liquidated or unliquidated.

36.     The Purchaser (or its designee) is authorized and directed, in accordance with Section 5.20 of the Purchase Agreement, to substitute, backstop or replace, as the case may be, in a manner reasonably satisfactory to the Debtors, those letters of credit existing as of the Closing that secure future obligations of the Purchaser under an Assumed Agreement and are identified in writing by the Debtors as part of the Cure Costs. The Purchaser shall cause the originals of any such substituted or replaced letters of credit to be returned to the Debtors or the issuer thereof with no further drawings made thereunder.

37.     The Purchaser is hereby granted a first priority lien and super-priority administrative claim over the proceeds of any tax refunds (including interest thereon), returns of withholding taxes or similar payments, and any proceeds of tax sharing, contribution or similar agreements (in each case, other than on refunds due to be paid to third parties pursuant to the Original Contribution Agreement, as defined in the Purchase Agreement) to secure the payment of all amounts due to the Purchaser from any of the Debtors under the tax indemnities in Article 9 of the Purchase Agreement.

38.     Effective upon the Closing and except as otherwise set forth herein or provided by stipulations filed with or announced to the Court with respect to a specific matter, all persons and entities are forever prohibited and enjoined from commencing or continuing in any matter any action or other proceeding, whether in law or equity, in any judicial, administrative, arbitral or other proceeding against the Purchaser, its successors and assigns, or the Purchased Assets, with respect to any (a) Claim other than (i) Assumed Liabilities or (ii) Claims against any Purchased Company or (b) successor liability of the Purchaser for any of the Debtors, including,

Exhibit 2
Page 48 of 106

without limitation, the following actions with respect to clauses (a) and (b): (i) commencing or
continuing any action or other proceeding pending or threatened against the Debtors as against
the Purchaser, or its successors, assigns, affiliates or their respective assets, including the
Purchased Assets; (ii) enforcing, attaching, collecting or recovering in any manner any judgment,
award, decree or order against the Debtors as against the Purchaser or its successors, assigns,
affiliates or their respective assets, including the Purchased Assets; (iii) creating, perfecting or
enforcing any lien, claim, interest or encumbrance against the Debtors as against the Purchaser or
its successors, assigns, affiliates or their respective assets, including the Purchased Assets;
(iv) asserting any setoff, right of subrogation or recoupment of any kind (in the case of
recoupment only, except as a defense for payment of an obligation other than an Assumed
Agreement) for any obligation of any of the Debtors as against any obligation due the Purchaser
or its successors, assigns, affiliates or their respective assets, including the Purchased Assets;
(v) commencing or continuing any action, in any manner or place, that does not comply, or is
inconsistent with, the provisions of this Sale Order or other orders of this Court, or the
agreements or actions contemplated or taken in respect thereof; or (vi) revoking, terminating or
failing or refusing to renew any license, permit or authorization to operate any of the Purchased
Assets or conduct any of the businesses operated with such assets.

        39.      Except for the applicable Assumed Liabilities, the Purchaser shall not
have any liability or other obligation of the Debtors or their affiliates arising under or related to
the Purchased Assets. Without limiting the generality of the foregoing, and except as otherwise
specifically provided herein or in the Purchase Agreement, the Purchaser shall not be liable for
any claims against the Debtors or any of their predecessors or affiliates, and the Purchaser shall
have no successor or vicarious liabilities of any kind or character, including, but not limited to,

Exhibit 2
Page 49 of 106

any theory of antitrust, environmental, successor or transferee liability, labor law, *de facto*

merger or substantial continuity, whether known or unknown as of the Closing, now existing or

hereafter arising, whether fixed or contingent, asserted or unasserted, liquidated or unliquidated,

with respect to the Debtors or their affiliates or any obligations of the Debtors or their affiliates

arising prior to the Closing, including, but not limited to, liabilities on account of any taxes

arising, accruing or payable under, out of, in connection with, or in any way relating to the

operation of the Purchased Assets prior to the Closing of the Sale Transaction.

      40.    Upon the Debtors' assignment of the Assumed Agreements to the

Purchaser under the provisions of this Sale Order and any additional order contemplated by the

Purchase Agreement, no default shall exist under any Assumed Agreement, and no counterparty

to any Assumed Agreement shall be permitted to declare a default by the Purchaser under such

Assumed Agreement or otherwise take action against the Purchaser as a result of any Debtor's

financial condition, bankruptcy or failure to perform any of its obligations under the relevant

Assumed Agreement.

      41.    For the avoidance of doubt:

(a)    with respect to each Excluded Contract, the Purchaser is not acquiring any right, title or interest in, to and under such Excluded Contract, including without limitation any claim, cause of action, right of recoupment or receivable (whether for money or property), and all rights of a Non-Debtor Counterparty against the Debtors arising under such Excluded Contract, including rights of setoff, are not modified or waived;

(b)    with respect to each Assumed Agreement, nothing in this Sale Order or the Purchase Agreement affects the contractual rights and remedies of a Non-Debtor Counterparty under such Assumed Agreement, including, without limitation, any right of setoff, recoupment, subrogation, indemnity rights and any defenses to performance, except to the extent such contractual rights and remedies result from the financial condition or bankruptcy of a Debtor or arise out of or relate to a default or failure to perform under such Assumed Agreement at or prior to the time of assumption and assignment;

Exhibit 2
Page 50 of 106

(c)    with respect to Purchased Assets (whether Assumed Agreements or other Purchased Assets such as Claims and receivables), nothing in this Sale Order or the Purchase Agreement affects any other defense or right of the non-Debtor obligor under applicable law, *provided that* a non-Debtor obligor may not assert any setoff, recoupment or other right or defense to the extent (a) resulting from the financial condition or bankruptcy of a Debtor or arising out of or relating to a default or failure to perform under such Assumed Agreement at or prior to the time of assumption and assignment or (b) arising out of or relating to an Excluded Liability; and

(d)    with respect to leases, nothing in this Sale Order or the Purchase Agreement shall (a) affect the rights of any lessor of property leased by a Debtor under an unexpired lease except to the extent such unexpired lease becomes an Assumed Agreement in accordance with the Contract Procedures and applicable law, (b) sell to the Purchaser any leased property not owned by a Debtor or (c) with respect to leases that are Excluded Contracts, affect possessory or ownership rights as against any Debtor or the Purchaser.

42.    The Purchaser has given substantial consideration under the Purchase Agreement for the benefit of the holders of Claims. The discrete consideration given by the Purchaser shall constitute valid and valuable consideration for the releases of any potential claims of successor liability of the Purchaser, which releases shall be deemed to have been given in favor of the Purchaser by all holders of any Claims of any kind whatsoever.

43.    While the Debtors' bankruptcy cases are pending, this Court shall retain jurisdiction to, among other things, interpret, enforce and implement the terms and provisions of this Sale Order and the Purchase Agreement, all amendments thereto, any waivers and consents thereunder (and of each of the agreements executed in connection therewith in all respects), to adjudicate disputes related to this Sale Order or the Purchase Agreement and to enter any orders under sections 105, 363 and/or 365 (or other relevant provisions) of the Bankruptcy Code with respect to the Assumed Agreements.

44.    Nothing in this Sale Order or the Purchase Agreement releases, nullifies, or enjoins the enforcement of any liability to a governmental unit under environmental statutes or

Exhibit 2
Page 51 of 106

regulations (or any associated liabilities for penalties, damages, cost recovery or injunctive relief)
that any entity would be subject to as the owner or operator of property after the date of entry of
this Sale Order.  Notwithstanding the foregoing sentence, nothing in this Sale Order shall be
interpreted to deem the Purchaser as the successor to the Debtors under any state law successor
liability doctrine with respect to any liabilities under environmental statutes or regulations for
penalties for days of violation prior to entry of this Sale Order or for liabilities relating to off-site
disposal of wastes by the Debtors prior to entry of this Sale Order.  Nothing in this paragraph
should be construed to create for any governmental unit any substantive right that does not
already exist under law.

45.    No bulk sales law, or similar law of any state or other jurisdiction shall
apply in any way to the transactions contemplated by the Purchase Agreement, the Sale Motion
and this Sale Order.

46.    The transactions contemplated by the Purchase Agreement are undertaken
by the Purchaser in good faith, as that term is used in section 363(m) of the Bankruptcy Code,
and accordingly, the reversal or modification on appeal of the authorization provided herein to
consummate the Sale Transaction shall not affect the validity of the Sale Transaction (including
the assumption and assignment of the Assumed Agreements), unless such authorization is duly
stayed pending such appeal.

47.    The consideration provided by the Purchaser for the Purchased Assets
constitutes reasonably equivalent value and fair consideration (as those terms may be defined in
each of the Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act and
section 548 of the Bankruptcy Code) under the Bankruptcy Code and under the laws of the

NYI-4178439v24                                    -45-

Exhibit 2
Page 52 of 106

United States, any state, territory or possession thereof or the District of Columbia or any other applicable jurisdiction with laws substantially similar to the foregoing.

48.     The Sale Transaction may not be avoided under section 365(n) of the Bankruptcy Code.

49.     The terms and provisions of the Purchase Agreement and this Sale Order shall be binding in all respects upon, and shall inure to the benefit of, the Debtors, their estates, their creditors, the Purchaser, the respective affiliates, successors and assigns of each, and any affected third parties, including, but not limited to, all persons asserting claims in the Purchased Assets to be sold to the Purchaser pursuant to the Purchase Agreement, notwithstanding any subsequent appointment of any trustee(s), examiner(s) or receiver(s) under any chapter of the Bankruptcy Code or any other law, and all such provisions and terms shall likewise be binding on such trustee(s), examiner(s) or receiver(s) and shall not be subject to rejection or avoidance by the Debtors, their estates, their creditors, their shareholders or any trustee(s), examiner(s), or receiver(s).

50.     The failure specifically to include any particular provision of the Purchase Agreement in this Sale Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Purchase Agreement and its exhibits and ancillary documents be authorized and approved in their entirety.

51.     The Purchase Agreement may be modified, amended or supplemented by the parties thereto, in a writing signed by both parties, and in accordance with the terms thereof, without further order of the Court, provided that any such modification, amendment or supplement does not materially change the terms of the Purchase Agreement or modify the express terms of this Sale Order.

NYI-4178439v24                           -46-

Exhibit 2
Page 53 of 106

52.    Each and every federal, state and local governmental agency, department or official is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Purchase Agreement.

53.    Subject to further order of the Court and consistent with the terms of the Purchase Agreement and the Transition Services Agreement, the Debtors and the Purchaser are authorized to, and shall, take appropriate measures to maintain and preserve, until the consummation of any chapter 11 plan for the Debtors, the books, records and any other documentation, including tapes or other audio or digital recordings and data in or retrievable from computers or servers relating to or reflecting the records held by the Debtors or their affiliates relating to the Debtors' businesses.

54.    Consistent with the terms of the Purchase Agreement and the Transition Services Agreement, the Debtors have agreed to transfer to the Purchaser (or one or more of its subsidiaries, as applicable) a substantial portion of the Debtors' cash management system maintained pursuant to an order of this Court (Docket No. 1303) entered on May 20, 2009, including, without limitation, several bank accounts maintained by the Debtors.  Such cash management system assets, including such bank accounts, constitute Purchased Assets under the Purchase Agreement.  Notwithstanding the foregoing transfers, the Debtors will maintain such bank accounts and a cash management system that is necessary to effect the orderly administration of the Debtors' chapter 11 estates, including any modifications thereof after the Closing, to ensure a reasonable accounting and segregation of the Debtors' cash  To the extent any funds of the Debtors that do not constitute Purchased Assets are held in accounts transferred to the Purchaser (or one or more of its subsidiaries), such funds shall be promptly returned to the appropriate Debtor, and such funds shall remain subject to any and all liens of the Debtors'

NYI-4178439v24                                    -47-

Exhibit 2
Page 54 of 106

lienholders thereon. Likewise, to the extent that any funds that constitute Purchased Assets are held in accounts maintained by one or more Debtors after the Closing, such funds shall be promptly transferred to the Purchaser. The applicable Debtors and the Purchaser (and/or one or more of its subsidiaries, as applicable), may execute any agreement, assignment, novation, instrument or other document the parties deem necessary or appropriate to effectuate the transfers described in this paragraph, which is consistent with the general authority to the same provided in paragraph 6 hereof.

55.    Those powers of attorney granted by Chrysler LLC and any of the other Debtors and any related documentation entered into by such entities for the purpose of (a) effectuating the transfers of such entities' interests in their non-debtor foreign affiliates to the Purchaser, Chrysler Motors LLC or their respective designees in connection with consummation of the Sale Transaction or (b) effectuating the transfers of interests in certain foreign affiliates to Chrysler LLC or any of the other Debtors prior to consummation of the Sale Transaction are here by ratified and approved in all respects, regardless of whether such powers of attorney or other documentation were issued or entered into prior to or subsequent to the Petition Date.

56.    The Debtors are hereby authorized and empowered, upon and in connection with the Closing, to change their corporate names and the caption of these chapter 11 cases, consistent with applicable law. The Debtors shall file a notice of change of case caption within one business day of the Closing, and the change of case caption for these chapter 11 cases shall be deemed effective as of the Closing.

57.    As provided by Bankruptcy Rules 6004(h) and 6006(d), this Sale Order shall not be stayed for ten days after its entry and shall be effective as of 12:00 noon, Eastern Time, on Friday June 5, 2009, and the Debtors and the Purchaser are authorized to close the Sale

Exhibit 2
Page 55 of 106

Transaction on or after 12:00 noon, Eastern Time, on Friday June 5, 2009.[4]  Any party objecting

to this Sale Order must exercise due diligence in filing an appeal and pursuing a stay or risk its

appeal being foreclosed as moot in the event Purchaser and the Debtors elect to close prior to this

Sale Order becoming a Final Order.

        58.     Any amounts payable to the Purchaser shall be paid by the Debtors in the

manner provided in the Purchase Agreement without further order of this Court, shall be an

allowed administrative claim under sections 503(b) and 507(a)(2) of the Bankruptcy Code, shall

be protected as provided in the Bidding Procedures Order and shall not be altered, amended,

discharged or affected by any plan proposed or confirmed in these cases without the prior written

consent of the Purchaser.

        59.     This Court retains jurisdiction to interpret, implement and enforce the

terms and provisions of this Sale Order including to compel delivery of the Purchased Assets, to

protect the Purchaser against any Claims and to enter any orders under sections 105, 363 or 365

(or other applicable provisions) of the Bankruptcy Code to transfer the Purchased Assets and the

Assumed Agreements to the Purchaser.

Dated:  New York, New York
       June 1, 2009

                                **s/Arthur J. Gonzalez**
                                UNITED STATES BANKRUPTCY JUDGE

---

[4] The Court considered the Debtor's request for a waiver of the stay imposed, pursuant to Bankruptcy Rules 6004(h) and 6006(d), objections filed to that request, and Debtors' modified request as of June 1, 2009, whereby Debtors' sought a waiver of the stay imposed to permit a closing to take place on Thursday, June 4, 2009 at 9:00 a.m.  In their modified request, the Debtors reference the deposition testimony of Matthew Feldman, an advisor to the President's Auto Task Force, indicating that the Debtors are losing $100 million a day, and the other exigent circumstances facing Chrysler, including the continuing deterioration of its asset value, its supply chain, and its going-concern value.  The Court determines that a partial waiver of the stay is justified.  Any request to further modify the stay should be made to the appellate court.

Exhibit 2
Page 56 of 106

**EXHIBIT A**
**PURCHASE AGREEMENT**

NYI-4178439v24

Exhibit 2
Page 57 of 106

**EXHIBIT B**
**SUMMARY SCHEDULE OF FILED OBJECTIONS**

NYI-4178439v24

Exhibit 2
Page 58 of 106

# EXHIBIT 3

Exhibit 3
Page 59 of 106

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| In re | : | Chapter 11 |
|  | : |  |
| OLD CARCO LLC | : | Case No. 09-50002 (AJG) |
| f/k/a CHRYSLER LLC, *et al.*, | : | Confirmed Cases |
|  | : |  |
| Debtors. | : |  |
|  | : |  |
| DANIEL TULACRO, | : |  |
|  | : |  |
| Plaintiff, | : |  |
| v. | : | Adv. No. 11-09401 (AJG) |
|  | : |  |
| CHRYSLER GROUP LLC, *et al.*, | : |  |
|  | : |  |
| Defendants. | : |  |
|  | : |  |

OPINION REGARDING DEFENDANT CHRYSLER GROUP LLC'S
MOTION TO DISMISS THE AMENDED COMPLAINT

On July 29, 2011, Chrysler Group LLC ("Chrysler Group"), the purchaser of

substantially all of the assets of Old Carco LLC (f/k/a Chrysler LLC) and its affiliated debtors

(collectively, the "Debtors"), filed a motion (the "Motion") seeking entry of an order, pursuant to

Federal Rule of Civil Procedure 12(b)(6), incorporated into bankruptcy practice by Rule 7012 of

the Federal Rules of Bankruptcy Procedure, dismissing this adversary proceeding with prejudice.

The plaintiff, Daniel Tulacro (the "Plaintiff"), opposed the Motion.  On September 22, 2011, the

Court held a hearing (the "Hearing") on the Motion.

In the amended complaint filed in the adversary proceeding, the Plaintiff asserts several

claims against Chrysler Group under California's Song-Beverly Consumer Warranty Act, Cal.

Civ. Code § 1790, *et seq.* (the "Song-Beverly Act"), based upon a failure to repair certain alleged

defects in Plaintiff's 2003 Dodge vehicle (the "Vehicle") which was manufactured by the

Exhibit 3
Page 60 of 106

Debtors and purchased (as a "used" vehicle) by Plaintiff in 2006.

In the Motion, Chrysler Group seeks dismissal of the Amended Complaint, arguing that the Plaintiff's claims are barred by the Court's June 1, 2009 order (the "Sale Order") approving the sale of substantially all of the Debtors' assets to Chrysler Group, free and clear of all claims other than liabilities expressly assumed by the Chrysler Group, pursuant to Section 363 of title 11 of the United States Code (the "Bankruptcy Code"). The Sale Order authorized the Debtors to enter into a Master Transaction Agreement, dated April 30, 2009 (as subsequently amended, the "MTA") with the Chrysler Group. The closing of the sale of the Debtors' assets to the Chrysler Group was on June 10, 2009 (the "Closing Date").

The Chrysler Group maintains that the claims asserted by the Plaintiff are not within the scope of those claims that it assumed under the Sale Order. Specifically, the Chrysler Group argues that the Song-Beverly Act is a "lemon law" and that the Sale Order expressly delineated those lemon-law liabilities that the Chrysler Group would assume. The Chrysler Group argues that, pursuant to Paragraph 19 of the Sale Order, it only assumed lemon-law liabilities for vehicles manufactured by the Debtors in the five years prior to the Closing Date. The Chrysler Group contends that, as a result, the Plaintiff's claims relating to the Vehicle, which was manufactured by the Debtors prior to June 10, 2004, was not within the ambit of the lemon-law liabilities that the Chrysler Group assumed because it only assumed lemon-law liabilities for vehicles manufactured after that date.

Each side argues that the plain meaning of the Sale Order and the MTA support their respective positions. The Plaintiff relies primarily on Section 2.08(g) of the MTA. The Chrysler Group argues that Section 2.08(g) of the MTA must be read in the context of all of the

2

Exhibit 3
Page 61 of 106

provisions of the MTA, as well as of the Sale Order, which provides that if the terms of the MTA
and Sale Order conflict, the Sale Order controls.

*DISCUSSION*

The Court has reviewed and considered the relevant documents, the parties' submissions
and the parties' arguments at the Hearing, and has determined that liability based upon the Song-
Beverly Act was not assumed by the Chrysler Group with respect to any vehicles manufactured
prior to June 10, 2004. Inasmuch as the Plaintiff's Vehicle was manufactured prior to that date,
Chrysler Group did not assume any such liability with respect to the Vehicle.

Although Section 2.08(g)[1] of the MTA includes "Liabilities pursuant to product
warranties" under the heading of liabilities that the Chrysler Group assumed, that section must
be read in the context of the entire agreement, together with the controlling Sale Order.

The Sale Order indicates that its terms control if in conflict with the MTA. Moreover,
Paragraph 19 of the Sale Order[2] specifically addresses lemon-law claims. This specific provision
contains a limitation based upon date of manufacture. Therefore, this "more specific and
authoritative provision" of the Sale Order would control over a general provision in the MTA.

---

[1] Section 2.08(g) of the MTA provides that Chrysler Group's Assumed Liabilities include "Liabilities
pursuant to product warranties . . . on vehicles sold by [the Debtors] prior to the Closing."

[2] Paragraph 19 of the Sale Order provides, in relevant part, as follows:
Notwithstanding anything else contained herein or in the Purchase Agreement, in connection with
the purchase of the Debtors' brands and related Purchased Assets, the Purchaser, from and after
the Closing, will recognize, honor and pay liabilities under Lemon Laws for additional repairs,
refunds, partial refunds (monetary damages) or replacement of a defective vehicle (including
reasonable attorneys' fees, if any, required to be paid under such Lemon Laws and necessarily
incurred in obtaining those remedies), and for any regulatory obligations under such Lemon Laws
arising now, including but not limited to cases resolved prepetition or in the future, on vehicles
manufactured by the Debtors in the five years prior to the Closing (without extending any statute
of limitations provided under such Lemon Laws), but in any event not including punitive,
exemplary, special, consequential or multiple damages or penalties and not including any claims
for personal injury or other consequential damages that may be asserted in relationship to such
vehicles under the Lemon Laws.

3

Exhibit 3
Page 62 of 106

*See Wolff v. Chrysler Group LLC*, Adv. Proc. No. 10-05007 (AJG) at 20.

In Paragraph 19 of the Sale Order, a lemon law is defined to mean

a federal or state statute, including, but not limited to, claims under the
Magnuson-Moss Warranty Act based on or in conjunction with a state breach of
warranty claim, requiring a manufacturer to provide a consumer remedy when the
manufacturer is unable to conform the vehicle to the warranty after a reasonable
number of attempts as defined in the applicable statute.

In addition, Paragraph 19 specifically contemplates that monetary damages may be one of the

consumer remedies for failure to conform a vehicle to the warranty. Thus, the Plaintiff's claims

premised on the Song-Beverly Act are lemon-law claims.

Moreover, reading Section 2.08(g) to include all lemon-law liabilities would have

eliminated the requirement for the specific assumption, pursuant to Sale Order Paragraph 19, of

certain lemon-law claims because those claims already would have been assumed under Section

2.08. Thus, such a reading would render Paragraph 19 of the Sale Order superfluous.

Further, Paragraph 19 of the Sale Order includes claims that might arise in the future and,

therefore, is the exclusive source of Chrysler Group's potential liabilities under lemon laws for

claims relating to vehicles manufactured by the Debtors, whether the claims arose before or after

the Closing.

Similarly, even with respect to breach of warranty claims that may arguably not rely on

lemon laws, the more specific and authoritative section concerning consumer actions related to

warranty claims, *i.e.*, breach of warranty claims, would be section 2.08(h) of the MTA which

provides that the Chrysler Group's Assumed Liabilities include

4

Exhibit 3
Page 63 of 106

(h)(i) all Product Liability Claims[3] arising from the sale after the Closing of Products or Inventory manufactured by Sellers or their Subsidiaries in whole or in part prior to the Closing and  (ii) all Product Liability Claims arising from the sale on or prior to the Closing of motor vehicles or component parts, in each case manufactured by the [Debtors] . . . solely to the extent such Product Liability Claims (A) arise directly from motor vehicle accidents occurring on or after Closing, (B) are not barred by any statute of limitations, (C) are not claims including or related to any alleged exposure to any asbestos-containing material or any other Hazardous Material and (D) do not include any claim for exemplary or punitive damages.

Prior to its amendment, which added subdivision (ii) to the provision, Section 2.08(h) only provided for the assumption by the Chrysler Group of those Product Warranty Claims related to products sold after the Closing Date.[4]  Thus, the amendment to Section 2.08(h), added to the breach of warranty claims assumed by the Chrysler Group, certain types of accident claims with respect to products sold prior to the Closing Date, but only if the claims came within the parameters set forth in subdivision (ii).  At the same time that Section 2.08(h) was amended, Section 2.09(i), which described liabilities that were excluded from assumption by the Chrysler Group, was also amended to add conforming language.[5]

_____

[3]"Product Liability Claims" - the term used for Sections 2.08(h) and 2.09(i) of the MTA, but not Section 2.09(g) - is defined, in relevant part, in the MTA to include
any Action or action taken . . . by a customer arising out of, or otherwise relating to in any way in respect of any other warranty claims, refunds, . . . defective material claims, merchandise returns and/or any similar claims, or any other claim or cause of action, whether such claim is known or unknown or asserted or unasserted with respect to, Products or items . . . sold . . . by the [Debtors], whether such claims or causes of action are known or unknown or asserted or unasserted.

[4]Product Warranty Claims related to products sold *before* the Closing Date were retained by the Debtors to be dealt with in the context of their bankruptcy cases.  Although currently there is no guaranty that there will be a distribution to the unsecured creditors in the bankruptcy cases, nonetheless, any liability that was not assumed by the Chrysler Group remained with the Debtors.

[5] As amended, Section 2.09(i) of the MTA provides that excluded from liabilities assumed by the Chrysler Group are
all Product Liability Claims arising from the sale of Products or Inventory on or prior to the Closing that are not described in Section 2.08(h).

5

Exhibit 3
Page 64 of 106

To give effect to all provisions of the MTA and Sale Order, and to render them consistent, the Court agrees with the Chrysler Group's assessment to the effect that

> Reading Paragraph 19 of the Sale Order and Sections 2.08(g), 2.08(h) and 2.09(i) of the MTA together and in context, it is clear that the proper construction of those provisions is that Chrysler Group assumed the Lemon Law claims defined by Paragraph 19 and the specific claims defined by Section 2.08(h), but, as made clear by the express liability exclusion set forth in Section 2.09(i), Chrysler Group did not assume any other claims for breach of [a Debtor] warranty relating to a vehicle manufactured before the Closing Date. Under Section 2.08(g), therefore, Chrysler Group assumed other warranty-related obligations, such as to pay for repairs under [Debtor] product warranties, but did not assume liability for breach-of-warranty claims. In other words, because the plain language of Section 2.09(i) of the MTA unambiguously bars claims for breach of [Debtor] product warranties, in order to give meaning to all terms of the MTA, Section 2.08(g) must be interpreted to encompass only the obligations of [Debtor] under its written limited warranty to "Cover the cost of all parts and Labor needed to repair . . ." (footnote and citation omitted).

Thus, the types of warranty-related obligations that the Chrysler Group assumed under Section 2.08(g) of the MTA were set forth in the limited written warranty issued in connection with the Vehicle, where the Debtors were obligated to "cover the cost of all parts and labor needed to repair any defective item on [a] truck supplied by [the Debtors] that is defective in material, workmanship or factory preparation." The obligations that the Chrysler Group assumed under that section were limited to those repair costs. As specified in Section 2.09(i) of the MTA, the Chrysler Group did not assume any other breach of warranty claims for vehicles sold prior to the Closing Date, except for the narrow exception set forth in Section 2.08(h)(ii) and the lemon-law carve out in Paragraph 19 of the Sale Order.

This is consistent with the entire structure of the MTA, which was initially crafted to allocate Product Liability Claims between the Debtor and the Chrysler Group for vehicles manufactured by the Debtors based upon whether those vehicles were sold to customers prior to

6

Exhibit 3
Page 65 of 106

or after the Closing Date.  As previously noted, Section 2.08(h), initially included in the listing

of liabilities that were assumed by the Chrysler Group "all Product Liability Claims arising from

the sale after the Closing [Date] of Products or Inventory manufactured by [the Debtors] . . .

prior to the Closing [Date]," and Section 209(i), included in the list of liabilities that were

excluded from assumption "all Product Liability Claims arising from the sale of Products or

Inventory prior to the Closing [Date]."  Although Sections 2.08(h) and 209(i) were subsequently

amended to provide for a limited exception to this structure for accident claims that met certain

criteria, the limited exception does not apply to Plaintiff's claims.  In addition, the exception for

certain lemon-law claims, which was added by Paragraph 19 of the Sale Order does not apply.

    Reconciling the relevant sections of the MTA and Paragraph 19 of the Sale Order in the

manner advocated by the Chrysler Group is further supported by the negotiations that led to the

addition of Paragraph 19 to the Sale Order.  In that regard, because the combined effect of

Sections 2.08(g) and 2.09(i) of the MTA was to deprive consumers of a remedy for a breach of a

warranty, the Ad Hoc Committee Seeking Fairness for Warranty and Lemon Law claimants (the

"Ad Hoc Committee") filed an objection to the proposed sale.  The compromise reached was to

add Paragraph 19, which carved out the specific exception to the broad exclusion of Section

2.09(i).  Upon the addition of that provision to the Sale Order, the Ad Hoc Committee withdrew

its objection.

<em>CONCLUSION</em>

    Pursuant to Paragraph 19 of the Sale Order, Chrysler Group's assumption of lemon-law

claims applies only with respect to vehicles manufactured by the Debtors in the five years before

the Closing Date.  The Plaintiff's Vehicle was manufactured more than five years prior to the

7

Exhibit 3
Page 66 of 106

Closing Date and, therefore, the Sale Order bars the Plaintiff's claims.

Similarly, for any breach of warranty claims that arguably do not come within the ambit of Paragraph 19 of the Sale Order, Sections 2.08(h) and 2.9(i) of the MTA set forth the breadth of Product Liability Claims (breach of warranty claims) assumed by the Chrysler Group. As the Plaintiff's asserts a breach of warranty claim for a Vehicle sold prior to the Closing Date and it does not meet the criteria set forth in Section 2.08(h) for breach of warranty claims on such vehicles assumed by the Debtors, the Plaintiff's claim is barred by the MTA and Sale Order.

Based upon the record of the Hearing, and all prior pleadings, papers, and proceedings had herein relating to the relief requested in the Motion; and due and proper notice of the Motion having been provided; the Court concludes that the claims that the Plaintiff asserts in the amended complaint are barred by the Sale Order and, therefore, the Plaintiff's claims against Chrysler Group are dismissed with prejudice.

The Chrysler Group is to settle an Order.


Dated: New York, New York
       October 28, 2011

                              /s/ Arthur J. Gonzalez
                              CHIEF UNITED STATES BANKRUPTCY JUDGE

8

Exhibit 3
Page 67 of 106

# EXHIBIT 4

Exhibit 4
Page 68 of 106



UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------ x
In re:                                                :
                                                      :   Chapter 11
OLD CARCO LLC, *et al.*,                              :
                                                      :   Case No. 09-50002 (AJG)
                                    Debtors.          :
                                                      :   (Jointly Administered)
                                                      :
------------------------------------------------------ x
                                                      :
                                                      :
GABRIELLA TATUM, *et al.*,                            :   Adv. Proc. No. 11-09411 (AJG)
                                                      :
                                                      :
                                    Plaintiffs,       :
                                                      :
v.                                                    :
                                                      :
CHRYSLER GROUP LLC,                                   :
                                                      :
                                    Defendant.        :
                                                      :
------------------------------------------------------ x

## ORDER GRANTING DEFENDANT
## <u>CHRYSLER GROUP LLC'S MOTION TO DISMISS</u>

This matter having come before the Court on the January 18, 2012 motion of

Chrysler Group LLC ("Chrysler Group") for entry of an order, pursuant to Rule 7012 of the

Federal Rules of Bankruptcy Procedure and Rule 12(b)(6) of the Federal Rules of Civil

Procedure, dismissing Count I of Plaintiffs' Second Amended Complaint against Chrysler Group

with prejudice (the "Motion"); the Court having considered Chrysler Group's memorandum of

law in support of the Motion, Plaintiffs' opposition to the Motion, Chrysler Group's reply

thereto, and the arguments of counsel concerning the Motion at a hearing (the "Hearing") before

Exhibit 4
Page 69 of 106

the Court on February 14, 2012; and due and proper notice having been provided; and after due

deliberation, with sufficient cause appearing therefore; and for the reasons advanced by the

Chrysler Group, as well as the reasons set forth by the Court at the Hearing, (as modified and

supplemented, attached as Exhibit "A" hereto), it is hereby

ORDERED, that the Motion is granted and Count I of the Second Amended

Complaint is dismissed with prejudice.

Dated: New York, New York
       February 15, 2012

SO ORDERED:

s/Arthur J. Gonzalez
Arthur J. Gonzalez
Chief United States Bankruptcy Judge

-2-

Exhibit 4
Page 70 of 106

Exhibit "A"

The Chrysler Group seeks dismissal of Count I of the Complaint, arguing that the claim is barred by the Court's June 1. 2009 order (the "Sale Order") approving the debtors' entry into the Master Transaction Agreement (the "MTA") between Old Carco and Chrysler Group, as amended, and the sale of substantially all of the Debtors' assets to Chrysler Group, free and clear of all claim other than liabilities expressly assumed by the Chrysler Group.

The Court has reviewed the parties' submissions, and considered their arguments at this hearing. Based upon the plain meaning of the Sale Order and the MTA, the Court concludes that the claim asserted in Count I of the Complaint is barred by the Sale Order.

The Closing Date of the sale of assets to the Chrysler Group was on June 10, 2009. The MTA was initially crafted to allocate product liability claims between the debtors and the purchaser, Chrysler Group, based upon whether the vehicle purchase date was on or prior to the Closing Date, or after the Closing Date. Thereafter, certain amendments were made that extended Chrysler Group's liability for vehicles purchased by consumers prior to the Closing Date within certain circumscribed parameters. Those liabilities related to certain types of accident claims, pursuant to Section 2.09(h)(ii) of the MTA, and liabilities under lemon-laws, pursuant to paragraph 19 of the Sale Order.

Count I of the Complaint alleges violations of the New Jersey Consumer Fraud Act. Therefore, Count I of the Complaint does not relate to accident claims or to lemon-law claims. The plaintiffs argue that the Fraud Act is a mechanism to enforce lemon-law claims. That statute, however, does not conform to the definition in the Sale Order of the lemon-law statutes where liabilities were being assumed, which were statutes "requiring a manufacturer to provide a consumer remedy when the manufacturer is unable to conform the vehicle to the warranty after a reasonable number of attempts as defined in the applicable statute.

With respect to vehicles sold to consumers prior to the Closing Date, pursuant to section 2.08(g), the Chrysler Group's liability under the written warranties is limited to the costs of repairing parts and labor. It does not include any warranty-related causes of action.

In its *Tulacro* decision, the Court set forth its interpretation of the interplay of the various provisions of the MTA and the Sale Order. In addition to the written limited warranties under Section 2.08(g) of the MTA, as noted, certain lemon-law liabilities were assumed under paragraph 19 of the Sale Order. The Chrysler Group did not assume other warranty-related liabilities.

The liability assumed was limited to the repair costs and the Chrysler Group did not assume any other breach of warranty claims for vehicles. To the extent that any repair is not effective, in that the parts and labor provided do not prevent the reoccurrence of the problem, that liability was not assumed. Thus, the Chrysler Group did not assume liability for breach-of-warranty claims for vehicles sold prior to the Closing Date. Section 2.09(i) bars claims for breach of product warranties for vehicles sold prior to the Closing Date.

Beyond labor and parts, the agreements were carefully crafted to limit the Chrysler Groups' exposure to any product liability causes of action that might be asserted, especially including any efforts to obtain punitive, exemplary, special, consequential or multiple damages or penalties, or other consequential damages.

Exhibit 4
Page 71 of 106

Case 1:16-cv-07123-WHP Document 27-1 Filed 09/27/16 Page 68 of 102

# EXHIBIT 5

Exhibit 5
Page 72 of 106

13V-175
(4 pages)

 **CHRYSLER**

RECEIVED
By Recall Management Division at 8:12 am, May 07, 2013

May 7, 2013

Ms. Nancy Lummen Lewis
Associate Administrator for Enforcement
National Highway Traffic Safety Administration
Recall Management Division (NVS-215)
Room: W48-302
1200 New Jersey Ave. SE
Washington, DC 20590

Dear Ms. Lewis:

Attached is Chrysler Group LLC's ("Chrysler") Defect Information Report, complying with the requirements of 49 CFR Part 573, Defect and Noncompliance Reports, which contains details of a potential safety related defect in vehicles.

Chrysler Group will conduct a voluntary safety recall to reflash the final drive controller on all affected vehicles with updated control software.

Sincerely,

Kristin Kolodge

Kristin J. Kolodge

Enclosure:    Defect Information Report for Chrysler Group LLC. Recall N23

cc:    Frank Borris, NHTSA

Chrysler Group LLC | 800 Chrysler Drive | CIMS 482-00-91 | Auburn Hills, MI USA | 48326-2757

Exhibit 5
Page 73 of 106

**DEFECT INFORMATION REPORT FOR CHRYSLER GROUP LLC**
Page 1

**Submission Date:** May 7, 2013

### 573.6(c)(1): Manufacturer's Name, Brand Name

Chrysler Group LLC, Jeep

### 573.6(c)(2): Identification of Affected Vehicles

| Make(s) | Model(s) | Model Year(s) | Inclusive Dates of Manufacture |
|---------|----------|---------------|-------------------------------|
| Jeep | Grand Cherokee | 2005 to 2010 | February 11, 2004 to March 9, 2010 |
| Jeep | Commander | 2006 to 2010 | January 31, 2005 to March 10, 2010 |

### 573.6(c)(2)(iv): Component manufacturer name, address, telephone number, and country of origin:

| | |
|---|---|
| Tier 1: | Subcomponent supplier: |
| Magna Powertrain | Preh de Mexico S.A. de C.V.GmbH |
| 1870 Technology Dr, | Crio 814 |
| Troy, MI 48083 | Guadalupe, Nuevo Leon |
| USA | Mexico |
| (248) 680-4900 | 52 81 5102 5700 |

### 573.6(c)(3): Potentially Affected Vehicle Population

295,345   (estimated)

### 573.6(c)(4): Percentage of Affected Vehicles

Unknown

### 573.6(c)(5): Description of Defect or Noncompliance

Some vehicles may experience a transfer case actuator encoder electrical failure that results in unintentional transfer case shifting into or through the neutral position, which may result in vehicle rollaway and could result in a crash.

Exhibit 5
Page 74 of 106

DEFECT INFORMATION REPORT FOR CHRYSLER GROUP LLC
Page 2

### 573.6(c)(6):  Chronology of Principal Events Leading to Determination of a Safety Defect

- On January 18, 2012, Chrysler opened an investigation in response to a customer complaining that their 2007 MY Grand Cherokee shifted to neutral and rolled upon a remote start.
- The 245 transfer case is an automatic 4WD system that shifts into and out of 4WD modes and ranges automatically or based on customer inputs.  The shifting is accomplished with an electric actuator (composed of a motor, gearing, and electric position encoder) and is commanded by the final drive control module.
- On January 30, 2012 engineering requested additional actuators be collected through the warranty system.  Engineering engaged the transfer case supplier to analyze the actuators returned under warranty.
- The warranty analysis was completed on October 11, 2012 and found cracks in the actuator circuit board traces that resulted in a biased (offset) position signal which could be incorrectly interpreted by the final drive controller.
- During the initial vehicle startup sequence, the controller can automatically command a transfer case shift, without input from the driver (attempting to correct its position based on a biased signal).
- On September 25, 2012 Chrysler obtained the software source code from the controller supplier and began to review the code for possible changes.
- On December 3, 2012, Chrysler completed software modifications to prevent unintended shifting due to a biased encoder signal.
- On March 19, 2013 Chrysler completed validation of the new software.
- On April 30, 2013, Chrysler Group LLC decided to conduct a voluntary safety recall to reflash the final drive controller on all affected vehicles.

### 573.6(c)(7):  Information Used in Determination of a Noncompliance

N/A

Exhibit 5
Page 75 of 106

**DEFECT INFORMATION REPORT FOR CHRYSLER GROUP LLC**
Page 3

### 573.6(c)(8): Description of Remedy

Chrysler will conduct a voluntary safety recall to reflash the final drive controller with new software.

Chrysler has a longstanding policy and practice of reimbursing owners who have incurred the cost of repairing a problem that subsequently becomes the subject of a field action. To ensure consistency, Chrysler, as part of the owner letter, will request that customers send the original receipt and/or other adequate proof of payment to the company for confirmation of the expense.

### 573.6(c)(10): Dealer and Owner Communications

Chrysler plans to begin notification of dealers and owners in June, 2013.
Chrysler will provide the dealer and owner letters when available.

### 573.6(c)(11): Manufacturer's Campaign Number

Chrysler has assigned recall number N23 to this action.

Exhibit 5
Page 76 of 106

# EXHIBIT 6

Exhibit 6
Page 77 of 106



U.S. Department of Transportation
**National Highway Traffic Safety Administration**

1200 New Jersey Avenue SE
Washington, DC 20590

May 10, 2013

Ms. Kristin Kolodge
Senior Manager, Product Investigations & Campaigns
Chrysler Group LLC
800 Chrysler Drive CIMS-482-00-91
Auburn Hills, MI 48326-2757

NVS-215KS
13V-175

**Subject:**  Possible Vehicle Rollaway

Dear Ms. Kolodge:

This letter serves to acknowledge Chrysler Group LLC's notification to the National Highway Traffic Safety Administration (NHTSA) of a safety recall which will be conducted pursuant to Federal law for the product(s) listed below. Please review the following information to ensure that it conforms to your records as this information is being made available to the public. If the information does not agree with your records, please contact us immediately to discuss your concerns.

**Makes/Models/Model Years:**
JEEP/COMMANDER/2006-2010
JEEP/GRAND CHEROKEE/2005-2010

**Mfr's Report Date:**   May 7, 2013

**NHTSA Campaign Number:**   13V-175

**Components:**
ELECTRICAL SYSTEM
POWER TRAIN:TRANSFER CASE (4-WHEEL DRIVE)

**Potential Number of Units Affected:**   295,345

**Problem Description:**
Chrysler Group LLC (Chrysler) is recalling certain model year 2005-2010 Jeep Grand Cherokee vehicles manufactured February 11, 2004, through March 9, 2010; and 2006-2010 Jeep Commander vehicles manufactured January 31, 2005, through March 10, 2010.  A transfer case electrical failure may result in an unintentional shifting of the transfer case into the neutral position.

**Consequence:**
If the vehicle shifts into neutral, it may roll away increasing the risk of a crash or personal injury.

**Remedy:**
Chrysler will notify owners, and dealers will reflash the final drive controller which governs the transfer case, with new software, free of charge.  The recall is expected to begin in June 2013.  Owners may contact Chrysler at 1-800-247-9753.  Chrysler's recall campaign number is N23.

**Notes:**
Owners may also contact the National Highway Traffic Safety Administration Vehicle Safety Hotline at 1-888-327-4236 (TTY 1-800-424-9153), or go to www.safercar.gov.



Exhibit 6
Page 78 of 106

Please be reminded of the following requirements:

You are required to submit a draft owner notification letter to this office no less than five days prior to mailing it to the customers. Also, copies of all notices, bulletins, dealer notifications, and other communications that relate to this recall, including a copy of the final owner notification letter and any subsequent owner follow-up notification letter(s), are required to be submitted to this office no later than 5 days after they are originally sent (if they are sent to more than one manufacturer, distributor, dealer, or purchaser/owner).

As stated in Part 573.7, submission of the first of six consecutive quarterly status reports is required within one month after the close of the calendar quarter in which notification to purchasers occurs. Therefore, the first quarterly report will be due on, or before, 30 days after the close of the calendar quarter.

Your contact for this recall will be Kelly Schuler who may be reached by phone at (202) 366-5227, or by email at kelly.schuler@dot.gov or through the office email at rmd.odi@dot.gov. We look forward to working with you.

Sincerely,

Jennifer Timian
Chief, Recall Management Division
Office of Defects Investigations
Enforcement



Exhibit 6
Page 79 of 106

Case 1:16-cv-07123-WHP   Document 27-1   Filed 09/27/16   Page 76 of 102

# EXHIBIT 7

Exhibit 7
Page 80 of 106

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------- x

In re:                                               :        Chapter 11
                                                     :
OLD CARCO LLC, f/k/a                                 :        Case No. 09-50002 (AJG)
CHRYSLER LLC, *et al.*,                              :
                                                     :
                    Debtors.                         :        (Jointly Administered)
                                                     :
--------------------------------------------------------- x
                                                     :
BRADLEY E. WOLFF,                                    :        Adv. Proc. No. 10-05007 (AJG)
                                                     :
                    Plaintiff,                       :
                                                     :
        -against-                                    :
                                                     :
CHRYSLER GROUP LLC; and                              :
DOES 1-50, inclusive,                                :
                                                     :
                    Defendants.                      :
                                                     :
--------------------------------------------------------- x

## OPINION GRANTING DEFENDANT'S MOTION TO DISMISS

A P P E A R A N C E S

SULLIVAN & CROMWELL LLP
Attorneys for Chrysler Group LLC
125 Broad Street
New York, NY 10004

        By:     Steven L. Holley, Esq.
                Michael J. Ushkow, Esq.

GATES, O'DOHERTY, GONTER & GUY, LLP
Attorneys for Chrysler Group LLC
15635 Alton Parkway, Suite 260
Irvine, CA 92618

        By:     Matthew M. Proudfoot, Esq.

Exhibit 7
Page 81 of 106

CARONNA, JOHNSON & HODDICK, LLP
Attorneys for Bradley E. Wolff
71650 Sahara Road, Suite 2
Rancho Mirage, CA 92270

        By:   Larry Hoddick, Esq.

MCCOY, TURNAGE & ROBERTSON, LLP
Attorneys for Bradley E. Wolff
5469 Kearney Villa Road, Suite 206
San Diego, CA 92123

        By:   Lilys D. McCoy, Esq.

ARTHUR J. GONZALEZ
CHIEF UNITED STATES BANKRUPTCY JUDGE

        Before this Court is a Motion to Dismiss pursuant to Federal Rule of Civil Procedure

12(b)(6) (the "Motion") by Chrysler Group LLC ("New Chrysler") against Bradley E. Wolff's

First Amended Complaint For Damages Based on Breach of Contract and Promissory Estoppel

(the "Complaint"). Mr. Wolff originated this proceeding in the Superior Court of Riverside,

California on December 4, 2009 with a prior version of the Complaint. New Chrysler removed

this proceeding to the United States District Court for the Central District of California pursuant

to sections 1331, 1334, and 1452 of Title 28 of the United States Code. On New Chrysler's

motion pursuant to section 1412 of Title 28 of the United States Code, the case was transferred to

the Southern District of New York on March 4, 2010 for referral to this Court based on this

Court's jurisdiction to interpret its own orders. Mr. Wolff filed the Complaint on April 6, 2010.

New Chrysler filed the Motion on June 14, 2010. Mr. Wolff filed an Opposition to the Motion

on July 8, 2010. New Chrysler filed a Reply in support of the Motion on July 13, 2010. This

Court conducted a hearing on July 15, 2010. For the reasons outlined below, the Motion is

granted in its entirety.

2

Exhibit 7
Page 82 of 106

## BACKGROUND

The following sets forth factual allegations found in the Complaint, which the Court must

assume to be true on a Rule 12(b)(6) motion. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147,

152 (2d Cir. 2002). Legal conclusions set forth in the Complaint have been excluded to the

extent they are not intertwined with relevant facts, as they should not be presumed to be true or

correct and do not bolster the factual sufficiency of a complaint on a motion to dismiss. *See*

*Starr v. Sony BMG*, 592 F.3d 314, 317 n.1 (2d Cir. 2010) (noting that a court "'considering a

motion to dismiss can choose to begin by identifying pleadings that, because they are no more

than conclusions, are not entitled to the assumptions of truth.'") (quoting *Ashcroft v. Iqbal*, 129

S. Ct. 1937, 1949-50 (2009)).

On November 17, 2003, Chrysler LLC (now known as "Old Carco") manufactured a

2004 Dodge Ram, which Bradley E. Wolff ("Mr. Wolff") later purchased. After experiencing

problems with the vehicle, Mr. Wolff filed a complaint against Old Carco in the Superior Court

of Riverside County, California on April 16, 2006, alleging violations of the Song-Beverly

Consumer Warranty Act and the Magnuson-Moss Warranty Act (the "Lemon Law(s)"). The

parties negotiated a resolution of the suit and Old Carco sent Mr. Wolff a draft settlement

agreement on April 21, 2009, under which Old Carco would agree to pay Mr. Wolff $16,000 in

damages and reasonable costs, expenses, and attorney's fees[1] and Mr. Wolff would agree to

dismiss his complaint (the "Settlement Agreement"). Mr. Wolff signed and returned this

agreement to Old Carco, but neither party took any further action to settle the case at that time.

---

[1] Mr. Wolff claimed $124,894.02 regarding such amounts in the California state suit against Old Carco, but Old
Carco's bankruptcy stayed the California suit before that court considered the request, and Mr. Wolff has dismissed
that case. Mr. Wolff requests the same amount plus additional costs, fees, and expenses in an amount according to
proof in the First Amended Complaint. Mr. Wolff also filed a Proof of Claim for $165,303.94 in the Old Carco
Chapter 11 case.

Exhibit 7
Page 83 of 106

Old Carco filed for Chapter 11 bankruptcy on April 30, 2009, before Old Carco or Mr. Wolff had performed any obligations under the Settlement Agreement. Old Carco entered the proceeding with an expectation that it would sell the bulk of its assets with court approval on an expedited schedule. All parties in interest received notice and an opportunity to be heard. The Ad Hoc Committee Seeking Fairness for Warranty and Lemon Law Claimants (the "Ad Hoc Committee") filed an objection to the Debtor's Motion for an Order Authorizing the Sale of Substantially All of Debtors' Assets Free and Clear of All Liens, Claim, Interests and Encumbrances and Certain Related Relief (the "Sale Motion" requesting the "Sale Order"). Mr. Wolff filed a proof of claim for his damages and expenses on May 14, 2009. The Ad Hoc Committee reached an agreement with Old Carco and New Chrysler (the "Agreement on Changes") regarding modifications to the proposed Sale Order and withdrew its objection.[2] Mr. Wolff did not file an objection to the Sale Order.

The Sale Order, entered on June 1, 2009, is an order of this Court authorizing New Chrysler and Old Carco to execute the Master Transaction Agreement. The Sale Order defines those terms of the sale that are relevant to the bankruptcy sale approval and refers to the Master Transaction Agreement for further details. The Sale Order directs that New Chrysler will assume only certain Lemon Law liabilities and executory contracts from Old Carco. Specifically, paragraph 19 states,

---

[2] Complaint, ¶¶ 18-25, Ex. 2-3. *See also* Ad Hoc Committee's Withdrawal of Objection to the Sale Order, Dock. No. 2916, Case 09-50002 (AJG), May 29, 2009. The Agreement on Changes included a comma between "prepetition" and "or" that the Sale Order did not include. At the hearing of July 15, 2010, Mr. Hoddick began his statement for Mr. Wolff by alleging, "Chrysler Group, in its Reply Brief that's before the Court has removed a critical comma from the paragraph 19 language that's before the court. This case may hinge on the meaning of that single comma. They have submitted a Reply Brief to the court removing critical punctuation from the Sale Order." Mr. Hoddick was mistaken; in fact, both parties have cited the correct Sale Order punctuation in their pleadings (although Mr. Wolff's pleadings occasionally conflate the Agreement on Changes and the Sale Order) and the comma's presence or absence does not affect the meaning of the Sale Order as it relates to this proceeding. *See* Compl. ¶26, Def.'s Memo. ¶6, Def.'s Reply ¶7. Because the variant comma is not material to the Court's conclusions, the Court will not resolve the issue in this opinion, although Mr. Hoddick's argument concerning the significance of the variation is considered in the Discussion.

4

Exhibit 7
Page 84 of 106

> Notwithstanding anything else contained herein or in the in the Purchase Agreement, in
> connection with the purchase of the Debtors' brands and related Assets, the Purchaser,
> from and after Closing, will recognize, honor and pay liabilities under Lemon Laws for
> additional repairs, refunds, partial refunds (monetary damages) or replacement of a
> defective vehicle (including reasonable attorney's fees, if any, required to be paid under
> such Lemon Laws and necessarily incurred in obtaining those remedies), and for any
> regulatory obligations under such Lemon Laws arising now, including but not limited to
> cases resolved prepetition or in the future, on vehicles manufactured by the Debtors in the
> five years prior to the Closing (without extending any statute of limitations provided
> under such Lemon Laws), but in any event not including punitive, exemplary, special,
> consequential or multiple damages or penalties and not including any claims for personal
> injury or other consequential damages that may be asserted in relationship to such
> vehicles under the Lemon Laws.

A corresponding amendment to the Master Transaction Agreement uses slightly different
language to assume the same liabilities, but in the event of any conflict, the Sale Order's
language controls. Additionally, regarding an issue not discussed specifically within the Sale
Order, section 2.08(n)(1) of the Article II Company Disclosure Letter to the Master Transaction
Agreement states that New Chrysler assumes certain "[l]iabilities under incentive programs
offered to dealers and customers prior to closing." Other provisions of the Sale Order emphasize
that New Chrysler assumes specific liabilities of Old Carco but does not become a successor to
Old Carco; all non-assumed Old Carco claims are barred against New Chrysler. *See* Sale Order
¶¶ 12-17, 35, 38, 39, 42. The sale closed on June 10, 2009 and the Sale Order is now final.

On August 24, 2009, Matthew Proudfoot, counsel for New Chrysler, sent a letter to Larry
Hoddick, counsel for Mr. Wolff (Pl.'s First Opp., Ex. E, the "Proudfoot Letter") serving court-
approved Notice Regarding Treatment of Lemon Law Claims in Connection With Chrysler LLC
Bankruptcy Cases and Sale of Assets to Chrysler Group with Exhibits (the "Lemon Law
Notice"). The Lemon Law Notice generally directs those parties to whom New Chrysler
assumed liabilities under paragraph 19 of the Sale Order to pursue their claim in one of the
following ways:

5

Exhibit 7
Page 85 of 106

(a) filing the appropriate papers in a Lemon Law Action (consistent with applicable procedural requirements in such action) to indicate that New Chrysler is being substituted for the Debtors as the defendant in the proceeding, *provided that* such papers contain an affirmative statement that only Assumed Lemon Law Liabilities are being pursued against New Chrysler, solely to the extent permitted by the Lemon Law Provision of the Sale Order, and that any additional pre-Closing liabilities will be pursued (if at all) only by filing a proof of claim in these cases; (b) dismissing the Lemon Law Action and filing a new action solely against New Chrysler, which seeks only relief with respect to the Assumed Lemon Law Liabilities; or (c) any other similar arrangement acceptable to the Debtors and New Chrysler in their sole discretion that results in no claims being pursued against the Debtors in any nonbankruptcy forum and no Excluded Liabilities being pursued against New Chrysler.
Compl. ¶37.

The Lemon Law Notice does not modify the Sale Order or any party's rights under the Sale Order; it only informs Lemon Law claimants of the effect of the Sale Order and New Chrysler's treatment of assumed liabilities. The Proudfoot Letter specifically states New Chrysler's opinion regarding Mr. Wolff's claim: "based on our review of the relevant materials we have determined that none of the claims asserted therein [by Mr. Wolff] have been assumed by [New Chrysler]. We therefore are unwilling to consent to the substitution of [New Chrysler] in place of Old Carco . . . ." This language most directly excludes options "(c)" of the Lemon Law Notice, but also expresses New Chrysler's belief that New Chrysler did not assume any liability to Mr. Wolff under the Sale Order, excluding options "(a)" and "(b)" unless Mr. Wolff can demonstrate that New Chrysler did assume the Settlement Agreement under the Sale Order. Mr. Wolff alleges that he relied on the Lemon Law Notice to pursue option "(b)"; he voluntarily dismissed his state proceeding against Old Carco with prejudice on December 3, 2009 and now pursues breach of contract and promissory estoppel claims against New Chrysler in this proceeding.

Mr. Wolff alleges that New Chrysler assumed or should have assumed the Settlement Agreement under the language of paragraph 19 of the Sale Order and has now breached that contract. Compl. ¶¶ 27-32, 46-47. Mr. Wolff further alleges that New Chrysler assumed Old

6

Exhibit 7
Page 86 of 106

Carco's settlement with him under the language of section 2.08(n)(1) of the Master Transaction Agreement as integrated into the Sale Order and has now breached that contract. Compl. ¶¶ 33-36, 46-47. Mr. Wolff also pleads a promissory estoppel claim based on the same facts. Citing the legal deficiencies of Mr. Wolff's claims, New Chrysler has moved for dismissal of this proceeding under Federal Rule of Civil Procedure 12(b)(6).

## JURISDICTION

The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334, under the July 10, 1984 "Standing Order of Referral of Cases to Bankruptcy Judges" of the United States District Court for the Southern District of New York (Ward, Acting C.J.), and under paragraph 59 of the Sale Order. Because this proceeding is ancillary to the Sale Order, it is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(N). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## DISCUSSION

*Motion to Dismiss Standard*

Federal Rule of Civil Procedure ("Rule") 12(b)(6) is incorporated into bankruptcy procedure by Federal Rule of Bankruptcy Procedure ("Bankruptcy Rule") 7012(b). In considering a Rule 12(b)(6) motion to dismiss for failure to state a claim for relief, the court "must accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 94, 127 S. Ct. 2197, 2200, 167 L. Ed. 2d 1081 (2007). In addition, the court draws all reasonable inferences from the factual allegations in favor of the plaintiff.

7

Exhibit 7
Page 87 of 106

*Walker v. City of New York*, 974 F.2d 293, 298 (2d Cir. 1992); *Myvett v. Williams*, 638 F. Supp.

2d 59, 64 (D.D.C. 2009).

   In considering such a motion, although a court accepts all the factual allegations in the

complaint as true, the court is "not bound to accept as true a legal conclusion couched as a factual

allegation." *Papasan v. Allain*, 478 U.S. 265, 286, 106 S. Ct. 2932, 2944, 92 L. Ed. 2d 209

(1986).  Bare assertions, "devoid of 'further factual enhancement'[,]" are not sufficient to

withstand a motion to dismiss. *Ashcroft v. Iqbal*, ___ U.S. ___, ___, 129 S. Ct. 1937, 1949, 173

L. Ed. 2d 868 (2009) (citation omitted).

   "Although bald assertions and conclusions of law are insufficient, the pleading standard is

nonetheless a liberal one." *Cooper v. Parsky*, 140 F.3d 433, 440 (2d Cir. 1998); *see also*

*Erickson*, 551 U.S. at 94, 127 S. Ct. at 2200 (noting that Rule 8(a)(2) sets forth "liberal pleading

standards").  Pursuant to Rule 8(a), which is made applicable to adversary proceedings by

Bankruptcy Rule 7008, in asserting a claim, the pleader need only set forth a short and plain

statement of the claim showing that the pleader is entitled to relief.  The purpose of the statement

is to provide "fair notice" of the claim and "the grounds upon which it rests." *Erickson*, 551 U.S.

at 93, 127 S. Ct. at 2200 (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct.

1955, 1964, 167 L. Ed. 2d 929 (2007) (quoting, in turn, *Conley v. Gibson*, 355 U.S. 41, 47, 78 S.

Ct. 99, 103, 2 L. Ed. 2d 80 (1957).  Thus, specific facts are not necessary. *Id.* 551 U.S. at 93,

127 S. Ct. at 2200.

   While detailed factual allegations are not necessary, the need to provide the "grounds" for

entitlement to relief requires "more than labels and conclusions" and more than "a formulaic

recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555, 127 S. Ct. at 1964-65.

The allegations must show that the right to relief is more than speculative. *Id.* at 553, 127 S. Ct.

8

Exhibit 7
Page 88 of 106

at 1965. There must be a "reasonably founded hope" that the discovery process will uncover

relevant evidence. *Id.* at 559, 563 n.8, 127 S. Ct. 1967, 1969 n.8.

To adequately support the claim, there must be sufficient facts identified to suggest that

the legally vulnerable conduct is plausible. *Id.* at 556, 127 S. Ct. at 1965. A complaint meets the

plausibility standard when factual content is pled "that allows the court to draw the reasonable

inference that the defendant is liable for the misconduct alleged." *Iqbal*, ___ U.S. at ___, 129 S.

Ct. at 1949. Once the plausibility threshold is met, the complaint survives even if the identified

facts seem improbable or recovery is thought to be remote or unlikely. *Twombly*, 550 U. S. at

556, 127 S. Ct. at 1965. Although *Twombly* was decided in the context of an antitrust litigation,

the plausibility standard to test the sufficiency of a complaint applies in all civil actions. *Iqbal*,

___ U.S. at ___, 129 S. Ct. at 1953. The plausibility standard, however, does "not require

heightened fact pleading of specifics, but only enough facts to state a claim to relief that is

plausible on its face." *Twombly*, 550 U.S. at 570, 127 S. Ct. at 1974. Thus, "once a claim has

been stated adequately, it may be supported by showing any set of facts consistent with the

allegations in the complaint." *Id.* at 563, 127 S. Ct. at 1969.

Rule 8(a)(2) "requires a 'showing,' rather than a blanket assertion, of entitlement to

relief." *Id.* at 555 n.3, 127 S. Ct. at 1965 n.3. However, once the claim is adequately supported,

specific facts beyond those needed to state the claim are not necessary. *Id.* at 570, 127 S. Ct. at

1973-74. Indeed, other sections of the Federal Rules of Civil Procedure support a simplified

notice pleading standard, including Rule 8(f), which provides that technical forms of pleading or

motions are not required, and Rule 8(e)(1), which provides that pleadings are to construed in a

way that does substantial justice. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 513-14, 122 S. Ct.

992, 998, 152 L. Ed. 2d 1 (2002). The simplicity required by the rule, in forgoing additional

9

Exhibit 7
Page 89 of 106

Case 1:16-cv-07128-WHP   Document 27   Filed 09/27/16   Page 90 of 102

factual detail, recognizes the ample opportunity afforded for discovery and other pre-trial

procedures, which permit the parties to obtain more detail as to the basis of the claim and as to

the disputed facts and issues. *Id.* at 512-13, 122 S. Ct. at 998; *see also, Conley*, 355 U.S. at 47-

48, 78 S. Ct. at 103. Based upon the liberal pleading standard established by Rule 8(a), even the

failure to cite a statute, or to cite the correct statute, will not affect the merits of the claim.

*Northrop v. Hoffman of Simsbury, Inc.*, 134 F.3d 41, 46 (2d Cir. 1997). In considering a motion

to dismiss, it is not the legal theory but, rather, the factual allegations that matter. *Id.*

      To survive a motion to dismiss, a plaintiff only has to allege sufficient facts, not prove

them. *Koppel v. 4987 Corp.*, 167 F.3d 125, 133 (2d Cir. 1999). A court's role in ruling on a

motion to dismiss is to evaluate the legal feasibility of the complaint, not to weigh the evidence

which may be offered to support it. *Cooper*, 140 F.3d at 440. The determination is not whether

a claimant will ultimately prevail, but whether the claimant should be allowed to offer evidence

to support the claim. *Swierkiewicz*, 534 U.S. at 511, 122 S. Ct. at 997.


*Distinction between Old Carco and New Chrysler*

      The Complaint pleads allegations against Old Carco and New Chrysler almost

interchangeably, but for the purposes of this proceeding solely against New Chrysler, it is

essential to distinguish the two entities. This Court's opinion approving the Sale Order and the

Sale Order itself define with a high degree of specificity which liabilities New Chrysler assumed

from Old Carco and which liabilities Old Carco retained. *See In re Chrysler LLC*, 405 B.R. 84

(Bankr. S.D.N.Y. 2009).[3]

---

[3] The Second Circuit affirmed the sale opinion by summary order. 2009 U.S. App LEXIS 12351, at *2 (2d Cir. 2009). The U.S. Supreme Court then denied objectors' motion for a stay of the Sale Order. *Ind. State Police Pension Trust v. Chrysler LLC (in re Chrysler LLC)*, 129 S. Ct. 2275 (2009). After the sale was consummated, the Second Circuit issued a full opinion affirming the sale opinion. *In re Chrysler LLC*, 576 F.3d 108 (2d Cir. 2009).

Exhibit 7
Page 90 of 106

Mr. Wolff alleges in the Complaint, "THE DEBTORS refused to honor all of their warranty obligations, including those to PLAINTIFF. Rather THE DEBTORS began picking and choosing which obligations they would uphold and which ones they would ignore." Compl. ¶15. This allegation and others like it in the pleadings contradict the documents Mr. Wolff has cited and do not lead logically to Mr. Wolff's requested relief. Old Carco, Debtors referenced in this case, did not choose which obligations to uphold and which to ignore, nor is it a party to the Complaint. New Chrysler is not a related debtor, nor is it responsible for all of Old Carco's obligations. Old Carco and New Chrysler are distinct entities against which different claims may be asserted. Any claims against New Chrysler based upon the purchase of Old Carco's assets are limited to those liabilities assumed under the Sale Order.

After receiving the Lemon Law Notice and the Proudfoot Letter, Mr. Wolff chose to dismiss his suit against Old Carco and pursue this proceeding against New Chrysler alone. Even if the Court accepts Mr. Wolff's claims against Old Carco as alleged, those claims do not determine the outcome of his action against New Chrysler. Because New Chrysler is a separate company that paid Old Carco adequate consideration for assets under the Sale Order, New Chrysler is not liable for all claims against Old Carco. Under the authority of sections 105 and 363, the Sale Order explicitly bars claims against New Chrysler based solely on Old Carco's liability; New Chrysler's liabilities are limited to those assumed under the Sale Order. Sale Order ¶¶ 12, 35. As discussed below, the terms of the Sale Order indicate that New Chrysler did not assume Old Carco's liability as to Mr. Wolff. [4]

---

The Supreme Court granted objectors' petition for certiorari and vacated the Second Circuit judgment, remanding the case to the Second Circuit "with instructions to dismiss the appeal as moot." 130 S. Ct. 1015 (2009). Because the appeal has been dismissed as moot, the Sale Order is now final and unappealable.

[4] Mr. Wolff alleges that New Chrysler has paid other claims similar to his, pointing to *Gualtieri v. Chrysler*, a case which is not attached, cited, or summarized in any of the pleadings thus far and which the Court has not located.

11

Exhibit 7
Page 91 of 106

*Breach of Contract Claim*

Mr. Wolff alleges that New Chrysler breached a contract with him. Under general

principles of contract law, a contract typically requires a bargain, consisting of mutual

manifestation of assent and mutual consideration. *Bowsher v. Merck & Co.*, 460 U.S. 824, 862

(1983) (citing Restatement (Second) of Contracts § 17 (1981)). Mr. Wolff alleges plausible facts

indicating that he reached such a bargain with Old Carco through the Settlement Agreement.[5] In

the absence of any alleged separate agreement between Mr. Wolff and New Chrysler, it is also

necessary for him to allege that New Chrysler assumed the Settlement Agreement under the Sale

Order and the Master Transaction Agreement.[6] Consequently, Mr. Wolff's breach of contract

claim rises or falls not on interpretation of a private contract, but on interpretation of the Sale

Order.

---

The Defendant's Opposition cites to the Declaration of Amy Benecoff to support the allegation, but the Declaration says nothing about *Gualtieri*. Regardless of whether Mr. Wolff could produce more factual support, the allegation is not material to the matter at hand: New Chrysler's assumption of certain liabilities and non-assumption of other liabilities under the Sale Order. New Chrysler may spend its financial and legal resources as it chooses; this Court only enforces those promises that New Chrysler made in connection with the Sale Order as part of the value it offered in exchange for Old Carco's assets. Classification of claims and equal treatment of claims within a class is only relevant when Mr. Wolff seeks repayment from Old Carco under the confirmed plan.

[5] Ordinarily the Court applies the choice of law standards of its forum state, New York, unless the protection of a federal policy or interest requires the application of federal common law. *See Bianco v. Erkins (In re Gaston & Snow)*, 243 F.3d 599, 606 (2d Cir. 2001). New York ordinarily applies the law of the jurisdiction having the greatest interest in the litigation. *Id.* at 607. The Settlement Agreement cites the California Civil Code and would resolve a California state court lawsuit. Mr. Wolff is a California resident. Interpretation of the Settlement Agreement would most logically be governed by California law. In any case, the Complaint does not allege any need to interpret the Settlement Agreement or any impact that choice of law would have on Mr. Wolff's claims. For the purposes of this Motion only, the Court assumes that the Settlement Agreement is a valid and enforceable contract between Old Carco and Mr. Wolff under any applicable law.

[6] *See* n. 5, *supra*. The Master Transaction Agreement is governed by New York law according to its terms, and the Sale Order was issued by this Court in a federal bankruptcy case in New York. New York law would most logically govern interpretation of those documents except to the extent that it is necessary to apply federal law to protect the consistency and finality of that bankruptcy law. In any case, the Complaint does not allege any impact that choice of law would have on Mr. Wolff's claims related to the Sale Order and the Master Transaction Agreement. In the absence of any alternative claim in the pleadings, the Court will interpret the Sale Order and the Master Transaction Agreement based on New York law and federal law.

Exhibit 7
Page 92 of 106

*Interpretation of the Sale Order*

     A court has special expertise regarding the meaning of its own order, and therefore its

interpretation is entitled to deference. *See Travelers Indem. Co. v. Bailey*, 129 S. Ct. 2195, 2204,

n. 4 (2009). Furthermore, "[i]f it is black-letter law that the terms of an unambiguous private

contract must be enforced irrespective of the parties' subjective intent,...it is all the clearer that a

court should enforce a court order, a public governmental act, according to its unambiguous

terms." *Id.*

     In a contract context, a court has the power to determine whether language is ambiguous

as a matter of law. *See Alexander & Alexander Servs., Inc. v. These Certain Underwriters at

Lloyd's, London,* 136 F.3d 82, 86 (2d Cir. 1998). The Second Circuit has summarized the

ambiguity standard for purposes of contract interpretation:

> In the past, we have defined ambiguous language as that which is "capable of more than
> one meaning when viewed objectively by a reasonably intelligent person who has
> examined the context of the entire integrated agreement and who is cognizant of the
> customs, practices, usages and terminology as generally understood in the particular trade
> or business." Conversely, language is not ambiguous when it has "a definite and precise
> meaning, unattended by danger of misconception in the purport of the [contract] itself,
> and concerning which there is no reasonable basis for a difference in opinion." The
> language of a contract is not made ambiguous simply because the parties urge different
> interpretations. Nor does ambiguity exist where one party's view "strain[s] the contract
> language beyond its reasonable and ordinary meaning." [citations omitted].
> *Seiden Assoc., Inc. v. ANC Holdings, Inc.,* 959 F.2d 425 (2d Cir. 1992).

Although this ambiguity standard originates in the contract context, it draws on general

interpretive conventions that apply with equal force to the interpretation of an order authorizing

the parties to enter a contract. *See generally Seabury Constr. Corp. v. Jeffrey Chain Corp.,* 289

F.3d 63 (2d Cir. 2002). The Sale Order controls the major terms of the Master Transaction

Agreement and is a prerequisite to the effectiveness of that contract. The ambiguity or clarity of

Exhibit 7
Page 93 of 106

the Sale Order with respect to New Chrysler's assumption of Lemon Law liabilities is
fundamental to Mr. Wolff's claims against New Chrysler.

If the Court finds as a matter of law that New Chrysler did not assume a contract with
Mr. Wolff under the plain meaning of the Sale Order, Mr. Wolff's breach of contract claim must
be dismissed, regardless of any factual allegations regarding the intent of the parties or New
Chrysler's payment of other claims. The Court need not consider extrinsic evidence to interpret
an unambiguous order. *See Alexander & Alexander*, 136 F.3d at 86. On the other hand, if the
Sale Order were ambiguous with respect to New Chrysler's assumption of Lemon Law liabilities
to Mr. Wolff, the Court might require further proceedings for the parties to present evidence in
order for the Court to resolve their dispute. *See Colonial Auto Ctr. v. Tomlin (in re Tomlin)*, 105
F.3d 933, 940-41 (4th Cir. 1997), *First Union Nat'l Bank v. Pictet Overseas Trust Corp.*, 477
F.3d 616, 620 (8th Cir. 2007). For the reasons set forth below, the Court finds that the Sale
Order unambiguously bars Mr. Wolff's claims.

*Assumption of Lemon Law Liabilities under the Paragraph 19 of the Sale Order*

Mr. Wolff interprets the Sale Order in light of the Agreement on Changes. This reliance
is correct only to the extent that the Agreement on Changes directly affected the language of the
final Sale Order, which has legal effect based on its plain meaning, regardless of the intention of
the parties or course of negotiations. The Ad Hoc Committee achieved the consent of Old Carco
and New Chrysler to three changes to the Sale Order: inclusion of partial refunds, inclusion of
settled cases, and inclusion of Magnuson Moss claims in conjunction with state breach of
warranty claims. These changes protected the rights of certain Lemon Law claimants and led the
Ad Hoc Committee to withdraw its objection. The changes clearly show that New Chrysler

14

Exhibit 7
Page 94 of 106

assumed certain liabilities under the Sale Order similar in some respects to Mr. Wolff's settlement. However, the changes did not modify or create an ambiguity about the phrase, "[comma] on vehicles manufactured by the Debtors in the five years prior to the closing." This time limit is one example of the discretion exercised by New Chrysler to assume certain liabilities and exclude others based on its business judgment, in accord with the limitations of the Bankruptcy Code.

Mr. Wolff focuses on the addition of the clause, "including but not limited to cases resolved prepetition," which he interprets as an inclusion of all resolved cases in the assumed liabilities without regard for the time limit. The inclusion clause must be interpreted in the context of the full sentence, not merely as a stand-alone provision. The clause removes any ambiguity about assumption of otherwise-qualified claims by individuals who had already agreed to settlements with Old Carco. However, the clause does not affect the later time limit, which existed before the Agreement on Changes, was not modified or rendered ambiguous, and remained intact in the Sale Order. The key sentence of paragraph 19 has only one object: "liabilities under Lemon Laws." All other clauses clarify *which* liabilities New Chrysler assumes. Grammatically and logically, the time limit must relate back to the sole object of the sentence and govern all assumption of liabilities.

The determinant of whether New Chrysler assumed a Lemon Law settlement with Mr. Wolff is the consistently punctuated time limit in paragraph 19 of the Sale Order. Perhaps because "or in the future" comes immediately before "[comma] on vehicles manufactured by the Debtors in the five years prior to the Closing," Mr. Wolff argues that the time limit only applies to obligations arising in the future and not already settled obligations. At first glance, it might appear that one could justify this reading by the "rule of the last antecedent, according to which a

15

Exhibit 7
Page 95 of 106

limiting clause or phrase. . . should ordinarily be read as modifying only the noun or phrase
which it immediately follows." *Barnhart v. Thomas*, 540 U.S. 20, 27-28 (2003). However, the
rule of last antecedent does not control interpretation of this clause; a frequently cited
grammatical corollary to the rule of last antecedent is that "use of a comma to set off a modifying
phrase from other clauses indicates that the qualifying language is to be applied to all of the
previous phrases and not merely the immediately preceding phrase." *United States v. Weisser*,
417 F.3d 336, 348 (2d Cir. 2005) (quoting *Elliot Coal Mining Co. v. Director, Office of Workers'
Comp. Programs*, 17 F.3d 616, 630 (3d Cir. 1994). The comma setting off "on vehicles
manufactured by the Debtors in the five years prior to the Closing" unambiguously applies the
time limit to all liabilities assumed earlier in the sentence.

A Sale Order with the effect Mr. Wolff seeks would use different language. For instance,
if the Sale Order instead stated that New Chrysler would assume "liabilities for repairs, cases
resolved prepetition[,] and [other] regulatory obligations arising in the future on vehicles
manufactured by the Debtor in five years prior to the Closing,"[7] Mr. Wolff would have at least a
plausible argument under *Barnhart* and similar cases. 540 U.S. at 27-28, *see also In re Enron
Creditors Recovery Corp.*, 380 B.R. 307, 319 (S.D.N.Y. 2008) (interpreting the phrase "all
indebtedness of [Enron] . . . evidenced by debentures, notes, bonds or other securities sold by
[Enron]" to mean that "sold by Enron" only modified "other securities"). The District Court
found that a condition included in the last item in a list, without additional punctuation, applied
only to limit that item, and not the earlier list items. However, the District Court also noted that
the rule of last antecedent only applies "where no contrary intention appears." *Id.* Regarding the
Sale Order, paragraph 19 clearly expresses a contrary intention, according to the grammatical

---

[7] The bracketed words in the hypothetical are optional and might give rise to unrelated interpretive issues. The point
of emphasis is the list structure and the scope of the final phrase.

Exhibit 7
Page 96 of 106

corollary to the rule of last antecedent. *Weisser*, 417 F.3d at 348. Paragraph 19 always concluded its list of assumed liabilities with the separate phrase, "[comma] on vehicles manufactured by the Debtors in the five years prior to the Closing," which applies a time limit to the assumption of Lemon Law liabilities. According to Mr. Wolff's allegations, no one ever sought or agreed to different language or punctuation in *this* portion of paragraph 19. The insertion of additional language earlier in the sentence ought not to cloud a clear condition that pre-dated that addition and was not modified by it.

Mr. Wolff's factual allegations, including those raised subsequent to the Complaint, are insufficient to overcome the plain meaning of paragraph 19 of the Sale Order. At the hearing on the Motion, Mr. Wolff asked the Court to add the comma between "prepetition" and "or in the future," which was included in the Agreement on Changes but not contained in the Sale Order. Mr. Wolff argues that the Ad Hoc Committee's withdrawal of its objection required the exact language of the Agreement on Changes, including the comma. Mr. Wolff further argues that the comma separation could narrow the five-year limit to "[regulatory obligations under such Lemon Laws arising] in the future," distinguishing those obligations from "regulatory obligations under such Lemon Laws arising now, including . . . cases resolved prepetition," which would have no time limit. The absence of the comma before "or in the future" may be a clerical error, but it is unnecessary to determine whether a clerical error correction is warranted, because the comma is not material to the Complaint's allegations. Additional commas in the sentence would not create the distinction that Mr. Wolff asks the Court to find in the Sale Order, because commas do not have the effect of periods or semicolons. The structure of the sentence unambiguously applies the time limit to the assumption of any Lemon Law liability, regardless of the inclusion of the variant comma.

17

Exhibit 7
Page 97 of 106

In further support of an interpretation of paragraph 19 under which New Chrysler assumed a Lemon Law liability to him, Mr. Wolff has supplied a declaration from Amy Benecoff, counsel for the Ad Hoc Committee. She understands that counsels for the Ad Hoc Committee, Old Carco, and New Chrysler "intended . . . that New Chrysler . . . would recognize, honor any [sic] pay all cases resolved prepetition regardless of the age of the vehicle, and that the five-year cut-off applied only to new lemon law claims brought after the petition date and cases that were unresolved prior to the petition date." Pl.'s Opp., Ex. C, ¶4. This declaration aligns with the Complaint's assertion that "it is clear from the exchange among the attorneys attached hereto as Exhibit 3 that the parties intended that THE DEBTORS assume and honor all the settlements in all <u>cases resolved prepetition</u>." Compl. ¶ 21. While the Complaint mistakenly refers to "THE DEBTORS" rather than New Chrysler, the Court understands from the context of the pleadings that Mr. Wolff alleges that the parties intended for New Chrysler to assume such settlements. However, the alleged intent of the parties is not material to interpretation of this unambiguous court order.

Even if the Court were to consider extrinsic evidence as alleged in search of ambiguity, none of Mr. Wolff's allegations would result in the Court finding any ambiguity in the Sale Order. In contrast to the detailed Sale Order, the emails among the Ad Hoc Committee, Old Carco, and New Chrysler are brief and simply demonstrate intent to agree to the language that became part of the Sale Order, while the Declaration of Amy Benecoff expresses a conclusory legal opinion unsupported by specific reference to the language of the Sale Order. One way to achieve the Ad Hoc Committee's alleged intention would have been to write separate sentences about the treatment of settled claims and unsettled claims. Another choice would have been to add language within the sentence explicitly stating that New Chrysler's obligations included

18

Exhibit 7
Page 98 of 106

settled cases regardless of date of manufacture, but excluded unsettled obligations on vehicles manufactured in the last five years. The Sale Order did not include these terms, yet now counsel for the Ad Hoc Committee, who had the opportunity to suggest different language, and Mr. Wolff, who did not participate in the negotiations although he was on notice that Old Carco had filed a bankruptcy petition, assert that all parties intended for a time limit to apply to the assumption of some liabilities but not others. Such assertion is made without any grammatical theory regarding the structure of the sentence at issue and does not render the Sale Order ambiguous.

New Chrysler assumed only specific Lemon Law liabilities from Old Carco under the Sale Order, and Mr. Wolff's claim falls outside the specified time limit. A ruling that the time limit only related to some preceding clauses in the same sentence would upset standard commercial expectations based on standard English grammar. The length of the sentence, the variant comma before "or in the future," and the intention of certain parties to the negotiation do not create ambiguity or override the plain meaning of the Sale Order. New Chrysler did not assume a contract with Mr. Wolff under paragraph 19 of the Sale Order and, therefore, could not have breached such a contract.

*Assumption of Incentive Programs under the Master Transaction Agreement*

Mr. Wolff further alleges that the settlement agreement was an incentive program that New Chrysler assumed as an executory contract under the Master Transaction Agreement as authorized by the Sale Order. Even within the Master Transaction Agreement, this allegation is incompatible with the plain meaning of "incentive program." The phrase Mr. Wolff relies on from the Master Transaction Agreement, "incentive programs offered to dealers and consumers,"

19

Exhibit 7
Page 99 of 106

clearly describes car manufacturer programs that encourage transactions between dealers and

customers by offering cash bonuses or attractive financing terms on car purchases. *See generally*

*Chrysler Credit Corp. v. J. Truett Payne, Inc.*, 607 F.2d 1133 (5th Cir. 1979) (discussing such a

program in an unrelated matter). Incentive programs are designed to incentivize new sales, not

to resolve issues that arise based on past sales. The plain meaning of the language opposes Mr.

Wolff's interpretation, which is a bare assertion of a legal conclusion unsupported by plausible

factual allegations.

     Additionally, there is no need to define New Chrysler's assumption of Lemon Law

liabilities based on the Master Transaction Agreement's incentive program provision when the

Sale Order treats Lemon Law liabilities. The Supreme Court has stated, "a document should be

read to give effect to all its provisions and to render them consistent with each other."

*Mastrobuono v. Shearson Lehman Hutton*, 514 U.S. 52, 63 (1995). The Sale Order incorporates

the Master Transaction Agreement, "subject to the terms and conditions of this Sale Order to the

extent of any express conflict herewith." Sale Order ¶4. The Sale Order provides specifically

for Lemon Law liabilities, with a limit based on date of manufacture. The Master Transaction

Agreement provides generally for incentive program liabilities, without a limit based on date of

manufacture. "[I]t is a fundamental rule of contract construction that 'specific terms and exact

terms are given greater weight than general language.'" *Aramony v. United Way of Am.*, 254

F.3d 403, 413 (2d Cir. 2001) (quoting Restatement (Second) of Contracts § 203(c) (1981)). No

reasonable interpreter of the Sale Order and Master Transaction Agreement would stretch the

definition of "incentive program" to describe Lemon Law settlements already addressed more

specifically in the Sale Order and render irrelevant the time limit in the more specific and

authoritative provision. The provisions have independent and non-contradictory effects only if

20

Exhibit 7
Page 100 of 106

one separates incentive programs from Lemon Law liabilities; the language of the Sale Order unambiguously provides these distinct treatments, and this Court must enforce them.

*Due Process and Challenges to the Sale Order*

Mr. Wolff alleges in the alternative, if the Court does not find that New Chrysler assumed an obligation to him under the Sale Order, that New Chrysler *should have* assumed an obligation to him.[8] He bases his request on the Bankruptcy Code (Compl. ¶ 30) and due process (Compl. ¶ 28), arguing that New Chrysler "is required to assume" a liability to him or that a Sale Order under which New Chrysler does not assume a liability to him is fundamentally unfair. Putting aside the issue of the timeliness of such assertions, these arguments are without merit; the Complaint's factual allegations do not support a legal claim that the Sale Order was unfair or otherwise must be modified. Instead, the Complaint asserts objections to the Sale Order that are similar to those that this Court overruled in the opinion accompanying the Sale Order. *See Chrysler*, 405 B.R. at 111. For purposes of clarity and completeness, the Court will summarize the reasons that such objections were overruled at that time and still must be overruled on this Complaint.

Mr. Wolff requests modification of the Sale Order based on due process concerns possibly related to the speed of the sale, but his legal argument would not have prevailed even had he made a timely objection before entry of the Sale Order. Other parties filed conceptually similar objections to the Sale Order, many of which Old Carco and New Chrysler resolved through negotiations, including the Ad Hoc Committee's Objection. This Court overruled all other objections because the sale complied with applicable law and provided the best available

---

[8] Mr. Wolff's initial complaint emphasized this allegation, while the amended Complaint places less emphasis on it but still makes related allegations. *See* Compl. ¶ 19, 28-31, 46-47, 55.

21

Exhibit 7
Page 101 of 106

prospect of recoveries for creditors of Old Carco. *See generally Chrysler*, 405 B.R. 84. Adequate notice of the bankruptcy and the sale and opportunity to be heard were provided to claimants. *Id.* at 109-12. The circumstances of the bankruptcy necessitated the form of the sale; Old Carco could not meet all of its obligations and was rapidly losing value, New Chrysler was the only bidder for Old Carco's assets, and New Chrysler would not make its value-adding bid if it was required to assume all of Old Carco's liabilities. *Id.* at 96-98. The sale was a justifiable business decision by the Debtors with authorization from the Court. *Id.* at 96. The sale was not a plan of reorganization, did not implicate plan requirements such as section 1123, and complied with bankruptcy sale requirements including section 363. *Id.* at 94-96. The purpose of the sale was not to effect a plan of reorganization and set distributions to classes of claimants, but to maximize the value of the estate and support the best possible recoveries under a separately confirmed plan. *Id.* The sale did not discharge any liabilities; instead, it left some liabilities as obligations of Old Carco for resolution under a plan.

Although Mr. Wolff has not specified which sections of the Bankruptcy Code he believes the Sale Order or New Chrysler's actions violated, his counsel argued at the hearing on the Motion, "these claimants that are in the same class cannot be treated differently for the bankruptcy to be fair and reasonable under the Bankruptcy Code." This argument does not apply correct legal principles. Mr. Wolff is not seeking relief as a claimant or a class member against Debtor Old Carco in this proceeding; the Complaint seeks payment in satisfaction of a contract that New Chrysler allegedly should have assumed under the Sale Order. This allegation must be dismissed because Mr. Wolff has not formed a legal argument that New Chrysler was obliged to assume *any* Lemon Law liabilities, that any correction to the Sale Order is necessary under

22

Exhibit 7
Page 102 of 106

Federal Rule of Civil Procedure 60(a), or that he has grounds for relief from the Sale Order under Federal Rule of Civil Procedure 60(b).

The history of this bankruptcy and the pleadings indicate no legal theory under which New Chrysler could be a successor to Old Carco or be bound to assume all of Old Carco's liabilities. Mr. Wolff challenges the sale process on a general level, but absent New Chrysler's involvement in this case, Old Carco would have been in no better position to pay Mr. Wolff's claim than it is now. *See Chrysler*, 405 B.R. at 97 (noting that a liquidation of Old Carco rather than a sale would have generated less value and there were no competing offers for Old Carco's assets). Within certain limitations not relevant to this case, New Chrysler was free to apply its business judgment to assume certain liabilities and not others. *See id.* at 99, n. 18 ("New Chrysler has determined that, to effectively carry on its business, it should take over certain other of the Debtors' obligations. Any such assumption of liability reflects the purchaser's business judgment, the effect of which does not constitute a *sub rosa* plan because the obligation is negotiated directly with the counterparty."). On notice and hearing, after extensive negotiations, the Sale Order provided for a sale free and clear of liabilities other than those New Chrysler had agreed to assume. New Chrysler paid fair consideration for Old Carco assets and assumed certain liabilities, including Lemon Law liabilities only on vehicles manufactured by Old Carco within five years of the Closing. There exists no legal basis for this Court to compel New Chrysler to assume liability to Mr. Wolff.

*Promissory Estoppel Claim*

New York law applies the promissory estoppel standard of section 90 of the Restatement of Contracts: "[t]he elements of a claim for promissory estoppel are 'a clear and unambiguous

23

Exhibit 7
Page 103 of 106

promise; a reasonable and foreseeable reliance by the party to whom the promise is made; and an injury sustained by the party asserting the estoppel by reason of his reliance.'" *Reprosystem, B.V. v. SCM Corp.*, 727 F.2d 257, 264 (2d Cir. 1984) (citing *Ripple's of Clearview, Inc. v. LeHavre Assoc.*, 452 N.Y.S.2d 447, 449 (N.Y. App. Div. 1982).[9] Promissory estoppel creates a binding promise under circumstances in which the parties did not agree to a standard contract with a bargained exchange of consideration, but justice still demands the enforcement of a promise. *See Merex A.G. v. Fairchild Weston Sys.*, 29 F.3d 821, 824 (2d Cir. 1994).

Mr. Wolff's promissory estoppel claim is functionally identical to his breach of contract claim; the performance he rendered and the performance he seeks are the same that the Settlement Agreement requires and he does not allege any independent promises by New Chrysler. As a result, promissory estoppel does not apply and the proper treatment of this case is under the standard contract theory discussed above. *See Merex*, 29 F.3d at 824. If New Chrysler had promised to pay Mr. Wolff, New Chrysler's promise would have been given in exchange for Mr. Wolff's promise to dismiss his lawsuit, creating a standard contract.

Even if the Court were to treat Mr. Wolff's factual allegations under a promissory estoppel theory, those allegations are legally insufficient for the same reasons that they were legally insufficient under a breach of contract theory. Prior to Mr. Wolff's withdrawal of his California lawsuit, New Chrysler declined on multiple occasions to assume or create any obligation to Mr. Wolff because his vehicle was manufactured more than five years prior to the Closing. Since New Chrysler did not assume Old Carco's contract with Mr. Wolff under the Sale

---

[9] The Court does not make a determination of choice of law at this time because there is no request in the pleadings for a particular choice of law and the deficiencies of Mr. Wolff's promissory estoppel claim are fundamental under the law of any state. The standard does not differ significantly under California law. *See Rosal v. First Federal Bank of California*, 671 F. Supp. 2d 1111, 1130 (N.D. Cal. 2009) (stating the same set of factors, but treating reliance as a separate factor from reasonability and foreseeability).

24

Exhibit 7
Page 104 of 106

Case 1:16-cv-07423-VM-HP   Document 27-1   Filed 09/27/16   Page 101 of 102   Pg 1

Order and Mr. Wolff makes no further allegations of a New Chrysler promise to him, it is clear that New Chrysler did not promise to pay Mr. Wolff to settle his case against Old Carco.

Furthermore, after New Chrysler clearly had not promised to pay Mr. Wolff, his alleged reliance on the existence of such a promise was not reasonable and foreseeable. The Proudfoot Letter and the Lemon Law Notice correctly quote and apply the Sale Order to state that the option to assert his Old Carco claim against New Chrysler is not available to Mr. Wolff. After receipt of this information, there was no reason for Mr. Wolff to dismiss his suit against Old Carco with the expectation that New Chrysler would pay him. Regardless of Mr. Wolff's view as to New Chrysler's contractual obligation to him under the Sale Order and the Settlement Agreement, he was notified that New Chrysler did not promise to pay him. Mr. Wolff has acted according to a different interpretation of the Sale Order from New Chrysler's interpretation, not in reasonable and foreseeable reliance on a clear promise by New Chrysler. If he had any remedy, it would be in breach of contract, not promissory estoppel.

## CONCLUSION

The Court finds that Mr. Wolff's Complaint fails to state a claim upon which relief can be granted. The Court has no alternative but to enforce the Sale Order as unambiguously written to exclude any liability from New Chrysler to Mr. Wolff. Mr. Wolff's allegations concerning the intent of the parties and promises Old Carco made to him do not suffice to state claims against New Chrysler. The breach of contract claim must be dismissed because Mr. Wolff's allegation that New Chrysler assumed a contract with him is a legal conclusion unsupported by his factual allegations and the unambiguous plain meaning of the Sale Order. The promissory estoppel claim must be dismissed because Mr. Wolff's allegation that New Chrysler promised to pay him

Exhibit 7
Page 105 of 106

and he reasonably relied on such a promise is a legal conclusion unsupported by his factual

allegations and the unambiguous plain meaning of the Sale Order.

       For the reasons stated above, the motion to dismiss filed by New Chrysler is granted in its

entirety. New Chrysler is directed to settle an order consistent with this opinion.

Dated: New York, New York
       July 30, 2010

                           **s/Arthur J. Gonzalez**
                           CHIEF UNITED STATES BANKRUPTCY JUDGE

26

Exhibit 7
Page 106 of 106