# **EXHIBIT A**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x
                                             :

In re                                     :    Chapter 11

                                             :

Chrysler LLC, *et al.*,               :    Case No. 09-50002 (AJG)

                                           :

                Debtors.       :    (Jointly Administered)

                                           :

-------------------------------------------------------------x

### ORDER (I) AUTHORIZING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES, (II) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES IN CONNECTION THEREWITH AND RELATED PROCEDURES AND (III) GRANTING RELATED RELIEF

        This matter coming before the Court on the motions, dated May 3, 2009 and May 22, 2009 (Docket Nos. 190 and 1742) (collectively, the "Sale Motion")[1] filed by the above-captioned debtors and debtors in possession (collectively, the "Debtors") for entry of an order (the "Sale Order"), pursuant to sections 105, 363 and 365 of the United States Bankruptcy Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"), Rules 2002, 6004, 6006, 9008 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rules 2002-1, 6004-1, 6006-1 and 9006-1(b) of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York: (i) authorizing and approving the entry into, performance under and terms and conditions of the Master Transaction Agreement, dated as of April 30, 2009 (collectively with all related agreements, documents or instruments and all exhibits, schedules and addenda to any of the foregoing, and as amended, the "Purchase Agreement"), substantially

---

[1]     Unless otherwise stated, all capitalized terms not defined herein shall have the meanings given to them in the Sale Motion and the Bidding Procedures Order (as defined below).

in the form attached hereto as <u>Exhibit A</u> (without all of its voluminous exhibits), between and among Fiat S.p.A. ("<u>Fiat</u>"), New CarCo Acquisition, LLC (the "<u>Purchaser</u>"), a Delaware limited liability company formed by Fiat, and the Debtors,[2] whereby the Debtors have agreed to sell, and the Purchaser has agreed to purchase the "<u>Purchased Assets</u>" (as such term is defined in Section 2.06 of the Purchase Agreement), which Purchased Assets include, without limitation, the Assumed Agreements (as defined below), substantially all of the Debtors' tangible, intangible and operating assets related to the research, design, manufacturing, production, assembly and distribution of passenger cars, trucks and other vehicles (including prototypes) under brand names that include Chrysler, Jeep® or Dodge (the "<u>Business</u>"), certain of the facilities related thereto and all rights, intellectual property, trade secrets, customer lists, domain names, books and records, software and other assets used in or necessary to the operation of the Business or related thereto to the Purchaser (collectively, and including all actions taken or required to be taken in connection with the implementation and consummation of the Purchase Agreement, the "<u>Sale Transaction</u>"); (ii) authorizing and approving the sale by the Debtors of the Purchased Assets, free and clear of liens, claims (as such term is defined by section 101(5) of the Bankruptcy Code), liabilities, encumbrances, rights, remedies, restrictions and interests and encumbrances of any kind or nature whatsoever whether arising before or after the Petition

---

[2]    The following Debtors are "Sellers" under the Purchase Agreement:  Alpha Holding, LP ("<u>Alpha</u>"), Chrysler, LLC; Chrysler Aviation Inc.; Chrysler Dutch Holding LLC; Chrysler Dutch Investment LLC; Chrysler Dutch Operating Group LLC; Chrysler Institute of Engineering; Chrysler International Corporation; Chrysler International Limited, L.L.C.; Chrysler International Services, S.A.; Chrysler Motors LLC; Chrysler Realty Company LLC; Chrysler Service Contracts Florida, Inc.; Chrysler Service Contracts Inc.; Chrysler Technologies Middle East Ltd.; Chrysler Transport Inc.; Chrysler Vans LLC; DCC 929, Inc.; Dealer Capital, Inc.; Global Electric Motorcars, LLC; NEV Mobile Service, LLC; NEV Service, LLC; Peapod Mobility LLC; TPF Asset, LLC; TPF Note, LLC; and Utility Assets LLC.

Date,[3] whether at law or in equity, including all claims or rights based on any successor or transferee liability, all environmental claims, all change in control provisions, all rights to object or consent to the effectiveness of the transfer of the Purchased Assets to the Purchaser or to be excused from accepting performance by the Purchaser or performing for the benefit of the Purchaser under any Assumed Agreement and all rights at law or in equity (collectively, "Claims") (other than certain liabilities that are expressly assumed or created by the Purchaser, as set forth in the Purchase Agreement or as described herein (collectively, the "Assumed Liabilities")); (iii) authorizing the assumption and assignment to the Purchaser of certain executory contracts and unexpired leases of the Debtors (collectively, the "Assumed Agreements") in accordance with the Contract Procedures set forth in the Bidding Procedures Order, the Purchase Agreement and this Sale Order; (iv) authorizing and approving the entry into, performance under and terms and conditions of the UAW Retiree Settlement Agreement (as defined herein); and (v) granting other related relief; the Court having conducted a hearing on the Sale Motion on May 27, 2009 through May 29, 2009 (collectively, the "Sale Hearing") at which time all interested parties were offered an opportunity to be heard with respect to the Sale Motion; the Court having reviewed and considered, among other things, (i) the Sale Motion and the exhibits thereto, (ii) the Purchase Agreement attached hereto as Exhibit A, (iii) this Court's prior order (Docket No. 492), dated May 8, 2009 (the "Bidding Procedures Order") approving competitive bidding procedures for the Purchased Assets (the "Bidding Procedures"), (iv) all objections to the Sale Transaction filed in accordance with the Bidding Procedures Order or raised on the record at the Sale Hearing, (v) Memorandum of Law in Support of Sale Motion

---

[3]     As used herein, "Petition Date" refers to (a) April 30, 2009 for all of the Debtors other than Alpha and (b) May 19, 2009 for Alpha.

(Docket No. 191), (vi) Supplemental Memorandum of Law in Support of Sale Motion (Docket No. 2130), (vii) the Consolidated Reply to Objections to the Sale Motion (Docket Nos. 2155 and 2565), (viii) the Statement of the United States Department of the Treasury in Support of the Commencement of Chrysler LLC's Chapter 11 Case (Docket No. 69), (ix) the Statement of the Official Committee of Unsecured Creditors in Support of Debtors Motion for Order Authorizing the Sale of Substantially All of the Debtors' Assets Free and Clear of Liens, Claims, Interests and Encumbrances (the "Creditors' Committee Statement"), and the related Memorandum of Law (Docket No. 1846 and 2147); (x) the Response to Various Objections Relating to Successor Liability Issues (Docket No. 2111); (xi) the Response of International Union, United Automobile, Aerospace and Agricultural Implement Workers of America to Motion of the Debtors and Debtors in Possession for an Order Authorizing the Sale of Substantially All of the Debtors' Operating Assets and Other Relief (Docket No. 2085); (xii) the Supplemental Statement of the International Union, United Automobile, Aerospace, and Agricultural Implement Workers Union of America, AFL-CIO in Support of Motion of the Debtors and Debtors in Possession for an Order Authorizing the Sale of Substantially All of the Debtors' Operating Assets and Other Relief and Response to Individual Retiree Statements Concerning Approval of UAW Retiree Settlement Agreement (Docket No. 2094) and (xiii) the arguments of counsel made, and the evidence proffered or adduced, at the Sale Hearing; and it appearing that due notice of the Sale Motion and the Bidding Procedures Order has been provided in accordance with the Bidding Procedures Order and that the relief requested in the Sale Motion is in the best interests of the Debtors, their estates and creditors and other parties in interest; and upon the record of the Sale Hearing and these cases; and after due deliberation thereon; and good and sufficient cause

appearing therefore, including for the reasons set forth in the Court's Opinion dated May 31, 2009 (Docket No. 3073);

## IT IS HEREBY FOUND AND DETERMINED THAT:

### THE DEBTORS AND THESE CASES

A.      As of the Petition Date and for a period of more than a year before the commencement of these chapter 11 cases, the Debtors worked with financial advisors and with their various constituencies to try to raise capital or implement a viable transaction that would allow them to continue the Debtors' operations.  (See DX 20; May 27, 2009 Hearing Tr. (Testimony of Tom Lasorda); May 28, 2009 Hearing Tr. (Testimony of Robert Nardelli); Deposition of Scott Garberding, May 24, 2009, Exhibit 2, at 87-92).  The Debtors presented credible evidence that, as of the Petition Date, they had explored strategic alternatives for the Business over an extended period of time and had communicated with more than 15 parties about possible sales, mergers, combinations and alternatives regarding debt or equity capital investments or financing and had prepared standalone business plans in the event that strategic alternatives did not materialize or were insufficient.  (See Id.).  The Sale Transaction is the result of the Debtors' extensive efforts.

### JURISDICTION, FINAL ORDER AND STATUTORY PREDICATES

B.      This Court has jurisdiction over the Sale Motion, the Sale Transaction and the Purchase Agreements pursuant to 28 U.S.C. §§ 157(b)(1) and 1334(a), and this matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (N) and (O).  Venue of these cases and the Sale Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.  Debtor Peapod Mobility LLC ("Peapod") is a New York limited liability company.  Debtor Chrysler Realty Company LLC ("Chrysler Realty") is the owner of certain valuable real property located on

11th Avenue in New York, New York. Debtor Chrysler is the direct or indirect parent of

Peapod, Chrysler Realty and each of the other Debtors.

      C.      This Sale Order constitutes a final and appealable order within the

meaning of 28 U.S.C. § 158(a). Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), the

Court expressly finds that there is no just reason for delay in the implementation of this Sale

Order, and expressly directs entry of judgment as set forth herein.

      D.      The statutory predicates for the relief sought in the Sale Motion and

granted in this Sale Order include, without limitation, sections 105(a), 363(b), (f) and (m) and

365(a), (b) and (f) of the Bankruptcy Code, and Bankruptcy Rules 2002, 6004 and 6006.

## JUDICIAL NOTICE

      E.      Pursuant to Federal Rule of Evidence 201(c), incorporated into these

proceedings pursuant to Bankruptcy Rule 9017, the Court takes judicial notice of the

(1) March 30, 2009 Remarks by the President of the United States on the American Automotive

Industry; (2) April 30, 2009 Remarks by the President of the United States on the Auto Industry;

and (3) the fact of the publication of the Notice of Proposed Sale of Substantially All of the

Debtors' Assets Free and Clear of Liens, Claims, Interests and Encumbrances and Final Sale

Hearing Related Thereto in the national editions of *The New York Times* on May 12, 2009, *The

Wall Street Journal* on May 12, 2009 and *USA Today* on May 13, 2009, and the worldwide

edition of *The Financial Times* on May 13, 2009. (See DX 8; DX 18; DX 19).

## SOUND BUSINESS PURPOSE

      F.      The Debtors seek to convey the Purchased Assets, including those related

to the research, design, manufacture (at 16 domestic manufacturing facilities), assembly (at

seven domestic assembly plants) and wholesale distribution of passenger cars and trucks under

the brand names Chrysler, Jeep® and Dodge, all of which are subject to Claims, including those

held by the Debtors' prepetition secured lenders. (See DX 64, at §2.06).

G.      In the second half of 2008, Chrysler began to experience an

"unprecedented" loss of cash (See May 28, 2009 Hearing Tr. (Testimony of Robert Nardelli)).

Currently, the Debtors are losing over $100 million dollars per day. (See Deposition of Matthew

Feldman, May 26, 2009, at 65:18-66:5). Unless the Sale Transaction is approved without delay,

the Debtors' assets will continue to erode, and they will be forced to liquidate in the near term.

(See May 28, 2009 Hearing Tr. (Testimony of Robert Nardelli); Deposition of Frank Ewasyshyn,

May 24, 2009, at Exhibit 1, at 7-29)).

H.      The Debtors have demonstrated, and the Purchase Agreement reflects,

both (1) good, sufficient and sound business purposes and justifications for the immediate

approval of the Purchase Agreement and the Sale Transaction (May 28, 2009 Hearing Tr.

(Testimony James Chapman); May 28, 2009 Hearing Tr. (Testimony of Robert Nardelli)); and

(2) compelling circumstances for the approval of the Purchase Agreement and the Sale

Transaction outside of the ordinary course of the Debtors' business pursuant to section 363(b) of

the Bankruptcy Code prior to, and outside of, a plan of reorganization in that, among other

things, the Debtors' estates will suffer immediate and irreparable harm if the relief requested in

the Sale Motion is not granted on an expedited basis (See May 28, 2009 Hearing Tr. (Testimony

of Alfredo Altavilla); May 28, 2009 Hearing Tr. (Testimony of Robert Nardelli); Deposition of

Scott Garberding, May 24, 2009, Exhibit 2, at 9-27; Deposition of Frank Ewasyshyn, May 24,

2009, Exhibit 1, at 8-29). In light of the exigent circumstances of these chapter 11 cases and the

risk of deterioration in the going concern value of the Purchased Assets pending the proposed

Sale Transaction, time is of the essence in (a) consummating the Sale Transaction, (b) preserving

the viability of the Debtors' businesses as going concerns and (c) minimizing the widespread and

adverse economic consequences for the Debtors' estates, their creditors, employees, retirees, the

automotive industry and the broader economy that would be threatened by protracted

proceedings in these chapter 11 cases.  (See DX 13; DX 14; May 27, 2009 Hearing Tr.

(Testimony of Thomas Lasorda); May 28, 2009 Hearing Tr. (Testimony of Ronald Nardelli);

May 27, 2009 Hearing Tr. (Testimony of Alfredo Altavilla); May 28, 2009 Hearing Tr.

(Testimony of James Chapman); Deposition Tr. of Ronald Bloom, at 65; see generally DX 20).

I.      The consummation of the Sale Transaction outside of a plan of

reorganization pursuant to the Purchase Agreement neither impermissibly restructures the rights

of the Debtors' creditors nor impermissibly dictates the terms of a liquidating plan of

reorganization for the Debtors.  The Sale Transaction does not constitute a *sub rosa* plan of

reorganization.  (See DX 4; DX 5; DX 10; May 27, 2009 Hearing Tr. (Testimony of Robert

Manzo)).

J.      Entry of an order approving the Purchase Agreement and all the

provisions thereof is a necessary condition precedent to the Purchaser's consummation of the

Sale Transaction, as set forth in the Purchase Agreement.  (See DX 64, at § 8.02(q)).

K.      The Purchase Agreement was not entered into, and none of the Debtors,

the Purchaser or the Purchaser's present or contemplated owners, have entered into the Purchase

Agreement or propose to consummate the Sale Transaction, for the purpose of hindering,

delaying or defrauding the Debtors' present or future creditors.  None of the Debtors,

the Purchaser nor the Purchaser's present or contemplated owners is entering into the Purchase

Agreement, or proposing to consummate the Sale Transaction, fraudulently for the purpose of

statutory and common law fraudulent conveyance and fraudulent transfer claims whether under

the Bankruptcy Code or under the laws of the United States, any state, territory, possession

thereof, or the District of Columbia or any other applicable jurisdiction with laws substantially

similar to the foregoing.  (See DX 5; DX 6; DX 10; May 27, 2009 Hearing Tr. (Testimony of

Altavilla)).

### HIGHEST AND BEST OFFER

L.      On May 8, 2009, this Court entered the Bidding Procedures Order

approving Bidding Procedures for the Purchased Assets.  The Bidding Procedures provided a

full, fair and reasonable opportunity for any entity to make an offer to purchase the Purchased

Assets.  No additional Qualifying Bids for the Purchased Assets were received by the Debtors.

Therefore, the Purchaser's bid, as reflected in the Purchase Agreement, is the only Qualified Bid

for the Purchased Assets and was designated as the Successful Bid pursuant to the Bidding

Procedures Order (Docket No. 492).  Likewise, no party came forward at the Sale Hearing with a

bid or offer.  As such, no Auction was conducted, and the Purchaser's bid, as reflected in the

Purchase Agreement, was presented to the Court as the Successful Bid. (See May 27, 2009

Hearing Tr. (Testimony of Robert Manzo)).

M.      As demonstrated by the testimony and other evidence proffered or

adduced prior to or at the Sale Hearing, and in light of the exigent circumstances presented and

emergency nature of the relief requested (1) the Debtors have adequately marketed the Purchased

Assets (See May 27, 2009 Hearing Tr. (Testimony of Thomas Lasorda); May 28, 2009 Hearing

Tr. (Testimony of Robert Nardelli); Deposition of Scott Garberding, May 24, 2009, Exhibit 2, at

87-92)); (2) the Purchased Assets are deteriorating rapidly in value and there are good business

reasons to sell these assets outside of a plan of reorganization (See May 28, 2009 Hearing Tr.

(Testimony of Robert Nardelli); Deposition of Frank Ewasyshyn, May 24, 2009, at Exhibit 1, at

7-29; Deposition of Matthew Feldman, May 26, 2009, at 65:21-66:5)); (3) the consideration

provided for in the Purchase Agreement constitutes the highest or otherwise best offer for the

Purchased Assets and provides fair and reasonable consideration for the Purchased Assets (See

May 27, 2009 Hearing Tr. (Testimony of Robert Manzo); May 28, 2009 Hearing Tr. (Testimony

of Robert Nardelli)); (4) the Sale Transaction, as a transfer of deteriorating assets, is an

extraordinary, non-market transaction, the consideration for which exceeds what would have

been obtainable in a transaction subject to ordinary market forces (See Deposition of Ronald

Bloom, May 26, 2009, at 65:4-66:10); (5) the Sale Transaction is the only alternative to

liquidation available to the Debtors (See May 28, 2009 Hearing Tr. (Testimony of Robert

Nardelli)); (6) if the Sale Transaction is not approved and consummated, the Debtors will have

no alternative but to cease operations and liquidate (See May 28, 2009 Hearing Tr. (Testimony

of Robert Nardelli)); (7) the Sale Transaction will provide a greater recovery for the Debtors'

creditors than would be provided by any other practical available alternative, including, without

limitation, liquidation whether under chapter 11 or chapter 7 of the Bankruptcy Code (See DX;

May 27, 2009 Hearing Tr. (Testimony of Robert Manzo)); (8) no other party or group of parties

has offered to purchase the Purchased Assets for greater economic value to the Debtors or their

estates (See May 27, 2009 Hearing Tr. (Testimony of Robert Manzo); May 27, 2009 Hearing Tr.

(Testimony of Thomas Lasorda); May 28, 2009 Hearing Tr. (Testimony of Robert Nardelli));

(9) the consideration to be paid by the Purchaser under the Purchase Agreement exceeds the

liquidation value of the Purchased Assets (See May 27, 2009 Hearing Tr. (Testimony of Robert

Manzo)) and (10) the consideration to be paid by the Purchaser under the Purchase Agreement

constitutes reasonably equivalent value and fair consideration (as those terms may be defined in

each of the Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act and

section 548 of the Bankruptcy Code) under the Bankruptcy Code and under the laws of the

United States, any state, territory or possession thereof or the District of Columbia, or any other applicable jurisdiction with laws substantially similar to the foregoing. (See DX 14; DX 15; May 28, 2009 Hearing Tr. (Testimony of James Chapman); May 28, 2009 Hearing Tr. (Testimony of Robert Nardelli)). The Debtors' determination that the Purchase Agreement constitutes the highest and best offer for the Purchased Assets constitutes a valid and sound exercise of the Debtors' business judgment. (See May 27, 2009 Hearing Tr. (Testimony of Thomas Lasorda); May 28, 2009 Hearing Tr. (Testimony of James Chapman); May 28, 2009 Hearing Tr. (Testimony of Robert Nardelli)).

N.       Neither the Purchaser nor Fiat have furnished the Debtors with a good faith deposit in connection with the Purchase Agreement. The Debtors submit that in light of the extensive prepetition negotiations culminating in the various complex agreements with the Debtors, the United States Department of the Treasury (the "U.S. Treasury"), the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (the "UAW") and other stakeholders, as well as Fiat's substantial investment of time and resources, the Purchaser's and Fiat's commitment to consummate the Fiat Transaction is clear without the need to provide a good faith deposit. See May 27, 2009 Hearing Tr. (Testimony of Alfredo Altavilla); May 28, 2009 (Testimony of David Curson); May 28, 2009 (Testimony of Robert Nardelli); May 28, 2009 (Testimony of James Chapman); Deposition of Matthew Feldman, May 26, 2009, at 37:21-39:1)).

### BEST INTEREST OF CREDITORS

O.       Approval of the Purchase Agreement and the consummation of the Sale Transaction with the Purchaser at this time is in the best interests of the Debtors, their estates, creditors, employees, retirees and other parties in interest. (See DX 6; Creditors' Committee Statement, at ¶ 2, Docket No. 1846; May 28, 2009 Hearing Tr. (Testimony of David Curson)).

## Description of the Purchaser and the Purchaser's Good Faith

P.        The Purchaser is a newly formed Delaware limited liability company that as of the date of the Sale Hearing, is a wholly-owned subsidiary of Fiat.  The Purchaser is not an "insider" of any of the Debtors, as that term is defined by section 101(31) of the Bankruptcy Code.  (See DX 64, at Art. IV-A).

Q.        Upon the closing of the Sale Transaction (the "Closing"), (1) Fiat will contribute to the Purchaser certain valuable technology and management expertise, (2) the U.S. Treasury and Export Development Canada ("EDC") will lend the Purchaser approximately $8 billion in new financing and (3) the UAW Retiree Settlement Agreement, the entry into which is a condition to the UAW CBA (as defined below) and its assumption and assignment to Purchaser, will become effective.  Following the making of the foregoing contributions to the Purchaser, Fiat, the VEBA (as defined below), the U.S. Treasury and EDC, through 7169931 Canada Inc., will hold 100% of the equity in the Purchaser.  (DX 3; DX 64, Exhibit J, K).

R.        The Purchaser is a person with whom the Debtors are associated within the meaning of section 525 of the Bankruptcy Code.

S.        The Purchase Agreement and each of the transactions contemplated therein were negotiated, proposed and entered into by the Debtors and the Purchaser in good faith, without collusion and from arm's-length bargaining positions.  The Purchaser has proceeded in good faith in all respects in connection with this proceeding, is a "good faith purchaser" within the meaning of section 363(m) of the Bankruptcy Code and, as such, is entitled to all the protections afforded thereby.  None of the Debtors, the Purchaser nor the Purchaser's present or contemplated owners have engaged in any conduct that (1) would cause or permit the Purchase Agreement or any of the transactions contemplated thereby to be avoided; (2) would tend to hinder, delay or defraud creditors; or (3) impose costs and damages under section 363(n)

of the Bankruptcy Code.  (See May 27, 2009 Hearing Tr. (Testimony of Alfredo Altavilla);

May 27, 2009 (Testimony of Robert Manzo); May 28, 2009 Hearing Tr. (Testimony of David

Curson); May 28, 2009 Hearing Tr. (Testimony of Robert Nardelli); Deposition of Matthew

Feldman, May 26, 2009, at 37:21-39:1; Deposition Tr. of Ronald Bloom, at 87).

## NOTICE OF THE SALE MOTION, AND THE CURE AMOUNTS

      T.      As evidenced by the affidavits and certificates of service filed with the

Court, in light of the exigent circumstances of these cases and the wasting nature of the Debtors'

temporarily idled facilities and assets and based upon the representations of counsel at the Sale

Hearing and the testimony of the Debtors' claims and noticing agent, the Court finds that:

(1) proper, timely, adequate and sufficient notice of the Sale Motion, the Bidding Procedures

Order, the Sale Hearing and the UAW Retiree Settlement Agreement has been provided by

the Debtors in accordance with the Bidding Procedures Order; (2) such notice, and the form and

manner thereof, was good, sufficient, reasonable and appropriate under the exigent

circumstances prevailing in these chapter 11 cases; and (3) no other or further notice of the Sale

Motion, the Sale Transaction, the Bidding Procedures, the Sale Hearing or the UAW Retiree

Settlement Agreement is or shall be required. (See DX 7; May 27, 2009 Hearing Tr. (Testimony

of  Daniel McElhinney)).  In light of the need to grant the relief requested in the Sale Motion on

an expedited basis to avoid any erosion in the going concern value of the Purchased Assets, a

reasonable opportunity to object or be heard with respect to the Sale Motion and the relief

requested therein has been afforded to all interested persons and entities, including, but not

limited to, the following:

      (i)      counsel to the Official Committees of Unsecured Creditors appointed in
these chapter 11 cases under section 1102 of the Bankruptcy Code (the "Creditors
Committee");

(ii)     the U.S. Treasury, a prepetition lender and the provider of the debtor in possession financing approved by this Court on a final basis on May 20, 2009 (the "<u>DIP Financing Facility</u>")"), outside counsel to the U.S. Treasury and the Acting United States Attorney for the Southern District of New York;

(iii)    counsel to EDC, a lender under the DIP Financing Facility;

(iv)    counsel to the UAW;

(v)     counsel to the Purchaser;

(vi)    counsel to the administrative agent and collateral agent for the Debtors' prepetition secured First Lien Lenders (as defined below);

(vii)   counsel to Cerberus;

(viii)  counsel to Daimler;

(ix)    parties who, in the past year, have expressed in writing to the Debtors an interest in acquiring the Purchased Assets;

(x)     nondebtor parties (collectively, the "<u>Non-Debtor Counterparties</u>") to the Assumed Agreements;

(xi)    all parties who are known or reasonably believed to have asserted a lien, encumbrance, claim or other interest in the Purchased Assets or who are reflected as secured parties in lien searches conducted by the Debtors;

(xii)   the Securities and Exchange Commission;

(xiii)  the Internal Revenue Service;

(xiv)   all applicable state attorneys general, local environmental enforcement agencies and local regulatory authorities;

(xv)    all applicable state and local taxing authorities;

(xvi)   the Office of the United States Trustee for the Southern District of New York;

(xvii)  the Federal Trade Commission;

(xviii) the United States Attorney General/Antitrust Division of Department of Justice;

(xix)   the Environmental Protection Agency;

(xx)    the United States Attorney;

(xxi)   the Pension Benefit Guaranty Corporation;

(xxii)   applicable foreign regulatory authorities in non-U.S. countries in which the Debtors do business;

(xxiii)  all parties that filed objections to the Sale Motion;

(xxiv)  all entities that have requested notice in these chapter 11 cases under Bankruptcy Rule 2002;

(xxv)   the Debtors' retirees and surviving spouses represented by the UAW, including the members of the "Class" as defined in the UAW Retiree Settlement Agreement;

(xxvi)  all employees of the Debtors;

(xxvii) all dealers with current agreements for the sale or leasing of Chrysler, Jeep or Dodge brand vehicles;

(xxviii) any other party identified on the creditor matrix in these cases.

(See DX 7).

U.       Additionally, the Debtors published notice of the Sale Transaction in the national editions of *USA Today*, *The Wall Street Journal* and *The New York Times*, as well as the worldwide edition of *The Financial Times*.  (See DX 8).  With regard to parties who have claims against the Debtors, but whose identities are not reasonably ascertainable by the Debtors (including, but not limited to, parties with potential contingent warranty claims against the Debtors), the Court finds that such publication notice was sufficient and reasonably calculated under the circumstances to reach such parties.

V.       In accordance with the Contract Procedures as set forth in the Bidding Procedures Order, the Debtors have provided notice or shall provide notice (an "Assignment Notice") of their intent to assume and assign the Assumed Agreements and of the related proposed amounts ("Cure Costs") to cure prepetition and postpetition defaults under Assumed Agreements with each such Non-Debtor Counterparty.  See Notices of Filing of Schedules of Designated Agreements (DX 16; DX 62; DX 63; Deposition of Scott Garberding, May 24, 2009,

Exhibit 1). The service and provision of the Assignment Notices that were served in accordance with the Bidding Procedures Order, was good, sufficient and appropriate under the circumstances and no further notice need be given with respect to the Cure Costs for the Assumed Agreements described by the Assignment Notices and the assumption and assignment of the Assumed Agreements. (See Affidavits of Service (Docket Nos. 1041, 1996, 1997, 1998, 2003, 2004, 2016, 2017, 2018, 2019, 2020, 2022, 2023, 2025, 2026, 2027, 2028, 2029, 2030, 2081 and 2108). All Non-Debtor Counterparties to the Assumed Agreements have had an opportunity to object to both the Cure Costs listed in the Assignment Notices and the assumption and assignment of the Assumed Agreements (including objections related to the adequate assurance of future performance and objections based on whether applicable law excuses the Non-Debtor Counterparty from accepting performance by, or rendering performance to, the Purchaser for purposes of section 365(c)(1) of the Bankruptcy Code). With respect to executory contracts or unexpired leases that are designated by the Debtors as Assumed Agreements pursuant to the Contract Procedures and Section 2.10 of the Purchase Agreement and for which responses to Assignment Notices are due after the entry of this Sale Order, the Contract Procedures provide all Non-Debtor Counterparties to such Assumed Agreements with the opportunity to object to both the Cure Costs identified in any Assignment Notice delivered to any such Non-Debtor Counterparty and the assumption and assignment of the applicable Assumed Agreement (including objections related to the adequate assurance of future performance and objections based on whether applicable law excuses the Non-Debtor Counterparty from accepting performance by, or rendering performance to, the Purchaser for purposes of section 365(c)(1) of the Bankruptcy Code).

## SECTION 363(F) REQUIREMENTS MET FOR FREE AND CLEAR SALE

W.       The Debtors may sell the Purchased Assets free and clear of all Claims because, in each case where a Claim is not an Assumed Liability, one or more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code have been satisfied.  Except as provided in this Sale Order, the assumption and assignment of each of the Assumed Agreements is also free and clear of all Claims other than the payment of the Cure Costs.

X.       The Debtors are the sole and lawful owners of the Purchased Assets and no other person has any ownership right title or interest therein.  The Debtors' non-Debtor affiliates have acknowledged and agreed to the sale and, as required by and in accordance with the Transition Services Agreement, transferred any legal, equitable or beneficial right, title or interest they may have in or to the Purchased Assets to the Purchaser.  (See DX 64).

Y.       The transfer of Purchased Assets constituting "Collateral" as defined under that certain Second Amended and Restated Collateral Trust Agreement (the "CTA"), dated as of January 2, 2009, among, *inter alia*, certain of the Debtors and their subsidiaries, JPMorgan Chase Bank, N.A. as both First Priority Agent ("First Priority Agent") and Second Priority Agent, the U.S. Treasury as Third Priority Agent and Wilmington Trust Company as Collateral Trustee (the "Collateral Trustee") has been consented to for purposes of section 363(f)(2) of the Bankruptcy Code, subject to and in accordance with that certain Consent to Sale and Liquidation of Collateral delivered by the First Priority Agent as "Controlling Party" under the CTA to the Debtors (the "First Priority Consent"), subject to the terms of the First Priority Consent, including, without limitation, to the indefeasible payment by the Purchaser immediately upon the sale of the Purchased Assets of $2 billion in immediately available funds to the First Priority Agent to be applied as set forth in the First Priority Consent.  The First Priority Consent binds all

parties holding debt under the First Lien Credit Agreement in their capacity as such (collectively, the "First Lien Lenders").  (See DX 55; DX 57).

Z.    In addition, those holders of Claims who did object fall within one or more of the other subsections of sections 363(f) and 365 of the Bankruptcy Code as (1) the consideration received in exchange for the Purchased Assets is greater than the aggregate value of all liens on the Purchased Assets (See May 27, 2009 Hearing Tr. (Testimony of Robert Manzo)), (2) there is a *bona fide* dispute with respect to certain of the Claims asserted (e.g., claims of certain dealers relating to the proposed rejection of their dealership agreements) (See May 28, 2009 Hearing Tr. (Testimony of Peter Grady); May 27, 2009 Hearing Tr. (Testimony of Alfredo Altavilla)); or (3) such holders could be compelled in a legal or equitable proceeding to accept a money satisfaction of their Claims.  The transfer of the Purchased Assets to the Purchaser under the Purchase Agreement will be a legal, valid and effective transfer of all of the legal, equitable and beneficial right, title and interest in and to the Purchased Assets free and clear of all Claims that are not Assumed Liabilities (including, specifically and without limitation, any products liability claims, environmental liabilities, employee benefit plans and any successor liability claims), except as otherwise provided in this Sale Order.  All holders of Claims are adequately protected — and the Sale Transaction thus satisfies section 363(e) of the Bankruptcy Code — by having their Claims, if any, attach to the proceeds of the Sale Transaction ultimately attributable to the property against which they have a Claim or other specifically dedicated funds, in the same order of priority and with the same validity, force and effect that such Claim holder had prior to the Sale Transaction, subject to any rights, claims and defenses of the Debtors or their estates, as applicable, or as otherwise provided herein.

AA.     The Purchaser would not have entered into the Purchase Agreement and would not consummate the Sale Transaction, thus adversely affecting the Debtors, their estates, creditors, employees, retirees and other parties in interest if the sale of the Purchased Assets was not free and clear of all Claims other than Assumed Liabilities, or if the Purchaser would, or in the future could, be liable for any such Claims, including, without limitation and as applicable, certain liabilities (collectively, the "Excluded Liabilities") that expressly are not assumed by the Purchaser, as set forth in the Purchase Agreement or in this Sale Order.  The Purchaser asserts that it will not consummate the Sale Transaction unless the Purchase Agreement specifically provides and this Court specifically orders that none of the Purchaser, its affiliates, their present or contemplated members or shareholders (other than the Debtors as the holder of equity in Purchaser), or the Purchased Assets will have any liability whatsoever with respect to, or be required to satisfy in any manner, whether at law or in equity, whether by payment, setoff or otherwise, directly or indirectly, (a) any Claim other than (x) an Assumed Liability or (y) a Claim against any "Purchased Company" (as such term is defined in the Purchase Agreement) or (b) any successor liability for any of the Debtors.  (See May 27, 2009 Hearing Tr. (Testimony of Alfredo Altavilla)).

BB.     Without limiting the generality of the foregoing, the Purchase Agreement provides the Debtors with reasonably equivalent value and fair consideration (as those terms are defined in the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act and the Bankruptcy Code), and was not entered into for the purpose or, nor does it have the effect of, hindering, delaying or defrauding creditors of any of the Debtors under any applicable laws. Except for the Assumed Liabilities, the Sale Transaction shall not impose or result in the imposition of any liability or responsibility on Purchaser or its affiliates, successors or assigns or

any of their respective assets (including the Purchased Assets), and the transfer of the Purchased

Assets to the Purchaser does not and will not subject the Purchaser or its affiliates, successors or

assigns or any of their respective assets (including the Purchased Assets), to any liability for any

Claims, including, without limitation, for any successor liability or any products liability for the

sale of any vehicles by the Debtors or their predecessors or affiliates, except as expressly

identified as an Assumed Liability.

### ASSUMPTION AND ASSIGNMENT OF THE ASSUMED AGREEMENTS

CC.     The assumption and assignment of the Assumed Agreements are integral

to the Purchase Agreement, are in the best interests of the Debtors and their estates and represent

the reasonable exercise of the Debtors' sound business judgment.  (See May 27, 2009 Hearing

Tr. (Testimony of Alfredo Altavilla); May 28, 2009 Hearing Tr. (Testimony of David Curson);

May 28, 2009 Hearing Tr. (Testimony of Peter Grady); May 27, 2009 Hearing Tr. (Testimony of

Thomas Lasorda); May 28, 2009 Hearing Tr. (Testimony of Robert Nardelli); May 28, 2009

Hearing Tr. (Testimony of James Chapman)).

DD.     With respect to each of the Assumed Agreements, the Debtors have met

all requirements of section 365(b) of the Bankruptcy Code.  Further, the Purchaser has provided

all necessary adequate assurance of future performance under the Assumed Agreements in

satisfaction of sections 365(b) and 365(f) of the Bankruptcy Code.  (See May 27, 2009 Hearing

Tr. (Testimony of Alfredo Altavilla)).  Accordingly, the Assumed Agreements can be assumed

by the Debtors and assigned to the Purchaser, as provided for in the Contract Procedures set forth

in the Bidding Procedures Order, the Sale Motion and the Purchase Agreement.  The Contract

Procedures are fair, appropriate and effective and, upon the payment by the Purchaser of all Cure

Costs (which costs are the sole obligation of the Purchaser under the Purchase Agreement) and

the payment of such other obligations assumed pursuant to this Sale Order and approval of the

assumption and assignment for a particular Assumed Agreement thereunder, the Debtors shall be

forever released from any and all liability under the Assumed Agreement.

EE.     The Purchaser has acknowledged that it will be required to comply with

the National Traffic and Motor Vehicle Safety Act, as amended and recodified ("NTMVSA"), as

applicable to the business of the Purchaser after the Closing Date.  In addition, the Purchaser has

agreed to assume as Assumed Liabilities under the Purchase Agreement and this Sale Order the

Debtors' notification, remedy and other obligations under 49 U.S.C. §§ 30116 through 30120 of

the NTMVSA relating to vehicles manufactured by the Debtors prior to the Closing Date that

have a defect related to motor vehicle safety or do not to comply with applicable motor vehicle

safety standards prescribed under the NTMVSA.  The Purchaser shall not otherwise be liable for

any failure by the Debtors to comply with the provisions of the NTMVSA.

FF.     For the avoidance of doubt, and notwithstanding anything else in this Sale

Order to the contrary:

- the Debtors are neither assuming nor assigning to the Purchaser the settlement
  agreement (the "2008 Settlement Agreement") between the Debtors, the UAW
  and certain of the Debtors' retirees, dated March 31, 2008, which was approved
  by the United States District Court for the Eastern District of Michigan on
  July 31, 2008, in the class action of *Int'l Union, UAW, et al. v. Chrysler, LLC*,
  Case No. 07-CV-14310 (E.D. Mich. filed Oct. 11, 2007) and established, among
  other things, an independent Voluntary Employee Beneficiary Association
  (the "VEBA") that would become responsible for retiree health care on behalf of
  current and future UAW retirees of the Debtors and their surviving spouses and
  eligible dependents (the "*English* Case VEBA") (DX 4; May 28, 2009 Hearing Tr.
  (Testimony of David Curson));

- the 2007 Chrysler-UAW National Agreement, including (1) the Production,
  Maintenance and Parts National Agreement, (2) the Engineering Office &
  Clerical National Agreement, (3) the Toledo Assembly Plant/Jeep Unit, Local 12
  Agreement, (4) Daimler Chrysler Financial Services North America, LLC
  (Farmington) and (5) Daimler Chrysler Financial Services North America, LLC
  (Detroit), and all appendices, memoranda of understanding, supplemental
  agreements, local agreements and benefit plans, as modified effective
  April 30, 2009 (the "UAW CBA"), shall be assumed by the Debtors and assigned
  to the Purchaser pursuant to this Sale Order and section 365 of the Bankruptcy

Code. Assumption and assignment of the UAW CBA is integral to the Sale Transaction and the Purchase Agreement, is in the best interests of the Debtors and their estates, creditors, employees and retirees and represent the reasonable exercise of the Debtors' sound business judgment (See May 28, 2009 Hearing Tr. (Testimony of David Curson));

- the UAW, as the exclusive collective bargaining representative of employees of the Purchaser and the "authorized representative" of UAW-represented retirees of the Debtors under section 1114(c) of the Bankruptcy Code, and the Purchaser engaged in good faith negotiations in conjunction with the Sale Transaction regarding the funding of retiree health benefits within the meaning of section 1114(a) of the Bankruptcy Code. Conditioned upon the consummation of the Sale Transaction and the assumption and assignment of the UAW CBA, the UAW and the Purchaser have entered into a Retiree Settlement Agreement (the "UAW Retiree Settlement Agreement"), which, among other things, provides for the financing by the Purchaser of modified retiree health care obligations for the Class and Covered Group (as defined in the UAW Retiree Settlement Agreement) through contributions by the Purchaser to the *English* Case VEBA. The Debtors, the Purchaser and the UAW specifically intend that their actions in connection with the UAW Retiree Settlement Agreement and related undertakings incorporate the compromise of certain claims and rights and shall be deemed to satisfy the requirements of 29 U.S.C. § 186(c)(2) (See DX 4; May 28, 2009 Hearing Tr. (Testimony of David Curson)); and

- the Debtors' sponsorship of the Internal Existing VEBA (as defined in the UAW Retiree Settlement Agreement) shall be transferred to the Purchaser under the Purchase Agreement (See DX 64, at § 6.08).

## VALIDITY OF THE TRANSFER

GG. As of the closing of the Sale Transaction (the "Closing"), the transfer of the Purchased Assets to the Purchaser will be a legal, valid and effective transfer of the Purchased Assets, and will vest the Purchaser with all right, title and interest of the Debtors in and to the Purchased Assets, free and clear of all Claims other than Assumed Liabilities.

HH. With the entry of this Sale Order, the Debtors (1) have full corporate power and authority to execute the Purchase Agreement and all other documents contemplated thereby, and the Sale Transaction has been duly and validly authorized by all necessary corporate action of the Debtors; (2) have all of the corporate power and authority necessary to consummate the transactions contemplated by the Purchase Agreement; (3) have taken all actions necessary to

authorize and approve the Purchase Agreement and the consummation by the Debtors of the

transactions contemplated thereby; and (4) upon entry of this Sale Order, need no consents or

approvals, other than those expressly provided for in the Purchase Agreement, which may be

waived by the Purchaser, to consummate such transactions. (See DX 38; DX 64 at Art. IV-A).

II.      To the extent that the right, title and interest of the Debtors in and to any

of the Purchased Assets ultimately is transferred to the Purchaser after the Closing pursuant to a

plan of reorganization confirmed in these chapter 11 cases, such transfer shall be deemed a

transfer pursuant to section 1146 of the Bankruptcy Code and shall not be taxed under any law

imposing a stamp, transfer or any other similar tax.

## PERSONALLY IDENTIFIABLE INFORMATION

JJ.      The Debtors currently maintain certain privacy policies that govern the use

of "personally identifiable information" (as such term is defined by section 101(41A) of the

Bankruptcy Code) in the operation of their businesses. The Debtors propose to sell certain assets

containing personally identifiable information in a manner that is not in compliance with their

current existing privacy policies. As such, in the Bidding Procedures Order, the Court directed

the U.S. Trustee to promptly appoint a consumer privacy ombudsman in accordance with

section 332 of the Bankruptcy Code, and Alan Chapell, CIPP (the "Privacy Ombudsman") was

appointed as a consumer privacy ombudsman under section 332 of the Bankruptcy Code on

May 11, 2009 (Docket No. 594). The Privacy Ombudsman is a disinterested person as required

by section 332(a) of the Bankruptcy Code. The Privacy Ombudsman filed his report with the

Court on May 28, 2009 (Docket No. 2790) (the "Ombudsman Report") and presented his report

at the Sale Hearing, and the Ombudsman Report has been reviewed and considered by the Court.

The Court has given due consideration to the (1) facts, (2) exigent circumstances surrounding

and (3) the conditions of the sale of personally identifiable information in connection with the

Sale Transaction, including as set forth in the Ombudsman Report. No showing has been made that the sale of personally identifiable information in connection with the Sale Transaction violates applicable non-bankruptcy law, and the Court concludes that such sale is appropriate in conjunction with the Sale Transaction.

**NOW THEREFORE, IT IS HEREBY
ORDERED, ADJUDGED, AND DECREED THAT:**

### GENERAL PROVISIONS

1.      The Sale Motion is granted in its entirety and entry into and performance under and in respect of the Purchase Agreement and the Sale Transaction is approved, as set forth in this Sale Order.

2.      The findings of fact and conclusions of law set forth in the Court's Opinion, dated May 31, 2009 (Docket No. 3073), as supplemented by the findings of fact stated above and conclusions of law stated herein shall constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent any finding of fact later shall be determined to be a conclusion of law, it shall be so deemed, and to the extent any conclusion of law later shall be determined to be a finding of fact, it shall be so deemed.

3.      All objections, if any, to the Sale Motion or the relief requested therein that have not been withdrawn, waived or settled as announced to the Court at the Sale Hearing or by stipulation filed with the Court, and all reservations of rights included therein, are hereby overruled on the merits with prejudice, except as expressly provided herein. Attached hereto as Exhibit B is a summary schedule of filed objections and the treatment of each.

09-50002-smb   Doc 3512-1   Filed 03/08/18   Entered 03/08/18 20:07:06   Main Document
Pg 25 of 52

## APPROVAL OF THE PURCHASE AGREEMENT

4.      The Purchase Agreement, all transactions contemplated therein and all of the terms and conditions thereof are hereby approved, subject to the terms and conditions of this Sale Order to the extent of any express conflict herewith.  In the event of any direct conflict between the terms and conditions of the Purchase Agreement and those of this Sale Order as in effect at the Closing Date, the terms and conditions of this Sale Order shall govern, provided that no change to this Sale Order made after the Closing Date without the consent of the Purchaser shall affect the rights or obligations of the Purchaser arising out of or relating to the Purchase Agreement in any manner.

5.      Pursuant to sections 105, 363 and 365 of the Bankruptcy Code, the Debtors are authorized and directed to perform their obligations under and comply with the terms of the Purchase Agreement and consummate the Sale Transaction, pursuant to and in accordance with the terms and conditions of the Purchase Agreement and this Sale Order.

6.      The Debtors, as well as their affiliates, officers, employees and agents, are authorized and directed to execute and deliver, and empowered to perform under, consummate and implement, the Purchase Agreement, in substantially the same form as the Purchase Agreement attached hereto as Exhibit A, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the Purchase Agreement and to take all further actions and execute such other documents as may be (a) reasonably requested by the Purchaser for the purpose of assigning, transferring, granting, conveying and conferring to the Purchaser, or reducing to possession, the Purchased Assets (including, but not limited to, all necessary transition services to be provided to the Purchaser by the Debtors), (b) necessary or appropriate to the performance of the obligations contemplated by the Purchase Agreement and (c) as may be reasonably requested by Purchaser to implement the Purchase Agreement and

consummate the Sale Transaction in accordance with the terms thereof, all without further order
of the Court.

7.      This Sale Order and the Purchase Agreement shall be binding in all
respects upon the Purchaser, the Debtors, their affiliates, any trustees appointed in the Debtors'
cases (whether under chapter 11 or chapter 7 of the Bankruptcy Code), all creditors (whether
known or unknown) of any Debtors, all interested parties and their successors and assigns,
including, but not limited to, any party asserting a Claim and any Non-Debtor Counterparty to
the Assumed Agreements.  Nothing contained in any chapter 11 plan confirmed in these
bankruptcy cases or the order confirming any such chapter 11 plan shall conflict with or derogate
from the provisions of the Purchase Agreement or this Sale Order, and to the extent of any
conflict or derogation between this Sale Order or the Purchase Agreement and such future plan
or order, the terms of this Sale Order and the Purchase Agreement shall control to the extent of
such conflict or derogation.

8.      All amounts, if any, to be paid by Debtors' pursuant to the Purchase
Agreement shall constitute administrative expenses pursuant to sections 503(b) and 507(a)(1) of
the Bankruptcy Code and shall be due and payable if and when any Debtors' obligations arise
under the Purchase Agreement without further order of the Court.

### TRANSFER OF PURCHASED ASSETS FREE AND CLEAR

9.      Pursuant to sections 105(a) and 363(f) of the Bankruptcy Code,
the Debtors are authorized and directed to transfer the Purchased Assets in accordance with the
terms of the Purchase Agreement.  The Purchased Assets shall be transferred to the Purchaser,
and upon consummation of the Purchase Agreement, such transfer (a) shall be a valid, legal,
binding and effective transfer; (b) shall vest the Purchaser with all right, title and interest of
the Debtors in the Purchased Assets; and (c) shall be free and clear of all Claims except for

Assumed Liabilities with all such Claims to attach to the proceeds of the Sale Transaction

ultimately attributable to the Purchased Assets against or in which such Claims are asserted, or

other specifically dedicated funds, in the order of their priority, with the same validity, force and

effect which they now have as against the Purchased Assets, subject to any rights, claims and

defenses the Debtors or their estates, as applicable, may possess with respect thereto.

        10.     In connection with the transfer of the Purchased Assets to the Purchaser

(a) the Debtors are authorized and directed to execute, deliver and perform their obligations

under the First Priority Consent, including by indefeasibly paying, or causing the indefeasible

payment of, immediately upon consummation of such transfer of the Purchased Assets,

$2 billion in immediately available funds to the First Priority Agent to be applied as set forth in

the First Priority Consent; and (b) Wilmington Trust Company as Collateral Trustee under the

CTA is authorized and directed to comply with the Direction Letter dated as of May 27, 2009

delivered to it by the First Priority Agent as "Controlling Party" under the CTA, including by

executing and delivering such documents as are necessary to permit the transfer of the Purchased

Assets free and clear of liens on the Purchased Assets held by Wilmington Trust Company as

Collateral Trustee under the CTA.

        11.     Notwithstanding paragraph 15 below or anything to the contrary in this

Sale Order or the Purchase Agreement, (a) any Purchased Asset that is subject to any mechanics',

carriers', workers', repairers', shippers', marine cargo, construction, toolers', molders' or similar

lien or any statutory lien on real and personal property for property taxes not yet due shall

continue to be subject to such lien after the Closing Date if and to the extent that such lien (i) is

valid, perfected and enforceable as of the Petition Date (or becomes valid, perfected and

enforceable after the Petition Date as permitted by section 546(b) or 362(b)(18) of the

Bankruptcy Code), (ii) could not be avoided by any Debtor under sections 544 to 549, inclusive, of the Bankruptcy Code or otherwise, were the Closing not to occur; and (iii) the Purchased Asset subject to such lien could not be sold free and clear of such lien under applicable non-bankruptcy law, and (b) any Liability as of the Closing Date that is secured by a lien described in clause (a) above (such lien, a "Continuing Lien") that is not otherwise an Assumed Liability shall constitute an Assumed Liability with respect to which there shall be no recourse to the Purchaser or any property of the Purchaser other than recourse to the property subject to such Continuing Lien.  The Purchased Assets are sold free and clear of any reclamation rights; *provided, however,* that nothing, in this Sale Order or the Purchase Agreement shall in any way impair the right of any claimant against the Debtors with respect to any alleged reclamation right to the extent such reclamation right is not subject to the prior rights of a holder of a security interest in the goods or proceeds with respect to which such reclamation right is alleged, or impair the ability of a claimant to seek adequate protection against the Debtors with respect to any such alleged reclamation right.  Further, nothing in this Sale Order or the Purchase Agreement shall prejudice any rights, defenses, objections or counterclaims that the Debtors, the Purchaser, the U.S. Treasury, EDC, the Creditors' Committee or any other party in interest may have with respect to the validity or priority of such asserted liens or rights, or the type (or amount), if any, of required adequate protection.

          12.     Except as otherwise provided in the Purchase Agreement, all persons and entities (and their respective successors and assigns), including, but not limited to, all debt security holders, equity security holders, affiliates, governmental, tax and regulatory authorities, lenders, customers, dealers, employees, trade creditors, litigation claimants and other creditors, holding Claims (whether legal or equitable, secured or unsecured, known or unknown, matured

or unmatured, contingent or non-contingent, liquidated or unliquidated, senior or subordinated)

except for Assumed Liabilities or Claims against any Purchased Company, arising under or out

of, in connection with, or in any way relating to, the Debtors, the Purchased Assets, the operation

of the Business prior to Closing or the transfer of the Purchased Assets to the Purchaser, are

hereby forever barred, estopped and permanently enjoined from asserting such Claims against

the Purchaser, its successors or assigns, its property or the Purchased Assets. No such persons or

entities shall assert against the Purchaser or their successors in interest any Claim arising from,

related to or in connection with the ownership, sale or operation of any Asset prior to the

Closing, except for Assumed Liabilities.

13.    This Sale Order (a) shall be effective as a determination that, as of the

Closing, (i) no Claims other than (x) Assumed Liabilities relating to the Purchased Assets or

(y) Claims against any Purchased Company, will be assertable against the Purchaser, its

affiliates, successors or assigns or any of their respective assets (including the Purchased Assets),

(ii) the Purchased Assets shall have been transferred to the Purchaser free and clear of all Claims

and (iii) the conveyances described herein have been effected; and (b) is and shall be binding

upon and govern the acts of all entities, including, without limitation, all filing agents, filing

officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of

deeds, registrars of patents, trademarks or other intellectual property, administrative agencies,

governmental departments, secretaries of state, federal and local officials and all other persons

and entities who may be required by operation of law, the duties of their office or contract, to

accept, file, register or otherwise record or release any documents or instruments, or who may be

required to report or insure any title or state of title in or to any lease; and each of the foregoing

persons and entities is hereby directed to accept for filing any and all of the documents and

instruments necessary and appropriate to consummate the transactions contemplated by the Purchase Agreement.

14.    If any person or entity that has filed financing statements, mortgages, mechanic's liens, *lis pendens* or other documents or agreements evidencing Claims against or in the Debtors or the Purchased Assets shall not have delivered to the Debtors prior to the Closing of the Sale Transaction, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of all interests that the person or entity has with respect to the Debtors or the Purchased Assets or otherwise, then only with regard to Purchased Assets that are purchased by the Purchaser pursuant to the Purchase Agreement and this Sale Order (a) the Debtors are hereby authorized and directed to execute and file such statements, instruments, releases and other documents on behalf of the person or entity with respect to the Purchased Assets; and (b) the Purchaser is hereby authorized to file, register or otherwise record a certified copy of this Sale Order, which, once filed, registered or otherwise recorded, shall constitute conclusive evidence of the release of all Claims against the applicable Purchased Assets other than the Assumed Liabilities.  This Sale Order is deemed to be in recordable form sufficient to be placed in the filing or recording system of each and every federal, state, or local government agency, department or office.

15.    All persons or entities in possession of some or all of the Purchased Assets are directed to surrender possession of such Purchased Assets to the Purchaser or its respective designees at the time of the Closing of the Sale Transaction.

16.    Following the Closing of the Sale Transaction, no holder of any Claim shall interfere with the Purchaser's title to or use and enjoyment of the Purchased Assets based

on or related to any such Claim, or based on any actions the Debtors may take in their chapter 11 cases.

17.     All persons and entities are prohibited and enjoined from taking any action to adversely affect or interfere with the ability of the Debtors to transfer the Purchased Assets to the Purchaser in accordance with the Purchase Agreement and this Sale Order.

18.     To the extent provided by section 525 of the Bankruptcy Code, no governmental unit may revoke or suspend any permit or license relating to the operation of the Purchased Assets sold, transferred or conveyed to the Purchaser on account of the filing or pendency of these chapter 11 cases or the consummation of the Sale Transaction contemplated by the Purchase Agreement.

19.     Notwithstanding anything else contained herein or in the Purchase Agreement, in connection with the purchase of the Debtors' brands and related Purchased Assets, the Purchaser, from and after the Closing, will recognize, honor and pay liabilities under Lemon Laws for additional repairs, refunds, partial refunds (monetary damages) or replacement of a defective vehicle (including reasonable attorneys' fees, if any, required to be paid under such Lemon Laws and necessarily incurred in obtaining those remedies), and for any regulatory obligations under such Lemon Laws arising now, including but not limited to cases resolved prepetition or in the future, on vehicles manufactured by the Debtors in the five years prior to the Closing (without extending any statute of limitations provided under such Lemon Laws), but in any event not including punitive, exemplary, special, consequential or multiple damages or penalties and not including any claims for personal injury or other consequential damages that may be asserted in relationship to such vehicles under the Lemon Laws.  As used herein, "Lemon Law" means a federal or state statute, including, but not limited to, claims under the Magnuson-

Moss Warranty Act based on or in conjunction with a state breach of warranty claim, requiring a manufacturer to provide a consumer remedy when the manufacturer is unable to conform the vehicle to the warranty after a reasonable number of attempts as defined in the applicable statute. In connection with the foregoing, the Purchaser has agreed to continue addressing Lemon Law claims (to the extent that they are Assumed Liabilities) using the same or substantially similar procedural mechanisms previously utilized by the Debtors.

20.     The Purchased Owned Real Property and PP&E (as such terms are defined in the Purchase Agreement) that, as of the Closing, are subject to existing statutory liens or any liens that may be created or perfected in accordance with section 362(b)(18) of the Bankruptcy Code shall be transferred to the Purchaser subject to (a) any applicable property taxes for the tax year 2009 (collectively, the "2009 Property Taxes") owed to state and local taxing authorities in the United States (collectively, the "Relevant Taxing Authorities") and (b) any liens related to such 2009 Property Taxes.  The 2009 Property Taxes shall be paid by the Purchaser; however, as between the Purchaser and the Debtors such 2009 Property Taxes shall be prorated as of the Closing Date and settled upon receipt of the relevant property tax bills.  The Relevant Taxing Authorities shall bill their 2009 Property Taxes to the Purchaser in the ordinary course, not as an expedited or jeopardy assessment.

21.     The Debtors shall deposit designated funds in the amount of $63 million in a dedicated escrow account (the "Tax Escrow") to satisfy sales and use taxes, Michigan business taxes and other taxes owed to the Relevant Taxing Authorities in respect of any of the Debtors (including predecessors of the Debtors) and not covered by paragraph 20 above, to the extent such taxes are (a) secured taxes or may become secured by liens that may be created or perfected in accordance with section 362(b)(18) of the Bankruptcy Code or (b) of the nature authorized to

be paid under the Order, Pursuant to Sections 105(a), 363(b), 507(a) and 541 of the Bankruptcy

Code, Authorizing the Debtors and Debtors in Possession to Pay Certain Prepetition Taxes

(Docket No. 355) to the extent such taxes were or may be asserted or assessed against

individuals (collectively, the "Additional Taxes").  Any Claims for Additional Taxes shall attach

to, and be satisfied from, the Tax Escrow.

      22.     (a)     Notwithstanding any contrary provision of this Sale Order or the

Purchase Agreement, the 61 Vehicles, as described and defined in the response of Wilmington

Trust Company to the Sale Motion (Docket No. 1188), will be treated as Excluded Assets that

will not be transferred to the Purchaser.

         (b)     Pursuant to sections 105(a), 363 and 365 of the Bankruptcy Code,

the Debtors' assumption and assignment to the Purchaser of all of the Debtors' right, title and

interest in or under the Debtors' guaranteed depreciation program agreement and ancillary

agreements related thereto (collectively, the "GDP Agreement") with Dollar Thrifty Automotive

Group, Inc. and its affiliates (collectively, "DTAG") are hereby approved, and all requirements

of section 365 of the Bankruptcy Code are hereby deemed satisfied as of the date of, and

effective only upon, the Closing of the Sale Transaction.  DTAG has consented to such

assumption and assignment and agrees that, subject to payment of Cure Costs, such assumption

and assignment shall not constitute an event of default thereunder or permit the termination

thereof.  The Debtors and DTAG shall confer in good faith to determine the amount of the Cure

Costs to be paid under the GDP Agreement.  If the Debtors and DTAG are unable to reach a

resolution of such cure cost amount, either of such parties may apply to the Court for an order,

upon notice and a hearing, determining the correct Cure Cost amount.

(c)      All obligations of Chrysler LLC under the GMAC MAFA Term

Sheet (the "GMAC Term Sheet") attached to the Purchase Agreement as Exhibit A, or if

executed, the definitive GMAC Master Autofinance Agreement, which agreement shall be

substantially on the same terms as the GMAC Term Sheet or the Annexes thereto, as well as any

intellectual property licensing agreements entered into connection therewith and all the other

agreements that are specified in the GMAC Term Sheet, including, without limitation, one or

more repurchase agreements with substantially the same terms as set forth in Annex D to

Exhibit A of the Purchase Agreement (collectively with the GMAC Term Sheet, the "GMAC

MAFA Documents") shall be assigned by the Debtors to the Purchaser, and the Purchaser shall

be deemed to have assumed the GMAC MAFA Documents, pursuant to this Sale Order and the

Bidding Procedures Order, and each non-Debtor party to the GMAC MAFA Documents shall be

deemed to have consented to such assumption and assignment.  Assumption and assignment of

the GMAC MAFA Documents are integral to the Sale Transaction and the Purchase Agreement,

are in the best interests of the Debtors and their estates, creditors, employees and retirees and

represent the reasonable exercise of the Debtors' sound business judgment.

(d)      At the Purchaser's written election, to be made by notice to

Chrysler Financial Services Americas LLC ("Chrysler Financial") no later than June 12, 2009, or

such other date as the Purchaser and Chrysler Financial may agree, either: (i) (A) the vehicles

related to unperformed or partially unperformed repurchase obligations arising from or related to

agreements between the Debtors and dealers whose dealerships were terminated prepetition, or

arising from or related to prepetition agreements between Chrysler Financial and the Debtors

(collectively, the "Repurchased Vehicles"), and (B) the vehicles commonly referred to by

Chrysler Financial and the Debtors as "conversion vehicles" that are currently in the possession

of entities that convert such vehicles into "conversion vehicles" (together with Repurchased Vehicles, the "Conversion and Repurchased Vehicles"), will be treated as "Excluded Assets" that will not be transferred to the Purchaser; or (ii) will be treated as Purchased Assets and the alleged liens in favor of Chrysler Financial or its affiliates on the Conversion and Repurchased Vehicles will be Continuing Liens to the extent they meet the requirements of subparagraphs 11(a)(i) through (iii) above.

(e)     Chrysler Financial and its affiliates object to the sale to the Purchaser of any insurance policy, surety bond or related indemnity arrangement to the extent that it (i) is an executory contract to extend a financial accommodation or a personal services contract and therefore not assumable and assignable to the Purchaser pursuant to section 365(c)(1) or (c)(2) of the Bankruptcy Code or (ii) is property the sale of which is not permitted under state or contract law and that entitles Chrysler Financial and its affiliates to adequate protection pursuant to section 363(e) of the Bankruptcy Code or that may not be sold free and clear of the interests of Chrysler Financial and its affiliates pursuant to section 363(f) of the Bankruptcy Code.  The parties reserve all rights (including, without limitation, any rights under the Contract Procedures and, in the case of the Purchaser, any rights against the Debtors pursuant to Sections 2.11 and 2.12 of the Purchase Agreement) and agree that no such policy, bond or arrangement shall be deemed to be transferred to Purchaser and that no liens, rights of setoff, equitable subrogation or equitable lien arising in favor of Chrysler Insurance Company, as insurer or surety, as against any Debtor's estate shall be terminated, diminished or affected by reason of any provision of the Purchase Agreement or this Sale Order until such objections are resolved by the Court.

23.     Nothing in this Sale Order or in the Purchase Agreement releases, nullifies or enjoins the enforcement of any liability to a governmental unit under police and regulatory statutes or regulations that any entity would be subject to as the owner or operator of property after the date of entry of this Sale Order.

## APPROVAL OF UAW RETIREE SETTLEMENT AGREEMENT

24.     The UAW Retiree Settlement Agreement, all transactions contemplated therein and all of the terms and conditions thereof are fair, reasonable and in the best interests of the retirees and are hereby approved.  The Debtors, the Purchaser and the UAW are authorized to perform their obligations under, or in connection with, the implementation of the UAW Retiree Settlement Agreement and comply with the terms of the UAW Retiree Settlement Agreement pursuant to and in accordance with the terms and conditions of the UAW Retiree Settlement Agreement and this Sale Order.  The Trust Amendments are hereby approved and the *English Case* VEBA Trust Agreement is reformed accordingly (as such terms are defined in the UAW Retiree Settlement Agreement).

## ASSUMPTION AND ASSIGNMENT OF ASSUMED AGREEMENTS

25.     Pursuant to sections 105(a), 363 and 365 of the Bankruptcy Code, and in accordance with the Contract Procedures, the Debtors' assumption and assignment or other transfer to the Purchaser of all of the Debtors' right, title and interest in or under the Assumed Agreements are hereby approved, with only such exceptions as Purchaser may agree in writing, and all requirements of section 365 of the Bankruptcy Code are hereby deemed satisfied.  For the avoidance of doubt, subject to the Contract Procedures (including the resolution of any Section 365 Objection and the issuance of a Confirmation Notice, as set forth in the Bidding Procedures Order), the Debtors shall be deemed to have assumed and assigned each of the Assumed Agreements as of the date of and effective only upon the Closing of the Sale Transaction and,

absent such Closing, each of the Assumed Agreements shall neither be deemed assumed nor

assigned and shall in all respects be subject to subsequent assumption or rejection by the Debtors

under the Bankruptcy Code.

26.    Except as provided herein, the Debtors are hereby authorized in

accordance with sections 105(a) and 365 of the Bankruptcy Code and the Contract Procedures to

assume and assign, sell and otherwise transfer the Assumed Agreements of all of the Debtors'

right, title or interest therein or thereunder to the Purchaser free and clear of all Claims, and to

execute and deliver to the Purchaser such documents or other instruments as may be necessary to

assign and transfer the Assumed Agreements to the Purchasers.

27.    In accordance with the Contract Procedures, the Assumed Agreements

shall be transferred to, and remain in full force and effect for the benefit of, the Purchaser in

accordance with their respective terms, notwithstanding any provision in any such Assumed

Agreement (including those of the type described in sections 365(e)(1) and (f) of the Bankruptcy

Code) that prohibits, restricts or conditions such assignment or transfer.  There shall be no rent

accelerations, assignment fees, penalties, increases or any other fees charged to the Purchaser or

the Debtors as a result of the assumption or assignment of the Assumed Agreements.  No

Assumed Agreement may be terminated, or the rights of any party modified in any respect,

including pursuant to any "change of control" clause, by any other party thereto as a result of the

transactions contemplated by the Purchase Agreement.

28.    To the extent that the Purchaser exercises its right to exclude any Assumed

Agreement from the Sale Transaction prior to the applicable Agreement Assumption Date, such

Assumed Agreement shall (a) be deemed never to have been assumed by the Debtors or assigned

to the Purchaser and (b) remain subject to assumption, rejection or assignment by the Debtors at any time in the future.

29.     Except as may be otherwise agreed to by the parties to an Assumed Agreement, the Cure Costs under the Assumed Agreements shall be paid by the Purchaser as soon as practicable and in no event later than ten days after the later of (a) the Closing of the Sale Transaction or (b) following the date on which such Assumed Agreement is deemed assumed and assigned in accordance with the Contract Procedures.  With respect to Disputed Cure Costs, the Purchaser shall reserve sufficient funds to pay the full amount of any Disputed Cure Costs related to the Sale Transaction until such time as there is a resolution among the parties or a final order of this Court determining the correct Cure Costs.  In addition to the Cure Costs (but without duplication), the Purchaser will assume and pay, in the ordinary course of business and as they come due, all amounts for goods delivered and services provided prepetition for which payment was not due as of the Petition Date and for postpetition goods delivered and services provided to the Debtors under each Assumed Agreement to the extent due and payable and not otherwise paid by the Debtors.

30.     Payment of the Cure Costs shall be a full satisfaction of any and all defaults under the Assumed Agreements, whether monetary or non-monetary, and upon payment of the Cure Costs any default of the Debtors thereunder shall have been irrevocably cured.  Upon the assumption and assignment of an Assumed Agreement under the Contract Procedures, the Debtors shall be released from any liability whatsoever arising under the Assumed Agreements and the Cure Costs and ongoing obligations under the Assumed Agreement shall be solely the obligation of the Purchaser.  Except as otherwise provided in this Sale Order, each Non-Debtor Counterparty to an Assumed Agreement hereby is forever barred, estopped and

permanently enjoined from asserting against the Debtors or the Purchaser, their successors or assigns or the property of any of them, any default existing as of the date of the assumption of the Assumed Agreement.

31.     The failure of the Debtors or the Purchaser to enforce at any time one or more terms or conditions of any Assumed Agreement shall not be a waiver of such terms or conditions, or of the Debtors' and the Purchaser's rights to enforce every term and condition of the Assumed Agreements.

32.     Upon the Agreement Assumption Date (or such earlier date as set forth in the Contract Procedures), the Purchaser shall be fully and irrevocably vested with all right, title and interest of the Debtors under the Assumed Agreements.

33.     The assignments of each of the Assumed Agreements are made in good faith under sections 363(b) and (m) of the Bankruptcy Code.

34.     In connection with the foregoing and consistent with the Contract Procedures, the Purchaser and the Creditors' Committee have agreed to the following: (a) no later than the second calendar day after the initial Section 365 Objection Deadline, the Purchaser will serve Confirmation Notices on the applicable Non-Debtor Counterparties; (b) no later than the second calendar day after the initial Section 365 Hearing, the Purchaser will serve additional Confirmation Notices on the applicable Non-Debtor Counterparties; (c) the Purchaser and the Creditors' Committee acknowledge that, if the Closing occurs prior to June 12, 2009, the terms of the Contract Procedures provide that the Assurance Letter procedure will not apply; and (d) paragraph 20 of the Bidding Procedures Order is clarified to provide that all Designated Agreements (rather than all contracts) that have not become Confirmed Contracts as of the Closing Date shall constitute "Excluded Contracts" for purposes of the Purchase Agreement

(without any requirement to update the Company Disclosure Letter) unless such Designated

Agreements subsequently become Confirmed Contracts in accordance with the Contract

Procedures.  The failure of the Purchaser to deliver a Confirmation Notice with respect to any

Non-Debtor Counterparty as contemplated in clause (a) and (b) of this paragraph 34, whether

because the parties have not agreed to Cure Costs or otherwise, shall not preclude the ability of

the Purchaser to deliver a Confirmation Notice to such Non-Debtor Counterparty after such time

and prior to the "Final Designation Date" (as defined in the Bidding Procedures Order).

<u>**ADDITIONAL PROVISIONS**</u>

35.     Except for the Assumed Liabilities expressly set forth in the Purchase

Agreement or described therein or Claims against any Purchased Company, none of the

Purchaser, its successors or assigns or any of their respective affiliates shall have any liability for

any Claim that (a) arose prior to the Closing Date, (b) relates to the production of vehicles prior

to the Closing Date or (c) otherwise is assertable against the Debtors or is related to the

Purchased Assets prior to the Closing Date.  The Purchaser shall not be deemed, as a result of

any action taken in connection with the Purchase Agreement or any of the transactions or

documents ancillary thereto or contemplated thereby or the acquisition of the Purchased Assets,

to:  (a) be a legal successor, or otherwise be deemed a successor to the Debtors (other than with

respect to any obligations arising under the Assumed Agreements from and after the Closing);

(b) have, *de facto* or otherwise, merged with or into the Debtors; or (c) be a mere continuation or

substantial continuation of the Debtors or the enterprise of the Debtors.  Without limiting the

foregoing, the Purchaser shall not have any successor, derivative or vicarious liabilities of any

kind or character for any Claims, including, but not limited to, on any theory of successor or

transferee liability, *de facto* merger or continuity, environmental, labor and employment,

products or antitrust liability, whether known or unknown as of the Closing, now existing or

hereafter arising, asserted or unasserted, fixed or contingent, liquidated or unliquidated.

36.     The Purchaser (or its designee) is authorized and directed, in accordance

with Section 5.20 of the Purchase Agreement, to substitute, backstop or replace, as the case may

be, in a manner reasonably satisfactory to the Debtors, those letters of credit existing as of the

Closing that secure future obligations of the Purchaser under an Assumed Agreement and are

identified in writing by the Debtors as part of the Cure Costs.  The Purchaser shall cause the

originals of any such substituted or replaced letters of credit to be returned to the Debtors or the

issuer thereof with no further drawings made thereunder.

37.     The Purchaser is hereby granted a first priority lien and super-priority

administrative claim over the proceeds of any tax refunds (including interest thereon), returns of

withholding taxes or similar payments, and any proceeds of tax sharing, contribution or similar

agreements (in each case, other than on refunds due to be paid to third parties pursuant to the

Original Contribution Agreement, as defined in the Purchase Agreement) to secure the payment

of all amounts due to the Purchaser from any of the Debtors under the tax indemnities in

Article 9 of the Purchase Agreement.

38.     Effective upon the Closing and except as otherwise set forth herein or

provided by stipulations filed with or announced to the Court with respect to a specific matter, all

persons and entities are forever prohibited and enjoined from commencing or continuing in any

matter any action or other proceeding, whether in law or equity, in any judicial, administrative,

arbitral or other proceeding against the Purchaser, its successors and assigns, or the Purchased

Assets, with respect to any (a) Claim other than (i) Assumed Liabilities or (ii) Claims against any

Purchased Company or (b) successor liability of the Purchaser for any of the Debtors, including,

without limitation, the following actions with respect to clauses (a) and (b):  (i) commencing or

continuing any action or other proceeding pending or threatened against the Debtors as against

the Purchaser, or its successors, assigns, affiliates or their respective assets, including the

Purchased Assets; (ii) enforcing, attaching, collecting or recovering in any manner any judgment,

award, decree or order against the Debtors as against the Purchaser or its successors, assigns,

affiliates or their respective assets, including the Purchased Assets; (iii) creating, perfecting or

enforcing any lien, claim, interest or encumbrance against the Debtors as against the Purchaser or

its successors, assigns, affiliates or their respective assets, including the Purchased Assets;

(iv) asserting any setoff, right of subrogation or recoupment of any kind (in the case of

recoupment only, except as a defense for payment of an obligation other than an Assumed

Agreement) for any obligation of any of the Debtors as against any obligation due the Purchaser

or its successors, assigns, affiliates or their respective assets, including the Purchased Assets;

(v) commencing or continuing any action, in any manner or place, that does not comply, or is

inconsistent with, the provisions of this Sale Order or other orders of this Court, or the

agreements or actions contemplated or taken in respect thereof; or (vi) revoking, terminating or

failing or refusing to renew any license, permit or authorization to operate any of the Purchased

Assets or conduct any of the businesses operated with such assets.

39.     Except for the applicable Assumed Liabilities, the Purchaser shall not

have any liability or other obligation of the Debtors or their affiliates arising under or related to

the Purchased Assets.  Without limiting the generality of the foregoing, and except as otherwise

specifically provided herein or in the Purchase Agreement, the Purchaser shall not be liable for

any claims against the Debtors or any of their predecessors or affiliates, and the Purchaser shall

have no successor or vicarious liabilities of any kind or character, including, but not limited to,

any theory of antitrust, environmental, successor or transferee liability, labor law, *de facto*

merger or substantial continuity, whether known or unknown as of the Closing, now existing or

hereafter arising, whether fixed or contingent, asserted or unasserted, liquidated or unliquidated,

with respect to the Debtors or their affiliates or any obligations of the Debtors or their affiliates

arising prior to the Closing, including, but not limited to, liabilities on account of any taxes

arising, accruing or payable under, out of, in connection with, or in any way relating to the

operation of the Purchased Assets prior to the Closing of the Sale Transaction.

40.     Upon the Debtors' assignment of the Assumed Agreements to the

Purchaser under the provisions of this Sale Order and any additional order contemplated by the

Purchase Agreement, no default shall exist under any Assumed Agreement, and no counterparty

to any Assumed Agreement shall be permitted to declare a default by the Purchaser under such

Assumed Agreement or otherwise take action against the Purchaser as a result of any Debtor's

financial condition, bankruptcy or failure to perform any of its obligations under the relevant

Assumed Agreement.

41.     For the avoidance of doubt:

(a)     with respect to each Excluded Contract, the Purchaser is not acquiring any
right, title or interest in, to and under such Excluded Contract, including
without limitation any claim, cause of action, right of recoupment or
receivable (whether for money or property), and all rights of a Non-Debtor
Counterparty against the Debtors arising under such Excluded Contract,
including rights of setoff, are not modified or waived;

(b)     with respect to each Assumed Agreement, nothing in this Sale Order or
the Purchase Agreement affects the contractual rights and remedies of a
Non-Debtor Counterparty under such Assumed Agreement, including,
without limitation, any right of setoff, recoupment, subrogation, indemnity
rights and any defenses to performance, except to the extent such
contractual rights and remedies result from the financial condition or
bankruptcy of a Debtor or arise out of or relate to a default or failure to
perform under such Assumed Agreement at or prior to the time of
assumption and assignment;

(c)      with respect to Purchased Assets (whether Assumed Agreements or other Purchased Assets such as Claims and receivables), nothing in this Sale Order or the Purchase Agreement affects any other defense or right of the non-Debtor obligor under applicable law, *provided that* a non-Debtor obligor may not assert any setoff, recoupment or other right or defense to the extent (a) resulting from the financial condition or bankruptcy of a Debtor or arising out of or relating to a default or failure to perform under such Assumed Agreement at or prior to the time of assumption and assignment or (b) arising out of or relating to an Excluded Liability; and

(d)      with respect to leases, nothing in this Sale Order or the Purchase Agreement shall (a) affect the rights of any lessor of property leased by a Debtor under an unexpired lease except to the extent such unexpired lease becomes an Assumed Agreement in accordance with the Contract Procedures and applicable law, (b) sell to the Purchaser any leased property not owned by a Debtor or (c) with respect to leases that are Excluded Contracts, affect possessory or ownership rights as against any Debtor or the Purchaser.

42.      The Purchaser has given substantial consideration under the Purchase Agreement for the benefit of the holders of Claims.  The discrete consideration given by the Purchaser shall constitute valid and valuable consideration for the releases of any potential claims of successor liability of the Purchaser, which releases shall be deemed to have been given in favor of the Purchaser by all holders of any Claims of any kind whatsoever.

43.      While the Debtors' bankruptcy cases are pending, this Court shall retain jurisdiction to, among other things, interpret, enforce and implement the terms and provisions of this Sale Order and the Purchase Agreement, all amendments thereto, any waivers and consents thereunder (and of each of the agreements executed in connection therewith in all respects), to adjudicate disputes related to this Sale Order or the Purchase Agreement and to enter any orders under sections 105, 363 and/or 365 (or other relevant provisions) of the Bankruptcy Code with respect to the Assumed Agreements.

44.      Nothing in this Sale Order or the Purchase Agreement releases, nullifies, or enjoins the enforcement of any liability to a governmental unit under environmental statutes or

regulations (or any associated liabilities for penalties, damages, cost recovery or injunctive relief)

that any entity would be subject to as the owner or operator of property after the date of entry of

this Sale Order.  Notwithstanding the foregoing sentence, nothing in this Sale Order shall be

interpreted to deem the Purchaser as the successor to the Debtors under any state law successor

liability doctrine with respect to any liabilities under environmental statutes or regulations for

penalties for days of violation prior to entry of this Sale Order or for liabilities relating to off-site

disposal of wastes by the Debtors prior to entry of this Sale Order.  Nothing in this paragraph

should be construed to create for any governmental unit any substantive right that does not

already exist under law.

45.     No bulk sales law, or similar law of any state or other jurisdiction shall

apply in any way to the transactions contemplated by the Purchase Agreement, the Sale Motion

and this Sale Order.

46.     The transactions contemplated by the Purchase Agreement are undertaken

by the Purchaser in good faith, as that term is used in section 363(m) of the Bankruptcy Code,

and accordingly, the reversal or modification on appeal of the authorization provided herein to

consummate the Sale Transaction shall not affect the validity of the Sale Transaction (including

the assumption and assignment of the Assumed Agreements), unless such authorization is duly

stayed pending such appeal.

47.     The consideration provided by the Purchaser for the Purchased Assets

constitutes reasonably equivalent value and fair consideration (as those terms may be defined in

each of the Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act and

section 548 of the Bankruptcy Code) under the Bankruptcy Code and under the laws of the

United States, any state, territory or possession thereof or the District of Columbia or any other

applicable jurisdiction with laws substantially similar to the foregoing.

48. The Sale Transaction may not be avoided under section 365(n) of the

Bankruptcy Code.

49. The terms and provisions of the Purchase Agreement and this Sale Order

shall be binding in all respects upon, and shall inure to the benefit of, the Debtors, their estates,

their creditors, the Purchaser, the respective affiliates, successors and assigns of each, and any

affected third parties, including, but not limited to, all persons asserting claims in the Purchased

Assets to be sold to the Purchaser pursuant to the Purchase Agreement, notwithstanding any

subsequent appointment of any trustee(s), examiner(s) or receiver(s) under any chapter of the

Bankruptcy Code or any other law, and all such provisions and terms shall likewise be binding

on such trustee(s), examiner(s) or receiver(s) and shall not be subject to rejection or avoidance by

the Debtors, their estates, their creditors, their shareholders or any trustee(s), examiner(s), or

receiver(s).

50. The failure specifically to include any particular provision of the Purchase

Agreement in this Sale Order shall not diminish or impair the effectiveness of such provision, it

being the intent of the Court that the Purchase Agreement and its exhibits and ancillary

documents be authorized and approved in their entirety.

51. The Purchase Agreement may be modified, amended or supplemented by

the parties thereto, in a writing signed by both parties, and in accordance with the terms thereof,

without further order of the Court, provided that any such modification, amendment or

supplement does not materially change the terms of the Purchase Agreement or modify the

express terms of this Sale Order.

52.     Each and every federal, state and local governmental agency, department or official is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Purchase Agreement.

53.     Subject to further order of the Court and consistent with the terms of the Purchase Agreement and the Transition Services Agreement, the Debtors and the Purchaser are authorized to, and shall, take appropriate measures to maintain and preserve, until the consummation of any chapter 11 plan for the Debtors, the books, records and any other documentation, including tapes or other audio or digital recordings and data in or retrievable from computers or servers relating to or reflecting the records held by the Debtors or their affiliates relating to the Debtors' businesses.

54.     Consistent with the terms of the Purchase Agreement and the Transition Services Agreement, the Debtors have agreed to transfer to the Purchaser (or one or more of its subsidiaries, as applicable) a substantial portion of the Debtors' cash management system maintained pursuant to an order of this Court (Docket No. 1303) entered on May 20, 2009, including, without limitation, several bank accounts maintained by the Debtors.  Such cash management system assets, including such bank accounts, constitute Purchased Assets under the Purchase Agreement.  Notwithstanding the foregoing transfers, the Debtors will maintain such bank accounts and a cash management system that is necessary to effect the orderly administration of the Debtors' chapter 11 estates, including any modifications thereof after the Closing, to ensure a reasonable accounting and segregation of the Debtors' cash  To the extent any funds of the Debtors that do not constitute Purchased Assets are held in accounts transferred to the Purchaser (or one or more of its subsidiaries), such funds shall be promptly returned to the appropriate Debtor, and such funds shall remain subject to any and all liens of the Debtors'

lienholders thereon.  Likewise, to the extent that any funds that constitute Purchased Assets are

held in accounts maintained by one or more Debtors after the Closing, such funds shall be

promptly transferred to the Purchaser.  The applicable Debtors and the Purchaser (and/or one or

more of its subsidiaries, as applicable), may execute any agreement, assignment, novation,

instrument or other document the parties deem necessary or appropriate to effectuate the

transfers described in this paragraph, which is consistent with the general authority to the same

provided in paragraph 6 hereof.

55.     Those powers of attorney granted by Chrysler LLC and any of the other

Debtors and any related documentation entered into by such entities for the purpose of (a)

effectuating the transfers of such entities' interests in their non-debtor foreign affiliates to the

Purchaser, Chrysler Motors LLC or their respective designees in connection with consummation

of the Sale Transaction or (b) effectuating the transfers of interests in certain foreign affiliates to

Chrysler LLC or any of the other Debtors prior to consummation of the Sale Transaction are here

by ratified and approved in all respects, regardless of whether such powers of attorney or other

documentation were issued or entered into prior to or subsequent to the Petition Date.

56.     The Debtors are hereby authorized and empowered, upon and in

connection with the Closing, to change their corporate names and the caption of these chapter 11

cases, consistent with applicable law.  The Debtors shall file a notice of change of case caption

within one business day of the Closing, and the change of case caption for these chapter 11 cases

shall be deemed effective as of the Closing.

57.     As provided by Bankruptcy Rules 6004(h) and 6006(d), this Sale Order

shall not be stayed for ten days after its entry and shall be effective as of 12:00 noon, Eastern

Time, on Friday June 5, 2009, and the Debtors and the Purchaser are authorized to close the Sale

Transaction on or after 12:00 noon, Eastern Time, on Friday June 5, 2009.[4]  Any party objecting

to this Sale Order must exercise due diligence in filing an appeal and pursuing a stay or risk its

appeal being foreclosed as moot in the event Purchaser and the Debtors elect to close prior to this

Sale Order becoming a Final Order.

58.     Any amounts payable to the Purchaser shall be paid by the Debtors in the

manner provided in the Purchase Agreement without further order of this Court, shall be an

allowed administrative claim under sections 503(b) and 507(a)(2) of the Bankruptcy Code, shall

be protected as provided in the Bidding Procedures Order and shall not be altered, amended,

discharged or affected by any plan proposed or confirmed in these cases without the prior written

consent of the Purchaser.

59.     This Court retains jurisdiction to interpret, implement and enforce the

terms and provisions of this Sale Order including to compel delivery of the Purchased Assets, to

protect the Purchaser against any Claims and to enter any orders under sections 105, 363 or 365

(or other applicable provisions) of the Bankruptcy Code to transfer the Purchased Assets and the

Assumed Agreements to the Purchaser.

Dated:  New York, New York
        June 1, 2009

                                        s/Arthur J. Gonzalez
                                        UNITED STATES BANKRUPTCY JUDGE

---

[4] The Court considered the Debtor's request for a waiver of the stay imposed, pursuant to Bankruptcy Rules 6004(h) and 6006(d), objections filed to that request, and Debtors' modified request as of June 1, 2009, whereby Debtors' sought a waiver of the stay imposed to permit a closing to take place on Thursday, June 4, 2009 at 9:00 a.m.  In their modified request, the Debtors reference the deposition testimony of Matthew Feldman, an advisor to the President's Auto Task Force, indicating that the Debtors are losing $100 million a day, and the other exigent circumstances facing Chrysler, including the continuing deterioration of its asset value, its supply chain, and its going-concern value.  The Court determines that a partial waiver of the stay is justified.  Any request to further modify the stay should be made to the appellate court.

09-50002-mg    Doc 8512-1    Filed 03/03/18    Entered 03/03/18 09:07:06    Main Document
Pg 50 of 52

**EXHIBIT A**
**PURCHASE AGREEMENT**

NYI-4178439v24

09-50002-smb   Doc 3252   Filed 06/01/09   Entered 06/01/09 20:07:06   Main Document
Pg 52 of 52

**EXHIBIT B**
**SUMMARY SCHEDULE OF FILED OBJECTIONS**