**GIBBONS P.C.**
Robert K. Malone, Esq.
Brett S. Theisen, Esq.
One Pennsylvania Plaza, 37th Fl.
New York, New York 10119
Telephone:  (212) 613-2000
Facsimile:  (212) 290-2018
E-mail:  rmalone@gibbonslaw.com
 btheisen@gibbonslaw.com

*Counsel for FCA US LLC*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| Old Carco LLC, *et al.* | Case No. 09-50002 (DSJ) |
| Debtors. | Jointly Administered |

**FCA US LLC'S MOTION TO ENFORCE**
**THE COURT'S SALE ORDER [DOCKET NO. 3232]**

FCA US LLC ("FCA US") hereby submits this Motion (the "Motion") for entry of an order

in the form attached hereto as Exhibit A (the "Proposed Order") enforcing this Court's *Order (I)*

*Authorizing the Sale of Substantially All of the Debtors' Assets Free and Clear of All Liens, Claims,*

*Interests and Encumbrances, (II) Authorizing the Assumption and Assignment of Certain*

*Executory Contracts and Unexpired Leases in Connection Therewith and Related Procedures and*

*(III) Granting Related Relief* [Docket No. 3232][1] (the "Sale Order"). Pursuant to the terms of the

---

[1] Unless otherwise specified, "Docket No." refers to the docket for above-captioned chapter 11 case, Case No. 09-5002 (DSJ) in the United States Bankruptcy Court for the Southern District of New York.

Sale Order, FCA US seeks to bar economic loss claims being asserted against it in two putative

class actions related to the Takata Airbag Products multidistrict litigation (the "Takata MDL") by

plaintiffs ("Plaintiffs") who purchased vehicles that were manufactured and sold by Old Carco

LLC ("Old Chrysler") prior to the sale of substantially all of its assets to FCA US's predecessor,

New Carco Acquisition LLC, under Section 363 of the Bankruptcy Code.  In support of this

Motion, FCA US respectfully states as follows:

**PRELIMINARY STATEMENT**

1.      This Court's role with respect to the Sale Order and the Takata MDL is a

"gatekeeper" role. *See Goodall v. Chrysler, Inc. (In re Old Carco LLC)*, 2018 WL 3854047, at *4

(Bankr. S.D.N.Y. Aug. 10, 2018).  This Court is best positioned to decide what claims and

allegations get through the "gate" because the Sale Order was entered by this Court and it is

governed by Second Circuit law; as such, this Court must set the guideposts for the United States

District Court for the Southern District of Florida (the "MDL Court").  If this Court determines

that a claim in the Takata MDL violates an enforceable provision of the Sale Order, it cannot

proceed; if a claim does not violate the Sale Order, then it is for the MDL Court consider the merits.

Simply put, if a vehicle was manufactured and sold by Old Chrysler prior to June 10, 2009, then

claims in the Takata MDL for economic losses relating to alleged defects in such vehicle violate

the Sale Order and must be barred.  *See Burton v. Chrysler Group LLC (In re Old Carco LLC)*,

492 B.R. 392, 405 (Bankr. S.D.N.Y. 2013) (post-Closing failure to warn claim barred by Sale

Order because breach of any post-Closing duty to warn did not proximately cause plaintiff's

economic injury).

2.      The Sale Order,[2] along with this Court's prior decisions interpreting it, make clear

that FCA US's assumption of certain Old Chrysler liabilities through the Master Transaction

---

[2] A copy of the Sale Order is attached as Exhibit A to the Declaration of Robert K. Malone in support of this

Agreement (the "MTA") was narrow and limited "with a high degree of specificity." *See Wolff v. Chrysler Group LLC (In re Old Carco LLC)*, 2010 Bankr. LEXIS 6320, at *17-18 (Bankr. S.D.N.Y. July 30, 2010) (J. Gonzalez). Despite the clear and unequivocal limitations set forth in the MTA, the Sale Order and related documents—and this Court's rulings enforcing the limitations in the Sale Order—Plaintiffs improperly seek to impose liabilities of Old Chrysler on FCA US. Thus, FCA US again finds itself in need of the Court's assistance to enforce the plain terms of its Sale Order, this time against Plaintiffs seeking to extract recoveries from FCA US in the Takata MDL for liabilities it did not assume.

3.      Plaintiffs, on behalf of themselves and as putative class representatives, seek monetary damages from FCA US on a smorgasbord of legal theories arising from their purchase or lease of FCA US vehicles, yet improperly seek to broaden such claims to include those that relate to Old Chrysler vehicles alleged to have defective Takata airbags, including statutory consumer protection laws, breach of implied warranty, negligence, fraud, and unjust enrichment claims (collectively, the claims involving Old Chrysler vehicles are hereinafter the "MDL Claims").  Notably, no Plaintiff has experienced personal injuries; the MDL Claims are for economic losses only—in essence: "the vehicle was defective, therefore I overpaid." Absent prompt enforcement of the Sale Order by this Court, FCA US—which, as explained below, was itself a victim of Takata's admitted scheme to conceal a potential defect from the automakers— will have to continue its defense of the MDL Claims in the MDL Court.

4.      Although FCA US sought to enforce the terms of the Sale Order by way of a motion to dismiss filed in the MDL Court in August 2018, the MDL Court effectively declined to reach the Sale Order argument when it issued its decision in June 2020, finding that "application of the

---

Motion (the "Malone Decl.").  Capitalized terms not otherwise defined herein are to be given the meanings ascribed to them in the Sale Order.

Sale Order is claim specific," and that it would not rule on the "all or nothing" argument that FCA

US advanced because the issue of FCA US's post-Closing conduct was for summary judgment or

trial. (Consumer MTD Order (defined below) at 41-43). The MDL Court thus denied FCA US a

critical benefit that it bargained for in the Sale and which former Judge Gonzalez approved: narrow

and limited assumption of Old Chrysler liabilities—among which were not economic loss claims

for vehicles manufactured and sold by Old Chrysler prior to the Sale Closing.[3] Through the instant

Motion, this Court can provide valuable assistance to the MDL Court with respect to the terms of

the Sale Order.

    5.    FCA US thus asks this Court to assume its "gatekeeper" function to interpret its

own order, *see Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 151 (2009), and determine whether

the MDL Claims may properly be asserted under the terms of the Sale Order and the Court's prior

decisions concerning the same. As former Judge Bernstein's *Burton* decision makes clear, they

cannot. In *Burton*, Judge Bernstein held that FCA US is not liable for claims relating to defects in

Old Chrysler-manufactured vehicles except to the extent that FCA US expressly assumed liability

for such claims pursuant to certain narrow exceptions set forth in the Sale Order and the MTA.

Claims for economic losses based on FCA US's alleged post-Closing failure to warn purchasers

of alleged defects in Old Chrysler-manufactured vehicles—the exact theory of liability put forth

by Plaintiffs here—are not Assumed Liabilities, and are therefore barred:

> the Sale Order bars the claim that New Chrysler breached a duty to warn
> Old Carco customers that their vehicles had a design flaw, to wit, the "fuel
> spit back problem." The duty to warn cases typically involve a plaintiff who
> suffers a personal injury because someone failed to warn him about a
> dangerous product, and the failure to warn *proximately caused* his
> *subsequent* injury. The plaintiffs in this case do not allege subsequent
> personal injuries. For example, they do not allege that fuel splashed back in
> their eyes as a result of the defect while refueling their vehicles. Instead,

---

[3] Following its determination of FCA US's motion to dismiss, the MDL Court directed the Plaintiffs and FCA US to
move through fact discovery, which is now largely complete. The time is now ripe—prior to the filing of dispositive
motions in the MDL Court—to bring the barred claims to this Court's attention for a definitive ruling.

> they seek monetary and injunctive relief based on a pre-Closing Date design
> flaw. (*SAC* ¶¶ 1, 38.) Each purchased a defective vehicle manufactured by
> Old Carco that requires more servicing and is worth less money. New
> Chrysler's failure to warn them that they purchased a defective vehicle
> manufactured by Old Carco did not *proximately cause* their economic
> injury, and each plaintiff's failure to warn claim "is a typical successor
> liability case dressed up to look like something else, and is prohibited by
> the plain language of the bankruptcy court's Order."

*Burton*, 492 B.R. at 405. The same reasoning applies with equal force to the MDL Claims, which

can be fairly summarized as arguing that there was a failure, or delay, in issuing a recall of certain

vehicles equipped with Takata airbags, which effectively allowed Plaintiffs to purchase those

vehicles and thus experience economic losses (i.e., they paid more than they otherwise would have

paid for defective vehicles, or perhaps would not have purchased them at all).

      6.     Further, Plaintiffs also allege that the defects were well-known by Takata, Old

Chrysler, and many others long before FCA US came into being in connection with its purchase

of Old Chrysler's assets under Section 363 on June 10, 2009 (the "Sale"). While FCA US

vigorously disputes those allegations for a number of reasons, including Takata's criminal

admission that it actively concealed the airbag issues from Chrysler and other automakers,[4] taking

the allegations as true for present purposes (by analogy to a Rule 12(b)(6) standard), it becomes

clear that even under Plaintiffs' version of events, any duty to notify the public concerning Takata

airbags arose with Old Chrysler, and was a known issue at the time of the Sale. Old Chrysler's

liabilities related to that duty (assuming, *arguendo*, that one existed) were not Assumed Liabilities

under the Sale Order and MTA. To the extent Plaintiffs have suffered economic losses as a result,

the proximate cause was Old Chrysler's failure—not any subsequent act or omission of FCA US.

Yet, Plaintiffs continue to impermissibly prosecute their MDL Claims against FCA US.

---

[4] A copy of the Takata criminal plea is attached as Exhibit B to the Malone Decl.

7.       The Court must not permit Plaintiffs' continued violation of the Sale Order; rather, it should follow its prior decisions and existing law of the case to enforce the Sale Order and enjoin successor liability claims like these.  These issues do not come to Court on a blank slate; the Court already decided in *Burton* that nearly identical economic loss claims related to a "fuel spit back" defect were barred against FCA US, which decision should control and be followed here.  Simply put, Plaintiffs cannot plausibly state cognizable, independent claims against FCA US relating to vehicles manufactured and sold by Old Chrysler prior to the Sale that are not inextricably intertwined with claims against Old Chrysler; as such, the Court must exercise its role as "gatekeeper" to preclude the MDL Claims in their entirety.

## **BACKGROUND**

### A.  The Sale Order and MTA

8.       On April 30, 2009, Old Carco LLC and certain of its affiliated debtors and debtors in possession (collectively, the "Debtors" or "Old Chrysler") commenced bankruptcy cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").

9.       Upon commencement of their chapter 11 cases, the Debtors focused on an expedited process for the sale of certain assets to FCA US's predecessor (then known as New CarCo Acquisition LLC).[5]   On April 30, 2009, FCA US entered into a Master Transaction Agreement (as amended and including all ancillary documents thereto, the "MTA") by and among FCA US, Fiat S.p.A., Old Carco, and certain other sellers identified therein.[6]

---

[5] New CarCo Acquisition LLC changed its name to Chrysler Group LLC and later to FCA US LLC.  Recently, as part of a merger with Peugot, FCA US LLC's parent corporation, Fiat Chrysler Automobiles N.V., became Stellantis N.V. However, the US entity remains FCA US LLC.

[6] A copy of the MTA is attached as Exhibit C to the Malone Decl.

10.     On May 3, 2009, Old Chrysler moved for entry of an order authorizing and approving, among other things, (i) Old Chrysler's entry into and performance under the terms and conditions of the MTA; and (ii) the sale by Old Chrysler of substantially all of its assets to FCA US pursuant to the MTA, free and clear of all claims and liabilities "whether arising before or after the Petition Date, whether at law or in equity, including all rights or claims based on any successor or transferee liability," other than expressly "Assumed Liabilities" (as defined in the MTA) [Docket No. 190 at 25].

11.     On May 27, 2009, FCA US was the successful bidder in the Debtors' asset sale. On June 1, 2009, following a multi-day trial, the Bankruptcy Court granted the Sale Motion and approved the transaction set forth in the MTA in its Sale Order.

12.     The Sale, on the terms set forth in the MTA, closed on June 10, 2009 (the "Closing Date" or "Closing").  The Sale Order authorized the transfer of the purchased assets "free and clear of all Claims except for Assumed Liabilities" (as defined in the MTA).  (Sale Order at ¶ 9).  The Court expressly ruled in the Sale Order that:

> **Except for the Assumed Liabilities expressly set forth in the Purchase Agreement** or described therein or Claims against any Purchased Company, **none of the Purchaser, its successors or assigns or any of their respective affiliates shall have any liability for any Claim that (a) arose prior to the Closing Date, (b) relates to the production of vehicles prior to the Closing Date or (c) otherwise is assertable against the Debtors or is related to the Purchased Assets prior to the Closing Date. The Purchaser shall not be deemed**, as a result of any action taken in connection with the Purchase Agreement or any of the transactions or documents ancillary thereto or contemplated thereby  or  the acquisition of the Purchased Assets to: (a) **be a legal successor, or otherwise be deemed a successor to the Debtors** (other than with respect to any obligations arising under the Assumed Agreements from and after the Closing); (b) **have, *de facto*,  or o therwise, merged with or into the Debtors; or** (c) **be a mere continuation or substantial continuation of the Debtors** or the enterprise of the Debtors. **Without limiting the foregoing,  the  Purchaser  shall  not  have  any  successor,**

> **derivative or vicarious liabilities of any kind or character for any Claims, including, but not limited to, on any theory of successor or transferee liability,** *de facto* **merger or continuity, environmental, labor and employment, products or antitrust liability, whether known or unknown as of the Closing, now existing or hereafter arising, asserted or unasserted, fixed or contingent, liquidated or unliquidated.**

(Sale Order at ¶ 35 (emphasis added)). The Sale Order further provides that, except for any expressly Assumed Liabilities, FCA US:

> shall not be liable for any claims against the Debtors or any of their predecessors or affiliates, and the **Purchaser shall have no successor or vicarious liabilities of any kind or character**, including, but not limited to, **any theory of successor or transferee liability now existing or hereafter arising**.

(Sale Order at ¶ 39 (emphasis added); *see also id.* at ¶ 42 (recognizing the release of any successor liability claims against FCA US)).

13. In addition, the Sale Order contains an injunction directing that "all persons and entities . . . holding Claims . . . arising under or out of, in connection with, or in any way relating to, the Debtors, **the Purchased Assets**, [or] the operation of the business prior to Closing," except for Assumed Liabilities, are "forever barred, estopped and permanently enjoined from asserting such Claims against [FCA US]." (Sale Order at ¶ 12) (emphasis added).

14. Section 2.08 of the MTA sets forth the specific, limited liabilities assumed by FCA US. On October 29, 2009, section 2.08(h) was amended to expand the scope of liabilities assumed relating to Product Liability Claims to include certain motor vehicle accident claims involving vehicles sold by Old Chrysler before Closing. (MTA, Amendment No. 4, at ¶ 1). Relevant to Plaintiffs' Complaints, therefore, FCA US did not assume any liability for ***any*** Product Liability Claims ***unless such claims arose from a motor vehicle accident***. On November 19, 2009, the Court entered an order approving Amendment No. 4 to the MTA. [Docket No. 5988].[7]

---

[7] A copy of the Order and annexed Amendment No. 4 to MTA is attached as Exhibit D to the Malone Decl.

15.     The MTA defines a Product Liability Claim as:

> any Action arising out of, or otherwise relating to in any way in
> respect of claims for personal injury, wrongful death or
> property damage resulting from exposure to, or any other
> warranty claims, refunds, rebates, property damage, product
> recalls, defective material claims, merchandise returns and/or any
> similar claims, **or any other claim or cause of action, whether
> such claim is known or unknown or asserted or unasserted**
> with respect to, Products or items purchased, sold, consigned,
> marketed, stored, delivered, distributed or transported by the
> Company Business, any Selling Group Member or any of its
> Subsidiaries, **whether such claims or causes of action are known
> or unknown or asserted or unasserted**.

(MTA Definitions Addendum, at p. 90, *as amended* by Amendment No. 1 to MTA, at ¶ 36

(emphasis added)).

16.     Furthermore, Section 2.09 of the MTA provides that FCA US "shall not assume

and shall be deemed not to have assumed" any liabilities of Old Chrysler other than the expressly

Assumed Liabilities.  (MTA § 2.09).  Section 2.09(j) specifically excludes "all Liabilities in strict

liability, negligence, gross negligence or recklessness for acts or omissions arising prior to or

ongoing at the Closing[.]" (MTA § 2.09(j).

**B.  The Takata MDL**

17.     The Takata MDL, *In re Takata Airbag Product Liability Litigation*, MDL No. 15-

02599, Economic Loss No. 14-24009 (S.D. Fla.), consolidates allegations of economic loss and

personal injury related to airbags manufactured by Takata Corporation and TK Holdings and

equipped in vehicles manufactured, sold, and distributed by numerous car makers, including

allegedly Old Chrysler and FCA US.  Plaintiffs in the Takata MDL allege that FCA US vehicles

were equipped with Takata airbags containing the chemical ammonium nitrate, which creates a

small explosion to inflate the airbags during a crash.   Plaintiffs, purchasers of vehicles

manufactured and sold both pre and post-Sale, contend that when exposed to high heat and

-9-

humidity, the explosion is much more forceful and can cause injuries. As stated by District Judge Moreno, who is presiding over the Takata MDL, "[t]he crux of Plaintiffs' legal claims [against FCA US] is that FCA knew or should have known of the Takata inflator defect prior to installing the Takata airbags in their vehicles, and that FCA concealed from, or failed to notify, the Plaintiffs and the general public of the full and complete nature of the inflator defect."[8] Plaintiffs allege that as a result, they would either not have purchased FCA US vehicles, or paid less than they did.

18.    As it pertains to FCA US, the Takata MDL is split into two actions: the *Boyd* "Consumer" Action and the *Butler* "Recycler" action. Plaintiffs filed their original claims against FCA US in a combined complaint, but thereafter the MDL Court ordered that the Consumer and Recycler claims be split, and Plaintiffs filed (i) an Amended Complaint in the Consumer action against only FCA US [Docket No. 2758, MDL No. 15-02599 (S.D. Fla.)] (as amended,[9] the "Consumer Complaint") and (ii) an Amended Complaint in the Recycler action against FCA US and other car makers [Docket No. 2781, MDL No. 15-02599 (S.D. Fla.)] (as amended,[10] the "Recycler Complaint," and together with the Consumer Complaint, the "Complaints"). The Consumer and Recycler Plaintiffs both assert claims against FCA US related to (i) Old Chrysler vehicles manufactured and sold prior to the Closing Date, and (ii) vehicles manufactured and sold by FCA US after the Closing Date. The Complaints erroneously allege that the Closing Date was "June 1, 2009" (Consumer Compl. at ¶ 3; Recycler Compl. at ¶ 51)—not the correct date of June

---

[8] See Order Granting in Part and Denying in Part FCA US LLC's Motion to Dismiss [Docket No. 1653, Economic Loss No. 14-24009-CV-MORENO (S.D. Fla.)] (the "Consumer MTD Order").

[9] See Docket No. 4024, MDL No. 15-02599 (S.D. Fla.), filed April 23, 2021, which is currently the operative Consumer Complaint.

[10] See Docket No. 4027, MDL No. 15-02599 (S.D. Fla.), filed April 24, 2021, which is currently the operative Recycler Complaint.

10, 2009—and as a result assert claims relating to an additional nine (9) days that are clearly outside the scope of any possible independent conduct of FCA US.  (Consumer Compl. a, ¶ 10).

### The Boyd "Consumer" Action

19.     Initially, the Consumer Complaint advanced claims of thirty-three (33) named plaintiffs (seven (7) of which purchased vehicles manufactured by Old Chrysler) and putative class members under (i) the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301 (a "lemon law"), (ii) Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c), (iii) various states' common law (for fraud, unjust enrichment and negligence), and (iv) various states' statutory consumer protection laws, including for breach of implied warranty.

20.     In response to successive motions to dismiss, the MDL Court eventually dismissed (i) all of the Magnuson-Moss Warranty Act claims and (ii) all of the RICO claims.  While some of the state law claims were also dismissed, there are surviving claims against FCA US for unjust enrichment, fraud claims, negligence claims, breach of implied warranty, and other statutory consumer protection violations. (Consumer MTD Order at 2-3).  The current operative Consumer and Recycler Complaints eliminate the counts dismissed by the MDL Court.

21.     In its most recently-filed motion to dismiss the Consumer Action claims, FCA US asked the MDL Court to dismiss all of the Consumer Plaintiffs' claims pursuant to the Sale Order. The MDL Court, however, effectively declined to reach the Sale Order argument, finding that "application of the Sale Order is claim specific," and that it would not rule on the "all or nothing" argument that FCA US advanced in its moving papers because the issue of FCA US's post-Closing conduct was for summary judgment or trial.  (Consumer MTD Order at 41-43).

22.     Fact discovery in the Consumer Action was extensive, spanning more than three years. Originally scheduled to end in winter 2020, fact discovery was extended six months by the

MDL Court *sua sponte*, finally closing July 31, 2021. FCA US reviewed and produced hundreds

of thousands of documents to Plaintiffs, in addition to responses to Plaintiffs' nearly 900 discovery

requests. Plaintiffs deposed 21 current and former Chrysler or FCA US employees and four FCA

US corporate representative witnesses. Simply put, Plaintiffs were given every opportunity to

substantiate their allegations relating to the MDL Claims in fact discovery, but were unable to do

so because those facts do not exist.

23.    Among the key evidence that emerged in discovery:

(A)    FCA US had no reason to be aware of a rupture risk in its air bag inflators
until 2014, shortly before the recalls. Though there were several recalls between 2008 and 2013
relating to Takata air bag inflator rupture risk, mainly in Honda vehicles, Takata repeatedly assured
Chrysler – and afterward, FCA US – and Takata's other customers that their vehicles were not
affected, and that these earlier recalls were due to limited-scope manufacturing defects, not design
defects as was the case in the larger Takata inflator recalls that began in 2014 and included FCA
US vehicles.[11] Nevertheless, FCA took steps to verify what Takata was reporting—for example,
following a 2013 recall affecting Honda and certain other automotive Original Equipment
Manufacturers ("OEMs"), an FCA engineer inspected Takata's production lines to ensure that the
same issue would not affect FCA vehicles.[12]

(B)    There was no significant delay between FCA US first being aware of a
rupture in one of its vehicles and issuing a recall. The first Takata inflator rupture in an FCA US
vehicle occurred in September 2013, and the vehicle could not be inspected to be confirmed until
February 2014.[13] In any event, Takata did not tell FCA US and other OEMs that there may be a
problem with their inflators until spring 2014. FCA US issued its first regional field action shortly
thereafter, in June 2014. On November 10, 2014, Takata issued a limited Safety Defect
Information Report ("DIR"), declaring defective some of its passenger air bag inflators, but not its
driver air bag inflators.[14] In response, on December 3, 2014, FCA US expanded its regional
campaign for passenger inflators to a national recall.[15] Takata issued an updated Defect

---

[11] *See* Ex. A to Declaration of William McDonald (the "McDonald Decl.") (Walter J. Boyle Dep.) at 193:16–194:6
(in 2013, "our [FCA US's] reaction was to go to Takata immediately and say, please let us know if we are affected by
this recall . . . . And their response was, no you're fine, you have different – you have betas, not alphas, or you have
different designs."), Ex. B to McDonald Decl. (James Webber Dep.) at 127:6-14 ("I was responding to what Takata
told us, which was we were not affected. And I was verifying their information that said we had no inflators in that
time frame, and I was double checking what they told us with what we knew internally."); see also Ex. C to McDonald
Decl. (2012 Takata Presentation to FCA US), Ex. D to McDonald Decl. (2013 Takata presentations to FCA US) at
pp. 15, 18 (explaining that in November 2002, long before Takata started producing inflators for Chrysler, Takata had
put in place the relevant process corrections that would prevent the 2013 recall defect from occurring).

[12] *See*, e.g., Ex. E to McDonald Decl. (June 14, 2013 email from J. Webber (FCA) to R. Raymor (FCA) et al.).

[13] *See* Ex. A to McDonald Decl. (Boyle Dep.) at 27:17–23.

[14] *See* Ex. F to McDonald Decl. (Takata Defect Information Report, submitted November 2013).

[15] *See See* Ex. G to McDonald Decl. (Part 573 Safety Recall Report NHTSA Recall No. 14V-770, submitted
December 3, 2014).

Information Report for driver air bag inflators on May 18, 2015.[16] On May 21, 2015, FCA US authorized an expanded inflator recall, and launched additional related recalls soon thereafter.[17] However, beginning in 2015, the rollout schedule for all OEMs' Takata inflator recalls was closely coordinated between the OEMs and the National Highway Traffic Safety Administration ("NHTSA"), due to the enormous resources required in this, the largest safety recall in history, and the need to prioritize the most at-risk vehicles first.[18]

(C)     Moreover, on January 13, 2017, long after the recalls had been underway, Takata pled guilty to federal criminal wire fraud charges in connection with its provision of airbag systems to automotive companies. In its guilty plea, Takata admitted it provided false testing information to OEMs in order to convey that Takata was meeting necessary specifications and to induce OEMs to use its air bags.[19] As to Chrysler in particular, in one example from 2006, Takata employees corresponded with each other about how certain data provided to Chrysler had been "cherry picked," going so far as to say it was "fictitious."[20] Neither Chrysler nor FCA US were ever told, nor had they any reason to expect, that this industry-leading and trusted supplier had manipulated data to falsely represent necessary compliance.[21]

### The Butler "Recycler" Action

24.     The Recycler action advanced claims of nine (9) named plaintiffs (seven (7) of which purchased vehicles manufactured by Old Chrysler) and putative class members under (i) RICO, (ii) the Lanham Act, 15 U.S.C. § 1501, (iii) various states' common law fraud statutes, and (iv) various states' consumer protection statutes.

25.     On March 9, 2021, the MDL Court issued an order[22] in Recycler action dismissing (i) the Lanham Act claims in full, and (ii) otherwise followed the rulings it had made in the Consumer action by dismissing the RICO claims, but sustaining most state law fraud and consumer protection claims.  The Court also dismissed FCA US entirely for lack of personal jurisdiction in Florida, but the Recycler Plaintiffs were permitted to amend, and the second amended complaint

---

[16] *See id.*
[17] See *id.*
[18] *See id.*; Ex. H to McDonald Decl. (NHTSA Coordinated Remedy Order dated November 3, 2015) at pp. 1-2, 15-18 (relating the purpose of the Coordinated Remedy Order and establishing industry-wide coordinated recall timeline).
[19] Ex. B to Malone Decl. (Takata Plea Agreement) at B-6–B-7.
[20] Ex. I to McDonald Decl. (Oct. 19, 2006 email from B. Hardenburg (Takata) to K. Fitzgerald (Takata) et al.)
[21] *See* Ex. A to McDonald Decl. (Boyle Dep.) at 80:12–17, Ex. J to McDonald Decl. (Steven L. Stram Dep Day 2 (November 19, 2020)) at 117:7-11; Ex K to McDonald Decl. (Brandon S. Marriott Dep.) 20:15-21:3.
[22] See Docket No. 3965, MDL No. 15-02599 (S.D. Fla.).

is subject to a renewed motion to dismiss for lack of personal jurisdiction that is fully briefed and remains pending.

26.     Discovery is ongoing in the Recycler Action; the fact discovery end-date is currently January 10, 2022.  To date, Recycler Plaintiffs served (and FCA responded and objected to) a single set of document requests.  FCA US has not yet served any affirmative requests on Recycler Plaintiffs.

### *Relevant Allegations in the MDL Complaints*

27.     Ostensibly, all of the MDL Claims are based on post-Closing conduct of FCA US.  (*See* Consumer Complaint at ¶ 3; Recycler Complaint at ¶ 51).  As explained below, however, these allegations cannot withstand close scrutiny; when read as a whole, the Complaints point squarely at Old Chrysler's pre-Closing conduct as the genesis of the MDL Claims.

28.     **Consumer Action**.  That the Consumer Complaint arises out of Old Chrysler's pre-Closing conduct is amply demonstrated as follows:

(a)     Paragraph 11 of the Consumer Complaint alleges that FCA US "became aware of more evidence of the Inflator Defect" by "the summer or 2009." No indication is given, however, when during the summer of 2009 FCA US purportedly became aware of that defect.  Reference is made to Honda's first "significant" recall of Takata airbags, but the Consumer Plaintiffs fail to allege whether 2009 FCA US's awareness arose before or after the June 10, 2009 sale date.  Certainly, if that that awareness arose before the sale date, it would have been alleged in the Consumer Complaint.

(b)     In paragraph 15 of the Consumer Complaint the Consumer Plaintiffs jump to 2014, referencing recalls by other automakers but fail to allege facts demonstrating actual knowledge of the Inflator Defect that would have given rise to a duty on the part of FCA US to warn.

(c)     Previously, in paragraph 2 of the Consumer Complaint, the Consumer Plaintiffs had referred to vehicles "manufactured, sold or leased by FCA, US, but then referenced Old Chrysler vehicles. This inconsistency is fatal to the Consumer Plaintiffs' contention that their claims against FCA US arise solely out of FCA US's conduct. That being the case, the Consumer Plaintiff's claims are clearly barred by the Sale Order.

(d)     In paragraph 106 of Consumer Complaint, the Consumer Plaintiffs were made aware of the Inflator Defect as a result of purported visits by FCA US personnel to Takata manufacturing plants. However, paragraph 107 references those visits commencing in 2001, long before FCA US came into existence. In sum, the Consumer Complaint does not, in fact, allege any visits by FCA US personnel to Takata manufacturing plants after June 10, 2009.

(e)     Sub-section III(A) of the General Factual Allegations section of the Consumer Complaint reference Old Chrysler's purported knowledge of the Inflator Defect, which the Consumer Plaintiffs blithely state were passed to FCA US upon its purchase of Old Chrysler's assets including its books and records. *See* ¶ 115 on p. 38.[23] In sub-section III(B) of the General Factual Allegations section of the Consumer Complaint, the Consumer Plaintiffs contend that, in addition to knowledge "inherited" from Old Chrysler, FCA US knew or should have had independent knowledge of the Inflator Defect. *See* ¶ 116 on p. 38. However, a careful review of those allegations demonstrates their grounding in Old Chrysler's conduct. For example, paragraph 117 on p.38 references Honda's 2008 recall of Takata airbags that allegedly put FCA US (which did not even exist at that point) on notice of the Inflator Defect. Similarly, paragraph 124 on p. 39 references events occurring "over the past 15 years," or, given the date of the Consumer Complaint,

---

[23] The current operative Consumer Complaint contains an error in the enumeration of the paragraphs. The numeration of the paragraphs goes up to ¶ 123 and then starts back again at ¶ 112 and repeats the numeration to ¶ 123. The result is that there are two sets of paragraphs numbered from 112 to 123. To avoid confusion, references to any paragraph identified as ¶¶ 112 through 123 will be clarified by identifying the page of the Consumer Complaint on which the paragraph is located.

between 2003 and 2018, but does not identify any events that occurred after June 10, 2009. Paragraphs 118 through 122 on pp. 38-39 reference a number of isolated incidents without any context in an apparent effort to demonstrate some knowledge of the Inflator Defect on the part of FCA US, but fails to identify any actual knowledge on the part of FCA US arising from those incidents. Paragraph 125 of the Consumer Complaint contends that FCA US knew or should have known about the Inflator Defect, but does not allege any facts supporting that contention.

(f)      Only in paragraph 16 of the Consumer Complaint, do the Consumer Plaintiffs actually allege facts evidencing FCA US's knowledge of the Inflator Defect. That knowledge dates to 2015 when Takata finally admitted to its existence. Thereafter, as the Consumer Plaintiffs themselves acknowledge, FCA US began to recall impacted vehicles.

(g)      In fact, Sub-sections III(A) and (B) of the General Factual Allegations section of the Consumer Complaint, reflect only the very weakest attempt by the Consumer Plaintiffs to pay lip service to their contention that the relief they seek against FCA US is based solely on FCA US's conduct. According to paragraph 119 on p. 36, FCA USA's concerns about the Takata airbag that somehow preceded its formation, going back to Old Chrysler's initial purchase of the airbags. Paragraph 120 on p. 37 references a "catastrophic failure" of the Takata airbag in a test that pre-dated FCA US's formation by nine years. There is a complete lack of allegations in the Consumer Complaint of FCA US's concerns about the Takata airbag after its establishment in 2009.

(h)      Similarly paragraphs 108 (on p. 34) and 118 (on p. 36) of the Consumer Complaint anachronistically reference the existence of FCA US employees long before such employees actually existed, and, in doing so, reference conduct by Old Chrysler. Paragraphs 121 through 123 and 112 (all on p. 37) reference actions involving Old Chrysler and Old Chrysler personnel. Yet the Consumer Plaintiffs fail to identify any of the personnel or allege that they were ever employed by FCA US.

(i)    Paragraph 118 also alleges that FCA US engineers "continued to approve the use of ammonium nitrate inflators" as early as 2004 and continued after the sale of Old Chrysler's assets to FCA US.  However, there were no FCA US engineers before June 10, 2009.  Hence, what the Consumer Plaintiffs allege is, at best, ongoing conduct.  Claims arising out of such ongoing conduct are barred by the Sale Order

(j)    Under the circumstances, the Consumer Plaintiffs' allegations, taken as a whole, are so dependent on their allegations against Old Chrysler that, absent those claims, their claims against FCA US are not viable.   This point is made abundantly clear in paragraphs 115 (on p. 34), 148, and 209 of the Consumer Complaint.  By tying FCA US's knowledge of the Inflator Defect into the documents and records allegedly transferred to FCA US upon the sale by Old Chrysler, the Consumer Plaintiffs underscore the grounding of their claims in the knowledge and actions of Old Chrysler.  By doing so, they assert the very type of successor liability claims that are barred by the Sale Order.

29.    The Consumer Plaintiffs' purported classes include purchasers of used vehicles manufactured by Old Chrysler prior to the June 10, 2009 Closing. (Consumer Compl. at ¶¶ 36, 39, 41, 50, 54, 61, 64, 192, 196, 198.  Among the named plaintiffs, seven allege in the Consumer Complaint that they purchased vehicles manufactured and sold by Old Chrysler long before the Closing Date.  (Consumer Compl. at ¶ 68).  Consumer Plaintiffs' claims are all premised on the central allegation that each of those vehicles has a defective Takata airbag.  *Id*., ¶ 2. The Takata airbag defects are alleged to have arisen prior to Closing. (*Id*. ¶¶ 7-10).

30.    **Recycler Action**.  That the Recycler Complaint points squarely at Old Chrysler's pre-Closing conduct is amply demonstrated as follows:

(a)    The Recycling Complaint alleges that "when [FCA US] purchased Takata Airbags, [it] was aware that the airbags used the volatile and unstable ammonium nitrate as the primary propellant in the inflators.  Recycling Complaint, ¶ 9.

(b)    In connection with that allegation, the Recycling Complaint only references incidents occurring before 2009 before FCA US was established.  *Id*., ¶¶ 11, 12, 13.

(c)    The Recycling Complaint further alleges that, even before purchasing the Takata airbags, FCA US was on notice that they used ammonium nitrate as a propellant because Takata discussed the designs of the airbags with, *inter alia*, FCA US, who approved them.  *Id*., ¶ 30.  No dates are given for these discussions, but the Complaint alleges that FCA US, *inter alia*, was put on notice of the Inflator Defect by 2008.  FCA US was not in existence in 2008 (although Old Chrysler was).  *Id*.  If notice acquired by no later than 2008 forms the basis of a duty to warn of the Inflator Defect, then that duty fell on Old Chrysler and not FCA US.  As such, such claims are barred by the Sale Order.

(d)    The Recycler Complaint further alleges that FCA US acquired all of Old Chrysler's books, records, personnel and, therefore, Old Chrysler's knowledge of the Inflator Defect.  *Id*., ¶ 52.  As discussed above in connection with the Consumer Complaint, this allegation implicates Old Chrysler and thoroughly undermines the allegation that "the causes of action in [the Recycler] Complaint are directed solely to [FCA US] and are based solely on [FCA US's] wrongful conduct." *Id*. at ¶ 51. In fact, the conduct complained of is that of Old Chrysler.

(e)    The Recysler Complaint erroneously alleges that FCA US put all Chrysler products into the stream of commerce, even though Old Chrysler put those products into the stream of commerce before the entry of the Sale Order.  *Id*., ¶ 52.

09-50002-mg    Doc 8560    Filed 09/30/21    Entered 09/30/21 21:25:21    Main Document
Pg 19 of 35

(f)    Butler alleges that it purchased Class Vehicles prior to certain unidentified recalls. *Id.*, ¶ 83. The dates of those recalls are not alleged. The earliest of the recalls referenced in the Recycler Complaint is a recall by Honda in 2008, a year before the Sale Order and the creation of FCA US. At the time of that recall, Old Chrysler was still operating and manufacturing product. In any event, Butler seeks to recover economic losses for Old Chrysler product that he purchased and is an end run around the prohibitions contained in the Sale Order.

(g)    Butler contends that it sells the Takata airbags from the Chrysler product he purchases, but alleges no facts demonstrating its unawareness of the Inflator Defect.

(h)    Butler acknowledges that FCA US commenced a regional field action[24] related to Takata inflator rupture risk in June, 2014. *Id.*, ¶ 292.

31.    As with the Consumer Plaintiffs, the Recycler Plaintiffs' purported classes include purchasers of used vehicles manufactured by Old Chrysler prior to the June 10, 2009 Closing. (See, e.g., Recycler Comp. at ¶¶ 586-588, and Exhibit A thereto). Among the named plaintiffs, seven allege in the Consumer Complaint that they purchased vehicles manufactured and sold by Old Chrysler long before the Closing Date. (Recycler Comp. at Exs. A, C-H). Again, Recycler Plaintiffs' claims are all premised on the Takata airbag defects alleged to have arose prior to Closing. *Id.*

32.    Given the Recycler Plaintiffs' obvious reliance on Old Chrysler knowledge and conduct as the basis for their claims (and resulting violation of the Sale Order), the scope of damages sought in the Takata MDL, and facing the prospect of inconsistent decisions on issues related to those properly before—and in fact already decided by—this Court, FCA US respectfully requests this Court's assistance.

---

[24] A regional field action is similar in effect to a recall, but not nationwide, instead targeting the inflators in certain southern states where Takata, NHTSA, and the OEMs believed the inflators may be most likely to exhibit a rupture risk. (*See* Ex. L to McDonald Decl. (FCA US LLC Chronology submitted to NHTSA, updated June 10, 2015)).

## JURISDICTION

33.    This Court has subject matter jurisdiction to consider the Motion pursuant to 28

U.S.C. §§ 157 and 1334, and expressly retained jurisdiction pursuant to paragraphs 43 and 59 of

the Sale Order.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

## RELIEF REQUESTED

34.    FCA US seeks entry of the Proposed Order enforcing this Court's Sale Order,

which prohibits and enjoins Plaintiffs from continuing to pursue MDL Claims against FCA US in

the Takata MDL for economic losses resulting from Plaintiffs' post-Closing purchases of vehicles

manufactured by Old Chrysler prior to the Closing Date.

## ARGUMENT

### I.    THE SALE ORDER BARS PLAINTIFFS' MDL CLAIMS

#### A.    Under the MTA, the Assumed Liabilities Relating to Vehicles Manufactured and Sold Prior to the Closing Date Were Extremely Limited and Do Not Include the MDL Claims.

35.    The question before the Court is whether Plaintiffs have stated plausible claims

against FCA US based *solely* on FCA US's post-Closing wrongful conduct, or whether the MDL

Claims are so inextricably linked with Old Chrysler's conduct—with the alleged resulting injuries

proximately caused by such conduct—that they are barred by the Sale Order.  FCA US submits it

is clearly the latter.

36.    The starting point, as this Court has repeatedly recognized in its prior decisions, is

that FCA US is not a successor to Old Chrysler and that FCA US "shall have no successor or

vicarious liabilities of any kind or character."  (Sale Order at ¶ 39).  The Sale Order extinguished

the right to pursue claims "on any theory of successor or transferee liability, . . . whether known

09-50002-mg    Doc 8560    Filed 09/30/21    Entered 09/30/21 21:25:21    Main Document
Pg 21 of 35

or unknown as of the Closing, now existing or hereafter arising, asserted or unasserted, fixed or

contingent, liquidated or unliquidated." (*Id.*).[25]  As Judge Bernstein explained in *Burton*:

> The Sale Order reinforced that New Chrysler was buying Old
> Carco's assets free and clear of all other claims. Except as noted,
> "[t]he transfer of the Purchased Assets to the Purchaser under the
> Purchase Agreement will be a legal, valid and effective transfer of
> all of the legal, equitable and beneficial right, title and interest in
> and to the Purchased Assets **free and clear of all Claims that are
> not Assumed Liabilities** (including, specifically and without
> limitation, any products liability claims, environmental liabilities,
> employee benefit plans and any successor liability claims), except
> as otherwise provided in this Sale Order." (Sale Order ¶ Z; accord
> id. ¶¶ 9, 12–17, 35, 38, 39, 42.)

*Burton*, 492 B.R. at 397-98 (emphasis added).

    37.    The Sale Order is clear that any claims "relat[ing] to the production of vehicles

prior to the Closing Date" fall within the scope of the Sale Order and are barred as against FCA

US unless the claim falls within one of the narrow exceptions set forth as Assumed Liabilities (as

that term is specifically defined in the MTA).  (Sale Order at ¶ 35).  This Court has reaffirmed that

provision in the Sale Order numerous times (with former Judges Gonzalez and Bernstein

presiding).  *E.g.*, *In re Old Carco LLC*, 593 B.R. 182, 199 (Bankr. S.D.N.Y. 2018) ("[T]he Sale

Order bars any claim based on injuries proximately caused by the failure to repair a pre-existing

defect in a vehicle manufactured and sold by Old Chrysler. The only repair obligations that New

Chrysler assumed were those imposed under the factory or extended warranties."); *In re Old Carco

LLC*, 538 B.R. 674, 678 (Bankr. S.D.N.Y. 2015) ("[t]he Sale Order contained several provisions

indicating that the transfer was free and clear of claims and interests in the assets and successor

---

[25] The Court's constitutional authority to grant such relief was affirmed by the Second Circuit as valid in *Ind. State
Police Pension Tr. v. Chrysler LLC (In re Chrysler LLC)*, 576 F.3d 108, 127 (2d Cir. 2009) (At that time, however,
the Second Circuit declined to "delineate the scope of the bankruptcy court's authority to extinguish future claims,
until such time as we are presented with an actual claim for an injury that is caused by Old Chrysler, that occurs after
the Sale, and that is cognizable under state successor liability law.").

-21-

liability" and that FCA US would not be liable for any Claims (as broadly defined in the Sale

Order) other than "Assumed Liabilities."); *Ricks v. New Chrysler Grp. LLC (In re Old Carco LLC),*

2013 Bankr. LEXIS 1796, at *6 (Bankr. S.D.N.Y. May 2, 2013) ("The Assumed Liabilities relating

to vehicles manufactured and sold before the Closing Date were few.").

38.     Thus, FCA US is only responsible for defending claims for those liabilities

expressly assumed under the terms of the MTA.  (*See* MTA § 2.08 ("Purchaser shall assume,

effective as of the Closing, and shall timely perform and discharge in accordance with their

respective terms, the Assumed Liabilities *and no others*" (emphasis added).)).  All other liabilities

were expressly excluded.  *Burton*, 492 B.R. at 397.  "Excluded Liabilities" included "all Liabilities

in strict liability, negligence, gross negligence or recklessness for acts or omissions arising prior

to or ongoing at the Closing," (MTA § 2.09(j)), and "all Product Liability Claims arising from the

sale of Products or Inventory on or prior to the Closing that are not described in Section 2.08(h)

[i.e., those arising from automobile accidents]." (MTA § 2.09(i); *Amendment No. 4* ¶ 2.)

39.     The MDL Claims are not Assumed Liabilities, for several reasons.  First, The MDL

Claims are Product Liability Claims, as that term is defined in the MTA:

> **any Action arising out of, or otherwise <u>relating to in any way</u> in respect
> of claims for** personal injury, wrongful death or property damage
> resulting from exposure to, or any other warranty claims, refunds,
> rebates, property damage, **product recalls**, **defective material claims,**
> merchandise returns and/or any similar claims, **or any other claim or
> cause of action, whether such claim is known or unknown or asserted**
> or unasserted **with respect to, Products** or items purchased, sold,
> consigned, marketed, stored, delivered, distributed or transported by
> the Company Business, any Selling Group Member or any of its
> Subsidiaries, **whether such claims or causes of action are known or
> unknown or asserted or unasserted**.

(MTA Definitions Addendum, at p. 90, *as amended* by Amendment No. 1 to MTA, at ¶ 36

(emphasis added); *supra* ¶ 12).  Unless a Product Liability Claim related to a motor vehicle

accident, however (See MTA, Section 2.08(h), Amendment No. 4, at ¶ 1)—which the MDL Claims

are not—it is an excluded liability under Section 2.09(i) of the MTA and enjoined by the Sale Order in its entirety.

40.    Second, if the Court determines that the MDL Claims are not Product Liability Claims (accidents), they are nevertheless outside the scope of the assumed warranty-type claims under Section 2.08(g).  As determined by Judge Gonzalez (who oversaw the sale and signed the Sale Order), and reinforced by Judge Bernstein, Section 2.08(g) of the MTA refers only to claims arising out of express warranties, either factory or extended.  *Burton*, 492 B.R. at 398 (citing *Tulacro v. Chrysler Group LLC (In re Old Carco LLC)*, Adv. No. 11-09401 (AJG), at 6-7, slip. op. (Bankr. S.D.N.Y. Oct. 28, 2011) [Adv. Proc. No. 11-09401 Docket No. 18] ("*Tulacro Opinion*"), *and Tatum v. Chrysler Group LLC (In re Old Carco LLC),* Adv. Proc. No. 1109411 (AJG), slip op. (Bankr. S.D.N.Y. Feb. 15, 2012) [Adv. Proc. No. 11–09411 Docket No. 73]); *In re Old Carco LLC*, 593 B.R. 182, 199 (Bankr. S.D.N.Y. 2018).  Here, Plaintiffs do not assert such claims, but rather assert claims for breach of **implied** warranties.  Such claims are more properly classified as Product Liability Claims, as explained above.

41.    Third, Section 2.09(j) expressly excludes "all Liabilities in strict liability, negligence, gross negligence or recklessness for acts or omissions arising prior to **or ongoing** at the Closing[.]" (emphasis added).  Here, Plaintiffs' consumer protection, fraud, unjust enrichment, and negligence claims—to the extent they seek liability for pre-closing or "ongoing" conduct— are all excluded as a result of Section 2.09(j) and thus barred by the Sale Order.  The Court previously determined that FCA US did not assume any liabilities based on fraud or fraudulent practices.  *Ricks*, 2013 Bankr. LEXIS 1796, at *15-16 (citing *Tatum*, Adv. Proc. No. 11-09411, Docket No. 73).

**B. Plaintiffs' Attempt to Skirt the Sale Order by Pleading Claims "Solely" Against FCA US is Unavailing, Because the Plaintiffs Cannot State Plausible Claims that are Independent of Old Chrysler.**

42.    Finally, the Court should reject Plaintiffs' allegations that all of the MDL claims are actually based on post-Closing conduct of FCA US, and therefore permissible as independent claims. Plaintiffs' allegations impermissibly lump FCA US with Old Chrysler, repeatedly—and incorrectly—treating FCA US as having somehow been "absorbed" by Old Chrysler and as a successor of Old Chrysler (*See, e.g*., Sub-Section III(A) of the General Factual Allegations section of the Consumer Complaint; Recycler Compl. at ¶¶ 369-382). Such allegations are insufficient to escape the Sale Order injunction. *See In re Motors Liquidation Co.*, 585 B.R. 708, 727 (Bankr. S.D.N.Y. 2018).

43.    While it has been held in the General Motors ignition switch litigation— albeit on very different facts and contracts—that a plaintiff may be able to assert a "genuinely independent claim" premised solely on the buyer's post-sale knowledge and conduct, the Court held that "it is not acceptable, as [plaintiff's] Complaint does in several paragraphs, to base allegations on generalized knowledge of both Old GM and New GM. To pass the bankruptcy gate, a complaint must clearly allege that its causes of action are based solely on New GM's post-closing wrongful conduct." *In re Motors Liquidation Co*., 568 B.R. 217, 231 (Bankr. S.D.N.Y. 2017). Plaintiffs' Complaints in the Takata MDL fail to do so. The GM Court further explained that "[c]laims premised in any way on Old GM conduct are properly proscribed under the Sale Agreement and the Sale Order." *In re Motors Liquidation Co*., 529 B.R. 510, 528 (Bankr. S.D.N.Y. 2015), *aff'd in part, rev'd in part, vacated in part*, *In re Motors Liquidation Co*., 829 F.3d 135 (2d Cir. 2016). Similarly here, Plaintiffs' generalized allegations improperly conflating Old Chrysler and FCA US actions demonstrate that there is no independent claim asserted against FCA US in the Complaint.

-24-

44.     As Judge Gonzalez made clear in *Wolff v. Chrysler Group LLC*, "Old Carco and [FCA US] are distinct entities against which different claims may be asserted," and "[b]ecause [FCA US] is a separate company that paid Old Carco adequate consideration for assets under the Sale Order, [FCA US] is not liable for all claims against Old Carco." 2010 Bankr. LEXIS 6320, at *17-18. In other words, FCA US is not and was never Old Chrysler. Instead, "[a]ny claims against [FCA US] based upon the purchase of Old Carco's assets are limited to those liabilities assumed under the Sale Order," which "define[s] with a high degree of specificity which liabilities [FCA US] assumed from Old Carco and which liabilities Old Carco retained." *Id*

45.     Plaintiffs' allegations concerning FCA US's post-Closing conduct are wholly conclusory and unsupported by the remaining factual allegations, all of which point unmistakably to conduct of Old Chrysler. *See, supra,* Background, Section B *Relevant Allegations in the MDL Complaints,* ¶¶ 28(a), (c)-(e), (g)-(j), 30(a)-(f).  Because Plaintiffs do not plausibly allege that their claims are based ***solely*** on FCA US's post-Closing wrongful conduct, *In re Old Carco LLC*, 593 B.R. 182, 199 (Bankr. S.D.N.Y. 2018) (emphasis added), the MDL Claims are not truly independent claims and thus are enjoined by the Sale Order.

46.     While the Complaints pay lip service to the MDL Claims being "solely against New Chrysler," as detailed above, most of the allegations relate to events that precede the Closing Date and could only involve Old Chrysler. *See, supra,* Background, Section B *Relevant Allegations in the MDL Complaints,* ¶¶ 28(a), (c)-(e), (g)-(j), 30(a)-(f).  Plaintiffs' allegations against FCA US are inextricably intertwined with Old Chrysler's alleged knowledge and conduct.  Notably, several allegations are facially impossible because they allege acts taken by FCA US prior to its formation. (*See, e.g., Sub-Section III(A) of the General Factual Allegations section of the* Consumer Complaint; Recycler Complaint at ¶¶369-382).  The only allegations concerning facts evidencing FCA US's knowledge of the Inflator Defect appears in paragraphs 14-16 of the Consumer

Complaint. On September 7, 2013, a Takata inflator ruptured in the first Chrysler or FCA US vehicle, a 2006 Dodge Charger (Consumer Compl. at ¶ 14) (which FCA US later demonstrated through discovery that it did not learn of until spring 2014).[26]

47.    The gist of the allegations in Consumer Complaints' ¶¶ 15-16 is that even though a rupture occurred in a Chrysler vehicle in September 2013, FCA US failed to issue a recall until 2015. This—remarkably *the only allegation the Complaint levels at FCA US itself*—is demonstrably false. FCA US acted quickly and—though only a single Chrysler vehicle had had a rupture—launched a regional field action in June 2014 to replace and test inflators in the states and territories where inflators were believed most likely to be at risk.[27]  FCA US converted its passenger inflator regional campaign to a  full national recall on December 3, 2014, once Takata identified those inflators as defective. [28]  Thereafter, FCA US immediately updated and expanding its recalls after Takata declared a defect on driver inflators in May 2015.[29] In this way, the allegations in Consumer Complaint ¶¶  15-16 not only ignore critical context, they are also flatly untrue.   Moreover, from 2015 forward, FCA US could not have issued additional recalls more quickly than it did because the OEMs' recalls were coordinated and scheduled through the Coordinated Remedy Order and its amendments, which was managed by the NHTSA. Thus, allegations that FCA US breached a duty to warn Plaintiffs prior to that date are factually incorrect and legally insufficient.  In any event, however, the Court need not weigh underlying facts to determine that the MDL Claims are barred: the Sale Order, and the Court's prior decisions, plainly bar all economic loss claims arising out of vehicles manufactured and sold prior to the Sale.

---

[26] *See* Ex. A to McDonald Decl. (Boyle Dep.) at 27:17–23.

[27] *See* Ex. L to McDonald Decl. (FCA US LLC Chronology submitted to NHTSA, updated June 10, 2015).

[28] *See* Ex. G to McDonald Decl. (Part 573 Safety Recall Report NHTSA Recall No. 14V-770, submitted December 3, 2014).

[29] *See* Ex. L to McDonald Decl. (FCA US LLC Chronology).

48.    Plaintiffs cannot evade the Sale Order injunction by simply stating, without supporting factual allegations, that their claims arise "solely" from FCA US's post-Closing conduct.    The Court's "gatekeeper" function requires it to closely examine the Complaints' allegations, analogous to a motion to dismiss standard, to determine if the alleged "independent" claims are facially plausible. *See Dearden v. FCA US LLC (In re Old Carco LLC)*, 582 B.R. 838, 843, 845 (Bankr. S.D.N.Y. 2018); *Burton*, 492 B.R. at 405 (post-Closing failure to warn claim barred by Sale Order because breach of any post-Closing duty to warn did not proximately cause plaintiff's economic injury).

49.    Examining the Complaints, it is clear that Plaintiffs do not "state a claim that is plausible on its face" against FCA US.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Plaintiffs' obligation to provide the "grounds" for an entitlement to relief requires "more than labels and conclusions" and more than a "formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555. Critical here, "only a complaint that states a plausible claim for relief survives a motion to dismiss, and determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the court to draw on its own judicial experience and common sense." *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (quoting *Iqbal*, 556 U.S. at 679 (internal quotations omitted). "When the allegations in a complaint, however true, could not raise a claim of entitlement to relief, this basic deficiency should . . . be exposed at the point of minimum expenditure of time and money by the parties and the court." *Twombly*, 550 U.S. at 558.  Here, if the Complaints do not state plausible **independent** claims for relief against FCA US, then they are barred by the Sale Order.  *Burton*, 492 B.R. at 405.

-27-

50.    If the Complaints' allegations against Old Chrysler are taken as true, then any duties to warn or recall as a result of the Takata airbag defects originated with Old Chrysler.  (*See, e.g., Sub-sections III (A) and (B) of the General Factual Allegations section of the* Consumer Complaint; Recycler Complaint at ¶¶ 369-382).  However, FCA US "did not assume Old Carco's duty to warn its customers…and any claim based on Old Carco's duty to warn is barred by the Sale Order."  *Id.*

51.    Further, the facts as pled in the Complaints indicate that the proximate cause of any economic losses experienced by Plaintiffs as purchasers of defective, Old Chrysler vehicles— regardless of the purchase date, or whether purchased new or used—was the defect concealed by Old Chrysler.  As explained by Judge Bernstein in *Burton*:

> "[FCA US's] failure to warn them that they purchased a defective vehicle manufactured by Old Carco did not *proximately cause* their economic injury, and each plaintiff's failure to warn claim 'is a typical successor liability case dressed up to look like something else, and is prohibited by the plain language of the [Sale Order].'"

*Burton*, 492 B.R. at 405.  If the proximate cause of Plaintiffs' economic losses was the defective condition, then the proximate cause cannot be a failure to warn (whether by Old Chrysler or FCA US).  If the injuries did not result from a failure to warn, then there is no basis to circumvent the Sale Order.  Moreover, a "duty to warn" is a personal injury products liability theory distinct from the negligence claims (for purely economic losses) that Plaintiffs assert here.  *See, e.g.*, *Burton*, 492 B.R. at 405 (citing *Florom* v. *Elliot Manufacturing*, 867 F.2d 570, 577 (10th Cir. 1989)). Judge Bernstein seized on this key distinction in his *Burton* analysis, discussed in detail below.

52.    Judge Bernstein later reaffirmed his analysis in *Burton* almost five years later, in *Dearden,* where he highlighted the distinction between post-Closing allegations that rely on Old Chrysler-created defects (and are thus barred) versus those that allege personal injuries due solely to New Chrysler/FCA US conduct (which are not barred)—

Counts One [negligence for fatal injuries arising from negligent design and manufacture] and Two [strict product liability for same injuries based on same defect] allege directly or through incorporation by reference that the proximate cause of the Decedents' fatal injuries was Old Chrysler's defective design of the fuel tank. This is a Product Liability Claim [arising from an accident] that may subject New Chrysler to liability for compensatory but not punitive damages. Count Three, which also incorporates the same proximate cause allegation, separately alleges that the proximate cause of the accident was New Chrysler's post-Closing breach of its independent duties to warn, recall, notify and retrofit. For the reasons stated, this cause of action, if legally sufficient, is not barred by the Sale Order or the MTA. In other words, if the proximate cause of the Decedents' fatal injuries, as alleged in Counts One and Two, was the defective design and manufacture of the Vehicle by Old Chrysler, the Plaintiff cannot recover punitive damages. If, on the other hand, the proximate cause of the Decedents' fatal injuries was due solely to New Chrysler's failure to warn, recall, notify or retrofit as alleged in Count Three, rather than the design flaw itself, the claim for punitive damages would not be barred by the Sale Order or the MTA, as amended.

*Dearden*, 582 B.R. at 845-46. While the Court allowed the *Dearden* plaintiff's punitive damages claim based on allegations of New Chrysler/FCA US post-Closing conduct to go forward, Judge Bernstein himself clearly distinguished such claims from *Burton* because they involved personal injuries arising from an accident (and thus an independent proximate cause), as opposed to purely economic loss claims. *Id.* at 845. Here, Plaintiffs' MDL Claims mirror the *Burton* claims and must be barred for the same reason.

53.     The root causes of Plaintiffs' alleged economic injuries—defective parts that have not been repaired or replaced—manifested themselves long before the Closing Date, irrespective of the date such vehicles were re-sold to Plaintiffs (or, perhaps even to prior owners and then again to Plaintiffs). If economic loss claims relating to an Old Chrysler vehicle do not ripen until after the Closing Date, then this Court's multiple prior decisions holding that the Sale Order bars precisely such claims were wrongly decided. *See, e.g.*, *Dearden*, 582 B.R. 838; *Burton*, 492 B.R. 392; and *Tulacro* Opinion at 4 (Gonzalez, J.) ("Paragraph 19 of the Sale Order includes claims that

might arise in the future and, therefore, is the exclusive source of Chrysler Group's potential

liabilities under lemon laws for claims relating to vehicles manufactured by the Debtors, whether

the claims arose before or after the Closing."). Moreover, because such vehicles can theoretically

be resold *ad infinitum*, without any notice to FCA US, there is potentially no limit to such claims,

To the contrary, the Court's prior decisions not only reached the correct conclusion that such

claims are barred by the Sale Order, but those decisions are law of the case upon which interested

parties have been bound to and relied for almost a decade.

54.     Notably, the terms of the MTA were heavily negotiated—resulting in four

amendments—including with input from members of the plaintiffs' bar.[30] Those parties objected

to the original proposed sale order language because they sought to prevent the purchaser (FCA

US's predecessor) from buying the assets free and clear of liability for express warranty and

personal injury claims. The plaintiffs' bar was largely successful in that respect, as both types of

claims ended up included in the final definition of Assumed Liabilities. Purely economic loss

claims relating to future, post-Sale purchases of Old Chrysler vehicles, however, are conspicuously

absent from the Assumed Liabilities definition.

55.     Finally, if the Court were to ignore the Complaints' allegations against Old Chrysler

altogether—in an attempt to isolate any "truly independent" allegations against FCA US,

consistent with the analysis in *Motors Liquidation Co*., 529 B.R. at 528—it would again have to

find that the claims against FCA US are not plausible due to the lack of any factual allegations that

could support a duty of FCA US to warn absent reliance on Old Chrysler knowledge and conduct.

---

[30] *See* Docket Nos. 1092 (Obj. to Sale of Ad Hoc Committee Seeking Fairness for Warranty and Lemon Law
Claimants), 1120 (Obj. to Sale of class plaintiffs in products defect action), 1192 (Obj. to Sale of Ad Hoc Committee
of Consumer-Victims of Chrysler LLC), 1201 (Obj. to Sale of purchasers of defective vehicles), 2470 (Written
Opening Statement for Sale Hr'g by Ad Hoc Committee of Consumer-Victims of Chrysler LLC), 3068 (Obj. to Relief
Under R. 6004 by Ad Hoc Committee of Consumer-Victims of Chrysler LLC), 3190 (Joinder to Dkt. 3068), and 5887
(Obj. to MTA Amendment No. 4).

As discussed above, the only specific allegation evidencing FCA US's post-Closing knowledge of the Inflator Defect is at paragraph 16 of the Consumer Complaint, which stems from Takata's own criminal plea acknowledging the defect.   Until that time, there are no allegations that can support an independent duty to warn. In light of the forgoing, Plaintiffs' Complaints cannot escape the Sale Order injunction based solely on FCA US's alleged post-Closing Date conduct.

## II.    THE LAW OF THE CASE DOCTRINE BARS PLAINTIFFS' MDL CLAIMS

56.    As noted above, Judge Bernstein addressed claims in *Burton* that were almost factually indistinguishable from the MDL Claims, and determined that FCA US was not liable for defects that existed pre-Closing, where such defects were known to Old Chrysler and thus triggered a pre-Closing duty to warn. *Burton*, 492 B.R. at 403-405.   "[T]he Sale Order bars any claims"— such as the MDL Claims here—"based on a breach of a duty that existed as of the time of the June 10, 2009 Closing." *Id.* at 395.

57.    "[W]hen a court has ruled on an issue, that decision should generally be adhered to by that court in subsequent stages in the same case," absent compelling reasons otherwise.  *United States v. Carr*, 557 F.3d 93, 102 (2d Cir. 2009) (*quoting United States v. Quintieri*, 306 F.3d 1217, 1225 (2d Cir. 2002); *Motors Liquidation Co.*, 585 B.R. at 725.   Compelling reasons may include an intervening change in the law, new evidence, or the need to correct a clear error or law or to prevent manifest injustice. *Carr*, 557 F.3d at 102.   By maintaining consistency in a court's rulings, the law of the case doctrine promotes "fairness to the parties, judicial economy, and the societal interest in finality." *Id*.   The ruling in *Burton* as to claims based on pre-Closing defects and associated duties to warn are law of this case, and no compelling reason exists to depart from that ruling with respect to the MDL Claims now asserted.

58.    In *Burton*, plaintiffs asserted claims related to a "fuel spit-back problem," a design flaw which caused fuel to spill out of the filler tube during refueling.  *See Burton*, 492 B.R. at 395.

The issue became known to the public in 2001, and Old Chrysler issued recalls in 2002, 2005, and January 2009. *Id.* After the Sale, FCA US took further steps to address the problem in September 2009 and forward, including extended warranties, but "did not issue any further recalls or advise current owners of a flaw, safety defect or hazard." *Id.* at 395-96. Some vehicles manufactured by FCA US after closing, including the 2010 Jeep Wrangler, had the same or similar fuel system components. *Id.* at 395. If a problem developed with respect to any vehicles, a customer could have it repaired by a Chrysler dealership. *Id.* at 396.

59.    In 2011, the *Burton* plaintiffs filed a class action complaint against FCA US. *Id.* at 399. Each plaintiff alleged that they had purchased and owned a used 2005 or 2006 model vehicle manufactured by Old Chrysler that suffered from the "fuel spit back" defect. *Id.* Plaintiffs alleged a "failure to warn the vehicle owners of the 'fuel spit back' design flaw and related safety issues, or correct the problem," and brought claims for negligence and breach of implied warranties arising from the same. *Id.* at 399-400. Plaintiffs asserted only economic loss damages from their purchase of a defective vehicle, and no personal injuries or property damage. *Id.* at 405.

60.    As Judge Bernstein explained, due to the nature of the claims being asserted by the *Burton* plaintiffs, the black letter rule that a Section 363 sale cannot cut off successor liability for injuries after the closing did not apply to the facts *sub judice*:

> *Grummon Olson* [445 B.R. 243 (Bankr. S.D.N.Y. 2011] is distinguishable. The plaintiffs or their predecessors (the previous owners of the vehicles) had a pre-petition relationship with Old Carco, and the design flaws that they now point to existed pre-petition. At a minimum, they held contingent claims because "the occurrence of the contingency or future event that would trigger liability was 'within the actual or presumed contemplation of the parties at the time the original relationship between the parties was created.'" *Id.* at 252 (quoting *United States v. LTV Corp. (In re Chateaugay Corp.),* 944 F.2d 997, 1004 (2d Cir.1991) (quoting *In re All Media Props., Inc.,* 5 B.R. 126, 133 (Bankr. S.D.Tex. 1980), *aff'd mem.,*646 F.2d 193 (5th Cir.1981))). Anyone who owns a car contemplates that it will need to be repaired, particularly when, as

here, Old Carco had already issued at least two and possibly three recall notices for the "fuel spit back" problem for certain Durango and other Old Carco vehicles before the original purchasers bought their vehicles from Old Carco.

*Burton*, 492 B.R. at 403.

61.    Judge Bernstein went on to address the "difficult question" presented by plaintiffs'

assertion of independent duty to warn claims against FCA US, ultimately rejecting those claims as

legally insufficient and barred by the Sale Order based on a proximate cause analysis:

> The "duty to warn" raises a more difficult question. New Chrysler did not assume Old Carco's duty to warn its customers about the "fuel spit back" problem, and any claim based on the breach of Old Carco's duty to warn is barred by the Sale Order. Nevertheless, the law may impose a separate duty to warn on New Chrysler. Here, New Chrysler purchased Old Carco's assets. Succession alone does not impose a duty to warn a predecessor's customers of pre-existing defects, *Florom v. Elliott Mfg.,* 867 F.2d 570, 577 (10th Cir.1989); *Travis v. Harris Corp.,* 565 F.2d 443, 448–49 (7th Cir.1977), but the duty may arise where the successor (1) succeeds to the predecessor's service contracts that cover the particular machine, (2) actually services the machine, (3) is aware of the defect and (4) knows the location of the machine's owner. *Florom,* 867 F.2d at 577; *Polius v. Clark Equip. Co.,* 802 F.2d 75, 84 (3d Cir.1986); *Travis,* 565 F.2d at 449; *Schumacher v. Richards Shear Co.,* 59 N.Y.2d 239, 464 N.Y.S.2d 437, 451 N.E.2d 195, 199 (1983); Restatement (Third) of Torts § 13 cmt. b (1998). In these circumstances, the law imposes a duty to warn because the successor has entered into a relationship with the customer and derives an actual or potential economic benefit. *Schumacher,* 464 N.Y.S.2d 437, 451 N.E.2d at 199.
>
> Here, the Sale Order bars the claim that New Chrysler breached a duty to warn Old Carco customers that their vehicles had a design flaw, to wit, the "fuel spit back problem." The duty to warn cases typically involve a plaintiff who suffers a personal injury because someone failed to warn him about a dangerous product, and the failure to warn *proximately caused* his *subsequent* injury. The plaintiffs in this case do not allege subsequent personal injuries. For example, they do not allege that fuel splashed back in their eyes as a result of the defect while refueling their vehicles. Instead, they seek monetary and injunctive relief based on a pre-Closing Date design flaw. (*SAC* ¶¶ 1, 38.) Each purchased a defective vehicle manufactured by Old Carco that requires more servicing and is worth less money. New Chrysler's failure to warn them that they purchased a defective vehicle manufactured by Old Carco did not *proximately cause* their economic injury, and each plaintiff's failure to warn claim "is a typical successor

> liability case dressed up to look like something else, and is prohibited by
> the plain language of the bankruptcy court's Order."

*Burton*, 492 B.R. at 405.  In a footnote, Judge Bernstein also noted the *Burton* plaintiffs' failure to

allege that FCA US "serviced the plaintiffs' vehicles or that [FCA US] is aware of each plaintiff's

location. As noted, the original plaintiffs apparently purchased used vehicles, and [FCA US] may

not even have a record of their ownership." *Id.*

62.    Like the *Burton* plaintiffs, the Takata MDL Plaintiffs' claims relate to an alleged

product defect in vehicles manufactured and originally sold by Old Chrysler—a defect Plaintiffs

allege was known to Old Chrysler (as well as other automakers) prior to the Closing Date.

Plaintiffs later bought those defective vehicles, and now bring claims for economic losses arising

out of their purchase against FCA US.  Plaintiffs assert no personal injury claims.  Although not

pled in the Complaints, there is no evidence that FCA US serviced any of Plaintiffs' vehicles, was

aware of Plaintiffs' locations, or even had a record of their ownership.  In sum, there are no material

differences in the underlying facts between the *Burton* plaintiffs and the Takata MDL Plaintiffs;

and, both are bound by the same Sale Order.

63.    FCA US submits that, in a case such as this, which is now in its second decade and

on its third presiding judge, the law of the case doctrine takes on even greater importance.  This

Court's interpretations of the Sale Order continue to impact litigation and parties across the

country; thus, a deviation from earlier rulings that has the effect of expanding the scope of

liabilities under the Sale Order has the potential to work injustice not only on FCA US, but on past

litigants whose would-be claims were precluded.

64.    FCA US respectfully asks this Court to find that Judge Bernstein's analysis and

ruling in *Burton* is binding law of the case that applies with equal force to the MDL Claims.

## NOTICE

65.    Copies of the within Motion have been provided (A) via email and regular mail to Plaintiffs' counsel, and (B) via CM/ECF to all other parties having formally requested notice via the Court's CM/ECF system.  FCA US respectfully submits that, in light of the nature of the relief requested, no further notice is necessary or required.

## CONCLUSION

66.    For the foregoing reasons, FCA US respectfully requests that the Court enforce the Sale Order as to Plaintiffs' MDL Claims and enter the Proposed Order, and grant such other and further relief as the Court deems just and proper, including but not limited to, all lawful costs and attorneys' fees.

Dated: September 30, 2021
         New York, New York

                                        Respectfully submitted,

                                        By:    */s/ Robert K. Malone*
                                             Robert K. Malone, Esq.
                                             Brett S. Theisen, Esq.
                                             **GIBBONS P.C.**
                                             One Pennsylvania Plaza, 37th Fl.
                                             New York, New York 10119
                                             Telephone:  (212) 613-2000
                                             Facsimile:   (212) 290-2018
                                             E-mail:     rmalone@gibbonslaw.com
                                                         btheisen@gibbonslaw.com

                                        *Counsel for FCA US LLC*