**Hearing Date and Time:  December 2, 2021 at 10:00 a.m. ET**
**Objection Deadline:  November 4, 2021 at 1:00 p.m. ET**

**STUTZMAN, BROMERG, ESSERMAN, & PLIFKA,**
**A PROFESSIONAL CORPORATION**
Sander L. Esserman, Esq.
Peter C. D'Apice, Esq.
2323 Bryan Street, Suite 2200
Dallas, Texas 75201
Telephone:  (214) 969-4900
Facsimile:  (214) 969-4999
Email:    esserman@sbep-law.com
          dapice@sbep-law.com

*Counsel for the Plaintiffs' Steering Committee*
*in In Re: Takata Airbag Product Liability*
*Litigation MDL*

# UNITED STATES BANKRUPTCY COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 |
| OLD CARCO LLC, *et al*., | Case No. 09-50002 (MG) |
| Debtors. | (Jointly Administered) |

## PLAINTIFFS' OPPOSITION TO FCA US LLC'S MOTION TO ENFORCE THE COURT'S SALE ORDER [DOCKET NO. 3232], AND INCORPORATED BRIEF

i

## **Table of Contents**

I.  PRELIMINARY STATEMENT ................................................................................................ 1

II.  BACKGROUND.................................................................................................................... 6

III.  ARGUMENT ........................................................................................................................ 9

    A.   THE MOTION IMPLICATES PRINCIPLES OF PRECLUSION AND MIGHT
NECESSITATE AN ADVERSARY PROCEEDING............................................................... 9

    B.   ALL NAMED PLAINTIFFS IN BOTH ACTIONS PURCHASED OR LEASED THE
VEHICLES GIVING RISE TO THEIR CLAIMS *POST-CLOSING*...................................... 10

    C.   THE MDL COURT APPLIED THE CORRECT STANDARD ...................................... 13

    D.   FCA CANNOT SIMPLY WISH AWAY ITS IMPUTED KNOWLEDGE ANY MORE
THAN IT CAN IGNORE ITS INDEPENDENT WRONGFUL CONDUCT.......................... 16

    E.   PLAINTIFFS' CLAIMS AGAINST FCA ARE UNAFFECTED BY THE SALE ORDER,
BUT EVEN IF COURT DETERMINES OTHERWISE, FCA'S REQUEST WOULD
VIOLATE DUE PROCESS. ................................................................................................. 21

IV.  CONCLUSION.................................................................................................................... 25

## Table of Authorities

### Cases

*Armonk Snack Mart, Inc. v. Robert Porpora Realty Corp. (In re Armonk Snack Mart, Inc.)*, Case No. 16-cv-5887 (NSR), 2018 WL 2225008  (S.D.N.Y. May 15, 2018) ............................................................ 10

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ................................................................................................ 14

*Badilla v. Midwest Air Traffic Control Service, Inc.*, 8 F.4th 105 (2d Cir. 2021) ...................................... 24

*Bell Atlantic. Corp. v. Twombly*, 550 U.S. 554-55 (2007) ........................................................................ 14

*Burton v. Chrysler Group (In re Old Carco LLC)* 492 B.R. 392  (Bankr. S.D.N.Y. 2013) ....... **3, 11, 12, 25**

*Castleman v. FCA US LLC*, No. 2:18-cv-00342-JNP-PMW, 2019 WL 1406611 (D. Utah Mar. 28, 2019) 5

*Center v. Hampton Affiliates, Inc.*, 66 N.Y.2d 782, 784  (N.Y. 1985) ...................................................... 17

*Dearden v. FCA US LLC (In re Old Carco LLC)* 582 B.R. 838 (Bankr. S.D.N.Y. 2018). ................... 5, 24

*Elliott v. General Motors LLC (In re Motors Liquidation Co.)* 829 F.3d 135 (2d Cir. 2016), *cert. denied sub nom. Gen. Motors LLC v. Elliott*, —U.S.—, 137 S. Ct. 1813 (2017) ...................................... passim

*Evans v. Ottimo*, 469 F.3d 278 (2d Cir. 2006) ...................................................................................... 10

*General Motors LLC. v. Buchanan (In re Motors Liquidation Co.)*, Case No. 20-CV-3093 (JMF), 2021 WL 1085362, (S.D.N.Y. Mar. 22, 2021) ...................................................................................... 17

*Hoblock v. Albany County Board of Elections*, 422 F.3d 77 (2d Cir. 2005) ............................................. 10

*Holland v. FCA U.S. LLC*, No. 1:15 CV 121, 2015 WL 5172996 (N.D. Ohio Sept. 3, 2015) .................... 5

*In re Johns-Manville*, 534 B.R. 553 (Bankr, S.D.N.Y. (2015) ............................................................ 2, 10

*In Re Motors Liquidation Co.*, 529 B.R. 510, 528 (Bankr. S.D.N.Y. 2015) .............................................. 23

*In re Motors Liquidation Co.*, 568 B.R. 217 (Bankr. S.D.N.Y. 2017) ......................................... 14, 15, 16

*In re Motors Liquidation Co.*, 576 B.R. 313, 322 (Bankr. S.D.N.Y. 2017) .............................................. 16

*In re Motors Liquidation Co.*, 590 B.R. 39 (S.D.N.Y. 2018) ................................................................... 23

*In re Motors Liquidation Co.*, 613 B.R. 570 (Bankr. S.D.N.Y. 2020) ...................................................... 14

*In re Motors Liquidation Co.*, Case No. 09-50026, 2015 WL 11070293, *1 (Bankr. S.D.N.Y. Dec. 4, 2015) ........................................................................................................................................ 17, 23

*In re Motors Liquidation Co.*, Case No. 20-CV-3093 (JMF), 2021 WL 1085362 (Bankr. S.D.N.Y. Mar. 22, 2021) ........................................................................................................................................ 15

*In re Old Carco LLC, 593 B.R. 182 (Bankr. S.D.N.Y. 2018), aff'd*, 603 B.R. 877 (S.D.N.Y. 2019), *aff'd*, 809 F. App'x 36 (2d Cir. 2020) ......................................................................................... 4, 14

*Mercado v. Audi of America, LLC*, Case No. ED CV18-02388 JAK (SPx), 2019 WL 9051000 (C.D. Cal. Nov. 26, 2019) ........................................................................................................................ 21

*Ojo v. United States*, No. 16 CV 4112 (MKB)(LB), 2019 WL 3852391 (E.D.N.Y. Aug. 15, 2019) ......... 15

*Pietrunti v. Island Diagnostic Laboratories*, 676 N.Y.S.2d 225, 252 A.D.2d 576 (N.Y. App. Civ. 1998) 15

*Prime Management, Inc. v. Steinegger*, 904 F.2d 811 (2d Cir. 1990) ...................................................... 10

*Raila v. United States*, 355 F.3d 118 (2d Cir. 2004) ............................................................................... 14

*Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 491 B.R. 27 (S.D.N.Y. 2013), *aff'd sub nom.*
   *Picard v. Fairfield Greenwich Ltd.*, 762 F.3d 199 (2d Cir. 2014) ........................................................ 10
*Turcotte v. Fell*, 68 N.Y.2d 432, 437, 510 N.Y.S.2d 49, 502 N.E.2d 964 (N.Y. 1986) ............................ 15

## Statutes

49 U.S.C. §§ 30101-30170 .................................................................................................................... 20

## Rules

Fed. R. Bankr. P. 7001(7) ................................................................................................................ 2, 11

**PLAINTIFFS' OPPOSITION TO FCA US LLC'S MOTION TO ENFORCE
THE COURT'S SALE ORDER [DOCKET NO. 3232],
AND INCORPORATED BRIEF**

Plaintiffs, Chair Lead Counsel, Lead Counsel, and Plaintiffs' Steering Committee in *In re Takata Airbag Product Liability Litigation* (the "**Takata MDL**"),[1] on behalf of the named plaintiffs in two putative class actions pending in the Takata MDL and subject to eventual class certification on behalf of others similarly situated (collectively, "**Plaintiffs**"), oppose the Motion to Enforce the Court's Sale Order [Docket No. 3232] (the "**Motion,**" Dkt. No. 8560) filed by FCA US LLC ("**FCA**" or alternatively, with its predecessor-in-interest following the "Closing" as defined below, "**New Chrysler**").

## I. PRELIMINARY STATEMENT

1.      The 2009 "Sale Order"[2] in *In re Old Carco LLC* approved, pursuant to 11 U.S.C. § 363, the sale of substantially all "Old Chrysler's" assets to New Chrysler "free and clear" of liens and encumbrances except for described Old Chrysler liabilities assumed by New Chrysler.[3] That "**363 Sale**" closed June 10, 2009 (the "**Closing**"). The Sale Order does not cut off New Chrysler's liability for its own wrongful post-Closing conduct. Although the Motion purportedly seeks to

---

[1]    The Takata MDL, styled *In re Takata Airbag Product Liability Litigation*, is MDL No. 2599, Lead Case 1:15-md-02599-FAM. The two putative class actions referred to are:  (1) *Bridget Boyd, et al., individually and on behalf of others similarly situated, v. FCA US LLC* (the "**Consumer Action**"), and (2) *Butler Auto Recycling, Inc., et al., individually and on behalf of all others similarly v. Honda Motor Co., Ltd., et al.*(the "**Recycler Action**" and, with the Consumer Action, the "**Actions**").  True and correct copies of all papers docketed in the Takata MDL that are cited herein as well as true and correct copies of all unpublished decisions cited herein, are attached to the Declaration of Kaitlyn Fletcher in Support of Plaintiffs' Opposition to FCA US LLC's Motion to Enforce the Court's Sale Order [Docket No. 3232], and Incorporated Brief filed contemporaneously herewith.

[2]    Order (I) Authorizing the Sale of Substantially All of the Debtors' Assets Free and Clear of All Liens, Claims, Interests and Encumbrances, (II) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection Therewith, and Related Procedures and (III) Granting Relief ("**Sales Order**") signed by Bankruptcy Judge Arthur J. Gonzalez on June 1, 2009.

[3]    The terms of the sale transaction itself are set forth in a Master Transaction Agreement dated as of April 30, 2009 (collectively with all related agreements, documents or instruments and all exhibits, schedules and addenda to any of the foregoing, and as amended, the "**MTA**").

1

enforce the Sale Order, it actually aims to broaden the effect of the Sale Order in an improper attempt to immunize FCA from consequences of its own post-Closing conduct. To the extent FCA seeks to expand the scope of the injunctions in the Sale Order to shield its own wrongful conduct, an adversary proceeding—not a motion—is the proper means for seeking such relief.[4] Accordingly, Plaintiffs request that the Motion be denied or converted into an adversary proceeding.

2.        Plaintiffs assert claims against FCA for economic damages in two putative class actions that are part of the Takata MDL. Plaintiffs' economic damages stem from New Chrysler's wrongful, deceptive conduct concerning a long-suppressed but now generally known product defect in Plaintiffs' Chrysler-branded[5] vehicles:  each contains a defective, potentially lethal Takata airbag. Had Plaintiffs known of the defect when they purchased the vehicles, they would have either declined to purchase them or paid less because of the defect.

3.        More than 3 years ago, FCA filed a motion in the Takata MDL seeking among other things dismissal of Plaintiffs' economic damages claims based on the Sale Order, effectively the identical relief sought here. Having afforded FCA a full and fair opportunity to be heard, United States District Judge Federico A. Moreno (the "**MDL Court**"), who has overseen the Takata MDL for over 6 years, declined in June 2020 to dismiss Plaintiffs' economic damages claims against FCA based on the Sale Order. Upon scrutinizing the record, reviewing the Sale Order, and analyzing the parties' arguments, Judge Moreno correctly held that the determination of whether a claim is barred by the Sale Order requires a claim-specific review. Having unsuccessfully sought dismissal of such claims from the MDL Court, FCA now euphemistically urges this Court to render

---

[4]      *See* Fed. R. Bankr. P. 7001(7); *In re Johns-Manville*, 534 B.R. 553, 562 (Bankr. S.D.N.Y. 2015).

[5]      For avoidance of confusion, as used herein "Chrysler-branded" is intended to encompass all affiliated branding including, for example, Jeep and Dodge.

2

"valuable assistance to the MDL Court with respect to the terms of the Sale Order."[6] As shown below, the MDL Court properly construed the terms of the Sale Order and, in the context of the record before it, properly denied FCA's motion to dismiss ("**MTD**") Plaintiffs' economic damages claims based on the Sale Order. The Motion is an attempted second bite at the apple brought more than a year after FCA's full and fair hearing before the MDL Court and should be denied as a threshold matter on the grounds of issue preclusion.

4.      Even if FCA were allowed to proceed on its Motion, it should fare no better here than it did before the MDL Court.  FCA's argument here and before the MDL Court is essentially the same: since Plaintiffs' economic damages were not among the Old Chrysler liabilities assumed by New Chrysler in connection with the 363 Sale and stem from Old Chrysler's conduct, FCA cannot be held liable for them. But FCA ignores a key fact: *all* the named Plaintiffs acquired the vehicles giving rise to their economic damages claims *after* the Closing. These vehicles were either (i) manufactured, sold, distributed, or leased by New Chrysler ("**Category 1 Vehicles**"), or (ii) manufactured, sold, distributed, or leased by Old Chrysler and purchased or leased by the particular named Plaintiff *after* Closing ("**Category 2 Vehicles**").

5.      FCA thus misses the point entirely when it accuses Plaintiffs of attempting to extract recoveries in respect of Old Chrysler liabilities FCA did not assume.[7] The liabilities at issue are direct and arise from FCA's own wrongful conduct.  Tellingly, although FCA refers to *Burton v. Chrysler Group (In re Old Carco LLC)*, in almost a third of the paragraphs in the Motion, FCA does not acknowledge the most relevant sentence from that decision: *"The claims asserted on behalf of the post-closing purchasers are not affected by the Sale Order."*[8]

---

[6]    Motion, ¶ 4.

[7]    *Id.*, ¶ 2.

[8]    492 B.R. 392, 406 (Bankr. S.D.N.Y. 2013).

6.    There are at least 3 reasons why the MDL Court's refusal to dismiss Plaintiffs' claims based on the Sale Order was correct and why, correspondingly, the Motion should be denied. First, to survive a MTD for failure to state a claim, the plaintiff's allegations need only be plausible. That threshold is not onerous, and Plaintiffs surmounted it.  FCA cannot and does not ask this Court to second guess the MDL Court's analysis of the merits of Plaintiffs' claims.[9]

7.    Second, FCA failed to refute Plaintiffs' key argument against Sale Order-based dismissals: that Plaintiffs' economic damages claims are based entirely on FCA's conduct—not Old Chrysler's, prompting the MDL Court to pointedly note that: "FCA's Reply does not sufficiently address Plaintiffs' core contention that FCA's post-closing wrongful conduct is actionable."[10] The MDL Court also recognized that Plaintiffs' emphasis on New Chrysler's post-Closing conduct in the record before it

> highlight[ed] the claim-specific nature of the Sale Order analysis, and FCA's ensuing failure to respond to this argument seals the Court's refusal to dismiss any of Plaintiffs' claims under the Sale Order.[11]

Instead of addressing Plaintiffs' core contention, the instant motion relies instead on conclusory assertions that Plaintiffs' allegations "inextricably" link Old Chrysler and FCA, a proposition the MDL Court rejected when it noted "the claim specific nature of the Sale Order analysis."

8.    Third, the MDL Court was absolutely correct when it stated that Plaintiffs' core contention—that FCA's post-closing wrongful conduct is actionable—is "supported by

---

[9]    *See In re Old Carco LLC, 593 B.R. 182, 190 (Bankr. S.D.N.Y. 2018), aff'd*, 603 B.R. 877 (S.D.N.Y. 2019), *aff'd*, 809 F. App'x 36 (2d Cir. 2020) (holding that once claims pass through the bankruptcy gate, "it is the role of the court presiding over the underlying action . . . to adjudicate the legal sufficiency and, ultimately, the merits of the claims in accordance with applicable non-bankruptcy law").  It warrants mention in such regard that the MDL Court stated that FCA could renew its arguments for dismissal based upon the Sales Order at summary judgment. Order Granting in Part and Denying in Part FCA US LLC's Motion to Dismiss [Consumer Action] (the "**Consumer MTD Order**"), Case No. 15-02599-MD-MORENO, Dkt. No. 1653 (S.D. Fla. Jun. 1, 2020) at 43.

[10]    *Id*. at 42.

[11]    *Id*. at 42-43.

interpretive case law."[12] The MDL Court appropriately cited *Dearden v. FCA US LLC (In re Old Carco LLC)*,[13] part of the law of the case that FCA mischaracterizes as barring Plaintiffs' claims in the Takata MDL,[14] where Judge Bernstein succinctly stated:

> At bottom, a post-Closing breach of an independent duty gives rise to a post-Closing right to payment, and the 'free and clear' provisions of the Sale Order cannot cut off New Chrysler's liability for its own wrongful, post-Closing conduct.[15]

9.     Case law supports the MDL Court's reasoning and denial of the instant Motion. The Second Circuit's dispositive decision in *Elliott v. General Motors* LLC *(In re Motors Liquidation Co.)*,[16] which FCA's Motion all but ignores, validates the MDL Court's reasoning as to claims based on Category 1 Vehicles at issue here (independent claims based on New GM's post-petition conduct were outside the GM sale order's "free and clear" provision)[17] and claims based on Category 2 Vehicles ("the [GM] Sale Order likewise does not cover the Used Car Purchaser's Claims," explaining that the Used Car Purchasers had purchased Old GM cars after the closing of the GM Sale Order).[18]

10.     While ignoring Plaintiff's core contention and the controlling case law as it did before the MDL Court, the Motion emphasizes proximate cause, an issue generally improper to

---

[12]   *Id.* at 42.

[13]   582 B.R. 838 (Bankr. S.D.N.Y. 2018).

[14]   Part II of the Motion, at p. 31, is captioned "The Law of the Case Doctrine Bars Plaintiffs' MDL Claims."

[15]   Consumer MTD Order at 42 (citing Dearden, 582 B.R. at 845 (additional citations omitted). The MDL Court cited additional supportive interpretive case law: *Castleman v. FCA US LLC*, No. 2:18-cv-00342-JNP-PMW, 2019 WL 1406611, at *4 (D. Utah Mar. 28, 2019) ("The Sale Order is not so broad as to preclude FCA's liability for post-Sale duty to warn."); *Holland v. FCA U.S. LLC*, No. 1:15 CV 121, 2015 WL 5172996, at *5 (N.D. Ohio Sept. 3, 2015) ("[T]his case is not one that argues liability simply because FCA is a successor to Old Chrysler, but rather whether FCA had a duty to act based knowledge it acquired and actions it took post Sale Order . . . ."). Consumer MTD Order at 42.

[16]   829 F.3d 135 (2d Cir. 2016), *cert. denied sub nom. Gen. Motors LLC v. Elliott*, —U.S.—, 137 S. Ct. 1813 (2017).

[17]   *Id.* at 157.

[18]   *Id.*

consider at the MTD stage. FCA insists, for example, that the proximate cause of Plaintiffs'

economic damage was Old Chrysler's lapse, "not any subsequent act or omission of [FCA]."[19]

But in response to this same argument, the MDL Court properly reminded FCA that "the question

of proximate cause is … reserved for the fact finder" and "not appropriately decided at the motion

to dismiss stage."[20] The same result should obtain here.  The Motion should be denied.

## II.  BACKGROUND

11.    Airbags in motor vehicles are supposed to protect and not harm, and should work

generally as follows: in the milliseconds following a vehicular collision, an inflator ignites a

propellant producing a gas that is directed into the airbag cushion causing the airbag to expand and

deploy. The Takata airbag scandal, which resulted in the largest automobile recall in U.S. history,

arose because Takata supplied its customers—various motor vehicle manufactures, including

FCA—with defective inflators for installation in their vehicles over a period of many years. The

defect stems from Takata's use of ammonium nitrate ("**AN**") as the propellant, a cost-cutting

measure in which FCA was complicit. Ammonium nitrate, commonly used as an industrial

explosive,[21] is a cheap but dangerously volatile compound, inherently unstable and sensitive to

moisture and temperature fluctuations inherent in the workings and use of a motor vehicle. As a

result, Takata airbags with AN have a dangerous propensity to explode violently, spraying metallic

debris—shrapnel—at vehicle occupants. It is grimly ironic that defective Takata airbags, though

ostensibly a safety device, endangered the very lives they were intended to protect.

12.    Approximately two dozen individuals are known to have died because of the Takata

---

[19]    Motion, ¶ 6.

[20]    Consumer MTD Order at 43 (quoting *Castleman*, 2019 WL 1406611, at *6).

[21]    Ammonium nitrate is the explosive Timothy McVeigh and Terry Nichols used in April 1995 to bomb the Alfred P. Murrah Federal Building in Oklahoma City, Oklahoma.

defect that auto manufacturers failed to disclose, and hundreds have been injured. Nationwide, more than 100 million Takata airbags have been installed in vehicles by manufacturers, including FCA. The Actions in the Takata MDL allege that those who purchased or leased these vehicles understood them to be equipped with a reliable, secure, and properly functional government-mandated safety device. They now know an undisclosed defect made this "safety device" potentially deadly. Purchasers and lessees of these vehicles would not have purchased or leased these vehicles had they known of this undetectable defect or, at a minimum, would have paid less than they did had they known of the defect. As a result of overpaying, each purchaser and lessee of a vehicle equipped with a defective Takata airbag has sustained economic damages.

13.     The Takata MDL, pending in the United States District Court for the Southern District of Florida, was created in February 2015 to centralize all personal injury and class actions against auto manufacturers who equipped their vehicles with defective Takata inflators. As with all MDLs, the goal was to efficiently and diligently oversee the hundreds of individual and class actions brought in federal courts around the country. To date, 8 of the 11 automakers in the Takata MDL have entered into class wide consumer settlements totaling over $1.5 billion.

14.     Within the Takata MDL, as noted, are two putative class actions (*i.e.*, the Actions) involving plaintiffs seeking to recover economic losses from FCA associated with their purchases of Chrysler-branded vehicles: the Consumer Action and the Recycler Action.[22] The plaintiffs in both Actions (*i.e.*, Plaintiffs) are purchasers or lessees of Chrysler-branded vehicles equipped with defective Takata airbags who are seeking to recover economic damages from FCA under various

---

[22]     *See, supra,* n. 1. The live complaint in the Consumer Action is the Second Amended Consolidated Class Action Complaint ("**Consumer Complaint**"), Case No. 1:15-md-02599-FAM, Dkt. No. 4024 (S.D. Fla. Apr. 23, 2021) and the live complaint in the Recycler Action is the Automotive Recyclers' *Corrected* Second Amended Consolidated Class Action Complaint ("**Recycler Complaint**" and, collectively with the Consumer Complaint, the "**Complaints**"), Case No. 1:15-MD-02599-FAM, Dkt. No. 4045-1 (S.D. Fla. May 7, 2021).

theories, including that FCA continued to deceptively promote its vehicles as safe when they were not. The Consumer Complaint specifically alleges—and common sense dictates—that consumers who paid for a safe car equipped with a reliable airbag but instead received a dangerous car equipped with a defective and potentially lethal airbag—paid an artificially inflated price and should be compensated for their overpayment.[23] Similarly, the Plaintiffs in the Recycler Action who purchased their vehicles to resell their constituent parts are unable to sell the Takata airbags which, being defective, are essentially valueless.[24]

15.    In August 2018, FCA filed a motion in the MDL Court for dismissal of the Consumer Action with prejudice ("**Consumer MTD**"),[25] arguing that economic loss claims of seven named Plaintiffs are barred by the Sale Order.[26] In July 2020 the MDL Court, informed by discovery amassed over a 3-year period,[27] issued a comprehensive order granting the Consumer MTD in part but declining to dismiss any of Plaintiffs' claims based on the Sale Order.[28] Clearly dissatisfied with the MDL Court's refusal to dismiss the Consumer Action,[29] FCA has now revived its misdirected argument in the instant Motion while hoping to achieve the same end: "Plaintiffs improperly seek to impose liabilities of Old Chrysler on FCA US."[30] Plaintiffs, however, cannot

---

[23]    Consumer Complaint, ¶ 18.

[24]    Recycler Complaint, ¶ 35.

[25]    FCA's Motion to Dismiss [Plaintiffs'] Amended Consolidated Complaint and Incorporated Memorandum of Law in the Consumer Action ("**FCA Consumer MTD**"), Dkt. No. 2983 (S.D. Fla. Aug. 20, 2018).

[26]    FCA Consumer Motion at Part III, pps. 36-37, *see also* FCA US LLC's Reply Memorandum of Law in Further Support of Its Motion to Dismiss the Amended Consolidated Complaint, Dkt. No. 3094 (S.D. Fla. Nov. 20, 2018) at p. 18.

[27]    Motion, ¶ 22.

[28]    Order Granting in Part and Denying in Part FCA US LLC's Motion to Dismiss [Consumer Action] (the "Consumer MTD Order", Case No. 1:14-cv-24009-FAM, Dkt. No. 1653 (S.D. Fla. Jun. 1, 2020) at 42-43.

[29]    The MDL Court noted "[t]he moving papers [*i.e.*, the Consumer Action MTD] frame the issue as all or nothing." Consumer MTD Order at 41.

[30]    Motion, ¶ 2.

be any clearer; as Plaintiffs have stated to the MDL Court and reiterate here:  the liabilities they seek to impose against FCA in the Takata MDL arise from *FCA's own post-Closing conduct* as demonstrated in Section D below.  The Sale Order simply does not bar such claims.[31]

15.     In declining to dismiss economic loss claims against FCA based on the Sale Order, Judge Moreno hit the mark, properly construing the Sale Order in the context of a MTD where to survive dismissal claims need only be plausibly alleged. The MDL Court correctly recognized "*the claim specific nature of the Sale Order analysis*[,]" while noting that FCA's "failure to respond to th[e] argument [that FCA's post-Closing conduct is the basis for Plaintiffs' claims] sealed the Court's refusal to dismiss any of Plaintiffs' claims under the Sale Order."[32]

16.     As shown below, the MDL Court's reasoning is unassailable. Plaintiffs' economic loss claims before the MDL *are* both plausible and grounded in FCA's own post-Closing conduct. Consequently, the Sale Order analysis *is* necessarily claim-specific. The MDL Court properly considered the Sale Order in rendering its decision and does not require "guidance" to read and properly construe it. Because the Motion lacks merit, it should be denied.

### III.  ARGUMENT

### A.     THE MOTION IMPLICATES PRINCIPLES OF PRECLUSION AND MIGHT NECESSITATE AN ADVERSARY PROCEEDING.

---

[31]   FCA also sought dismissal of all claims against it in the Recycler Action. *See* Automotive Defendants' Motion to Dismiss Automotive Recycler Plaintiffs' First Amended Complaint and Incorporated Memorandum of Law, Dkt. No. 2976) (S.D. Fla. Aug. 20, 2018) and Defendant FCA US LLC's Supplemental Memorandum of Law in Further Support of Its Motion to Dismiss the Automobile Recyclers' First Amended Consolidated Complaint, Dkt. No. 2987 (S.D. Fla. Aug. 21, 2018). By a separate order issued last March, the MDL Court dismissed all claims against FCA in the Recycler Action for lack of personal jurisdiction.  *See* Dkt. No. 3965 (S.D. Fla. Mar. 9, 2021). Plaintiffs then filed an amended complaint in each Action, *see* n. 22, *supra*, and FCA has since filed a renewed MTD for lack or personal jurisdiction that is pending before the MDL court.

[32]   Consumer MTD Order at 42-43 (emphasis added).

17.     "Collateral estoppel, or issue preclusion, is a doctrine which prohibits the litigation of any issue that was previously litigated and decided."[33] FCA is collaterally estopped from revisiting, through the Motion, the MDL Court's refusal to dismiss Plaintiffs' economic damages claims based on the Sale Order, having previously litigated the same issue there and having been afforded a full and fair opportunity to be heard. Collateral estoppel applies in bankruptcy proceedings.[34] Had FCA really thought it appropriate for this Court to decide whether any of Plaintiffs' economic loss claims should be dismissed based on the Sale Order, it ought to have raised the issue with this Court *years* ago.[35] The Motion's statement that "the time is now ripe … to bring the barred claims to this Court's attention for a definitive ruling" rings especially hollow since FCA obtained a ruling on that issue from the MDL Court more than a year ago.[36]

18.     Further, Federal Rule of Bankruptcy Procedure 7001(7) specifies that "a proceeding to obtain an injunction or other equitable relief," except when provided for under a plan, is an adversary proceeding. Thus, to the extent FCA seeks to expand the breadth of the injunctions in the Sale Order to protect it from its own wrongful conduct, a motion is improper and an adversary proceeding is required.[37]

19.     For the above reasons alone, the Motion should be denied.

**B.    ALL NAMED PLAINTIFFS IN BOTH ACTIONS PURCHASED OR LEASED THE VEHICLES GIVING RISE TO THEIR CLAIMS *POST-CLOSING.***

---

[33]    *Armonk Snack Mart, Inc. v. Robert Porpora Realty Corp. (In re Armonk Snack Mart, Inc.)*, Case No. 16-cv-5887 (NSR), 2018 WL 2225008, *4 (S.D.N.Y. May 15, 2018) (citing *Hoblock v. Albany County Board of Elections*, 422 F.3d 77, 94 (2d Cir. 2005); *Prime Management, Inc. v. Steinegger*, 904 F.2d 811, 916 (2d Cir. 1990).

[34]    *Id.* (citing *Evans v. Ottimo*, 469 F.3d 278, 281 (2d Cir. 2006).

[35]    *See Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 491 B.R. 27, 35 (S.D.N.Y. 2013), *aff'd sub nom. Picard v. Fairfield Greenwich Ltd.*, 762 F.3d 199 (2d Cir. 2014) (holding that laches was sufficient to deny motion to enforce injunction).

[36]    Motion, ¶ 4 n. 3.

[37]    *See In re Johns-Manville*, 534 B.R. 553, 562 (Bankr. S.D.N.Y. (2015).

20.    It bears repeating that *every single named Plaintiff* in both Actions purchased (or leased) the vehicles that are the basis of their respective claims *after the Closing*[38] and that Judge Bernstein stated in *Burton* that "claims asserted on behalf of post-closing purchasers are not affected by the Sale Order."[39]  That alone is sufficient grounds to deny the Motion.

21.    According to the Motion's express terms and those of the proposed order accompanying it, FCA

> seeks to bar economic loss claims purportedly being asserted against it in [the two putative class actions] related to the … Takata MDL by plaintiffs … who purchased ***vehicles that were manufactured and sold by Old Carco LLC ("Old Chrysler") prior to the sale*** of substantially all of its assets to [FCA]'s predecessor …  under Section 363 of the Bankruptcy Code.[40]

22.    The Motion's scope is thus limited to seeking relief from claims arising from Category 2 Vehicles (*i.e.*, vehicles manufactured, sold, distributed, or leased by Old Chrysler and purchased or leased by the particular named Plaintiff post-Closing). By contrast, claims arising from vehicles manufactured, distributed, sold or leased by New Chrysler *after* the Closing— Category 1 Vehicles—lie outside the Motion's stated breadth because Old Chrysler could not have

---

[38]    As no class has yet been certified in either Action, it is premature at this juncture to discuss the composition of the eventual classes.

[39]    492 B.R. at 406.

[40]    Motion at 2 (emphasis added). Similarly, FCA US's proposed order accompanying the Motion, Exh. A thereto, includes decretal language that "[a]ll claims in the Takata MDL, *In re Takata Airbag Product Liability Litigation*, MDL No. 15-025899, Economic Loss No. 14-24009 (S.D. Fla.), based on economic losses arising from the purchase or lease of a vehicle that was manufactured and sold by Old Chrysler before June 10, 2009 are barred by the Sale Order."

sold any vehicles post-Closing.[41] This limitation has been recognized in the law of the case.[42]

23.    FCA accuses Plaintiffs of muddling Old Chrysler's pre-Closing conduct with FCA's post-Closing conduct.[43] But it is FCA—not Plaintiffs—who is intent on blurring the distinction between Old Chrysler and FCA, apparently hoping that the more tightly it tethers itself to Old Chrysler, the more compelling its Sale Order argument for dismissing Plaintiffs' claims may be.[44] FCA makes liberal and conclusory use of the word "inextricably" in an effort to bind itself to Old Chrysler's pre-Closing conduct:

- the Motion asserts "Plaintiffs cannot plausibly state cognizable, independent claims against FCA relating to vehicles manufactured and sold by Old Chrysler prior to the Sale that are not inextricably intertwined with claims against Old Chrysler[;]"[45]

- FCA casts the question before the Court as "whether the MDL Claims are so inextricably linked with Old Chrysler's conduct … that they are barred by the Sale Order[;]"[46]and

- in paragraph 46, FCA answers that question:  "Plaintiffs' allegations against [FCA] are inextricably intertwined with Old Chrysler's alleged knowledge and conduct."[47]

---

[41]    The Consumer Complaint both defines "Class Vehicles" to be a vehicle in the United States equipped with defective airbags and either manufactured, sold, distributed, or leased by New Chrysler or manufactured, sold, distributed, or leased by Old Chrysler and purchased or leased by a Class member after June 1, 2009.  Consumer Complaint, ¶ 86; Recycler Complaint, ¶ 201.  Indeed, of the 23 named Plaintiffs in the Consumer Action, for example, 15 purchased vehicles that are model year 2012 or newer and thus obviously manufactured and sold on FCA's watch, not Old Chrysler's.  Consumer Complaint, ¶ 84.  As noted, the Closing occurred on June 10, 2009, not June 1, 2009, but this discrepancy in the Consumer Complaint is irrelevant for the purposes of the Motion since all named Plaintiffs in the Actions purchased their vehicles well after June 10, 2009, and the correct date will be reflected in any order certifying a class.

[42]    *See, e.g., Burton v. Chrysler Group, LLC (In re Old Carco LLC)*, 492 B.R. 392, 395 (Bankr. S.D.N.Y. 2013) (Sale Order "obviously does not bar claims concerning vehicles manufactured or sold by New Chrysler after the closing or injuries resulting from the breach of any duties that arose under non-bankruptcy law after the closing").

[43]    Motion, ¶ 42 (faulting Plaintiffs' for "impermissibly lump[ing FCA] with Old Chrysler, repeatedly—and incorrectly—treating [FCA] has having somehow been 'absorbed by Old Chrysler and as a successor of Old Chrysler.").

[44]    *See* Motion, ¶ 27 ("… when read as a whole, the Complaints point squarely at Old Chrysler's pre-Closing conduct as the genesis of the MDL claims.").

[45]    *Id*., ¶ 7.

[46]    *Id*., ¶ 35.

[47]    *Id*., ¶ 46.

12

By locking arms with (while pointing the finger at) Old Chrysler, FCA hopes to avoid the "claim-specific" analysis the MDL Court says is necessary and the consequences for its independent wrongful conduct for which the law allows FCA to be held liable.

24.     The named Plaintiffs' economic damages claims against FCA are not barred by the Sale Order. As noted, they all acquired their subject vehicles *after* the Closing. Some acquired their Category 1 Vehicles from New Chrysler dealers. Others acquired used Category 2 Vehicles that Old Chrysler had manufactured. The Complaints expressly allege that Plaintiffs' claims are based solely on New Chrysler's conduct, what that conduct entailed, and the corporate knowledge underlying it. The Second Circuit has held that independent claims not based on a right to payment that arose prepetition or on prepetition conduct are outside the "free and clear" provision of the GM sale order, which has a similar "free and clear" provision to the FCA Sale Order.[48] It has likewise held that the GM sale order does not cover the claims of used car purchasers who had no relation to the vehicle manufacturer pre-petition.[49] These same principles apply here: Plaintiffs' independent claims are not based on a right to payment that arose prepetition or on prepetition conduct, are outside the Sale Order's "free and clear" provision, and the Sale Order does not cover the claims of used car purchasers who had no relation to the vehicle manufacturer pre-petition. The allegations of FCA's independent wrongful conduct are summarized in Section D below. The Sale Order is no bar to the named Plaintiffs' claims here, as the MDL Court correctly determined.

## C.    THE MDL COURT APPLIED THE CORRECT STANDARD.

25.     In refusing to dismiss Plaintiffs' claims based on the Sale Order, the MDL Court was appropriately mindful of the governing standard:

---

[48]   *Elliott*, 829 F.3d at 157.

[49]   *Id.*

… [t]o survive a motion to dismiss, the "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"[50]

A claim is facially plausible when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[51]

26.    In the specific context of the Actions, there is a unique consideration that bears on plausibility: independence. Plaintiffs' claims based on FCA's post-petition conduct (as opposed to Old Chrysler's pre-petition conduct) are "independent" in the sense of being rooted in post-petition breaches of duties *FCA* (not Old Chrysler) owed Plaintiffs. Plaintiffs' claims did not arise prior to the filing of Old Chrysler's bankruptcy petition. These *independent* claims against FCA lie outside the scope of the Sale Order's "free and clear" provision.[52] This Court has ruled that "claims based on post-closing wrongful conduct of New GM could go forward as Independent Claims, but such claims must clearly distinguish between actions of Old GM and GM."[53] Allegations based on generalized knowledge of Old GM and New GM are not sufficient,[54] but allegations that distinguish between the actions of Old GM and New GM are.

27.    In their current Complaints before the MDL Court, Plaintiffs have assiduously sought to distinguish between Old Chrysler's pre-closing conduct and New Chrysler's post-Closing conduct, while also delineating the relevant knowledge imputed to New Chrysler and the

---

[50]    Consumer MTD Order at 4 (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic. Corp. v. Twombly*, 550 U.S. 554-55, 570 (2007) *see also Raila v. United States*, 355 F.3d 118, 119 (2d Cir. 2004) ("[T]he court must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of plaintiff" when considering a MTD for failure to state a claim.).

[51]    556 U.S. at 662 (citing *Bell Atl.*, 550 at 556).

[52]    *Elliott*, 829 F.3d at 157.

[53]    *In re Motors Liquidation Co.*, 613 B.R. 570, 575 (Bankr. S.D.N.Y. 2020) (citing *In re Motors Liquidation Co.*, 568 B.R. 217, 220 n.1 (Bankr. S.D.N.Y. 2017)); *accord In re Old Carco LLC*, 593 B.R. 182, 199 (Bankr. S.D.N.Y. 2018), *aff'd*, 603 B.R. 877 (S.D.N.Y. 2019), *aff'd*, 809 F. App'x 36 (2d Cir. 2020) ("A § 363 sale order may not bar a claim that arises from wrongful conduct occurring after the sale.").

[54]    *Id*. (citing 568 B.R. at 231 (footnote omitted)).

14

knowledge it acquired directly.[55] For its part, FCA persists in towing in the Motion the same tired

line it took before the MDL Court: "Plaintiffs' generalized allegations improperly conflat[e] Old

Chrysler and [FCA] actions … ."[56]  Regardless, Plaintiffs' independent claims against FCA are

not barred at the "bankruptcy gate."[57]

28.    FCA's categorical assertion in the heading at the top of page 24 of the Motion—

"… Plaintiffs Cannot State Plausible Claims that are Independent of Old Chrysler"—is thus not

supported by the allegations in the Plaintiffs' complaints. Indeed, controlling Second Circuit

precedent holds that independent claims against FCA arising with respect to Old Chrysler-

manufactured vehicles are not barred by the Sale Order.[58] Without setting forth "the whole

universe of possible independent claims," the Second Circuit stated that some could "involve

*misrepresentations by New GM as to the safety of Old GM cars*."[59] Where, for example, FCA

misrepresented the safety of an Old Chrysler vehicle, FCA is on the hook for its independent

misrepresentation. Because it is axiomatic that conduct can include inaction when there is a duty

to act or disclose,[60] it logically follows that when *New Chrysler knows*, through knowledge

imputed to it, as supplemented by knowledge it acquired after the Closing, that a critical safety

device is defective to the point of being potentially deadly and fails to timely disclose that defect,

to individuals whose lives are threatened by the defect, that conduct is actionable as well.

---

[55]  *See, infra*, ¶¶ 34-36.

[56]  Motion, ¶ 43.

[57]  *In re Motors Liquidation Co.*, Case No. 20-CV-3093 (JMF), 2021 WL 1085362 (Bankr. S.D.N.Y. Mar. 22, 2021) (citing *In re Motors Liquidation Co*., 568 B.R. 217, 222 (Bankr. S.D.N.Y. 2017).

[58]  *Elliott*, 829 F.3d at 158 (GM sale order "does not cover independent claims or Used Car Purchasers' claims.").

[59]  *Id*. (emphasis added).

[60]  *See, e.g., Ojo v. United States*, No. 16 CV 4112 (MKB)(LB), 2019 WL 3852391 (E.D.N.Y. Aug. 15, 2019) (New York law recognizes failure to act negligence claims); *see, also Pietrunti v. Island Diagnostic Laboratories*, 676 N.Y.S.2d 225, 252 A.D.2d 576 (N.Y. App. Civ. 1998) (quoting *Turcotte v. Fell*, 68 N.Y.2d 432, 437, 510 N.Y.S.2d 49, 502 N.E.2d 964 (N.Y. 1986) (determination of the existence of a duty and the concomitant scope of that include involve consideration of the wrongfulness of the defendant's "action or inaction").

29.     FCA *knows* the Sale Order is unavailing with respect to independent claims arising from its own post-Closing conduct; the Motion cites a decision in the GM Ignition Switch MDL in which this Honorable Court stated "[t]o pass the bankruptcy gate, a complaint must clearly allege that its causes of action are based solely on New GM's post-closing wrongful conduct."[61] The current Complaints in both Actions do just that.[62] FCA seems incapable of reconciling itself to the inherently "claim specific nature of the Sale Order analysis"[63] where its independent, post-Closing conduct is both determinative and consequential.  Piqued by the MDL Court's ruling, FCA persists in its misguided quest to find shelter under the Sale Order not just from Old Chrysler's misdeeds, but from its own that occurred after the Closing.

**D.    FCA CANNOT SIMPLY WISH AWAY ITS IMPUTED KNOWLEDGE ANY MORE THAN IT CAN IGNORE ITS INDEPENDENT WRONGFUL CONDUCT.**

30.     At the Closing, Old Chrysler's books and records became New Chrysler's[64] but, perhaps even more importantly, so did "Transferred Employees."[65]  Although the Motion is literally correct that "there were no [FCA] engineers before June 10, 2009[,]"[66]—because  FCA did not exist until just prior to the Closing—it is also correct that quite a lot of Old Chrysler engineers and other employees became employed by New Chrysler upon the Closing. Those engineers and other personnel did not come to New Chrysler as blank slates. Some were already

---

[61]   Motion, ¶ 43 (citing *In re Motors Liquidation Co.*, 568 B.R. 217, 231 (Bankr. S.D.N.Y. 2017); *see, also*, *In re Motors Liquidation Co.*, 576 B.R. 313, 322 (Bankr. S.D.N.Y. 2017) ("Simply adding 'and [New GM]' to paragraphs of a complaint concerning Old GM conduct is not enough to pass through the gate as an Independent Claim."). The Complaints in the Actions do not suffer from this defect, but allege wrongful conduct of FCA, certainly sufficient to survive a MTD as the MDL Court ruled.

[62]   Consumer Complaint, ¶ 86; Recycler Complaint, ¶ 201.

[63]   Consumer MTD Order at 42-43.¶

[64]   MTA, § 2.06(k) ("Purchased Assets" include "all Documents of whatever nature and wherever located that are related to the Company Business as currently conducted, including those in the possession or control of the Sellers[.]").

[65]   *Id.*, art. IV ("Employment Matters).

[66]   Motion, ¶ 28(i).

16

steeped in the Takata inflator scandal.  The Sale Order does not erase their memories or knowledge.

Common sense and case law, however, do impute such inherited knowledge to FCA.

31.    Generally, knowledge acquired by an agent acting within the scope of the agency

is imputed to, and binding with respect to, the principal.[67] Judge Gerber addressed the issue of

New GM's imputed knowledge and ruled that knowledge of New GM personnel, *whenever*

*acquired*, may be imputed to New GM if permitted under nonbankruptcy law:

> … knowledge of Old GM may be imputed to New GM, if permitted by non-bankruptcy law, to the extent such knowledge was "inherited" from Old GM if such information (a) was actually known to a New GM employee (*e.g.,* because it is the knowledge of the same employee or because it was communicated to a New GM employee), or (b) could be ascertained from New GM's books and records, even if such books and records were transferred by Old GM to New GM as part of the 363 Sale and, therefore, first came into existence before the 363 Sale.  … For causes of action where nonbankruptcy law permits imputation of knowledge to New GM using the above principles, it is possible for such knowledge, depending on the specific circumstances, to be imputed to New GM as early as the first day of its existence.[68]

32.    The same principle applies to FCA's retention of Old Chrysler engineers and

employees upon the Closing.  Indeed, the district court recently affirmed this Court's order

permitting through the bankruptcy gate a duty-to-warn claim against New GM based on knowledge

held by a New GM employee who gained that knowledge through his prior employment with Old

GM, which *could* be imputed to New GM to support an independent claim—a principle that

"rulings in these proceedings have long made clear."[69] To the extent the current complaints in the

Actions make allegations of facts or information Old Chrysler employees knew prior to the

Closing, knowledge of such information is imputed to FCA as of the Closing.

---

[67]    *See, e.g.*, *Center v. Hampton Affiliates, Inc.*, 66 N.Y.2d 782, 784  (N.Y. 1985).

[68]    *In re Motors Liquidation Co.*, Case No. 09-50026, 2015 WL 11070293, *1 (Bankr. S.D.N.Y. Dec. 4, 2015).

[69]    *General Motors LLC. v. Buchanan (In re Motors Liquidation Co.)*, Case No. 20-CV-3093 (JMF), 2021 WL 1085362, *4 (S.D.N.Y. Mar. 22, 2021) (citing Judge Gerber, 2015 WL 11070293, *1).

33.    The body of that imputed knowledge is considerable and includes, as alleged by Plaintiffs, broad awareness of the danger associated with the Takata inflators, including that they were "problematic," that they utilized "dangerous volatile" AN as a propellant, which necessitated additional testing resulting in "deviation requests" and failing to meet specifications that Old Chrysler had participated in formulating, and even raising concerns about the "integrity" of the inflator module during and after deployment.

34.    Specifically, Plaintiffs allege knowledge as to the following that is imputed to FCA:

- "Old Chrysler had long been aware of the problems associated with the use of [AN] in Takata's airbags" from the extensive literature and "Old Chrysler's intimate involvement in developing specifications and testing standards for the problematic ammonium nitrate inflators …." Consumer Complaint, ¶ 114; Recycler Complaint, ¶ 369;

- in 1992, Old Chrysler (with Ford and GM) founded the United States Council for Automotive Research ("USCAR") and began collaborating on USCAR specifications for airbag inflators, including requirements for testing related to the use of AN as a propellant and recognition that inflators using AN were problematic and required additional testing. Consumer Complaint, ¶ 115; Recycler Complaint, ¶ 370;

- the *New York Times* reported in the late 1990s that Autoliv, another company that supplied airbags to Old Chrysler, had studied the Takata airbag and learned that it utilized the dangerously volatile AN. Consumer Complaint, ¶ 116; Recycler Complaint, ¶ 371;

- according to the *New York Times*, Robert Taylor, Autoliv's head chemist at the time, analyzed every facet of the Takata airbag including the AN propellant, noting that when the airbag was detonated, "the gas generated so fast, it blows the inflator to bits;" Consumer Complaint, ¶ 117; Recycler Complaint, ¶ 372;

- Chris Hock, a former member of Mr. Taylor's team, said a mock AN inflator test "totally destroyed the fixture" and "turned it into shrapnel" and, upon information and belief, these findings were shared with Old Chrysler;" Consumer Complaint, ¶ 117; Recycler Complaint, ¶ 372;

- "[d]espite being presented with deviation requests and test results from Takata showing th[at its] inflators did not meet the USCAR specifications, New Chrysler engineers continued to approve the use of [AN] inflators.  This occurred as early as 2004 …."[70] Consumer Complaint, ¶ 118; Recycler Complaint, ¶ 373;

---

[70]    To the extent this occurred prior to the 2009 Closing, the approvals would have been by Old Chrysler engineers.

18

- "[d]uring the early 2000s, Old Chrysler's Product Engineers expressed concerns as to the integrity of the Takata [AN] inflator module during and post deployment;" Consumer Complaint, ¶ 121; Recycler Complaint, ¶ 376;

- "Old Chrysler was also aware, in the early 2000s, that the Takata [AN] PSDI-4 inflator did not meet the tank curve targets for its USCAR delta process validation ('PV') tests, and that this out-of-spec performance had a high probability of contributing to issues Old Chrysler had already experienced in previous PV testing;" Consumer Complaint, ¶ 122; Recycler Complaint, ¶ 377;

- "[f]urthermore, Old Chrysler had concerns about the ballistic performance of the Takata [AN] inflators at an early stage. Old Chrysler did not want to allow a Production Part Approval Process ('PPAP') to be based on the limits proposed by Takata's research entity, Inflation Systems, Inc. ('ISI'). In 2006, Takata was concerned that it would be unable to support the program timing for Chrysler's PSDI-5 driver side airbag due to Takata's inability to mitigate flaming issues, which released molten propellant from the inflator;" Consumer Complaint, ¶ 123; Recycler Complaint, ¶ 378;

- "[b]y 2007, on information and belief, Old Chrysler was also made aware of the Takata [AN] inflator's tendency to exhibit 'anomaly activity,' 'ballistic shift,' and 'aggressive behavior.'" Further, at the "[s]ame time, the long-standing problems associated with [AN] and its phase stabilized counterpart continued to be publicly disclosed. Consumer Complaint, ¶ 112-13 (p.37),[71] Recycler Complaint, ¶¶ 379-380.

35.    Plaintiffs also allege that New Chrysler acquired considerable knowledge post-Closing directly, including from inflator malfunctions during testing and in the field causing injury, and a 2013 exceptionally blunt email received from GM's head of inflator technology to New Chrysler expressing the conviction that the problem was a "core design or process issue":

- an inflator rupture occurred during PV testing for New Chrysler at Takata's Monclova facility. Consumer Complaint, ¶ 118 (p. 38); Recycler Complaint, ¶ 385;

- in October 2011, a Chrysler vehicle experienced an inadvertent airbag deployment during repair at a New Chrysler plant, and the repairman noted both a hissing sound during deployment and that the connectors had melted. Consumer Complaint, ¶ 119 (p. 38); Recycler Complaint, ¶ 386;

- in April 2013, New Chrysler was made aware that Takata's SDI-X AN inflator did not meet the slope testing standards during PV testing, but New Chrysler granted

---

[71]    As a consequence of paragraph misnumbering, there are some different paragraphs in the Consumer Complaint that have the same paragraph number. Where this is an issue, a page reference is also included in the citation.

deviations and approved it for production. Consumer Complaint, ¶ 120 (p. 38); Recycler Complaint, ¶ 387;

- in July 2013, New Chrysler was made aware of an issue with a New Chrysler inflator deployment testing at Takata's laboratory that occurred June 20, 2013 during a visit to Takata's Monclova facility. Consumer Complaint, ¶ 121 (p. 39); Recycler Complaint, ¶ 388;

- on September 7, 2013, a PSDI-4 inflator in a Chrysler vehicle ruptured in the field, injuring the vehicle occupant. Consumer Complaint, ¶ 122 (p. 39): Recycler Complaint, ¶ 389; and

- by 2013, NHTSA began forcing Takata and the auto industry into action and four million vehicles were recalled by 10 manufacturers in April and May 2013 while, during that same period of time, New Chrysler employees were communicating with other automakers about the root cause of the Takata airbag ruptures and GM's head of inflator technology stated in an email to New Chrysler that a Honda's spokesperson's April 2013 explanation for the recall—human errors during production—was "Bull S%$t," also expressing the view that the Takata defect "has to be a core design or process issue, not a 'mistake.'" Consumer Complaint, ¶ 123 (p. 39); Recycler Complaint, ¶ 390.

36.    Plaintiffs have also alleged post-Closing conduct on the part of New Chrysler including *direct knowledge of deviation requests*, *failures to meet specifications*, *informational failures* (*i.e.*, not promptly advise consumers of known defects, misleading advertisements and promotional materials trumpeting safety, failed repairs and, in light of the foregoing, a stunning statement in 2014—a year after the email from GM's head of inflator technology warning of an inflator "core design" issue—that a limited recall was not based on an identified defect but conducted out of an abundance of caution).  Specifically:

- despite being presented with deviation requests and test results from Takata showing that the AN inflators did not meet the USCAR specifications, New Chrysler engineers continued to approve their use after the Closing. Consumer Complaint, ¶ 118 (p. 36); Recycler Complaint, ¶ 373;

- New Chrysler has violated its affirmative duty, imposed under the Transportation Recall Enhancement, Accountability, and Documentation Act (the "TREAD Act")[72] to promptly advise customers about known defects. Consumer Complaint, ¶ 125 (p. 39); Recycler Complaint, ¶ 392;

---

[72]    The Transportation Recall Enhancement, Accountability, and Documentation ("TREAD") Act, 49 U.S.C. §§ 30101-30170, was enacted in 2000 to increase consumer safety through mandates assigned to the National Highway Traffic Safety Administration ("NHTSA"). *See, e.g.*, *Mercado v. Audi of America, LLC*, Case

- New Chrysler has maintained at all relevant times, in advertisements and promotional materials, to which Plaintiffs were exposed directly or indirectly prior to acquiring their vehicles, that Chrysler-branded vehicles were safe and reliable, misleading statements that were material to their vehicle acquisitions. Consumer Complaint, ¶ 126 (p. 40); Recycler Complaint, ¶ 315; (eight specific examples from New Chrysler's website, press releases, product brochures and dating from 2009-17 are alleged in ¶ 127(a)-(h) of the Consumer Complaint and nine are alleged in ¶ 316(b)(i)-(ix) of the Recycler Complaint);

- just prior to a New Chrysler field action in June 2014 covering only select vehicles in Florida, Hawaii, Puerto Rico, and the U.S. Virgin Islands, New Chrysler stated:

  > Chrysler Group has agreed, in principle, to honor an [NHTSA] request to replace airbag inflators in certain vehicles registered in four U.S. regions… This is not a safety recall. Chrysler Group has not identified a defect. This is a field action conducted out of an abundance of caution.

  Consumer Complaint, ¶ 129; Recycler Complaint, ¶ 292;

- New Chrysler made no pretense of a proper safety recall until 2014, which expanded the field action to include just 208,700 or so older-model vehicles originally purchased or ever registered in 7 U.S. States and 5 territories—the first of many recalls for New Chrysler despite an abundance of public information regarding the dangers associated with Takata airbags using AN; Consumer Complaint, ¶¶ 130 & 119 (p. 36); see also, Recycler Complaint, ¶ 292; and

- New Chrysler has "repaired" some vehicles with defective Takata-manufactured replacement components incorporating AN as the primary propellant, necessitating further repair to correct the defect. Consumer Action, ¶ 143; Recycler, ¶ 335.

37.    In light of Plaintiffs' detailed allegations summarized above, FCA's insistence in the Motion that Plaintiffs' economic damages claims arise entirely out of Old Chrysler's pre-Closing conduct cannot be credited.[73]

## E.    PLAINTIFFS' CLAIMS AGAINST FCA ARE UNAFFECTED BY THE SALE ORDER, BUT EVEN IF COURT DETERMINES OTHERWISE, FCA'S REQUEST WOULD VIOLATE DUE PROCESS.

---

No. ED CV18-02388 JAK (SPx), 2019 WL 9051000, *9 (C.D. Cal. Nov. 26, 2019) (the statute's "early warning reporting requirements," 49 U.S.C. §30166, "require manufacturers of vehicles to provide the NHTSA with certain information following the discovery of a safety defect and to provide notice to owners and purchasers who are affected.). The duty arises when "the manufacturer (1) learns the vehicle or equipment contains a defect and decides in good faith that the defect is related to motor vehicle safety; or (2) decides in good faith that the vehicle or equipment does not comply with an applicable motor vehicle safety standard prescribed under this chapter." *Id*. (citing 49 U.S.C. § 30118(c)).

[73]    Motion, ¶¶ 28 & 30.

21

38.     All the named Plaintiffs' claims in the Actions (*i.e.*, claims based on Category 1 Vehicles and Category 2 Vehicles) are independent claims against FCA. The Complaints in both Actions carefully detail conduct on the part of New Chrysler/FCA along with imputed knowledge supplemented by knowledge directly obtained.[74] Further, the Second Circuit's 2016 *Elliott* decision made it abundantly clear that independent claims against automaker New GM lie outside the scope of the GM sale agreement:

> By definition, independent claims are claims based on New GM's own post-closing wrongful conduct.  Though the parties do not lay out the whole universe of possible independent claims, we can imagine that some claims involve misrepresentations by New GM as to the safety of Old GM cars.  These sorts of claims are based on New GM's *post*-petition conduct, and are not claims that are based on a right to payment that arose before the filing of [the] petition or that are based on pre-petition conduct.  Thus, these claims are outside the scope of the Sale Order's "free and clear" provision.[75]

*Elliott's* definition of independent claims applies with equal force to the independent claims alleged in Plaintiffs' complaints.  Indeed, the specific example of an independent claim identified by the Second Circuit in *Elliott*—alleged misrepresentations by New GM regarding the safety of Old GM cars—sounds like New Chrysler's public pronouncement in 2014 that an airbag recall was "not a safety recall" and that New Chrysler had "not identified a defect."[76]  It also sounds like the advertisements and promotional materials FCA released telling the public that Chrysler-branded vehicles were safe and reliable when it knew otherwise.[77]

39.     More specifically with regard to Plaintiffs' claims based on their acquisition of Category 2 Vehicles, the Second Circuit stated with respect to GM:

---

[74]    829 F.3d at 157. *See, supra*, ¶¶ 34-36.

[75]    The "free and clear" provisions in the Sale Order and the GM sale order appear to be substantially equivalent.

[76]    *See, supra*, ¶ 36 (fourth bullet point).

[77]    *See, supra*, ¶ 36 (third bullet point).

… the Sale Order likewise does not cover the Used Car Purchasers' claims. The Used Car Purchasers were individuals who purchased Old GM cars *after* the closing, without knowledge of the defect or possible claim against New GM. They had no relation with Old GM prior to bankruptcy. Indeed, as of the bankruptcy petition there were an unknown number of unknown individuals who would one day purchase Old GM vehicles secondhand. There could have been no contact or relationship—actual or presumed—between Old GM and these specific plaintiffs, who otherwise had no awareness of the ignition switch defect or putative claims against New GM. We cannot, consistent with bankruptcy law, read the Sale Order to cover their claims.[78]

40.    Plaintiffs have clearly alleged independent claims against FCA based solely on New Chrysler/FCA's failure to warn, as outlined above. Failure to warn allegations based on post-Closing wrongful conduct are independent claims that can pass through the "bankruptcy gate" and are not barred by the Sale Order.[79]

41.    In such regard, Plaintiffs alleged in the Consumer Complaint that:

New Chrysler knew or should have known that the Takata airbags installed in millions of vehicles were defective and potentially deadly. New Chrysler concealed its knowledge of the nature and extent of the Inflator Defect from the public while continuing to advertise its product as safe and reliable…. Moreover, New Chrysler has violated its affirmative duty, imposed under the Transportation Recall Enhancement, Accountability, and Documentation Act (the "TREAD ACT"), to promptly advise customers about known defect.[80]

42.    Similarly, in the Recycler Complaint, Plaintiffs allege that:

New Chrysler knew or should have known that the Takata airbags installed in millions of vehicles were defective and potentially deadly. New Chrysler, who concealed its knowledge of the nature and extent of the Inflator Defect from the public while continuing to advertise its product as safe and reliable…. Moreover, New Chrysler has violated its affirmative duty, imposed under the Transportation

---

[78]    829 F.3d at 157. For its part, FCA all but ignores *Elliott* notwithstanding the statement in the Motion that "the Sale Order … is governed by Second Circuit law[.]" Motion, ¶ 1. The only citation to *Elliott* in the Motion is a perfunctory reference to the decision as comprising subsequent history of *In Re Motors Liquidation Co*., 529 B.R. 510, 528 (Bankr. S.D.N.Y. 2015)). Motion, ¶ 43.

[79]    *In re Motors Liquidation Co.,* 2015 WL 11070293, at *5; *see also In re Motors Liquidation Co.,* 590 B.R. 39, 61 (S.D.N.Y. 2018) (holding that claimants' failure to warn allegations concerning vehicular defects were sufficient to state an independent claim).

[80]    Consumer Complaint, ¶ 125 (p. 39).

Recall Enhancement, Accountability, and Documentation Act (the "TREAD ACT"), to promptly advise customers about known defects.[81]

43.    Instead of citing the most pertinent Second Circuit governing precedent, FCA descends into a rabbit hole, suggesting that Old Chrysler's conduct is necessarily the proximate cause of Plaintiffs' economic damage irrespective of FCA's conduct—or the actual allegations of the complaints.[82] This emphasis on proximate cause, as the MDL Court previously noted, is misplaced because proximate cause is ordinarily a question of fact for a jury.[83] It is for the eventual factfinder to determine whether post-Closing conduct on the part of FCA proximately caused Plaintiffs' economic damage.  Judge Bernstein reached the same conclusion in *Dearden*, holding that "the question of what proximately caused" the plaintiff's injuries "is for the factfinder."[84]

44.    Nothing in the Sale Order relieves FCA of its obligation to properly discharge its duties to the named Plaintiffs or the eventual class of Plaintiffs. Its knowledge of the Takata inflator fiasco, imputed and otherwise obtained, *obligated* FCA to act in the interests of operators and passengers of such vehicles. Possessed with the knowledge of a defect and its attendant far-reaching safety ramifications, FCA was under a duty to issue timely warnings regarding the potential for Takata-inflators in its vehicles to malfunction with potentially lethal consequences. And because Plaintiffs purchased their vehicles after the Closing, it is more than plausible that FCA's post-Closing failure to act on its corporate knowledge proximately caused Plaintiffs' economic damages.  This key fact distinguishes the enjoined claims of *pre*-Closing purchasers in

---

[81]    Recyclers' Complaint at ¶ 392.

[82]    *See, e.g.*, Motion, ¶ 51 ("… the facts as pled in the Complaints indicate that the proximate cause of any economic losses experienced by Plaintiffs as purchasers of defective, Old Chrysler vehicles—regardless of the purchases date, or whether purchased new or used—was the defect concealed by Old Chrysler.").

[83]    *Badilla v. Midwest Air Traffic Control Service, Inc.*, 8 F.4th 105, 135 (2d Cir. 2021)[83] ("[I]ssues of proximate cause are generally fact matters to be resolved by a jury.").

[84]    582 B.R. at 846.

*Burton*, where a post-Closing disclosure of the defect—after they had purchased their vehicles—would not have prevented their economic damages.[85]

45.    Further, FCA put out public pronouncements that Chrysler-branded vehicles were safe.  In connection with the 2013 "field action" that preceded the first sizeable recall by only a year, FCA affirmatively misrepresented to the public that it had not identified a defect with respect to the Takata inflators and that it was acting "only out of an abundance of caution" in connection with the field action. In light of Plaintiffs' plausible allegations of independent actionable conduct on the part of FCA, FCA's invocation of the Sale Order in the Motion smacks of "catch me if you can" hubris.  The MDL Court would not have it and, respectfully, neither should this Court.

46.    However, if the Court were to find, *arguendo*, that the Sale Order *does* apply to any of Plaintiffs' economic damages claims such that it would bar them, significant due process issues arise.  Because Plaintiffs were not afforded adequate (or any) notice of the inflator defect in connection with the proposed "free and clear" 363 Sale, barring their claims at this juncture would violate procedural due process.[86] Any lack of due process afforded them will be raised by Plaintiffs in subsequent proceedings before this Court and, in connection with such proceedings, Plaintiffs will seek to have the Expert Report of Robert N. Renz, Jr. Dated August 16, 2021 ("**Renz Report**") establishing FCA's knowledge of the inflator defect imputed in part from Old Chrysler, filed with the Court under seal and made part of the record for the Court's consideration.[87]

## IV.  CONCLUSION

For the foregoing reasons, FCA's Motion should be in all things denied.

---

[85]    492 B.R. at 405-06.

[86]    *Elliott*, 829 F.3d at 166 (where enforcement of the GM sale order would violate procedural due process as to certain plaintiffs, "the bankruptcy court erred in granting New GM's motion to enforce and these plaintiffs thus cannot 'be bound by the terms of the [Sale] Order[ ].'") (internal quotation marks omitted).

[87]    The Renz Report was served on FCA on August 16, 2021, and Mr. Renz has been deposed in the Takata MDL.

November 4, 2021
Dallas, Texas

Respectfully submitted,

STUTZMAN, BROMBERG, ESSERMAN
& PLIFKA, A PROFESSIONAL
CORPORATION

By: /s/   *Sander L. Esserman*

Sander L. Esserman
Peter C. D'Apice
2323 Bryan Street, Suite 2200
Dallas, Texas 75201
Telephone:  (214) 969-4900
Facsimile:  (214) 969-4999

*COUNSEL FOR THE PLAINTIFFS'*
*STEERING COMMITTEE IN IN RE:*
*TAKATA AIRBAG PRODUCT LIABILITY*
*LITIGATION MDL*

and

Peter Prieto
FL Bar No. 501492
**PODHURST ORSECK, P.A.**
One S.E. Third Ave., Suite 2300
Miami, Florida 33131
(305) 358-2800
(305) 358-2382 (facsimile)
pprieto@podhurst.com

*MDL ACTION PLAINTIFFS' CHAIR*
*LEAD COUNSEL*