**STUTZMAN, BROMERG, ESSERMAN, & PLIFKA,**
**A PROFESSIONAL CORPORATION**
Sander L. Esserman, Esq.
Peter C. D'Apice, Esq.
2323 Bryan Street, Suite 2200
Dallas, Texas 75201
Telephone: (214) 969-4900
Facsimile: (214) 969-4999
Email:    esserman@sbep-law.com
          dapice@sbep-law.com

*Counsel for the Plaintiffs' Steering Committee*
*in In Re: Takata Airbag Product Liability*
*Litigation MDL*

# UNITED STATES BANKRUPTCY COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 |
| OLD CARCO LLC, *et al.*, | Case No. 09-50002 (MG) |
| Debtors. | (Jointly Administered) |

## DECLARATION OF KAITLYN C. FLETCHER PURSUANT TO 28 U.S.C. 1746 IN SUPPORT OF PLAINTIFFS' OPPOSITION TO FCA US LLC'S MOTION TO ENFORCE THE COURT'S SALE ORDER [DOCKET NO. 3232], AND INCORPORATED BRIEF

The undersigned Kaitlyn C. Fletcher declares as follows:

1.      My name is Kaitlyn C. Fletcher. I am over the age of 18 years, of sound mind, capable of making this Declaration, and personally acquainted with the facts stated herein.

2.      I am an attorney at law admitted to practice in the State of Texas and am an associate with the law firm of Stutzman, Bromberg, Esserman & Plifka, A

Professional Corporation ("**SBEP**"), whose office is located at 2323 Bryan Street, Suite 2200, Dallas, Texas 75201.    SBEP serves as counsel for the Plaintiffs' Steering Committee in *In Re: Takata Airbag Product Liability Litigation MDL*.

3.       I respectfully submit this Declaration in support of the *Opposition to FCA US LLC's Motion to Enforce the Court's Sale Order [Docket No. 3232], and Incorporated Brief* (the "**Opposition**").    Capitalized terms used in this Declaration and not otherwise defined shall have the meanings ascribed to them in the Opposition.

4.       Attached hereto as **Exhibits A through H** are true and correct copies of certain papers filed and docketed in what is referred to in the Opposition as the Takata MDL, styled *In re Takata Airbag Product Liability Litigation*, MDL No. 2599, Lead Case 1:15-md-02599-FAM, which I obtained through Pacer.    These papers are cited in the Opposition.    Specifically:

- attached hereto as **Exhibit A** is a true and correct copy of *Automotive Defendants' Motion to Dismiss Automotive Recycler Plaintiffs' First Amended Complaint and Incorporated Memorandum of Law*, dated August 20, 2020 [Dkt. No. 2976];

- attached hereto as **Exhibit B** is a true and correct copy of *FCA US LLC's Motion to Dismiss the Amended Consolidated Complaint and Incorporated Memorandum of Law*, dated August 20, 2018 [Dkt. No. 2983] and defined in the Opposition as the "FCA Consumer MTD";

- attached hereto as **Exhibit C** is a true and correct copy of *Defendant FCA US LLC's Supplemental Memorandum of Law in Further Support of Its Motion to Dismiss the Automobile Recyclers' First Amended Consolidated Complaint*, dated August 21, 2018 [Dkt. No. 2987];

- attached hereto as **Exhibit D** is a true and correct copy of *FCA US LLC's Reply Memorandum of Law in Further Support of Its Motion to Dismiss the Amended Consolidated Complaint*, dated November 20, 2018 [Dkt. No. 3094];

2

- attached hereto as **Exhibit E** is a true and correct copy of the Order on Motion to Dismiss, dated March 9, 2021 [Dkt. No. 3965];

- attached hereto as **Exhibit F** is a true and correct copy of the *Second Amended Consolidated Class Action Complaint*, dated April 23, 2021 [Dkt. No. 4024] and defined in the Opposition as the "Consumer Complaint"; and

- attached hereto as **Exhibit G** is a true and correct copy of *Automotive Recyclers' Corrected Second Amended Consolidated Class Action Complaint*, dated May 7, 2021 [Dkt. No. 4045-1] and defined in the Opposition as the "Recycler Complaint"; and

- attached hereto as **Exhibit H** is a true and correct copy of the *Order Granting In Part and Denying In Part FCA US LLC's Motion to Dismiss*, dated June 1, 2020 [Dkt. 1653] and defined in the Opposition as the "Consumer MTD Order".

5.     Additionally, attached hereto as **Exhibits I through O** are true and correct copies of unpublished opinions cited in the Brief that I obtained through WestLaw. Specifically,

- attached hereto as **Exhibit I** is a true and correct copy of *In re Motors Liquidation Co.,* Case No. 09-50026, 2015 WL 11070293 (Bankr. S.D.N.Y Dec. 4, 2015);

- attached hereto as **Exhibit J** is a true and correct copy of *In re Motors Liquidation Co.,* Case No. 20-cv-3093 (JMF), 2021 WL 1085362 (Bankr. S.D.N.Y. Mar. 22, 2021);

- attached hereto as **Exhibit K** is a true and correct copy of *Armonk Snack Mart, Inc. v. Robert Porpora Realty Corp. (In re Armonk Snack Mart, Inc.)*, Case No. 16-cv-5887 (NSR), 2018 WL 2225008 (S.D.N.Y. May 15, 2018);

- attached hereto as **Exhibit L** is a true and correct copy of *Ojo v. United States*, No. 16 CV 4112 (MKB)(LB), 2019 WL 3852391 (E.D.N.Y. Aug. 15, 2019); and

- attached hereto as **Exhibit M** is a true and correct copy of *Mercado v. Audi of Am., LLC*, No. EDCV1802388JAKSPX, 2019 WL 9051000 (C.D. Cal. Nov. 26, 2019).

- attached hereto as **Exhibit N** is a true and correct copy of *Castleman v. FCA US LLC*, No. 2:18-cv-00342-JNP-PMW, 2019 WL 1406611 (D. Utah Mar. 28, 2019).

- attached hereto as **Exhibit O** is a true and correct copy of *Holland v. FCA U.S. LLC*, No. 1:15 CV 121, 2015 WL 5172996 (N.D. Ohio Sept. 3, 2015).

I declare under penalty of perjury that the foregoing is true and correct.


Executed on: November 4, 2021
Dallas, Texas


                                    */s/ Kaitlyn C. Fletcher*___
                                      Kaitlyn C. Fletcher

# EXHIBIT A

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

| | |
|---|---|
| IN RE: TAKATA AIRBAG PRODUCT LIABILITY LITIGATION<br><br>This Document Relates to Economic Loss Class Actions and: | MDL No. 2599<br><br>Master File No. 15-2599-MD-MORENO<br><br>S.D. Fla. Case No. 1:14-cv-24009-MORENO |
| BUTLER AUTO RECYCLING, INC.; CUNNINGHAM BROTHERS AUTO PARTS, LLC; MIDWAY AUTO PARTS LLC; ROAD TESTED PARTS, INC. D/B/A WEAVERPARTS.COM; SNYDER'S LTD.; TRIPLE D CORPORATION D/B/A KNOX AUTO PARTS; AUTOMOTIVE DISMANTLERS AND RECYCLERS ASSOCIATION, INC. D/B/A AUTOMOTIVE RECYCLERS ASSOCIATION; RIGSBY'S AUTO PARTS & SALES, INC.; QUARNO'S AUTO SALVAGE; YOUNG'S AUTO CENTER AND SALVAGE, LP, individually and on behalf of all others similarly situated,<br><br>       Plaintiffs,<br><br>   v.<br><br>HONDA MOTOR CO., LTD., AMERICAN HONDA MOTOR CO., INC., HONDA R&D CO., LTD, AMERICAN HONDA MOTOR CO., INC., BAYERISCHE MOTOREN WERKE AG, BMW OF NORTH AMERICA, LLC, BMW MANUFACTURING CO., LLC, FCA US LLC, GENERAL MOTORS COMPANY, GENERAL MOTORS HOLDINGS LLC, GENERAL MOTORS LLC, TOYOTA MOTOR CORPORATION, TOYOTA MOTOR SALES, U.S.A., INC., AND TOYOTA MOTOR ENGINEERING & MANUFACTURING NORTH AMERICA, INC., MAZDA MOTOR CORPORATION, MAZDA MOTOR OF AMERICA, INC., NISSAN MOTOR CO., LTD., NISSAN NORTH AMERICA, INC., FUJI HEAVY INDUSTRIES, LTD., SUBARU OF AMERICA, INC., VOLKSWAGEN AKTIENGESELLSCHAFT, VOLKSWAGEN GROUP OF AMERICA, AUDI AKTIENGESELLSCHAFT, AUDI OF AMERICA, LLC, MERCEDES-BENZ USA, LLC, and DAIMLER AG,<br><br>       Defendants. | **AUTOMOTIVE DEFENDANTS' MOTION TO DISMISS AUTOMOTIVE RECYCLER PLAINTIFFS' FIRST AMENDED COMPLAINT AND INCORPORATED MEMORANDUM OF LAW** |

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ................................................................................................1

II.    PROCEDURAL HISTORY.................................................................................4

III.   PLEADING STANDARDS.................................................................................5

IV.   ARGUMENT ......................................................................................................6

      A.     Plaintiffs' Claims Under the Racketeer Influenced and Corrupt Organizations Act Fail..........................................................................................................7

            1.     Plaintiffs' Substantive RICO Counts Fail for Lack of a Direct Relation Between the Injury Asserted and the Injurious Conduct Alleged ...............................................................................................7

            2.     Plaintiffs' RICO Conspiracy Claims Under Section 1962(d) Fail.............13

      B.     Plaintiffs Fail to State a Claim Under the Lanham Act (Count 21) ......................14

            1.     Plaintiffs' Lanham Act Claim Fails for Lack of Proximate Cause............14

            2.     Plaintiffs' Lanham Act Claim Fails for Lack of False or Misleading Statements Made in Commercial Advertising or Promotion ...................15

            3.     Plaintiffs Do Not Fall Within the Zone of Interests Required to State a Claim Under the Lanham Act ................................................................19

            4.     Plaintiffs' Lanham Act Claim Fails to State a Claim for Contributory Liability........................................................................................................20

      C.     Plaintiffs' Consumer Protection Claims Fail for Lack of Proximate Cause and Suffer from Additional Fatal Deficiencies.............................................................21

            1.     Plaintiffs' Claims for Violation of Florida's Deceptive and Unfair Trade Practices Act (Count 23) Fail for Lack of Causation ......................21

            2.     Plaintiffs' Claims for Violation of Florida's Deceptive and Unfair Trade Practices Act (Count 23) Fail for the Additional Reason that Plaintiffs Were Not Involved in Consumer Transactions .........................22

            3.     Plaintiffs' Claims for Violation of North Carolina's Unfair and Deceptive Trade Practices Act (Count 25) and Knox's Tennessee CPA Claim (Count 26) Fail for Lack of Proximate Cause .......................23

4.      Weaver and Young Lack Standing to Pursue Claims for Violation of the North Carolina Unfair and Deceptive Trade Practices Act (Count 25) ............................................................................................................25

5.      Snyder's Claim for Violation of the Texas Deceptive Trade Practices-Consumer Protection Act (Count 27) Fails for Lack of Producing Cause ............................................................................................................26

6.      Snyder's Fails to State a Claim for Violation of the Texas Deceptive Trade Practices-Consumer Protection Act Because There is No Connection to a Consumer Transaction (Count 27) ...................................28

7.      Weaver's Claim for Violation of Georgia's Uniform Deceptive Trade Practices Act Fails (Count 24) for Lack of Standing and Causation .........30

D.      Plaintiffs Fail to State a Claim for Fraudulent Concealment and Fraudulent Misrepresentation (Count 22) ................................................................................31

1.      Plaintiffs' Claim for Fraudulent Concealment and Fraudulent Misrepresentation Fails for Lack of Proximate Cause.............................31

2.      Plaintiffs' Claim for Fraudulent Concealment and Fraudulent Misrepresentation Fails for Lack of Duty to Disclose and Intent to Defraud ...................................................................................................34

3.      Plaintiffs Fail to Allege They Actually and Justifiably Relied on Any Actionable Representations ......................................................................37

V.      CONCLUSION.................................................................................................................39

REQUEST FOR HEARING.............................................................................................................39

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Am. Home Prods. Corp. v. Johnson & Johnson*,
654 F. Supp. 568 (S.D.N.Y. 1987) ...................................................................16

*Amstadt v. U.S. Brass Corp.*,
919 S.W.2d 644 (Tex. 1996)...........................................................................28

*Amsterdam Tobacco Inc. v. Philip Morris Inc.*,
107 F. Supp. 2d 210 (S.D.N.Y. 2000).............................................................11

*Anza v. Ideal Steel Supply Corp.*,
547 U.S. 451 (2006)...................................................................................8, 10

*Arthur Andersen & Co. v. Perry Equip. Corp.*,
945 S.W.2d 812 (Tex. 1997)...........................................................................33

*Baranco v. Ford Motor Co.*,
294 F. Supp. 3d 950 (N.D. Cal. 2018) .......................................................24, 25

*Bell Atl. Corp.* v. *Twombly*,
550 U.S. 544 (2007)........................................................................................6

*Belville v. Ford Motor Co.*,
13 F. Supp. 3d 528 (S.D. W.Va. 2014)............................................................38

*Bolinger v. First Multiple Listing Serv., Inc.*,
838 F. Supp. 2d 1340 (N.D. Ga. 2012) ............................................................30

*Box Office Entm't, LLC v. Brian D. Gordon, CPA, P.A.*,
No. 05-21010-CIV, 2007 WL 1362898 (S.D. Fla. May 9, 2007)...........................33

*Bradford v. Vento*,
48 S.W.3d 749 (Tex. 2001)..............................................................................35

*Breeden v. Richmond Cmty. Coll.*,
171 F.R.D. 189 (M.D.N.C. 1997) ................................................................34, 36

*Caper Corp. v. Wells Fargo Bank, N.A.*,
578 F. App'x 276 (4th Cir. 2014) ....................................................................37

*Cirulli v. Hyundai Motor Co.*,
No. CV 08-0854 AG, 2009 WL 5788762 (C.D. Cal. June 12, 2009).....................16

iii

*City of Pontiac Policemen's & Firemen's Retirement Sys. v. UBS AG,*
    752 F.3d 173 (2d Cir. 2014)............................................................................17

*City of Sterling Heights Gen. Employees' Ret. Sys. v. Hospira, Inc.,*
    No. 11 C 8332, 2013 WL 566805 (N.D. Ill. Feb. 13, 2013)....................................17

*Coburn Supply Co., Inc. v. Kohler Co.,*
    342 F.3d 372 (5th Cir. 2003) ............................................................................35

*Cytyc Corp. v. Neuromedical Sys., Inc.,*
    12 F. Supp. 2d (S.D.N.Y. 1998)........................................................................16

*Daigle v. Ford Motor Co.,*
    No. 09-3214, 2012 WL 3113854 (D. Minn. July 31, 2012) ..................................16

*Daugherty v. Jacobs,*
    187 S.W.3d 607 (Tex. App. 2006)......................................................................26

*DiGrazia v. Atl. Mut. Ins. Co.,*
    944 S.W.2d 731 (Tex. App. 1997)......................................................................33

*Doe v. Boys Clubs of Greater Dallas, Inc.,*
    907 S.W.2d 472 (Tex. 1995)........................................................................26, 27

*Duty Free Ams., Inc. v. Estee Lauder Companies, Inc.,*
    797 F.3d 1248 (11th Cir. 2015) ........................................................................20

*Earthcam, Inc. v. Oxblue Corp.,*
    No. 11-cv-02278-WSD, 2012 WL 12836518 (N.D. Ga. Mar. 26, 2012) ...................15, 16, 31

*ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.,*
    553 F.3d 187 (2d Cir. 2009)............................................................................17

*Efron v. Embassy Suites (Puerto Rico), Inc.,*
    223 F.3d 12 (1st Cir. 2000)..............................................................................14

*Eli Lilly & Co. v. Roussel Corp.,*
    23 F. Supp. 2d 460 (D.N.J. 1998) ......................................................................11

*Finley v. Kondaur Capital Corp.,*
    909 F. Supp. 2d 969 (W.D. Tenn. 2012)..............................................................36

*Food Lion, Inc. v. Cap. Cities/ABC, Inc.,*
    194 F.3d 505 (4th Cir. 1999) ............................................................................25

*Footbridge Ltd. v. Countrywide Home Loans, Inc.,*
    No. 09 Civ. 4050, 2010 WL 3790810 (S.D.N.Y. Sept. 28, 2010) ...........................17

iv

*In re Ford Motor Co. E-350 Van Prods. Liab. Litig. (No. II),*
No. 03-4558, 2010 WL 2813788 (D.N.J. July 9, 2010) ........................................16

*In re Ford Motor Co. Sec. Litig. Class Action,*
381 F.3d 563 (6th Cir. 2004) ..................................................................................16

*Frank Brunckhorst CO., L.L.C. v. Coastal Atl., Inc.,*
542 F. Supp. 2d 452 (E.D. Va. 2008) ....................................................................35

*Franklin Pres. Ltd. P'ship v. Nurtur N. Carolina, LLC,*
No. 1:14CV266, 2016 WL 3039832 (M.D.N.C. May 27, 2016), *appeal
dismissed* (Sept. 22, 2016) .....................................................................................24

*Friedman v. Am. Guardian Warranty Servs., Inc.,*
837 So. 2d 1165 (Fla. 4th DCA 2003) ...................................................................34

*Garcia v. Vera,*
342 S.W.3d 721 (Tex. App. 2011) .........................................................................36

*Gardner v. Weiler,*
630 So. 2d 670 (Fla. 4th DCA 1994) ....................................................................32

*In re Gen. Motors Corp. Anti-Lock Brake Prods. Liab. Litig.,*
966 F. Supp. 1525 (E.D. Mo. 1997), *aff'd, Briehl v. Gen. Motors Corp.,* 172
F.3d 623 (8th Cir. 1999) ...................................................................................16, 36

*In re Gen. Motors LLC Ignition Switch Litig.,*
257 F. Supp. 3d 372 (S.D.N.Y. 2017), *modified on reconsideration,* No. 14-
MC-2543, 2017 WL 3443623 (S.D.N.Y. Aug. 9, 2017) ..................................32, 35

*Gonzalez v. Nat'l Ins. Crime Bureau,*
427 F. App'x 394 (5th Cir. 2011) ..........................................................................35

*Govreau v. Albers,*
No. 2:10-CV-04135, 2010 WL 4817143 (W.D. Mo. Nov. 22, 2010) ....................38

*Grant Thornton LLP v. Prospect High Income Fund,*
314 S.W. 3d 913 (Tex. 2010) .................................................................................37

*Greater Houston Transp. Co. v. Uber Techs., Inc.,*
155 F. Supp. 3d 670 (S.D. Tex. 2015) ...................................................................16

*Harris v. Mid-W. Egg Donation, LLC,*
365 S.W.3d 274 (Mo. Ct. App. 2012) ....................................................................34

*Harton v. Harton,*
344 S.E.2d 117 (N.C. Ct. App. 1986) ....................................................................36

v

*Harvey v. Ford Motor Credit Co.*,
No. 03A01-9807-CV-00235, 1999 WL 486894 (Tenn. Ct. App. July 13, 1999)...................23

*Helpling v. Rheem Mfg. Co.*,
No. 1:15-CV-2247, 2016 WL 1222264 (N.D. Ga. Mar. 23, 2016) ..........................................30

*Hemi Grp., LLC v. City of New York, N.Y.*,
559 U.S. 1 (2010).............................................................................................................8, 9

*Hindsman v. General Motors LLC*,
No. 17-cv-05337, 2018 WL 2463113 (N.D. Cal. June 1, 2018)..............................................38

*Hoffman v. A. B. Chance Co.*,
339 F. Supp. 1385 (M.D. Pa. 1972) ......................................................................................16

*Holmes v. Sec. Inv'r Prot. Corp.*,
503 U.S. 258 (1992)..........................................................................................................6, 8

*Hopkins v. Green Dot Corp.*,
No. 5:16-CV-365, 2016 WL 4468272 (W.D. Tex. Aug. 24, 2016).........................................27

*Howard v. Am. Online Inc.*,
208 F.3d 741 (9th Cir. 2000) ................................................................................................14

*IHS Cedars Treatment Ctr. of DeSoto, Texas, Inc. v. Mason*,
143 S.W.3d 794 (Tex. 2004).................................................................................................26

*Imperial Premium Fin., Inc. v. Khoury*,
129 F.3d 347 (5th Cir. 1997) ................................................................................................35

*Ins. Co. of N. Am. v. Morris*,
981 S.W.2d 667 (Tex. 1998).................................................................................................35

*Intertape Polymer Corp. v. Inspired Techs., Inc.*,
725 F. Supp. 2d 1319 (M.D. Fla. 2010).................................................................................22

*J-Hanna v. Enter. Rent-A-Car Co. of San Francisco, LLC*,
672 F. App'x 737 (9th Cir. 2017) ..........................................................................................31

*Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.*,
299 F.3d 1242 (11th Cir. 2002) ............................................................................................14

*Joseph v. Bernstein*,
No. 13-24355-CIV, 2014 WL 4101392 (S.D. Fla. Aug. 19, 2014) ..........................................6

*Joy v. MERSCORP, Inc.*,
935 F. Supp. 2d 848 (E.D.N.C. 2013)....................................................................................33

*Karam v. Corinthian Colleges, Inc.*,
   No. CV 10-6523-GHK, 2012 WL 8499135 (C.D. Cal. Aug. 20, 2012) ..................................17

*Kelly v. Georgia-Pac. LLC*,
   671 F. Supp. 2d 785 (E.D.N.C. 2009) .........................................................................................24

*Lance v. Wade*,
   457 So. 2d 1008 (Fla. 1984) ........................................................................................................36

*Leon v. Tapas & Tintos, Inc.*,
   51 F. Supp. 3d 1290 (S.D. Fla. 2014) .........................................................................................22

*Lexmark Int'l Inc. v. Static Control Components, Inc.*,
   572 U.S. 118 (2014) ...............................................................................................14, 19, 20

*Locus Telecomms., Inc. v. Talk Global LLC*,
   No. 14-1205, 2014 WL 4271635 (D.N.J. Aug. 28, 2014) .................................................19, 20

*Lombardo v. Johnson & Johnson Consumer Companies, Inc.*,
   124 F. Supp. 3d 1283 (S.D. Fla. 2015) .......................................................................................21

*Lopez v. CTPartners Executive Search Inc.*,
   173 F. Supp. 3d 12 (S.D.N.Y. 2016) ..........................................................................................17

*M&T Bank Corp.* v. *McGraw-Hill Cos., Inc.*,
   5 N.Y.S.3d 783, 126 A.D.3d 1414 (4th Dep't 2015) ..................................................................18

*In re Marsh & Mclennan Co., Inc. Sec. Litig.*,
   501 F. Supp. 2d 452 (S.D.N.Y. 2006) .........................................................................................17

*Maison v. Ford Motor Co.*, No. 1:04-CV-041-SPM, 2005 WL 1684159 (N.D. Fla.
   July 7, 2005) ................................................................................................................................37

*Marshall v. Kusch*,
   84 S.W.3d 781 (Tex. App. 2002) ..........................................................................................28, 29

*McCabe v. Daimler AG*,
   160 F. Supp. 3d 1337 (N.D. Ga. 2015) .................................................................32, 35, 37

*Med S. Health Plans, LLC v. Life of S. Ins. Co.*,
   No. 4:07-CV-134, 2008 WL 2119915 (M.D. Ga. May 19, 2008) ..............................................31

*Metrocall of Delaware, Inc. v. Continental Cellular Corp.*,
   437 S.E.2d 189 (Va. 1993) ..........................................................................................................38

*Moore v. Fenex, Inc.*,
   809 F.2d 297 (6th Cir. 1987) ......................................................................................................31

*Moore v. Midgette,*
   252 F. Supp. 776 (E.D.N.C. 1966)......................................................................36

*Mprove v. KLT Telecom, Inc.,*
   135 S.W.3d 481 (Mo. Ct. App. 2004).................................................................33

*Murray v. Hadid,*
   385 S.E.2d 898 (Va. 1989)..................................................................................33

*Murray v. Royal Const. Co.,*
   No. CL01–04–7383, 2002 WL 32238304 (Va. Cir. Ct. June 10, 2002)..................36

*Myre v. Meletio,*
   307 S.W.3d 839 (Tex. App. 2010)................................................................35, 36

*New Mexico Oncology & Hematology Consultants, Ltd. v. Presbyterian*
   *Healthcare Servs.,*
   54 F. Supp. 3d 1189 (D.N.M. 2014) ...................................................................10

*Omnicare, Inc.* v. *Laborers Dist. Council Constr. Indus. Pension Fund,*
   135 S. Ct. 1318 (2015) (Scalia, J., concurring)...................................................18

*Patten v. Standard Oil Co. of Louisiana,*
   55 S.W.2d 759 (Tenn. 1933)...............................................................................32

*Peace v. ITCOA, LLC,*
   No. 13-16-00370-CV, 2018 WL 1633518 (Tex. App. Apr. 5, 2018)......................27

*Peeler v. Hughes & Luce,*
   868 S.W.2d 823 (Tex. App. 1993).......................................................................26

*Pelletier v. Zweifel,*
   921 F.2d 1465 (11th Cir. 1991), *abrogated on other grounds by Bridge v.*
   *Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008) ...............................................8

*Perry v. Am. Tobacco Co.,*
   324 F.3d 845 (6th Cir. 2003) ..............................................................................23

*Pinecrest Consortium, Inc. v. Mercedes-Benz, USA, LLC,*
   No. 13-20803-CIV-MORENO, 2013 WL 1786356 (S.D. Fla. April 25, 2013)......22

*Prof'l Laundry Mgmt. Sys., Inc. v. Aquatic Techs., Inc.,*
   109 S.W.3d 200 (Mo. Ct. App. 2003)............................................................32, 36

*Ratcliff v. Am. Honda Motor Co, Inc.,*
   No. 17CV174, 2018 WL 3542865 (M.D.N.C. July 23, 2018).............................35

*Ray v. Spirit Airlines, Inc.,*
   836 F.3d 1340 (11th Cir. 2016) ...................................................................8

*Roca Labs, Inc. v. Consumer Opinion Corp.,*
   No. 8:14-CV-2096, 2014 WL 6389657 (M.D. Fla. Nov. 16, 2014) ........................21

*Romedy v. Willett Lincoln-Mercury, Inc.,*
   220 S.E.2d 74 (Ga. Ct. App. 1975) ...........................................................36

*S. States Imports, Inc. v. Subaru of Am., Inc.,*
   No. 5:05-CV-752, 2008 WL 2234625 (E.D.N.C. May 30, 2008) ...................23, 24

*Sabol v. Ford Motor Co.,*
   No. 14-6654, 2015 WL 4378504 (E.D. Pa. July 16, 2015) .................................16

*Sain v. Adams Auto Grp., Inc.,*
   781 S.E.2d 655 (N.C. Ct. App. 2016) .......................................................24, 25

*Saltire Indus., Inc. v. Waller, Lansden, Dortch & Davis, PLLC,*
   491 F.3d 522 (6th Cir. 2007) ..........................................................34, 35, 37

*Se. Laborers Health & Welfare Fund v. Bayer Corp.,*
   655 F. Supp. 2d 1270 (S.D. Fla. 2009) .......................................................10

*Silverstein v. Procter & Gamble Mfg. Co.,*
   No. CV 108-003, 2008 WL 4889677 (S.D. Ga. Nov. 12, 2008) ..........................30

*Speier-Roche v. Volkswagen Grp. of Am. Inc.,*
   No. 14-20107-CIV, 2014 WL 1745050 (S.D. Fla. Apr. 30, 2014) ...........................5

*State v. Mark Marks, P.A.,*
   698 So. 2d 533 (Fla. 1997) ......................................................................35

*Static Control Components, Inc. v. Darkprint Imaging, Inc.,*
   135 F. Supp. 2d 722 (M.D.N.C. 2001) .......................................................25

*Stracener v. Swindle,*
   No. 01A01-9502-CH-00047, 1995 WL 414873 (Tenn. Ct. App. July 14, 1995) ...................32

*Strates Shows, Inc. v. Amusements of Am., Inc.,*
   646 S.E.2d 418 (N.C. Ct. App. 2007) .......................................................23

*Synergy Fin., L.L.C. v. Zarro,*
   329 F. Supp. 2d 701 (W.D.N.C. 2004) .......................................................25

*Taxinet, Corp. v. Leon,*
   No. 16-24266-CIV, 2018 U.S. Dist. LEXIS 116128 (S.D. Fla. July 10, 2018) .....................22

*Taylor v. Am. Honda Motor Co.*,
  555 F. Supp. 59 (M.D. Fla. 1982) ........................................................................32

*Taylor v. Bennett Chevrolet/Buick, Inc.*,
  609 S.E.2d 215 (Ga. Ct. App. 2005) ...................................................................32

*Terrill v. Electrolux Home Prod., Inc.*,
  753 F. Supp. 2d 1272 (S.D. Ga. 2010)................................................................30

*Todd v. Perry Homes*,
  156 S.W.3d 919 (Tex. App. 2005)..................................................................28, 29

*TransPetrol, Ltd. v. Radulovic*,
  764 So. 2d 878 (Fla. Dist. Ct. App. 2000) ..........................................................35

*United States v. Pendergraft*,
  297 F.3d 1198 (11th Cir. 2002) .............................................................................8

*United States v. Ward*,
  486 F.3d 1212 (11th Cir. 2007) .............................................................................8

*USA Nutraceuticals Grp., Inc.* v. *BPI Sports, LLC*,
  No. 15-CIV-80352, 2016 WL 4254257 (S.D. Fla. Feb. 16, 2016) .........................19

*Van Deusen v. Snead*,
  441 S.E.2d 207 (Va. 1994)...................................................................................37

*White v. Early*,
  211 S.W.3d 723 (Tenn. Ct. App. 2006) ..........................................................23, 24

*Williams v. Dresser Indus., Inc.*,
  120 F.3d 1163 (11th Cir. 1997) ...........................................................................34

*Willingham v. Glob. Payments, Inc.*,
  No. 1:12-CV-1157, 2013 WL 440702 (N.D. Ga. Feb. 5, 2013) .............................30

*Zaccagnino v. Nissan N. Am., Inc.*,
  No. 14 CIV 3690 LLS, 2015 WL 3929620 (S.D.N.Y. June 17, 2015)....................15

**Statutes**

15 U.S.C. § 1125(a) ...................................................................................14, 20

15 U.S.C. § 1125(a)(1)(B) .........................................................................15, 20

15 U.S.C. § 1501 *et seq.* (Lanham Act) ............................................... *passim*

18 U.S.C. § 1962(c) ..............................................................................*passim*

18 U.S.C. § 1962(d) ...................................................................................................13

18 U.S.C. § 1964(c) .....................................................................................................8

Fla. Stat. § 501.211(2) ..............................................................................................21

Ga. Code Ann. § 10-1-373(a) ...................................................................................30

N.C. G. S. § 75-1.1.....................................................................................................25

**Other Authorities**

RESTATEMENT (SECOND) OF CONTRACTS § 168 (1981) ............................................18

RESTATEMENT (SECOND) OF TORTS § 539, cmt. c (1977) .........................................18

Fed. R. Civ. P. 8 ...........................................................................................................6

Fed. R. Civ. P. 12(b)(6)............................................................................................5, 6

## I.     <u>Introduction</u>

Plaintiffs are a collection of automotive recyclers, colloquially known as junk yards, and their association who allege that they purchased what are essentially junked Class Vehicles from salvage auctions, tow operators, charities, and the public. They did so with the hopes that the sum of the resalable parts would surpass what they paid for the vehicle. They did not buy these vehicles because of any advertising or promotion by the Automotive Defendants,[1] who sell or lease new vehicles to consumers. Years, miles, crashes and wear-and-tear intervened between the original sales of these vehicles and their purchase as junk for salvage.

Plaintiffs have sued the Automotive Defendants because the Takata airbags in the cars they purchased are under the largest motor vehicle recall in U.S. history and as a result of that recall, Plaintiffs cannot resell the recalled Takata airbags. More accurately, they are under recall as a result of Takata's decade-long criminal fraud—a fraud that Takata has acknowledged, and for which it has pled guilty and agreed to pay a one-billion dollar fine—which Takata perpetrated on the Automotive Defendants to whom they sold airbags with inflators that turned out to be dangerous in some instances. In what appears to be the first class action lawsuit of its kind, Plaintiffs have filed suit against the Automotive Defendants—not Takata, since it no longer

---

[1]     For purposes of this motion, "Automotive Defendants" refers to Honda Motor Co., Ltd., American Honda Motor Co., Inc., Honda of America Mfg., Inc., Honda R&D Co., Ltd., BMW of North America, LLC, BMW Manufacturing Co., LLC, Bayerische Motoren Werke AG, FCA US LLC, General Motors LLC, General Motors Holdings LLC, General Motors Company, Mazda Motor Corporation, Mazda Motor of America, Inc., Mercedes-Benz USA, LLC, Daimler AG, Nissan Motor Co., Ltd., Nissan North America, Inc., Fuji Heavy Industries n/k/a Subaru Corporation, Subaru of America, Inc., Toyota Motor Corporation, Toyota Motor Sales, U.S.A., Inc., Toyota Motor Engineering & Manufacturing North America, Inc., Volkswagen Aktiengesellschaft, Volkswagen Group of America, Inc., Audi Aktiengesellschaft, and Audi of America, LLC. Joinder in this motion by Bayerische Motoren Werke AG, Daimler AG, FCA US LLC, Volkswagen Group of America, Inc., Volkswagen Aktiengesellschaft, Audi of America, LLC, Audi Aktiengesellschaft, General Motors Company, General Motors Holdings LLC, and General Motors LLC is subject to and without waiving any defenses, including, but not limited to, lack of personal jurisdiction and any due process arguments.

exists—to recover what they claim was the resale value of the recalled Takata airbags and therefore turn what they claim are "valueless" Takata airbags into gold.

As purchasers of junked vehicles who purchase them to sell whatever component parts they can, Plaintiffs take a risk every time they buy a junked car since junked vehicles typically were in a major accident or are so worn out they can no longer be driven. There is a risk that some components will actually *be* junk – that is, not operational, damaged, recalled, or simply not in demand. That risk is a necessary reality of every purchase the recyclers make, because every vehicle is purchased "as is." The business is speculative by its nature.  The idea that anything the Automotive Defendants did or didn't do somehow caused Plaintiffs a loss that they did not otherwise accept when they purchased a junked vehicle is fallacious. Simply put, all of the Plaintiffs' claims must be dismissed because the required causal link between the Automotive Defendants' alleged conduct and Plaintiffs' alleged damages is illusory or nonexistent.

Indeed, the Automotive Defendants have publicly warned for years that recycled and aftermarket parts, and airbags in particular, were and are unsafe and should not be resold for use by consumers. And though Plaintiffs now claim that the Automotive Defendants failed to disclose the safety risks associated with Takata airbags, Plaintiffs have historically ignored safety warnings about airbags salvaged from junked vehicles when it suited their financial interests to do so. Plaintiffs claim, on the one hand, that the Automotive Defendants should have initiated the Takata Recalls earlier, but, on the other, claim that the profits they supposedly made on the sale of Takata airbags (despite warnings that junked or recycled parts should not be reused) prior to the Recalls has been lost and that this loss is somehow the Automotive Defendants' fault. Of course, had the Recalls been initiated earlier, the profits Plaintiffs made on salvaged Takata

airbags before the Recalls would never have been made in the first place. The Court should not ignore the inconsistent and conclusory nature of their allegations. Recalled Takata airbags, like any recalled part, cannot legally be sold to consumers, a risk well known to Plaintiffs. Plaintiffs also ignore the fact that, in this unusual instance, many of the Automotive Defendants have, with NHTSA's encouragement, sought to purchase as many junkyard Takata airbags as they can find to ensure that—notwithstanding the proscription on sale of recalled parts—the putative class of automotive recyclers here do not end up reselling the airbags for installation into different vehicles.[2]

Plaintiffs' claims are also subject to dismissal on other grounds. The Lanham Act claim fails because Plaintiffs do not allege any actionable statements in commercial advertising or promotion and Plaintiffs are not within the "zone of interest" Congress intended to protect. Plaintiffs' Florida DUTPA claims fail because the Plaintiffs bringing those claims were not involved in consumer transactions; Plaintiffs lack standing to pursue claims under the North Carolina UDTPA; Snyder's Texas DTPA claim fails because Snyder's has failed to allege its connection to a consumer transaction; and Weaver's claim for violation of the Georgia UDTPA fails for lack of standing.

In addition to lacking proximate cause, Plaintiffs' common law fraud claim fails because the Complaint alleges no basis upon which to infer a duty on the part of the Automotive Defendants to disclose anything to Plaintiffs, that the Automotive Defendants acted with any

---

[2] Automotive Defendants implemented a buyback program to purchase recalled, non-deployed airbags from salvage yards. Rebuilders Automotive Supply, the Automotive Defendants' partner with respect to the buyback program, offers $55 for qualified driver-side airbags and $60 for passenger-side airbags. *See* http://www.rascorepro.com/Assets/Recalls/en/HondaAirbagRecallNotice.pdf?t=636377038796656969; http://www.rascorepro.com/Assets/Recalls/en/ytb_info.pdf?t=636652052953541577.

intent to defraud Plaintiffs, or that Plaintiffs actually or justifiably relied on any actionable representations.

Because any amendment will necessarily be futile, all of Plaintiffs' claims against the Automotive Defendants should be dismissed with prejudice.

## II.  **Procedural History**

A putative class action suit on behalf of automotive recyclers was first brought against Takata and seven vehicle manufacturers (the "Original Automotive Defendants") on February 10, 2015, by the Automotive Recyclers' Association ("ARA"). *Automotive Dismantlers and Recyclers Assoc., Inc. v. Takata Corp. et al.*, 1:15-cv-20520-FAM (Moreno, J.). The ARA's claims, brought as assignees of two recyclers, were consolidated with the consumer economic loss claims in the First, Second, and Third Amended Consolidated Class Action Complaints filed April 30, 2015 (Dkt. No. 544), June 15, 2015 (Dkt. No. 579), and July 14, 2017 (Dkt. No. 1895), respectively.[3]

On July 17, 2015, the Original Automotive Defendants moved to dismiss the claims brought by the ARA in the Second Amended Consolidated Class Action Complaint (Dkt. No. 609). On March 11, 2016, this Court granted the Original Automotive Defendants' motion to dismiss the ARA's claims for fraudulent misrepresentation and concealment (Count 104), violation of 28 states' deceptive trade practices acts (Count 105), and violation of Florida's DUTPA (Count 106), (Dkt. No. 975).

On March 14, 2018, the ARA and a handful of automotive recyclers (together "Plaintiffs") filed complaints against FCA, VW, Audi, Daimler, and GM directly in the MDL.

---

[3]    A Third Amended Consolidated Class Action Complaint was filed on July 14, 2017 (Dkt. No. 1895), and in response to the Court's July 26, 2017, dismissal of the July 14, 2017 filing (Dkt. No. 1919), refiled as a *Revised* Third Amended Consolidated Class Action Complaint on August 7, 2017 (Dkt. No. 1969).

(Dkt. No. 2428 [General Motors Company, General Motors Holdings LLC, General Motors

LLC], Dkt. No. 2429 [FCA US LLC]; Dkt. No. 2430 [Volkswagen Group of America, Inc., Audi

of America, LLC, Volkswagen AG, Audi AG, Mercedes-Benz USA, LLC, and Daimler AG]).

Following the Court's direction to consolidate all recycler claims (other than those against

Ford),[4] on May 18, 2018, Plaintiffs directly filed a First Amended Consolidated Class Action

Complaint (Dkt. No. 2781) (hereinafter, "Complaint") against all of the Automotive Defendants.

Plaintiffs allege that they bought Class Vehicles containing Takata airbags at "insurance salvage

auctions and from tow operators, charities, and the public." Complaint ¶¶ 83-90, 458. Plaintiffs

allege that, had they known of the Inflator Defect, they would not have purchased the Class

Vehicles or would not have paid as much for them as they did. *Id.* ¶¶ 83-90. Plaintiffs seek to

recover monetary damages from the Automotive Defendants because they claim to possess

Takata airbags that are "essentially valueless." *Id.* ¶ 35.

## III.    Pleading Standards

Under Rule 12(b)(6), Plaintiffs' claims should be dismissed if, accepting the allegations

in the complaint as true and viewing them in a light most favorable to Plaintiffs, Plaintiffs fail to

state a claim. *See* Fed. R. Civ. P. 12(b)(6); *Speier-Roche* v. *Volkswagen Grp. of Am. Inc.*, No. 14-

20107-CIV, 2014 WL 1745050, at *1 (S.D. Fla. Apr. 30, 2014). Legal conclusions do not

---

[4]    On April 26, 2018, the Court ordered Plaintiffs to file a First Amended Consolidated Class Action Complaint combining all claims brought by all automotive recycler plaintiffs against all defendants except Ford Motor Company ("Ford"). Dkt. No. 2651. On April 30, 2018, the consumer plaintiffs and automotive recycler plaintiffs filed their Fourth Amended Consolidated Class Action Complaint ("Fourth Amended Complaint") against Ford. Dkt. No. 2670. On July 16, 2018, Ford executed a settlement agreement to resolve the consumer plaintiffs' claims against Ford, (Dkt. No. 2909-1), and Plaintiffs filed their Motion for Preliminary Approval as to those consumer claims (Dkt. No. 2910). On August 15, 2018, the Court severed the automotive recycler plaintiffs' claims from the consumer plaintiffs' claims in the Fourth Amended Complaint and consolidated the automotive recycler plaintiffs' claims against Ford with their claims against all other automotive defendants. Dkt. No. 2969.

suffice, nor do "'labels and conclusions'" or "'a formulaic recitation of the elements of a cause

of action.'" *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 555 (2007).

Group pleading also does not satisfy the requirements of either Rule 12(b)(6) or Rule (8).

A complaint that lumps together separate corporate defendants as a single fictional entity and

then makes undifferentiated allegations against that composite entity cannot survive a motion to

dismiss. *See Joseph v. Bernstein*, No. 13-24355-CIV, 2014 WL 4101392, at *3 (S.D. Fla. Aug.

19, 2014) ("When a complaint indiscriminately lumps all defendants together, it fails to comply

with Rule 8.") (citation omitted).[5]

## IV. <u>Argument</u>

The absence of proximate or legal causation requires dismissal of all of Plaintiffs'

claims.[6] "Proximate cause" is used generically to label "the judicial tools used to limit a person's

responsibility for the consequences of that person's own acts." *Holmes v. Sec. Inv'r Prot. Corp.*,

503 U.S. 258, 268 (1992). The notion of proximate cause reflects "ideas of what justice

demands, or of what is administratively possible and convenient." *Id.* (citation omitted). Here,

the Automotive Defendants' alleged conduct is so far removed from the harm the Plaintiffs

allegedly sustained that it cannot be regarded as the legal or proximate cause of that harm.

Plaintiffs allege that the Automotive Defendants' failure to disclose the defects in the airbag

inflators caused consumers to buy more vehicles containing the airbags than would otherwise

been the case. Years later, when some of these vehicles reached the end of their useful life,

---

[5] As explained in the brief of the VW/Audi Defendants filed concurrently, the Complaint contains no substantive allegations against those Automotive Defendants and thus fails to state a claim. Nor does the Complaint contain adequate allegations as to BMW AG as an entity. Instead, BMW AG is lumped in together with other BMW entities or with every other defendant in the case. *See, e.g.*, FAC ¶ 50 ("BMW Defendants" or "BMW"); ¶ 3 ("Vehicle Manufacturer Defendants"). For that reason, Plaintiffs fail to state any claim whatsoever against BMW AG.
[6] *See infra* Sections IV.A, IV.B.1, IV.C.1, IV.C.3, IV.C.5, IV.C.7, and IV.D.1.

Plaintiffs bought them to resell the component parts, including the airbags. Because the airbags were later recalled, Plaintiffs cannot sell those that remain in stock. This lengthy chain of causation requires taking into account not only multiple transactions but also the intervening recall mandated by U.S. law. Plaintiffs' Complaint presents a classic case of legal causation stretched beyond the breaking point.

Moreover, as set forth below, Plaintiffs' claims warrant dismissal on various other grounds, each independently sufficient to require dismissal.

A.  **Plaintiffs' Claims Under the Racketeer Influenced and Corrupt Organizations Act Fail**

Plaintiffs allege every Automotive Defendant violated RICO by purchasing airbags from Takata—a supplier that turned out to be engaged in a systematic, decade-long criminal fraud *against* the Automotive Defendants—that ultimately led to a guilty plea, massive fines, and its demise in bankruptcy court. Implausibly, Plaintiffs assert that rather than being victims of Takata's fraud, the Automotive Defendants were in fact partners and co-conspirators with Takata.

Notwithstanding Plaintiffs' attempt to warp reality to serve their own purpose, Plaintiffs' RICO claims nonetheless fail because they cannot establish the required element of a direct relation between the injury asserted and the injurious conduct alleged. And because Plaintiffs fail to plead a substantive violation of RICO, Plaintiffs' claims for RICO conspiracy must be dismissed.

1.  **Plaintiffs' Substantive RICO Counts Fail for Lack of a Direct Relation Between the Injury Asserted and the Injurious Conduct Alleged**

Plaintiffs allege substantive RICO counts against each Automotive Defendant, claiming that each individually engaged in RICO enterprises with Takata and conducted a pattern of

7

racketeering activity based on predicate acts of mail fraud and wire fraud. *See, e.g.*, Complaint ¶¶

508, 514, 536, 542, 644, 650, 710, 716, 776, 782.[7]  All of these claims fail, however, because

Plaintiffs have not adequately alleged—nor could they ever allege—that they have suffered any

injury "by reasons of" the Automotive Defendants' alleged conduct. 18 U.S.C. § 1964(c); *Ray v.

Spirit Airlines, Inc.*, 836 F.3d 1340, 1348 (11th Cir. 2016). To recover under a civil RICO claim,

it is not enough for a plaintiff to merely allege *a* link between a pattern of racketeering activity

and their claimed injury; there must be "some direct relation between" the two. *Hemi Grp., LLC

v. City of New York, N.Y.*, 559 U.S. 1, 9 (2010) (quoting *Holmes v. Securities Investor Protection

Corp.,* 503 U.S. 258, 268 (1992)). That direct relation is entirely absent here.

The Supreme Court has repeatedly emphasized that courts should not accept claims from

those who are injured only remotely and indirectly, and should instead limit recovery of damages

to the individuals who are "immediate victims" of the allegedly wrongful conduct. *Anza v. Ideal

Steel Supply Corp.*, 547 U.S. 451, 460 (2006); *see also Hemi Group*, 559 U.S. at 9 ("A link that

is 'too remote,' 'purely contingent,' or 'indirec[t]' is insufficient." (quoting *Holmes*, 503 U.S. at

271)); *Holmes*, 503 U.S. at 269 ("[T]he less direct an injury is, the more difficult it becomes to

ascertain the amount of a plaintiff's damages attributable to the violation, as distinct from other,

independent, factors.") Thus, the ability to recover damages should not "go beyond the first step"

and a plaintiff whose causation theory "requires [the Court] to move well beyond the first

step . . . cannot satisfy RICO's direct relationship requirement." *Hemi Group*, 559 U.S. at 10.

---

[7]    The elements of mail and wire fraud are essentially the same. *Pelletier v. Zweifel*, 921 F.2d
1465, 1498 (11th Cir. 1991), *abrogated on other grounds by Bridge v. Phoenix Bond & Indem.
Co.*, 553 U.S. 639 (2008). To state a claim for mail or wire fraud, Plaintiffs must allege that
Automotive Defendants: (1) intentionally participated in a scheme or artifice to defraud another
of money or property; and (2) used or caused to be used the mails or wires in furtherance of the
scheme or artifice. *United States v. Ward*, 486 F.3d 1212, 1221–22 (11th Cir. 2007); *United
States v. Pendergraft*, 297 F.3d 1198, 1208 (11th Cir. 2002).

Plaintiffs' allegations demonstrate that their theory of causation goes "well beyond the first step," *id.*, and ask this Court to permit recovery where the Automotive Defendants' alleged conduct is many steps removed from their alleged injury. The Automotive Defendants do not advertise to Plaintiffs because they do not sell vehicles to junkyards. Thus, even accepting their allegations as true for purposes of this motion, the causal link between conduct and alleged damage is entirely lacking.

Plaintiffs allege that the Automotive Defendants were motivated to sell vehicles "at a higher price or for higher profit" and "to avoid incurring the expenses associated with recalling vehicles plagued by the Inflator Defect." Complaint ¶¶ 509, 543, 578, 612, 645, 678, 711, 744, 777, 810. And they further allege that this was accomplished through statements on the Automotive Defendants' websites, statements to NHTSA, to the press, and advertisements to their customers. *Id.* ¶¶ 514, 548, 583, 617, 650, 683, 716, 749, 782, 816. Wholly absent in these allegations is any claim that these alleged predicate acts were directed at Plaintiffs or motivated to cause harm to Plaintiffs or, indeed, heard or seen by Plaintiffs.

Simply stated, Plaintiffs are not customers of the Automotive Defendants but rather engage in a business entirely separate from the business of the Automotive Defendants. Plaintiffs bought the Class Vehicles long after they had left the Automotive Defendants' hands—after the vehicles had been sold to consumers, and in many cases, resold, wrecked, totaled, salvaged, or auctioned off. And they bought those vehicles "as is" with no guarantee from anyone that any particular part was good or could or would be sold, or that parts of salvaged vehicles would not be subject to safety recalls. *See* Complaint ¶¶ 83-90, 458. Even accepting Plaintiffs' allegations as true, the chain of causation required to find that the Automotive Defendants intended to injure

Plaintiffs, several steps down the chain of vehicle ownership, is simply too attenuated to meet RICO's exacting direct relationship requirement.

The attenuation between the alleged mail and wire fraud and Plaintiffs' injuries, and the numerous intervening factors, including the multiple transactions that led to the Class Vehicles being sold at insurance auctions, preclude a finding of proximate cause. *See, e.g.*, *Anza*, 547 U.S. at 458-59 (among other reasons, finding proximate cause lacking where the defendant "could have lowered its prices for any number of reasons unconnected to the asserted pattern of fraud" and the plaintiff's "lost sales could have resulted from factors other than [the defendants'] alleged acts of fraud."); *New Mexico Oncology & Hematology Consultants, Ltd. v. Presbyterian Healthcare Servs.*, 54 F. Supp. 3d 1189, 1243 (D.N.M. 2014) (dismissing RICO claim when defendants' issuance of mandate to seniors covered under defendants' insurance to purchase drugs from defendants was an intervening cause that broke the chain of causation between the harm alleged —*i.e.*, loss of plaintiff's sales—and the RICO violation—*i.e.*, fraud on pharmaceutical companies); *Se. Laborers Health & Welfare Fund* v. *Bayer Corp.*, 655 F. Supp. 2d 1270, 1281-82 (S.D. Fla. 2009) (dismissing RICO claim where plaintiff's alleged losses might have been caused by factors other than pharmaceutical defendant's alleged omissions and misrepresentations regarding a medication's safety and efficacy, including doctors' "independent knowledge," extent of marketing, doses prescribed, and alternative treatments).

Moreover, Plaintiffs claim they are injured because they possess and cannot resell "essentially valueless" Takata airbags. But that purported "injury," if it exists at all,[8] was not the result of any of the alleged predicate acts of mail fraud or wire fraud. Rather, Plaintiffs'

---

[8] As discussed above, a robust buyback program is in place and has arguably given Plaintiffs more of a market than they ever would have had absent the Recalls.

purported injury arises from the intervening criminal acts of Takata (to which Takata pled guilty) and the ensuing legal prohibition against the resale of recalled parts that allegedly curtailed the market for the Plaintiffs' used Takata airbags. The U.S. Department of Justice found that the Automotive Defendants were the victims of Takata's fraud. *See* Takata Corporation's Rule 11 Plea Agreement, in *United States of America v. Takata Corp.*, U.S.D.C. E.D. Mich. No. 16-20810, RJN, Ex. C, at p. 10 (stating that auto manufacturers were defrauded by and victims of Takata's fraud scheme) & Att. B *thereto* at ¶¶ 32-33 (identifying OEMs as victims of Takata's fraud). Therefore, Plaintiffs cannot plausibly allege that it was the Automotive Defendants who caused Plaintiffs' alleged injuries. *Amsterdam Tobacco Inc. v. Philip Morris Inc.*, 107 F. Supp. 2d 210, 219 (S.D.N.Y. 2000) (dismissing RICO claim where the direct cause of plaintiffs' lost profits was not any activity of Philip Morris but rather the smuggling activity and the decision by consumers not to purchase cigarettes from plaintiffs); *Eli Lilly & Co. v. Roussel Corp.*, 23 F. Supp. 2d 460, 485 (D.N.J. 1998) (dismissing RICO claim where alleged injuries resulted from "many intervening acts and causes," including decisions by the FDA, competitors, retailers, doctors, and consumers).

Independent of these intervening acts, the Automotive Defendants themselves previously also warned Plaintiffs *not* to resell the airbags, making the causation alleged particularly implausible here. The debate between the automotive recycling industry and automotive manufacturers regarding the safety of recycled and aftermarket parts, and airbags in particular, has been ongoing since 2001, well before the Recalls. *See* U.S. General Accounting Office, *Motor Vehicle Safety: NHTSA's Ability to Detect and Recall Defective Replacement Crash Part Is Limited*," GAO-01-225 (Jan. 31, 2001), Request for Judicial Notice ("RJN"), Ex. A, at pp. 10-11 (noting that since 2001, the debate on the use of recycled airbags has been divided, with

OEMs, some insurance companies, and body shop owners taking the view that they are not safe

and recycling organizations and some insurance companies taking the opposite view that

recycled airbags were viable, economical, and safe alternatives and that therefore "recyclers

[were] creating a market in which drivers can purchase replacement airbags.")

In November 2009, Michael Wilson of the ARA and Jennifer Cole of the Alliance of

Automobile Manufacturers attended a committee meeting in which Ms. Cole conveyed

automakers' strong opposition to any legislation that would promote salvaged airbags because

"there was no proof that salvaged airbags would deploy correctly." Taking the opposite view in

the committee meeting, Mr. Wilson said that salvaged airbags were safe. *See* Minutes of

National Conf. of Ins. Legislators: Special Property-Casualty Insurance Comm. Mtg. on Airbag

Fraud Model Act, New Orleans, LA, November 19, 2009, RJN, Ex. B, at pp. 2, 3.[9] In addition,

certain Automotive Defendants publicly discouraged consumers from purchasing recycled and

aftermarket parts, and airbags in particular. RJN, Exs. F-M (position statements of the

Automotive Defendants). For example:

- Since at least 2007, American Honda has taken the position that "[t]he installation and use of salvaged or used air bag system components in a Honda or Acura vehicle may compromise the intended performance of that vehicle's air bag system as there is no certainty of the history, quality, condition, or compatibility of a salvaged or used air bag system component." American Honda recommended that "only new Honda or Acura air bag system components designed and designated for use in the specific Honda or Acura vehicle being repaired be installed in that vehicle." RJN, Ex. F.

- Toyota similarly discouraged the use of salvaged airbags: "At this time, we believe there are no systems or processes in place to regulate the quality of used salvage parts in the market…. Due to the critical nature of the Supplemental Restraint Systems, also known as air bags, Toyota does not support the use of any used salvage or imitation parts for repair." RJN, Ex. G.

[9] *See also* RJN, Ex. D (noting that as of 2005, automakers were insisting that only new replacement air bag modules be used and that ARA was aware of their position on recycled airbags), Ex. E.

- New GM (and Old GM before it) has likewise explicitly discouraged the use of salvaged airbags: "Due to the critical nature of the design of air bag systems, GM does not support the use of any used, salvaged, or imitation parts for repair. . . . Never use air bag parts from another vehicle or source. . . . Reuse of used or salvaged components brings into question the conditions under which the components were obtained and stored prior to use. Components could have been damaged or stored under unfavorable conditions that could compromise performance and reliability." RJN, Ex. I.

- In 2012, Volkswagen publicly took the position that "[a]ftermarket, salvage, or remanufactured SRS airbag system parts do not meet the exacting specifications of Genuine Volkswagen Parts and therefore are not an acceptable method of repair on any Volkswagen vehicle. These parts may depreciate the value of the vehicle and/or put the vehicle occupants at risk." RJN, Ex. J.

Indeed, totally ignoring the Automotive Defendants' public safety warnings not to use or resell salvaged airbags of any type, Plaintiffs are the only parties who attempted to create a "resale market" in salvaged airbags.

Given automotive recyclers' and ARA's longstanding knowledge that the Automotive Defendants were actively *discouraging* resale of all salvaged airbags, not just Takata airbags, Plaintiffs cannot plausibly establish proximate causation between the alleged actions, inactions, or representations of the Automotive Defendants and the creation of any purported "resale market."

In short, Plaintiffs' substantive RICO claims (Counts 1, 3, 5, 7, 9, 11, 13, 15, 17, and 19) should be dismissed for lack of proximate cause. That dismissal should be without leave to amend because it is clear that after multiple attempts at amending the Complaint, Plaintiffs do not, and cannot, allege any facts to show that their alleged injuries were directly caused by any alleged mail fraud or wire fraud by the Automotive Defendants.

## 2. Plaintiffs' RICO Conspiracy Claims Under Section 1962(d) Fail

Plaintiffs' failure to state a claim under RICO section 1962(c) is also fatal to their adjunct claims under section 1962(d) for conspiracy (Counts 2, 4, 6, 8, 10, 12, 14, 16, 18, and 20).

"Plaintiffs cannot claim that a conspiracy to violate RICO existed if they do not adequately plead a substantive violation of RICO." *Howard v. Am. Online Inc.*, 208 F.3d 741, 751 (9th Cir. 2000); *see also Efron v. Embassy Suites (Puerto Rico), Inc.*, 223 F.3d 12, 21 (1st Cir. 2000) (same). Accordingly, Counts 2, 4, 6, 8, 10, 12, 14, 16, 18, and 20 should also be dismissed without leave to amend.

### B.     Plaintiffs Fail to State a Claim Under the Lanham Act (Count 21)

Plaintiffs' Lanham Act claim should be dismissed because the allegations do not, and cannot, satisfy the proximate cause requirement; the alleged statements are not actionable as false *or* misleading under the statute; and Plaintiffs lack statutory standing.

To establish a false advertising claim under section 1125(a), a plaintiff must allege that (1) the commercial advertisement was false or misleading; (2) the advertisement deceived, or had the capacity to deceive, consumers; (3) the deception had a material effect on purchasing decisions; (4) the misrepresented product or service affects interstate commerce; and (5) the plaintiff has been—or is likely to be—injured as a result of the false advertising. *Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.*, 299 F.3d 1242, 1247 (11th Cir. 2002). The allegations must also demonstrate plaintiff's standing under *Lexmark Int'l Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 133-34 (2014).

### 1.     Plaintiffs' Lanham Act Claim Fails for Lack of Proximate Cause

To state a viable Lanham Act claim, the plaintiff "must show economic or reputational injury *flowing directly* from the deception wrought by the defendant's advertising." *See Lexmark*, 572 U.S. at 133(emphasis added); *see id.* ("The question [proximate-cause analysis] presents is whether the harm alleged has a sufficiently close connection to the conduct the statute prohibits."). Plaintiffs' Complaint fails to plead allegations sufficient to establish that their alleged injury arises from any of the general statements of the Automotive Defendants identified

14

in the Complaint. Complaint ¶ 210(a)-(j). None of the statements attributed to the Automotive

Defendants mention Plaintiffs' recycling industry or the quality, safety, or reliability of *recycled

airbags*.[10] Many do not relate to airbags at all, but are just general safety-related statements.

More importantly, Plaintiffs fail to allege that the Automotive Defendants' statements resulted in

the decision of *the customers of the Automotive Recycler Plaintiffs* to withhold purchases from

the Automotive Recycler Plaintiffs.

**2.  Plaintiffs' Lanham Act Claim Fails for Lack of False or Misleading
Statements Made in Commercial Advertising or Promotion**

Plaintiffs allege that the Automotive Defendants violated the Lanham Act by falsely

representing that the Class Vehicles were "safe" and "reliable," pointing to scores of purported

representations about "safety and reliability" from the Automotive Defendants as the basis for

their claim. *See* Complaint ¶¶ 840, 847. But these statements, which generally mention the

safety, reliability, quality, and superiority of a limited subset of the Automotive Defendant's

vehicles, are quintessential, non-actionable puffery and cannot support a Lanham Act claim as a

matter of law.

To be actionable under section 1125(a)(1)(B), a statement must be a "specific and

measurable claim, capable of being proved false or of being reasonably interpreted as a statement

of objective fact." *Earthcam, Inc. v. Oxblue Corp.*, No. 11-cv-02278-WSD, 2012 WL 12836518,

at *5 (N.D. Ga. Mar. 26, 2012). Statements that are subjective, exaggerated "puffery" are non-

actionable. *Id.* Courts have routinely recognized that "promoting a car as generally safe and

reliable is too general a representation to be proven true or false" and therefore is non-actionable

puffery. *Zaccagnino v. Nissan N. Am., Inc.*, No. 14 CIV 3690 LLS, 2015 WL 3929620, at *4

---

[10]    To the contrary, as already mentioned, the Automotive Defendants expressly warned
salvaged yards against the propriety of using recycled airbags. *See* RJN, Ex. B, at pp. 2-3.

(S.D.N.Y. June 17, 2015); *see also In re Ford Motor Co. Sec. Litig. Class Action*, 381 F.3d 563, 570 (6th Cir. 2004) (holding phrases such as "worldwide leader in automotive safety" and "designing safety into" cars to make "customers to feel safe and secure in their vehicles at all times" were non-actionable puffery).[11]

Plaintiffs' effort to build a claim based on general statements that the Automotive Defendants have a corporate culture committed to safety or building safe vehicles is equally unavailing. *See, e.g.*, Complaint ¶ 847(a)(iv), (b)(viii), (c)(x), (c)(xiv), (d)(ix), (e)(iii), (f)(v), (g)(ii), (h)(iv), (i)(ii), (j)(iii); *cf. id.* ¶ 906 (alleging the Automotive Defendants committed deception by "presenting themselves as reputable manufacturers that value safety"). Courts have consistently rejected claims based on statements or omissions about a company's culture. *See,*

---

[11]    *Earthcam*, 2012 WL 12836518, at *5 (statements that party is "the leader," "most reliable," "highest performance," are not actionable under the Lanham Act); *Cytyc Corp. v. Neuromedical Sys., Inc.*, 12 F. Supp. 2d, 296, 300-01 (S.D.N.Y. 1998) (statement that product was "the new 'Gold Standard'" was non-actionable under the Lanham Act); *Am. Home Prods. Corp. v. Johnson & Johnson*, 654 F. Supp. 568, 580 (S.D.N.Y. 1987) (claim of "superior safety profile . . . within the tolerable range of commercial puffery"); *Cirulli v. Hyundai Motor Co.*, No. CV 08-0854 AG, 2009 WL 5788762, at *3 (C.D. Cal. June 12, 2009) (statement that vehicle has "excellent design, construction, and safety" is non-actionable); *Sabol v. Ford Motor Co.*, No. 14-6654, 2015 WL 4378504, *5 (E.D. Pa. July 16, 2015) (statements that vehicle was "safe" and "reliable" were non-actionable puffery); *Daigle v. Ford Motor Co.*, No. 09-3214, 2012 WL 3113854, *9 (D. Minn. July 31, 2012) ("[A]dvertisements that the Freestar [minivan] was safe and reliable are merely statements of opinions or commendation, which are not actionable"); *In re Ford Motor Co. E-350 Van Prods. Liab. Litig. (No. II)*, No. 03-4558, 2010 WL 2813788, at *8–9 (D.N.J. July 9, 2010) (statements that vehicle was "very safe" and the like were non-actionable); *In re Gen. Motors Corp. Anti-Lock Brake Prods. Liab. Litig.*, 966 F. Supp. 1525, 1534 (E.D. Mo. 1997) (allegations that "GM has through its national advertisements, press releases and promotions created a false impression that the ABS system is 'safe and reliable'" were "statements of puffery"), *aff'd*, *Briehl v. Gen. Motors Corp.*, 172 F.3d 623 (8th Cir. 1999); *Greater Houston Transp. Co. v. Uber Techs., Inc.*, 155 F. Supp. 3d 670, 683 (S.D. Tex. 2015) (the statement "'SAFEST RIDE ON THE ROAD—Going the Distance to Put People First' is a bald assertion of superiority—a general, subjective claim that lacks concrete measurability" and thus was not actionable); *Hoffman v. A. B. Chance Co.*, 339 F. Supp. 1385, 1388 (M.D. Pa. 1972) ("The general representation that a product 'offered unprecedented safety' is a statement of opinion and is in the nature of seller's 'puffing.'").

*e.g.*, *City of Pontiac Policemen's & Firemen's Retirement Sys. v. UBS AG*, 752 F.3d 173, 183 (2d Cir. 2014) ("It is well-established that general statements about reputation, integrity, and compliance with ethical norms are inactionable 'puffery'"); *ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 205-06 (2d Cir. 2009) (holding that statements concerning company's discipline, integrity, and risk management process "are too general to cause a reasonable investor to rely upon them").[12]

In addition, despite the fact that the recalled vehicles span more than a dozen model years, Plaintiffs cite only a smattering of advertising and other materials that consist of nothing more than subjective statements, non-actionable puffery, or objectively true statements about, for example, the fact that vehicles are equipped with airbags. *E.g.*, Complaint ¶ 847(a) (BMW statements), (b) (FCA statements), (d) (Honda statements), (e) (Mazda statements), (f) (Mercedes statements), (g) (citing a 2005 Nissan brochure and a 2015 website statement), (h) (Subaru statements made in 2005 and 2015), (i) (a 2002 Toyota website representation and another in 2015, both general and not specific to any vehicle), (j) (Volkswagen and Audi statements). The Complaint is similarly devoid of allegations that establish the falsity or misleading nature of any

---

[12]    *Karam v. Corinthian Colleges, Inc.*, No. CV 10-6523-GHK, 2012 WL 8499135, at *10 (C.D. Cal. Aug. 20, 2012) (collecting cases) (statements regarding commitment to regulatory compliance were "too generic and indefinite" to give rise to securities fraud claim); *Footbridge Ltd. v. Countrywide Home Loans, Inc.*, No. 09 Civ. 4050, 2010 WL 3790810, at *24 (S.D.N.Y. Sept. 28, 2010) ("Statements about corporate culture and integrity are typically considered to be inactionable puffery."); *Lopez v. CTPartners Executive Search Inc.*, 173 F. Supp. 3d 12, 28 (S.D.N.Y. 2016) ("It is well-established that general statements about reputation, integrity, and compliance with ethical norms are inactionable 'puffery'"); *City of Sterling Heights Gen. Employees' Ret. Sys. v. Hospira, Inc.*, No. 11 C 8332, 2013 WL 566805, at *24 (N.D. Ill. Feb. 13, 2013) (holding that statements regarding company's goal of achieving a "culture of continuous improvement" was "devoid of substantive factual matter" and thus inactionable puffery); *In re Marsh & Mclennan Co., Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 475 (S.D.N.Y. 2006) (holding company's statements regarding "culture of excellence" were inactionable puffery).

of the statements attributed to the Automotive Defendants.[13] This is fatal to the Lanham Act claim.

Even if these alleged opinion statements could be construed as false because they omit material information—and they cannot—Plaintiffs' claims would fail because they do not allege that the opinion statements were subjectively false. Indeed, to show that a statement of opinion is false, Plaintiffs must show that the Automotive Defendants had knowledge of facts that would render its "opinion fantastic," RESTATEMENT (SECOND) OF TORTS § 539, cmt. c (1977), or that the opinions are so far "removed from the truth as to be incompatible with the facts known to the maker," RESTATEMENT (SECOND) OF CONTRACTS § 168 (1981). *See also M&T Bank Corp.* v. *McGraw-Hill Cos., Inc.*, 5 N.Y.S.3d 783, 785, 126 A.D.3d 1414, 1416, (4th Dep't 2015) (plaintiffs must "plead and prove that the holder of the opinion did not subjectively believe the opinion at the time it was made and made the statement with the intent to deceive."); *cf. Omnicare, Inc.* v. *Laborers Dist. Council Constr. Indus. Pension Fund*, 135 S. Ct. 1318, 1336 (2015) (Scalia, J., concurring) (noting that at common law, opinion statement "was actionable only if the speaker *knew* it was false, if he *knew* he did not know it, or if he *knew* the listener would understand the statement to have a basis *that the speaker knew was not true*."). Here,

---

[13]    See, for example, the allegations concerning the Nissan defendants' statements. Plaintiffs point to a 2005 brochure that purportedly states that among other features, Nissan vehicles possess "advanced airbags that will help safeguard you and your passengers in the event of an accident." Complaint ¶ 847(g)(i). Plaintiffs allege no facts indicating that the vehicles referenced in the brochure (which are unidentified) do not contain advanced airbags or that airbags do not help safeguard occupants in the event of an accident. The statement is neither false nor misleading. The other statement is from the Nissan website in 2015, years after the last recalled vehicles were sold and is nothing more than a statement that Nissan is committed to being a leader in automotive safety. It is typical of the kind of generalized opinion statement that has repeatedly been held not to be actionable under the Lanham Act.

general statements that the Automotive Defendants' vehicles were safe are in no way pled to be so far from reality as to be "fantastical."

### 3. Plaintiffs Do Not Fall Within the Zone of Interests Required to State a Claim Under the Lanham Act

Plaintiffs' Lanham Act claim also fails for the independent reason that Plaintiffs lack statutory standing. The Supreme Court in *Lexmark* clarified that a plaintiff does not have standing to pursue a Lanham Act claim unless the complaint pleads facts sufficient to establish that plaintiff is within the "zone of interests" Congress intended to protect, and that its alleged "economic or reputational injury *flow[s] directly* from the deception wrought by the defendant's advertising." *Lexmark*, 572 U.S. at 133; *see also id.* (a plaintiff typically satisfies standing "when deception of consumers causes them to *withhold trade from the plaintiff*") (emphasis added).

Plaintiffs here fail to allege any connection between the statements made by the Automotive Defendants, *see* Complaint ¶ 847, and Plaintiffs' customers withholding of trade. None of the alleged statements mention Plaintiffs' recycling industry. *See id.* There is similarly no mention of the quality, safety, or reliability of airbags that are sold by Plaintiffs or any other recyclers. *See id.* Plaintiffs thus cannot establish a right to relief under the Lanham Act because their alleged injury "does not stem from conduct . . . which unfairly diminished [plaintiff's] competitive position in the marketplace." *Locus Telecomms., Inc. v. Talk Global LLC*, No. 14-1205, 2014 WL 4271635, at *2 (D.N.J. Aug. 28, 2014); *see also USA Nutraceuticals Grp., Inc. v. BPI Sports, LLC*, No. 15-CIV-80352, 2016 WL 4254257, at *5 (S.D. Fla. Feb. 16, 2016) (Lanham Act plaintiff must allege "a material deception" that makes "consumers [more] likely to purchase [defendant's] products over [plaintiff's]" or unfairly maligns the plaintiff's business).

Plaintiffs additionally fail to allege facts sufficient to demonstrate they are within the "zone of interests" of the Lanham Act false advertising statute. *See Lexmark*, 572 U.S. at 134.

The Supreme Court held in *Lexmark* that "to come within the zone of interests in a suit for false advertising under § 1125(a), a plaintiff must allege an injury to a commercial interest in *reputation or sales*." *Lexmark*, 572 U.S. at 131-32 (emphasis added). Here, Plaintiffs assert that they "would not have purchased the Class Vehicles or [they] would not have paid as much for them as [they] did," (Complaint ¶¶ 83–90) because the "misleading statements had a material effect on the purchasing decisions *of automotive recyclers*," (Complaint ¶ 854). Plaintiffs thus assert injuries as disappointed buyers from third parties, not as competitors. Indeed, they claim the same injury as any disappointed consumer. Under *Lexmark*, they clearly cannot invoke the protection of the Lanham Act: "A consumer who is hoodwinked into purchasing a disappointing product may well have an injury-in-fact cognizable under Article III, but he cannot invoke the protection of the Lanham Act . . . . Even a business misled by a supplier into purchasing an inferior product is, like consumers generally, not under the Act's aegis." *Lexmark*, 572 U.S. at 132; *see also Locus*, 2014 WL 4271635, at *2 (same).

### 4.    Plaintiffs' Lanham Act Claim Fails to State a Claim for Contributory Liability

Nor do Plaintiffs state a claim against the Automotive Defendants as contributorily liable under section 1125(a)(1)(B). Where a plaintiff seeks to hold a defendant "contributorily liable," the allegations must demonstrate that (1) a third party in fact directly engaged in false advertising that injured the plaintiff, and (2) defendant contributed to that conduct either by knowingly inducing or causing the conduct, or by materially participating in it. *Duty Free Ams., Inc. v. Estee Lauder Companies, Inc.*, 797 F.3d 1248, 1277 (11th Cir. 2015). Here, Plaintiffs fail to identify any false advertising by Takata that can serve as the basis for a contributory liability theory.

### C.     Plaintiffs' Consumer Protection Claims Fail for Lack of Proximate Cause and Suffer from Additional Fatal Deficiencies

#### 1.     Plaintiffs' Claims for Violation of Florida's Deceptive and Unfair Trade Practices Act (Count 23) Fail for Lack of Causation

The Florida DUTPA limits recovery to "actual damages" suffered "as a result of" deceptive practices. Fla. Stat. § 501.211(2). Thus, causation is a necessary element of the FDUTPA claim, and must be "direct, rather than remote or speculative." *Lombardo v. Johnson & Johnson Consumer Companies, Inc.*, 124 F. Supp. 3d 1283, 1290 (S.D. Fla. 2015) (quoting *Hennegan Co. v. Arriola,* 855 F. Supp. 2d 1354, 1361 (S.D. Fla. 2012)).

As explained *supra* in Section IV.A.1, Plaintiffs' theory of causation is far too attenuated to satisfy a proximate cause standard. Plaintiffs have not shown any deceptive representations or any omissions that the Automotive Defendants made that are directly traceable to their decision to purchase salvaged Class Vehicles "as is" at auction from a myriad of third party sellers, who themselves have no connection to the Automotive Defendants. The Automotive Defendants do not market to recyclers like Plaintiffs. They do not make representations or warranties that the component parts of a salvaged vehicle are useable or otherwise can be resold. This attenuated theory of causation—which essentially boils down to the notion that the Automotive Defendants put the car in the stream of commerce and after being sold, resold, wrecked, and when it was sold for salvage, it ended up in Plaintiffs' hands—falls short of the standard required to survive dismissal. *See Lombardo*, 124 F. Supp. 3d at 1284 (rejecting FDUPTA claim on causation grounds where manufacturer's alleged misconduct was too remote to affect downstream sales practices of third-party sellers); *Roca Labs, Inc. v. Consumer Opinion Corp.*, No. 8:14-CV-2096, 2014 WL 6389657, at *6 (M.D. Fla. Nov. 16, 2014) (the plaintiff was not likely to prevail on its FDUTPA claim against website operator because the claimed loss of business and reputation

21

stemmed from the content of the reviews rather than any deceptive actions by the website operator).

Moreover, to the extent ARA's and Butler's claims under the Florida DUTPA are predicated on the same conduct that underlies the Lanham Act claim, *see supra* Section IV.B, the FDUTPA claims also necessarily fail. *See Intertape Polymer Corp. v. Inspired Techs., Inc.*, 725 F. Supp. 2d 1319, 1335–36 (M.D. Fla. 2010) (FDUTPA "essentially mirrors" the Lanham Act where predicated on the same conduct and must fail to the extent the Lanham Act claim fails).

### 2. Plaintiffs' Claims for Violation of Florida's Deceptive and Unfair Trade Practices Act (Count 23) Fail for the Additional Reason that Plaintiffs Were Not Involved in Consumer Transactions

In addition to failing for lack of proximate cause as set forth *supra* at Section IV.C.1, Count 23's claims for violation of the FDUTPA fail for the additional reason that a party bringing a claim for a violation of FDUTPA must prove that the injury or detriment resulted from a consumer transaction. *Taxinet, Corp. v. Leon*, No. 16-24266-CIV, 2018 U.S. Dist. LEXIS 116128, at *16 (S.D. Fla. July 10, 2018) ("[A]lthough the scope of the Act applies to protect businesses and individuals, it applies to *consumer transactions* in trade or commerce.") (emphasis supplied); *Pinecrest Consortium, Inc. v. Mercedes-Benz, USA, LLC*, No. 13-20803-CIV-MORENO, 2013 WL 1786356, at *1 (S.D. Fla. April 25, 2013) ("[FDUTPA] has no application to entities complaining of tortious conduct which is not the result of a *consumer transaction*") (emphasis added); *Leon v. Tapas & Tintos, Inc.*, 51 F. Supp. 3d 1290, 1297 (S.D. Fla. 2014) (dismissing FDUTPA claim where plaintiff was not "alleged to have[] engaged in any consumer transaction"). Here, ARA and Butler do not allege that they were involved in consumer transactions under Florida law. Rather, they allege that they are businesses involved in commercial transactions involving purchasing vehicles from "insurance salvage auctions, tow operators, charities, and the public," removing the airbags from the vehicles, and then attempting

22

to resell them to consumers, automotive repair shops, automotive dealerships, wholesalers, or other automotive recyclers. *See* Complaint ¶¶ 83, 89, 455, 457, 458.

### 3. Plaintiffs' Claims for Violation of North Carolina's Unfair and Deceptive Trade Practices Act (Count 25) and Knox's Tennessee CPA Claim (Count 26) Fail for Lack of Proximate Cause

Weaver's and Young's claims under the North Carolina UDTPA, and Knox's claim under the Tennessee CPA also fail for lack of proximate cause. *S. States Imports, Inc. v. Subaru of Am., Inc.*, No. 5:05-CV-752, 2008 WL 2234625, at *7-8 (E.D.N.C. May 30, 2008) (proximate cause requires establishing "a cause which in natural and continuous sequence, unbroken by any new and independent cause, produced the plaintiff's injuries") (quoting *Adams v. Mills,* 322 S.E.2d 164, 171 (N.C. 1984)); *Strates Shows, Inc. v. Amusements of Am., Inc.*, 646 S.E.2d 418, 424 (N.C. Ct. App. 2007); *White v. Early,* 211 S.W.3d 723, 741 (Tenn. Ct. App. 2006) (to recover damages under the Tennessee CPA, a plaintiff must show that the defendant's wrongful conduct proximately caused his injury); *Harvey v. Ford Motor Credit Co.*, No. 03A01-9807-CV-00235, 1999 WL 486894, at *2 (Tenn. Ct. App. July 13, 1999).

The causation elements under the North Carolina UDTPA and the Tennessee CPA are the same as the proximate cause element under RICO. *See Strates Shows, Inc.*, 646 S.E.2d at 425 (stating that element of causation in federal RICO claim is the same as in the North Carolina's UDTPA claim); *Perry v. Am. Tobacco Co.*, 324 F.3d 845, 851 (6th Cir. 2003) (applying same proximate cause standard to Tennessee CPA claim as RICO claim).

Accordingly, for all of the same reasons discussed above with respect to the substantive RICO claims in Section IV.A.1, Weaver's and Young's claims under the North Carolina UDTPA and Knox's claim under the Tennessee CPA must be dismissed because they have not pled proximate cause. *See Strates Shows, Inc.*, 646 S.E.2d at 425 (unsuccessful bidder's claim under the North Carolina UDTPA would fail for lack of proximate cause where it failed to establish

that but for the alleged illegal conduct the plaintiff would have been awarded the contract, including the fact that there were six other bidders); *S. States Imports, Inc.*, 2008 WL 2234625, at *10 (granting summary judgment because there was no proximate cause between the failure to award a new dealer point to dealership and the claimed lost opportunity to establish a new Subaru dealership because of a host of intervening factors, including the existence of other potential dealers and the subjective nature of Subaru's dealership selection process); *White,* 211 S.W.3d at 741 (proximate causation was lacking where purchaser's use and enjoyment of boat slip was not caused by allegedly false representations regarding terms and condition of lease renewal, but rather by the failure of a condition for the continuation of the lease).

Weaver's and Young's North Carolina UDTPA claims are particularly ripe for dismissal because causation under that statute requires both actual and reasonable reliance. *See Baranco v. Ford Motor Co.*, 294 F. Supp. 3d 950, 970 (N.D. Cal. 2018); *Franklin Pres. Ltd. P'ship v. Nurtur N. Carolina, LLC*, No. 1:14CV266, 2016 WL 3039832, at *4 (M.D.N.C. May 27, 2016), *appeal dismissed* (Sept. 22, 2016). Weaver and Young can show neither. They do not allege any representation from any Automotive Defendant that they actually saw or heard. *See, e.g.*, *Kelly v. Georgia-Pac. LLC*, 671 F. Supp. 2d 785, 799 (E.D.N.C. 2009) ("Kelly does not allege actual reliance or that the misrepresentation proximately caused the damage. Thus, the court grants defendants' motion to dismiss the UDTPA claim.") (citation omitted). Nor do they allege any contact with the Automotive Defendants that would create actual reliance on an omission theory. *See Baranco*, 294 F. Supp. 3d at 970 (dismissing UDTPA claim where plaintiff failed to "allege that he interacted with a Ford dealership in connection with the purchase and would have received information therefrom"); *Sain v. Adams Auto Grp., Inc.*, 781 S.E.2d 655, 660 (N.C. Ct. App. 2016) ("Plaintiffs' amended complaint is wholly devoid of allegations tending to show

24

Capital One made any direct statements to Plaintiffs, or Plaintiffs' decision to purchase the vehicle was based on any actual misrepresentations or omissions made by Capital One.").

To the extent Weaver and Young could come up with an actual representation or omission they relied upon (they cannot), that reliance would be unreasonable as a matter of law. The Automotive Defendants consistently disclaimed the reliability and safety of the salvaged airbags putting Plaintiffs on notice that the salvaged airbags that form the basis of Plaintiffs' claims should never be resold. *See supra* Section IV.A.1. Because Weaver and Young fail to show actual and reasonable reliance, their UDTPA claims against all Automotive Defendants must be dismissed. *See Baranco*, 294 F. Supp. 3d at 970; *Sain*, 781 S.E.2d at 660.

### 4. Weaver and Young Lack Standing to Pursue Claims for Violation of the North Carolina Unfair and Deceptive Trade Practices Act (Count 25)

In addition to failing for a lack of proximate cause as set forth *supra* at Section IV.C.3, Weaver's and Young's claims for violation of North Carolina UDPTA fail for the additional reason that the statute's protections extend to businesses only where they are competitors, potential competitors, or are engaged in commercial dealings with each other. *Food Lion, Inc. v. Cap. Cities/ABC, Inc.*, 194 F.3d 505, 520 (4th Cir. 1999) ("one business is permitted to assert an UTPA claim against another business only when the businesses are competitors (or potential competitors) or are engaged in commercial dealings with each other."); *Synergy Fin., L.L.C. v. Zarro*, 329 F. Supp. 2d 701, 710 (W.D.N.C. 2004) (the North Carolina UDTPA could not be used "because there [was] no competitive or business relationship that [could] be policed for the benefit of the consuming public.") (citation omitted); *Static Control Components, Inc. v. Darkprint Imaging, Inc.*, 135 F. Supp. 2d 722, 731 (M.D.N.C. 2001) (superseded by statute on other grounds) ("N.C. G. S. § 75-1.1 . . . appl[ies] to dealings between businesses. . . . [O]ne

business is permitted to assert an UPTA claim against another business only when the businesses are competitors.") (citations omitted).

Weaver's and Young's North Carolina UDTPA claims fail as a matter of law because Weaver and Young have not alleged, and cannot allege, they are competitors, potential competitors, or are engaged in commercial dealings with the Automotive Defendants. Rather Weaver and Young allege that they are involved in commercial transactions with "insurance salvage auctions, tow operators, charities, and the public," removing the airbags from the vehicles, and then attempting to resell them to consumers, automotive repair shops, automotive dealerships, wholesalers, or other automotive recyclers. *See* Complaint ¶¶ 86, 90, 455, 457, 458. None of the Automotive Defendants is engaged in any of these commercial activities.

### 5. Snyder's Claim for Violation of the Texas Deceptive Trade Practices-Consumer Protection Act (Count 27) Fails for Lack of Producing Cause

Snyder's Texas DTPA claim must be dismissed for failure to adequately plead that the Automotive Defendants' conduct was a producing cause of its injuries. The producing cause standard is substantially similar to the proximate cause standard with the lone exception that a plaintiff is not required to show that its harm was foreseeable to the defendant. *Peeler v. Hughes & Luce*, 868 S.W.2d 823, 828 (Tex. App. 1993) (citation omitted). Nevertheless, a plaintiff must still prove an "unbroken causal connection" between the misrepresentation and the injuries. *Doe v. Boys Clubs of Greater Dallas, Inc.*, 907 S.W.2d 472, 481 (Tex. 1995). It is not enough to simply show the defendant's conduct "furnish[ed] a condition which makes the injuries possible." *IHS Cedars Treatment Ctr. of DeSoto, Texas, Inc. v. Mason*, 143 S.W.3d 794, 799 (Tex. 2004). Rather, Plaintiffs must demonstrate a clear causal chain that is unbroken by intervening, negating, or subsequent causes. *See Boys Club*, 907 S.W.2d at 481–82; *Daugherty v. Jacobs*, 187 S.W.3d 607, 615 (Tex. App. 2006) (citing *Boys Club*, 907 S.W.2d at 481).

26

Plaintiffs cannot show the unbroken causal connection required by Texas law. The Automotive Defendants' alleged conduct is far too attenuated from the injuries Plaintiffs claim. Plaintiffs purchased Class Vehicles for purposes of harvesting and reselling hundreds of component parts, of which the airbag is just one, and no reasonable inference can be drawn that any actions or inactions by the Automotive Defendants caused Plaintiffs to purchase Class Vehicles. Plaintiffs fail to identify any specific misrepresentations that they actually saw or heard that induced them to purchase salvaged vehicles containing the Takata airbags. *See Boys Club*, 907 S.W.3d at 480 ("When the statement was made, no transaction was occurring between Mrs. Coe and the Boys Club. The alleged misrepresentation did not induce Mrs. Coe into doing business with the Boys Club, and it was not the producing cause of the damages that later arose from Mullens's acts.") (emphasis removed).

Furthermore, Takata's conduct that led to the federally-mandated recall is an intervening and superseding cause that breaks the purported causal connection between any conduct by the Automotive Defendants and Plaintiffs' possession of harvested junked Takata airbags that they cannot legally sell. *Peace v. ITCOA, LLC*, No. 13-16-00370-CV, 2018 WL 1633518, at *7 (Tex. App. Apr. 5, 2018) (City's employment of its eminent domain power was the but-for cause of the land taking that broke the causal chain between escrow agents' failure to disclose the existence of the easement); *Hopkins v. Green Dot Corp.*, No. 5:16-CV-365, 2016 WL 4468272, at *7 (W.D. Tex. Aug. 24, 2016) (although the defendants' inadequate disclosures and fraud protection measures regarding electronic funds transfer cards furnished a condition that made fraud victim's injuries possible, the alleged inadequate disclosures were not the producing cause of injuries).

Accordingly, Snyder's claim under the Texas DTPA should be dismissed because no plausible facts are alleged to show the existence of producing cause, which is an essential element of the DTPA claim.

**6.      Snyder's Fails to State a Claim for Violation of the Texas Deceptive Trade Practices-Consumer Protection Act Because There is No Connection to a Consumer Transaction (Count 27)**

To recover under the Texas DTPA, a plaintiff must show the defendant engaged in deceptive conduct "in connection with a consumer transaction." *Amstadt v. U.S. Brass Corp.*, 919 S.W.2d 644, 649 (Tex. 1996); *see also Todd v. Perry Homes*, 156 S.W.3d 919, 922 (Tex. App. 2005). The Texas Supreme Court expressly fashioned this rule to limit subsequent purchasers of a product from using the DTPA to "reach upstream manufacturers" who had no connection to their purchase of a product. *Amstadt*, 919 S.W.2d at 644. To avoid dismissal, a plaintiff who is a downstream purchaser must plead one of two exceptions: (1) the remote manufacturer's representations were intended to and did in fact reach it or (2) the plaintiff's "second transaction" with a third party nevertheless benefitted the manufacturer. *Marshall v. Kusch*, 84 S.W.3d 781, 786–87 (Tex. App. 2002); *see also Amstadt*, 919 S.W. 2d at 651 (finding no consumer transaction where there was no evidence defendant's representations were "intended to be or actually [were] passed on to consumers"); *id.* at 652 ("As with Shell, U.S. Brass' marketing efforts were not intended to, nor were they, incorporated into the marketing of the homes to the plaintiffs"). Snyder's fails to adequately plead either.

First, although the Complaint identifies a slew of purported "safety and reliability representations," Complaint ¶ 210, Snyder's does not allege that those representations were intended to reach automotive recyclers like it. Those statements say nothing about the safety, reliability, or value of the wrecked, damaged, and salvaged Class Vehicles, and do not evince any intention that the Automotive Defendants intended those statements to reach junkyards who

28

are looking to buy totaled vehicles for scrap parts. Any argument to the contrary would be foreclosed by the Automotive Defendants' consistent statements disclaiming the safety and reliability of salvaged airbag components. And even if Snyder's could adequately plead that the Automotive Defendants intended for these representations to reach it (and it cannot), it still fails to allege that a single one of those representations *actually* reached it. *Marshall*, 84 S.W. 3d at 787 ("Here, none of Marshall's misrepresentations reached Kusch. Therefore, no misrepresentation was made in connection with the sale to Kusch."). As a result, Snyder's cannot rely on the first exception to *Amstadt*'s consumer transaction requirement.

Second, Snyder's does not put forth any allegations that would satisfy the second exception—showing that this "second transaction" nevertheless benefitted the Automotive Defendants. Plaintiffs do not allege that their isolated transactions with third parties benefitted the Automotive Defendants in the slightest. For good reason—the Automotive Defendants had no connection to these downstream sales and saw no revenue from them whatsoever. *See Marshall*, 84 S.W.3d at 787 ("There was no benefit or agreement that created any benefit to [defendant] if a [third-party seller] sold the property").

Because Snyder's cannot demonstrate that either exception applies, its DTPA claim is barred for failure to show any deceptive conduct occurred "in connection with a consumer transaction." *Todd*, 156 S.W. 3d at 922 (affirming dismissal of DTPA claim where there was no evidence that defendant was "connected to [plaintiffs'] purchase of the home, that any representations [defendant] made about the house reached the [plaintiffs], or that [defendant] benefited from their purchase of the house"). Snyder's Texas DTPA claim fails for this additional reason as well.

### 7. Weaver's Claim for Violation of Georgia's Uniform Deceptive Trade Practices Act Fails (Count 24) for Lack of Standing and Causation

Injunctive relief is the only remedy available under the Georgia UDTPA. *Bolinger v. First Multiple Listing Serv., Inc.*, 838 F. Supp. 2d 1340, 1364 (N.D. Ga. 2012) (citing *Catrett v. Landmark Dodge, Inc.,* 560 S.E.2d 101, 106 (Ga. Ct. App. 2002)). "In order to obtain injunctive relief under Georgia's UDTPA, a plaintiff must show that he is likely to be damaged by the defendant's deceptive trade practice. A plaintiff who demonstrates past harm, but does not allege ongoing or future harm, has not shown that he is likely to be damaged within the meaning of section 10-1-373(a)." *Silverstein v. Procter & Gamble Mfg. Co.,* No. CV 108-003, 2008 WL 4889677, at *4 (S.D. Ga. Nov. 12, 2008); *Helpling v. Rheem Mfg. Co.*, No. 1:15-CV-2247, 2016 WL 1222264, at *15 (N.D. Ga. Mar. 23, 2016) ("To have standing to seek injunctive relief under the [Georgia] UDTPA, a plaintiff must show . . . that she is likely to be damaged in the future by some deceptive trade practice of the defendant") (quotation omitted).

Weaver brings this lawsuit with respect to Class Vehicles with Takata airbags that it purchased "[p]rior to the recalls." Complaint ¶ 86; *see also id.* ¶ 478 (defining Georgia state class as automotive recyclers who, ***prior to the date on which a Class Vehicle was recalled***, purchased a Class Vehicle). To the extent the Court does not dismiss Weaver's Georgia UDTPA claim for lack of proximate cause, because Weaver seeks relief solely for past harm, the Georgia UDTPA claim should be dismissed on the alternative ground that Weaver lacks standing and fails to state a claim under Georgia's UDTPA. *Terrill v. Electrolux Home Prod., Inc.*, 753 F. Supp. 2d 1272, 1291-92 (S.D. Ga. 2010) (dismissing Georgia UDTPA claim where it was based entirely on past wrongs); *see also Willingham v. Glob. Payments, Inc.*, No. 1:12-CV-1157, 2013 WL 440702, at *17 (N.D. Ga. Feb. 5, 2013) (dismissing Georgia UDTPA with prejudice where allegations of future harm were based entirely on speculation of an increased risk of identity

30

theft). And, at a minimum, the Court must strike Weaver's request for "general damages" and "exemplary damages," *see* Complaint ¶¶ 919, 921, because those are indisputably not recoverable under the Georgia UDTPA. *Med S. Health Plans, LLC v. Life of S. Ins. Co.*, No. 4:07-CV-134, 2008 WL 2119915, at *8 (M.D. Ga. May 19, 2008) (dismissing Georgia UDTPA claim where plaintiff sought to recover money damages because "injunctive relief is the only available remedy" under the statute).

Furthermore, because Plaintiffs' claim for violation of Georgia's UDTPA mirrors the Lanham Act false advertising claim standards, Plaintiffs' failure to establish a Lanham Act claim requires that Count 24 necessarily fails as well. *See Earthcam, Inc. v. Oxblue Corp.*, No. 1:11-CV-02278, 2012 WL 12836518, at *4 (N.D. Ga. Mar. 26, 2012).

### D.  Plaintiffs Fail to State a Claim for Fraudulent Concealment and Fraudulent Misrepresentation (Count 22)

#### 1.  Plaintiffs' Claim for Fraudulent Concealment and Fraudulent Misrepresentation Fails for Lack of Proximate Cause

Plaintiffs assert a claim for fraudulent concealment and fraudulent misrepresentation "under the common law of fraudulent concealment." Complaint ¶ 861. While they contend "there are no true conflicts (case-dispositive differences) among various states' laws of fraudulent concealment," that is not true. *Id.* Many states—including several directly at issue here—prohibit a fraudulent concealment claim where there was no transaction between the plaintiff and the defendant.[14] This variation between states is a case-dispositive difference that is

---

[14]     *See, e.g.*, *J-Hanna v. Enter. Rent-A-Car Co. of San Francisco, LLC*, 672 F. App'x 737 (9th Cir. 2017) (affirming summary judgment on Arizona common law fraudulent concealment claim where plaintiff failed to show "Enterprise was a party to the sale of a vehicle to J-Hanna"); *Moore v. Fenex, Inc.*, 809 F.2d 297, 303 (6th Cir. 1987) (applying Ohio law) ("The cases illustrate, and the Restatement supports, that this claim applies between parties to a business transaction. We are aware of no case, nor has any been cited, where a party has been held liable for fraudulent nondisclosure that had no direct dealings with the plaintiff.").

directly implicated here, where not a single Plaintiff engaged in a transaction with any Automotive Defendant to purchase a Class Vehicle. Thus, consistent with Plaintiffs' allegations, their claims should be evaluated under the laws of their respective states. *Id.* ("In the alternative, Plaintiffs brings this claim against Defendants under the laws of the states where Plaintiffs and Class members purchased their Class Vehicles.").

As a threshold issue, Florida, Tennessee, and Texas bar fraudulent concealment claims where the defendant was not a party to the transaction at issue.[15] Thus, the common law fraud claims of Butler, Knox, and Snyder's fail as a matter of law because they have not alleged—nor could they ever allege—that they engaged in a transaction with any Automotive Defendant to acquire the Class Vehicles. But all of Plaintiffs' fraud claims are subject to dismissal for lack of proximate cause. Proximate cause is an essential element of fraud claims under the laws of Florida, Georgia, Missouri, Tennessee, Texas, and Virginia. *See Gardner v. Weiler*, 630 So. 2d 670, 670–71 (Fla. 4th DCA 1994) (**Florida**); *Taylor v. Bennett Chevrolet/Buick, Inc.*, 609 S.E.2d 215, 217 (Ga. Ct. App. 2005) (**Georgia**); *Prof'l Laundry Mgmt. Sys., Inc. v. Aquatic Techs., Inc.*, 109 S.W.3d 200, 205 (Mo. Ct. App. 2003) (**Missouri**); *Stracener v. Swindle*, No. 01A01-9502-

---

[15]   *In re Gen. Motors LLC Ignition Switch Litig.*, 257 F. Supp. 3d 372, 453 (S.D.N.Y. 2017), *modified on reconsideration,* No. 14-MC-2543, 2017 WL 3443623 (S.D.N.Y. Aug. 9, 2017) ("At a minimum, therefore, Texas law requires proof of a transaction between the parties of *some sort* (even arm's length) before a duty to disclose will arise. Because none of the Texas Plaintiffs interacted with New GM directly, New GM's motion to dismiss their fraudulent concealment claims must be and is granted."); *McCabe v. Daimler AG*, 160 F. Supp. 3d 1337, 1354 (N.D. Ga. 2015) (applying Texas law) ("On the other hand, there was no arms length transaction between Stone and Defendants—Stone purchased his car from a third-party seller."); *Taylor v. Am. Honda Motor Co.*, 555 F. Supp. 59, 64 (M.D. Fla. 1982) ("Initially, the plaintiffs' complaint is deficient, if for no other reason, because it fails to allege any sales transaction whatever between Taylor and American Honda. No Florida case has gone so far as to impose upon merchants a duty to disclose information to the public at large, and this Court declines to do so today."); *Patten v. Standard Oil Co. of Louisiana*, 55 S.W.2d 759, 761 (Tenn. 1933) ("Where there is no dealing between the parties, there can be no concealment.")

CH-00047, 1995 WL 414873, at *3 (Tenn. Ct. App. July 14, 1995) (**Tennessee**); *DiGrazia v. Atl. Mut. Ins. Co.*, 944 S.W.2d 731, 735 (Tex. App. 1997) (**Texas**); *Murray v. Hadid*, 385 S.E.2d 898, 903–04 (Va. 1989) (**Virginia**). Similarly, under North Carolina law, detrimental reliance and damages proximately flowing from such reliance are essential elements of a fraud claim. *Joy v. MERSCORP, Inc.*, 935 F. Supp. 2d 848, 862 (E.D.N.C. 2013).

Proximate cause is that "cause that, in a natural and continuous sequence, unbroken by any efficient intervening cause, produced the result complained of, and without which the result would not have occurred." *Mprove v. KLT Telecom, Inc.*, 135 S.W.3d 481, 490 (Mo. Ct. App. 2004) (citation omitted); *see also Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 816 (Tex. 1997) (general damages are recoverable under Texas law if they flow "naturally and necessarily" from the defendant's wrongful act and consequential damages are recoverable if they are the "foreseeable" result of the wrong). An unforeseeable intervening cause will break the causal connection. *See, e.g.*, *Box Office Entm't, LLC v. Brian D. Gordon, CPA, P.A.*, No. 05-21010-CIV, 2007 WL 1362898, at *10 (S.D. Fla. May 9, 2007) (defendants' audit of company was not the proximate cause of the plaintiff's injury stemming from undelivered machines because injunction and asset freeze obtained by the Federal Trade Commission was unforeseeable intervening cause).

Plaintiffs' claimed damages are by no means the natural or foreseeable consequence of the Automotive Defendants' alleged conduct, and the life cycle of the vehicle demonstrates this point clearly: the Automotive Defendants marketed and first sold Class Vehicles, then years (and likely many owners) later those vehicles ended up declared "total losses" or salvaged, resulting in the vehicles being sold at insurance salvage auctions or by tow operators and charities. Then, the vehicles finally ended up in the hands of Plaintiffs, recycling businesses who harvested

33

Takata airbags for resale. Then the Recalls happened, and, after all of those events that stretched

over a long period of years, Plaintiffs are allegedly now in possession of "essentially valueless"

Takata airbags. With all of those uncertain, variable contingencies between the Automotive

Defendants' marketing and sale of the vehicles and the alleged harm, no reasonable person could

conclude that Plaintiffs' decision to purchase these salvaged vehicles was the direct, natural, and

foreseeable consequence of the Automotive Defendants' alleged conduct and, for that reason,

Plaintiffs' claims must fail.

### 2. Plaintiffs' Claim for Fraudulent Concealment and Fraudulent Misrepresentation Fails for Lack of Duty to Disclose and Intent to Defraud

In addition to failing for lack of proximate cause, Plaintiffs' fraud claim fails based on the

absence of a duty to disclose and lack of any plausible allegation of intent to defraud.

Where a fraud claim is based on the failure to disclose material facts, the laws of the

states in which Plaintiffs reside require that there be a relationship between the parties that gives

rise to a legal duty on the part of a defendant to disclose the allegedly material fact to the

plaintiff.[16] Plaintiffs' fraudulent concealment claim fails because they do not allege any facts

---

[16]   *See Friedman v. Am. Guardian Warranty Servs., Inc.*, 837 So. 2d 1165, 1166 (Fla. 4th DCA 2003) (fraud based upon a failure to disclose material information exists only when a duty to make such disclosure exists, and such duty arises when one party has information which the other party has a right to know because there is a fiduciary or other relation of trust or confidence between the two parties) (citations omitted) (**Florida**); *Williams v. Dresser Indus., Inc.*, 120 F.3d 1163, 1167 n.15 (11th Cir. 1997) ("An obligation to disclose must exist before a party may be held liable for fraud based upon the concealment of material facts.") (citing *William Goldberg & Co., Inc. v. Cohen*, 466 S.E.2d 872, 877 (Ga. Ct. App. 1995)) (**Georgia**); *Harris v. Mid-W. Egg Donation, LLC*, 365 S.W.3d 274, 276 (Mo. Ct. App. 2012) ("Silence or nondisclosure becomes misrepresentation only when there is a duty to speak.") (**Missouri**); *Breeden v. Richmond Cmty. Coll.*, 171 F.R.D. 189, 196 (M.D.N.C. 1997) ("Outside of a fiduciary relationship, a duty to disclose may also arise in situations where parties are dealing at arm's length and one party has taken affirmative steps to conceal material facts from the other, or where one party has knowledge of a latent defect in the subject matter of the dealings about which the other party is both ignorant and unable to discover through reasonable diligence.") (**North Carolina**); *Saltire Indus., Inc. v. Waller, Lansden, Dortch & Davis, PLLC*, 491 F.3d 522, 529 (6th Cir. 2007)

34

establishing that any of the Automotive Defendants had a relationship that would require them to

provide any information of any kind to Plaintiffs. To start, Florida, Georgia, and Texas do not

impose a duty to disclose unless the parties have a fiduciary or confidential relationship.[17] The

remaining states—Missouri, North Carolina, Tennessee, and Virginia—do not impose a duty to

disclose unless the parties are engaged in an arm's length transaction.[18] And even then much

---

(finding that in the absence of either a fiduciary, contractual, or other business relationship, there was no duty to disclose) (**Tennessee**); *Myre v. Meletio*, 307 S.W.3d 839, 843 (Tex. App. 2010) ("In the absence of a duty to disclose, however, a failure to disclose does not constitute fraud.") (citations omitted) (**Texas**); *Frank Brunckhorst CO., L.L.C. v. Coastal Atl., Inc.*, 542 F. Supp. 2d 452, 461 (E.D. Va. 2008) (the concealment of a material fact is only actionable as fraud if there exists some duty on the part of the concealing party to disclose) (**Virginia**).

[17]   *See In re Gen. Motors LLC Ignition Switch Litig.*, 257 F. Supp. 3d at 454 (applying Texas law) ("Plaintiffs' fraudulent concealment claims cannot proceed absent fiduciary or confidential relationships."); *McCabe v. Daimler AG*, 160 F. Supp. 3d 1337, 1351 (N.D. Ga. 2015) ("Plaintiffs have failed to cite to a single case in which a court has applied Georgia law to find a duty to disclose outside of a confidential or special relationship in facts similar to this case, where there is no evidence that Defendants had direct knowledge of Plaintiffs' purchases of the vehicles in question and had no apparent relationship with Plaintiffs."); *TransPetrol, Ltd. v. Radulovic*, 764 So. 2d 878, 879-80 (Fla. Dist. Ct. App. 2000) (duty to disclose only arises under Florida law "because of a fiduciary or other relation of trust or confidence between [the parties]"); *accord State v. Mark Marks, P.A.*, 698 So. 2d 533, 539 (Fla. 1997) (same); *Ins. Co. of N. Am. v. Morris*, 981 S.W.2d 667, 674 (Tex. 1998) ("Generally, no duty of disclosure arises without evidence of a confidential or fiduciary relationship."); *Gonzalez v. Nat'l Ins. Crime Bureau*, 427 F. App'x 394, 398 (5th Cir. 2011) (same); *Coburn Supply Co., Inc. v. Kohler Co.*, 342 F.3d 372 (5th Cir. 2003) (applying Texas law); *Imperial Premium Fin., Inc. v. Khoury*, 129 F.3d 347, 352-53 (5th Cir. 1997) ("Under Texas law, in the absence of a duty to disclose, mere silence does not amount to fraud or misrepresentation; and a duty to disclose arises only where a fiduciary or confidential relationship exists."); *see also Bradford v. Vento*, 48 S.W.3d 749, 755-56 (Tex. 2001) (expressly declining to recognize duty to disclose "in an arm's-length business transaction when a party makes a partial disclosure that, although true, conveys a false impression").

[18]*See Saltire Indus., Inc. v. Waller, Lansden, Dortch & Davis, PLLC*, 491 F.3d 522, 529 (6th Cir. 2007) ("Although the Tennessee courts have recognized that a duty to disclose can arise even where a fiduciary relationship did not exist, there has always been a contractual or other type of business relationship between the parties underlying the fraud claim."); *Ratcliff v. Am. Honda Motor Co, Inc.*, No. 17CV174, 2018 WL 3542865, at *3 (M.D.N.C. July 23, 2018) (dismissing fraudulent concealment claim where plaintiff failed to allege "she was in any type of arms-length dealings with Ford or Hennessy, nor has she alleged a fiduciary or other direct relationship that would create a duty to disclose under North Carolina law"); *McCabe v. Daimler AG*, 160 F. Supp. 3d at 1355-57 (rejecting duty to disclose on remote manufacturer where plaintiff could not

35

more is required to impose a duty within the context of an arm's length transaction. Here, Plaintiffs do not allege the existence of any relationship whatsoever between any of the Automotive Defendants and Plaintiffs. That failure alone requires dismissal of the fraud claim. *See Myre v. Meletio*, 307 S.W.3d 839, 843 (Tex. App. 2010) (concluding that developer could not be liable for fraud as there was no basis to impose a duty to disclose to homeowners with whom the developer had no relationship and no contact).

    Plaintiffs' fraud claim against the Automotive Defendants also fails because Plaintiffs have not alleged, and cannot allege, facts establishing that the Automotive Defendants *intended to induce Recycler Plaintiffs* to buy Class Vehicles, as required by the applicable states' laws.[19]

---

show an "underlying contractual relationship"); *Breeden v. Richmond Cmty. Coll.*, 171 F.R.D. 189, 196 (M.D.N.C. 1997) ("Outside of a fiduciary relationship, a duty to disclose may also arise in situations where parties are dealing at arm's length and one party has taken affirmative steps to conceal material facts from the other, or where one party has knowledge of a latent defect in the subject matter of the dealings about which the other party is both ignorant and unable to discover through reasonable diligence."); *Harton v. Harton*, 344 S.E.2d 117, 119 (N.C. Ct. App. 1986) ("The two remaining situations in which a duty to disclose exists arise outside a fiduciary relationship, *when the parties are negotiating at arm's length*." (emphasis added)); *In re Gen. Motors Corp. Anti-Lock Brake Prod. Liab. Litig.*, 966 F. Supp. 1525, 1535 (E.D. Mo. 1997), *aff'd sub nom. Briehl v. Gen. Motors Corp.*, 172 F.3d 623 (8th Cir. 1999) (absent sales transaction between the parties, there was no duty to disclose information to the public at large); *Murray v. Royal Const. Co.*, No. CL01–04–7383, 2002 WL 32238304, at *2 (Va. Cir. Ct. June 10, 2002) (dismissing fraud claim where plaintiff failed to allege "any communication" or "any type of relationship" between him and defendant).

[19] *Lance v. Wade*, 457 So. 2d 1008, 1011 (Fla. 1984) (fraud requires "intent by the person making the statement that the representation will induce another to act on it") (**Florida**); *Romedy v. Willett Lincoln-Mercury, Inc.*, 220 S.E.2d 74, 75 (Ga. Ct. App. 1975) (fraud and or deceit requires "an intention to induce the plaintiff to act or refrain from acting in reliance by the plaintiff") (quotations and citations omitted) (**Georgia**); *Prof'l Laundry Mgmt. Sys., Inc. v. Aquatic Techs., Inc.*, 109 S.W.3d 200, 205 (Mo. Ct. App. 2003) (elements of fraud include "the speaker's intent that the representation should be acted upon by the hearer in a manner reasonably contemplated") (citation omitted) (**Missouri**); *Moore v. Midgette*, 252 F. Supp. 776, 779 (E.D.N.C. 1966) (an essential element of actionable fraud is an intent to deceive) (citing *Early v. Eley*, 91 S.E.2d 919 (N.C. 1956)) (**North Carolina**); *Finley v. Kondaur Capital Corp.*, 909 F. Supp. 2d 969, 977 (W.D. Tenn. 2012) (common law fraud in Tennessee requires fraudulent intent) (internal quotations omitted) (**Tennessee**); *Garcia v. Vera*, 342 S.W.3d 721, 725 (Tex. App. 2011) (an element of fraud is an intent to induce reliance) (citations omitted)

Indeed, because the Automotive Defendants do not sell to Plaintiffs and Plaintiffs do not confer

any benefit on the Automotive Defendants, it is implausible that the Automotive Defendants had

any intent to induce Plaintiffs' reliance or any intent to deceive Plaintiffs.  Thus, Plaintiffs cannot

state a viable fraud claim against the Automotive Defendants because there is not a shred of

evidence set forth in the Complaint to support the assertion that any of them *intended* for

Plaintiffs to purchase Class Vehicles for the purpose of reselling Takata airbags to consumers.

Here too, there is no plausible connection between alleged cause and effect.

### 3.    Plaintiffs Fail to Allege They Actually and Justifiably Relied on Any Actionable Representations

Perhaps acknowledging that they cannot pursue an omission theory because the

Automotive Defendants owed them no duty to disclose, Plaintiffs allege that the Automotive

Defendants are also liable because they "misrepresented the safety and reliability of [their]

vehicles." Complaint ¶ 869. But those allegations are equally deficient and any fraudulent

misrepresentation claim must be dismissed for two reasons. First, like their Lanham Act claim,

Plaintiffs have not identified any actionable representations and instead can only point to

commercial puffery from each Automotive Defendant touting the safety, reliability, and

superiority of their vehicles. *See supra* Section IV.B.2. And second, Plaintiffs have failed to

adequately plead the indispensable elements of actual and justifiable reliance.[20]

---

(**Texas**); *Van Deusen v. Snead*, 441 S.E.2d 207, 209 (Va. 1994) (an element of fraud is an intent to mislead) (citation omitted) (**Virginia**).

[20]    *Caper Corp. v. Wells Fargo Bank, N.A.*, 578 F. App'x 276, 281 (4th Cir. 2014) (applying North Carolina law) ("To state a claim for actual fraud, the plaintiff must allege facts plausibly showing that . . . the plaintiff relied on the representation and its reliance was reasonable . . . ."); *Saltire*, 491 F.3d at 526 (holding Tennessee law requires "reasonable reliance on the representation"); *Daimler*, 160 F. Supp. 3d at 1350 (holding Georgia fraud law requires "justifiable reliance"); *Grant Thornton LLP v. Prospect High Income Fund*, 314 S.W. 3d 913, 923 (Tex. 2010) ("Both fraud and negligent misrepresentation require that the plaintiff show actual and justifiable reliance."); *Maison v. Ford Motor Co.*, No. 1:04-CV-041-SPM, 2005 WL 1684159, at *1 (N.D. Fla. July 7, 2005) ("Under Florida law, a claim of fraudulent concealment

Plaintiffs' fraud claims require a particularized showing of reliance at the pleading stage, which the Complaint fails to include. To begin with, Plaintiffs cannot show reliance on any misrepresentations or omissions by the Automotive Defendants because they offer nothing more than a series of vague statements about "safety" in a handful of the Automotive Defendants' marketing materials and do not specify who relied upon each statement, when they viewed each statement, or how they relied upon it. *See*, *e.g.*, Complaint ¶¶ 83-90, 209-210, 867-868. None of the Plaintiffs have alleged that they read or relied on any of the challenged misstatements, nor have they pled "any specific interactions with [the Automotive Defendants] before purchasing their [v]ehicles." *Hindsman v. General Motors LLC*, No. 17-cv-05337, 2018 WL 2463113, at *13 (N.D. Cal. June 1, 2018). Instead, they merely make generalized allegations regarding the *existence* of commercials, marketing materials, press releases, and internet advertisements about safety and reliability, *see, e.g.*, Complaint ¶ 210(a)–(j), which is insufficient to plead reliance even under a theory of fraudulent concealment. *Id.; see also Belville v. Ford Motor Co.*, 13 F. Supp. 3d 528, 546 (S.D. W.Va. 2014) (dismissing fraudulent concealment claim because "although Plaintiffs identify . . . various reports, advertisements, and statements made by Ford, no Plaintiff states he or she actually saw, heard, or relied upon any of those specific reports, advertisements, or statements").

Moreover, even if they could plead reliance—and they cannot—any such reliance would be unjustified and unreasonable because the Automotive Defendants routinely discouraged and

---

requires . . . resulting injury to the party *acting in justifiable reliance on the representation*." (emphasis added)); *Govreau v. Albers*, No. 2:10-CV-04135, 2010 WL 4817143, at *2 (W.D. Mo. Nov. 22, 2010) ("To prove a claim for fraud in Missouri, a plaintiff must show . . . (5) the hearer's reliance on [the representation's] truth, and the right to rely thereon. . . ."); *Metrocall of Delaware, Inc. v. Continental Cellular Corp.*, 437 S.E.2d 189, 194 (Va. 1993) ("But to establish fraud, it is essential the defrauded party demonstrates the right to reasonably rely upon the misrepresentation; some courts label this requirement 'justifiable reliance.'" (citation omitted)).

disclaimed the reliability and safety of salvaged airbag modules like the ones that form the basis

of Plaintiffs' damages claim. Thus, because any reliance would be unreasonable, it would be

futile to allow Plaintiffs to amend their pleading to allege reliance. As a result, the Court should

dismiss Count 22 with prejudice.

## V.     <u>CONCLUSION</u>

For the foregoing reasons, all of Plaintiffs' claims against the Automotive Defendants

contained in the First Amended Consolidated Class Action Complaint should be dismissed

without leave to amend. Plaintiffs have already had opportunities to amend, and are no closer to

stating a viable claim than they were at the start of this MDL. Further amendments would

similarly be futile because there is not, and never will be, any causal connection between

anything the Automotive Defendants did or didn't do and the Plaintiffs' alleged damages.

Dismissal should be granted without leave to amend.

### REQUEST FOR HEARING

Pursuant to Local Rule 7.1(b)(2), the Automotive Defendants hereby respectfully request

oral argument on their Joint Motion to Dismiss the Automotive Recyclers' Complaint.  Given the

number of causes of action asserted by Plaintiffs against multiple Automotive Defendants and

the unique circumstances presented in this case, the Automotive Defendants believe that the

Court's decision-making process would be significantly aided by oral argument. A hearing on

the motion would be helpful to the Court because this litigation is at a critical stage in the

proceedings where Plaintiffs' 27 causes of action likely can be streamlined for purposes of

litigation. The Automotive Defendants estimate one hour will be necessary for argument.

*(Signature pages follow)*

Dated: August 20, 2018                    Respectfully submitted,

                                          By: */s/ Mitchell E. Widom*

                                          **Michael L. Mallow** (*admitted pro hac vice*)
                                          mmallow@sidley.com
                                          **SIDLEY AUSTIN LLP**
                                          555 West Fifth Street
                                          Los Angeles, CA 90013
                                          T: 213 896-6000
                                          F: 213 896-6600

                                          **Eric S. Mattson** (*admitted pro hac vice*)
                                          emattson@sidley.com
                                          **Michael C. Andolina** (*admitted pro hac vice*)
                                          mandolina@sidley.com
                                          **SIDLEY AUSTIN LLP**
                                          One South Dearborn Street
                                          Chicago, IL 60603
                                          T: 312 853-7000
                                          F: 312 853-7036

                                          **Marty Steinberg**
                                          marty.steinberg@hoganlovells.com
                                          **HOGAN LOVELLS LLP**
                                          600 Brickell Avenue, Suite 2700
                                          Miami, FL 33131
                                          T: 305 459-6629
                                          F: 305 459-6550

                                          **Mitchell Widom**
                                          mwidom@bilzin.com
                                          **BILZIN SUMBERG BAENA
                                          PRICE & AXELROD LLP**
                                          1450 Brickell Avenue, Suite 2300
                                          Miami, FL 33131
                                          T: 305 374-7580
                                          F: 305 374-7593

                                          *Counsel for American Honda Motor Co.,
                                          Inc., Honda of America Mfg., Inc., Honda
                                          Motor Co., Ltd., and Honda R&D Co. Ltd.*

| */s/ Jesse H. Diner* | */s/ Michael C. Marsh* |
|---|---|
| **Rosemary J. Bruno** | **Cari K. Dawson** |
| rosmary.bruno@bipc.com | cari.dawson@alston.com |

| | |
|---|---|
| (*admitted pro hac vice*) | **Scott A. Elder** |
| **Christopher Dalton** | scott.elder@alston.com |
| christopher.dalton@bipc.com | **Daniel C. Norris** |
| (*admitted pro hac vice*) | daniel.norris@alston.com |
| **Jesse H. Diner** | **Jason Rottner** |
| jesse.diner@bipc.com | jason.rottner@alston.com |
| **BUCHANAN INGERSOLL & ROONEY PC** | **ALSTON & BIRD LLP** |
| 550 Broad Street, Suite 810 | One Atlantic Center |
| Newark, NJ 07102 | 1201 West Peachtree Street |
| T: 973 273-9800 | Atlanta, GA 30309 |
| **BUCHANAN INGERSOLL & ROONEY PC** | T: 404 881-7000 |
| 1200 East Las Olas Blvd., Suite 500 | F: 404 881-7777 |
| Fort Lauderdale, FL 33301 | (*admitted pro hac vice*) |
| T: 954-703-3900 | **Michael C. Marsh** |
| | michael.marsh@akerman.com |
| **Eric Kizirian** | **Ryan Roman** |
| eric.kizirian@lewisbrisbois.com | ryan.roman@akerman.com |
| (*admitted pro hac vice*) | **AKERMAN LLP** |
| **LEWIS BRISBOIS BISGAARD & SMITH LLP** | 98 Southeast Seventh St., Ste. 1100 |
| 633 W. 5th Street, Suite 4000 | Miami, FL 33131 |
| Los Angeles, CA 90071 | T: 305 374-5600 |
| T: 213-250-1800 | |
| | ***Counsel for Mazda Motor of America, Inc. and Mazda Motor Corporation*** |
| ***Counsel for BMW of North America, LLC and BMW Manufacturing Co., LLC*** | |
| /s/ Ramón A. Abadin | /s/ Stanley H. Wakshlag |
| **E. Paul Cauley, Jr.** | **Jeffrey L. Chase** |
| paul.cauley@dbr.com | jchase@herzfeld-rubin.com |
| **S. Vance Wittie** | **Michael B. Gallub** |
| vance.wittie@dbr.com | mgallub@herzfeld-rubin.com |
| **DRINKER BIDDLE & REATH LLP** | **Homer B. Ramsey** |
| 1717 Main Street | hramsey@herzfeld-rubin.com |
| Suite 5400 | **HERZFELD & RUBIN, P.C.** |
| Dallas, TX 75201 | 125 Broad Street |
| T: 469 357-2500 | New York, NY 10004 |
| F: 469 327-0860 | T: 212 471-8500 |
| (*admitted pro hac vice*) | F: 212 344-3333 |
| | (*admitted pro hac vice*) |
| **Ramón A. Abadin** | |
| rabadin@abadinlaw.net | **Stanley H. Wakshlag** |
| **RAMON A. ABADIN, P.A.** | shw@knpa.com |
| 2333 Ponce de Leon Boulevard | **Robert D.W. Landon III** |

41

| | |
|---|---|
| BAC Colonnade Office Tower, Suite 134<br>Coral Gables, FL 33134<br>T: (305) 768-9839<br><br>**_Counsel for Nissan North America, Inc. and Nissan Motor Co., Ltd._** | rdl@knpa.com<br>**KENNY NACHWALTER, P.A.**<br>1441 Brickell Avenue<br>Suite 1100<br>Miami, FL 33131<br>T: 305 373-1000<br>F: 305 372-1861<br><br>**_Counsel for Subaru of America, Inc. and Fuji Heavy Industries Ltd. n/k/a Subaru Corporation_** |
| _/s/ John C. Seipp, Jr._<br>**Terri S. Reiskin**<br>treiskin@dykema.com<br>**DYKEMA GOSSETT PLLC**<br>1301 K Street, NW, Suite 1100 West<br>Washington, D.C. 20005<br>T: 202 906-8600<br>F: 855 216-7884<br>_(admitted pro hac vice)_<br>**John C. Seipp, Jr.**<br>john.seipp@bowmanandbrooke.com<br>**Donald A. Blackwell**<br>donald.blackwell@bowmanandbrooke.com<br>**BOWMAN AND BROOKE LLP**<br>Two Alhambra Plaza, Suite 800<br>Miami, FL 33134<br>T: 305 995-5600<br>F: 305 995-6090<br>**Robert M. Brochin**<br>rbrochin@morganlewis.com<br>**MORGAN LEWIS & BOCKIUS LLP**<br>200 S. Biscayne Blvd., Suite 5300<br>Miami, FL 33131<br>T: 305 415 3456<br>F: 305 415 3001<br><br>**_Counsel for Toyota Motor Sales, U.S.A., Inc., Toyota Motor Engineering & Manufacturing North America, Inc., and Toyota Motor Corporation_** | _/s/ Leonid Feller_<br>**Renee D. Smith**<br>Renee.smith@kirkland.com<br>**Leonid Feller**<br>Leonid.feller@kirkland.com<br>**Kirkland & Ellis LLP**<br>300 North LaSalle, Suite 2400<br>Chicago, IL 60654<br><br>**Laurie M. Riley**<br>lriley@joneswalker.com<br>**Jones Walker LLP**<br>201 South Biscayne Blvd. Suite 2600<br>Miami, FL 33131<br><br>**_Counsel for General Motors Company, General Motors Holdings LLC, and General Motors LLC_** |
| _/s/ Gerald E. Greenberg_<br>**Adam M. Schachter**<br>Florida Bar No. 647101 | _/s/ Douglas B. Brown_<br>**Douglas B. Brown**<br>Florida Bar No. 242527 |

| | |
|---|---|
| aschachter@gsgpa.com<br>**Gerald E. Greenberg**<br>Florida Bar No. 440094<br>ggreenberg@gsgpa.com<br>**GELBER SCHACHTER & GREENBERG, P.A.**<br>1221 Brickell Avenue, Suite 2010<br>Miami, Florida 33131<br>Telephone: (305) 728-0950<br>Facsimile: (305) 728-0951<br>E-service: efilings@gsgpa.com<br><br>**Robert J. Giuffra, Jr.** (*pro hac vice*)<br>**Suhana S. Han** (*pro hac vice*)<br>**Yavar Bathaee** (*pro hac vice*)<br>**SULLIVAN & CROMWELL LLP**<br>125 Broad Street<br>New York, NY 10004<br>Telephone: (212) 558-4000<br>giuffrar@sullcrom.com<br>hans@sullcrom.com<br>bathaeey@sullcrom.com<br><br>**James H. Congdon** (*pro hac vice*)<br>**SULLIVAN & CROMWELL LLP**<br>1700 New York Ave NW<br>Washington, DC 20006<br>Telephone: (202) 956-7500<br>congdonj@sullcrom.com<br><br>*Counsel for Volkswagen Group of America, Inc., Audi of America, LLC, Volkswagen AG, and Audi AG* | dbrown@rumberger.com<br>**Scott M. Sarason**<br>Florida Bar No. 394718<br>ssarason@rumberger.com<br>**RUMBERGER, KIRK & CALDWELL**<br>Brickell City Tower, Suite 3000<br>80 Southwest 8th Street<br>Miami, FL 33130-3037<br>T: 407 839-4550<br>F: 407 835-2050<br><br>**Brian D. Glueckstein** (*pro hac vice*)<br>gluecksteinb@sullcrom.com<br>**Darrell S. Cafasso** (*pro hac vice*)<br>cafassod@sullcrom.com<br>**SULLIVAN & CROMWELL LLP**<br>125 Broad Street<br>New York, NY 10004<br>T: 212 558-4000<br>F: 212 558-3588<br><br>**Elizabeth A. Rose** (*pro hac vice*)<br>rosee@sullcrom.com<br>**SULLIVAN & CROMWELL LLP**<br>1700 New York Avenue, N.W.<br>Suite 700<br>Washington, D.C. 20006<br>T: 202 956-7500<br>F: 202 293-6330<br><br>*Counsel for FCA US LLC* |
| /s/ Raoul G. Cantero<br>Raoul G. Cantero (Florida Bar No.: 552356)<br>rcantero@whitecase.com<br>Angela D. Daker (Florida Bar No.: 681571)<br>adaker@whitecase.com<br>**WHITE & CASE LLP**<br>Southeast Financial Center<br>200 South Biscayne Boulevard, Suite 4900<br>Miami, FL 33131<br>Telephone:     +1 305 371 2700<br>Facsimile:      +1 305 358 5744 | /s/ Steven D. Jansma<br>**Steven D. Jansma**<br>steven.jansma@nortonrosefulbright.com<br>**NORTON ROSE FULBRIGHT US LLP**<br>300 Convent Street, Suite 2100<br>San Antonio, Texas 78205<br>(210) 270 9366<br><br>**Jessica Farley**<br>jessica.farley@nortonfosefulbright.com<br>**NORTON ROSE FULBRIGHT US LLP**<br>1301 McKinney, Suite 5100<br>Houston, Texas 77010-3095 |

| | |
|---|---|
| Troy M. Yoshino (*admitted pro hac vice*)<br>troy.yoshino@squirepb.com<br>Eric Knapp (*admitted pro hac vice*)<br>eric.knapp@squirepb.com<br>**SQUIRE PATTON BOGGS (US) LLP**<br>275 Battery Street, Suite 2600<br>San Francisco, CA 94111<br>Telephone: +1 415 954 0200<br><br>***Counsel for Defendants Mercedes-Benz USA, LLC and Daimler AG*** | ***Counsel for Bayerische Motoren Werke AG*** |

## ATTESTATION REGARDING SIGNATURES

Pursuant to the CM/ECF Administrative Procedures for the United States District Court, Southern District of Florida, I, Mitchell E. Widom, counsel for defendants American Honda Motor Co., Inc., Honda of America Mfg., Inc., Honda Motor Co., Ltd., and Honda R&D Co. Ltd., hereby attest that those defendants, along with defendants BMW of North America, LLC, BMW Manufacturing Co., LLC, Bayerische Motoren Werke AG, FCA US LLC, General Motors LLC, General Motors Holdings LLC, General Motors Company, Mazda Motor Corporation, Mazda Motor of America, Inc., Mercedes-Benz USA, LLC, Daimler AG, Nissan Motor Co., Ltd., Nissan North America, Inc., Fuji Heavy Industries n/k/a Subaru Corporation, Subaru of America, Inc., Toyota Motor Corporation, Toyota Motor Sales, U.S.A., Inc., Toyota Motor Engineering & Manufacturing North America, Inc., Volkswagen Aktiengesellschaft, Volkswagen Group of America, Inc., Audi Aktiengesellschaft, and Audi of America, LLC, concur in the content and have authorized the filing of Automotive Defendants' Motion to Dismiss Automotive Recycler Plaintiffs' First Amended Complaint and Incorporated Memorandum of Law.

*/s/ Mitchell E. Widom*
Mitchell E. Widom

## CERTIFICATE OF SERVICE

I hereby certify that on August 20, 2018, I electronically filed the foregoing document

with the Clerk of the Court using CM/ECF. I also certify the foregoing document is being served

today on all counsel of record in this case via transmission of Notice of Electronic Filing

generated by CM/ECF.

*/s/ Mitchell E. Widom*
Mitchell E. Widom

**EXHIBIT B**

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

**IN RE TAKATA AIRBAG PRODUCT
LIABILITY LITIGATION**

THIS DOCUMENT RELATES TO
ECONOMIC LOSS TRACK CASES

BRIDGET BOYD, *et al.*, individually and
on behalf of all others similarly situated,

                           *Plaintiffs*,

    v.

FCA US LLC,

                          *Defendant*.

MDL No. 2599
Master File No. 15-MD-02599-FAM
S.D. Fla. Case No. 1:15-CV-24009-FAM

## FCA US LLC'S MOTION TO DISMISS
## THE AMENDED CONSOLIDATED COMPLAINT
## <u>AND INCORPORATED MEMORANDUM OF LAW</u>

## TABLE OF CONTENTS

**PAGE**

PRELIMINARY STATEMENT ............................................................................1

FACTUAL AND PROCEDURAL BACKGROUND.............................................7

    A.    Chrysler's Bankruptcy and Formation of FCA US LLC ........................7

    B.    Takata's Defective Airbags........................................................................8

    C.    Prior MDL Proceedings ...........................................................................10

    D.    Takata's Guilty Plea and Liquidation .....................................................11

    E.    Plaintiffs' Attempt to Restart the MDL Proceedings.............................12

LEGAL STANDARD.............................................................................................18

ARGUMENT ..........................................................................................................19

I.    THE COURT LACKS PERSONAL JURISDICTION OVER FCA...............19

    A.    FCA Is Not Subject to General Jurisdiction in Florida...........................19

    B.    FCA Is Not Subject to Specific Jurisdiction in Florida for Any of
        Plaintiffs' Claims .....................................................................................20

II.    PLAINTIFFS DO NOT ADEQUATELY PLEAD A RICO CLAIM AGAINST
      FCA.............................................................................................................26

    A.    Plaintiffs Do Not Plead That FCA Participated in a RICO Enterprise .................26

    B.    Plaintiffs Fail to Allege That FCA Engaged in a Pattern of Racketeering
        Activity .....................................................................................................28

    C.    Plaintiffs Do Not Plead a Cognizable RICO Injury.................................33

    D.    Plaintiffs Do Not Plead Proximate Causation..........................................35

III.    THE CLAIMS OF SEVEN PLAINTIFFS WHO OWN CHRYSLER VEHICLES
       ARE BARRED BY THE SALE ORDER ........................................................36

IV.    PLAINTIFFS' COMMON-LAW AND STATE CONSUMER PROTECTION
       ACT CLAIMS FAIL AS A MATTER OF LAW..........................................37

    A.    Plaintiffs Fail to Allege Actionable Misstatements ...............................38

i

B.     Plaintiffs Do Not Adequately Allege That FCA Knew That Takata's PSAN Inflators Were Defective............................................................................39

C.     Plaintiffs Fail to Allege That They Relied on Any of FCA's Alleged Misstatements ............................................................................................44

D.     Many of Plaintiffs' Common-Law and Consumer Protection Act Claims Are Time-Barred Because No Tolling Doctrine Applies .....................................45

E.     Plaintiffs' Common-Law Unjust Enrichment Claims Should Be Dismissed for Failure to Adequately Allege Privity ..............................................46

F.     Numerous Plaintiffs' Claims Are Barred by the Economic Loss Rule ................47

G.     Seventeen of Plaintiffs' Consumer Protection Acts Claims Should Be Dismissed for Several Additional Reasons............................................................48

V.     PLAINTIFFS' IMPLIED WARRANTY CLAIMS AND CORRESPONDING MMWA CLAIMS SHOULD BE DISMISSED ....................................................48

A.     Plaintiffs' MMWA Claims Cannot Proceed as a Class Action ...........................48

B.     Plaintiffs' MMWA Claims Fail Where There Is No Related Implied Warranty Claim.......................................................................................49

C.     The New York and North Carolina Plaintiffs' Implied Warranty and MMWA Claims Should Be Dismissed for Lack of Privity ..................................49

D.     Fifteen Plaintiffs' Claims for Breach of Implied Warranty and Associated MMWA Claims Should Be Dismissed as Untimely ............................................50

CONCLUSION.....................................................................................................................50

# TABLE OF AUTHORITIES

**PAGE(S)**

## CASES

*2002 Irrevocable Trust for Richard C. Hvizdak* v. *Huntington National Bank*,
2008 WL 5110778 (M.D. Fla. Dec. 1, 2008)..................................................39

*Alan* v. *Wells Fargo Bank, N.A.*,
2014 WL 11393570 (S.D. Fla. June 18, 2014) ..............................................44

*Ambrosia Coal & Construction Co.* v. *Pages Morales*,
482 F.3d 1309 (11th Cir. 2007) .....................................................................4

*American Pipe & Construction Co.* v. *Utah*,
414 U.S. 538 (1974)......................................................................................46

*In re Apple iPhone 3G Product Liability Litigation*,
728 F. Supp. 2d 1065 (N.D. Cal. 2010) ........................................................49

*Asahi Metal Industrial Co.* v. *Superior Court of California, Solano Cty.*,
480 U.S. 102 (1987)......................................................................................24

*Bell Atlantic Corp.* v. *Twombly*,
550 U.S. 544 (2007)......................................................................................18

*Bethesda Chevy Chase Surgery Center, LLC* v. *Unitedhealthcare Insurance Co.*,
2016 WL 3042957 (D. Md. May 27, 2016) ...................................................43

*Bluewater Trading LLC* v. *Fountaine Pajot, S.A.*,
2008 WL 2705432 (S.D. Fla. July 9, 2008)...................................................21

*Borchardt* v. *Mako Marine International, LLC*,
2011 WL 4636799 (S.D. Fla. Oct. 6, 2011) ..................................................49

*Boyle* v. *United States*,
556 U.S. 938 (2009).......................................................................................27

*In re Bridgestone/Firestone, Inc. Tires Products Liability Litigation*,
155 F. Supp. 2d 1069 (S.D. Ind. 2001) ........................................................34

*Bristol-Myers Squibb Co.* v. *Superior Court of California, San Francisco County*,
137 S. Ct. 1773 (2017)........................................................................4, 25, 26

*Brown* v. *Bottling Group, LLC*,
159 F. Supp. 3d 1308 (M.D. Fla. 2016) ........................................................24

*Byrd* v. *Drive Electric, LLC*,
    2017 WL 2126910 (S.D. Ga. May 16, 2017)..................................................................24

*Carmouche* v. *Carnival Corp.*,
    36 F. Supp. 3d 1335 (S.D. Fla. 2014) ........................................................................22

*Committee to Protect our Agricultural Water* v. *Occidental Oil & Gas Corp.*,
    235 F. Supp. 3d 1132 (E.D. Cal. 2017)....................................................................47

*Corporex Development & Construction Management, Inc.* v. *Shook, Inc.*,
    835 N.E.2d 701 (Ohio 2005) ..................................................................................47

*Counts* v. *General Motors, LLC*,
    237 F. Supp. 3d 572 (E.D. Mich. 2017)...................................................................39

*Courboin* v. *Scott*,
    596 F. App'x 729 (11th Cir. 2014) ..........................................................................23

*Crawford* v. *Franklin Credit Management Corp.*,
    758 F.3d 473 (2d Cir. 2014).....................................................................................29

*DA Air Taxi LLC* v. *Diamond Aircraft Industries, Inc.*,
    2009 WL 10668159 (S.D. Fla. Nov. 5, 2009)..........................................................49

*Daimler AG* v. *Bauman*,
    571 U.S. 117 (2014)............................................................................................2, 19

*Davila* v. *Delta Air Lines, Inc.*,
    326 F.3d 1183 (11th Cir. 2003) ..............................................................................18

*Day* v. *Taylor*,
    400 F.3d 1272 (11th Cir. 2005) ................................................................................7

*Dorr-Oliver Inc.* v. *Fluid-Quip, Inc.*,
    834 F. Supp. 1008 (N.D. Ill. 1993) .........................................................................48

*Energy Investors Fund, L.P.* v. *Metric Constructors, Inc.*,
    525 S.E.2d 441 (N.C. 2000).....................................................................................50

*Erwin* v. *Ford Motor Co.*,
    2016 WL 7655398 (M.D. Fla. Aug. 31, 2016) ........................................................47

*In re FCA US LLC Monostable Electronic Gearshift Litig.*,
    280 F. Supp. 3d 975 (E.D. Mich. 2017)...................................................................37

*Fetterhoff* v. *Liberty Life Assurity Co.*,
    282 F. App'x 740 (11th Cir. 2008) ...........................................................................7

*First Commercial Trust Co.* v. *Lorcin Engineering, Inc.*,
  900 S.W.2d 202 (Ark. 1995)............................................................................47

*Geier* v. *American Honda Motor Co.*,
  529 U.S. 861 (2000)......................................................................................48

*In re Gen. Motors LLC Ignition Switch Litigation*,
  154 F. Supp. 3d 30 (S.D.N.Y. 2015).............................................................41

*In re: Gen. Motors LLC Ignition Switch Litigation*,
  2016 WL 3920353 (S.D.N.Y. July 15, 2016) ......................................... 5, 33-34

*GolTV, Inc.* v. *Fox Sports Latin America Ltd.*,
  277 F. Supp. 3d 1301 (S.D. Fla. 2017) ..........................................................22

*United States* ex rel. *Graves* v. *Plaza Medical Centers Corp.*,
  2014 WL 5040284 (S.D. Fla. Oct. 8, 2014)....................................................18

*Hemi Group, LLC* v. *City of N.Y.*,
  559 U.S. 1 (2010)..........................................................................................35

*Hinkle* v. *Continental Motors, Inc.*,
  268 F. Supp. 3d 1312 (M.D. Fla. 2017) ...........................................................3

*Hoseline, Inc.* v. *U.S.A. Diversified Products, Inc.*,
  40 F.3d 1198 (11th Cir. 1994) .......................................................................47

*Ivar* v. *Elk River Partners, LLC*,
  705 F. Supp. 2d 1220 (D. Colo. 2010)...........................................................34

*J. McIntyre Machinery, Ltd.* v. *Nicastro*,
  564 U.S. 873 (2011)....................................................................................3, 24

*Kaczmarek* v. *International Business Machines Corp.*,
  30 F. Supp. 2d 626 (S.D.N.Y. 1998)..............................................................28

*Keeton* v. *Gynecare Worldwide*,
  2016 WL 2753866 (S.D. Fla. Jan. 29, 2016) ..................................................33

*Kidwell* v. *Wagoner*,
  2010 WL 11507301 (M.D. Fla. Sept. 10, 2010) ..............................................37

*Koch* v. *Royal Wine Merchants, Ltd.*,
  847 F. Supp. 2d 1370 (S.D. Fla. 2012) ...............................................21, 29, 30

*Kolle* v. *Mainship Corp.*,
  2006 WL 1085067 (E.D.N.Y. Apr. 20, 2006) ............................................ 49-50

*Leon* v. *Continental AG*,
    301 F. Supp. 3d 1203 (S.D. Fla. 2017) ........................................................22, 23, 25

*Licciardello* v. *Lovelady*,
    544 F.3d 1280 (11th Cir. 2008) ...........................................................................21

*Lindner Dividend Fund, Inc.* v. *Ernst & Young*,
    880 F. Supp. 49 (D. Mass. 1995) .........................................................................46

*Lorali, Inc.* v. *SMK Associates, LLC*,
    2014 WL 12536977 (S.D. Fla. Aug. 26, 2014)....................................................45

*In re Managed Care Litigation*,
    150 F. Supp. 2d 1330 (S.D. Fla. 2001) ................................................................39

*In re Managed Care Litigation*,
    2009 WL 347795 (S.D. Fla. 2009) .............................................................. 28-29, 30

*McLaughlin* v. *American Tobacco Co.*,
    522 F.3d 215 (2d Cir. 2008)............................................................................4, 33

*Mizzaro* v. *Home Depot, Inc.*,
    544 F.3d 1237 (11th Cir. 2008) ...........................................................................18

*In re Motors Liquidation Co.*,
    568 B.R. 217 (S.D.N.Y. 2017).............................................................................41

*Murphy* v. *Stonewall Kitchen, LLC*,
    503 S.W.3d 308 (Mo. App. 2016) .......................................................................48

*United States* ex rel. *O'Donnell* v. *Countrywide Home Loans, Inc.*,
    822 F.3d 650 (2d Cir. 2016)................................................................................39

*In re Ocwen Financial Corp. Securities Litigation*,
    2015 WL 12780960 (S.D. Fla. Sept. 4, 2015) .....................................................44

*In re Old Carco LLC*,
    2013 WL 1856330 (Bankr. S.D.N.Y. May 12, 2013)...................................5, 8, 36

*In re Old Carco LLC*,
    492 B.R. 392 (Bankr. S.D.N.Y. 2013) .............................................................5, 36

*Peruyero* v. *Airbus S.A.S.*,
    83 F. Supp. 3d 1283 (S.D. Fla. 2014) ..................................................................18

*In re Pharmaceutical Industry Average Wholesale Price Litigation*,
    307 F. Supp. 2d 196 (D. Mass. 2004) ..................................................................27

*Philips* v. *Ford Motor Co.*,
　Case No. 14-CV-02989-LHK (N.D. Cal. Feb. 13, 2015), Dkt. No. 48 ...................................45

*PT United Can Co.* v. *Crown Cork & Seal Co.*,
　138 F.3d 65 (2d Cir. 1998)...................................................................................................21

*Raie* v. *Cheminova Inc.*,
　336 F.3d 1278 (11th Cir. 2003) ...........................................................................................46

*Ray* v. *Spirit Airlines, Inc.*,
　2015 WL 11143079 (S.D. Fla. June 4, 2015) .......................................................................29

*Ray* v. *Spirit Airlines, Inc.*,
　836 F.3d 1340 (11th Cir. 2016) .................................................................................4, 28, 35

*Recao* v. *Bell Helicopter Textron, Inc.*,
　2014 WL 12595302 (S.D. Fla. Sept. 23, 2014) ...................................................................19

*Republic of Panama* v. *BCCI Holdings (Lux.) S.A.*,
　119 F.3d 935 (11th Cir. 1997) .............................................................................................29

*Sculptchair, Inc.* v. *Century Arts, Ltd.*,
　94 F.3d 623 (11th Cir. 1996) ...............................................................................................19

*Sharma* v. *Drug Enforcement Agency*,
　2010 WL 11483805 (S.D. Fla. Nov. 10, 2010)....................................................................28

*Sharyland Water Supply Corp.* v. *City of Alton*,
　354 S.W.3d 407 (Tex. 2011).............................................................................................47-48

*In re Showa Denko K.K. L-Tryptophan Product Liability Litigation-II*,
　953 F.2d 162 (4th Cir. 1992) ...............................................................................................20

*Spratley* v. *FCA US LLC*,
　2017 WL 4023348 (N.D.N.Y. Sept. 12, 2017) ....................................................................26

*In re Telectronics Pacing Systems, Inc.*,
　953 F. Supp. 909 (S.D. Ohio 1997) .....................................................................................20

*Thomas* v. *Ross & Hardies*,
　9 F. Supp. 2d 547 (D. Md. 1998) .........................................................................................28

*Tiismann* v. *Linda Martin Homes Corp.*,
　637 S.E.2d 14 (Ga. 2006).....................................................................................................44

*Truthinadvertisingenforcers.com* v. *Dish Network, LLC*,
　2016 WL 7230955 (M.D. Fla. Dec. 14, 2016)......................................................................33

*Tuckish* v. *Pompano Motor Co.*,
    337 F. Supp. 2d 1313 (S.D. Fla. 2004) ...............................................................38

*Uhlig* v. *Darby Bank & Trust Co.*,
    556 F. App'x 883 (11th Cir. 2014) ...................................................................42

*Vanover* v. *NCO Financial Services, Inc.*,
    857 F.3d 833 (11th Cir. 2017) ...........................................................................13

*Varner* v. *Domestic Corp.*,
    2017 WL 3730618 (S.D. Fla. Feb. 7, 2017) ....................................................49

*Vermeulen* v. *Renault, U.S.A., Inc.*,
    985 F.2d 1534 (11th Cir. 1993) ...................................................................23-24

*Viridis Corp.* v. *TCA Global Credit Master Fund, LP*,
    155 F. Supp. 3d 1344 (S.D. Fla. 2015) ...................................................4, 33, 35

*Wilson* v. *Hewlett-Packard Co.*,
    668 F.3d 1136 (9th Cir. 2012) ...........................................................................43

*Xaros* v. *U.S. Fidelity & Guaranty Co.*,
    820 F.2d 1176 (11th Cir. 1987) .........................................................................20

*Zine* v. *Chrysler Corp.*,
    600 N.W.2d 384 (Mich. App. Ct. 1999) ..........................................................48

**STATUTES**

15 U.S.C. § 2310 .....................................................................................................49

28 U.S.C. § 1407 .....................................................................................................20

Alabama Code § 8-19-10 ........................................................................................48

Arkansas Code Ann. § 4-88-113 .............................................................................48

South Carolina Code Ann. § 39-5-140 ...................................................................48

Florida Statute § 48.193 ....................................................................................21, 22

**OTHER AUTHORITIES**

Fed. R. Civ. P. 9(b) ........................................................................................ *passim*

Fed. R. Civ. P. 12(b)(2) ......................................................................................1, 18

Fed. R. Civ. P. 12(b)(6) ......................................................................................1, 18

Pursuant to Rules 12(b)(2) and 12(b)(6) of the Federal Rules of Civil Procedure, FCA US LLC ("FCA") respectfully moves to dismiss with prejudice Plaintiffs' Amended Consolidated Class Action Complaint (Dkt. 2758) (the "Complaint" or "Compl.").

## PRELIMINARY STATEMENT

This multidistrict litigation ("MDL") was commenced more than three years ago against Takata Corporation and its U.S. subsidiary TK Holdings, Inc. ("TK Holdings") (collectively, "Takata") and seven original equipment manufacturers ("OEMs," collectively, the "Original OEM Defendants") concerning alleged economic losses from the purchase or lease of vehicles containing defective Takata airbags. Hundreds of pages of briefs were filed solely in connection with the defendants' dismissal motions; the Court issued nine decisions on those motions alone; more than one million documents were produced; and almost 100 depositions were taken in the litigation. All of this was done without the participation of FCA because the plaintiffs (the "Original Plaintiffs") and their counsel made the strategic decision not to sue FCA at the time.

Now, several years later, when this MDL should be winding down, the very same lawyers, on behalf of alleged owners and lessees of certain Chrysler LLC ("Chrysler") and FCA vehicles, seek to press the restart button against FCA. Plaintiffs could have brought this very same action three years ago. Instead, they waited until now to advance the exact same factual theories and most of the same claims against FCA that their lawyers brought against the Original OEM Defendants. Nothing in this Complaint is new.

What is new, however, is that in January 2017, Takata pled guilty to criminal wire fraud based on the falsification of data it provided to the OEMs. As part of its guilty plea, Takata admitted in federal court that it defrauded FCA (and other OEMs):

- From 2005 to 2015, Takata "induc[ed] the victim OEMs to purchase airbag systems . . . by deceiving the OEMs through the submission of false and fraudulent reports

and other information that concealed the true and accurate test results for the inflators." Ex. 1 at B-6-B-7 (*United States* v. *Takata Corp.*, 16-cr-20810 (E.D. Mich.), Dkt. 23) (the "Plea Agreement").[1]

- "Had the victim OEMs known the true and accurate test information and data relating to the PSAN inflators, the faulty, inferior, nonperforming, noncompliant, or dangerous PSAN inflators would not have been installed in vehicles as they were." *Id.* at B-12.

Furthermore, faced with astronomical liabilities for its wrongdoing, Takata filed for bankruptcy protection in June 2017 and is in the process of being liquidated. FCA submitted claims in the Takata bankruptcies for an estimated **$2.7 billion** in expenses to recall and replace Takata's defective airbags. Ultimately, FCA will only recover a tiny fraction of those losses from Takata.

Against this backdrop, Plaintiffs' desire to drag FCA—and the Court—through another round of this MDL should not be countenanced. Even putting aside the waste of judicial resources, inefficiencies and unfairness associated with their claim-splitting tactics, Plaintiffs' 893-paragraph Complaint falls well short of stating legally viable claims against FCA. Length should not be mistaken for merit here; when all is said and done, Plaintiffs' Complaint is utterly devoid of well-pleaded factual allegations that could support any of their claims against FCA. The Complaint should be dismissed with prejudice, for several independent reasons.

**The Court Lacks Personal Jurisdiction Over FCA.** Plaintiffs filed their Complaint directly in this District. As a result, unlike in the earlier proceedings against the Original OEM Defendants, the only forum that is relevant for the Court's jurisdictional analysis is Florida.

*First*, this Court does not have general (or "all-purpose") jurisdiction over FCA because FCA is not "at home" in Florida. *See Daimler AG* v. *Bauman*, 571 U.S. 117, 137 (2014). Rather, as the Complaint recognizes, FCA is incorporated in Delaware and maintains its

---

[1] All references to "Ex. _" herein are to FCA's Request for Judicial Notice ("RJN"), dated August 20, 2018, unless otherwise noted.

principal place of business in Michigan. (Compl. ¶ 27.) Plaintiffs' assertion that this Court can

exercise general jurisdiction because transferor courts have general jurisdiction over FCA (*id.*

¶ 25) is incorrect: Plaintiffs chose to file their Complaint directly on this Court's MDL docket

and thus no transferor courts exist for this case.

*Second*, this Court does not have specific (or "case-linked") jurisdiction over FCA

because Plaintiffs do not allege that their claims arise out of any activity that FCA undertook in

or with Florida. To begin, Plaintiffs' attempt to rely on the RICO nationwide service of process

provision fails because, as discussed below, their RICO claims are legally defective and should

be dismissed as a matter of law. Further, Plaintiffs' meager allegation that a single named

Plaintiff purchased his vehicle in Florida from an independent dealership (not FCA) (*id.* ¶ 49) is

insufficient to satisfy the Florida long-arm statute because it does not demonstrate that FCA is

"carrying on business" in Florida, that FCA "committed a tortious act" in Florida, or that FCA

caused "injury to person or property" in Florida. *Hinkle* v. *Cont'l Motors, Inc.*, 268 F. Supp. 3d

1312, 1323, 1324-25 (M.D. Fla. 2017). That bare allegation is also insufficient to satisfy the Due

Process Clause because it does not demonstrate any purposeful contact with Florida. *See*, *e.g.*, *J.*

*McIntyre Mach., Ltd.* v. *Nicastro*, 564 U.S. 873, 882 (2011) ("The defendant's transmission of

goods permits the exercise of jurisdiction only where the defendant can be said to have targeted

the forum; as a general rule, it is not enough that the defendant might have predicted that its

goods will reach the forum State.").

As for the remaining 32 named Plaintiffs' claims, Plaintiffs do not even attempt to allege

that those claims are connected to Florida and instead contend that this Court should exercise

"pendent" personal jurisdiction. (Compl. ¶ 23.) But this contention fails because the Court does

not have personal jurisdiction over FCA even as to the Florida Plaintiff's claims and thus there is

no conceivable basis for so-called "pendent" jurisdiction. In any event, Plaintiffs' argument is foreclosed by *Bristol-Myers Squibb Co.* v. *Superior Court of California, San Francisco County*, where the Supreme Court made clear that "the mere fact" that resident plaintiffs' claims are connected to the forum state "does not allow the State to assert specific jurisdiction over the nonresidents' claims." 137 S. Ct. 1773, 1781 (2017). No further analysis is required—the lack of personal jurisdiction over FCA requires the dismissal of this entire action.

**Plaintiffs' RICO Claims Are Spurious**. Plaintiffs allege that Takata and FCA endeavored together in a scheme to defraud Plaintiffs into purchasing their vehicles while "conceal[ing] the nature and scope of the Inflator Defect," in violation of 18 U.S.C. § 1964(c)-(d). (Compl. ¶ 200.) But Plaintiffs do not come close to alleging any of the requisite elements of a civil RICO claim, let alone with the specificity required by Rule 9(b)—especially in light of Takata's recent guilty plea, which utterly refutes Plaintiffs' bare allegation that FCA conspired with Takata. In particular, Plaintiffs fail to allege with particularity that:

> (i) FCA joined a criminal enterprise with Takata, because they do not plead a shared criminal purpose. *See Ray* v. *Spirit Airlines, Inc.*, 836 F.3d 1340, 1353 (11th Cir. 2016).

> (ii) FCA was engaged in a pattern of racketeering activity, because they do not plead any of the who, what, where, when, and how of the purportedly fraudulent communications that Plaintiffs contend constituted mail and wire fraud. *See Ambrosia Coal & Const. Co.* v. *Pages Morales*, 482 F.3d 1309, 1316-17 (11th Cir. 2007).

> (iii) Plaintiffs have suffered a cognizable injury, because their allegation that they overpaid for their vehicles by an unquantified amount and that the vehicles have diminished in value by an unspecified amount does not constitute a concrete injury to "business or property." *See McLaughlin* v. *Am. Tobacco Co.*, 522 F.3d 215, 228 (2d Cir. 2008).

> (iv) any injuries they suffered were proximately caused by FCA, because they do not allege that they relied on any of FCA's allegedly fraudulent statements or include any allegations linking their supposed injuries to the fraud. *See Ray*, 836 F.3d at 1349.

Plaintiffs' RICO conspiracy claim separately fails because Plaintiffs have not adequately alleged that FCA entered into an agreement with Takata to violate RICO. *Viridis Corp.* v. *TCA*

*Global Credit Master Fund, LP*, 155 F. Supp. 3d 1344, 1365 (S.D. Fla. 2015). Unlike the RICO

conspiracy claims the Court let proceed against Takata and Honda, there are simply no well-

pleaded allegations that could possibly support a RICO claim against FCA. Plaintiffs' attempt to

bring such claims—which they neglected to bring against any of the Original OEM Defendants

(save Honda)—is a transparent attempt to manufacture personal jurisdiction over FCA where

none otherwise exists. In short, this is far from "the rare complaint that actually states a claim

for civil RICO." *See In re: Gen. Motors LLC Ignition Switch Litig.*, 2016 WL 3920353, at *11

(S.D.N.Y. July 15, 2016).

**Chrysler's Bankruptcy Extinguished Certain of Plaintiffs' Claims**. Plaintiffs' claims

relating to seven Chrysler vehicles are separately barred by the bankruptcy Sale Order governing

FCA's acquisition of certain of Chrysler's assets during Chrysler's bankruptcy proceedings. The

Sale Order, which authorized the asset sale transaction that closed on June 10, 2009, expressly

limits FCA's liability arising from vehicles manufactured and initially sold by Chrysler to certain

expressly Assumed Liabilities (as defined therein), including, for example, express warranty

claims and certain product liability claims arising from vehicle accidents. None of the claims set

forth in the Complaint are Assumed Liabilities. *See In re Old Carco LLC*, 2013 WL 1856330, at

*4-5 (Bankr. S.D.N.Y. May 12, 2013); *In re Old Carco LLC*, 492 B.R. 392, 396 n.9, 403 (Bankr.

S.D.N.Y. 2013) (dismissing economic loss claims as outside scope of FCA's Assumed

Liabilities).

**Plaintiffs' State-Law Claims Are Inadequately Pled.** In support of their common-law

and consumer protection act claims, which all sound in fraud, Plaintiffs identified just a handful

of statements from FCA's website or marketing materials as purported misstatements. (Compl.

¶ 127.) But Plaintiffs do not allege what was false or misleading about any of these statements

or what specific additional information should have been disclosed. Nor do Plaintiffs allege that they actually read or relied on any of these statements in purchasing or leasing their vehicles. Further, Plaintiffs do not adequately allege that FCA knew or should have known of the scope and extent of the defects in Takata's inflators. Indeed, they identify only seven paragraphs in their 893-paragraph Complaint that purportedly include allegations showing knowledge. (Compl. ¶¶ 117-123.) None of these conclusory allegations withstands even the slightest scrutiny. Plaintiffs fail to identify a single FCA employee by name who supposedly possessed any of this information, nor do Plaintiffs allege how any these allegations relate to the defect underlying the Takata airbag recalls at issue. Further, Plaintiffs' common-law claims (including unjust enrichment and negligence) and consumer protection act claims are separately barred by (i) the applicable statutes of limitations; (ii) the economic loss rule; (iii) privity rules; or (iv) other specific state-law requirements.

**Plaintiffs' MMWA and Implied Warranty Claims Are Legally Defective.** The Magnuson-Moss Warranty Act ("MMWA") is not an independent cause of action, but instead depends on an underlying breach of warranty claim. Plaintiffs' MMWA claims fail because (1) the statute expressly states that a class action cannot be maintained with less than 100 named plaintiffs (and there are only 33 named plaintiffs here); (2) Plaintiffs from five states have not asserted an underlying state-law warranty claim; (3) Plaintiffs from two states have failed to allege privity between themselves and FCA, which is required under their states' laws in order to assert an implied warranty claim; and (4) the implied warranty claims of 15 Plaintiffs are barred by the statute of limitations (and no "discovery rule" exception applies in those states).

6

## FACTUAL AND PROCEDURAL BACKGROUND[2]

### A.      Chrysler's Bankruptcy and Formation of FCA US LLC

After sustaining a $16.8 billion net loss from early 2008 to early 2009 in the throes of the

Great Recession, in February 2009, Chrysler told the U.S. government that, without significant

inflows of capital, it would not survive.  In March 2009, the U.S. government agreed to provide a

lifeline of capital to Chrysler, but only if Chrysler was able to secure a strategic partner within 30

days.  Only Fiat S.p.A. ("Fiat") was willing to incur the enormous risk and invest the time,

resources, and industry know-how to form an alliance with Chrysler and to help save tens of

thousands of American jobs.

With Fiat in place as a strategic partner, in April 2009, Chrysler filed for Chapter 11

bankruptcy protection.  At the conclusion of the bankruptcy process, Chrysler ceased to exist.

The majority of its assets were purchased by Chrysler Group, LLC ("Chrysler Group"), a newly

formed entity owned by Fiat, the U.S. and Canadian governments, and the United Auto Workers

("UAW") Retiree Medical Benefits Trust.[3]

In June 2009, the Bankruptcy Court approved the sale in a final Sale Order.  Ex. 2

(Chrysler Sale Order).  The Sale Order, which took effect on June 10, 2009, specified that

Chrysler Group's liability for vehicles manufactured by Chrysler was limited to certain expressly

Assumed Liabilities (as defined therein), and all other Chrysler liabilities were expressly

excluded.  *See id.* ¶ 35; *see also In re Old Carco LLC*, 2013 WL 1856330, at *2-3 (Assumed

---

[2] The Court may consider documents whose contents are "alleged in a complaint" and that are "incorporated by reference into" the complaint.  *Day* v. *Taylor*, 400 F.3d 1272, 1276 (11th Cir. 2005); *see also Fetterhoff* v. *Liberty Life Assur. Co.*, 282 F. App'x 740, 743 n.1 (11th Cir. 2008).

[3] The U.S. and Canadian governments were able to appoint the majority of Chrysler Group's Board of Directors.  Ex. 3 (Press Release, FCA, Fiat Group and Chrysler Enter Into a Global Strategic Alliance (Apr. 30, 2009)).

Liabilities include (i) express "warranties, product returns and rebates"; (ii) certain product-liability claims arising from "motor vehicle accidents"; and (iii) certain "Lemon Law" claims).

The Sale Order authorized the transfer of the purchased assets "free and clear" of all Claims pursuant to section 363 of the Bankruptcy Code, except for the expressly Assumed Liabilities. Ex. 2 ¶ 9.  Moreover, the Bankruptcy Court expressly determined that Chrysler Group shall have no successor liabilities with respect to claims arising against Chrysler.  *Id.* at ¶ 39.

In May 2011, the U.S. and Canadian government loans were repaid in full (providing a 19.7% return on the U.S. government's investment),[4] and a few months later Fiat completed the acquisition of the U.S. and Canadian governments' stakes in Chrysler Group.  In December 2014, Chrysler Group changed its name to FCA US LLC.

### B. Takata's Defective Airbags

#### 1. *Takata's Airbag Manufacturing Business*

Until its recent bankruptcy, Takata was a major international developer, manufacturer, and supplier of airbag systems.  *See* Ex. 1 at B-2 (Plea Agreement).  As of 2015, Takata was the second largest supplier of airbag systems in the world, accounting for more than 20% of all airbag systems sold that year, and having sold hundreds of millions of airbag systems to OEMs since 2000.  *See id.* at B-2, B-4.

OEMs that ordered airbag systems from Takata required that they "had to meet strict safety and performance requirements that were expressly communicated to Takata."  *Id.* at B-3. Takata then developed, tested, and produced airbag systems that purported to meet all of the OEM's safety and performance specifications.  *See id.* at B-3, B-4, B-6-B-7.  Relying on

---

[4] *See* Ex. 4 (FCA's Current Event Report (Form 8-K) (May 24, 2011).

Takata's (false) test information—which showed that its airbag systems met the OEMs' safety specifications—the OEMs installed the Takata airbag systems in their vehicles. *See* Ex. 5 ¶ 33 (Coordinated Remedy Program Proceeding ("CRO")).

**2.**     ***Recalls of Takata's Airbags***

In November 2008, Honda issued a limited recall of certain driver-side airbags containing PSDI model PSAN inflators manufactured by Takata. According to NHTSA, "[a]t that time, the defect was thought to be the result of a specific manufacturing issue involving a propellant press at Takata's Moses Lake, Washington plant." *See id.* ¶ 3. However, "[d]ue to various purported discrepancies in Takata's record keeping for the affected parts, and changing theories as to the root cause of the defect, Honda expanded the scope of the recall several times between 2009 and 2011." *Id.* Neither Takata, Honda, nor NHTSA published any information suggesting that the problems with the PSDI model inflators extended beyond a small subset of Honda vehicles.

In late May 2014, Takata informed NHTSA that Takata was aware of three additional rupture incidents that it had not previously reported to NHTSA. *Id.* ¶ 5. Shortly thereafter, in June 2014, in coordination with NHTSA, FCA and other affected OEMs instituted a series of field actions (limited voluntary recalls) of vehicles containing Takata PSAN inflators that Takata had newly identified as being at risk. *Id.* ¶¶ 5-6.

Subsequently, on May 18, 2015, Takata filed four Defect Information Reports ("DIRs") with NHTSA, identifying safety-related defects in Takata airbag systems containing specific PSAN inflators. Two of the DIRs identified FCA as an affected OEM. As a result of this new information from Takata, and in close coordination with NHTSA, on May 28, 2015, FCA announced a nationwide recall of vehicles containing the at-issue Takata PSAN inflators. Ten other OEMs also issued nationwide recalls in this timeframe. NHTSA also issued a Consent

Order to Takata, requiring Takata to remedy the defect identified in the subject PSAN inflators.
Ex. 6 ¶ 6 (Initial Consent Order); Ex. 5 ¶ 13 (CRO).

By November 2015, Takata had identified additional airbag systems that contained
defective PSAN inflators, and, as a result, NHTSA issued the CRO to Takata and 12 OEMs—
including FCA—whose vehicles contained the defective Takata PSAN inflators.  *See* Ex. 5 ¶¶ 1,
16 (CRO).  Through the CRO, NHTSA ordered OEMs to prioritize the recall of vehicles based
on the: "(1) age of the inflator (with older presenting a greater risk of rupture); (2) geographic
location of the inflator (with prolonged exposure to H[igh] A[bsolute] H[umidity] presenting a
greater risk of rupture); and (3) location of the Takata inflator in the vehicle (driver, passenger,
or both)."  Ex. 7 ¶ 33 (Third CRO).

The Takata airbag recall has become the largest vehicle recall in U.S. history, extending
to approximately 65 to 70 million vehicles.

### C.     Prior MDL Proceedings

In March 2015, this Court appointed lead counsel for the economic loss track cases.  (*See*
Dkt. 393.)  In April 2015, lead counsel for the economic loss track filed an Amended
Consolidated Class Action Complaint ("CAC").  (*See* Dkt. 544.)  Despite the fact that Chrysler
Group was initially named as a defendant in several of the economic loss cases that were
transferred to the MDL, FCA was not named as a defendant in the CAC, nor in any of the
amendments thereto.  (*See id*.)  Instead, lead counsel chose to pursue claims only against Takata
and the Original OEM Defendants.

The CAC asserted claims for (i) violations of the MMWA; (ii) breach of implied
warranty of merchantability; (iii) common-law fraud, unjust enrichment, and negligent failure to
recall; and (iv) violations of state consumer fraud acts, unfair competition laws, and false

advertising laws.  Although the Original Plaintiffs asserted RICO claims against Takata and

Honda, they did not assert such claims against any of the other Original OEM Defendants.

After vigorously litigating these claims for several years, each of the Original OEM

Defendants, without admitting liability, settled with the plaintiffs.  (*See* Dkts. 1724, 1971, 2013,

2909.)  The attorneys' fees awarded to class counsel were set between 20%-30% of the total

settlement with each defendant, resulting in an aggregate fee award to plaintiffs' counsel of over

$300 million (not including the recent Ford settlement).  (*See* Dkts. 2162, 2164, 2166, 2168,

2386, 2389.)

### D.    Takata's Guilty Plea and Liquidation

#### 1.    *Takata Pleads Guilty to Fraud*

On January 13, 2017, Takata pled guilty to federal criminal wire fraud charges in

connection with its provision of airbags to OEMs.  Ex. 1 (Plea Agreement).  Takata made at least

three admissions in the Plea Agreement that are relevant here.

*First*, Takata admitted that it was directly responsible for ensuring that the airbags it

manufactured and sold met the safety and performance requirements of the OEMs.  *See id.* at B-

2-B-3.  *Second*, Takata admitted that despite its responsibility for ensuring airbag safety and

performance, it defrauded the OEMs by providing them "with materially false, fraudulent, and

misleading test information and data . . . about the PSAN inflators."  *Id.* at B-8-B9.  Takata

admitted that from 2005 to 2015, it perpetrated this fraud on the OEMs "by strategically adding,

editing, or changing information and data" contained in the "test information and data . . .

relating to the PSAN inflators."  *Id.  Third*, Takata admitted that it "induc[ed] the victim OEMs

to purchase airbag systems" on the basis of the fraudulent test information and data sent by

Takata to the OEMs.  *Id.* at B-6-B-7.  Indeed, Takata admitted that "[h]ad the victim OEMs

known the true and accurate test information and data relating to the PSAN inflators, the faulty,

11

inferior, nonperforming, noncompliant, or dangerous PSAN inflators would not have been installed in vehicles as they were." *Id.* at B-12.

As a result of its fraud, Takata was sentenced to pay a total of $1 billion in criminal penalties, including $850 million in restitution to the OEMs, whom Takata acknowledged were the victims of its fraud. *Id.* at B-3-B-4. FCA received $52 million of that restitution fund.

### 2. *Takata's Bankruptcy*

On June 25, 2017, Takata Corporation filed Civil Rehabilitation insolvency proceedings in Japan, and TK Holdings, Takata Corporation's U.S. subsidiary, filed for Chapter 11 bankruptcy protection. As a result of Takata's wrongdoing, TK Holdings faced estimated liabilities ranging from $10 billion to $50 billion in reimbursement to the OEMs for recall-related costs as well as potential liabilities from class action lawsuits in the United States, Canada, and elsewhere. Ex. 8 at 3 (TK Holdings's Bankruptcy Petition). At the time of Takata's bankruptcy filings, FCA had already expended hundreds of millions of dollars in its efforts to recall and replace Takata's airbags. FCA submitted claims in the Takata bankruptcy proceedings in the U.S. and Japan detailing its estimated more than $2.7 billion in total expenses in connection with recalling and replacing all of the defective Takata airbags that were installed in Chrysler or FCA vehicles. *See* Ex. 9 (FCA's Proof of Claim). However, FCA will recover only approximately two percent (including the criminal restitution) of its expenses from Takata.

### E. Plaintiffs' Attempt to Restart the MDL Proceedings

### 1. *Plaintiffs File Copycat Complaints*

On March 14, 2018, as the MDL appeared to be winding down, lead counsel, presumably motivated by the lucrative settlements extracted from the Original OEM Defendants, filed two

economic loss putative class action complaints against FCA.[5]  First, lead counsel filed a putative

class action complaint on behalf of 32 named plaintiffs in the Eastern District of Michigan (the

"*Dwinnells* Plaintiffs").  The *Dwinnells* Plaintiffs allege that they purchased or leased new or

used Chrysler and FCA vehicles and, in connection with those transactions, assert MMWA

claims, common-law fraud and negligence claims, implied warranty claims, and Michigan state-

law claims (but not RICO claims).  *See Dwinnells* v. *FCA USA LLC*, No. 18-10848 (E.D. Mich.

Mar. 14, 2018), Dkt. 1 ("*Dwinnells* complaint").[6]

Two hours later, lead counsel filed the instant Complaint, another putative class action

brought on behalf of all 32 of the named *Dwinnells* Plaintiffs plus one additional named

plaintiff—a Florida resident.[7]  Plaintiffs directly filed their Complaint on this Court's MDL

docket.  *See Boyd* v. *FCA USA LLC*, MDL 2599 (Mar. 14, 2018), Dkt. 2429.  Unlike the

*Dwinnells* complaint, the *Boyd* complaint includes civil RICO claims, which, if legally viable,

permit nationwide service of process.  In addition, the *Boyd* complaint included claims on behalf

---

[5] In addition, on the same day, lead counsel filed nearly identical claims against Volkswagen, Audi, Daimler, Mercedes-Benz, General Motors, and various subsidiaries.

[6] Lead counsel notified the Eastern District of Michigan that *Dwinnells* was soon to be transferred to this MDL on the same day the case was filed, March 14, 2018.  *See* Order, *Dwinnells* v. *FCA USA LLC*, No. 18-10848 (E.D. Mich. Mar. 14, 2018), Dkt. 3.  Following its transfer to the MDL, this Court ordered the case administratively closed on March 29, 2018.  *See Dwinnells* v. *FCA USA LLC*, No. 18-cv-21153 (S.D. Fla. Mar. 29, 2018), Dkt. 10.

[7] By filing successive complaints on behalf of the same plaintiffs that arise out of the same factual allegations, Plaintiffs have engaged in impermissible claim-splitting.  *See Vanover* v. *NCO Financial Services, Inc.*, 857 F.3d 833, 841 (11th Cir. 2017).  Because the *Boyd* complaint was filed after the *Dwinnells* complaint, *Boyd* should be dismissed.  *See*, *e.g.*, *id.* at 843 (affirming district court's dismissal of subsequently filed complaint).  FCA joins in the arguments put forward on this issue by Volkswagen *et al.* in their Motion to Dismiss the Amended Complaint and Incorporated Memorandum of Law ("VW MTD").

of a putative class of automotive recycler plaintiffs; however, pursuant to this Court's order (Dkt. 2651) lead counsel amended the *Boyd* complaint to remove the recycler claims (Dkt. 2758).

## 2. *Plaintiffs' Allegations*

Plaintiffs repeat allegations that the Original Plaintiffs asserted against the Original OEM Defendants three years ago—and could have been asserted against FCA then, namely, that FCA "misrepresented as safe [FCA] and [Chrysler] vehicles and deceptively concealed the fact that inflators in these vehicles were prone to explode and maim or kill drivers and passengers." (Compl. ¶ 2; *see id.* ¶ 10 (alleging that FCA "sold and leased vehicles to consumers that contained [the] deadly Takata airbags and misrepresented the safety and/or concealed material facts concerning the Inflator Defect"); *id.* ¶ 16 (alleging that FCA "continues to misrepresent these vehicles as safe and has delayed the repair of nearly all of these defective airbags").) Based on these allegations, Plaintiffs bring claims for common-law fraud, unjust enrichment, negligence, consumer protection act violations, breach of implied warranty and MMWA, and RICO claims.

**FCA's Alleged Misrepresentations.** Plaintiffs identify only a small number of allegedly "misleading statements about the Class Vehicle's safety in [FCA's] advertisements and promotional materials." (*Id.* ¶ 127.) Specifically, Plaintiffs point to the following:

- Generic statements about safety, such as that FCA's mission is "[t]o create the type of exciting, efficient, reliable, safe vehicles you expect and deserve" (*id.* ¶ 127(a)), and that Jeep Wrangler has "safety and security and convenience features" (*id.* ¶ 127(b));

- Statements that the 2012 Chrysler 300 and 2012 Dodge Charger had received safety ratings from NHTSA and the Insurance Institute for Highway Safety (*id.* ¶ 127(c));

- Statements in brochures that certain vehicles contained "advanced multistage front air bags" and/or "supplemental front-seat mounted pelvic thorax side air bags, driver-side knee air bag, and supplemental side-curtain air bags" (*id.* ¶ 127(d)-(h)).

Plaintiffs do not allege what was false or misleading about these statements or what additional information should have been disclosed. Nor do Plaintiffs allege that they read or

relied on any of these statements. Indeed, most of the Plaintiffs do not allege that they read or

heard *any* FCA advertisements or marketing prior to purchasing or leasing their vehicles.

      *FCA's Alleged Knowledge.* Despite accusing FCA of "misrepresent[ing] as safe . . . its

vehicles" and "deceptively conceal[ing] the fact that inflators in these vehicles were prone to

explode and maim or kill drivers and passengers" (*id.* ¶ 2), Plaintiffs' 893-paragraph Complaint

contains less than ten allegations about FCA's purported knowledge of the defects in Takata's

PSAN inflators. In particular, Plaintiffs allege that FCA "knew or should have known of the

Inflator Defect" based on the following:

- **Honda's 2008 Recall.** "Given that the Takata airbags [FCA] used in its vehicles contained the same ammonium-nitrate propellant as used in Honda vehicles" (*id.* ¶ 117) (even though Plaintiffs plead no facts to show that the inflators used in FCA vehicles were the same model, were manufactured at the same time or place, or otherwise experienced any similar issues as the Takata inflators used in the Honda vehicles);

- **USCAR Slope Testing.** In April 2013, FCA "was made aware that Takata's SDI-X ammonium-nitrate inflator did not meet slope testing standards during PV testing, but [FCA] granted deviations and approved the inflator for Chrysler production" (*id.* ¶ 120) (even though Plaintiffs do not allege who at FCA was supposedly made aware that this particular type of inflator did not meet "slope testing standards," the significance of granting a deviation, or whether the slope testing standards are in any way related to the defect that is the subject of the nationwide recalls);

- **Four Isolated Testing, Repair, or Deployment Incidents.** (i) An October 2010 "inflator rupture [that] occurred during PV testing for [FCA] at Takata's Monclova facility" (*id.* ¶ 118); (ii) an October 2011 "inadvertent airbag deployment during vehicle repair at an [FCA] plant" (*id.* ¶ 119); (iii) "an issue with [an FCA] inflator deployment during testing at Takata's laboratory," which FCA "was made aware of during a July 2013 visit" (*id.* ¶ 121); and (iv) "a PSDI-4 inflator in a Chrysler vehicle ruptured in the field, injuring the vehicle occupant" in September 2013 (*id.* ¶ 122) (even though Plaintiffs do not allege who at FCA was made aware of each of these incidents, why the incident were related to the defect that is the subject of the nationwide recalls, or why these isolated incidents should have alerted FCA to design defects in all such Takata airbags);

- **Email from General Motors.** In April 2013, "General Motors' head of inflator technology" sent an email to unnamed recipients at FCA and Ford expressing the view that Honda's statement that its recall "stemmed from human errors during production" was "Bull S%$t" and "that the Takata defect 'has to be a core design issue or process issue, not a 'mistake'" (*id.* ¶ 123) (even though Plaintiffs fail to

allege who at FCA supposedly received this email, whether they responded, or how General Motors's speculation that there might be a "design issue or process issue" affecting Honda airbags should have put FCA on notice of an industry-wide defect in Takata's PSAN inflators).

Plaintiffs also allege that FCA "inherited" knowledge from Chrysler, which supposedly had knowledge of or concerns about ammonium nitrate inflators in the "early 2000s." (*Id.* ¶¶ 99-112.) Again, Plaintiffs do not allege who within Chrysler possessed any of this supposed knowledge or how any of these allegations were connected to or provided knowledge of the defect underlying the Takata recalls. In any event, Plaintiffs fail to allege that any of this information was in fact transferred to FCA following Chrysler's bankruptcy.

**FCA's Alleged RICO Enterprise with Takata.** With respect to their RICO claims, Plaintiffs allege that Takata and FCA were engaged in an "association-in-fact [RICO] enterprise" (*id.* ¶ 198), whereby Takata and FCA "collaborated and colluded with each other . . . to deceive Plaintiffs and Class members into purchasing dangerous and defective vehicles; and actively concealed the danger and Inflator Defect from Plaintiffs and Class members." (*Id.* ¶ 198(d).) Plaintiffs allege that the "common purpose" of the enterprise was selling "as many airbags, and vehicles containing such airbags, as possible, and thereby maximizing [Takata's and FCA's] revenue and profitability." (*Id.* ¶ 201.) Plaintiffs contend that the following communications that FCA either sent or received constituted predicate criminal acts of mail and wire fraud:

- "[C]ountless shipments of, and payment for, millions of inflators" (*id.* ¶ 211(b));
- An April 2013 communication with Takata approving "deviations from USCAR specifications for Takata inflators" (*id.* ¶ 211(c); *see also id.* ¶ 211(a));
- Communications between June and July 2013 with Takata "concerning an inflator rupture that occurred during testing at Takata's facility in Mexico" (*id.* ¶ 211(d)); and

- Communications with government regulators and the public regarding the Takata recall effort (*id.* ¶ 211(e)-(k)).[8]

For the majority of these purported acts of mail or wire fraud, Plaintiffs do not attempt to explain what was fraudulent about these communications. Instead, in conclusory fashion, Plaintiffs allege that FCA either did not disclose information to "the public and regulators in order to conceal the scope and nature of the inflator defect" (*id.* ¶ 211(c)-(d), (g), (i)-(j)) or "misrepresent[ed] that [FCA] had not identified a defect, when it in fact knew of the Defective Airbags and the Inflator Defect" (*id.* ¶ 211(e)). With respect to certain of FCA's communications with NHTSA, Plaintiffs contend that these were misleading because FCA allegedly knew "that the defect was present in millions of its vehicles" but stated that "the defect was only present in airbags in certain high humidity areas." (Compl. ¶ 211(f).) Similarly, with respect to FCA's recall notices, Plaintiffs contend that FCA "misleadingly suggested that the replacement airbags would be free of a defect, when in fact, if Takata airbags were used as replacements, they are also plagued by the Inflator Defect." (Compl. ¶ 211(h); *see id.* ¶ 211(k).)

*Alleged Injuries.* Plaintiffs contend that they have suffered "economic losses stemming from [FCA's] manufacture, sale or lease, and false representations concerning the defective airbags in the Class Vehicles." (Compl. ¶ 69.) None of the Plaintiffs, however, allege that they have suffered any out-of-pocket costs, that they have been unable to use their vehicles, or that they have attempted to sell or have sold their vehicles at a diminished value.

---

[8] Plaintiffs refer to several of these same communications as constituting overt acts for purposes of their RICO conspiracy claim. (Compl. ¶ 222(b)-(e).) Plaintiffs also allege that a series of communications from *Takata* to Honda, Honda vehicle owners, and NHTSA—none of which are alleged to involve FCA—constitute overt acts. (*Id.* ¶ 223(a)-(i).)

## LEGAL STANDARD

*Rule 12(b)(2)*.  Under Rule 12(b)(2), "[t]o withstand a motion to dismiss, a plaintiff must

plead sufficient facts to establish a *prima facie* case of jurisdiction over the non-resident

defendant."  *Peruyero* v. *Airbus S.A.S.*, 83 F. Supp. 3d 1283, 1286 (S.D. Fla. 2014).  "To

determine whether personal jurisdiction exists over an out-of-state defendant," a court first

"determine[s] whether, pursuant to state law, the applicable state long-arm statute is satisfied,"

and "[s]econd, if the state long-arm statute is satisfied, the court must consider whether the

exercise of jurisdiction over the defendant would violate the Due Process Clause of the

Fourteenth Amendment to the United States Constitution."  *Id.* at 1287 (quotation omitted).

*Rule 12(b)(6)*.  Under Rule 12(b)(6), a court must dismiss a complaint if it fails to plead

"enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp.* v. *Twombly*,

550 U.S. 544, 570 (2007).  "[C]onclusory allegations, unwarranted factual deductions or legal

conclusions masquerading as facts will not prevent dismissal."  *Davila* v. *Delta Air Lines, Inc.*,

326 F.3d 1183, 1185 (11th Cir. 2003).

When a claim is premised on allegations of fraud (including alleged fraudulent

omissions), the heightened particularity requirement of Rule 9(b) applies.  *See United States* ex

rel. *Graves* v. *Plaza Med. Ctrs. Corp.*, 2014 WL 5040284, at *2 (S.D. Fla. Oct. 8, 2014)

(Moreno, J.).  The complaint must therefore specify: "(1) precisely what statements were made

in what documents or oral representations or what omissions were made, (2) the time and place

of each such statement and the person responsible for making (or, in the case of omissions, not

making) same, (3) the content of such statements and the manner in which they misled the

plaintiff, and (4) what the defendants obtained as a consequence of the fraud."  *Mizzaro* v. *Home

Depot, Inc.*, 544 F.3d 1237, 1239 (11th Cir. 2008) (quotation omitted).

## ARGUMENT

**I.    THE COURT LACKS PERSONAL JURISDICTION OVER FCA.**

Plaintiffs have not met their threshold burden of establishing a *prima facie* case of either general (all-purpose) or specific (case-linked) personal jurisdiction over FCA, and thus the Court should dismiss the Complaint in its entirety.  *Sculptchair, Inc.* v. *Century Arts, Ltd.*, 94 F.3d 623, 627 (11th Cir. 1996) ("the plaintiff bears the burden of proving personal jurisdiction").

**A.    FCA Is Not Subject to General Jurisdiction in Florida.**

Plaintiffs cannot demonstrate that FCA is subject to this Court's exercise of general jurisdiction because FCA is not "at home" in Florida.  As the Supreme Court has made clear, "only a limited set of affiliations with a forum will render a defendant amenable to all-purpose jurisdiction there," with the "paradigm bases" being "place of incorporation and the principal place of business."  *Daimler*, 571 U.S. at 137.  As Plaintiffs acknowledge, FCA is neither incorporated in nor maintains its principal place of business in Florida.[9]  (Compl. ¶ 27.)

Plaintiffs nonetheless assert that "transferor courts that have transferred actions to this MDL have general jurisdiction over [FCA], and this Court, under 28 U.S.C. § 1407, has personal jurisdiction over [FCA] to the same extent as any transferor court."  (Compl. ¶ 25.)  This is simply incorrect—there is no transferor court for this action because Plaintiffs directly filed the

---

[9] Although Plaintiffs allege, in conclusory fashion, that "[FCA] has agents, or transacts business in this District" (Compl. ¶ 24), engaging in business in a jurisdiction—even if that business is substantial and continuous in nature—is insufficient to render a corporation "at home" in that jurisdiction.  *Daimler*, 571 U.S. at 137.  Similarly, registration in Florida (Compl. ¶ 23) does not constitute consent to jurisdiction.  *Recao* v. *Bell Helicopter Textron, Inc.*, 2014 WL 12595302, at *4 (S.D. Fla. Sept. 23, 2014).

Complaint on the Court's MDL docket. Section 1407, therefore, is wholly inapplicable here.[10] The fact that some other court exists that could exercise general jurisdiction over FCA and that could, in theory, act as a transferor, does not create jurisdiction here. *See In re Telectronics Pacing Sys., Inc.*, 953 F. Supp. 909, 914 (S.D. Ohio 1997) ("Plaintiffs argue that § 1407 allows the Court to exercise personal jurisdiction over the Australian Defendants in all of the cases if a transferor court had jurisdiction over them in any individual case. No court has ever reached such a conclusion."). As this Court previously put it, "Plaintiffs' arguments regarding the inefficiency created by needing to refile the [directly filed] cases" in the appropriate court may be "sympathetic," "but such inefficiency does not circumvent Defendants' right to have suits filed against them in an appropriate court." (Dkt. 887.)

### B. FCA Is Not Subject to Specific Jurisdiction in Florida for Any of Plaintiffs' Claims.

Plaintiffs also assert that this Court may exercise specific jurisdiction over FCA with respect to (i) their RICO claims and (ii) the claims of the sole Florida Plaintiff. Neither is true.

#### 1. Plaintiffs' RICO Claims Do Not Provide a Basis for Exercising Specific Jurisdiction.

As discussed in Section II, Plaintiffs' RICO claims are baseless and should be dismissed. As a result, Plaintiffs cannot avail themselves of RICO's nationwide service of process provision

---

[10] Although *Dwinnells* was transferred into the MDL, this occurred *after* Plaintiffs filed the instant action on March 14, 2018, *see* District Transfer Order, No. 18-21153, Dkt. 8, and thus the Eastern District of Michigan, where *Dwinnells* was filed, is not a transferor court with respect to this case. *See In re Showa Denko K.K. L-Tryptophan Prod. Liab. Litig.-II*, 953 F.2d 162, 165 (4th Cir. 1992) ("While § 1407 provides a procedure for transferring cases filed in different districts to a single district court for pretrial proceedings, nowhere does it expand the jurisdiction of either the transferor or the transferee court."). *Dwinnells* has not been consolidated with this action, but, even if it had, "[c]onsolidation does not result in a merger of suits or parties such that federal jurisdiction in one case can be engrafted upon a case with which it is consolidated." *Xaros* v. *U.S. Fidelity & Guar. Co.*, 820 F.2d 1176, 1180 n.1 (11th Cir. 1987).

20

as a basis for specific jurisdiction over FCA.[11]  *See Koch* v. *Royal Wine Merchants, Ltd.*, 847 F. Supp. 2d 1370, 1378 (S.D. Fla. 2012) ("[H]aving found that Plaintiff's claim under the RICO Act must be dismissed, the Court must also dismiss the state law claims unless Plaintiff can independently establish personal jurisdiction with respect to those claims.").[12]

### 2. Plaintiffs Fail to Plead Sufficient Facts to Demonstrate That FCA Is Subject to Specific Jurisdiction in Florida.

To establish specific jurisdiction in Florida, a plaintiff must demonstrate both that (1) Florida's long-arm statute reaches the defendant and (2) the exercise of personal jurisdiction comports with the Fourteenth Amendment's Due Process Clause.  *See Licciardello* v. *Lovelady*, 544 F.3d 1280, 1283 (11th Cir. 2008).  Here, Plaintiffs' only factual allegation that bears any connection to Florida is that "Plaintiff Khoury owns a 2012 Dodge Challenger, which he purchased new . . . from Napleton's Chrysler Jeep in Palm Beach, Florida."  (Compl. ¶ 49.)  This lone allegation does not support specific jurisdiction over FCA with respect to Mr. Khoury's claims (and Plaintiffs plead *no* facts to support jurisdiction for the other 32 non-Florida Plaintiffs' claims).

### (a) Plaintiffs Fail to Allege That Exercising Jurisdiction Is Proper Under Florida's Long-Arm Statute.

To establish that jurisdiction is proper under Florida's long-arm statute, a plaintiff must demonstrate that the defendant has committed at least one of the acts enumerated in the statute

---

[11] Unlike the RICO statute, "the Magnuson-Moss Act does not authorize nationwide service." *Bluewater Trading LLC* v. *Fountaine Pajot, S.A.*, 2008 WL 2705432, at *2 (S.D. Fla. July 9, 2008), *aff'd*, 335 F. App'x 905 (11th Cir. 2009).

[12] Even if Plaintiffs' RICO claims were to survive, FCA submits that "a civil RICO action can only be brought in a district court where personal jurisdiction based on minimum contacts is established as to at least one defendant." *See, e.g.*, *PT United Can Co.* v. *Crown Cork & Seal Co.*, 138 F.3d 65, 71 (2d Cir. 1998).  FCA acknowledges that the Eleventh Circuit has taken a different approach, and raises this argument at this juncture to preserve the issue for appeal.

and that the plaintiff's claims arise from that act. Plaintiffs here invoke three separate provisions

of the Florida long-arm statute, stating that their claims arise out of (1) "[FCA] operating,

conducting, engaging in, or carrying on a business or business venture in this state or having an

office or agency in this state"; (2) FCA "committing a tortious act in this state"; or (3) FCA

"causing injury to property in this state arising out of [FCA's] acts and omissions outside this

state." (Compl. ¶ 23 (citing Fla. Stat. § 48.193(1)(a)(1), (2), (6)).) But Plaintiffs' formulaic

recitation of the statutory language, untethered to any actual *facts*, does not create jurisdiction.

*First*, Mr. Khoury's allegation that he purchased a Dodge Challenger in Florida from an

independent dealership (not FCA) does not establish that FCA is "carrying on a business" in

Florida because it ascribes no conduct to FCA whatsoever, let alone "demonstrate[s] a general

course of business for pecuniary benefit connected with the alleged tort." *Carmouche* v.

*Carnival Corp.*, 36 F. Supp. 3d 1335, 1340 (S.D. Fla. 2014). In fact, in *Leon* v. *Continental AG*,

301 F. Supp. 3d 1203, 1216 n.6 (S.D. Fla. 2017), the court considered a similar allegation that

plaintiffs purchased vehicles from dealerships within Florida, finding no jurisdiction over OEM

defendants because such allegations left the "[c]ourt unable to infer which of [the defendant's]

contacts with Florida support specific personal jurisdiction." This case is no different.

*Second*, Mr. Khoury's allegation does not establish that FCA "committed a tortious act"

in Florida. *Leon*, 301 F. Supp. 3d at 1216 ("[P]laintiffs' generalized statements . . . do not

support an inference that [out-of-state defendant] committed a tortious act in Florida as

contemplated by Section 48.193(1)(a)(2)."). To successfully plead a tortious act, plaintiffs must

allege that "the claim asserted against the defendant arises from its forum-related contacts."

*GolTV, Inc.* v. *Fox Sports Latin Am. Ltd.*, 277 F. Supp. 3d 1301, 1311 (S.D. Fla. 2017). By

merely alleging that he purchased a vehicle in Florida from a dealership, Mr. Khoury has not

attributed any conduct to FCA—let alone tortious conduct—in Florida. To the extent Mr.

Khoury complains that FCA committed tortious conduct by making alleged misstatements about

vehicle safety, Mr. Khoury has not identified any such statements that he read or heard in

Florida, nor has he alleged that FCA directed such statements to him in Florida. (*See* Compl.

¶ 49.) As in *Leon*, the mere allegation that a plaintiff purchased an allegedly defective vehicle in

Florida, without more, is not sufficient to "support the Court's specific personal jurisdiction"

over FCA pursuant to 48.193(1)(a)(2). *Leon*, 301 F. Supp. 3d at 1217.

      *Third*, Mr. Khoury's allegation does not establish that FCA "caused injury to persons or

property within this state arising out of an act or omission by the defendant outside this state"

(Compl. ¶ 23) because Mr. Khoury has alleged only economic injury, not injury to person or

property. "Florida's Supreme Court has held that economic injury, unaccompanied by physical

injury or property damage, is insufficient to subject a non-resident defendant to personal

jurisdiction under § 48.193(1)(a)(6)." *Courboin* v. *Scott*, 596 F. App'x 729, 734 (11th Cir.

2014); *see Leon*, 301 F. Supp. 3d at 1217.

      **(b)**    ***Plaintiffs Fail to Allege That Exercising Personal Jurisdiction
Is Consistent With the Due Process Clause.***

      Even if Plaintiffs could establish the applicability of Florida's long-arm statute (they

cannot), they fail to demonstrate that the exercise of specific jurisdiction over FCA with respect

to Mr. Khoury's claims would be consistent with constitutional due process. Under Eleventh

Circuit law, to satisfy the Due Process Clause, Plaintiffs must demonstrate three things:

> First, the [defendant's] contacts must be related to the plaintiff's cause of action or
> have given rise to it. Second, the contacts must involve some act by which the
> defendant purposefully avails itself of the privilege of conducting activities within the
> forum . . . , thus invoking the benefits and protections of its laws. Third, the
> defendant's contacts with the forum must be such that [the defendant] should
> reasonably anticipate being haled into court there.

*Vermeulen* v. *Renault, U.S.A., Inc.*, 985 F.2d 1534, 1546 (11th Cir. 1993) (quotation omitted).

Here, Plaintiffs cannot meet at least two of the three requirements.

*First*, Mr. Khoury's alleged purchase of a Dodge Challenger in Florida falls short of

demonstrating FCA's "purposeful availment." A "manufacturer purposefully avails itself of a

state if it makes products to order for a third party knowing they will be sold there." *Byrd* v.

*Drive Elec., LLC*, 2017 WL 2126910, at *4 (S.D. Ga. May 16, 2017). By contrast, a plaintiff

does not demonstrate purposeful availment where he "has shown no specific effort by the

[defendant] to sell in [the forum state]," even if, through the stream of commerce, the

defendant's products may be available for purchase in that state. *J. McIntyre*, 564 U.S. at 888-89

(Breyer, J., concurring in judgment); *see Asahi Metal Indus. Co.* v. *Superior Court of California,*

*Solano Cty.*, 480 U.S. 102, 112 (1987) (holding that "[t]he placement of a product into the stream

of commerce, without more, is not an act of the defendant purposefully directed toward the

forum State"). Plaintiffs' mere assertion that Mr. Khoury purchased an FCA vehicle in Florida

from a dealership, without more, does not plead any specific effort by FCA to sell vehicles in

Florida, and thus fails to establish purposeful availment.

*Second*, Plaintiffs have not alleged any activity that would have led FCA to "reasonably

anticipate being haled into court" in Florida. *Vermeulen*, 985 F.2d at 1546. Courts have required

more than "mere 'awareness'" that an out-of-state manufacturer's products might "travel to

Florida." *See Brown* v. *Bottling Grp., LLC*, 159 F. Supp. 3d 1308, 1315 (M.D. Fla. 2016)

(finding personal jurisdiction only where the plaintiff demonstrated that the defendant "built-to-

order four cranes, knowing that the cranes were destined for Florida"). The exercise of specific

jurisdiction is not reasonable, where, as here, Plaintiffs merely leave it for the Court to infer that

the defendant "delivered its vehicles into Florida for placement into the stream of commerce through a contract or otherwise." *Leon*, 301 F. Supp. 3d at 1217.

### (c) There Is No Basis to Exercise Specific Jurisdiction Over FCA for Non-Florida Plaintiffs' Claims.

In a single sentence, without any factual or legal support, Plaintiffs assert that "[t]his Court has pendant or supplemental personal jurisdiction over the claims of non-Florida Plaintiffs." (Compl. ¶ 23.) But having failed to establish specific jurisdiction over the claims of the lone Florida plaintiff, Plaintiffs are left with no basis for this Court to exercise personal jurisdiction (pendent or otherwise) over the 32 non-Florida Plaintiffs' claims. In any event, they have not shown that this Court should exercise personal jurisdiction over the non-Florida Plaintiffs' claims, which bear absolutely no connection to Florida.

In *Bristol-Myers*, hundreds of plaintiffs "assert[ed] a variety of state-law claims based on injuries allegedly caused by [defendant's] drug called Plavix." 137 S. Ct. at 1777. The case, which was filed in a California state court, was brought by over 600 plaintiffs, 86 of whom were California residents and the rest of whom who were residents of 33 other states. *Id.* at 1778. The non-California resident plaintiffs did not allege any connection between their own claims and California, but instead asserted that their claims were related to the claims of the California plaintiffs' claims. *Id.* at 1778-79. The California courts concluded that specific jurisdiction existed, but the Supreme Court reversed, holding that "[t]he mere fact that other plaintiffs were prescribed, obtained, and ingested Plavix in California—and allegedly sustained the same injuries as did the nonresidents—does not allow the State to assert specific jurisdiction over the nonresidents' claims." *Id.* at 1781. The Court emphasized that "[w]hat is needed—and what is missing here—is a connection between the forum and the specific claims at issue." *Id.*

Here, too, there is absolutely no connection between this "forum and the specific claims at issue." *Id.* The 32 non-Florida Plaintiffs have not even alleged the most basic connection with Florida, such as that they purchased their vehicles in Florida or were injured in Florida. Thus no basis exists for the Court to exercise jurisdiction over the non-Florida Plaintiffs' claims. *See id.; see also Spratley* v. *FCA US LLC*, 2017 WL 4023348, at \*7 (N.D.N.Y. Sept. 12, 2017) ("imposing personal jurisdiction for all of the claims because specific jurisdiction may lie as to this one plaintiff's claims would run afoul of the traditional notions of fair play and substantial justice that form the bedrock of any court's personal jurisdiction analysis") (quotation omitted).

## II.    PLAINTIFFS DO NOT ADEQUATELY PLEAD A RICO CLAIM AGAINST FCA.

With their RICO claims, Plaintiffs are trying to manufacture personal jurisdiction against FCA where none otherwise exists. But Plaintiffs are grasping at straws: their civil RICO claims are legally defective on their face, especially in light of Takata's recent guilty plea admissions that it defrauded FCA and other OEMs that purchased Takata airbags. FCA recognizes that the Court previously permitted RICO claims against Takata (for a substantive violation and conspiracy claim) and Honda (for a conspiracy claim) to proceed, but the allegations supporting those claims are altogether different from the allegations now before the Court. There, plaintiffs levied detailed allegations of Takata and Honda sharing information about airbag ruptures in Honda vehicles that had caused injury to occupants, sharing post-hoc testing of used inflators in Honda vehicles and conducting joint analyses of ruptures, agreeing to downplay a rupture as anomaly, and jointly drafting fraudulent communications to NHTSA. (*See* Dkt. 1895 ¶¶ 427, 438.) None of that is alleged here.

### A.    Plaintiffs Do Not Plead That FCA Participated in a RICO Enterprise.

Plaintiffs' RICO claims should be dismissed because they fail to allege adequately that FCA was engaged in an "association-in-fact" RICO enterprise with Takata. (Compl. ¶ 198.)

"[A]n association-in-fact enterprise must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle* v. *United States*, 556 U.S. 938, 946 (2009). Here, Plaintiffs have not pled any common criminal purpose, much less done so with the specificity required under Rule 9(b). Plaintiffs merely allege, in wholly conclusory terms, that Takata and FCA sought "to sell as many airbags, and vehicles containing [Takata] airbags, as possible, and thereby maximize the[ir] revenue and profitability" (Compl. ¶ 201). But alleging that FCA desired to maximize "revenue and profitability" hardly amounts to a criminal purpose, let alone one that it shared with Takata.

In *In re Pharmaceutical Industry Average Wholesale Price Litigation*, for example, plaintiffs alleged that pharmaceutical companies and certain publishers of medical information "fraudulently overstate[d] the published average wholesale prices of many . . . prescription drugs." 307 F. Supp. 2d 196, 201 (D. Mass. 2004). The court found "[t]hese allegations of an association-in-fact enterprise fall short" because "[t]he participants, as described, do not share a common purpose more specific than that common to many human endeavors, the reaping of a profit." *Id.* at 204. Therefore, "without a shared illegal purpose to defraud, the shared innocent objective . . . would not support a claim of a RICO enterprise." *Id.* at 205; *see also Comm. to Protect our Agric. Water* v. *Occidental Oil & Gas Corp.*, 235 F. Supp. 3d 1132, 1175-76 (E.D. Cal. 2017) (dismissing RICO claim where plaintiffs alleged that defendants "formed an enterprise with a common purpose to maximize profits [and] increase revenues" because plaintiffs "plead[] no specific facts indicating that defendants acted with an objective unrelated to ordinary business or government aims") (quotation omitted). The same is true here—Plaintiffs allege no facts suggesting that FCA acted with an objective unrelated to ordinary business aims.

Plaintiffs' conclusory allegations that Takata "with [FCA's] guidance, designed, manufactured, and sold millions of Defective Airbags" (Compl. ¶ 198(a)), and that FCA "designed, manufactured, and sold millions of vehicles equipped with Defective Airbags" (*id.* ¶ 198(c)), fare no better. Such allegations simply describe the respective businesses of an airbag manufacturer and a car manufacturer, which is insufficient to satisfy the "associates" element. *See Ray*, 836 F.3d at 1353 (engaging in "wholly innocent activity undertaken as a course of regular business" was insufficient); *see also Kaczmarek* v. *Int'l Bus. Machines Corp.*, 30 F. Supp. 2d 626, 630 (S.D.N.Y. 1998) (noting failure to distinguish the association of entities from the typical and ordinary participants who act separately for the purpose of distributing any product). A RICO enterprise requires something more than the alleged manufacture and sale of defective products; otherwise, every defective product case would be a RICO case.

Plaintiffs also ignore that Takata specifically admitted that it induced FCA and other OEMs to purchase and install airbag systems that they *would not otherwise have purchased* if not for Takata's own fraud. Ex. 1 at B-8, B-11 (Plea Agreement). The facts stated in the Plea Agreement constitute binding judicial admissions as to Takata. *See Sharma* v. *D.E.A.*, 2010 WL 11483805, at *10 (S.D. Fla. Nov. 10, 2010). Further, Plaintiffs fail to identify any authority for the proposition that a party, such as FCA, could simultaneously be engaged in a scheme to defraud and be a victim of that same fraudulent scheme. To the contrary, courts have made clear that RICO is not intended to apply to the victims of another's fraud. *See Thomas* v. *Ross & Hardies*, 9 F. Supp. 2d 547, 556 (D. Md. 1998).

**B.     Plaintiffs Fail to Allege That FCA Engaged in a Pattern of Racketeering Activity.**

"[I]n order to prove a pattern of racketeering, a plaintiff must show at least two racketeering predicates that are related, and that they amount to or pose a threat of continued

criminal activity." *In re Managed Care Litig.*, 2009 WL 347795, at *3 (S.D. Fla. 2009). Where, as here, allegations of mail and wire fraud constitute the predicate acts, the plaintiff must plead with the particularity required under Rule 9(b) facts showing that the defendant acted with "specific intent to defraud." *Koch*, 847 F. Supp. 2d at 1376. Plaintiffs fail to plead predicate acts with the requisite specific intent to defraud. Indeed, Plaintiffs' bare allegations illustrate precisely why "RICO claims premised on mail or wire fraud must be particularly scrutinized because of the relative ease with which a plaintiff may mold a RICO pattern from allegations that, upon closer scrutiny, do not support it." *Crawford* v. *Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 489 (2d Cir. 2014) (quotation omitted).

Plaintiffs allege that "[s]ince June 1, 2009" FCA has engaged in a "pattern of racketeering activity in violation of the mail and wire fraud statutes." (Compl. ¶ 211.)[13] But, while Plaintiffs reference "communications with NHTSA, statements to the press and communications with [Takata]" (*id.* ¶ 210), they fall far short of pleading the required "who, what, where, and when" of each supposedly fraudulent communication. *See Ray* v. *Spirit Airlines, Inc.*, 2015 WL 11143079, at *5 (S.D. Fla. June 4, 2015). Further, Plaintiffs' bald allegation that FCA's "conduct in furtherance of this scheme was intentional" (Compl. ¶ 212) is insufficient to demonstrate specific intent to defraud. *See Republic of Pan.* v. *BCCI Holdings (Lux.) S.A.*, 119 F.3d 935, 949 (11th Cir. 1997) ("RICO . . . allegations of scienter cannot be merely conclusory and unsupported by any factual allegations") (quotation omitted).

---

[13] As discussed above, during the first several years of this supposed racketeering activity, the U.S. and Canadian governments had a sizable ownership interest in FCA (known as Chrysler Group at the time) and appointed a majority of the board. *See supra* at n. 3. Plaintiffs' RICO claims thus implausibly suggest that a corporation partially owned and managed by designees of the U.S. and Canadian governments was engaged in a criminal enterprise.

*Purchase Orders*.  Plaintiffs allege in conclusory fashion that "[f]rom July 10, 2009

through at least 2017, [FCA] repeatedly transmitted . . . countless shipments of, and payments

for, millions of inflators" and that "[t]hese regular, repeated shipments facilitated and furthered

the scheme to defraud."  (Compl. ¶ 211(b).)  But Plaintiffs do not allege what was false or

fraudulent about these routine business communications.  Instead, Plaintiffs simply assume that

FCA was engaged in a fraud with Takata, and then label these routine business communications

as predicate acts in furtherance of the fraud.  This has it exactly backwards.  Plaintiffs must plead

with particularity criminal predicate acts that FCA committed with "specific intent to defraud."

*Koch*, 847 F. Supp. 2d at 1375.  It is not enough for Plaintiffs to "simply allege[] *a priori* that

[FCA] hatched a plan to fraudulently [conceal the inflator defect], and then labeled letters and

emails related to [the inflators] as 'fraud' connected to that plan."  *See In re Managed Care

Litig.*, 2009 WL 347795, at *3.

*USCAR Specifications*.  Plaintiffs next allege that "[o]n or around April 4, 2013," FCA

sent a communication to Takata "approv[ing] of deviations from USCAR specifications for

Takata inflators."  (Compl. ¶ 211(c); *see also id*. ¶ 211(a).)[14]  Plaintiffs assert that FCA "failed to

timely disclose these facts to the public or regulators."  (*Id*. ¶ 211(c).)  Without explanation,

Plaintiffs contend that specific inflators did not meet certain unexplained "slope testing

standards" but FCA "granted deviations" nonetheless.  (*Id*. ¶ 120.)  Other than a vague reference

to "slope testing standards," Plaintiffs do not even allege what the supposed deviations were,

much less how they were in any way connected to the defect underlying the nationwide recall of

---

[14] Two paragraphs earlier, Plaintiffs make the conclusory allegation that FCA communicated
regarding "the repeated failure of Takata's inflators to meet the USCAR Specifications."
(Compl. ¶ 211(a).)  But throughout Plaintiffs' 893-paragraph Complaint, they only allege one
specific instance on April 4, 2013, when FCA approved a deviation from USCAR specifications.

Takata PSAN inflators.  Nor do Plaintiffs allege what was supposedly false about this

communication, what in particular FCA should have disclosed, when it should have been

disclosed, or how the failure to disclose it amounted to fraud.

    ***Rupture During Testing.***  Plaintiffs also allege that around "June 12, 2013 and July 16,

2013," FCA sent communications "concerning an inflator rupture that occurred during testing at

Takata's facility in Mexico."  (*Id.* ¶ 211(d); *see also* ¶ 121.)  But Plaintiffs do not identify any

specific communications from FCA, or indicate who at FCA supposedly participated in these

communications, or allege how this was in any way related to the defect underlying the recall of

Takata PSAN inflators or why this isolated "issue" should have been "disclose[d] . . . to the

public and regulators."  (*Id.* ¶ 211(d).)

    ***Correspondence with NHTSA.***  Plaintiffs allege that in June and November 2014, FCA

sent communications to NHTSA misrepresenting that "the defect was only present in airbags in

certain high humidity areas."  (Compl. ¶ 211(f).)  Although Plaintiffs contend that FCA knew

"that the defect was present in millions of its vehicles" (*id.*), they plead no *facts* to support this

conclusory allegation.  FCA acted at all times in consultation with NHTSA, including

specifically during the regional field actions it instituted in June and November 2014, at

NHTSA's urging.  Ex. 5 ¶ 6 (CRO).  At the time, as NHTSA has explained, the available "data .

. . indicated that certain Takata frontal air bag inflators in regions prone to constant long-term

exposure to high absolute humidity . . . posed a safety risk."  (*Id.*)  FCA's actions were entirely

aligned with NHTSA, and Plaintiffs offer nothing but rank conjecture to suggest that FCA knew

at this juncture that the risk of rupture was more widespread.

    Similarly, Plaintiffs allege that on December 3, 2014, FCA transmitted to NHTSA "a

chronology of rupture events that omitted numerous ruptures of which [FCA] was aware."

(Compl. ¶ 211(g).)  Again, Plaintiffs do not allege any other information about this purported chronology, much less identify any specific ruptures that FCA omitted or how FCA was supposedly "aware" of those ruptures.  Tellingly, NHTSA has never accused FCA of making false or misleading statements in connection with FCA's recall efforts.

      *Recall Notices*.  Plaintiffs allege that in 2014 and 2015, FCA sent recall notices that "misleadingly suggested that the replacement airbags would be free of a defect, when in fact, if Takata airbags were used as replacements, they are also plagued by the Inflator Defect." (*Id.* ¶ 211(h).)  Plaintiffs fail to identify any language in the recall notices that they claim was misleading, and instead seem to contend that the recall notices were misleading because they did not disclose that Takata airbags could be "used as replacements."  But Plaintiffs' premise—that new Takata airbags were "plagued by the Inflator Defect"—is incorrect because NHTSA itself had concluded that the risk of an airbag rupture only develops over time and therefore new Takata airbags did not present this risk.  As a result, NHTSA expressly approved of the use of new Takata airbags as replacement parts.  Ex. 7 ¶ 10 n.10 (Third CRO).  Plaintiffs have not explained (and cannot explain) how FCA misled Plaintiffs when FCA was acting in accordance with and at the direction of NHTSA, the federal agency charged with overseeing the recall.  Plaintiffs also allege that "[FCA] continues to transmit . . . advertisements and communications with the public and NHTSA, misrepresenting that the replacement airbags are safe and reliable, when in fact they too suffer from the Inflator Defect."  (Compl. ¶ 211(k).)  This conclusory

allegation suffers from all of the deficiencies just described and also fails to identify any specific
advertisements or communications, let alone the specific statements that were allegedly false.[15]

### C. Plaintiffs Do Not Plead a Cognizable RICO Injury.

Plaintiffs' RICO claims fail for the additional reason that the injuries they allege—
unquantified "overpayment" and unspecified "diminution in value" of their vehicles—are not the
type of concrete financial injury that is actionable under RICO. "To establish a civil RICO
claim, a plaintiff must demonstrate . . . the requisite injury to 'business or property.'"
*Truthinadvertisingenforcers.com* v. *Dish Network, LLC*, 2016 WL 7230955, at *5 (M.D. Fla.
Dec. 14, 2016). In the Eleventh Circuit, "[c]ourts have excluded from the phrase's meaning
injury to mere expectancy interests or to an intangible property interest." *Id.* Instead, a RICO
plaintiff must have suffered a "concrete financial loss." *Keeton* v. *Gynecare Worldwide*, 2016
WL 2753866, at *3 (S.D. Fla. Jan. 29, 2016). Plaintiffs here have failed to do so.

*Overpayment.* Plaintiffs allege that they paid more than they should have for their
vehicles and thus were "deprived of the benefit of their bargain." (Compl. ¶ 215(a).) This type
of injury is not sufficiently tangible to constitute an injury to business or property. *See*
*McLaughlin*, 522 F.3d at 228 (unavailability of intangible, expectancy-type benefit of the bargain
damages "follows from the text of RICO, which compensates only for injury to business or
property"). For example, in a putative class action against General Motors stemming from its
recall of millions of vehicles because of a defective ignition switch that could "caus[e] a car to

---

[15] Plaintiffs' allegations of RICO conspiracy fail for the same reasons. "In order to state a civil
RICO conspiracy claim, a plaintiff must allege an illegal agreement to violate a substantive
provision of the RICO statute." *Viridis*, 155 F. Supp. 3d at 1365 (quotation omitted). A mere
conclusory allegation is not enough—instead, a plaintiff must allege facts "to show or to create a
reasonable inference that Defendants made an agreement." *Id.* (quotation omitted).

33

lose power and the functionality of several critical safety features," the plaintiffs alleged that

they were injured because they "purchased for x dollars a New GM car that contained a latent

defect; had they known about the defect, they would have paid fewer than x dollars for the car

(or not bought the car at all), because a car with a safety defect is worth less than a car without a

safety defect." *In re Gen. Motors LLC Ignition Switch Litig.*, 2016 WL 3920353, at *1, 3, 7.

The court found that plaintiffs had not pled a cognizable RICO injury because "benefit of the

bargain" damages "are generally unavailable in RICO suits" and "plainly" unavailable where a

RICO claim "sound[s] in fraud in the inducement." *Id*. at *16 (quotation omitted). "[A] party's

'expectation'" that the product they are purchasing is worth the price they are paying is not

"business or property." *Id*. (quoting *McLaughlin*, 522 F.3d at 228). This case is no different.

     ***Diminished Value.*** Plaintiffs allege that the "value of the Class Vehicles have

diminished, thus reducing their resale values." (Compl. ¶ 215(b).) But Plaintiffs plead no *facts*

to support this theory; they do not allege any facts showing that there has in fact been a decline

in the market value of their vehicles, let alone a decline in value attributable to FCA's alleged

wrongdoing. Plaintiffs' supposed diminished value injury is unsupported and conjectural and

thus not actionable under RICO. *See Ivar* v. *Elk River Partners, LLC*, 705 F. Supp. 2d 1220,

1235 (D. Colo. 2010) (no RICO injury because "there is no allegation that Plaintiffs ever tried to

sell their [property]"); *In re Bridgestone/Firestone, Inc. Tires Prods. Liab. Litig.*, 155 F. Supp. 2d

1069, 1091 (S.D. Ind. 2001) (allegations of paying inflated prices insufficient to plead a RICO

injury because they failed to "prove an actual, concrete monetary loss").[16]

---

[16] Although Plaintiffs include an allegation that class members have "suffered damages in the
form of out-of-pocket and loss-of-use expenses and costs" (*id*. ¶ 19), none of the named
Plaintiffs allege that they personally suffered any such costs. (*See id*. ¶¶ 28-68.)

### D. Plaintiffs Do Not Plead Proximate Causation.

Even assuming Plaintiffs adequately pled a RICO injury, they have not adequately alleged that the injury was "by reason of" FCA's supposed fraud, and thus their RICO claims must be dismissed for failure to adequately allege proximate cause. The Supreme Court has held that a civil RICO plaintiff is required "to show that a RICO predicate offense not only was a but for cause of his injury, but was the proximate cause as well." *Hemi Grp., LLC* v. *City of N.Y.*, 559 U.S. 1, 9 (2010) (quotation omitted); *see Ray*, 836 F.3d at 1351 ("There is no ambiguity in Supreme Court or Eleventh Circuit precedent about the requirement that a civil RICO claim must sufficiently plead proximate cause.").

Here, while Plaintiffs assert that their purported injuries stem from FCA "promot[ing] and tout[ing] the safety, reliability, and quality of its vehicles" while allegedly "concealing the nature and scope of the Inflator Defect" (Compl. ¶ 209), the Complaint does not allege that any of the named Plaintiffs (or anyone else) actually relied on any of the alleged fraudulent communications that Plaintiffs claim constitute "predicate acts." Instead, Plaintiffs baldly assert that FCA's "violations of 18 U.S.C. § 1962(c) have directly and proximately caused injuries and damages to Plaintiffs and Class members." (*Id*. ¶ 216.) This is not nearly enough to allege proximate cause. *Ray*, 836 F.3d at 1349 (dismissing claim because the "complaint asserted only the bald conclusion that the plaintiffs relied on a misrepresentation without showing how that reliance was manifested"); *see also Viridis*, 155 F. Supp. 3d at 1356 (holding allegations insufficient to support claim that plaintiffs suffered damages as a result of defendants' conduct).

For all of these reasons, Plaintiffs have failed to state a claim against FCA for a substantive RICO violation. Because Plaintiffs have failed to state a substantive RICO claim, their RICO conspiracy claim must also be dismissed. *See Viridis Corp.*, 155 F. Supp. 3d at 1365.

III.   **THE CLAIMS OF SEVEN PLAINTIFFS WHO OWN CHRYSLER VEHICLES ARE BARRED BY THE SALE ORDER.**

The claims of seven Plaintiffs who own vehicles manufactured by Chrysler—not FCA—are barred by the bankruptcy Sale Order governing FCA's acquisition of certain of Chrysler's assets.[17]  FCA's liability for vehicles manufactured by Chrysler and sold prior to when the Sale Order closed—June 10, 2009—is limited to certain expressly Assumed Liabilities (as defined therein), which include only enumerated claims, including, express warranty claims, certain product liability claims arising from motor vehicle accidents, and certain Lemon Law claims. *See In re Old Carco LLC*, 2013 WL 1856330, at *4-5; *In re Old Carco LLC*, 492 B.R. at 396 n.9, 403 (recognizing the limited scope of FCA's Assumed Liabilities and dismissing economic loss claims).  Here, the Plaintiffs who purchased *used* Chrysler vehicles assert claims under the RICO statute, common-law fraud, unjust enrichment and negligence, MMWA, state-law claims for breach of implied warranty, and state-law consumer protection act claims—none of which falls under the narrow categories of Assumed Liabilities.[18]

---

[17] This includes the only named plaintiff from Maryland (Dwinnells; 2006 Dodge Dakota), a California plaintiff (Maldia; 2006 Dodge Charger), a Michigan plaintiff (Krzeminski; 2007 Dodge Ram 1500), the only plaintiff from Mississippi (Sturgis; 2007 Chrysler Aspen), two of the three Ohio plaintiffs (Fischer and Price; 2007 Dodge 3500 Ram and 2005 Chrysler 300), and a Texas plaintiff (Boyd; 2009 Chrysler Aspen).

[18] Courts have confirmed that FCA's liability does not include fraud claims, *see In re Old Carco LLC*, 2013 WL 1856330, at *5 (FCA "did not assume any liabilities based on fraud or fraudulent practices"), and failure to warn claims, *see In re Old Carco LLC*, 492 B.R. at 405 ("The Sale Order bars claims that FCA breached a duty to warn Chrysler Group's "customers that their vehicles had a design flaw" in the absence of personal injury, because such claims are "typical successor liability case[s] dressed up to look like something else").  Further, although these Plaintiffs assert MMWA claims (Compl. ¶ 181), those claims are based on alleged breaches of implied warranties only, and therefore are barred by the Sale Order. *Id.* at 396 n.9, 403 (holding that FCA did not assume liability for claims based on implied warranties).

Plaintiffs try to sidestep the Sale Order by limiting the purported class to persons who purchased vehicles after June 1, 2009. (Compl. ¶ 157.) But this does not avoid the Sale Order, because it applies to *all* Chrysler vehicles manufactured prior to June 10, 2009, regardless of when such vehicles may have been resold. *See* Ex. 2 ¶ 35. Plaintiffs' attempt to distinguish claims of individuals who purchased used vehicles must fail. The claims at issue in the Complaint arise out of the purported design defect in the vehicle and are barred. (*See id.* ¶¶ 9, 12, 35, 39.) For this reason alone, these claims should be dismissed. *See Kidwell* v. *Wagoner*, 2010 WL 11507301, at *4 (M.D. Fla. Sept. 10, 2010) (dismissing, with prejudice, claims brought by the plaintiff that were barred "by the express terms" of a sale order previously approved by "the Bankruptcy Court for the Southern District of New York").

## IV. PLAINTIFFS' COMMON-LAW AND STATE CONSUMER PROTECTION ACT CLAIMS FAIL AS A MATTER OF LAW.

With respect to Plaintiffs' common-law fraud and consumer protection act claims, Plaintiffs have not alleged: (i) any actionable misstatements or omissions; (ii) that FCA had knowledge of the inflator defects (or that Chrysler had such knowledge and that such knowledge actually transferred to FCA); or (iii) that any Plaintiffs actually read or relied on any of the challenged statements. Further, Plaintiffs' common-law claims (including unjust enrichment and negligence) and consumer protection act claims are barred by: (i) the applicable statute of limitations (and no tolling doctrine applies); (ii) the economic loss rule; (iii) privity rules; or (iv) other specific state-law requirements. For one or more of these reasons, each of their common-law and consumer protection act claims should be dismissed.[19]

---

[19] The claims of two plaintiffs—Campagnone and Cooper (Compl. ¶¶ 37-38)—should be dismissed because their alleged purchases post-date the announcement of recalls for their vehicles. *See In re FCA US LLC Monostable Elec. Gearshift Litig.*, 280 F. Supp. 3d 975, 1006

A. **Plaintiffs Fail to Allege Actionable Misstatements.**

Although Plaintiffs contend that FCA "continuously maintained that Chrysler-branded vehicles were safe and reliable and uniformly concealed the Inflator Defect" (Compl. ¶ 126), Plaintiffs identify just three types of statements (eight statements in total) that they contend were misrepresentations: (1) generalized statements about safety; (2) statements about industry safety ratings; and (3) statements that reference airbags.  (*Id*. ¶ 127.)

To state a claim for fraud or a violation of the consumer protection laws with respect to any of these challenged statements, Plaintiffs are required to allege that there was a false statement or omission of material fact; the Complaint fails to do so and the claims must fail.  *See, e.g.*, *Tuckish* v. *Pompano Motor Co.*, 337 F. Supp. 2d 1313, 1320-21 (S.D. Fla. 2004) (noting "[t]he elements of common law fraud [include] a false statement of fact"); *see* Appendix C, E.[20] For most of the statements put at issue, the Complaint offers no allegations that they are false, and therefore fail for that reason alone.  (*See* Compl. ¶ 127(b)-(h).)

The few remaining allegations of misrepresentation do not fare any better.  Plaintiffs allege that a 2017 statement on FCA's website reflects that its mission is "[t]o create the type of exciting, efficient, reliable, safe vehicles you expect and deserve."  (*Id*. ¶ 127(a).)  But even if this were to be alleged to be false,  it is non-actionable puffery because such statements are

---

(E.D. Mich. 2017) (finding no authority to support "the proposition that a consumer can maintain a viable claim . . . concerning an allegedly concealed defect after the date when the defendant had filed a recall notice of the defect with NHTSA"); *see also* Appendix B.

[20] As noted in Appendix C, some state consumer protection statutes also permit a claim to be brought based on an unfair trade "practice."  Plaintiffs make conclusory allegations that FCA engaged in deceptive "acts or practices," but do not state what these practices were beyond restating their allegations that FCA made misstatements regarding the safety of its vehicles. (*See*, *e.g.*, Compl. ¶¶ 313, 357, 360, 378, 380, 382, 396.)

"inherently subjective" or "nonquantifiable." *See Counts* v. *Gen. Motors, LLC*, 237 F. Supp. 3d

572, 597-98 (E.D. Mich. 2017) (holding that General Motors's representations about the "'high

quality' and 'safety' of its vehicles" were non-actionable puffery); *In re Managed Care Litig.*,

150 F. Supp. 2d 1330, 1346 (S.D. Fla. 2001) ("[M]ere opinions or exaggerations concerning the

qualities of the Defendants' plans would be puffery").

Moreover, the cited statements in a press release and a brochure stating that two specific

Chrysler vehicles—the 2012 Dodge Charger and the 2012 Chrysler 300—had received either

"5-star safety ratings from NHTSA" or were named a "'Top Safety Pick' by the Insurance

Institute for Highway Safety" (*id*. ¶ 127(c), (d)) were in fact true.[21]

In sum, Plaintiffs fail to identify any actionable misrepresentation, and their common-law

fraud and consumer protection act claims should therefore be dismissed.[22] *See* Appendix A.

### B. Plaintiffs Do Not Adequately Allege That FCA Knew That Takata's PSAN Inflators Were Defective.

Plaintiffs also fail to plead that FCA knew that the Takata PSAN inflators that were

installed in Plaintiffs' vehicles were defective at the time Plaintiffs purchased or leased their

vehicles. "It is emphatically the case . . . that a representation is fraudulent only if made with the

contemporaneous intent to defraud—*i.e.*, the statement was knowingly or recklessly false and

made with the intent to induce harmful reliance." *E.g.*, *U.S.* ex rel. *O'Donnell* v. *Countrywide*

*Home Loans, Inc.*, 822 F.3d 650, 658 (2d Cir. 2016).

---

[21] Ex. 11 (Insurance Institute for Highway Safety - 2012 Ratings).

[22] Plaintiffs' pleading failure is not remedied by a vague allegation that FCA failed to disclose
that the PSAN inflators were defective (*see* Compl. ¶ 20) because even in an omissions case,
plaintiffs are still required to identify where and when particular omissions took place and what
material fact was omitted. *See 2002 Irrevocable Tr. for Richard C. Hvizdak* v. *Huntington Nat.
Bank*, 2008 WL 5110778, at *10 (M.D. Fla. Dec. 1, 2008) (holding that Rule 9(b) was not
satisfied when no omissions are specifically identified).

39

      1.     **Plaintiffs Do Not Adequately Allege That Chrysler Knew Takata's Airbags Were Defective or That Chrysler's Purported Knowledge Actually Transferred to FCA.**

Plaintiffs contend that Chrysler knew of the defects in Takata's PSAN Inflators, but none of their allegations actually show knowledge:

- In 1992 Chrysler, Ford, and General Motors developed USCAR specifications for airbag inflators, including additional testing for ammonium nitrate (Compl. ¶ 100). Plaintiffs do not allege who from Chrysler developed these specifications, what purpose they served, or how this "additional testing" is related to the defect underlying the Takata airbag recalls. (*Id.*)

- Another airbag manufacturer conducted testing of ammonium nitrate inflators in the late 1990s (*id*. ¶¶ 101-02). Plaintiffs merely allege that "on information and belief" this information was shared with Chrysler but they do not allege who at Chrysler purportedly learned this information or when. (*Id.* ¶ 102.)

- There was an "abundance" of public information regarding the "dangerously volatile compound, ammonium nitrate." (*Id*. ¶ 104; *see also id.* ¶ 113.) Plaintiffs do not allege that anyone at Chrysler had knowledge of any particular information or how this information related to the defect underlying the Takata airbag recalls.

- In the early 2000s, "the PSDI-4 inflator did not meet the tank curve targets for its USCAR delta process validation ('PV') tests" (*id.* ¶ 107; *see also id.* ¶¶ 103, 108). Plaintiffs do not allege who at Chrysler was aware of this information or how "tank curve targets" relate to the problems underlying the Takata airbag recalls.

- In the early 2000s, unnamed Chrysler product engineers expressed concerns regarding the "integrity" of the PSAN inflator module (*id.* ¶ 106). Plaintiffs do not allege the names of these product engineers or the names of anyone to whom they supposedly expressed concerns, nor do they allege how these unspecified concerns relate to the defect underlying the Takata airbag recalls.

- Chrysler "was aware of" the tendency of Takata's inflators to exhibit "anomaly activity," "ballistic shifts," and "aggressive behavior" (*id.* ¶ 112). Plaintiffs do not allege who at Chrysler "was aware of" this information or how it relates to the defect underlying the Takata airbag recalls.

In any event, Plaintiffs plead no facts to show that Chrysler's purported knowledge *actually* transferred to FCA since all of these events predate FCA's purchase of Chrysler's assets. Plaintiffs make only the conclusory assertion that "[w]hen [FCA] acquired Old Chrysler's books, records, and personnel, it acquired the knowledge of the Inflator Defect that those books, records, and personnel held." (*Id.* ¶ 115.) The law, however, is clear: the

collective knowledge of a bankrupt entity is *not* imputed to the new entity; rather, a plaintiff

must show that specific knowledge or information *actually* transferred to the new entity. *See In*

*re Gen. Motors LLC Ignition Switch Litig.*, 154 F. Supp. 3d 30, 34 (S.D.N.Y. 2015) (noting that

"as a matter of bankruptcy law, knowledge of Old GM personnel or knowledge of information

contained in Old GM files could be imputed to New GM only to the extent that it could be

shown, as a matter of non-bankruptcy law, that New GM actually had that knowledge"); *In re*

*Motors Liquidation Co.*, 568 B.R. 217, 230 (S.D.N.Y. 2017) ("It is not acceptable . . . to base

allegations on generalized knowledge of both Old GM and New GM.").

Here, Plaintiffs fail to allege that any particular information transferred from Chrysler to

FCA. For example, Plaintiffs assert that, "[d]uring the early 2000s, Old Chrysler's Product

Engineers expressed concerns as to the integrity of the Takata ammonium-nitrate inflator module

during and post-deployment." (*Id.* ¶ 106.) Plaintiffs do not, however, allege that these

anonymous Product Engineers were hired by FCA following the bankruptcy sale transaction or

otherwise actually became known to FCA. Plaintiffs' knowledge allegations thus fail.

### 2. Plaintiffs' Conclusory Allegations About FCA's Purported Knowledge Are Likewise Insufficient.

Plaintiffs are left only with their few meager allegations concerning FCA's post-

bankruptcy sale knowledge. Plaintiffs allege only that: (1) FCA was "on notice" that Takata's

airbags were defective as a result of Honda's 2008 recall of certain Honda vehicles; (2) FCA

approved a request from Takata for a "deviation" from USCAR slope testing specifications;

(3) that FCA was aware of four testing, repair, or deployment incidents involving airbags; and

(4) an unnamed FCA employee received an email in 2013 from a General Motors employee

commenting on Honda's recall. (*Id.* ¶¶ 117-23, 211(c).) As set forth below, these conclusory

allegations, both individually and collectively, fail to adequately allege FCA's knowledge of a

supposed "common, uniform" defect in Takata PSAN inflators.  *See Uhlig* v. *Darby Bank & Tr. Co.*, 556 F. App'x 883, 888-89 (11th Cir. 2014) ("Although [Plaintiff] makes the conclusory allegation that [Defendant] 'knew or should have known' its representations 'were false,' he offers no facts, nor presents any evidence, to support that assertion.").

**Honda's 2008 Recall.**  Plaintiffs allege that "the Takata airbags New Chrysler used in its vehicles contained the same ammonium-nitrate propellant as used in Honda vehicles" and therefore "New Chrysler was put on notice" by Honda's 2008 recall.  (*Id.* ¶ 117.)  As an initial matter, Honda's 2008 recall announcement took place prior to Chrysler's bankruptcy, and therefore FCA (*i.e.*, "New Chrysler") was not in existence.  Moreover, Plaintiffs fail to plead any facts to show that the issue affecting the specific Honda vehicles that were subject to the 2008 recalls was present in any Chrysler or FCA vehicles, much less that FCA had such knowledge. To the contrary, Takata told NHTSA that "[t]he physical characteristics of the inflator housing used in the Honda vehicles subject to these recalls are unique to Honda."  Ex. 10 (Dec. 23, 2009 Response from Takata to NHTSA).

**Slope Testing Deviation.**  Plaintiffs allege that in April 2013, FCA "was made aware that Takata's SDI-X ammonium nitrate inflator did not meet the slope testing standards during PV testing, but [FCA] granted deviations and approved the inflator for Chrysler production." (Compl. ¶¶ 120, 211(c).)  Once again, Plaintiffs do not allege who at FCA was supposedly "made aware" that this particular type of inflator—the SDI-X—"did not meet slope testing standards," or how FCA was supposedly made aware.  Plaintiffs fail to allege how the supposed failure to "meet the slope testing standards" and the request for a "deviation" from those standards is in any way connected to the reasons underlying the recall of the SDI-X inflator or any other PSAN inflator.  Thus, this vague allegation fails to demonstrate that FCA knew that

vehicles containing SDI-X inflators were unsafe, let alone that any other of its vehicles containing different PSAN inflators were unsafe. *See Wilson* v. *Hewlett-Packard Co.*, 668 F.3d 1136, 1147 (9th Cir. 2012) (holding "[t]he allegation that . . . the manufacturer, had 'access to the aggregate information and data regarding the risk of overheating' is speculative and does not suggest how any tests or information could have alerted [the manufacturer] to the defect").

*Four Isolated Testing, Repair, or Deployment Incidents*. Plaintiffs recite a total of four incidents relating to either the testing, repair, or deployment of an airbag between October 2010 and September 2013. (Compl. ¶¶ 118, 119, 121, 122.)

- Plaintiffs do not allege in even conclusory fashion that FCA was aware of the alleged October 2010 rupture incident at a Takata facility in Mexico (*id.* ¶ 118), much less allege specifically who at FCA may have learned this information and when.

- Plaintiffs fail to allege that any information about an October 2011 inadvertent airbag deployment in a Chrysler vehicle (*id.* ¶ 119) was shared with anyone outside of the plant. Further, the Complaint does not allege the type or model year of the vehicle, the type of airbag or inflator involved, or how it relates to the PSAN inflator issues. *See Bethesda Chevy Chase Surgery Ctr., LLC* v. *Unitedhealthcare Ins. Co.*, 2016 WL 3042957, at *5 (D. Md. May 27, 2016) (holding "even if one employee of a defendant company may have [had] notice of certain claims, that employee's notice may alone be insufficient to impute knowledge onto the entire entity.").

- Plaintiffs fail to allege any details regarding the supposed deployment "issue" on June 20, 2013, at Takata's laboratory in Mexico (Compl. ¶ 121), including what type of inflator was being tested and who at FCA was supposedly "made aware of the issue."

- Plaintiffs do not allege the make or model year of the Chrysler vehicle that allegedly experienced an airbag rupture on September 7, 2013 (*id.* ¶ 122), where the vehicle was registered, or what type of PSAN inflator was being utilized in the airbag.

*Email from General Motors*. Plaintiffs allege that, "in an email to New Chrysler and Ford, General Motors' head of inflator technology said the explanation for the recall given by a Honda spokesperson in April 2013—that the problem stemmed from human errors during production— was "Bull S%$t," and he expressed his view that the Takata defect has to be a core design issue or process issue, not a "mistake." (*Id*. ¶ 123.) Plaintiffs do not identify the sender

of this supposed email, the date the email was supposedly sent, or the person or persons at FCA

who supposedly received this email; nor do they allege that anyone from FCA read or responded

to the email.  Such a vague and conclusory allegation is insufficient to allege anything about

FCA's supposed knowledge at the time of the alleged fraud.  *See, e.g.*, *In re Ocwen Fin. Corp.*

*Sec. Litig.*, 2015 WL 12780960, at *10 (S.D. Fla. Sept. 4, 2015) ("[The confidential witness's]

allegation that [a risk officer] was aware of technology issues and concerns of unnamed

employees fails to explain how [a risk officer's] knowledge of could be imputed to [defendant

company] or [defendant chairman].").  In addition, the General Motors' employee's skepticism

of Honda's explanation for Honda's recall of certain PSAN inflators in Honda vehicles is not

probative of whether FCA's vehicles were safe.

Whether viewed separately or together, these conclusory allegations lack the necessary

factual support to adequately allege that FCA had knowledge of the existence or scope of the

defects in Takata's PSAN inflators prior to the implementation of the recall process.  *See Alan* v.

*Wells Fargo Bank, N.A.*, 2014 WL 11393570, at *3 (S.D. Fla. June 18, 2014) ("As to Plaintiff's

claim for fraud, Plaintiff's allegations fall far short of Rule 9(b)'s pleading requirements for a

fraud claim.  Further, Plaintiff's claims of Defendant's knowledge and intent to induce are

conclusory and speculative, and lack factual support.").

### C. Plaintiffs Fail to Allege That They Relied on Any of FCA's Alleged Misstatements.

Plaintiffs fail to adequately allege that they relied on, or were induced by, FCA's

supposed misstatements, as required under the law of each relevant state.  *See*, *e.g.*, *Tiismann* v.

*Linda Martin Homes Corp.*, 637 S.E.2d 14, 16 (Ga. 2006) ("[A] claimant who alleges the

[Georgia Fair Business Practices Act] was violated as the result of a misrepresentation must

demonstrate that he was injured as the result of the reliance upon the alleged misrepresentation.")

(citation omitted); *see* Appendix C.  Crucially, no Plaintiff alleges that he or she viewed any of

the alleged misstatements prior to purchasing or leasing their vehicles.[23]  (Compl. ¶ 127.)  While

some Plaintiffs allege, in general terms, that prior to purchasing or leasing their vehicle they

viewed unspecified advertisements for their vehicle or other FCA vehicles, such vague

allegations are plainly insufficient to state a claim under any pleading standard, let alone Rule

9(b).  (*See, e.g.*, *id.* ¶ 39 ("Prior to purchasing the vehicle, [Maryland] Plaintiff Dwinnells saw

television commercials touting Chrysler's safety and reliability.").)  The remaining Plaintiffs fail

to allege that they heard or viewed any FCA advertisements or marketing materials at all.

Plaintiffs cannot simply fall back on the theory that FCA made unspecified omissions to

save their claims.  Indeed, courts have specifically held in automobile defect cases that plaintiffs

must plead reliance and cannot merely allege that the manufacturer omitted disclosure of safety

defects.  *See, e.g.*, *Philips* v. *Ford Motor Co.*, Case No. 14-CV-02989-LHK (N.D. Cal. Feb. 13,

2015), Dkt. No. 48 at 9-10 (dismissing claim based on failure to disclose defect when plaintiffs

"d[id] not specify what materials" they "viewed prior to purchasing their cars").

### D. Many of Plaintiffs' Common-Law and Consumer Protection Act Claims Are Time-Barred Because No Tolling Doctrine Applies.

At least 18 of Plaintiffs' common-law and consumer protection act claims are untimely

and must be dismissed.  Plaintiffs contend that their claims should be tolled based on (i) the

doctrine of fraudulent concealment (Compl. ¶¶ 148-150); (ii) estoppel (*id.* ¶ 151); (iii) the

---

[23] Nor could Plaintiffs have relied on two of FCA's alleged misstatements made in 2017—well after all Plaintiffs purchased their vehicles.  (*See* Compl. ¶ 127(a)-(b).)  "Obviously, Plaintiff could not have relied to its detriment on statements made after the contract had been formed." *Lorali, Inc.* v. *SMK Assocs., LLC*, 2014 WL 12536977, at *7 (S.D. Fla. Aug. 26, 2014).

discovery rule (*id.* ¶¶ 152-53); or (iv) *American Pipe & Construction Co.* v. *Utah*, 414 U.S. 538

(1974) (*id.* ¶¶ 154-55). Each contention is misplaced:

- Equitable tolling under the doctrine of fraudulent concealment requires more than mere non-disclosure, as this Court has previously held. (*See* Nissan Order at 27, Dkt. 1208); *see also Raie* v. *Cheminova Inc.*, 336 F.3d 1278, 1281 n.1 (11th Cir. 2003) ("Fraudulent concealment requires the defendants to engage in the willful concealment of the cause of action using fraudulent means to achieve that concealment."). Plaintiffs' allegations are insufficient to meet this threshold as they do not allege that FCA made any affirmative representations about the safety of Takata PSAN inflators. (*See* Nissan Order at 27, Dkt. 1208.)

- Because Plaintiffs have not alleged any active concealment by FCA, FCA is not "estopped from relying on" applicable statutes of limitations. (Compl. ¶ 151.)

- The "discovery rule" does not apply to all of Plaintiffs' state-law causes of action. *See* Appendix B.

- *American Pipe* tolling does not apply where, as here, a "defendant was initially named in some of the various class action suits filed," and "the plaintiffs in those actions chose not to assert claims against the defendant in the consolidated and amended class action complaint, under the same caption, which superseded the earlier complaints." *Lindner Dividend Fund, Inc.* v. *Ernst & Young*, 880 F. Supp. 49, 54 (D. Mass. 1995).

Because no tolling doctrine applies here, 18 of Plaintiffs' common-law and consumer protection

act claims should be dismissed as time-barred. *See* Appendix B.

### E. Plaintiffs' Common-Law Unjust Enrichment Claims Should Be Dismissed for Failure to Adequately Allege Privity.

All of Plaintiffs' claims for common-law unjust enrichment fail for lack of privity.[24] As

this Court has previously recognized, for states that require privity to maintain an unjust

enrichment claim, such claims must be dismissed if a plaintiff cannot demonstrate that they have

conferred a direct benefit on a defendant. Here, Plaintiffs fail to adequately allege that they

---

[24] In addition, as the Court has found, an express warranty at purchase precludes a claim for unjust enrichment. *See* Dkt. 1208 (Nissan Order) at 22-23. Here, the unjust enrichment claims of 12 Plaintiffs who pled the existence of an express warranty should be dismissed, as Plaintiffs have failed to adequately allege unconscionability. *Id.*; *see also* VW MTD, Section VII(F)(4).

conferred a direct benefit on FCA as required under the law of each relevant state.[25]  *See*

Appendix D.  Thus Plaintiffs' unjust enrichment claims should be dismissed.[26]

### F.    Numerous Plaintiffs' Claims Are Barred by the Economic Loss Rule.

At least 26 of Plaintiffs' claims for common-law fraud and negligence should be

dismissed because their states have adopted the economic loss rule.[27]  *See* Appendix F.  Under

that rule, the recovery of damages in tort is prohibited when a product defect results in economic

loss only.  *See Hoseline, Inc.* v. *U.S.A. Diversified Prod., Inc.*, 40 F.3d 1198, 1200 (11th Cir.

1994).  As this Court has previously held, where a state has adopted the economic loss rule (and

does not recognize an exception to it), all tort-based claims are barred, including both common-

law fraud and negligence claims.  (Dkts. 1099, 1202, 1208.)  Moreover, although some states

recognize an exception to the economic loss rule for fraud claims, the exception does not apply

to negligence claims, which remain barred by the rule.  *See, e.g.*, *Sharyland Water Supply Corp.*

---

[25] FCA does not sell vehicles to the public directly, and contrary to Plaintiffs' conclusory allegation (Compl. ¶ 185), dealerships that sell FCA vehicles are not FCA's agents.  *See Erwin* v. *Ford Motor Co.*, 2016 WL 7655398, at *8 (M.D. Fla. Aug. 31, 2016).  Moreover, even if a purchase from an authorized dealership could somehow confer a benefit on FCA, Plaintiffs have not alleged that they purchased their vehicles from such dealerships.  In any event, 16 Plaintiffs have not even alleged that they purchased their vehicles from a dealership with even a nominal affiliation to FCA.  Finally, the California and Texas Plaintiffs' claims must be dismissed because unjust enrichment is not a cognizable cause of action in those states.  *See* Appendix D.

[26] Relatedly, under Ohio law, economic losses cannot be recovered in a tort action absent privity.  *Corporex Dev. & Constr. Mgt., Inc.* v. *Shook, Inc.*, 835 N.E.2d 701, 705 (Ohio 2005).  The Ohio Plaintiffs have not alleged that they purchased their vehicles from FCA or a dealership with even a nominal affiliation; thus their fraud and negligence claims are barred for a lack of privity.

[27] Moreover, all Plaintiffs' negligence claims should be dismissed because Takata's admitted criminal acts break any causal connection between FCA's allegedly negligent conduct and Plaintiffs' purported injuries.  *See, e.g.*, *First Commercial Tr. Co.* v. *Lorcin Eng'g, Inc.*, 900 S.W.2d 202, 204 (Ark. 1995) ("In general no liability exists in tort for harm resulting from the criminal acts of third parties.") (quotation omitted)).

47

v. *City of Alton*, 354 S.W.3d 407, 418 (Tex. 2011). As a result, 15 of Plaintiffs' common-law

fraud claims and 11 of Plaintiffs' negligence claims are barred.[28] *See* Appendix A.

### G. Seventeen of Plaintiffs' Consumer Protection Acts Claims Should Be Dismissed for Several Additional Reasons.

Seventeen of Plaintiffs' claims under the consumer protection laws should be dismissed

for additional reasons unique to the laws of those eight states (*see* Appendix A):

- Alabama, Arkansas, and South Carolina prohibit plaintiffs from bringing class actions pursuant to those states' consumer protection laws. *See* Ala. Code § 8-19-10(f); Ark. Code Ann. § 4-88-113(f)(1)(B); S.C. Code Ann. § 39-5-140.

- The Michigan Consumer Protection Act and the Missouri Merchandising Practices Act require plaintiffs to allege that they purchased the product at issue for "personal purposes," which neither the Michigan Plaintiffs nor the Missouri Plaintiffs have alleged. *See Zine* v. *Chrysler Corp.*, 600 N.W.2d 384, 393 (Mich. App. Ct. 1999); *accord Murphy* v. *Stonewall Kitchen, LLC*, 503 S.W.3d 308, 311 (Mo. App. 2016).

- Under Illinois's and Georgia's Deceptive Trade Practices Acts and California's Unfair Competition Law, plaintiffs are only entitled to injunctive relief. *See, e.g.*, *Dorr-Oliver Inc.* v. *Fluid-Quip, Inc.*, 834 F. Supp. 1008, 1014 (N.D. Ill. 1993). But injunctive relief is preempted by the federal Safety Act because it would "[stand] as an obstacle to the accomplishment and execution of the important means-related federal objectives" of NHTSA's oversight of the recall. *See Geier* v. *Am. Honda Motor Co.*, 529 U.S. 861, 881 (2000).[29]

## V. PLAINTIFFS' IMPLIED WARRANTY CLAIMS AND CORRESPONDING MMWA CLAIMS SHOULD BE DISMISSED.

### A. Plaintiffs' MMWA Claims Cannot Proceed as a Class Action.

Plaintiffs' MMWA claims cannot proceed as a class action because they do not satisfy

the statutory requirements for bringing such a claim. The MMWA expressly states that "no

claim shall be cognizable" if an "action is brought as a class action, and the number of named

---

[28] Plaintiffs' claims under Pennsylvania's and North Carolina's respective unfair trade practices acts are likewise barred by the economic loss rule. (*See* Dkt. 1208 at 8.)

[29] Likewise, Plaintiffs' request for injunctive relief "to enjoin [FCA] from continuing its negligence by continuing to install Defective Airbags in Class Vehicles" (Compl. ¶ 259) is precluded by the Safety Act. *See* VW MTD, Section VIII.

plaintiffs is less than one hundred." 15 U.S.C. § 2310(d)(3)(C); *see DA Air Taxi LLC* v. *Diamond Aircraft Indus., Inc.*, 2009 WL 10668159, at *3 (S.D. Fla. Nov. 5, 2009) ("[The MMWA] prohibits class actions thereunder if the number of named plaintiffs is less than one hundred."). Here, there are only 33 named Plaintiffs, and thus this claim should be dismissed.[30]

**B.      Plaintiffs' MMWA Claims Fail Where There Is No Related Implied Warranty Claim.**

The MMWA claims of nine Plaintiffs must be dismissed because they fail to allege a breach of warranty claim. In order to state a claim under the MMWA, a plaintiff must allege an underlying state-law breach of warranty claim. *Varner* v. *Domestic Corp.*, 2017 WL 3730618, at *11 (S.D. Fla. Feb. 7, 2017) ("A claim under the [MMWA] is dependent upon having a viable underlying state breach of warranty claim.") (quotation omitted); *see also In re Apple iPhone 3G Prod. Liab. Litig.*, 728 F. Supp. 2d 1065, 1072 n.10 (N.D. Cal. 2010) (holding the MMWA "merely provides a federal cause of action for state law implied warranty claims"). Plaintiffs have failed to allege a breach of express or implied warranty under the laws of Alabama, Arizona, Florida, Illinois or Ohio. As a result, these nine Plaintiffs' MMWA claims should be dismissed. *See* Appendix A.

**C.      The New York and North Carolina Plaintiffs' Implied Warranty and MMWA Claims Should Be Dismissed for Lack of Privity.**

Plaintiffs' implied warranty claims under New York and North Carolina law must be dismissed for failure to allege privity between Plaintiffs and FCA. *See Kolle* v. *Mainship Corp.*, 2006 WL 1085067, at *5 (E.D.N.Y. Apr. 20, 2006) ("It is clear that New York law requires

---

[30] Plaintiffs' rote reference to CAFA should not permit them to circumvent the requirements imposed by Congress. *See Borchardt* v. *Mako Marine International, LLC*, 2011 WL 4636799, at *2 (S.D. Fla. Oct. 6, 2011) ("The one-hundred plaintiff requirement for a maintenance of a class action under [MMWA] . . . cannot be avoided . . . simply because the requirements under [CAFA] are also satisfied.").

privity in order for Plaintiff to assert a breach of an implied warranty claim."); *Energy Investors Fund, L.P.* v. *Metric Constructors, Inc.*, 525 S.E.2d 441, 446 (N.C. 2000) (same under North Carolina law).  Plaintiffs Abdallah (New York), O'Neal (North Carolina), and Swanson (North Carolina) have not alleged that they purchased their vehicles from FCA.  (Compl. ¶¶ 35, 59, 65.) Because these Plaintiffs are not in privity with FCA, they both fail to state a claim for implied warranty and they cannot maintain an MMWA claim predicated on implied warranty.

### D. Fifteen Plaintiffs' Claims for Breach of Implied Warranty and Associated MMWA Claims Should Be Dismissed as Untimely.

Numerous Plaintiffs' claims for breach of implied warranty and their associated MMWA claims should be dismissed as untimely because their claims accrued at the time of the initial sale or lease of the vehicle and the applicable statute of limitations has thus expired.  *See* Appendix B.  With one exception, all states in which Plaintiffs bring a claim for a breach of implied warranty have adopted U.C.C. § 2-725.  *Id.*  As this Court has recognized in the Prior MDL Proceedings, the "discovery exception" of U.C.C. § 2-725 does not apply to a breach of implied warranty.  (Dkt. 1202 at 28.)  Thus, the implied warranty claims of 15 Plaintiffs expired prior to the initiation of this action, and their implied warranty and MMWA claims should be dismissed.[31]  *See* Appendix A.

### CONCLUSION

For the foregoing reasons, FCA respectfully requests that the Court dismiss the Complaint with prejudice.

---

[31] Plaintiffs' implied warranty claims should be dismissed for the additional reason that pre-suit notice is a prerequisite, and Plaintiffs fail to adequately allege that they provided pre-suit notice. (*See* Compl. ¶ 189.)  FCA acknowledges that the Court rejected this argument in the Prior MDL Proceedings and raises it solely to preserve for appeal.

Dated:  August 20, 2018              Respectfully submitted,

                                      By: */s/ Scott M. Sarason*

**Douglas B. Brown**
dbrown@rumberger.com
Florida Bar No. 242527
**Scott M. Sarason**
ssarason@rumberger.com
Florida Bar No. 394718
**RUMBERGER, KIRK & CALDWELL**
Brickell City Tower, Suite 3000
80 Southwest 8th Street
Miami, FL 33130-3037
T: 407 839-4550
F: 407 835-2050

**Brian D. Glueckstein** (*pro hac vice*)
gluecksteinb@sullcrom.com
**Darrell S. Cafasso** (*pro hac vice*)
cafassod@sullcrom.com
**SULLIVAN & CROMWELL LLP**
125 Broad Street
New York, NY  10004
T: 212 558-4000
F: 212 558-3588

**Elizabeth A. Rose** (*pro hac vice*)
rosee@sullcrom.com
**SULLIVAN & CROMWELL LLP**
1700 New York Avenue, N.W.
Suite 700
Washington, D.C.  20006
T: 202 956-7500
F: 202 293-6330

*Counsel for FCA US LLC*

## REQUEST FOR HEARING

Pursuant to Local Rule 7.1(b)(2), Counsel for FCA US LLC ("FCA") respectfully

requests oral argument on its Motion to Dismiss the Amended Consolidated Complaint (the

"Motion") to answer any questions that the Court may have about the legal issues raised in the

Motion.  Counsel notes that FCA is a new party to these proceedings and has not previously been

heard by this Court.  Counsel estimates that one hour is required for argument.

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing was filed via

CM/ECF and served on all counsel of record via electronic notices generated by CM/ECF on

August 20, 2018.

*/s/ Scott M. Sarason*

**EXHIBIT C**

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

IN RE TAKATA AIRBAG PRODUCT
LIABILITY LITIGATION

THIS DOCUMENT RELATES TO
ECONOMIC LOSS TRACK CASES

BUTLER AUTO RECYCLING, INC., *et
al.*, individually and on behalf of all others
similarly situated,

      *Plaintiffs*,

  v.

HONDA MOTOR CO. LTD, *et al.*,

      *Defendants*.

MDL No. 2599
Master File No. 15-MD-02599-FAM
S.D. Fla. Case No. 1:15-CV-24009-FAM

### DEFENDANT FCA US LLC'S SUPPLEMENTAL MEMORANDUM
### OF LAW IN FURTHER SUPPORT OF ITS MOTION TO DISMISS THE
### AUTOMOBILE RECYCLERS' FIRST AMENDED CONSOLIDATED COMPLAINT

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................1

BACKGROUND ................................................................................................................1

ARGUMENT ....................................................................................................................5

I.      THE COURT LACKS PERSONAL JURISDICTION OVER FCA ..............................5

        A.    Plaintiffs' RICO Claims Do Not Provide a Basis for Exercising
            Specific Jurisdiction ..........................................................................................6

        B.    Plaintiffs Fail to Plead Any Facts to Demonstrate That FCA Is Subject
            to Specific Jurisdiction in Florida ....................................................................6

II.     MOST OF PLAINTIFFS' CLAIMS ARE BARRED BY THE SALE ORDER ..............10

III.    PLAINTIFFS DO NOT ADEQUATELY PLEAD RICO CLAIMS AGAINST
       FCA ..............................................................................................................10

IV.    PLAINTIFFS' TENNESSEE AND TEXAS STATUTORY CLAIMS SHOULD
       BE DISMISSED AS TIME-BARRED ................................................................13

CONCLUSION ..............................................................................................................15

# TABLE OF AUTHORITIES

**Page**

## CASES

*In re Bridgestone/Firestone, Inc. Tires Products Liability Litigation*,
    155 F. Supp. 2d 1069 (S.D. Ind. 2001) ...................................................................12

*Brown* v. *Bottling Group, LLC,*,
    159 F. Supp. 3d 1308, 1315 (M.D. Fla. 2016) ...............................................................9

*Bristol-Myers Squibb Co.* v. *Superior Court of California, San Francisco County*,
    137 S. Ct. 1773 (2017) ..............................................................................7, 9

*Carmouche* v. *Carnival Corp.*,
    36 F. Supp. 3d 1335 (S.D. Fla. 2014) ...................................................................7

*Courboin* v. *Scott*,
    596 F. App'x 729 (11th Cir. 2014) .......................................................................8

*Helicopteros Nacionales de Colombia, S.A.* v. *Hall*,
    466 U.S. 408, 417 (1984) .............................................................................9

*In re Duramax Diesel Litigation*,
    289 F. Supp. 3d 1037 (E.D. Mich. 2018) ...............................................................12

*In re FCA US LLC Monostable Electronic Gearshift Litigation*,
    280 F. Supp. 3d 975 (E.D. Mich. 2017) ................................................................13

*In re General Motors LLC Ignition Switch Litigation*,
    2016 WL 3920353 (S.D.N.Y. July, 15 2016) ...........................................................11

*Ivar* v. *Elk River Partners, LLC*,
    705 F. Supp. 2d 1220 (D. Colo. 2010)..................................................................12

*J. McIntyre Machinery Ltd.* v. *Nicastro*,
    564 U.S. 873 (2011)...................................................................................9

*Keeton* v. *Gynecare Worldwide*,
    2016 WL 2753866 (S.D. Fla. Jan. 29, 2016) ...........................................................11

*Koch* v. *Royal Wine Merchants, Ltd.*,
    847 F. Supp. 2d 1370 (S.D. Fla. 2012) ..................................................................6

*Leon* v. *Continental AG*,
    301 F. Supp. 3d 1203 (S.D. Fla. 2017) ..................................................................9

*Licciardello* v. *Lovelady*,
    544 F.3d 1280 (11th Cir. 2008) .........................................................................6

*Maio* v. *Aetna, Inc.*,
    221 F.3d 472 (3d Cir. 2000)............................................................................11, 12

*Martinez* v. *Bank of America Corp.*,
    2014 WL 2735668 (S.D. Fla. June 16, 2014) .........................................................14

*McLaughlin* v. *American Tobacco Co.*,
    522 F.3d 215 (2d Cir. 2008)...................................................................................12

*Montesi* v. *Nationwide Mutual Ins. Co.*,
    970 F. Supp. 2d 784, 789 (W.D. Tenn. 2013)........................................................13

*In re Old Carco LLC*,
    2013 WL 1856330 (Bankr. S.D.N.Y. May 12, 2013)..............................................10

*In re Old Carco LLC*,
    492 B.R. 392 (Bankr. S.D.N.Y. 2013)....................................................................10

*Omar ex rel. Cannon* v. *Lindsey*,
    334 F.3d 1246, 1251 (11th Cir. 2003) ...................................................................14

*Purdue Research Found.* v. *Sanofi-Synthelabo, S.A.*,
    338 F.3d 773 (7th Cir. 2003) ...................................................................................6

*Sculptchair, Inc.* v. *Century Arts, Ltd.*,
    94 F.3d 623 (11th Cir. 1996) ...................................................................................5

*Sykes* v. *Public Storage Inc.*,
    425 F. App'x 359 (5th Cir. 2011) ...........................................................................14

*Sutton* v. *Canon U.S.A., Inc.*,
    2009 WL 10670005 (M.D. Fla. Mar. 31, 2009) ....................................................14

*Truthinadvertisingenforcers.com* v. *Dish Network, LLC*,
    2016 WL 7230955 (M.D. Fla. Dec. 14, 2016).......................................................11

*Vermeulen* v. *Renault, U.S.A., Inc.*,,
    985 F.2d 1534 (11th Cir. 1993) ...............................................................................8

*Walden* v. *Fiore*,
    571 U.S. 277 (2014)..............................................................................................6, 9

## STATUTES

Florida Statute § 48.193.......................................................................................................7

Texas Business & Commerce Code Annotated § 17.565 ...................................................13

## INTRODUCTION

Defendant FCA US LLC ("FCA") respectfully submits this supplemental memorandum of law in further support of the Automotive Defendants' Motion to Dismiss Automotive Recycler Plaintiffs' First Amended Consolidated Class Action Complaint and Incorporated Memorandum of Law ("Joint Memorandum").  In addition to the grounds for dismissal presented in the Joint Memorandum, Plaintiffs' claims against FCA should be dismissed for the following additional reasons:  (1) the Court lacks personal jurisdiction over FCA; (2) the Sale Order from Chrysler LLC's ("Chrysler") bankruptcy bars all of Plaintiffs' claims against FCA for 451 out of the 482 salvage vehicles alleged owned by Plaintiffs; (3) Plaintiffs fail to plead a viable RICO claim against FCA; and (4) certain of Plaintiffs' state-law claims are time-barred as to FCA.[1]

## BACKGROUND

***Recycler Plaintiffs***.  Plaintiffs are seven individual "automotive parts recyclers" and the Automotive Dismantlers and Recyclers Association, Inc. ("ARA"), which is "an international trade association."[2]  (Recycler Plaintiffs' First Amended Consolidated Class Action Complaint ("Complaint" or "Compl.") ¶¶ 83-90, Dkt. 2887.)  Plaintiffs have their places of business in seven different states—Florida, Georgia, Missouri, North Carolina, Tennessee, Texas and Virginia.  (*Id*.)  Plaintiffs allege that they "purchase vehicles from a number of sources, including insurance salvage auctions, tow operators, charities, and the public" (*id*. ¶ 455), and then

---

[1] All references to "Ex. _" herein are to FCA's Request for Judicial Notice ("RJN"), dated August 20, 2018, unless otherwise noted.

[2] The named plaintiffs are ARA and Midway Auto Parts LLC ("Midway"), Butler Auto Recycling ("Butler"), Cunningham Bros. Auto Parts, LLC ("Cunningham"), Snyder's Ltd. ("Snyder"), Triple D. Corporation d/b/a Knox Auto Parts ("Knox"), Road Tested Parts, Inc. d/b/a Weaverparts.com and Young's Auto Center and Salvage LP.  ARA alleges that it had been assigned claims by two automotive parts recyclers:  Rigsby's Auto Parts & Sales, Inc. and Quarno's Auto Salvage.  (Compl. ¶ 89.)

"transport[] the vehicles to their facilities." (*Id.* ¶ 461.) Plaintiffs allege that they purchase these salvaged vehicles "based, in part, on the presence and condition of the automotive parts contained in the vehicle," which they eventually remove and resell "to consumers, automotive repair shops, automotive dealerships, wholesalers and other automotive recyclers." (*Id.* ¶¶ 456-57.) Plaintiffs do not allege how much they paid for salvaged vehicles or any of the parts therein, nor do they allege the prices they charge or the profits they reap from selling parts.

Although Plaintiffs have identified the makes and models of the salvaged vehicles they allegedly possess, they do not provide any information on when or where they obtained these vehicles. (*See id.* Exs. A-H.) One of the Plaintiffs—Cunningham—does not allege that it owns *any* FCA vehicles.[3] The other Plaintiffs allege that they own salvaged Chrysler or FCA vehicles which contain Takata airbags with PSAN inflators. Critically, however, the vast majority of the salvaged "FCA" vehicles Plaintiffs claim they own (451 out of 482 vehicles total) are Chrysler vehicles from model years 2003 to 2009, for which FCA assumed no liabilities for Plaintiffs' claims pursuant to the Sale Order entered in Chrysler's bankruptcy proceedings, as explained below. (*Id.*)

As noted in the Joint Memorandum, Plaintiffs do not allege that they had *any* interaction with FCA (or with any of the other Automotive Defendants) in the process of purchasing salvaged vehicles. Indeed, Plaintiffs do not allege that they purchased any vehicles (or parts) from FCA, but instead acknowledge that they obtained salvaged vehicles from sources such as insurance auctions, tow operators and charities. (Compl. ¶ 458.) Nor do Plaintiffs allege that

---

[3] To the extent Plaintiffs purport to assert claims against FCA on behalf of Cunningham, those claims must be dismissed because Cunningham does not allege ownership of any FCA vehicles. (Compl. Ex. B.)

FCA had any role in determining how much Plaintiffs paid for the salvaged vehicles or that FCA in any way profited from those third-party transactions of inoperable vehicles.

Nevertheless, they purport to bring sweeping claims against FCA for violations of RICO (18 U.S.C. § 1962(c)-(d)), the Lanham (Trademark) Act (15 U.S.C. § 1501, *et seq.*), common-law fraud, and the consumer protection laws of Florida, Georgia, North Carolina, Tennessee and Texas, based on flimsy allegations, many of which are copied from the Consumer Plaintiffs' Amended Consolidated Class Action Complaint (Dkt. 2758) ("Consumer Complaint").[4]

***FCA's Alleged Misrepresentations***.  Plaintiffs identify the same small number of alleged misstatements from FCA's website and vehicle brochures as are challenged in the Consumer Complaint.  (*E.g., compare* Compl. ¶ 847(b)(vi) (2012 Dodge Charger includes "advanced multistage front air bags, supplemental front-seat mounted pelvic thorax side air bags, driver-side knee air bag, and supplemental side-curtain air bags"), *with* Consumer Compl. ¶ 127(d) (same).) Plaintiffs also challenge one additional statement from 2014 regarding FCA's decision to conduct a field action "to replace airbag inflators in certain vehicles registered in four U.S. regions."  (Compl. ¶ 847(b)(vii).)  Plaintiffs do not allege what was false or misleading about any of these statements or what specific information should have been disclosed.  Moreover, none of

---

[4] The publicly filed version of the Complaint contains numerous paragraphs that are redacted. As it pertains to FCA, the redacted paragraphs contain the exact same content as unredacted paragraphs in the Consumer Complaint.  (Dkt. 2758.)  In an effort to comply with the Protective Order, FCA has not quoted the redacted allegations in this memorandum; however, FCA incorporates by reference the arguments it made with respect to these identical allegations in its Motion to Dismiss the Amended Consolidated Complaint and Incorporated Memorandum of Law ("Consumer MTD Brief").

the Plaintiffs allege that they read or relied on *any* of FCA's statements prior to purchasing or obtaining salvaged Chrysler or FCA vehicles.[5]

  ***FCA's Alleged Knowledge***.  As in the Consumer Complaint, Plaintiffs' claims against FCA rest on the allegation that FCA "knew or should have known that the Takata airbags installed in millions of vehicles were defective . . . [but] concealed their knowledge . . . while continuing to advertise their products as safe and reliable." (*Id*. ¶ 28.)  In support, Plaintiffs repeat the same bare allegations regarding FCA's purported knowledge as made in the Consumer Complaint.  (Compl. ¶¶ 279-84; Consumer Compl. ¶¶ 118-23.)  Although the allegations are word-for-word identical, in the present Complaint Plaintiffs have redacted those allegations, whereas in the Consumer Complaint the same allegations are unredacted.  *See supra* at n.4.  FCA thus refers the Court to its description of those allegations (and its arguments as to the deficiencies of those allegations) as set forth in the Consumer MTD Brief.  *See* Consumer MTD Brief at 15-16; 39-44.

  ***FCA's Alleged RICO Enterprise***.  Plaintiffs allege that each of the Automotive Defendants, including FCA, engaged in a separate "association-in-fact [RICO] enterprise" with Takata (*e.g.*, Compl. ¶ 536), through which they "collaborated and colluded with each other . . . to deceive Plaintiffs and Class members into purchasing dangerous and defective vehicles; and actively concealed the danger and Inflator Defect from Plaintiffs and Class members" (*See, e.g., id*. ¶ 536(b).)  As in the Consumer Complaint, Plaintiffs contend that certain communications that FCA sent or received constituted mail and wire fraud; however, unlike the Consumer

---

[5] Further, five of the Plaintiffs—Butler, Cunningham, Midway, Snyder, and ARA—do not allege that they own *any* of the types of vehicles referenced in the challenged statements (*i.e.*, Chrysler 300 (Model Year 2009, 2011, 2012), 2011 Dodge Dakota, 2011 Jeep Wrangler, and 2012 Dodge Charger).  (*See* Compl. Exs. A, B, D, E, G.)

Complaint, here Plaintiffs have redacted those identical allegations. (Compl. ¶¶ 549(a)-(k);

Consumer Compl. ¶¶ 211(a)-(k).) FCA thus refers the Court to its description of those

allegations (and its arguments as to the deficiencies of those allegations) as set forth in the

Consumer MTD Brief. *See* Consumer MTD Brief at 16-17; 28-33.

      *Alleged Injuries*. Plaintiffs contend that they "were injured and continue to suffer injury

to their commercial interests in the sale of airbags by eliminating the resale market for the

Defective Airbags." (Compl. ¶ 858.) Specifically, Plaintiffs argue that:

- They have been "deprived of the benefit of the bargain" as a result of "overpayment for . . . purchased [FCA or Chrysler] vehicles." (*Id*. ¶ 553(a).)
- "[T]he airbags are essentially valueless and . . . [they] are now unable to sell them." (*Id*. ¶ 553(b).)
- "[T]he value of the [FCA] vehicles diminished . . . reducing their resale values." (*Id*. ¶ 553(c).)

None of the Plaintiffs identify any specific costs or losses they claim to have incurred.

## ARGUMENT

## I.    THE COURT LACKS PERSONAL JURISDICTION OVER FCA.

      As a threshold matter, the Court should dismiss FCA from this action because it lacks

personal jurisdiction over FCA. Plaintiffs have the burden of establishing a *prima facie* case of

personal jurisdiction over FCA. *Sculptchair, Inc.* v. *Century Arts, Ltd.*, 94 F.3d 623, 627 (11th

Cir. 1996) (noting that "[u]nder Florida law, the plaintiff bears the burden of proving personal

jurisdiction."). As in the Consumer Complaint, Plaintiffs here assert that this Court may exercise

specific jurisdiction over FCA based on (i) their RICO claims and (ii) the claims of the sole

Florida Plaintiff. (Compl. ¶¶ 23-29.) Neither is true.[6]

---

[6] As set forth in the Consumer MTD Brief, which FCA incorporates by reference here, the Court lacks general jurisdiction over FCA. *See* Consumer MTD Brief at 19-20. In particular, contrary to Plaintiffs' contention that "this Court, under 28 U.S.C. §1407, has personal jurisdiction over

**A.      Plaintiffs' RICO Claims Do Not Provide a Basis for Exercising
Specific Jurisdiction.**

As discussed *infra* in Section III, Plaintiffs' RICO claims against FCA are defective as a

matter of law.  As a result, Plaintiffs cannot avail themselves of the RICO statute's nationwide

service of process provision as a basis for this Court to exercise specific jurisdiction over FCA.

*See Koch* v. *Royal Wine Merchants, Ltd.*, 847 F. Supp. 2d 1370, 1378 (S.D. Fla. 2012); *see also*

Consumer MTD Brief at 20-21.

**B.      Plaintiffs Fail to Plead Any Facts to Demonstrate That FCA Is Subject
to Specific Jurisdiction in Florida.**

To establish specific jurisdiction in Florida, a plaintiff must demonstrate that (1) Florida's

long-arm statute reaches the defendant and (2) that the exercise of personal jurisdiction comports

with the Due Process Clause.  *See Licciardello* v. *Lovelady*, 544 F.3d 1280, 1283 (11th Cir.

2008).  Plaintiffs hardly try to meet that burden.  In their 991-paragraph Complaint, they allege

just *one* connection to Florida—one named Plaintiff (Butler) purportedly resides there.[7]  (Compl.

¶ 83.)  But a plaintiff's residence has never been sufficient to establish personal jurisdiction over

a defendant.  *See Walden* v. *Fiore*, 571 U.S. 277, 285 (2014) (holding that "the plaintiff cannot

be the only link between the defendant and the forum.").  And, even if Plaintiffs had pled facts to

show that FCA had contacts with Florida (which they have not), such contacts are only relevant

---

Defendants to the same extent as any transferor court" (Compl. ¶ 40), there is no transferor court
for the claims against FCA.  Rather, Plaintiffs' claims were directly filed on this Court's docket,
first in the Consumer Complaint and thereafter in the present Complaint.

[7] Although the assignors of ARA's claims are alleged to be incorporated in Florida (Compl.
¶ 89), their residence is irrelevant to the jurisdictional analysis because "an assignee does not
step automatically into the shoes of the assignor for purposes of personal jurisdiction."  *Purdue
Research Found.* v. *Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 784 (7th Cir. 2003).  Regardless, a
*plaintiff's* residence does not supply a connection between the *defendant* and a forum.  *See infra*
7-8.

to the jurisdictional analysis if they are connected to Plaintiffs' claims. *See Bristol-Myers Squibb Co.* v. *Superior Court of California, San Francisco County*, 137 S. Ct. 1773, 1781 (2017) (finding that when "there is no such connection [to plaintiff's claims], specific jurisdiction is lacking *regardless of the extent of a defendant's unconnected activities in the State*") (emphasis added). As discussed below, there is not a single allegation in the Complaint establishing that FCA had contacts with Florida, let alone contacts that bear any connection to Plaintiffs' claims.

### 1. Plaintiffs Fail to Allege That Exercising Jurisdiction Is Proper Under Florida's Long-Arm Statute.

In a nod to the Florida long-arm statute, Plaintiffs invoke three separate provisions of the statute, making undifferentiated assertions that each of the Automotive Defendants: (1) has been "operating, conducting, engaging in, or carrying on a business or business venture in this state or having an office or agency in this state"; (2) "commit[ed] a tortious act in this state"; or (3) "caus[ed] injury to property in this state arising out of Defendants acts and omissions outside this state." (Compl. ¶ 38 (citing Fla. Stat. § 48.193(1)(a)(1), (2), (6).) This formulaic recitation of the statutory language not only fails to distinguish between FCA and the other Automotive Defendants, but it is completely untethered to any *facts*. Neither this bare recitation of the legal standard, nor Plaintiffs' allegation that Butler resides in Florida, come anywhere close to demonstrating that Florida's long-arm statute extends to FCA:

- Butler's presence in Florida does not demonstrate that *FCA* is "carrying on business" in Florida pursuant to Fla. Stat. § 48.193(1)(a)(1). Butler does not allege that it purchased any salvaged vehicles in Florida, much less from FCA in Florida. Indeed, Plaintiffs fail to ascribe any conduct to FCA whatsoever, let alone "demonstrate a general course of business for pecuniary benefit connected with the alleged tort." *Carmouche* v. *Carnival Corp.*, 36 F. Supp. 3d 1335, 1340 (S.D. Fla. 2014).

- Butler's presence in Florida does not show that FCA "committed a tortious act" in Florida pursuant to Fla. Stat. § 48.193(1)(a)(2). Although Plaintiffs allege that FCA made certain misrepresentations regarding vehicle safety, Butler does not allege that it read or relied on such statements in Florida (or elsewhere) (Compl. ¶ 83), nor does Butler allege that FCA directed such statements at recyclers in Florida.

- Butler's presence in Florida and its ownership of salvaged FCA vehicles that it claims have declined in value does not demonstrate that FCA "caused injury to persons or property" within Florida because "Florida's Supreme Court has held that economic injury, unaccompanied by physical injury or property damage, is insufficient to subject a non-resident defendant to personal jurisdiction under § 48.193(1)(a)(6)." *Courboin* v. *Scott*, 596 F. App'x 729, 734 (11th Cir. 2014).

In short, given that Plaintiffs have not alleged that FCA took any action in Florida

whatsoever, they cannot show that the Florida long-arm statute reaches FCA.

### 2. Plaintiffs Fail to Demonstrate That Exercising Personal Jurisdiction Over FCA Is Consistent With Constitutional Limits.

Even if Plaintiffs could establish that the Florida long-arm statute applies (they cannot),

they fail to demonstrate that exercising specific jurisdiction over FCA with respect to Butler's

claims would be consistent with due process. To satisfy the Due Process Clause:

> First, the [defendant's] contacts must be related to the plaintiff's cause of action or have given rise to it. Second, the contacts must involve some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum . . . , thus invoking the benefits and protections of its laws. Third, the defendant's contacts with the forum must be such that [the defendant] should reasonably anticipate being haled into court there.

*Vermeulen* v. *Renault, U.S.A., Inc.*, 985 F.2d 1534, 1546 (11th Cir. 1993) (quotation omitted).

Where, as here, Plaintiffs have not pled *any* contacts between FCA and Florida, the requirements

of constitutional due process are clearly not met. This is not a close question.

In fact, Plaintiffs' own allegations underscore the lack of connection between FCA and

Florida with respect to their claims. For example, Plaintiffs allege that Butler (and the other

named plaintiffs) obtained their salvaged vehicles from third parties—such as tow companies

and salvage auctions (Compl. ¶ 458)—not from FCA. In addition, Plaintiffs allege that they

"transported the vehicles to their facilities" after acquiring those vehicles from unspecified

locations. (*Id.* ¶ 461.) These allegations reflect activity taking place entirely independent of

FCA. This type of unilateral conduct by Butler (or any of the other named plaintiffs), even if it

occurred within Florida, does not form a connection between FCA and Florida.  *See Helicopteros*

*Nacionales de Colombia, S.A.* v. *Hall*, 466 U.S. 408, 417 (1984) (holding that the "unilateral

activity of another party or a third person is not an appropriate consideration when determining

whether a defendant has sufficient contacts with a forum State to justify an assertion of

jurisdiction"); *Walden*, 571 U.S. at 285 ("[T]he plaintiff cannot be the only link between the

defendant and the forum.").[8]

　　In sum, the Complaint is devoid of allegations demonstrating that FCA engaged in the

necessary "suit-related conduct" to "create a substantial connection with the forum."  *See id.* at

284.  As a result, there is no basis for this Court to exercise specific jurisdiction over FCA, and

FCA should be dismissed from the Complaint.[9]

---

[8] Nor can Plaintiffs rely on a "stream of commerce" theory to try to create jurisdiction over
FCA.  *See J. McIntyre Machinery Ltd.* v. *Nicastro*, 564 U.S. 873, 877-78 (2011) (Breyer, J.,
concurring in judgment) ("[S]tream of commerce doctrine cannot displace" the "general rule"
that a defendant must "purposefully avail[] itself of the privilege of conducting activities within
the forum").  Courts require more than mere awareness that an out-of-state manufacturer's
products might "travel to Florida."  *See Brown* v. *Bottling Grp.*, LLC, 159 F. Supp. 3d 1308,
1315 (M.D. Fla. 2016) (finding personal jurisdiction only where the plaintiff demonstrated that
the defendant "built-to-order four cranes, knowing that the cranes were destined for Florida");
*see also Leon* v. *Continental AG*, 301 F. Supp. 3d 1203, 1217 (S.D. Fla. 2017) (distinguishing
particular allegations that defendant "delivered" customized vehicles to Florida pursuant to a
"contractual relationship" from the mere "unsupported inference that [defendant car
manufacturer] delivered its vehicles into Florida for placement into the stream of commerce
through a contract or otherwise"); *see also* Consumer MTD Brief at 23-25.

[9] Without any factual or legal support, Plaintiffs assert that "[t]his Court has pendant or
supplemental personal jurisdiction over the claims of non-Florida Plaintiffs."  (Compl. ¶ 38.)  As
set forth in the Consumer MTD Brief, this argument fails for two reasons:  (1) because Plaintiffs
fail to establish personal jurisdiction over the Florida Plaintiff's claims, there is no basis for this
Court to exercise pendant or supplemental jurisdiction; and (2) even if they could establish
jurisdiction over the Florida Plaintiff's claims (they cannot), the Supreme Court has held that
exercising jurisdiction over non-resident plaintiffs' claims under such circumstances is
inconsistent with constitutional due process.  *See* Consumer MTD Brief at 25-26 (discussing
*Bristol-Myers*, 137 S. Ct. at 1781).

## II.     MOST OF PLAINTIFFS' CLAIMS ARE BARRED BY THE SALE ORDER.

Plaintiffs' claims arise from their alleged ownership of salvaged vehicles manufactured by Chrysler (451 vehicles) and FCA (31 vehicles).  (*See* Compl. Exs. A-H.)  All of Plaintiffs' claims relating to their alleged ownership of Chrysler vehicles are barred by the bankruptcy Sale Order governing FCA's acquisition of certain of Chrysler's assets.  *See* Ex. 1 (Chrysler Sale Order).  As set forth in the Consumer MTD Brief, FCA's liability for vehicles manufactured and initially sold by Chrysler prior to FCA's acquisition of certain Chrysler assets on June 10, 2009, as authorized by the Sale Order, is limited to certain expressly Assumed Liabilities (as defined therein).  *See* Consumer MTD Brief at 7-8, 36-37; *see In re Old Carco LLC*, 2013 WL 1856330, at *4-5 (Bankr. S.D.N.Y. May 12, 2013); *In re Old Carco LLC*, 492 B.R. 392, 396 n.9, 403 (Bankr. S.D.N.Y. 2013).  Here, nearly all of the supposed "FCA" vehicles the Plaintiffs own— 451 out of 482 vehicles total—are in fact 2003 to 2009 model year Chrysler vehicles.  (*See* Compl. Exs. A-H.)  None of Plaintiffs' claims fall under the narrow categories of liability that FCA assumed and, consequently, any claims related to those Chrysler vehicles should be dismissed as barred by the Sale Order.

## III.    PLAINTIFFS DO NOT ADEQUATELY PLEAD RICO CLAIMS AGAINST FCA.

In contrast to the limited claims that ARA asserted three years ago, Plaintiffs now assert separate RICO claims against the Automotive Defendants, including FCA, alleging that each defendant agreed to enter into and participate in a separate criminal conspiracy with Takata for the purpose of "conceal[ing] the scope and nature of the Inflator Defect found in millions of Defective Airbags in the United States . . . [which] helped [the Automotive Defendants] and Takata sell more vehicles and airbags than they otherwise would have."  (*See*, *e.g.*, Compl. ¶ 543.)  These claims fail for the reasons set forth in (i) the Joint Memorandum and (ii) FCA's

-10-

Consumer MTD Brief.[10]  Plaintiffs' claims also fail because they do not allege a cognizable

RICO injury.

"To establish a civil RICO claim, a plaintiff must demonstrate . . . the requisite injury to

'business or property.'" *Truthinadvertisingenforcers.com* v. *Dish Network, LLC*, 2016 WL

7230955, at *5 (M.D. Fla. Dec. 14, 2016).  In the Eleventh Circuit, "[c]ourts have excluded from

the phrase's meaning injury to mere expectancy interests or to an intangible property interest."

*Id.* (quotation omitted).  Instead, a RICO plaintiff must have suffered a "concrete financial loss"

to "demonstrate injury for RICO purposes."  *Keeton* v. *Gynecare Worldwide*, 2016 WL 2753866,

at *3 (S.D. Fla. Jan. 29, 2016).  Furthermore, a plaintiff must show that it could plausibly

measure the financial loss alleged to have been sustained.  *See Maio* v. *Aetna, Inc.*, 221 F.3d 472,

495 (3d Cir. 2000) (identifying dismissals of RICO claims where either the injury itself, or the

measurement thereof, was "too speculative").  Plaintiffs' purported "overpayment" and

"diminution in value" injuries are not cognizable under RICO.

***Overpayment for Vehicles and Airbags***.  Plaintiffs allege that they were injured by:

(i) "overpayment for leased or purchased Class Vehicles,"[11] which "deprived [them] of the

benefit of their bargain" (Compl. ¶ 553(a)); and (ii) "overpayment . . . in that the airbags are

essentially valueless and the Automotive Recyclers are now unable to sell them" (*id.* ¶ 553(b)).

But this type of injury is not cognizable because "[a] party's 'expectation'" that the product they

---

[10] To avoid burdening the Court with yet more argument, FCA incorporates those arguments
here:  Plaintiffs' RICO claims should be dismissed because they fail to allege that any injury they
suffered was proximately caused by the alleged acts of mail or wire fraud.  *See* Joint Mem. at 7-
13.  Plaintiffs also fail to allege adequately that: (i) FCA participated in a criminal RICO
"enterprise" with Takata; (ii) FCA engaged in a pattern of racketeering; or (iii) FCA entered into
an agreement with Takata to violate the RICO statute.  *See* Consumer MTD Brief at 26-33.

[11] Plaintiffs' reference to "overpayment for leased" vehicles makes no sense in the context of
salvaged vehicles and suggests that they have mechanically repeated allegations from prior
complaints.

-11-

are purchasing is worth the price they are paying is not an injury to "business or property." *In re Gen. Motors LLC Ignition Switch Litig.*, 2016 WL 3920353, at \*16 (S.D.N.Y. July, 15 2016) (quotation omitted); *see also McLaughlin* v. *Am. Tobacco Co.*, 522 F.3d 215, 228 (2d Cir. 2008) (unavailability of intangible, expectancy-type benefit of the bargain damages "follows from the text of RICO, which compensates only for injury to business or property"). This is all the more true where, as here, Plaintiffs did not purchase the product from FCA and FCA had no role in determining the price paid by Plaintiffs. Moreover, Plaintiffs have made no effort to quantify their supposed overpayments, which further underscores that this type of alleged injury is entirely speculative. *See Maio*, 221 F.3d at 495; *In re Duramax Diesel Litig.*, 298 F. Supp. 3d 1037, 1071 (E.D. Mich. 2018) (holding that "the contention that [plaintiffs] 'would have paid substantially less' [for their vehicles] appears to be premised on some approximation of what the new market value for the vehicles would have been. Determining what that decrease in value would have been seems hopelessly speculative.").

*Diminished Value*. Plaintiffs also allege that the "values of the Class Vehicles have diminished, thus reducing their resale value." (Compl. ¶ 553(c).) Yet none of Plaintiffs has alleged that they incurred an actual monetary loss as a result of reselling any FCA vehicle—nor could they given that these vehicles are inoperable and unsaleable. (*See id.* ¶ 89.) Plaintiffs plead no *facts* to support the bare assertion of a diminution in value, and thus their injury is conjectural and not actionable under RICO. *See Ivar* v. *Elk River Partners, LLC*, 705 F. Supp. 2d 1220, 1235 (D. Colo. 2010) (finding no RICO injury because "there is no allegation that Plaintiffs ever tried to sell their [property]"); *see also In re Bridgestone/Firestone, Inc. Tires Prods. Liab. Litig.*, 155 F. Supp. 2d 1069, 1090 (S.D. Ind. 2001) (dismissing RICO claim where

-12-

plaintiffs did not allege they "incurred an actual monetary loss . . . by selling or attempting to sell" their vehicles).

## IV. PLAINTIFFS' TENNESSEE AND TEXAS STATUTORY CLAIMS SHOULD BE DISMISSED AS TIME-BARRED.

Plaintiffs' hide-the-ball tactics of failing to set forth even the dates of their transactions—where there is no question that this is information that Plaintiffs should have in their possession—is abusive and should not be tolerated.[12]  In any event, Plaintiff Knox's claim under the Tennessee Consumer Protection Act ("TCPA") and Plaintiff Snyder's claim (at least in part) under the Texas Deceptive Trade Practices Act ("TDTPA") appear to be untimely on their face:

- TCPA claims are subject to a one-year statute of limitations.  *Montesi* v. *Nationwide Mut. Ins. Co.*, 970 F. Supp. 2d 784, 789 (W.D. Tenn. 2013).  Every FCA vehicle that Knox allegedly owns was subject to a recall announced no later than May 27, 2016.  Ex. 2 (May 27, 2016 FCA Press Release).  Knox therefore knew or "in the exercise of reasonable care and diligence should know that an injury ha[d] been sustained" as of that date.  *Montesi*, 970 F. Supp. 2d, at 789.  Nonetheless, Knox did not assert any claims against FCA until almost two years later, on March 14, 2018.

- TDTPA claims are subject to a two-year statute of limitations.  Tex. Bus. & Com. Code Ann. § 17.565.  More than half of the vehicles Snyder allegedly possesses were subject to recalls that were announced on May 28, 2015.  (*See* Compl. Ex. E.; Ex. 3 (May 28, 2015 Letter e Recall 15v312); Ex. 4 (May 28, 2015 Letter re Recall 15v313.)  Snyder therefore "knew, or by exercising reasonable diligence, should have known of facts giving rise to a cause of action" under the TDTPA for these vehicles in May 2015, almost three years prior to when Snyder asserted claims against FCA.  *Sykes* v. *Pub. Storage Inc.*, 425 F. App'x 359, 362 (5th Cir. 2011) (quotation omitted).

---

[12] FCA specifically reserves the right to challenge the timeliness of all of Plaintiffs' claims at a later date once Plaintiffs have provided purchase dates of their salvaged vehicles.  Further, if any of Plaintiffs' vehicles were purchased *after* the announcement of the recalls of the vehicles' airbags, those claims should also be dismissed.  *See In re FCA US LLC Monostable Elec. Gearshift Litig.*, 280 F. Supp. 3d 975, 1006 (E.D. Mich. 2017) (finding no authority to support "proposition that a consumer can maintain a viable claim for statutory or common law consumer fraud concerning an allegedly concealed defect after the date when the defendant had filed a recall notice of the defect with NHTSA.").

Given these facial deficiencies, which are apparent based on the model years of the vehicles and the dates when recalls were announced, Knox's TCPA claim and Snyder's TDTPA claim (in part) should be dismissed as time-barred. *See Omar ex rel. Cannon* v. *Lindsey*, 334 F.3d 1246, 1251 (11th Cir. 2003) (explaining that "it is proper to grant a Rule 12(b)(6) motion if noncompliance with the statute of limitations is apparent on the face of the complaint"); *see also Martinez* v. *Bank of Am. Corp.*, 2014 WL 2735668, at *2 (S.D. Fla. June 16, 2014) (holding that "Plaintiff's tort-based claims are barred by the statute of limitations and due to be dismissed with prejudice").[13] Their failure to comply with the statutes of limitations is not saved by the conclusory assertion that their claims are tolled. Rather, for the same reasons as set forth in the Consumer MTD Brief (at 45-46), there is no applicable tolling doctrine here, and Plaintiffs' claims should be dismissed.

---

[13] Plaintiff Butler's claim under the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") is also suspect on its face given that the latest model year FCA vehicle that Butler claims to have in stock is 2011. FDUTPA claims are subject to a four-year statute of limitations, and, contrary to Plaintiffs' assertion (Compl. ¶¶ 470-71), the discovery rule does not apply to FDUTPA claims. *Sutton* v. *Canon U.S.A., Inc.*, 2009 WL 10670005, at *2 (M.D. Fla. Mar. 31, 2009). To the extent that Butler's FDUTPA claim is based on purchases that occurred prior to March 14, 2014 (four years before the time when Butler first asserted claims against FCA), those claims are barred.

-14-

## CONCLUSION

For the foregoing reasons, and those set forth in the Joint Memorandum, FCA

respectfully requests that the Court dismiss the Complaint against FCA in its entirety, with

prejudice.

Dated:  August 20, 2018                          Respectfully submitted,

                                                 By: */s/ Scott M. Sarason*

                                                 **Douglas B. Brown**
                                                 Florida Bar No. 242527
                                                 dbrown@rumberger.com
                                                 **Scott M. Sarason**
                                                 Florida Bar No. 394718
                                                 ssarason@rumberger.com
                                                 **RUMBERGER, KIRK & CALDWELL**
                                                 Brickell City Tower, Suite 3000
                                                 80 Southwest 8th Street
                                                 Miami, FL 33130-3037
                                                 T: 407 839-4550
                                                 F: 407 835-2050

                                                 **Brian D. Glueckstein** (*pro hac vice*)
                                                 gluecksteinb@sullcrom.com
                                                 **Darrell S. Cafasso** (*pro hac vice*)
                                                 cafassod@sullcrom.com
                                                 **SULLIVAN & CROMWELL LLP**
                                                 125 Broad Street
                                                 New York, NY  10004
                                                 T: 212 558-4000
                                                 F: 212 558-3588

                                                 **Elizabeth A. Rose** (*pro hac vice*)
                                                 rosee@sullcrom.com
                                                 **SULLIVAN & CROMWELL LLP**
                                                 1700 New York Avenue, N.W.
                                                 Suite 700
                                                 Washington, D.C.  20006
                                                 T: 202 956-7500
                                                 F: 202 293-6330

                                                 *Counsel for FCA US LLC*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing was filed via

CM/ECF and served on all counsel of record via electronic notices generated by CM/ECF on

August 20, 2018.

*/s/ Scott M. Sarason*

**EXHIBIT D**

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### MIAMI DIVISION

| | |
|---|---|
| **IN RE TAKATA AIRBAG PRODUCT LIABILITY LITIGATION**<br><br>THIS DOCUMENT RELATES TO ECONOMIC LOSS TRACK CASES<br><br>BRIDGET BOYD, *et al.*, individually and on behalf of all others similarly situated,<br><br>                        *Plaintiffs*,<br>    v.<br><br>FCA US LLC,<br><br>                        *Defendant*. | MDL No. 2599<br>Master File No. 15-MD-02599-FAM<br>S.D. Fla. Case No. 1:15-CV-24009-FAM |

## FCA US LLC'S REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF ITS MOTION TO DISMISS THE AMENDED CONSOLIDATED COMPLAINT

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ..................................................................................1

ARGUMENT ............................................................................................................2

I.    THE OPPOSITION CONFIRMS THAT THE COURT LACKS PERSONAL
JURISDICTION OVER FCA........................................................................2

    A.    That This Action Is Part of an MDL Does Not Mean That the Court
Has General Jurisdiction Over FCA ...................................................2

    B.    There Is No Basis for This Court to Exercise Specific Jurisdiction Over
FCA ....................................................................................................3

        1.    Plaintiffs' Meritless RICO Claims Do Not Support This Court's
Exercise of Specific Jurisdiction...................................... 3

        2.    The Complaint Fails to Allege Any Contacts Between FCA
and Florida ...................................................................... 4

            (a)    The Complaint Fails to Plead Facts Supporting Application of the
Florida Long-Arm Statute to FCA ................................. 4

            (b)    The Exercise of Specific Jurisdiction Over FCA Would Be
Inconsistent With Due Process ........................................ 5

        3.    There Is No Basis for Exercising Jurisdiction Over the Non-Florida
Plaintiffs' Claims, Which Have No Connection to This Forum................. 8

    C.    Plaintiffs Are Not Entitled to Jurisdictional Discovery Because They
Failed to Meet Their Burden of Pleading Jurisdictional Facts in the
Complaint............................................................................................9

II.    THE COMPLAINT'S SPARSE ALLEGATIONS AGAINST FCA FAIL TO
STATE A CLAIM FOR A RICO VIOLATION ...........................................9

    A.    The Court May Consider the Takata Guilty Plea and Binding Admissions
Therein ..............................................................................................10

    B.    Previous Allegations Against Takata and Honda Are Fundamentally
Different Than Plaintiffs' Allegations Against FCA ...........................12

    C.    The Complaint's Allegations Against FCA Come Nowhere Close to
Stating a RICO Claim ........................................................................14

        1.    Plaintiffs Fail to Adequately Allege That FCA Formed a Criminal
Enterprise With Takata .......................................................... 14

2.      The Complaint Fails to Adequately Allege That FCA Engaged in
        Any Mail or Wire Fraud, Let Alone a Pattern of Such Criminal
        Acts .................................................................................................... 16

3.      The Complaint's Generalized Allegations of Injury Do Not Plead
        a Cognizable RICO Injury ................................................................... 17

4.      Plaintiffs Offer Nothing More Than a Conclusory Allegation of
        Proximate Causation ............................................................................ 18

III.    THE SALE ORDER BARS LIABILITY FOR CHRYSLER VEHICLES
        REGARDLESS OF WHEN SUCH VEHICLES WERE RESOLD ................................. 18

IV.     THE OPPOSITION CONFIRMS THAT PLAINTIFFS HAVE NOT
        ADEQUATELY ALLEGED COMMON LAW OR STATUTORY CONSUMER
        PROTECTION CLAIMS .................................................................................................. 19

        A.      The Complaint Fails to Adequately Allege Several Elements of Their
                Common Law Fraud and Consumer Protection Act Claims ................................ 19

                1.      The Complaint Fails to Adequately Allege That FCA Made Any
                        Actionable Misstatements or Omissions ................................................. 20

                2.      The Complaint's Handful of Conclusory Allegations Regarding
                        FCA's Purported Knowledge of the Inflator Defect Are
                        Insufficient ............................................................................................ 20

                3.      The Complaint's Failure to Adequately Allege Reliance Is Not
                        Cured by Plaintiffs' Claim to Have Relied on Unspecified
                        Omissions ............................................................................................... 22

        B.      Because No Tolling Doctrine Applies, Numerous Claims Should Be
                Dismissed as Untimely ...................................................................................... 23

        C.      Many of Plaintiffs' Claims Should Be Dismissed for Additional Reasons ......... 24

CONCLUSION .......................................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

*American Dental Association* v. *Cigna Corp.*,
    605 F.3d 1283 (11th Cir. 2010) ......................................................................10

*American Pipe and Construction Co.* v. *Utah*,
    414 U.S. 538 (1974)........................................................................................24

*American United Life Insurance Co.* v. *Martinez*,
    480 F.3d 1043 (11th Cir. 2007) ......................................................................10

*Asahi Metal Industry Co.* v. *Superior Court of California, Solano County*,
    480 U.S. 102 (1987)..........................................................................................7

*Ashcroft* v. *Iqbal*,
    556 U.S. 662 (2009)..........................................................................................5

*Auto Owners Insurance Co.* v. *Mims*,
    2007 WL 9711344 (N.D. Ala. Dec. 18, 2007)...............................................11

*Beguelg Investment Management Inc.* v. *Four Seasons Hotel Ltd.*,
    2011 WL 4434891 (S.D. Fla. Sept. 23, 2011) ...............................................20

*Bolen* v. *Illinois National Insurance Co.*,
    2012 WL 4856811 (M.D. Fla. Aug. 28, 2012) ...............................................25

*In re Bridgestone/Firestone*,
    155 F. Supp. 2d 1069 (S.D. Ind. 2001)...........................................................17

*Bristol-Myers Squibb Co.* v. *Superior Court of California, San Francisco County*,
    137 S. Ct. 1773 (2017)......................................................................................8

*Brooks* v. *Blue Cross & Blue Shield of Florida, Inc.*,
    116 F.3d 1364 (11th Cir. 1997) ......................................................................20

*Burgess* v. *Religious Technology Center, Inc.*,
    600 F. App'x 657 (11th Cir. 2015) ...............................................................2, 6

*Burton* v. *Chrysler Group, LLC*,
    492 B.R. 392 (Bankr. S.D.N.Y. 2013).............................................................19

*Carrera* v. *UPS Supply Chain Solutions, Inc.*,
    2012 WL 12860910 (S.D. Fla. Sept. 21, 2012) .............................................25

*China Agritech, Inc.* v. *Resh*,
    138 S. Ct. 1800 (2018)....................................................................................23

*In re Chrysler-Dodge-Jeep Ecodiesel,*
   295 F. Supp. 3d 927 (N.D. Cal. 2018) ...................................................................16

*In re Chrysler LLC,*
   576 F.3d 108 (2d Cir. 2009)...................................................................................18

*Counts* v. *General Motors, LLC,*
   237 F. Supp. 3d 572 (E.D. Mich. 2017).................................................................20

*Curry* v. *TD Ameritrade, Inc.,*
   662 F. App'x 769 (11th Cir. 2016) .........................................................................10

*Elliott* v. *Gen. Motors LLC,*
   829 F.3d 135 (2d Cir. 2016)...................................................................................19

*Erwin* v. *Ford Motor Co.,*
   2016 WL 7655398 (M.D. Fla. Aug. 31, 2016) .......................................................6

*Faith Enterprises Group, Inc.* v. *Avis Budget Group,*
   2012 WL 1409403 (N.D. Ga. Apr. 20, 2012) .......................................................15

*In re General Motors LLC Ignition Switch Litigation,*
   154 F. Supp. 3d 30 (S.D.N.Y. 2015)......................................................................21

*Hatton* v. *Chrysler Canada, Inc.,*
   937 F. Supp. 2d 1356 (M.D. Fla. 2013)...................................................................7

*Hemi Group, LLC* v. *City of New York,*
   559 U.S. 1 (2010).....................................................................................................18

*Horne* v. *Potter,*
   392 F. App'x 800 (11th Cir. 2010) ...................................................................10, 11

*Horowitz* v. *AT&T, Inc.,*
   2018 WL 1942525 (D.N.J. Apr. 25, 2018) ..............................................................8

*Ironworkers Local Union 68* v. *Astrazeneca Pharmaceuticals,*
   634 F.3d 1352 (11th Cir. 2011) ..............................................................................17

*J. McIntyre Machinery, Ltd.* v. *Nicastro,*
   564 U.S. 873 (2011).................................................................................................7

*Koch* v. *Royal Wine Merchants, Ltd.,*
   847 F. Supp. 2d 1370 (S.D. Fla. 2012) ..............................................................3, 8

*Leon* v. *Continental AG,*
   301 F. Supp. 3d 1203 (S.D. Fla. 2017) ...................................................................6

*In re LIBOR-Based Financial Instruments Antitrust Litigation*,
    27 F. Supp. 3d 447 (S.D.N.Y. 2014)..................................................................23

*Maclin* v. *Reliable Reports of Texas, Inc.*,
    2018 WL 1468821 (N.D. Ohio Mar. 26, 2018) .................................................8

*In re Managed Care Litigation*,
    298 F. Supp. 2d 1259 (S.D. Fla. 2003) .............................................................15

*Melendez* v. *Town of Bay Harbor Islands*,
    2014 WL 6682535 (S.D. Fla. Nov. 25, 2014)..............................................4, 24

*In re Merrill Lynch Ltd. Partnerships Litigation*,
    154 F.3d 56 (2d Cir. 1998)................................................................................17

*United States* ex rel. *Miller* v. *Bill Harbert International Construction, Inc.*,
    608 F.3d 871 (D.C. Cir. 2010) .........................................................................12

*In re Motors Liquidation Co.*,
    568 B.R. 217 (S.D.N.Y. 2017)..........................................................................21

*United States* ex rel. *O'Donnell* v. *Countrywide Home Loans, Inc.*,
    822 F.3d 650 (2d Cir. 2016)..............................................................................19

*In re Old Carco LLC*,
    2013 WL 1856330 (Bankr. S.D.N.Y. May 12, 2013)........................................18

*Peruyero* v. *Airbus S.A.S.*,
    83 F. Supp. 3d 1283 (S.D. Fla. 2014) ................................................................9

*R&R Games, Inc.* v. *Fundex Games, Ltd.*,
    2013 WL 3729309 (M.D. Fla. July 12, 2013) ...................................................5

*Raie* v. *Cheminova Inc.*,
    336 F.3d 1278 (11th Cir. 2003) .......................................................................24

*Republic of Panama* v. *BCCI Holdings (Luxembourg) S.A.*,
    119 F.3d 935 (11th Cir. 1997) ................................................................4, 16, 17

*Roy* v. *FedEx Ground Package Systems, Inc.*,
    2018 WL 2324092 (D. Mass. May 22, 2018) ....................................................8

*Ray* v. *Spirit Airlines, Inc.*,
    836 F.3d 1340, 1349 (11th Cir. 2016) ..............................................................18

*Simpson* v. *Sanderson Farms, Inc.*,
    744 F.3d 702 (11th Cir. 2014) .........................................................................17

*Sloan* v. *General Motors LLC*,
  287 F. Supp. 3d 840 (N.D. Cal. 2018) .................................................................22

*Snow* v. *DirecTV, Inc.*,
  450 F.3d 1314 (11th Cir. 2006) ........................................................................5, 6

*In re Takata*,
  2015 WL 9987659 (S.D. Fla. Dec. 2, 2015) ........................................................13

*Thompson* v. *Carnival Corp.*,
  174 F. Supp. 3d 1327 (S.D. Fla. 2016) ................................................................9

*Thompson* v. *Proctor & Gamble Co.*,
  2018 WL 5113052 (S.D. Fla. Oct. 19, 2018).......................................................20

*Tikiz Franchising, LLC* v. *Piddington*,
  2017 WL 8780761 (S.D. Fla. Aug. 1, 2017)....................................................20, 22

*United States* v. *Church*,
  955 F.2d 688 (11th Cir. 1992) ...........................................................................15

*United States* v. *Westry*,
  524 F.3d 1198 (11th Cir. 2008) ..........................................................................11

*United Technologies Corp.* v. *Mazer*,
  556 F.3d 1260 (11th Cir. 2009) ...........................................................................2

*Wahl* v. *General Electric Co.*,
  786 F.3d 491 (6th Cir. 2015) ...............................................................................3

*Westchester Fire Insurance Co.* v. *Vector Aerospace*,
  2017 WL 4326097 (S.D. Fla. Sept. 27, 2017) ......................................................9

*Williams* v. *Mohawk Industries, Inc.*,
  465 F.3d 1277 (11th Cir. 2006) .....................................................................14, 15

*Wilson* v. *Hewlett-Packard Co.*,
  668 F.3d 1136 (9th Cir. 2012) ...........................................................................21

## STATUTE AND RULES

Florida Statute § 48.193 .......................................................................................4, 5

Fed. R. Civ. P. 9 ...............................................................................................10, 20

Fed. R. Evid. 803 ..............................................................................................11, 12

Fed. R. Evid. 804 .................................................................................................11

## PRELIMINARY STATEMENT

Plaintiffs use remarkably little of their 151-page opposition brief (Dkt. 3034, the "Opposition") to engage with the arguments that FCA raised in its motion to dismiss or address the allegations that actually appear in their complaint. Instead, Plaintiffs strategically group FCA with the other new defendants and urge the Court to apply prior rulings—involving different defendants and different allegations in different circumstances—to their allegations against FCA, all in an attempt to elide significant differences in the allegations and pretend that the Court's prior rulings are controlling. They are not. As explained in FCA's opening brief, the complaint *against FCA* is rife with fatal deficiencies—including that it fails adequately to allege that the Court has personal jurisdiction over FCA, and contains no facts plausibly suggesting that FCA knew during the relevant period about Takata's unlawful conduct, much less was complicit in it.

The Opposition does nothing to answer these criticisms. Instead, it seeks to saddle FCA with allegations sustained against others, and mischaracterizes the complaint against FCA to suggest it contains allegations it does not. And rather than explain how Plaintiffs' claims are not precluded by Takata's judicially noticeable admission that it provided fraudulent information to FCA and other OEMs regarding the defective airbag systems at issue in this action, the Opposition begs the Court to ignore that admission, further confirming that Plaintiffs' allegations against FCA are implausible.

Nor does the Opposition offer any defensible explanation for why Plaintiffs belatedly brought this action against FCA, after they previously recognized there was no such case to pursue. Plaintiffs' assertion that they were unaware of their claims against FCA "at the time the initial MDL complaint was filed" (Opp. at 10) is disingenuous at best. Not only do Plaintiffs fail to point to a single alleged fact in support of that assertion, but they contradict it by arguing that none of their claims should be dismissed as untimely because all of the statutes of limitations have been tolled since October 2014, when claims were first asserted against FCA but not pursued. Plaintiffs have no valid excuse for waiting more than three years to assert their claims against FCA, many of which are now time-barred. Similarly, they offer no justification for asking this Court, at a time when this MDL proceeding was nearing its end, to restart the litigation simply because Plaintiffs now want to pursue claims against FCA after they litigated the same subject matters against other defendants. Plaintiffs' strategy, which would impose undue burdens on the Court and be fundamentally unfair to FCA, should not be allowed.

## ARGUMENT

**I.    THE OPPOSITION CONFIRMS THAT THE COURT LACKS PERSONAL JURISDICTION OVER FCA.**

Plaintiffs are required to plead facts to support a *prima facie* case of jurisdiction.  *United Tech. Corp.* v. *Mazer*, 556 F.3d 1260, 1274 (11th Cir. 2009).  The complaint fails to do so, which the Opposition effectively concedes by resorting to misdirection.  Rather than address the allegations in the complaint, the Opposition mischaracterizes the origin of this action and raises brand new allegations in an impermissible attempt to backfill deficiencies.  *See, e.g.*, *Burgess* v. *Religious Tech. Ctr., Inc.*, 600 F. App'x 657, 665 (11th Cir. 2015) ("We repeatedly have held that plaintiffs cannot amend their complaint through a response to a motion to dismiss.").  Plaintiffs' claims should be dismissed for lack of personal jurisdiction over FCA because: (i) there is *no* transferor court for this action and thus this Court does not have general jurisdiction over FCA; (ii) Plaintiffs' facially defective RICO claims cannot serve as a jurisdictional hook for their MMWA and state-law claims; (iii) the complaint falls far short of pleading facts sufficient to satisfy the long-arm statute or constitutional due process for the lone Florida plaintiff's claims; and (iv) there is no basis for this Court to exercise specific jurisdiction over FCA for claims that have no connection to Florida.  Anticipating this result, Plaintiffs try to delay the inevitable by requesting jurisdictional discovery—that request should be denied.

**A.    That This Action Is Part of an MDL Does Not Mean That the Court Has General Jurisdiction Over FCA.**

Plaintiffs argue that, "[a]s an MDL Transferee Court, this Court can exercise general jurisdiction" over FCA because "an MDL court can exercise personal jurisdiction to the same extent that the transferor court could."  (Opp. at 18 (quotation omitted)).  That argument is predicated on fiction and the Court should reject it:  there is no "transferor court" for this action because Plaintiffs filed this case directly in this Court, which does not have general jurisdiction over FCA.[1]  Plaintiffs' attempt to rely on the jurisdictional reach of another court only underscores their failure to plead that this Court has jurisdiction over FCA in this action.

---

[1] This Court has not permitted the direct filing of actions in this MDL.  *Wahl* v. *General Electric Co.*, 786 F.3d 491 (6th Cir. 2015), does not suggest otherwise.  (*See* Opp. at 20 n.11.)  There, the "MDL panel issued a 'Direct Filing Order'" that permitted plaintiffs to file directly in the transferee court.  *Wahl*, 786 F.3d at 493.  No such order was issued here.

Plaintiffs endeavor to rewrite history by asserting that *Dwinnells*—a separate action brought by a subset of the *Boyd* plaintiffs advancing different claims in a different court—is the same case as the present one. (*Id.* at 19-20.) But *Dwinnells* and *Boyd* are decidedly distinct. Despite Plaintiffs having labeled *Boyd* a "consolidated complaint," its filing initiated a separate action against FCA that was not consolidated with any other actions pending before this Court.[2] And while it is true that the plaintiffs in *Dwinnells* sought transfer of their case to the MDL, that transfer ultimately occurred 13 days *after* Plaintiffs commenced this case in this Court, and *Dwinnells* is stayed. Plaintiffs offer no explanation of how the transfer of *Dwinnells* to the MDL possibly could have consolidated that case with *Boyd* or rendered the Eastern District of Michigan a "transferor court" of the *Boyd* action. (*See* FCA MTD at 19-20.) Nor could they have because Plaintiffs cannot invent a transferor court where none exists.[3]

Notably, while Plaintiffs pretend their action was transferred to this Court from the Eastern District of Michigan, they never suggest that *Boyd* would be remanded there for trial. That omission is telling: Plaintiffs argue that *Boyd* was transferred to this Court when it suits them—to try to establish jurisdiction over FCA—but ignore that fiction when it does not.

**B.      There Is No Basis for This Court to Exercise Specific Jurisdiction Over FCA.**

**1.      Plaintiffs' Meritless RICO Claims Do Not Support This Court's Exercise of Specific Jurisdiction.**

Plaintiffs contend that, "on the basis of Plaintiffs' RICO claims alone, this Court has personal jurisdiction over [FCA] with respect to the claims of all Plaintiffs." (Opp. at 15.) But Plaintiffs cannot manufacture jurisdiction over FCA for all of their claims by pointing to their facially deficient RICO claims (*see* FCA MTD at 26-35; *infra* Section II).[4] *Koch* v. *Royal Wine Merchs., Ltd.*, 847 F. Supp. 2d 1370, 1378 (S.D. Fla. 2012) (because "Plaintiff's claim under the RICO Act must be dismissed [for failure to state a claim], the Court must also dismiss the state

---

[2] Plaintiffs assert that the Court "directed" them "to file consolidated complaints bringing together the claims of economic loss Plaintiffs." (Opp. at 22.) But the cited order (i) was entered on April 26, 2018, more than six weeks after Plaintiffs had already filed *Boyd*, and (ii) ordered consolidation only with respect to the automotive recyclers' claims, which, at the time, were divided across four complaints against various defendants. (*See* Dkt. 2651.)

[3] Because there is no transferor court for this action, the cases Plaintiffs cite, which stress that transferee courts have the same pre-trial jurisdiction as their transferor courts, are inapplicable.

[4] Plaintiffs fail to offer any explanation for why *Dwinnells* did not include RICO claims but *Boyd* does. The obvious explanation is that *Boyd* needed a jurisdictional hook.

-3-

law claims unless Plaintiff can independently establish personal jurisdiction with respect to those claims").

Plaintiffs rely on *Republic of Panama* v. *BCCI Holdings (Luxembourg) S.A.*, 119 F.3d 935 (11th Cir. 1997) to argue that this Court may exercise personal jurisdiction over FCA with respect to all of Plaintiffs' claims so long as their RICO claims are "colorable." (*See* Opp. at 16.) That reliance is misplaced. In *Republic of Panama*, the court observed that, "[a]s a general rule, courts should address issues relating to personal jurisdiction before reaching the merits of a plaintiff's claims" because "[a] defendant that is not subject to the jurisdiction of the court cannot be bound by its rulings." 119 F.3d at 940. In that context, the court explained that, before reaching the merits of a federal claim, a court should first ensure that it has jurisdiction over the claim, which requires, at a minimum, that the federal "right claimed is [not] so insubstantial, implausible, or foreclosed by prior decisions of this Court, or otherwise devoid of merit." *Id*. at 941. *Republic of Panama* has no bearing on FCA's argument that Plaintiffs' RICO claims should be dismissed for failure to state a claim, and, once dismissed, cannot provide a basis for the Court to exercise jurisdiction over FCA with respect to Plaintiffs' other claims.

## 2. The Complaint Fails to Allege Any Contacts Between FCA and Florida.

As set forth in FCA's opening brief (FCA MTD at 21-25), Plaintiffs' single allegation that one named plaintiff purchased his vehicle in Florida fails to demonstrate a connection between FCA and Florida that would satisfy either the Florida long-arm statute or constitutional due process.

### (a) The Complaint Fails to Plead Facts Supporting Application of the Florida Long-Arm Statute to FCA.

Plaintiffs contend that merely tracking the language of two provisions of Section 48.193 is sufficient to satisfy Florida's long-arm statute (Opp. at 23),[5] but that argument disregards federal pleading standards, which require Plaintiffs to plead more than "naked assertions devoid

---

[5] Plaintiffs fail to make any mention of subsection 48.193(1)(a)(6)—let alone respond to FCA's arguments regarding that provision of the long-arm statute (*see* FCA MTD at 23)—and thus have abandoned any contention that it applies to FCA. *See Melendez* v. *Town of Bay Harbor Islands*, 2014 WL 6682535, at *7 (S.D. Fla. Nov. 25, 2014).

of further factual enhancement." *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009); *Snow* v. *DirecTV, Inc.*, 450 F.3d 1314, 1318 (11th Cir. 2006) (rejecting plaintiffs' recitation of Section 48.193(1)(b) as "vague and conclusory allegations . . . which are insufficient to establish a prima facie case of personal jurisdiction"); *R&R Games, Inc.* v. *Fundex Games, Ltd.*, 2013 WL 3729309, at *5 (M.D. Fla. July 12, 2013) (holding "[a] conclusory allegation cannot serve as the basis for personal jurisdiction").[6]  Although Plaintiffs also contend that the complaint "includes myriad allegations demonstrating how Defendants' business activities and tortious conduct nationwide, including Florida, gave rise to Plaintiffs' claims" (Opp. at 23), Plaintiffs fail to provide a single example of such an allegation against FCA (*id.*).  Indeed, the only allegation in the complaint that pertains to Florida is that a single named plaintiff purchased his vehicle there, and, as set forth in FCA's opening brief, that is insufficient to satisfy the Florida long-arm statute.  (*See* FCA MTD at 21-23.)

      **(b)**     **The Exercise of Specific Jurisdiction Over FCA Would Be Inconsistent With Due Process.**

Even if Plaintiffs were able to show that the Florida long-arm statute applies here, the complaint does not allege facts sufficient to show that the exercise of specific jurisdiction over FCA would be consistent with due process.  The Opposition declares that the complaint "easily satisfie[s]" constitutional requirements (Opp. at 24), but its dearth of factual allegations shows otherwise.

      **i.**     **The Complaint Fails to Allege That Plaintiffs' Claims Arise Out of Any Contacts That FCA Had With Florida.**

Plaintiffs assert for the first time in the Opposition that their "claims arise out of . . . Defendants' relationships with authorized dealerships" (*id.*), and that those "dealerships . . . agreed to serve as the sales agent in the forum, i.e., Florida" (*id.* at 29 (citing Compl. ¶ 49)).  As a preliminary matter, neither paragraph 49 nor any other part of the complaint contains a single allegation regarding FCA's relationship with authorized dealerships, let alone an allegation that authorized dealers served as FCA's sales agents in Florida.  In fact, the complaint

---

[6] The case that Plaintiffs rely on improperly applied *state* pleading standards, and should not be followed here.  (*See* Opp. at 23 (quoting *Gregory* v. *EBF & Assocs., L.P.*, 595 F. Supp. 2d 1334, 1339 (S.D. Fla. 2009)).)

does not even allege that FCA had *any* authorized dealerships in Florida.[7]  Plaintiffs cannot
amend the complaint in opposing a motion to dismiss.  *See, e.g.*, *Burgess*, 600 F. App'x at 665.

But even if the complaint had alleged that FCA has authorized dealerships in Florida and
that dealerships serve as sales agents for FCA, such conclusory allegations would be insufficient
to impute the dealerships' activities to FCA for purposes of the jurisdictional analysis.  *Snow*,
450 F.3d at 1318 (noting that the complaint "presents no factual allegations demonstrating an
agency relationship"); *Erwin* v. *Ford Motor Co.*, 2016 WL 7655398, at *8 (M.D. Fla. Aug. 31,
2016) ( "To the extent Plaintiff argues that the independent Ford dealerships located in Florida
are agents of Ford  . . . [and their contacts] can be imputed to Ford for jurisdictional analysis
purposes, that argument also fails").  Not only do Plaintiffs fail to allege even the most basic
facts to support a principal-agent relationship, they also fail to allege that FCA required
dealerships to make particular statements that were false or misleading about the airbag systems
in FCA vehicles or about the overall safety of FCA vehicles.  *See Erwin*, 2016 WL 7655398, at
*8 (emphasizing that "Plaintiff does not allege anywhere in his entire complaint that the
independent Ford dealerships, as Ford's agents or otherwise, did or did not do anything related to
performing Ford's warranty and recall obligations that in any way caused or related to Plaintiff's
claims").  In any event, Plaintiffs' unsubstantiated assertions about dealerships do not help
Plaintiffs satisfy the "arising out of" prong of the due process analysis given that Khoury—the
lone Florida plaintiff—does not allege that he heard, saw, or read, much less relied upon, any
advertisements about FCA vehicles in Florida (or anywhere) prior to purchasing his vehicle.

### ii.  The Complaint Fails to Allege That FCA Had Any Purposeful Contact With Florida.

In recognition of their failure to allege that FCA engaged in any activity *in* Florida,
Plaintiffs try to convince the Court that they have satisfied the "purposeful availment" prong of
the due process analysis by arguing that FCA engaged in activities directed *at* Florida.  In
particular, the Opposition argues that "Defendants misleadingly engaged in deceptive practices

---

[7] Nor do Plaintiffs allege that Khoury (or any other named plaintiff) purchased his vehicle from
an authorized dealership.  Thus, Plaintiffs' attempt to distinguish *Leon* v. *Continental AG*, 301 F.
Supp. 3d 1203 (S.D. Fla. 2017), which is directly on point, fails.  (*See* Opp. at 27 n.19.)  Indeed,
the *Leon* court rejected plaintiffs' belated attempt to plead that the Florida plaintiffs bought or
leased their vehicles from Honda's agents in Florida.  301 F. Supp. at 1228 n.8 (noting plaintiffs
put forth these alleged facts for the first time in their opposition to Honda's motion to dismiss).

directed at Florida Plaintiffs." (Opp. at 27 (citing Compl. ¶¶ 126-27, 421-23); *see also id*. at 29
("Defendants . . . engaged in additional conduct targeting the Florida market").) But the
paragraphs of the complaint that the Opposition cites as supposed support for that argument
reference no facts to substantiate it. Specifically, those cited paragraphs allege that, "in
advertisements and promotional materials, [FCA] continuously maintained that Chrysler-branded
vehicles were safe and reliable," and "Plaintiffs, directly or indirectly, were exposed to these
advertisements or promotional materials." (Compl. ¶ 126.) Neither these allegations nor any
other in the complaint provide *any* support for Plaintiffs' contention that FCA "directed"
deceptive practices "at Florida Plaintiffs." Similarly, Plaintiffs pretend that a handful of
allegedly false statements, none of which are alleged to have been directed to anyone in Florida,
support their contention that FCA purposefully directed deceptive practices at Florida. (*See id*.
¶ 127(a) (referencing FCA's website).) They do the same with respect to paragraphs 421 to 423,
which assert simply that Plaintiffs are "consumers" under the Florida Deceptive Trade Practices
Act and that FCA engaged in "trade or commerce" under the Act—these too make no mention of
FCA directing its activities or conduct at Florida.[8]

Plaintiffs resort to arguing that the "'stream-of-commerce' test for personal jurisdiction
. . . unquestionably encompasses this case." (Opp. at 25.) In doing so, Plaintiffs disregard that
"the [Supreme] Court, in separate opinions, has strongly suggested that a single sale of a product
in a State does not constitute an adequate basis for asserting jurisdiction over an out-of-state
defendant, *even if that defendant places his goods in the stream of commerce*, fully aware (and
hoping) that such a sale will take place." *J. McIntyre Mach., Ltd.* v. *Nicastro*, 564 U.S. 873,
888–89 (2011) (Breyer, J., concurring) (emphasis added); *see also Asahi Metal Indus. Co.* v.
*Superior Court of Cal., Solano Cty.*, 480 U.S. 102, 111 (1987). Here, as in *J. McIntyre*, Plaintiffs
have alleged no more than "a single sale of a product in a State"—*i.e.*, Khoury's purchase of a
2012 Dodge Charger in Palm Beach, Florida.[9]

---

[8] Plaintiffs also assert, in passing, that "Defendants purposely availed themselves of the privilege
of selling hundreds of millions, if not billions, of dollars of vehicles in Florida" (Opp. at 24), but
this statement is unsubstantiated, undifferentiated, and absent from the complaint.

[9] For this reason, the cases on which Plaintiffs rely are factually distinguishable. *See, e.g.,
Hatton* v. *Chrysler Can., Inc.*, 937 F. Supp. 2d 1356, 1362 (M.D. Fla. 2013) (alleging, among
other things, "that Chrysler Canada . . . ships thousands of vehicles it manufactures to Florida

### 3. There Is No Basis for Exercising Jurisdiction Over the Non-Florida Plaintiffs' Claims, Which Have No Connection to This Forum.

Plaintiffs argue that, "[b]ecause Defendants are subject to specific jurisdiction under Florida's long-arm statute with respect to Florida Plaintiffs' claims, the doctrine of pendent personal jurisdiction provides this Court with specific jurisdiction for all Plaintiffs' claims against FCA." (Opp. at 30.) Plaintiffs are wrong. As set forth above, the Court does not have specific jurisdiction over the lone Florida Plaintiff's claims, and thus there can be no pendent jurisdiction. Moreover, *Bristol-Myers* reinforced long-standing principles about personal jurisdiction and made clear that specific jurisdiction requires "a connection between the forum and the specific claims at issue." *Bristol-Myers Squibb Co.* v. *Superior Court of Cal., San Francisco Cty.*, 137 S. Ct. 1773, 1781 (2017). Plaintiffs argue that the Supreme Court's decision only "concerns the due process limits on the exercise of specific jurisdiction by a State." (Opp. at 32.) But if Plaintiffs' RICO claims are dismissed (as they should be), Plaintiffs are left with only one federal claim under the MMWA (which does not provide for nationwide service of process) and various state-law claims.[10] Under such circumstances, the due process limitations of the Fourteenth Amendment are applicable. *See Koch*, 847 F. Supp. 2d at 1378. Other federal courts have reached similar conclusions.[11]

---

every year . . . derived billions of dollars in monetary benefit from the sale of its vehicles in Florida and continues to derive significant gain from the sale of its vehicles in Florida, and . . . maintained business contacts and activity with Florida Chrysler dealers").

[10] Moreover, as to the lone Florida Plaintiff (Khoury), Plaintiffs have conceded that he does not have a valid MMWA claim (*see* Opp. at 116 n.77; *infra* n.25), and thus only his Florida state-law claims are at issue.

[11] *See, e.g.*, *Roy* v. *FedEx Ground Package Sys., Inc.*, 2018 WL 2324092, at *9 (D. Mass. May 22, 2018) ("[T]here can be no doubt that the 'settled principles' of specific jurisdiction on which the *Bristol-Myers* Court relied apply here, notwithstanding that this case is pending in federal and not state court."); *Horowitz* v. *AT&T, Inc.*, 2018 WL 1942525, at *14-16 (D.N.J. Apr. 25, 2018) (citing *Bristol-Myers* and finding that the court lacked personal jurisdiction in a putative class action over the ADEA claims of named nonresident plaintiffs whose claims had no connection to the forum state); *Maclin* v. *Reliable Reports of Tex., Inc.*, 2018 WL 1468821, at *4 (N.D. Ohio Mar. 26, 2018) (rejecting the position that *Bristol-Myers* did not apply in a putative nationwide FLSA action and dismissing the FLSA claims of non-Ohio plaintiffs for lack of personal jurisdiction).

**C.    Plaintiffs Are Not Entitled to Jurisdictional Discovery Because They Failed to Meet Their Burden of Pleading Jurisdictional Facts in the Complaint.**

In recognition of their deficient allegations, Plaintiffs argue that the Court should "defer ruling . . . until jurisdictional discovery is complete." (Opp. at 33.) Jurisdictional discovery is not appropriate, however, where a plaintiff "fails to make a prima facie showing that [the defendant] is subject to specific jurisdiction." *Peruyero* v. *Airbus S.A.S.*, 83 F. Supp. 3d 1283, 1290 (S.D. Fla. 2014). Indeed, Plaintiffs are "foreclosed from pursuing jurisdictional discovery in an attempt to marshal facts that [they] should have had—but did not—before coming through the courthouse doors." *Thompson* v. *Carnival Corp.*, 174 F. Supp. 3d 1327, 1339 (S.D. Fla. 2016). As this Court has previously held, there is "no absolute right to conduct jurisdictional discovery" and a plaintiff seeking such discovery must "set forth specific information . . . that will establish personal jurisdiction." *Westchester Fire Ins. Co.* v. *Vector Aerospace*, 2017 WL 4326097, at *3 (S.D. Fla. Sept. 27, 2017) (quotation omitted). Plaintiffs failed to do so.[12]

**II.    THE COMPLAINT'S SPARSE ALLEGATIONS AGAINST FCA FAIL TO STATE A CLAIM FOR A RICO VIOLATION.**

Rather than address the RICO allegations that Plaintiffs plead in the complaint against FCA or engage with any of the arguments that FCA raised in its opening brief regarding the deficiencies of those allegations, Plaintiffs instead attempt to convince this Court to reflexively apply its prior decision from three years ago with respect to Takata and Honda, notwithstanding the significant differences in the allegations against FCA or that Takata has since pled guilty to criminally defrauding FCA (and other OEMs). Plaintiffs' attempt to assert RICO claims against FCA based on allegations against other defendants should be seen for what it is: a baseless attempt to manufacture jurisdiction over FCA. Plaintiffs' actual allegations against FCA fall far short of stating a claim under RICO.[13]

---

[12] Although Plaintiffs are not entitled to jurisdictional discovery, in an effort to promote efficiency, FCA offered to stipulate to certain jurisdictional facts. Plaintiffs instead filed their Opposition seeking a do-over. Such gamesmanship should not be rewarded.

[13] Plaintiffs contend that FCA is trying to impose a higher pleading standard on their RICO allegations than is appropriate. (*See* Opp. at 63 n.45; *see also id.* at 78 n.58.) To be clear, "[b]ecause Plaintiffs' section 1962(c) claim is based on an alleged pattern of racketeering consisting entirely of the predicate acts of mail and wire fraud, their substantive RICO allegations must comply not only with the plausibility criteria articulated in *Twombly* and *Iqbal*

-9-

A.      The Court May Consider the Takata Guilty Plea and Binding Admissions Therein.

Plaintiffs' argument that the Court cannot consider Takata's court-approved guilty plea and the factual admissions underlying the plea because it is "extrinsic evidence" (Opp. at 35) is wrong.  Plaintiffs concede, as they must, that the Court can take judicial notice of the "fact that Takata entered into a plea agreement and made certain statements in the plea agreement." (*Id.* at 36-37).  But they then argue that the Court cannot consider "the adjudicative contents of Takata's plea agreement" on the premises that (i) their truth is disputed, and (ii) they are inadmissible hearsay. (*Id.* at 37-38).[14]  Neither is correct.

*First*, there can be no reasonable dispute regarding the truth of the statements that Takata made under oath in a court-approved document in support of its criminal guilty plea to the extent that those statements pertain to Takata's own actions and its own conduct. *See Horne* v. *Potter*, 392 F. App'x 800, 802 (11th Cir. 2010) ("The district court properly took judicial notice of the [pleadings and orders] in [defendant's] first case, which were public records that were 'not subject to reasonable dispute'" because they were "capable of accurate and ready determination by resort to sources whose accuracy could not reasonably be questioned.'") (quoting Fed. R. Evid. 201(b)); *see also Curry* v. *TD Ameritrade, Inc.,* 662 F. App'x 769, 770, 771 & n.3 (11th Cir. 2016) (judicially noticing a third party's "indictment and settlement" for securities fraud when affirming the district court's dismissal of a suit alleging defendant "aided and participated"

---

but also with Fed. R. Civ. P. 9(b)'s heightened pleading standard, which requires that in alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." *Am. Dental Ass'n* v. *Cigna Corp.*, 605 F.3d 1283, 1291 (11th Cir. 2010) (quotation and alteration omitted); *see also American United Life Ins. Co.* v. *Martinez*, 480 F.3d 1043, 1067-68 (11th Cir. 2007) (stating that "where a conspiracy claim alleges that two or more parties agreed to commit fraud, the plaintiffs must plead this act with specificity.").

[14] Plaintiffs also argue that because the Plea did not specifically identify any of the Defendants by name, it is "pure speculation" to assume that any of the Defendants is one of the undefined OEMs. (Opp. at 38-39.)  But Plaintiffs ignore the fact that the Plea defined the term OEMs as "companies that purchased airbag systems from Takata and installed them in vehicles that they manufactured and sold" which is the foundation of Plaintiffs' Complaint. (Ex. 1 at B-3.) Moreover, FCA was one of the recipients of the victim restitution fund. (*See* FCA MTD at 12.)

in that same fraud).[15]  Indeed, as Takata's counsel recognized before this Court in the prior litigation, the "Statement of Facts is certainly an admission by Takata."  (Tr. of Feb. 28, 2017 Status Conf. at 14:5-6 (Dkt. 1429).)

*Second*, Takata's binding admissions are plainly admissible under at least two hearsay exceptions:  Rule 804(b)(3)'s exception for statements against interest and Rule 803(22)'s exception for judgment of a previous conviction.  "To be admissible under Rule 804(b)(3), a statement must satisfy three elements:  (1) the declarant [must be] unavailable; (2) the statement so far tends to subject the declarant to criminal liability that a reasonable person in his position would not have made the statement unless he believed it to be true; and (3) the statement is corroborated by circumstances clearly indicating its trustworthiness."  *See United States* v. *Westry*, 524 F.3d 1198, 1214 (11th Cir. 2008).  Takata's statements underlying the guilty plea meet these requirements because:  (i) Takata is unavailable as a witness due to its dissolution in bankruptcy; (ii) the statements subjected Takata to criminal liability; and (iii) the statements were accepted by Judge Steeh of the United States District Court for the Eastern District of Michigan, which corroborates their trustworthiness.

Similarly, under Rule 803(22), "evidence of a final judgment of conviction" is admissible if (i) "the judgment was entered after a . . . guilty plea"; (ii) "the conviction was for a crime punishable by . . . imprisonment for more than a year"; (iii) "the evidence is admitted to prove any fact essential to the judgment"; and (iv) "when offered by the prosecutor in a criminal case for a purpose other than impeachment, the judgment was against the defendant."  Fed. R. Evid. 803(22).  Takata's statements supporting its guilty plea satisfy this exception because (i) Takata was convicted after Judge Steeh entered the plea agreement; (ii) Takata's criminal wire fraud is, by statute, punishable by imprisonment for greater than one year; (iii) Takata's admissions that it

---

[15] Additionally, Plaintiffs assert that the "contents of Takata's plea agreement . . . are not from a source whose accuracy cannot be reasonably questioned."  (Opp. at 38.)  That is wrong.  Courts routinely judicially notice court filings, including those with fewer procedural safeguards than a court-approved plea agreement entered into under penalty of perjury that subjected a defendant to criminal liability.  *See, e.g.*, *Horne*, 392 F. App'x at 802; *Auto Owners Ins. Co.* v. *Mims*,  2007 WL 9711344, at *6 (N.D. Ala. Dec. 18, 2007) (rejecting "defendants' argument that plaintiff's submission of the case action summary of [a third party's] guilty pleas . . . should be stricken because said record is an uncertified document" because "[t]he court may take judicial notice of facts capable of 'accurate and ready determination by resort[ing] to resources whose accuracy cannot be reasonably questioned'" and "state court records are such a resource").

provided fraudulent information to OEMs were essential to the wire fraud conviction; and
(iv) "this case is not a criminal prosecution, [so] the rule does not preclude introduction of the
plea documents as evidence of the judgment 'against persons other than the accused.'" *See, e.g.*,
*U.S.* ex rel. *Miller* v. *Bill Harbert Int'l Const., Inc.*, 608 F.3d 871, 891-92 (D.C. Cir. 2010)
(affirming district court's decision in antitrust suit against contractors to admit, under Rule
803(22), one contractor's plea agreement and accompanying statement of facts because "the plea
and accompanying memorandum were evidence of the factual admissions therein, and were
therefore relevant pieces of evidence that are admissible against all defendants.").

Accordingly, the Court may judicially notice not only the fact of Takata's guilty plea and
the statements therein, but also the truth of those statements, which include Takata's admission
that, from 2005 to 2015, Takata "induc[ed] the victim OEMs to purchase airbag systems . . . by
deceiving the OEMs through the submission of false and fraudulent reports and other
information that concealed the true and accurate test results for the inflators." (Ex. 1 (Takata
Plea) at B-6-B-7.)  Indeed, Plaintiffs' counsel acknowledged this very same admission in its
motion for final approval of the Ford settlement (*see* Dkt. 3069 at 6, 28), and should not be able
to have it both ways—Plaintiffs cannot use Takata's admissions when it serves them and ask the
Court to ignore those same admissions when it does not.

### B.      Previous Allegations Against Takata and Honda Are Fundamentally Different Than Plaintiffs' Allegations Against FCA.

The Opposition stakes Plaintiffs' claim that they have adequately alleged RICO
violations against FCA on their argument that those allegations are "indistinguishable from those
that this Court determined stated viable RICO claims in the initial MDL complaint." (*See, e.g.*,
Opp. at 62).  That is both false and telling:  Plaintiffs' reliance on fundamentally different
allegations against different defendants in different circumstances is an implicit concession that
their allegations against FCA are deficient.

In trying to shift blame to FCA, Plaintiffs ignore that their allegations against FCA pale
in comparison to their prior allegations against Takata and Honda.  *First*, the prior complaint
alleges that, after Takata learned of an inflator rupture in a vehicle in the field in 2004, Takata
secretly tested airbags that it retrieved from scrapped vehicles and later ordered its engineers to
destroy evidence of the testing.  (*See* Dkt. 579 ¶¶ 230-232.)  *Second*, the prior complaint alleges
that Takata and Honda knew about multiple incidents of inflators rupturing in Honda vehicles in
the field, causing injury to the vehicle occupants, *years* before informing NHTSA or initiating a

recall.  (*See id.* ¶¶ 12, 228, 234.)  *Third*, the prior complaint contains allegations that Takata and

Honda jointly conducted secret testing of inflators that Honda removed from vehicles that had

been on the road and then destroyed the test results or agreed to downplay their significance.

(*See id.* ¶¶ 14, 235, 238.)  *Fourth*, that complaint alleges that, even after Honda understood the

defect, it stood idle as ruptures in the field injured additional vehicle occupants in 2008 and

2009.  (*Id.* ¶¶ 237, 241.)

Presented with these allegations of concerted activity, the Court concluded that Plaintiffs

adequately alleged RICO conspiracy claims against Takata and Honda because "Plaintiffs allege

that over the course of a decade, Takata and Honda 'shared information about injurious airbag

deployments—jointly and secretly—investigated the possible causes of those deployments,

delayed and/or prevented the release of inculpatory information, misled regulatory authorities,

and maintained a consistent public posture as to the scope of vehicles affected by the Defective

Airbags and the safety risks those airbags posed.'"  *In re Takata*, 2015 WL 9987659, at *2 (S.D.

Fla. Dec. 2, 2015).

In stark contrast, the complaint does not contain a single allegation that FCA (i) knew of

any inflator rupture in the field that caused injury to a vehicle occupant without taking

responsive action soon thereafter, (ii) conducted secret post-rupture testing—with Takata or on

its own—of inflators, let alone that FCA participated in any cover-up or reached any agreement

with Takata as to how to characterize tests, or (iii) agreed with Takata to downplay the

significance of field ruptures involving occupant injury or agreed on what information to provide

to NHTSA.  Instead, the complaint alleges only one incident (in September 2013) of an occupant

being injured when an airbag deployed in an FCA vehicle, and the complaint goes on to allege

that, within months of that incident, FCA began its recall efforts.  (Compl. ¶ 122.)  In fact, in its

entirety, the complaint alleges only three other incidents involving FCA at all, and two of them

occurred during *pre-production testing* at *Takata's* facility; none is alleged to have involved any

occupant injuries.  (*Id.* ¶¶ 118-19, 121.)

Despite these vast differences, and that Takata has admitted to "deceiving the OEMs

through the submission of false and fraudulent reports and other information that concealed the

true and accurate test results for the inflators" (Ex. 1 at B-6-B-7), Plaintiffs ask this Court to

apply here its 2015 decision denying a motion to dismiss RICO claims against Takata and

Honda.  Indeed, in a desperate attempt to equate FCA with Takata and Honda, Plaintiffs copied

language from the Court's 2015 decision, substituted FCA in place of Honda, and pasted that verbatim language into their complaint against FCA. (*See* Compl. ¶ 197 ("Takata and [FCA] shared information about erroneous or injurious airbag deployments, jointly and secretly; investigated the possible causes of those deployments; delayed and/or prevented the release of inculpatory information; misled regulatory authorities; and maintained a consistent public posture as to the scope of vehicles affected by the Defective Airbags, and the safety risks those airbags posed.").) Of course, this summary of factual allegations against *Takata* and *Honda* has nothing to do with *FCA*, and the complaint alleges no such facts as to FCA.

### C. The Complaint's Allegations Against FCA Come Nowhere Close to Stating a RICO Claim.

#### 1. Plaintiffs Fail to Adequately Allege That FCA Formed a Criminal Enterprise With Takata.

As FCA explained in its moving brief, an allegation that FCA sought to maximize "revenue and profitability" does not amount to a criminal purpose, let alone one that FCA shared with Takata. (*See* FCA MTD at 27 (quoting Compl. ¶ 201).) The Opposition offers no response to this argument, and instead doubles down on Plaintiffs' assertion that alleging "financial benefits" is sufficient to "allege[] a common purpose for the purposes of RICO." (Opp. at 77 (quoting *Williams* v. *Mohawk Indus., Inc.*, 465 F.3d 1277 (11th Cir. 2006), *abrogated on other grounds as recognized in Simpson* v. *Sanderson Farms, Inc.*, 744 F.3d 702, 714-15 (11th Cir. 2014) (quotation omitted)).) But the case that Plaintiffs cite as support for this position does not provide it. In *Williams*, the plaintiffs "allege[d] that the [third-party] recruiters and Mohawk share the common purpose of obtaining illegal workers for employment by Mohawk," that "each recruiter is paid a fee for each worker it supplies to Mohawk," and that "Mohawk has made various incentive payments to employees and other recruiters for locating workers that Mohawk eventually employs and harbors." 465 F.3d at 1284. On those pleadings, the court concluded that the plaintiffs had adequately alleged a shared criminal purpose—recruiting and harboring illegal workers—which was supported by the plaintiffs' allegations that Mohawk was paying other enterprise members to carry out this common objective. Nothing could be further from the allegations here. Not only do Plaintiffs fail to allege a common criminal purpose, but even Plaintiffs' contention that both Takata and FCA sought to maximize profitability is devoid of any allegation that this was a shared or joint endeavor that Takata and FCA undertook together. Moreover, that FCA (and other OEMs) were the victims of Takata's fraud renders Plaintiffs'

-14-

so-called allegations of a common criminal purpose even less plausible.  *Faith Enterprises Grp., Inc.* v. *Avis Budget Grp.*, 2012 WL 1409403, at *5 (N.D. Ga. Apr. 20, 2012) ("Indeed, unlike in *Williams,* the independent operators and franchisees were not conspirators in Avis' alleged fraud, but were victims of that fraud. Thus, the Complaint does not sufficiently allege that the Defendants combined with an 'enterprise' under 18 U.S.C. § 1962(c).").[16]

Similarly, Plaintiffs belabor the uncontested proposition that a RICO enterprise can be comprised of an informal association of distinct entities (Opp. at 76-77) instead of responding to FCA's argument that Plaintiffs failed to adequately allege that FCA was associating with Takata in order to carry out a criminal scheme.  Plaintiffs pretend that they "describe—in detail—the roles that each of the[] distinct entities and individuals played in the enterprise" (*id*. at 77), when, in fact, the Opposition cites to only one paragraph that contains an entirely conclusory allegation about FCA's purported role in the enterprise.[17]  (*See id*. at 77 (citing Compl. ¶ 198).)  Moreover, the role that Plaintiffs ascribe to FCA—purchasing airbags from Takata and installing them in FCA's vehicles[18]—is part of FCA's ordinary business and does not support the inference that FCA was associated in a criminal enterprise with Takata.  (*See* FCA MTD at 28); *In re Managed Care Litig.*, 298 F. Supp. 2d 1259, 1276 (S.D. Fla. 2003) (RICO "liability depends on showing that the defendants conducted or participated in the conduct of the 'enterprise's affairs,' not just their own affairs.").

---

[16] Plaintiffs cite *United States* v. *Church* for the proposition that "devotion to making money from repeated criminal activity" demonstrates a RICO enterprise's common purpose.  (Opp. at 78-79 (citing 955 F.2d 688, 698 (11th Cir. 1992)).  But, in *Church*, the defendants engaged in obtaining income from illegal drug trade.  *Church*, 955 F.2d at 698-99.  In contrast, Plaintiffs' allegations depict ordinary business activity as somehow criminal because it involved Takata.

[17] Plaintiffs contend that the "[FCA]-Takata RICO Enterprise" is still "continuing to this day" (Compl. ¶ 204), but they fail to explain how this is possible given that Takata no longer exists.

[18] Plaintiffs cite *In re Chrysler-Dodge-Jeep Ecodiesel*, in which the plaintiffs established "a relationship more substantial than a routine contract" by making "specific factual allegations" regarding devices that "had only a deceitful purpose—to cheat emissions tests."  295 F. Supp. 3d 927, 981 (N.D. Cal. 2018).  Here, there is a crucial difference—an airbag does not "plausibly ha[ve] only a deceitful purpose."  *Id.*  The court there nonetheless emphasized that "RICO liability must be predicated on a relationship more substantial than a routine contract between a service provider and its client."  *Id.*

-15-

## 2. The Complaint Fails to Adequately Allege That FCA Engaged in Any Mail or Wire Fraud, Let Alone a Pattern of Such Criminal Acts.

Plaintiffs contend that they have carried their burden of pleading repeated predicate acts of mail and wire fraud by alleging that communications were used in furtherance of a scheme to defraud. (Opp. at 65.) But, as set forth in FCA's opening brief, the complaint fails to adequately allege that anyone at FCA had specific intent to defraud. (*See* FCA MTD at 29.) Again, the Opposition pretends that the complaint contains allegations it does not. *First*, Plaintiffs quote the complaint's allegation that "the purpose of the scheme to defraud was to conceal the scope and nature of the Inflator Defect found in millions of Defective Airbags in the United States in order to avoid incurring the expenses associated with repairing the Inflator Defect in [FCA] vehicles," and "maintain[] and boost[] consumer confidence in the [FCA] brand." (Compl. ¶ 205; *see* Opp. at 65.) This conclusory allegation about the supposed "purpose of the scheme to defraud" fails to allege that anyone at FCA knew about the "scope and nature" of the defect and intentionally sought to conceal that information. (Compl. ¶ 205); *see Republic of Panama*, 119 F.3d at 949 (plaintiff "must allege either that [defendants] had fraudulent intent when committing the banking transactions outlined in the complaint or, at a minimum, knew that the money involved in these transactions derived from unlawful activity"). *Second*, Plaintiffs quote from paragraph 197 of the complaint, which, as explained above, is not a factual allegation (much less a "detailed" one against FCA), but was instead taken from the Court's decision summarizing allegations in another complaint against Takata and Honda. (Opp. at 65.)

Without directly responding to any of FCA's arguments regarding each of the alleged instances of mail and wire fraud, Plaintiffs declare that the complaint "demonstrat[es] the existence of the scheme to defraud." (Opp. at 65-66.) Specifically, Plaintiffs argue that their allegations "demonstrat[e] FCA's knowledge of the dangerous nature and risk of Takata's inflators" and that "the inflators did not meet FCA's safety specifications." (*Id.* at 66 (citing Compl. ¶ 211(c)-(d)).) But paragraph 211(c) merely alleges one instance in April 2013 when FCA "approved of deviations from USCAR specifications," without alleging that the specifications had anything to do with safety or that they were connected to the defect underlying the nationwide recall. (Compl. ¶ 211(c); *see* FCA MTD at 30-31.) Similarly, paragraph 211(d) alleges that, in June and July 2013, FCA and Takata communicated about a single "inflator rupture that occurred during testing at Takata's facility in Mexico," but does not allege what FCA was told about this incident (or who specifically was told) or how this lone incident during

-16-

testing shows that FCA knew that all Takata inflators were defective. (Compl. ¶ 211(d); *see* FCA MTD at 31.) Plaintiffs also declare that the complaint pleads "numerous mail and wire communications in which FCA conceals its own knowledge of the danger and propensity to rupture of Takata's inflators, in addition to actual rupture events." (Opp. at 66 (citing Compl. ¶¶ 211(e)-(j)).) But none of the cited paragraphs plead facts to support that assertion, as each is devoid of allegations (much less particularized ones) that FCA knowingly or intentionally engaged in fraud. (*See* FCA MTD at 31-32.) "RICO . . . allegations of scienter cannot be merely conclusory and unsupported by any factual allegations." *See Republic of Pan.*, 119 F.3d at 949.[19]

### 3. The Complaint's Generalized Allegations of Injury Do Not Plead a Cognizable RICO Injury.

The Opposition declares that Plaintiffs "have suffered concrete injuries to their property as a result of Defendants' RICO violations" (Opp. at 68), but the complaint contains only conclusory allegations of overpayment or diminution in value, which are not concrete financial losses under RICO. *See Simpson*, 744 F.3d at 709 ("[Plaintiffs] have offered no market data that might permit us plausibly to infer a gap between the wages they *actually* received at [defendant company] and the wages they *would have* received but for the alleged . . . misconduct.").[20] Moreover, where, as here, an alleged "injury[ ] may be eliminated or significantly reduced" because of some "contractual or other legal remed[y]," such as the government-mandated recall process, the "RICO injury is speculative." *In re Merrill Lynch Ltd. P'ships Litig.*, 154 F.3d 56, 59 (2d Cir. 1998).

The Opposition also asserts that Plaintiffs experienced "out-of-pocket and loss-of-use expenses and costs stemming from the recalls" (Opp. at 68), and that "several Plaintiffs provided specific examples of incurring such costs and expenses" (*id.* at 71). No such allegations exist in the complaint against FCA, and the cited "support" is a complaint by a set of different plaintiffs

---

[19] Plaintiffs' RICO conspiracy claim must similarly fail because plaintiffs are required to allege an illegal agreement to violate RICO and did not. (*See* FCA MTD at 33 n.15 (citing *Viridis Corp.* v. *TCA Global Credit Master Fund, LP*, 155 F. Supp. 3d 1344, 1365 (S.D. Fla. 2015).)

[20] Plaintiffs critique *In re Bridgestone/Firestone*, 155 F. Supp. 2d 1069 (S.D. Ind. 2001) (Opp. at 69 n.49), but that case is entirely consistent with the Eleventh Circuit's teaching that the "injury to business or property" element of RICO "has a 'restrictive significance.'" *Ironworkers Local Union 68* v. *Astrazeneca Pharms.*, 634 F.3d 1352, 1361 (11th Cir. 2011) (quoting *Reiter* v. *Sonotone Corp.*, 442 U.S. 330, 339 (1979)).

filed against a set of different defendants. (*See id.* at 72 n.53.) None of the 33 named Plaintiffs here allege any such losses or costs. (Compl. ¶¶ 35-67.)

### 4. Plaintiffs Offer Nothing More Than a Conclusory Allegation of Proximate Causation.

The Opposition declares that Plaintiffs have met their burden of alleging proximate cause because, Plaintiffs claim, they "would not have purchased their Class Vehicles or would not have paid as much for their vehicles had Defendants not concealed the nature and extent of the Inflator Defect." (Opp. at 74.) But this fails to explain how Plaintiffs' supposed injury was "by reason of" FCA's supposed fraud. Plaintiffs are required to allege that FCA's supposed predicate acts of mail and wire fraud "was the proximate cause," not just a but for cause, of Plaintiffs' injuries. *Hemi Grp., LLC* v. *City of N.Y.*, 559 U.S. 1, 9 (2010). Plaintiffs fail to connect the alleged acts of mail and wire fraud to any of the alleged misstatements, and they similarly fail to connect any of the alleged misstatements to Plaintiffs' purchasing decisions. *See Ray* v. *Spirit Airlines, Inc.*, 836 F.3d 1340, 1349 (11th Cir. 2016) (dismissing claim because the "complaint asserted only the bald conclusion that the plaintiffs relied on a misrepresentation without showing how that reliance was manifested").

## III. THE SALE ORDER BARS LIABILITY FOR CHRYSLER VEHICLES REGARDLESS OF WHEN SUCH VEHICLES WERE RESOLD.

Plaintiffs' attempt to dodge the effect of the Chrysler Sale Order by limiting their purported class to persons who purchased vehicles after June 1, 2009 (*see* Opp. at 145) is futile because the Sale Order limits FCA's liability for *all* Chrysler vehicles manufactured and initially sold prior to June 10, 2009. *See In re Old Carco LLC*, 2013 WL 1856330, at *4-5 (Bankr. S.D.N.Y. May 2, 2013). With the exception of the narrowly defined Assumed Liabilities—none of which are at issue here (*see* FCA MTD at 36)—FCA has no successor or transferee liability with respect to Chrysler vehicles that were manufactured and originally sold when Chrysler was still in existence. *See In re Chrysler LLC*, 576 F.3d 108, 127 (2d Cir. 2009), *vacated*, 592 F.3d 370, 370 (2d Cir. 2010) (per curiam) (noting that "[t]he Sale Order extinguished the right to pursue claims 'on any theory of successor or transferee liability[,] whether known or unknown as of the Closing'"). Contrary to Plaintiffs' suggestion, liability that was not expressly assumed is not revived simply because a used Chrysler vehicle is subsequently sold to another owner after June 10, 2009. In arguing for a contrary result, Plaintiffs assert that "post-closing purchasers are not affected by the Sale Order." (Opp. at 145 (quoting *Burton* v. *Chrysler Group, LLC (In re*

-18-

*Old Carco LLC*), 492 B.R. 392, 406 (Bankr. S.D.N.Y. 2013)).)  But Plaintiffs misstate *Burton*'s holding to get to that false conclusion.  In discussing "post-closing purchasers," the *Burton* court referred to "owners who purchased cars manufactured or sold by *New Chrysler* after the closing [of the Sale Order]," not post-Sale Order purchasers of used Chrysler vehicles.  *Burton*, 492 B.R. at 404 (emphasis added).  Indeed, the plaintiffs in *Burton* whose claims were dismissed as barred by the Sale Order included at least two individuals who purchased a used Chrysler vehicle *after* June 10, 2009, directly foreclosing Plaintiffs' argument.  *See* Complaint (12-CV-6602, ECF No. 1-1 at ¶¶ 19-20).[21]  Thus, the claims of the seven named Plaintiffs who own vehicles manufactured by Chrysler should be dismissed.

## IV. THE OPPOSITION CONFIRMS THAT PLAINTIFFS HAVE NOT ADEQUATELY ALLEGED COMMON LAW OR STATUTORY CONSUMER PROTECTION CLAIMS.

For each of Plaintiffs' common law and consumer protection act claims that sound in fraud, Plaintiffs failed to adequately allege (i) actionable statements or omissions, (ii) FCA's knowledge that Takata's inflators were defective, and (iii) detrimental reliance on the purported misstatements or omissions.  Plaintiffs respond by once again attempting to conflate FCA with prior defendants, while ignoring the specific deficiencies that FCA identified in its moving brief.

### A. The Complaint Fails to Adequately Allege Several Elements of Their Common Law Fraud and Consumer Protection Act Claims.

Plaintiffs' common law fraud and consumer protection act claims should be dismissed because Plaintiffs fail to adequately allege that FCA knew of a defect in Takata's inflators (or that Chrysler had such knowledge, which actually transferred to FCA) at the time when any of the alleged misstatements were made.  *E.g.*, *U.S. ex rel. O'Donnell* v. *Countrywide Home Loans, Inc.*, 822 F.3d 650, 658 (2d Cir. 2016) ("It is emphatically the case . . . that a representation is fraudulent only if made with the contemporaneous intent to defraud—*i.e.*, the statement was knowingly or recklessly false and made with the intent to induce harmful reliance.").  The complaint also fails to adequately allege the who, what, when, and where that is required to plead fraud claims, even when such claims are based on omissions as opposed to affirmative

---

[21] Plaintiffs' citation to *Elliott* v. *Gen. Motors LLC* relating to a different Sale Order is inapposite.  *See* 829 F.3d 135, 155 (2d Cir. 2016) (noting that courts have continued to address the language in sale orders on a "case-by-case basis").

misrepresentations.  *Begualg Inv. Mgmt. Inc.* v. *Four Seasons Hotel Ltd.*, 2011 WL 4434891, at
*4 (S.D. Fla. Sept. 23, 2011) ("Plaintiffs have not detailed the required who, what, where, when,
how of the allegedly false statements and again fails to specify each Defendant's participation in
the alleged fraud."); *Brooks* v. *Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1370-71
(11th Cir. 1997) (holding that Rule 9(b)'s particularity requirements of who, what, where, when,
how are applicable to omissions).

1.    The Complaint Fails to Adequately Allege That FCA Made Any<br>Actionable Misstatements or Omissions

The Opposition offers no response to FCA's argument that the complaint fails to allege
that the purported misstatements contain any false statement of material fact.  (*See* FCA MTD at
38-39.)  Instead, Plaintiffs argue that it would be inappropriate to conclude at the motion to
dismiss stage that any of the statements constitute nonactionable puffery.  (*See* Opp. at 94-97.)
Not so:  the Eleventh "Circuit and others . . . have recognized that some representations, referred
to as 'puffery,' are not actionable as a matter of law because no reasonable person could rely
upon the representations as intended conveyances of fact."  *Thompson* v. *Proctor & Gamble Co.*,
2018 WL 5113052, at *2 (S.D. Fla. Oct. 19, 2018) (citing *Mfg. Research Corp.* v. *Greenlee Tool
Co.*, 693 F.2d 1037, 1040 (11th Cir. 1982)); *see also Counts* v. *Gen. Motors, LLC*, 237 F. Supp.
3d 572, 597-98 (E.D. Mich. 2017) (GM's representations about the "'high quality' and 'safety'
of its vehicles" were non-actionable puffery).

The Opposition resorts to arguing that "'puffery' [is] irrelevant to Plaintiffs' omissions-
based claims."  (Opp. at 96.)  But the complaint does not allege "precisely . . . what omissions
were made" or "the time and place of each such statement and the person responsible for making
(or, in the case of omissions, not making) same"—all of which Plaintiffs are required to plead
with particularity.  *See Tikiz Franchising, LLC* v. *Piddington*, 2017 WL 8780761, at *4 (S.D.
Fla. Aug. 1, 2017) ("Rule 9(b) requires that material misrepresentations *or omissions* be pled
with particularity." (emphasis added)).

2.    The Complaint's Handful of Conclusory Allegations Regarding<br>FCA's Purported Knowledge of the Inflator Defect Are Insufficient.

In an attempt to sidestep a glaring pleading defect—the complaint's failure to allege
FCA's knowledge of the Inflator Defect—Plaintiffs again attempt to conflate FCA with
defendants in the prior litigation by arguing that the Court's prior rulings should reflexively be
applied here.  (*See* Opp. at 89.)  Plaintiffs point to language in the Court's earlier decisions and

-20-

then falsely argue that they have pled the same information against FCA that other plaintiffs pled against other defendants, despite that their allegations against FCA are fundamentally different. In particular, while Plaintiffs point to the Court's findings that plaintiffs in earlier cases had pled that the defendants reviewed the designs of Takata's inflators prior to approving their use and knew that the airbags contained "volatile and unstable ammonium nitrate" (Opp. at 89), Plaintiffs have not alleged the same of FCA. Instead, Plaintiffs point to entirely conclusory allegations that fail to plausibly allege FCA's knowledge. As an example, Plaintiffs cite to their allegation that "Takata shared [] testing with Old Chrysler personnel" that "revealed the propellant exhibited ballistic shifts and overly aggressive behavior." (*Id.* (citing Compl. ¶ 8).) But this conclusory allegation fails to allege *who* at Chrysler Takata supposedly shared this information, *what* information was shared, and *when* Takata shared it, and therefore the allegation should not be credited. Furthermore, any purported knowledge that Chrysler had cannot be imputed to FCA without factual allegations showing that the knowledge was transferred to FCA, and the complaint includes no such allegations. (*See also* FCA MTD at 40-41.) Plaintiffs' allegation that FCA "took possession" of Chrysler's books and records (Opp. at 92) is insufficient.[22]

As another example, Plaintiffs refer to an allegation that FCA "encounter[ed] 'energetic disassemblies' (i.e., ruptures) in Takata airbags meant for [FCA's] vehicles." (Opp. at 89-90 (citing Compl. ¶¶ 12-13).) Again, Plaintiffs' allegation about unspecified "energetic disassemblies" is entirely conclusory and does not adequately allege that anyone at FCA had knowledge of a defect, much less a universal one. *See Wilson* v. *Hewlett-Packard Co.*, 668 F.3d 1136, 1147 (9th Cir. 2012) ("allegation that . . . manufacturer, had 'access to the aggregate information and data regarding the risk of overheating' is speculative and does not suggest how any tests or information could have alerted [manufacturer] to the defect").

---

[22] Plaintiffs incorrectly argue that "neither of FCA's cited authorities speak to the pleading standard for imputing the pre-bankruptcy entity's knowledge to its successors." (Opp. at 92 n.66.) To the contrary, the cases are clear that there must be allegations of the post-bankruptcy entity's *actual* knowledge. *See In re General Motors LLC Ignition Switch Litig.*, 154 F. Supp. 3d 30, 34 (S.D.N.Y. 2015) ("knowledge of Old GM personnel or knowledge of information contained in Old GM files could be imputed to New GM only to the extent that it could be shown . . . that New GM actually had that knowledge); *In re Motors Liquidation Co.*, 568 B.R. 217, 230 (Bankr. S.D.N.Y. 2017) ("It is not acceptable . . . to base allegations on generalized knowledge of both Old GM and New GM.").

Plaintiffs point to a mere five paragraphs of the complaint seeking to establish FCA's knowledge, which they claim plead "knowledge of ruptures of inflators intended for [FCA's] vehicles," "inadvertent deployments at [FCA's] facilities or otherwise reported to it," and "a field rupture causing injury." (Opp. at 92 (citing Compl. ¶¶ 118-22).) These baseless conclusory statements do not adequately plead that FCA had knowledge of a universal defect (or any defect) in Takata's inflators at the time of any of the alleged misstatements. (*See* FCA MTD at 41-44.) Furthermore, Takata has now admitted in its criminal guilty plea that it deceived and victimized the OEMs. (Ex. 1 (Takata Plea) at B-6.)

### 3. The Complaint's Failure to Adequately Allege Reliance Is Not Cured by Plaintiffs' Claim to Have Relied on Unspecified Omissions.

Plaintiffs tacitly concede that the complaint fails to allege reliance on any particular misstatements but nonetheless contend that they have alleged "reli[ance] on Defendants' omissions." (Opp. at 99.) That is false: the complaint fails to adequately allege a single actionable omission. But even if it did, the complaint would need to further allege "the manner in which [the omission] misled the plaintiff." *Tikiz Franchising*, 2017 WL 8780761, at *4. The complaint does not, but instead merely contains a rote allegation, repeated verbatim for each plaintiff, that, if they "had known about the Inflator Defect" they "would not have purchased Class Vehicles or would not have paid as much for them as they did." (Compl. ¶¶ 35-67; *see also* Opp. at 99.) Such a conclusory allegation does not meet Plaintiffs' pleading burden. Plaintiffs also argue that they can plead reliance "even without specifically identifying a particular advertisement in which the omitted information should have been included, so long as they provide plausible allegations . . . that they would have received the information in some way had Defendant exercised reasonable care." (Opp. at 100 (quoting *Sloan* v. *General Motors LLC*, 287 F. Supp. 3d 840, 878 (N.D. Cal. 2018)).) But Plaintiffs failed to plead any such allegations. Notably, in *Sloan*, the court required plaintiffs to not only plead that they had purchased from an authorized dealership but also to "adequately ple[a]d an agency relationship between [the manufacturer] and its authorized dealerships." 287 F. Supp. 3d at 876. Here, Plaintiffs have *not* alleged that they purchased their vehicles from authorized dealerships, much less that FCA has an agency relationship with any authorized dealers.[23]

---

[23] Plaintiffs also contend that "reliance on a material omission is presumed" under certain states' laws (Opp. at 99), but the two cases they cite do not stand for that proposition.

-22-

**B.      Because No Tolling Doctrine Applies, Numerous Claims Should Be Dismissed as Untimely.**

Thirty-five state law claims asserted by 24 Plaintiffs should be dismissed because they are time-barred.  (*See* FCA MTD at 45-46 & Appx. B.)  Plaintiffs assert that, "pursuant to *American Pipe and Construction Co.* v. *Utah*, 414 U.S. 538 (1974), the claims of Plaintiffs and other Class members were tolled from at least October 31, 2014, when a nationwide class action was filed against [FCA]."  (Opp. at 101.)  As FCA explained in its moving brief (FCA MTD at 46), Plaintiffs cannot claim *American Pipe* tolling based on the October 31, 2014 filing of *Bonet* v. *Takata Corp.* because that action was subsequently subsumed by a consolidated amended complaint in which the plaintiffs chose not to name FCA.  *See, e.g., In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 27 F. Supp. 3d 447, 486 (S.D.N.Y. 2014) (finding that the *American Pipe* tolling period ended "the date when exchange-based plaintiffs filed the [first amended complaint] that did not name SG as a defendant").  Thus, even if Plaintiffs' claims were tolled when *Bonet* was filed in October 2014, that tolling ended in April 2015 when FCA was dropped from the consolidated amended complaint.

The Opposition offers no meaningful response.  Plaintiffs contend that this is "not a situation where any plaintiffs chose to abandon claims against FCA," and they point to a footnote in the consolidated amended complaint purporting to reserve rights.  (Opp. at 102.)  Far from demonstrating that class action claims against FCA have been pending since 2014, this statement shows that the putative class of plaintiffs asserting claims in the consolidated amended complaint *deliberately chose* not to pursue class claims against FCA at that time.

Even if the Court accepts Plaintiffs' contention that any applicable statutes of limitations have been tolled since *Bonet* was filed in October 2014, the current action must be dismissed as an improper successive class action.  As the Supreme Court recently held, "[t]he 'efficiency and economy of litigation' that support tolling of individual claims . . . do not support maintenance of untimely successive class actions; any additional *class* filings should be made early on, soon after the commencement of the first action seeking class certification."  *China Agritech, Inc.* v. *Resh*, 138 S.Ct. 1800, 1806 (2018) ("We hold that *American Pipe* does not permit a plaintiff who waits out the statute of limitations to piggyback on an earlier, timely filed class action.").  Plaintiffs cannot have it both ways:  they cannot simultaneously claim tolling based on the prior litigation and proceed with a new putative class action four years later.  Either the instant action should be dismissed as an improper class action succeeding *Bonet*, or Plaintiffs must

-23-

acknowledge that *Bonet* is not a live class action against FCA, in which case Plaintiffs may proceed only with respect to claims that are not time-barred.[24]

### C. Many of Plaintiffs' Claims Should Be Dismissed for Additional Reasons.

*Conceded Claims.* *First*, Plaintiffs expressly agree that 14 of their claims should be dismissed.[25] *Second*, by providing no response to FCA's arguments about the deficiency of another 51 claims, the Court should treat those arguments as conceded and dismiss the related claims.[26] *See, e.g.*, *Melendez*, 2014 WL 6682535, at *7 ("When a plaintiff files an opposition to a dispositive motion and addresses only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded." (quotation omitted)).

---

[24] Similarly, Plaintiffs' argument that their claims were tolled based on "various equitable doctrines," such as fraudulent concealment, is unavailing. (*See* Opp. at 102-103.) Plaintiffs fail to identify any examples of FCA's supposed "willful concealment of the cause of action using fraudulent means to achieve that concealment," *Raie* v. *Cheminova Inc.*, 336 F.3d 1278, 1282 n.1 (11th Cir. 2003), and have not explained how they were prevented from bringing claims against FCA until March 2018 (nor could they given that similar claims were filed against FCA back in October 2014). (*See* FCA MTD at 46).

[25] The following should therefore be dismissed with prejudice: the implied warranty claims under New York (**Count 36**) and North Carolina (**Count 38**) (*see* Opp. at 116 n.77); and the MMWA claims under the laws of Alabama, Arizona, Florida, Illinois, North Carolina, and Ohio (**Count 1**) (*id.*).

[26] Plaintiffs provide no response to FCA's arguments: regarding the claims of **Plaintiffs Campagnone and Cooper** (*see* FCA's MTD at 37 n.19; App. B at 1 n.1); that the economic loss rule bars the Mississippi Plaintiffs' fraud claim **(Count 4)** (*see* FCA's MTD at 47-48; App. F at 1); that 16 Plaintiffs' unjust enrichment claims fail for lack of privity because they have not pled any facts showing even a nominal affiliation with FCA **(Count 5)** (*see* FCA's MTD at 47 n.25; App. A at 2 n.6); that eight Plaintiffs' unjust enrichment claims are time-barred because the discovery rule does *not* apply under their states' laws **(Count 5)** (*see* FCA's MTD at 45-46; App. B at 3-5); that 12 Plaintiffs' unjust enrichment claims fail because they have not adequately alleged the unconscionability of their written warranties **(Count 5)** (*see* FCA's MTD at 46 n.24; App. A at 2 n.7); that the Ohio, Missouri, and Texas Plaintiffs' negligence claims are barred by the economic loss rule **(Count 6)** (*see* FCA's MTD at 47-48; App. F at 3); that the negligence claims of Plaintiffs Gibson (Georgia) and Moore (Texas) are time-barred because the discovery rule does *not* apply to Gibson's claim and Moore's claim is untimely in light of when his vehicle's recall was announced **(Count 6)** (*see* FCA MTD at 45-46; App. B at 5-6); and that the Pennsylvania UDTPA claim is barred by the economic-loss rule **(Count 40)** (*see* FCA MTD at 48 n.28; App. F at 4).

    ***Claims Contrary to Controlling Authority.***  For many of Plaintiffs' state law claims, Plaintiffs respond to FCA's arguments, which are supported by controlling caselaw, by citing to caselaw that is nonbinding and against the weight of authority.[27]  *See Bolen* v. *Ill. Nat. Ins. Co.*, 2012 WL 4856811, at \*6 (M.D. Fla. Aug. 28, 2012) ("Although there is non-binding authority to the contrary, this Court grants deference to the characterization given by state courts to claims under state law.").[28]

## CONCLUSION

    For the foregoing reasons and those set forth in FCA's opening brief, FCA respectfully requests that the Court dismiss the complaint with prejudice.

---

[27] Relatedly, while Plaintiffs have identified courts outside the Eleventh Circuit that have held that CAFA allows plaintiffs to plead around the 100-plaintiff requirement for class actions under the MMWA (*see* Opp. at 117), FCA cited caselaw from within the Eleventh Circuit that held that the MMWA "prohibits class actions thereunder if the number of named plaintiffs is less than one hundred." (*See* FCA MTD at 49 (quoting *DA Air Taxi LLC* v. *Diamond Aircraft Indus., Inc.*, 2009 WL 10668159, at \*3 (S.D. Fla. Nov. 5, 2009).)  Plaintiffs' MMWA class claims should thus be dismissed.

[28] Plaintiffs are wrong that the appendices submitted by FCA should be ignored because those appendices are entirely proper.  Far from raising "argument-by-appendix," as Plaintiffs falsely suggest in the Opposition (Opp. at 112-13), the appendices merely serve as an (i) organizational aid to track the arguments that apply to the 33 Plaintiffs' claims under 46 separate counts; and (ii) an alternative to page-long string cites to relevant caselaw.  Because FCA did not use its appendices to raise legal arguments that it did not raise in its brief, the authorities that Plaintiffs cite are inapposite.  Further, this Court has considered appendices submitted by Takata and Toyota during the prior litigation (*see* Dkts. 614-1; 622-1; 622-2; 622-3) and other courts have considered such aids in other dispositive motions.  *See, e.g.*, *Carrera* v. *UPS Supply Chain Sols., Inc.*, 2012 WL 12860910, at \*5 (S.D. Fla. Sept. 21, 2012).

Dated:  November 20, 2018

Respectfully submitted,

By: */s/ Douglas B. Brown*

**Douglas B. Brown**
dbrown@rumberger.com
Florida Bar No. 242527
**Scott M. Sarason**
ssarason@rumberger.com
Florida Bar No. 394718
**RUMBERGER, KIRK & CALDWELL**
Brickell City Tower, Suite 3000
80 Southwest 8th Street
Miami, FL 33130-3037
T: 407 839-4550
F: 407 835-2050

**Brian D. Glueckstein** (*pro hac vice*)
gluecksteinb@sullcrom.com
**Matthew J. Porpora** (*pro hac vice*)
porporam@sullcrom.com
**SULLIVAN & CROMWELL LLP**
125 Broad Street
New York, NY  10004
T: 212 558-4000
F: 212 558-3588

**Elizabeth A. Rose** (*pro hac vice*)
rosee@sullcrom.com
**SULLIVAN & CROMWELL LLP**
1700 New York Avenue, N.W.
Suite 700
Washington, D.C.  20006
T: 202 956-7500
F: 202 293-6330

*Counsel for FCA US LLC*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing was filed via

CM/ECF and served on all counsel of record via electronic notices generated by CM/ECF on

November 20, 2018.

/s/ *Douglas B. Brown*

# EXHIBIT E

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Miami Division

**MDL No. 2599**
**Master File No. 15-02599-MD-MORENO**
**Economic Loss No. 14-24009-CV-MORENO**

IN RE:

**TAKATA AIRBAG PRODUCTS**
**LIABILITY LITIGATION**
_____/

BUTLER AUTO RECYCLING,
INC., *et. al.*, *individually and on behalf*
*of all others similarly situated,*

          Plaintiffs,

   v.

HONDA MOTOR CO., LTD., *et. al.*,[1]

          Defendants.
_____/

    This multidistrict litigation consolidates allegations of economic loss and personal injury

related to airbags manufactured by former-defendants Takata Corporation and TK Holdings

(collectively, "Takata") and equipped in vehicles distributed by Defendant vehicle manufacturers.[2]

---

[1] Audi Aktiengesellschaft, Audi of America, LLC, BMW of North America, LLC, BMW Manufacturing Co., LLC, FCA US LLC, Ford Motor Company, General Motors Company, General Motors Holdings LLC, General Motors LLC, Honda Motor Co., Ltd., American Honda Motor Co., Inc., Honda R&D Co., Ltd, American Honda Motor Co., Inc., Mazda Motor Corporation, Mazda Motor of America, Inc., Mercedes-Benz USA, LLC, Daimler AG, Nissan Motor Co., Ltd., Nissan North America, Inc., Fuji Heavy Industries, Ltd. *n/k/a* Subaru of America, Inc., Toyota Motor Corporation, Toyota Motor Sales, U.S.A., Inc., Toyota Motor Engineering & Manufacturing North America, Inc., Volkswagen Aktiengesellschaft, Volkswagen Group of America.

[2] BMW of North America, LLC and BMW Manufacturing Co., LLC are collectively referred to

The allegations are that Defendants' vehicles were equipped with Takata airbags containing the chemical ammonium nitrate, which creates a small explosion to inflate the airbags during a crash. Plaintiffs, who are automotive part recycler companies that purchased vehicles manufactured by the Automotive Defendants that were equipped with Takata airbags containing the propellant ammonium nitrate, contend that when exposed to high heat and humidity, the explosion is much more forceful and can cause significant injuries and even death.

THIS CAUSE comes before the Court upon the Automotive Defendants' Motion to Dismiss Automotive Recycler Plaintiffs' First Amended Complaint **(D.E. 2976)**,[3] as well as the supplemental Motions to Dismiss filed by Mercedes-Benz **(D.E. 2984)**, Volkswagen **(D.E. 2985)**, and FCA US LLC **(D.E. 2987)**. New GM separately moves to dismiss for lack of personal jurisdiction all non-Florida Plaintiffs in footnote 5 of its Motion to Dismiss the consolidated consumer complaint **(D.E. 2981)**. Ford also separately moved to dismiss the *Sinclair* complaint **(D.E. 2887)**, but that motion was denied as moot in light of the settlement of consumer claims. Ford later requested that the Court defer resolution of Ford's motion to dismiss as to the Recyclers

---

as "BMW." FCA US LLC is referred to as "FCA." Ford Motor Company is referred to as "Ford." General Motors Company, General Motors Holdings LLC, and General Motors LLC are collectively referred to as "General Motors." Defendants Honda Motor Co., Ltd., American Honda Motor Co., Inc., and Honda R&D Co., Ltd, American Honda Motor Co., Inc. are collectively referred to as "Honda." Mazda Motor Corporation and Mazda Motor of America, Inc. are collectively referred to as "Mazda." Mercedes-Benz USA, LLC and Daimler AG are collectively referred to as "Mercedes-Benz." Nissan Motor Co., Ltd. and Nissan North America, Inc. are collectively referred to as "Nissan." Fuji Heavy Industries, Ltd. n/k/a Subaru of America, Inc. is referred to as "Subaru." Toyota Motor Corporation, Toyota Motor Sales, U.S.A., Inc., and Toyota Motor Engineering & Manufacturing North America, Inc. are collectively referred to as "Toyota." Volkswagen Aktiengesellschaft and Volkswagen Group of America are collectively referred to, along with Audi Aktiengesellschaft and Audi of America, LLC ("Audi"), as "Volkswagen."

[3] Ford adopts the Automotive Defendants' Motion to Dismiss. (*See* D.E. 3006.)

until the completion of briefing and argument on any motions to dismiss filed by the other Automotive Defendants, and the Court agreed to do so. Ford's Motion to Dismiss argues that the non-Florida Plaintiffs' claims should be dismissed for lack of personal jurisdiction. Together, the Motions seek to dismiss all claims asserted by the Automotive Recycler Plaintiffs in two separate complaints: *Sinclair, et. al. v. Ford Motor Company* ("*Sinclair*") **(D.E. 2670)** and *Butler Auto Recycling, Inc., et. al. v. Honda Motor Co., Ltd., et. al.* ("*Butler*") **(D.E. 2781).**[4]

THE COURT has thoroughly reviewed the *Butler* and *Sinclair* Complaints, the Automotive Defendants' Motions to Dismiss, the Plaintiffs' Responses in Opposition, the Defendants' Replies, and both parties' supplemental briefing pursuant to the Court's requests. The Court also heard oral argument from the parties on certain issues raised in the moving papers. For the reasons discussed below, the Court **GRANTS IN PART AND DENIES IN PART** the Automotive Defendants' Motions to Dismiss.

## BACKGROUND

The Plaintiffs are automotive part recycler companies that purchased vehicles manufactured by the Automotive Defendants that were equipped with Takata airbags containing the propellant ammonium nitrate. Like the Consumer Plaintiffs, the Recycler Plaintiffs allege ammonium nitrate is an innately volatile and unstable propellant that imposes an unreasonable risk of serious foreseeable harm or death upon drivers of the Automotive Defendants' vehicles. The

---

[4] Previously, the Automotive-Recycler Plaintiffs' claims against Ford were severed from the Consumer Plaintiffs' claims in the Fourth Amended Complaint (D.E. 2670), and then consolidated for pretrial purposes with the Automotive-Recycler Plaintiffs' claims against the remaining Defendants, *see* D.E. 2969. The claims remaining against Ford from the *Sinclair* Complaint are: Counts 1–2 (RICO); Counts 35–39 (various state consumer protection statutes); Count 40 (Lanham Act); and Count 41 (Fraudulent Concealment and Fraudulent Misrepresentation).

- 3 -

crux of the Recycler Plaintiffs' legal claims is that the Automotive Defendants knew or should have known of these defects prior to installing the Takata airbags in their vehicles, and that the Automotive Defendants concealed from, or failed to notify, the Recycler Plaintiffs and the general public of the full and complete nature of the defect, despite being aware of problems arising during the design and testing process, and through various rupture incidents and recalls. As a result, the Recycler Plaintiffs allege they overpaid for vehicles manufactured by the Automotive Defendants, and they are now unable to sell both the airbags and the vehicles in light of the defects.

The Recyclers filed their First Amended Consolidated Class complaint against Automotive Defendants in 2018 (the *Butler* complaint) **(D.E. 2781)**. The *Butler* Complaint, which largely mirrors the *Sinclair* Complaint, levels the following 27 claims against the remaining Automotive Defendants: violations of the RICO Act (Counts 1–20); violations of the Lanham Act (Count 21); common-law fraudulent concealment and fraudulent misrepresentation (Count 22); and violations of the consumer protection statutes in Florida, Georgia, North Carolina, Tennessee, and Texas (Counts 23–27).

The *Sinclair* Complaint asserts the following 9 claims against Ford: violations of the Racketeer Influenced and Corrupt Organizations ("RICO") Act (Counts 1–2); violations of consumer protection statutes in Florida, Georgia, North Carolina, Tennessee, and Texas (Counts 35–39); violations of the Lanham Act (Count 40); and common-law fraudulent concealment and fraudulent misrepresentation (Count 41).

While those complaints and concomitant motions to dismiss were pending, this Court entered several orders pertaining to the Consumer Track complaints against FCA, the Mercedes defendants, the VW defendants, the Audi defendants, and New GM. Those orders dismissed all RICO claims against those defendants, dismissed some state law statutory fraud claims, sustained

- 4 -

most common law fraud claims, and dismissed all direct file actions for lack of personal jurisdiction over the above Defendants in the Southern District of Florida. The Court also entirely dismissed Audi AG, Daimler AG, and Volkswagen AG due to a lack of personal jurisdiction in the Southern District of Florida.

The Court will now begin by addressing the personal jurisdiction challenges, and then proceed to addressing the substantive claims.

## ANALYSIS

### I.    Personal Jurisdiction

The personal jurisdiction issues here are complicated. Both transferor and directly-filed plaintiffs are at issue, as are post-transfer amended complaints which add both new claims and new defendants. There are also potential waivers of personal jurisdiction defenses. It is useful to begin with a brief history of the litigation.

#### A. Direct File Complaints vs. Transferor Complaints

In 2015 and 2016, various Automotive Recyclers filed complaints in district courts around the country including N.D. Fla., W.D. Va., W.D. Mo., M.D. Ga., W.D. Tex., E.D. Tenn., and S.D. Fla. The Defendants, at that time, included Honda, BMW, Mazda, Nissan, Subaru, Toyota, and Ford entities ("Legacy Defendants"). Those complaints were then transferred to this Court via the Joint Panel on Multidistrict Litigation.[5]

---

[5]Those complaints include: *Butler Auto Recycling v. Takata Corp.* (N.D. Fla. Mar. 25, 2016) (transferred to MDL on 4/12/2016*), Cunningham Bros. Auto Parts, LLC v. Takata Corp.* (W.D. Va. Mar. 29, 2016) (transferred to MDL on 4/12/2016), *Midway Auto Parts LLC v. Takata Corp.* (W.D. Mo.) (transferred to MDL on 3/10/2016), *Road-Tested Parts, Inc. v. Ford Motor Co.* (M.D. Ga. Feb. 22, 2018) (transferred to MDL on 3/7/2018), *Synder's Ltd. V. Takata Corp.* (W.D. Tex. Oct. 8, 2015) (transferred to MDL on 10/23/2015), *Triple D. Corp. v. Takata Corp.* (E.D. Tenn.

- 5 -

On March 14, 2018, however, Plaintiffs filed new complaints on the MDL docket—the *Puhalla*, *Boyd*, and *Whitaker* complaints—as well as new complaints on behalf of six of the seven transferor Plaintiffs. The March 14, 2018 "new complaints" or "amendments" (the parties dispute the terminology) added the "New Defendants"—i.e., FCA, New GM, Mercedes (both domestic and foreign entities), and Volkswagen (both domestic and foreign entities). They also added Racketeer Influenced and Corrupt Organization Act claims, which, if adequately pleaded, would give nationwide jurisdiction.

Then, on April 26, 2018, the Court ordered the Recycler Plaintiffs to "combin[e] all claims brought by all automotive recycler plaintiffs against all defendants *except* Ford Motor Company," and amend the Direct-File Complaints to exclude claims brought by Recycler Plaintiffs. **(D.E. 2651.)** In accordance with the Court's instructions, the Recycler Plaintiffs filed the Automotive Recyclers' First Amended Consolidated Class Action Complaint on the MDL docket on May 18, 2018. That day, the Plaintiffs also filed a complaint on behalf of Automotive Recycler Young's Auto Center and Salvage.[6] There is no question that Young's complaint was directly filed in the MDL, and thus the Defendants must be subject to personal jurisdiction in the state of Florida, as this Court has previously ruled. *In Re Takata Prod. Liab. Litig.*, 396 F. Supp. 3d 1101, 1168-69 (S.D. Fla. 2019).

---

Mar. 21, 2016) (transferred to MDL 4/1/2016), *Automotive Dismantlers and Recyclers Assoc. v. Am. Honda. Motor Co.* (S.D. Fla. Feb. 2, 2015) (transferred to MDL on 3/9/2015). The direct file complaint is by plaintiff Young's Auto Center and Salvage, LP.

[6] This complaint was only brought against the Legacy Defendants.

- 6 -

Now, Defendants argue that all Defendants who were added after the complaints were transferred to the Southern District of Florida, i.e. the New Defendants, are also "direct-file" Defendants because they were added once the complaints had already been transferred to the MDL Court. Defendants correctly point out that the Court has previously ruled direct-file defendants must be subject to personal jurisdiction in this District, and they argue the Court must dismiss those New Defendants because they are directly filed and are not subject to personal jurisdiction here. Plaintiffs respond that the New Defendants should be assessed according to the jurisdictional reach of the transferor courts, which is they argue is standard MDL practice.

Thus, the Court must decide how it will categorize these "New Defendants." There are two options. First, as **added by amendment** to the transferor complaints, and thus personal jurisdiction is evaluated under the rules of the transferor court. Or second, as defendants added by **new complaints that were directly filed** in the MDL, and thus personal jurisdiction is evaluated under the rules of this Court. This Court's prior orders are instructive here.

In a May 2019 Order on the Consumer track[7], the Court held that the "directly-filed" complaint was the legally operative one, but also held that, within the directly-filed consolidated complaint, the Transferor Plaintiffs and the Direct-File Plaintiffs **retain their separate legal identities**. Accordingly, the Court held that it was appropriate to sever the actions when pre-trial proceedings end and transfer the transferor actions back to the Court from which they came. *In Re Takata Prod. Liab. Litig.*, 379 F. Supp. 3d. 1333, 1343 (S.D. Fla. 2019). Clearly, the Court has previously maintained a legal distinction between directly filed and transferred actions even when

---

[7] There, Plaintiffs added new *plaintiffs* and new *claims* once in the MDL. Here new *defendants* were added.

- 7 -

in the same complaint.

The Plaintiffs, however, cite several other multidistrict litigations and the Multidistrict Litigation Manual to support the argument that best practice is to allow Plaintiffs to add new claims and defendants through amendment to complaints that have already been transferred to the MDL. Otherwise, the case would be transferred back and forth each time new defendants are added—this creates unnecessary delay and extra burden on the JPML when almost 40% of the federal courts' civil caseload is already MDL cases. This point about efficiency is well taken—but not entirely appropriate here. In the case cited by Plaintiffs, other courts deemed complaints to have retained their transferor identity when they were *amended* once already in the MDL. The New Defendants here were not added by *amendment*. On March 14, 2018, the Plaintiffs filed **NEW** complaints containing the New Defendants—specifically, the *Puhalla*, *Whitaker*, and *Boyd* complaints. Then, almost two months later, the Court ordered the Plaintiffs to separate Recyclers from Consumers, which resulted in the Recycler's First Amended Consolidated Class Action Complaint against both new and old Defendants. So, although all defendants still end up together in the First Amended Consolidated Class Complaint, Plaintiffs did not amend the old transferor complaints—they filed new complaints which were later consolidated with the transferor complaints.

The Court must be consistent with its prior orders, and thus it now holds that the New Defendants were directly filed. This holding is also consistent with Supreme Court precedent. As this Court noted in its previous order, the Supreme Court has recognized that "[c]ases consolidated for MDL pretrial proceedings ordinarily retain their *separate identities*." *Gelboim v. Bank of Am. Corp.*, 574 U.S. 405, 406 (2015) (emphasis added). Thus, when pre-trial proceedings conclude, the Court will need to sever each legally distinct action and remand it to the appropriate district.

- 8 -

The New Defendants have no such transferor Court available to them because the complaint in which they were first introduced to this Court was filed in the MDL. An MDL Court only has its own jurisdictional powers and those of any transferor court. Following a transfer, the transferee judge has all the jurisdiction and powers over pretrial proceedings in the actions transferred to him that the transferor judge would have had in the absence of transfer. *In re FMC Corp. Patent Litigation,* 422 F. Supp. 1163, 1165 (J.P.M.D.L.1976) (citations omitted). No transferor Court exists for the New Defendants, so they must be subject to the jurisdiction of this Court. As previously held, those Defendants are not. *In re Takata Airbag Prod. Liab. Litig.*, 396 F. Supp. 3d 1101, 1168–69 (S.D. Fla. 2019) (dismissing the New Defendants because their only jurisdictionally sufficient claims, the RICO claims, have been dismissed). Because the jurisdictional allegations here are materially identical to those in the consumer complaints and because the Court will dismiss RICO claims against the New Defendants later in this order, all claims against **Audi of America, LLC, Mercedes-Benz USA, LLC, and Volkswagen Group of America, LLC** are **dismissed** for lack of personal jurisdiction in the Southern District of Florida. The Court also **dismisses** all claims against **Daimler AG, Audi AG, and Volkswagen AG** for lack of personal jurisdiction.[8]

Finally, the Court dismisses all claims against FCA and New GM for lack of personal jurisdiction because neither the *Boyd* complaint against FCA, the *Whitaker* complaint against New GM, nor the seven transferor complaints were filed in districts where those companies are subject

---

[8] The Plaintiffs do not that these Defendants are not subject to personal jurisdiction in Florida. *See also In re Takata Airbag Prod. Liab. Litig.*, 396 F. Supp. 3d 1101 (S.D. Fla. 2019) (holding that these Defendants are not subject to specific personal jurisdiction in Florida).

- 9 -

to general personal jurisdiction.[9] Nor are these Defendants subject to specific personal jurisdiction in Florida. *In re Takata Airbag Prod. Liab. Litig.*, 396 F. Supp. 3d 1101, 1142 (S.D. Fla. 2019).

Notably, both non-Florida and Florida Plaintiffs' claims against New GM are dismissed. The Court realizes that New GM, in its relevant motions, only moved to dismiss the non-Florida Plaintiffs for lack of personal jurisdiction. Previously, on the Consumer track, the Court dismissed Florida Plaintiffs' claims against New GM where GM did not move for dismissal of Florida Plaintiffs. It now does so again here because New GM is not subject to personal jurisdiction in Florida.[10] This is true whether the claims belong to Floridians or non-Floridians. *In re Takata Airbag Prod. Liab. Litig.*, 396 F. Supp. 3d 1101, 1142-43. (S.D. Fla. 2019).

The Court is aware of its option to allow Plaintiffs to amend their complaint. However, after many years and much expense, it does not appear that Plaintiffs can make a case of specific jurisdiction in Florida so the opportunity to amend would be futile.

### B. Waiver

The Legacy Defendants also make a personal jurisdiction argument. They argue that direct-filed claims must be dismissed if Legacy Defendants are not subject to personal jurisdiction in Florida.[11] Of those Defendants, only Ford separately moved to dismiss for lack of personal

---

[9] FCA and New GM are subject to general jurisdiction in Michigan. The Consumer Plaintiffs filed transferor complaints in the Eastern District of Michigan, but the Recycler Plaintiffs did not.

[10] Readers of this Court's (numerous) *Takata* opinions will recognize that the Court relies upon the Eleventh Circuit's opinion in *Courboin v. Scott*, 596 F. App'x 729 (11th Cir. 2014) to support the fact that the Court can *sua sponte* dismiss claims against non-moving Defendants when they are similarly situated to moving Defendants. Some Legacy Defendants later rely on this same case to persuade the Court to overlook a complete waiver of personal jurisdiction defenses. The Court does not find *Courboin* applicable in that context and explains why *infra*.

[11] The only direct-file Plaintiff that makes claims against the Legacy Defendants is Young's Auto

- 10 -

jurisdiction. But Ford also makes clear that it has no opposition to the Court exercising jurisdiction over the Recycler Plaintiffs' claims that were transferred into the MDL from other districts. It writes, "Plaintiffs correctly note that those Automotive-Recycler Plaintiffs' claims were transferred into the MDL from various transferor courts. . . . Ford *withdraws* its motion to dismiss for lack of personal jurisdiction as to those Automotive-Recycler Plaintiffs' claims. Thus, Ford's motion to dismiss for lack of personal jurisdiction is directed to the non-Florida *Consumer* Plaintiffs and Automotive-Recycler Plaintiff Young's Auto Center and Salvage, LP." D.E. 2911 at n.1 (emphasis added). Young's Auto Center is a North Carolina-based Plaintiff. Thus, this Southern District of Florida Court must have specific personal jurisdiction over Ford with respect to a North Carolinian's claims. This Court has already held that it would exercise pendent personal jurisdiction over claims by non-Florida Plaintiffs against Ford. D.E. 1417 at n.3.

Ford counters that this Court's pendent personal jurisdiction holding was pre-*Bristol-Myers Squibb*, a 2017 Supreme Court decision that held in order for a state court to exercise personal jurisdiction over non-resident defendant, there must be a link between the forum and the specific plaintiff's claim. *Bristol-Myers Squibb Co. v. Superior Court of California, San Francisco Cty.*, 137 S. Ct. 1773 (2017). It would not suffice that *some* plaintiffs' claims were linked to the forum, even if all plaintiffs had the same cause of action; each plaintiff needed to have their own link. *Id.* Now, Ford argues, this Court cannot exercise jurisdiction over Young's claims in conjunction with claims over which Ford has already admitted this Court has jurisdiction over because Young's is a North Carolina entity whose claims have no link to this forum.

---

Center and Salvage LP.

But this argument ignores this Court's prior holdings on the applicability of *Brisol-Myers*

*Squibb* to federal court, putative class actions, and multi-district litigations. Other automotive

defendants made this identical argument, and the Court rejected it then.

> Mercedes and Volkswagen argue *Bristol-Myers* precludes the Court from exercising
> pendent personal jurisdiction over the non-Florida putative class members' claims. (D.E.
> 2988 at 45 n.19.) But this argument flies in the face of several rulings that *Bristol-Myers*
> does not *per se* preclude federal courts from exercising pendent personal jurisdiction over
> claims advanced by nonresident plaintiffs. *See, e.g., Sloan v. General Motors LLC*, 287 F.
> Supp. 3d 840, 862 (N.D. Cal. 2018) (exercising pendent personal jurisdiction over claims
> advanced by nonresident plaintiffs in light of the "absence of interstate sovereignty
> concerns present in *Bristol-Myers*"); *In re Packaged Seafood Prod. Antitrust Litig.*, 338 F.
> Supp. 3d 1118, 1172–73 (S.D. Cal. 2018) (rejecting argument that pendent personal
> jurisdiction doctrine did not survive *Bristol-Myers*); *Allen v. ConAgra Foods, Inc.*, 2018
> WL 6460451, at *4 (N.D. Cal. Dec. 10, 2018) (exercising pendent personal jurisdiction
> over claims brought by nonresident plaintiffs and noting *Bristol-Myers* did not apply
> because "the Supreme Court could not have intended to severely narrow the forum choices
> available to *class* action plaintiffs when it decided a case involving a *mass* action")
> (emphasis in original).

*In re Takata Airbag Prod. Liab. Litig.*, 396 F. Supp. 3d 1101, 1136 (S.D. Fla. 2019). Indeed, the

*Bristol-Myers* Court made it abundantly clear that "our decision concerns the due process limits

on the exercise of specific jurisdiction by a State, we leave open the question whether the Fifth

Amendment imposes the same restrictions on the exercise of personal jurisdiction by a federal

court." *Bristol-Myers*, at 1781, 83-84. Thus, *Bristol-Myers* does not limit this MDL Court's ability

to exercise supplemental jurisdiction over non-Florida Plaintiffs' claims against Ford—the Court

declines to dismiss Young's Auto Parts complaint against Ford, even though it was directly filed.

The rest of the Defendants made Rule 12(b) motions without including objections to

personal jurisdiction. "[T]he requirement of personal jurisdiction represents first of all an

individual right, it can, like other such rights, be waived." *Ins. Corp. of Ireland v. Compagnie des

Bauxites de Guinee*, 456 U.S. 694, 703 (1982). By the plain text of Rule 12(h)(1)(B)(i), a

Defendant waives some Rule 12(b) defenses (including personal jurisdiction) when it does not

- 12 -

raise them in a Rule 12 motion. That is exactly what the Legacy Defendants did here in their motion to dismiss at D.E. 2976. *Palmer v. Braun*, 376 F.3d 1254, 1259 (11th Cir. 2004) ("It is well-settled that lack of personal jurisdiction is a waivable defect, and that a defendant waives any objection to the district court's jurisdiction over his person by not objecting to it in a responsive pleading or a Fed. R. Civ. P. 12 motion."); *Posner v. Essex Ins. Co.*, 178 F.3d 1209, 1214 n.4 (11th Cir. 1999) ("Essex did not move for dismissal on the grounds that the Florida courts lacked personal jurisdiction over it. By omitting this defense from its motion, Essex waived any challenge it could have asserted to the court's exercise of personal jurisdiction over it.").

Defendants cite *Courboin v. Scott*, 596 F. App'x 729 (11th Cir. 2014), an unpublished Eleventh Circuit opinion for the proposition that "[a] district court may on its own motion dismiss an action as to defendants who have not moved to dismiss where such defendants are in a position similar to that of moving defendants or where claims against such defendants are integrally related." *Courboin*, 596 F. App'x at 735. As Defendants note, this Court previously cited *Courboin* when it *sua sponte* dismissed Florida Consumer Plaintiffs' claims against New GM for lack of personal jurisdiction, even though New GM had only moved to dismiss the non-Florida Consumer Plaintiffs' claims on that basis.[12] *In re Takata Airbag Prod. Liab. Litig.*, 396 F. Supp. 3d 1101, 1143 n.11 (S.D. Fla. 2019).

---

[12] The Court is dismissing all claims against New GM and not dismissing all claims against Ford, even though both parties only made partial motions to dismiss for lack of personal jurisdiction, because of the unique features of this long, sprawling litigation. The Court was able to exercise jurisdiction over Young's claims against Ford because that jurisdiction was supplemental to the jurisdiction the Court was *already* exercising over Ford pursuant to Ford's acceptance of this Court's jurisdiction over the transferor Recycler Plaintiffs' claims against it. On the other hand, all Recycler Plaintiffs' complaints against New GM were *directly filed*, which gave this Court no opportunity to exercise jurisdiction in the first place. To exercise jurisdiction over the Florida Plaintiffs' claims against New GM would raise the question—supplemental to what?

- 13 -

However, there is vast difference between dismissing additional claims against the same Defendant after the Defendant rightly challenged the Court's power over said Defendant and dismissing *all* claims against a Defendant that did not timely challenge the Court's power at all. In *Courboin*, the Eleventh Circuit specifically based its holding that a district court may, on its own, dismiss an action as to defendants who have not moved to dismiss where such defendants are in a position similar to that of moving defendants on the promise that the district court will do so "fairly"—usually by providing an opportunity for the other party to respond. *Courboin v. Scott*, 596 F. App'x 729, 735 (11th Cir. 2014). In the Court's earlier order citing *Courboin*, Plaintiffs had the opportunity to respond to the argument that New GM was subject to the Court's jurisdiction because New GM moved to dismiss for lack of personal jurisdiction with respect to *all* but the Florida Plaintiffs' claims. Here, Plaintiffs had no such opportunity. It is also worth noting that in *Courboin*, Defendants there had yet to respond *at all* when the Court made its *sua sponte* dismissal. By contrast, these parties have engaged in three years of litigation.[13]

Lastly, in a precedential, albeit older than *Courboin*, opinion, the Eleventh Circuit considered whether a court even has the power to, on its own initiative, dismiss an action based on a waived personal jurisdiction defense. It concluded that a court does not have that power because waiver "confer[s] personal jurisdiction on the Court by consent." *Pardazi v. Cullman Med. Ctr.*, 896 F.2d 1313, 1317 (11th Cir. 1990). Thus, the Court finds that the Legacy Defendants waived their personal jurisdiction defense against the direct-filed claims and that Young's claims may

---

[13] Additionally, it is not for the Court to speculate as to why these Defendants chose not to challenge personal jurisdiction at all at the appropriate stage of the litigation. For example, some Defendants may choose to intentionally waive their personal jurisdiction objections to reap the benefits of the global peace that comes with a settlement during an MDL.

- 14 -

proceed to the extent that they state a claim for relief.

To recap, all claims against Audi AG, Daimler AG, Volkswagen AG, Audi of America LLC, Mercedes-Benz USA LLC, Volkswagen Group of America LLC, FCA US LLC, and New GM.

## II. Racketeer Influenced and Corrupt Organizations Act (RICO) – Counts 3, 5, 7, 9, 11, 13, 15, 17, and 19 – Violation of 18 U.S.C. § 1962(c)

Recycler Plaintiffs bring RICO claims, both § 1962(c) and (d), against all automaker defendants. The Court will discuss the § 1962(c) claims first, then § 1962(d), but will reserve discussion of the claims against Honda until after each of those sections.

To state a plausible Section 1962(c) claim, Plaintiffs must allege that Defendants: (1) engaged in conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. *Williams v. Mohawk Indus., Inc.*, 465 F.3d 1277, 1282 (11th Cir. 2006), *abrogated on other grounds by Ray v. Spirit Airlines, Inc.*, 836 F.3d 1340, 1349 (11th Cir. 2016). Racketeering activity is defined as any act indictable under any of the statutory provisions listed in 18 U.S.C. Section 1961(1), which includes mail and wire fraud in violation of 18 U.S.C. Sections 1341 and 1343. *See Kemp v. Am. Tel. & Tel. Co.*, 393 F.3d 1354, 1359 (11th Cir. 2004). A "pattern of racketeering activity" requires the commission of at least two such acts within a ten-year period. *See* 18 U.S.C. § 1961(5); *Rajput v. City Trading, LLC*, 476 F. App'x 177, 180 (11th Cir. 2012).

Plaintiffs' pattern of racketeering claims are predicated on mail and wire fraud, and thus "must comply not only with the plausibility criteria articulated in *Twombly* and *Iqbal*, but also with Fed. R. Civ. P. 9(b)'s heightened pleading standard, which requires that '[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.'" *Amer. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1291 (11th Cir. 2010) (quoting *Ambrosia Coal*

- 15 -

& *Constr. Co. v. Pages Morales*, 482 F.3d 1309, 1316 n.10 (11th Cir. 2007)). "Given the routine use of mail and wire communications in business operations ...[,] 'RICO claims premised on mail or wire fraud must be particularly scrutinized because of the relative ease with which a plaintiff may mold a RICO pattern from allegations that, upon closer scrutiny, do not support it.'" *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 489 (2d Cir. 2014) (quoting *Efron v. Embassy Suites (Puerto Rico), Inc.*, 223 F.3d 12, 20 (1st Cir. 2000)).

To comply with Rule 9(b), Plaintiffs must allege: "(1) the precise statements, documents, or misrepresentations made; (2) the time, place, and person responsible for the statement; (3) the content and manner in which these statements misled the Plaintiffs; and (4) what the defendants gained by the alleged fraud." *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1380–81 (11th Cir. 1997) (*per curiam*) (citation omitted). In addition, the plaintiff must allege particular facts with respect to each defendant's participation in the fraud. *Id.* at 1381. In other words, a plaintiff is required to set forth specific allegations as to each defendant that will fulfill the "who, what, when, where, and how" pertaining to the underlying fraud. *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1262 (11th Cir. 2006) (citation omitted). At bottom, the purpose of the particularity rule is to alert defendants to their precise misconduct and protect them against baseless charges of fraudulent behavior. *See Durham v. Bus. Mgmt. Assocs.*, 847 F.2d 1505, 1511 (11th Cir. 1988) (citing *Seville Indus. Mach. Corp. v. Southmost Mach. Corp.*, 742 F.2d 786, 791 (3d Cir. 1984)).

In June 2019, this Court dismissed substantive RICO claims as well as RICO conspiracy claims brought by Consumer Plaintiffs against defendants FCA, Mercedes, Volkswagen, Audi, and General Motors. *In re Takata Airbag Prod. Liab. Litig.*, 396 F. Supp. 3d 1101 (2019). Those claims were dismissed for insufficiently alleging a pattern of racketeering activity based on mail

and wire fraud. The Court held that the consumer plaintiffs' allegations of mail and wire fraud did not comply with Rule 9(b). "Plaintiffs fail to plead with sufficient particularity that any of the Defendants engaged in a pattern of racketeering activity premised on mail and wire fraud. Far from 'precise,' Plaintiffs' allegations describe in *general* terms the contents of the Defendants' internal communications, and the Defendants' communications with Takata, government authorities, and the public." *In re Takata Airbag Prod. Liab. Litig.*, 396 F. Supp. 3d 1101, 1159 (S.D. Fla. 2019). Although, as here, the Plaintiffs sufficiently alleged Defendants' knowledge of issues with Takata airbags, the allegations "provide[d] no basis in fact upon which the Court could conclude that any specific act of any specific Defendant[ ] is indictable for mail or wire fraud," *Id.* (citing *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1381 (11th Cir. 1997)). The Court then ordered supplemental briefing as to why the Recycler Plaintiffs' RICO allegations, which are materially similar to the Consumer Plaintiffs', should not meet the same fate.

The Recycler Plaintiffs' allegations against almost every automaker defendant (except for Honda) are similar to each other automaker defendant. The Recycler Plaintiffs allege that the automakers knew in some form that Takata's airbags had issues, communicated internally, with Takata, and with regulators about those issues, but failed to disclose their concerns to the public. The Plaintiffs then assert, numerous times, that these communications and failures to disclose were made "in order to conceal the scope and nature of the [defect]." In the previous RICO order, the Court already discounted this style of pleading as "conclusory" and "susceptible to numerous explanations." *Id.* at 1160. Indeed, the RICO allegations that the Court has already dismissed were even more specific than the ones at issue here. With the exception of the allegations against Honda, Mercedes, and GM, Plaintiffs do not specifically identify a single one of Defendants' employees nor do they identify exactly what the communications said (beyond their general subject matter).

Of course, the allegations against Mercedes and GM, which are more specific than those remaining claims, have already been dismissed. *Compare* D.E. 3915-1 ¶¶ 568-589 (GM) *with* D.E. 3915-1 ¶¶ 602-623 (Nissan).

In their supplemental briefing, Recycler Plaintiffs merely restate a summary version of their RICO allegations. They do not attempt to distinguish the RICO allegations against BMW, Ford, Mazda, Nissan, Subaru, and Toyota from those the Court has already dismissed. Nor can they. In the BMW allegations, for instance, Plaintiffs give no details as to *who* at BMW made the communications, nor *what* those communications said in detail. All of the allegations boil down to 1) Defendants had knowledge of occasional inflator defects and 2) Defendants submitted regulatory filings and made representations regarding safety to the public. Of course Plaintiffs allege that these filings and representations were misleading, but Plaintiffs do not plead the contents nor the source of these representations, thereby making it difficult for the Court to determine whether the representations were actually false and doubly difficult for the Court to determine whether the representations were part of a larger scheme. This Court "cannot infer a scheme-driven deception from a complaint that provides no details of fraud or conspiracy." *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1293 (11th Cir. 2010). As this Court as previously held,

> Plaintiffs' allegations fail to explain how the "deviations from" or "failure to meet" the USCAR specifications had any connection with vehicle safety or nationwide recalls based on the inflator defect, let alone how those alleged deviations or failures constitute mail or wire fraud. And Plaintiffs' allegations about purchases and shipments of inflators seem to assume these communications are fraud based, but they do not allege additional details explaining how these otherwise routine business communications constitute fraud.

*In re Takata Airbag Prod. Liab. Litig.*, 396 F. Supp. 3d 1101, 1159–60 (S.D. Fla. 2019). The

- 18 -

Recycler Plaintiffs' allegations suffer from the same deficiencies. The business communications described by Plaintiffs, even if perhaps overly motivated by profit with too little regard for safety, are not described with sufficient particularity nor do they plausibly show that Defendants devised a scheme to defraud. The § 1962(c) claims against **BMW, Ford, Mazda, Nissan, Subaru, and Toyota** are therefore **dismissed**.

### III.   Racketeer Influenced and Corrupt Organizations Act (RICO) – Counts 4, 6, 8, 10, 12, 14, 16, 18, 20 – Violation of 18 U.S.C. § 1962(d)

The § 1962(d) against these Defendants suffer from the same defects. While it is possible to make out a violation of § 1962(d) without a § 1962(c) violation, as this Court has previously held, there must be *additional* allegations. "[W]where a plaintiff fails to state a RICO claim and the conspiracy count does not contain additional allegations, [then] the conspiracy claim necessarily fails." *In re Takata Airbag Prod. Liab. Litig.*, 396 F. Supp. 3d 1101, 1164 (S.D. Fla. 2019) (citing *Rogers v. Nacchio*, 241 F. App'x 602, 609 (11th Cir. 2007)).

"The essence of a RICO conspiracy claim is that each defendant has *agreed* to participate in the conduct of an enterprise's illegal activities." *Solomon v. Blue Cross & Blue Shield Ass'n*, 574 F. Supp. 2d 1288, 1291 (S.D. Fla. 2008) (citing 18 U.S.C. § 1962(d)) (emphasis in original). This Court has previously held that "proof of the agreement is at the heart of a conspiracy claim." *Id.* (quoting *In re Managed Care Litig.*, 430 F. Supp. 2d 1336, 1345 (S.D. Fla. 2006)). Plaintiffs can establish a RICO conspiracy claim by showing a Defendant: (1) agreed to the overall objective of the conspiracy; or (2) agreed to commit two predicate acts. *Am. Dental Ass'n*, 605 F.3d at 1293 (quoting *Republic of Panama*, 119 F.3d at 950). A RICO agreement need not be established by direct evidence; it may be inferred from the conduct of the participants. *Id.*

- 19 -

The allegations against the remaining Defendants, at best, allege knowledge that Takata airbags installed in their vehicles could be defective. And the they allege that Takata knew this too. For example, "Takata was aware of faulty welding and rust in the inflators produced at its plant in Monclova, Mexico, which Takata engineers believed could cause the inflators to fail" and "Mazda . . . could have predicted [this]." D.E. 3915-1 ¶¶ 695(a)-(c). But what the allegations against Mazda (and the other Defendants) do not allege is that the parties jointly discussed their knowledge and mutually agreed to intentionally conceal it.

The already-dismissed § 1962(d) allegations against Mercedes are closest to plausibly alleging a violation. There, Plaintiffs allege that Mercedes "modified its own specifications for the Takata inflators so that they would be easier for Takata to meet, by agreeing to deviations in order to get the Inflators approved for installation." Plaintiffs also allege that Mercedes and Takata: "decided together to forego key performance requirements and resolve testing failures that they knew should have rendered the Defective Inflators unfit for approval"; "agreed to ignore tests related to ballistic performance at hot temperatures"; and later "worked together to try to convince NHTSA to reduce the scope of the recall." *In re Takata Airbag Prod. Liab. Litig.*, 396 F. Supp. 3d 1101, 1166 (S.D. Fla. 2019) (quoting the consumer complaint). Again, however, none of those allegations included a single date or identified a single person acting on behalf of Mercedes or Takata. As this Court held then, this failure does not enable the Court to "juxtapose communications between [Mercedes] and Takata with a timeline of Takata's alleged conspiratorial conduct to implicate that [Mercedes] acted in agreement with the objectives of the alleged conspiracy." *Id.* at 1167. The allegations against the remaining Defendants not addressed in the consumer order do not present nearly such a close call. Thus, the § 1962(d) claims against all

- 20 -

Defendants except Honda (discussed below) are **dismissed**.

IV. **Racketeer Influenced and Corrupt Organizations Act (RICO) – Counts 1 and 2–
Violation of 18 U.S.C. § 1962(c) and (d)**

A. Sufficiency of the Allegations

Now the Court turns to the RICO allegations against Honda. The § 1962(c) allegations against Honda narrowly, but plausibly, state a claim. This Court has not previously ruled on the plausibility of a § 1962(c) claim against Honda—the Consumer Plaintiffs only brought (d) claims against Honda, which the Court held presented a close question, yet were enough to survive a motion to dismiss. *Id.* at 1163. Now considering the § 1962(c) allegations against Honda for the first time, the Court notes they suffer from some of the same defects described above—Plaintiffs do not specifically identify the employees that made the communications at issue and many of the allegations focus on Honda's knowledge of Takata's defects rather than the particulars of how Honda devised and executed its scheme to defraud the Recyclers. However, in the general allegations section of the complaint, Plaintiffs do allege a 2005 Honda email reports that Honda and Takata engineers in Japan agreed to hold a meeting about inflators that would "be 'secret' to the American associate(s)" in order to "make it an honest talk," and agreed to discuss "material that is modified to an innocuous version" that "delete[d]" certain data. **D.E. 3915-1 at ¶ 246.** Plaintiffs also allege that Honda knew Takata was lying about the inflator ruptures as early as 2012, but continued to use them until 2016. **Id. at ¶ 260.** Honda also conducted joint testing with Takata and communicated to regulators **together**. **Id. at ¶ 515(b)-(c).** To willingly participate in Takata's fraud is to adopt it as Honda's own. This behavior is distinct from the other automakers' perhaps improperly high-risk tolerance toward Takata's inflators or their own misleading of their customers. For that reason, as well as a closer business relationship between Takata and Honda,

- 21 -

the Plaintiffs' § 1962(c) and (d) allegations against Honda meet Rule 9(b)'s standard and are more plausible than those against the other automotive Defendants.

### B. Proximate Causation

However, the Defendants also argue that Plaintiffs cannot meet RICO's heightened "direct causation" standard. *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006) ("When a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries."). Above, the Court did not need to discuss 18 U.S.C. § 1964(c), the statutory requirement that a Plaintiff be injured "by reason of" the § 1962 violation in order to recover, because it found that Plaintiffs did not sufficiently allege a § 1962(c) or (d) violation against those Defendants.

The Supreme Court has interpreted this requirement as more than mere factual causation; it is a "demand for some direct relation between the injury asserted and the injurious conduct alleged." *Holmes v. Securities Investor Protection Corporation,* 503 U.S. 258, 268 (1992). A link that is "too remote," "purely contingent," or "indirect" is insufficient. *Corcel Corp. v. Ferguson Enterprises, Inc.*, 551 F. App'x 571, 576 (11th Cir. 2014) (quoting *Holmes*). In so interpreting, the Supreme Court relied on the legislative history of the RICO statute, which revealed that "Congress modeled § 1964(c) on the civil-action provision of the federal antitrust laws, § 4 of the Clayton Act." *Id.*, at 267; *see also Corcel Corp.*, 551 F. App'x 571 (11th Cir. 2014). In addition to analogizing to the antitrust laws, the Supreme Court has also provided motivating principles by which to evaluate proximate cause in RICO cases. They include (1) "the difficulty that can arise when a court attempts to ascertain the damages caused by some remote action"; (2) "the speculative nature of the proceedings that would follow if [the plaintiff] were permitted to maintain

its claim"; (3) whether the alleged harm "could have resulted from factors other than [the plaintiff's] alleged acts of fraud"; (4) "any appreciable risk of duplicative recoveries"; and (5) whether "the immediate victims of [the] alleged RICO violation can be expected to vindicate the laws by pursuing their own claims." *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 458-60 (2006).

The Supreme Court has been careful to limit the availability of RICO damages for Plaintiffs more than one "step" from the Defendants' conduct. In *Hemi Grp., LLC v. City of New York, N.Y.*, Chief Justice Roberts explained that the general tendency of the law, with respect to damages, is not to "go beyond the first step," and that the "general tendency of the law applies with full force to proximate cause inquiries under RICO." 559 U.S. 1, 10 (2010). In that case, the City of New York claimed it was harmed by Hemi Group's failure to submit tax information to the New York State. The failure to report to the State (step one) led to the City being unable to determine how much back tax to collect from the Defendant, Hemi Group (step two). The Court held that this theory of causation was too attenuated to meet "RICO's direct relationship requirement." *Id.* A Southern District of Florida Court applied *Hemi Grp.* to deny a RICO recovery in an almost identical scenario to which the Recycler Plaintiffs find themselves. In *Koch v. Royal Wine Merchants, Ltd.*, Plaintiff brought RICO claims (among others) against Defendant wine importers and sellers for importing and selling counterfeit high-end wines. 907 F. Supp. 2d 1332 (S.D. Fla. 2012) (Hurley, J.). The catch, relevant here, is that Plaintiff did not buy the wines from Defendants. He bought from third parties who had relied on Defendants' misrepresentations, and alleged he, too, relied on those misrepresentations. The Court went on to consider some of the factors described above and held 1) it was difficult to apportion damages between Defendants' conduct and independent factors, such as the price of wine set by the intermediate sellers, 2) there was a

- 23 -

risk of multiple recoveries because the original buyers already may have brought claims against Defendants for those same misrepresentations, and 3) directly injured victims could be counted on to vindicate the law and deter misconduct because there were more of them and they suffered greater harms. *Id.* at 1343-44. As a result of this analysis, the Court dismissed the RICO claims.

Applying these principles to the Recyclers' claims, the Court holds that Plaintiffs ask the Court to "go beyond the first step" of causal analysis and run afoul of the motivating principles the Supreme Court has set forth for RICO proximate cause. The direct victims of the Defendants' actions are the consumers who bought cars from Defendants and their dealerships. In brief, they overpaid for certain vehicles because Defendants concealed the airbag defect. It is true that Recyclers were then in turn harmed by overpaying for vehicles on the secondary or tertiary market, but their harm is derivative of the Consumers' harm. Because Consumers overpaid, the price the Recyclers paid was also artificially inflated. The Consumer Plaintiffs here are akin to the buyers who purchased wine directly from the Defendants in *Koch*, while the Recyclers are akin to the Plaintiff who could not recover, even though he relied on the Defendants' representations, because the causal chain was attenuated by the actions of the buyer. In *Koch*, those actions included an independently set price and potential quality representations by parties other than the Defendant. Here, it is difficult to say how much of the Plaintiffs' harm came from the Defendants' misrepresentations versus resale prices set in the secondary market. And there is clearly a risk of multiple recoveries—Consumer lawsuits are pending before this very Court. This also demonstrates that "direct victims" are more than capable of vindicating the law.

Additionally, the three Courts of Appeals that have addressed the issue have held that indirect purchasers cannot sue under RICO. *Trollinger v. Tyson Foods, Inc.*, 370 F.3d 602, 616

- 24 -

(6th Cir. 2004) ("[I]ndirect purchasers lack standing under RICO ... to sue for overcharges passed

on to them by middlemen."); *McCarthy v. Recordex Serv., Inc.*, 80 F.3d 842, 855 (3d Cir. 1996)

("[A]ntitrust standing principles apply equally to allegations of RICO violations."); *Carter v.*

*Berger*, 777 F.2d 1173, 1177 (7th Cir. 1985) ("The *Hanover Shoe-Illinois Brick* rule promotes

enforcement and therefore applies to RICO, too."). These holdings were based on the Supreme

Court's so-called "direct purchaser" rule first laid out in *Ill. Brick Co. v. Illinois.*, 431 U.S. 720

(1977). There, the Court held that an indirect-purchaser cannot use a pass-on theory to recover

against an antitrust violator. The Supreme Court warned that allowing indirect purchasers to

recover under such a theory would "transform treble-damages actions into massive multiparty

litigations involving many levels of distribution and including large classes of ultimate consumers

remote from the defendant." *Id.*

Although the Eleventh Circuit has not adopted this theory in the RICO context, it has made

clear that "Congress modeled § 1964(c) on the civil-action provision of the federal anti-trust laws."

*Corcel Corp. v. Ferguson Enterprises, Inc.*, 551 F. App'x 571, 576 (11th Cir. 2014). It logically

follows that limits the Supreme Court has placed on anti-trust standing, namely the direct purchaser

rule, would apply in the RICO context as well. Recycler Plaintiffs are not direct purchasers. They

do not allege that they bought class vehicles from Defendants *or* their dealerships. *Cf. Apple v.*

*Pepper*, 139 S. Ct. 1514 (2019) (holding that consumers who purchased apps whose prices were

set by third parties can sue Apple under the anti-trust laws because consumers payments went

directly to Apple).

It is true that this Court has previously sustained Plaintiffs' § 1962(d) claims against Honda.

*In re: Takata Airbag Prod. Liab. Litig.*, No. 14-24009-CV, 2015 WL 9987659, at *1 (S.D. Fla.

- 25 -

Dec. 2, 2015). However, that order was exceedingly early in the litigation and thus could not provide, at that time, a deeper analysis. Upon that deeper analysis and with the benefit of several amended complaints—most importantly, including amendments that separated Consumer and Recycler Plaintiffs—the Court's thinking is now better informed. Thus, after close consideration of the Supreme Court's and Eleventh Circuit's guidance concerning the interpretation of "by reason of" in § 1964(c), the animating principles behind the direct-purchaser rule, and the RICO statute's similarity to the anti-trust laws, the Court holds Plaintiffs are unable to meet § 1964(c)'s strict causation requirement. The remaining RICO allegations against **Honda** are **dismissed**.

## V.    Lanham Act – Count 21 – Violation of 15 U.S.C. §§ 1501, *et. seq.*

All Plaintiffs bring claims for violation of the Lanham Act against Honda, BMW, Mazda, Nissan, Subaru, and Toyota;  Plaintiffs Butler, Knox, Midway, Synder's, and Weaver bring them against New Chrysler; Plaintiffs Butler, Knox, Synder's, and Weaver bring them against the GM Defendants; and Plaintiffs Butler, Cunningham, Knox, Midway, Snyder's, and Weaver bring them against Mercedes and the Volkswagen Defendants. Each group of Plaintiffs brings this claim individually and on behalf of the Nationwide Automotive Recycler Class. Due to the personal jurisdiction holdings above, only the claims against Honda, BMW, Mazda, Nissan, Subaru, and Toyota remain.

To establish a false advertising claim under Section 1125(a), a plaintiff must allege that (1) the commercial advertisement was false or misleading; (2) the advertisement deceived, or had the capacity to deceive, consumers; (3) the deception had a material effect on purchasing decisions; (4) the misrepresented product or service affects interstate commerce; and (5) the plaintiff has been—or is likely to be—injured as a result of the false advertising. *Johnson & Johnson Vision*

*Care, Inc. v. 1-800 Contacts, Inc.*, 299 F.3d 1242, 1247 (11th Cir. 2002). The allegations must also demonstrate plaintiff's standing under *Lexmark Int'l Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 133-34 (2014).

First, the Court addresses the statutory standing issue because it is dispositive. In *Lexmark*, the Supreme Court held that a Plaintiff must satisfy two prerequisites to have statutory standing under the Lanham Act: First, they must show that they are within the statute's zone of interests which the Court defined as "an injury to a commercial interest in reputation or sales." A mere disappointed **consumer** suffers Article III injury but does not have a cause of action under the Lanham Act. *Id.* at 132. Second, they must allege injuries "proximately caused by violations of the statute." *Id.* at 131-32. The crux of the Recyclers' claim is that Defendants' false advertising artificially inflated the price which Recyclers were willing to pay for cars because the Recyclers base their purchase price on what consumers are willing to pay, and consumers were duped by the false advertising. When the truth came out, Recyclers were left with used cars they paid too much for.

A. Zone of Interests Analysis:

The Lanham Act is, at its heart, a proscription on unfair competition. The Recycler Plaintiffs are not competitors of Takata, nor are they competitors of Honda, BMW, Mazda, Ford, etc. No consumer is faced with the decision of buying a new (or even used) Honda Civic or instead buying a tire and an airbag from one of the Plaintiffs. While the Supreme Court rejected the requirement that the challenged speech be made by a competitor, it is clear from the text of the Act itself that Congress' concern with respect to false advertising cases was protecting persons engaged in commerce against unfair competition. 15 U.S.C. § 1127 ("The intent of this Chapter is . . . to protect persons engaged in such commerce from unfair competition . . ."). Although hard to define,

- 27 -

unfair competition has historically been understood as injuries to business reputation and present and future sales. *See* Rogers, Book Review, 39 YALE L.J. 297, 299 (1929); *see generally* 3 Restatement of Torts, ch. 35, Introductory Note, pp. 536–537 (1938). As a result, **the Supreme Court explicitly held that "even a business misled by a supplier into purchasing an inferior product is, like consumers generally, not under the Act's aegis."** *Lexmark*, 572 U.S. at 132. That is the exact scenario in which the Recyclers find themselves. Even though their business model is to eventually re-sell used cars and car parts, their relationship to the automotive manufacturer defendants is one of disappointed consumer to hoodwinking supplier. And those plaintiffs are not the sort Congress intended to be able to sue under this section of the Act. Because Plaintiffs do not have statutory standing, their Lanham Act claims are **dismissed**.

## VI.    Common Law Fraudulent Concealment & Fraudulent Misrepresentation – Count 22

The basic elements of a fraudulent concealment claim are generally: (1) a duty to disclose on the part of defendant; (2) concealment or failure to disclose by defendant; (3) reliance by the plaintiff (or inducement of plaintiff to act); (4) damages; and (5) proximate causation. *Garcia v. Chrysler Grp. LLC*, 127 F. Supp. 3d 212, 234 (S.D.N.Y. 2015). In several different orders the Court has held that Plaintiffs alleged their fraud claims with particularity, both Takata and the Automotive Defendants actual knowledge of the defects, Consumer Plaintiffs' sufficiently alleged that Defendants made material misstatements/omissions, Consumer Plaintiffs' sufficiently alleged reliance, and thus declined to dismiss the plaintiffs' claims. *In re Takata Airbag Prod. Liab. Litig.*, No. 14-24009-CV, 2020 WL 3286821 at *7-8 (S.D. Fla. May 29, 2020) (consumer claims); *In re Takata Airbag Prod. Liab. Litig.*, 462 F. Supp. 3d 1304, 1317 (2020) ("Therefore, as it had throughout this litigation under similar allegations, the Court declines to dismiss the fraud-based

- 28 -

claims on grounds that Defendants did not have a duty to disclose.").

In response to the Court's Summer 2020 order asking for briefing asking why the Court's previous orders should not also apply to this motion to dismiss, the Defendants make what is, at its core, a relatively simple argument—that the Recycler Plaintiffs are unlike the Consumer Plaintiffs because their connection to Defendants is too remote. This remoteness, the argument goes, affects everything from whether there is a duty to disclose to *these particular Plaintiffs* to whether the Defendants' misrepresentations proximately caused the Recyclers' injuries. The Court will not rehash the holdings that are applicable to both the Recycler and Consumer complaints but will address the Recycler-specific arguments below. After a comprehensive survey of state law, the Court dismisses a few claims entirely but allows most to proceed to summary judgment.[14]

### A. Texas:

Defendants argue that they had no duty to disclose to the Recyclers, and thus cannot be held liable under Texas common law of fraudulent concealment. Plaintiffs argue this question has already been decided by this Court elsewhere in the litigation. In a 2017 order on the *consumer* side of this case, this Court wrote,

> Texas law states that "[a] duty to disclose may arise in four situations: (1) when there is a fiduciary relationship; (2) when one voluntarily discloses information, the whole truth must be disclosed; (3) when one makes a representation, new information must be disclosed when that new information makes the earlier representation misleading or untrue; and (4) when one makes a partial disclosure and conveys a false impression." *Vial v. Gas Sol., Ltd.,* 187 S.W.3d 220, 230 (Tex. App. 2006). For the reasons discussed *supra,* the Court finds that Plaintiffs have sufficiently alleged that Ford had a duty to disclose additional facts about the safety of its vehicles under Texas law.

---

[14] The Court did previously did not address state law differences because Defendants did not raise them. Now, Defendants argue those differences are dispositive. *In re Takata Airbag Prod. Liab. Litig.*, 462 F. Supp. 3d 1304, 1317 n.6 (S.D. Fla. 2020)

*In re Takata Airbag Prod. Liab. Litig.*, No. 14-24009-CV, 2017 WL 775811 (S.D. Fla. Feb. 27, 2017). However, subsequent Courts to consider the question of fraudulent concealment under Texas law have disagreed. Judge Jesse Furman of the Southern District of New York also analyzed Texas law in the context of an automobile MDL, finding, "Texas law requires proof of a transaction between the parties of *some sort* (even arm's length) before a duty to disclose will arise." *In re Gen. Motors LLC Ignition Switch Litig.*, 257 F. Supp. 3d 372, 454 (S.D.N.Y. 2017), *modified on reconsideration,* No. 14-MC-2543 (JMF), 2017 WL 3443623 (S.D.N.Y. Aug. 9, 2017). That Court noted Texas courts have been "to put it mildly, a tad inconsistent" on the question, but the weight of the case law (including Texas high court and Fifth Circuit decisions) suggests that in any of the four scenarios mentioned above, there must be at least some fiduciary or confidential relationship before there is a duty to disclose. *Id.*

In *In re Gen. Motors LLC Ignition Switch*, the Court found that Texas law did not even support a fraudulent concealment claim between a plaintiff-purchaser and defendant-manufacturer. Here, the connection is even more attenuated—the plaintiffs are second-hand purchasers. Several other federal courts have made similar rulings. *Id.* at 454-55 (collecting cases). However, considering the somewhat inconsistent and unclear nature of Texas law, it goes too far to say that, even taking all of Plaintiffs' factual allegations as true, that there could never be a duty to disclose under Texas law. It is a toss-up as to whether the *Butler* and *Sinclair* plaintiffs' Texas common law claims should survive a motion to dismiss. Because the Court has previously ruled to let Plaintiffs' Texas claims survive, the Court **denies** the Defendants' motion to dismiss on the point, although it acknowledges it is a close question.

### B. Georgia:

The analysis of a duty to disclose under Georgia law is similar to the Texas analysis.

- 30 -

Specifically, whether or not such unique facts apart from a fiduciary relationship that could give rise to a duty to disclose exist here. *Bogle v. Bragg*, 248 Ga. App. 632, 636 (2001) (holding a duty to disclose may arise from the particular circumstances of the case); *Secklinger-Lee Co. v. Allstate Ins. Co.*, 32 F.Supp.2d 1348, 1354 (N.D. Ga. 1998) ("In the absence of special circumstances one must exercise ordinary diligence in making an independent verification of contractual terms and representations, failure to do which will bar an action based on fraud.") (citations omitted).

The Plaintiffs allege that special circumstances exist here as a result of the Defendants' "exclusive and/or far superior knowledge and access to the facts . . . and [knowledge] that the facts were not known to or reasonably discoverable by Plaintiffs and the Class." (D.E. 2781, ¶ 866(a).) In a similar automobile tort case, a Georgia federal court dismissed fraudulent concealment claims brought by consumer plaintiffs at the summary judgment stage writing, "Plaintiffs have failed to cite to a single case in which a court has applied Georgia law to find a duty to disclose outside of a confidential or special relationship in facts similar to this case, where there is no evidence that Defendants had direct knowledge of Plaintiffs' purchases of the vehicles in question and had no apparent relationship with Plaintiffs." *McCabe v. Daimler AG*, 160 F. Supp. 3d 1337, 1351 (N.D. Ga. 2015). The Court went on to explain that while a duty to disclose *can* arise under the "special relationship" prong, no evidence of such a relationship was before the Court at that time. *Id.*

Again, however, the Plaintiffs correctly point to this Court's prior refusals to dismiss common law claims based on no duty to disclose.

> In these prior orders, the Court found the duty to disclose was invoked based on the plaintiffs' allegations that certain automotive manufacturers: (1) failed to disclose their knowledge of the inflator defect prior to the plaintiffs' purchases; (2) made incomplete representations about the safety and reliability of their vehicles (while purposefully withholding material facts from the plaintiffs that contradicted the representations); and (3) highly touted through marketing materials their vehicles' safety features and overall safety quality.

- 31 -

*In re Takata Airbag Prod. Liab. Litig.*, 462 F. Supp. 3d 1304, 1317 (S.D. Fla. 2020) (discussing the Court's prior Consumer Plaintiff orders). True, those prior orders had not specifically analyzed Georgia law. The Court understands Georgia fraudulent concealment law as encouraging potential plaintiffs to do their due diligence before engaging in a transaction. This explains why those in a fiduciary relationship or other special circumstances are owed a duty to disclose—we would not expect their counterparties to try to pull a fast on them. For other potential plaintiffs, it is caveat emptor. But these buyers—the Recyclers—could not protect themselves no matter how much diligence they performed because of the hidden nature of the inflator defect; the Court holds that the Plaintiffs have sufficiently alleged "special circumstances" that create a duty to disclose at this motion to dismiss stage.

Once again, this is a close question, but the decision is consistent with the Court's other orders. Thus, the Court **denies** the motion to dismiss with respect to Georgia common law.

**C. Virginia**:

The analysis under Virginia law is very similar to Georgia—this Court has not engaged in a state specific inquiry of the duty to disclose under Virginia law, but has declined to dismiss the Virginia fraud claims for the Consumer Plaintiffs as a general matter. Defendants do not give any reason why Virginia should be treated differently, nor has the Court found one. The one Virginia case Defendants cite for the proposition that a duty to disclose requires a fiduciary relationship does not clearly state that the Plaintiff's fraud claim failed for lack of a fiduciary relationship—the Court there also found no false statement or deliberate concealment, nor did the Court believe the allegations were sufficiently specific. *Murray v. Royal Const. Co.*, 61 Va. Cir. 643 (2002). Further, to the extent Defendants rely on a proximate cause defense, the Court intends to deal with those

- 32 -

fact-specific questions at the summary judgment stage. The motion to dismiss is **denied** with respect to Virginia common law claims.

### D. Florida:

The Court has previously found a duty to disclose to the Consumer Plaintiffs under Florida common law. *Id.* at 1317. Under Florida law, this Court wrote,

> "A duty to disclose may also 'arise where a party undertakes to disclose certain facts, such that the party must then disclose the entire truth known to him.' *Marriot Int'l, Inc. v. Am. Bridge Bahamas, Ltd.*, 193 So. 3d 902, 908 (Fla. 3d DCA 2015). 'Such a claim, however, must be supported by some evidence of a statement that would trigger the further duty to disclose all known material facts.' *Id.*"

*In re Takata Airbag Prod. Liab. Litig.*, No. 14-24009-CV, 2016 WL 11662171, at *6 (S.D. Fla. Sept. 30, 2016). Defendants argue that this complaint should be different because "unlike recyclers, consumers intend to drive cars when they buy them." This argument is unavailing at the motion to dismiss stage. Because the Recycler Plaintiffs plausibly allege that the Defendants' statements had a material effect on their decision to buy the cars, whether they intended to drive them or re-sell their parts, their claims survive a motion to dismiss. The Defendants' motion to dismiss is **denied** with respect to Florida common law claims.

### E. Tennessee

First, Defendants argue, under Tennessee law, a fraudulent concealment claim cannot even stand when the Defendant was not a party to the transaction at issue. And second, there is no duty to disclose under Tennessee law absent an arms' length business relationship. Defendants also argue that proximate cause is a necessary element of the tort and does not exist here, but as the Court has already stated, that is a question for the summary judgment stage.

Defendants cite a 1933 Tennessee Supreme Court case for the proposition that parties must have some kind of relationship for there to be concealment in the first place. *Patten v. Standard*

- 33 -

*Oil Co. of Louisiana*, 55 S.W.2d 759, 761 (Tenn. 1933) ("Where there is no dealing between the parties, there can be no concealment."). Plaintiffs have no response to this argument. Plaintiffs also have no Tennessee specific response to the Defendants' argument that there is no duty to disclose absent a relationship between the parties. Instead, Plaintiffs cite to a 2017 order from this Court. That order, without considering the specifics of Tennessee common law, held that Plaintiffs had stated a viable fraudulent concealment claim. *In re Takata Airbag Prod. Liab. Litig.*, No. 14-24009-CV, 2017 WL 2406711 (S.D. Fla. June 1, 2017). However, that order came while Takata was still in the case and the consumer and recycler claims had yet to have been split. Additionally, the Court was considering the common law of 20 states at that time. Here, the Court only must deal with the common law of 7 states.

Under vastly different circumstances, it appears clear that the Plaintiffs fail to allege a duty to disclose, and thus fail to allege a fraudulent concealment claim under Tennessee law. "The duty to disclose arises in three distinct circumstances: (1) '[w]here there is a previous definite fiduciary relation between the parties,' (2) '[w]here it appears one or each of the parties to the contract expressly reposes a trust and confidence in the other,' and (3) '[w]here the contract or transaction is intrinsically fiduciary and calls for perfect good faith.'" *Shah v. Racetrac Petroleum Co.*, 338 F.3d 557, 571 (6th Cir. 2003) (citing *Domestic Sewing Mach. Co. v. Jackson,* 83 Tenn. 418, 425 (1885)). None of those three circumstances are present here. While the Sixth Circuit noted that some courts deviate from that 1885 opinion, it also held "federal courts considering fraudulent concealment under Tennessee law have made clear that *Domestic Sewing* is the governing law." *Id.* Thus, the Court **dismisses** Plaintiffs' Tennessee common law claims for failure to state a claim.

## F. Missouri

Defendants make the same arguments in Missouri as they do in the other states. Again, this

Court will focus on the duty to disclose. In Missouri, a duty to disclose only arises when there is a confidential or fiduciary relationship, when there is privity of contract or when one party has superior knowledge or information not within the fair and reasonable reach of the other party. *In re Gen. Motors Corp. Anti-Lock Brake Prod. Liab. Litig.*, 966 F. Supp. 1525, 1535 (E.D. Mo. 1997), *aff'd sub nom. Briehl v. Gen. Motors Corp.*, 172 F.3d 623 (8th Cir. 1999) (internal citations and quotations omitted). The last category leaves significantly more leeway for the Court to find a duty to disclose at the summary judgment stage than does Tennessee common law, for instance. Thus, the Court will adhere to its general practice in this case and allow the Missouri common law claims to proceed to summary judgment; the motion to dismiss is **denied** on this point.

### G. North Carolina

Defendants make the same arguments in attempting to dismiss the North Carolina fraudulent concealment claims. The Court has not previously addressed North Carolina *common law* in depth, but it did previously find that Plaintiffs "sufficiently alleged that Defendants had a separate and distinct duty under North Carolina law to not provide false information to induce the purchase of Defendants' vehicles." *In re Takata Airbag Prod. Liab. Litig.*, 462 F. Supp. 3d 1304 (S.D. Fla. 2020). However, this holding was in relation to North Carolina *statutory* law and it was on the consumer side of the case. Further, it was based on case law that held that, under North Carolina law, a party to a contract owes the other contracting party a separate and distinct duty not to provide false information to induce the execution of the contract. *Id.* at 1320. Here, the Recycler plaintiffs had no contractual relationship with the Defendants.[15]

---

[15] To be fair, neither did the consumers (they were in contractual privity with the dealerships). But the Court did not elaborate in the Order.

- 35 -

There is significant case law holding that North Carolina law has a higher threshold for a duty to disclose. "North Carolina requires a relationship of trust or confidence to support finding a duty to disclose, based on a fiduciary relationship, a contractual relationship, or other similar relationship." *Ratcliff v. Am. Honda Motor Co, Inc.*, No. 17-CV-174, 2018 WL 3542865 (M.D.N.C. July 23, 2018), *report and recommendation adopted sub nom. Ratcliff v. Am. Honda Motor Co.*, No. 1:17-CV-174, 2018 WL 3849911 (M.D.N.C. Aug. 13, 2018). *See also Burnette v. Nicolet, Inc.*, 818 F.2d 1098, 1101 (4th Cir. 1986) ("The lower court found that North Carolina has never recognized a cause of action for fraudulent concealment in the absence of a relationship of trust or confidence created by a fiduciary, contractual or other similar relationship which imposes upon the defendant a 'duty to speak' to the plaintiff."); *Ponzio v. Mercedes-Benz USA, LLC*, 447 F. Supp. 3d 194, 232 (D.N.J. 2020) (dismissing North Carolina fraudulent concealment claim absent a contractual or other special relationship, even though Defendant may have taken affirmative steps to conceal material facts that only Defendant could have known).

On the other hand, one federal MDL court has found duties to disclose under North Carolina law in similar cases. For example, that court held the NC fraudulent concealment claim was clearly viable because a party to a contract owes the other contracting party a separate and distinct duty not to provide false information. *In re MyFord Touch Consumer Litig.*, 46 F. Supp. 3d 936 (N.D. Cal. 2014). In this case, plaintiff consumers purchased Defendant-Manufacturer vehicles through dealerships.

Because the balance of the case law supports Defendants' arguments that something more than no relationship at all is needed to create a duty disclose, the Court **dismisses** Plaintiffs' North Carolina common law claims.

VII.    **State Statutory Claims**

- 36 -

Again, as a general matter, this Court has previously held that Plaintiffs have sufficiently

alleged the basic elements of state statutory fraud claims such as knowledge of the inflator defect,

Defendants' false statements/omissions, reliance, manifestation of defect, and particularity under

Rule 9(b).[16] Below, the Court considers the state-specific differences Defendants raise.

A. Choice of Law Standard

Generally, a federal court hearing state law claims applies the choice of law rules of the

forum state. *Grupo Televisa, S.A. v. Telemundo Commc'ns Grp., Inc.*, 485 F.3d 1233, 1240 (11th

Cir. 2007). However, "[i]n cases transferred pursuant to 28 U.S.C. § 1407, the transferee district

court must apply the state law, including its choice of law rules, that would have been applied had

there been no change of venue." *In re Managed Care Litig.*, 298 F. Supp. 2d 1259, 1296 (S.D. Fla.

2003); *Van Dusen v. Barrack*, 376 U.S. 612, 639 (1964); *In re Toytota Motor Corp. Unintended

Acceleration*, 785 F. Supp. 2d 925, 931 (C.D. Cal. 2011). Accordingly, "all states in which the

transferor court of an individual action sits are considered forum states, and an independent choice

of law determination is necessary for the states of all transferor courts." *In re Conagra Peanut

Butter Prods. Liab. Litig.*, 251 F.R.D. 689, 693 (N.D. Ga. 2008).

This choice of law framework is not altered by the use of a consolidated complaint as a

procedural device to streamline the litigation, unless the parties so consent. *See id.* ("[U]sing a

master complaint as the operative pleading for choice of law purposes is not unprecedented in

multidistrict litigation. However, it is generally used as a substantive pleading only when the

---

[16] The only one of these elements the Defendants seriously contest in their supplemental briefing is reliance. They argue it is implausible to suggest that Recyclers *actually* rely on consumer advertisements in their purchasing decisions. (**D.E. 3863 at 7.**) This issue is best suited for the finder of fact.

- 37 -

parties have consented to such an arrangement." (citations omitted)); *see also In re Toyota Motor Corp. Unintended Acceleration*, 785 F. Supp. 2d at 931 (stating that "[n]either the general authorization of the coordination and consolidation under the MDL statute nor the more specific use of consolidated complaints, as the Court has required here, is intended to alter the substantive rights of the parties" and adding, "[t]he use of a consolidated complaint has been described as 'a procedural device rather than a substantive pleading with the power to alter the choice of law[] rules applicable to the plaintiffs' claims.'" (citing *In re Mercedes-Benz Tele Aid Contract Litig.*, 257 F.R.D. 46, 56 (D.N.J. 2009)).

B. Georgia:

Plaintiffs stipulate to dismissal of Weaver's Georgia state law claim. He is the only Georgia plaintiff. The Georgia state statutory claims are **dismissed**.

C. Florida:

Defendants argue ARA's and Butler's Florida Deceptive and Unfair Trade Practices Act claim fails because they did not plead (i) any injury legally caused by the Defendants, and (ii) that they were party to a consumer transaction with Defendants governed by FDUPTA. Defendants discount the Court's prior orders letting Florida statutory claims survive on the causation point because Consumer Plaintiffs are vastly different from Recycler Plaintiffs with respect to proximate causation. The essence of the argument is Defendants' that the representations about the safety of their vehicles were aimed at consumers—their representations should not have, and could not have, been taken to warrant anything about the quality of used and salvaged vehicles or vehicle parts. Thus, it is legally impossible for such representations to have caused they Plaintiffs' harm. Further, Defendants argue that the Recyclers do not even allege that Defendants made such representations.

As discussed above, this proximate causation debate is more appropriate for summary

- 38 -

judgment. This is especially considering that Plaintiffs have adequately alleged the Defendants made certain representations/misstatements and adequately alleged that Plaintiffs would have foregone or paid less for the vehicles in the absence of the representations/misstatements. Thus, the question is whether it is impossible, as a matter of law, for an indirect seller to have "caused" a Plaintiff's harm with their alleged misstatements. The Defendants do not cite a case that stands for such a proposition.

Second, Defendants argue that the Recycler Plaintiffs are not even "consumers" within the ambit of the FDUTPA. They cite to a prior order of this Court which held, "[u]nder FDUTPA, a plaintiff must plead an injury or detriment resulting from a consumer transaction." *Pinecrest Consortium, Inc. v. Mercedes-Benz*, USA, LLC, 2013 WL 1786356 at *3-4 (S.D. Fla. April 25, 2013). In the same opinion, this Court also wrote, "[a]lthough FDUTPA may extend to protect business entities by such violative practices, 'it has no application to entities complaining of tortious conduct which is not the result of a consumer transaction.'" *Id.* That is the language Defendants rely on.

However, the opinion went on to define "consumer" as "one who has engaged in the purchase of goods or services." *Id.* at 2. And other Courts in this district have held that a broader definition of "consumer" that includes other businesses is consistent with the overall purpose of FDUTPA which is to "protect the *consuming* public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.202(2) (emphasis added)." *Kertesz v. Net Transactions, Ltd.*, 635 F. Supp. 2d 1339, 1349 (S.D. Fla. 2009) (Marra, J.). My understanding is that a non-consumer should be understood as an entity with no connection to the transaction in question or a business competitor—here, the Recyclers are neither. And it should be

- 39 -

noted that the Plaintiff in this Court's *Pinecrest* opinion was a specially formed corporation for the purpose of litigation and had not engaged in any transaction, which is why the Court held that it had no standing under FDUTPA.

So, is a Recycler, a business that consumes used cars (albeit not directly from Defendants) to then re-sell them, engaged in a "consumer transaction?" Again, "a consumer is one engaged in the purchase of goods or services . . ." *Burger King Corp. v. H&H Restaurants, LLC*, No. 99-2855, 2001 WL 1850888, at *9 (S.D. Fla. Nov. 30, 2001) (Jordan, J.). While the Recyclers are in the business of *selling* parts, they are also *buyers* of goods. It is clear they qualify as "consumers" under the statute. Thus, Defendants' motion to dismiss is **denied** with respect to the Florida Deceptive and Unfair Trade Practices Act claim.

D. North Carolina:

Defendants argue that Plaintiffs' claims under the North Carolina Unfair and Deceptive Trade Practices Act should be dismissed because 1) Plaintiffs cannot demonstrate reliance and proximate causation and 2) Plaintiffs do not have statutory standing because the statute was intended to protect parties engaged in a direct commercial transaction or business competitors only.

On the reliance and proximate causation, Court again will address these challenges at the summary judgment stage. On the second point, Defendants' argument is very similar to their argument under the Florida statute—they cite *Food Lion, Inc. v. Cap. Cities/ABC, Inc.*, 194 F.3d 505, 520 (4th Cir. 1999), for the proposition that NCDUTPA could not apply because there was no business or competitive relationship between recyclers and auto manufacturers. However, other, more recent federal court rulings and opinions from the Supreme Court of North Carolina point to the opposite conclusion. **Supreme Court of North Carolina has held that, "any**

- 40 -

consumer injured by unfair or deceptive trade practices can bring a UDTP claim." *Walker v. Fleetwood Homes of North Carolina, Inc.,* 362 N.C. 63, 67 (N.C. 2007). The court also cited its own precedent stating that "[i]n enacting G.S. 75–16 ... our Legislature intended to establish an effective private cause of action for *aggrieved consumers* in this State." *Id.* "Federal courts interpreting the NCUDTPA have allowed claims asserted by businesses against one another as long as the challenged practices affect commerce or the marketplace." *Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline, PLC,* 737 F. Supp. 2d 380, 419 (E.D. Pa. 2010). Thus, on the basis of the more recent NC case law, the Court **denies** the Defendants' motion to dismiss the NCUDTPA claim.

E. Tennessee:

Defendants move to dismiss claims under Tennessee's Consumer Protection Act on 1) proximate cause grounds and 2) the argument that used cars are not "goods" within the definition of the statute. The Court holds for Defendants here—the statute and case law are clear that "goods" are defined to mean "any tangible chattels leased, bought, or otherwise obtained for use by an individual primarily for personal, family, or household purposes or a franchise, distributorship agreement, or similar business opportunity." Tenn. Code Ann. § 47-18-103(7); *Milan Supply Chain Sols. Inc. v. Navistar Inc.,* No. W201800084COAR3CV, 2019 WL 3812483 (Tenn. Ct. App. Aug. 14, 2019), *appeal granted* (Jan. 16, 2020). The used cars purchased by Recyclers are clearly not goods for personal use nor are they a franchise or similar business opportunity. In their reply, Plaintiffs do not attempt to address this argument. Thus, like the Tennessee common law claims, the Tennessee Consumer Protection Act claims are **dismissed**.

F. Texas:

As with every other state, Defendants argue the Texas Deceptive Trade Practices Act

- 41 -

claims should be dismissed because 1) Plaintiffs do not adequately plead proximate causation and 2) the claims are not "in connection with" a consumer transaction. These arguments are related. In support of their arguments, Defendants cite a Texas federal court which held, "[t]he Texas Supreme Court has made clear that DTPA claims based on allegedly false, misleading, deceptive, or unconscionable acts cannot be brought against remote, or 'upstream,' manufacturers and suppliers that never directly transacted with the plaintiff-consumer. *Chavez v. Ford Motor Co.*, No. EP-18-CV-109-KC, 2018 WL 6190601, at *3 (W.D. Tex. Sept. 26, 2018) (citing *Amstadt v. U.S. Brass Corp.*, 919 S.W.2d 644, 649 (Tex. 1996)).

In that *Amstadt* opinion, however, the Texas Supreme Court also made clear that the TDTPA is not limited to those in contractual privity with the Defendant. *Amstadt* at 649. Plaintiffs interpret the "in connection with" a consumer transaction requirement to focus on whether the Defendants' allegedly violative conduct influenced the consumers' behavior. Here, Plaintiffs argue that the auto makers' misrepresentations and omissions factored into their decision to purchase used cars. Thus, even though the Defendants did not sell the cars to the Plaintiffs directly, their allegedly deceptive acts were still the "producing cause" of Plaintiffs' injury.

Additionally, the *Chavez* case cited by Defendants is not quite on point. The plaintiff there complained of statements made by the *car salesman* at the dealership—there was no allegation that the *manufacturers'* advertising influenced the purchase. Ultimately the case law does not demonstrate that Plaintiffs, categorically, cannot prove proximate cause if all their allegations are taken as true. Defendants' arguments are better addressed at the summary judgment stage and the motion to dismiss is **denied** with respect to Texas state law claims.

## VIII. CONCLUSION

Based on the foregoing, it is hereby

**ORDERED AND ADJUDGED** that Defendants' Motions **(D.E. 2887, 2976, 2981, 2984,**

**2985)** are **GRANTED IN PART** and **DENIED IN PART** as follows:

- All claims against Audi AG, Daimler AG, Volkswagen AG, Audi of America LLC, Mercedes-Benz USA LLC, Volkswagen Group of America LLC, FCA US LLC, and New GM are dismissed for lack of personal jurisdiction

- Counts 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19 20 of the *Butler* complaint and Counts 1 and 2 of the *Sinclair* complaint (the RICO claims) are dismissed for failure to state a claim for relief

- Count 21 of the *Butler* complaint and Count 40 of the *Sinclair* complaint (Lanham Act) are dismissed for failure to state a claim for relief

- Count 22 of the *Butler* complaint and Count 41 of the *Sinclair* complaint are dismissed for Tennessee and North Carolina claims **only** for failure to state a claim

- Counts 24 and 27 of the *Butler* complaint and Counts 36 and 38 of the *Sinclair* complaint are dismissed for failure to state a claim

**DONE AND ORDERED** in Chambers, Miami, Florida, this 9ᵗʰ day of March, 2021.

FEDERICO A. MORENO
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record

- 43 -

**EXHIBIT F**

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

| | |
|---|---|
| **IN RE: TAKATA AIRBAG PRODUCT LIABILITY LITIGATION** | MDL No. 2599 |
| This Document Relates to All Economic Loss Class Actions and: | Master File No.15- MD 2599-FAM |
| | S.D. Fla. Case No. 1:14-cv-24009-FAM |
| BRIDGET BOYD, et al., individually and on behalf of all others similarly situated, | |
| Plaintiffs, | |
| v. | **JURY TRIAL DEMANDED** |
| FCA US LLC, | |
| Defendant. | |

---

# SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

# TABLE OF CONTENTS

NATURE OF CLAIMS ............................................................................................... 1

JURISDICTION AND VENUE .................................................................................. 6

THE PARTIES ............................................................................................................ 13

    I.     New Chrysler ................................................................................... 13

    II.    Plaintiffs ......................................................................................... 13

GENERAL FACTUAL ALLEGATIONS .................................................................. 26

    I.     Definitions ...................................................................................... 26

    II.    Takata's Airbags Have a Common, Uniform Defect ....................... 29

        A.    Defendants Chose an Inexpensive and Dangerous Propellant ................. 29

        B.    The Risks of the Inflator Defect Were Exacerbated by Takata's and New Chrysler's Abysmal Quality Control ................................. 33

    III.   New Chrysler's Knowledge of the Defective Airbag ....................... 35

        A.    New Chrysler's Inherited Knowledge .................................... 35

        B.    New Chrysler's Acquisition of Additional Post-Sale Knowledge .......... 38

    IV.   New Chrysler Sold Its Vehicles As "Safe" and "Reliable" ................ 40

    V.    Inadequate Recalls and Failure to Assist Impacted Consumers ......... 42

        A.    Slow and Inadequate Recalls ................................................. 42

        B.    Failure to Provide Replacement Vehicles .............................. 44

        C.    Defective Replacement Airbags ............................................ 44

TOLLING OF THE STATUTE OF LIMITATIONS ................................................ 46

    I.     Fraudulent Concealment ................................................................. 46

    II.    Estoppel ......................................................................................... 46

    III.   Discovery Rule ............................................................................... 47

    IV.   *American Pipe* Tolling .................................................................. 47

CLASS ACTION ALLEGATIONS ........................................................................... 48

    I.     The Classes ..................................................................................... 48

    II.    Numerosity ..................................................................................... 49

    III.   Predominance of Common Issues ................................................... 50

    IV.   Typicality ....................................................................................... 52

    V.    Adequate Representation ................................................................ 52

    VI.   Superiority ..................................................................................... 52

REALLEGATION AND INCORPORATION BY REFERENCE ............................. 54

CLAIMS FOR RELIEF ............................................................................................. 54

    I.     Nationwide Claims .......................................................................... 54

        A.    Federal Claims ..................................................................... 54

|  |  | 1. | Dismissed | 54 |
|  |  | 2. | Dismissed | 55 |
|  |  | 3. | Dismissed | 55 |
|  | B. |  | Common Law and State Law Claims | 55 |
|  |  | 4. | Fraud | 55 |
|  |  | 5. | Unjust Enrichment | 58 |
|  |  | 6. | Negligence | 59 |
| II. |  |  | State Class Claims | 61 |
|  | A. |  | Claims Brought on Behalf of the Alabama Consumer Class | 61 |
|  |  | 7. | Dismissed | 61 |
|  | B. |  | Claims Brought on Behalf of the Arizona Consumer Class | 61 |
|  |  | 8. | Violation of the Arizona Consumer Fraud Act, Ariz. Rev. Stat. § 44-1521 | 61 |
|  | C. |  | Claims Brought on Behalf of the Arkansas Class | 66 |
|  |  | 9. | Dismissed | 66 |
|  |  | 10. | Dismissed | 66 |
|  | B. |  | Claims Brought on Behalf of the California Consumer Class | 66 |
|  |  | 11. | Violation of Song-Beverly Consumer Warranty Act for Breach of Implied Warranty of Merchantability (California Lemon Law) | 66 |
|  |  | 12. | Violation of the California Unfair Competition Law Cal. Bus. & Prof. Code § 17200 | 68 |
|  |  | 13. | Violation of the California False Advertising Law, Cal. Bus. & Prof. Code § 17500 | 72 |
|  |  | 14. | Violation of the Consumer Legal Remedies Act Cal. Civ. Code § 1750 | 74 |
|  |  | 15. | Dismissed | 82 |
|  | C. |  | Claims Brought on Behalf of the Florida Consumer Class | 82 |
|  |  | 16. | Violation of the Florida Deceptive and Unfair Trade Practices Act Fla. Stat. § 501.201 | 82 |
|  | D. |  | Claims Brought on Behalf of the Georgia Consumer Class | 86 |
|  |  | 17. | Violation of the Georgia Fair Business Practices Act Ga. Code Ann. § 10-1-390 | 86 |
|  |  | 18. | Violation of the Georgia Uniform Deceptive Trade Practices Act Ga. Code Ann. § 10-1-370 | 92 |
|  | E. |  | Claims Brought on Behalf of the Illinois Consumer Class | 96 |

19. Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act 815 ILCS § 505/1 ......................................... 96

20. Violation of the Illinois Uniform Deceptive Trade Practices Act 815 ILCS § 510/1 ................................................................... 102

F. Claims Brought on Behalf of the Indiana Consumer Class .................. 103

21. Dismissed ........................................................................................ 103

22. Dismissed ........................................................................................ 104

G. Claims Brought on Behalf of the Maryland Consumer Class ............... 104

23. Breach of the Implied Warranty of Merchantability Md. Code Ann., Com. Law §§ 2-315 and 2A-213 .................................. 104

24. Violation of the Maryland Consumer Protection Act, Md. Code Ann., Com. Law § 13-101 ....................................................... 105

H. Claims Brought on Behalf of the Massachusetts Consumer Class ........ 111

25. Deceptive Acts or Practices Prohibited by Massachusetts Law Mass. Gen. Laws Ch. 93A, §1 ................................................... 111

26. Breach of the Implied Warranty of Merchantability Mass. Gen. Laws Ann. ch. 106, § 2-314 ................................................... 116

I. Claims Brought on Behalf of the Michigan Consumer Class ............... 117

27. Violation of the Michigan Consumer Protection Act Mich. Comp. Laws § 445.903 .................................................................... 117

28. Breach of Implied Warranty of Merchantability Mich. Comp. Laws § 440.2314 .................................................................. 123

J. Claims Brought on Behalf of the Mississippi Consumer Class ............. 124

29. Dismissed ........................................................................................ 124

K. Claims Brought on Behalf of the Missouri Consumer Class ................ 124

30. Dismissed ........................................................................................ 124

31. Dismissed ........................................................................................ 124

L. Claims Brought on Behalf of the New Jersey Consumer Class ............. 124

32. Violation of the New Jersey Consumer Fraud Act, N.J. Stat. Ann. § 56:8-1 ....................................................................... 124

33. Breach of the New Jersey Implied Warranty of Merchantability, N.J. Stat. Ann. § 12a:2-314 .................................. 129

M. Claims Brought on Behalf of the New York Consumer Class .............. 130

34. Violation of the New York General Business Law, N.Y.
   Gen. Bus. Law § 349 ............................................................... 130

35. Violation of the New York General Business Law, N.Y.
   Gen. Bus. Law § 350 ................................................................ 135

36. Dismissed ...................................................................................... 137

N.  Claims Brought on Behalf of the North Carolina Consumer Class ....... 137

37. Violation of the North Carolina Unfair and Deceptive
   Trade Practices Act N.C. Gen. Stat. § 75-1.1 ................................. 137

38. Dismissed ...................................................................................... 142

O.  Claims Brought on Behalf of the Ohio Consumer Class ....................... 142

39. Violation of the Consumer Sales Practices Act Ohio Rev.
   Code § 1345.01 ............................................................................ 142

P.  Claims Brought on Behalf of the Pennsylvania Consumer Class ........... 147

40. Dismissed ...................................................................................... 147

41. Dismissed ...................................................................................... 147

Q.  Claims Brought on Behalf of the South Carolina Consumer Class ....... 148

42. Violation of the South Carolina Unfair Trade Practices Act
   S.C. Code Ann. § 39-5-10 ............................................................. 148

43. Violation of the South Carolina Regulation of
   Manufacturers, Distributors, and Dealers Act S.C. Code
   Ann. §56-15-10 ............................................................................ 153

44. Breach of the Implied Warranty of Merchantability S.C.
   Code Ann. § 36-2-314 .................................................................. 154

R.  Claims Brought on Behalf of the Texas Consumer Class ..................... 155

45. Violation of the Deceptive Trade Practices Act Tex. Bus. &
   Com. Code § 17.41 ....................................................................... 155

46. Breach of the Implied Warranty of Merchantability Tex.
   Bus. & Com. Code Ann. § 2.314 .................................................. 161

PRAYER FOR RELIEF ......................................................................... 162

Plaintiffs, based on personal knowledge as to themselves, and upon information and belief as to all other matters, allege as follows:

## NATURE OF CLAIMS

1. The things meant to protect us should not be made in a way that harms or even kills us. This is particularly true of cars because they are a tool millions of people use every day. People trust that their cars were designed and built to keep them safe. And they expect that automakers take every reasonable step to make sure that nothing in their cars endangers the lives of those who ride in them.

2. This action concerns defective airbags manufactured by Takata Corporation and its related entities, including TK Holdings, Inc. ("Takata"), which contain inflators using the notoriously volatile and unstable compound, ammonium nitrate, but which were nevertheless equipped in vehicles that Defendant FCA US LLC f/k/a/ Chrysler Group LLC ("New Chrysler") manufactured, sold or leased. New Chrysler misrepresented as safe New Chrysler and Old Chrysler (as defined below) vehicles and deceptively concealed the fact that inflators in these vehicles were prone to explode and maim or kill drivers and passengers.

3. New Chrysler was created on or about June 1, 2009, in connection with the sale of substantially all of the assets of Chrysler LLC ("Old Chrysler"), pursuant to a Sale Motion and Purchase Agreement ("Sale Agreement") approved by the United States Bankruptcy Court for the Southern District of New York under Section 363 of the U.S. Bankruptcy Code (the "363 Sale"). As a result of the 363 Sale, New Chrysler acquired substantially all of Old Chrysler's books, records, and personnel and knowledge of the defective Takata airbags those books, records, and personnel held. New Chrysler also took responsibility for any necessary recalls of both New and Old Chrysler vehicles going forward. The causes of action in this Complaint are directed solely to New Chrysler and are based solely on New Chrysler's wrongful conduct.

- 1 -

4.      An airbag is a critical safety feature of any motor vehicle.  Airbags are meant to prevent occupants from striking hard objects in the vehicle, such as the steering wheel, dashboard, or windshield.  An airbag's inflator, as its name suggests, is supposed to rapidly inflate the airbag upon vehicle impact.  In the milliseconds following a crash, the inflator ignites a propellant to produce gas that is released into the airbag cushion, causing the airbag cushion to expand and deploy.  The term "airbag" shall be used herein to refer to the entire airbag module, including the inflator.

5.      All Takata airbags at issue in this litigation share a common, uniform defect: the use of ammonium nitrate, a notoriously volatile and unstable compound, as the propellant in their defectively designed inflators (the "Inflator Defect").  Under ordinary conditions, including daily temperature swings and contact with moisture in the air, Takata's ammonium-nitrate propellant transforms and destabilizes, causing irregular and dangerous behavior resulting in violent combustion.  Ammonium nitrate is well-known for its explosive power.  Indeed, it is the explosive that Timothy McVeigh and Terry Nichols used in April 1995 to bomb the Alfred P. Murrah Federal Building in downtown Oklahoma City. In 2006, a Takata factory likewise suffered a severe explosion because of ammonium nitrate, a fact known to its original equipment manufacturer ("OEM") clients, including Old Chrysler.  In August 2016, a truck carrying Takata airbag parts crashed on a Texas road, detonating the ammonium nitrate in the truck in an immense blast, destroying a home, killing the elderly homeowner, and injuring four of her visitors.

6.      Because of the common, uniform Inflator Defect, Takata airbags often fail to perform as they should.  Instead of protecting vehicle occupants from bodily injury during accidents, the defective Takata airbags too often violently explode, sometimes expelling metal

debris and shrapnel at drivers and passengers. As of February 2018, Takata airbags have been responsible for at least 22 deaths and hundreds of serious injuries worldwide.

7.     In the late 1990s, when Takata shelved a safer propellant in favor of the far cheaper ammonium nitrate, it was aware of these risks and did so over the objections and concerns of its engineers in Michigan. Tellingly, Takata is, on information and belief, the only major airbag manufacturer that uses ammonium nitrate as the primary propellant in its airbag inflators.

8.     Takata's own testing of its airbag inflators containing ammonium nitrate from 2000 to 2007 confirmed problems with the inflators' stability. The testing results revealed the propellant exhibited ballistic shifts and overly aggressive behavior when deployed, which can lead to explosive airbag ruptures. The testing also revealed the inflators' tendency to "flame" or catch fire when the airbags ruptured. Takata shared the results of this testing with Old Chrysler personnel.

9.     In April 2009, Old Chrysler filed for bankruptcy.

10.     On June 1, 2009, the 363 Sale closed. Thereafter, New Chrysler, carrying with it the same knowledge about the Takata Inflator Defect as Old Chrysler, sold and leased vehicles to consumers that contained deadly Takata airbags and misrepresented the safety of and/or concealed materials facts concerning the Inflator Defect in both New and Old Chrysler vehicles containing the defective airbags.

11.     Moreover, New Chrysler became aware of more evidence of the Inflator Defect. For example, in the summer of 2009, Honda initiated its first significant recall of Takata airbags in the United States, recalling approximately 440,000 vehicles as a result of numerous deaths and injuries caused by the Inflator Defect. Knowing that New Chrysler used the same Takata airbags

in its own vehicles that likewise contained the same ammonium-nitrate propellant, New Chrysler did nothing to inform consumers or initiate a recall.

12.     Meanwhile, New Chrysler continued to encounter "energetic disassemblies" (*i.e.*, ruptures) in Takata airbags meant for its New Chrysler vehicles.

13.     These "energetic disassemblies" began to emerge in the field as well.  In 2013, an energetic disassembly occurred in a New Chrysler vehicle in the field, causing injury to the occupant.

14.     Tragically, these airbag failures were the first of many to come.  More than a decade after the first incidents of airbag ruptures, Takata's disassemblies and "non-conformances" involving "high performing ballistics" continued, but New Chrysler took no meaningful action in response.

15.     In early 2014, other automakers recalled millions of additional vehicles due to the Inflator Defect. During that same period of time, employees at New Chrysler were communicating with other automakers about the true root cause of Takata airbag ruptures and recalls.  But New Chrysler did not issue any additional recalls, withholding vital information from occupants of other New and Old Chrysler vehicles on the road.

16.     In May 2015, in the face of pressure from the National Highway Traffic and Safety Administration ("NHTSA"), Congress, and the public, Takata finally admitted the existence of the Inflator Defect and agreed to phase out the use of ammonium nitrate in its airbag inflators.  In response, New Chrysler has had no choice but issue its own recalls.  To date, New Chrysler has recalled approximately 5.5 million New and Old Chrysler vehicles containing the deadly Takata airbags.  Yet, New Chrysler continues to misrepresent these vehicles as safe and has delayed the repair of nearly all of these defective airbags while it pleads with NHTSA for permission to

conduct more tests. New Chrysler has not yet recalled an additional 1.3 million vehicles that contain the same Defective Inflators, leaving its consumers and the occupants of those vehicles in grave danger.

17. The defective Takata airbags create a dangerous condition that gives rise to a clear, substantial, and unreasonable danger of death or personal injury. New Chrysler put profits ahead of safety by continuing to equip vehicles with Takata airbags year after year, even though it knew or should have known those airbags were defective. Despite the shocking record of airbag failures, injuries, and deaths caused by the Inflator Defect, New Chrysler was slow to fully investigate the problem and slow to report the full extent of the danger to drivers and passengers of New and Old Chrysler vehicles. Only relatively recently—on the heels of media scrutiny—has New Chrysler begun recalling the millions of vehicles in the United States with the Inflator Defect. And these recalls are just a public relations illusion, as New Chrysler has delayed repairing the defective airbags, continuing to misrepresent and/or conceal material facts regarding their safety.

18. As a result of this misconduct, Plaintiffs and members of the proposed Classes were harmed and suffered actual damages. Plaintiffs and the Classes did not receive the benefit of their bargain; rather, they purchased or leased vehicles that are of a lesser standard, grade, and quality than represented, and they did not receive vehicles that met ordinary and reasonable consumer expectations regarding safe and reliable operation. Purchasers or lessees of the Class Vehicles (defined below) paid more, either through a higher purchase price or higher lease payments, than they would have had the Inflator Defect been disclosed. Plaintiffs and the Classes were deprived of having a safe, defect-free airbag installed in their vehicles, and New Chrysler unjustly benefited from its unconscionable delay in recalling its defective products, as it avoided incurring the costs associated with recalls and installing replacement parts for years.

19.     Plaintiffs and the Classes also suffered damages in the form of out-of-pocket and loss-of-use expenses and costs, including but not limited to expenses and costs associated with taking time off from work, paying for rental cars or other transportation arrangements, and paying for child care.  Also, as a direct result of misconduct by New Chrysler, each Plaintiff and Class member has out-of-pocket economic damage by virtue of having incurred the expense of taking the time to bring vehicles in for repair.

20.     Plaintiffs and the Classes also suffered damages as a result of New Chrysler's concealment and suppression of the facts concerning the safety, quality, and reliability of New and Old Chrysler vehicles with the defective Takata airbags.  New Chrysler's false representations and omissions concerning the safety and reliability of those vehicles and its concealment of the known safety defects plaguing those vehicles and its brand caused Plaintiffs and Class members to purchase, lease, or retain New and Old Chrysler vehicles of diminished value.

## JURISDICTION AND VENUE

21.     Jurisdiction is proper in this Court pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because members of the proposed Plaintiff Classes are citizens of states different from New Chrysler's home state, and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs.  Also, jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1331, because Plaintiffs' former RICO and Magnusson-Moss claims arise under federal law.  This Court has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367.

22.     This Court has personal jurisdiction over Plaintiffs because Plaintiffs submit to the Court's jurisdiction.

23.     This Court has personal jurisdiction over New Chrysler pursuant to Florida Statutes § 48.193(1)(a)(1), (2), and (6), because: New Chrysler conducts substantial business in this

District; some of the actions giving rise to the Complaint took place in this District; and some of Plaintiffs' claims arise out of New Chrysler operating, conducting, engaging in, or carrying on a business or business venture in this state or having an office or agency in this state, committing a tortious act in this state, and causing injury to property in this state arising out of New Chrysler's acts and omissions outside this state; and at or about the time of such injuries New Chrysler was engaged in solicitation or service activities within this state, or products, materials, or things processed, serviced, or manufactured by New Chrysler anywhere were used or consumed within this state in the ordinary course of commerce, trade, or use. This Court also has personal jurisdiction over New Chrysler because it consented to jurisdiction by registering to do business in Florida. This Court has pendant or supplemental personal jurisdiction over the claims of non-Florida Plaintiffs.

24.     New Chrysler is in the business of designing, developing, manufacturing, marketing, and selling automobiles in the United States, including in Florida. New Chrysler and its affiliates sold more than 2 million vehicles in the United States in 2019 alone, generating more than $50 billion in revenue. Florida is a significant market for New Chrysler and it generates a substantial percentage of its revenue from the sale of its vehicles in Florida.

25.     During the relevant time period, New Chrysler has continuously registered to do business in Florida and has appointed a registered agent in Florida. It most recently renewed its registration by filing an annual report on May 11, 2020, with the Florida Department of State, Division of Corporations, identifying CT Corporation System of Plantation, Florida as its registered agent, and Richard Palmer, Mark Stewart, and Michael Manley as "authorized persons" and managers.

26.     New Chrysler established channels for marketing Class Vehicles and providing regular advice to owners and lessees of Class Vehicles, including Plaintiffs, in the United States and this District by licensing its trademarks to dealerships and authorizing dealerships to sell New Chrysler vehicles.

27.     New Chrysler created or controlled the distribution network that brought Class Vehicles, including Plaintiffs' vehicles, to Florida. There are more than ten New Chrysler-authorized dealerships in Florida that sell new, used, and New Chrysler-Certified Pre-Owned vehicles.

28.     New Chrysler provided information to train personnel in the United States, including in Florida, in the repair, servicing, and preparation of Class Vehicles, including Plaintiffs' Vehicles.

29.     New Chrysler Class Vehicles, including Plaintiffs' vehicles, were the subject of nationwide advertising campaigns that were intended to reach and did reach Florida, that advertised and promoted the alleged safety of Class Vehicles, and that were controlled, directed, funded, and/or approved by New Chrysler. New Chrysler directed and approved the publication and distribution of these advertisements toward Florida consumers and Plaintiffs, with the intent and knowledge that they would reach consumers, including Class Members, in Florida, via television, print publications, and the internet. None of these advertisements or marketing materials disclosed that Plaintiffs' vehicles or Class Vehicles were equipped with defective Takata inflators.

30.     During the relevant time period, New Chrysler regularly communicated with authorized dealerships in the United States, including in Florida, to facilitate the sale and service of Class Vehicles, including Plaintiffs' vehicles, in the United States, including in Florida.

- 8 -

31. During the relevant time period, employees of New Chrysler regularly travelled to Florida to facilitate the sale and service of Class Vehicles, including Plaintiffs' vehicles, in Florida.

32. New Chrysler's website, during the relevant time period, has been accessible and accessed in Florida by Class Members. This website solicits the sale of New Chrysler vehicles and connects customers with New Chrysler-authorized dealers in the United States, including in Florida.

33. New Chrysler solicited the sale or lease of Class vehicles, including Plaintiffs' vehicles, in Florida. New Chrysler also markets vehicles in Florida by regularly attending trade shows in Florida every year.

34. New Chrysler has engaged in substantial business in Florida—among other things, advertising, selling, and servicing the models of vehicles that Plaintiffs here claim are defective.

35. New Chrysler encourages a resale market for its vehicles in Florida: almost all of its authorized dealerships buy and sell used Chrysler, Dodge, and Jeep vehicles, as well as selling new ones.

36. New Chrysler engages in wide-ranging promotional activities, including television, print, online, and direct-mail advertisements in Florida. By every means imaginable—among them billboards, TV and radio spots, print ads, and direct mail— New Chrysler urges residents of Florida to buy its vehicles, including the Class Vehicles.

37. Chrysler, Dodge, and Jeep vehicles—including the Class Vehicles—are available for sale, whether new or used, throughout Florida.

38. New Chrysler provides original parts to its dealerships, auto supply stores, and repair shops in Florida to ensure that consumers can keep their vehicles running long past the date of sale.

- 9 -

39.     New Chrysler's own network of dealers offers an array of maintenance and repair services, thus fostering an ongoing relationship between New Chrysler and its customers. There are at least 69 New Chrysler-authorized dealerships in Florida, all of which sold new and used Class Vehicles to Florida Class Members.

40.     Florida Plaintiffs suffered economic harm, loss, and damages in Florida as a result of purchasing Class Vehicles in Florida.

41.     During the relevant time period, employees of New Chrysler travelled to Florida to discuss, investigate, and evaluate PSAN inflators with Takata entities and investigate reported rupture and aggressive deployment events.

42.     New Chrysler marketed Class Vehicles, including Plaintiffs' vehicles, through affiliated distributors, which agreed to serve as sales agents for New Chrysler in the United States and this District.

43.     New Chrysler, directly or indirectly through agreements with financial service providers, engaged in the financing of authorized dealerships throughout the United States and this District, including the authorized dealerships that sold Class Vehicles to Plaintiffs.

44.     During the relevant period, New Chrysler regularly transported and distributed for sale tens of thousands of Class Vehicles to authorized dealerships in Florida to facilitate the sale of such Class Vehicles to consumers in Florida. For example, New Chrysler shipped Plaintiff Khoury's 2012 Dodge Charger to Napleton North Lake Chrysler Jeep Dodge in Palm Beach Gardens, Florida, an authorized New Chrysler-dealership, for sale in or around June 2012. This type of transaction for New Chrysler's pecuniary benefit occurred tens of thousands of times during the relevant time period with respect to the sale of Class Vehicles in Florida.

45.     During the relevant period, New Chrysler created, managed, marketed, and directed the Chrysler-Certified Pre-Owned Vehicle program, through its continuous contacts with authorized dealerships around the country and in Florida, to encourage consumers, including Class Members, to purchase used Class Vehicles from New Chrysler-authorized dealerships. This resulted in the sale of the 2012 Dodge Charger, which was a Chrysler-Certified Pre-Owned Vehicle, to Plaintiff Khoury from Napleton North Lake Chrysler Jeep Dodge in Palm Beach Gardens, Florida, in 2014. These types of transactions involving Class Vehicles, for New Chrysler's pecuniary benefit, occurred thousands of times during the relevant time period with respect to the sale of Chrysler-Certified Pre-Owned Class Vehicles in Florida.

46.     New Chrysler distributed Class Vehicles in the United States and Florida with "Monroney" labels that described the equipment and features of the vehicles, knowing that New Chrysler-authorized dealers would then sell Class Vehicles, both new and used, to consumers with these labels visible. Upon information and belief, Monroney labels for many of the Class Vehicles are available at https://monroneylabels.com/. The Monroney labels, which New Chrysler caused to be drafted, uniformly and misleadingly assured consumer that Class Vehicles had working airbags. This information would have suggested to any reasonable consumer that the Takata airbags installed in the Class Vehicles did not suffer from a defect and would perform their intended function during a collision.

47.     To facilitate the sale and service of Class Vehicles in Florida, New Chrysler directly or indirectly operates a parts distribution center, with numerous employees, in Orlando, Florida.

48.     During the relevant time period, New Chrysler has registered and maintained registrations with the United States government for trademarks associated with its New Chrysler-

- 11 -

branded vehicles and parts, which it uses to identify and distinguish its vehicles and parts in the United States and this District.

49.     New Chrysler, with the assistance of retained vendors, tracks the registration of Class Vehicles in the United States, including in Florida, to facilitate its communication with customers, including Plaintiffs and Class Members in Florida.

50.     For jurisdictional and venue purposes, the claims asserted in this consolidated complaint by non-Florida Plaintiffs who purchased or leased Class Vehicles are intended to amend and supersede the complaint originally filed in *Dwinnells v. FCA US LLC*, No. 2:18-cv-10848 (E.D. Mich.), in the Eastern District of Michigan and transferred to this Court for consolidated pretrial proceedings.  Standing in the shoes of the Eastern District of Michigan, this Court, as an MDL transferee Court, may exercise general jurisdiction over New Chrysler, which is "at home" in the Eastern District of Michigan, where its principal places of business is located.

51.     For jurisdictional and venue purposes, the claims asserted in this consolidated complaint by Florida Plaintiffs who purchased or leased their Class Vehicles in Florida are, per the Court's Orders, "Direct-File" claims to be litigated in this Court, both during and after pretrial proceedings.

52.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a) because a substantial part of the events or omissions giving rise to these claims occurred in this District, New Chrysler has caused harm to Class members residing in this District, and New Chrysler is a resident of this District under 28 U.S.C. § 1391(c)(2) because it is subject to personal jurisdiction in this district.

## THE PARTIES

### I.    New Chrysler

53.    FCA US LLC ("New Chrysler"), formerly known as Chrysler Group LLC, is a Delaware limited liability company with its principal place of business located at 1000 Chrysler Drive, Auburn Hills, Michigan, and New Chrysler is a citizen of the States of Delaware and Michigan.  The sole owner of New Chrysler is Fiat Chrysler Automobiles N.V., a public limited liability company incorporated under the laws of the Netherlands with its principal place of business located in London, United Kingdom.

### II.    Plaintiffs

54.    Unless otherwise indicated, all Plaintiffs identified below purchased or leased their Class Vehicles primarily for personal, family, and household use.  All Plaintiffs identified below and the proposed Classes were harmed and suffered actual damages.

55.    The defective Takata airbags significantly diminished the value of the Class Vehicles in which they are installed.  Such vehicles have been stigmatized as a result of being recalled and equipped with Takata airbags as well as by the widespread publicity of the Inflator Defect.

56.    The Inflator Defect that New Chrysler concealed throughout the Class Period related to the safety and reliability of the Class Vehicles, and it affected the brand perception and market value of all Class Vehicles.  Information concerning the safety of these vehicles, including whether New Chrysler would implement necessary corrective safety measures for these vehicles, was material.  Reasonable consumers would consider that information important in deciding whether to purchase, lease, operate, trade in, or sell Class Vehicles.  Provided with the truth regarding these vehicles, Plaintiffs and Class Members would not have purchased or leased their

Class Vehicles and/or would not have paid as much as they did; and would not, to their practical ability to do so, have continued to drive the Class Vehicles without corrective safety measures or other affirmative steps by New Chrysler to make these vehicles safe and protect their economic value.

57.     Further, all Plaintiffs identified below and in the proposed Classes did not receive the benefit of their bargain; rather, they purchased and leased vehicles that are of a lesser standard, grade, and quality than represented, and they did not receive vehicles that met ordinary and reasonable consumer expectations regarding safe and reliable operation.  All Plaintiffs identified below and in the proposed Classes, either through a higher purchase price or higher lease payments, paid more than they would have or would not have otherwise purchased said vehicles, had the Inflator Defect been disclosed.  All Plaintiffs identified below and in the proposed Classes were deprived of having a safe, defect-free airbag installed in their vehicles, and New Chrysler unjustly benefited from its unconscionable delay in recalling its defective products, as it avoided incurring the costs associated with recalls and installing replacement parts for many years.

58.     All Plaintiffs identified below and in the proposed Classes also suffered damages in the form of out-of-pocket and loss-of-use expenses and costs, including but not limited to expenses and costs associated with taking time off from work, paying for rental cars or other transportation arrangements, and child care.

59.     All Plaintiffs identified below and members of the proposed Classes who have brought their vehicles to dealerships have suffered out-of-pocket economic damages by virtue of having incurred the expense of taking the time to bring their vehicles in for repair.

60. The defective Takata airbags create a dangerous condition that gives rise to a clear, substantial, and unreasonable danger of death or personal injury to all identified Plaintiffs below and the proposed Classes.

Rmzy Abdallah—New York

61. Plaintiff Rmzy Abdallah resides in Orchard Park, New York. Plaintiff owned a 2015 Jeep Wrangler Sahara Edition, which he purchased new on June 14, 2015 for approximately $39,500 from Towne Chrysler Jeep, a New Chrysler dealership in Hamburg, New York. Plaintiff's vehicle was covered by a written warranty. Plaintiff viewed or heard commercials and reviews through television, radio, and the internet that touted the safety and reliability of his vehicle and New Chrysler vehicles generally. To Plaintiff's knowledge, the airbags in his vehicle have not been repaired or replaced. Plaintiff purchased his 2015 Jeep Wrangler Sahara Edition for recreational off-road use but has stopped driving his vehicle off road out of concern for his safety due to the Inflator Defect. The value of Plaintiff's 2015 Jeep Wrangler Sahara Edition has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, Plaintiff would not have purchased the 2015 Jeep Wrangler Sahara Edition or would not have paid as much as he did for it.

Bridget Boyd—Texas

62. Plaintiff Bridget Boyd resides in Longview, Texas. Plaintiff Boyd owns a 2009 Chrysler Aspen, which she purchased used on April 11, 2015 for $20,200 from Driver's Choice in White Oak, Texas. On information and belief, New Chrysler has informed NHTSA and has publicly stated that 2009 Chrysler Aspen vehicles contain Takata airbags with the Inflator Defect and are subject to recall. After learning of this recall, Plaintiff attempted to get the airbags in her vehicle replaced but no replacement parts were available. The value of Plaintiff's vehicle has been

- 15 -

diminished as a result of the Inflator Defect.  If Plaintiff had known about the Inflator Defect, she would have not purchased the vehicle, or would not have paid as much as she did for it.

Carla Campagnone—Massachusetts

63.    Plaintiff Carla Campagnone resides in Everett, Massachusetts. Plaintiff Campagnone owns a 2016 Jeep Wrangler, which was purchased new on June 26, 2016 for $44,610 from Kelly Jeep in Lynnfield, Massachusetts. Plaintiff's vehicle is covered under the original written warranty as well as under Mopar's extended warranty. Plaintiff Campagnone reviewed materials regarding airbags and promotional materials for the 2016 Jeep Wrangler prior to purchasing it, at least some of which mentioned the vehicle was equipped with side airbags. On information and belief, New Chrysler has informed NHTSA and has publicly stated, that its 2016 Jeep Wrangler vehicles contain Takata airbags with the Inflator Defect and are subject to recall. When Plaintiff first learned of the recall, she looked it up and discovered that her vehicle was not scheduled to received replacement parts for several years. The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, she would have not purchased the vehicle, or would not have paid as much as she did for it.

T'Keya Cooper—South Carolina

64.    Plaintiff T'Keyah Cooper resides in Spartanburg, South Carolina. Plaintiff Cooper owned a 2015 Dodge Charger, which she purchased used on September 5, 2017 for $24,772.50 from Spartanburg Chrysler Dodge Jeep Ram in Spartanburg, South Carolina. Plaintiff's 2015 Dodge Charger was covered by a written warranty. Plaintiff Cooper purchased an extended warranty. On information and belief, New Chrysler has informed NHTSA and has publicly stated that its 2015 Dodge Charger vehicles contain Takata airbags with the Inflator Defect and are subject to recall. The value of Plaintiff's vehicle has been diminished as a result of the Inflator

- 16 -

Defect. If Plaintiff had known about the Inflator Defect, she would have not purchased the vehicle, or would not have paid as much as she did for it.

Daniel Dwinnells—Maryland

65.     Plaintiff Daniel Dwinnells resides in Smithsburg, Maryland. Plaintiff Dwinnells owns a 2006 Dodge Dakota, which he purchased used on August 12, 2013 for $8,995.62 from Ideal Buick GMC in Frederick, Maryland. Prior to purchasing the vehicle, Plaintiff Dwinnells saw television commercials touting Chrysler's safety and reliability. On information and belief, New Chrysler has informed NHTSA and has publicly stated that its 2011 Dodge Dakota vehicles contain Takata airbags with the Inflator Defect and are subject to recall. To Plaintiff Dwinnells' knowledge, the airbags in his 2006 Dodge Dakota have never been repaired or replaced, despite Plaintiff Dwinnells making numerous attempts to participate in the recall. The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, he would have not purchased the vehicle, or would not have paid as much as he did for it.

Michael Eikenberry—Indiana

66.     Plaintiff Michael Eikenberry resides in Tampa, Florida. Plaintiff Eikenberry owned a 2012 Chrysler 300, which he purchased used on June 5, 2015 from Auto World in Kokomo, Indiana. The vehicle was previously covered under a written warranty. On information and belief, New Chrysler has informed NHTSA and has publicly stated that its 2015 Chrysler 300 vehicles contain Takata airbags with the Inflator Defect and are subject to recall. The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, he would have not purchased the vehicle, or would not have paid as much as he did for it.

John Fuesting—Illinois

67.     Plaintiff John Fuesting resides in Collinsville, Illinois.  Plaintiff John Fuesting owned a 2015 Jeep Wrangler, which he purchased new on February 25, 2015 for $40,832 from Cassens & Sons Chrysler Dodge Jeep Ram, a New Chrysler dealership in Edwardsville, Illinois.  Prior to purchasing his vehicle, Plaintiff John Fuesting viewed or heard commercials and reviews through television, radio, and the internet that touted the safety and reliability of his vehicle and New Chrysler vehicles generally.   The value of Plaintiff's 2015 Jeep Wrangler has been diminished as a result of the Inflator Defect.  If Plaintiff had known about the Inflator Defect, he would have not purchased the vehicle, or would not have paid as much as he did for it.

Priscilla Fuesting—Illinois

68.     Plaintiff Priscilla Fuesting resides in Collinsville, Illinois.  Plaintiff Priscilla Fuesting owns a 2015 Jeep Wrangler, which she purchased new on February 27, 2015 for $36,000 from Cassens & Sons Chrysler Dodge Jeep Ram, a New Chrysler dealership in Edwardsville, Illinois.  Prior to purchasing her vehicle, Plaintiff Priscilla Fuesting viewed or heard commercials and reviews through television, radio, and the internet that touted the safety and reliability of her vehicle and Jeep vehicles generally.  The value of Plaintiff's 2015 Jeep Wrangler has been diminished as a result of the Inflator Defect.  If Plaintiff had known about the Inflator Defect, she would have not purchased the vehicle, or would not have paid as much as she did for it.

Michelle Gibson—Georgia

69.     Plaintiff Michelle Gibson resides in Lithonia, Georgia.  Plaintiff Gibson owned a 2010 Dodge Charger which she purchased used on August 14, 2013 for $36,000 from US Auto

- 18 -

Sales, a New Chrysler dealership in Snellville, Georgia. Plaintiff viewed or heard commercials and reviews through television, radio, and the internet that touted the safety and reliability of her vehicle and New Chrysler vehicles generally. To Plaintiff's knowledge, the airbags in her 2010 Dodge Charger have not been repaired or replaced. The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect. If Plaintiff Gibson had known about the Inflator Defect, she would not have purchased the vehicle or would not have paid as much as she did for it.

Rushelle Gonder—California

70.     Plaintiff Rushelle Gonder resides in Long Beach, California. Plaintiff Gonder owns a 2010 Chrysler 300 Touring, which she purchased used on July 20, 2012 for $21,000 from Scott Robinson Chrysler in Torrance, California. On information and belief, New Chrysler has informed NHTSA and has publicly stated that 2010 Chrysler 300 vehicles contain Takata airbags with the Inflator Defect and are subject to recall. The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, she would have not purchased the vehicle, or would not have paid as much as she did for it.

Deborah Hillyer—Michigan

71.     Plaintiff Deborah Hillyer resides in Warren, Michigan. Plaintiff Hillyer owns a 2015 Chrysler 300, which she purchased used on July 29, 2016, for $29,987.76 from AM Automotive LLC in Roseville, Michigan. On information and belief, New Chrysler has informed NHTSA and has publicly stated that its 2015 Chrysler 300 vehicles contain Takata airbags with the Inflator Defect and are subject to recall. The value of Plaintiff's vehicle has been diminished

as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, she would have not purchased the vehicle, or would not have paid as much as she did for it.

Debrah Johnson—Georgia

72.    Plaintiff Debrah Johnson resides in Covington, Georgia. Plaintiff Johnson owns a 2014 Dodge Charger, which she purchased new on July 29, 2014 for $29,867.98 from Landmark Chrysler Jeep Dodge, a New Chrysler dealership in Morrow, Georgia. Plaintiff viewed or heard commercials and reviews through television, radio, and the internet that touted the safety and reliability of her vehicle and New Chrysler vehicles generally. The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect. If Plaintiff Johnson had known about the Inflator Defect, she would not have purchased the 2014 Dodge Charger, or would not have paid as much as she did for it.

Victor Khoury—Florida

73.    Plaintiff Victor Khoury resides in West Palm Beach, Florida. Plaintiff Khoury owned a 2012 Dodge Charger, which he purchased, as a Chrysler-Certified Pre-Owned Vehicle, on July 31, 2014 for $24,208.13 from Napleton's Chrysler Jeep in Palm Beach Gardens, Florida, a New Chrysler-authorized dealership. Plaintiff Khoury viewed or heard commercials online and in the newspaper that touted the safety and reliability of his vehicle and New Chrysler vehicles generally. New Chrysler created and/or approved such advertisements and directed their publication and distribution to reach Florida residents like Plaintiff Khoury. Plaintiff Khoury purchased an extended bumper to bumper warranty for his 2012 Dodge Charger to cover the vehicle up to 136,000 miles. The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, he would have not purchased the vehicle, or would not have paid as much as he did for it.

- 20 -

Dave Krzeminski—Michigan

74.     Plaintiff Dave Krzeminski resides in Howell, Michigan. Plaintiff Krzeminski

owns a 2007 Dodge Ram 1500, which he purchased used for roughly $14,000 from a used car

dealership in Howell, Michigan in January 2013. On information and belief, Defendant New

Chrysler has informed NHTSA and has publicly stated that 2007 Dodge Ram 1500 vehicles

contain Takata airbags with the Inflator Defect and are subject to recall. Plaintiff Krzeminski

was not notified of this recall until late 2017. To Plaintiff Krzeminski's knowledge, the airbags

in his 2007 Dodge Ram 1500 have never been repaired or replaced. The value of Plaintiff's

vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the

Inflator Defect, he would have not purchased the vehicle, or would not have paid as much as he

did for it.

Pedro Lucero—California

75.     Plaintiff Pedro Lucero resides in Fairfield, California. Plaintiff Lucero owns a

2012 Chrysler 300, which he purchased new in April of 2012 for $42,000 from Elk Grove

Chrysler in Elk Grove, California. Plaintiff Lucero's 2012 Chrysler 300 is covered under a

standard written warranty from Chrysler. Prior to purchasing his vehicle, Plaintiff Lucero

viewed television commercials and new car brochures. On information and belief, New Chrysler

has informed NHTSA and has publicly stated that its 2012 Chrysler 300 vehicles contain Takata

airbags with the Inflator Defect and are subject to recall. The value of Plaintiff's vehicle has

been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator

Defect, he would have not purchased the vehicle, or would not have paid as much as he did for

it.

- 21 -

Victoria Lykins—Ohio

76.     Plaintiff Victoria Lykins resides in Sardinia, Ohio. Plaintiff Lykins owns a 2012 Dodge Challenger, which she purchased new in November 2013 for $32,000 from Jeff Wyler, Eastgate Automall in Batavia, Ohio. Plaintiff Lykin's vehicle is currently under written warranty. Plaintiff viewed television and internet advertisements for the vehicle prior to purchase. On information and belief, New Chrysler has informed NHTSA and has publicly stated that its 2012 Dodge Challenger vehicles contain Takata airbags with the Inflator Defect and are subject to recall. The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, she would have not purchased the vehicle, or would not have paid as much as she did for it.

Ronaldo Maldia—California

77.     Plaintiff Ronaldo Maldia resides in Poway, California. Plaintiff Maldia owned a 2006 Dodge Charger, which was purchased used in December 2010 for $18,554 from Balboa Motors in San Diego, California.  The value of his 2006 Dodge Charger has been diminished as a result of the Inflator Defect. If Plaintiff Maldia had known about the Inflator Defect, he would not have purchased the 2006 Dodge Charger or would not have paid as much as he did for it.

Gene Marsilio—New Jersey

78.     Plaintiff Gene Marsilio resides in Fair Lawn, New Jersey.  Plaintiff Marsilio owned a 2012 Dodge Challenger which he purchased used on March 21, 2016 for $35,351.53 from Luxury Haus, a dealership in Leonia, New Jersey.  Plaintiff viewed or heard commercials and reviews through television, radio, and the internet that touted the safety and reliability of his vehicle and New Chrysler vehicles generally. The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect.  If Plaintiff Marsilio had known about the Inflator

Defect, he would not have purchased the vehicle, or would not have paid as much as he did for it.

Michael McClellion—South Carolina

79.     Plaintiff Michael McClellion resides in Pelzer, South Carolina. Plaintiff McClellion owned a 2010 Dodge Charger, which he purchased used on February 9, 2011 for $18,900 from Elite Car Rental in Greenville, South Carolina. Prior to purchasing the vehicle, Plaintiff McClellion viewed advertisements for the vehicle.  On information and belief, New Chrysler has informed NHTSA and has publicly stated that 2010 Dodge Charger vehicles contain Takata airbags with the Inflator Defect and are subject to recall. However, when Plaintiff McClellion contacted the dealership about the airbags, he was told that he could keep driving his vehicle and that his vehicle was fine. To Plaintiff McClellion's knowledge, the airbags in his 2010 Dodge Charger were replaced under the recall; one in August of 2015 and the other in November of 2017.  The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, he would not have purchased the vehicle, or would not have paid as much as he did for it.

Randy Nielsen—Alabama

80.     Plaintiff Randy Nielsen resides in Cape Giradeau, Missouri. Plaintiff Nielsen owned a 2012 Chrysler 300, which he purchased used on January 2, 2014, for $22,500 from Alexander Dodge in Albertville, Alabama. Plaintiff Nielsen's 2012 Chrysler 300 was covered under the manufacturer's written warranty. Prior to purchasing the vehicle, Plaintiff Nielsen reviewed TV and radio advertisements as well as e-mails from Chrysler, which promoted the vehicle's safety. On information and belief, New Chrysler has informed NHTSA and has

publicly stated that its 2012 Chrysler 300 vehicles contain Takata airbags with the Inflator Defect and are subject to recall. When Plaintiff Nielsen initially called about the recall, the dealership was not able to schedule an appointment to get the vehicle repaired. Plaintiff Nielsen's airbags were replaced in December 2017. The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, he would have not purchased the vehicle, or would not have paid as much as he did for it.

Laquintha O'Neal—North Carolina

81.     Plaintiff Laquintha O'Neal resides in Kannapolis, North Carolina. Plaintiff O'Neal owns a 2012 Dodge Charger, which she purchased on March 8, 2015 for $20,427.50 from Carmax in Charlotte, North Carolina. On information and belief, New Chrysler has informed NHTSA and has publicly stated that its 2012 Dodge Charger vehicles contain Takata airbags with the Inflator Defect and are subject to recall. The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, she would have not purchased the vehicle, or would not have paid as much as she did for it.

Laurie Reynolds—Arizona

82.     Plaintiff Laurie Reynolds resides in Lake Havasu City, Arizona. Plaintiff Reynolds owns a 2013 Dodge Charger, which she purchased used on May 12, 2016 for $21,565.46 from Anderson Toyota in Lake Havasu City, Arizona. On information and belief, New Chrysler has informed NHTSA and has publicly stated that its 2013 Dodge Charger vehicles contain Takata airbags with the Inflator Defect and are subject to recall. To Plaintiff Reynolds' knowledge, the airbags in her 2013 Dodge Charger have been repaired or replaced. The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect. If Plaintiff

had known about the Inflator Defect, she would have not purchased the vehicle, or would not have paid as much as she did for it.

Elizabeth Washington—Illinois

83.    Plaintiff Elizabeth Washington resides in Milwaukee, Wisconsin. Plaintiff Washington owns a 2010 Dodge Challenger, which she purchased used on October 9, 2013 from Howard Automotive in Elmhurst, Illinois. On information and belief, Defendant New Chrysler has informed NHTSA and has publicly stated that 2010 Dodge Challenger vehicles contain Takata airbags with the Inflator Defect and are subject to recall. Plaintiff Washington learned of the recall when she received a postcard in the mail. When Plaintiff Washington contacted a dealership to set up an appointment to get her airbag fixed, she was told that the replacement parts were not available. After multiple attempts to get the recall countermeasure performed, on November 18, 2017, the airbag in Plaintiff Washington's 2010 Dodge Challenger was replaced. The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, she would have not purchased the vehicle, or would not have paid as much as she did for it.

84.    For ease of reference, the following chart organizes the Consumer Plaintiffs by the state in which they acquired their respective Class Vehicles:

| No. | State of Purchase | Plaintiff | Vehicle |
|---|---|---|---|
| 1 | Alabama | Randy Nielsen | 2012 Chrysler 300 |
| 2 | Arizona | Laurie Reynolds | 2013 Dodge Charger |
| 3 | California | Rushelle Gonder | 2010 Chrysler 300 Touring, |
| 4 | California | Pedro Lucero | 2012 Chrysler 300 |
| 5 | California | Ronaldo Maldia | 2006 Dodge Charger |
| 6 | Florida | Victor Khoury | 2012 Dodge Charger |

- 25 -

| No. | State of Purchase | Plaintiff | Vehicle |
|---|---|---|---|
| 7 | Georgia | Michelle Gibson | 2010 Dodge Charger |
| 8 | Georgia | Debrah Johnson | 2014 Dodge Charger |
| 9 | Illinois | John Fuesting | 2015 Jeep Wrangler |
| 10 | Illinois | Priscilla Fuesting | 2015 Jeep Wrangler |
| 11 | Illinois | Elizabeth Washington | 2010 Dodge Challenger |
| 12 | Indiana | Michael Eikenberry | 2012 Chrysler 300 |
| 13 | Maryland | Daniel Dwinnells | 2006 Dodge Dakota |
| 14 | Massachusetts | Carla Campagnone | 2016 Jeep Wrangler |
| 15 | Michigan | Deborah Hillyer | 2015 Chrysler 300 |
| 16 | Michigan | Dave Krzeminski | 2007 Dodge Ram 1500 |
| 17 | New Jersey | Gene Marsilio | 2012 Dodge Challenger |
| 18 | New York | Rmzy Abdallah | 2015 Jeep Wrangler |
| 19 | North Carolina | Laquintha O'Neal | 2012 Dodge Charger |
| 20 | Ohio | Victoria Lykins | 2012 Dodge Challenger |
| 21 | South Carolina | T'Keya Cooper | 2015 Dodge Charger |
| 22 | South Carolina | Michael McClellion | 2010 Dodge Charger |
| 23 | Texas | Bridget Boyd | 2009 Chrysler Aspen |

## GENERAL FACTUAL ALLEGATIONS

### I.    Definitions

85.    Plaintiffs bring this action on behalf of themselves and all persons similarly situated who purchased or leased Class Vehicles (defined below).  Plaintiffs seek redress individually and on behalf of those similarly situated for economic losses stemming from New Chrysler's manufacture, sale or lease, and false representations concerning the defective airbags in the Class Vehicles, including but not limited to diminished value.  Plaintiffs, on behalf of themselves and those similarly situated, seek to recover damages, statutory penalties, and injunctive relief/equitable relief.

86.    "Class Vehicles" refers to all vehicles in the United States that (a) were equipped with Defective Airbags (defined below) as original equipment and (b) were: (1) manufactured,

sold, distributed, or leased by New Chrysler; or (2) manufactured, sold, distributed, or leased by Old Chrysler and purchased or leased by a Class member after June 1, 2009.

87.    "Defective Airbags" refers to all airbag modules (including inflators) manufactured by Takata ("Takata airbags") that use propellant containing ammonium nitrate in their inflators (the "Inflator Defect"), including: (a) all airbags that are subject to the recalls identified in the tables set forth in paragraph 89 below; (b) all Takata airbags in New and Old Chrysler vehicles subject to recalls relating to Takata's May 18, 2015, DIRs, the Coordinated Remedy Order issued by NHTSA in *In re Docket No. NHTSA-2015-0055 Coordinated Remedy Program Proceeding*, and amendments thereto, concerning Takata's ammonium nitrate inflators, and the Consent Order issued by NHTSA in *In re EA 15-001 Air Bag Inflator Rupture*, and any amendments thereto; and (c) all Takata airbags in New and Old Chrysler vehicles subject to any subsequent expansion of pre-existing recalls, new recalls, amendments to pre-existing DIRs, or new DIRs, announced prior to the date of an order granting class certification, relating to the tendency of such airbags to over-aggressively deploy or rupture.

88.    All Defective Airbags contain the Inflator Defect. As a result of the Inflator Defect, all Defective Airbags have an unreasonably dangerous tendency to (a) rupture and expel metal shrapnel that tears through the airbag and poses a threat of serious injury or death to occupants; and/or (b) hyper-aggressively deploy and seriously injure occupants through contact with the airbag.

89.    The following tables identify, to the best of Plaintiffs' understanding and without the benefit of discovery, the New and Old Chrysler vehicles either recalled or scheduled to be recalled to date, and which of the front airbags were included in the recall for each vehicle (driver

side or passenger side).  All of these recalls have been issued by New Chrysler, including for

vehicles manufactured by Old Chrysler.

| Recall | Make | Model | Model Years | Side(s) |
|--------|------|-------|-------------|---------|
| 14V-354,<br>14V-770,<br>14V-817,<br>15V-313,<br>16V-352,<br>18E-001,<br>18E-002,<br>18E-003,<br>19V018 | Chrysler | 300 | 2005-2015 | Both |
| 14V-354,<br>14V-770,<br>14V-817,<br>15V-313,<br>16V-352,<br>18E-003 | Chrysler | Aspen | 2007-2009 | Both |
| 16V-081 | Chrysler | Crossfire | 2006-2008 | Driver |
| 15V-313,<br>16V-352 | Chrysler | SRT8 | 2005-2010 | Both |
| 15V-313,<br>16V-352,<br>18E-002,<br>18E-003,<br>19V018 | Dodge | Challenger | 2008-2014 | Both |
| 15V-313,<br>16V-352,<br>18E-002,<br>18E-003,<br>19V018 | Dodge | Charger | 2005-2015 | Both |
| 14V-354,<br>14V-770,<br>14V-817,<br>15V-313,<br>16V-352,<br>18E-002,<br>18E-003 | Dodge | Dakota | 2005-2011 | Both |

| Recall | Make | Model | Model Years | Side(s) |
|---|---|---|---|---|
| 14V-354, 14V-770, 14V-817, 15V-313, 16V-352, 18E-003 | Dodge | Durango | 2004-2009 | Both |
| 14V-817, 15V-313, 16V-352 | Dodge | Magnum | 2005-2010 | Both |
| 14V-354, 14V-770, 14V-817, 15V-313, 16V-352, 18E-003 | Dodge Ram | 1500/2500/3500 Pickup | 2003-2009 | Both |
| 14V-354, 14V-770, 14V-817, 15V-313, 16V-352, 18E-003 | Dodge Ram | 3500 Cab Chassis | 2007-2010 | Both |
| 14V-354, 14V-770, 14V-817, 15V-313, 16V-352, 18E-002, 18E-003 | Dodge Ram | 4500/5500 Cab Chassis | 2008-2010 | Both |
| 16V-352, 19V018 | Jeep | Wrangler | 2007-2016 | Passenger |

## II.     Takata's Airbags Have a Common, Uniform Defect

### A.     Defendants Chose an Inexpensive and Dangerous Propellant

90.     The part of the airbag at issue in this matter is the inflator. The inflator consists of

a metal canister loaded with propellant wafers or pellets, and the inflator is placed in the airbag

module. Upon impact, the propellant wafers or pellets ignite, triggering a chemical reaction that produces gas, which in turn inflates the fabric airbag. This process occurs within milliseconds.

91. The following basic illustration depicts Takata's airbag module:



92. When it began manufacturing airbags in the 1980s, Takata used sodium azide as the propellant within its inflators. In the mid-1990s, Takata began using a different propellant called 5-aminotetrazole, in part due to toxicity issues associated with sodium azide.

93. In the late-1990's, Takata's managers pressured its engineers in Michigan to devise a lower-cost propellant based upon ammonium nitrate, a compound used in fertilizer and explosives.

94. Ammonium nitrate is an inherently volatile and unstable chemical. Daily temperature swings are large enough for ammonium nitrate to cycle through three of its five crystalline states, adding to its volatility. It also readily absorbs moisture from the atmosphere. The chemical's sensitivity to temperature and moisture causes it to break down over time, which

can lead to unpredictable and dangerous results, such as violent detonation. As one explosives expert bluntly stated in *The New York Times*, ammonium nitrate "shouldn't be used in airbags," and it is better suited to large demolitions in mining and construction.

95.     From the time it began investigating ammonium nitrate in the late 1990s, Takata understood these risks and publicized them in the industry. Indeed, in a 1996 patent document, Takata expressed concern that an ammonium-nitrate propellant would be vulnerable to temperature changes and that its casing "might even blow up." Takata further recognized "[o]ne of the major problems with the use of ammonium nitrate is that it undergoes several crystalline phase changes," one of which occurs at approximately 90 degrees Fahrenheit. Takata also noted that if ammonium nitrate undergoes this type of temperature change, the compound may "expand and contract and change shape resulting in growth and cracking" of the propellant, which might cause an airbag inflator to "not operate properly or [it] might even blow up because of the excess pressure generated."

96.     Takata further admitted in a 1999 patent document that pure ammonium nitrate is "problematic" because many gas generating compositions made with it are "thermally unstable."

97.     In 1999, as the ammonium nitrate design was being considered, Takata's engineering team in Moses Lake, Washington raised objections and pointed to publicly available explosives manuals that warned of the risk of disintegration and irregular, overly-energetic combustion. As one former Takata engineer noted, "ammonium nitrate stuck out like a sore thumb," and yet his team had only "a couple days" to do its review.

98.     Not surprisingly, other major airbag manufacturers, including Autoliv and Key Safety Systems, have reportedly avoided using ammonium nitrate as a propellant. Indeed, at a

- 31 -

Congressional hearing in June 2015, Takata's representative confirmed Takata was the only major airbag manufacturer that uses ammonium nitrate as a primary propellant in its inflators.

99.     The only conceivable advantage to using the ammonium nitrate compound for an airbag manufacturer, according to the expert quoted in *The New York Times*, is that it is "cheap, unbelievably cheap." Takata had originally planned to use tetrazole as its propellant, which is both more stable than ammonium nitrate and also more environmentally friendly, among other benefits. But tetrazole was too expensive for Takata, and Takata executives ultimately pressured engineers in Michigan to develop a cheaper alternative.

100.     Takata began receiving complaints regarding the Inflator Defect shortly after introducing the redesigned airbag to the market, and those complaints continued to multiply over the years.  Nevertheless, rather than switch to the compound it knew would be safer, even if more expensive, Takata recklessly opted to try, over the course of many years, to stabilize a compound that resists stabilization.

101.     For example, in a 2006 patent application, Takata discussed the need to test the performance of ammonium nitrate at various extreme temperatures because it is an unstable chemical, and these tests could reveal many problems, including "over-pressurization of the inflator leading to rupture." The 2006 patent document purportedly contained a fix for that sort of rupturing.

102.     Notably, the alleged fix in 2006 came *after* an inflator rupture incident in 2004 that caused a serious injury, and incidents continued to mount after that time as well.  Takata submitted a patent application with other purported "fixes" as recently as 2013.  These ongoing, albeit unsuccessful, efforts show that Takata knew throughout the relevant period that its airbags were defective.

- 32 -

103.     In a 2007 patent for allegedly phase stabilized ammonium nitrate that incorporates a scavenging additive designed to retain moisture in an effort to prevent these catastrophic inflator ruptures, Takata representatives noted the following:

> Without the addition of the [additive], and as shown in [the patent], the ballistic curves indicate that changes occurred in the gas generant after 50 cycles. After 100 cycles the ballistic performance was very aggressive and did not meet USCAR specification. After 200 cycles the ballistic performance was so aggressive that the inflator ruptured due to extremely high internal pressures.

104.     The inflators were "grenades" in the glove box or steering wheel waiting to detonate after going through 100 or 200 cycles of thermal cycling, which, of course, is something cars in the real world will eventually do.

105.     The use of this additive (or any other) designed to address ammonium nitrate's hygroscopic nature (affinity for moisture) is, at best, a temporary fix because at some point the additive will no longer be able to absorb the excess moisture and the ballistic curves will again exceed specification leading to ruptures.

**B.     The Risks of the Inflator Defect Were Exacerbated by Takata's and New Chrysler's Abysmal Quality Control**

106.     Takata and New Chrysler became further aware of the instability of Takata's ammonium-nitrate propellant from the persistent and glaring quality control problems Takata encountered in its manufacturing operations. The Takata plants that manufactured the airbags and inflators at issue in this Complaint include plants located in Moses Lake, Washington, LaGrange, Georgia, and Monclova, Mexico. New Chrysler routinely visited and audited Takata operations, including in response to quality and safety concerns.

107.     Starting in 2001, engineers at Takata's Monclova, Mexico plant identified a range of problems, including rust, which they said could have caused inflators to fail. Between 2001 and

2003, Takata struggled with at least 45 different inflator problems, according to dozens of internal reports titled "potential failures" and reviewed by *Reuters*.

108.    On at least three occasions between 2005 and 2006, Takata engineers struggled to eliminate leaks found in inflators, according to engineering presentations.  In 2005, Shainin, a U.S. consulting firm, found a pattern of additional problems.  Underscoring Takata's reckless use of the volatile and unstable ammonium nitrate, on March 31, 2006, the Monclova, Mexico plant was rocked by violent explosions in containers loaded with propellant.  New Chrysler employees were made aware of this incident soon after it occurred.

109.    Apparently, not even that terrible accident could prompt serious and lasting improvements: in a February 2007 email to multiple colleagues, one manager stated that "[t]he whole situation makes me sick," referring to Takata's failure to implement checks it had introduced to try to keep the airbags containing the unstable and volatile ammonium-nitrate propellant from failing.

110.    Takata engineers also scrambled as late as 2009 to address its propellant issues after "inflators tested from multiple propellant lots showed aggressive ballistics," according to an internal presentation in June 2009.

111.    Based on internal Takata documents, Takata was struggling to meet a surge in demand for its airbags.  Putting profits ahead of safety, Takata exhibited shoddy and reckless behavior in the handling of its ammonium-nitrate propellant.  In March 2011, a Takata supervisor at the Monclova, Mexico plant sent an e-mail to other employees stating, "A part that is not welded = one life less, which shows we are not fulfilling the mission." The title of the e-mail was "Defectos y defectos y defectos!!!!" This shoddy and reckless attitude permeated all of Takata's operations and facilities.

- 34 -

112.    Yet handling problems at Takata facilities persisted. Another manager urged employees to examine the propellant visible in a cross section of an airbag inflator, noting that "[t]he propellant arrangement inside is what can be damaged when the airbags are dropped. . . . Here you can see why it is important to handle our product properly."  A 2009 presentation of guidelines on handling inflators and airbag units also stressed the dangers of mishandling them. The presentation included a link to a video that appeared to show side-curtain airbags deploying violently, sending one of the airbags' inflators hurtling into the car's cabin.

113.    Despite knowing it was shipping potentially deadly products, including inflators containing unstable and volatile ammonium-nitrate propellant, Takata resisted taking back damaged or wet airbag modules, in part because Takata struggled to keep up with a surge in demand for its airbags through the early and mid-2000s as it won big new clients like Old Chrysler.

## III.    New Chrysler's Knowledge of the Defective Airbag

### A.    New Chrysler's Inherited Knowledge

114.    As a result of the extensive literature detailing the problems with using ammonium nitrate as well as Old Chrysler's intimate involvement in developing specifications and testing standards for the problematic ammonium nitrate inflators, Old Chrysler had long been aware of the problems associated with the use of ammonium nitrate in Takata's airbags.

115.    In 1992, Old Chrysler, along with Ford and General Motors, founded the United States Council for Automotive Research ("USCAR").  Thereafter, these three U.S. automakers began collaborating on the USCAR specifications for airbag inflators.  These specifications included requirements for testing related to the use of ammonium nitrate as a propellant in airbag inflators.  These USCAR specifications recognized that inflators using ammonium nitrate were particularly problematic and required additional testing:

- 35 -

> **Propellant Stability**. Ammonium Nitrate containing propellants
> shall be required to undergo added stability evaluation for propellant
> strength and burn rate stability as agreed to by the Responsible
> Vehicle Engineering Organization.

This required additional testing was based upon the well-known problems with ammonium nitrate

losing stability when exposed to moisture and thermal cycling.

116.     In fact, the *New York Times* has reported that, in the late 1990s, Autoliv, another

company that supplied airbags to Old Chrysler, had its scientists study the Takata airbag, and they

learned that it utilized the dangerously volatile compound, ammonium nitrate.

117.     According to the *New York Times*, Robert Taylor, Autoliv's head chemist at the

time, analyzed every facet of the Takata airbag, including the ammonium-nitrate propellant. The

takeaway, Taylor said, was that when the airbag was detonated, "the gas generated so fast, it blows

the inflator to bits." Chris Hock, a former member of Mr. Taylor's team, said a mock ammonium-

nitrate inflator test "totally destroyed the fixture" and "turned it into shrapnel." Upon information

and belief, these findings were shared with Old Chrysler and subsequently passed on to New

Chrysler.

118.     Despite being presented with deviation requests and test results from Takata

showing that the ammonium-nitrate inflators did not meet the USCAR specifications, New

Chrysler engineers continued to approve the use of ammonium nitrate inflators. This occurred as

early as 2004 and continued after the 363 Sale.

119.     New Chrysler did not issue its first official recall until 2014, despite an abundance

of public information regarding the dangers associated with Takata airbags using ammonium

nitrate, and New Chrysler's own issues and concerns that it has had with these airbags since

implementation.

120.     For example, a Takata ammonium-nitrate inflator experienced catastrophic failure during testing, when the structural integrity of the inflator failed upon auto ignition in 2000.

121.     During the early 2000s, Old Chrysler's Product Engineers expressed concerns as to the integrity of the Takata ammonium-nitrate inflator module during and post deployment.

122.     Old Chrysler was also aware, in the early 2000s, that the Takata ammonium-nitrate PSDI-4 inflator did not meet the tank curve targets for its USCAR delta process validation ("PV") tests, and that this out-of-spec performance had a high probability of contributing to issues Old Chrysler had already experienced in previous PV testing.

123.     Furthermore, Old Chrysler had concerns about the ballistic performance of the Takata ammonium-nitrate inflators at an early stage. Old Chrysler did not want to allow a Production Part Approval Process ("PPAP") to be based on the limits proposed by Takata's research entity, Inflation Systems, Inc. ("ISI"). In 2006, Takata was concerned that it would be unable to support the program timing for Chrysler's PSDI -5 driver side airbag due to Takata's inability to mitigate flaming issues, which released molten propellant from the inflator

112.     By 2007, on information and belief, Old Chrysler was also made aware of the Takata ammonium-nitrate inflator's tendency to exhibit "anomaly activity," "ballistic shift," and "aggressive behavior."

113.     At the same time, the long-standing problems associated with ammonium nitrate and its phase stabilized counterpart continued to be publicly disclosed.

114.     The use of an additive designed to address ammonium nitrate's hygroscopic nature (i.e., affinity for moisture) is, at best, a temporary fix because at some point the additive will no longer be able to absorb the excess moisture and the ballistic curves will again exceed specification leading to ruptures.

115.     In April 2009, Old Chrysler filed for bankruptcy.  On June 1, 2009, under Section 363 of the U.S. Bankruptcy Code, the United States Bankruptcy Court for the Southern District of New York approved the sale of substantially all of Old Chrysler's assets pursuant to the Sale Agreement, and New Chrysler acquired substantially all of Old Chrysler's books, records, and personnel.  When New Chrysler acquired Old Chrysler's books, records, and personnel, it acquired the knowledge of the Inflator Defect that those books, records, and personnel held.

### B.     New Chrysler's Acquisition of Additional Post-Sale Knowledge

116.     In addition to the knowledge of the Inflator Defect that New Chrysler inherited from Old Chrysler, New Chrysler independently knew or should have known of the Inflator Defect almost immediately after the closing of the 363 Sale.

117.     In the fall of 2008, Honda initiated its first recall of Takata airbags in the U.S. Given that the Takata airbags New Chrysler used in its vehicles contained the same ammonium-nitrate propellant as used in the Honda vehicles, New Chrysler was put on notice, but ultimately did nothing meaningful about it and instead ordered a million more ammonium-nitrate inflators from Takata.

118.     In October of 2010, an inflator rupture occurred during PV testing for New Chrysler at Takata's Monclova facility.

119.     In October of 2011, a Chrysler vehicle experienced an inadvertent airbag deployment during vehicle repair at a New Chrysler plant. The repairman noted a hissing sound during deployment and noted that the connectors had melted.

120.     In April of 2013, New Chrysler was made aware that Takata's SDI-X ammonium-nitrate inflator did not meet the slope testing standards during PV testing, but New Chrysler granted deviations and approved the inflator for Chrysler production.

- 38 -

121.    On June 20, 2013, there was an issue with a New Chrysler inflator deployment during testing at Takata's laboratory. New Chrysler was made aware of the issue during a July 2013 visit to Takata's Monclova facility.

122.    On September 7, 2013, a PSDI-4 inflator in a Chrysler vehicle ruptured in the field, injuring the vehicle occupant.

123.    By 2013, NHTSA began to force Takata and the auto industry into action. In April and May 2013 alone, approximately 4 million vehicles were recalled by ten automotive manufacturers as a result of the Inflator Defect. During that same period of time, employees at New Chrysler were communicating with other automakers about the root cause of the Takata airbag ruptures and recalls. For example, in an e-mail to New Chrysler and Ford, General Motors' head of inflator technology said the explanation for the recall given by a Honda spokesperson in April 2013—that the problem stemmed from human errors during production—was "Bull S%$t," and he expressed his view that the Takata defect "has to be a core design issue or process issue, not a 'mistake.'"

124.    Over the past 15 years, worldwide, there have been at least 22 deaths and hundreds of serious injuries linked to defective Takata airbags in a myriad of vehicles made by various automotive manufacturers, including New Chrysler. Though New Chrysler was aware of these incidents, as well as problems with its own airbag inflators, it continued to equip its vehicles with Takata ammonium-nitrate airbags, maintain publicly that they were safe, and conceal the nature and existence of the Inflator Defect.

125.    New Chrysler knew or should have known that the Takata airbags installed in millions of vehicles were defective and potentially deadly. New Chrysler, who concealed its knowledge of the nature and extent of the Inflator Defect from the public while continuing to

advertise its products as safe and reliable, has shown a blatant disregard for public welfare and safety. Moreover, New Chrysler has violated its affirmative duty, imposed under the Transportation Recall Enhancement, Accountability, and Documentation Act (the "TREAD Act"), to promptly advise customers about known defects.

## IV.    New Chrysler Sold Its Vehicles As "Safe" and "Reliable"

126.    At all relevant times, in advertisements and promotional materials, New Chrysler continuously maintained that Chrysler-branded vehicles were safe and reliable and uniformly concealed the Inflator Defect. Plaintiffs, directly or indirectly, were exposed to these advertisements or promotional materials prior to purchasing or leasing Class Vehicles. The misleading statements about Class Vehicles' safety in New Chrysler's advertisements and promotional materials were material to decisions to purchase or lease Class Vehicles.

127.    Examples of New Chrysler's safety and reliability representations include the following:

a.    In 2017, New Chrysler's website listed its mission as: "To create the type of exciting, efficient, reliable, safe vehicles you expect and deserve."

b.    In 2017, New Chrysler described the design of the 2007 - 2017 Jeep Wrangler on Jeep's website as: "With an all-new frame, exterior and interior design, engine, safety and security and convenience features, the Jeep Wrangler was built on the successful, original Jeep Brand formula."

c.    A February 9, 2012 press release boasted that the 2012 Chrysler 300 and 2012 Dodge Charger had achieved 5-star safety ratings from NHTSA, and it boasted that the Chrysler 300 and Dodge Charger were named a "Top Safety Pick" by the Insurance Institute for Highway Safety. The press release further quoted the Senior Vice President-Engineering of

- 40 -

Chrysler, who stated: "we're very pleased that both the 2012 Chrysler 300 and 2012 Dodge Charger have achieved the highest overall rating" and that: "both vehicles are robustly designed with a rigid structure to protect occupants and have numerous advanced safety features."

        d.     The 2012 Dodge Charger brochure highlighted that the Charger was a 2011 Insurance for Highway Safety ("IHS") top safety pick. The brochure further stated that: "[s]afety and security are the driving principles behind every Dodge vehicle, including Charger" and that: "[a]dvanced multistage front air bags, supplemental front-seat mounted pelvic-thorax side air bags, driver-side knee air bag, and supplemental side-curtain air bags for front and rear outboard occupants are all standard."

        e.     The 2011 Dodge Dakota brochure claimed that the: "Dakota heritage of protecting you and your passengers is uncompromising. In addition to the many safety and security features listed here, all 2011 Dakota models now feature supplemental side-curtain air bags as standard equipment and, of course, four-wheel ABS."

        f.     The 2011 Jeep Wrangler brochure asserted that: "Wrangler's got your back, your sides, as well as your front end. Just as Wranglers are purpose-built for fun, they're also infused with advanced active and passive systems designed to help keep you safe and secure. At the forefront are the standard advanced multistage front air bags."

        g.     The 2011 Chrysler 300 brochure included the slogan: "[t]his kind of safety gives you that kind of security." The brochure further advertised that: "advanced multistage front air bags, supplemental front-seat thorax side air bags, driver-knee air bag, and supplemental side-curtain air bags for front and rear outboard occupants are all standard."

        h.     The 2009 Chrysler 300 brochure stated that:

> [n]o one wants to test a vehicle's impact resistance, but 300 is ready, if it occurs…. Advanced multistage front air bags deploy in staged

amounts, depending on impact severity, while available front seat-mounted side air bags with supplemental front and rear side-curtain air bags offer additional side-impact protection to front and rear outboard occupants.

## V.   Inadequate Recalls and Failure to Assist Impacted Consumers

### A.   Slow and Inadequate Recalls

128.   Though the first Takata Airbag related recall was launched years earlier, New Chrysler failed to initiate a field action or recall until 2014.

129.   Just prior to the New Chrysler field action in June of 2014, which covered only select vehicles in Florida, Hawaii, Puerto Rico, and the U.S. Virgin Islands, New Chrysler told the public that there was not a safety defect with its inflator. New Chrysler stated:

> Chrysler Group has agreed, in principle, to honor a National Highway Traffic Safety Administration request to replace airbag inflators in certain vehicles registered in four U.S. regions… This is not a safety recall. Chrysler Group has not identified a defect. This is a field action conducted out of an abundance of caution.

130.   New Chrysler failed to initiate a proper safety recall until 2014, which expanded the field action to include roughly a mere 208,700 older-model vehicles originally purchased or ever registered in only seven U.S. states and five territories. This recall would be the first of many for New Chrysler.

131.   Even those vehicles that have been recalled have little chance of being repaired in the near term.   Under the recalls required under NHTSA's Coordinated Remedy Order, approximately 44 million vehicles will be recalled in the United States due to the Inflator Defect.

132.   At a Congressional hearing in June 2015, Takata's representative testified that Takata was shipping approximately 700,000 replacement inflators per month, and it expected to increase production to 1 million replacement inflators per month by September 2015—well short of the number required to supply the ten automakers that have issued recalls.

133. At the current rate, it will take several years to produce enough inflators to fix all recalled vehicles in the U.S., even setting aside the question of whether service departments would be able to stock parts, field subject vehicles, and provide the necessary services in a timely manner.

134. Not surprisingly, authorized dealers are experiencing a severe shortage of parts to replace the faulty airbags. Dealers have been telling frustrated car owners they can expect to wait many months before their airbags can be replaced.

135. In response to the airbag replacement shortage, certain automakers have taken the extreme step of disabling passenger airbags entirely and putting a "Do Not Sit Here" decal in the vehicle until a proper repair can be made. In the alternative, some automakers are advising customers to refrain from driving their vehicles until the airbags can be replaced.

136. Other automakers have also chosen to "repair" their customers' vehicles not by providing temporary replacement vehicles or replacement parts, but by disengaging the Takata airbags entirely.

137. New Chrysler stated that: "[t]o help control the proper allocation and inventory of parts, customer notifications are being prioritized by geography and make and model year of vehicle," meaning that many drivers will not receive notices for weeks or longer, as they continue to drive vehicles with potentially deadly airbags.

138. Even to this day, certain New and Old Chrysler vehicles, such at the 2009 Chrysler Aspen, are only under recall if registered in certain geographic zones.

139. Congress has voiced concerns about this serious problem. Senators Richard Blumenthal and Edward J. Markey, in a letter to the Department of Transportation ("DOT"), said they were:

> alarmed and astonished that NHTSA has endorsed a policy recently announced by Toyota and GM that dealers should disable

passenger-side airbags and instruct against permitting passengers in the front seat if replacement parts for these airbags are unavailable. As a matter of policy, this step is extraordinarily troubling and potentially dangerous. As a matter of law . . . §30122(b) of the Motor Vehicle Safety Act (49 U.S.C.) prohibits a manufacturer from knowingly making a safety device inoperative unless the [DOT] issues a specific exemption. We are unaware of an exemption from your office in the case of Takata airbags.

### B. Failure to Provide Replacement Vehicles

140. The Class Vehicles are not safe to drive. They have been recalled, and yet replacement of the Defective Airbags could take years. Due to New Chrysler's failures, Plaintiffs and Class members are left with poor options: be without use of a vehicle; purchase, lease, or rent a new vehicle until New Chrysler completes the recall; or use a vehicle with a dangerous or disabled airbag over an extended period of time.

141. As Senators Blumenthal and Markey asserted, "all drivers deserve access to loaners or rental cars at no cost to them while they await repairs to their cars that make them safe enough to drive again."

142. New Chrysler is not providing loaner or replacement vehicles on a comprehensive basis.

### C. Defective Replacement Airbags

143. Perhaps most alarming, the replacement components manufactured by Takata that many OEMs, including New Chrysler, are using to "repair" recalled Class Vehicles suffer from the same Inflator Defect that plagues the parts being removed: they use ammonium nitrate as the inflator's primary propellant. Indeed, Takata admitted in its submitted DIRs and at the June 2015 Congressional hearing that inflators installed in recalled vehicles as replacement parts are, in fact,

- 44 -

defective and must be replaced yet again. And even recall notices issued in 2015 acknowledge that certain "replacement inflators are of the same design and materials as the inflators being replaced."

144. Moreover, inspection of inflators manufactured by Takata as recently as 2014 and installed by manufacturers through the recall process reveals that the ammonium nitrate pellets within the inflators already show signs of moisture-induced instability, such as rust stains, the tendency to clump together, and size variations. As a result, Takata cannot reasonably assure Plaintiffs or Class members that Class Vehicles equipped with such post-recall replacement parts will be any safer than they were with the initial Defective Airbags.

145. Yet, the Part 573 Safety Recall Report for Chrysler Recall 15V-312 submitted May 26, 2015, states that: "[r]eplacement inflators are of the same design and materials as the inflators being replaced; however, Takata has communicated to FCA US that the new replacement inflators reflect, continuous process improvements that were introduced in the SPI inflators after MY 2008." However, both Takata and New Chrysler knew the defect was not corrected.

146. By way of example, Paragraph 30 of the November 2015 Consent Order provides that the NHTSA Administrator may issue final orders for the recall of Takata's desiccated phase stabilized ammonium nitrate ("PSAN") inflators, used as both original and replacement equipment, if no root cause has been determined by Takata or any other credible source, or if Takata has not otherwise shown the safety and/or service life of the parts by December 31, 2019. But as of July 10, 2017, Takata began recalling certain desiccated PSAN inflators installed in Ford, Mazda, and Nissan vehicles.

147. Moreover, while Takata and automakers, including New Chrysler, had previously assured the public that the Defective Airbags had been remedied and that the new airbags being placed in recalled vehicles were safe, in fact, several automakers, including New Chrysler, have

been or will be required to recall some vehicles from model year 2013 and later because of the risk of the Takata airbags rupturing. And Takata has now admitted that replacement airbags installed in some recalled vehicles are defective as well and it cannot assure the public that replacement inflators containing ammonium nitrate are safe and not prone to rupture.

## TOLLING OF THE STATUTE OF LIMITATIONS

### I.  Fraudulent Concealment

148.  New Chrysler has known of the Inflator Defect since June 1, 2009, when New Chrysler obtained all of Old Chrysler's books, records, and personnel, and their knowledge of the Inflator Defect, including Takata's own testing, numerous incidents of energetic disassembly in Defective Airbags made for New and Old Chrysler vehicles, and recalls initiated by other automakers. New Chrysler obtained further knowledge of the Inflator Defect after June 1, 2009, when it learned of the results of additional Takata testing, field incidents involving the defective Takata Airbags, and mounting recalls by other automakers. New Chrysler has concealed from, or failed to notify, Plaintiffs, Class members, and the general public of, the full and complete nature of the Inflator Defect.

149.  Although New Chrysler has now acknowledged to safety regulators that Takata's airbags are defective, for years, New Chrysler did not fully investigate or disclose the seriousness of the issue and in fact downplayed the widespread prevalence of the problem.

150.  Any applicable statute of limitations has therefore been tolled by New Chrysler's knowledge, active concealment, and denial of the facts alleged herein, which behavior is ongoing.

### II.  Estoppel

151.  New Chrysler was, and is, under a continuous duty to disclose to Plaintiffs and proposed Class members the true character, quality, and nature of the Class Vehicles. They

- 46 -

actively concealed the true character, quality, and nature of the vehicles, and knowingly made misrepresentations about the quality, reliability, characteristics, and performance of the vehicles. Plaintiffs and proposed Class members reasonably relied upon New Chrysler's knowing, and affirmative misrepresentations and/or active concealment of these facts. Based on the foregoing, New Chrysler is estopped from relying on any statute of limitations in defense of this action.

## III. Discovery Rule

152. The causes of action alleged here did not accrue until Plaintiffs and proposed Class members discovered that their vehicles had the Defective Airbags.

153. Plaintiffs and proposed Class members, however, had no realistic ability to discern that the vehicles were defective, until after either the Defective Airbags exploded ,or their vehicles were recalled. Even then, Plaintiffs and proposed Class members would have had no reason to discover their causes of action, because of New Chrysler's active concealment of the true nature of the defect.

## IV. *American Pipe* Tolling

154. A putative class action suit on behalf of a nationwide class was brought against New Chrysler on October 31, 2014. *See Bonet v. Takata Corporation*, et al., No. 14-cv-24087 (S.D. Fla.). At the time it was brought, Plaintiffs and the other Class members in this case were part of the classes alleged in the action.

155. Accordingly, pursuant to *American Pipe and Construction Co. v. Utah*, 414 U.S. 538 (1974), the claims of Plaintiffs and other Class members were tolled from at least October 31, 2014. Additional class actions filed by Plaintiffs following the *Bonet* action provide additional bases for *American Pipe* tolling.

- 47 -

## CLASS ACTION ALLEGATIONS

156.    The proposed Classes' claims all derive directly from a single course of conduct by New Chrysler.  This case is about the responsibility of New Chrysler, at law and in equity, for its knowledge, conduct, and products. New Chrysler has engaged in uniform and standardized conduct toward the proposed Classes.  It did not differentiate, in degree of care or candor, in its actions or inactions, or in the content of its statements or omissions, among individual Class members.  The objective facts on these subjects are the same for all Class members.  Within each Claim for Relief asserted by the respective proposed Classes, the same legal standards govern. Additionally, many—and for some, all—states share the same legal standards and elements of proof, facilitating the certification of multistate or nationwide classes for some or all claims. Accordingly, Plaintiffs bring this lawsuit as a class action on their own behalf, and on behalf of all other persons similarly situated, as members of the proposed Classes pursuant to Federal Rules of Civil Procedure 23(a), (b)(2), and/or (b)(3), and/or (c)(4). This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

## I.    The Classes

157.    The Consumer Plaintiffs bring this action, and seek to certify and maintain it as a class action, under Federal Rules of Civil Procedure 23(a), (b)(2), and/or (b)(3), and/or c(4), on behalf of themselves, and a Nationwide Consumer Class defined as follows:

> All persons in the United States who, prior to the date on which the Class Vehicle was recalled and after June 1, 2009, (a) entered into a lease for a Class Vehicles, or (b) bought a Class Vehicle, and who (i) still own or lease the Class Vehicle, or (ii) sold the Class Vehicle after the date on which the Class Vehicle was recalled, or (iii) following an accident, whose Class Vehicle was declared a total loss after the date on which the Class Vehicle was recalled.

- 48 -

158.     The Consumer Plaintiffs allege statewide class action claims on behalf of separate classes in the following states: Alabama, Arkansas, Arizona, California, Georgia, Florida, Indiana, Illinois, Maryland, Massachusetts, Michigan, Mississippi, Missouri, New Jersey, New York, North Carolina, Ohio, Pennsylvania, South Carolina, and Texas. These State Consumer Classes are initially defined as follows:

> All persons who, prior to the date on which the Class Vehicle was recalled and after June 1, 2009, (a) entered into a lease for a Class Vehicle, or (b) bought a Class Vehicle in the state of ____ (*e.g.*, California), and who (i) still own or lease the Class Vehicle, or (ii) sold the Class Vehicle after the date on which the Class Vehicle was recalled, or (iii) following an accident, whose Class Vehicle was declared a total loss after the date on which the Class Vehicle was recalled.

159.     The proposed Nationwide Consumer Class and Statewide Consumer Classes, and their members, are sometimes referred to herein as the "Class" or "Classes."

160.     Excluded from each Class are Takata and New Chrysler; their employees, officers, directors, legal representatives, heirs, and successors; wholly or partly owned subsidiaries or affiliates of New Chrysler; Class Counsel and their employees; and the judicial officers, their immediate family members, and associated court staff assigned to this case.

## II.     <u>Numerosity</u>

161.     This action satisfies the requirements of Federal Rule of Civil Procedure 23(a)(1). There are millions of Class Vehicles nationwide, and thousands of Class Vehicles in each of the States. Individual joinder of all Class members is impracticable.

162.     Each of the Classes is ascertainable because its members can be readily identified using registration records, sales records, production records, and other information kept by New Chrysler or third parties in the usual course of business and within their control.  Plaintiffs anticipate providing appropriate notice to each certified Class, in compliance with Federal Rules

of Civil Procedure 23(c)(1)(2)(A) and/or (B), to be approved by the Court after class certification, or pursuant to court order under Rule 23(d).

## III.   **Predominance of Common Issues**

163.   This action satisfies the requirements of Federal Rules of Civil Procedure 23(a)(2) and (b)(3), because questions of law and fact that have common answers, and are the same for each of the respective Classes, predominate over questions affecting only individual Class members. These include, without limitation, the following:

a.   Whether the Class Vehicles suffer from the Inflator Defect;

b.   Whether New Chrysler knew, or should have known, about the Inflator Defect, and, if so, how long New Chrysler has known of the defect;

c.   Whether New Chrysler had a duty to disclose the defective nature of the Class Vehicles to Plaintiffs and Class members;

d.   Whether New Chrysler omitted and failed to disclose material facts about the Class Vehicles;

e.   Whether New Chrysler's concealment of the true defective nature of the Class Vehicles induced Plaintiffs and Class members to act to their detriment by purchasing the Class Vehicles;

f.   Whether New Chrysler's conduct tolls any or all applicable limitations periods by acts of fraudulent concealment, application of the discovery rule, or equitable estoppel;

g.   Whether New Chrysler misrepresented that the Class Vehicles were safe;

h.   Whether New Chrysler engaged in unfair, deceptive, unlawful and/or fraudulent acts or practices, in trade or commerce, by failing to disclose that the Class Vehicles were designed, manufactured, and sold with defective airbag inflators;

- 50 -

i.  Whether New Chrysler's conduct, as alleged herein, was likely to mislead a reasonable consumer;

j.  Whether New Chrysler's statements, concealments, and omissions regarding the Class Vehicles, were material, in that a reasonable consumer could consider them important in purchasing, selling, maintaining, or operating such vehicles;

k.  Whether New Chrysler violated each of the States' consumer protection statutes, and if so, what remedies are available under those statutes;

l.  Whether the Class Vehicles were unfit for the ordinary purposes for which they were used, in violation of the implied warranty of merchantability;

m.  Whether New Chrysler's unlawful, unfair, and/or deceptive practices harmed Plaintiffs and the Classes;

n.  Whether the Class Vehicles have suffered a diminution of value as a result of those Vehicles' incorporation of the airbags at issue;

o.  Whether New Chrysler has been unjustly enriched by its conduct;

p.  Whether Plaintiffs and the Classes are entitled to equitable relief, including, but not limited to, a preliminary and/or permanent injunction;

q.  Whether Plaintiffs and the Classes are entitled to a declaratory judgment stating that the airbag inflators in the Class Vehicles are defective and/or not merchantable;

r.  Whether New Chrysler should be declared responsible for notifying all Class members of the Inflator Defect, and ensuring that all vehicles with the airbag inflator defect are promptly recalled and repaired;

s.  What aggregate amounts of statutory penalties are sufficient to punish and deter New Chrysler, and to vindicate statutory and public policy;

- 51 -

        t.      How such penalties should be most equitably distributed among Class members; and

        u.      Whether New Chrysler associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity.

## IV.    **Typicality**

164.    This action satisfies the requirements of Federal Rule of Civil Procedure 23(a)(3), because Plaintiffs' claims are typical of the claims of the Class members, and arise from the same course of conduct by New Chrysler.  The relief Plaintiffs seek is typical of the relief sought for the absent Class members.

## V.    **Adequate Representation**

165.    Plaintiffs will fairly and adequately represent and protect the interests of the Classes.  Plaintiffs have retained counsel with substantial experience in prosecuting consumer class actions, including actions involving defective products.

166.    Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the Classes, and have the financial resources to do so.  Neither Plaintiffs nor their counsel have interests adverse to those of the Classes.

## VI.    **Superiority**

167.    This action satisfies the requirements of Federal Rule of Civil Procedure 23(b)(2), because New Chrysler has acted and refused to act on grounds generally applicable to each Class, thereby making appropriate final injunctive and/or corresponding declaratory relief with respect to each Class as a whole.

168.    This action satisfies the requirements of Federal Rule of Civil Procedure 23(b)(3), because a class action is superior to other available methods for the fair and efficient adjudication of this controversy. The common questions of law and fact regarding New Chrysler's conduct and responsibility predominate over any questions affecting only individual Class members.

169.    Because the damages suffered by each individual Class member may be relatively small, the expense and burden of individual litigation would make it very difficult or impossible for individual Class members to redress the wrongs done to each of them individually, such that most or all Class members would have no rational economic interest in individually controlling the prosecution of specific actions; and the burden imposed on the judicial system by individual litigation—by even a small fraction of the Class—would be enormous, making class adjudication the superior alternative under Federal Rule of Civil Procedure 23(b)(3)(A).

170.    The conduct of this action as a class action presents far fewer management difficulties; far better conserves judicial resources, and the parties' resources; and far more effectively protects the rights of each Class member than would piecemeal litigation. Compared to the expense, burdens, inconsistencies, economic infeasibility, and inefficiencies of individualized litigation, the challenges of managing this action as a class action are substantially outweighed by the benefits to the legitimate interests of the parties, the court, and the public of class treatment in this court, making class adjudication superior to other alternatives, under Federal Rule of Civil Procedure 23(b)(3)(D).

171.    Plaintiffs are not aware of any obstacles likely to be encountered in the management of this action that would preclude its maintenance as a class action. Federal Rule of Civil Procedure 23 provides the Court with the authority and flexibility to maximize the efficiencies and benefits of the class mechanism, and reduce management challenges. The Court may, on motion of

Plaintiffs, or on its own determination, certify nationwide, statewide and/or multistate classes for claims sharing common legal questions; utilize the provisions of Rule 23(c)(4) to certify any particular claims, issues, or common questions of fact or law, for class-wide adjudication; certify and adjudicate bellwether class claims; and utilize Rule 23(c)(5) to divide any Class into subclasses.

172.     The Classes expressly disclaim any recovery in this action for physical injury resulting from the Inflator Defect without waiving or dismissing such claims.  Plaintiffs are informed and believe that injuries suffered in crashes as a result of Defective Airbags implicate the Class Vehicles; constitute evidence supporting various claims, including diminution of value; and are continuing to occur because of New Chrysler's delays and inaction regarding the commencement and completion of recalls and installation of Defective Airbags as replacement airbags.  The increased risk of injury from the Inflator Defect serves as an independent justification for the relief sought by Plaintiffs and the Classes.

## REALLEGATION AND INCORPORATION BY REFERENCE

173.     Plaintiffs reallege and incorporate by reference all of the preceding paragraphs and allegations of this Complaint, including the Nature of Claims, Factual Allegations, Tolling Allegations, and Class Action Allegations, as though fully set forth in each of the following Claims for Relief asserted on behalf of the Nationwide Class and the Statewide Classes.

## CLAIMS FOR RELIEF

I.     **Nationwide Claims**

A.     **Federal Claims**

## COUNT 1

### Dismissed

## COUNT 2

### Dismissed

## COUNT 3

### Dismissed

**B.** **Common Law and State Law Claims**

## COUNT 4

### Fraud

174. Plaintiffs (excluding Plaintiffs Khoury, Cooper, Eikenberry, Nielsen, and McClellion) bring this claim on behalf of themselves and the members of the Nationwide Consumer Class (excluding Class Members who purchased a Class Vehicle in Mississippi, South Carolina, or Florida) under the common law of fraud, as there are no true conflicts (case-dispositive differences) among various states' laws of fraud, or in the alternative, under the laws of the states where Plaintiffs and Class Members purchased their Class Vehicles.

175. New Chrysler concealed and suppressed material facts regarding the Defective Airbags—most the fact that they were equipped with Defective Airbags which, among other things, (a) rupture and expel metal shrapnel that tears through the airbag and poses a threat of serious injury or death to occupants; and/or (b) hyper-aggressively deploy and seriously injure occupants through contact with the airbag.

176. New Chrysler took steps to ensure that its employees did not reveal the known safety Inflator Defect to regulators or consumers.

177. On information and belief, New Chrysler still has not made full and adequate disclosure, continues to defraud Plaintiffs and the Class, and continues to conceal material information regarding the Inflator Defect that exists in the Class Vehicles.

178.     New Chrysler had a duty to disclose the Inflator Defect because it:

a.     Had exclusive and/or far superior knowledge and access to the facts, and New Chrysler knew the facts were not known to or reasonably discoverable by Plaintiffs and the Class;

b.     Intentionally concealed the foregoing from Plaintiffs and Class Members; and

c.     Made incomplete representations about the safety and reliability of the Defective Airbags and, by extension, the Class Vehicles, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

179.     These omitted and concealed facts were material because they would be relied on by a reasonable person purchasing, leasing, or retaining a new or used motor vehicle and because they directly impact the value of the Class Vehicles purchased or leased by Plaintiffs and the Class. Whether a manufacturer's products are safe and reliable and whether that manufacturer stands behind its products are material concerns to a consumer.  Plaintiffs and Class Members trusted New Chrysler not to sell or lease them vehicles that were defective or that violated federal law governing motor vehicle safety.

180.     New Chrysler concealed and suppressed these material facts to falsely assure purchasers and consumers that its airbags were capable of performing safely, as represented by New Chrysler and reasonably expected by consumers.

181.     New Chrysler also misrepresented the safety and reliability of its vehicles, because it either (a) knew but did not disclose the Inflator Defect; (b) knew that it did not know whether its safety and reliability representations were true or false; or (c) should have known that its misrepresentations were false.

182.    New Chrysler actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and to avoid recalls that would hurt the brand's image and cost New Chrysler money.  New Chrysler concealed these facts at the expense of Plaintiffs and the Class.

183.    Plaintiffs and the Class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed or suppressed facts.

184.    Had they been aware of the Defective Airbags and New Chrysler's callous disregard for safety, Plaintiffs and the Class either would not have paid as much for their Class Vehicles or would not have purchased or leased them at all.

185.    Plaintiffs did not receive the benefit of their bargain as a result of New Chrysler's fraudulent conduct.

186.    Because of the concealment and/or suppression of the facts, Plaintiffs and the Class sustained damage because they own vehicles that diminished in value as a result of New Chrysler's concealment of, failure to timely disclose, and/or misrepresentations concerning the serious Inflator Defect in millions of Class Vehicles and the serious safety and quality issues caused by New Chrysler's conduct.

187.    The value of all Class members' vehicles has diminished as a result of New Chrysler's fraudulent conduct in connection with the Defective Airbags and made any reasonable consumer reluctant to purchase any of the Class Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

188.    Accordingly, New Chrysler is liable to the Class for their damages in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain or overpayment for the Class Vehicles at the time of purchase, the diminished value of the Defective Airbags and the

Class Vehicles, and/or the costs incurred in storing, maintaining or otherwise disposing of the defective airbags.

189.    New Chrysler's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class's rights and well-being and with the aim of enriching New Chrysler. New Chrysler's conduct, which exhibits the highest degree of reprehensibility, being intentional, continuous, placing others at risk of death and injury, and effecting public safety, warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT 5

### Unjust Enrichment

190.    Consumer Plaintiffs (excluding Plaintiffs Reynolds, Maldia, Washington, Eikenberry, Dwinnells, Hillyer, Krzeminski, Marsilio, O'Neal, Fischer, Lykins, Price, Boyd, Swanson, and McClellion) bring this claim on behalf of themselves and the members of the Nationwide Consumer Class (excluding Class Members who purchased a Class Vehicle in Arizona, Maryland, Mississippi, New Jersey, North Carolina, and Ohio), under the common law of unjust enrichment, as there are no true conflicts (case-dispositive differences) among various states' laws of unjust enrichment, or in the alternative, under the laws of the states where Plaintiffs and Class Members purchased their Class Vehicles, including California, Georgia, Illinois, Massachusetts, Michigan, New York, South Carolina, and Texas.

191.    New Chrysler has received and retained a benefit from the Plaintiffs and inequity has resulted.

192.    New Chrysler benefitted through its unjust conduct, by selling Class Vehicles with a concealed safety-and-reliability related defect, at a profit for more than these Vehicles were

worth to Plaintiffs, who overpaid for these Vehicles, and/or would not have purchased these Vehicles at all; and who have been forced to pay other costs.

193.    It is inequitable for New Chrysler to retain these benefits.

194.    Consumer Plaintiffs do not have an adequate remedy at law.

195.    As a result of New Chrysler's conduct, the amount of its unjust enrichment should be disgorged in an amount to be proven at trial.

**COUNT 6**

**Negligence**

196.    Maryland Consumer Plaintiffs bring this claim on behalf of themselves and their respective State Class under the law Maryland, where Plaintiffs and Class Members purchased their Class Vehicles.

197.    New Chrysler owed a duty of care to Plaintiffs, who were a foreseeable end user, to design and manufacture its airbags so that they would not be defective or unreasonably dangerous to foreseeable end users, including Plaintiffs.

198.    New Chrysler breached its duty of care by, among other things:

a.      Negligently and recklessly equipping their vehicles with Defective Airbags;

b.      Negligently and recklessly failing to take all necessary steps to ensure that its products—which literally can make the difference between life and death in an accident— function as designed, specified, promised, and intended;

c.      Negligently and recklessly failing to take all necessary steps to ensure that profits took a back seat to safety;

d.      Negligently and recklessly failing to take all necessary steps to ensure that the Defective Airbags did not suffer from a common, uniform defect: the use of ammonium nitrate, a notoriously volatile and unstable compound, as the propellant in their inflators; and

e.　　Negligently and recklessly failing concealing the nature and scope of the Inflator Defect.

199.　New Chrysler's negligence was the direct, actual, and proximate cause of foreseeable damages suffered by Plaintiffs, as well as ongoing foreseeable damages that Plaintiffs continue to suffer to this day.

200.　As a direct, actual, and proximate result of New Chrysler's misconduct, Plaintiffs and the members of the proposed Classes were harmed and suffered actual damages, which are continuing in nature, including:

a.　　the significantly diminished value of the vehicles in which the defective and unreasonably dangerous airbags are installed; and

b.　　the continued exposure of Plaintiffs to an unreasonably dangerous condition that gives rise to a clear and present danger of death or personal injury.

201.　New Chrysler's negligence is ongoing and continuing, because New Chrysler continues to obfuscate, not fully cooperate with regulatory authorities, and manufacture replacement airbags that are defective and unreasonably dangerous, suffering from the same serious Inflator Defect inherent in the original airbags that are at issue in this litigation, which poses an unreasonable risk of serious foreseeable harm or death, from which the original airbags suffer.

202.　In addition to damages, Consumer Plaintiffs seek injunctive relief to enjoin the New Chrysler from continuing its negligence by continuing to install Defective Airbags in Class Vehicles.

II. **State Class Claims**

    A.     **Claims Brought on Behalf of the Alabama Consumer Class**

### COUNT 7

**Dismissed**

    B.     **Claims Brought on Behalf of the Arizona Consumer Class**

### COUNT 8

**Violation of the Arizona Consumer Fraud Act,
Ariz. Rev. Stat. § 44-1521**

203.     This claim is brought by the Arizona Consumer Plaintiffs on behalf of themselves and the Arizona Consumer Class against New Chrysler.

204.     The Arizona Consumer Plaintiffs, the Arizona Consumer Class members, and New Chrysler are "persons" within the meaning of the Arizona Consumer Fraud Act ("Arizona CFA"), Ariz. Rev. Stat. § 44-1521(6).

205.     The Class Vehicles and/or the Defective Airbags installed in them are "merchandise" within the meaning of Ariz. Rev. Stat. § 44-1521(5).

206.     The Arizona CFA provides that:

> The act, use or employment by any person of any deception, deceptive act or practice, fraud, . . . . misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale . . . of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice.

Ariz.Rev. Stat. § 44-1522(A).

207.     In the course of its business, New Chrysler failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them as described herein and otherwise engaged in activities with a tendency or capacity to deceive.

208.     New Chrysler also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, or misrepresentations or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles and/or the Defective Airbags installed in them.

209.     New Chrysler has known of the Inflator Defect in the Defective Airbags since at least June 1, 2009, when it acquired substantially all of Old Chrysler's books, records, and personnel, and the knowledge about the defective Takata airbags those books, records, and personnel held.  New Chrysler failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them.

210.     By failing to disclose and by actively concealing the Inflator Defect in the Class Vehicles and/or the Defective Airbags installed in them, by marketing them as safe, reliable, and of high quality, and by presenting themselves as reputable manufacturers that value safety, New Chrysler engaged in unfair or deceptive business practices in violation of the Arizona CFA.  New Chrysler deliberately withheld the information about the propensity of the Defective Airbags to violently explode and/or expel vehicle occupants with lethal amounts of metal debris and shrapnel, instead of protecting vehicle occupants from bodily injury during accidents, in order to ensure that consumers would purchase the Class Vehicles.

211.     In the course of its business, New Chrysler willfully failed to disclose and actively concealed the dangerous risks posed by the many safety issues and the serious Inflator Defect discussed above.  New Chrysler compounded the deception by repeatedly asserting that the Class Vehicles and/or the Defective Airbags installed in them were safe, reliable, and of high quality, and by claiming to be a reputable manufacturer that values safety.

- 62 -

212.    New Chrysler's unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers, and were likely to and did in fact deceive reasonable consumers, including the Arizona Consumer Plaintiffs and the Arizona Consumer Class members, about the true safety and reliability of Class Vehicles and/or the Defective Airbags installed in them, the quality of New Chrysler's brands, and the true value of the Class Vehicles.

213.    New Chrysler intentionally and knowingly misrepresented material facts regarding the Class Vehicles and/or the Defective Airbags installed in them with an intent to mislead the Arizona Consumer Plaintiffs and the Arizona Consumer Class.

214.    New Chrysler knew or should have known that its conduct violated the Arizona CFA.

215.    As alleged above, New Chrysler made material statements about the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them that were either false or misleading.  New Chrysler's representations, omissions, statements, and commentary have included selling and marketing the Class Vehicles as safe and reliable, despite its knowledge of the Inflator Defect or its failure to reasonably investigate it.

216.    To protect its profits and to avoid remediation costs and a public relations nightmare, New Chrysler concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them and their tragic consequences and allowed unsuspecting new and used car purchasers to continue to buy/lease the Class Vehicles and to continue driving highly dangerous vehicles.

217. New Chrysler owed the Arizona Consumer Plaintiffs and the Arizona Consumer Class a duty to disclose the true safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them because New Chrysler:

  a. Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

  b. Intentionally concealed the foregoing from the Arizona Consumer Plaintiffs and the Arizona Consumer Class; and/or

  c. Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from the Arizona Consumer Plaintiffs and the Arizona Consumer Class that contradicted these representations.

218. Because New Chrysler fraudulently concealed the Inflator Defect in Class Vehicles and/or the Defective Airbags installed in them, resulting in a raft of negative publicity once the Inflator Defect finally began to be disclosed, the value of the Class Vehicles has greatly diminished. In light of the stigma attached to Class Vehicles by New Chrysler's conduct, they are now worth significantly less than they otherwise would be.

219. New Chrysler's failure to disclose and active concealment of the dangers and risks posed by the Defective Airbags in Class Vehicles were material to the Arizona Consumer Plaintiffs and the Arizona Consumer Class. A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals the Inflator Defect rather than promptly remedies them.

220. The Arizona Consumer Plaintiffs and the Arizona Consumer Class suffered ascertainable loss caused by New Chrysler's misrepresentations and its failure to disclose material information. Had they been aware of the Inflator Defect that existed in the Class Vehicles and/or

- 64 -

the Defective Airbags installed in them, and New Chrysler's complete disregard for safety, the Arizona Consumer Plaintiffs and the Arizona Consumer Class members either would not have paid as much for their vehicles as they did or would not have purchased or leased them at all. The Arizona Consumer Plaintiffs and the Arizona Consumer Class did not receive the benefit of their bargain as a result of New Chrysler's misconduct.

221.    New Chrysler's violations present a continuing risk to the Arizona Consumer Plaintiffs and the Arizona Consumer Class, as well as to the general public. New Chrysler's unlawful acts and practices complained of herein affect the public interest. The recalls and repairs instituted by New Chrysler have not been adequate.

222.    As a direct and proximate result of New Chrysler's violations of the Arizona CFA, the Arizona Consumer Plaintiffs and the Arizona Consumer Class have suffered injury-in-fact and/or actual damage.

223.    The Arizona Consumer Plaintiffs and the Arizona Consumer Class seek monetary relief against New Chrysler in an amount to be determined at trial. The Arizona Consumer Plaintiffs and the Arizona Consumer Class also seek punitive damages because New Chrysler engaged in aggravated and outrageous conduct with an evil mind.

224.    The Arizona Consumer Plaintiffs and the Arizona Consumer Class also seek an order enjoining New Chrysler's unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Arizona CFA.

## C.     Claims Brought on Behalf of the Arkansas Class

### COUNT 9

**Dismissed**

### COUNT 10

**Dismissed**

## B.     Claims Brought on Behalf of the California Consumer Class

### COUNT 11

**Violation of Song-Beverly Consumer Warranty Act for Breach of Implied Warranty of Merchantability (California Lemon Law)**

225.    In the event the Court declines to certify a Nationwide Consumer Class under the Magnuson-Moss Warranty Act, this claim is brought only on behalf of the California Consumer Class against New Chrysler.

226.    The California Consumer Plaintiffs bring this claim on behalf of themselves and the members of the California Consumer Class under the laws of California against New Chrysler with regard to Defective Vehicles that New Chrysler manufactured or sold.

227.    The California Consumer Plaintiffs and members of the California Consumer Class are "buyers" within the meaning of Cal. Civ. Code § 1791(b).

228.    The Class Vehicles are "consumer goods" within the meaning of Cal. Civ. Code § 1791(a).

229.    New Chrysler is a "manufacturer" of the Class Vehicles within the meaning Cal. Civ. Code § 1791(j).

230.    New Chrysler impliedly warranted to the California Consumer Plaintiffs and the California Consumer Class that their Class Vehicles were "merchantable" within the meaning of Cal. Civ. Code §§ 1791.1(a) and 1792; however, the Class Vehicles do not have the quality that a buyer would reasonably expect, and were therefore not merchantable.

231. Cal. Civ. Code § 1791.1(a) states:

232. "Implied warranty of merchantability" or "implied warranty that goods are merchantable" means that the consumer goods meet each of the following:

(1)     Pass without objection in the trade under the contract description.

(2)     Are fit for the ordinary purposes for which such goods are used.

(3)     Are adequately contained, packaged, and labeled.

(4)     Conform to the promises or affirmations of fact made on the container or label.

233. The Class Vehicles would not pass without objection in the automotive trade because they were equipped with Defective Airbags, which among other things, have a tendency to: (a) rupture and expel metal shrapnel that tears through the airbag and poses a threat of serious injury or death to occupants; and/or (b) hyper-aggressively deploy and seriously injure occupants through contact with the airbag, leading to an unreasonable likelihood of serious bodily injury or death to vehicle occupants, instead of protecting vehicle occupants from bodily injury during accidents.

234. Because of the Inflator Defect, the Class Vehicles are not safe to drive, and thus not fit for ordinary purposes.

235. The Class Vehicles are not adequately labeled because the labeling fails to disclose the Inflator Defect. New Chrysler failed to warn about that dangerous Inflator Defect in the Class Vehicles.

236. New Chrysler breached the implied warranty of merchantability by manufacturing and selling Class Vehicles equipped with Defective Airbags containing the Inflator Defect which among other things, causes the airbags to: (a) rupture and expel metal shrapnel that tears through the airbag and poses a threat of serious injury or death to occupants; and/or (b) hyper-aggressively

- 67 -

deploy and seriously injure occupants through contact with the airbag. The Defective Airbags have deprived the California Consumer Plaintiffs and the California Consumer Class of the benefit of their bargain, and have caused the Class Vehicles to depreciate in value.

237. Notice of breach is not required because the California Consumer Plaintiffs and the California Consumer Class did not purchase their automobiles directly from New Chrysler. Furthermore, on information and belief, New Chrysler had notice of these issues by its knowledge of the issues, through customer complaints, numerous complaints filed against it and/or others, internal investigations, and individual letters and communications sent by consumers before New Chrysler issued the recalls and after the allegations of the Inflator Defect became public.

238. As a direct and proximate result of New Chrysler's breach of its duties under California's Lemon Law, the California Consumer Plaintiffs and the California Consumer Class received goods whose dangerous condition substantially impairs their value. The California Consumer Plaintiffs and the California Consumer Class have been damaged by the diminished value, malfunctioning, and non-use of their Class Vehicles.

239. Under Cal. Civ. Code §§ 1791.1(d) and 1794, the California Consumer Plaintiffs and the California Consumer Class are entitled to damages and other legal and equitable relief including, at their election, the purchase price of their Class Vehicles or the overpayment or diminution in value of their Class Vehicles.

240. Under Cal. Civ. Code § 1794, the California Consumer Plaintiffs and the California Consumer Class are entitled to costs and attorneys' fees.

## COUNT 12

### Violation of the California Unfair Competition Law
### Cal. Bus. & Prof. Code § 17200

241.     California Consumer Plaintiffs bring this claim on behalf of themselves and the members of the California Consumer Class against New Chrysler.

242.     Cal. Bus. & Prof. Code § 17200 prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice" and "unfair, deceptive, untrue or misleading advertising. . . ."  New Chrysler engaged in conduct that violated each of this statute's three prongs.

243.     New Chrysler committed an unlawful business act or practice in violation of § 17200 by its violations of the Consumer Legal Remedies Act and Cal. Civ. Code § 1750 as set forth below, by the acts and practices set forth in this Complaint.

244.     New Chrysler also violated the unlawful prong because it has engaged in violations of the TREAD Act, 49 U.S.C. § 30101, and its accompanying regulations by failing to promptly notify vehicle owners, purchases, dealers, and NHTSA of the defective Class Vehicles and/or the Defective Airbags installed in them and failing to remedy the Inflator Defect.

245.     Federal Motor Vehicle Safety Standard ("FMVSS") 573 governs a motor vehicle manufacturer's responsibility to notify the NHTSA of a motor vehicle defect within five days of determining that a defect in a vehicle has been determined to be safety-related.  *See* 49 C.F.R. § 573.6.

246.     New Chrysler violated the reporting requirements of FMVSS 573 by failing to report the Inflator Defect or any of the other dangers or risks posed by the Defective Airbags within five days of determining the defect existed, and failing to recall all Class Vehicles.

247.     New Chrysler violated the common-law claim of negligent failure to recall, because New Chrysler knew or should have known that the Class Vehicles and/or the Defective Airbags installed in them were dangerous and/or were likely to be dangerous when used in a reasonably

- 69 -

foreseeable manner; New Chrysler became aware of the attendant risks after they were sold; New Chrysler continued to gain information further corroborating the Inflator Defect and dangers posed by it; and New Chrysler failed to adequately recall the defective vehicles in a timely manner, which failure was a substantial factor in causing harm to the California Consumer Plaintiffs and the California Consumer Class, including diminished value and out-of-pocket costs.

248. New Chrysler committed unfair business acts and practices in violation of § 17200 when it concealed the existence and nature of the Inflator Defect and the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them. New Chrysler represented that the Class Vehicles and/or the Defective Airbags installed in them were reliable and safe when, in fact, they are not.

249. New Chrysler also violated the unfairness prong of § 17200 by failing to properly administer the numerous recalls of Class Vehicles with the Defective Airbags installed in them. As alleged above, the recalls have proceeded unreasonably slowly in light of the safety-related nature of the Inflator Defect and have been plagued with shortages of replacement parts, as well as a paucity of loaner vehicles available for the California Consumer Class whose vehicles are in the process of being repaired.

250. New Chrysler violated the fraudulent prong of § 17200 because the misrepresentations and omissions regarding the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them as set forth in this Complaint were likely to deceive a reasonable consumer and the information would be material to a reasonable consumer.

251. New Chrysler committed fraudulent business acts and practices in violation of § 17200 when it concealed the existence and nature of the Inflator Defect and the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them, while representing in

- 70 -

its marketing, advertising, and other broadly disseminated representations that the Class Vehicles and/or the Defective Airbags installed in them were reliable and safe when, in fact, they are not. New Chrysler's active concealment of the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them are likely to mislead the public with regard to their true defective nature.

252.     New Chrysler violated the unfair prong of § 17200 because of the acts and practices set forth in the Complaint, including the manufacture and sale of Class Vehicles and/or the Defective Airbags installed in them and New Chrysler's failure to adequately investigate, disclose, and remedy, offend established public policy, and because of the harm they cause to consumers greatly outweighs any benefits associated with those practices. New Chrysler's conduct has also impaired competition within the automotive vehicles market and has prevented the California Consumer Plaintiffs and the California Consumer Class from making fully informed decisions about whether to purchase or lease Class Vehicles and/or the Defective Airbags installed in them and/or the price to be paid to purchase or lease them.

253.     The California Consumer Plaintiffs and the California Consumer Class have suffered injuries in fact, including the loss of money or property, as a result of New Chrysler's unfair, unlawful, and/or deceptive practices. As set forth above, each member of the California Consumer Class, in purchasing or leasing Class Vehicles with the Defective Airbags installed in them, relied on the misrepresentations and/or omissions of New Chrysler with respect of the safety and reliability of the vehicles. Had the California Consumer Plaintiffs and the California Consumer Class known the truth, they would not have purchased or leased their vehicles and/or paid as much for them.

- 71 -

254.     All of the wrongful conduct alleged herein occurred and continues to occur in the conduct of New Chrysler's businesses.  New Chrysler's wrongful conduct is part of a pattern or generalized course of conduct that is still perpetuated and repeated.

255.     As a direct and proximate result of New Chrysler's unfair and deceptive practices, the California Consumer Plaintiffs and the California Consumer Class have suffered and will continue to suffer actual damages.

256.     The California Consumer Plaintiffs and the California Consumer Class request that this Court enter such orders or judgments as may be necessary to enjoin New Chrysler from continuing its unfair, unlawful, and/or deceptive practices, as provided in Cal. Bus. & Prof. Code § 17203; and for such other relief set forth below.

## COUNT 13

### Violation of the California False Advertising Law,
### Cal. Bus. & Prof. Code § 17500

257.     The California Consumer Plaintiffs bring this claim against New Chrysler on behalf of themselves and the California Consumer Class.

258.     California Bus. & Prof. Code § 17500 states:

> It is unlawful for any . . . corporation . . . with intent directly or indirectly to dispose of real or personal property . . . to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated … from this state before the public in any state, in any newspaper or other publication, or any advertising device, … or in any other manner or means whatever, including over the Internet, any statement … which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading.

259.     New Chrysler caused to be made or disseminated through California and the United States, through advertising, marketing, and other publications, statements that were untrue or misleading and which were known or which by the exercise of reasonable care should have been

- 72 -

known to New Chrysler to be untrue and misleading to consumers, including the California Consumer Plaintiffs and the California Consumer Class.

260.    New Chrysler violated § 17500 because the misrepresentations and omissions regarding the safety, reliability, and functionality of the Class Vehicles and/or the Defective Airbags installed in them as set forth in this Complaint were material and likely to deceive a reasonable consumer.

261.    The California Consumer Plaintiffs and the California Consumer Class have suffered an injury in fact, including the loss of money or property, as a result of New Chrysler's unfair, unlawful, and/or deceptive practices.  In purchasing or leasing their Class Vehicles, California Consumer Plaintiffs and the California Consumer Class relied on the misrepresentations and/or omissions of New Chrysler with respect to the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them.  New Chrysler's representations turned out not to be true because the Class Vehicles and/or the Defective Airbags installed in them are inherently defective and dangerous in that the Defective Airbags violently explode and/or expel vehicle occupants with lethal amounts of metal debris and shrapnel, instead of protecting vehicle occupants from bodily injury during accidents.  Had the California Consumer Plaintiffs and the California Consumer Class known the truth, they would not have purchased or leased their Class Vehicles and/or paid as much for them.  Accordingly, the California Consumer Plaintiffs and the California Consumer Class members overpaid for their Class Vehicles and did not receive the benefit of their bargain.

262.    All of the wrongful conduct alleged herein occurred and continues to occur in the conduct of New Chrysler's business.  New Chrysler's wrongful conduct is part of a pattern or

generalized course of conduct that is still perpetuated and repeated, both in the State of California and nationwide.

263.    The California Consumer Plaintiffs, individually and on behalf of the California Consumer Class members, request that this Court enter such orders or judgments as may be necessary to enjoin New Chrysler from continuing its unfair, unlawful, and/or deceptive practices and to restore to the California Consumer Plaintiffs and the California Consumer Class any money New Chrysler acquired by unfair competition, including restitution and/or restitutionary disgorgement, and for such other relief set forth below.

## COUNT 14

### Violation of the Consumer Legal Remedies Act
### Cal. Civ. Code § 1750

264.    The California Consumer Plaintiffs bring this claim on behalf of themselves and the members of the California Consumer Class under the laws of California against New Chrysler.

265.    The Class Vehicles are "goods" as defined in Cal. Civ. Code § 1761(a).

266.    The California Consumer Plaintiffs, the California Consumer Class members, and New Chrysler are "persons" as defined in Cal. Civ. Code § 1761(c).

267.    The California Consumer Plaintiffs and the California Consumer Class members are "consumers" as defined in Cal. Civ. Code § 1761(d).

268.    California's Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1750, prohibits "unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer[.]" Cal. Civ. Code § 1770(a).

269.    New Chrysler has engaged in unfair or deceptive acts or practices that violated Cal. Civ. Code § 1750, as described above and below, by among other things, representing that the

Class Vehicles and/or the Defective Airbags installed in them have characteristics, uses, benefits, and qualities which they do not have; representing that they are of a particular standard, quality, and grade when they are not; advertising them with the intent not to sell or lease them as advertised; and representing that the subject of a transaction involving them has been supplied in accordance with a previous representation when it has not.

270.    In the course of its business, New Chrysler failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them as described herein and otherwise engaged in activities with a tendency or capacity to deceive.

271.    New Chrysler also engaged in unlawful trade practices by representing that the Class Vehicles and/or the Defective Airbags installed in them have characteristics, uses, benefits, and qualities which they do not have; representing that they are of a particular standard and quality when they are not; advertising them with the intent not to sell or lease them as advertised; and omitting material facts in describing them.  New Chrysler is directly liable for engaging in unfair and deceptive acts or practices in the conduct of trade or commerce in violation of the CLRA. Defendant parent companies are also liable for their subsidiaries' violation of the CLRA, because the subsidiaries act and acted as the parent companies' general agents in the United States for purposes of sales and marketing.

272.    New Chrysler has known of the Inflator Defect in the Defective Airbags since at least June 1, 2009, when it acquired substantially all of Old Chrysler's books, records, and personnel and the knowledge about the defective Takata airbags those books, records, and personnel held.  New Chrysler failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them.

273. By failing to disclose and by actively concealing the Inflator Defect in the Class Vehicles and/or the Defective Airbags installed in them, by marketing them as safe, reliable, and of high quality, and by presenting themselves as reputable manufacturers that value safety, New Chrysler engaged in unfair or deceptive business practices in violation of the CLRA. New Chrysler deliberately withheld the information about the propensity of the Defective Airbags to aggressively deploy and/or violently explode and spray vehicle occupants with lethal amounts of metal debris and shrapnel, instead of protecting vehicle occupants from bodily injury during accidents, in order to ensure that consumers would purchase the Class Vehicles.

274. New Chrysler intentionally and knowingly misrepresented material facts regarding the Class Vehicles and/or the Defective Airbags installed in them with an intent to mislead the California Consumer Plaintiffs and the California Consumer Class.

275. New Chrysler knew or should have known that its conduct violated the CLRA.

276. As alleged above, New Chrysler made material statements about the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them that were either false or misleading. New Chrysler's representations, omissions, statements, and commentary have included selling and marketing the Class Vehicles as "safe" and "reliable," despite its knowledge of the Inflator Defect or its failure to reasonably investigate it.

277. To protect its profits and to avoid remediation costs and a public relations nightmare, New Chrysler concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them and their tragic consequences and allowed unsuspecting new and used car purchasers to continue to buy/lease the Class Vehicles and to continue driving highly dangerous vehicles.

278.     New Chrysler owed the California Consumer Plaintiffs a duty to disclose the true safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them because New Chrysler:

a.     Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

b.     Intentionally concealed the foregoing from the California Consumer Plaintiffs and the California Consumer Class; and/or

Made

c.     Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from the California Consumer Plaintiffs and the California Consumer Class that contradicted these representations.

279.     The Class Vehicles and/or the Defective Airbags installed in them posed and/or pose an unreasonable risk of death or serious bodily injury to the California Consumer Plaintiffs and the California Consumer Class, passengers, other motorists, pedestrians, and the public at large, because the Defective Airbags are inherently defective and dangerous in that the Defective Airbags aggressively deploy and/or violently explode and spray vehicle occupants with lethal amounts of metal debris and shrapnel, instead of protecting vehicle occupants from bodily injury during accidents.

280.     New Chrysler's unfair or deceptive acts or practices were likely to deceive reasonable consumers, including the California Consumer Plaintiffs and the California Consumer Class, about the true safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them.  New Chrysler intentionally and knowingly misrepresented material facts

regarding the Class Vehicles and/or the Defective Airbags installed in them with an intent to mislead the California Consumer Plaintiffs and the California Consumer Class.

281. New Chrysler has also violated the CLRA by violating the TREAD Act, 49 U.S.C. § 30101, and its accompanying regulations by failing to promptly notify vehicle owners, purchases, dealers, and NHTSA of the defective Class Vehicles and/or the Defective Airbags installed in them and failing to remedy the Inflator Defect.

282. Under the TREAD Act and its regulations, if a manufacturer learns that a vehicle contains a defect and that defect is related to motor vehicle safety, the manufacturer must disclose the defect. 49 U.S.C. § 30118(c)(1) & (2).

283. Under the TREAD Act, if it is determined that the vehicle is defective, the manufacturer must promptly notify vehicle owners, purchasers, and dealers of the defect and remedy the defect. 49 U.S.C. § 30118(b)(2)(A) & (B).

284. Under the TREAD Act, manufacturers must also file a report with NHTSA within five working days of discovering "a defect in a vehicle or item of equipment has been determined to be safety related, or a noncompliance with a motor vehicle safety standard has been determined to exist." 49 C.F.R. § 573.6(a) & (b). At a minimum, the report to NHTSA must include: the manufacturer's name; the identification of the vehicles or equipment containing the defect, including the make, line, model year, and years of manufacturing; a description of the basis for determining the recall population; how those vehicles differ from similar vehicles that the manufacturer excluded from the recall; and a description of the defect. 49 C.F.R. § 276.6(b), (c)(1), (c)(2), & (c)(5).

285. The manufacturer must also promptly inform NHTSA regarding: the total number of vehicles or equipment potentially containing the defect; the percentage of vehicles estimated to

contain the defect; a chronology of all principal events that were the basis for the determination
that the defect related to motor vehicle safety, including a summary of all warranty claims, field
or service reports, and other information, with its dates of receipt; and a description of the plan to
remedy the defect.  49 C.F.R. § 276.6(b) & (c).

286.    The TREAD Act provides that any manufacturer who violates 49 U.S.C. § 30166
must pay a civil penalty to the U.S. Government.  The current penalty "is $7,000 per violation per
day," and the maximum penalty "for a related series of daily violations is $17,350,000."  49 C.F.R.
§ 578.6(c).

287.    New Chrysler engaged in deceptive business practices prohibited by the CLRA and
Cal. Civ. Code § 1750, by failing to disclose and by actively concealing dangers and risks posed
by the Defective Airbags, by selling vehicles while violating the TREAD Act, and by other conduct
as alleged herein.

288.    New Chrysler knew that the Class Vehicles and/or the Defective Airbags installed
in them contained the Inflator Defect that could cause the airbags to violently explode and/or expel
vehicle occupants with lethal amounts of metal debris and shrapnel, instead of protecting vehicle
occupants from bodily injury during accidents, but New Chrysler failed for many years to inform
NHTSA of this defect.  Consequently, the public, including the California Consumer Plaintiffs and
the California Consumer Class, received no notice of the Inflator Defect.  New Chrysler failed to
inform NHTSA or warn the California Consumer Plaintiffs, the California Consumer Class, and
the public about these inherent dangers, despite having a duty to do so.

289.    New Chrysler's unfair or deceptive acts or practices were likely to and did in fact
deceive reasonable consumers, including the California Consumer Plaintiffs and the California

Consumer Class members, about the true safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them.

290.    Because New Chrysler fraudulently concealed the Inflator Defect in Class Vehicles and/or the Defective Airbags installed in them, resulting in a raft of negative publicity once the Inflator Defect finally began to be disclosed, the value of the Class Vehicles has greatly diminished.  In light of the stigma attached to Class Vehicles by New Chrysler's conduct, they are now worth significantly less than they otherwise would be.

291.    New Chrysler's failure to disclose and active concealment of the dangers and risks posed by the Defective Airbags in Class Vehicles were material to the California Consumer Plaintiffs and the California Consumer Class.  A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

292.    The California Consumer Plaintiffs and California Consumer Class suffered ascertainable loss caused by New Chrysler's misrepresentations and its failure to disclose material information.  Had they been aware of the Inflator Defect that existed in the Class Vehicles and/or the Defective Airbags installed in them and New Chrysler's complete disregard for safety, the California Consumer Plaintiffs and California Consumer Class members either would not have paid as much for their vehicles as they did or would not have purchased or leased them at all.  The California Consumer Plaintiffs and the California Consumer Class members did not receive the benefit of their bargain as a result of New Chrysler's misconduct.

293.    The California Consumer Plaintiffs and the California Consumer Class risk irreparable injury as a result of New Chrysler's acts and omissions in violation of the CLRA, and these violations present a continuing risk to the California Consumer Plaintiffs and the California

- 80 -

Consumer Class, as well as to the general public. New Chrysler's unlawful acts and practices complained of herein affect the public interest.

294. The recalls and repairs instituted by New Chrysler have not been adequate. The recall is not an effective remedy and is not offered for all Class Vehicles and other vehicles with Defective Airbags susceptible to the malfunctions described herein. Moreover, New Chrysler's failure to comply with TREAD Act disclosure obligations continues to pose a grave risk to the California Consumer Plaintiffs and the California Consumer Class.

295. As a direct and proximate result of New Chrysler's violations of the CLRA, the California Consumer Plaintiffs and the California Consumer Class members have suffered injury-in-fact and/or actual damage. The California Consumer Plaintiffs and the California Consumer Class currently own or lease or within the class period have owned or leased Class Vehicles with Defective Airbags installed in them that are defective and inherently unsafe. The California Consumer Plaintiffs and the California Consumer Class risk irreparable injury as a result of New Chrysler's acts and omissions in violation of the CLRA, and these violations present a continuing risk to the California Consumer Plaintiffs and the California Consumer Class, as well as to the general public.

296. In accordance with section 1782(a) of the CLRA, Plaintiffs' counsel, on behalf of the California Consumer Plaintiffs, served New Chrysler with notice of its alleged violations of California Civil Code § 1770(a) relating to the Class Vehicles and/or the Defective Airbags installed in them purchased by the California Consumer Plaintiffs and the California Consumer Class and demanded that New Chrysler correct or agree to correct the actions described therein. New Chrysler has failed to do so. Plaintiffs therefore seek compensatory and monetary damages to which the California Consumer Plaintiffs and Class Members are entitled.

# COUNT 15

## Dismissed

## C.    Claims Brought on Behalf of the Florida Consumer Class

# COUNT 16

## Violation of the Florida Deceptive and Unfair Trade Practices Act
## Fla. Stat. § 501.201

297.    This claim is brought only on behalf of the Florida Consumer Class against New Chrysler.

298.    Plaintiffs are "consumers" within the meaning of Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. § 501.203(7).

299.    New Chrysler is engaged in "trade or commerce" within the meaning of Fla. Stat. § 501.203(8).

300.    The FDUTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce …" Fla. Stat. § 501.204(1).  New Chrysler participated in unfair and deceptive trade practices that violated the FDUTPA as described herein.

301.    In the course of its business, New Chrysler willfully failed to disclose and actively concealed the dangerous risks posed by the many safety issues and the serious Inflator Defect discussed above. New Chrysler compounded the deception by repeatedly asserting that the Class Vehicles and/or the Defective Airbags installed in them were safe, reliable, and of high quality and by claiming to be a reputable manufacturer that values safety.

302.    New Chrysler also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, or misrepresentations or concealment, suppression, or omission

of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Class Vehicles and/or the Defective Airbags installed in them.

303.    New Chrysler has known of the Inflator Defect in the Defective Airbags since at least June 1, 2009, when it acquired substantially all of Old Chrysler's books, records, and personnel and the knowledge about the defective Takata airbags those books, records, and personnel held.  New Chrysler failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them.

304.    Furthermore, New Chrysler was again made aware of the Inflator Defect in the Takata airbags in New Chrysler's vehicles in 2009, following Honda's recall; in 2010 following a rupture that occurred during the testing of one of New Chrysler's airbags; and in 2013 following a field rupture in a Chrysler vehicle.  New Chrysler willfully failed to disclose and actively concealed the dangerous risks posed by the Class Vehicles and/or the Defective Airbags installed in them.

305.    By failing to disclose and by actively concealing the Inflator Defect in the Class Vehicles and/or the Defective Airbags installed in them, by marketing them as safe, reliable, and of high quality, and by presenting themselves as reputable manufacturers that value safety, New Chrysler engaged in unfair or deceptive business practices in violation of the FDUTPA.  New Chrysler deliberately withheld the information about the propensity of the Defective Airbags to aggressively deploy and/or violently explode and spray vehicle occupants with lethal amounts of metal debris and shrapnel, instead of protecting vehicle occupants from bodily injury during accidents, in order to ensure that consumers would purchase the Class Vehicles.

306.    In the course of New Chrysler's business it willfully failed to disclose and actively concealed the dangerous risks posed by the many safety issues and the serious Inflator Defect

discussed above. New Chrysler compounded the deception by repeatedly asserting that the Class Vehicles and/or the Defective Airbags installed in them were safe, reliable, and of high quality and by claiming to be a reputable manufacturer that values safety.

307.    New Chrysler's unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers and were likely to and did in fact deceive reasonable consumers, including the Florida Consumer Plaintiffs, about the true safety and reliability of Class Vehicles and/or the Defective Airbags installed in them, the quality of New Chrysler's brands, and the true value of the Class Vehicles.

308.    New Chrysler intentionally and knowingly misrepresented material facts regarding the Class Vehicles and/or the Defective Airbags installed in them with an intent to mislead the Florida Consumer Plaintiffs and the Florida Consumer Class.

309.    New Chrysler knew or should have known that its conduct violated the FDUTPA.

310.    As alleged above, New Chrysler made material statements about the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them that were either false or misleading.  New Chrysler's representations, omissions, statements, and commentary have included selling and marketing the Class Vehicles as safe and reliable, despite its  knowledge of the Inflator Defect or their failure to reasonably investigate it.

311.    To protect profits and to avoid remediation costs and a public relations nightmare, New Chrysler concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them and their tragic consequences and allowed unsuspecting new and used car purchasers to continue to buy/lease the Class Vehicles and continue to drive highly dangerous vehicles.

312.     New Chrysler owed the Florida Consumer Plaintiffs a duty to disclose the true safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them because New Chrysler:

a.     Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

b.     Intentionally concealed the foregoing from the Florida Consumer Plaintiffs; and/or

c.     Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from the Florida Consumer Plaintiffs that contradicted these representations.

313.     Because New Chrysler fraudulently concealed the Inflator Defect in Class Vehicles and/or the Defective Airbags installed in them, resulting in a raft of negative publicity once the Inflator Defect finally began to be disclosed, the value of the Class Vehicles has greatly diminished.  In light of the stigma attached to Class Vehicles by New Chrysler's conduct, they are now worth significantly less than they otherwise would be.

314.     New Chrysler's failure to disclose and active concealment of the dangers and risks posed by the Defective Airbags in Class Vehicles were material to the Florida Consumer Plaintiffs and the Florida Consumer Class.  A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

315.     The Florida Consumer Plaintiffs and the Florida Consumer Class suffered ascertainable loss caused by New Chrysler's misrepresentations and its failure to disclose material information.  Had they been aware of the Inflator Defect that existed in the Class Vehicles and/or

the Defective Airbags installed in them and New Chrysler's complete disregard for safety, the Florida Consumer Plaintiffs either would not have paid as much for their vehicles as they did or would not have purchased or leased them at all. The Florida Consumer Plaintiffs did not receive the benefit of their bargain as a result of Chrysler's misconduct.

316.     The Florida Consumer Plaintiffs and the Florida Consumer Class risk irreparable injury as a result of New Chrysler's acts and omissions in violation of the FDUTPA, and these violations present a continuing risk to the Florida Consumer Plaintiffs, the Florida Consumer Class, as well as to the general public.  New Chrysler's unlawful acts and practices complained of herein affect the public interest.

317.     As a direct and proximate result of New Chrysler's violations of the FDUTPA, the Florida Consumer Plaintiffs and the Florida Consumer Class have suffered injury-in-fact and/or actual damage.

318.     The Florida Consumer Plaintiffs and the Florida Consumer Class are entitled to recover their actual damages under Fla. Stat. § 501.211(2) and attorneys' fees under Fla. Stat. § 501.2105(1).

319.     The Florida Consumer Plaintiffs also seek an order enjoining New Chrysler's unfair, unlawful, and/or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief available under the FDUTPA.

### D.     Claims Brought on Behalf of the Georgia Consumer Class

### COUNT 17

**Violation of the Georgia Fair Business Practices Act**
**Ga. Code Ann. § 10-1-390**

320.     This claim is brought by the Georgia Consumer Plaintiffs individually and on behalf of the Georgia Consumer Class against New Chrysler.

321.     Georgia Consumer Plaintiffs and the Georgia Consumer Class members are "consumers" within the meaning of Ga. Code Ann. § 10-1-392(6).

322.     Georgia Consumer Plaintiffs, the Georgia Consumer Class members, and New Chrysler are "persons" within the meaning Ga. Code Ann. § 10-1-392(24).

323.     New Chrysler was and is engaged in "trade" and "commerce" within the meaning of Ga. Code Ann. § 10-1-392(28).

324.     The Georgia Fair Business Practices Act ("Georgia FBPA") declares "[u]nfair or deceptive acts or practices in the conduct of consumer transactions and consumer acts or practices in trade or commerce" to be unlawful, Ga. Code Ann. § 10-1-393(a), including but not limited to "representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have," "[r]epresenting that goods or services are of a particular standard, quality, or grade … if they are of another," and "[a]dvertising goods or services with intent not to sell them as advertised," Ga. Code Ann. § 10-1-393(b).

325.     By failing to disclose and actively concealing the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them, New Chrysler engaged in unfair or deceptive practices prohibited by the Georgia FBPA, including: (1) representing that the Class Vehicles and/or the Defective Airbags installed in them have characteristics, uses, benefits, and qualities which they do not have; (2) representing that they are of a particular standard, quality, and grade when they are not; and (3) advertising them with the intent not to sell or lease them as advertised.  New Chrysler participated in unfair or deceptive acts or practices that violated the Georgia FBPA.

326. In the course of its business, New Chrysler failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them as described herein and otherwise engaged in activities with a tendency or capacity to deceive.

327. New Chrysler also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles and/or the Defective Airbags installed in them.

328. New Chrysler has known of the Inflator Defect in the Defective Airbags since at least June 1, 2009, when it acquired substantially all of Old Chrysler's books, records, and personnel, and the knowledge about the defective Takata airbags those books, records, and personnel held. New Chrysler failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them.

329. By failing to disclose and by actively concealing the Inflator Defect in the Class Vehicles and/or the Defective Airbags installed in them, by marketing them as safe, reliable, and of high quality, and by presenting themselves as reputable manufacturers that value safety, New Chrysler engaged in unfair or deceptive business practices in violation of the Georgia FBPA. New Chrysler deliberately withheld the information about the propensity of the Defective Airbags to aggressively deploy, and/or violently explode and spray vehicle occupants with lethal amounts of metal debris and shrapnel, instead of protecting vehicle occupants from bodily injury during accidents, in order to ensure that consumers would purchase the Class Vehicles.

330. In the course of New Chrysler's business, it willfully failed to disclose and actively concealed the dangerous risks posed by the many safety issues and the serious Inflator Defect discussed above. New Chrysler compounded the deception by repeatedly asserting that the Class

Vehicles and/or the Defective Airbags installed in them were safe, reliable, and of high quality, and by claiming to be a reputable manufacturer that values safety.

331.    New Chrysler's unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers, and were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of Class Vehicles and/or the Defective Airbags installed in them, the quality of New Chrysler's brands, and the true value of the Class Vehicles.

332.    New Chrysler intentionally and knowingly misrepresented material facts regarding the Class Vehicles and/or the Defective Airbags installed in them with an intent to mislead Georgia Consumer Plaintiffs and the Georgia Consumer Class.

333.    New Chrysler knew or should have known that its conduct violated the Georgia FBPA.

334.    As alleged above, New Chrysler made material statements about the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them that were either false or misleading.  New Chrysler's representations, omissions, statements, and commentary have included selling and marketing the Class Vehicles as "safe" and "reliable," despite its knowledge of the Inflator Defect or their failure to reasonably investigate it.

335.    To protect its profits and to avoid remediation costs and a public relations nightmare, New Chrysler concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them and their tragic consequences, and allowed unsuspecting new and used car purchasers to continue to buy/lease the Class Vehicles, and allowed them to continue driving highly dangerous vehicles.

336.    New Chrysler owed Georgia Consumer Plaintiffs and the Georgia Consumer Class a duty to disclose the true safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them because New Chrysler:

a.    Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

b.    Intentionally concealed the foregoing from Georgia Consumer Plaintiffs and the Georgia Consumer Class; and/or

c.    Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from Georgia Consumer Plaintiffs and the Georgia Consumer Class that contradicted these representations.

337.    Because New Chrysler fraudulently concealed the Inflator Defect in Class Vehicles and/or the Defective Airbags installed in them, resulting in a raft of negative publicity once the Inflator Defect finally began to be disclosed, the value of the Class Vehicles has greatly diminished.  In light of the stigma attached to Class Vehicles by New Chrysler's conduct, they are now worth significantly less than they otherwise would be.

338.    New Chrysler's failure to disclose and active concealment of the dangers and risks posed by the Defective Airbags in Class Vehicles were material to Georgia Consumer Plaintiffs and the Georgia Consumer Class.  A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

339.    Georgia Consumer Plaintiffs and the Georgia Consumer Class suffered ascertainable loss caused by New Chrysler's misrepresentations and their failure to disclose material information.  Had they been aware of the Inflator Defect that existed in the Class Vehicles

and/or the Defective Airbags installed in them, and New Chrysler's complete disregard for safety, Georgia Consumer Plaintiffs and the Georgia Consumer Class would not have paid as much for their vehicles or would not have purchased or leased them at all. Georgia Consumer Plaintiffs and the Georgia Consumer Class did not receive the benefit of their bargain as a result of New Chrysler's misconduct.

340.    New Chrysler's violations present a continuing risk to Georgia Consumer Plaintiffs and the Georgia Consumer Class as well as to the general public. New Chrysler's unlawful acts and practices complained of herein affect the public interest. The recalls and repairs instituted by New Chrysler have not been adequate.

341.    As a direct and proximate result of New Chrysler's violations of the Georgia FBPA, Georgia Consumer Plaintiffs and the Georgia Consumer Class have suffered injury-in-fact and/or actual damage.

342.    Georgia Consumer Plaintiffs and the Georgia Consumer Class are entitled to recover damages and exemplary damages (for intentional violations) per Ga. Code Ann. § 10-1-399(a).

343.    Georgia Consumer Plaintiffs and the Georgia Consumer Class also seek an order enjoining New Chrysler's unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Georgia FBPA per Ga. Code Ann. § 10-1-399.

344.    In accordance with Ga. Code Ann. § 10-1-399(b), Plaintiffs' counsel, on behalf of Plaintiffs, served New Chrysler with notice of their alleged violations of the Georgia FBPA relating to the Class Vehicles and/or the Defective Airbags installed in them purchased by Plaintiffs and Class Members, and demanded that New Chrysler correct or agree to correct the

actions described therein. New Chrysler have failed to do so. Plaintiffs therefore seek

compensatory and monetary damages to which Plaintiffs and Class Members are entitled.

**COUNT 18**

**Violation of the Georgia Uniform Deceptive Trade Practices Act**
**Ga. Code Ann. § 10-1-370**

345.    This claim is brought by the Georgia Consumer Plaintiffs individually and on

behalf of the Georgia Consumer Class against New Chrysler.

346.    Georgia Consumer Plaintiffs, the Georgia Consumer Class members, and New

Chrysler are "persons" within the meaning of the Georgia Uniform Deceptive Trade Practices Act

("Georgia UDTPA"), Ga. Code Ann. § 10-1-371(5).

347.    The Georgia UDTPA prohibits "deceptive trade practices," which include the

"misrepresentation of standard or quality of goods or services," and "engaging in any other conduct

which similarly creates a likelihood of confusion or of misunderstanding." Ga. Code Ann. § 10-1-

372(a).  By failing to disclose and actively concealing the dangers and risks posed by the Class

Vehicles and/or the Defective Airbags installed in them, New Chrysler engaged in deceptive trade

practices prohibited by the Georgia UDTPA.

348.    In the course of its business, New Chrysler failed to disclose and actively concealed

the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them

as described herein and otherwise engaged in activities with a tendency or capacity to deceive.

349.    New Chrysler also engaged in unlawful trade practices by employing deception,

deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of

any material fact with intent that others rely upon such concealment, suppression or omission, in

connection with the sale of the Class Vehicles and/or the Defective Airbags installed in them.

350.     New Chrysler has known of the Inflator Defect in the Defective Airbags since at least June 1, 2009, when it acquired substantially all of Old Chrysler's books, records, and personnel, and the knowledge about the defective Takata airbags those books, records, and personnel held.  New Chrysler failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them.

351.     By failing to disclose and by actively concealing the Inflator Defect in the Class Vehicles and/or the Defective Airbags installed in them, by marketing them as safe, reliable, and of high quality, and by presenting themselves as reputable manufacturers that value safety, New Chrysler engaged in unfair or deceptive business practices in violation of the Georgia UDTPA. New Chrysler deliberately withheld the information about the propensity of the Defective Airbags to aggressively deploy, and/or violently explode and spray vehicle occupants with lethal amounts of metal debris and shrapnel, instead of protecting vehicle occupants from bodily injury during accidents, in order to ensure that consumers would purchase the Class Vehicles.

352.     In the course of New Chrysler's business, it willfully failed to disclose and actively concealed the dangerous risks posed by the many safety issues and the serious Inflator Defect discussed above. New Chrysler compounded the deception by repeatedly asserting that the Class Vehicles and/or the Defective Airbags installed in them were safe, reliable, and of high quality, and by claiming to be reputable manufacturers that value safety.

353.     New Chrysler's unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers, and were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of Class Vehicles and/or the Defective

- 93 -

Airbags installed in them, the quality of New Chrysler's brands, and the true value of the Class Vehicles.

354.    New Chrysler intentionally and knowingly misrepresented material facts regarding the Class Vehicles and/or the Defective Airbags installed in them with an intent to mislead Georgia Consumer Plaintiffs and the Georgia Consumer Class.

355.    New Chrysler knew or should have known that its conduct violated the Georgia UDTPA.

356.    As alleged above, New Chrysler made material statements about the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them that were either false or misleading.  New Chrysler's representations, omissions, statements, and commentary have included selling and marketing the Class Vehicles as "safe" and "reliable," despite its knowledge of the Inflator Defect or their failure to reasonably investigate it.

357.    To protect its profits and to avoid remediation costs and a public relations nightmare, New Chrysler concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them and their tragic consequences, and allowed unsuspecting new and used car purchasers to continue to buy/lease the Class Vehicles, and allowed them to continue driving highly dangerous vehicles.

358.    New Chrysler owed Georgia Consumer Plaintiffs and the Georgia Consumer Class a duty to disclose the true safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them because New Chrysler:

        a.      Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

b.     Intentionally concealed the foregoing from Georgia Consumer Plaintiffs and the Georgia Consumer Class; and/or

c.     Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from Georgia Consumer Plaintiffs and the Georgia Consumer Class that contradicted these representations.

359.     Because New Chrysler fraudulently concealed the Inflator Defect in Class Vehicles and/or the Defective Airbags installed in them, resulting in a raft of negative publicity once the Inflator Defect finally began to be disclosed, the value of the Class Vehicles has greatly diminished.  In light of the stigma attached to Class Vehicles by New Chrysler's conduct, they are now worth significantly less than they otherwise would be.

360.     New Chrysler's failure to disclose and active concealment of the dangers and risks posed by the Defective Airbags in Class Vehicles were material to Georgia Consumer Plaintiffs and the Georgia Consumer Class.  A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

361.     Georgia Consumer Plaintiffs and the Georgia Consumer Class suffered ascertainable loss caused by New Chrysler's misrepresentations and their failure to disclose material information.  Had they been aware of the Inflator Defect that existed in the Class Vehicles and/or the Defective Airbags installed in them, and New Chrysler's complete disregard for safety, Georgia Consumer Plaintiffs and the Georgia Consumer Class either would not have paid as much for their vehicles or would not have purchased or leased them at all.  Plaintiffs did not receive the benefit of their bargain as a result of New Chrysler's misconduct.

362.     New Chrysler's violations present a continuing risk to Georgia Consumer Plaintiffs and the Georgia Consumer Class as well as to the general public.  New Chrysler's unlawful acts and practices complained of herein affect the public interest.  The recalls and repairs instituted by New Chrysler have not been adequate.

363.     As a direct and proximate result of New Chrysler's violations of the Georgia UDTPA, Georgia Consumer Plaintiffs and the Georgia Consumer Class have suffered injury-in-fact and/or actual damage.

364.     Georgia Consumer Plaintiffs and the Georgia Consumer Class seek an order enjoining New Chrysler's unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Georgia UDTPA per Ga. Code Ann. § 10-1-373.

E.     **Claims Brought on Behalf of the Illinois Consumer Class**

**COUNT 19**

**Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act**
**815 ILCS § 505/1**

365.     This claim is brought on behalf of the Illinois Consumer Class against New Chrysler.

366.     New Chrysler and Takata are "persons" as that term is defined in 815 ILCS 505/1(c).

367.     Plaintiff and the Illinois Class Members are "consumers" as that term is defined in 815 ILCS 505/1(e).

368.     The Illinois Consumer Fraud and Deceptive Business Practices Act ("Illinois CFDBPA") prohibits:

> [U]nfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise,

misrepresentation or the concealment, suppression or omission of any material fact,
with intent that others rely upon the concealment, suppression or omission of such
material fact . . . in the conduct of trade or commerce . . . whether any person has
in fact been misled, deceived or damaged thereby.

815 ILCS § 505/2.

369.  New Chrysler participated in misleading, false, or deceptive acts that violated the
Illinois CFDBPA, by failing to disclose and actively concealing the dangers and risks posed by the
Class Vehicles and/or the Defective Airbags installed in them.  New Chrysler also engaged in
unlawful trade practices by: (1) representing that the Class Vehicles and/or the Defective Airbags
installed in them have characteristics, uses, benefits, and qualities which they do not have; (2)
representing that they are of a particular standard and quality when they are not; (3) advertising
them with the intent not to sell or lease them as advertised; and (4) otherwise engaging in conduct
likely to deceive.

370.  New Chrysler's actions as set forth below and above occurred in the conduct of
trade or commerce.

371.  In the course of its business, New Chrysler willfully failed to disclose and actively
concealed the dangerous risks posed by the many safety issues and the serious Inflator Defect
discussed above. New Chrysler compounded the deception by repeatedly asserting that the Class
Vehicles and/or the Defective Airbags installed in them were safe, reliable, and of high quality and
by claiming to be a reputable manufacturer that values safety.

372.  New Chrysler also engaged in unlawful trade practices by employing deception,
deceptive acts or practices, fraud, or misrepresentations or concealment, suppression, or omission

of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Class Vehicles and/or the Defective Airbags installed in them.

373.    New Chrysler has known of the Inflator Defect in the Defective Airbags since at least June 1, 2009, when it acquired substantially all of Old Chrysler's books, records, and personnel and the knowledge about the defective Takata airbags those books, records, and personnel held.  New Chrysler failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them.

374.    Furthermore, New Chrysler was again made aware of the Inflator Defect in the Takata airbags in New Chrysler's vehicles in 2009, following Honda's recall; in 2010 following a rupture that occurred during the testing of one of New Chrysler's airbags; and in 2013 following a field rupture in a Chrysler vehicle.  New Chrysler willfully failed to disclose and actively concealed the dangerous risks posed by the Class Vehicles and/or the Defective Airbags installed in them

375.    By failing to disclose and by actively concealing the Inflator Defect in the Class Vehicles and/or the Defective Airbags installed in them, by marketing them as safe, reliable, and of high quality and by presenting themselves as reputable manufacturers that value safety, New Chrysler engaged in unfair or deceptive business practices in violation of the Illinois CFDBPA. New Chrysler deliberately withheld the information about the propensity of the Defective Airbags to aggressively deploy and/or violently explode and spray vehicle occupants with lethal amounts of metal debris and shrapnel, instead of protecting vehicle occupants from bodily injury during accidents, in order to ensure that consumers would purchase the Class Vehicles.

376.    In the course of New Chrysler's business, it willfully failed to disclose and actively concealed the dangerous risks posed by the many safety issues and the serious Inflator Defect

discussed above. New Chrysler compounded the deception by repeatedly asserting that the Class Vehicles and/or the Defective Airbags installed in them were safe, reliable, and of high quality and by claiming to be a reputable manufacturer that values safety.

377.    New Chrysler's unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers, and were likely to and did in fact deceive reasonable consumers, including the Illinois Consumer Plaintiffs, about the true safety and reliability of Class Vehicles and/or the Defective Airbags installed in them, the quality of New Chrysler's brands and the true value of the Class Vehicles.

378.    New Chrysler intentionally and knowingly misrepresented material facts regarding the Class Vehicles and/or the Defective Airbags installed in them with an intent to mislead the Illinois Consumer Plaintiffs and the Illinois Consumer Class.

379.    New Chrysler knew or should have known that its conduct violated the Illinois CFDBPA.

380.    As alleged above, New Chrysler made material statements about the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them that were either false or misleading.  New Chrysler's representations, omissions, statements, and commentary have included selling and marketing the Class Vehicles as "safe" and "reliable," despite their knowledge of the Inflator Defect or their failure to reasonably investigate it.

381.    To protect its profits and to avoid remediation costs and a public relations nightmare, New Chrysler concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them and their tragic consequences and allowed unsuspecting new

and used car purchasers to continue to buy/lease the Class Vehicles and continue driving highly dangerous vehicles.

382.   New Chrysler owed the Illinois Consumer Plaintiffs a duty to disclose the true safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them because New Chrysler:

   a.   Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

   b.   Intentionally concealed the foregoing from the Illinois Consumer Plaintiffs; and/or

   c.   Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from the Illinois Consumer Plaintiffs that contradicted these representations.

383.   Because New Chrysler fraudulently concealed the Inflator Defect in Class Vehicles and/or the Defective Airbags installed in them, resulting in a raft of negative publicity once the Inflator Defect finally began to be disclosed, the value of the Class Vehicles has greatly diminished.  In light of the stigma attached to Class Vehicles by New Chrysler's conduct, they are now worth significantly less than they otherwise would be.

384.   New Chrysler's failure to disclose and active concealment of the dangers and risks posed by the Defective Airbags in Class Vehicles were material to the Illinois Consumer Plaintiffs and the Illinois Consumer Class.  A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

385.     The Illinois Consumer Plaintiffs and the Illinois Consumer Class suffered ascertainable loss caused by New Chrysler's misrepresentations and their failure to disclose material information.  Had they been aware of the Inflator Defect that existed in the Class Vehicles and/or the Defective Airbags installed in them, and New Chrysler's complete disregard for safety, the Illinois Consumer Plaintiffs either would not have paid as much for their vehicles as they did or would not have purchased or leased them at all.  The Illinois Consumer Plaintiffs did not receive the benefit of their bargain as a result of New Chrysler's misconduct.

386.     New Chrysler's violations present a continuing risk to the Illinois Consumer Plaintiffs, to the Illinois Consumer Class, as well as to the general public.  New Chrysler's unlawful acts and practices complained of herein affect the public interest.

387.     As a direct and proximate result of New Chrysler's violations of the Illinois CFDBPA, the Illinois Consumer Plaintiffs and the Illinois Consumer Class have suffered injury-in-fact and/or actual damage.

388.     Pursuant to 815 ILCS § 505/10a(a), the Illinois Consumer Plaintiffs and the Illinois Consumer Class seek monetary relief against New Chrysler in the amount of actual damages, as well as punitive damages because New Chrysler acted with fraud and/or malice and/or were grossly negligent.

389.     The Illinois Consumer Plaintiffs also seek an order enjoining New Chrysler's unfair and/or deceptive acts or practices, punitive damages, and attorneys' fees, and any other just and proper relief available under 815 ILCS § 505/1.

## COUNT 20

### Violation of the Illinois Uniform Deceptive Trade Practices Act
### 815 ILCS § 510/1

390.     This claim is brought on behalf of the Illinois Consumer Class against New Chrysler.

391.     Illinois's Uniform Deceptive Trade Practices Act ("Illinois UDTPA"), 815 ILCS § 510/2, prohibits deceptive trade practices, including among others:

> (2) caus[ing] likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services; … (5) represent[ing] that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have …; (7) represent[ing] that goods or services are of a particular standard, quality, or grade … if they are of another; … (9) advertis[ing] goods or services with intent not to sell them as advertised; … [and] (12) engag[ing] in any other conduct which similarly creates a likelihood of confusion or misunderstanding.

392.     New Chrysler and Takata are "persons" as defined in 815 ILCS § 510/1(5).

393.     In the course of New Chrysler's business, Defendants failed to disclose and actively concealed the Inflator Defect in the Class Vehicles and/or the Defective Airbags installed in them as described above.  Accordingly, Defendants engaged in deceptive trade practices as defined in 815 ILCS § 510/2, including representing that the Class Vehicles and/or the Defective Airbags installed in them have characteristics, uses, benefits, and qualities which they do not have; representing that they are of a particular standard and quality when they are not; advertising them

with the intent not to sell or lease them as advertised; and otherwise engaging in conduct likely to deceive.

394.    New Chrysler intended for the Illinois Consumer Plaintiff and the Illinois Consumer Class to rely on aforementioned unfair and deceptive acts and practices, including the misrepresentations and omissions alleged hereinabove.

395.    New Chrysler's actions as set forth below and above occurred in the conduct of trade or commerce.

396.    New Chrysler's conduct proximately caused injuries to the Illinois Consumer Plaintiff and the Illinois Consumer Class.

397.    The Illinois Consumer Plaintiff and the Illinois Consumer Class were injured as a result of New Chrysler's conduct in that the Illinois Consumer Plaintiff and the Illinois Consumer Class overpaid for their Class Vehicles and did not receive the benefit of their bargain, and their Class Vehicles have suffered a diminution in value.  These injuries are the direct and natural consequence of New Chrysler's misrepresentations and omissions.

398.    The Illinois Consumer Plaintiffs seek an order enjoining New Chrysler's deceptive practices, attorneys' fees, and any other just and proper relief available under the Illinois UDTPA per 815 ILCS § 510/3.

F.    **Claims Brought on Behalf of the Indiana Consumer Class**

**COUNT 21**

**Dismissed**

## COUNT 22

### Dismissed

**G.    Claims Brought on Behalf of the Maryland Consumer Class**

## COUNT 23

### Breach of the Implied Warranty of Merchantability
### Md. Code Ann., Com. Law §§ 2-315 and 2A-213

399.    In the event the Court declines to certify a Nationwide Consumer Class under the Magnuson-Moss Warranty Act, this claim is brought only on behalf of the Maryland Consumer Class against New Chrysler.

400.    New Chrysler is and was at all relevant times a "merchant" with respect to motor vehicles under Md. Code Ann., Com. Law §§ 2-104(1) and 2A-103(3), and a "seller" of motor vehicles under § 2-103(1)(d).

401.    With respect to leases, New Chrysler is and was at all relevant times a "lessor" of motor vehicles under Md. Code Ann., Com. Law §2A-103(1)(p).

402.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Md. Code Ann., Com. Law §§ 2-105(1) and §2A-103(1)(h).

403.    A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Md. Code Ann., Com. Law §§ 2-315 and 2A-213.

404.    The Class Vehicles and/or the Defective Airbags installed in them, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars and airbags are used. Specifically, they are inherently defective and dangerous in that the Defective Airbags: (a) rupture and expel metal shrapnel that tears through the airbag and poses a threat of serious injury or death to occupants; and/or (b) hyper-aggressively deploy and seriously

injure occupants through contact with the airbag, instead of protecting vehicle occupants from bodily injury during accidents.

405.     New Chrysler was provided notice of these issues through its direct knowledge of the issues, customer complaints, numerous complaints filed against it and/or others, internal investigations, and individual letters and communications sent by the consumers before New Chrysler issued the recalls and after the allegations of the Inflator Defect became public.

As a direct and proximate result of New Chrysler's breach of the warranties of merchantability, the Maryland Consumer Plaintiffs and the Maryland Consumer Class have been damaged in an amount to be proven at trial.

<u>**COUNT 24**</u>

**Violation of the Maryland Consumer Protection Act,**
**Md. Code Ann., Com. Law § 13-101**

406.     This claim is brought by the Maryland Consumer Plaintiffs on behalf of themselves and the Maryland Consumer Class against New Chrysler.

407.     The Maryland Consumer Plaintiffs and the Maryland Consumer Class members are "consumers" within the meaning of Md. Code Ann., Com. Law § 13-101(c).

408.     The Maryland Consumer Plaintiffs, the Maryland Consumer Class members, and New Chrysler are "persons" within the meaning of Md. Code Ann., Com. Law § 13-101(h).

409.     The Class Vehicles and/or the Defective Airbags installed in them are "consumer goods" within the meaning of Md. Code Ann., Com. Law § 13-101(d).

410.     The Maryland Consumer Protection Act ("Maryland CPA") declares several specific actions to be unlawful deceptive trade practices, including:

a. "False, falsely disparaging, or misleading oral or written statement, visual description, or other representation of any kind which has the capacity, tendency, or effect of deceiving or misleading consumers;"

b. "Representing that [c]onsumer goods . . . have a sponsorship, approval, accessory, characteristic, ingredient, use, benefit, or quantity which they do not have;"

c. "Representing that [c]onsumer goods . . . are of a particular standard, quality, grade, style, or model which they are not;"

d. "Failure to state a material fact if the failure deceives or tends to deceive;"

e. "Advertisement or offer of consumer goods . . . [w]ithout intent to sell, lease, or rent them as advertised or offered;" and

f. "Deception, fraud, false pretense, false premise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection with [t]he promotion or sale of any consumer goods . . . ."

Md. Code Ann., Com. Law § 13-301.

411. By misrepresenting the Class Vehicles and/or the Defective Airbags as safe and by failing to disclose and actively concealing the Inflator Defect, New Chrysler engaged in deceptive business practices prohibited by the Maryland CPA, including:

a. Making false or misleading oral or written statements about the Class Vehicles and/or the Defective Airbags which have the capacity, tendency, or effect of deceiving or misleading consumers;

b. Representing that the Class Vehicles and/or the Defective Airbags have characteristics, uses, and benefits which they do not have;

c.     Representing that the Class Vehicles and/or the Defective Airbags are of a particular standard, quality, and grade which they are not;

d.     Advertising the Class Vehicles and/or the Defective Airbags without intent to sell or lease them as advertised;

e.     Engaging in deception, fraud, false pretense, false premise, misrepresentation, or knowing concealment, suppression, or omission of material facts concerning the Class Vehicles and/or the Defective Airbags with the intent that a consumer rely on the same in connection with the promotion or sale the Class Vehicles and/or the Defective Airbags.

412.   New Chrysler has known of the Inflator Defect in the Defective Airbags since at least June 1, 2009, when it acquired substantially all of Old Chrysler's books, records, and personnel, and the knowledge about the defective Takata airbags those books, records, and personnel held.  New Chrysler failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them.

413.   By failing to disclose and by actively concealing the Inflator Defect in the Class Vehicles and/or the Defective Airbags installed in them, by marketing them as safe, reliable, and of high quality, and by presenting themselves as reputable manufacturers that value safety, New Chrysler engaged in unfair or deceptive business practices in violation of the Maryland CPA.  New Chrysler deliberately withheld the information about the propensity of the Defective Airbags to aggressively deploy and/or violently explode and spray vehicle occupants with lethal amounts of metal debris and shrapnel, instead of protecting vehicle occupants from bodily injury during accidents, in order to ensure that consumers would purchase the Class Vehicles.

414.   In the course of its business, New Chrysler willfully failed to disclose and actively concealed the dangerous risks posed by the many safety issues and the serious Inflator Defect

- 107 -

discussed above. New Chrysler compounded the deception by repeatedly asserting that the Class Vehicles and/or the Defective Airbags installed in them were safe, reliable, and of high quality, and by claiming to be a reputable manufacturer that values safety.

415. New Chrysler's unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers and were likely to and did in fact deceive reasonable consumers, including the Maryland Consumer Plaintiffs and the Maryland Consumer Class members, about the true safety and reliability of Class Vehicles and/or the Defective Airbags installed in them, the quality of New Chrysler's brands, and the true value of the Class Vehicles.

416. New Chrysler intentionally and knowingly misrepresented material facts regarding the Class Vehicles and/or the Defective Airbags installed in them with an intent to mislead the Maryland Consumer Plaintiffs and the Maryland Consumer Class members.

417. New Chrysler knew or should have known that its conduct violated the Maryland CPA.

418. As alleged above, New Chrysler made material statements about the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them that were either false or misleading. New Chrysler's representations, omissions, statements, and commentary have included selling and marketing the Class Vehicles as safe and reliable, despite its knowledge of the Inflator Defect or their failure to reasonably investigate it.

419. To protect its profits and to avoid remediation costs and a public relations nightmare, New Chrysler concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them and their tragic consequences and allowed unsuspecting new

and used car purchasers to continue to buy/lease the Class Vehicles and to continue driving highly dangerous vehicles.

420.    New Chrysler owed the Maryland Consumer Plaintiffs and the Maryland Consumer Class members a duty to disclose the true safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them because New Chrysler:

a.    Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

b.    Intentionally concealed the foregoing from the Maryland Consumer Plaintiffs and the Maryland Consumer Class; and/or

c.    Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from the Maryland Consumer Plaintiffs and the Maryland Consumer Class that contradicted these representations.

421.    Because New Chrysler fraudulently concealed the Inflator Defect in Class Vehicles and/or the Defective Airbags installed in them, resulting in a raft of negative publicity once the Inflator Defect finally began to be disclosed, the value of the Class Vehicles has greatly diminished.  In light of the stigma attached to Class Vehicles by New Chrysler's conduct, they are now worth significantly less than they otherwise would be.

422.    New Chrysler's failure to disclose and active concealment of the dangers and risks posed by the Defective Airbags in Class Vehicles were material to the Maryland Consumer Plaintiffs and the Maryland Consumer Class.  A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals the Inflator Defect rather than promptly remedies them.

423.     The Maryland Consumer Plaintiffs and the Maryland Consumer Class suffered ascertainable loss caused by New Chrysler's misrepresentations and its failure to disclose material information.  Had they been aware of the Inflator Defect that existed in the Class Vehicles and/or the Defective Airbags installed in them and New Chrysler's complete disregard for safety, the Maryland Consumer Plaintiffs and the Maryland Consumer Class members either would not have paid as much for their vehicles as they did or would not have purchased or leased them at all.  The Maryland Consumer Plaintiffs and the Maryland Consumer Class members did not receive the benefit of their bargain as a result of New Chrysler's misconduct.

424.     New Chrysler's violations present a continuing risk to the Maryland Consumer Plaintiffs and the Maryland Consumer Class, as well as to the general public.  New Chrysler's unlawful acts and practices complained of herein affect the public interest.  The recalls and repairs instituted by New Chrysler have not been adequate.

425.     As a direct and proximate result of New Chrysler's violations of the Maryland CPA, the Maryland Consumer Plaintiffs and the Maryland Consumer Class have suffered injury-in-fact and/or actual damage.

426.     Pursuant to Md. Code Ann., Com. Law § 13-408, the Maryland Consumer Plaintiffs and the Maryland Consumer Class seek monetary relief against New Chrysler in an amount to be determined at trial.

427.     The Maryland Consumer Plaintiffs and the Maryland Consumer Class also seek an order enjoining New Chrysler's unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Maryland CPA.

### H.    Claims Brought on Behalf of the Massachusetts Consumer Class

### COUNT 25

**Deceptive Acts or Practices Prohibited by Massachusetts Law
Mass. Gen. Laws Ch. 93A, §1**

428.    This claim is brought only on behalf of the Massachusetts Consumer Class against New Chrysler.

429.    The Massachusetts Consumer Plaintiffs, the Massachusetts Consumer Class, and New Chrysler are "persons" within the meaning of Mass. Gen. Laws ch. 93A, § 1(a).

430.    New Chrysler engaged in "trade" or "commerce" within the meaning of Mass. Gen. Laws 93A, § 1(b).

431.    Massachusetts law (the "Massachusetts Act") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." Mass. Gen. Laws Ch. 93A, § 2.  New Chrysler participated in misleading, false, or deceptive acts that violated the Massachusetts Act.  By failing to disclose and actively concealing the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them, New Chrysler engaged in deceptive business practices prohibited by the Massachusetts Act.

432.    In the course of its business, New Chrysler willfully failed to disclose and actively concealed the dangerous risks posed by the many safety issues and the serious Inflator Defect discussed above. New Chrysler compounded the deception by repeatedly asserting that the Class Vehicles and/or the Defective Airbags installed in them were safe, reliable, and of high quality and by claiming to be a reputable manufacturer that values safety.

433.    New Chrysler also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, or misrepresentations or concealment, suppression, or omission

of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Class Vehicles and/or the Defective Airbags installed in them.

434. New Chrysler has known of the Inflator Defect in the Defective Airbags since at least June 1, 2009, when it acquired substantially all of Old Chrysler's books, records, and personnel, and the knowledge about the defective Takata airbags those books, records, and personnel held. New Chrysler failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them.

435. Furthermore, New Chrysler was again made aware of the Inflator Defect in the Takata airbags in New Chrysler's vehicles in 2009, following Honda's recall; in 2010 following a rupture that occurred during the testing of one of New Chrysler's airbags; and in 2013 following a field rupture in a Chrysler vehicle. New Chrysler willfully failed to disclose and actively concealed the dangerous risks posed by the Class Vehicles and/or the Defective Airbags installed in them.

436. By failing to disclose and by actively concealing the Inflator Defect in the Class Vehicles and/or the Defective Airbags installed in them, by marketing them as safe, reliable, and of high quality, and by presenting themselves as reputable manufacturers that value safety, New Chrysler engaged in unfair or deceptive business practices in violation of the Massachusetts Act. New Chrysler deliberately withheld the information about the propensity of Defective Airbags to violently explode and/or expel lethal amounts of metal debris and shrapnel, instead of protecting vehicle occupants from bodily injury during accidents, in order to ensure that consumers would purchase the Class Vehicles.

437. In the course of New Chrysler's business, they willfully failed to disclose and actively concealed the dangerous risks posed by the many safety issues and the serious Inflator

Defect discussed above. New Chrysler compounded the deception by repeatedly asserting that the Class Vehicles and/or the Defective Airbags installed in them were safe, reliable, and of high quality and by claiming to be a reputable manufacturer that values safety.

438.     New Chrysler's unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers and were likely to and did in fact deceive reasonable consumers, including the Massachusetts Consumer Plaintiffs, about the true safety and reliability of Class Vehicles and/or the Defective Airbags installed in them, the quality of New Chrysler's brands, and the true value of the Class Vehicles.

439.     New Chrysler intentionally and knowingly misrepresented material facts regarding the Class Vehicles and/or the Defective Airbags installed in them with intent to mislead the Massachusetts Consumer Plaintiffs and the Massachusetts Consumer Class.

440.     New Chrysler knew or should have known that its conduct violated the Massachusetts Act.

441.     As alleged above, New Chrysler made material statements about the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them that were either false or misleading.  New Chrysler's representations, omissions, statements, and commentary have included selling and marketing the Class Vehicles as "safe" and "reliable," despite their knowledge of the Inflator Defect or their failure to reasonably investigate it.

442.     To protect its profits and to avoid remediation costs and a public relations nightmare, New Chrysler concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them and their tragic consequences, and allowed unsuspecting new

and used car purchasers to continue to buy/lease the Class Vehicles and to continue driving highly dangerous vehicles.

443. New Chrysler owed the Massachusetts Consumer Plaintiffs a duty to disclose the true safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them because New Chrysler:

        a.      Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

        b.      Intentionally concealed the foregoing from the Massachusetts Consumer Plaintiffs; and/or

        c.      Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from the Massachusetts Consumer Plaintiffs that contradicted these representations.

444. Because New Chrysler fraudulently concealed the Inflator Defect in Class Vehicles and/or the Defective Airbags installed in them, resulting in a raft of negative publicity once the Inflator Defect finally began to be disclosed, the value of the Class Vehicles has greatly diminished. In light of the stigma attached to Class Vehicles by New Chrysler's conduct, they are now worth significantly less than they otherwise would be.

445. New Chrysler's failure to disclose and active concealment of the dangers and risks posed by the Defective Airbags in Class Vehicles were material to the Massachusetts Consumer Plaintiffs and the Massachusetts Consumer Class. A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

446.    The Massachusetts Consumer Plaintiffs and the Massachusetts Consumer Class suffered ascertainable loss caused by New Chrysler's misrepresentations and their failure to disclose material information.  Had they been aware of the Inflator Defect that existed in the Class Vehicles and/or the Defective Airbags installed in them and New Chrysler's complete disregard for safety, the Massachusetts Consumer Plaintiffs either would not have paid as much for their vehicles as they did or would not have purchased or leased them at all.  The Massachusetts Consumer Plaintiffs did not receive the benefit of their bargain as a result of New Chrysler's misconduct.

447.    New Chrysler's violations present a continuing risk to the Massachusetts Consumer Plaintiffs, to the Massachusetts Consumer Class, as well as to the general public.  New Chrysler's unlawful acts and practices complained of herein affect the public interest.

448.    As a direct and proximate result of New Chrysler's violations of the Massachusetts Act, the Massachusetts Consumer Plaintiffs and the Massachusetts Consumer Class have suffered injury-in-fact and/or actual damage.

449.    Pursuant to Mass. Gen. Laws ch. 93A, § 9, the Massachusetts Consumer Plaintiffs and the Massachusetts Consumer Class seek monetary relief against New Chrysler measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $25 for each Massachusetts Consumer Plaintiff and each Massachusetts Consumer Class member. Because New Chrysler's conduct was committed willfully and knowingly, Plaintiffs are entitled to recover, for each Massachusetts Consumer Plaintiff and each Massachusetts Consumer Class member, up to three times actual damages, but no less than two times actual damages.

450.     The Massachusetts Consumer Plaintiffs also seek an order enjoining New Chrysler's unfair and/or deceptive acts or practices, punitive damages, and attorneys' fees, costs, and any other just and proper relief available under the Massachusetts Act.

451.     On November 14, 2017, the Massachusetts Consumer Plaintiffs' counsel, on behalf of the Massachusetts Consumer Plaintiffs, sent a letter to New Chrysler complying with Mass. Gen. Laws ch. 93A, § 9(3), providing New Chrysler with notice of their alleged violations of the Massachusetts Act relating to the Class Vehicles and/or the Defective Airbags installed in them purchased by the Massachusetts Consumer Plaintiffs and the Massachusetts Consumer Class, and demanding that New Chrysler correct or agree to correct the actions described therein.  Because New Chrysler failed to remedy their unlawful conduct within the requisite time period, the Massachusetts Consumer Plaintiffs seek all damages and relief to which the Massachusetts Consumer Plaintiffs and the Massachusetts Consumer Class are entitled.

## COUNT 26

### Breach of the Implied Warranty of Merchantability
### Mass. Gen. Laws Ann. ch. 106, § 2-314

452.      In the event the Court declines to certify a Nationwide Consumer Class under the Magnuson-Moss Warranty Act, this claim is brought only on behalf of the Massachusetts Consumer Class against New Chrysler.

453.     New Chrysler is and was at all relevant times a merchant with respect to motor vehicles and/or airbags within the meaning of Mass. Gen. Laws Ann. ch. 106, § 2-104(1).

454.     A warranty that the Class Vehicles and/or the Defective Airbags installed in them were in merchantable condition was implied by law in Class Vehicle transactions, pursuant to Mass. Gen. Laws Ann. ch. 106, § 2-314.

455.     The Class Vehicles and/or the Defective Airbags installed in them, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars and airbags are used.  Specifically, they are inherently defective and dangerous in that the Defective Airbags aggressively deploy and/or violently explode and spray vehicle occupants with lethal amounts of metal debris and shrapnel, instead of protecting vehicle occupants from bodily injury during accidents.

456.     New Chrysler was provided notice of these issues through its direct knowledge of the issues, customer complaints, numerous complaints filed against it and/or others, internal investigations, and individual letters and communications sent by consumers before New Chrysler issued the recalls and after the allegations of the Inflator Defect became public.

457.     As a direct and proximate result of New Chrysler's breach of the warranties of merchantability, the Massachusetts Consumer Plaintiffs and the Massachusetts Consumer Class have been damaged in an amount to be proven at trial.

## I.     Claims Brought on Behalf of the Michigan Consumer Class

### COUNT 27

### Violation of the Michigan Consumer Protection Act
### Mich. Comp. Laws § 445.903

458.     This claim is brought only on behalf of the Michigan Consumer Class against New Chrysler.

459.     The Michigan Consumer Plaintiffs and the Michigan Consumer Class are "person[s]" within the meaning of the Mich. Comp. Laws § 445.902(1)(d).

460.     At all relevant times hereto, Chrysler was a "person" engaged in "trade or commerce" within the meaning of the Mich. Comp. Laws §§ 445.902(1)(d) and (g).

- 117 -

461.    The Michigan Consumer Protection Act ("Michigan CPA") prohibits "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce . . . ." Mich. Comp. Laws § 445.903(1).  New Chrysler engaged in unfair, unconscionable, or deceptive methods, acts or practices prohibited by the Michigan CPA, including: "(c) Representing that goods or services have . . . characteristics . . . that they do not have . . . .;" "(e) Representing that goods or services are of a particular standard . . . if they are of another;" "(s) Failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer;" "(bb) Making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is;" and "(cc) Failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner."  Mich. Comp. Laws § 445.903(1).  By failing to disclose and actively concealing the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them, New Chrysler participated in unfair, deceptive, and unconscionable acts that violated the Michigan CPA.

462.    In the course of its business, New Chrysler willfully failed to disclose and actively concealed the dangerous risks posed by the Class Vehicles and/or the Defective Airbags installed in them as described herein and otherwise engaged in activities with a tendency or capacity to deceive. New Chrysler also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles and/or the Defective Airbags installed in them.

463.    New Chrysler has known of the Inflator Defect in the Defective Airbags since at least June 1, 2009, when it acquired substantially all of Old Chrysler's books, records, and

personnel, and the knowledge about the defective Takata airbags those books, records, and personnel held. New Chrysler failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them.

464.     Furthermore, New Chrysler was again made aware of the Inflator Defect in the Takata airbags in New Chrysler's vehicles in 2009, following Honda's recall; in 2010 following a rupture that occurred during the testing of one of New Chrysler's airbags; and in 2013 following a field rupture in a Chrysler vehicle. New Chrysler willfully failed to disclose and actively concealed the dangerous risks posed by the Class Vehicles and/or the Defective Airbags installed in them.

465.     By failing to disclose and by actively concealing the Inflator Defect in the Class Vehicles and/or the Defective Airbags installed in them, by marketing them as safe, reliable, and of high quality, and by presenting themselves as reputable manufacturers that value safety, New Chrysler engaged in unfair or deceptive business practices in violation of the Michigan CPA. New Chrysler deliberately withheld the information about the propensity of the Defective Airbags violently exploding and/or expelling vehicle occupants with lethal amounts of metal debris and shrapnel, instead of protecting vehicle occupants from bodily injury during accidents, in order to ensure that consumers would purchase the Class Vehicles.

466.     In the course of New Chrysler's business, it willfully failed to disclose and actively concealed the dangerous risks posed by the Inflator Defect discussed above. New Chrysler compounded the deception by repeatedly asserting that the Class Vehicles and/or the Defective Airbags installed in them were safe, reliable, and of high quality, and by claiming to be a reputable manufacturer that values safety.

- 119 -

467.    New Chrysler's unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers, and were likely to and did in fact deceive reasonable consumers, including the Michigan Consumer Plaintiffs, about the true safety and reliability of Class Vehicles and/or the Defective Airbags installed in them, the quality of New Chrysler's brands, and the true value of the Class Vehicles.

468.    New Chrysler intentionally and knowingly misrepresented material facts regarding the Class Vehicles and/or the Defective Airbags installed in them with intent to mislead the Michigan Consumer Plaintiffs and the Michigan Consumer Class.

469.    New Chrysler, before and after the bankruptcy sale in 2009, knew or should have known that its conduct violated the Michigan CPA.

470.    As alleged above, New Chrysler made material statements about the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them that were either false or misleading.  New Chrysler's representations, omissions, statements, and commentary have included selling and marketing the Class Vehicles as "safe" and "reliable," despite their knowledge of the Inflator Defect or their failure to reasonably investigate it.

471.    To protect profits and to avoid remediation costs and a public relations nightmare, New Chrysler concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them and their tragic consequences, and allowed unsuspecting new and used car purchasers to continue to buy/lease the Class Vehicles, and allowed them to continue driving highly dangerous vehicles.

472.    New Chrysler owed the Michigan Consumer Plaintiffs a duty to disclose the true safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them because New Chrysler:

a.    Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

b.    Intentionally concealed the foregoing from the Michigan Consumer Plaintiffs; and/or

c.    Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from the Michigan Consumer Plaintiffs that contradicted these representations.

473.    Because New Chrysler fraudulently concealed the Inflator Defect in Class Vehicles and/or the Defective Airbags installed in them, resulting in a raft of negative publicity once the Inflator Defect finally began to be disclosed, the value of the Class Vehicles has greatly diminished.  In light of the stigma attached to Class Vehicles by Chrysler's conduct, they are now worth significantly less than they otherwise would be.

474.    New Chrysler's failure to disclose and active concealment of the dangers and risks posed by the Defective Airbags in Class Vehicles were material to the Michigan Consumer Plaintiffs and the Michigan Consumer Class.  A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

475.    The Michigan Consumer Plaintiffs and the Michigan Consumer Class suffered ascertainable loss caused by New Chrysler's misrepresentations and their failure to disclose material information.  Had they been aware of the Inflator Defect that existed in the Class Vehicles

and/or the Defective Airbags installed in them, and New Chrysler's complete disregard for safety, the Michigan Consumer Plaintiffs either would not have paid as much for their vehicles as they did or would not have purchased or leased them at all. The Michigan Consumer Plaintiffs did not receive the benefit of their bargain as a result of Chrysler's misconduct.

476. New Chrysler's violations present a continuing risk to the Michigan Consumer Plaintiffs, the Michigan Consumer Class, as well as to the general public. Chrysler's unlawful acts and practices complained of herein affect the public interest.

477. As a direct and proximate result of New Chrysler's violations of the Michigan CPA, the Michigan Consumer Plaintiffs and the Michigan Consumer Class have suffered injury-in-fact and/or actual damage.

478. The Michigan Consumer Plaintiffs seek injunctive relief to enjoin New Chrysler from continuing its unfair and deceptive acts; monetary relief against New Chrysler New Chrysler measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $250 for the Michigan Consumer Plaintiffs and each Michigan Consumer Class member; reasonable attorneys' fees; and any other just and proper relief available under Mich. Comp. Laws § 445.911.

479. The Michigan Consumer Plaintiffs also seek punitive damages against New Chrysler because it carried out despicable conduct with willful and conscious disregard of the rights and safety of others. New Chrysler intentionally and willfully misrepresented the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them, deceived the Michigan Consumer Plaintiffs and the Michigan Consumer Class on life-or-death matters, and concealed material facts that only they knew—all to avoid the expense and public relations nightmare of correcting a deadly flaw in the Class Vehicles and/or the Defective Airbags installed

in them. New Chrysler's unlawful conduct constitutes malice, oppression, and fraud warranting punitive damages.

## COUNT 28

**Breach of Implied Warranty of Merchantability**
**Mich. Comp. Laws § 440.2314**

480.    In the event the Court declines to certify a Nationwide Consumer Class under the Magnuson-Moss Warranty Act, this claim is brought only on behalf of the Michigan Consumer Class against New Chrysler.

481.    New Chrysler is and was at all relevant times a merchant with respect to motor vehicles and/or airbags within the meaning of Mich. Comp. Laws § 440.2314(1).

482.    A warranty that the Class Vehicles and/or the Defective Airbags installed in them were in merchantable condition was implied by law in Class Vehicle transactions, pursuant to Mich. Comp. Laws § 440.2314.

483.    The Class Vehicles and/or the Defective Airbags installed in them, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars and airbags are used.  Specifically, they are inherently defective and dangerous in that the Defective Airbags aggressively deploy, and/or violently explode and spray vehicle occupants with lethal amounts of metal debris and shrapnel, instead of protecting vehicle occupants from bodily injury during accidents.

484.    New Chrysler was provided notice of these issues by its knowledge of the issues, by customer complaints, by numerous complaints filed against it and/or others, by internal investigations, and by individual letters and communications sent by consumers before New Chrysler issued the recalls and after the allegations of the Inflator Defect became public.

485.    As a direct and proximate result of New Chrysler's breach of the warranties of merchantability, the Michigan Consumer Plaintiffs and the Michigan Consumer Class have been damaged in an amount to be proven at trial.

### J.    Claims Brought on Behalf of the Mississippi Consumer Class

### COUNT 29

**Dismissed**

### K.    Claims Brought on Behalf of the Missouri Consumer Class

### COUNT 30

**Dismissed**

### COUNT 31

**Dismissed**

### L.    Claims Brought on Behalf of the New Jersey Consumer Class

### COUNT 32

**Violation of the New Jersey Consumer Fraud Act,
N.J. Stat. Ann. § 56:8-1**

486.    This claim is brought by the New Jersey Consumer Plaintiffs individually and on behalf of the New Jersey Consumer Class against New Chrysler.

487.    New Jersey Consumer Plaintiffs, the New Jersey Consumer Class members, and New Chrysler each is or was a "person" within the meaning of N.J. Stat. Ann. § 56:8-1(d).

488.    New Chrysler engaged in "sales" of "merchandise" within the meaning of N.J. Stat. Ann. § 56:8-1(c), (d).

489. The New Jersey Consumer Fraud Act ("New Jersey CFA") makes unlawful "[t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression or omission of any material fact with the intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby…" N.J. Stat. Ann. § 56:8-2.

490. New Chrysler engaged in unconscionable or deceptive acts or practices that violated the New Jersey CFA as described above and below, and did so with the intent that Class members rely upon their acts, concealment, suppression or omissions.

491. In the course of its business, New Chrysler failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them as described herein and otherwise engaged in activities with a tendency or capacity to deceive.

492. New Chrysler also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles and/or the Defective Airbags installed in them.

493. New Chrysler has known of the Inflator Defect in the Defective Airbags since at least June 1, 2009, when it acquired substantially all of Old Chrysler's books, records, and personnel, and the knowledge about the defective Takata airbags those books, records, and personnel held. New Chrysler failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them.

- 125 -

494. By failing to disclose and by actively concealing the Inflator Defect in the Class Vehicles and/or the Defective Airbags installed in them, by marketing them as safe, reliable, and of high quality, and by presenting themselves as reputable manufacturers that value safety, New Chrysler engaged in unfair or deceptive business practices in violation of the New Jersey CFA. New Chrysler deliberately withheld the information about the propensity of the Defective Airbags to aggressively deploy, and/or violently explode and spray vehicle occupants with lethal amounts of metal debris and shrapnel, instead of protecting vehicle occupants from bodily injury during accidents, in order to ensure that consumers would purchase the Class Vehicles.

495. In the course of its business, New Chrysler willfully failed to disclose and actively concealed the dangerous risks posed by the many safety issues and serious defect discussed above. New Chrysler compounded the deception by repeatedly asserting that the Class Vehicles and/or the Defective Airbags installed in them were safe, reliable, and of high quality, and by claiming to be reputable manufacturers that value safety.

496. New Chrysler's unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers, and were likely to and did in fact deceive reasonable consumers, including New Jersey Consumer Plaintiffs and the New Jersey Consumer Class, about the true safety and reliability of Class Vehicles and/or the Defective Airbags installed in them, the quality of the New Chrysler's brands, and the true value of the Class Vehicles.

497. New Chrysler intentionally and knowingly misrepresented material facts regarding the Class Vehicles and/or the Defective Airbags installed in them with an intent to mislead New Jersey Consumer Plaintiffs and the New Jersey Consumer Class.

498.     New Chrysler knew or should have known that its conduct violated the New Jersey CFA.

499.     As alleged above, New Chrysler made material statements about the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them that were either false or misleading.  New Chrysler's representations, omissions, statements, and commentary have included selling and marketing the Class Vehicles as "safe" and "reliable," despite their knowledge of the Inflator Defect or their failure to reasonably investigate it.

500.     To protect its profits and to avoid remediation costs and a public relations nightmare, New Chrysler concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them and their tragic consequences, and allowed unsuspecting new and used car purchasers to continue to buy/lease the Class Vehicles, and allowed them to continue driving these highly dangerous vehicles.

501.     New Chrysler owed New Jersey Consumer Plaintiffs and the New Jersey Consumer Class a duty to disclose the true safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them because New Chrysler:

a.     Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

b.     Intentionally concealed the foregoing from New Jersey Consumer Plaintiffs and the New Jersey Consumer Class; and/or

c.     Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from New Jersey Consumer Plaintiffs and the New Jersey Consumer Class that contradicted these representations.

- 127 -

502.     Because New Chrysler fraudulently concealed the Inflator Defect in Class Vehicles and/or the Defective Airbags installed in them, resulting in a raft of negative publicity once the Inflator Defect finally began to be disclosed, the value of the Class Vehicles has greatly diminished.  In light of the stigma attached to Class Vehicles by New Chrysler's conduct, they are now worth significantly less than they otherwise would be.

503.     New Chrysler's failure to disclose and active concealment of the dangers and risks posed by the Defective Airbags in Class Vehicles were material to New Jersey Consumer Plaintiffs and the New Jersey Consumer Class.  A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals the Inflator Defect rather than promptly remedies them.

504.     New Jersey Consumer Plaintiffs and the New Jersey Consumer Class suffered ascertainable loss caused by New Chrysler's misrepresentations and their failure to disclose material information.  Had they been aware of the Inflator Defect that existed in the Class Vehicles and/or the Defective Airbags installed in them, and New Chrysler's complete disregard for safety, New Jersey Consumer Plaintiffs and the New Jersey Consumer Class either would not have paid as much for their vehicles or would not have purchased or leased them at all.  New Jersey Consumer Plaintiffs and the New Jersey Consumer Class did not receive the benefit of their bargain as a result of New Chrysler's misconduct.

505.     New Chrysler's violations present a continuing risk to New Jersey Consumer Plaintiffs and the New Jersey Consumer Class, as well as to the general public.  New Chrysler's unlawful acts and practices complained of herein affect the public interest.  The recalls and repairs instituted by New Chrysler have not been adequate.

506.     As a direct and proximate result of New Chrysler's violations of the New Jersey

CFA, New Jersey Consumer Plaintiffs and the New Jersey Consumer Class have suffered injury-

in-fact and/or actual damage.

507.     New Jersey Consumer Plaintiffs and the New Jersey Consumer Class are entitled

to recover legal and/or equitable relief including an order enjoining New Chrysler's unlawful

conduct, treble damages, costs and reasonable attorneys' fees pursuant to N.J. Stat. Ann. § 56:8-

19, and any other just and appropriate relief.

## COUNT 33

### Breach of the New Jersey Implied Warranty of Merchantability, N.J. Stat. Ann. § 12a:2-314

508.     In the event the Court declines to certify a Nationwide Consumer Class under the

Magnuson-Moss Warranty Act, New Jersey Consumer Plaintiffs bring this claim on behalf of

themselves and the members of the New Jersey Consumer Class under the laws of New Jersey

against New Chrysler.

509.     Each Defendant is a merchant with respect to motor vehicles and/or airbags.

510.     When New Jersey Consumer Plaintiffs and the New Jersey Consumer Class

purchased or leased their Class Vehicles, the transaction contained an implied warranty that the

Class Vehicles and/or the Defective Airbags installed in them were in merchantable condition.

511.     At the time of sale and all times thereafter, the Class Vehicles and/or the Defective

Airbags installed in them were not merchantable and not fit for the ordinary purpose for which

cars and airbags are used.  Specifically, the Class Vehicles are inherently defective in that they are

equipped with Defective Airbags with the Inflator Defect which causes, among other things, the

Defective Airbags to: (a) rupture and expel metal shrapnel that tears through the airbag and poses

- 129 -

a threat of serious injury or death to occupants; and/or (b) hyper-aggressively deploy and seriously injure occupants through contact with the airbag.

512.    On information and belief, New Chrysler had notice of the Inflator Defect by its knowledge of the issues, by customer complaints, by numerous complaints filed against it and/or others, by internal investigations, and by numerous individual letters and communications sent by consumers before or within a reasonable amount of time after Honda issued the first recalls and the allegations of the Inflator Defect became public.

513.    As a direct and proximate result of New Chrysler's breach of the warranties of merchantability, New Jersey Consumer Plaintiffs and the New Jersey Consumer Class have been damaged in an amount to be proven at trial.

**M.     Claims Brought on Behalf of the New York Consumer Class**

**COUNT 34**

**Violation of the New York General Business Law,
N.Y. Gen. Bus. Law § 349**

514.    This claim is brought by the New York Consumer Plaintiffs individually and on behalf of the New York Consumer Class against New Chrysler.

515.    New York Consumer Plaintiffs and the New York Consumer Class members are "persons" within the meaning of New York General Business Law ("New York GBL"), N.Y. Gen. Bus. Law § 349(h).

516.    New Chrysler is a "person," "firm," "corporation," or "association" within the meaning of N.Y. Gen. Bus. Law § 349.

517.    The New York GBL makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce." N.Y. Gen. Bus. Law § 349. New Chrysler's conduct directed

toward consumers, as described above and below, constitutes "deceptive acts or practices" within the meaning of the New York GBL.

518.    New Chrysler's actions as set forth above occurred in the conduct of trade or commerce.

519.    In the course of its business, New Chrysler failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them as described herein and otherwise engaged in activities with a tendency or capacity to deceive.

520.    New Chrysler also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles and/or the Defective Airbags installed in them.

521.    New Chrysler has known of the Inflator Defect in the Defective Airbags since at least June 1, 2009, when it acquired substantially all of Old Chrysler's books, records, and personnel, and the knowledge about the defective Takata airbags those books, records, and personnel held.  New Chrysler failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them.

522.    By failing to disclose and by actively concealing the Inflator Defect in the Class Vehicles and/or the Defective Airbags installed in them, by marketing them as safe, reliable, and of high quality, and by presenting themselves as reputable manufacturers that value safety, New Chrysler engaged in unfair or deceptive business practices in violation of the New York GBL. New Chrysler deliberately withheld the information about the propensity of the Defective Airbags to aggressively deploy, and/or violently explode and spray vehicle occupants with lethal amounts

of metal debris and shrapnel, instead of protecting vehicle occupants from bodily injury during accidents, in order to ensure that consumers would purchase the Class Vehicles.

523.     In the course of its business, New Chrysler willfully failed to disclose and actively concealed the dangerous risks posed by the many safety issues and serious defect discussed above. New Chrysler compounded the deception by repeatedly asserting that the Class Vehicles and/or the Defective Airbags installed in them were safe, reliable, and of high quality, and by claiming to be reputable manufacturers that value safety.

524.     New Chrysler's unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers, and were likely to and did in fact deceive reasonable consumers, including New York Consumer Plaintiffs and the New York Consumer Class, about the true safety and reliability of Class Vehicles and/or the Defective Airbags installed in them, the quality of New Chrysler's brands, and the true value of the Class Vehicles.

525.     New Chrysler intentionally and knowingly misrepresented material facts regarding the Class Vehicles and/or the Defective Airbags installed in them with an intent to mislead New York Consumer Plaintiffs and the New York Consumer Class.

526.     New Chrysler knew or should have known that its conduct violated the New York GBL.

527.     As alleged above, New Chrysler made material statements about the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them that were either false or misleading.  New Chrysler's representations, omissions, statements, and commentary have included selling and marketing the Class Vehicles as "safe" and "reliable," despite their knowledge of the Inflator Defect or their failure to reasonably investigate it.

528.    To protect its profits and to avoid remediation costs and a public relations nightmare, New Chrysler concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them and their tragic consequences, and allowed unsuspecting new and used car purchasers to continue to buy/lease the Class Vehicles, and allowed them to continue driving highly dangerous vehicles.

529.    New Chrysler owed New York Consumer Plaintiffs and the New York Consumer Class a duty to disclose the true safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them because New Chrysler:

a.    Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

b.    Intentionally concealed the foregoing from New York Consumer Plaintiffs and the New York Consumer Class; and/or

c.    Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from New York Consumer Plaintiffs and the New York Consumer Class that contradicted these representations.

530.    Because New Chrysler fraudulently concealed the Inflator Defect in Class Vehicles and/or the Defective Airbags installed in them, resulting in a raft of negative publicity once the Inflator Defect finally began to be disclosed, the value of the Class Vehicles has greatly diminished.  In light of the stigma attached to Class Vehicles by New Chrysler's conduct, they are now worth significantly less than they otherwise would be.

531.    New Chrysler's failure to disclose and active concealment of the dangers and risks posed by the Defective Airbags in Class Vehicles were material to New York Consumer Plaintiffs and the New York Consumer Class.  A vehicle made by a reputable manufacturer of safe vehicles

is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

532.    New York Consumer Plaintiffs and the New York Consumer Class suffered ascertainable loss caused by New Chrysler's misrepresentations and their failure to disclose material information. Had they been aware of the Inflator Defect that existed in the Class Vehicles and/or the Defective Airbags installed in them, and New Chrysler's complete disregard for safety, New York Consumer Plaintiffs and the New York Consumer Class either would not have paid as much for their vehicles or would not have purchased or leased them at all. New York Consumer Plaintiffs and the New York Consumer Class did not receive the benefit of their bargain as a result of New Chrysler's misconduct.

533.    New Chrysler's violations present a continuing risk to New York Consumer Plaintiffs and the New York Consumer Class, as well as to the general public. New Chrysler's unlawful acts and practices complained of herein affect the public interest. The recalls and repairs instituted by New Chrysler have not been adequate.

534.    As a direct and proximate result of New Chrysler's violations of the New York GBL, New York Consumer Plaintiffs and the New York Consumer Class have suffered injury-in-fact and/or actual damage.

535.    New York Consumer Plaintiffs and the New York Consumer Class members seek punitive damages against New Chrysler because New Chrysler's conduct was egregious. New Chrysler misrepresented the safety and reliability of millions of Class Vehicles and/or the Defective Airbags installed in them, concealed the Inflator Defect in millions of them, deceived New York Consumer Plaintiffs and the New York Consumer Class on life-or-death matters, and concealed material facts that only New Chrysler knew, all to avoid the expense and public relations

nightmare of correcting the serious flaw in millions of Class Vehicles and/or the Defective Airbags installed in them. New Chrysler's egregious conduct warrants punitive damages.

536. Because New Chrysler's willful and knowing conduct caused injury to the New York Consumer Class, New York Consumer Plaintiffs and Class Members seeks recovery of actual damages or $50, whichever is greater, discretionary treble damages up to $1,000, punitive damages, reasonable attorneys' fees and costs, an order enjoining New Chrysler's deceptive conduct, and any other just and proper relief available under N.Y. Gen. Bus. Law § 349.

## COUNT 35

### Violation of the New York General Business Law,
### N.Y. Gen. Bus. Law § 350

537. This claim is brought by the New York Consumer Plaintiffs individually and on behalf of the New York Consumer Class against New Chrysler.

538. New Chrysler is engaged in the "conduct of business, trade or commerce," within the meaning of N.Y. Gen. Bus. Law § 350.

539. N.Y. Gen. Bus. Law § 350 makes unlawful "[f]alse advertising in the conduct of any business, trade or commerce." False advertising includes "advertising, including labeling, of a commodity . . . if such advertising is misleading in a material respect," taking into account "the extent to which the advertising fails to reveal facts material in light of … representations [made] with respect to the commodity …." N.Y. Gen. Bus. Law § 350-a.

540. New Chrysler caused to be made or disseminated through New York, through advertising, marketing and other publications, statements that were untrue or misleading, and that were known, or which by the exercise of reasonable care should have been known to New Chrysler, to be untrue and misleading to consumers and the New York Consumer Class.

541.    New Chrysler violated § 350 because the misrepresentations and omissions regarding the Inflator Defect, and New Chrysler's failure to disclose and active concealing of the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them, as set forth above, were material and likely to deceive a reasonable consumer.

542.    New York Consumer Class members have suffered an injury, including the loss of money or property, as a result of New Chrysler's false advertising.  In purchasing or leasing Class Vehicles with the Defective Airbags installed in them, New York Consumer Plaintiffs and the New York Consumer Class relied on the misrepresentations and/or omissions of New Chrysler with respect to the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them.  New Chrysler's representations were false and/or misleading because the concealed the Inflator Defect and safety issues seriously undermine the value of the Class Vehicles.  Had New York Consumer Plaintiffs and the New York Consumer Class known this, they would not have purchased or leased their vehicles and/or paid as much for them.

543.    Pursuant to N.Y. Gen. Bus. Law § 350 e, the New York Consumer Class seeks monetary relief against New Chrysler measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $500 each for New York Consumer Class member.   Because New Chrysler's conduct was committed willfully and knowingly, New York members are entitled to recover three times actual damages, up to $10,000, for each New York Class member.

544.    The New York Consumer Class also seeks an order enjoining New Chrysler's unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under General Business Law § 350.

## COUNT 36

### Dismissed

N.      **Claims Brought on Behalf of the North Carolina Consumer Class**

## COUNT 37

**Violation of the North Carolina Unfair and Deceptive Trade Practices Act**
**N.C. Gen. Stat. § 75-1.1**

545.    This claim is brought on behalf of the North Carolina Consumer Class against New Chrysler.

546.    New Chrysler engaged in "commerce" within the meaning of N.C. Gen. Stat. § 75-1.1(b).

547.    The North Carolina Unfair and Deceptive Trade Practices Act ("UDTPA") broadly prohibits "unfair or deceptive acts or practices in or affecting commerce." N.C. Gen. Stat. § 75-1.1(a). As alleged above and below, New Chrysler willfully committed unfair or deceptive acts or practices in violation of the North Carolina UDTPA.

548.    In the course of its business, New Chrysler willfully failed to disclose and actively concealed the dangerous risks posed by the many safety issues and the serious Inflator Defect discussed above. New Chrysler compounded the deception by repeatedly asserting that the Class Vehicles and/or the Defective Airbags installed in them were safe, reliable, and of high quality, and by claiming to be a reputable manufacturer that values safety.

549.    New Chrysler also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles and/or the Defective Airbags installed in them

550.    New Chrysler has known of the Inflator Defect in the Defective Airbags since at least June 1, 2009, when it acquired substantially all of Old Chrysler's books, records, and personnel, and the knowledge about the defective Takata airbags those books, records, and personnel held.  New Chrysler failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them.

551.    Furthermore, New Chrysler was again made aware of the Inflator Defect in the Takata airbags in New Chrysler's vehicles in 2009, following Honda's recall; in 2010 following a rupture that occurred during the testing of one of New Chrysler's airbags; and in 2013 following a field rupture in a Chrysler vehicle.  New Chrysler willfully failed to disclose and actively concealed the dangerous risks posed by the Class Vehicles and/or the Defective Airbags installed in them.

552.    By failing to disclose and by actively concealing the Inflator Defect in the Class Vehicles and/or the Defective Airbags installed in them, by marketing them as safe, reliable, and of high quality, and by presenting themselves as reputable manufacturers that value safety, New Chrysler engaged in unfair or deceptive business practices in violation of the North Carolina UDTPA.  New Chrysler deliberately withheld the information about the propensity of the Defective Airbags to aggressively deploy, and/or violently explode and spray vehicle occupants with lethal amounts of metal debris and shrapnel, instead of protecting vehicle occupants from bodily injury during accidents, in order to ensure that consumers would purchase the Class Vehicles.

553.    In the course of New Chrysler's business, they willfully failed to disclose and actively concealed the dangerous risks posed by the many safety issues and serious defect discussed above. New Chrysler compounded the deception by repeatedly asserting that the Class

Vehicles and/or the Defective Airbags installed in them were safe, reliable, and of high quality, and by claiming to be a reputable manufacturer that values safety.

554.　New Chrysler's unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers, and were likely to and did in fact deceive reasonable consumers, including the North Carolina Consumer Plaintiffs, about the true safety and reliability of Class Vehicles and/or the Defective Airbags installed in them, the quality of Chrysler's brands, and the true value of the Class Vehicles.

555.　New Chrysler intentionally and knowingly misrepresented material facts regarding the Class Vehicles and/or the Defective Airbags installed in them with intent to mislead the North Carolina Consumer Plaintiffs and the North Carolina Consumer Class.

556.　New Chrysler knew or should have known that its conduct violated the North Carolina UDTPA.

557.　As alleged above, New Chrysler made material statements about the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them that were either false or misleading.  New Chrysler's representations, omissions, statements, and commentary have included selling and marketing the Class Vehicles as "safe" and "reliable," despite their knowledge of the Inflator Defect or their failure to reasonably investigate it.

558.　To protect its profits and to avoid remediation costs and a public relations nightmare, New Chrysler concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them and their tragic consequences, and allowed unsuspecting new and used car purchasers to continue to buy/lease the Class Vehicles, and allowed them to continue driving highly dangerous vehicles.

559. New Chrysler owed the North Carolina Consumer Plaintiffs a duty to disclose the true safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them because New Chrysler:

a. Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

b. Intentionally concealed the foregoing from the North Carolina Consumer Plaintiffs; and/or

c. Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from the North Carolina Consumer Plaintiffs that contradicted these representations.

560. Because New Chrysler fraudulently concealed the Inflator Defect in Class Vehicles and/or the Defective Airbags installed in them, resulting in a raft of negative publicity once the Inflator Defect finally began to be disclosed, the value of the Class Vehicles has greatly diminished. In light of the stigma attached to Class Vehicles by New Chrysler's conduct, they are now worth significantly less than they otherwise would be.

561. New Chrysler's failure to disclose and active concealment of the dangers and risks posed by the Defective Airbags in Class Vehicles were material to the North Carolina Consumer Plaintiffs and the North Carolina Consumer Class. A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

562. The North Carolina Consumer Plaintiffs and the North Carolina Consumer Class suffered ascertainable loss caused by New Chrysler's misrepresentations and their failure to disclose material information. Had they been aware of the Inflator Defect that existed in the Class

- 140 -

Vehicles and/or the Defective Airbags installed in them, and New Chrysler's complete disregard for safety, the North Carolina Consumer Plaintiffs either would not have paid as much for their vehicles as they did or would not have purchased or leased them at all. The North Carolina Consumer Plaintiffs did not receive the benefit of their bargain as a result of New Chrysler's misconduct.

563.    New Chrysler's violations present a continuing risk to the North Carolina Consumer Plaintiffs, the North Carolina Consumer Class, as well as to the general public. New Chrysler's unlawful acts and practices complained of herein affect the public interest.

564.    As a direct and proximate result of New Chrysler's violations of the North Carolina UDTPA, the North Carolina Consumer Plaintiffs and the North Carolina Consumer Class have suffered injury-in-fact and/or actual damage.

565.    The North Carolina Consumer Class members seek punitive damages against New Chrysler because New Chrysler's conduct was malicious, willful, reckless, wanton, fraudulent, and in bad faith.

566.    New Chrysler fraudulently and willfully misrepresented the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them, deceived North Carolina Class members on life-or-death matters, and concealed material facts that only they knew, all to avoid the expense and public relations nightmare of correcting the myriad flaws in the Class Vehicles and/or the Defective Airbags installed in them. Because New Chrysler's conduct was malicious, willful, reckless, wanton, fraudulent, and in bad faith, it warrants punitive damages.

567.    The North Carolina Consumer Plaintiffs seek an order for treble their actual damages, an order enjoining New Chrysler's unlawful acts, costs of Court, attorney's fees, and

any other just and proper relief available under the North Carolina UDTPA, N.C. Gen. Stat. § 75-16.

## COUNT 38

### Dismissed

O.    **Claims Brought on Behalf of the Ohio Consumer Class**

## COUNT 39

### Violation of the Consumer Sales Practices Act
### Ohio Rev. Code § 1345.01

568.    This claim is brought only on behalf of the Ohio Consumer Class against New Chrysler.

569.    The Ohio Consumer Plaintiffs and the Ohio Consumer Class are "consumers" as that term is defined in Ohio Rev. Code § 1345.01(D), and their purchases and leases of the Class Vehicles with the Defective Airbags installed in them are "consumer transactions" within the meaning of Ohio Rev. Code § 1345.01(A).

570.    New Chrysler and Takata are "suppliers" as that term is defined in Ohio Rev. Code § 1345.01(C).    The Ohio Consumer Sales Practices Act ("Ohio CSPA"), Ohio Rev. Code § 1345.02, broadly prohibits unfair or deceptive acts or practices in connection with a consumer transaction. Specifically, and without limitation of the broad prohibition, the Ohio CSPA prohibits suppliers from representing (i) that goods have characteristics or uses or benefits which they do not have; (ii) that their goods are of a particular quality or grade they are not; and (iii) that the subject of a consumer transaction has been supplied in accordance with a previous representation, if it has not.    Id.    New Chrysler's conduct as alleged above and below constitutes unfair and/or deceptive consumer sales practices in violation of Ohio Rev. Code § 1345.02.

571.     By failing to disclose and actively concealing the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them, New Chrysler engaged in deceptive business practices prohibited by the Ohio CSPA, including: representing that the Class Vehicles and/or the Defective Airbags installed in them have characteristics, uses, benefits, and qualities which they do not have; representing that they are of a particular standard, quality, and grade when they are not; representing that the subject of a transaction involving them has been supplied in accordance with a previous representation when it has not; and engaging in other unfair or deceptive acts or practices.

572.     New Chrysler's actions as set forth above occurred in the conduct of trade or commerce.

573.     In the course of its business, New Chrysler willfully failed to disclose and actively concealed the dangerous risks posed by the many safety issues and the serious Inflator Defect discussed above. New Chrysler compounded the deception by repeatedly asserting that the Class Vehicles and/or the Defective Airbags installed in them were safe, reliable, and of high quality, and by claiming to be a reputable manufacturer that values safety.  New Chrysler also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles and/or the Defective Airbags installed in them.

574.     New Chrysler has known of the Inflator Defect in the Defective Airbags since at least June 1, 2009, when it acquired substantially all of Old Chrysler's books, records, and personnel, and the knowledge about the defective Takata airbags those books, records, and

personnel held. New Chrysler failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them.

575. Furthermore, New Chrysler was again made aware of the Inflator Defect in the Takata airbags in New Chrysler's vehicles in 2009, following Honda's recall; in 2010 following a rupture that occurred during the testing of one of New Chrysler's airbags; and in 2013 following a field rupture in a Chrysler vehicle. New Chrysler willfully failed to disclose and actively concealed the dangerous risks posed by the Class Vehicles and/or the Defective Airbags installed in them.

576. By failing to disclose and by actively concealing the Inflator Defect in the Class Vehicles and/or the Defective Airbags installed in them, by marketing them as safe, reliable, and of high quality, and by presenting themselves as reputable manufacturers that value safety, New Chrysler engaged in unfair or deceptive business practices in violation of the Ohio CSPA. New Chrysler deliberately withheld the information about the propensity of the Defective Airbags to aggressively deploy, and/or violently explode and spray vehicle occupants with lethal amounts of metal debris and shrapnel, instead of protecting vehicle occupants from bodily injury during accidents, in order to ensure that consumers would purchase the Class Vehicles.

577. In the course of New Chrysler's business, they willfully failed to disclose and actively concealed the dangerous risks posed by the many safety issues and serious defect discussed above. New Chrysler compounded the deception by repeatedly asserting that the Class Vehicles and/or the Defective Airbags installed in them were safe, reliable, and of high quality, and by claiming to be a reputable manufacturer that values safety.

578. New Chrysler's unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead and create a

- 144 -

false impression in consumers, and were likely to and did in fact deceive reasonable consumers, including the Ohio Consumer Plaintiffs, about the true safety and reliability of Class Vehicles and/or the Defective Airbags installed in them, the quality of New Chrysler's brands, and the true value of the Class Vehicles.

579.     New Chrysler intentionally and knowingly misrepresented material facts regarding the Class Vehicles and/or the Defective Airbags installed in them with intent to mislead the Ohio Consumer Plaintiffs and the Ohio Consumer Class.

580.     New Chrysler knew or should have known that its conduct violated the Ohio CSPA.

581.     As alleged above, New Chrysler made material statements about the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them that were either false or misleading.  New Chrysler's representations, omissions, statements, and commentary have included selling and marketing the Class Vehicles as "safe" and "reliable," despite their knowledge of the Inflator Defect or their failure to reasonably investigate it.

582.     To protect its profits and to avoid remediation costs and a public relations nightmare, New Chrysler concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them and their tragic consequences, and allowed unsuspecting new and used car purchasers to continue to buy/lease the Class Vehicles, and allowed them to continue driving highly dangerous vehicles.

583.     New Chrysler owed the Ohio Consumer Plaintiffs a duty to disclose the true safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them because New Chrysler:

          a.     Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

b.      Intentionally concealed the foregoing from the Ohio Consumer Plaintiffs; and/or

c.      Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from the Ohio Consumer Plaintiffs that contradicted these representations.

584.    Because New Chrysler fraudulently concealed the Inflator Defect in Class Vehicles and/or the Defective Airbags installed in them, resulting in a raft of negative publicity once the Inflator Defect finally began to be disclosed, the value of the Class Vehicles has greatly diminished. In light of the stigma attached to Class Vehicles by New Chrysler's conduct, they are now worth significantly less than they otherwise would be.

585.    New Chrysler's failure to disclose and active concealment of the dangers and risks posed by the Defective Airbags in Class Vehicles were material to the Ohio Consumer Plaintiffs and the Ohio Consumer Class. A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

586.    The Ohio Consumer Plaintiffs and the Ohio Consumer Class suffered ascertainable loss caused by New Chrysler's misrepresentations and their failure to disclose material information. Had they been aware of the Inflator Defect that existed in the Class Vehicles and/or the Defective Airbags installed in them, and New Chrysler's complete disregard for safety, the Ohio Consumer Plaintiffs either would not have paid as much for their vehicles as they did or would not have purchased or leased them at all. The Ohio Consumer Plaintiffs did not receive the benefit of their bargain as a result of New Chrysler's misconduct.

587.     New Chrysler's violations present a continuing risk to the Ohio Consumer Plaintiffs, the Ohio Consumer Class, as well as to the general public.  New Chrysler's unlawful acts and practices complained of herein affect the public interest.

588.     As a direct and proximate result of New Chrysler's violations of the Ohio CSPA, the Ohio Consumer Plaintiffs and the Ohio Consumer Class have suffered injury-in-fact and/or actual damage.

589.     The Ohio Consumer Class members seek punitive damages against New Chrysler because their conduct was egregious.  New Chrysler misrepresented the safety and reliability of millions of Class Vehicles and/or the Defective Airbags installed in them, concealed the Inflator Defect in millions of them, deceived the Ohio Consumer Class on life-or-death matters, and concealed material facts that only New Chrysler knew, all to avoid the expense and public relations nightmare of correcting the serious flaw in millions of Class Vehicles and/or the Defective Airbags installed in them.  New Chrysler's egregious conduct warrants punitive damages.

590.     As a result of the foregoing wrongful conduct of New Chrysler, the Ohio Consumer Plaintiffs and the Ohio Consumer Class have been damaged in an amount to be proven at trial, and seek all just and proper remedies, including, but not limited to, actual and statutory damages, an order enjoining New Chrysler's deceptive and unfair conduct, treble damages, court costs and reasonable attorneys' fees, pursuant to Ohio Rev. Code § 1345.09.

## P.      Claims Brought on Behalf of the Pennsylvania Consumer Class

### COUNT 40

**Dismissed**

### COUNT 41

**Dismissed**

**Q.**     **Claims Brought on Behalf of the South Carolina Consumer Class**

**COUNT 42**

**Violation of the South Carolina Unfair Trade Practices Act**
**S.C. Code Ann. § 39-5-10**

591.    This claim is brought only on behalf of the South Carolina Consumer Class against New Chrysler.

592.    New Chrysler is a "person" under S.C. Code Ann. § 39-5-10. 2740. The South Carolina Unfair Trade Practices Act ("South Carolina UTPA") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce . . . ." S.C. Code Ann. § 39-5-20(a). New Chrysler engaged in unfair and deceptive acts or practices and violated the South Carolina UTPA by failing to disclose and actively concealing the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them. New Chrysler' actions as set forth below and above occurred in the conduct of trade or commerce.

593.    In the course of its business, New Chrysler willfully failed to disclose and actively concealed the dangerous risks posed by the many safety issues and the serious Inflator Defect discussed above. New Chrysler compounded the deception by repeatedly asserting that the Class Vehicles and/or the Defective Airbags installed in them were safe, reliable, and of high quality, and by claiming to be a reputable manufacturer that values safety.

594.    New Chrysler also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the Class Vehicles and/or the Defective Airbags installed in them

595.    New Chrysler has known of the Inflator Defect in the Defective Airbags since at least June 1, 2009, when it acquired substantially all of Old Chrysler's books, records, and

- 148 -

personnel, and the knowledge about the defective Takata airbags those books, records, and personnel held. New Chrysler failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them.

596.     Furthermore, New Chrysler was again made aware of the Inflator Defect in the Takata airbags in New Chrysler's vehicles in 2009, following Honda's recall; in 2010 following a rupture that occurred during the testing of one of New Chrysler's airbags; and in 2013 following a field rupture in a Chrysler vehicle. New Chrysler willfully failed to disclose and actively concealed the dangerous risks posed by the Class Vehicles and/or the Defective Airbags installed in them.

597.     By failing to disclose and by actively concealing the Inflator Defect in the Class Vehicles and/or the Defective Airbags installed in them, by marketing them as safe, reliable, and of high quality, and by presenting themselves as reputable manufacturers that value safety, New Chrysler engaged in unfair or deceptive business practices in violation of the FDUTPA. New Chrysler deliberately withheld the information about the propensity of the Defective Airbags to aggressively deploy, and/or violently explode and spray vehicle occupants with lethal amounts of metal debris and shrapnel, instead of protecting vehicle occupants from bodily injury during accidents, in order to ensure that consumers would purchase the Class Vehicles.

598.     In the course of New Chrysler's business, after the bankruptcy sale in 2009, both willfully failed to disclose and actively concealed the dangerous risks posed by the many safety issues and the serious Inflator Defect discussed above. New Chrysler compounded the deception by repeatedly asserting that the Class Vehicles and/or the Defective Airbags installed in them were safe, reliable, and of high quality, and by claiming to be a reputable manufacturer that values safety.

599.   New Chrysler's unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers, and were likely to and did in fact deceive reasonable consumers, including the South Carolina Consumer Plaintiffs, about the true safety and reliability of Class Vehicles and/or the Defective Airbags installed in them, the quality of New Chrysler' brands, and the true value of the Class Vehicles. New Chrysler intentionally and knowingly misrepresented material facts regarding the Class Vehicles and/or the Defective Airbags installed in them with an intent to mislead the South Carolina Consumer Plaintiffs and the South Carolina Consumer Class.

600.   New Chrysler knew or should have known that its conduct violated the South Carolina UTPA.

601.   As alleged above, New Chrysler made material statements about the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them that were either false or misleading.  New Chrysler' representations, omissions, statements, and commentary have included selling and marketing the Class Vehicles as "safe" and "reliable," despite their knowledge of the Inflator Defect or their failure to reasonably investigate it.

602.   To protect its profits and to avoid remediation costs and a public relations nightmare, New Chrysler, after the bankruptcy sale in 2009, concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them and their tragic consequences, and allowed unsuspecting new and used car purchasers to continue to buy/lease the Class Vehicles, and allowed them to continue driving highly dangerous vehicles.

603.   New Chrysler owed the South Carolina Consumer Plaintiffs a duty to disclose the true safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them because New Chrysler:

a.    Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

b.    Intentionally concealed the foregoing from the South Carolina Consumer Plaintiffs; and/or

c.    Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from the South Carolina Consumer Plaintiffs that contradicted these representations.

604.    Because New Chrysler fraudulently concealed the Inflator Defect in Class Vehicles and/or the Defective Airbags installed in them, resulting in a raft of negative publicity once the Inflator Defect finally began to be disclosed, the value of the Class Vehicles has greatly diminished.  In light of the stigma attached to Class Vehicles by New Chrysler' conduct, they are now worth significantly less than they otherwise would be.

605.    New Chrysler's failure to disclose and active concealment of the dangers and risks posed by the Defective Airbags in Class Vehicles were material to the South Carolina Consumer Plaintiffs and the South Carolina Consumer Class.  A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

606.    The South Carolina Consumer Plaintiffs and the South Carolina Consumer Class suffered ascertainable loss caused by New Chrysler' misrepresentations and their failure to disclose material information.  Had they been aware of the Inflator Defect that existed in the Class Vehicles and/or the Defective Airbags installed in them, and New Chrysler's complete disregard for safety, the South Carolina Consumer Plaintiffs either would not have paid as much for their vehicles as they did or would not have purchased or leased them at all.  The South Carolina

- 151 -

Consumer Plaintiffs did not receive the benefit of their bargain as a result of New Chrysler' misconduct.

607.    New Chrysler's violations present a continuing risk to the South Carolina Consumer Plaintiffs, the South Carolina Consumer Class, as well as to the general public.  New Chrysler' unlawful acts and practices complained of herein affect the public interest.

608.    As a direct and proximate result of New Chrysler's violations of the South Carolina UTPA, the South Carolina Consumer Plaintiffs and the South Carolina Consumer Class have suffered injury-in-fact and/or actual damage.

609.    Pursuant to S.C. Code Ann. § 39-5-140(a), the South Carolina Consumer Plaintiffs seek monetary relief against New Chrysler to recover for their economic losses.  Because New Chrysler' actions were willful and knowing, the South Carolina Consumer Plaintiffs' damages should be trebled. *Id.*

610.    The South Carolina Consumer Plaintiffs further allege that New Chrysler's malicious and deliberate conduct warrants an assessment of punitive damages because New Chrysler carried out despicable conduct with willful and conscious disregard of the rights and safety of others, subjecting the South Carolina Consumer Plaintiffs and the South Carolina Consumer Class to cruel and unjust hardship as a result.  New Chrysler' intentionally and willfully misrepresented the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them, deceived the South Carolina Consumer Plaintiffs and the South Carolina Consumer Class on life-or-death matters, and concealed material facts that only New Chrysler knew, all to avoid the expense and public relations nightmare of correcting a deadly flaws in the Class Vehicles and/or the Defective Airbags installed in them.  New Chrysler' unlawful conduct constitutes malice, oppression, and fraud warranting punitive damages.  The South Carolina

Consumer Plaintiffs further seek an order enjoining New Chrysler' unfair or deceptive acts or practices.

## COUNT 43

**Violation of the South Carolina Regulation of Manufacturers,
Distributors, and Dealers Act
S.C. Code Ann. §56-15-10**

611.     This claim is brought only on behalf of the South Carolina Consumer Class against New Chrysler.

612.     The Vehicle Manufacturing New Chrysler is a "manufacturer" as set forth in S.C. Code Ann.§ 56-15-10, as it was engaged in the business of manufacturing or assembling new and unused motor vehicles.

613.     New Chrysler committed unfair or deceptive acts or practices that violated the South Carolina Regulation of Manufacturers, Distributors, and Dealers Act ("Dealers Act"), S.C. Code Ann. § 56-15-30.

614.     New Chrysler engaged in actions which were arbitrary, in bad faith, unconscionable, and which caused damage to the South Carolina Consumer Plaintiffs, the South Carolina Consumer Class, and to the public.

615.     New Chrysler's bad faith and unconscionable actions include, but are not limited to: (1) representing that Class Vehicles and/or the Defective Airbags installed in them have characteristics, uses, benefits, and qualities which they do not have, (2) representing that they are of a particular standard, quality, and grade when they are not, (3) advertising them with the intent not to sell or lease them as advertised, (4) representing that a transaction involving them confers or involves rights, remedies, and obligations which it does not, and (5) representing that the subject

of a transaction involving them has been supplied in accordance with a previous representation when it has not.

616.    New Chrysler resorted to and used false and misleading advertisements in connection with their business.  As alleged above, they made numerous material statements and omissions regarding the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them that were either false or misleading.  Each of these statements and omissions contributed to the deceptive context of New Chrysler' unlawful advertising and representations as a whole.

617.    Pursuant to S.C. Code Ann. § 56-15-110(2), the South Carolina Consumer Plaintiffs bring this action on behalf of themselves and the South Carolina Consumer Class, as the action is one of common or general interest to many persons and the parties are too numerous to bring them all before the court.

618.    The South Carolina Consumer Plaintiffs and the South Carolina Consumer Class are entitled to double their actual damages, the cost of the suit, attorney's fees pursuant to S.C. Code Ann. § 56-15-110. The South Carolina Consumer Plaintiffs also seek injunctive relief under S.C. Code Ann. § 56-15-110.  The South Carolina Consumer Plaintiffs also seek treble damages because New Chrysler acted maliciously.

## COUNT 44

### Breach of the Implied Warranty of Merchantability
### S.C. Code Ann. § 36-2-314

619.    In the event the Court declines to certify a Nationwide Consumer Class under the Magnuson-Moss Warranty Act, this claim is brought only on behalf of the South Carolina Consumer Class against New Chrysler.

620.    New Chrysler is and was at all relevant times a merchant with respect to motor vehicles and/or airbags within the meaning of S.C. Code Ann. § 36-2-314.

621.    A warranty that the Class Vehicles and/or the Defective Airbags installed in them were in merchantable condition was implied by law in Class Vehicle transactions, pursuant to S.C. Code Ann. § 36-2-314.

622.    The Class Vehicles and/or the Defective Airbags installed in them, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars and airbags are used.  Specifically, they are inherently defective and dangerous in that the Defective Airbags: (a) rupture and expel metal shrapnel that tears through the airbag and poses a threat of serious injury or death to occupants; and/or (b) hyper-aggressively deploy and seriously injure occupants through contact with the airbag, instead of protecting vehicle occupants from bodily injury during accidents.

623.    New Chrysler was provided notice of these issues by its knowledge of the issues, by customer complaints, by numerous complaints filed against it and/or others, by internal investigations, and by individual letters and communications sent by consumers before New Chrysler issued the recalls and after the allegations of the Inflator Defect became public.

624.    As a direct and proximate result of New Chrysler's breach of the warranties of merchantability, the South Carolina Consumer Plaintiffs and the South Carolina Consumer Class have been damaged in an amount to be proven at trial.

**R.      Claims Brought on Behalf of the Texas Consumer Class**

**COUNT 45**

**Violation of the Deceptive Trade Practices Act
Tex. Bus. & Com. Code § 17.41**

- 155 -

625. This claim is brought only on behalf of the Texas Consumer Class against New Chrysler.

626. The Texas Consumer Plaintiffs and the Texas Consumer Class are individuals, partnerships and corporations with assets of less than $25 million (or are controlled by corporations or entities with less than $25 million in assets). *See* Tex. Bus. & Com. Code § 17.41.

627. The Texas Deceptive Trade Practices-Consumer Protection Act ("Texas DTPA") prohibits "[f]alse, misleading, or deceptive acts or practices in the conduct of any trade or commerce," Tex. Bus. & Com. Code § 17.46(a), and an "unconscionable action or course of action," which means "an act or practice which, to a consumer's detriment, takes advantage of the lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree," Tex. Bus. & Com. Code §§ 17.45(5), 17.50(a)(3). New Chrysler has committed false, misleading, unconscionable, and deceptive acts or practices in the conduct of trade or commerce.

628. New Chrysler also violated the Texas DTPA by: (1) representing that the Class Vehicles and/or the Defective Airbags installed in them have characteristics, uses, benefits, and qualities which they do not have; (2) representing that they are of a particular standard, quality, and grade when they are not; (3) advertising them with the intent not to sell or lease them as advertised; and (4) failing to disclose information concerning them with the intent to induce consumers to purchase or lease them.

629. In the course of its business, New Chrysler willfully failed to disclose and actively concealed the dangerous risks posed by the many safety issues and the serious Inflator Defect discussed above. New Chrysler compounded the deception by repeatedly asserting that the Class Vehicles and/or the Defective Airbags installed in them were safe, reliable, and of high quality, and by claiming to be a reputable manufacturer that values safety.

- 156 -

630. New Chrysler also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles and/or the Defective Airbags installed in them.

631. New Chrysler has known of the Inflator Defect in the Defective Airbags since at least June 1, 2009, when it acquired substantially all of Old Chrysler's books, records, and personnel, and the knowledge about the defective Takata airbags those books, records, and personnel held. New Chrysler failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them.

632. Furthermore, New Chrysler was again made aware of the Inflator Defect in the Takata airbags in New Chrysler's vehicles in 2009, following Honda's recall; in 2010 following a rupture that occurred during the testing of one of New Chrysler's airbags; and in 2013 following a field rupture in a Chrysler vehicle. New Chrysler willfully failed to disclose and actively concealed the dangerous risks posed by the Class Vehicles and/or the Defective Airbags installed in them.

633. By failing to disclose and by actively concealing the Inflator Defect in the Class Vehicles and/or the Defective Airbags installed in them, by marketing them as safe, reliable, and of high quality, and by presenting themselves as reputable manufacturers that value safety, New Chrysler engaged in unfair or deceptive business practices in violation of FDUTPA. New Chrysler deliberately withheld the information about the propensity of the Defective Airbags to violently explode and/or expel lethal amounts of metal debris and shrapnel, instead of protecting vehicle occupants from bodily injury during accidents, in order to ensure that consumers would purchase the Class Vehicles.

634. In the course of New Chrysler's business, they willfully failed to disclose and actively concealed the dangerous risks posed by the many safety issues and the serious Inflator Defect discussed above. New Chrysler compounded the deception by repeatedly asserting that the Class Vehicles and/or the Defective Airbags installed in them were safe, reliable, and of high quality, and by claiming to be a reputable manufacturer that values safety.

635. New Chrysler's unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers, and were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of Class Vehicles and/or the Defective Airbags installed in them, the quality of New Chrysler' brands, and the true value of the Class Vehicles.

636. New Chrysler intentionally and knowingly misrepresented material facts regarding the Class Vehicles and/or the Defective Airbags installed in them with an intent to mislead the Texas Consumer Plaintiffs and the Texas Consumer Class.

637. New Chrysler knew or should have known that its conduct violated the Texas DTPA.

638. As alleged above, New Chrysler made material statements about the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them that were either false or misleading. New Chrysler' representations, omissions, statements, and commentary have included selling and marketing the Class Vehicles as "safe" and "reliable," despite their knowledge of the Inflator Defect or their failure to reasonably investigate it.

639. To protect its profits and to avoid remediation costs and a public relations nightmare, New Chrysler concealed the dangers and risks posed by the Class Vehicles and/or the

- 158 -

Defective Airbags installed in them and their tragic consequences, and allowed unsuspecting new and used car purchasers to continue to buy/lease the Class Vehicles, and allowed them to continue driving highly dangerous vehicles.

640.　New Chrysler owed the Texas Consumer Plaintiffs a duty to disclose the true safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them because New Chrysler:

　　　　a.　　Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

　　　　b.　　Intentionally concealed the foregoing from the Texas Consumer Plaintiffs; and/or

　　　　c.　　Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from the Texas Consumer Plaintiffs that contradicted these representations.

641.　Because New Chrysler fraudulently concealed the Inflator Defect in Class Vehicles and/or the Defective Airbags installed in them, resulting in a raft of negative publicity once the Inflator Defect finally began to be disclosed, the value of the Class Vehicles has greatly diminished.  In light of the stigma attached to Class Vehicles by New Chrysler' conduct, they are now worth significantly less than they otherwise would be.

642.　New Chrysler's failure to disclose and active concealment of the dangers and risks posed by the Defective Airbags in Class Vehicles were material to the Texas Consumer Plaintiffs and the Texas Consumer Class.  A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

643. The Texas Consumer Plaintiffs and the Texas Consumer Class suffered ascertainable loss caused by New Chrysler' misrepresentations and their failure to disclose material information. Had they been aware of the Inflator Defect that existed in the Class Vehicles and/or the Defective Airbags installed in them, and New Chrysler's complete disregard for safety, the Texas Consumer Plaintiffs either would not have paid as much for their vehicles as they did or would not have purchased or leased them at all. The Texas Consumer Plaintiffs did not receive the benefit of their bargain as a result of New Chrysler' misconduct.

644. New Chrysler's violations present a continuing risk to the Texas Consumer Plaintiffs, the Texas Consumer Class, as well as to the general public. New Chrysler' unlawful acts and practices complained of herein affect the public interest.

645. As a direct and proximate result of New Chrysler's violations of the Texas DTPA, the Texas Consumer Plaintiffs and the Texas Consumer Class have suffered injury-in-fact and/or actual damage.

646. Pursuant to Tex. Bus. & Com. Code § 17.50(a)(1) and (b), the Texas Consumer Plaintiffs and the Texas Consumer Class seek monetary relief against New Chrysler measured as actual damages in an amount to be determined at trial, treble damages for New Chrysler' knowing violations of the Texas DTPA, and any other just and proper relief available under the Texas DTPA.

647. For those Texas Consumer Class members who wish to rescind their purchases, they are entitled under Tex. Bus. & Com. Code § 17.50(b)(4) to rescission and other relief necessary to restore any money or property that was acquired from them based on violations of the Texas DTPA.

648.     The Texas Consumer Plaintiffs and the Texas Consumer Class also seek court costs and attorneys' fees under § 17.50(d) of the Texas DTPA.

649.     In accordance with Tex. Bus. & Com. Code § 17.505(a), Plaintiffs' counsel, on behalf of the Texas Consumer Plaintiffs, served New Chrysler with notice of their alleged violations of the Texas DTPA relating to the Class Vehicles and/or the Defective Airbags installed in them purchased by the Texas Consumer Plaintiffs and the Texas Consumer Class, and demanded that New Chrysler correct or agree to correct the actions described therein.  If New Chrysler fail to do so, the Texas Consumer Plaintiffs will amend this Complaint as of right (or otherwise seek leave to amend the Complaint) to include compensatory and monetary damages to which the Texas Consumer Plaintiffs and the Texas Consumer Class members are entitled.

**COUNT 46**

**Breach of the Implied Warranty of Merchantability**
**Tex. Bus. & Com. Code Ann. § 2.314**

650.     In the event the Court declines to certify a Nationwide Consumer Class under the Magnuson-Moss Warranty Act, this claim is brought only on behalf of the Texas Consumer Class against New Chrysler.

651.     New Chrysler is and was at all relevant times a merchant with respect to motor vehicles and/or airbags within the meaning of Tex. Bus. & Com. Code Ann. § 2.104.

652.     A warranty that the Class Vehicles and/or the Defective Airbags installed in them were in merchantable condition was implied by law in Class Vehicle transactions, pursuant to Tex. Bus. & Com. Code Ann. § 2.314.

653.     The Class Vehicles and/or the Defective Airbags installed in them, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars and airbags are used.  Specifically, they are inherently defective and dangerous in that the

Defective Airbags: (a) rupture and expel metal shrapnel that tears through the airbag and poses a threat of serious injury or death to occupants; and/or (b) hyper-aggressively deploy and seriously injure occupants through contact with the airbag, instead of protecting vehicle occupants from bodily injury during accidents.

654.     New Chrysler was provided notice of these issues by its knowledge of the issues, by customer complaints, by numerous complaints filed against it and/or others, by internal investigations, and by individual letters and communications sent by consumers before New Chrysler issued the recalls and after the allegations of the Inflator Defect became public.

655.     As a direct and proximate result of New Chrysler's breach of the warranties of merchantability, the Texas Consumer Plaintiffs and the Texas Consumer Class have been damaged in an amount to be proven at trial.

## PRAYER FOR RELIEF

Plaintiffs, on behalf of themselves and all others similarly situated, request the Court to enter judgment against New Chrysler, as follows:

A.     An order certifying the proposed Classes, designating Plaintiffs as the named representatives of the Classes, designating the undersigned as Class Counsel, and making such further orders for the protection of Class members as the Court deems appropriate, under Fed. R. Civ. P. 23;

B.     A declaration that the airbags in Class Vehicles are defective;

C.     An order enjoining New Chrysler to desist from further deceptive distribution, sales, and lease practices with respect to the Class Vehicles and such other injunctive relief that the Court deems just and proper;

D.　　An award to Plaintiffs and Class Members of compensatory, exemplary, and punitive remedies and damages and statutory penalties, including interest, in an amount to be proven at trial;

E.　　An award to Plaintiffs and Class Members for the return of the purchase prices of the Class Vehicles, with interest from the time it was paid, for the reimbursement of the reasonable expenses occasioned by the sale, for damages, and for reasonable attorney fees;

F.　　A Defendant-funded program, using transparent, consistent, and reasonable protocols, under which out-of-pocket and loss-of-use expenses and damages claims associated with the Defective Airbags in Plaintiffs' and Class Members' Class Vehicles, can be made and paid, such that New Chrysler, not the Class Members, absorb the losses and expenses fairly traceable to the recalls of the vehicles and correction of the Defective Airbags;

G.　　A declaration that New Chrysler must disgorge, for the benefit of Plaintiff and Class Members, all or part of the ill-gotten profits they received from the sale or lease of the Class Vehicles or make full restitution to Plaintiffs and Class Members;

H.　　An award of attorneys' fees and costs, as allowed by law;

I.　　An award of prejudgment and post judgment interest, as provided by law;

J.　　Leave to amend this Complaint to conform to the evidence produced at trial; and

K.　　Such other relief as may be appropriate under the circumstances.

## **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a jury trial as to all issues triable by a jury.

DATED: April 23, 2021

**PODHURST ORSECK, P.A.**

*/s/* Peter Prieto
Peter Prieto (FBN 501492)
Aaron S. Podhurst (FBN 63606)
Stephen F. Rosenthal (FBN 131458)
John Gravante  (FBN 617113)
Matthew P. Weinshall (FBN 84783)
Alissa Del Riego (FBN 99742)
SunTrust International Center
One Southeast 3rd Ave, Suite 2300
Miami, Florida 33131
Phone: (305) 358-2800
Fax: (305) 358-2382
pprieto@podhurst.com
apodhurst@podhurst.com
srosenthal@podhurst.com
jgravante@podhurst.com
mweinshall@podhurst.com
adelriego@podhurst.com

*Chair Lead Counsel for Plaintiffs*

| COLSON HICKS EIDSON | SMITH LACIEN, LLP |
|---|---|
| Lewis S. "Mike" Eidson<br>mike@colson.com<br>Curtis Bradley Miner<br>curt@colson.com<br>255 Alhambra Circle, PH<br>Coral Gables, FL 33134<br>T: 305-476-7400<br><br>*Plaintiffs' Personal Injury Track Lead Counsel* | Todd A. Smith<br>tsmith@smithlacien.com<br>70 West Madison St., Ste. 5770<br>Chicago, IL 60602<br>T: 312-509-8900<br><br>*Plaintiffs' Economic Damages Track Co-Lead Counsel* |
| **BOIES, SCHILLER & FLEXNER LLP** | **BARON & BUDD, PC** |
| David Boies, Esq.<br>Motty Shulman, Esq. (Fla Bar. No. 175056)<br>333 Main Street<br>Armonk, NY 10504<br>Tel: (914) 749-8200<br>Fax: (914) 749-8300<br>dboies@bsfllp.com<br>mshulman@bsfllp.com<br><br>Stephen N. Zack, Esq. (Fla. Bar. No. 145215)<br>100 Southeast 2nd Street, Suite 2800<br>Miami, FL 33131<br>Tel: (305) 539-8400<br>Fax: (305) 539-1307<br>szack@bsfllp.com<br>mheise@bsfllp.com<br><br>*Plaintiffs' Economic Damages Track Co-Lead Counsel* | Roland Tellis<br>rtellis@baronbudd.com<br>David Fernandes<br>dfernandes@bardonbudd.com<br>Mark Pifko<br>mpifko@baronbudd.com<br>15910 Ventura Blvd.,<br>Suite 1600<br>Encino, CA 91436<br>T: 818-839-2333<br><br>J.Burton LeBlanc<br>9015 Bluebonnet Blvd.<br>Baton Rouge, LA 70810<br>T: 225-761-6463<br><br>*Plaintiffs' Steering Committee* |
| **CARELLA BYRNE CECCHI OLSTEIN BRODY & AGNELLO, PC** | **LIEFF CABRASER HEIMANN AND BERNSTEIN LLP** |
| James E. Cecchi<br>jcecchi@carellabyrne.com<br>5 Becker Farm Road<br>Roseland, NJ 07068-1739<br>T: 973 994-1700<br>f: 973 994-1744<br><br>*Plaintiffs' Steering Committee* | Elizabeth Cabraser<br>ecabraser@lchb.com<br>Nimish R. Desai<br>ndesai@lchb.com<br>275 Battery St., Suite 3000<br>San Francisco, CA 94111-3339<br>T: 415-956-1000<br><br>David Stellings<br>250 Hudson Street, 8th Floor<br>NY, NY 10012<br>212-355-9500<br>dstellings@lchb.com<br><br>*Plaintiffs' Steering Committee* |

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on April 23, 2021, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify the foregoing document is being served this day on all counsel of record via transmission of Notice of Electronic Filing generated by CM/ECF.

By: */s/ Peter Prieto*  
Peter Prieto

**EXHIBIT G**

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

| | |
|---|---|
| **IN RE: TAKATA AIRBAG PRODUCT LIABILITY LITIGATION**<br><br>This Document Relates to Economic Loss Class Actions and: | MDL No. 2599<br><br>Master File No.15- MD 2599-FAM<br><br>S.D. Fla. Case No. 1:14-cv-24009-FAM |

BUTLER AUTO RECYCLING, INC.; CUNNINGHAM BROTHERS AUTO PARTS, LLC; MIDWAY AUTO PARTS LLC; ROAD TESTED PARTS, INC. D/B/A WEAVERPARTS.COM; SNYDER'S LTD.; TRIPLE D CORPORATION D/B/A KNOX AUTO PARTS; AUTOMOTIVE DISMANTLERS AND RECYCLERS ASSOCIATION, INC. D/B/A AUTOMOTIVE RECYCLERS ASSOCIATION; RIGSBY'S AUTO PARTS & SALES, INC.; QUARNO'S AUTO SALVAGE; YOUNG'S AUTO CENTER AND SALVAGE, LP, individually and on behalf of all others similarly situated,

                    Plaintiffs,

          v.

HONDA MOTOR CO., LTD., AMERICAN HONDA MOTOR CO., INC.,HONDA R&D CO., LTD, BMW OF NORTH AMERICA, LLC, BMW MANUFACTURING CO., LLC, FCA US LLC, GENERAL MOTORS COMPANY, GENERAL MOTORS HOLDINGS LLC, GENERAL MOTORS LLC, TOYOTA MOTOR CORPORATION, TOYOTA MOTOR SALES, U.S.A., INC., AND TOYOTA MOTOR ENGINEERING & MANUFACTURING NORTH AMERICA, INC., MAZDA MOTOR CORPORATION, MAZDA MOTOR OF AMERICA, INC., NISSAN MOTOR CO., LTD., NISSAN NORTH AMERICA, INC., FUJI HEAVY INDUSTRIES, LTD., SUBARU OF AMERICA, INC., VOLKSWAGEN GROUP OF AMERICA, AUDI OF AMERICA, LLC, and MERCEDES-BENZ USA, LLC,

                    Defendants.

**JURY TRIAL DEMANDED**

**AUTOMOTIVE RECYCLERS'
*CORRECTED* SECOND
AMENDED CONSOLIDATED
CLASS ACTION COMPLAINT**

# TABLE OF CONTENTS

**Page**

NATURE OF CLAIMS ........................................................................................... 1

JURISDICTION AND VENUE ........................................................................... 10

    I.      Vehicle Manufacturer Defendants ........................................... 12

    II.     Plaintiffs............................................................................................. 36

GENERAL FACTUAL ALLEGATIONS............................................................. 39

    I.      Definitions........................................................................................ 39

    I.      Takata is a Major Manufacturer of Airbags and Inflators ................... 66

    II.     Takata's Airbags Have A Common, Uniform Defect ......................... 67

          A.     Takata Recklessly Chose An Inexpensive and Dangerous
Propellant..................................................................................... 67

          B.     The Risks of the Inflator Defect Were Exacerbated by Takata's and
Defendants' Abysmal Quality Control ..................................... 71

    III.    Takata Airbag Failures and Defendants' Inadequate Response ......... 73

          A.     2003-2008: Early Incidents and the 2008 Honda Recall (08V-593) ....... 73

          B.     2008-2009: Additional Incidents, the 2009 Honda Recall (09V-
259), and Honda's and Takata's Misleading Reporting to NHTSA ........ 76

          C.     2010: The 2010 Recall (10V-041) and Honda's Shifting
Explanations.................................................................................. 81

          D.     2011-2012: Mounting Honda Recalls, Including the 2011 Recall
(11V-260)....................................................................................... 82

          E.     2013-2014: Takata's Belated Admissions of Broader Defects and
the 2013 Recall (13V-132)........................................................ 85

          F.     2014-2015: Forced National Recall And Takata's Admission of a
Defect........................................................................................... 91

    IV.    The Vehicle Manufacturer Defendants Sold Their Vehicles As "Safe" and
"Reliable".......................................................................................... 97

    V.     Defendants' Inadequate Recalls and Failure to Assist Impacted Consumers.... 110

          A.     Slow and Inadequate Recalls ................................................... 110

          B.     GM Defendants Delay Repairs and Continue to Put Customers at
Risk .............................................................................................. 112

          C.     Defective Replacement Airbags .............................................. 114

    VI.    Additional General Allegations Against Vehicle Manufacturer Defendants .... 115

          A.     Honda Allegations ..................................................................... 115

          B.     New Chrysler Allegations......................................................... 122

          C.     GM Defendants Allegations ..................................................... 127

Case 1:15-md-02599-FAM Document 4311 Entered on FLSD Docket 05/07/2021 Page 3 of

**TABLE OF CONTENTS**
(continued)

Page

D.     Nissan Allegations ................................................................................ 135

E.     BMW Allegations ................................................................................ 142

F.     Mazda Allegations ............................................................................... 147

G.     Mercedes Allegations .......................................................................... 150

H.     Subaru Allegations .............................................................................. 156

I.     Toyota Allegations .............................................................................. 157

J.     Volkswagen Allegations ...................................................................... 160

K.     Knowledge Through the German Car Consortium ................................ 164

VII.     Automotive Recyclers Purchased Class Vehicles Containing Defective Airbags for Amounts Greater than Their Actual Value and Maintained the Defective Airbags for the Purposes of Resale ..................................................... 166

TOLLING OF THE STATUTE OF LIMITATIONS .......................................................... 170

CLASS ACTION ALLEGATIONS ................................................................................... 172

A.     All Defendants Except New Chrysler and the GM ................................ 173

B.     New Chrysler ...................................................................................... 174

C.     The GM Defendants ............................................................................ 175

CLAIMS FOR RELIEF ................................................................................................... 181

I.     Nationwide Claims ...................................................................................... 181

A.     Federal Claims .................................................................................... 181

1.     Dismissed ............................................................................. 181

2.     Dismissed ............................................................................. 182

3.     Dismissed ............................................................................. 182

4.     Dismissed ............................................................................. 182

5.     Dismissed ............................................................................. 182

6.     Dismissed ............................................................................. 182

7.     Dismissed ............................................................................. 182

8.     Dismissed ............................................................................. 182

9.     Dismissed ............................................................................. 182

10.     Dismissed ............................................................................. 182

11.     Dismissed ............................................................................. 182

12.     Dismissed ............................................................................. 182

# TABLE OF CONTENTS
## (continued)

|  |  |  | Page |
|---|---|---|---|
| 13. | Dismissed | | 182 |
| 14. | Dismissed | | 183 |
| 15. | Dismissed | | 183 |
| 16. | Dismissed | | 183 |
| 17. | Dismissed | | 183 |
| 18. | Dismissed | | 183 |
| 19. | Dismissed | | 183 |
| 20. | Dismissed | | 183 |
| 21. | Dismissed | | 183 |
| B. | Common Law Claim | | 183 |
| 22. | Fraudulent Concealment & Fraudulent Misrepresentation | | 183 |
| II. | State Class Claims | | 187 |
| 23. | Violation of Florida's Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201, *et. seq.* | | 187 |
| 24. | Dismissed | | 192 |
| 25. | Violation of the North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. §§ 75-1.1, *et seq.* | | 192 |
| 26. | Dismissed | | 197 |
| 27. | Violation of the Deceptive Trade Practices Act Tex. Bus. & Com. Code §§ 17.41, *et seq.* | | 197 |
| PRAYER FOR RELIEF | | | 202 |
| DEMAND FOR JURY TRIAL | | | 204 |

Automotive Recycler Plaintiffs ("Plaintiffs" or "Automotive Recyclers"), based on personal knowledge as to themselves, and upon information and belief as to all other matters, allege as follows:

## NATURE OF CLAIMS

1.      People trust and rely on the manufacturers of motor vehicles and of critical safety devices to make safe products that do not give rise to a clear danger of death or personal injury. An airbag is a critical safety feature of any motor vehicle.  Airbags are meant to inflate rapidly during an automobile collision to prevent occupants from striking hard objects in the vehicle, such as the steering wheel, dashboard, or windshield.

2.      An airbag supplier must take all necessary steps to ensure that its products—which literally can make the difference between life and death in an accident—function as designed, specified, promised, and intended.  Profits must take a back seat to safety for the airbag manufacturer, and also for the automobile manufacturer when it makes its product sourcing decisions.

3.      This action concerns defective airbags manufactured by Takata Corporation and its related entities ("Takata") and equipped in vehicles manufactured, sold, or leased by Defendants Honda, BMW, Chrysler, GM, Mazda, Mercedes-Benz, Nissan, Subaru, Toyota, and Volkswagen and their related entities (collectively the "Vehicle Manufacturer Defendants").  Defendants knowingly misrepresented their vehicles as being safe and deceptively concealed the fact that inflators in their vehicles were prone to aggressively deploy and/or violently explode and maim or kill drivers and passengers.

4.      All Takata airbags at issue in this litigation share a common, uniform defect: the use of ammonium nitrate, a notoriously volatile and unstable compound, as the propellant in their

defectively designed inflators (the "Inflator Defect"). The inflator, as its name suggests, is supposed to inflate the airbag upon vehicle impact. In the milliseconds following a crash, the inflator ignites a propellant to produce gas that is released into the airbag cushion, causing the airbag cushion to expand and deploy. The term "airbag" shall be used herein to refer to the entire airbag module, including the inflator.

5.     The following basic illustration depicts Takata's airbag module:



6.     In the late 1990s, Takata shelved a safer chemical propellant in favor of ammonium nitrate, a far cheaper and more unstable compound that is much better suited for large demolitions in mining and construction. Indeed, ammonium nitrate is the explosive that Timothy McVeigh and Terry Nichols used in April 1995 to bomb the Alfred P. Murrah Federal Building in downtown Oklahoma City.

7.     Under ordinary conditions, including daily temperature swings and contact with moisture in the air, Takata's ammonium-nitrate propellant transforms and destabilizes, causing

irregular and dangerous behavior ranging from inertness to violent combustion. When Takata decided to abandon the safer propellant in favor of the more dangerous but cheaper one, it was aware of these risks and did so over the objections and concerns of its engineers in Michigan. Tellingly, Takata is the only major airbag manufacturer that uses ammonium nitrate as the primary propellant in its airbag inflators.

8.      As a result of the common, uniform Inflator Defect, Takata airbags often fail to perform as they should. Instead of protecting vehicle occupants from bodily injury during accidents, the defective Takata airbags too often aggressively deploy and/or violently explode, sometimes expelling metal debris and shrapnel at vehicle occupants. As of February 2018, Takata airbags have been responsible for at least 22 deaths and hundreds of serious injuries worldwide.

9.      When the Vehicle Manufacturer Defendants purchased Takata's airbags for their vehicles, they were aware that the airbags used the volatile and unstable ammonium nitrate as the primary propellant in the inflators.

10.      The volatility and instability of Takata's ammonium-nitrate propellant has been underscored by the glaring and persistent quality control problems that have plagued Takata's manufacturing operations.

11.      Takata and the Vehicle Manufacturer Defendants first received word of startling airbag failures in the field no later than 2003, when a Takata inflator ruptured in a BMW vehicle in Switzerland. BMW and Takata jointly investigated the incident in one of Takata's Michigan facilities, and inaccurately minimized the incident as an anomaly, without alerting federal safety regulators.

12.      Similarly, in 2004, a Takata airbag in a Honda Accord in Alabama exploded, shot out metal shrapnel, and severely injured the car's driver. Honda and Takata investigated the

incident and inaccurately minimized it as "an anomaly." Honda did not issue a recall. Neither Honda nor Takata sought the involvement of federal safety regulators.

13. The serious danger posed by the Inflator Defect was not disclosed to U.S. safety regulators until 2008, despite red flags raised by prior Takata airbag ruptures or explosions. It took three additional reports of airbag rupture incidents in 2007 to prompt the 2008 disclosure, and even then, Takata and Honda falsely assured regulators that they needed to recall only approximately 4,000 Honda vehicles, claiming that they had identified all "possible vehicles that could potentially experience the problem."

14. Behind the scenes, however, Takata and Honda were busy conducting tests that revealed far more serious problems. As reported in The New York Times, Takata conducted secret tests in 2004, which confirmed that its inflators were defective, and then destroyed those test results to conceal the defect. After a 2007 airbag rupture, Honda began collecting inflators for further testing as well.

15. Tragically, these airbag failures were the first of many to come. Honda and Takata were forced to issue further recalls in 2009, 2010, and 2011, but they did so in a limited and misleading way, apparently in an effort to avoid the huge costs and bad publicity that would have been associated with appropriately sized and broader recalls. Despite the repeated Takata/Honda recalls, and though the other Vehicle Manufacturer Defendants knew their vehicles were also equipped with Takata airbags containing ammonium nitrate, they failed to take reasonable measures to investigate or protect the public.

16. Over a decade after the first incidents of airbag ruptures, Defendants' obfuscation and inaction broke down in the face of mounting incidents and increased scrutiny by regulators, the press, and private plaintiffs. By the middle of 2013, the pace of the recalls increased

exponentially as the National Highway Traffic Safety Administration ("NHTSA") began to force
Defendants into action. Whereas approximately 3 million vehicles had been recalled up until that
point (the vast majority of which were Hondas), the April–May 2013 recalls added 4 million more
vehicles to the list, across ten manufacturers. Just one year later, in June 2014, another 5.6 million
vehicles were recalled, and by October 2014, global recalls had reached 16.5 million vehicles. As
of July 2017, global recalls exceeded 60 million vehicles.

17.     Even then, Defendants worked hard to limit the scope of the recalls to humid parts
of the country. They strenuously and falsely claimed that the risks caused by the Inflator Defect
disappeared to the north of some arbitrary latitude in the American South. And they
mischaracterized the Inflator Defect as the product of idiosyncratic manufacturing flaws.

18.     By November 2014, in anticipation of a United States Senate hearing to be attended
by Takata and the major automakers, NHTSA demanded that the recalls be expanded to the entire
country for certain driver side airbags, citing airbag rupture incidents in North Carolina and
California. Incredibly, Takata refused, and testified at Congressional hearings that vehicles in non-
humid regions were safe, *even as it claimed that it had not yet determined the root cause of the
failures*.

19.     With additional pressure and public scrutiny, the Vehicle Manufacturer Defendants
eventually agreed to NHTSA's demand. At that point, the total number of recalled vehicles
escalated to approximately 17 million in the United States and 25 million worldwide.

20.     In response to the additional pressure and public scrutiny, Defendants were forced
to consult with external explosives and airbag specialists, and performed additional testing on
Takata's airbags. This testing confirmed what Defendants already knew: Takata's airbags
containing ammonium nitrate were defective and prone to rupture.

21. In light of this testing, Takata was unable to deny the existence of the Inflator Defect any longer. On May 18, 2015, Takata filed four Defect Information Reports ("DIRs") with NHTSA and agreed to a Consent Order regarding its (1) PSDI, PSDI-4, and PSDI-4K driver air bag inflators; (2) SPI passenger air bag inflators; (3) PSPI-L passenger air bag inflators; and (4) PSPI passenger air bag inflators, respectively. After concealing the Inflator Defect for more than a decade, Takata finally admitted that "a defect related to motor vehicle safety may arise in some of the subject inflators." And in testimony presented to Congress following the submission of its DIRs, Takata's representative admitted that the use of ammonium nitrate is a factor that contributes to the tendency of Takata's airbags to rupture, and that as a result, Takata will phase out the use of ammonium nitrate. Still, even Takata's defect admission is inaccurate and misleading, because the Inflator Defect is manifest in each of Takata's inflators containing ammonium nitrate. And shockingly, certain Vehicle Manufacturer Defendants continue to equip new vehicles with inflators containing ammonium nitrate, even after conceding that inflators containing ammonium nitrate create an unacceptable public safety hazard.

22. Further, in its DIRs, Takata acknowledged that the defect is present in inflators that were installed in vehicles as replacement parts through prior recalls, necessitating a second recall of those vehicles.

23. As a result of Takata's admission that its inflators are defective, tens of millions of additional vehicles have been or will be recalled in the United States, pushing the total number of recalled vehicles nationwide to nearly 44 million with approximately 70 million defective Takata airbags. While Takata has records of which manufacturers it sold defective inflators to, it claims not to have records of which vehicles those inflators were installed in. The Vehicle Manufacturers

possess those records, however, and are thus in the process of identifying which vehicles must be recalled based on Takata's DIRs.

24.     As a result of Defendants' concealment of the Inflator Defect for more than a decade, the recalls now underway cannot be implemented effectively.  Defendants have acknowledged that the process could take several *years* because of supply constraints.  Even before the number of recalled vehicles nationwide doubled from approximately 17 million to 34 million, Honda's spokesman acknowledged that"[t]here's simply not enough parts to repair every recalled single car immediately."

25.     Even if there were enough airbags, dealers are unable to keep up with the volume of customers rushing to get their Takata airbags replaced.  Following the expanded recalls in late 2014, some dealers reported receiving up to *900 calls per day* about the recalls, and told customers that they may have to wait months before airbags can be replaced.  And following Takata's submission of the May 18th DIRs, NHTSA's recall website received over one million visits.

26.     Consumers are, therefore, in the frightening position of having to drive dangerous vehicles for many months (or even years) while they wait for Defendants to replace the defective airbags in their cars.  Some of the Defendants are not providing replacement or loaner vehicles, even though there is an immediate need to provide safe vehicles to consumers.  As a result, many consumers are effectively left without a safe vehicle to take them to and from work, to pick up their children from school or childcare, or, in the most urgent situations, to transport themselves or someone else to a hospital.

27.     Even more troubling, many of the replacement airbags that Takata and the vehicle manufacturers are using to "repair" recalled vehicles suffer from the same common, uniform defect that plagues the airbags being removed—they use unstable and dangerous ammonium nitrate as

the propellant within the inflator, a fact that Takata's representative admitted at a Congressional hearing in June 2015. At the Congressional hearing, the Takata representative repeatedly refused to provide assurances that Takata's replacement airbags are safe and defect-free.

28. Takata and the Vehicle Manufacturer Defendants knew or should have known that the Takata airbags installed in millions of vehicles were defective. Both Takata and the Vehicle Manufacturer Defendants, who concealed their knowledge of the nature and extent of the defect from the public while continuing to advertise their products as safe and reliable, have shown a blatant disregard for public welfare and safety. Moreover, the Vehicle Manufacturer Defendants have violated their affirmative duty, imposed under the Transportation Recall Enhancement, Accountability, and Documentation Act (the "TREAD Act"), to promptly advise customers about known defects.

29. The actions of Defendant Honda have been especially disturbing. Despite the shocking record of injuries and failures in Honda vehicles, Takata and Honda were slow to report the full extent of the danger to drivers and passengers, and they failed to issue appropriate recalls. Honda and Takata provided contradictory and inconsistent explanations to regulators for the Inflator Defect in Takata's airbags, which led to more confusion and delay. Indeed, the danger of defective airbags and the number of vehicles affected was concealed for years after it became apparent there was a potentially lethal problem. Although Takata and Honda repeatedly had actual knowledge and/or were on notice of, and failed to fully investigate, the problem and issue proper recalls, they allowed the problem to proliferate and cause numerous injuries and several deaths over the last 15 years.

30. Even before purchasing inflators from Takata, the Vehicle Manufacturer Defendants were aware that Takata used volatile and unstable ammonium nitrate as the primary

propellant in its inflators, and thus the Vehicle Manufacturer Defendants were on notice of the Inflator Defect even before they installed the inflators in their vehicles, because Takata reviewed the designs of the inflators with the Vehicle Manufacturers and the Vehicle Manufacturers approved the designs. The Vehicle Manufacturer Defendants were also put on notice of the Inflator Defect no later than 2008, when Honda first notified regulators of a problem with its Takata airbags. Because their vehicles also contained Takata airbags, the Vehicle Manufacturer Defendants knew or should have known at that time that there was a safety problem with their airbags, and the Vehicle Manufacturer Defendants should have launched their own investigations and notified their customers. That responsibility only grew as incidents multiplied.

31.     Instead, Defendants put profits ahead of safety. Takata cut corners to build cheaper airbags, and the Vehicle Manufacturer Defendants sold consumers vehicles that they knew or should have known contained those defective airbags. For several years Defendants engaged in a pattern of reckless disregard, deception, concealment, and obfuscation. Only relatively recently – on the heels of media scrutiny – have Defendants begun recalling the millions of vehicles in the United States with the Inflator Defect.

32.     As a result of Defendants' misconduct, Plaintiffs and members of the proposed Classes were harmed and suffered actual damages. The defective Takata airbags significantly diminish the value of the vehicles in which they are installed. Defendants' false representations and omissions concerning the safety and reliability of their vehicles, and their concealment of the known safety defects plaguing those vehicles and their brands, caused Plaintiffs and Class members to purchase and retain vehicles of diminished value. Now, such vehicles have been stigmatized as a result of being recalled and equipped with Takata airbags as well as by the widespread publicity of the Inflator Defect.

33.     Further, Plaintiffs and the Classes did not receive the benefit of their bargain; rather, they purchased vehicles that are of a lesser standard, grade, and quality than represented, and they did not receive vehicles that met ordinary and reasonable consumer and business expectations regarding safe and reliable operation. Purchasers of the Class Vehicles paid more than they would have had the Inflator Defect been disclosed. Defendants unjustly benefited from their unconscionable delay in recalling their defective products, as they avoided incurring the costs associated with recalls and installing replacement parts for many years.

34.     The defective Takata airbags create a dangerous condition that gives rise to a clear, substantial, and unreasonable danger of death or personal injury.

35.     Plaintiff Automotive Recyclers and members of the Classes purchased Class Vehicles and the defective Takata airbags contained in the vehicles, but are now unable to sell the airbags, which are essentially valueless. Had they known the truth about the problems associated with the Inflator Defect, the Automotive Recyclers and class members would not have purchased the Class Vehicles and airbags contained therein or would have paid a reduced amount. Moreover, Automotive Recyclers and class members have suffered economic injury as they incurred additional costs for identifying, storing, maintaining, or otherwise disposing of the defective Takata airbags.

## JURISDICTION AND VENUE

36.     Jurisdiction is proper in this Court pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because members of the proposed Plaintiff Class are citizens of states different from Defendants' home states, and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs. Also, jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1331, because Plaintiffs' RICO claims arise under federal law, and pursuant to 15 U.S.C. § 1121

for Plaintiffs' Lanham Act claims.  This Court has supplemental jurisdiction over Plaintiffs' state

law claims under 28 U.S.C. § 1367.

37.     This Court has personal jurisdiction over Plaintiffs because Plaintiffs submit to the

Court's jurisdiction.

38.     This Court has personal jurisdiction over Defendants pursuant to Florida Statutes §

48.193(1)(a)(1), (2), and (6), because they conduct substantial business in this District; some of

the actions giving rise to the Complaint took place in this District; and some of Plaintiffs' claims

arise out of Defendants operating, conducting, engaging in, or carrying on a business or business

venture in this state or having an office or agency in this state, committing a tortious act in this

state, and causing injury to property in this state arising out of Defendants' acts and omissions

outside this state; and at or about the time of such injuries Defendants were engaged in solicitation

or service activities within this state, or products, materials, or things processed, serviced, or

manufactured by Defendants anywhere were used or consumed within this state in the ordinary

course of commerce, trade, or use.  This Court also has personal jurisdiction over Defendants who

waived any right to contest personal jurisdiction by declining to raise an objection to personal

jurisdiction in their prior Rule 12 motions.  This Court also has personal jurisdiction over

Defendants because they consented to jurisdiction by registering to do business in Florida.  This

Court has pendant or supplemental personal jurisdiction over the claims of non-Florida Plaintiffs.

39.     This Court also has personal jurisdiction over the Defendants under 18 U.S.C. §

1965 because they are found or have agents or transact business in this District.

40.     This Court also has personal jurisdiction over the Defendants, because transferor

courts that have transferred actions to this MDL have general jurisdiction over the Defendants, and

this Court, under 28 U.S.C. § 1407, has personal jurisdiction over Defendants to the same extent

as any transferor court has personal jurisdiction over them. These transferor courts are located in the states in which each of the Defendants are respectively headquartered, and thus this Court may exercise general jurisdiction over Defendants. To the extent necessary for personal jurisdiction purposes, any claims asserted by non-Florida Plaintiffs in this First Amended Consolidated Class Action Complaint may be deemed to have been filed in a transferor court that may exercise personal jurisdiction over Defendants for such claims.

41.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a) because a substantial part of the events or omissions giving rise to these claims occurred in this District, Defendants have caused harm to Class members residing in this District, and Defendants are residents of this District under 28 U.S.C. § 1391(c)(2) because they are subject to personal jurisdiction in this district. Also, venue is proper in this district pursuant to 18 U.S.C. § 1965 and 28 U.S.C. § 1407.

## I.     **Vehicle Manufacturer Defendants**

42.     Defendant Honda Motor Co., Ltd. ("Honda Motor") is a foreign for-profit corporation with its principal place of business in Tokyo, Japan. Honda Motor manufactures and sells motorcycles, automobiles, and power products through independent retail dealers, outlets, and authorized dealerships primarily in Japan, North America, Europe, and Asia.

43.     Defendant American Honda Motor Co., Inc. ("American Honda") is a subsidiary of Honda Motor headquartered in Torrance, California. American Honda conducts the sale, marketing, and operational activities for Honda cars, trucks, sport utility vehicles, and automobile parts in the United States. American Honda manufactures and assembles its vehicles for sale in the United States in automobile plants located in Greensburg, Indiana; East Liberty, Ohio; Lincoln, Alabama; and Marysville, Ohio.

44.     Defendant Honda of America Mfg Inc. ("Honda Mfg") is an Ohio corporation with its principal place of business in Marysville, Ohio.  Honda Mfg is a subsidiary of Honda Motor.  Honda Mfg is involved in the design, manufacture, testing, marketing, distribution and sale of Honda vehicles in the United States, including those utilizing Takata airbags.

45.     Defendant Honda R&D Co. Ltd. ("Honda R & D") is a Japanese corporation with its principal place of business in Wako, Japan.  Honda R&D is a subsidiary of Honda Motor. Honda R&D is involved in the design, development, manufacture, assembly, testing, distribution and sale of Honda vehicles, including those utilizing Takata airbags.

46.     Defendants Honda Motor, Honda Mfg, Honda R&D, and American Honda are collectively referred to as "Honda" or "Honda Defendants."  Honda vehicles sold in the United States contain defective airbags manufactured by Takata.  The Honda Defendants deliver these products into the stream of commerce with the expectation that they will be purchased by consumers in the United States and the State of Florida.

47.     Defendant BMW of North America, LLC ("BMW North America") is a subsidiary of BMW AG and is headquartered in Woodcliff Lake, New Jersey.  BMW of North America is the United States importer of BMW vehicles.

48.     Defendant BMW Manufacturing Co., LLC ("BMW Manufacturing") is a Delaware limited liability company with its principal place of business in Spartanburg, South Carolina.  BMW Manufacturing is a subsidiary of BMW AG. BMW Manufacturing is involved in the design, manufacture and testing in the United States of BMW vehicles.

49.     Defendants BMW Manufacturing, and BMW North America are collectively referred to as "BMW" or "BMW Defendants."  BMW vehicles sold in the United States contain defective airbags manufactured by Takata.  The BMW Defendants deliver these products into the

stream of commerce with the expectation that they will be purchased by consumers in the United States and the State of Florida.

50.     FCA US LLC ("New Chrysler"), formerly known as Chrysler Group LLC, is a Delaware limited liability company with its principal place of business located at 1000 Chrysler Drive, Auburn Hills, Michigan and New Chrysler is a citizen of the States of Delaware and Michigan.  The sole owner of New Chrysler is Fiat Chrysler Automobiles N.V., a public limited liability company incorporated under the laws of the Netherlands with its principal place of business located in London, United Kingdom.

51.     New Chrysler was created on or about June 1, 2009, in connection with the sale of substantially all of the assets of Chrysler LLC ("Old Chrysler"), pursuant to a Sale Motion and Purchase Agreement ("Chrysler Sale Agreement") approved by the United States Bankruptcy Court for the Southern District of New York under Section 363 of the U.S. Bankruptcy Code (the "Chrysler 363 Sale").  As a result of the Chrysler 363 Sale, New Chrysler acquired substantially all of Old Chrysler's books, records, and personnel and knowledge of the defective Takata airbags those books, records, and personnel held.  New Chrysler also took responsibility for any necessary recalls of both New and Old Chrysler vehicles going forward.  The causes of action in this Complaint against New Chrysler are directed solely to New Chrysler and are based solely on New Chrysler's wrongful conduct.

52.     Chrysler vehicles sold in the United States by New Chrysler contain defective airbags manufactured by Takata.  New Chrysler delivers these products into the stream of commerce with the expectation that they will be purchased by consumers in the United States and the State of Florida.

53.     General Motors LLC ("New GM") is a Delaware limited liability company with its principal place of business located at 300 Renaissance Center, Detroit, Michigan, and is a citizen of the States of Delaware and Michigan.  The sole member and owner of New GM is General Motors Holdings LLC.

54.     General Motors Holdings LLC ("GM Holdings") is a Delaware limited liability company with its principal place of business in Detroit, Michigan, and is a citizen of the States of Delaware and Michigan.  The sole member and owner of GM Holdings is General Motors Company.

55.     General Motors Company ("GM Parent") is a Delaware corporation with its principal place of business in Detroit, Michigan, and is a citizen of the States of Delaware and Michigan.  GM Parent's only asset is 100% ownership interest in GM Holdings.  In SEC filings, GM Parent states: "We [defined as GM Parent] design, build and sell cars, trucks, crossovers and automobile parents worldwide."  According to SEC filings, GM Parent sells vehicles "through [its] dealer network to retail customers."  As stated in SEC filings, GM Parent is also responsible for determining when a recall should be conducted and for making reports to NHTSA.

56.     GM Parent and GM Holdings have complete domination and control over New GM.

57.     New GM, GM Parent, and GM Holdings are collectively referred to as the "GM Defendants."

58.     The GM Defendants were created on or about July 10, 2009, in connection with the sale of substantially all of the assets of General Motors Corporation ("Old GM") pursuant to a Master Sale and Purchase Agreement ("GM Sale Agreement") approved by the United States Bankruptcy Court for the Southern District of New York under Section 363 of the U.S. Bankruptcy

Code (the "GM 363 Sale"). As a result of the GM 363 Sale, New GM acquired substantially all of Old GM's books, records, and personnel, including Rita Kauppi (Global Commodity Manager for Airbags), Leo Knowlden (Lead Engineer for Inflators), and Tony Popovski (Global Purchasing Manager for Airbags)—all of whom had specific knowledge of the defective Takata airbags. New GM then transferred some of these assets to GM Holdings. Defendants thereby acquired from Old GM knowledge about the defective Takata airbags that those books, records, and personnel held. GM Parent and New GM also took responsibility for any necessary recalls of both New and Old GM vehicles going forward. The causes of action in this Complaint against the GM Defendants are directed solely to GM Parent, GM Holdings, and New GM and are based solely on their wrongful conduct.

59.     GM vehicles sold in the United States by the GM Defendants contain defective airbags manufactured by Takata. The GM Defendants delivered these products into the stream of commerce with the expectation that they will be purchased by consumers in the United States and the State of Florida.

60.     Defendant Mazda Corporation, along with its subsidiaries, develops, manufactures, and sells automotive vehicles worldwide. Mazda's global headquarters are located in Hiroshima, Japan.

61.     Defendant Mazda Motor of America, Inc. doing business as Mazda North American Operations ("Mazda North American"), a subsidiary of Mazda, is a California corporation with its corporate headquarters located in Irvine, California. Mazda North American is responsible for the distribution, marketing and sales of Mazda brand automobiles in the United States.

62.     Defendants Mazda and Mazda North American are collectively referred to as "Mazda" or the "Mazda Defendants." Mazda vehicles sold in the United States contain defective

airbags manufactured by Takata. The Mazda Defendants deliver these products into the stream of commerce with the expectation that they will be purchased by consumers in the United States and the State of Florida.

63.    Mercedes-Benz USA, LLC ("MBUSA") is a Delaware limited liability corporation, whose principal place of business is 303 Perimeter Center North, Suite 202, Atlanta, Georgia 30346. Until approximately July 2015, Mercedes's principal place of business was 1 Mercedes Drive, Montvale, New Jersey 07645. Daimler AG is the parent corporation of MBUSA. Daimler AG and MBUSA are collectively referred to as "Mercedes" or "Mercedes Defendants." The Mercedes Defendants engineered, designed, developed, manufactured, or installed the Defective Airbags in the Mercedes-branded Class Vehicles, and approved the Defective Airbags for use in those vehicles. The Mercedes Defendants deliver these products into the stream of commerce with the expectation that they will be purchased by consumers in the United States and the State of Florida.They also developed, reviewed, and approved the marketing and advertising campaigns designed to sell these Class Vehicles.

64.    Defendant Nissan Motor Company, Ltd. ("Nissan"), along with its subsidiaries, develops, manufactures, and sells automotive vehicles worldwide. Nissan's global headquarters are located in Yokohama, Japan.

65.    Defendant Nissan North America, Inc. ("Nissan North America"), a subsidiary of Nissan, is a California corporation with its corporate headquarters located in Franklin, Tennessee. Nissan North America is responsible for the distribution, marketing and sales of Nissan and Infiniti brand automobiles in the United States.

66.    Defendants Nissan and Nissan North America are collectively referred to as "Nissan" or the "Nissan Defendants." Nissan vehicles sold in the United States contain defective

airbags manufactured by Takata. The Nissan Defendants deliver these products into the stream of commerce with the expectation that they will be purchased by consumers in the United States and the State of Florida.

67. Defendant Fuji Heavy Industries ("Fuji"), the parent company of Subaru, is a transportation conglomerate. Along with its subsidiaries, Fuji develops, manufactures, and sells automotive vehicles worldwide. Fuji's global headquarters are located in Tokyo, Japan.

68. Defendant Subaru of America, Inc. ("Subaru America"), a subsidiary of Fuji, is a New Jersey corporation with its corporate headquarters located in Cherry Hill, New Jersey. Subaru of America is responsible for the distribution, marketing and sales of Subaru brand automobiles in the United States.

69. Defendants Fuji and Subaru America are collectively referred to as "Subaru" or the "Subaru Defendants." Subaru vehicles sold in the United States contain defective airbags manufactured by Takata. The Subaru Defendants deliver these products into the stream of commerce with the expectation that they will be purchased by consumers in the United States and the State of Florida.

70. Defendant Toyota Motor Corporation ("Toyota") is the world's largest automaker and the largest seller of automobiles in the United States. Toyota is a Japanese Corporation headquartered in Toyota City, Aichi Prefecture, Japan.

71. Defendant Toyota Motor Sales, U.S.A., Inc. ("Toyota U.S.A.") is a wholly-owned subsidiary of Toyota Motor Corporation and is responsible for the marketing, sales, and distribution in the United States of automobiles manufactured by Toyota Motor Corporation. Toyota U.S.A. is headquartered in Torrance, California and is a subsidiary of Toyota Motor Corporation.

72. Toyota Motor Engineering & Manufacturing North America, Inc. ("TEMA") is headquartered in Erlanger, Kentucky with major operations in Arizona, California, and Michigan. TEMA is responsible for Toyota's engineering design and development, research and development, and manufacturing activities in the U.S., Mexico, and Canada. TEMA is a subsidiary of Toyota Motor Corporation.

73. Defendants Toyota, Toyota U.S.A., and TEMA are collectively referred to as "Toyota" or the "Toyota Defendants." Toyota vehicles sold in the United States contain defective airbags manufactured by Takata. The Toyota Defendants deliver these products into the stream of commerce with the expectation that they will be purchased by consumers in the United States and the State of Florida.

74. Volkswagen Group of America ("VW America") is a New Jersey corporation doing business throughout the United States. VW America's corporate headquarters is located in Herndon, Virginia. VW America is a wholly-owned U.S. subsidiary of VW AG, and it engages in business activities in furtherance of the interests of VW AG, including the advertising, marketing and sale of Volkswagen automobiles worldwide.

75. Audi of America, LLC ("Audi America") is a Delaware limited liability company, with its principal place of business located at 2200 Ferdinand Porsche Drive, Herndon, Virginia 20171. Audi America is a wholly-owned U.S. subsidiary of Audi AG, and it engages in business, including the advertising, marketing and sale of Audi automobiles, in all 50 states.

76. As used in this Complaint, "Audi" and "Audi Defendants" refers to Audi AG and Audi America. "Volkswagen" and "Volkswagen Defendants" refers to VW AG, VW America, Audi AG, and Audi America.

77.     The Volkswagen Defendants engineered, designed, developed, manufactured, or installed the Defective Airbags in the Volkswagen- and Audi-branded Class Vehicles (defined below), and approved the Defective Airbags for use in those vehicles. The Volkswagen Defendants deliver these products into the stream of commerce with the expectation that they will be purchased by consumers in the United States and the State of Florida.  They also developed, reviewed, and approved the marketing and advertising campaigns designed to sell these Class Vehicles.

78.     Collectively, these parties are referred to as the "Vehicle Manufacturer Defendants."

79.     New GM is in the business of designing, developing, manufacturing, marketing, and selling automobiles in the United States, including in Florida.  New GM and its affiliates sold more than 2.8 million vehicles in the United States in 2019 alone, generating more than $80 billion in revenue.  Florida is a significant market for New GM and it generates a substantial percentage of its revenue from the sale of its vehicles in Florida.

80.     During the relevant time period, New GM has continuously registered to do business in Florida and has appointed a registered agent in Florida.  It most recently renewed its registration by filing an annual report on January 14, 2020, with the Florida Department of State, Division of Corporations, identifying Corporation Service Company of Tallahassee, Florida as its registered agent, and Dhivya Suryadevara, Rick Hansen, and Mark Reuss as "authorized persons" and managers.

81.     New GM established channels for marketing Class Vehicles and providing regular advice to owners and lessees of Class Vehicles, including Plaintiffs, in the United States and this District by licensing its trademarks to dealerships and authorizing dealerships to sell New GM vehicles.  There are more than fifteen New GM-authorized dealerships in Florida that sell new, used, and New GM-Certified Pre-Owned vehicles.

82.  New GM created or controlled the distribution network that brought Class Vehicles, including Plaintiffs' vehicles, to Florida.

83.  New GM provided information to train personnel in the United States, including in Florida, in the repair, servicing, and preparation of Class Vehicles, including Plaintiffs' Vehicles.

84.  New GM Class Vehicles, including Plaintiffs' vehicles, were the subject of nationwide advertising campaigns that were intended to reach and did reach Florida, that advertised and promoted the alleged safety of Class Vehicles, and that were controlled, directed, funded, and/or approved by New GM.  New GM directed and approved the publication and distribution of these advertisements toward Florida consumers and Plaintiffs, with the intent and knowledge that they would reach consumers, including Class Members, in Florida, via television, print publications, and the internet.  None of these advertisements or marketing materials disclosed that Plaintiffs' vehicles or Class Vehicles were equipped with defective Takata inflators.

85.  During the relevant time period, New GM regularly communicated with authorized dealerships in the United States, including in Florida, to facilitate the sale and service of Class Vehicles, including Plaintiffs' vehicles, in the United States, including in Florida.

86.  During the relevant time period, employees of New GM regularly travelled to Florida to facilitate the sale and service of Class Vehicles, including Plaintiffs' vehicles, in Florida.

87.  New GM's website, during the relevant time period, has been accessible and accessed in Florida by Class Members.  This website solicits the sale of New GM vehicles and connects customers with New GM-authorized dealers in the United States, including in Florida.

88.  New GM solicited the sale or lease of Class vehicles, including Plaintiffs' vehicles, in Florida.  New GM also markets vehicles in Florida by regularly attending trade shows in Florida every year.

89.  New GM has engaged in substantial business in Florida—among other things, advertising, selling, and servicing the models of vehicles that Plaintiffs here claim are defective.

90.     New GM encourages a resale market for its vehicles in Florida: almost all of its authorized dealerships buy and sell used Chevrolet, GM, Cadillac, Saab, and GMC vehicles, as well as selling new ones.

91.     New GM engages in wide-ranging promotional activities, including television, print, online, and direct-mail advertisements in Florida.  By every means imaginable—among them billboards, TV and radio spots, print ads, and direct mail—New GM urges residents of Florida to buy its vehicles, including the Class Vehicles.  This creates a market for New GM vehicles in Florida.

92.     Chevrolet, GM, Cadillac, Saab, and GMC vehicles—including the Class Vehicles—are available for sale, whether new or used, throughout Florida.

93.     New GM provides original parts to its dealerships, auto supply stores, and repair shops in Florida to ensure that consumers can keep their vehicles running long past the date of sale.

94.     New GM's own network of dealers offers an array of maintenance and repair services, thus fostering an ongoing relationship between New Chrysler and its customers.  There are at least 56 New GM-authorized dealerships in Florida, all of which sold new and used Class Vehicles to Florida Class Members.

95.     Florida Plaintiffs suffered economic harm, loss, and damages in Florida as a result of purchasing Class Vehicles in Florida.

96.     During the relevant time period, employees of New GM travelled to Florida to discuss, investigate, and evaluate PSAN inflators with Takata entities and investigate reported rupture and aggressive deployment events.

97.     New GM marketed Class Vehicles, including Plaintiffs' vehicles, through affiliated distributors, which agreed to serve as sales agents for New GM in the United States and this District.

98.     New GM, directly or indirectly through agreements with affiliated financial service providers, such as General Motors Financial Company, Inc., engaged in the financing of

authorized dealerships throughout the United States and this District, including the authorized dealerships that sold Class Vehicles to Plaintiffs.

99.     During the relevant period, New GM regularly transported and distributed for sale tens of thousands of Class Vehicles to authorized dealerships in Florida to facilitate the sale of such Class Vehicles to consumers in Florida.

100.    During the relevant period, New GM created, managed, marketed, and directed the New GM-Certified Pre-Owned Vehicle program, through its continuous contacts with authorized dealerships around the country and in Florida, to encourage consumers, including Class Members, to purchase used Class Vehicles from New GM-authorized dealerships.

101.    New GM distributed Class Vehicles in the United States and Florida with "Monroney" labels that described the equipment and features of the vehicles, knowing that New GM-authorized dealers would then sell Class Vehicles, both new and used, to consumers with these labels visible. Upon information and belief, Monroney labels for many of the Class Vehicles are available at https://monroneylabels.com/. The Monroney labels, which New GM caused to be drafted, uniformly and misleadingly assured consumer that Class Vehicles had working airbags. This information would have suggested to any reasonable consumer that the Takata airbags installed in the Class Vehicles did not suffer from a defect and would perform their intended function during a collision.

102.    To facilitate the sale and service of Class Vehicles in Florida, New GM directly or indirectly operates a 362,000 square foot parts distribution center, with numerous employees, in Jacksonville, Florida.

103.    During the relevant time period, New GM has registered and maintained registrations with the United States government for trademarks associated with its New GM-branded vehicles and parts, which it uses to identify and distinguish its vehicles and parts in the United States and this District.

104. New GM, with the assistance of retained vendors, tracks the registration of Class Vehicles in the United States, including in Florida, to facilitate its communication with customers, including Plaintiffs and Class Members in Florida.

105. New Chrysler is in the business of designing, developing, manufacturing, marketing, and selling automobiles in the United States, including in Florida. New Chrysler and its affiliates sold more than 2 million vehicles in the United States in 2019 alone, generating more than $50 billion in revenue. Florida is a significant market for New Chrysler and it generates a substantial percentage of its revenue from the sale of its vehicles in Florida.

106. During the relevant time period, New Chrysler has continuously registered to do business in Florida and has appointed a registered agent in Florida. It most recently renewed its registration by filing an annual report on May 11, 2020, with the Florida Department of State, Division of Corporations, identifying CT Corporation System of Plantation, Florida as its registered agent, and Richard Palmer, Mark Stewart, and Michael Manley as "authorized persons" and managers.

107. New Chrysler established channels for marketing Class Vehicles and providing regular advice to owners and lessees of Class Vehicles, including Plaintiffs, in the United States and this District by licensing its trademarks to dealerships and authorizing dealerships to sell New Chrysler vehicles.

108. New Chrysler created or controlled the distribution network that brought Class Vehicles, including Plaintiffs' vehicles, to Florida. There are more than ten New Chrysler-authorized dealerships in Florida that sell new, used, and New Chrysler-Certified Pre-Owned vehicles.

109. New Chrysler provided information to train personnel in the United States, including in Florida, in the repair, servicing, and preparation of Class Vehicles, including Plaintiffs' Vehicles.

110. New Chrysler Class Vehicles, including Plaintiffs' vehicles, were the subject of nationwide advertising campaigns that were intended to reach and did reach Florida, that

- 24 -

advertised and promoted the alleged safety of Class Vehicles, and that were controlled, directed, funded, and/or approved by New Chrysler. New Chrysler directed and approved the publication and distribution of these advertisements toward Florida consumers and Plaintiffs, with the intent and knowledge that they would reach consumers, including Class Members, in Florida, via television, print publications, and the internet. None of these advertisements or marketing materials disclosed that Plaintiffs' vehicles or Class Vehicles were equipped with defective Takata inflators.

111.     During the relevant time period, New Chrysler regularly communicated with authorized dealerships in the United States, including in Florida, to facilitate the sale and service of Class Vehicles, including Plaintiffs' vehicles, in the United States, including in Florida.

112.     During the relevant time period, employees of New Chrysler regularly travelled to Florida to facilitate the sale and service of Class Vehicles, including Plaintiffs' vehicles, in Florida.

113.     New Chrysler's website, during the relevant time period, has been accessible and accessed in Florida by Class Members. This website solicits the sale of New Chrysler vehicles and connects customers with New Chrysler-authorized dealers in the United States, including in Florida.

114.     New Chrysler solicited the sale or lease of Class vehicles, including Plaintiffs' vehicles, in Florida. New Chrysler also markets vehicles in Florida by regularly attending trade shows in Florida every year.

115.     New Chrysler has engaged in substantial business in Florida—among other things, advertising, selling, and servicing the models of vehicles that Plaintiffs here claim are defective.

116.     New Chrysler encourages a resale market for its vehicles in Florida: almost all of its authorized dealerships buy and sell used Chrysler, Dodge, and Jeep vehicles, as well as selling new ones.

117.     New Chrysler engages in wide-ranging promotional activities, including television, print, online, and direct-mail advertisements in Florida.  By every means imaginable— among them billboards, TV and radio spots, print ads, and direct mail— New Chrysler urges residents of Florida to buy its vehicles, including the Class Vehicles.

118.     Chrysler, Dodge, and Jeep vehicles—including the Class Vehicles—are available for sale, whether new or used, throughout Florida.

119.     New Chrysler provides original parts to its dealerships, auto supply stores, and repair shops in Florida to ensure that consumers can keep their vehicles running long past the date of sale.

120.     New Chrysler's own network of dealers offers an array of maintenance and repair services, thus fostering an ongoing relationship between New Chrysler and its customers. There are at least 69 New Chrysler-authorized dealerships in Florida, all of which sold new and used Class Vehicles to Florida Class Members.

121.     Florida Plaintiffs suffered economic harm, loss, and damages in Florida as a result of purchasing Class Vehicles in Florida.

122.     During the relevant time period, employees of New Chrysler travelled to Florida to discuss, investigate, and evaluate PSAN inflators with Takata entities and investigate reported rupture and aggressive deployment events.

123.     New Chrysler marketed Class Vehicles, including Plaintiffs' vehicles, through affiliated distributors, which agreed to serve as sales agents for New Chrysler in the United States and this District.

124.     New Chrysler, directly or indirectly through agreements with financial service providers, engaged in the financing of authorized dealerships throughout the United States and this District, including the authorized dealerships that sold Class Vehicles to Plaintiffs.

125.     During the relevant period, New Chrysler regularly transported and distributed for sale tens of thousands of Class Vehicles to authorized dealerships in Florida to facilitate the sale of such Class Vehicles to consumers in Florida.

126.     During the relevant period, New Chrysler created, managed, marketed, and directed the Chrysler-Certified Pre-Owned Vehicle program, through its continuous contacts with authorized dealerships around the country and in Florida, to encourage consumers, including Class Members, to purchase used Class Vehicles from New Chrysler-authorized dealerships.

127.     New Chrysler distributed Class Vehicles in the United States and Florida with "Monroney" labels that described the equipment and features of the vehicles, knowing that New Chrysler-authorized dealers would then sell Class Vehicles, both new and used, to consumers with these labels visible. Upon information and belief, Monroney labels for many of the Class Vehicles are available at https://monroneylabels.com/. The Monroney labels, which New Chrysler caused to be drafted, uniformly and misleadingly assured consumer that Class Vehicles had working airbags. This information would have suggested to any reasonable consumer that the Takata airbags installed in the Class Vehicles did not suffer from a defect and would perform their intended function during a collision.

128.     To facilitate the sale and service of Class Vehicles in Florida, New Chrysler directly or indirectly operates a parts distribution center, with numerous employees, in Orlando, Florida.

129.     During the relevant time period, New Chrysler has registered and maintained registrations with the United States government for trademarks associated with its New Chrysler-branded vehicles and parts, which it uses to identify and distinguish its vehicles and parts in the United States and this District.

130.     New Chrysler, with the assistance of retained vendors, tracks the registration of Class Vehicles in the United States, including in Florida, to facilitate its communication with customers, including Plaintiffs and Class Members in Florida.

131.     The Volkswagen Defendants engineered, designed, developed, manufactured, or installed the Defective Airbags in the Volkswagen- and Audi-branded Class Vehicles (defined below), and approved the Defective Airbags for use in those vehicles. They also developed,

reviewed, and approved the marketing and advertising campaigns designed to sell these Class Vehicles in the United States and Florida.

132.    In 2018 alone, the Volkswagen Defendants sold more than 620,000 vehicles in the United States, generating more than $20 billion in revenue.  The Volkswagen Defendants sold more than 1,000,000 Class Vehicles in the United States equipped with Defective Airbags.

133.    Volkswagen has engaged in substantial business in Florida—among other things, advertising, selling, and servicing the models of vehicles that Plaintiffs here claim are defective.

134.    Volkswagen encourages a resale market for its vehicles in Florida: almost all of its authorized dealerships buy and sell used VW and Audi vehicles, as well as selling new ones.

135.    Volkswagen engages in wide-ranging promotional activities, including television, print, online, and direct-mail advertisements in Florida.  By every means imaginable—among them billboards, TV and radio spots, print ads, and direct mail— Volkswagen urges residents Florida to buy its vehicles, including the Class Vehicles.

136.    VW and Audi cars—including the Class Vehicles—are available for sale, whether new or used, throughout the Florida.

137.    Volkswagen provides original parts to its dealerships, auto supply stores, and repair shops in Florida to ensure that consumers can keep their vehicles running long past the date of sale.

138.    Volkswagen's own network of dealers offers an array of maintenance and repair services, thus fostering an ongoing relationship between Volkswagen and its customers. There are at least 42 Volkswagen- or Audi-authorized dealerships in Florida, all of which sold new and used Class Vehicles.

139.    Florida Plaintiffs suffered economic harm, loss, and damages in Florida as a result of purchasing the VW and Audi Class Vehicles in Florida.

140.    The Volkswagen Defendants developed the owner's manuals, warranty booklets, product brochures, advertisements, and other promotional materials relating to the VW

and Audi Class Vehicles sold in the United States, with the intent that these documents would be distributed in all 50 states and caused those materials to be disseminated throughout the United States and Florida.

141.    The Volkswagen Defendants acknowledged in a recent annual report that the United States is a key sales market for Volkswagen vehicles. Volkswagen's sales in the United States and Florida are voluntary, intentional, and regular.

142.    The Volkswagen Defendants designed and/or manufactured the Class Vehicles, including Plaintiffs' vehicles, for sale in the United States and Florida. The United States and its constituent states have a collection of federal and state laws that require manufacturers to build their passenger vehicles specifically to meet the standards established by those laws. The Volkswagen Defendants specifically designed Plaintiffs' Audi and VW Class Vehicles to meet federal and state regulations and standards, including the Federal Motor Vehicle Safety Standards.

143.    The Volkswagen Defendants certified to U.S. government officials that Audi and VW Class Vehicles met U.S. federal requirements and standards so that the vehicles could be sold in the United States and Florida. Employees of the Volkswagen Defendants or their related entities also affixed labels to the engines of Audi and VW Class Vehicles to disclose to U.S. Customs and Border Protection agents that the vehicles were covered by valid certificates for the United States.

144.    The Volkswagen Defendants established channels for marketing Class Vehicles and providing regular advice to owners and lessees of Class Vehicles, including Plaintiffs, in the United States and Florida, by licensing their trademarks to dealerships and authorizing dealerships to sell their vehicles.

145.    The Volkswagen Defendants marketed Class Vehicles, including Plaintiffs' vehicles, through affiliated distributors, in the United States and Florida.

146.    The Volkswagen Defendants directly or indirectly, engaged in the financing of authorized dealerships throughout the United States and Florida.

147. The Volkswagen Defendants created or controlled the distribution network that brought Class Vehicles, including Plaintiffs' vehicles, to the United States and Florida. The Volkswagen Defendants regularly transported and distributed for sale tens of thousands of Class Vehicles to authorized dealerships in United States and Florida to facilitate the sale of such Class Vehicles to consumers in United States and Florida.

148. The Volkswagen Defendants were involved in providing information to train personnel in the United States and Florida in the repair, servicing, and preparation of Class Vehicles, including Plaintiffs' Vehicles.

149. VW and Audi Class Vehicles, including Plaintiffs' vehicles, were the subject of nationwide advertising campaigns that were intended to reach and did reach Florida, that advertised and promoted the alleged safety of Class Vehicles, and that were controlled, directed, funded, and/or approved by the Volkswagen Defendants. None of these advertisements or marketing materials disclosed that Plaintiffs' vehicles or Class Vehicles were equipped with defective Takata inflators.

150. From 2004 through the present, the Volkswagen Defendants regularly communicated with authorized dealerships in the United States and Florida to facilitate the sale and service of Class Vehicles, including Plaintiffs' vehicles, in the United States and Florida. The Volkswagen Defendants managed, marketed, and directed the VW- and Audi-Certified Pre-Owned Vehicle programs, through their continuous contacts with authorized dealerships in the United States and Florida to encourage consumers, including Class Members, to purchase used Class Vehicles from VW- and Audi-authorized dealerships.

151. From 2004 through the present, employees of the Volkswagen Defendants regularly travelled throughout the United States and Florida to facilitate the sale and service of Class Vehicles, including Plaintiffs' vehicles, in the United States and Florida.

152. The websites Volkswagen and Audi, from 2005 through the present, have been accessible and accessed in the United States and Florida. These websites solicit the sale of VW and Audi vehicles and connect U.S. customers with VW and Audi authorized dealers.

153.     Volkswagen Defendants solicited the sale or lease of Class vehicles, including Plaintiffs' vehicles, in the United States and Florida.  Volkswagen Defendants also market vehicles in the United States and Florida by regularly attending trade shows in the United States and Florida every year.

154.     Volkswagen and Audi entities have, as recently as 2018, brought litigation in U.S. courts to protect their "distinctive and world-famous trademarks" from infringement and counterfeiting.  The protection afforded their trademarks and patents under U.S. law enabled Volkswagen to sell Class Vehicles in the United States and Florida.

155.     In a recent complaint to enforce its trademark rights, an Audi entity represented that it "sells Audi automobiles and genuine parts and accessories through a network of licensed Audi dealerships."  It also conceded that it operates an interactive website through which consumers can purchase accessories and parts directly from Audi.

156.     From 1960 through the present, an Audi entity has registered and maintained registrations with the U.S. government for trademarks associated with its vehicles and parts, which it uses to identify and distinguish its vehicles and parts in the United States and Florida.

157.     Volkswagen admitted in a recent trademark infringement complaint that it sells VW automobiles through a network of licensed VW dealerships, and that it operates an interactive website through which consumers can purchase goods and parts.

158.     From 1957 through the present, a Volkswagen entity has registered and maintained registrations with the U.S. government for trademarks associated with its vehicles and parts, which it uses to identify and distinguish its vehicles and parts in the United States. Volkswagen considers the "VW brand" to be a core component of the company, and claims that the "Audi and VW Marks are invaluable assets of substantial and inestimable worth to Audi and VW."

159.     The Volkswagen Defendants use the VW and Audi trademarks to promote the sale of VW and Audi vehicles in the United States and Florida.

160.     Mercedes-Benz USA, LLC ("MBUSA") is a Delaware limited liability corporation, whose principal place of business is 303 Perimeter Center North, Suite 202, Atlanta, Georgia 30346. Until approximately July 2015, Mercedes's principal place of business was 1 Mercedes Drive, Montvale, New Jersey 07645. MBUSA is a wholly owned subsidiary of Daimler Aktiengesellschaft ("Daimler AG") and engages in business, including the advertising, marketing, and sale of Mercedes-Benz automobiles, including Class Vehicles, in all 50 states, in furtherance of the interests of Daimler AG. MBUSA employs over 1,600 workers in the U.S. MBUSA is Daimler AG's principal North American subsidiary. MBUSA renders services on behalf of Daimler AG that are sufficiently important to Daimler AG and its sale of vehicles in the United States that Daimler AG would perform those services itself if MBUSA did not exist. In consumer transactions, like those with Plaintiffs, Daimler AG's unified brand and logo serve as its and MBUSA's official seal and signature as to consumers.

161.     There are approximately 380 authorized Mercedes dealerships in the U.S. In fiscal year 2018 alone, MBUSA sold more than 320,000 vehicles in the United States, generating more than $10 billion in revenue. And MBUSA sold more than 1 million Class Vehicles in the United States equipped with Defective Airbags.

162.     MBUSA has engaged in substantial business in Florida—among other things, advertising, selling, and servicing the models of vehicles that Plaintiffs here claim are defective.

163.     MBUSA encourages a resale market for its vehicles in Florida: almost all of its authorized dealerships buy and sell used Mercedes vehicles, as well as selling new ones.

164.     MBUSA engages in wide-ranging promotional activities, including television, print, online, and direct-mail advertisements in Florida. By every means imaginable—among them billboards, TV and radio spots, print ads, and direct mail—MBUSA urges residents of Florida to buy its vehicles, including the Class Vehicles.

165.     Mercedes cars—including the Class Vehicles—are available for sale, whether new or used, throughout Florida.

166.     MBUSA provides original parts to its dealerships, auto supply stores, and repair shops in Florida to ensure that consumers can keep their vehicles running long past the date of sale.

167.     MBUSA's own network of dealers offers an array of maintenance and repair services, thus fostering an ongoing relationship between MBUSA and its customers.  There are at least 30 Mercedes-authorized dealerships in Florida, all of which sold new and used Class Vehicles to Florida Class Members.

168.     Florida Plaintiffs suffered economic harm, loss, and damages in Florida as a result of purchasing the Mercedes Class Vehicles in Florida.

169.     MBUSA and its related entities are collectively referred to as "Mercedes." Mercedes holds itself out as Mercedes-Benz, a single entity that caters to American consumers and purposely avails itself of the United States market for automobiles.  Mercedes also advertises its connection to Florida on its website, representing that its Jacksonville, Florida parts distribution center "supports dealers in the region with parts supply and houses parts inventory."

170.     Mercedes engineered, designed, developed, manufactured, or installed the Defective Airbags in the Mercedes-branded Class Vehicles, and approved the Defective Airbags for use in those vehicles and for sale in the United States and Florida. MBUSA also developed, reviewed, and approved the marketing and advertising campaigns designed to sell these Class Vehicles in the United States and Florida.

171.     MBUSA developed the owner's manuals, warranty booklets, product brochures, advertisements, and other promotional materials relating to the Mercedes Class Vehicles sold in the United States, with the intent that these documents would be distributed in all 50 states and caused those materials to be disseminated throughout the United States and Florida.

172.     MBUSA acknowledged in a recent annual report that the United States is a key sales market for it.  MBUSA's sales in the United States and Florida are voluntary, intentional, and regular.

173.     Mercedes designed and/or manufactured the Class Vehicles, including Plaintiffs' vehicles, for sale in the United States and Florida.  The United States and its constituent states have a collection of federal and state laws that require manufacturers to build their passenger vehicles specifically to meet the standards established by those laws.  Mercedes specifically designed Plaintiffs' Mercedes Class Vehicles to meet federal and state regulations and standards, including the Federal Motor Vehicle Safety Standards.

174.     Mercedes supervisors certified to U.S. government officials that Mercedes Class Vehicles met U.S. federal requirements and standards so that the vehicles could be sold in the United States.  Mercedes employees also affixed labels to the engines of Mercedes Class Vehicles to disclose to U.S. Customs and Border Protection agents that the vehicles were covered by valid certificates for the United States.

175.     MBUSA established channels for marketing Class Vehicles and providing regular advice to owners and lessees of Class Vehicles, including Plaintiffs, in the United States and Florida by licensing its trademarks to dealerships and authorizing dealerships to sell its vehicles.

176.     MBUSA marketed Class Vehicles, including Plaintiffs' vehicles, through affiliated distributors in the United States and Florida.  MBUSA also markets vehicles in the United States and Florida by regularly attending trade shows in the United States and Florida every year.

177.     MBUSA, directly or indirectly, engaged in the financing of authorized dealerships throughout the United States and Florida.

178.     MBUSA created or controlled the distribution network, including the 380 authorized dealerships, that brought Class Vehicles, including Plaintiffs' vehicles, to the United States and Florida for sale or lease.  MBUSA regularly transported and distributed for sale tens of thousands of Class Vehicles to authorized dealerships in United States and Florida to facilitate the sale of such Class Vehicles to consumers in United States and Florida.

179.    MBUSA was involved in providing information to train personnel in the United States and Florida in the repair, servicing, and preparation of Class Vehicles, including Plaintiffs' Vehicles.

180.    Mercedes Class Vehicles, including Plaintiffs' vehicles, were the subject of nationwide advertising campaigns that were intended to reach and did reach Florida, that advertised and promoted the alleged safety of Class Vehicles, and that were controlled, directed, funded, and/or approved by MBUSA.  None of these advertisements or marketing materials disclosed that Plaintiffs' vehicles or Class Vehicles were equipped with defective Takata inflators.

181.    From 2004 through the present, MBUSA regularly communicated with authorized dealerships in the United States and Florida to facilitate the sale and service of Class Vehicles, including Plaintiffs' vehicles, in the United States and Florida.  MBUSA, managed, marketed, and directed the Mercedes-Benz Certified Pre-Owned Vehicle program, through their continuous contacts with authorized dealerships in the United States and Florida, to encourage consumers, including Class Members, to purchase used Class Vehicles from Mercedes-authorized dealerships.

182.    From 2004 through the present, employees, managers, and officers of MBUSA regularly travelled throughout the United States and Florida to facilitate the sale and service of Mercedes vehicles, including Class Vehicles and Plaintiffs' vehicles, in the United States and Florida.

183.    The Mercedes website, from 2005 through the present, has been accessible and accessed in the United States and Florida.  The website solicits the sale of Mercedes vehicles and connects U.S. customers with Mercedes authorized dealers.

184.    MBUSA solicited the sale or lease of Class vehicles, including Plaintiffs' vehicles, in the United States and Florida.

185.    Mercedes entities have, at least as recently as 2016, brought litigation in U.S. courts to protect Mercedes trademarks from infringement and counterfeiting.  The protection

afforded its trademarks and patents under U.S. law enabled Mercedes to sell Class Vehicles in the United States, this District and Florida.

186.    A Mercedes entity owns all rights, title, and interest in U.S. Trademark Registration No. 657,386 for MERCEDES-BENZ, which is a word mark for goods including automobiles, motor trucks, and parts thereof.  The MERCEDES-BENZ Mark was registered on January 21, 1958 based on a corresponding German trademark registered on October 10, 1927.  A Mercedes entity also has registered and maintains registration with the U.S. government trademarks for the design of its distinctive emblem, the three-pointed star.

187.    In a recent complaint to enforce its trademark rights, Mercedes conceded its direct role in controlling advertisements and marketing of its vehicles in the United States, stating that it has "expended millions of dollars in advertising across the country in connection with the MERCEDES-BENZ Mark," which has "established the MERCEDES-BENZ mark as famous and/or well-known among U.S. purchasers of motor vehicles and wheels, as well as among the general members of the U.S. public."

188.    Mercedes licenses the use of the Mercedes trademarks to authorized dealerships to promote the sale of Mercedes-Benz vehicles in the United States and Florida.

## II.    Plaintiffs

189.   Butler Auto Recycling, Inc. ("Butler") is an automotive parts recycler and Florida corporation with its principal place of business at 6401 N. Palafox St., Pensacola, FL 32503.  Prior to the recalls set forth herein, Butler purchased Class Vehicles, as defined below, containing Takata airbags.  Butler purchased these Takata airbags for purposes of resale.  Had Butler known of the Inflator Defect, it would not have purchased the Class Vehicles or it would not have paid as much for them as it did.

190.   Cunningham Brothers Auto Parts, LLC ("Cunningham") is an automotive parts recycler and Delaware limited liability company with its principal place of business at 10980

- 36 -

Wards Rd., Rustburg, VA 24588.  Prior to the recalls set forth herein, Cunningham purchased

Class Vehicles, as defined below, containing Takata airbags.  Cunningham purchased these Takata

airbags for purposes of resale.  Had Cunningham known of the Inflator Defect, it would not have

purchased the Class Vehicles or it would not have paid as much for them as it did.

191.  Midway Auto Parts LLC ("Midway") is an automotive parts recycler and Delaware

limited liability company with its principal place of business at 4210 Gardner Ave., Kansas City,

MO 64120.  Prior to the recalls set forth herein, Midway purchased Class Vehicles, as defined

below, containing Takata airbags.  Midway purchased these Takata airbags for purposes of resale.

Had Midway known of the Inflator Defect, it would not have purchased the Class Vehicles or it

would not have paid as much for them as it did.

192.  Road Tested Parts, Inc. d/b/a WeaverParts.com ("Weaver") is an automotive parts

recycler and Georgia corporation with a principal place of business at 774 Highway 320,

Carnesville, GA 30521.  Weaver also has a substantial business operation at 9001 Stitt St., Monroe,

NC 28110.  Prior to the recalls set forth herein, Weaver purchased Class Vehicles, as defined

below, containing Takata airbags.  Weaver purchased these Takata airbags for purposes of resale.

Had Weaver known of the Inflator Defect, it would not have purchased the Class Vehicles or it

would not have paid as much for them as it did.

193.  Snyder's Ltd. ("Snyder's") is an automotive parts recycler and Texas corporation

with its principal place of business at 24549 State Hwy. 95, Holland, Texas 76534.  Prior to the

recalls set forth herein, Snyder's purchased Class Vehicles, as defined below, containing Takata

airbags.  Snyder's purchased these Takata airbags for purposes of resale.  Had Snyder's known of

the Inflator Defect, it would not have purchased the Class Vehicles or it would not have paid as

much for them as it did.

194.    Triple D Corporation d/b/a Knox Auto Parts ("Knox") is an automotive parts recycler and Tennessee corporation with its principal place of business at 8721 Oakridge Hwy., Knoxville, TN 37931.  Prior to the recalls set forth herein, Knox purchased Class Vehicles, as defined below, containing Takata airbags.  Knox purchased these Takata airbags for purposes of resale.  Had Knox known of the Inflator Defect, it would not have purchased the Class Vehicles or it would not have paid as much for them as it did.

195.    Automotive Dismantlers and Recyclers Association, Inc. d/b/a Automotive Recyclers Association ("ARA") is incorporated in New York with its principal place of business in Virginia.  ARA is an international trade association of businesses dedicated to the efficient removal and reuse of automotive parts, and the safe disposal of inoperable motor vehicles.  ARA directly services approximately 1,050 member companies and approximately 3,500 additional companies through affiliated organizations.

a.    ARA proceeds with this litigation pursuant to an assignment of claims by Rigsby's Auto Parts & Sales, Inc., and Quarno's Auto Salvage (collectively the "Assignors").

b.    Rigsby's Auto Parts & Sales, Inc. ("Rigsby's") is an automotive parts recycler and Florida corporation with its principal place of business at 40147 Lynbrook Drive, Zephyrhills, Florida 33540.  Prior to the recalls set forth herein, Rigsby's purchased Class Vehicles, as defined below, containing Takata airbags.  Rigsby's still purchased these Takata airbags for purposes of resale.  Had Rigsby's known of the Inflator Defect, it would not have purchased the Class Vehicles or it would not have paid as much for them as it did.

c.    Quarno's Auto Salvage ("Quarno's") is an automotive parts recycler with its principal place of business at 550 Quarno Road, Cocoa, Florida 32927-4840. Prior

- 38 -

to the recalls set forth herein, Quarno's purchased Class Vehicles, as defined below, containing Takata airbags. Quarno's purchased these Takata airbags for purposes of resale. Had Quarno's known of the Inflator Defect, it would not have purchased the Class Vehicles or it would not have paid as much for them as it did.

196. Young's Auto Center and Salvage, LP ("Young's") is an automotive parts recycler and North Carolina limited partnership with its principal place of business at 2500 N.C. Highway 242 South, Benson, NC 27504. Prior to the recalls set forth herein, Young's purchased Class Vehicles, as defined below, containing Takata airbags. Young's purchased these Takata airbags for purposes of resale. Had Young's known of the Inflator Defect, it would not have purchased the Class Vehicles or it would not have paid as much for them as it did.

197. Butler, Cunningham, Knox, Midway, Snyder's, Weaver, ARA, and Young's are collectively referred to as "Plaintiffs" or "Automotive Recycler Plaintiffs."

## GENERAL FACTUAL ALLEGATIONS

### I.      Definitions

198. Plaintiffs bring this action on behalf of themselves and all persons similarly situated who purchased Class Vehicles (defined below). Plaintiffs seek redress individually and on behalf of those similarly situated for economic losses stemming from Defendants' manufacture, sale or lease, and false representations and omissions concerning the Defective Airbags in the Class Vehicles, including but not limited to diminished value. Plaintiffs, on behalf of themselves and those similarly situated, seek to recover damages and statutory penalties, and injunctive relief/equitable relief.

199. "Defective Airbags" refers to all airbag modules (including inflators) manufactured by Takata ("Takata airbags") that use propellant containing ammonium nitrate in their inflators

(the "Inflator Defect"), including (a) all airbags that are subject to the recalls identified in the table set forth in paragraph 97, *infra*; (b) all Takata airbags subject to recalls relating to Takata's May 18, 2015 DIRs, the Coordinated Remedy Order issued by NHTSA in *In re Docket No. NHTSA-2015-0055 Coordinated Remedy Program Proceeding*, and amendments thereto, concerning Takata's ammonium-nitrate inflators, and the Consent Order issued by NHTSA in *In re EA 15-001 Air Bag Inflator Rupture*, and any amendments thereto; and (c) all Takata airbags subject to any subsequent expansion of pre-existing recalls, new recalls, amendments to pre-existing DIRs, or new DIRs, announced prior to the date of an order granting class certification, relating to the tendency of such airbags to over-aggressively deploy or rupture. All Defective Airbags contain the Inflator Defect. As a result of the Inflator Defect, Defective Airbags have an unreasonably dangerous tendency to: (a) rupture and expel metal shrapnel that tears through the airbag and poses a threat of serious injury or death to occupants; and/or (b) hyper-aggressively deploy and seriously injure occupants through contact with the airbag.

200. With respect to all Defendants except New Chrysler and GM, "Class Vehicles" refers to all vehicles purchased in the United States that have Defective Airbags.

201. With respect to New Chrysler, "Class Vehicles" refers to all vehicles in the United States that have Defective Airbags that were: (1) manufactured, sold, or distributed by New Chrysler; or (2) manufactured, sold, or distributed by Old Chrysler and purchased by a Class member after June 1, 2009.

202. With respect to the GM Defendants, "Class Vehicles" refers to all vehicles in the United States that have Defective Airbags that were (1) manufactured, sold, or distributed by the GM Defendants or (2) manufactured, sold, or distributed by Old GM and purchased by a Plaintiff or Class member after July 10, 2009.

203.    As detailed in this Complaint, over the course of nine years Takata and the Vehicle

Manufacturer Defendants have issued a series of partial, misleading, and ultimately ineffective

recalls to address the Defective Airbags.  The following table identifies, to the best of Plaintiffs'

understanding and without the benefit of discovery, the recalled vehicles by manufacturer, and

which of the airbags are included in the recall for each vehicle (driver, passenger, or both):

| Manufacturer | Recall | Make | Model | Model Years | Side(s) | Zone[1] |
|---|---|---|---|---|---|---|
| BMW | 13V172 | BMW | 325Ci | 2002-2003 | Passenger | N/A |
| BMW | 13V172 | BMW | 325i | 2002-2003 | Passenger | N/A |
| BMW | 13V172 | BMW | 325iT | 2002-2003 | Passenger | N/A |
| BMW | 13V172 | BMW | 325xi | 2002-2003 | Passenger | N/A |
| BMW | 13V172 | BMW | 325xiT | 2002-2003 | Passenger | N/A |
| BMW | 13V172 | BMW | 330Ci Convertible | 2002-2003 | Passenger | N/A |
| BMW | 13V172 | BMW | 330Ci Coupe | 2002-2003 | Passenger | N/A |
| BMW | 13V172 | BMW | 330i | 2002-2003 | Passenger | N/A |
| BMW | 13V172 | BMW | 330xi Sedan | 2002-2003 | Passenger | N/A |
| BMW | 13V172 | BMW | M3 Convertible | 2002-2003 | Passenger | N/A |
| BMW | 13V172 | BMW | M3 Coupe | 2002-2003 | Passenger | N/A |
| BMW | 14V348 | BMW | 325i | 2004-2006 | Both | N/A |
| BMW | 14V348 | BMW | 325xi | 2004-2005 | Both | N/A |

[1] In its original Coordinated Remedy Order, dated November 3, 2015, NHTSA prioritized recalls in the "High Absolute Humidity" Zone ("HAH").  Each Vehicle Manufacturer was permitted to define its own HAH Zone, provided that it included at a minimum all vehicles ever sold or registered in Alabama, Florida, Georgia, Hawaii, Louisiana, Mississippi, Texas, Puerto Rico, American Samoa, Guam, Saipan, and the U.S. Virgin Islands.  The Non-HAH Zone included all other states and the District of Columbia.

In May 2016, converted the HAH and Non-HAH Zones into three new zones:
a.    Zone A includes all former HAH areas, plus California and South Carolina;
b.    Zone B includes Arizona, Arkansas, Delaware, District of Columbia, Illinois, Indiana, Kansas, Kentucky, Maryland, Missouri, Nebraska, Nevada, New Jersey, New Mexico, North Carolina, Ohio, Oklahoma, Pennsylvania, Tennessee, Virginia, and West Virginia;
c.    Zone C includes Alaska, Colorado, Connecticut, Idaho, Iowa, Maine, Massachusetts, Michigan, Minnesota, Montana, New Hampshire, New York, North Dakota, Oregon, Rhode Island, South Dakota, Utah, Vermont, Washington, Wisconsin and Wyoming.

Some recalls are not limited by zone because they were initiated before NHTSA's creation of zones in November 2015, or because they apply nationwide (*e.g.*, recalls of replacement inflators).

| Manufacturer | Recall | Make | Model | Model Years | Side(s) | Zone[1] |
|---|---|---|---|---|---|---|
| BMW | 14V348 | BMW | 330i | 2004-2006 | Both | N/A |
| BMW | 14V348 | BMW | 330xi | 2004-2005 | Both | N/A |
| BMW | 14V348 | BMW | M3 | 2004-2006 | Both | N/A |
| BMW | 14V428 | BMW | 323i | 2000 | Passenger | N/A |
| BMW | 14V428 | BMW | 325i | 2001-2006 | Passenger | N/A |
| BMW | 14V428 | BMW | 325xi | 2001-2005 | Passenger | N/A |
| BMW | 14V428 | BMW | 328i | 2000 | Passenger | N/A |
| BMW | 14V428 | BMW | 330i | 2001-2006 | Passenger | N/A |
| BMW | 14V428 | BMW | 330xi | 2001-2005 | Passenger | N/A |
| BMW | 14V428 | BMW | M3 | 2001-2006 | Passenger | N/A |
| BMW | 15V318 | BMW | 325i/325xi/330i/330xi Sedan | 2002-2005 | Driver | N/A |
| BMW | 15V318 | BMW | 325xi/325i Sports Wagon | 2002-2005 | Driver | N/A |
| BMW | 15V318 | BMW | 330Ci/325Ci/M3 Convertible | 2002-2006 | Driver | N/A |
| BMW | 15V318 | BMW | 325i/330i/M3 Coupe | 2002-2006 | Driver | N/A |
| BMW | 15V318 | BMW | M5/540i/525i/530i Sedan | 2002-2006 | Driver | N/A |
| BMW | 15V318 | BMW | 540i/525i Sports Wagon | 2002-2003 | Driver | N/A |
| BMW | 15V318 | BMW | X5 3.0i/4.4i Sports Activity Vehicle | 2003-2004 | Driver | N/A |
| BMW | 16V071 | BMW | 1 Series M | 2008-2013 | Driver | N/A |
| BMW | 16V071 | BMW | 128i | 2008-2013 | Driver | N/A |
| BMW | 16V071 | BMW | 135i | 2008-2013 | Driver | N/A |
| BMW | 16V071 | BMW | 325 | 2006-2012 | Driver | N/A |
| BMW | 16V071 | BMW | 328 | 2006-2013 | Driver | N/A |
| BMW | 16V071 | BMW | 330 | 2006-2011 | Driver | N/A |
| BMW | 16V071 | BMW | 335 | 2006-2013 | Driver | N/A |
| BMW | 16V071 | BMW | M3 | 2007-2013 | Driver | N/A |
| BMW | 16V071 | BMW | X1 SAV | 2013-2015 | Driver | N/A |
| BMW | 16V071 | BMW | X3 SAV | 2007-2010 | Driver | N/A |
| BMW | 16V071 | BMW | X5 SAV | 2007-2013 | Driver | N/A |
| BMW | 16V071 | BMW | X6 ActiveHybrid Sac | 2010-2011 | Driver | N/A |
| BMW | 16V071 | BMW | X6 Sac | 2008-2009, 2012-2014 | Driver | N/A |
| BMW | 16V364 | BMW | X5M | 2007-2011 | Passenger | A |
| BMW | 16V364 | BMW | X6 M | 2008-2011 | Passenger | A |
| BMW | 16V364 | BMW | X6 ActiveHybrid SAC | 2010-2011 | Passenger | A |

| Manufacturer | Recall | Make | Model | Model Years | Side(s) | Zone[1] |
|---|---|---|---|---|---|---|
| BMW | 16V364 | BMW | X5 xDrive30i | 2007-2011 | Passenger | A |
| BMW | 16V364 | BMW | X5 xDrive35i | 2007-2011 | Passenger | A |
| BMW | 16V364 | BMW | X5 xDrive48i | 2007-2011 | Passenger | A |
| BMW | 16V364 | BMW | X5 xDrive50i | 2007-2011 | Passenger | A |
| BMW | 16V364 | BMW | X5 xDrive30i | 2007-2008 | Passenger | B |
| BMW | 16V364 | BMW | X5 xDrive35i | 2007-2008 | Passenger | B |
| BMW | 16V364 | BMW | X5 xDrive48i | 2007-2008 | Passenger | B |
| BMW | 16V364 | BMW | X5 xDrive50i | 2007-2008 | Passenger | B |
| BMW | 16V364 | BMW | X5M | 2007-2008 | Passenger | B |
| BMW | 16V364 | BMW | X6 xDrive35i | 2008 | Passenger | B |
| BMW | 16V364 | BMW | X6 xDrive50i | 2008 | Passenger | B |
| BMW | 16V364 | BMW | X6 M | 2008 | Passenger | B |
| BMW | 17V020 | BMW | X5 | 2007-2009, 2012 | Passenger | A |
| BMW | 17V020 | BMW | X6 | 2008-2009, 2012 | Passenger | A |
| BMW | 17V020 | BMW | X5 | 2009 | Passenger | B |
| BMW | 17V020 | BMW | X6 | 2009 | Passenger | B |
| BMW | 17V020 | BMW | X5 | 2007-2008 | Passenger | C |
| BMW | 17V020 | BMW | X6 | 2008 | Passenger | C |
| BMW | 17V047 | BMW | 320 | 2000-2002 | Driver | N/A |
| BMW | 17V047 | BMW | 323 | 2000-2002 | Driver | N/A |
| BMW | 17V047 | BMW | 325 | 2000-2002 | Driver | N/A |
| BMW | 17V047 | BMW | 330 | 2000-2002 | Driver | N/A |
| BMW | 17V047 | BMW | 525 | 2001-2002 | Driver | N/A |
| BMW | 17V047 | BMW | 530 | 2001-2002 | Driver | N/A |
| BMW | 17V047 | BMW | 540 | 2001-2002 | Driver | N/A |
| BMW | 17V047 | BMW | M3 | 2000-2002 | Driver | N/A |
| BMW | 17V047 | BMW | M5 | 2000-2002 | Driver | N/A |
| BMW | 17V047 | BMW | X5 | 2000-2002 | Driver | N/A |
| Chrysler | 14V354 | Chrysler | 300 | 2005-2008 | Both | HAH |
| Chrysler | 14V354 | Chrysler | Aspen | 2007-2008 | Both | HAH |
| Chrysler | 14V354 | Dodge | Dakota | 2005-2008 | Both | HAH |
| Chrysler | 14V354 | Dodge | Durango | 2004-2008 | Both | HAH |
| Chrysler | 14V354 | Dodge | Ram 1500 | 2003-2008 | Both | HAH |
| Chrysler | 14V354 | Dodge | Ram 2500 | 2005-2008 | Both | HAH |
| Chrysler | 14V354 | Dodge | Ram 3500 | 2006-2008 | Both | HAH |
| Chrysler | 14V354 | Dodge | Ram 3500 Cab Chassis | 2007-2008 | Both | HAH |

| Manufacturer | Recall | Make | Model | Model Years | Side(s) | Zone[1] |
|---|---|---|---|---|---|---|
| Chrysler | 14V354 | Dodge | Ram 4500 Cab Chassis | 2006-2008 | Both | HAH |
| Chrysler | 14V354 | Dodge | Ram 5500 | 2008 | Both | HAH |
| Chrysler | 14V770 | Chrysler | 300/ 300C/ 300 SRT8 | 2005 | Passenger | HAH |
| Chrysler | 14V770 | Dodge | Dakota | 2005 | Passenger | HAH |
| Chrysler | 14V770 | Dodge | Durango | 2004-2005 | Passenger | HAH |
| Chrysler | 14V770 | Dodge | Magnum | 2005 | Passenger | HAH |
| Chrysler | 14V770 | Dodge | Ram 1500 | 20043-2005 | Passenger | HAH |
| Chrysler | 14V770 | Dodge | Ram 2500 | 20043-2005 | Passenger | HAH |
| Chrysler | 14V770 | Dodge | Ram 3500 | 20043-2005 | Passenger | HAH |
| Chrysler | 14V817 | Chrysler | 300 | 2005-2007 | Driver | N/A |
| Chrysler | 14V817 | Chrysler | 300C | 2005-2007 | Driver | N/A |
| Chrysler | 14V817 | Chrysler | Aspen | 2007 | Driver | N/A |
| Chrysler | 14V817 | Chrysler | SRT8 | 2005-2007 | Driver | N/A |
| Chrysler | 14V817 | Dodge | Charger | 2005-2007 | Driver | N/A |
| Chrysler | 14V817 | Dodge | Dakota | 2005-2007 | Driver | N/A |
| Chrysler | 14V817 | Dodge | Durango | 2004-2007 | Driver | N/A |
| Chrysler | 14V817 | Dodge | Magnum | 2005-2007 | Driver | N/A |
| Chrysler | 14V817 | Dodge | Ram 1500 | 2004-2007 | Driver | N/A |
| Chrysler | 14V817 | Dodge | Ram 2500 | 2005-2007 | Driver | N/A |
| Chrysler | 14V817 | Dodge | Ram 3500 | 2006-2007 | Driver | N/A |
| Chrysler | 14V817 | Mitsubishi | Raider | 2006-2007 | Driver | N/A |
| Chrysler | 15V312 | Dodge | Ram 1500/2500/3500 | 2003 | Passenger | N/A |
| Chrysler | 15V313 | Chrysler | Aspen | 2007-2008 | Driver | N/A |
| Chrysler | 15V313 | Chrysler | 300/300C/SRT8 | 2005-2010 | Driver | N/A |
| Chrysler | 15V313 | Dodge | Ram 2500 Pickup | 2005-2009 | Driver | N/A |
| Chrysler | 15V313 | Dodge | Ram 1500 Pickup | 2004-2008 | Driver | N/A |
| Chrysler | 15V313 | Dodge | Ram 3500 Pickup | 2006-2009 | Driver | N/A |
| Chrysler | 15V313 | Dodge | Ram 3500 Cab Chassis | 2007-2009 | Driver | N/A |
| Chrysler | 15V313 | Dodge | Ram 4500/5500 Cam Chassis | 2008-2010 | Driver | N/A |
| Chrysler | 15V313 | Dodge | Durango | 2004-2008 | Driver | N/A |
| Chrysler | 15V313 | Dodge | Charger/Magnum | 2005-2010 | Driver | N/A |
| Chrysler | 15V313 | Dodge | Dakota | 2005-2011 | Driver | N/A |
| Chrysler | 15V313 | Mitsubishi | Raider | 2006-2010 | Driver | N/A |
| Chrysler | 15V313 | Sterling | 4500/5500 Cab Chassis | 2008-2009 | Driver | N/A |
| Chrysler | 15V354 | Dodge | Sprinter 2500/3500 | 2006-2008 | Passenger | N/A |

| Manufacturer | Recall | Make | Model | Model Years | Side(s) | Zone[1] |
|---|---|---|---|---|---|---|
| Chrysler | 15V354 | Freightline | Sprinter 2500/3500 | 2007-2008 | Passenger | N/A |
| Chrysler | 15V361 | Sterling | Bullet 4500/5500 Chassis Cab | 2008-2009 | Driver | N/A |
| Chrysler | 15V444 | Dodge | Challenger | 2008-2010 | Driver | N/A |
| Chrysler | 16V341 | Ferrari | California | 2009-2011 | Passenger (PSPI-2) | N/A |
| Chrysler | 16V341 | Ferrari | 458 Italia | 2010-2011 | Passenger (PSPI-2) | N/A |
| Chrysler | 16V352 | Chrysler | Aspen | 2007-2009 | Passenger | A, B |
| Chrysler | 16V352 | Chrysler | 300 | 2005-2012 | Passenger | A |
| Chrysler | 16V352 | Chrysler | 300 | 2005-2009 | Passenger | B |
| Chrysler | 16V352 | Chrysler | Aspen | 2007-2008 | Passenger | C |
| Chrysler | 16V352 | Chrysler | 300 | 2005-2008 | Passenger | C |
| Chrysler | 16V352 | Dodge | RAM 2500[2] | 2005-2009 | Passenger | A |
| Chrysler | 16V352 | Dodge | RAM 1500 | 2004-2008 | Passenger | A,B |
| Chrysler | 16V352 | Dodge | RAM 2500 | 2005-2009 | Passenger | A, B |
| Chrysler | 16V352 | Dodge | RAM 3500 | 2006-2009 | Passenger | A, B |
| Chrysler | 16V352 | Dodge | RAM 3500 Cab Chassis | 2007-2010 | Passenger | A |
| Chrysler | 16V352 | Dodge | RAM 4500/5500 Cab Chassis | 2008-2010 | Passenger | A |
| Chrysler | 16V352 | Dodge | Durango | 2004-2009 | Passenger | A, B |
| Chrysler | 16V352 | Dodge | Challenger | 2008-2012 | Passenger | A |
| Chrysler | 16V352 | Dodge | Magnum | 2005-2008 | Passenger | A, B |
| Chrysler | 16V352 | Dodge | Dakota | 2005-2011 | Passenger | A |
| Chrysler | 16V352 | Dodge | Charger | 2006-2012 | Passenger | A |
| Chrysler | 16V352 | Dodge | RAM 3500 Cab Chassis | 2007-2009 | Passenger | B |
| Chrysler | 16V352 | Dodge | RAM 4500/5500 Cab Chassis | 2008-2009 | Passenger | B |
| Chrysler | 16V352 | Dodge | Challenger | 2008-2009 | Passenger | B |
| Chrysler | 16V352 | Dodge | Dakota | 2005-2009 | Passenger | B |
| Chrysler | 16V352 | Dodge | Charger | 2006-2009 | Passenger | B |
| Chrysler | 16V352 | Dodge | RAM 2500 | 2005-2008 | Passenger | C |
| Chrysler | 16V352 | Dodge | RAM 3500 | 2006-2008 | Passenger | C |
| Chrysler | 16V352 | Dodge | RAM 3500 Cab Chassis | 2007-2008 | Passenger | C |
| Chrysler | 16V352 | Dodge | RAM 4500/5500 Cab Chassis | 2008 | Passenger | C |
| Chrysler | 16V352 | Dodge | Durango | 2004-2008 | Passenger | C |

[2] Specifically, those manufactured at the St. Louis North Assembly Plant.

| Manufacturer | Recall | Make | Model | Model Years | Side(s) | Zone[1] |
|---|---|---|---|---|---|---|
| Chrysler | 16V352 | Dodge | Challenger | 2008 | Passenger | C |
| Chrysler | 16V352 | Dodge | Magnum | 2005-2008 | Passenger | C |
| Chrysler | 16V352 | Dodge | Dakota | 2005-2008 | Passenger | C |
| Chrysler | 16V352 | Dodge | Charger | 2006-2008 | Passenger | C |
| Chrysler | 16V352 | Jeep | Wrangler | 2007-2012 | Passenger | A |
| Chrysler | 16V352 | Jeep | Wrangler | 2007-2009 | Passenger | B |
| Chrysler | 16V352 | Jeep | Wrangler | 2007-2008 | Passenger | C |
| Chrysler | 16V352 | Mitsubishi | Raider | 2006-2009 | Passenger | A, B |
| Chrysler | 16V352 | Mitsubishi | Raider | 2006-2008 | Passenger | C |
| Chrysler | 16V947 | Chrysler | Aspen | 2009 | Driver | N/A |
| Chrysler | 16V947 | Dodge | Durango | 2009 | Driver | N/A |
| Chrysler | 16V947 | Dodge | RAM 3500 | 2010 | Driver | N/A |
| Chrysler | 17V018 | Ferrari | California | 2012 | Passenger (PSPI-2) | A |
| Chrysler | 17V018 | Ferrari | 458 Italia | 2012 | Passenger (PSPI-2) | A |
| Chrysler | 17V018 | Ferrari | 458 Spider | 2012 | Passenger (PSPI-2) | A |
| Chrysler | 17V018 | Ferrari | FF | 2012 | Passenger (PSPI-2) | A |
| Daimler | 16V077 | Freightliner | Sprinter 2500/3500 | 2007-2009 | Passenger | N/A |
| Daimler | 16V081 | Mercedes-Benz | ML320 BlueTec 4Matic | 2009-2010 | Driver | N/A |
| Daimler | 16V081 | Mercedes-Benz | GL320 BlueTec 4Matic | 2009-2010 | Driver | N/A |
| Daimler | 16V081 | Mercedes-Benz | R320 CDI 4Matic | 2009-2010 | Driver | N/A |
| Daimler | 16V081 | Mercedes-Benz | E350 Cabriolet | 2011 | Driver | N/A |
| Daimler | 16V081 | Mercedes-Benz | E550 Cabriolet | 2011 | Driver | N/A |
| Daimler | 16V081 | Mercedes-Benz | ML350 | 2009-2011 | Driver | N/A |
| Daimler | 16V081 | Mercedes-Benz | ML350 4Matic | 2009-2011 | Driver | N/A |
| Daimler | 16V081 | Mercedes-Benz | ML550 4Matic | 2009-2011 | Driver | N/A |
| Daimler | 16V081 | Mercedes-Benz | ML63 AMG | 2009-2011 | Driver | N/A |
| Daimler | 16V081 | Mercedes-Benz | C63 AMG | 2009-2011 | Driver | N/A |

| Manufacturer | Recall | Make | Model | Model Years | Side(s) | Zone[1] |
|---|---|---|---|---|---|---|
| Daimler | 16V081 | Mercedes-Benz | ML450 4Matic Hybrid | 2010-2011 | Driver | N/A |
| Daimler | 16V081 | Mercedes-Benz | E350Coupe | 2010-2011 | Driver | N/A |
| Daimler | 16V081 | Mercedes-Benz | E350 $Matic | 2010-2011 | Driver | N/A |
| Daimler | 16V081 | Mercedes-Benz | E550 Coupe | 2010-2011 | Driver | N/A |
| Daimler | 16V081 | Mercedes-Benz | E550 4Matic | 2010-2011 | Driver | N/A |
| Daimler | 16V081 | Mercedes-Benz | E63 AMG | 2010-2011 | Driver | N/A |
| Daimler | 16V081 | Mercedes-Benz | GL350 BlueTec 4Matic | 2011-2012 | Driver | N/A |
| Daimler | 16V081 | Mercedes-Benz | R350 BlueTec 4Matic | 2011-2012 | Driver | N/A |
| Daimler | 16V081 | Mercedes-Benz | GL450 4Matic | 2009-2012 | Driver | N/A |
| Daimler | 16V081 | Mercedes-Benz | GL550 4Matic | 2009-2012 | Driver | N/A |
| Daimler | 16V081 | Mercedes-Benz | R350 4Matic | 2009-2012 | Driver | N/A |
| Daimler | 16V081 | Mercedes-Benz | SLK280 | 2007-2008 | Driver | N/A |
| Daimler | 16V081 | Mercedes-Benz | SLK350 | 2007-2008 | Driver | N/A |
| Daimler | 16V081 | Mercedes-Benz | SLK55 AMG | 2007-2008 | Driver | N/A |
| Daimler | 16V081 | Mercedes-Benz | SLS AMG Coupe | 2011-2014 | Driver | N/A |
| Daimler | 16V081 | Mercedes-Benz | SLS AMG Cabriolet | 2012 | Driver | N/A |
| Daimler | 16V081 | Mercedes-Benz | SLS AMG GT | 2013-2014 | Driver | N/A |
| Daimler | 16V081 | Mercedes-Benz | SLS AMG GT Cabriolet | 2013-2014 | Driver | N/A |
| Daimler | 16V081 | Mercedes-Benz | C230 Kompressor | 2005 | Driver | N/A |
| Daimler | 16V081 | Mercedes-Benz | C320 | 2005 | Driver | N/A |
| Daimler | 16V081 | Mercedes-Benz | C230 | 2006-2007 | Driver | N/A |

| Manufacturer | Recall | Make | Model | Model Years | Side(s) | Zone[1] |
|---|---|---|---|---|---|---|
| Daimler | 16V081 | Mercedes-Benz | C350 | 2006-2011 | Driver | N/A |
| Daimler | 16V081 | Mercedes-Benz | C300 | 2008-2011 | Driver | N/A |
| Daimler | 16V081 | Mercedes-Benz | C300 4Matic | 2008-2011 | Driver | N/A |
| Daimler | 16V081 | Mercedes-Benz | GLK350 | 2010-2012 | Driver | N/A |
| Daimler | 16V081 | Mercedes-Benz | GLK350 4Matic | 2010-2012 | Driver | N/A |
| Daimler | 16V363 | Mercedes-Benz | C300 Sedan | 2008-2011 | Driver | A |
| Daimler | 16V363 | Mercedes-Benz | C300 4matic Sedan | 2008-2011 | Passenger | A |
| Daimler | 16V363 | Mercedes-Benz | C350 Sedan | 2008-2011 | Passenger | A |
| Daimler | 16V363 | Mercedes-Benz | C63 AMG Sedan | 2008-2011 | Passenger | A |
| Daimler | 16V363 | Mercedes-Benz | GLK350 | 2010-2011 | Passenger | A |
| Daimler | 16V363 | Mercedes-Benz | GLK350 4-Matic | 2010-2011 | Passenger | A |
| Daimler | 16V363 | Mercedes-Benz | E350 Coupe | 2010-2011 | Passenger | A |
| Daimler | 16V363 | Mercedes-Benz | SLS AMG | 2011 | Passenger | A |
| Daimler | 16V363 | Mercedes-Benz | E350 Convertible | 2011 | Passenger | A |
| Daimler | 16V363 | Mercedes-Benz | E550 Coupe | 2011 | Passenger | A |
| Daimler | 16V363 | Mercedes-Benz | E550 Convertible | 2011 | Passenger | A |
| Daimler | 16V363 | Mercedes-Benz | C300 Sedan | 2008 | Passenger | B |
| Daimler | 16V363 | Mercedes-Benz | C350 Sedan | 2008 | Passenger | B |
| Daimler | 16V363 | Mercedes-Benz | C63 AMG Sedan | 2008 | Passenger | B |
| Daimler | 16V363 | Mercedes-Benz | C300 4-Matic Sedan | 2008 | Passenger | B |
| Daimler | 17V017 | Mercedes-Benz | C300 4Matic | 2012 | Passenger | A |
| Daimler | 17V017 | Mercedes-Benz | C250 | 2012 | Passenger | A |

| Manufacturer | Recall | Make | Model | Model Years | Side(s) | Zone[1] |
|---|---|---|---|---|---|---|
| Daimler | 17V017 | Mercedes-Benz | C250 Coupe | 2012 | Passenger | A |
| Daimler | 17V017 | Mercedes-Benz | C350 | 2012 | Passenger | A |
| Daimler | 17V017 | Mercedes-Benz | C350 Coupe 4Matic | 2012 | Passenger | A |
| Daimler | 17V017 | Mercedes-Benz | C350 Coupe | 2012 | Passenger | A |
| Daimler | 17V017 | Mercedes-Benz | C63 AMG | 2012 | Passenger | A |
| Daimler | 17V017 | Mercedes-Benz | C63 AMG Coupe | 2012 | Passenger | A |
| Daimler | 17V017 | Mercedes-Benz | E350 Coupe 4Matic | 2012 | Passenger | A |
| Daimler | 17V017 | Mercedes-Benz | E350 Cabrio | 2012 | Passenger | A |
| Daimler | 17V017 | Mercedes-Benz | E350 Coupe | 2012 | Passenger | A |
| Daimler | 17V017 | Mercedes-Benz | E550 Cabrio | 2012 | Passenger | A |
| Daimler | 17V017 | Mercedes-Benz | E550 Coupe | 2012 | Passenger | A |
| Daimler | 17V017 | Mercedes-Benz | GLK350 4Matic | 2012 | Passenger | A |
| Daimler | 17V017 | Mercedes-Benz | GLK350 | 2012 | Passenger | A |
| Daimler | 17V017 | Mercedes-Benz | SLS AMG Cabrio | 2012 | Passenger | A |
| Daimler | 17V017 | Mercedes-Benz | SLS AMG Coupe | 2012 | Passenger | A |
| Daimler | 17V017 | Mercedes-Benz | C300 4Matic | 2009 | Passenger | B |
| Daimler | 17V017 | Mercedes-Benz | C300 | 2009 | Passenger | B |
| Daimler | 17V017 | Mercedes-Benz | C350 | 2009 | Passenger | B |
| Daimler | 17V017 | Mercedes-Benz | C63 AMG | 2009 | Passenger | B |
| Daimler | 17V017 | Mercedes-Benz | C300 4Matic | 2008 | Passenger | C |
| Daimler | 17V017 | Mercedes-Benz | C300 | 2008 | Passenger | C |
| Daimler | 17V017 | Mercedes-Benz | C350 | 2008 | Passenger | C |

| Manufacturer | Recall | Make | Model | Model Years | Side(s) | Zone[1] |
|---|---|---|---|---|---|---|
| Daimler | 17V478 | Freighliner | Sprinter 2500/3500 | 2007-2009 | Passenger | N/A |
| Ford | 14V343 | Ford | GT | 2005-2006 | Both Driver | A |
| Ford | 14V343 | Ford | Mustangs | 2005-2008 | Driver | A |
| Ford | 14V343 | Ford | Ranger | 2004-2005 | Both Driver | A |
| Ford | 14V787 | Ford | GT | 2005-2006 | Passenger | A |
| Ford | 14V787 | Ford | Ranger | 2004-2005 | Passenger | A |
| Ford | 14V802 | Ford | GT | 2005-2006 | Driver | N/A |
| Ford | 14V802 | Ford | Mustang | 2005-2008 | Driver | N/A |
| Ford | 15V319 | Ford | Mustang | 2005-2014 | Driver | N/A |
| Ford | 15V319 | Ford | GT | 2005-2006 | Driver | N/A |
| Ford | 15V322 | Ford | Ranger | 2004-2006 | Passenger | N/A |
| Ford | 15V322 | Ford | Ranger | 2004-2006 | Passenger | N/A |
| Ford | 16V036 | Ford | Ranger | 2004-2006 | Driver | N/A |
| Ford | 16V036 | Ford | Ranger | 2007-2008 | Passenger | B |
| Ford | 16V384 | Ford | Edge | 2007-2010 | Passenger | A |
| Ford | 16V384 | Ford | Ford GT | 2005-2006 | Passenger | A |
| Ford | 16V384 | Ford | Fusion | 2006-2011 | Passenger | A |
| Ford | 16V384 | Ford | Mustang | 2005-2011 | Passenger | A |
| Ford | 16V384 | Ford | Ranger | 2007-2011 | Passenger | A |
| Ford | 16V384 | Ford | Edge | 2007-2008 | Passenger | B |
| Ford | 16V384 | Ford | Ford GT | 2005-2006 | Passenger | B |
| Ford | 16V384 | Ford | Fusion | 2006-2008 | Passenger | B |
| Ford | 16V384 | Ford | Mustang | 2005-2008 | Passenger | B |
| Ford | 16V384 | Ford | Ranger | 2007-2008 | Passenger | B |
| Ford | 16V384 | Lincoln | MKX | 2007-2010 | Passenger | A |
| Ford | 16V384 | Lincoln | MKZ | 2006-2011 | Passenger | A |
| Ford | 16V384 | Lincoln | Zephyr | 2006-2011 | Passenger | A |
| Ford | 16V384 | Lincoln | MKX | 2007-2008 | Passenger | B |
| Ford | 16V384 | Lincoln | MKZ | 2006-2008 | Passenger | B |
| Ford | 16V384 | Lincoln | Zephyr | 2006-2008 | Passenger | B |
| Ford | 16V384 | Mercury | Milan | 2006-2011 | Passenger | A |
| Ford | 16V384 | Mercury | Milan | 2006-2008 | Passenger | B |
| Ford | 17V024 | Ford | Fusion | 2006-2009, 2012 | Passenger | A |
| Ford | 17V024 | Ford | Mustang | 2005-2009, 2012 | Passenger | A |
| Ford | 17V024 | Ford | Edge | 2009 | Passenger | B |

| Manufacturer | Recall | Make | Model | Model Years | Side(s) | Zone[1] |
|---|---|---|---|---|---|---|
| Ford | 17V024 | Ford | Fusion | 2009 | Passenger | B |
| Ford | 17V024 | Ford | Mustang | 2009 | Passenger | B |
| Ford | 17V024 | Ford | Ranger | 2009 | Passenger | B |
| Ford | 17V024 | Ford | Edge | 2007-2008 | Passenger | C |
| Ford | 17V024 | Ford | Fusion | 2006-2008 | Passenger | C |
| Ford | 17V024 | Ford | GT | 2005-2006 | Passenger | C |
| Ford | 17V024 | Ford | Mustang | 2005-2008 | Passenger | C |
| Ford | 17V024 | Ford | Ranger | 2007-2008 | Passenger | C |
| Ford | 17V024 | Lincoln | MKZ | 2006-2009, 2012 | Passenger | A |
| Ford | 17V024 | Lincoln | Zephyr | 2006-2009, 2012 | Passenger | A |
| Ford | 17V024 | Lincoln | MKX | 2009 | Passenger | B |
| Ford | 17V024 | Lincoln | MKZ | 2009 | Passenger | B |
| Ford | 17V024 | Lincoln | Zephyr | 2009 | Passenger | B |
| Ford | 17V024 | Lincoln | MKX | 2007-2008 | Passenger | C |
| Ford | 17V024 | Lincoln | MKZ | 2006-2008 | Passenger | C |
| Ford | 17V024 | Lincoln | Zephyr | 2006-2008 | Passenger | C |
| Ford | 17V024 | Mercury | Milan | 2009 | Passenger | B |
| Ford | 17V024 | Mercury | Milan | 2006-2008 | Passenger | C |
| GM | 14V372 | Chevrolet | Cruze | 2013-2014 | Driver | N/A |
| GM | 15V324 | Chevrolet | Silverado HD | 2007-2008 | Passenger | HAH, Non-HAH |
| GM | 15V324 | GMC | Sierra HD | 2007-2008 | Passenger | HAH, Non-HAH |
| GM | 15V666 | Buick | LaCrosse | 2015 | Side | N/A |
| GM | 15V666 | Cadillac | XTS | 2015 | Side | N/A |
| GM | 15V666 | Chevrolet | Camaro | 2015 | Side | N/A |
| GM | 15V666 | Chevrolet | Equinox | 2015 | Side | N/A |
| GM | 15V666 | Chevrolet | Malibu | 2015 | Side | N/A |
| GM | 15V666 | GMC | Terrain | 2015 | Side | N/A |
| GM | 16V063 | Saab | 9-3 | 2006-2011 | Driver | N/A |
| GM | 16V063 | Saab | 9-5 | 2006-2009 | Driver | N/A |
| GM | 16V063 | Saturn | Astra | 2008-2009 | Driver | N/A |
| GM | 16V381 | Cadillac | Escalade | 2009-2011 | Passenger | A |
| GM | 16V381 | Cadillac | Escalade ESV | 2009-2011 | Passenger | A |
| GM | 16V381 | Cadillac | Escalade EXT | 2009-2011 | Passenger | A |
| GM | 16V381 | Chevrolet | Avalanche | 2009-2011 | Passenger | A |

| Manufacturer | Recall | Make | Model | Model Years | Side(s) | Zone[1] |
|---|---|---|---|---|---|---|
| GM | 16V381 | Chevrolet | Silverado HD | 2009-2011 | Passenger | A |
| GM | 16V381 | Chevrolet | Silverado LD | 2009-2011 | Passenger | A |
| GM | 16V381 | Chevrolet | Suburban | 2009-2011 | Passenger | A |
| GM | 16V381 | Chevrolet | Tahoe | 2009-2011 | Passenger | A |
| GM | 16V381 | GMC | Sierra HD | 2009-2011 | Passenger | A |
| GM | 16V381 | GMC | Sierra LD | 2009-2011 | Passenger | A |
| GM | 16V381 | GMC | Yukon | 2009-2011 | Passenger | A, B |
| GM | 16V381 | GMC | Yukon XL | 2009-2011 | Passenger | A |
| GM | 16V381, 16V383 | Cadillac | Escalade | 2007-2008 | Passenger | A, B |
| GM | 16V381, 16V383 | Cadillac | Escalade ESV | 2007-2008 | Passenger | A, B |
| GM | 16V381, 16V383 | Cadillac | Escalade EXT | 2007-2008 | Passenger | A, B |
| GM | 16V381, 16V383 | Chevrolet | Avalanche | 2007-2008 | Passenger | A, B |
| GM | 16V381, 16V383 | Chevrolet | Silverado LD | 2007-2008 | Passenger | A, B |
| GM | 16V381, 16V383 | Chevrolet | Suburban | 2007-2008 | Passenger | A, B |
| GM | 16V381, 16V383 | Chevrolet | Tahoe | 2007-2008 | Passenger | A, B |
| GM | 16V381, 16V383 | GMC | Sierra LD | 2007-2008 | Passenger | A, B |
| GM | 16V381, 16V383 | GMC | Yukon | 2007-2008 | Passenger | A |
| GM | 16V381, 16V383 | GMC | Yukon XL | 2007-2008 | Passenger | A, B |
| GM | 17V006 | Pontiac | Vibe | 2009 | Passenger | B |
| GM | 17V010 | Cadillac | Escalade | 2012 | Passenger | A |
| GM | 17V010 | Cadillac | Escalade ESV | 2012 | Passenger | A |
| GM | 17V010 | Cadillac | Escalade EXT | 2012 | Passenger | A |
| GM | 17V010 | Chevrolet | Avalanche | 2012 | Passenger | A |
| GM | 17V010 | Chevrolet | Silverado HD | 2012 | Passenger | A |
| GM | 17V010 | Chevrolet | Silverado LD | 2012 | Passenger | A |
| GM | 17V010 | Chevrolet | Suburban | 2012 | Passenger | A |
| GM | 17V010 | Chevrolet | Tahoe | 2012 | Passenger | A |
| GM | 17V010 | GMC | Sierra HD | 2012 | Passenger | A |
| GM | 17V010 | GMC | Sierra LD | 2012 | Passenger | A |
| GM | 17V010 | GMC | Yukon | 2012 | Passenger | A |
| GM | 17V010 | GMC | Yukon XL | 2012 | Passenger | A |

| Manufacturer | Recall | Make | Model | Model Years | Side(s) | Zone[1] |
|---|---|---|---|---|---|---|
| GM | 17V019 | Cadillac | Escalade | 2009 | Passenger | B |
| GM | 17V019 | Cadillac | Escalade ESV | 2009 | Passenger | B |
| GM | 17V019 | Cadillac | Escalade EXT | 2009 | Passenger | B |
| GM | 17V019 | Chevrolet | Avalanche | 2009 | Passenger | B |
| GM | 17V019 | Chevrolet | Silverado HD | 2009 | Passenger | B |
| GM | 17V019 | Chevrolet | Silverado LD | 2009 | Passenger | B |
| GM | 17V019 | Chevrolet | Suburban | 2009 | Passenger | B |
| GM | 17V019 | Chevrolet | Tahoe | 2009 | Passenger | B |
| GM | 17V019 | GMC | Sierra HD | 2009 | Passenger | B |
| GM | 17V019 | GMC | Sierra LD | 2009 | Passenger | B |
| GM | 17V019 | GMC | Yukon | 2009 | Passenger | B |
| GM | 17V019 | GMC | Yukon XL | 2009 | Passenger | B |
| GM | 17V021 | Cadillac | Escalade | 2007-2008 | Passenger | C |
| GM | 17V021 | Cadillac | Escalade ESV | 2007-2008 | Passenger | C |
| GM | 17V021 | Cadillac | Escalade EXT | 2007-2008 | Passenger | C |
| GM | 17V021 | Chevrolet | Avalanche | 2007-2008 | Passenger | C |
| GM | 17V021 | Chevrolet | Silverado LD | 2007-2008 | Passenger | C |
| GM | 17V021 | Chevrolet | Suburban | 2007-2008 | Passenger | C |
| GM | 17V021 | Chevrolet | Tahoe | 2007-2008 | Passenger | C |
| GM | 17V021 | GMC | Sierra LD | 2007-2008 | Passenger | C |
| GM | 17V021 | GMC | Yukon | 2007-2008 | Passenger | C |
| GM | 17V021 | GMC | Yukon XL | 2007-2008 | Passenger | C |
| Honda | 08V593 | Honda | Accord | 2001 | Driver | N/A |
| Honda | 08V593 | Honda | Civic | 2001 | Driver | N/A |
| Honda | 09V259 | Acura | TL/CL | 2002 | Driver | N/A |
| Honda | 09V259 | Honda | Accord | 2001-2002 | Driver | N/A |
| Honda | 09V259 | Honda | Civic | 2001 | Driver | N/A |
| Honda | 10V041 | Acura | CL | 2003 | Driver | N/A |
| Honda | 10V041 | Acura | TL | 2002-2003 | Driver | N/A |
| Honda | 10V041 | Honda | Accord | 2001-2002 | Driver | N/A |
| Honda | 10V041 | Honda | Civic | 2001-2003 | Driver | N/A |
| Honda | 10V041 | Honda | CR-V | 2002 | Driver | N/A |
| Honda | 10V041 | Honda | Odyssey | 2002 | Driver | N/A |
| Honda | 10V041 | Honda | Pilot | 2003 | Driver | N/A |
| Honda | 11V260 | Acura | CL | 2003 | Driver | N/A |
| Honda | 11V260 | Acura | TL | 2002-2003 | Driver | N/A |
| Honda | 11V260 | Honda | Accord | 2001-2002 | Driver | N/A |
| Honda | 11V260 | Honda | Civic | 2001-2003 | Driver | N/A |

| Manufacturer | Recall | Make | Model | Model Years | Side(s) | Zone[1] |
|---|---|---|---|---|---|---|
| Honda | 11V260 | Honda | Civic Hybrid | 2003 | Driver | N/A |
| Honda | 11V260 | Honda | CR-V | 2002-2004 | Driver | N/A |
| Honda | 11V260 | Honda | Odyssey | 2002-2003 | Driver | N/A |
| Honda | 11V260 | Honda | Pilot | 2003 | Driver | N/A |
| Honda | 13V132 | Honda | Civic | 2001-2003 | Passenger | N/A |
| Honda | 13V132 | Honda | CR-V | 2002-2003 | Passenger | N/A |
| Honda | 13V132 | Honda | Odyssey | 2002 | Passenger | N/A |
| Honda | 14V349 | Acura | MDX | 2003 | Passenger | N/A |
| Honda | 14V349 | Honda | Accord | 2003 | Passenger | N/A |
| Honda | 14V349 | Honda | Civic | 2002-2003 | Passenger | N/A |
| Honda | 14V349 | Honda | CR-V | 2002-2003 | Passenger | N/A |
| Honda | 14V349 | Honda | Element | 2003 | Passenger | N/A |
| Honda | 14V349 | Honda | Odyssey | 2002-2003 | Passenger | N/A |
| Honda | 14V349 | Honda | Pilot | 2003 | Passenger | N/A |
| Honda | 14V351 | Acura | MDX | 2003-2006 | Driver | N/A |
| Honda | 14V351 | Acura | TL/CL | 2002-2003 | Driver | N/A |
| Honda | 14V351 | Honda | Accord | 2001-2007 | Driver | N/A |
| Honda | 14V351 | Honda | Accord | 2001-2002 | Driver | N/A |
| Honda | 14V351 | Honda | Civic | 2001-2005 | Driver | N/A |
| Honda | 14V351 | Honda | CR-V | 2002-2006 | Driver | N/A |
| Honda | 14V351 | Honda | Element | 2003-2011 | Driver | N/A |
| Honda | 14V351 | Honda | Odyssey | 2002-2004 | Driver | N/A |
| Honda | 14V351 | Honda | Pilot | 2003-2007 | Driver | N/A |
| Honda | 14V351 | Honda | Ridgeline | 2006 | Driver | N/A |
| Honda | 14V353 | Acura | MDX | 2003-2005 | Passenger | N/A |
| Honda | 14V353 | Acura | RL | 2005 | Passenger | N/A |
| Honda | 14V353 | Honda | Accord | 2003-2005 | Passenger | N/A |
| Honda | 14V353 | Honda | Civic | 2003-2005 | Passenger | N/A |
| Honda | 14V353 | Honda | CR-V | 2003-2005 | Passenger | N/A |
| Honda | 14V353 | Honda | Element | 2003-2004 | Passenger | N/A |
| Honda | 14V353 | Honda | Odyssey | 2003-2004 | Passenger | N/A |
| Honda | 14V353 | Honda | Pilot | 2003-2005 | Passenger | N/A |
| Honda | 14V353 | Honda | Ridgeline | 2006 | Passenger | N/A |
| Honda | 14V700 | Acura | MDX | 2003-2005 | Passenger | A |
| Honda | 14V700 | Acura | RL | 2005 | Passenger | A |
| Honda | 14V700 | Honda | Accord | 2003-2005 | Passenger | A |
| Honda | 14V700 | Honda | Civic | 2001-2005 | Passenger | A |
| Honda | 14V700 | Honda | Civic (CNG) | 2003-2004 | Passenger | A |

| Manufacturer | Recall | Make | Model | Model Years | Side(s) | Zone[1] |
|---|---|---|---|---|---|---|
| Honda | 14V700 | Honda | Civic Hybrid | 2003-2005 | Passenger | A |
| Honda | 14V700 | Honda | CR-V | 2002-2005 | Passenger | A |
| Honda | 14V700 | Honda | Element | 2003-2004 | Passenger | A |
| Honda | 14V700 | Honda | Odyssey | 2002-2004 | Passenger | A |
| Honda | 14V700 | Honda | Pilot | 2003-2005 | Passenger | A |
| Honda | 14V700 | Honda | Ridgeline | 2006 | Passenger | A |
| Honda | 15V153 | Honda | Accord | 2001 | Driver | N/A |
| Honda | 15V153 | Honda | Civic | 2004 | Driver | N/A |
| Honda | 15V153 | Honda | Pilot | 2008 | Driver | N/A |
| Honda | 15V320 | Acura | CL | 2003 | Driver | N/A |
| Honda | 15V320 | Acura | MDX | 2003-2006 | Driver | N/A |
| Honda | 15V320 | Acura | TL | 2002-2003 | Driver | N/A |
| Honda | 15V320 | Honda | Accord | 2001-2007 | Driver | N/A |
| Honda | 15V320 | Honda | Civic | 2001-2005 | Driver | N/A |
| Honda | 15V320 | Honda | CR-V | 2002-2006 | Driver | N/A |
| Honda | 15V320 | Honda | Element | 2003-2011 | Driver | N/A |
| Honda | 15V320 | Honda | Odyssey | 2002-2004 | Driver | N/A |
| Honda | 15V320 | Honda | Pilot | 2003-2008 | Driver | N/A |
| Honda | 15V320 | Honda | Ridgeline | 2006 | Driver | N/A |
| Honda | 15V370 | Acura | MDX | 2003 | Passenger | N/A |
| Honda | 15V370 | Honda | Accord | 2003-2007 | Passenger | N/A |
| Honda | 15V370 | Honda | Civic | 2001-2005 | Passenger | N/A |
| Honda | 15V370 | Honda | Civic GX | 2001-2004 | Passenger | N/A |
| Honda | 15V370 | Honda | Civic Hybrid | 2003-2005 | Passenger | N/A |
| Honda | 15V370 | Honda | CR-V | 2002-2004 | Passenger | N/A |
| Honda | 15V370 | Honda | Element | 2003 | Passenger | N/A |
| Honda | 15V370 | Honda | Odyssey | 2002-2003 | Passenger | N/A |
| Honda | 15V370 | Honda | Pilot | 2003 | Passenger | N/A |
| Honda | 16V061 | Acura | ILX | 2013-2016 | Driver | N/A |
| Honda | 16V061 | Acura | RDX | 2007-2016 | Driver | N/A |
| Honda | 16V061 | Acura | RL | 2005-2012 | Driver | N/A |
| Honda | 16V061 | Acura | TL | 2009-2014 | Driver | N/A |
| Honda | 16V061 | Acura | ZDX | 2010-2013 | Driver | N/A |
| Honda | 16V061 | Honda | CR-V | 2007-2011 | Driver | N/A |
| Honda | 16V061 | Honda | CR-Z | 2011-2015 | Driver | N/A |
| Honda | 16V061 | Honda | Fit | 2009-2013 | Driver | N/A |
| Honda | 16V061 | Honda | Fit EV | 2013-2014 | Driver | N/A |
| Honda | 16V061 | Honda | Insight | 2010-2014 | Driver | N/A |

| Manufacturer | Recall | Make | Model | Model Years | Side(s) | Zone[1] |
|---|---|---|---|---|---|---|
| Honda | 16V061 | Honda | Ridgeline | 2007-2014 | Driver | N/A |
| Honda | 16V344 | Acura | MDX | 2003-2006 | Passenger | A, B |
| Honda | 16V344 | Acura | RL | 2005-2011 | Passenger | A |
| Honda | 16V344 | Acura | RL | 2005-2008 | Passenger | B |
| Honda | 16V344 | Acura | MDX | 2003-2004 | Passenger | C |
| Honda | 16V344 | Honda | CR-V | 2005-2006 | Passenger | A, B |
| Honda | 16V344 | Honda | Element | 2003-2011 | Passenger | A |
| Honda | 16V344 | Honda | Fit | 2007-2008 | Passenger | A, B |
| Honda | 16V344 | Honda | Odyssey | 2002-2004 | Passenger | A, B, C |
| Honda | 16V344 | Honda | Pilot | 2003-2008 | Passenger | A, B |
| Honda | 16V344 | Honda | Ridgeline | 2006-2011 | Passenger | A |
| Honda | 16V344 | Honda | Element | 2003-2008 | Passenger | B |
| Honda | 16V344 | Honda | Ridgeline | 2006-2008 | Passenger | B |
| Honda | 16V344 | Honda | Elemnet | 2003-2004 | Passenger | C |
| Honda | 16V344 | Honda | Pilot | 2003-2004 | Passenger | C |
| Honda | 16V346 | Acura | TSX | 2009-2011 | Passenger | A |
| Honda | 16V346 | Acura | TSX Sportswagon | 2011 | Passenger | A |
| Honda | 16V346 | Acura | ZDX | 2010-2011 | Passenger | A |
| Honda | 16V346 | Honda | Accord | 2008-2011 | Passenger | A |
| Honda | 16V346 | Honda | Accord Crosstour | 2010-2011 | Passenger | A |
| Honda | 16V346 | Honda | Civic | 2006-2011 | Passenger | A |
| Honda | 16V346 | Honda | Civic GX | 2006-2011 | Passenger | A |
| Honda | 16V346 | Honda | Civic Hybrid | 2006-2011 | Passenger | A |
| Honda | 16V346 | Honda | CR-V | 2007-2011 | Passenger | A |
| Honda | 16V346 | Honda | FCX Clarity | 2010-2011 | Passenger | A |
| Honda | 16V346 | Honda | Fit | 2009-2011 | Passenger | A |
| Honda | 16V346 | Honda | Insight | 2010-2011 | Passenger | A |
| Honda | 16V346 | Honda | Pilot | 2009-2011 | Passenger | A |
| Honda | 16V346 | Honda | Accord | 2008 | Passenger | B |
| Honda | 16V346 | Honda | Civic | 2006-2008 | Passenger | B |
| Honda | 16V346 | Honda | Civic GX | 2006-2008 | Passenger | B |
| Honda | 16V346 | Honda | Civic Hybrid | 2006-2008 | Passenger | B |
| Honda | 16V346 | Honda | CR-V | 2007-2008 | Passenger | B |
| Honda | 17V029 | Acura | MDX | 2005-2006 | Passenger | A,B, C |
| Honda | 17V029 | Acura | RL | 2005-2012 | Passenger | A |
| Honda | 17V029 | Acura | RL | 2005-2009 | Passenger | B, C |
| Honda | 17V029 | Acura | RL | 2005-2008 | Passenger | C |
| Honda | 17V029 | Honda | CR-V | 2005-2006 | Passenger | A,B, C |

| Manufacturer | Recall | Make | Model | Model Years | Side(s) | Zone[1] |
|---|---|---|---|---|---|---|
| Honda | 17V029 | Honda | Element | 2005-2011 | Passenger | A |
| Honda | 17V029 | Honda | Fit | 2007-2008 | Passenger | A,B, C |
| Honda | 17V029 | Honda | Pilot | 2005-2008 | Passenger | A, B,C |
| Honda | 17V029 | Honda | Ridgeline | 2006-2012 | Passenger | A |
| Honda | 17V029 | Honda | Element | 2005-2009 | Passenger | B |
| Honda | 17V029 | Honda | Ridgeline | 2006-2009 | Passenger | B |
| Honda | 17V029 | Honda | Element | 2005-2008 | Passenger | C |
| Honda | 17V029 | Honda | Ridgeline | 2006-2008 | Passenger | C |
| Honda | 17V030 | Acura | TSX | 2009-20122012 | Passenger | A |
| Honda | 17V030 | Acura | TSX Sportswagon | 2011-2012 | Passenger | A |
| Honda | 17V030 | Acura | ZDX | 2010-2012 | Passenger | A |
| Honda | 17V030 | Acura | TSX | 2009 | Passenger | B |
| Honda | 17V030 | Honda | Accord | 2008-2012 | Passenger | A |
| Honda | 17V030 | Honda | Accord Crosstour | 2010-2012 | Passenger | A |
| Honda | 17V030 | Honda | Civic | 2006-2011 | Passenger | A |
| Honda | 17V030 | Honda | Civic Hybrid | 2006-2011 | Passenger | A |
| Honda | 17V030 | Honda | CR-V | 2007-2011 | Passenger | A |
| Honda | 17V030 | Honda | FCX Clarity | 2012 | Passenger | A |
| Honda | 17V030 | Honda | Fit | 2009-2012 | Passenger | A,B |
| Honda | 17V030 | Honda | Insight | 2010-2012 | Passenger | A |
| Honda | 17V030 | Honda | Pilot | 2009-2012 | Passenger | A |
| Honda | 17V030 | Honda | Fit | 2009 | Passenger | B |
| Honda | 17V030 | Honda | Pilot | 2009 | Passenger | B |
| Honda | 17V030 | Honda | Accord | 2008-2009 | Passenger | B |
| Honda | 17V030 | Honda | Civic | 2006-2009 | Passenger | B |
| Honda | 17V030 | Honda | Civic Hybrid | 2006-2009 | Passenger | B |
| Honda | 17V030 | Honda | Civic NGV | 2006-2009 | Passenger | B |
| Honda | 17V030 | Honda | CR-V | 2007-2009 | Passenger | B |
| Honda | 17V030 | Honda | Accord | 2008 | Passenger | C |
| Honda | 17V030 | Honda | Civic | 2006-2008 | Passenger | C |
| Honda | 17V030 | Honda | Civic Hybrid | 2006-2008 | Passenger | C |
| Honda | 17V030 | Honda | Civic NGV | 2006-2008 | Passenger | C |
| Honda | 17V030 | Honda | CR-V | 2007-2008 | Passenger | C |
| Honda | 18V041 | Acura | RL | 2010-2012 | Passenger | A |
| Honda | 18V041 | Acura | RL | 2010 | Passenger | B |
| Honda | 18V041 | Acura | RL | 2009 | Passenger | C |
| Honda | 18V041 | Honda | Element | 2010 | Passenger | A |
| Honda | 18V041 | Honda | Ridgeline | 2010-2013 | Passenger | A |

| Manufacturer | Recall | Make | Model | Model Years | Side(s) | Zone[1] |
|---|---|---|---|---|---|---|
| Honda | 18V041 | Honda | Element | 2010-2011 | Passenger | B |
| Honda | 18V041 | Honda | Ridgeline | 2010-2011 | Passenger | B |
| Honda | 18V041 | Honda | Element | 2009 | Passenger | C |
| Honda | 18V041 | Honda | Ridgeline | 2009 | Passenger | C |
| Mazda | 13V130 | Mazda | Mazda6 | 2003-2004 | Passenger | N/A |
| Mazda | 13V130 | Mazda | RX-8 | 2004 | Passenger | N/A |
| Mazda | 14V344 | Mazda | B-Series | 2004 | Both | A |
| Mazda | 14V344 | Mazda | Mazda6 | 2003-2008 | Both | A |
| Mazda | 14V344 | Mazda | MazdaSpeed6 | 2006-2007 | Both | A |
| Mazda | 14V344 | Mazda | MPV | 2004-2005 | Both | A |
| Mazda | 14V344 | Mazda | RX-8 | 2004-2008 | Both | A |
| Mazda | 14V362 | Mazda | Mazda6 | 2003-2004 | Passenger | N.A |
| Mazda | 14V362 | Mazda | RX-8 | 2004 | Passenger | N/A |
| Mazda | 14V773 | Mazda | B-Series | 2004-2005 | Passenger | A |
| Mazda | 14V773 | Mazda | Mazda6 | 2003-2006 | Passenger | A |
| Mazda | 14V773 | Mazda | MPV | 2004-2005 | Passenger | A |
| Mazda | 14V773 | Mazda | RX-8 | 2004-2005 | Passenger | A |
| Mazda | 15V345 | Mazda | Mazda 6 | 2003-2008 | Driver | N/A |
| Mazda | 15V345 | Mazda | RX-8 | 2004-2008 | Driver | N/A |
| Mazda | 15V345 | Mazda | MazdaSpeed 6 | 2006-2007 | Driver | N/A |
| Mazda | 15V346 | Mazda | B-Series | 2004-2006 | Passenger | N/A |
| Mazda | 15V382 | Mazda | Mazda6 | 2003-2008 | Driver | N/A |
| Mazda | 15V382 | Mazda | MazdaSpeed6 | 2006-2007 | Driver | N/A |
| Mazda | 15V382 | Mazda | RX-8 | 2004-2008 | Driver | N/A |
| Mazda | 15V869 | Mazda | MAZDA6 | 2003-2008 | Passenger | N/A |
| Mazda | 15V869 | Mazda | MazdaSpeed6 | 2006-2007 | Passenger | N/A |
| Mazda | 15V869 | Mazda | RX-8 | 2004 | Passenger | N/A |
| Mazda | 16V048 | Mazda | B-Series Truck | 2004-2006 | Driver | N/A |
| Mazda | 16V354 | Mazda | Mazda6 | 2003-2008 | Passenger | A, B |
| Mazda | 16V354 | Mazda | MazdaSpeed6 | 2006-2007 | Passenger | A |
| Mazda | 16V354 | Mazda | MPV | 2004-2006 | Passenger | A, B |
| Mazda | 16V354 | Mazda | RX-8 | 2004-2011 | Passenger | A |
| Mazda | 16V354 | Mazda | RX-8 | 2004-2008 | Passenger | B |
| Mazda | 16V354 | Mazda | RX-8 | 2004 | Passenger | C |
| Mazda | 16V354 | Mazda | MPV | 2004 | Passenger | C |
| Mazda | 16V354 | Mazda | Mazda6 | 2003-2004 | Passenger | C |
| Mazda | 16V356 | Mazda | CX-7 | 2007-2011 | Passenger | N/A |
| Mazda | 16V356 | Mazda | CX-9 | 2007-2011 | Passenger | N/A |

| Manufacturer | Recall | Make | Model | Model Years | Side(s) | Zone[1] |
|---|---|---|---|---|---|---|
| Mazda | 16V356 | Mazda | Mazda6 | 2009-2011 | Passenger | N/A |
| Mazda | 16V499 | Mazda | B-Series Truck | 2007-2009 | Passenger | A |
| Mazda | 16V499 | Mazda | B-Series Truck | 2007-2009 | Passenger | B |
| Mazda | 17V011 | Mazda | MPV | 2005-2006 | Passenger | C |
| Mazda | 17V011 | Mazda | RPX-8 | 2005-2009 | Passenger | B |
| Mazda | 17V011 | Mazda | RX-8 | 2005-2008 | Passenger | C |
| Mazda | 17V012 | Mazda | CX-7 | 2007-2009, 2012 | Passenger | N/A |
| Mazda | 17V012 | Mazda | CX-9 | 2007-2009, 2012 | Passenger | N/A |
| Mazda | 17V012 | Mazda | Mazda6 | 2009, 2012 | Passenger | N/A |
| Mazda | 17V013 | Mazda | B-Series Truck | 2007-2009 | Passenger | B |
| Mazda | 17V013 | Mazda | B-Series Truck | 2007-2008 | Passenger | C |
| Mazda | 18V017 | Mazda | RX-8 | 2010 | Passenger | B |
| Mazda | 18V017 | Mazda | RX-8 | 2009 | Passenger | C |
| Nissan | 13V136 | Infiniti | FX35 | 2003 | Passenger | N/A |
| Nissan | 13V136 | Infiniti | FX45 | 2003 | Passenger | N/A |
| Nissan | 13V136 | Infiniti | I-30 | 2001 | Passenger | N/A |
| Nissan | 13V136 | Infiniti | I35 | 2002-2003 | Passenger | N/A |
| Nissan | 13V136 | Infiniti | QX4 | 2002-2003 | Passenger | N/A |
| Nissan | 13V136 | Nissan | Maxima | 2001-2003 | Passenger | N/A |
| Nissan | 13V136 | Nissan | Pathfinder | 2001-2003 | Passenger | N/A |
| Nissan | 13V136 | Nissan | Sentra | 2002-2003 | Passenger | N/A |
| Nissan | 14V340 | Infiniti | FX | 2003-2005 | Passenger | N/A |
| Nissan | 14V340 | Infiniti | I35 | 2003-2004 | Passenger | N/A |
| Nissan | 14V340 | Infiniti | M | 2006 | Passenger | N/A |
| Nissan | 14V340 | Nissan | Pathfinder | 2003-2004 | Passenger | N/A |
| Nissan | 14V340 | Nissan | Sentra | 2004-2006 | Passenger | N/A |
| Nissan | 14V701 | Infiniti | FX35 | 2003-2005 | Passenger | HAH |
| Nissan | 14V701 | Infiniti | FX45 | 2003-2005 | Passenger | HAH |
| Nissan | 14V701 | Infiniti | I35 | 2003-2004 | Passenger | HAH |
| Nissan | 14V701 | Infiniti | M35 | 2006 | Passenger | HAH |
| Nissan | 14V701 | Infiniti | M45 | 2006 | Passenger | HAH |
| Nissan | 14V701 | Nissan | Pathfinder | 2003-2004 | Passenger | HAH |
| Nissan | 14V701 | Nissan | Sentra | 2004-2006 | Passenger | HAH |
| Nissan | 15V226 | Infiniti | FX35 | 2003-2005 | Passenger | HAH |
| Nissan | 15V226 | Infiniti | FX45 | 2003-2005 | Passenger | HAH |
| Nissan | 15V226 | Infiniti | I35 | 2003-2004 | Passenger | HAH |
| Nissan | 15V226 | Infiniti | M35 | 2006 | Passenger | HAH |

| Manufacturer | Recall | Make | Model | Model Years | Side(s) | Zone[1] |
|---|---|---|---|---|---|---|
| Nissan | 15V226 | Infiniti | M45 | 2006 | Passenger | HAH |
| Nissan | 15V226 | Infiniti | FX35 | 2003-2005 | Passenger | A |
| Nissan | 15V226 | Infiniti | FX45 | 2003-2005 | Passenger | A |
| Nissan | 15V226 | Infiniti | I35 | 2003-2004 | Passenger | A |
| Nissan | 15V226 | Infiniti | M35 | 2006 | Passenger | A |
| Nissan | 15V226 | Infiniti | M45 | 2006 | Passenger | A |
| Nissan | 15V226 | Nissan | Sentra | 2006 | Passenger | HAH |
| Nissan | 16V349 | Infiniti | FX35 | 2003-2008 | Passenger | HAH |
| Nissan | 16V349 | Infiniti | FX45 | 2003-2008 | Passenger | HAH |
| Nissan | 16V349 | Infiniti | I30 | 2003-2004 | Passenger | |
| Nissan | 16V349 | Infiniti | I35 | 2003-2004 | Passenger | A, B, C |
| Nissan | 16V349 | Infiniti | M35 | 2006-2010 | Passenger | A |
| Nissan | 16V349 | Infiniti | M45 | 2006-2010 | Passenger | A |
| Nissan | 16V349 | Infiniti | FX35 | 2005-2008 | Passenger | B |
| Nissan | 16V349 | Infiniti | FX45 | 2005-2008 | Passenger | B |
| Nissan | 16V349 | Infiniti | M35 | 2006-2008 | Passenger | B |
| Nissan | 16V349 | Infiniti | M45 | 2006-2008 | Passenger | B |
| Nissan | 16V349 | Nissan | Versa | 2007-2011 | Passenger | A |
| Nissan | 16V349 | Nissan | Versa | 2007-2008 | Passenger | B |
| Nissan | 17V028 | Infiniti | M35/ M45 | 2006-2010 | Passenger | C |
| Nissan | 17V028 | Infinti | FX35/ FX 45 | 2005-2008 | Passenger | C |
| Nissan | 17V028 | Nissan | FX35 | 2005-2008 | Passenger | C |
| Nissan | 17V028 | Nissan | FX45 | 2005-2008 | Passenger | C |
| Nissan | 17V028 | Nissan | M35 | 20096-2010 | Passenger | B |
| Nissan | 17V028 | Nissan | M45 | 20069-2010 | Passenger | B |
| Nissan | 17V028 | Nissan | Versa | 2007-2009, 2012 | Passenger | A |
| Nissan | 17V028 | Nissan | Versa sedans and hatchbacks | 2009 | Passenger | B |
| Nissan | 17V028 | Nissan | Versa sedans and hatchbacks | 2007-2008 | Passenger | C |
| Nissan | 17V068 | Infiniti | QX4 | 2002 | Passenger | N/A |
| Nissan | 17V068 | Nissan | Pathfinder | 2002 | Passenger | N/A |
| Nissan | 17V449 | Nissan | Versa Sedans | 2007-2011 | Driver | N/A |
| Nissan | 17V449 | Nissan | Versa HB | 2007-2012 | Driver | N/A |
| Nissan | 18V044 | Nissan | Versa HB and Sedans | 2009-2010 | Passenger | B |
| Nissan | 18V044 | Nissan | Versa HB and Sedans | 2009 | Passenger | C |
| Subaru | 14V399 | Subaru | Baja | 2003-2004 | Passenger | N/A |
| Subaru | 14V399 | Subaru | Impreza | 2004 | Passenger | N/A |

| Manufacturer | Recall | Make | Model | Model Years | Side(s) | Zone[1] |
|---|---|---|---|---|---|---|
| Subaru | 14V399 | Subaru | Legacy | 2003-2004 | Passenger | N/A |
| Subaru | 14V399 | Subaru | Outback | 2003-2004 | Passenger | N/A |
| Subaru | 14V471 | Subaru | Baja | 2003-2005 | Passenger | HAH |
| Subaru | 14V471 | Subaru | Impreza | 2004-2005 | Passenger | HAH |
| Subaru | 14V471 | Subaru | Legacy | 2003-2005 | Passenger | HAH |
| Subaru | 14V471 | Subaru | Outback | 2003-2005 | Passenger | HAH |
| Subaru | 14V763 | Saab | 9-2X | 2005 | Passenger | HAH |
| Subaru | 14V763 | Subaru | Baja | 2003-2005 | Passenger | HAH |
| Subaru | 14V763 | Subaru | Impreza | 2004-2005 | Passenger | HAH |
| Subaru | 14V763 | Subaru | Legacy | 2003-2005 | Passenger | HAH |
| Subaru | 14V763 | Subaru | Outback | 2003-2005 | Passenger | HAH |
| Subaru | 15V323 | Saab | 9-2x | 2005 | Passenger | N/A |
| Subaru | 15V323 | Subaru | Impreza Sedan/Station Wagon | 2004-2005 | Passenger | N/A |
| Subaru | 15V323 | Subaru | Baja | 2003-2004 | Passenger | N/A |
| Subaru | 15V323 | Subaru | Legacy | 2003-2008 | Passenger | N/A |
| Subaru | 15V323 | Subaru | Outback | 2003-2008 | Passenger | N/A |
| Subaru | 16V358 | Saab | 9-2X | 2006 | Passenger | A |
| Subaru | 16V358 | Subaru | Baja | 2003-2006 | Passenger | A |
| Subaru | 16V358 | Subaru | Forester | 2009-2011 | Passenger | A |
| Subaru | 16V358 | Subaru | Impreza | 2006-2011 | Passenger | A |
| Subaru | 16V358 | Subaru | Legacy | 2003-2004, 2009-2011 | Passenger | A |
| Subaru | 16V358 | Subaru | Outback | 2003-3004, 2009-2011 | Passenger | A |
| Subaru | 16V358 | Subaru | Tribeca | 2006-2011 | Passenger | A |
| Subaru | 16V359 | Saab | 9-2X | 2006 | Passenger | B |
| Subaru | 16V359 | Subaru | Baja | 2003-2006 | Passenger | B |
| Subaru | 16V359 | Subaru | Impreza | 2006-2008 | Passenger | B |
| Subaru | 16V359 | Subaru | Legacy | 2003-2004 | Passenger | B |
| Subaru | 16V359 | Subaru | Outback | 2003-2004 | Passenger | B |
| Subaru | 16V359 | Subaru | Tribeca | 2006-2008 | Passenger | B |
| Subaru | 16V361 | Subaru | Baja | 2003-2004 | Passenger | C |
| Subaru | 16V361 | Subaru | Legacy | 2003-2004 | Passenger | C |
| Subaru | 16V361 | Subaru | Outback | 2003-2004 | Passenger | C |
| Subaru | 17V014 | Subaru | Baja | 2005-2006 | Passenger | A |
| Subaru | 17V014 | Subaru | Forester | 2009-2012 | Passenger | A |
| Subaru | 17V014 | Subaru | Impreza | 2006-2011 | Passenger | A |
| Subaru | 17V014 | Subaru | Legacy | 2009-2012 | Passenger | A |

| Manufacturer | Recall | Make | Model | Model Years | Side(s) | Zone[1] |
|---|---|---|---|---|---|---|
| Subaru | 17V014 | Subaru | Outback | 2009-2012 | Passenger | A |
| Subaru | 17V014 | Subaru | Tribeca | 2006-2012 | Passenger | A |
| Subaru | 17V014 | Subaru | WRX | 2012 | Passenger | A |
| Subaru | 17V016 | Saab | 9-2X | 2006 | Passenger | C |
| Subaru | 17V016 | Subaru | Baja | 2005-2006 | Passenger | C |
| Subaru | 17V016 | Subaru | Impreza | 2006-2008 | Passenger | C |
| Subaru | 17V016 | Subaru | Tribeca | 2006-2008 | Passenger | C |
| Subaru | 17V026 | Subaru | Baja | 2005-2006 | Passenger | B |
| Subaru | 17V026 | Subaru | Forester | 2009 | Passenger | B |
| Subaru | 17V026 | Subaru | Impreza | 2006-2009 | Passenger | B |
| Subaru | 17V026 | Subaru | Legacy | 2009 | Passenger | B |
| Subaru | 17V026 | Subaru | Outback | 2009 | Passenger | B |
| Subaru | 17V026 | Subaru | Tribeca | 2006-2009 | Passenger | B |
| Subaru | 18V012 | Subaru | Legacy | 2009-2013 | Passenger | A |
| Subaru | 18V012 | Subaru | Forester | 2009-2013 | Passenger | A |
| Subaru | 18V012 | Subaru | Tribeca | 2009-2013 | Passenger | A |
| Subaru | 18V012 | Subaru | WRX | 2009-2013 | Passenger | A |
| Subaru | 18V012 | Subaru | Outback | 2009-2013 | Passenger | A |
| Subaru | 18V013 | Subaru | Tribeca | 2009-2010 | Passenger | B |
| Subaru | 18V013 | Subaru | Impreza | 2009-2010 | Passenger | B |
| Subaru | 18V013 | Subaru | Forester | 2009-2010 | Passenger | B |
| Subaru | 18V013 | Subaru | WRX | 2009-2010 | Passenger | B |
| Subaru | 18V013 | Subaru | Legacy | 2009-2010 | Passenger | B |
| Subaru | 18V013 | Subaru | Outback | 2009-2010 | Passenger | B |
| Subaru | 18V014 | Subaru | Tribeca | 2009-2010 | Passenger | B |
| Subaru | 18V014 | Subaru | Impreza | 2009 | Passenger | C |
| Subaru | 18V014 | Subaru | Forester | 2009 | Passenger | C |
| Subaru | 18V014 | Subaru | WRX | 2009 | Passenger | C |
| Subaru | 18V014 | Subaru | Legacy | 2009 | Passenger | C |
| Subaru | 18V014 | Subaru | Outback | 2009 | Passenger | C |
| Toyota | 13V133 | Lexus | SC430 | 2002-2004 | Passenger | N/A |
| Toyota | 13V133 | Toyota | Corolla | 2003-2004 | Passenger | N/A |
| Toyota | 13V133 | Toyota | Matrix | 2003-2004 | Passenger | N/A |
| Toyota | 13V133 | Toyota | Sequoia | 2002-2004 | Passenger | N/A |
| Toyota | 13V133 | Toyota | Tundra | 2003-2004 | Passenger | N/A |
| Toyota | 14V312 | Lexus | SC | 2002-2004 | Passenger | N/A |
| Toyota | 14V312 | Toyota | Corolla | 2003-2004 | Passenger | N/A |
| Toyota | 14V312 | Toyota | Matrix | 2003-2004 | Passenger | N/A |

| Manufacturer | Recall | Make | Model | Model Years | Side(s) | Zone[1] |
|---|---|---|---|---|---|---|
| Toyota | 14V312 | Toyota | Sequoia | 2002-2004 | Passenger | N/A |
| Toyota | 14V312 | Toyota | Tundra | 2003-2004 | Passenger | N/A |
| Toyota | 14V350 | Lexus | SC430 | 2003-2005 | Passenger | N/A |
| Toyota | 14V350 | Toyota | Corolla | 2003-2005 | Passenger | N/A |
| Toyota | 14V350 | Toyota | Matrix | 2003-2005 | Passenger | N/A |
| Toyota | 14V350 | Toyota | Sequoia | 2003-2005 | Passenger | N/A |
| Toyota | 14V350 | Toyota | Tundra | 2003-2005 | Passenger | N/A |
| Toyota | 14V655 | Lexus | SC | 2002-2005 | Passenger | N/A |
| Toyota | 14V655 | Toyota | Corolla | 2003-2005 | Passenger | N/A |
| Toyota | 14V655 | Toyota | Matrix | 2003-2005 | Passenger | N/A |
| Toyota | 14V655 | Toyota | Sequoia | 2002-2005 | Passenger | N/A |
| Toyota | 14V655 | Toyota | Tundra | 2003-2005 | Passenger | N/A |
| Toyota | 16V127 | Lexus | SC430 | 2008-2010 | Passenger | N/A |
| Toyota | 16V127 | Pontiac | Vibe | 2008 | Passenger | N/A |
| Toyota | 16V127 | Toyota | Corolla | 2008 | Passenger | N/A |
| Toyota | 16V127 | Toyota | Corolla Matrix | 2008 | Passenger | N/A |
| Toyota | 16V128 | Lexus | SC430 | 2008-2010 | Passenger | HAH |
| Toyota | 16V128 | Pontiac | Vibe | 2008 | Passenger | HAH |
| Toyota | 16V128 | Toyota | Corolla | 2008 | Passenger | HAH |
| Toyota | 16V128 | Toyota | Corolla Matrix | 2008 | Passenger | HAH |
| Toyota | 16V340 | Lexus | ES 350 | 2007-2011 | Passenger | A |
| Toyota | 16V340 | Lexus | GX460 | 2010-2011 | Passenger | A |
| Toyota | 16V340 | Lexus | IS 250 | 2006-2011 | Passenger | A |
| Toyota | 16V340 | Lexus | IS 250C | 2010-2011 | Passenger | A |
| Toyota | 16V340 | Lexus | IS 350 | 2006-2011 | Passenger | A |
| Toyota | 16V340 | Lexus | IS 350C | 2010-2011 | Passenger | A |
| Toyota | 16V340 | Lexus | IS F | 2008-2011 | Passenger | A |
| Toyota | 16V340 | Pontiac | Vibe | 2009-2010 | Passenger | A |
| Toyota | 16V340 | Toyota | 4Runner | 2010-2011 | Passenger | A |
| Toyota | 16V340 | Toyota | Corolla | 2009-2011 | Passenger | A |
| Toyota | 16V340 | Toyota | Corolla Matrix | 2009-2011 | Passenger | A |
| Toyota | 16V340 | Toyota | Sienna | 2011 | Passenger | A |
| Toyota | 16V340 | Toyota | Scion xB | 2008-2011 | Passenger | A |
| Toyota | 16V340 | Toyota | Yaris Hatchback | 2006-2011 | Passenger | A |
| Toyota | 16V340 | Toyota | Yaris Sedan | 2007-2011 | Passenger | A |
| Toyota | 16V354 | Lexus | IS F | 2008 | Passenger | B |
| Toyota | 16V354 | Lexus | IS250 | 2006-2008 | Passenger | B |
| Toyota | 16V354 | Lexus | IS350 | 2006-2008 | Passenger | B |

| Manufacturer | Recall | Make | Model | Model Years | Side(s) | Zone[1] |
|---|---|---|---|---|---|---|
| Toyota | 16V354 | Lexus | ES350 | 2007-2008 | Passenger | B |
| Toyota | 16V354 | Scion | xB | 2008 | Passenger | B |
| Toyota | 16V354 | Toyota | Yaris | 2007-2008 | Passenger | B |
| Toyota | 17V006 | Lexus | ES 350 | 2007-2009, 2012 | Passenger | A |
| Toyota | 17V006 | Lexus | GX460 | 2012 | Passenger | A |
| Toyota | 17V006 | Lexus | IS 250 | 2006-2009, 2012 | Passenger | A |
| Toyota | 17V006 | Lexus | IS 250C | 2012 | Passenger | A |
| Toyota | 17V006 | Lexus | IS 350 | 2006-2009, 2012 | Passenger | A |
| Toyota | 17V006 | Lexus | IS 350C | 2012 | Passenger | A |
| Toyota | 17V006 | Lexus | IS F | 2008-2009, 2012 | Passenger | A |
| Toyota | 17V006 | Lexus | LFA | 2012 | Passenger | A |
| Toyota | 17V006 | Lexus | ES 350 | 2009 | Passenger | B |
| Toyota | 17V006 | Lexus | IS 250 | 2009 | Passenger | B |
| Toyota | 17V006 | Lexus | IS 350 | 2009 | Passenger | B |
| Toyota | 17V006 | Lexus | IS F | 2009 | Passenger | B |
| Toyota | 17V006 | Lexus | IS 250 | 2006-2008 | Passenger | C |
| Toyota | 17V006 | Lexus | IS 350 | 2006-2008 | Passenger | C |
| Toyota | 17V006 | Lexus | ES350 | 2007-2008 | Passenger | C |
| Toyota | 17V006 | Lexus | ISF | 2008 | Passenger | C |
| Toyota | 17V006 | Pontiac | Vibe | 2009 | Passenger | B |
| Toyota | 17V006 | Pontiac | Vibe | 2009 | Passenger | B |
| Toyota | 17V006 | Scion | xB | 2009 | Passenger | B |
| Toyota | 17V006 | Scion | xB | 2008 | Passenger | C |
| Toyota | 17V006 | Toyota | 4Runner | 2012 | Passenger | A |
| Toyota | 17V006 | Toyota | Corolla | 2009, 2012 | Passenger | A |
| Toyota | 17V006 | Toyota | Corolla Matrix | 2009, 2012 | Passenger | A |
| Toyota | 17V006 | Toyota | Sienna | 2012 | Passenger | A |
| Toyota | 17V006 | Toyota | Yaris Hatchback | 2007-2009 | Passenger | C |
| Toyota | 17V006 | Toyota | Yaris Sedan | 2007-2009, 2012 | Passenger | A |
| Toyota | 17V006 | Toyota | Corolla | 2009 | Passenger | B |
| Toyota | 17V006 | Toyota | Corolla Matrix | 2009 | Passenger | B |
| Toyota | 17V006 | Toyota | Yaris Hatchback | 2009 | Passenger | B |
| Toyota | 17V006 | Toyota | Yaris Sedan | 2009 | Passenger | B |
| Toyota | 17V006 | Toyota | Yaris Hatchback | 2007-2008 | Passenger | C |
| Toyota | 17V006 | Toyota | Yaris Sedan | 2007-2008 | Passenger | C |

| Manufacturer | Recall | Make | Model | Model Years | Side(s) | Zone[1] |
|---|---|---|---|---|---|---|
| Toyota/GM | 14V312 | Pontiac | Vibe | 2003-2004 | Passenger | N/A |
| Toyota/GM | 14V350 | Pontiac | Vibe | 2003-2005 | Passenger | N/A |
| Toyota/GM | 14V655 | Pontiac | Vibe | 2003-2005 | Passenger | N/A |
| Volkswagen | 16V079 | Audi | A3 | 2005-2013 | Driver (PSDI-5) | N/A |
| Volkswagen | 16V078 | Audi | A5 Cabriolet | 2010-2011 | Driver (SDI) | N/A |
| Volkswagen | 16V078 | Audi | Q5 | 2009-2012 | Driver (SDI) | N/A |
| Volkswagen | 16V078 | Volkswagen | CC | 2009-2014 | Driver (SDI) | N/A |
| Volkswagen | 16V078 | Volkswagen | Eos | 2012-2014 | Driver (SDI) | N/A |
| Volkswagen | 16V078 | Volkswagen | Jetta SportWagen and Golf | 2010-2014 | Driver (SDI) | N/A |
| Volkswagen | 16V078 | Volkswagen | Passat | 2012-2014 | Driver (SDI) | N/A |
| Volkswagen | 16V078 | Volkswagen | Passat Sedan and Wagon | 2007-2010 | Driver (SDI) | N/A |
| Volkswagen | 16V078 | Volkswagen | S5 Cabriolet | 2010-2012 | Driver | N/A |
| Volkswagen | 16V079 | Audi | A4 Cabriolet | 2006-2009 | Driver (PSDI-5) | N/A |
| Volkswagen | 16V079 | Audi | S4 Cabriolet | 2007-2009 | Driver (PSDI-5) | N/A |
| Volkswagen | 16V079 | Volkswagen | Passat Sedan and Wagon | 2006 | Driver (PSDI-5) | N/A |
| Volkswagen | 16V382 | Audi | A4 | 2004-2008 | Passenger | A, B |
| Volkswagen | 16V382 | Audi | A6 | 2005-2011 | Passenger | A |
| Volkswagen | 16V382 | Audi | A6 | 2005-2008 | Passenger | B |
| Volkswagen | 16V382 | Audi | A4 | 2004 | Passenger | C |
| Volkswagen | 17V032 | Audi | A4 Cabriolet | 2009 | Passenger | B |
| Volkswagen | 17V032 | Audi | S4 Cabriolet | 2009 | Passenger | B |
| Volkswagen | 17V032 | Audi | A6 Avant | 2009 | Passenger | B |
| Volkswagen | 17V032 | Audi | A6 Sedan | 2009 | Passenger | B |
| Volkswagen | 17V032 | Audi | S6 Sedan | 2009 | Passenger | B |
| Volkswagen | 17V032 | Audi | A4 Avant | 2005-2008 | Passenger | C |
| Volkswagen | 17V032 | Audi | A4 Sedan | 2005-2008 | Passenger | C |
| Volkswagen | 17V032 | Audi | A6 Sedan | 2005-2008 | Passenger | C |
| Volkswagen | 17V032 | Audi | S4 Avant | 2005-2008 | Passenger | C |
| Volkswagen | 17V032 | Audi | S4 Sedan | 2005-2008 | Passenger | C |
| Volkswagen | 17V032 | Audi | A6 Avant | 2006-2008 | Passenger | C |

| Manufacturer | Recall | Make | Model | Model Years | Side(s) | Zone[1] |
|---|---|---|---|---|---|---|
| Volkswagen | 17V032 | Audi | RS4 Cabriolet | 2008 | Passenger | C |
| Volkswagen | 17V032 | Audi | A4 Cabriolet | 2007-2008 | Passenger | C |
| Volkswagen | 17V032 | Audi | RS4 Sedan | 2007-2008 | Passenger | C |
| Volkswagen | 17V032 | Audi | S4 Cabriolet | 2007-2008 | Passenger | C |
| Volkswagen | 17V032 | Audi | S6 Sedan | 2007-2008 | Passenger | C |
| Volkswagen | 18V004 | Audi | A6 Avant | 2010-2011 | Passenger (PSPI) | B |
| Volkswagen | 18V004 | Audi | A6 Sedan | 2010-2011 | Passenger (PSPI) | B |
| Volkswagen | 18V004 | Audi | S6 Sedan | 2010-2011 | Passenger (PSPI) | B |
| Volkswagen | 18V004 | Audi | A4 Cabriolet | 2009 | Passenger | C |
| Volkswagen | 18V004 | Audi | S4 Cabriolet | 2009 | Passenger | C |
| Volkswagen | 18V004 | Audi | A6 Avant | 2009-2011 | Passenger | C |
| Volkswagen | 18V004 | Audi | A6 Sedan | 2009-2011 | Passenger | C |
| Volkswagen | 18V004 | Audi | S6 Sedan | 2009-2011 | Passenger | C |
| Volkswagen | 18V082 | Audi | S5 Cabriolet | 2010-2012 | Driver (SDI) | N/A |
| Volkswagen | 18V082 | Audi | Q5 | 2009-2012 | Driver | N/A |
| Volkswagen | 18V082 | Audi | S5 Cabriolet | 2010-2012 | Driver | N/A |

204.   In addition to the recalls listed in the table above, there are many future recalls required by NHTSA that have not yet been announced by the manufacturers.  These future recalls include model years 2013 and later in Zone A and model years 2009 and later in Zone C.  The future recalls apply to all manufacturers and will continue through December 2019.[3]

**I.**     **Takata is a Major Manufacturer of Airbags and Inflators**

205.   Takata was the world's second largest manufacturer of automotive safety devices, including airbags. Takata was one of the first companies to market driver-side airbags in the early 1980s.

---

[3] *See* Amended Annex A and https://www.nhtsa.gov/takata-air-bags/takata-recall-expansion-what-consumers-need-know.

206.    Takata has supplied airbags to automakers for U.S. vehicles and to state and local governmental purchasers since at least 1983.  By 2014, Takata had captured 22 percent of the global automotive airbag market.

207.    Takata manufactured, distributed, and sold Defective Airbags that can cause serious bodily injury or death; and intentionally concealed the foregoing from Plaintiffs, Class members, and federal regulators.

## II.    **Takata's Airbags Have A Common, Uniform Defect**

### A.    **Takata Recklessly Chose An Inexpensive and Dangerous Propellant**

208.    The part of the airbag at issue in this matter is the inflator. The inflator consists of a metal canister loaded with propellant wafers or pellets, and is placed in the airbag module.  Upon impact, the propellant wafers or pellets ignite, triggering a chemical reaction that produces gas, which in turn inflates the fabric airbag.  This process occurs within milliseconds.

209.    The following basic illustration, included earlier in the complaint as well, depicts Takata's airbag module:



Steering Wheel

Airbag

Airbag Cover

Inflator

210.    When it began manufacturing airbags in the 1980s, Takata used a compound called sodium azide as the propellant within its inflators.  In the mid-1990s, Takata began using a different propellant called 5-aminotetrazole, in part due to toxicity issues associated with sodium azide.

211.    In the late-1990s, Takata's managers pressured its engineers in Michigan to devise a lower cost propellant based upon ammonium nitrate, a compound used in fertilizer and explosives.  Ammonium nitrate is a dangerous material that should not be used in airbags.  It is an inherently volatile and unstable chemical.

212.    Daily temperature swings are large enough for the ammonium nitrate to cycle through three of its five crystalline states, adding to its volatility.  It also readily absorbs moisture from the atmosphere.  The chemical's sensitivity to temperature and moisture cause it to break down over time, which in turn results in violent detonation.  As one explosives expert bluntly

stated in *The New York Times*, ammonium nitrate "shouldn't be used in airbags," and is better suited to large demolitions in mining and construction.

213.    From the time it began investigating ammonium nitrate in the late 1990s, Takata understood these risks.  Indeed, Takata expressed concern in a patent document in 1996 that an ammonium-nitrate propellant would be vulnerable to temperature changes and that its casing "might even blow up."  Takata further recognized that "[o]ne of the major problems with the use of ammonium nitrate is that it undergoes several crystalline phase changes," one of which occurs at approximately 90 degrees Fahrenheit.  If ammonium nitrate undergoes this type of temperature change, the compound may "expand and contract and change shape resulting in growth and cracking" of the propellant, which might cause an airbag inflator to "not operate properly or ***might even blow up*** because of the excess pressure generated" (emphasis added).

214.    Takata further admitted in a patent document from 1999 that pure ammonium nitrate is "problematic" because many gas generating compositions made with it are "thermally unstable."

215.    In 1999, as the ammonium nitrate design was being considered, Takata's engineering team in Moses Lake, Washington, raised objections and pointed to a publicly available explosives manuals that warned of the risk of disintegration and irregular, overly-energetic combustion.  As one former Takata engineer noted, "ammonium nitrate stuck out like a sore thumb," and yet his team was given only "a couple days" to do its review.

216.    Not surprisingly, other major airbag manufacturers, including Autoliv, Key Safety Systems, and TRW Automotive, have reportedly avoided or abandoned using ammonium nitrate as a propellant.  Indeed, Takata's representative confirmed at a Congressional hearing in June 2015 that Takata is the only major airbag manufacturer that uses ammonium nitrate as a primary propellant in its inflators.

- 69 -

217.   The only conceivable advantage to the compound for an airbag manufacturer, according to the expert quoted in *The New York Times*, is that it is "cheap, unbelievably cheap." Indeed, Takata had originally planned to use tetrazole as its propellant, which is not only more stable than ammonium nitrate, but also yields other desired benefits, such as being more environmentally friendly.  But tetrazole was too expensive for Takata, and executives ultimately pressured engineers in Michigan to develop a cheaper alternative.

218.   Takata began receiving complaints regarding the Inflator Defect shortly after introducing the redesigned airbag to the market, and those complaints continued to multiply over the years.  Nevertheless, rather than switch to the compound it knew would be safer, even if more expensive, Takata recklessly opted to try, over the course of many years, to stabilize a compound that resists stabilization.

219.   For example, in a 2006 patent application, Takata discussed the need to test the performance of ammonium nitrate at various extreme temperatures because it is an unstable chemical, and these tests could reveal many problems, including "over-pressurization of the inflator leading to rupture."  The 2006 patent document purportedly contained a fix for that sort of rupturing.

220.   Notably, the alleged fix in 2006 came *after* a rupture incident in 2004 that caused a serious injury, and incidents continued to mount after that time as well.

221.   In a 2007 patent for allegedly phase stabilized ammonium nitrate that incorporates a scavenging additive designed to retain moisture in an effort to prevent these catastrophic ruptures, Takata representatives noted the following:

> Without the addition of the [additive], and as shown in [the patent], the ballistic curves indicate that changes occurred in the gas generant after 50 cycles. After 100 cycles the ballistic performance was very aggressive and did not meet USCAR specification. After 200 cycles the ballistic performance was so aggressive the

ballistic performance was so aggressive that the inflator ruptured due to extremely
high internal pressures.

222.    Thus, Takata's inflators were "grenades" in the glove box or steering wheel waiting
to detonate after going through 100 or 200 cycles of thermal cycling, which, of course, is
something cars in the real world will eventually do.

223.    The use of this additive (or any other) designed to address ammonium nitrate's
hygroscopic nature (affinity for moisture) is, at best, a temporary fix because at some point the
additive will no longer be able to absorb the excess moisture and the ballistic curves will again
exceed specification leading to ruptures.

224.    Takata submitted a patent application with other purported "fixes" as recently as
2013.  These ongoing, albeit unsuccessful, efforts show that Takata knew throughout the relevant
period that its airbags were defective.

**B.**     **The Risks of the Inflator Defect Were Exacerbated by Takata's and
        Defendants' Abysmal Quality Control**

225.    Takata and the Vehicle Manufacturer Defendants became further aware of the
instability of its ammonium-nitrate propellant from the persistent and glaring quality control
problems Takata encountered in its manufacturing operations. The Takata plants that
manufactured the airbags and inflators at issue in this Complaint include plants located in Moses
Lake, Washington, LaGrange, Georgia, and Monclova, Mexico.  Defendants routinely visited and
audited Takata operations, including in response to quality and safety concerns.

226.    Starting in 2001, engineers at Takata's Monclova, Mexico plant identified a range
of problems, including rust, which they said could have caused inflators to fail.  Between 2001 and
2003, Takata struggled with at least 45 different inflator problems, according to dozens of internal
reports titled "potential failures" and reviewed by *Reuters*.  On at least three occasions between
2005 and 2006, Takata engineers struggled to eliminate leaks found in inflators, according to

engineering presentations. In 2005, Shainin, a U.S. consulting firm, found a pattern of additional problems.

227. Underscoring Takata's reckless use of the volatile and unstable ammonium nitrate, on March 31, 2006, the Monclova, Mexico plant was rocked by violent explosions in containers loaded with propellant. The Vehicle Manufacturer Defendants were made aware of this incident soon after it occurred.

228. Apparently, not even that terrible accident could prompt serious and lasting improvements: in a February 2007 email to multiple colleagues, one manager stated that "[t]he whole situation makes me sick," referring to Takata's failure to implement checks it had introduced to try to keep the airbags containing the unstable and volatile ammonium-nitrate propellant from failing.

229. Takata engineers also scrambled as late as 2009 to address its propellant issues after "inflators tested from multiple propellant lots showed aggressive ballistics," according to an internal presentation in June 2009.

230. Based on internal Takata documents, Takata was struggling to meet a surge in demand for its airbags. Putting profits ahead of safety, Takata exhibited shoddy and reckless behavior in the handling of its ammonium-nitrate propellant. In March 2011, a Takata supervisor at the Monclova, Mexico plant sent an e-mail to other employees stating "A part that is not welded = one life less, which shows we are not fulfilling the mission." The title of the e-mail was "Defectos y defectos y defectos!!!!" This shoddy and reckless attitude permeated all of Takata's operations and facilities.

231. Yet handling problems at Takata facilities persisted: another manager urged employees to examine the propellant visible in a cross section of an airbag inflator, noting that

"[t]he propellant arrangement inside is what can be damaged when the airbags are dropped. . . . Here you can see why it is important to handle our product properly." A 2009 presentation of guidelines on handling inflators and airbag units also stressed the dangers of mishandling them. The presentation included a link to a video that appeared to show side-curtain airbags deploying violently, sending the inflator hurtling into the car's cabin.

232. Despite knowing it was shipping potentially deadly products, including inflators containing unstable and volatile ammonium-nitrate propellant, Takata resisted taking back damaged or wet airbag modules, in part because Takata struggled to keep up with a surge in demand for its airbags through the early and mid-2000s as it won big new clients like Old GM.

233. Moreover, while Defendants, and particularly Takata, had previously assured the public that the Defective Airbags had been remedied and that the new airbags being placed in recalled vehicles were safe, in fact, several Vehicle Manufacturer Defendants have been or will be required to recall model year 2013, 2014, 2015, and 2016 vehicles because of the risk of the Takata airbags rupturing. And Takata has now admitted that replacement airbags installed in recalled vehicles are defective as well, and cannot assure the public that replacement inflators containing ammonium nitrate are safe and not prone to rupture.

## III.   Takata Airbag Failures and Defendants' Inadequate Response

### A.   2003-2008: Early Incidents and the 2008 Honda Recall (08V-593)

234. Honda was among the first automakers to use Takata's new airbags. Honda and Takata began discussing inflators with ammonium-nitrate propellant as early as 1998, and Honda first installed such inflators in its 2001 Model Year vehicles. Since then, Takata airbags containing the Inflator Defect have been installed in vehicles manufactured by at least ten automakers.

235.   On November 1, 2003, Charlene Weaver of Arizona—one of the least humid states in the country—was a passenger in a 2004 Subaru Impreza when she was killed in a Takata airbag-related accident.  As summarized in a later section of this Complaint, her car was not recalled until May 2015, more than a decade later.

236.   Also in 2003, an inflator ruptured in a BMW in Switzerland, prompting a January 2004 investigation by Takata and BMW.  That investigation took place at a Takata facility in Michigan and involved inflators sold to BMW, Honda, and Toyota.  The testing was ordered by a senior Takata executive, and the results indicated that the inflators were defective.  Takata confirmed this in a Defect Information Report to NHTSA more than a decade later.

237.   In 2004, a Takata airbag violently exploded in a Honda Accord in Alabama, shooting out metal fragments and injuring the car's driver. Honda was notified of the incident, and at least one Takata employee recalled being told that Honda examined the part before turning it over to Takata.  Takata reported back to Honda that it was unable to find a cause for the incident. Ultimately, the companies deemed the incident "an anomaly," and conducted no further investigation or analysis to the public's knowledge.  Notably, Honda and Takata did not issue a recall or even involve federal safety regulators beyond completing a reporting form in a cursory and incomplete manner.

238.   Yet, by this time, Takata was aware of the broad problems associated with its choice of the unstable and volatile ammonium nitrate as a propellant.  As noted above, between 2001 and 2003, internal Takata reports titled "potential failures" showed that Takata struggled with at least 45 different inflator problems, and that, in 2002, the Monclova, Mexico plant recorded 60 to 80 defects for every million inflators shipped to automakers—six to eight times beyond Takata's own quality control limit.

239.    In June and August of 2007, Honda notified Takata of three additional airbag explosion incidents. All three accidents involved metal fragments propelling into the faces and bodies of car passengers upon deployment of the airbags. As with the 2004 incident, Honda did not initiate a recall or provide information about the ruptures to federal regulators. Rather, it callously risked vehicle occupants' safety as it purportedly awaited a failure mode analysis being conducted by Takata.

240.    After the 2007 incidents, Honda and Takata began another internal investigation, including a survey of inflators. Starting in late 2007 or early 2008, Honda began collecting inflators returned to dealers for reasons unrelated to the exploding-airbag defect, and sent them to Takata for investigation, all without informing vehicle owners or regulators.  Honda also collected inflators from scrap yards for the same purpose.

241.    Takata began what became a year-long study of the Inflator Defect. Takata's engineers ultimately claimed that workers at a Takata factory in Monclova, Mexico had left moisture-sensitive explosives out on the plant floor, making them prone to overly energetic combustion.  Takata advised Honda that by November 2002, it had corrected any such handling deficiencies.

242.    The victims of the four Honda incidents—one in 2004 and three in 2007—brought legal claims against Honda, which the automaker settled on a strictly confidential basis.  While Honda filed a standard report with U.S. safety regulators for each of these four incidents, its reports tellingly omitted the most critical detail of these incidents: the Defective Airbags posed a substantial risk of serious injury or death when deployed.  In later submissions to NHTSA, Honda admitted that it had received still other complaints in this timeframe:

a. On July 25, 2008, Honda received an unidentified complaint related to Takata driver-side airbag ruptures.

b. On September 11, 2008, Honda received notice of a complaint regarding an "unusual" driver-side airbag deployment.

243. Takata shared the results of the inflator survey analysis with Honda on October 2, 2008. That analysis indicated an airbag inflator problem. Honda and Takata claimed, however, that only a small number or inflators were affected.

244. As a result, Honda issued a recall, but only for 3,940 vehicles in the United States. This November 2008 recall involved certain 2001 Honda Accord and Civic vehicles with airbags that "could produce excessive internal pressure," causing "the inflator to rupture," spraying metal fragments through the airbag cushion ("2008 Recall"). Honda reported that it learned of the problem from a June 2007 claim, and falsely assured regulators that it had identified all "possible vehicles that could potentially experience the problem."

245. Even as Takata and Honda advocated a minuscule recall focused on older models— less than 0.1 percent of the total Honda recall to date—at about the same time, in April 2009, Takata engineers scrambled to repair a flaw in a machine at the Monclova, Mexico factory that made the airbag propellant more volatile, according to materials from a company presentation given that year.

**B. 2008-2009: Additional Incidents, the 2009 Honda Recall (09V-259), and Honda's and Takata's Misleading Reporting to NHTSA**

246. Additional incidents took place after the 2008 Recall that underscored its inadequacy:

a. On April 27, 2009, six months after the limited 2008 recall, a Takata airbag in Jennifer Griffin's 2001 Honda Civic exploded after a minor accident in Orlando,

Florida. The explosion sent a two-inch piece of shrapnel from the Defective Airbag

flying into Ms. Griffin's neck. Although Ms. Griffin survived, when highway

troopers found her, she was bleeding from a severe gash in her neck. Ms. Griffin's

car was not part of the 2008 Recall. Honda received notice of the incident no later

than September 2009, and likely months earlier in July towards the beginning of its

correspondence with NHTSA regarding the upcoming 2009 recall.

b.　　On May 28, 2009, 18-year-old Ashley Parham of Oklahoma was killed while

driving a 2001 Honda Accord when the Takata airbag in her car exploded after her

car bumped another car in a parking lot. While she apparently survived the collision

itself, the metal shrapnel that shot out of the exploding Defective Airbag sliced open

her carotid artery and she bled to death. Ms. Parham's car was not part of the 2008

Recall.

c.　　Another Takata airbag-related fatal incident took place in Virginia on June 9, 2009,

and Honda ultimately settled a lawsuit brought by the decedent's family.

d.　　According to one of its submissions related to the upcoming 2009 Recall, Honda

received three additional Takata airbag unusual deployment complaints on July 27,

July 31, and August 31, 2009.

247. With incidents mounting, Takata and Honda revisited the issue yet again. In

June 2009, Takata reported to Honda that the defective airbag components had been made at its

factory in Moses Lake, Washington. At the time, Takata engineers claimed that between 2000 and

2002, a flaw in a machine that presses air bag explosives into wafers had made the explosives

unstable. The Takata engineers further claimed that with the defective airbags, explosives in the

metal inflator, which would normally burn down and produce the nitrogen gas to inflate the air

bag, instead burn aggressively and cause the inflator to burst, shooting hot fragments through the air bag's fabric.

248.    After two years of investigation, Honda and Takata claimed that a machine at Takata's Moses Lake factory in Washington state had failed to compress chemicals firmly enough. That left the inflators vulnerable to moisture, potentially causing the bags to inflate more forcefully than they were supposed to. At that time, Takata also acknowledged that the defect covered a wider range of vehicles than initially estimated, but claimed that the plant had made numerous upgrades to its machinery in late 2002, which it claimed had improved the quality of its explosives.

249.    In June 2009, Takata provided a follow up report to Honda on its November 2008 analysis, stating that issues related to propellant production appeared to have caused the improper inflator performance.

250.    As a result of Takata's June 2009 follow-up report and the additional claims of "unusual deployments," on June 30, 2009, Honda issued another recall, this one covering 2001 and 2002 Civic, Accord, and Acura vehicles ("2009 Recall").  Thus, it was two months *after* Ms. Parham's death that Honda expanded its 2008 Recall to include the model she drove.

251.    In August 2009, NHTSA's Recall Management Division sent Honda an information request to explain why it did not include 2009 Recall vehicles in the 2008 Recall, and "to evaluate the timeliness of [Honda's] recent defect decision."

252.    NHTSA also wanted to know "the difference between the driver's airbag inflators in those vehicles from the inflators in the 09V-259 vehicles and explain how this distinction, or any other between the two sets of vehicles, convinced [Honda] at the time that it did not need to include the latter set in the 08V-593 recall population."

- 78 -

253. NHTSA's Recall Management Division further requested that Honda provide complaints, lawsuits, warranty claims, and field reports, along with an explanation of the "unusual driver-side airbag deployments" and Honda's investigative efforts.

254. In Honda's September 16, 2009 reply to NHTSA, the automaker said that its information about the "unusual driver airbag deployments" came from Takata: "[w]e understood the causal factors to be related to airbag propellant due to handling of the propellant during airbag inflator module assembly."

255. Honda also reported, based on information from Takata, that the problem with the airbags was isolated to the "production of the airbag propellant prior to assembly of the inflators." Specifically, the cause was "related to the process of pressing the propellant into wafers that were later installed into the inflator modules," and limited to "a specific production process" involving one high-precision compression press that was used to form the propellant into wafers, the automaker told NHTSA.

256. Honda also disclosed to NHTSA that it had fielded nine complaints and one lawsuit related to the 2008 and 2009 Recalls. Honda also finally informed NHTSA about the 2004 incident involving an "unusual deployment" of the vehicle's airbag. Honda claimed that it "only recently [was] reminded of this incident," and that, until recently, Honda "had not associated it with the [2008 Recall] campaign."

257. Through a November 20, 2009 request, NHTSA also sought information from Takata. Takata submitted a partial response to NHTSA on December 23, 2009 ("Partial Response"), and then a full response on February 19, 2010 ("Full Response"). Both responses provided vague and misleading information about the seriousness of the problem.

258.   Takata claimed that there were no substantive design differences between the inflators in the airbags at issue in the two recalls, but cited differences in the production processes between the lots.

259.   Takata also claimed that the defects only existed in specific lots manufactured between certain dates.  It claimed that the inflators involved in the 2008 Recall were manufactured between October 29, 2000 and December 1, 2000, and that inflators involved in the 2009 Recall were manufactured between August 23, 2000 and February 25, 2001.  Takata did not provide the dates the inflators were shipped, as NHTSA requested, because, as Takata admitted, its records did not have that information. Instead, it gave just the manufacturing dates.

260.   In its Full Response, Takata claimed that the defect identified in the 2009 Recall was the result of a single compression press (the "Stokes press") in a single plant. Takata further claimed that while it did manufacture 2,400 inflators using the same process as the defective inflators, the design was different and "[t]herefore, Takata is convinced that the inflators sold [redacted] contain no safety-related defect."

261.   Takata falsely wrote in its Full Response that it "believed - [redacted] - that expanding the recall to include all vehicles equipped with inflators manufactured with Stokes propellant produced through and including February 28, 2001 would capture all inflators with tablets that had a risk of producing overly energetic combustion. This recommendation, as well as the analysis that supported it, was presented to Honda on June 12, 2009."

262.   In both the Partial Response and the Full Response, Takata stated: "Takata has not provided any airbag inflators that are the same or substantially similar to the inflators in vehicles covered by Recalls 08V-593 [in 2008] and 09V-259 [in 2009] to any customers other than Honda.

The physical characteristics of the inflator housing used in the Honda vehicles subject to these recalls are unique to Honda." This statement would prove to be false.

263.    Based on Takata's and Honda's misrepresentations and omissions concerning the nature and scope of the Inflator Defect, NHTSA closed its investigation into the Takata airbags on May 6, 2010.

264.    In the months following NHTSA's 2009/2010 request for information, Takata engineers came up with yet another purported explanation for the ruptures; specifically, that in September 2001, machine operators at the Moses Lake, Washington plant could have inadvertently switched off an "auto reject" function that weeded out poorly made explosives that can become unstable. However, Takata assured Honda at the time that, "as part of the upgrades at that plant, in September 2002, the supplier had added a locking mechanism that prevented workers from turning the auto-reject function off."

265.    The *Wall Street Journal* further reported that "Honda and Takata discovered more problems. At Moses Lake, employees had switched off a mechanism that automatically checked whether the right amount of propellant was loaded in inflators; at a plant in Monclova, Mexico, a dehumidifier that kept parts dry hadn't been turned on. At times poor record-keeping meant Honda and Takata couldn't figure out which cars had defective bags."

C.    **2010: The 2010 Recall (10V-041) and Honda's Shifting Explanations**

266.    Honda's and Takata's ongoing cover-up and ineffective recalls continued to cost lives.  In December 2009, a 2001 Honda Accord driven by Gurjit Rathore, 33, hit a mail truck in Richmond, Virginia.  Her air bag exploded, propelling shrapnel into her neck and chest, and she bled to death in front of her three children, according to a lawsuit filed by her family.

267.   In February 2010, only months after its previous recall, Honda announced a third recall for an additional 379,000 vehicles across a number of models ("2010 Recall").

268.   Honda's explanation for the airbag defect changed yet again, but still misleadingly focused on the manufacturing process. Honda explained that of the two different manufacturing processes used in the preparation of an airbag propellant, one process was within specification and the other was not. Honda's expanded recall supposedly reached those vehicles employing airbags that had utilized manufacturing processes not within specification.

269.   Once again, however, injuries continued to mount:

a.     In April 2010, two months after the 2010 Recall, the Takata airbag in Kristy Williams's 2001 Honda Civic exploded while she was stopped at a traffic light in Morrow, Georgia, sending metal shards into her neck and causing profuse bleeding. She survived only because she applied pressure with her fingers to stem the arterial bleeding.

b.     On November 8, 2010, Suetania Emmanuel of St. Croix, U.S. Virgin Islands was driving a 2002 Honda Civic when the Takata airbag exploded and sent shards of metal into her face and throat.

**D.     2011-2012: Mounting Honda Recalls, Including the 2011 Recall (11V-260)**

270.   In April 2011, Honda filed a Part 573 Defect and Noncompliance report for 2,430 replacement service part airbag modules that might have been installed in vehicles covered by previous recall expansions ("2011 Recall"). Honda was unable to determine which vehicles contained the defective replacement parts, forcing it to recall all 833,277 vehicles that might have had the part installed.

271.    According to documents submitted with the 2011 Recall, on August 15, 2011, Honda became aware of an August 1, 2011 "energetic deployment of a driver's airbag inflator that was outside of the prior range of suspect inflators." On September 2, 2011, Honda and Takata began an analysis of these so-called "outside of range" occurrences.

272.    Further underscoring the instability of the ammonium-nitrate propellant, on or about September 14, 2011, Honda and Takata began investigating the possibility that airbag inflator propellant lots were mixed during airbag inflator assembly, prompting further analysis of airbag inflator production records for the period when propellant was processed by the suspect method.

273.    Honda reported its death and injury tallies to regulators only in a confidential submission in December 2011, when it issued a fifth limited recall for the rupture defect, according to NHTSA. That recall expanded Recall No. 11V-260 (April 2011), to include an additional 272,779 Honda and Acura vehicles. The expanded recall also included another 640 airbags sold as replacement parts; however, because Honda could not determine on which vehicles the 640 replacement airbags were installed, an additional 603,241 vehicles had to be recalled. Collectively, 1.7 million Honda and Acura vehicles had been recalled by the end of 2011 because they contained Takata-manufactured airbags.

274.    In the meantime, Honda and Takata quietly continued their internal investigation into the Inflator Defect. According to Honda, an exploding airbag in Puerto Rico in October 2011 prompted Honda to ask permission from NHTSA to collect "healthy" airbag modules to see if "abnormal combustion was possible." The collection began on March 14, 2012, and by November 21, 2012, Honda in fact found that even its so-called "healthy" airbags could abnormally combust in certain conditions.

275.    Notably, in or about December 2012, NHTSA's Office of Defects Investigation ("ODI") notified Honda that there were numerous injury or death incidents listed on a spreadsheet Honda provided to NHTSA in connection with NHTSA's Takata investigation that were *not* previously provided to NHTSA under the early warning reporting system established by the TREAD Act.  In late 2014, Honda ultimately admitted that it failed to report 1,729 serious accidents resulting in injuries or deaths to NHTSA between 2003 and 2014.  Eight of these incidents involved Takata airbags.  In January 2015, Honda agreed to pay a $70 million fine for this startling failure.

276.    Toyota also received additional direct notice of the Inflator Defect in this timeframe. Starting in September 2012, Toyota received field reports of three U.S. vehicles with fractured inflators—two were front passenger side airbags that deployed inadvertently. Toyota recovered 144 in-use inflators from both the Japan and U.S. markets for Takata to evaluate. In February 2013, Takata informed Toyota that some of the propellant wafers found within the recovered inflators were cracked, possibly due to lower material density.

277.    Dangerous and tragic incidents continued to mount during this period.

   a.    On April 20, 2011, an unidentified man was hurt in Puerto Rico when the Takata driver-side airbag ruptured in his 2001 Honda Accord LX. His attorney notified NHTSA on May 26, 2011.

   b.    On September 20, 2011, Eddie Rodriguez crashed his Honda Civic in Puerto Rico, deploying airbags that launched sharp pieces of metal toward him.  Honda reached a confidential settlement with the driver in 2013.

   c.    On October 20, 2011, there was an alleged rupture of a passenger side airbag in Puerto Rico; Honda obtained the vehicle for analysis on February 3, 2012.

    d.    On December 4, 2011, Miranda Perez suffered left eye blindness due to a Defective

Airbag rupture while driving her 2003 BMW M3 in Buffalo, New York.

    e.    On March 2, 2012, Angelina Sujata suffered chest injuries due to a Takata airbag

rupture while driving her 2001 Honda Civic in Chapin, South Carolina.

    f.    On March 8, 2012, Sharonda Blowe of Jacksonville, Florida was severely injured

while driving a 2001 Honda Accord when she was struck in the head by pieces of

metal exploding out of a Defective Airbag. Ms. Blowe brought suit and reached a

confidential settlement.

    g.    On September 2, 2012, Monique Roig suffered facial injuries due to a Defective

Airbag rupture while riding in a 2001 Honda Civic in Miami-Dade County, Florida.

**E.**    **<u>2013-2014: Takata's Belated Admissions of Broader Defects and the 2013</u>**
**<u>Recall (13V-132)</u>**

278.   By 2013, it became clear to federal regulators, and Defendants were already aware,

that the Defective Airbag issue and the number of Defective Airbags were much more significant

than Takata or Honda initially reported to NHTSA.

279.   On February 8, 2013, NHTSA and Honda met to discuss the "ongoing investigation"

into Honda's defective Takata airbags. By March 6, 2013, Honda claimed that:

> A recreation of propellant production using the same methods as were used during
> 2001-2002 production periods indicated that it was possible for propellant produced
> during 2001-2002 to be manufactured out of specification without the
> manufacturing processes correctly identifying and removing the out of
> specification propellant. Separately, Honda was informed by the supplier of another
> potential concern related to airbag inflator production that could affect the
> performance of these airbag modules.

280.   In February and March 2013, Takata notified Nissan and Mazda that it was

investigating airbag quality. Separately, Takata advised Honda "of another potential concern

related to airbag inflator production that could affect the performance of these airbag modules."

281.   On April 10, 2013, Honda filed a Recall Notification ("2013 Recall") for an additional 561,422 vehicles that could be affected by the following part defect:

**Defect description:**

In certain vehicles, the passenger's (frontal) airbag inflator could produce excessive internal pressure. If an affected airbag deploys, the increased internal pressure may cause the inflator to rupture. In the event of an inflator rupture, metal fragments could be propelled upward toward the windshield, or downward toward the front passenger's foot well, potentially causing injury to a vehicle occupant.

282.   On April 11, 2013, Takata filed a Defect Information Report titled "Certain Airbag Inflators Used as Original Equipment." In that report, Takata misleadingly attributed the defect to isolated manufacturing flaws, describing the Defective Airbags as follows:

Some propellant wafers produced at Takata's plant in Moses Lake, Washington, between April 13, 2000 and September 11, 2002 may have been produced with an inadequate compaction force. . . . In addition some propellant wafers used in inflators produced at Takata's plant in Monclova, Mexico between October 4, 2001 and October 31, 2002, may have been exposed to uncontrolled moisture conditions. Those wafers could have absorbed moisture beyond the allowable limits . . . . In both cases, the propellant could potentially deteriorate over time due to environmental factors, which could lead to over-aggressive combustion in the event of an air bag deployment. This could create excessive internal pressure within the inflator, and the body of the inflator could rupture.

283.   It was not until its April 2013 Defect Information Report that Takata finally admitted that the defective inflators were installed as original equipment in vehicles manufactured by companies other than Honda, including Toyota, Nissan, Mazda, and BMW. Takata did not know, however, how many inflators were installed as original equipment in vehicles manufactured by companies other than Honda.

284.   In April 2013, based on Takata's new admissions, six major automakers, including Nissan, Mazda, BMW, Pontiac, and Honda, issued recalls of 3.6 million vehicles containing Takata airbags.  The other Defendants, by contrast, issued no recalls, falsely representing that their vehicles were safe.

285.    With the increased awareness and scrutiny, news of incidents became more widespread:

a.    On August 5, 2013, Joseph Nasworthy of Jacksonville, Florida suffered severe lacerations to his eye and nose when the Takata airbag exploded upon deployment in his 2005 Honda Civic.

b.    On September 1, 2013, Stephanie Erdman of Destin, Florida was driving a 2002 Honda Civic when she was hit in the eye by shards of metal that shot from the Takata airbag.  Ms. Erdman filed suit and reached a confidential settlement.

c.    Also in September 2013, when police got to the scene of a minor car accident in Alhambra, California, they thought the driver, Hai Ming Xu, had been shot in the face.  In fact, he was killed by shrapnel exploding from the Takata airbag in his 2002 Acura TL that deployed when it hit the wall of a building.  As *The New York Times* reported:

The authorities have not determined a reason for the injuries, though his coroner's report cited tears in his airbag and facial trauma from a foreign object.  And problems persist with Honda's reporting of potential defects.

In at least four more recent suspected ruptures, including the one linked to [the California driver's] death, Honda has not filed a so-called early warning report with safety regulators, as is required in cases where there is a claim of defect that resulted in an injury or death, according to case lawyers and legal filings.

d.    On October 12, 2013, Brandi Owens of Forsyth County, Georgia was injured in a low-speed accident when the driver's side Takata airbag of her 2013 Chevy Cruze exploded and detached from the steering wheel. According to a lawsuit, metal from the airbag hit Owens in the face and left her blind in one eye.

286.    By 2014, the incident rate picked up even more dramatically, with over a dozen incidents involving injuries or fatalities in Nissan, Honda, Toyota, Chevy, and Mazda vehicles

taking place in a variety of regions in the country, from humid Puerto Rico to far drier Massachusetts and California. For example:

a. On February 19, 2014, a Takata passenger airbag ruptured and sprayed metal fragments at the passenger following a crash in a 2007 Chrysler 300.

b. On February 20, 2014, a Takata driver's side airbag in a 2003 Dodge Ram 1500 ruptured and ejected metal fragments following an accident. The driver suffered severe physical injury as a result.

c. On March 14, 2014, Susan Cosgrove of Fremont, California was injured in a low-speed accident while driving a 2013 Chevy Cruze. The Takata-related recall notice on her car arrived at her residence after the incident.

d. On May 29, 2014, Corey Burdick of Eustes, Florida was driving a 2001 Honda Civic when the airbag deployed and sent shards of metal into his eye.

e. In June 2014, a low-speed accident involving a 2005 Honda Accord in Los Angeles, California, caused the car's driver-side airbag to "detonate," sending hot metal and plastic shrapnel into the cabin.

287. With accidents proliferating, Takata met with NHTSA officials on May 20, 2014 to provide information about inflator ruptures not covered by previous recalls. At that meeting, Takata noted that "all six of the potentially-relevant rupture incidents had occurred in either Florida or Puerto Rico." The referenced incidents included both passenger and driver side airbags. This statement omitted one of the earliest incidents, Ms. Weaver's 2003 accident in Arizona, as well as later incidents in drier locales, as noted above.

288. On June 11, 2014, NHTSA's ODI published an ODI Resume for a preliminary evaluation of Investigation No. PE 14-016. That document stated that NHTSA was opening an

investigation "in order to collect all known facts from [Takata] and the vehicle manufacturers that it believes may have manufactured vehicles equipped with inflators produced during the same period as those that have demonstrated rupture events in the field."

289.   Also on June 11, 2014, Takata informed NHTSA that it "believes that an [sic] number of the inflators identified above were provided to the following vehicle manufacturers for use in vehicles sold in the United States (the manufacturers are listed in alphabetical order): BMW, Chrysler, Honda, Mazda, Nissan, and Toyota." Takata's June 11, 2014 letter further stated:

> If we determine that any of those inflators were sold to other vehicle manufacturers, we will let you know promptly. Takata is not certain which models or model years of vehicles are equipped with the subject inflators, and it does not know how many of those vehicles were sold in or are registered in the States to be covered by the requested field actions. That information will need to be obtained from the affected vehicle manufacturers.

290.   On June 20, 2014, Honda issued additional recalls for a total of nearly 4.5 million Honda and Acura vehicles that contained Defective Airbags.

291.   On June 26, 2014, GM recalled over 29,000 Chevrolet Cruze vehicles because the Defective Airbags have a tendency to not deploy at all or rupture and cause metal fragments to strike and severely injure vehicle occupants.


292.   Though the first Takata Airbag related recall was launched years earlier, New Chrysler failed to initiate a field action or recall until 2014.  Just prior to the New Chrysler field action in June of 2014, which covered a mere 208,700 older-model vehicles in Florida, Hawaii, Puerto Rico, and the U.S. Virgin Islands, New Chrysler told the public that there was not a safety defect with its inflator. New Chrysler stated:

> Chrysler Group has agreed, in principle, to honor a National Highway Traffic Safety Administration request to replace airbag inflators in certain vehicles registered in four U.S. regions… This is

not a safety recall. Chrysler Group has not identified a defect. This
is a field action conducted out of an abundance of caution.

293.   By the end of June 2014, the number of vehicles that had been recalled due to
Takata's Defective Airbags had increased to over 6 million, a small fraction of the total recall. The
Vehicle Manufacturer Defendants, however, had still not recalled all of the vehicles containing
Defective Airbags.

294.   On July 8, 2014, Honda expanded a "two million vehicle air bag recall by as many
as one million more vehicles in California." *The New York Times* reported that "[a] defective
inflator could explode in a crash, sending shards of its metal casing into the passenger
compartment. The inflator was made by Takata Corporation, which has said the propellant inside
the inflator was not properly prepared and was too powerful."

295.   In August 2014, Honda issued yet another recall of Honda and Acura vehicles, its
ninth for the defect—bringing the total of recalled Honda and Acura vehicles to six million.

296.   The tragic pattern of mounting injuries and casualties in the face of Defendants'
sluggish response continued:

a.   On June 25, 2014, Patricia Mincey was rendered quadriplegic due to a Takata
airbag rupture while driving her 2001 Honda Civic in Jacksonville, Florida.

b.   On July 7, 2014, Claribel Nunez of Hialeah, Florida suffered severe wounds to her
forehead from shrapnel that exploded out of a Takata airbag in her 2001 Honda
Civic.

c.   On July 22, 2014, Joshua Reliford suffered severe facial and brain injuries due to a
Takata airbag rupture while driving his 2001 Honda Civic in McCraken County,
Kentucky.

d.   On July 28, 2014, Francisco Demarco died due to a Takata airbag rupture while riding in the passenger seat of a 2007 Honda Accord in Palm Beach County, Florida.

e.   On August 17, 2014, a Takata airbag ruptured after an accident in a 2007 Ford Mustang, deploying with abrupt force and ejecting a metal fragment into the driver's leg.  Ford was notified of the incident.

f.   On October 2, 2014, Florida resident Hien Tran died, four days after her 2001 Honda Accord struck another car in Orlando and the Takata airbag exploded, sending shrapnel into her neck. The medical examiner stated that the shrapnel tore through the airbag, hitting Ms. Tran and causing "stab-type wounds" and cutting her trachea. Indeed, her death was initially investigated as a homicide by detectives. A week after she died, she received a letter in the mail from Honda urging her to get her car fixed because of faulty airbags that could explode.

g.   On October 4, 2014, Devon Rideout suffered permanent loss of vision due to an alleged Takata airbag rupture while riding passenger in a 2001 BMW 330i in Chesapeake City, Virginia.

F.   **Forced National Recall And Takata's Admission of a Defect**

297.   On October 22, 2014, NHTSA expanded the recall list to cover ten automakers and 7.8 million vehicles, over 5 million of which were Hondas.  In a Consumer Advisory dated October 22, 2014, NHTSA sent an urgent warning to the owners of the now "7.8 million Affected Vehicles":

> The National Highway Traffic Safety Administration urges owners of certain Toyota, Honda, Mazda, BMW, Nissan, Mitsubishi, Subaru, Chrysler, Ford and General Motors vehicles to act immediately on recall notices to replace defective Takata airbags. Over seven million vehicles are involved in these recalls, which

- 91 -

have occurred as far back as 18 months ago and as recently as Monday. The message comes with urgency, especially for owners of vehicles affected by regional recalls in the following areas: Florida, Puerto Rico, limited areas near the Gulf of Mexico in Texas, Alabama, Mississippi, Georgia, and Louisiana, as well as Guam, Saipan, American Samoa, Virgin Islands and Hawaii.

298.    On October 29, 2014, NHTSA sent letters to ten automakers regarding the safety risks posed by the Takata airbags. The letter stated that "[t]he ongoing cooperation of all manufacturers who have recalled vehicles is essential to address this safety risk," and that the "NHTSA team is engaged with you in critical work to better understand the failures and take action to remedy the safety risk . . . ." NHTSA's letter also asked the automakers to provide NHTSA with information as to their recall process, urged a faster response from them, and stated that "more can and should be done as soon as possible to prevent any further tragedies."

299.    The U.S. Department of Justice also began investigating whether Takata committed any crimes.  On November 13, 2014, the United States District Court for the Southern District of New York issued a federal grand jury subpoena to Takata and Honda.

300.    By November 18, 2014, it was clear to NHTSA that even the extensive recalls to date were insufficient.  NHTSA therefore demanded a national recall of Chrysler, Ford, Honda, Mazda, and BMW vehicles with certain driver-side airbags made by Takata.

301.    Takata refused to support a national recall at a hearing before the U.S. House of Representatives Energy and Commerce Subcommittee on December 3, 2014, claiming there was "not enough scientific evidence" to support a national recall.  Yet, as NHTSA Administrator David Friedman stated, "when we saw real-world incidents on the driver side, one in California, we pushed Honda to make sure that their recall covered that region. Then very recently, we became aware of a driver side incident in North Carolina. With six total incidents, two of which are outside that region, we can no longer support a regional recall. Our policy is clear: Recalls must be nationwide unless the manufacturers can demonstrate that they are regional. With the new data, it

is clear they can no longer demonstrate that the region that was used before was appropriate for driver side airbags."

302.    The geographic scope of the incidents undermined Takata's focus on humidity as the defining contributor to the dangerous ruptures. As Mr. Friedman explained, "[o]ne of the most frustrating parts about this is that neither the automakers nor Takata have been able to get to the bottom of the root cause on this. We have been pushing them to do so."

303.    As of the December 3, 2014 House of Representatives hearing, Honda, Ford, Chrysler, and Toyota had all agreed to a nationwide recall, principally for driver side airbags. Days later, Mazda expanded the geographic scope of its recall. By December 23, BMW had also agreed to a nationwide recall.

304.    Having misrepresented and omitted the nature and scope of the Inflator Defect for over a decade, 10 vehicle manufacturers met in December 2014 to "sort out a way to understand the technical issues involved." Some defendants, including Volkswagen and Mercedes, were shockingly absent. A few months later, in March 2015, Honda announced an advertising campaign to promote the recall—a step it could and should have taken a decade ago. A few days later, Honda announced another 105,000 vehicles that needed to be recalled (Recall 15V-153), consisting of vehicles that should have been part of the 2014 recalls.

305.    Frustrated by Takata's continual foot-dragging, NHTSA imposed a $14,000 per day fine that started on Friday, February 20, 2015, concluding that Takata had not been forthcoming with the information. Days later, NHTSA demanded that Takata preserve all airbag inflators removed through the recall process.

306.    In response to public scrutiny and pressure from NHTSA and private plaintiffs, Defendants were forced to consult with external explosives and airbag specialists, and performed

additional testing on Takata's airbags. This testing confirmed what Defendants already knew: Takata's airbags containing ammonium nitrate were defective and prone to over-aggressive deployment and rupture.

307. In light of this testing, Takata was unable to deny the existence of the Inflator Defect any longer. On May 18, 2015, Takata filed four Defect Information Reports ("DIRs") with NHTSA and agreed to a Consent Order regarding its (1) PSDI, PSDI-4, and PSDI-4K driver air bag inflators; (2) SPI passenger air bag inflators; (3) PSPI-L passenger air bag inflators; and (4) PSPI passenger air bag inflators, respectively. After concealing the Inflator Defect for more than a decade, Takata finally admitted that "a defect related to motor vehicle safety may arise in some of the subject inflators." And in testimony presented to Congress following the submission of its DIRs, Takata's representative admitted that the use of ammonium nitrate is a factor that contributes to the tendency of Takata's airbags to rupture, and that as a result, Takata will phase out the use of ammonium nitrate.

308. Still, even Takata's defect admission is inaccurate and misleading, because the Inflator Defect is manifest in each of Takata's airbags containing ammonium nitrate. And shockingly, certain Vehicle Manufacturer Defendants continue to equip new vehicles with airbags containing ammonium nitrate, even after admitting that airbags containing ammonium nitrate as the primary propellant are prone to rupture, and thus create an unacceptable public safety hazard.

309. Further, in its DIRs, Takata acknowledged that the Inflator Defect is present in inflators that were installed in vehicles as replacement parts through prior recalls, necessitating a second recall of those vehicles.

310. As a result of Takata's admission that its inflators are defective, the total number of recalled vehicles nationwide will exceed 40 million. While Takata has records tracking which

manufacturers it sold Defective Airbags to, it claims not to have records indicating which vehicles those Defective Airbags were installed in. The Vehicle Manufacturers possess those records, however, and are thus in the process of identifying which vehicles must be recalled based on Takata's DIRs and its corresponding admission that its airbags are defective.

311.    In the meantime, the risk of injury remains very real, and is exacerbated by Defendants' poor execution of the recalls, as discussed in Section V, *infra*.

a.    On November 19, 2014, Racquel Hudson suffered extensive first and second degree burns due to a Takata airbag rupture while driving her 2004 Honda Odyssey in San Antonio, Texas.

b.    On December 12, 2014, the driver-side airbag in a 2002 BMW 325 parked in the owner's driveway deployed with such energy that it melted and burned the dashboard and ceiling panel, created burn marks throughout the cabin, and shattered the front windshield.

c.    On December 31, 2014, the Takata driver-side airbag in a 2008 Mazda 6 deployed following an accident, ejecting metal fragments that injured the driver's face.

d.    On January 18, 2015, Carlos Solis was killed in an accident in Houston, Texas, and a ruptured Takata airbag was the suspected cause.

e.    On April 5, 2015, the Takata driver-side airbag in a 2005 Honda Accord ruptured, sending metal shards and shrapnel into the vehicle and severing 22-year old Kylan Langlinais's carotid artery; Honda's recall notice arrived two days after the crash, and Ms. Langlinais died from her injuries that same day.

312.    In September 2015, NHTSA was forced to contact Volkswagen and Mercedes to seek information regarding their uses of Takata airbags. Consistent with Defendants' long pattern

of behavior, and despite the increasingly irrefutable evidence of the inherent, uniform defect in Takata's ammonium-nitrate inflators, Volkswagen wrote to NHTSA in February 2016, in an effort to push back against the inclusion in comprehensive recalls of its own defective vehicles. Eventually, in its Third Amended Coordinated Remedy Order, issued December 9, 2016, NHTSA expanded the recall to Volkswagen and Mercedes.

313.    Over the past 15 years that Defendants and Takata knew there was a problem with the safety of its airbags, there have been at least 22 deaths and hundreds of injuries linked to defective Takata airbags worldwide. As detailed above, the incidents date back to at least 2003, and involve vehicles made by Defendants. Each of the Defendants knew of the Inflator Defect by virtue of these incidents—in addition to many other sources—but failed to disclose the nature and scope of the Inflator Defect, choosing to put their customers' lives at risk in order to avoid expensive recalls.

314.    The Defendants were on further notice due to unusual Takata airbag deployments that should have prompted further inquiry into the airbags' fitness for use. A review of publicly-available NHTSA complaints shows dozens of incidents of Takata airbags inadvertently deploying in the Class Vehicles—events likely tied to the unstable and volatile ammonium-nitrate propellant. These complaints started as early as September 2005, and involve vehicles manufactured by Acura (Honda), BMW, Dodge (Chrysler), Ford, Mitsubishi, Pontiac, Subaru, and Toyota. Some of these incidents showed still further signs of the Inflator Defect, including airbags that deployed with such force that they caused the windshield to crack, break, or shatter, and others that caused unusual smoke and fire (or both). For example:

a.    Takata airbags inadvertently deployed and caused windshields to crack, shatter, or break in a 2004 Mitsubishi Lancer on November 23, 2006, a 2003 Toyota Corolla

on May 3, 2010, a 2003 Toyota Matrix on August 17, 2010 (in addition to causing unusual smoke), and a 2003 Toyota Matrix on January 29, 2012 (in addition to damaging the dashboard).

b.   Takata airbags inadvertently deployed and caused unusual smoke and heat in a 2003 Acura MDX on January 29, 2012, causing the driver skin burns, and a 2003 Toyota Corolla on March 17, 2014.

## IV. The Vehicle Manufacturer Defendants Sold Their Vehicles As "Safe" and "Reliable"

315.   At all relevant times, in advertisements and promotional materials, the Vehicle Manufacturer Defendants continuously maintained that their vehicles were safe and reliable and uniformly concealed the Inflator Defect. Plaintiffs, directly or indirectly, were exposed to these advertisements or promotional materials prior to purchasing or leasing Class Vehicles. The misleading statements about Class Vehicles' safety in Defendants' regulatory filings, advertisements, and promotional materials were material to decisions to purchase Class Vehicles.

316.   Examples of the Vehicle Manufacturers' safety and reliability representations, from 2000 through the present, include the following:

a.   **BMW**:

i.   In 2005, BMW represented on its website: "Driver's and passenger's front airbag supplemental restraint system (SRS) with 'smart' dual-threshold, dual-stage deployment and sensor to help prevent unnecessary passenger's airbag deployment."

ii.   In 2008 BMW represented on its website: "The driver and front passenger airbags provide effective protection for the head and upper-torso area, preventing contact with the steering wheel and dashboard. In a head-on collision, you have the best possible protection."

iii.    In 2008 BMW represented on its website: "The principle behind the function of the front airbags for driver and passenger is very simple: in the event of an impact with a force greater than the safe threshold, the airbag sensors activate a substance that causes the airbags to instantly inflate. Within a fraction of a second, the airbags form a protective cushion over the steering wheel and dashboard, significantly reducing the risk of cranial and upper body injuries."

iv.    In 2015, BMW represented on its website: "There is no end to our quest for the next innovation. And it's not just about greater power and more efficient performance. It's also about safety. We prepare our vehicles to expect the unexpected."

b.    **New Chrysler:**

i.    The 2009 Chrysler 300 brochure stated that: "[n]o one wants to test a vehicle's impact resistance, but 300 is ready, if it occurs…. Advanced multistage front air bags deploy in staged amounts, depending on impact severity, while available front seat-mounted side air bags with supplemental front and rear side-curtain air bags offer additional side-impact protection to front and rear outboard occupants."

ii.    The 2011 Dodge Dakota brochure claimed that the: "Dakota heritage of protecting you and your passengers is uncompromising. In addition to the many safety and security features listed here, all 2011 Dakota models now feature supplemental side-curtain air bags as standard equipment and, of course, four-wheel ABS."

iii.    The 2011 Jeep Wrangler brochure asserted that: "Wrangler's got your back, your sides, as well as your front end. Just as Wranglers are purpose-built for fun, they're also infused with advanced active and passive systems designed to help keep you safe and secure. At the forefront are the standard advanced multistage front air bags."

iv.    The 2011 Chrysler 300 brochure included the slogan: "[t]his kind of safety gives you that kind of security." The brochure further advertised that: "advanced multistage front air bags, supplemental front-seat thorax side air bags, driver-knee air bag, and supplemental side-curtain air bags for front and rear outboard occupants are all standard."

v.    A February 9, 2012 press release boasted that the 2012 Chrysler 300 and 2012 Dodge Charger had achieved 5-star safety ratings from NHTSA, and it boasted that the Chrysler 300 and Dodge Charger were named a "Top Safety Pick" by the Insurance Institute for Highway Safety. The press release further quoted the Senior Vice President-Engineering of Chrysler, who stated: "we're very pleased that both the 2012 Chrysler 300 and 2012 Dodge Charger have achieved the highest overall rating" and that: "both vehicles are robustly designed with a rigid structure to protect occupants and have numerous advanced safety features."

vi.    The 2012 Dodge Charger brochure highlighted that the Charger was a 2011 Insurance for Highway Safety ("IHS") top safety pick. The brochure further stated that: "[s]afety and security are the driving principles behind every Dodge vehicle, including Charger" and that: "[a]dvanced multistage front air bags,

supplemental front-seat mounted pelvic-thorax side air bags, driver-side knee air bag, and supplemental side-curtain air bags for front and rear outboard occupants are all standard."

vii.   Just prior to the New Chrysler field action in June of 2014, New Chrysler told the public that there was not a safety defect with its inflator. New Chrysler stated: "Chrysler Group has agreed, in principle, to honor a National Highway Traffic Safety Administration request to replace airbag inflators in certain vehicles registered in four U.S. regions… This is not a safety recall. Chrysler Group has not identified a defect. This is a field action conducted out of an abundance of caution."

viii.  In 2017, New Chrysler's website listed its mission as: "To create the type of exciting, efficient, reliable, safe vehicles you expect and deserve."

ix.   In 2017, New Chrysler described the design of the 2007–2017 Jeep Wrangler on Jeep's website as: "With an all-new frame, exterior and interior design, engine, safety and security and convenience features, the Jeep Wrangler was built on the successful, original Jeep Brand formula."

c.   **GM Defendants:**

i.   In its 2010 Annual Report, GM Parent proclaimed its products would "improve safety and enhance the overall driving experience for our customers."

ii.   In an April 2010 video advertisement, GM Parent Chairman and CEO, Ed Whitacre, stated that New GM was "designing, building, and selling the best

cars in the world," and has "unmatched lifesaving technology" to keep customers safe.

iii. On November 10, 2010, New GM published a video that told consumers that New GM actually prevents any defects from reaching consumers. The video, titled "Andy Danko: The White Glove Quality Check," explains that there are "quality processes in the plant[s] that prevent any defects from getting out."

iv. New GM's brochure for the 2010 Chevy Avalanche called the truck a "Four-Wheel Bodyguard," in connection with its airbags, and an "all-encompassing approach to safety." This model is subject to the Inflator Defect recalls.

v. An August 29, 2011, advertisement on Defendants' website stated that "Chevrolet provides consumers with fuel-efficient, safe and reliable vehicles that deliver high quality, expressive design, spirited performance and value."

vi. The promotional brochure for New GM's 2011 Cadillac Escalade series noted: "Passenger safety is a primary consideration throughout the engineering process." It also advised potential customers that "[a] look beneath the beautiful exterior reveals a comprehensive approach to safety."

vii. Defendants published on their website a December 27, 2011, an interview with Gay Kent (General Motors Executive Director of Vehicle Safety and Crashworthiness), who stated, "[o]ur safety strategy is about providing continuous protection for our customers before, during and after a crash. . . . We design safety and crashworthiness into our vehicles very early in development." In the interview, Kent touted "GM's own internal requirements

- 101 -

for vehicle safety and crashworthiness, which go above and beyond federal requirements."

viii. An April 2012, New GM national advertising campaign slogan proclaimed: "Safety. Utility. Performance."

ix. In a July 10, 2012, news release, Chris Perry (Chevrolet Global Vice President of Marketing) stated, "[w]e think customers who have been driving competitive makes or even older Chevrolets will be very pleased by today's Chevrolet designs, easy-to-use technologies, comprehensive safety and the quality built into all of our cars, trucks and crossovers."

x. GM Parent's 2013 Annual Report asserts that "[n]othing is more important than the safety of our customers."

xi. During a presentation at the May 2014 North American Conference on Elderly Mobility, Gay Kent (General Motors Director of Global Vehicle Safety) stated that "[t]he safety of all our customers is our utmost concern."

xii. In December 2014, Defendants issued a news release touting the Insurance Institute for Highway Safety (IIHS)'s designation of four Chevrolet vehicle models as "Top Safety Picks," including some models subject to recalls due to the Inflator Defect.

xiii. In a February 2015 news release, Defendants advertised high rankings in a J.D. Power Vehicle Dependability Study for several models subject to the Inflator Defect recalls. The news release highlighted the GMC Sierra (which is subject to the Inflator Defect recalls) for becoming "the first full-size pickup to receive the highest-possible five-star Overall Vehicle Score for safety."

- 102 -

      xiv.    In 2017, Defendants' website stated: "Safety is always our priority. It's the main concern with each and every car we design and a driving principle of our company."

**d.**    **Honda:**

      i.    In 2002, Honda represented on its website: "Having already earned top safety ratings with its quadruple five-star front- and side-impact crash test ratings, the 2002 Odyssey now offers the latest generation of airbag systems from Honda. Driver's and front passenger's dual stage airbags (SRS) along with driver's and front passenger's side airbags are now standard equipment on all models . . . . Both front airbags have a dual-stage inflator that can deploy the airbag at one of two rates depending on the severity of the crash . . . . The front passenger's side airbag has an automatic cutoff system that is designed to prevent side airbag deployment if a child (or small statured adult) leans into the side airbag deployment path. Once the child returns to an upright position, the side airbag will be able to deploy and provide protection in the event of a side impact . . . . Building on the standard anti-lock braking system (ABS), new standard rear disc brakes result in improved stopping performance with higher resistance to brake fade and a more responsive brake pedal feel. Amber rear turn signals have been added, which help other drivers differentiate the indicators with increased clarity."

      ii.    In 2002, Honda represented in a commercial: "5-stars of frontal collision tests . . . that's a safe car. Safe, get it through your head. To see what safe really means, take a look at a close look at the 2002 civic from Honda."

iii.    In 2002, Honda represented in brochures: "Honda's commitment to safe driving is in evidence throughout every vehicle . . . . Every new vehicle comes with dual front airbags (SRS), most using a dual stage design... All designed to keep you and yours out of harm's way."

iv.    In 2004, Honda represented in brochures: "A glance at the crash-test data posted by the U.S. government's National Highway Traffic Safety Administration reveals a galaxy of 5-star ratings for Honda cars and trucks. In fact, five of our models to date – Accord Coupe, Civic Coupe, CR-V, Odyssey and Pilot – have earned the highest NHTSA crash-test ratings in frontal and side impact testing . . . . It's a solid testament to our emphasis on safety."

v.    In 2007, Honda represented on its website: "Through innovative original research, Honda has created advanced airbags that offer outstanding levels of occupant protection."

vi.    In 2007, Honda also represented on its website: "Honda led the industry through advances such as driver and front passenger airbags with 'dual output inflators' that adjust the deployment force of the airbags to the severity of the crash."

vii.    In 2007, Honda also represented on its website: "The Honda Accord is the first mid-size sedan to offer front, front-side and side curtain airbags as standard equipment. Accord earned a 5-star frontal impact rating from the U.S. government and a frontal 'Best Pick' from the Insurance Institute for Highway Safety (IIHS)."

viii.    In 2007, Honda also represented on its website: "Every Honda and Acura vehicle begins with a basic structure designed to be fundamentally safe, but we add advanced technology as standard equipment that can help the driver maintain control of the vehicle."

ix.    In 2015, Honda represented on its website: "Honda is committed to providing safety for everyone—that means crash protection not only for our own drivers and passengers, but also for the occupants of other vehicles, and injury mitigation for pedestrians." "As a leader, Honda looks beyond government regulations, studying real world situations to develop new safety technologies for everyone."

x.    In 2015, Honda represented on its website: "Acura believes driving a luxury car should be a highly enjoyable experience. And while we tend to dwell on the more exhilarating aspects of our vehicles, we consider your safety a top priority. . . . Safety has been top of mind with Acura engineers since day one. . . . Over the years, we've added many advanced safety technologies to the list, and the vast majority of them are now standard on every model."

e.    **Mazda**:

i.    In 2004, Mazda represented in brochures that its cars possessed "inspiring performance" and "reassuring safety features."

ii.    In 2005, Mazda represented on its website: "[I]n every configuration, you'll enjoy Mazda's legendary performance, function, style and safety."

iii.    In 2015, Mazda represented on its website: "In the realm of safety, Mazda's aim is to achieve a safe and accident-free automotive society from the three

viewpoints of vehicles, people, and roads and infrastructure. Specifically, the Company carries out research and development into safety technologies based on the Mazda Proactive Safety philosophy, which particularly respects the driver, and has released vehicles featuring the full suite of Mazda's advanced safety technologies . . ."

f.    **Mercedes**

i.    In a May 15, 2013 Mercedes press release on the Mercedes website, Dr. Dieter Zetsche, Chairman of the Board of Management of Daimler AG and Head of Mercedes-Benz Cars said: "Rather than being about safety or aesthetics, power or efficiency, comfort or dynamism, our aspirations were 'the best or nothing' in every respect. No other car stands for the Mercedes-Benz brand promise more than the S-Class."

ii.   In a June 18, 2014, Mercedes press release on the Mercedes website, Mercedes stated: "Hallmark Mercedes high level of safety- To make top-class safety available for everyone, the CLS-Class will in the future be fitted with a host of new assistance systems along with existing systems with upgraded functionality."

iii.  In a March 22, 2016, Mercedes press release on the Mercedes website, Mercedes stated about its Coupe: "In keeping with the Mercedes-Benz tradition, the body forms the foundation for exemplary crash safety. A high-strength safety passenger compartment forms the core of this concept. It is surrounded by specially designed and crash-tested deformation zones, which ensure the best possible occupant safety. In addition to 3-point safety belts

with pyrotechnical and reversible belt tensioning and belt-force limitation for driver, front passenger and those in the outer rear seats, numerous airbags serve to protect the vehicle's occupants in an accident. These include combined thorax/pelvis side bags for driver and front passenger and an optimized window bag extending over both seat rows, optional side bags for the outer rear seats and a driver knee bag."

iv.    In a September 1, 2015, press release on the Mercedes website, Prof. Dr. Thomas Weber, Member of the Daimler Board of Management responsible for Group Research and Head of Mercedes-Benz claimed that "[t]he S-Class sets the pace on the global market when it comes to safety, efficiency and comfort."

v.    In a 2011 C-Class brochure, Mercedes touted its "legacy of safety innovation," promising "top-rated safety" that is "not just equipped with a list of safety features [but] engineered as an orchestrated system that is designed to make the most of the precious milliseconds it takes to avoid, or survive, a collision."

vi.    In a 2011 M-Class brochure, Mercedes touted its "Five Star Safety." With respect to airbags in particular, the brochure promises "10-way air bag protection. . . eight air bags offer a total of 10 ways of protection."

vii.    In a 2012 S-Class Brochure, Mercedes claimed that the "S-Class is engineered not merely to meet expectations, but to redefine every measure of how an automobile… can protect its occupants." The S-Class is "engineered with visionary safety advances."

g.    **Nissan/Infiniti**:

  i.    In 2005, Nissan represented in brochures that its vehicles possessed "an entire set of safety features to help protect you from the unavoidable, including steel reinforcements, guard beams and advanced airbags that will help safeguard you and your passengers in the event of an accident."

  ii.    In 2015, Nissan represented on its website: "Nissan is committed to its position as a leader in the world of automotive safety. This dedication to comprehensive safety goes into the engineering and design of every vehicle we make . . . ."

h.    **Subaru**:

  i.    In 2005, Subaru represented on its website: "Features like seatbelts with front pretensioners and force limiters, crumple zones, side-impact beams, front air bags and a Ring-Shaped Reinforcement Frame aid in minimizing the effects of a collision."

  ii.    In 2005, Subaru represented in its brochures: "THE SUBARU DRIVING EXPERIENCE EVOKES MANY EMOTIONS. Confidence should always be one of them. Which is why every Subaru is engineered according to the principles of 'Active Driving/Active Safety.'"

  iii.    In 2005, Subaru represented in its brochures: "Advanced front air bags, including passenger-side dual-stage deployment, help provide optimal protection for the driver and front passenger."

  iv.    In 2015, Subaru represented on its website: "Safety drives Subaru design."

i.    **Toyota/Lexus**:

       i.     In 2002, Toyota represented on its website: "With safety features like dual front air bags, crumple zones and 3-point seatbelts in every seating position. So gather up all the hikers -- big and small -- and head out. Way out."

       ii.    In 2015, Toyota represented on its website: "For us, the journey towards a safe road never ends. This belief, along with our collaborative research efforts, drives us to create advancements and innovations in safety that have helped (and continue to help) prevent crashes and protect people."

j.    **Volkswagen:**

       i.     Brochures, including those distributed at dealerships, which regularly touted its vehicles' standard and optional airbags.

       ii.    A 2008 Audi A4 brochure that touted its "IIHS top safety pick" designation, and asserts it is "not just safe for its size, [but] safe for any size."

      iii.   A 2012 Passat brochure that promised "passive safety features to help protect you and keep you safe," and that Volkswagen will "place safety at the top of our list."

      iv.   A 2010 Jetta brochure that touted its "IIHS top safety pick" designation, and its use of "the latest in safety technology," as well as its multiple airbags.

       v.    A 2010 VW CC brochure that touts the brand's industry-leading number of "IIHS top safety pick" designations, and "six standard airbags."

      vi.    A 2011 Audi A6 brochure that promises "all-encompassing safety," and highlights the vehicle's standard airbags.

     vii.   A 2012 Audi A3 brochure that states "we kind of have a thing for safety," and promises airbags as a standard feature.

317. Contrary to these representations and countless others like them, Defendants failed to equip Class Vehicles with airbags that would meet these proclaimed standards and failed to disclose to consumers that their vehicles actually contained dangerous and defective airbags.

## V.   Defendants' Inadequate Recalls and Failure to Assist Impacted Consumers

### A.   Slow and Inadequate Recalls

318. Even those vehicles that have been recalled have little chance of being repaired in the near term. Under the recalls required under NHTSA's Coordinated Remedy Order, approximately 44 million will be recalled in the United States due to the Inflator Defect.

319. At a Congressional hearing in June 2015, Takata's representative testified that Takata was shipping approximately 700,000 replacement inflators per month, and expected to increase production to 1 million replacement inflators per month by September 2015—well short of the number required to supply the ten automakers that have issued recalls.

320. At the current rate, it will take several years to produce enough Takata inflators to fix all recalled vehicles in the U.S., even setting aside the question of whether service departments would be able to provide the necessary services in a timely manner.

321. Not surprisingly, authorized dealers are experiencing a severe shortage of parts to replace the faulty airbags. Dealers have been telling frustrated car owners they can expect to wait many months before their airbags can be replaced.

322. Honda stated that it would not send recall letters to car owners or lessees until there are parts available, meaning that many drivers would not receive notices for weeks or longer, as they continue to drive vehicles with potentially deadly airbags. Honda owners who have received recall notices have been told to wait at least a month before their authorized dealer has availability to assess their vehicle.

323.     New Chrysler stated that: "[t]o help control the proper allocation and inventory of parts, customer notifications are being prioritized by geography and make and model year of vehicle," meaning that many drivers will not receive notices for weeks or longer, as they continue to drive vehicles with potentially deadly airbags.  Even to this day, certain New and Old Chrysler vehicles, such at the 2009 Chrysler Aspen, are only under recall if registered in certain geographic zones.

324.     In February 2017,  Mercedes sought year-long extensions for completing the recall in approximately 800,000 of its vehicles.   Additionally,  in correspondence to Plaintiffs and consumers, in December 2017 and January 2018, Mercedes acknowledged that "the availability of replacement parts [was] taking longer than anticipated." It also indicated that it needed to obtain an extension of time from NHTSA to provide replacement parts, and that for certain vehicle owners belonging to a particular priority group established by NHTSA, replacement parts would not be expected to be available until March 31, 2018. Under the revised schedules, the remedy will not even *begin* for certain Mercedes vehicles until September 2019.   The Defendants' delay is consequential—it exposes purchasers, lessees, drivers, passengers, and, indeed, the general public, to an ongoing and unnecessary risk of harm.

325.     Toyota dealers have reported that wait times for customers who own affected vehicles to get their Takata airbags replaced could be as long as one to three months.

326.     In response to the airbag replacement shortage, certain Vehicle Manufacturer Defendants have taken the extreme step of disabling passenger airbags entirely and putting a "Do Not Sit Here" decal in the vehicle until a proper repair can be made. In the alternative, some Vehicle Manufacturer Defendants are advising customers to refrain from driving their vehicles until the airbags can be replaced.

327.    Other automakers have also chosen to "repair" their customers' vehicles not by providing temporary replacement vehicles or replacement parts, but by disengaging the Takata airbags entirely.

328.    Congress has voiced concerns about this serious problem. Senators Richard Blumenthal and Edward J. Markey, in a letter to the Department of Transportation ("DOT"), said they were "alarmed and astonished that NHTSA has endorsed a policy recently announced by Toyota and GM that dealers should disable passenger-side airbags and instruct against permitting passengers in the front seat if replacement parts for these airbags are unavailable. As a matter of policy, this step is extraordinarily troubling and potentially dangerous. As a matter of law . . . §30122(b) of the Motor Vehicle Safety Act (49 U.S.C.) prohibits a manufacturer from knowingly making a safety device inoperative unless the [DOT] issues a specific exemption. We are unaware of an exemption from your office in the case of Takata airbags."

329.    As the manufacturers finally took steps to issue national recalls—after forceful prodding by NHTSA—commentators noted not only the potential supply constraints, but also a more frightening concern: "no one knows if the replacement inflators currently being installed will suffer the same issue." Indeed, in response to repeated questioning at a Congressional hearing in June 2015, Takata's representative refused to assure the public that replacement inflators containing ammonium nitrate would be safe and not prone to rupture.

### B.    GM Defendants Delay Repairs and Continue to Put Customers at Risk

330.    The GM Defendants have used their considerable clout within the U.S. auto industry to delay repairs of nearly all the GM vehicles that are currently under recall due to the Inflator Defect.  In November 2016, GM Parent and New GM appealed to NHTSA to allow them to delay repairs on all 2.5 million vehicles recalled in May 2016, so that they could conduct more

tests on the Defective Airbags. When GM Parent and New GM recalled the additional 820,000 vehicles in January 2017, they requested that NHTSA allow repair of those vehicles to be deferred as well. Accordingly, GM Parent and New GM have asked to delay repair of approximately 90% of the vehicles that they have recalled due to the Inflator Defect. Undoubtedly, GM Parent and New GM will ask to defer recalls of the 630,000 vehicles subject to the most recent January 2018 DIRs as well, leaving even more vehicle occupants at risk.

331.    GM Parent and New GM claim the Takata airbags used in these vehicles should be "safe" to drive for a few more years, which obviates the need for an immediate recall, despite the fact that these airbags utilize the same ammonium-nitrate propellant contained in every other defective Takata airbag.

332.    Notably, if GM Parent and New GM convince regulators that the Takata airbags in these vehicles are somehow safe, the recalls will be cancelled—saving Defendants $880 million, according to a GM Parent filing with securities regulators.

333.    Initially, GM Parent and New GM requested until August 31, 2017, to prove that these vehicles were safe, and recently asked for a further extension until March 31, 2018—a delay of nearly 2 years since the first of these vehicles were recalled. Consumers are, therefore, forced to play "Russian Roulette" with their vehicles: they must drive dangerous vehicles for years while they wait for the GM Defendants to replace the defective airbags in their cars, all the while exposing themselves and their passengers to the terrifying risk of being seriously injured or killed by their airbags in the event of a collision.

334.    The GM Defendants' persistent attempts to limit the scope of their recalls demonstrate a modus operandi of putting profits over people.

C. <u>**Defective Replacement Airbags**</u>

335.    Perhaps most alarming, the replacement components manufactured by Takata that the Vehicle Manufacturer Defendants are using to "repair" recalled Class Vehicles suffer from the same Inflator Defect that plagues the parts being removed: they use ammonium nitrate as the inflator's primary propellant.  Indeed, Takata admitted in its submitted DIRs and at the June 2015 Congressional hearing that inflators installed in recalled vehicles as replacement parts are, in fact, defective and must be replaced yet again.  And even recall notices issued in 2015 acknowledge that certain "replacement inflators are of the same design and materials as the inflators being replaced."

336.    Moreover, inspection of inflators manufactured by Takata as recently as 2014 and installed in Class Vehicles by Vehicle Manufacturer Defendants through the recall process reveals that the ammonium nitrate pellets within the inflators already show signs of moisture-induced instability, such as rust stains, the tendency to clump together, and size variations.  As a result, Takata cannot reasonably assure Plaintiffs or Class members that Class Vehicles equipped with such post-recall replacement parts will be any safer than they were with the initial Defective Airbags.

337.    By way of example, Paragraph 30 of the November 2015 Consent Order provides that the NHTSA Administrator may issue final orders for the recall of Takata's desiccated phase stabilized ammonium nitrate ("PSAN") inflators, used as both original and replacement equipment, if no root cause has been determined by Takata or any other credible source, or if Takata has not otherwise shown the safety and/or service life of the parts by December 31, 2019. But as of July 10, 2017, Takata began recalling certain desiccated PSAN inflators installed in Ford, Mazda, and Nissan vehicles.

338.     Moreover, while Takata and Defendants had previously assured the public that the Defective Airbags had been remedied and that the new airbags being placed in recalled vehicles were safe, in fact, several Defendants have been or will be required to recall some vehicles from model year 2013 and later because of the risk of the Takata airbags rupturing.  And Takata has now admitted that replacement airbags installed in some recalled vehicles are defective as well and it cannot assure the public that replacement inflators containing ammonium nitrate are safe and not prone to rupture.

339.     As of August 2017, New GM told NHTSA that it had still not come up with a safe replacement for the Defective Inflators currently being used in millions of its vehicles.

## VI.     Additional General Allegations Against Vehicle Manufacturer Defendants

### A.     Honda Allegations

340.     No later than 1999, Takata provided Honda with the formula of the propellant within the Defective Airbags, disclosing that the propellant was made of ammonium nitrate. Honda's engineers were aware that ammonium nitrate was an unstable, volatile chemical.

341.     In fact, no later than 1999, Honda's engineers were concerned enough about the stability of Takata's ammonium-nitrate propellant to request the results of an aging study measuring how heating the propellant for several thousand hours affected it.

342.     Importantly, it was Honda that developed its own technical specifications that governed the environmental and durability testing of Takata's inflators and provided those specifications to Takata to implement.  Honda's specifications detailed which tests to perform and the technical aspects of each, such as what temperatures to use and how many cycles to complete. Indeed, at all relevant times, Honda ultimately exercised control over the design and manufacturing of Takata's Defective Airbags.

343.    Honda's specifications were woefully inadequate.  For example, Honda provided specifications for high temperature testing, but the specification failed to account for the real world environmental exposures that the inflators would undergo.  In addition, Honda only required that Takata conduct 48 cycles of heat shock testing, a number that Honda knew or should have known was insufficient to provide meaningful data about ballistic changes in the propellant and inconsistent with industry standards.  A publically available Takata patent from 2006 reveals that it takes at least 50 thermal cycles to identify ballistic changes.  Honda was also explicitly shown that competitors like Autoliv tested ammonium nitrate at 1200 cycles, and under such conditions, ammonium nitrate degraded to such an extent that it would burn uncontrollably and thereby cause an airbag rupture.  Yet Honda never changed its testing specifications, and directed Takata to test Honda inflators under the minimum threshold in order to avoid negative results.

344.    Approximately one year before it sold vehicles to the unsuspecting public with Takata's Defective Airbags, Honda actually experienced, firsthand, the danger posed by Takata's inflators.  On October 16, 1999, at Honda's testing facilities in Japan, Honda and Takata deployed an airbag module containing a P-SDI inflator at room temperature.  The P-SDI inflator, however, ruptured, scattering metal shrapnel more than 20 feet from the deployment point.  The rupture was so startling that one engineer complained of pressure in his chest and coughing for at least two days after the test, and another engineer complained of an earache caused by the noise of the rupture.

345.    Takata prepared a report on the October 16, 1999 rupture, blaming it on a manufacturing error, but at least one experienced Honda engineer did not believe that Takata's analysis adequately explained the rupture and, as a result, lost trust in Takata, a view he communicated to other engineers at Honda at that time and subsequently.

346. Between the October 16, 1999 rupture and February 2000, Takata's and Honda's engineers met on numerous occasions to discuss the design of Takata's inflators and propellant. At this time, Takata recommended using a "shark fin" shaped propellant, as Takata's engineers were concerned that an alternative design, the "batwing" shape, may be manufactured with inconsistent density and may crack, which could lead to over-pressurization within the inflator. Nonetheless, Honda directed Takata to use the "batwing" shape for the propellant. Honda rushed the design and production of Takata's inflators in order to maintain its own production schedules, as Honda would not have been able to sell its vehicles in the United States at this time if they did not contain airbags.

347. In mid-January 2000, Honda witnessed yet another rupture during testing of a P-SDI. This rupture, like the first, was a very significant event, as Honda's engineers have not been able to recall any other instances in which inflators manufactured by a company other than Takata have ruptured during testing. Despite two ruptures before the start of mass production—highly unusual and alarming events—occurring within three months, Honda disregarded its concerns about the safety and stability of Takata's airbags because of their "inexpensiveness."

348. Even after the first Takata inflators were installed in Honda vehicles, which were then sold to Class Members, Honda's engineers remained extensively involved in the testing, design, and manufacturing of Takata's inflators, conducting regular site visits and Quality Assurance Visits and reviewing test data. Whenever Honda would recommend action items or changes to manufacturing processes, Takata would implement them.

349. In 2003, Autoliv, another Honda airbag supplier, filed a patent that was publically available to Honda that further confirmed the impracticality and danger in using ammonium nitrate as a propellant in airbags, including ammonium nitrate's high sensitivity to pressure and phase

changes, which can strongly affect the burn rate of the propellant. The patent also described the impact of even small fluctuations in humidity and that it was impractical or unrealistic to sufficiently control humidity in the mass production of ammonium-nitrate propellant.

350. In May 2004, Honda was notified of the first field rupture in a Honda vehicle, involving a 2002 Honda Accord in Alabama. In that event, the driver, Latasha Hatchett, was sliced across the face by a piece of shrapnel from her airbag. Honda did not disclose the event to Takata for at least several months. No remedial action was taken by Honda and the incident was written off as an "anomaly."

351. Honda recognized in 2005 that it had received test results from Takata concerning the PSDI5 inflator that did not match other data that Honda had received, as an engineer noticed that a document provided by Takata "differs from the document that [Honda] has."

352. A 2005 Honda email reports that Honda and Takata engineers in Japan agreed to hold a meeting about inflators that would "be 'secret' to the American associate(s)" in order to "make it an honest talk," and agreed to discuss "material that is modified to an innocuous version" that "delete[d]" certain data. Indeed, numerous documents containing the minutes of meetings between Honda and Takata engineers note that certain topics could not be recorded in the meeting minutes due to their sensitivity or to maintain secrecy.

353. In 2006, Takata's airbag inflator plant in Monclova, Mexico, experienced a massive explosion fueled by the ammonium nitrate used in the inflators Honda was installing in its vehicles, destroying a portion of the Takata factory. Honda was aware of this explosion, and in fact, it delayed PV testing of Takata inflators bound for Honda's vehicles.

354. In November 2007, after several more field ruptures seriously injured vehicle occupants, Takata prepared a presentation for Honda to discuss potential causes of field ruptures.

Takata reported to Honda that "the inflator demonstrated increased aggressiveness with increasing moisture and increasing exposure times," and that "the highest moisture test showed a significant trend toward aggressiveness." Even with this knowledge, Honda neither suspended the use of Takata inflators nor disclosed these risks to consumers and regulators. Honda executives claimed that there was "no hurry" to further investigate the problem.

355. In May 2009, following the horrific death of Ashley Parham, an 18-year-old girl in Oklahoma, who had her throat sliced open by metal fragments following a minor accident in her high school parking lot and bled to death with her younger brother beside her in the passenger seat, Honda expressed that "we cannot leave the matter to Takata any longer," because they have already been working on the matter for three years without resolution. Honda's CEO in 2015, Takanobu Ito, would echo this statement publicly, conceding that Honda had been "growing at a pace and scale beyond our means" and that the Inflator Defect ultimately was an "automobile" issue.

356. Also in 2009, senior Honda engineers met with Autoliv, a Takata competitor, which made a presentation to Honda warning of the "disadvantages of ammonium nitrate," including "phase changes," which Autoliv reported could result in "volume changes" and "density changes." These volume and density changes were precisely the reasons that the inflators were exploding— with these changes, the propellant would no longer burn consistently but instead would burn uncontrollably creating greatly increased pressure resulting in the explosion of the airbag assembly. Autoliv also offered to supply Honda with inflators.

357. By the end of 2009, Honda was aware that inflators in at least 14 of its vehicles had ruptured in the field, maiming or killing the vehicles' occupants. Armed with this information on how deadly its inflators were, Honda nonetheless continued to equip its vehicles with Takata's Defective Airbags.

- 119 -

358.  Knowing that its customers were being killed or injured by these exploding airbags, instead of using Autoliv—who had been a dual supplier of airbags for the same Honda models from approximately 2002 to 2006—Honda moved forward with Takata and, knowing that more airbags would explode in the future if they kept using these Defective Airbags, Honda secretly requested a design change "so that an inflator container or metal part that is part of it does not fly towards the passengers even if the pressure inside the inflator rises abnormally."

359.  At the same time, Honda knew that the Inflator Defect would need to be concealed. Indeed, Honda engineers were "afraid what answers will come out" if a third party investigated Honda's use of ammonium nitrate, since it is a "material that has a crystallization change and is difficult to stabilize."

360.  By 2010, after 14 confirmed field ruptures, Honda employees, including the Senior Vice President of Parts and Service, suggested that climactic conditions including moisture and high ambient temperatures should be taken into account for the purpose of prioritizing recalls because of the apparent connection between these factors and the field ruptures. Yet Honda continued to purchase and use Takata's inflators and refused to dramatically expand its recalls.

361.  Meanwhile, in 2009 and 2010, high-level members of a Honda engineering team investigating the Inflator Defect were voicing their distrust for Takata, and in particular, Takata's Japanese employees. Honda's engineers referred to Takata as a "shady company," and noted that "Takata's Japanese people are not to be trusted." Honda urged Takata "to tell the truth." Honda employees noted that their "distrust only grows" in Takata. Rather than switch suppliers, Honda continued to purchase and use Takata's Defective Airbags for at least another six years.

362.  This is despite Autoliv informing Honda during the same timeframe that it could provide inflators *without* ammonium nitrate that were physically identical to the inflators being

supplied by Takata so that no other changes would be needed to the airbag assembly. Honda nonetheless chose to continue using Takata's defective ammonium-nitrate inflators that were seriously injuring and killing its passengers even though Honda claimed it had no idea what the root cause of the defect was, especially after shifting explanations from Takata.

363.    Honda's employees also conceded Honda's culpability for future incidents injuring or killing vehicle occupants.  Specifically, a high-level Honda engineer noted that "[i]f a worst case incident were to occur in the field, it will be highly regrettable.  If the same mistake is made twice, it will be worse than just being a fool. . . . If it happens twice, it will be a ***negligent homicide***" (emphasis added).

364.    Despite the concession that future incidents would amount to negligent homicide, Honda's Prevention Reoccurrence Committee made the decision to "not get involved with propellant issue but proceed at maker's [i.e., Takata's] responsibility."  Thus, as early as 2010, Honda made the decision to push the blame onto Takata rather than take action to avoid injuring or killing its customers.  Honda even expressed an unwillingness to accept comments to its specifications because of the fear that "HGT will be liable."

365.    In 2012, Honda understood that none of the other airbag companies appeared to have similar problems to Takata, and that "this propellant has a unique problem (meaning other than production)."  By the end of 2012, Honda was aware that inflators in at least 35 of its vehicles had ruptured in the field, maiming or killing the vehicles' occupants.  Yet Honda continued to equip its vehicles with Takata's airbags for another four years.

366.    In 2012, senior Honda executives had a "sense[] of distrust and crisis toward Takata."  Honda also recognized that Takata was lying to it about the incidents of ruptures and expressed the belief that it should "stop using not only their 2004 [Ammonium Nitrate] propellant

- 121 -

but also completely stop all business transactions with such an untrustworthy company." But it refused to do so until 2016.

367.    Honda engineers in 2012 attributed ruptures to the use of Takata's 2004 propellant and were shocked to hear it was still being used in new model cars. They warned Honda to "consider changing [the propellant] for the 2014 model all together or making a running change in the middle of next year." But Honda refused to do so until 2016

368.    Indeed, Honda was aware of at least 113 confirmed ruptures by the end of 2015, all before it stopped equipping its vehicles with Takata's Defective Airbags.

### B.    New Chrysler Allegations

#### (i)    New Chrysler's Inherited Knowledge

369.    As a result of the extensive literature detailing the problems with using ammonium nitrate as well as Old Chrysler's intimate involvement in developing specifications and testing standards for the problematic ammonium nitrate inflators, Old Chrysler had long been aware of the problems associated with the use of ammonium nitrate in Takata's airbags.

370.    In 1992, Old Chrysler, along with Ford and General Motors, founded the United States Council for Automotive Research ("USCAR"). Thereafter, these three U.S. automakers began collaborating on the USCAR specifications for airbag inflators. These specifications included requirements for testing related to the use of ammonium nitrate as a propellant in airbag inflators. These USCAR specifications recognized that inflators using ammonium nitrate were particularly problematic and required additional testing:

> **Propellant Stability**. Ammonium Nitrate containing propellants shall be required to undergo added stability evaluation for propellant strength and burn rate stability as agreed to by the Responsible Vehicle Engineering Organization.

This required additional testing was based upon the well-known problems with ammonium nitrate losing stability when exposed to moisture and thermal cycling.

371.    In fact, the *New York Times* has reported that, in the late 1990s, Autoliv, another company that supplied airbags to Old Chrysler, had its scientists study the Takata airbag, and they learned that it utilized the dangerously volatile compound, ammonium nitrate.

372.    According to the *New York Times*, Robert Taylor, Autoliv's head chemist at the time, analyzed every facet of the Takata airbag, including the ammonium-nitrate propellant.  The takeaway, Taylor said, was that when the airbag was detonated, "the gas generated so fast, it blows the inflator to bits."  Chris Hock, a former member of Mr. Taylor's team, said a mock ammonium-nitrate inflator test "totally destroyed the fixture" and "turned it into shrapnel." Upon information and belief, these findings were shared with Old Chrysler and subsequently passed on to New Chrysler.

373.    Despite being presented with deviation requests and test results from Takata showing that the ammonium-nitrate inflators did not meet the USCAR specifications, New Chrysler engineers continued to approve the use of ammonium nitrate inflators. This occurred as early as 2004 and continued after the Chrysler 363 Sale.

374.    New Chrysler did not issue its first official recall until 2014, despite an abundance of public information regarding the dangers associated with Takata airbags using ammonium nitrate, and New Chrysler's own issues and concerns that it has had with these airbags since implementation.

375.    For example, a Takata ammonium-nitrate inflator experienced catastrophic failure during testing, when the structural integrity of the inflator failed upon auto ignition in 2000.

376. During the early 2000s, Old Chrysler's Product Engineers expressed concerns as to the integrity of the Takata ammonium-nitrate inflator module during and post deployment.

377. Old Chrysler was also aware, in the early 2000s, that the Takata ammonium-nitrate PSDI-4 inflator did not meet the tank curve targets for its USCAR delta process validation ("PV") tests, and that this out-of-spec performance had a high probability of contributing to issues Old Chrysler had already experienced in previous PV testing.

378. Furthermore, Old Chrysler had concerns about the ballistic performance of the Takata ammonium-nitrate inflators at an early stage. Old Chrysler did not want to allow a Production Part Approval Process ("PPAP") to be based on the limits proposed by Takata's research entity, Inflation Systems, Inc. ("ISI"). In 2006, Takata was concerned that it would be unable to support the program timing for Chrysler's PSDI -5 driver side airbag due to Takata's inability to mitigate flaming issues, which released molten propellant from the inflator

379. By 2007, on information and belief, Old Chrysler was also made aware of the Takata ammonium-nitrate inflator's tendency to exhibit "anomaly activity," "ballistic shift," and "aggressive behavior."

380. At the same time, the long-standing problems associated with ammonium nitrate and its phase stabilized counterpart continued to be publicly disclosed.

381. The use of an additive designed to address ammonium nitrate's hygroscopic nature (i.e., affinity for moisture) is, at best, a temporary fix because at some point the additive will no longer be able to absorb the excess moisture and the ballistic curves will again exceed specification leading to ruptures.

382. In April 2009, Old Chrysler filed for bankruptcy. On June 1, 2009, under Section 363 of the U.S. Bankruptcy Code, the United States Bankruptcy Court for the Southern District of

New York approved the sale of substantially all of Old Chrysler's assets pursuant to the Chrysler Sale Agreement, and New Chrysler acquired substantially all of Old Chrysler's books, records, and personnel. When New Chrysler acquired Old Chrysler's books, records, and personnel, it acquired the knowledge of the Inflator Defect that those books, records, and personnel held.

### (ii) New Chrysler's Acquisition of Additional Post-Sale Knowledge

383.    In addition to the knowledge of the Inflator Defect that New Chrysler inherited from Old Chrysler, New Chrysler independently knew or should have known of the Inflator Defect almost immediately after the closing of the Chrysler 363 Sale. Thereafter, New Chrysler, carrying with it the same knowledge about the Takata Inflator Defect as Old Chrysler, sold and leased vehicles to consumers that contained deadly Takata airbags and misrepresented the safety of and/or concealed materials facts concerning the Inflator Defect in both New and Old Chrysler vehicles containing the defective airbags.

384.    In the summer of 2009, Honda initiated its first significant recall of Takata airbags in the United States, recalling approximately 440,000 vehicles as a result of numerous deaths and injuries caused by the Inflator Defect. Knowing that New Chrysler used the same Takata airbags in its own vehicles that likewise contained the same ammonium-nitrate propellant, New Chrysler did nothing to inform consumers or initiate a recall. Instead, New Chrysler ordered a million more ammonium-nitrate inflators from Takata.

385.    In October of 2010, an inflator rupture occurred during PV testing for New Chrysler at Takata's Monclova facility.

386.    In October of 2011, a Chrysler vehicle experienced an inadvertent airbag deployment during vehicle repair at a New Chrysler plant. The repairman noted a hissing sound during deployment and noted that the connectors had melted.

- 125 -

387.    In April of 2013, New Chrysler was made aware that Takata's SDI-X ammonium-nitrate inflator did not meet the slope testing standards during PV testing, but New Chrysler granted deviations and approved the inflator for Chrysler production.

388.    On June 20, 2013, there was an issue with a New Chrysler inflator deployment during testing at Takata's laboratory. New Chrysler was made aware of the issue during a July 2013 visit to Takata's Monclova facility.

389.    On September 7, 2013, a PSDI-4 inflator in a Chrysler vehicle ruptured in the field, injuring the vehicle occupant.

390.    By 2013, NHTSA began to force Takata and the auto industry into action. In April and May 2013 alone, approximately 4 million vehicles were recalled by ten automotive manufacturers as a result of the Inflator Defect. During that same period of time, employees at New Chrysler were communicating with other automakers about the root cause of the Takata airbag ruptures and recalls. For example, in an e-mail to New Chrysler and Ford, General Motors' head of inflator technology said the explanation for the recall given by a Honda spokesperson in April 2013—that the problem stemmed from human errors during production—was "Bull S%$t," and he expressed his view that the Takata defect "has to be a core design issue or process issue, not a 'mistake.'"

391.    Over the past 15 years, worldwide, there have been at least 22 deaths and hundreds of serious injuries linked to defective Takata airbags in a myriad of vehicles made by various automotive manufacturers, including New Chrysler. Though New Chrysler was aware of these incidents, as well as problems with its own airbag inflators, it continued to equip its vehicles with Takata ammonium-nitrate airbags, maintain publicly that they were safe, and conceal the nature and existence of the Inflator Defect.

- 126 -

392.    New Chrysler knew or should have known that the Takata airbags installed in millions of vehicles were defective and potentially deadly.  New Chrysler, who concealed its knowledge of the nature and extent of the Inflator Defect from the public while continuing to advertise its products as safe and reliable, has shown a blatant disregard for public welfare and safety.    Moreover, New Chrysler has violated its affirmative duty, imposed under the Transportation Recall Enhancement, Accountability, and Documentation Act (the "TREAD Act"), to promptly advise customers about known defects.

### C.    GM Defendants Allegations

### (i)    GM Defendants' Inherited Knowledge

393.    Old GM had knowledge of the Inflator Defect before it purchased a single airbag from Takata.  According to the *New York Times*, in the late 1990s, Takata, then a little-known Japanese supplier, contacted Old GM and offered to supply Old GM with a much cheaper automotive airbag.  Leo Knowlden of Old GM was told by Takata that its "2004 propellant" contained ammonium nitrate and was even handed copies of Takata's patent documents, which explicitly highlighted the stabilization problems of ammonium nitrate.  Nonetheless, attracted to Takata's lower prices, Old GM turned to its existing airbag supplier—the Swedish-American company Autoliv—and asked it to match Takata's cheaper design or risk losing the automaker's business.  When Autoliv's scientists studied the Takata airbag, they learned that it utilized the dangerously volatile compound, ammonium nitrate.

394.    Robert Taylor, Autoliv's head chemist at the time, analyzed every facet of the Takata airbag, including the propellant, ammonium nitrate.  The takeaway, he said, was that when the airbag was detonated, "the gas generated so fast, it blows the inflator to bits."  Chris Hock, a

former member of Mr. Taylor's team, said a mock ammonium nitrate inflator test "totally destroyed the fixture" and "turned it into shrapnel."

395.    The former Autoliv scientists considered their verdict against the use of ammonium nitrate irrefutable and alerted Old GM to the dangers of equipping its vehicles with Takata's airbags.  According to Mr. Taylor, no later than 1999, Autoliv specifically told Old GM, "[n]o, we can't do it, we're not going to use [ammonium nitrate]."  Upon information and belief, Rita Kauppi, Old GM's Global Commodity Manager for Airbags, who stayed on with New GM after the 363 Sale, was involved in these discussions.  Mr. Taylor and Mr. Hock stated that Autoliv was so concerned about the use of ammonium nitrate, that it likewise warned other manufacturers of the dangers of using Takata's airbag.

396.    Old GM began equipping its vehicles with Takata's airbags in the early 2000s, in the face of Autoliv's warning about ammonium nitrate.

397.    The proof of the Inflator Defect did not end there.  Beginning in the early 2000s, Old GM closely reviewed proposed airbag designs from Takata, and employed extensive design and product validation processes, before approving them for us in its vehicles.  Old GM also regularly audited and reviewed Takata's manufacturing processes, including with site visits of Takata's facilities.  The results of Old GM's review of the Takata inflator were troubling to say the least.

398.    According to internal Takata documents, Old GM expressed concern to Takata about the inflator's "ballistic variability," which refers to the inflator's tendency to underinflate (causing the airbag to fail to deploy) or overinflate (causing dangerously aggressive deployments or explosions).  As early as April 2003, Old GM communicated to Takata that "GM [was] very concerned about the variability of [Takata's inflator] products."  In order to discuss these concerns,

Old GM employees, including Tony Popovski (Old GM's Global Purchasing Manager for Airbags who stayed on with New GM after the 363 Sale), visited Takata's Moses Lake facility. During the visit, Bob Bowser, an Old GM engineer, voiced numerous concerns about Takata's inadequate ballistic testing, moisture control issues, and inability to meet inflator specifications. Bowser repeated these concerns in a memorandum, which was received by Popovski, Rita Kauppi (Global Commodity Manager for Airbags), and Leo Knowlden (Lead Engineer for Inflators)—all three of whom stayed on with New GM after the 363 Sale.

399.    In September 2004, Takata representatives met with Knowlden, Old GM's principal on inflator technology, to discuss Old GM's concern over the inflator's dangerous "ballistic shift," and tendency to "flame" in instances of airbag rupture. At the meeting, Knowlden openly "question[ed] the ability of inflator products from Takata to meet specifications that most other suppliers [had] met 'years ago.'"

400.    There is no indication that Takata ever solved these issues. In March 2006, Takata inflators being tested for GM vehicles continued to show "aggressive behavior." In May 2006, Takata representatives met with Knowlden to discuss the status of inflator development for GM vehicles. In tests conducted just a few weeks before, "molten propellant" escaped the airbag, and a Takata employee admitted "we cannot get good results" with the inflator design. At the meeting, Knowlden told Takata that "GM is more than ever sensitiv[e] to inflator flaming due to [air]bag ruptures and associated conditions."

401.    Indeed, ruptures occurred in Takata's airbags made for Old GM before the airbags could even be installed in Old GM's vehicles. In July 2008, an "energetic disassembly" of a Takata inflator was detected during testing of an airbag inflator made for Old GM at Takata's Freiberg facility. Energetic disassembly is a euphemism for an explosion of the inflator that causes the

inflator to break apart and fire metal particulate out of the airbag. As a result of this incident, Old GM issued a limited recall in Europe only.

402. In May 2009, another energetic disassembly of a Takata inflator made for Old GM at Takata's Monclova facility was detected and reported to Old GM.

403. In June 2009, Old GM filed for bankruptcy. On July 5, 2009, under Section 363 of the U.S. Bankruptcy Code, the United States Bankruptcy Court for the Southern District of New York approved the sale of substantially all of Old GM's assets pursuant to a Master Sale and Purchase Agreement ("GM Sale Agreement"). The GM Sale Agreement officially closed on July 10, 2009, by which New GM acquired substantially all of Old GM's books, records, and personnel, including Rita Kauppi (Global Commodity Manager for Airbags), Leo Knowlden (Lead Engineer for Inflators), and Tony Popovski (Global Purchasing Manager for Airbags). New GM then transferred some of these assets to GM Holdings. The GM Defendants thereby acquired the knowledge of the Inflator Defect that those books, records, and personnel held.

**(ii)    GM Defendants' Acquisition of Additional Post-Sale Knowledge**

404. In addition to the knowledge of the Inflator Defect inherited from Old GM through acquired books, records, and personnel, the GM Defendants independently knew, or should have known, of the Inflator Defect almost immediately after the closing of the GM 363 Sale.

405. In the summer of 2009, Honda initiated its first recall of Takata airbags in the United States, in the wake of the death of a driver of a 2001 Honda Accord. Given that GM vehicles used Takata airbags containing the same ammonium-nitrate propellant, in August 2009, Leo Knowlden, now New GM's head of inflator technology, expressed concern to Takata about "AN [ammonium nitrate] propellant stability." However, the GM Defendants ultimately did nothing about it, and New GM instead ordered a million more inflators from Takata.

406.     On March 11, 2010, an energetic disassembly of a Takata inflator made for New
GM at Takata's Monclova facility, was detected during standard lot acceptance testing.  In its
failure mode analysis, Takata reported to New GM that the inflator suffered from a "body rupture"
caused by the propellant.

407.     On March 19, 2010, another energetic disassembly of a Takata inflator, made for
New GM at Takata's Monclova facility, was detected during production validation testing.  In its
failure mode analysis, Takata again reported to New GM that the inflator suffered from a "body
rupture" caused by the propellant.

408.     On April 17, 2010, yet another energetic disassembly of a Takata inflator made for
New GM at Takata's Monclova facility was detected during lot acceptance testing.  Takata yet
again told New GM that the inflator suffered from a "body rupture" caused by the propellant.

409.     Despite three separate instances of energetic disassembly detected in inflators made
for New GM, occurring within a 36-day span, the GM Defendants did nothing to meaningfully
investigate the problem, notify the appropriate regulators, or notify the Class.

410.     Signs that these ruptures were beginning to occur in the field emerged no later than
2011.  In February 2011, New GM reported to Takata that a driver in a GM vehicle claimed his
thighs were burned when a Takata airbag deployed and expelled searing hot inflator gases into the
cabin.

411.     In February 2012, Takata noted "several non-conformances" in a New GM inflator
"due to high performing ballistics."  Takata reported the incident to New GM but blamed the
problem on a supplier.  The GM Defendants took no meaningful action in response.

412.     On May 9, 2014, Takata informed New GM of a "field event with a ruptured
inflator," involving a 2013 Chevrolet Cruze vehicle.  The GM Defendants and Takata were already

aware of a previous incident in October 2013, when a Takata airbag exploded in another 2013 Chevy Cruze, leaving the driver completely blind in one eye. Rather than publicize the truth, both Takata and New GM blamed the ruptures on a manufacturing problem. Indeed, Knowlden demanded that Takata "put the story together that may potentially limit the scope" of a recall, rather than disclose the Inflator Defect to ensure the safety of drivers and passengers in New and Old GM vehicles. Takata abided, and on June 26, 2014, GM Parent and New GM issued only a limited recall for approximately 29,000 2013-2014 Chevrolet Cruze vehicles. The GM Defendants' spokesperson, Jim Cain, denied any connection to the ever-increasing Takata airbag recalls by other vehicle manufacturers, stating that "[t]heirs is a chemistry issue, and ours is a mechanical issue." Thus, the GM Defendants misrepresented the cause and scope of the problem and omitted information they knew about the defective Takata airbags in other New and Old GM vehicles.

413. As a matter of fact, Knowlden, the man charged with approving Takata's airbag for Old GM and New GM, also happened to be an ex-Takata employee who was known by Takata as a "pro-Takata products guy." With Mr. Knowlden at the helm, Takata did not "expect any issues" from GM (Old or New), no matter how many problems with the Takata airbag Old GM or New GM encountered.

414. Notably, this is not the first instance in which Defendants have engaged in fraudulent conduct to sell vehicles. On September 17, 2015, New GM was charged with one count of engaging in a scheme to conceal material facts from NHTSA and one count of wire fraud, and entered into a deferred prosecution agreement, in which it admitted that it failed to disclose a safety defect to NHTSA and misled U.S. consumers about the same defect and agreed to a $900 million forfeiture.

415. With pro-Takata Leo Knowlden in charge of inflator technology, Defendants kept mum, even as the pace of recalls increased exponentially as NHTSA began to force Takata and the auto industry into action. As millions of vehicles were recalled by other auto manufacturers as a result of the Inflator Defect, employees at New GM were communicating with other automakers about the true root cause of the airbag ruptures and recalls. For example, in an e-mail to Ford and Chrysler, Knowlden said that the explanation for the recall given by a Honda spokesperson in April 2013—that the problem stemmed from human errors during production—was "Bull S%$t," and expressed his view that the Takata defect "has to be a core design issue or process issue, not a 'mistake.'" Yet, GM Parent and New GM did not recall any vehicles beyond the limited number of Chevrolet Cruze models, withholding vital information from occupants of other New and Old GM vehicles on the road.

416. In late 2014, while other automakers agreed to NHTSA's demand for an expanded, nationwide recall, GM Parent and New GM did not recall any additional vehicles, despite their knowledge that the Class Vehicles contained the Defective Inflators that had by this point caused numerous injuries and deaths.

417. As a result of Takata's May 18, 2015 DIR which admits that its inflators are defective, GM Parent and New GM had no choice but to issue recalls in 2015. However, they continued to minimize the problem, recalling only certain 2007-2008 Chevrolet Silverado HD and GMC Sierra HD models (approximately 330,000 total vehicles)—falsely representing that other GM-branded vehicles were safe, and omitting information about the deadly Takata airbags they contained.

- 133 -

418.    In May 2015, New GM also began administering recalls for 2003-2010 Pontiac
Vibe, and 2005-2006 Saab 9-2x models, which were issued by GM's manufacturing partners,
Toyota and Subaru, respectively.

419.    In October 2015, New GM Parent and New GM recalled side-mounted Takata
airbag modules in a mere 395 total vehicles,[4] due to potential under- and over-inflation, but
claimed they did not know the cause of the problem and refused to admit any connection with the
tens of millions of inflators that had now been recalled due to the Inflator Defect.

420.    Then, in February 2016, New GM Parent and New GM issued a recall for 2006-
2011 Saab 9-3, 2006-2009 Saab 9-5, and 2008-2009 Saturn Astra models (approximately 180,000
vehicles total).

421.    The GM Defendants, however, continued to deny the scope of the Inflator Defect,
and misrepresent other GM models as safe until May 2016, when Takata issued additional DIRs
implicating more GM models.  In response, New GM Parent and New GM were forced to issue
recalls for 2007-2011 Chevrolet Avalanche, Escalade, Escalade ESV, Escalade EXT, Sierra LD,
Silverado LD, Suburban, Tahoe, Yukon, and Yukon XL vehicles; and expand the recall of Sierra
HD and Silverado HD vehicles to encompass 2009-2011 models—approximately 2.5 million
vehicles total.  In January 2017, New GM Parent and New GM subsequently added approximately
820,000 more of these models to the recall, which now included model year 2012 vehicles, again
in response to DIRs issued by Takata.

422.    GM Parent and New GM have admitted that an additional 2.4 million of their
vehicles, from model years 2009-2014, contain Defective Airbags, but they have not yet issued

[4] 2015 Buick LaCrosse, Cadillac XTS, Chevrolet Camaro, Chevrolet Equinox, Chevrolet Malibu, and GMC Terrain vehicles.

recalls for these vehicles.  This includes approximately 630,000 vehicles subject to Takata's most recent DIRs, issued on or about January 2, 2018.

### D.    Nissan Allegations

423.    At all relevant times, Nissan exercised close control over its suppliers, including airbag and airbag inflator suppliers. Nissan prepared and maintained design specifications for both the airbag and inflator, which suppliers like Takata were and are required to meet.

424.    Nissan closely reviewed proposed airbag designs from Takata before approving them for use in its vehicles through design and product validation processes. Nissan knew in 1999, including from design meetings with Takata, that Takata used an ammonium-nitrate propellant in its inflators.

425.    From the outset, Nissan also knew that propellant degradation, including through moisture, could lead to overpressurization—or "propellant creep burst," as Takata once described it to Nissan—and rupture.  Despite the switch to a new and novel inflator propellant, Nissan did not revise its airbag or inflator specifications to test for risks especially posed by ammonium nitrate.

426.    Nissan approved Takata's passenger side inflators made with ammonium-nitrate propellant in or about September 2000. It installed them in various Nissan and Infiniti vehicles sold in the United States, beginning with model year 2001. Nissan was motivated in significant part—if not solely—by cost savings it expected to realize by switching to Takata's ammonium-nitrate inflator.

427.    Nissan also regularly audited and reviewed Takata's manufacturing processes, including with site visits, such as one by Senior Manager Toshimi Yamanoi in or about February

2003, an inspection of Takata's production lines in or about February 2006, and a similar inspection in November 2009.

428.     In addition to its direct knowledge that Takata's inflators used ammonium nitrate, Nissan was continually reminded of the inherent danger of the propellant. For example, in or about 2004 and 2005, Nissan received driver-side airbag design proposals from Takata. These proposals contemplated adding desiccant, i.e., a drying agent, to the ammonium-nitrate propellant. Desiccant is a moisture control agent, and its proposed addition was therefore a clear indicator that the propellant was susceptible to moisture-related problems.

429.     Takata meeting minutes from January 2006 show that an ammonium-nitrate inflator ruptured during testing, and that the rupture was discussed with Nissan, which sought further information. Takata's minutes suggest that Takata and Nissan were discussing "moisture absorption materials," again demonstrating an understanding that ammonium-nitrate hygroscopicity posed risks to the propellant's stability and safety.

430.     Takata expressly advised Nissan by no later than January 2006 that, for its ammonium-nitrate propellant, "a desiccant is a must" if it was to pass Nissan's aging specifications.   Notably, none of Nissan's passenger side airbags to date included a desiccant in the ammonium-nitrate propellant and, in fact, it continued installing non-desiccated, passenger side inflators for many years to come.

431.     In August 2006, in connection with Nissan's joint venture with French automaker Renault, an engineer at Renault warned Nissan repeatedly and in stark terms of the dangers of ammonium-nitrate propellant, which had led Renault to reject Takata as a supplier in late 2004. This Renault engineer described ammonium nitrate to Nissan as a "risky propellant" and an "explosive with phase changes not correctly under control." He went on to note that even though

the Takata "inflator is much more risky" because of its "hygroscopic issu[e]," in fact, he saw a litany of other problems, including poor quality control in the assembly process, and subpar logistics "con[c]erning [] protection against moisture." The Renault engineer went on to alert Nissan to an explosion at Takata's factory in Monclova, Mexico, underscoring the concerns he starkly conveyed to Nissan.

432. Nissan was nonetheless intent on persuading Renault to switch to Takata's inflators, and conferred with Takata to obtain information to help it make its case to Renault.

433. Renault, however, considered its use a product safety issue and thus refused to accept ammonium nitrate as a propellant. In a September 2006 memo, Renault reiterated to Nissan that it rejected Takata's ammonium-nitrate inflators in 2004, and further that "Takata recognized the accuracy of the Renault critical analysis of their inflator, agreed with it, and proposed to develop products" accordingly—i.e., to eventually transition to the safer propellant other suppliers were using. The memo repeated Renault's conclusions regarding ammonium-nitrate propellants: they are "very hygroscopic" and "absorb much more water" than alternate propellants. And, importantly, that absorption (and desorption) of water appeared to have long-term consequences for the propellant, whereas the alternative propellant, GuNi, was not only more resistant to water, but also quickly desorbs it at lower relative humidity, and maintains its pyrotechnic properties despite any such moisture cycling. Renault went on to explain that largely because of this key flaw, ammonium nitrate "usually . . . [is] not used in pyrotechnic compositions," and in fact was a "very exotic product" in the automotive world. Critically, the moisture risk to ammonium nitrate spanned from production all the way through the "car lifetime."

434. In sum, "very little moisture could be dramatic during lifetime," and Takata's manufacturing processes did nothing to protect against that risk. Compared to GuNi, ammonium

nitrate could easily deteriorate in the presence of lower relative humidity, posing both the risk of aggressive deployment or moisture, or with enough deterioration, non-deployment.

435.     Apart from the hygroscopic issue, Renault could not accept ammonium nitrate for the independent reason that it "is not stable enough with temperature," even with additives meant to enhance its phase stability.  Even with this knowledge, Nissan continued to use Takata's ammonium-nitrate inflators, without disclosing the risk to the public.

436.     In their resulting discussions, Takata expressly advised Nissan that, in fact, "PSAN is inferior in hygroscopic property," but "generally cheaper"—indeed, apparently more than seven times cheaper than a safer, more stable alternative.

437.     Ultimately, Nissan tried for more than a year to convince Renault to use Takata's ammonium-nitrate propellant without success because of its moisture sensitivity and general instability. During that process, Nissan made express reference to the cost difference between ammonium nitrate and the safer alternative, GuNi. This focus on cost was not new. In December 2004, in connection with Nissan's and Renault's joint audit of Takata, Nissan emphasized that Takata should increase "safety without increase of cost," and sought for Takata to demonstrate its "cost efficient technologies" as compared to other suppliers.

438.     Renault ultimately concluded that, in light of Nissan's apparent refusal to accept the very engineering judgment that Takata had itself acknowledged was accurate, "we are being asked to sustain dual path inflator development forever into the future."

439.     On top of the repeated warnings from Renault, and candid admissions from Takata, Nissan was simultaneously expressing "extreme dissatisfaction in Takata's overall performance" in December 2006.  This was part of a longstanding trend. For example, in April 2004, Nissan discovered two defective passenger-side airbag inflators during a vehicle inspection.  In August

2004, Nissan questioned Takata about a Takata airbag that failed to fully inflate and tore during NHTSA crash testing on a Honda vehicle. In or about August 2004, Nissan learned that a Takata driver side airbag tore during NHTSA testing. In the joint December 2004 audit referenced above, Renault's engineer scored Takata with a supplier grade of "2" on a scale of 1 to 5, with 1 being the lowest.

440.    Shockingly, despite this history, and despite its knowledge of ammonium nitrate's critical and innate flaws as a consumer-facing propellant, Nissan weakened its inflator design specifications in December 2006 to eliminate a "high temperature deterioration test." Takata rightly concluded this would make Nissan's specification easier to meet; indeed, it is one of the types of tests needed for risky, hygroscopic propellants like ammonium nitrate.

441.    Nissan continued using Takata's inflators without a recall through 2008. In February 2008, Takata prepared a memo concerning the status of certain propellant used in Nissan's inflators. In this memo, Takata reported that it had produced a number of initial inflator lots, which had been subject to "inflator level Heat Aging and Thermal Shock per Nissan spec. to test for stability." The testing revealed instances of energetic disassembly in passenger-side inflators after Nissan's Heat Age and Thermal Shock. Takata also noted that "[t]he critical critierium [sic] in terms of stability after aging are tablet density, tablet crush strength, and moisture." In fact, this memo states that "[m]oisture is believed to be the largest contributor to current inflator level issues." This only reinforced Takata's conclusion-shared with Nissan many years prior—that "[d]ue to the current unknowns surrounding 2004L" that "desiccant must be used" with ammonium-nitrate propellant.

442.    In July 2008, Nissan investigated multiple instances of abnormal airbag deployments and field "explosions."

443.    In October 2009, Takata airbags installed in a Nissan vehicle ruptured when intentionally deployed at a scrapyard in Japan. The deployment created a large explosive noise and emitted smoke in an atypical fashion. Parts of the inflator flew out, breaking the windshield.  This prompted a recall of vehicles in Japan and an exceedingly small recall of less than 50 vehicles in the United States, both in 2010.

444.    Nissan was also aware of ruptures in—and corresponding recalls of—other OEMs' vehicles, including, for example, the Honda recall in 2009. In December 2009, Nissan learned of a rupture in another automaker's vehicles after an intentional deployment at a scrapyard.

445.    Nissan knows "it's not appropriate to omit anything" from reporting to NHTSA about safety issues, or to "communicate the facts in a way" to influence NHTSA to a preferred outcome.

446.    Nonetheless, when preparing a Defect Information Report for NHTSA in connection with the limited 2010 recall, Nissan employees planned "creative DIR writing" and to give "the impression we are on top" of the propellant wafer issues that were purportedly behind the recall.  Nissan decided not to report to NHTSA information about missing parts in Takata inflators from October 2000, or two other ruptures experienced by other automakers in Japan, despite internally linking those facts to the defect that gave rise to the 2010 recalls.  Further, Nissan resisted NHTSA's addition of language that rupturing inflators posed a risk of dangerous projectiles.

447.    Nissan's first major United States recall of Nissan or Infiniti vehicles with Defective Airbags was not until 2013. It took approximately two more years for Nissan to expand some of its recalls from regional to national actions. To this day, certain of the recalls of Infiniti vehicles remain regional in scope.

448. Even after Nissan had made a determination that a major United States recall was required, it waited at least three weeks to file its required Defect Information Report with NHTSA, opting instead to time its filing with that of Takata and other OEMs, and in the process placing innumerable consumers at continued risk.

449. In a repeat of its 2010 reporting to NHTSA, Nissan's initial defect communication to NHTSA in April 2013 failed to explain the risk of fragments of a ruptured inflator striking and causing injury to vehicle occupants—information Nissan only included after NHTSA expressly requested it.

450. By March 2013, as Nissan began readying its first recall, it knew of over a dozen abnormal deployments with Takata airbags in other OEMs' vehicles.

451. Following the publicity of the recalls, news of Takata inflator ruptures in Nissan vehicles accelerated.

452. Between January and June of 2014, for example, Nissan learned of ruptures in its vehicles in Puerto Rico, Florida, Texas, Arizona, and Georgia, many of which resulted in injuries to vehicle occupants.

453. In September 2014, a 2004 Nissan Sentra airbag ruptured, apparently causing the passenger dashboard to blow apart, and a large hole in the windshield above it. That same month, another rupture occurred in a 2002 Nissan Sentra in Tennessee.

454. In November 2014, ruptures occurred in a 2002 Nissan Sentra in Arizona and a 2005 Nissan Sentra in Florida.

455. Ruptures were also reported in Georgia: a 2005 Nissan Sentra in June 2015, and in a 2003 Nissan Sentra in May 2016.

456. In November 2014, as Takata airbag recalls continued to expand, Nissan belatedly revisited Takata's ongoing failures both in design review and manufacturing quality control, implicitly recognizing that Takata had never complied with prior requests from Nissan to improve in both areas, most notably in 2008. Further, even as Defendants publicly pinned the defect to isolated manufacturing issues, Nissan acknowledged "there are problems that cannot be explained only by" such issues, and admitted that "this issue is too significant to settle this as a manufacturing problem," not least because the "understanding of creating an inflator was a dangerous as creating a bomb."

457. Ultimately, Nissan would wait over two years before it advised NHTSA in May 2015 that it had recalled the full affected population. Rather than proactively recalling the entire population at once, it slowly expanded the scope over the course of seven recalls over that two year period. Even then, its statement to NHTSA in May 2015 was premature: on July 12, 2017, over two years later, Takata and Nissan announced that another 515,000 2007-2012 Nissan Versas sold into the United States, and outfitted with desiccated ammonium nitrate inflators, would be recalled.

### E.    BMW Allegations

458. At all relevant times, BMW exercised close control over its suppliers, including airbag and airbag inflator suppliers. BMW prepared and maintained design specifications for both the airbag and inflator, which suppliers like Takata were and are required to meet.

459. BMW knew from as early as 1999 that Takata airbags were unsafe after a May 1999 Takata design review of a new BMW inflator revealed "controversial" issues regarding the aluminum used for the inflator closure as well as "inadequate . . . igniter safety factors."

460.     Safety concerns only mounted thereafter.  In 2001, collision testing demonstrated improper airbag deployments that in some instances caused the vehicles' windshields to break. BMW was aware of these issues and requested a meeting with Takata to discuss them.

461.     Around the same time, BMW raised concerns about the "variability" of the Takata inflator deployments during testing and expressed "doubts" about the inflator technology generally.  Nonetheless, BMW ultimately accepted the Takata inflator because it was substantially cheaper than competitor models.

462.     Further testing continued to underscore the inflators' inherent volatility. In early 2002, BMW conducted "bonfire" tests to ensure the inflators complied with European shipping regulations.  Bonfire tests are performed on packages of an explosive substance to determine whether there is potential for a mass explosion or a hazard from dangerous projections. A fire is ignited a few meters from the package to test whether the package will burn or explode.   When BMW conducted bonfire tests on Takata's inflators along with other competitor's inflators, "Takata products were the only ones to experience non-conformances . . . ."  Indeed, out of 24 Takata modules tested, all 24 burned during the bonfire testing.  Eleven of 12 driver-side inflators ruptured and 1 of 12 passenger-side inflators ruptured.   At least one passenger-side inflator burned despite being located 60 meters from the bonfire (a passing specification requires no evidence of burning within 4 meters of the bonfire).  Despite these failed tests, BMW approved the Takata inflators for installation.

463.     In May 2003, shortly after the first Takata inflators installed in BMW vehicles were placed in the market, BMW was notified by a customer of a field incident in Switzerland involving an inflator rupture.[5]  According to an internal BMW report, an accident triggered the airbag to

---

[5] Although this field incident occurred in Switzerland, it involved an E46 BMW (BMW 3 Series

*Footnote continued on next page*

deploy, causing the gas generator to separate, "cut through the airbag fabric," and "impact the vehicle interior with high energy." Takata initially took the position, in the form of a letter to BMW, that the field incident "was likely an isolated event." According to Takata, "BMW accepted Takata's position through inaction . . . . They never commented on the letter after submission."

464.    BMW's inaction continued. By at least 2009, BMW became aware of a 2007 field incident involving another Takata inflator, this time in a Honda vehicle. Takata made a presentation to BMW to distinguish the 2003 BMW field incident from the 2007 Honda field incident (the latter of which triggered a U.S. recall). The presentation, however, highlighted that both inflators used the same "main propellant" technology—ammonium nitrate. In December 2009, BMW began seeking from Takata "alternative solutions to AN-based propellant." Yet, BMW publicly adopted Takata's position that the field incident was nothing more than an anomaly, and a few months later, BMW disingenuously reported to NHTSA that it was "unaware of any incidents in the field involving a malfunction of these inflators."

465.    By February 2010, BMW acknowledged internally the potential deadly ramifications of continuing to use Takata's inflator's in its vehicles. BMW also raised concerns with Takata, with BMW engineers noting that every time BMW performed testing on a Takata airbag, it "blows up" or something "severe" happens.

466.    Despite BMW's grave concerns about the safety and viability of Takata's inflators, BMW once again sought to rely on Takata to evade inquiry from regulators. By early 2010, Honda's recall of vehicles with Takata inflators was well underway. In February 2010, BMW pressured Takata to "make a statement" to NHTSA to "endorse or with confidence proclaim the quality of their product." BMW planned to use this statement by Takata as "the basis for NO

_____

produced from 1998-2006) that was also sold in the U.S. The E46 vehicle in question was produced in 2001.

recall." Takata itself acknowledged that this was BMW's longstanding modus operandi. In fact, more than simply seeking to rely on a statement by Takata, BMW actively collaborated with Takata to tailor the language in its favor "to avoid the recall if possible." Once Takata issued its statement (approved by BMW) to NHTSA, BMW announced it would not recall any vehicles.

467. In 2013, BMW once again pressured Takata so that it could avoid a recall. Despite being told by Takata that the inflator specifications for BMW vehicles did not reduce the risk of explosion compared to other recalled vehicles, BMW "continue[d] to ask so many questions" because "they are trying hard to find a reason to avoid a recall." BMW insisted on finding a way to "perform a simple action like reprogramming the control module" despite the fact that Takata concluded such a change "does not change the risk." Under mounting pressure from NHTSA, BMW was ultimately forced to begin recalling vehicles in 2013.

468. When BMW finally did commence its vehicle recalls in 2013—long after many other Vehicle Manufacturer Defendants—it did so reluctantly and dishonestly. BMW referred to its vehicle recall campaigns in official notices to its customers and NHTSA as "improvement campaigns" and "special technical campaigns," specifically avoiding the words "safety" and "recall."

469. In doing so, when communicating to its customers via its dealer network, BMW insisted that "the words safety and recall will NOT be used" because "NHTSA [was] allowing manufacturers to use [those] names in their official fillings/submittals . . . . if they, the manufacturers, [had] not determined a safety defect exist[ed]." BMW continued this tactic even after NHTSA mandated BMW change its language and refer to its vehicle "campaigns" as recalls: "in the interest of consistent communications to owners on an issue that could have severe

consequences, we must be direct and plain and we must insist that BMW call its campaign a recall."

470.     Additionally, even after BMW began instituting recalls of its vehicles, it continued to emphasize the *lack* of safety concerns stemming from the Takata inflator defect to the public. For instance, in 2014, BMW expressly told its customers that it was "not aware of any ruptured airbag inflators in the field, neither on the driver nor on the passenger side.  Given this, we are not recommending that people do not drive their car."  BMW made similar representations to the public in 2015.  According to BMW's internal documents, however, in both 2014 and 2015, BMW was made aware of several field incidents—going back as far as 2004—where customers alleged injuries resulting from Defective Airbags:

a.     In November 2004, an exploding airbag caused "metal shrapnel" to deploy from the airbag, striking the passenger in the face.  The passenger's face was "severely cut" and she continued to have scars 10 years later.

b.     In September 2010, an exploding airbag caused a passenger to suffer from facial cuts, scrapes, and burns.  The owner of the vehicle subsequently received a recall notice.

c.     In February 2014, an exploding airbag in Florida shot metal beads into the passenger's skin.

d.     In a July 2014 submission to NHTSA, BMW admitted that after "a retrospective review of field incidents . . . BMW noted a small number of incidents which might be related to this issue, and had resulted in a limited number in which there were frontal passenger side airbag induced injuries."

e.     In September 2014, an exploding airbag in Washington fired a metal particle into the eye of a 12 year old passenger.

f.     Around December 2014, an exploding airbag caused a piece of debris to come from the airbag which struck the passenger. The airbag "had a hole in the middle." The passenger suffered from a burn on her right arm.

g.     In January 2015, an exploding airbag caused "shrapnel" to cut a passenger under her eye and on her left hand.

h.     In January 2015, an exploding airbag caused an unspecified but likely serious injury to a 13-year-old girl. The driver examined the airbag after the accident and "found some pieces on the passenger floor."

**F.**     **Mazda Allegations**

471.    At all relevant times, Mazda exercised close control over its suppliers, including airbag and airbag inflator suppliers. Mazda prepared and maintained design specifications for both the airbag and inflator, which suppliers like Takata were and are required to meet.

472.    By February 2002, Mazda was aware that two Takata PSDI-4 inflators ruptured at Mazda testing facilities: one during an Out-of-Position occupant ("OOP") test and another during an ambient module test. Mazda reported both ruptures to Takata, and in both cases Takata determined that the root cause of the failures was propellant-related.

473.    Nonetheless, Mazda selected Takata airbags containing ammonium nitrate to save $2 per inflator over an inflator that did not contain the highly unstable substance. Mazda knew that this unstable compound was the propellant in its airbags as early as 2007.

474.    In May 2003, Mazda experienced another "very severe defect" with Takata inflators and threatened to stop doing business with Takata altogether.

- 147 -

475.   By December 2008, a Mazda engineer noted that Mazda was aware that its use of Takata airbags resulted in many "erroneous explosions" in its vehicles.

476.   In January 2009, Mazda continued to discuss problems with Takata airbags and unintentional explosions of those airbags at meetings intended for discussion of very serious issues occurring in its vehicles.

477.   By 2009, Mazda knew about the Honda recall, that there was a defect involving the propellant, and that the defect had resulted in the death or serious injury of 7 people.  Mazda employees internally discussed these incidents in August 2009 and knew that the root cause was related to the propellant.

478.   For years, Mazda failed to properly investigate the airbag failures, despite mounting incidents.  In 2011, there was an inadvertent airbag deployment involving a PSDI-4 inflator in a Mazda vehicle. In 2012, a Takata twin airbag in a Mazda vehicle deployed incorrectly and injured a passenger.

479.   On April 26, 2014, a Takata airbag in a 2005 Mazda6 ruptured in Florida, when Dorothy Gravlin rear-ended the car in front of her going 25 mph. Ms. Gravlin suffered cuts and burns on her arms and face. She also experienced hearing loss after the incident.

480.   Mazda did not issue its first recall until April 10, 2013, and that recall affected only 149 vehicles. The recall was expanded on June 23, 2014 (i.e., after Ms. Gravlin was injured by an airbag rupture earlier that year), but the expanded recall still did not encompass the vehicle that Ms. Gravlin was driving (a 2005 Mazda6). Rather, on June 19, 2014, Mazda notified NHTSA that it would conduct a Special Service Program for driver and passenger-side airbag inflators for certain 2003-2007 Mazda6 vehicles in Florida, Hawaii, and Puerto Rico. The Special Service Program was superseded by a recall only in October 2014.

481.    Mazda was slow to roll out recalls because it was concerned about its costs and resources, not passenger safety.  Internal documents show that the Mazda Defendants were aware that many vehicles equipped with defective Takata inflators were not subject to the recall.  For example, in December 2014, Mazda knew that some of its not yet recalled vehicles used the same inflators as recalled vehicles but deliberately chose not to recall them because of concerns over a "very limited parts" supply.

482.    On January 9, 2015, Mazda again internally discussed the recall rollout and noted: "As much as we all would like to expeditiously launch recall programs for each and every concern that is justified, this does not always happen due to costs and financial funding available. Regarding resources of time and headcount, we run very lean on available engineers to follow-up on each and every safety defect concern."

483.    On March 24, 2015, Heidi Mauro was driving her 2003 Mazda6 at around 20 mph when her vehicle was struck by another vehicle in Walton, Florida.  Her driver-side airbag inflator exploded.  Ms. Mauro was struck in her face, neck, and chest by metal debris expelled by the airbag, resulting in serious injuries, including a ruptured left eardrum (which resulted in significant hearing loss) and burns to her chest and face.  Mazda learned of this field incident shortly after it occurred.

484.    Mazda waited until June 9, 2015 to expand its recall to all 2003-2008 Mazda6 vehicles, all 2004-2008 RX-8 vehicles, and all 2006-2007 Mazdaspeed vehicles, including Ms. Mauro's vehicle.

485.    Once Mazda launched its recalls, they were poorly implemented.  Despite issuing recalls, customers were not able to have the defective parts in their vehicle replaced until they received a second letter stating that parts were available.  The limited number of parts that were

- 149 -

available were given out sparingly. Internally, Mazda admitted that it was only giving parts to upset customers that contacted Mazda dealers.

486.    Mazda consistently downplayed the severity of risks associated with the Takata airbags used in its vehicles. For example, it instructed its field managers and customer service personnel to tell customers that the airbags "may not deploy properly in the event of an accident," completely and deliberately misrepresenting the fact that the airbags posed serious safety risks, including death.

### G.    Mercedes Allegations

487.    At all relevant times, Mercedes exercised close control over suppliers, including airbag and airbag-inflator suppliers. Mercedes prepared and maintained design specifications for both the airbag and inflator, which suppliers like Takata were, and are, required to meet.

488.    Mercedes closely reviewed proposed airbag designs from Takata, and employed extensive design and product validation processes before approving them for use in its vehicles. Mercedes also regularly audited and reviewed Takata's manufacturing processes, including visits to, and checks of, Takata's facilities.

489.    Mercedes knew prior to approving the Defective Airbags that Takata used an ammonium nitrate propellant in its inflators. Takata expressly marketed ammonium nitrate as an inexpensive propellant, and recognized Mercedes's goal of reducing cost.

490.    Mercedes was intimately involved in the design and testing of the Defective Airbags prior to its approval for the airbags' use in the recalled Mercedes Class vehicles. It has a long history of involvement with, and knowledge of, the manufacturing and product design of inflators used in the vehicles that it sold. Over the years, Mercedes developed an expertise in inflator technology.

491.    In November 1988, a joint venture called Inflation Systems, Inc. ("ISI") was formed between Takata and Bayern-Chemie (of Germany) (a part of the Daimler Benz group). The original charter of ISI was to manufacture driver-side inflators in North America. The site of the manufacturing facility for ISI was LaGrange, Georgia, which was built in 1991 on property owned by Takata.

492.    Both Daimler Benz and Takata worked closely on the manufacturing and product design of Takata's inflators. Bayern-Chemie had responsibility for product design and manufacturing, while Takata used the ISI-manufactured inflators in modules that would be sold directly to automakers. Notably, ISI was operating in 1996, when Takata expressed concerns in patent documents about the risks of using ammonium nitrate in inflators.

493.    Moreover, Mercedes had its own airbag expert(s), who worked together with Takata in the development, testing, and approval of the Defective Airbags. Accordingly, Mercedes was aware of Takata's use of ammonium nitrate, including all technical details of allegedly phase stabilized ammonium-nitrate inflators, prior to its approval of the Defective Airbags for use in Mercedes Class Vehicles.

494.    Given Takata's concerns about the risks of ammonium nitrate, dating back to its 1996 patent documents, and the subsequent concerns of Mercedes engineers during the pre-approval phase of the Defective Inflators, Mercedes was, or should have been, fully aware of the dangers associated with using ammonium nitrate as a propellant in its airbag inflators.

495.    Mercedes also had specific "concerns" regarding the performance of the Defective Inflators prior to approving them for use in the Class Vehicles. These concerns—discussed internally by managers or engineers at Daimler AG in emails exchanged between employees of

Daimler Chrysler and employees of Takata on May 6, 2003 and May 7, 2003—focused on the "the module having integrity during and post-deployment."

496.    Also around this time, in April and May 2003, Mercedes recognized that the defective Takata Airbags failed to meet Mercedes's own requirements for approval, as reflected by their ongoing concerns over the variability and performance issues of the Takata inflators during pre-approval testing. Further, prior to Mercedes's approval of the Defective Inflators for installation in Mercedes Class Vehicles, Mercedes employees raised concerns to Takata that the inflator was the cause of module performance issues, including "module cover tearing," and "cushion tearing." This was consistent with testing that Takata conducted, which showed "bulging," an indicator of "high pressure."

497.    A June 15, 2005 email from a Daimler Chrysler airbag engineer to a Takata program manager, reflects that Mercedes engineers, who had pyrotechnic expertise and worked with Takata on the testing and approval processes of the Defective Airbags, were fully aware of the performance problems plaguing the inflators, and their difficulty meeting USCAR standards prior to approving the Defective Inflators for installation in the Mercedes Class Vehicles.

498.    These same Mercedes engineers repeatedly expressed concerns about the PSDI-5 inflator based on the performance of the airbags in pre-approval testing.

499.    Despite these concerns, Mercedes ultimately approved Takata's airbags for installation in Class Vehicles. As indicated in an October 20, 2004, email, Mercedes only approved Takata's airbag after Mercedes engineers agreed to forego key performance variables. Indeed, Mercedes was fully aware that the Defective Inflators could not meet its own specifications, but it nevertheless approved the defective inflators for installation in Mercedes Class Vehicles.

500.     On at least one occasion, in or about October 2006, Mercedes waived several of its own requirements and ultimately decided to accept "deviations."  As such, Mercedes was fully aware of the risks associated with ammonium nitrate, and consciously and intentionally disregarded those risks by approving the Defective Airbags for installation in the Mercedes Class Vehicles.

501.     As noted above, in March 2006, Takata's Monclova, Mexico plant was the site of massive explosions due to ammonium nitrate. Mercedes was well aware of these incidents, and therefore, the inherent danger of using ammonium nitrate. However, instead of focusing on these risks, Mercedes focused on inflator production levels. Days after the Monclova plant explosion, on April 5, 2006, a senior Daimler engineer performed an inspection of the Monclova inflator and molding operations, including an examination of parts for any defects. He marveled at the extensive repairs to date, the fact that production was slated to begin again that evening, and that "an army" of contractors was in place to complete the work. Only a year later did Mercedes meet with Takata to discuss the changes implemented to Takata's propellant-material handling in the wake of the explosion, given the concerns over the explosive power of ammonium nitrate.

502.     At least through its 2017 model year vehicles, which Mercedes sold and continued to sell to consumers without disclosing that the vehicles contained Defective Airbags that would later be recalled, Mercedes has, throughout the class period, failed to disclose the known risks and defects of its Defective Inflators to consumers.

503.     Even after the historic recalls were announced, Mercedes continued to sell new vehicles that were equipped with Defective Airbags, including the 2016-2017 E-Class Coupe/Convertible, without informing consumers that their new cars contained these Defective

Airbags. Frustratingly, even these new vehicles will be recalled, though owners and lessees will likely have to wait years for a remedy.

504.    The recalls that have been issued by Mercedes to replace the Defective Airbags have been largely ineffective. According to NHTSA's website, as of December 2017, only 2% of the affected Mercedes vehicles have been remedied.

505.    Notwithstanding recalls and notices by other manufacturers, and Mercedes's awareness of the risks and/or dangers presented by ammonium-nitrate dependent inflators, Mercedes buried its head in the sand, claiming it did not become aware of the issues requiring recalls of the Class Vehicles until January 25, 2016, when Takata submitted a DIR to NHTSA reporting a potential safety defect for SDI and PSDI-5 driver-side airbag inflators.

506.    Mercedes's denial of knowledge belies the facts and its numerous communications with Takata regarding the Inflator Defect well before January 2016.  This assertion by Mercedes, that it was unaware of the need for a recall until 2016, is false, and reflects its internal efforts to delay the safety recall and conceal from its customers the need for a recall. Indeed, prior to 2016, Mercedes stayed silent in the face of the mountain of information available to it regarding the dangers associated with the airbags, the use of ammonium nitrate as a propellant, and its own internal discussions regarding these dangers with Takata.

507.    For example, years before Mercedes issued its first Takata recall, high level personnel at Daimler AG participated in quarterly management meetings with Takata, where information regarding airbag engineering, ballistic test results, and certain ruptures and anomalies were discussed.

508. Also discussed at these meetings, between Mercedes and Takata, were vehicle temperature studies showing that moisture would become problematic for the main propellant well within the expected useful life of the Class Vehicles.

509. Further, despite being fully informed about the potential dangers of the use of ammonium nitrate in Takata airbags from the time they were approved for installation in the Mercedes Class Vehicles and the mounds of evidence publicly available regarding the dangerous characteristics of ammonium nitrate, Mercedes unreasonably delayed recalling the Class Vehicles. This unreasonable delay has occurred even though Mercedes has acknowledged to consumers that "[t]he defect in [their] driver, passenger, or both driver and passenger frontal airbag inflators may cause the airbag to explode during airbag deployment[,] and could result in metal fragments striking the front occupants, possibly causing serious injury or death."

510. In light of Mercedes's knowledge about the use of ammonium nitrate, pre-approval testing and the inability of the Defective Inflators to meet applicable standards, Mercedes should have refused to install the Defective Inflators in its vehicles and recalled Class Vehicles years before it reluctantly did.

511. For example, Takata included Mercedes as among the automakers who were provided potentially defective inflators in a June 2014 filing with NHTSA. Yet, Mercedes claimed that its inclusion in this letter to NHTSA was a mistake.

512. Over one million Mercedes vehicles have officially been recalled as part of the massive action arising from the installation of the Defective Airbags.

H.    **Subaru Allegations**

513.    At all relevant times, Subaru exercised close control over its suppliers, including airbag and airbag inflator suppliers. Subaru prepared and maintained design specifications for both the airbag and inflator, which suppliers like Takata were and are required to meet.

514.    Subaru knew from as early as May 2003 that Takata airbags were unsafe after a May 2003 test resulted in a burst inflator due to excessive gas output.

515.    Safety concerns only mounted thereafter.    In January 2007, the Subaru SPI-2 inflators were failing Subaru's ballistic design review and process validation testing.    Reports revealed that the inflators were exceeding ballistic limits resulting in excessive output.

516.    In or about September 2008, internal Takata communications suggest that Subaru was aware that Subaru's PSD16 inflators had the same defects as similar inflators installed in Honda vehicles.

517.    In September and October 2008, Subaru discussed the multiple problems related to the fact that its airbags were tearing upon deployment, posing safety risks to vehicle occupants. Subaru suggested that the problem was related only to welding, but given prior ballistic testing, it knew or was reckless in not knowing that the airbags suffered from an inherent design defect.

518.    In July 2009, Subaru discussed via email the airbag defects related to Honda's recall of nearly 4 million vehicles for inflators that produced excessive internal pressure leading to rupture and dispersal of metal fragments, including the fact that there were 7 fatalities associated with the defect at that time.    Subaru engineers and executives discussed the likelihood that such a defect was also present in Subaru vehicles and, given prior field incidents and ballistic testing failures, knew or were reckless in not knowing that the defect was also present in Subaru's inflators.

519.    In March 2013, Takata discussed with Subaru multiple field incidents and investigations into Takata inflators that posed serious safety risks. From these discussions, Subaru knew that its inflators had a propellant-related defect similar to those in Honda's and other Vehicle Manufacturer Defendants' vehicles that would result in inflator overpressurization and explosion.

520.    Around the same time in March 2013, Subaru knew that such defects were present in its vehicles. Subaru engaged in internal discussions related to field incidents or testing in a 2003 Subaru Legacy that showed it knew the passenger airbags in those vehicles posed serious safety risks to vehicle occupants.

521.    In February 2015, Subaru learned that a 2007 Subaru Outback was involved in an accident in which the front passenger airbag ruptured causing shrapnel and head injuries to the passenger. Subaru officials acknowledged that the vehicle was not subject to Subaru's then-existing piecemeal recall.

522.    In February 2015, Subaru acknowledged in internal emails that Takata inflators used in its vehicles have a design flaw caused by the use of ammonium nitrate as a propellant, which is sensitive to temperature change and leads to "abnormal deployment."

523.    In March 2015, Subaru became aware of a NHTSA complaint detailing an incident involving a Subaru Impreza in which the Takata airbag deployed with such force that the female passenger sustained a frontal skull fracture, sustained neurological trauma, and had to be placed on life support for 6 days until she died.

## I.    **Toyota Allegations**

524.    At all relevant times, Toyota exercised close control over its suppliers, including airbag and airbag inflator suppliers. Toyota prepared and maintained design specifications for both the airbag and inflator, which suppliers like Takata were and are required to meet.

525.     Toyota closely reviewed proposed airbag designs from Takata before approving them for use in its vehicles through design and product validation processes. Toyota knew as early as 2000, including from design meetings with Takata, that Takata used an ammonium-nitrate propellant in its inflators.

526.     From the outset, Toyota also knew that that the ballistics of the propellant used in Takata airbags were hard to control and it was concerned with ballistics variability. Nonetheless, Toyota ultimately approved inflators using ammonium nitrate for use in its vehicles.

527.     In October 2001, Toyota met with Takata to evaluate test results of Takata inflators used in its vehicles. Toyota told Takata that the pressurization results in its testing did not meet Toyota's requirements. This early testing shows that Toyota had an understanding of the Takata inflators' propellant's chemical behavior, including burn time, and Toyota knew or was reckless in not knowing how volatile and difficult the propellant was to control.

528.     In addition to its direct knowledge that Takata's inflators used ammonium nitrate, Toyota was continually reminded of the inherent danger of the propellant. As early as November 2002, Toyota's own testing of Takata airbags installed in its vehicles revealed significant abnormalities and the need for modifications of the airbags to meet its own safety specifications.

529.     Again in June 2003, Toyota again informed Takata that Takata inflators used in Toyota vehicles were rupturing during Toyota's independent testing. Toyota reported that the inflators sparked upon deployment and one had an 8-inch hole after deployment. Toyota remarked that similar but less severe "phenomena" occurred in its testing of the prototype inflators, and one employee suggested the expulsion of gas heat may have been the cause.

530.     In August 2003, Takata records reflect that Toyota reported an "abnormal explosion event" to Takata. Based on the facts of Toyota's report, including that the inflator was exploding

*prior to* operation of the ignition and that there were two explosions 20 seconds apart when normal operation would have only resulted in one, Toyota knew or was reckless in not knowing that Takata inflators posed safety risks to vehicle occupants.

531.    By December 2003, Toyota had expressed concerns over Takata's quality performance, which it deemed "unacceptable."    Nonetheless, Toyota apparently awarded additional business to Takata because Takata airbags were cheaper than its competitors.

532.    In 2007 and 2008, Toyota learned of abnormal Takata airbag deployments in the field, including one where a passenger side curtain airbag spontaneously deployed and another where the airbags deployed without impact while the driver was sitting in his vehicle at a drive-through.

533.    By May 2009, after another abnormal deployment of a Takata airbag occurred in a Toyota Corolla during vehicle scrapping at an automotive recycler facility in Japan, Toyota commissioned an internal "SECRET" report.  The report details that the airbag ruptured and was severely damaged, with the inflator almost completely destroyed from the explosion.  Shrapnel was found inside the inflator.  The "feedback" section of the report notes that either the Toyota field reviewer or the recycler commented that he was "glad [the vehicle] was not in use by the customer.  It was a case in which a passenger protection device transformed into a killing weapon."

534.    By August 2009, Toyota was "dramatically apprehensive about the quality state of Takata."  Toyota began demanding additional testing and quality data from Takata.  Shortly thereafter, Toyota conducted multiple tests of passenger-side airbag inflators.  The testing results in every one of the airbag samples revealed defects with the propellant, and one set of tests resulted in deployments in which propellant debris was scattered everywhere.  The testing report stated that some airbags deployed abnormally "and some of the components of the inflator may fly out."  The

root cause is identified as defects with the propellant, including that the propellant absorbed "excessive moisture due to the field environment," which resulted in "aggressive" combustion.

535.    On or about June 30, 2010, Toyota issued only a very limited recall for vehicles in Japan despite its knowledge of the serious problems and risks associated with its use of Takata's airbags.  Toyota described the problem as an "improper assembly" manufacturing defect.  Even though Toyota knew similar inflators were used in its vehicles in the United States, it did not recall or notify U.S. consumers.

536.    In July 2010 and February 2011, Toyota investigated two additional abnormal Takata airbag deployments, including one in a driver-side airbag.

537.    In October 2011, an internal report from Toyota's National Quality Operations Manager to Toyota's Vice President of Customer Quality Engineering Center reflects that Toyota was aware of at least 26 unintentional airbag deployments and ruptures in 2003-2004 Corolla and Matrix vehicles, including one as early as December 21, 2004.  The report noted that some of the deployments resulted in the windshield needing to be replaced after deployment, including one where the front windshield was shattered.

### J.    Volkswagen Allegations

538.    As a result of the extensive literature detailing the problems with using ammonium nitrate, Volkswagen's intimate involvement in developing specifications and testing standards for the problematic ammonium-nitrate inflators and a variety of adverse incidents, Volkswagen has long been aware of the safety problems associated with using ammonium nitrate in Takata airbags.

539.    At all relevant times, Volkswagen exercised close control over suppliers, including airbag and airbag inflator suppliers. Volkswagen prepared and maintained design specification for both the airbag and the inflator, which suppliers—like Takata—were, and are, required to meet.

540.     Volkswagen closely reviewed proposed airbag designs from Takata and employed extensive design and product validation processes before approving them for use in its vehicles. Volkswagen also regularly audited and reviewed Takata's manufacturing processes, including visits to, and checks of, Takata's facilities.

541.     Volkswagen knew, no later than March 2002, including from presentations and design meetings, that Takata used an ammonium nitrate propellant in its inflators. Takata expressly marketed ammonium nitrate as an inexpensive propellant and recognized Volkswagen's goal of reducing cost. Volkswagen also received data sheets that identified the chemical breakdown of Takata's propellant, including ammonium nitrate.

542.     Volkswagen was aware, for example, through failure mode and effects analyses, that propellant degradation could cause a loss of the inflator's structural integrity. Upon information and belief, despite the switch to a new and novel inflator propellant, Volkswagen did not revise its airbag or inflator specifications and test for flaws unique to ammonium nitrate.

543.     Volkswagen approved Takata's ammonium-nitrate inflators and installed them in Volkswagen and Audi models sold in the United States, beginning with model year 2004 vehicles for Audi, and 2006 for Volkswagen.

544.     Volkswagen had repeated quality issues with Takata beginning as far back as 2003, including failed airbag modules during testing, and unexplained, unexpected facility changes for the production of airbags, which frustrated Volkswagen. On at least one occasion in 2003, Volkswagen rejected a Takata production line after an audit.

545.     Yet quality issues continued to arise. In September 2006, Volkswagen reported a torn airbag to Takata and abnormal deployments of airbags, both at cold and ambient temperatures. Volkswagen also experienced airbag tearing in July 2007. In July 2007, a Volkswagen subsidiary

in South America reported to Takata faulty inflators in side airbags, expressing concern over a flame that occurred during testing, and apparent cushion ruptures in the thorax area.

546.    Persistent quality problems and disturbing test results provided further warning to Volkswagen,  In or about October 2004, 30 out of 100 ammonium-nitrate inflators came apart during bonfire testing conducted by Volkswagen. Likewise, in or about February 2009, numerous inflators ruptured during testing that Takata was performing at Volkswagen's express request.

547.    This pattern was punctuated by a rupture in April 2009 of an inflator in Brazil during testing by Volkswagen of completed airbag modules set to be installed in vehicles. Takata communicated to Volkswagen that the suspected root cause was a low density propellant. In presentations drafted for Volkswagen, Takata also admitted worse performance of its inflator at higher temperatures and informed Volkswagen many inflator ruptures that occurred during testing at 80 and 85 degrees Celsius.  During these dicussions, Takata and Volkswagen discussed precisely the failure mechanisms and risks that have led to a series of the largest recalls in history—and that should have led to immediate recalls, and the use of a safer propellant long ago.

548.    Takata also informed Volkswagen that a greater propellant surface area— potentially caused by lower density—could significantly increase the burn rate and inflator pressurization, to the point of rupture. Volkswagen therefore knew in 2009 and earlier—that Takata's ammonium-nitrate propellant could be susceptible to long-term aging and degradation. Volkswagen, in fact, raised these concerns with Takata. Volkswagen personnel in Germany considered this a high-risk situation and clearly recognized a worst-case scenario, in which portions of the inflator could explode and shoot fragments towards the occupants. Volkswagen, however not only failed to inform its consumers of these risks, issues and recalls on existing

vehicles, but also continued to manufacture and sell vehicles with Defective Airbags for years to come.

549.    By model year 2012, and following discussion with Volkswagen that began in or about 2010, Takata began adding a desiccant to inflators manufactured for Volkswagen. A desiccant is a moisture control agent, and its proposed addition was yet another clear indicator of Volkswagen's knowledge that the propellant was susceptible to moisture and degradation under ordinary conditions.

550.    Volkswagen was also aware of recalls by other automakers for the same issue(s), including, for example, Honda's 2011 recall. Volkswagen suspected a risk of broader problems across Takata inflators, and even expressed that concern to Takata.

551.    By May 2015, Takata had filed Defect Information Reports ("DIRs") admitting the defect and continued to add inflator models through additional DIRs in the coming years. Despite overwhelming evidence of the defect, Volkswagen did not issue recalls, warn consumers, or otherwise protect them from the risk, through, for example, systematic loaner vehicle programs. Indeed, in correspondence with the National Highway Traffic Safety Administration ("NHTSA") in early 2016, Volkswagen went so far as to try to *avoid* a recall, even as other automakers were undertaking their own and moving ahead.

552.    In June 2015, Volkswagen reported that a Takata-made side-curtain airbag inflator, in a 2015 Volkswagen Tiguan crossover, ruptured after the driver hit a deer. News reports at the time noted that the incident stood out from previously reported Takata ruptures, because of the more recent model year of the vehicle. No later than October 2015, Volkswagen was reportedly gathering and testing Takata inflators.

553.    By February 2016, Takata and Volkswagen had issued recalls of approximately 850,000 Volkswagen and Audi vehicles; today, the total recalled population is closer to one million. Volkswagen resisted issuing a recall, informing NHTSA that the facts did not support a recall, and that certain subsets of inflators should be deemed acceptable after testing.

554.    This was not the first instance of Volkswagen downplaying the risk of Takata's inflators. In or about July 2015, Volkswagen insisted that Takata produce ammonium-nitrate inflators *without* desiccant—a move Takata strongly opposed. Indeed, as of June 2016, well after the industry had collectively recalled tens of millions of vehicles with ammonium-nitrate inflators, Volkswagen said it was continuing to use front-airbag ammonium-nitrate inflators *without* desiccant on certain 2016 and 2017 model year cars, including the Volkswagen CC, Audi TT, and Audi R8.

555.    Nor is this the first instance in which Volkswagen has engaged in fraudulent conduct to sell vehicles.  In January 2017, Volkswagen pled guilty to three criminal felony counts of conspiracy to defraud the United States and its U.S. customers for misleading the Environmental Protection Agency and U.S. customers about whether various Volkswagen, Audi, and Porsche branded vehicles complied with U.S. emissions standards.  Volkswagen also pled guilty to obstruction of justice for destroying documents related to its scheme.

### K.    Knowledge Through the German Car Consortium

556.    At all relevant times, Defendants BMW, Volkswagen, and Mercedes, together with Porsche, belonged to a technical consortium made up of leading German car companies that, among other things, adopt and maintain technical standards for airbags and inflators. The consortium is often referred to as Arbeitskreis or the Group of Five Working Committee ("the Group of Five").

557.     On information and belief, this consortium's standards have, at minimum, contributed to BMW, Volkswagen, and Mercedes' airbag and inflator testing standards during the entire time period implicated by this lawsuit. In light of these long-standing common standards and Takata's entry into the airbag market during this period, Plaintiffs allege, on information and belief, that the Group of Five members would have collectively evaluated the airbags and inflators for approval, in addition to automakers' individual efforts.

558.     Indeed, the consortium members met with Takata on at least one occasion, in or about February 2007, at which time the ammonium-nitrate airbag inflators were a topic of discussion. The parties discussed module testing, helium leak testing, and temperature- and moisture-related failure modes, of ammonium-nitrate inflators—precisely the factors and issues that eventually led to the airbag recalls—thus signaling the consortium's clear and ongoing knowledge of the unacceptable risks associated with Takata's airbags.

559.     In light of the consortium members' close working relationship on airbag and inflator issues and their joint focus, by no later than 2007, on precisely the issues that led to the recalls, Plaintiffs allege, on information and belief, that BMW, Volkswagen, and Mercedes as consortium members were, or should have been, aware of ruptures and/or abnormal deployments in their respective vehicles—for example, a 2003 BMW rupture.

560.     In addition to their knowledge of the airbag defect through their own interactions with Takata and work in the Group of Five Consortium, BMW, Volkswagen, and Mercedes also tracked Takata's interactions with other major automakers.  Any cursory attention paid to Takata's track record, including the history of field incidents and recalls detailed above, should have further fueled oncern over ammonium-nitrate inflators.

**VII.** **Automotive Recyclers Purchased Class Vehicles Containing Defective Airbags for Amounts Greater than Their Actual Value and Maintained the Defective Airbags for the Purposes of Resale**

561.    Generally, automotive recycling businesses purchase vehicles from a number of sources, including insurance salvage auctions, tow operators, charities, and the public.

562.    Automotive recycling businesses calculate the purchase price for individual vehicles based, in part, on the presence and condition of the automotive parts contained in the vehicle.  In particular, the presence of undeployed airbags is taken into account by automotive recycling businesses in determining the appropriate purchase price for the vehicle.

563.    Automotive recycling businesses store and maintain the airbags and then resell them to consumers, automotive repair shops, automotive dealerships, wholesalers or other automotive recyclers.

564.    Here, Automotive Recycler Plaintiffs and members of the Nationwide Automotive Recycler Class purchased Class Vehicles containing Takata airbags at insurance salvage auctions and from tow operators, charities, and the public.

565.    Automotive Recycler Plaintiffs own or have suffered losses on at least 1,900 airbags that are currently subject to Takata-related recalls.

a.    On information and belief, Butler has purchased at least the Class Vehicles identified in Exhibit A (manufactured or sold by Defendants) including the airbag or airbags, and: (i) still possesses any such airbag; (ii) sold any such airbag or component of the airbag module to Takata or the Vehicle Manufacturer Defendants or an agent or third party acting on their behalf, after the date on which the Class Vehicle was recalled, for a price less than fair market value had the airbag not been recalled; or (iii) destroyed or disposed of any such airbag, after the date on which the Class Vehicle was recalled.

- 166 -

b.    On information and belief, Cunningham has purchased at least the Class Vehicles identified in Exhibit B (manufactured or sold by Defendants) including the airbag or airbags, and: (i) still possesses any such airbag; (ii) sold any such airbag or component of the airbag module to Takata or the Vehicle Manufacturer Defendants or an agent or third party acting on their behalf, after the date on which the Class Vehicle was recalled, for a price less than fair market value had the airbag not been recalled; or (iii) destroyed or disposed of any such airbag, after the date on which the Class Vehicle was recalled.

c.    On information and belief, Knox has purchased at least the Class Vehicles identified in Exhibit C (manufactured or sold by Defendants) including the airbag or airbags, and: (i) still possesses any such airbag; (ii) sold any such airbag or component of the airbag module to Takata or the Vehicle Manufacturer Defendants or an agent or third party acting on their behalf, after the date on which the Class Vehicle was recalled, for a price less than fair market value had the airbag not been recalled; or (iii) destroyed or disposed of any such airbag, after the date on which the Class Vehicle was recalled.

d.    On information and belief, Midway has purchased at least the Class Vehicles identified in Exhibit D (manufactured or sold by Defendants) including the airbag or airbags, and: (i) still possesses any such airbag; (ii) sold any such airbag or component of the airbag module to Takata or the Vehicle Manufacturer Defendants or an agent or third party acting on their behalf, after the date on which the Class Vehicle was recalled, for a price less than fair market value had the airbag not been

recalled; or (iii) destroyed or disposed of any such airbag, after the date on which the Class Vehicle was recalled.

e.      On information and belief, Snyder's has purchased at least the Class Vehicles identified in Exhibit E (manufactured or sold by Defendants) including the airbag or airbags, and: (i) still possesses any such airbag; (ii) sold any such airbag or component of the airbag module to Takata or the Vehicle Manufacturer Defendants or an agent or third party acting on their behalf, after the date on which the Class Vehicle was recalled, for a price less than fair market value had the airbag not been recalled; or (iii) destroyed or disposed of any such airbag, after the date on which the Class Vehicle was recalled.

f.       On information and belief, Weaver has purchased at least the Class Vehicles identified in Exhibit F (manufactured or sold by Defendants) including the airbag or airbags, and: (i) still possesses any such airbag; (ii) sold any such airbag or component of the airbag module to Takata or the Vehicle Manufacturer Defendants or an agent or third party acting on their behalf, after the date on which the Class Vehicle was recalled, for a price less than fair market value had the airbag not been recalled; or (iii) destroyed or disposed of any such airbag, after the date on which the Class Vehicle was recalled.

g.      On information and belief, Assignors have purchased at least the Class Vehicles identified in Exhibit G (manufactured or sold by Defendants) including the airbag or airbags, and: (i) still possesses any such airbag; (ii) sold any such airbag or component of the airbag module to Takata or the Vehicle Manufacturer Defendants or an agent or third party acting on their behalf, after the date on which the Class

Vehicle was recalled, for a price less than fair market value had the airbag not been recalled; or (iii) destroyed or disposed of any such airbag, after the date on which the Class Vehicle was recalled.

h.      On information and belief, Young's has purchased at least the Class Vehicles identified in Exhibit H (manufactured or sold by Defendants) including the airbag or airbags, and: (i) still possesses any such airbag; (ii) sold any such airbag or component of the airbag module to Takata or the Vehicle Manufacturer Defendants or an agent or third party acting on their behalf, after the date on which the Class Vehicle was recalled, for a price less than fair market value had the airbag not been recalled; or (iii) destroyed or disposed of any such airbag, after the date on which the Class Vehicle was recalled.

566.    Automotive Recycler Plaintiffs and members of the Nationwide Automotive Recycler Class calculate the purchase price for each of the Class Vehicles based on, among other things, the demand for the vehicles, their constituent parts, and the expected resale value of those parts.

567.    After Automotive Recycler Plaintiffs and members of the Nationwide Automotive Recycler Class purchased the Class Vehicles containing the Takata airbags, they transported the vehicles to their facilities. An inspection of the airbags by Automotive Recycler Plaintiffs and Nationwide Automotive Recycler Class members would not have revealed the Inflator Defect.

568.    At the time that Automotive Recycler Plaintiffs and members of the Nationwide Automotive Recycler Class purchased the Class Vehicles, they had a reasonable expectation that Defendants would sell safe products and would abide by federal, state, and common law obligations to affirmatively disclose known defects in a timely manner.

569. This did not happen and, as a result, Automotive Recycler Plaintiffs and members of the Nationwide Automotive Recycler Class purchased the Class Vehicles containing Takata airbags for amounts greater than their worth.

570. As detailed above, national and regional media outlets around the country have reported extensively about the Defective Airbags, raising public awareness of the Inflator Defect and its safety implications. The market value for Takata airbags in the Class Vehicles has been eliminated and there is no ability to resell these airbags. Finally, Automotive Recycler Plaintiffs and members of the Nationwide Automotive Recycler Class have been injured by the costs of identifying, storing, maintaining, and otherwise disposing of the defective Takata airbags.

571. Moreover, the Vehicle Manufacturer Defendants and Takata have consistently resisted providing automotive recyclers with the data needed (such as a comprehensive list of specific vehicle identification numbers (VINs) and airbag serial numbers) to enable automotive recyclers to efficiently and effectively identify defective airbags manufactured by Takata.

## TOLLING OF THE STATUTE OF LIMITATIONS

### Fraudulent Concealment

572. Upon information and belief, Takata has known of the Inflator Defect in its Defective Airbags since at least the 1990s. Prior to installing the Defective Airbags in their vehicles, the Vehicle Manufacturer Defendants knew or should have known of the Inflator Defect, because Takata informed them that the Defective Airbags contained the volatile and unstable ammonium nitrate. In addition, Defendant Honda was again made aware of the Inflator Defect in the Takata airbags in Honda's vehicles in 2004, following a rupture incident. New Chrysler and the GM Defendants knew about the Inflator Defect from the moments of their inception in 2009, and the other Vehicle Manufacturer Defendants were made aware of the Inflator Defect in Takata's

airbags no later than 2008.  Defendants have concealed from or failed to notify Plaintiffs, Class

members, and the public of the full and complete nature of the Inflator Defect.

573.    Although Defendants have now acknowledged to safety regulators that Takata's

airbags are defective, for years, Defendants did not fully investigate or disclose the seriousness of

the issue and in fact downplayed the widespread prevalence of the problem.

574.    Any applicable statute of limitations has therefore been tolled by Defendants'

knowledge, active concealment, and denial of the facts alleged herein. This behavior is still

ongoing.

### Estoppel

575.    Defendants were and are under a continuous duty to disclose to Plaintiffs and Class

members the true character, quality, and nature of the Class Vehicles.  They actively concealed the

true character, quality, and nature of the vehicles and knowingly made misrepresentations about

the quality, reliability, characteristics, and performance of the vehicles.  Plaintiffs and Class

members reasonably relied upon Defendants' knowing and affirmative misrepresentations and/or

active concealment of these facts.  Based on the foregoing, Defendants are estopped from relying

on any statute of limitations in defense of this action.

### Discovery Rule

576.    The causes of action alleged herein did not accrue until Plaintiffs and Class

members discovered that their vehicles had the Defective Airbags.

577.    Plaintiffs and Class members, however, had no realistic ability to discern that the

vehicles were defective until – at the earliest – when the vehicles were recalled.  Even then,

Plaintiffs and Class members had no reason to discover their causes of action because of

Defendants' active concealment of the true nature of the defect.

*American Pipe* **Tolling**

578.    A putative class action suit on behalf of automotive recyclers was brought against Defendants on February 10, 2015. *Automotive Dismantlers and Recyclers Assoc., Inc. v. Takata Corp. et al.,* 1:15-cv-20520-FAM (Moreno, J.).  At the time it was brought, Plaintiffs and the other Class members in this case were part of the classes alleged in the *Automotive Dismantlers* action.

579.    Accordingly, pursuant to *American Pipe and Construction Co. v. Utah*, 414 U.S. 538 (1974), the claims of Plaintiffs and other Class members were tolled from at least February 10, 2015.  Additional class actions filed by Plaintiffs following the *Automotive Dismantlers* action provide additional bases for *American Pipe* tolling.

## CLASS ACTION ALLEGATIONS

580.    The Classes' claims all derive directly from a single course of conduct by Takata and the Vehicle Manufacturer Defendants.  This case is about the responsibility of Takata and the Vehicle Manufacturer Defendants, at law and in equity, for their knowledge, their conduct, and their products. Takata and the Vehicle Manufacturer Defendants have engaged in uniform and standardized conduct toward the Classes.  They did not differentiate, in degree of care or candor, in their actions or inactions, or in the content of their statements or omissions, among individual Class members. The objective facts on these subjects are the same for all Class members. Within each Claim for Relief asserted by the respective Classes, the same legal standards govern. Additionally, many states, and for some claims all states, share the same legal standards and elements of proof, facilitating the certification of multistate or nationwide classes for some or all claims.  Accordingly, Plaintiffs bring this lawsuit as a class action on their own behalf and on behalf of all other persons similarly situated as members of the proposed Classes pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) and/or (b)(2) and/or (c)(4). This action satisfies

the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

### The Automotive Recycler Classes

581.    The Nationwide Automotive Recyclers Classes proposed below, the State Automotive Recycler Classes proposed below, and all their members are sometimes referred to herein as the "Class" or "Classes."

582.    Excluded from each Class proposed below are Takata and Defendants, their employees, officers, directors, legal representatives, heirs, successors and wholly or partly owned subsidiaries or affiliates of Defendants; Class Counsel and their employees; and the judicial officers and their immediate family members and associated court staff assigned to this case.

### A.    All Defendants Except New Chrysler and the GM

583.    With respect to all Defendants except New Chrysler and GM, Automotive Recycler Plaintiffs bring this action pursuant to Federal Rules of Civil Procedure 23(a), (b)(2) and/or (b)(3) on behalf of a Nationwide Automotive Recycler Class defined as follows:

> All automotive recyclers in the United States who, prior to the date on which a Class Vehicle was recalled, purchased a Class Vehicle containing an undeployed Takata airbag, and who: (i) still possesses any such airbag; (ii) sold any such airbag or component of the airbag module to Takata or Defendants or an agent or third party acting on their behalf, after the date on which the Class Vehicle was recalled; or (iii) destroyed or disposed of any such airbag, after the date on which the Class Vehicle was recalled.

584.    With respect to all Defendants except New Chrysler and GM, Automotive Recycler Plaintiffs (except with respect to Snyder's Texas Deceptive Trade Practices Act claim) allege statewide class action claims on behalf of separate classes in the following states: Florida, Georgia, North Carolina, Missouri, Tennessee, and Virginia. These State Automotive Recycler Classes are initially defined as follows:

> All automotive recyclers who, prior to the date on which a Class Vehicle was

recalled, purchased a Class Vehicle in the state of _____ (*e.g.*, Florida) containing an undeployed Takata airbag, and who: (i) still possess any such airbag; (ii) sold any such airbag or component of the airbag module to Takata or Defendants or an agent or third party acting on their behalf, after the date on which the Class Vehicle was recalled; or (iii) destroyed or disposed of any such airbag, after the date on which the Class Vehicle was recalled.

585. With respect to its Texas Deceptive Trade Practices Act claim against all Defendants except New Chrysler and GM,, Snyder's alleges statewide class action claims on behalf of a Texas Automotive Recycler Class initially defined as follows:

All automotive recyclers with assets of less than $25 million (or controlled by entities with assets of less than $25 million) in the state of Texas who, prior to the date on which a Class Vehicle was recalled, purchased a Class Vehicle containing an undeployed Takata airbag, and who: (i) still possess any such airbag; or, after the date on which the Class Vehicle was recalled, (ii) sold any such airbag or component of the airbag module to Takata or Defendants or an agent or third party acting on their behalf; or (iii) destroyed or disposed of any such airbag.

## B. **New Chrysler**

586. With respect to New Chrysler, Automotive Recycler Plaintiffs bring this action pursuant to Federal Rules of Civil Procedure 23(a), (b)(2) and/or (b)(3), on behalf of a Nationwide Automotive Recycler Class defined as follows:

All automotive recyclers in the United States who, prior to the date on which a Class Vehicle was recalled and after June 1, 2009, purchased a Class Vehicle containing an undeployed Takata airbag, and who: (i) still possesses any such airbag; (ii) sold any such airbag or component of the airbag module to New Chrysler or an agent or third party acting on its behalf, after the date on which the Class Vehicle was recalled; or (iii) destroyed or disposed of any such airbag, after the date on which the Class Vehicle was recalled.

587. With respect to New Chrysler, Automotive Recycler Plaintiffs (except with respect to Snyder's Texas Deceptive Trade Practices Act claim) allege statewide class action claims on behalf of separate classes in the following states: Florida, Georgia, Missouri, North Carolina, and Tennessee. These State Automotive Recycler Classes are initially defined as follows:

All automotive recyclers who, prior to the date on which a Class Vehicle was recalled and after June 1, 2009, purchased a Class Vehicle in the state of _____ (*e.g.*,

Florida) containing an undeployed Takata airbag, and who: (i) still possess any such airbag; (ii) sold any such airbag or component of the airbag module to New Chrysler or an agent or third party acting on its behalf, after the date on which the Class Vehicle was recalled; or (iii) destroyed or disposed of any such airbag, after the date on which the Class Vehicle was recalled.

588.    With respect to its Texas Deceptive Trade Practices Act claim against New Chrysler, Snyder's alleges statewide class action claims on behalf of the Texas Automotive Recycler Class initially defined as follows:

All automotive recyclers with assets of less than $25 million (or controlled by entities with assets of less than $25 million) in the state of Texas who, prior to the date on which a Class Vehicle was recalled, and after June 1, 2009, purchased a Class Vehicle containing an undeployed Takata airbag, and who: (i) still possess any such airbag; or, after the date on which the Class Vehicle was recalled, (ii) sold any such airbag or component of the airbag module to Takata or New Chrysler or an agent or third party acting on their behalf; or (iii) destroyed or disposed of any such airbag.

## C.    **The GM Defendants**

589.    With respect to the GM Defendants, Automotive Recycler Plaintiffs bring this action pursuant to Federal Rules of Civil Procedure 23(a); and (b)(2), and/or (b)(3), on behalf of a Nationwide Automotive Recycler Class, defined as follows:

All automotive recyclers in the United States who, prior to the date on which a Class Vehicle was recalled and after July 10, 2009, purchased a Class Vehicle containing an undeployed Takata airbag, and who: (i) still possesses any such airbag; (ii) sold any such airbag or component of the airbag module to Defendants or an agent or third party acting on their behalf, after the date on which the Class Vehicle was recalled; or (iii) destroyed or disposed of any such airbag, after the date on which the Class Vehicle was recalled.

590.    With respect to the GM Defendants, Automotive Recycler Plaintiffs (except with respect to Snyder's Texas Deceptive Trade Practices Act claim) allege statewide class action claims on behalf of separate classes in the following states: Florida, Georgia, North Carolina, and Tennessee.  These State Automotive Recycler Classes are initially defined as follows:

All automotive recyclers who, prior to the date on which a Class Vehicle was recalled and after July 10, 2009, purchased a Class Vehicle in the state of ____

(*e.g.*, Florida) containing an undeployed Takata airbag, and who: (i) still possess any such airbag; (ii) sold any such airbag or component of the airbag module to Defendants or an agent or third party acting on their behalf, after the date on which the Class Vehicle was recalled; or (iii) destroyed or disposed of any such airbag, after the date on which the Class Vehicle was recalled.

591.    With respect to its Texas Deceptive Trade Practices Act claim against the GM Defendants, Snyder's alleges statewide class action claims on behalf of a Texas Automotive Recycler Class initially defined as follows:

> All automotive recyclers with assets of less than $25 million (or controlled by entities with assets of less than $25 million) in the state of Texas who, prior to the date on which a Class Vehicle was recalled and after July 10, 2009, purchased a Class Vehicle containing an undeployed Takata airbag, and who: (i) still possess any such airbag; or, after the date on which the Class Vehicle was recalled, (ii) sold any such airbag or component of the airbag module to Takata or Defendants or an agent or third party acting on their behalf; or (iii) destroyed or disposed of any such airbag.

### **Numerosity and Ascertainability**

592.    This action satisfies the requirements of Fed. R. Civ. P. 23(a)(1).  There are millions of Class Vehicles nationwide, and thousands of Class Vehicles in each of the States.  Moreover, there are thousands of Automotive Recycler Class members in the United States.  Individual joinder of all Class members is impracticable.

593.    Each of the Classes is ascertainable because its members can be readily identified using business records, registration records, sales records, production records, and other information kept by Takata, Vehicle Manufacturer Defendants, Plaintiffs or third parties in the usual course of business and within their control. Plaintiffs anticipate providing appropriate notice to each certified Class, in compliance with Fed. R. Civ. P. 23(c)(1)(2)(A) and/or (B), to be approved by the Court after class certification, or pursuant to court order under Fed. R. Civ. P. 23(d).

## Predominance of Common Issues

594.     This action satisfies the requirements of Fed. R. Civ. P. 23(a)(2) and 23(b)(3) because questions of law and fact that have common answers that are the same for each of the respective Classes predominate over questions affecting only individual Class members. These include, without limitation, the following:

a.     Whether the Class Vehicles suffer from the Inflator Defect;

b.     Whether the Class Vehicles have suffered a diminution of value as a result of those Vehicles' incorporation of the airbags at issue;

c.     Whether Defendants knew or should have known about the Inflator Defect, and, if so, how long Defendants have known of the defect;

d.     Whether the defective nature of the Class Vehicles constitutes a material fact reasonable businesses would have considered in deciding whether to purchase a Defective Vehicle;

e.     Whether Defendants had a duty to disclose the defective nature of the Class Vehicles to Plaintiffs and Class members;

f.     Whether Defendants omitted and failed to disclose material facts about the Class Vehicles;

g.     Whether Defendants' concealment of the true defective nature of the Class Vehicles induced Plaintiffs and Class members to act to their detriment by purchasing the Class Vehicles;

h.     Whether Defendants' conduct tolls any or all applicable limitations periods by acts of fraudulent concealment, application of the discovery rule, or equitable estoppels;

i.     Whether Defendants misrepresented that the Class Vehicles were safe;

j.      Whether Defendants engaged in unfair, deceptive, unlawful and/or fraudulent acts
        or practices in trade or commerce by failing to disclose that the Class Vehicles were
        designed, manufactured, and sold with defective airbag inflators;

k.      Whether Defendants' conduct, as alleged herein, was likely to mislead a reasonable
        business;

l.      Whether Defendants' statements, concealments and omissions regarding the Class
        Vehicles were material, in that a reasonable consumer could consider them
        important in purchasing, selling, maintaining, or operating such vehicles;

m.      Whether Defendants violated each of the States' consumer protection statutes, and
        if so, what remedies are available under those statutes;

n.      Whether Plaintiffs and the Classes are entitled to a declaratory judgment stating
        that the airbag inflators in the Class Vehicles are defective and/or not merchantable;

o.      Whether Defendants' unlawful, unfair, and/or deceptive practices harmed Plaintiffs
        and the Classes;

p.      Whether Plaintiffs and the Classes are entitled to equitable relief, including, but not
        limited to, a preliminary and/or permanent injunction;

q.      Whether Defendants should be declared responsible for notifying all Class
        members of the Inflator Defect and ensuring that all vehicles with the airbag Inflator
        Defect are promptly recalled and repaired;

r.      What aggregate amounts of statutory penalties are sufficient to punish and deter
        Defendants and to vindicate statutory and public policy;

s.      How such penalties should be most equitably distributed among Class members;

t.      Whether certain Defendants conspired together to violate RICO; and

u.      Whether certain Defendants associated with any enterprise engaged in, or the
activities of which affect, interstate or foreign commerce, to conduct or participate,
directly or indirectly, in the conduct of such enterprise's affairs through a pattern
of racketeering activity.

### Typicality

595.      This action satisfies the requirements of Fed. R. Civ. P. 23(a)(3) because
Plaintiffs' claims are typical of the claims of the Class members, and arise from the same course
of conduct by Takata and the Vehicle Manufacturer Defendants. The relief Plaintiffs seek is typical
of the relief sought for the absent Class members.

### Adequate Representation

596.      Plaintiffs will fairly and adequately represent and protect the interests of the
Classes. Plaintiffs have retained counsel with substantial experience in prosecuting consumer class
actions, including actions involving defective products.

597.      Plaintiffs and their counsel are committed to vigorously prosecuting this action on
behalf of the Classes, and have the financial resources to do so. Neither Plaintiffs nor their counsel
have interests adverse to those of the Classes.

### Superiority

598.      This action satisfies the requirements of Fed. R. Civ. P. 23(b)(2) because the
Vehicle Manufacturer Defendants have acted and refused to act on grounds generally applicable
to each Class, thereby making appropriate final injunctive and/or corresponding declaratory relief
with respect to each Class as a whole.

599.    This action satisfies the requirements of Fed. R. Civ. P. 23(b)(3) because a class action is superior to other available methods for the fair and efficient adjudication of this controversy. The common questions of law and of fact regarding Takata and the Vehicle Manufacturer Defendants' conduct and responsibility predominate over any questions affecting only individual Class members.

600.    Because the damages suffered by each individual Class member may be relatively small, the expense and burden of individual litigation would make it very difficult or impossible for individual Class members to redress the wrongs done to each of them individually, such that most or all Class members would have no rational economic interest in individually controlling the prosecution of specific actions, and the burden imposed on the judicial system by individual litigation by even a small fraction of the Class would be enormous, making class adjudication the superior alternative under Fed. R. Civ. P. 23(b)(3)(A).

601.    The conduct of this action as a class action presents far fewer management difficulties, far better conserves judicial resources and the parties' resources, and far more effectively protects the rights of each Class member than would piecemeal litigation. Compared to the expense, burdens, inconsistencies, economic infeasibility, and inefficiencies of individualized litigation, the challenges of managing this action as a class action are substantially outweighed by the benefits to the legitimate interests of the parties, the court, and the public of class treatment in this court, making class adjudication superior to other alternatives, under Fed. R. Civ. P. 23(b)(3)(D).

602.    Plaintiffs are not aware of any obstacles likely to be encountered in the management of this action that would preclude its maintenance as a class action. Rule 23 provides the Court with authority and flexibility to maximize the efficiencies and benefits of the class mechanism and

reduce management challenges. The Court may, on motion of Plaintiffs or on its own determination, certify nationwide, statewide and/or multistate classes for claims sharing common legal questions; utilize the provisions of Rule 23(c)(4) to certify any particular claims, issues, or common questions of fact or law for class-wide adjudication; certify and adjudicate bellwether class claims; and utilize Rule 23(c)(5) to divide any Class into subclasses.

603. The Classes expressly disclaim any recovery in this action for physical injury resulting from the Inflator Defect without waiving or dismissing such claims. Plaintiffs are informed and believe that injuries suffered in crashes as a result of Defective Airbags implicate the Class Vehicles, constitute evidence supporting various claims, including diminution of value, and are continuing to occur because of Defendants' delays and inaction regarding the commencement and completion of recalls, and because of the installation of Defective Airbags as replacement airbags. The increased risk of injury from the Inflator Defect serves as an independent justification for the relief sought by Plaintiffs and the Classes.

## REALLEGATION AND INCORPORATION BY REFERENCE

604. Plaintiffs reallege and incorporate by reference all of the preceding paragraphs and allegations of this Complaint, including the Nature of Claims, Factual Allegations, Tolling Allegations, and Class Action Allegations, as though fully set forth in each of the following Claims for Relief asserted on behalf of the Nationwide Class and the Statewide Classes.

## CLAIMS FOR RELIEF

I.       **Nationwide Claims**

    A.       **Federal Claims**

## COUNT 1

**Dismissed**

**COUNT 2**

**Dismissed**

**COUNT 3**

**Dismissed**

**COUNT 4**

**Dismissed**

**COUNT 5**

**Dismissed**

**COUNT 6**

**Dismissed**

**COUNT 7**

**Dismissed**

**COUNT 8**

**Dismissed**

**COUNT 9**

**Dismissed**

**COUNT 10**

**Dismissed**

**COUNT 11**

**Dismissed**

**COUNT 12**

**Dismissed**

**COUNT 13**

**Dismissed**

**COUNT 14**

**Dismissed**

**COUNT 15**

**Dismissed**

**COUNT 16**

**Dismissed**

**COUNT 17**

**Dismissed**

**COUNT 18**

**Dismissed**

**COUNT 19**

**Dismissed**

**COUNT 20**

**Dismissed**

**COUNT 21**

**Dismissed**

**B.** **Common Law Claim**

**COUNT 22**

**Fraudulent Concealment & Fraudulent Misrepresentation**

605.    This claim is brought by (a) all Plaintiffs against Honda, BMW, Mazda, Nissan, Subaru, and Toyota; (b) Plaintiff Butler against New Chrysler, GM Defendants, Mercedes and the Volkswagen Defendants. Each group of Plaintiffs brings this claim on behalf of themselves and the members of the Nationwide Automotive Recycler Class (excluding Class members who

purchased a Class Vehicle in Florida, Pennsylvania, Tennessee, or North Carolina) under the common law of fraudulent concealment, as there are no true conflicts (case-dispositive differences) among various states' laws of fraudulent concealment. In the alternative, Plaintiffs brings this claim against Defendants under the laws of the states where Plaintiffs and Class members purchased their Class Vehicles.

606. As described above, Defendants made material omissions and affirmative misrepresentations regarding the Class Vehicles and the Defective Airbags contained therein.

607. Defendants concealed and suppressed material facts regarding the Defective Airbags—most importantly, the Inflator Defect, which causes, among other things, the Defective Airbags to: (a) rupture and expel metal shrapnel that tears through the airbag and poses a threat of serious injury or death to occupants; and/or (b) hyper-aggressively deploy and seriously injure occupants through contact with the airbag.

608. Defendants took steps to ensure that its employees did not reveal the known safety Inflator Defect to regulators, consumers, or businesses like Automotive Recycler Plaintiffs and members of the Nationwide Automotive Recycler Class.

609. On information and belief, Takata still has not made full and adequate disclosure, continues to defraud Automotive Recycler Plaintiffs and members of the Nationwide Automotive Recycler Class and continues to conceal material information regarding the Inflator Defect that exists in the Defective Airbags.

610. Defendants had a duty to disclose the Inflator Defect because they:

a. Had exclusive and/or far superior knowledge and access to the facts than Automotive Recycler Plaintiffs and members of the Nationwide Automotive

Recycler Class, and knew that the facts were not known to or reasonably discoverable by Plaintiffs and the Class;

b.  Intentionally concealed the foregoing from Automotive Recycler Plaintiffs and members of the Nationwide Automotive Recycler Class; and

c.  Made incomplete representations about the safety and reliability of the Defective Airbags and, by extension, the Class Vehicles, while purposefully withholding material facts from Automotive Recycler Plaintiffs and members of the Nationwide Automotive Recycler Class that contradicted these representations.

611.  These omitted and concealed facts were material because they would be relied on by purchasers of the Class Vehicles, including the Automotive Recycler Plaintiffs and members of the Nationwide Automotive Recycler Class. Whether a manufacturer's products are safe and reliable, and whether that manufacturer stands behind its products are material concerns to a purchaser. Automotive Recycler Plaintiffs and members of the Nationwide Automotive Recycler Class trusted Defendants not to sell or fail to recall vehicles that were unsafe or defective or that violated federal law governing motor vehicle safety.

612.  Defendants concealed and suppressed these material facts to falsely assure the public that their vehicles were capable of performing safely, as represented by them and reasonably expected by purchasers of the Class Vehicles.

613.  Defendants also misrepresented the safety and reliability of its vehicles, because they either (a) knew but did not disclose the Inflator Defect; (b) knew that they did not know whether their safety and reliability representations were true or false; or (c) should have known that their misrepresentations were false.

- 185 -

614.     Defendants actively concealed or suppressed these material facts, in whole or in part, to maintain a market for their vehicles, to protect their profits, and to avoid recalls that would harm or damage their brands' image and cost them money.  Defendants concealed these facts at the expense of Automotive Recycler Plaintiffs and members of the Nationwide Automotive Recycler Class.

615.     Automotive Recycler Plaintiffs and members of the Nationwide Automotive Recycler Class were unaware and could not have been aware of these omitted material facts and would not have acted as they did if they had known of the concealed or suppressed facts.

616.     Had they been aware of the Defective Airbags and Defendants' callous disregard for safety, Automotive Recycler Plaintiffs and members of the Nationwide Automotive Recycler Class would have paid less for their Class Vehicles.  Automotive Recycler Plaintiffs and members of the Nationwide Automotive Recycler Class did not receive the benefit of their bargain as a result of Defendants' fraudulent concealment.

617.     Because of the concealment and/or suppression of the facts, Automotive Recycler Plaintiffs and members of the Nationwide Automotive Recycler Class sustained damage because they purchased Class Vehicles with Defective Airbags (that cannot be resold) as a result of Defendants' concealment of, and failure to timely disclose, and/or misrepresentations concerning the serious Inflator Defect in millions of Class Vehicles and the serious safety and quality issues caused by their conduct.

618.     The value of all Class Vehicles has diminished as a result of Defendants' fraudulent conduct in connection with the Defective Airbags and has made any reasonable consumer reluctant to purchase any of the Class Vehicles, let alone pay what otherwise would have been fair market value for the parts, including airbags, to repair them.

619.     Accordingly, Automotive Recycler Plaintiffs and members of the Nationwide Automotive Recycler Class have been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain or overpayment for the Class Vehicles at the time of purchase, the diminished value of the Defective Airbags and the Class Vehicles, and/or the costs incurred in storing, maintaining or otherwise disposing of the defective airbags.

620.     Defendants' acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Automotive Recycler Plaintiffs' and Nationwide Automotive Recycler Class members' rights and well-being, and with the aim of enriching themselves. Defendants' conduct, which exhibits the highest degree of reprehensibility, being intentional, continuous, placing others at risk of death and injury, and effecting public safety, warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## II.     State Class Claims

### COUNT 23

**Violation of Florida's Deceptive and Unfair Trade Practices Act,
Fla. Stat. §§ 501.201, *et. seq.***

621.     This claim is brought by ARA and Butler ("Florida Automotive Recycler Plaintiffs") individually and on behalf of the Florida Automotive Recycler Class against Honda, BMW, Mazda, Nissan, Subaru, and Toyota.  Butler also brings this claim individually and on behalf of the Florida Automotive Recycler Class against New Chrysler, the GM Defendants, Mercedes, and the Volkswagen Defendants.

622.     Assignors, Butler, and the Florida Automotive Recycler Class are "consumers" within the meaning of Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. § 501.203(7).

623. Defendants are engaged in "trade or commerce" within the meaning of Fla. Stat. § 501.203(8).

624. FDUTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204(1). Defendants participated in unfair and deceptive trade practices that violated the FDUTPA as described herein.

625. In the course of their business, Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them as described herein and otherwise engaged in activities with a tendency or capacity to deceive.

626. Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles and/or the Defective Airbags installed in them.

627. Takata has known of the Inflator Defect in the Defective Airbags since at least the 1990s. Prior to installing the Defective Airbags in their vehicles, the Vehicle Manufacturer Defendants knew or should have known of the Inflator Defect, because Takata informed them that the Defective Airbags contained the volatile and unstable ammonium nitrate. In addition, Defendant Honda has known of the Inflator Defect in the Defective Airbags in Honda's vehicles since at least 2004. New Chrysler and the GM Defendants knew about the Inflator Defect from the moments of their inception in 2009, and the other Vehicle Manufacturer Defendants have known or should have known of the Inflator Defect in the Defective Airbags since at least 2008. Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them.

628.     By failing to disclose and actively concealing the Inflator Defect in the Class Vehicles and/or the Defective Airbags installed in them, by marketing them as safe, reliable, and of high quality, and by presenting themselves as reputable manufacturers that value safety, Defendants engaged in unfair or deceptive business practices in violation of the FDUTPA. Defendants deliberately withheld the information about the propensity of the Defective Airbags to aggressively deploy, and/or violently explode and spray vehicle occupants with lethal amounts of metal debris and shrapnel, instead of protecting vehicle occupants from bodily injury during accidents, in order to ensure that consumers would purchase the Class Vehicles.

629.     In the course of Defendants' business, they willfully failed to disclose and actively concealed the dangerous risks posed by the many safety issues and the serious Inflator Defect discussed above. Defendants compounded the deception by repeatedly asserting that the Class Vehicles and/or the Defective Airbags installed in them were safe, reliable, and of high quality, and by claiming to be reputable manufacturers that value safety.

630.     Defendants' unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers, and were likely to and did in fact deceive reasonable consumers, including Assignors, Butler, and the Florida Automotive Recycler Class members, about the true safety and reliability of Class Vehicles and/or the Defective Airbags installed in them, the quality of Defendants' brands, and the true value of the Class Vehicles.

631.     Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles and/or the Defective Airbags installed in them with an intent to mislead Assignors, Butler, and the Florida Automotive Recycler Class.

632.     Defendants knew or should have known that their conduct violated the FDUTPA.

633. As alleged above, Defendants made material statements about the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them that were either false or misleading. Defendants' representations, omissions, statements, and commentary have included selling and marketing the Class Vehicles as "safe" and "reliable," despite their knowledge of the Inflator Defect or their failure to reasonably investigate it.

634. To protect their profits and to avoid remediation costs and a public relations nightmare, Defendants concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them and their tragic consequences, and allowed ARA and Butler and the Florida Automotive Recycler Class members to continue the resale of highly dangerous vehicles and vehicle parts.

635. Defendants owed Assignors, Butler, and the Florida Automotive Recycler Class members a duty to disclose the true safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them because Defendants:

    a.    Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

    b.    Intentionally concealed the foregoing from Plaintiff; and/or

    c.    Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from Assignors, Butler, and the Florida Automotive Recycler Class members that contradicted these representations.

636. Because Defendants fraudulently concealed the Inflator Defect in Class Vehicles and/or the Defective Airbags installed in them, resulting in a raft of negative publicity once the Inflator Defect finally began to be disclosed, the value of the Class Vehicles has greatly

- 190 -

diminished. In light of the stigma attached to Class Vehicles by Defendants' conduct, they are now worth significantly less than they otherwise would be.

637. Defendants' failure to disclose and active concealment of the dangers and risks posed by the Defective Airbags in Class Vehicles were material to Assignors, Butler, and the Florida Automotive Recycler Class. A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

638. Assignors, Butler, and the Florida Automotive Recycler Class suffered ascertainable loss caused by Defendants' misrepresentations and their failure to disclose material information. Had they been aware of the Inflator Defect that existed in the Class Vehicles and/or the Defective Airbags installed in them, and Defendants' complete disregard for safety, Assignors, Butler, and the Florida Automotive Recycler Class members either would have paid less for their vehicles or would not have purchased or leased them at all. Assignors, Butler, and the Florida Automotive Recycler Class members did not receive the benefit of their bargain as a result of Defendants' misconduct.

639. Assignors, Butler, and the Florida Automotive Recycler Class risk irreparable injury as a result of Defendants' act and omissions in violation of the FDUTPA, and these violations present a continuing risk to Assignors, Butler, and the Florida Automotive Recycler Class, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest. The recalls and repairs instituted by Defendants have not been adequate.

640.　　As a direct and proximate result of Defendants' violations of the FDUTPA, Assignors, Butler, and the Florida Automotive Recycler Class have suffered injury-in-fact and/or actual damage.

641.　　Florida Automotive Recycler Plaintiffs and the Florida Automotive Recycler Class are entitled to recover their actual damages under Fla. Stat. § 501.211(2) and attorneys' fees under Fla. Stat. § 501.2105(1).

642.　　Florida Automotive Recycler Plaintiffs and the Florida Automotive Recycler Class also seek an order enjoining Defendants' unfair, unlawful, and/or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief available under the FDUTPA.

## COUNT 24

### Dismissed

## COUNT 25

### Violation of the North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. §§ 75-1.1, *et seq.*

643.　　This claim is brought by Weaver and Young's individually and on behalf of the North Carolina Automotive Recycler Class against all Defendants Honda, BMW, Mazda, Nissan, Subaru, and Toyota.

644.　　Defendants engaged in "commerce" within the meaning of N.C. Gen. Stat. § 75-1.1(b).

645.　　The North Carolina Unfair and Deceptive Trade Practices Act ("UDTPA") broadly prohibits "unfair or deceptive acts or practices in or affecting commerce." N.C. Gen. Stat. § 75-1.1(a). As alleged above and below, Defendants willfully committed unfair or deceptive acts or practices in violation of the North Carolina UDTPA.

646.　　In the course of their business, Defendants failed to disclose and actively concealed

the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them as described herein and otherwise engaged in activities with a tendency or capacity to deceive.

647.    Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles and/or the Defective Airbags installed in them.

648.    Takata has known of the Inflator Defect in its Defective Airbags since at least the 1990s. Prior to installing the Defective Airbags in their vehicles, the Vehicle Manufacturer Defendants knew or should have known of the Inflator Defect, because Takata informed them that the Defective Airbags contained the volatile and unstable ammonium nitrate and the Vehicle Manufacturer Defendants approved Takata's designs. In addition, Defendant Honda was again made aware of the Inflator Defect in the Takata airbags in Honda's vehicles in 2004, following a rupture incident. New Chrysler and the GM Defendants knew about the Inflator Defect from the moments of their inception in 2009, and the other Vehicle Manufacturer Defendants were again made aware of the Inflator Defect in Takata's airbags not later than 2008, when Honda first notified regulators of a problem with its Takata airbags. Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them.

649.    By failing to disclose and by actively concealing the Inflator Defect in the Class Vehicles and/or the Defective Airbags installed in them, by marketing them as safe, reliable, and of high quality, and by presenting themselves as reputable manufacturers that value safety, Defendants engaged in unfair or deceptive business practices in violation of the North Carolina UDTPA. Defendants deliberately withheld the information about the propensity of the Defective

Airbags to aggressively deploy, and/or violently explode and spray vehicle occupants with lethal amounts of metal debris and shrapnel, instead of protecting vehicle occupants from bodily injury during accidents, in order to ensure that the Class Vehicles were purchased.

650.     In the course of Defendants' business, they willfully failed to disclose and actively concealed the dangerous risks posed by the many safety issues and serious defect discussed above. Defendants compounded the deception by repeatedly asserting that the Class Vehicles and/or the Defective Airbags installed in them were safe, reliable, and of high quality, and by claiming to be reputable manufacturers that value safety.

651.     Defendants' unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead, tended to create a false impression in purchasers, were likely to and did in fact deceive reasonable purchasers, including Weaver, Young's, and the North Carolina Automotive Recycler Class, about the true safety and reliability of Class Vehicles and/or the Defective Airbags installed in them, the quality of Defendants' brands, and the true value of the Class Vehicles.

652.     Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles and/or the Defective Airbags installed in them with an intent to mislead Weaver, Young's, and the North Carolina Automotive Recycler Class.

653.     Defendants knew or should have known that their conduct violated the North Carolina UDTPA.

654.     As alleged above, Defendants made material statements about the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them that were either false or misleading.  Defendants' representations, omissions, statements, and commentary have included selling and marketing the Class Vehicles as "safe" and "reliable," despite their knowledge

- 194 -

of the Inflator Defect or their failure to reasonably investigate it.

655.    To protect their profits and to avoid remediation costs and a public relations nightmare, Defendants concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them and their tragic consequences, and allowed Weaver, Young's, and the North Carolina Automotive Recycler Class members to continue the resale of highly dangerous vehicles and vehicle parts.

656.    Defendants owed Weaver, Young's, and the North Carolina Automotive Recycler Class a duty to disclose the true safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them because Defendants:

a.    Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

b.    Intentionally concealed the foregoing from Weaver, Young's and the North Carolina Automotive Recycler Class; and/or

c.    Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from Weaver, Young's, and the North Carolina Automotive Recycler Class that contradicted these representations.

657.    Because Defendants fraudulently concealed the Inflator Defect in Class Vehicles and/or the Defective Airbags installed in them, resulting in a raft of negative publicity once the Inflator Defect finally began to be disclosed, the value of the Class Vehicles has greatly diminished. In light of the stigma attached to Class Vehicles by Defendants' conduct, they are now worth significantly less than they otherwise would be.

658.    Defendants' failure to disclose and active concealment of the dangers and risks posed by the Defective Airbags in Class Vehicles were material to Weaver, Young's, and the North

Carolina Automotive Recycler Class. A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

659.    Weaver, Young's and the North Carolina Automotive Recycler Class suffered ascertainable loss caused by Defendants' misrepresentations and their failure to disclose material information. Had they been aware of the Inflator Defect that existed in the Class Vehicles and/or the Defective Airbags installed in them, and Defendants' complete disregard for safety, Weaver, Young's, and the North Carolina Automotive Recycler Class either would have paid less for their vehicles or would not have purchased or leased them at all. Weaver, Young's, and the North Carolina Automotive Recycler Class did not receive the benefit of their bargain as a result of Defendants' misconduct.

660.    Weaver, Young's, and the North Carolina Automotive Recycler Class risk irreparable injury as a result of Defendants' acts and omissions in violation of the North Carolina Act, and these violations present a continuing risk to Weaver, Young's, and the North Carolina Automotive Recycler Class, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.  The recalls and repairs instituted by Defendants have not been adequate.

661.    As a direct and proximate result of Defendants' violations of the North Carolina UDTPA, Weaver, Young's, and the North Carolina Automotive Recycler Class have suffered injury-in-fact and/or actual damage.

662.    Weaver, Young's, and members of the North Carolina Automotive Recycler Class seek punitive damages against Defendants because Defendants' conduct was malicious, willful, reckless, wanton, fraudulent, and in bad faith.

663.    Defendants fraudulently and willfully misrepresented the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them, deceived Weaver, Young's, and North Carolina Automotive Recycler Class on life-or-death matters, and concealed material facts that only Defendants knew, all to avoid the expense and public relations nightmare of correcting the myriad flaws in the Class Vehicles and/or the Defective Airbags installed in them. Because Defendants' conduct was malicious, willful, reckless, wanton, fraudulent, and in bad faith, it warrants punitive damages.

664.    Weaver, Young's, and the North Carolina Automotive Recycler Class seek an order for treble their actual damages, an order enjoining Defendants' unlawful acts, costs of Court, attorney's fees, and any other just and proper relief available under the North Carolina UDTPA, N.C. Gen. Stat. § 75-16.

## COUNT 26

### Dismissed

## COUNT 27

### Violation of the Deceptive Trade Practices Act
### Tex. Bus. & Com. Code §§ 17.41, *et seq.*

665.    This claim is brought by Snyder's individually and on behalf of the Texas Automotive Recycler Class against the Legacy Defendants.

666.    Snyder's and the Texas Automotive Recycler Class are individuals, partnerships and corporations with assets of less than $25 million (or are controlled by corporations or entities with less than $25 million in assets). *See* Tex. Bus. & Com. Code § 17.41.

667.    The Texas Deceptive Trade Practices-Consumer Protection Act ("Texas DTPA") prohibits "[f]alse, misleading, or deceptive acts or practices in the conduct of any trade or commerce," Tex. Bus. & Com. Code § 17.46(a), and an "unconscionable action or course of

action," Tex. Bus. & Com. Code § 17.45(5), which means "an act or practice which, to a consumer's detriment, takes advantage of the lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree," Tex. Bus. & Com. Code § 17.50(a)(3). Defendants have committed false, misleading, unconscionable, and deceptive acts or practices in the conduct of trade or commerce.

668.   Defendants also violated the Texas DTPA by: (1) representing that the Class Vehicles and/or the Defective Airbags installed in them have characteristics, uses, benefits, and qualities which they do not have; (2) representing that they are of a particular standard, quality, and grade when they are not; (3) advertising them with the intent not to sell or lease them as advertised; and (4) failing to disclose information concerning them with the intent to induce others to purchase or lease them.

669.   In the course of their business, Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them as described herein and otherwise engaged in activities with a tendency or capacity to deceive.

670.   Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles and/or the Defective Airbags installed in them.

671.   Takata has known of the Inflator Defect in its Defective Airbags since at least the 1990s. Prior to installing the Defective Airbags in their vehicles, the Vehicle Manufacturer Defendants knew or should have known of the Inflator Defect, because Takata informed them that the Defective Airbags contained the volatile and unstable ammonium nitrate and the Vehicle Manufacturer Defendants approved Takata's designs. In addition, Defendant Honda has known of

the Inflator Defect in the Defective Airbags in Honda's vehicles since at least 2004. New Chrysler and the GM Defendants knew about the Inflator Defect from the moments of their inception in 2009, and the other Vehicle Manufacturer Defendants have known or should have known of the Inflator Defect in the Defective Airbags since at least 2008. Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them.

672. By failing to disclose and by actively concealing the Inflator Defect in the Class Vehicles and/or the Defective Airbags installed in them, by marketing them as safe, reliable, and of high quality, and by presenting themselves as reputable manufacturers that value safety, Defendants engaged in unfair or deceptive business practices in violation of the Texas DTPA. Defendants deliberately withheld the information about the propensity of the Defective Airbags to aggressively deploy and/or violently explode and spray vehicle occupants with lethal amounts of metal debris and shrapnel, instead of protecting vehicle occupants from bodily injury during accidents, in order to ensure the purchase of the Class Vehicles.

673. In the course of Defendants' business, they willfully failed to disclose and actively concealed the dangerous risks posed by the many safety issues and serious defect discussed above. Defendants compounded the deception by repeatedly asserting that the Class Vehicles and/or the Defective Airbags installed in them were safe, reliable, and of high quality, and by claiming to be reputable manufacturers that value safety.

674. Defendants' unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead, tended to create a false impression in purchasers, were likely to and did in fact deceive reasonable purchasers, including Snyder's and the Texas Automotive Recycler Class members, about the true

safety and reliability of Class Vehicles and/or the Defective Airbags installed in them, the quality of Defendants' brands, and the true value of the recalled vehicles.

675. Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles and/or the Defective Airbags installed in them with an intent to mislead Snyder's and the Texas Automotive Recycler Class.

676. Defendants knew or should have known that their conduct violated the Texas DTPA.

677. As alleged above, Defendants made material statements about the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them that were either false or misleading. Defendants' representations, omissions, statements, and commentary have included selling and marketing the Class Vehicles as "safe" and "reliable," despite their knowledge of the Inflator Defect or their failure to reasonably investigate it.

678. To protect their profits and to avoid remediation costs and a public relations nightmare, Defendants concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them and their tragic consequences, and allowed unsuspecting car purchasers to continue to buy the Class Vehicles, and allowed them to continue the resale of highly dangerous vehicles and vehicle parts.

679. Defendants owed Snyder's and the Texas Automotive Recycler Class a duty to disclose the true safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them because Defendants:

    a.    Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

    b.    Intentionally concealed the foregoing from Snyder's and the Texas Automotive Recycler Class; and/or

c.      Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from Snyder's and the Texas Automotive Recycler Class that contradicted these representations.

680.    Because Defendants fraudulently concealed the Inflator Defect in Class Vehicles and/or the Defective Airbags installed in them, resulting in a raft of negative publicity once the Inflator Defect finally began to be disclosed, the value of the Class Vehicles has greatly diminished.  In light of the stigma attached to Class Vehicles by Defendants' conduct, they are now worth significantly less than they otherwise would be.

681.    Defendants' failure to disclose and active concealment of the dangers and risks posed by the Defective Airbags in Class Vehicles were material to Snyder's and the Texas Automotive Recycler Class.  A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

682.    Snyder's and the Texas Automotive Recycler Class suffered ascertainable loss caused by Defendants' misrepresentations and their failure to disclose material information.  Had they been aware of the Inflator Defect that existed in the Class Vehicles and/or the Defective Airbags installed in them, and Defendants' complete disregard for safety, automotive recyclers like Plaintiff and the Texas Automotive Recycler Class would have paid less for their vehicles or would not have purchased them at all.  Snyder's and the Texas Automotive Recycler Class did not receive the benefit of their bargain as a result of Defendants' misconduct.

683.    Snyder's and the Texas Automotive Recycler Class risk irreparable injury as a result of Defendants' acts and omissions in violation of the Texas DTPA, and these violations present a continuing risk to Snyder's and the Texas Automotive Recycler Class, as well as to the

general public. Defendants' unlawful acts and practices complained of herein affect the public interest. The recalls and repairs instituted by Defendants have not been adequate.

684.    As a direct and proximate result of Defendants' violations of the Texas DTPA, Snyder's and the Texas Automotive Recycler Class have suffered injury-in-fact and/or actual damage.

685.    Pursuant to Tex. Bus. & Com. Code § 17.50(a)(1) and (b), Snyder's and the Texas Automotive Recycler Class seek monetary relief against Defendants measured as actual damages in an amount to be determined at trial, treble damages for Defendants' knowing violations of the Texas DTPA, and any other just and proper relief available under the Texas DTPA.

686.    For those Texas Automotive Recycler Class members who wish to rescind their purchases, they are entitled under Tex. Bus. & Com. Code § 17.50(b)(4) to rescission and other relief necessary to restore any money or property that was acquired from them based on violations of the Texas DTPA.

687.    Snyder's and the Texas Automotive Recycler Class also seek court costs and attorneys' fees under § 17.50(d) of the Texas DTPA.

688.    In accordance with Tex. Bus. & Com. Code § 17.505(a), Defendants are on notice of their alleged violations of the Texas DTPA relating to the Class Vehicles and/or the Defective Airbags installed in them purchased by Snyder's and the Texas Automotive Recycler Class. Snyder's demanded that Defendants correct or agree to correct the actions described herein. Defendants have failed to do so.

## **PRAYER FOR RELIEF**

Plaintiffs, on behalf of themselves and all others similarly situated, request the Court to enter judgment against Defendants, as follows:

A. An order certifying the proposed Classes, designating Plaintiffs as the named representatives of the Classes, designating the undersigned as Class Counsel, and making such further orders for the protection of Class members as the Court deems appropriate, under Fed. R. Civ. P. 23;

B. A declaration that the airbags in Class Vehicles are defective;

C. An order enjoining Defendants to desist from further deceptive distribution and with respect to the Class Vehicles and such other injunctive relief that the Court deems just and proper;

D. An award to Plaintiffs and Class Members of compensatory, exemplary, and punitive remedies and damages and statutory penalties, including interest, in an amount to be proven at trial;

E. An award to Plaintiffs and Class Members for the return of the purchase price of the Class Vehicles and/or the defective airbags, with interest from the time it was paid, for the reimbursement of the reasonable expenses occasioned by the purchase, for damages and for reasonable attorney fees;

F. A Defendant-funded program, using transparent, consistent, and reasonable protocols, under which out-of-pocket and loss-of-use expenses and damages claims associated with the Defective Airbags in Plaintiffs' and Class Members' Class Vehicles, can be made and paid, such that Defendants, not the Class Members, absorb the losses and expenses fairly traceable to the recall of the vehicles and correction of the Defective Airbags;

G. A declaration that Defendants must disgorge, for the benefit of Plaintiffs and Class Members, all or part of the ill-gotten profits they received from the sale of the Class Vehicles, or make full restitution to Plaintiffs and Class Members;

H.      An award of attorneys' fees and costs, as allowed by law;

I.      An award of prejudgment and post-judgment interest, as provided by law;

J.      Leave to amend this Complaint to conform to the evidence produced at trial; and

K.      Such other relief as may be appropriate under the circumstances.

## **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a jury trial as to all issues triable by a jury.

DATED: May 18, 2018

**PODHURST ORSECK, P.A.**
SunTrust International Center
One Southeast 3rd Ave, Suite 2300
Miami, Florida 33131
Phone: (305) 358-2800
Fax: (305) 358-2382

 /s/ Peter Prieto
Peter Prieto (FBN 501492)
Aaron S. Podhurst (FBN 63606)
Stephen F. Rosenthal (FBN 131458)
John Gravante  (FBN 617113)
Matthew P. Weinshall (FBN 84783)
Alissa Del Riego (FBN 99742)
pprieto@podhurst.com
apodhurst@podhurst.com
srosenthal@podhurst.com
jgravante@podhurst.com
mweinshall@podhurst.com
adelriego@podhurst.com

*Chair Lead Counsel for Plaintiffs*

| | |
|---|---|
| **COLSON HICKS EIDSON**<br>Lewis S. "Mike" Eidson<br>mike@colson.com<br>Curtis Bradley Miner<br>curt@colson.com<br>255 Alhambra Circle, PH<br>Coral Gables, FL 33134<br>T: 305-476-7400<br><br>By: /s/ Curtis Bradley Miner<br><br>*Plaintiffs' Personal Injury Track Lead Counsel* | **POWER ROGERS & SMITH, P.C.**<br>Todd A. Smith<br>tsmith@prslaw.com<br>70 West Madison St., 55th Floor<br>Chicago, IL 60602<br>T: 312-236-9381<br><br>By: /s/ Todd A. Smith<br><br>*Plaintiffs' Economic Damages Track Co-Lead Counsel* |
| **BOIES, SCHILLER & FLEXNER LLP**<br>David Boies, Esq.<br>Motty Shuhnan, Esq. (Fla Bar. No. 175056)<br>333 Main Street<br>Armonk, NY 10504<br>Tel: (914) 749-8200<br>Fax: (914) 749-8300<br>dboies@bsfllp.com<br>mshulman@bsfllp.com<br><br>Stephen N. Zack, Esq. (Fla. Bar. No. 145215)<br>Mark J. Heise, Esq. (Fla. Bar No. 771090)<br>100 Southeast 2nd Street, Suite 2800<br>Miami, FL 33131<br>Tel: (305) 539-8400<br>Fax: (305) 539-1307<br>szack@bsfllp.com<br>mheise@bsfllp.com<br><br>Richard B. Drubel, Esq.<br>Jonathan R. Voegele, Esq.<br>26 South Main Street<br>Hanover, NH 03755<br>Tel: (603) 643-9090<br>Fax: (603) 643-9010<br>rdrubel@bsfllp.com<br>jvoegele@bsfllp.com<br><br>By: /s/ David Boies, Esq.<br><br>*Plaintiffs' Economic Damages Track Co-Lead Counsel* | **BARON & BUDD, PC**<br>Roland Tellis<br>rtellis@baronbudd.com<br>David Fernandes<br>dfernandes@bardonbudd.com<br>Mark Pifko<br>mpifko@baronbudd.com<br>15910 Ventura Blvd.,<br>Suite 1600<br>Encino, CA 91436<br>T: 818-839-2333<br><br>J.Burton LeBlanc<br>9015 Bluebonnet Blvd.<br>Baton Rouge, LA 70810<br>T: 225-761-6463<br><br>By: /s/ Roland Tellis<br><br>*Plaintiffs' Steering Committee* |

| CARELLA BYRNE CECCHI OLSTEIN BRODY & AGNELLO, PC | LIEFF CABRASER HEIMANN AND BERNSTEIN LLP |
|---|---|
| James E. Cecchi<br>jcecchi@carellabyrne.com<br>5 Becker Farm Road<br>Roseland, NJ   07068-1739<br>T: 973 994-1700<br>f: 973 994-1744<br><br>By: /s/ James E. Cecchi<br><br>*Plaintiffs' Steering Committee* | Elizabeth Cabraser<br>ecabraser@lchb.com<br>Phong-Chau Gia Nguyen<br>pgnguyen@lchb.com<br>275 Battery St., Suite 3000<br>San Francisco, CA 94111-3339<br>T: 415-956-1000<br><br>David Stellings<br>250 Hudson Street, 8th Floor<br>NY, NY 10012<br>212-355-9500<br>dstellings@lchb.com<br><br>By: /s/ Elizabeth Cabraser<br><br>*Plaintiffs' Steering Committee* |

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on May 18, 2018 I electronically filed the foregoing document

with the Clerk of the Court using CM/ECF.  I also certify the foregoing document is being served

this day on all counsel of record via transmission of Notice of Electronic Filing generated by

CM/ECF.

By: <u>/s/Peter Prieto</u>
Peter Prieto

# EXHIBIT H

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Miami Division

**MDL No. 2599**
**Master File No. 15-02599-MD-MORENO**
**Economic Loss No. 14-24009-CV-MORENO**

IN RE

**TAKATA AIRBAG PRODUCTS**
**LIABILITY LITIGATION**

_____/

BRIDGET BOYD, *et. al.*, individually and
on behalf of all others similarly situated,

        Plaintiffs,

    v.

FCA US LLC,

        Defendant.

_____/

**ORDER GRANTING IN PART AND DENYING IN PART**
**FCA US LLC'S MOTION TO DISMISS**

# I.   <u>INTRODUCTION</u>

This multidistrict litigation consolidates allegations of economic loss and personal injury related to airbags manufactured by former-defendants Takata Corporation and TK Holdings (collectively, "Takata") and equipped in vehicles distributed by FCA US LLC.  The allegations are that FCA's vehicles were equipped with Takata airbags containing the chemical ammonium nitrate, which creates a small explosion to inflate the airbags during a crash.  Plaintiffs, who are consumers of FCA's vehicles, contend that when exposed to high heat and humidity, the explosion is much more forceful and can cause significant injuries and even death.

The crux of Plaintiffs' legal claims is that FCA knew or should have known of the Takata inflator defect prior to installing the Takata airbags in their vehicles, and that FCA concealed from, or failed to notify, the Plaintiffs and the general public of the full and complete nature of the inflator defect.  Plaintiffs allege that as a result of FCA's concealment, Plaintiffs would not have purchased their vehicles or would not have paid as much for them as they did.

FCA vigorously contests the sufficiency of the allegations supporting the myriad of claims remaining in the 46-count Complaint.  The Court has thoroughly reviewed the allegations in the Complaint and the arguments in the parties' moving papers.  This Order resolves all remaining claims asserted by the Consumer Plaintiffs against FCA.

For the reasons explained below, FCA's Motion to Dismiss **(D.E. 2983)** is **GRANTED IN PART** as follows:

- The nationwide-class Magnuson-Moss Warranty Act claim (Count 1) is **DISMISSED** in full;

- The statewide-class breach of implied warranty claims under the laws of Indiana, New York, and North Carolina (Counts 22, 36, and 38), and the duplicative claim under California law (Count 15), are **DISMISSED**;

- The statewide-class statutory consumer protection claims under the laws of Alabama, Florida, Indiana, and Pennsylvania (Counts 7, 16, 21, and 40) are **DISMISSED** in full, and the claims under the laws of California, Georgia, and Illinois (Counts 12, 18, and 20) are **DISMISSED** only to the extent they seek damages;

- The fraud claim (Count 4) is **DISMISSED** as to named-Plaintiffs Arlen Sturgis (Mississippi), and T'Keya Cooper, Jamelle Lowery, and Michael McClellion (South Carolina), and as to all putative class members whose fraud claims are governed under the laws of Alabama, Florida, Indiana, Mississippi, and South Carolina;

- The unjust enrichment claim (Count 5) is **DISMISSED** as to all putative class members whose unjust enrichment claims are governed under the laws of Alabama, Arizona, Florida, Indiana, Maryland, Mississippi, New Jersey, North Carolina, and Ohio, and as to these named-Plaintiffs: Laurie Reynolds (Arizona); Ronaldo Maldia (California); Daniel Dwinnells (Maryland); Michael Eikenberry, Kenneth Fischer, Deborah Hillyer, Dave Krzeminski, and Elizabeth Washington (Michigan); Arlen Sturgis (Mississippi); Gene Marsilio (New Jersey); Laquintha O'Neal and Terrie Swanson (North Carolina); Victoria Lykins and Reginald Price (Ohio); Jamelle Lowery (South Carolina); and Bridget Boyd (Texas); and

- The negligence claim (Count 6) is **DISMISSED** as to all named-Plaintiffs whose negligence claims are governed under the laws of Alabama, Arizona, Florida, Georgia, Indiana, Mississippi, Missouri, New Jersey, New York, Ohio, and Texas, and as to all putative class members whose negligence claims are governed under the laws of these states.

Furthermore, the Motion to Dismiss is **DENIED** as to the following claims, which will proceed to summary judgment:

- The statewide-class statutory consumer protection and breach of implied warranty claims in Counts 8–14, 17–20, 23–35, 37, 39, and 41–46;

- Claims for fraud (Count 4) asserted by all named-Plaintiffs whose claims are governed under the laws of Arizona, Arkansas, California, Georgia, Illinois, Maryland, Massachusetts, Michigan, Missouri, New Jersey, New York, North Carolina, Ohio, and Texas;

- Claims for unjust enrichment (Count 5) asserted by these named-Plaintiffs: Cathy Parker and Bobbie Simmons (Arkansas); Rushelle Gonder and Pedro Lucero (California); Michelle Gibson and Debrah Johnson (Georgia); John Fuesting and Priscilla Fuesting (Illinois); Carla Campagnone

(Massachusetts); Randy Nielsen (Michigan); Jason Williams (Missouri); Rmzy Abdallah (New York); Marcia Griffith (Pennsylvania); T'Keya Cooper (South Carolina); and Shanna Moore (Texas); and

- Claims for negligence (Count 6) asserted by these named-Plaintiffs: Cathy Parker and Bobbie Simmons (Arkansas) and Daniel Dwinnells (Maryland).

## II.    LEGAL STANDARD

"A pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).  To survive a motion to dismiss, the "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

A claim has facial plausibility when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).  Although legal conclusions can provide the framework of the complaint, they must be supported by factual allegations.  *Id.* at 679.  Detailed factual allegations are not required, but the complaint must offer more than "labels and conclusions" or "a formulaic recitation of the elements of the cause of action."  *Twombly*, 550 U.S. at 555 (citation omitted). The factual allegations must be enough to "raise a right to relief above the speculative level."  *Id.* (citations omitted).

Where a cause of action sounds in fraud, the allegations in the complaint must satisfy the particularity pleading requirement of Federal Rule of Civil Procedure 9(b).  Under Rule 9(b), "a party must state with particularity the circumstances constituting fraud or mistake"; although "conditions of a person's mind," such as malice, intent, and knowledge may be alleged generally. Fed. R. Civ. P. 9(b).  To comply with Rule 9(b), a plaintiff must allege: (1) the precise statements,

documents, or misrepresentations made; (2) the time, place, and person responsible for the statement; (3) the content and manner in which these statements misled the plaintiffs; and (4) what the defendants gained by the alleged fraud. *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1380–81 (11th Cir. 1997) (*per curiam*) (citation omitted). In other words, a plaintiff is required to plead the "who, what, when, where, and how" pertaining to the underlying fraud. *See Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1262 (11th Cir. 2006) (citation omitted). The purpose of particularity pleading is to alert the defendants to their precise misconduct and protect them against baseless charges of fraudulent behavior. *See Durham v. Bus. Mgmt. Assocs.*, 847 F.2d 1505, 1511 (11th Cir. 1988) (citation omitted).

Finally, at the motion to dismiss stage, the Court must view the allegations in the complaint in the light most favorable to the plaintiffs and accept well-pleaded facts as true. *See St. Joseph's Hosp., Inc. v. Hosp. Corp. of Am.*, 795 F.2d 948, 954 (11th Cir. 1986).

## III.   DISCUSSION

In a previous order, the Court resolved FCA's personal jurisdiction challenge and ruled on the sufficiency of the allegations supporting the Racketeer Influenced and Corrupt Organizations Act claims. *See In re Takata Airbag Prods. Liab. Litig.*, 396 F. Supp. 3d 1101 (S.D. Fla. 2019). After thoroughly reviewing the Complaint and the moving papers, the Court dismissed the RICO claims (Counts 2 and 3), and the "Direct-File Action" in its entirety for lack of personal jurisdiction.

The Court will now resolve FCA's challenges to the claims remaining in the 46-count Complaint, which includes: a nationwide-class claim under the Magnuson-Moss Warranty Act (Count 1); nationwide-class common-law claims for fraud, unjust enrichment, and negligence (Counts 4–6); and statewide-class claims alleging breach of implied warranty and violations of

various state unfair and deceptive trade practices statutes (Counts 7–46). Before addressing the sufficiency of the allegations, the Court will determine the substantive law governing the claims of each named-Plaintiff.

A.   **APPLICABLE LAW**

Questions of federal law in cases transferred under 28 U.S.C. Section 1407 are governed by the clearly settled law of the transferee court's circuit. *See In re Managed Care Litig.*, 150 F. Supp. 2d 1330, 1336 (S.D. Fla. 2001) (citing *Murphy v. F.D.I.C.*, 208 F.3d 959, 966 (11th Cir. 2000) ("Since the federal courts are all interpreting the same federal law, uniformity does not require that transferee courts defer to the law of the transferor circuit.") (citing *In re Korean Air Lines Disaster of September 1, 1983*, 829 F.2d 1171, 1176 (D.C. Cir. 1987) (ruling, in the context of a Section 1407(a) transfer, that "[b]inding precedent for all is set only by the Supreme Court, and for the district courts within a circuit, only by the court of appeals for that circuit"))).

Questions arising under state law are generally governed by the substantive state law dictated by the choice of law rules of the federal court's state. *See Grupo Televisa, S.A. v. Telemundo Commc'ns Grp., Inc.*, 485 F.3d 1233, 1240 (11th Cir. 2007). But in cases transferred under Section 1407, the transferee court must apply the substantive state law dictated by the choice of law rules of the transferor court's state. *See In re Takata Airbag Prods. Liab. Litig.*, 193 F. Supp. 3d 1324, 1332 (S.D. Fla. 2016) (quoting *In re Managed Care Litig.*, 298 F. Supp. 2d 1259, 1296 (S.D. Fla. 2003)).

B.   **CHOICE-OF-LAW ANALYSIS**

The Complaint consolidates the Plaintiffs and the claims that were filed in the *Dwinnells* Complaint in the Eastern District of Michigan and later transferred to this Court by the Judicial Panel on Multidistrict Litigation, with the claims of Plaintiff Victor Khoury, the only

plaintiff to file his claims directly in this MDL proceeding. *See In re Takata Airbag Prods. Liab. Litig.*, 379 F. Supp. 3d 1333, 1336–37 (S.D. Fla. 2019) (summarizing procedural and substantive background of the *Dwinnells* Complaint). The claims asserted by Khoury were previously dismissed in their entirety, thus obviating any choice of law analysis here. *See In re Takata Airbag Prods. Liab. Litig.*, 396 F. Supp. 3d at 1169 & n.17.

For the remaining named-Plaintiffs, the Court will now apply Michigan choice of law rules, which recognize a presumption in favor of *lex fori* and apply Michigan law "unless a 'rational reason' to do otherwise exists." *Std. Fire Ins. Co. v. Ford Motor Co.*, 723 F.3d 690, 693 (6th Cir. 2013) (quoting *Sutherland v. Kennington Truck Serv., Ltd.*, 562 N.W. 2d 466, 471 (Mich. 1997)). In determining whether there is a rational reason to displace Michigan law, the Court must undertake a two-step analysis. *Sutherland*, 562 N.W. 2d at 471. First, the Court "must determine if any foreign state has an interest in having its law applied. If no state has such an interest, the presumption that Michigan law will apply cannot be overcome." *Id.* On the other hand, if a foreign state does have an interest in having its law applied, the Court "must then determine if Michigan's interests mandate that Michigan law be applied, despite the foreign interests." *Id.* (citing *Olmstead v. Anderson*, 400 N.W. 2d 292, 304–05 (Mich. 1987)).

As in the *Whitaker* Order, the Court finds that for the named-Plaintiffs that purchased or leased their vehicle in their state of residence, there is a "rational reason" to depart from applying Michigan substantive law. (D.E. 3838 at 7–8 (the "*Whitaker* Order") (citing *In re Takata Airbag Prods. Liab. Litig.*, No. 14-24009-CV, 2016 WL 5848843, at *5 (S.D. Fla. Sept. 21, 2016); *In re Takata Airbag Prods. Liab. Litig.*, No. 14-24009-CV, 2016 WL 6072406, at *6 (S.D. Fla. Oct. 14, 2016)).) Accordingly, substantive law applies to these named-Plaintiffs as follows: **Arizona** law to Laurie Reynolds; **Arkansas** law to Cathy Parker and Bobbie Simmons; **California** law to

Rushelle Gonder, Pedro Lucero, and Ronaldo Maldia; **Georgia** law to Michelle Gibson and Debrah Johnson; **Illinois** law to John Fuesting and Priscilla Fuesting; **Maryland** law to Daniel Dwinnells; **Massachusetts** law to Carla Campagnone; **Michigan** law to Deborah Hillyer and Dave Krzeminski; **Mississippi** law to Arlen Sturgis; **Missouri** law to Jason Williams; **New Jersey** law to Gene Marsilio; **New York** law to Rmzy Abdallah; **North Carolina** law to Laquintha O'Neal and Terrie Swanson; **Ohio** law to Victoria Lykins and Reginald Price; **Pennsylvania** law to Marcia Griffith; **South Carolina** law to T'Keya Cooper, Jamelle Lowery, and Michael McClellion; and **Texas** law to Bridget Boyd and Shanna Moore.

Also like the *Whitaker* Order, the Court finds that Michigan substantive law applies to the named-Plaintiffs that purchased or leased their vehicle in a state where they do not live. (*See* D.E. 3838 at 8–9 (citing *In re Takata Airbag Prods. Liab. Litig.*, 2016 WL 6072406, at *6).) These named-Plaintiffs include: Michael Eikenberry, Kenneth Fischer, Randy Nielsen, and Elizabeth Washington.

Based on this choice-of-law analysis, certain claims must be dismissed. Because the substantive laws of Alabama, Florida, and Indiana do not apply to any named-Plaintiffs, the statutory claims arising under the laws of these states (Counts 7, 16, and 21–22) are **DISMISSED** in full; as are the common law claims (Counts 4–6) to the extent they are asserted under the laws of these states. By extension, all these counts are also **DISMISSED** as to all putative class members with these claims. *See Wooden v. Bd. of Regents of Univ. Sys. of Georgia*, 247 F.3d 1262, 1288 (11th Cir. 2001) ("[A] claim cannot be asserted on behalf of a class unless at least one named plaintiff has suffered the injury that gives rise to that claim.") (quoting *Prado-Steiman ex rel. Prado v. Bush*, 221 F.3d 1266, 1280 (11th Cir. 2000)).

Even though FCA attacks these claims with several arguments, for sake of brevity and

clarity, the Court will not specifically reference these claims or FCA's corresponding arguments elsewhere in this Order.  For the same reasons, the Court also will not reference these claims in the conclusion sections of each heading.  Where applicable, however, the Court refers to these dismissals as the "choice-of-law dismissals."

Having determined the substantive law that governs the claims of each named-Plaintiff, the Court will now address the sufficiency of Plaintiffs' allegations.  The Court will begin by reviewing the fraud-based claims (common law and statutory), and then evaluate the remaining common law claims (negligence and unjust enrichment).  Next, the Court will analyze the nationwide-class Magnuson-Moss Warranty Act claim and the statewide-class breach of implied warranty claims.  And finally, the Court will assess FCA's argument that the Sale Order bars all claims by certain named-Plaintiffs.

## C.   NATIONWIDE-CLASS COMMON-LAW FRAUD AND STATEWIDE-CLASS STATUTORY CONSUMER PROTECTION CLAIMS

Plaintiffs assert a nationwide-class common-law fraud claim (Count 4) and numerous statewide-class statutory consumer protection claims (Counts 7–9, 12–14, 16–21, 24–25, 27, 30–32, 34–35, 37, 39–40, 42–43, and 45).  The Court will first address the arguments common to both types of "fraud-based" claims, and then address claim-specific arguments.  For ease of reference, the Court refers to the common-law fraud and statutory consumer protection claims as "fraud-based" claims; this term accurately describes the claims and is consistent with the *Puhalla* and *Whitaker* Orders.  (*See In re Takata Airbag Prods. Liab. Litig.*, --- F. Supp. 3d ---, 2020 WL 2764196, at \*6 (S.D. Fla. May 27, 2020) ("*Puhalla* Order"); D.E. 3838 at 10.)

### 1.   Common Challenges

FCA argues that all fraud-based claims should be dismissed because Plaintiffs fail to adequately allege: (1) that FCA had actual knowledge of the alleged inflator defect; (2) that FCA

- 9 -

made material misrepresentations or omissions; and (3) that Plaintiffs relied on any of FCA's material misrepresentations or omissions. FCA also urges that certain fraud-based claims are either time-barred, barred by the economic loss rule, or fail for lack of privity. The Court addresses each argument in turn.

### a)    Knowledge of Inflator Defect

First, FCA argues that all fraud-based claims must be dismissed because Plaintiffs fail to allege that FCA had actual knowledge of the inflator defect. Notably, "knowledge may be alleged generally." *In re Takata Airbag Prods. Liab. Litig.*, 396 F. Supp. 3d at 1118 (quoting Fed. R. Civ. P. 9(b)). And after closely reviewing the allegations in the Complaint, the Court found in a previous order that Plaintiffs sufficiently alleged that FCA had knowledge of the risks posed by installing Takata airbags in their vehicles. *See id.* at 1159.[1] Accordingly, the Court declines to dismiss the fraud-based claims on this basis.

### b)    Omissions and Misstatements

Second, FCA argues that all fraud-based claims must be dismissed because Plaintiffs do not adequately allege that FCA either failed to disclose the Takata inflator defect, or made any actionable misstatements about the safety of its vehicles. Plaintiffs maintain that FCA breached a duty owed to the Plaintiffs by failing to fully inform them about the nature of the Takata inflator defect. Plaintiffs also contend that FCA made actionable misstatements by falsely touting the safety of their vehicles.

---

[1] Throughout this litigation, the Court has made the same finding on similar allegations. *See In re Takata Airbag Products Liab. Litig.*, --- F. Supp. 3d ---, 2020 WL 2764196, at *6 & n.5; *In re Takata Airbag Products Liab. Litig.*, 193 F. Supp. 3d at 1336 ("The Court finds that Plaintiffs have sufficiently alleged Mazda's knowledge of the alleged inflator defect . . . ."); *In re Takata Airbag Products Liab. Litig.*, 255 F. Supp. 3d 1241, 1258 (S.D. Fla. 2017) (same as to Honda).

In the *Puhalla* and *Whitaker* Orders, the Court resolved a similar challenge brought by Mercedes, Audi, Volkswagen, and General Motors. Looking to prior rulings in this case, the Court explained that, by definition, Plaintiffs cannot point to one particular statement because an *omission* is a non-statement. (*See In re Takata Airbag Prods. Liab. Litig.*, --- F. Supp. 3d ---, 2020 WL 2764196, at *7 (citing *In re Takata Airbag Prods. Liab. Litig.*, 193 F. Supp. 3d at 1337–38); D.E. 3838 at 11 (citing same).) After reviewing those plaintiffs' allegations, the Court found that they sufficiently alleged that Mercedes, Audi, Volkswagen, and General Motors had a duty to disclose the inflator defect, and thus declined to dismiss any of those plaintiffs' claims. *See id.*

Like the plaintiffs in *Puhalla* and *Whitaker*, Plaintiffs here also allege that FCA had a duty to disclose the inflator defect because it had exclusive and/or far superior knowledge and access to facts that were not known to or reasonably discoverable by Plaintiffs, and which FCA intentionally concealed from Plaintiffs, all the while making incomplete representations about the safety and reliability of their vehicles. (*See* D.E. 2758 at ¶¶ 235(a)–(c).) Therefore, for the reasons explained in the *Puhalla* and *Whitaker* Orders, and as the Court has throughout this litigation on similar allegations, the Court declines to dismiss any fraud-based claims on this ground.

As for FCA's "puffery" argument, the Court explained in the *Puhalla* and *Whitaker* Orders that "[a]lthough marketing materials about safety features may be construed as puffery when viewed in isolation, such marketing can 'cross the line from mere puffery to active misrepresentations' when statements about safety are read next to allegations that an automotive manufacturer had actual knowledge of the alleged safety defect." (*See In re Takata Airbag Prods. Liab. Litig.*, --- F. Supp. 3d ---, 2020 WL 2764196, at *8 (quoting *In re Gen. Motors LLC Ignition Switch Litig.*, 257 F. Supp. 3d 372, 457 (S.D.N.Y. 2017); citing *see also In re Toyota Motor Corp.*, No. 8:10ML 02151 JVS (FMOx), 2012 WL 12929769, at *18 (C.D. Cal. May 4, 2012)

("Advertising a car as safe and reliable when it actually has a safety-related defect that may render it unable to stop is not 'within the tolerable range of commercial puffery,' especially because Toyota allegedly had exclusive knowledge of the SUA defect.")); D.E. 3838 at 14 (citing same).)

Like the plaintiffs in *Puhalla* and *Whitaker*, Plaintiffs here allege that FCA distributed marketing materials that touted FCA's commitment to vehicle safety. (*See* D.E. 2758 at ¶¶ 127(a)–(h).) Among other examples, Plaintiffs allege that FCA: (1) promoted two vehicle models as receiving an Insurance Institute for Highway Safety "top safety pick" (both models later subject to recalls for the inflator defect); (2) published a press release touting that two vehicle models had achieved 5-star safety ratings from the National Highway Traffic Safety Administration (both models later subject to recalls for the inflator defect); and (3) published brochures for four vehicle models that specifically promoted the vehicles' airbag features (each model later subject to recalls for the inflator defect). *See id.* at ¶¶ 73, 127(c)–(h). Plaintiffs also allege that, through these promotions, FCA "continuously maintained that Chrysler-branded vehicles were safe and reliable," yet "uniformly concealed the Inflator Defect"—which was "material to decisions to purchase or lease Class Vehicles." *Id.* at ¶ 126. And as discussed above, Plaintiffs sufficiently allege that FCA had actual knowledge of the inflator defect. *See supra* Sec.III.C.1.a; *see also In re Takata Airbag Prods. Liab. Litig.*, 396 F. Supp. 3d at 1159. Taken together, the Court finds that Plaintiffs sufficiently allege that the promotion of vehicle safety in FCA's marketing materials crosses the line from mere "puffery" to active misrepresentation.

So, in addition to the duty to disclose, the Court also finds that Plaintiffs' allegations of material misstatements—*i.e.* that FCA continued to promote the safety of their vehicles despite having actual knowledge of the inflator defect—are sufficient to survive the Motion to Dismiss.

Of course, at summary judgment or trial, FCA can present evidence to disprove these allegations. But for now, the claims survive dismissal.

### c) <u>Reliance</u>

Third, FCA argues that all fraud-based claims must be dismissed because Plaintiffs fail to adequately allege reliance on any statements made by FCA. In the *Puhalla* Order, this Court rejected the same argument and ruled that the plaintiffs sufficiently alleged reliance against Mercedes, Audi, and Volkswagen. *See In re Takata Airbag Prods. Liab. Litig.*, --- F. Supp. 3d ---, 2020 WL 2764196, at *8–9 (citing *In re Takata Airbag Prods. Liab. Litig.*, No. 14-24009, 2017 WL 2406711, at *6 (S.D. Fla. June 1, 2017) (ruling same as to allegations against Takata); *In re Takata Airbag Prods. Liab. Litig.*, No. 14-24009-CV, 2016 WL 5844872, at *3–4 (ruling same as to allegations against Subaru)).

Like many of the plaintiffs before them, Plaintiffs here allege that they "were unaware of . . . omitted material facts," "would not have acted as they did if they had known of the concealed or suppressed facts," and that "[h]ad they been aware of the Defective Airbags . . . [they] either would not have paid as much for their Class Vehicles, or they would not have purchased or leased them at all." (D.E. 2758 ¶¶ 240–41.) Once more, these allegations sufficiently plead reliance. Accordingly, the Court will not dismiss any fraud-based claims on this ground.

### d) <u>Time Bars</u>

Fourth, FCA argues that fraud-based claims under the laws of Arizona, Georgia, Ohio, and Texas are barred by the statute of limitations. Plaintiffs disagree.

### (1) <u>Discovery Rule (Arizona)</u>

To start, the statute of limitations for a claim under the Arizona Consumer Fraud Act is "within one year after the cause of action accrues." Ariz. Rev. Stat. Ann. § 12-541(5). FCA argues

that Plaintiff Laurie Reynolds' fraud-based claims under Arizona law, filed on March 14, 2018,[2] are barred by the one-year statute of limitations because a recall for her vehicle was announced on December 9, 2016 and thus her claim expired one year later on December 9, 2017.

Although Arizona does not recognize fraudulent concealment tolling, under Arizona's discovery rule, the statute of limitations for a claim under the Arizona Consumer Fraud Act begins running "when the defrauded party discovers or with reasonable diligence could have discovered the fraud." *Alaface v. Nat'l Inv. Co.*, 892 P.2d 1375, 1379 (Ariz. Ct. App. 1994) (quoting *Mister Donut of Am., Inc. v. Harris*, 723 P.2d 670, 672 (Ariz. 1986) (*en banc*)). "When discovery occurs and a cause of action accrues are usually and necessarily questions of fact for the jury." *Schellenbach v. GoDaddy.com LLC*, No. CV-16-00746-PHX-DGC, 2017 WL 192920, at \*4 (D. Ariz. Jan. 18, 2017) (quoting *Doe v. Roe*, 955 P.2d 951, 961 (Ariz. 1998) (*en banc*); citing *Walk v. Ring*, 44 P.3d 990, 996 (Ariz. 2002) (*en banc*); *Alaface*, 892 P.2d at 1379). "The jury must determine at what point Plaintiff's knowledge, understanding, and acceptance in the aggregate provided sufficient facts to constitute a cause of action." *Schellenbach*, 2017 WL 192920, at \*4 (quoting *Doe*, 955 P.2d at 962).

Even though the statute of limitations is an affirmative defense that is properly raised in a motion to dismiss, where it appears from the face of the complaint that the claim is barred, "the motion should not be granted 'unless it appears certain plaintiff will not be entitled to relief under any set of facts susceptible of proof under the claims stated.'" *Id.* (quoting *Anson v. Am. Motors Corp.*, 747 P.2d 581, 582 (Ariz. Ct. App. 1987)). As, indeed, the statute of limitations defense

---

[2] Prior to transfer to this MDL proceeding, Reynolds's fraud-based claims were initially filed in the *Dwinnells* Complaint in the Eastern District of Michigan on March 14, 2018.

"is never favored" by courts. *Id.* (quoting *Gust, Rosenfeld & Henderson v. Prudential Ins. Co. of Am.*, 898 P.2d 964, 968 (Ariz. 1995)).

Aside from summarily asserting the date the recall was announced and the date Reynolds's claim should have expired, FCA advances no argument regarding when Reynolds actually received notice of the recall. And, as Plaintiffs contend, "though the relevant recall was *announced* on December 9, 2016, it does not follow as a matter of law that Plaintiff Reynolds received notice on that date." (D.E. 3034 at 136 (emphasis in original).) The Court agrees with Plaintiffs on this point, and FCA cites no legal authority ruling otherwise. Therefore, the Court declines to dismiss at this time Reynolds's Arizona Consumer Fraud Act claim on statute of limitations grounds. At summary judgment or trial, though, FCA may renew its argument and present evidence showing when Reynolds was put on notice of her fraud-based claims.

FCA also argues that the statute of limitations bars Reynolds's common law fraud claim. The Court disagrees here as well. Under FCA's theory, Reynolds's fraud claim accrued on December 9, 2016, when a recall was announced for her vehicle. But the statute of limitations for a common law fraud claim in Arizona is "within three years after the cause of action accrues." Ariz. Rev. Stat. Ann. § 12-543(3). So, even under FCA's theory, Reynolds's common law fraud claim, filed on March 14, 2018, was filed within the statute of limitations period (which would have expired on December 9, 2019). Thus, the Court also declines to dismiss Reynolds's fraud claim on statute of limitations grounds.

### (2)   Fraudulent Concealment Tolling (Georgia, Ohio, and Texas)

As for the states that remain, this Court has recognized that fraudulent concealment tolling applies in Ohio and Texas. *See In re Takata Airbag Prods. Liab. Litig.*, --- F. Supp. 3d ---, 2020 WL 2764196, at *25 (ruling the plaintiffs invoked fraudulent concealment tolling under Texas

law) (citing *KPMG Peat Marwick v. Harrison County Hous. Fin. Corp.*, 988 S.W. 2d 746, 750 (Tex. 1999)); *In re Takata Airbag Prods. Liab. Litig.*, 2017 WL 2406711, at *13 (ruling same under Ohio law). And Georgia also recognizes fraudulent concealment tolling. *See Daniel v. Amicalola Elec. Membership Corp.*, 711 S.E. 2d 709, 716 (Ga. 2011) (citing *Jim Walter Corp. v. Ward*, 265 S.E. 2d 7 (Ga. 1980); *McElmurray v. Augusta–Richmond County*, 618 S.E. 2d 59, 68 (Ga. Ct. App. 2005)).

For the reasons fully explained in the *Puhalla* and *Whitaker* Orders, and other previous orders, the Court finds that Plaintiffs' allegations, taken as true and viewed in the light most favorable to them, sufficiently invoke fraudulent concealment tolling under the laws of Georgia, Ohio, and Texas.

### e) **Economic Loss Bars**

Fifth, FCA argues that certain statutory and common law fraud claims are barred by the economic loss rule because Plaintiffs only seek to recover economic loss damages. Plaintiffs urge that several states recognize a fraud exception to the economic loss rule, and thus their statutory and common law fraud-based claims can proceed under the laws of these states.

### (1) **Statutory Consumer Protection Claims**

In the *Puhalla* and *Whitaker* Orders, the Court resolved economic loss challenges under North Carolina's Unfair or Deceptive Trade Practices Act and Pennsylvania's Unfair Trade Practices and Consumer Protection Law. (*See In re Takata Airbag Prods. Liab. Litig.*, --- F. Supp. 3d ---, 2020 WL 2764196, at *9–10; D.E. 3838 at 18–19.) For the same reasons explained in those Orders, the claim under North Carolina's Unfair or Deceptive Trade Practices Act (Count 37) is not barred by the economic loss rule and will proceed to summary judgment; but the claim under Pennsylvania's Unfair Trade Practices and Consumer Protection Law (Count 40) is barred by the

economic loss rule, and is accordingly **DISMISSED**.

### (2)    Common Law Claims

Turning to the common law claims, FCA argues that the economic loss rule bars fraud claims under the laws of Arizona, Massachusetts, Michigan, Mississippi, Missouri, New Jersey, New York, Ohio, and South Carolina. Plaintiffs respond that all these states recognize a fraud exception to the economic loss rule—with the lone of exception of Mississippi, and thus, Count 4 is **DISMISSED** as to Arlen Sturgis, the lone named-Plaintiff with a Mississippi fraud claim.

In the *Puhalla* Order, the Court found that Arizona, Michigan, New Jersey, New York, and Ohio all recognize a fraud exception to the economic loss rule, and then ruled that the plaintiffs' fraudulent concealment[3] allegations sufficiently invoked the fraud exception in these states. (*See In re Takata Airbag Prods. Liab. Litig.*, --- F. Supp. 3d ---, 2020 WL 2764196, at *10 (citing *Martin v. Weed Inc.*, No. CV-18-00027-TUC-RM, 2018 WL 2431837, at *6–7 (D. Ariz. May 30, 2018) (applying fraud exception to economic loss rule under Arizona law); *Huron Tool & Eng'g Co. v. Precision Consulting Servs., Inc.*, 532 N.W.2d 541, 545 (Mich. Ct. App. 2001) (same under Michigan law); *G & F Graphic Services, Inc. v. Graphic Innovators, Inc.*, 18 F. Supp. 3d 583, 593 (D.N.J. 2014) (same under New Jersey law); *In re Gen. Motors LLC Ignition Switch Litig.*, 257 F. Supp. 3d at 432–33 (same under New York law) (collecting cases); *Agilysys, Inc. v. Gordon*, No.

---

[3] Although the claim in Count 4 is styled as fraud—as opposed to fraudulent concealment or inducement—as the Court explained in the *Whitaker* Order, what matters legally is what Plaintiffs allege. (*See* D.E. 3838 at 17 (citing *Huber v. Crop Prod. Servs., Inc.*, No. 06-14564-BC, 2007 WL 2746625, at *6 (E.D. Mich. Sept. 19, 2007).) And there, the Court ruled that because the plaintiffs alleged that General Motors's precontractual concealment of material facts induced the plaintiffs to purchase their vehicles, the fraud claim was not barred by Michigan's economic loss rule. Like the plaintiffs in *Whitaker*, Plaintiffs here allege the same against FCA. (*See* D.E. 2758 at ¶¶ 236–37.) Thus, the styling of the claim as "fraud" does not change the Court's analysis here.

1:06 CV 1665, 2008 WL 11377731, at *6–7 (N.D. Ohio Jan. 11, 2008) (same under Ohio law) (collecting cases)). And in an earlier order, the Court found and ruled the same under Missouri law because, "similar to the reasoning applied under Michigan law," the fraudulent concealment claim was "independent of any contract." *See In re Takata Airbag Prods. Liab. Litig.*, 2017 WL 2406711, at *8.

For the same reasons explained in those orders, the Court finds that Plaintiffs' allegations sufficiently invoke the fraud exception to the economic loss rule in Arizona, Michigan, Missouri, New Jersey, New York, and Ohio. The Court will now address Massachusetts and South Carolina, the only states not previously addressed.

### (i)    Massachusetts

In Massachusetts, "purely economic losses are unrecoverable in tort and strict liability actions in the absence of personal injury or property damage." *FMR Corp. v. Boston Edison Co.*, 613 N.E. 2d 902, 903 (Mass. 1993). But the economic loss rule "does not apply to 'pecuniary loss incurred as a result of an actionable misrepresentation.'" *Passatempo v. McMenimen*, 960 N.E. 2d 275, 294 (Mass. 2012) (quoting *Nota Constr. Corp. v. Keyes Assocs., Inc.*, 694 N.E. 2d 401, 405 n.1 (Mass. App. Ct. 1998)); *see also Arthur D. Little Intern., Inc. v. Dooyang Corp.*, 928 F. Supp. 1189, 1205 (D. Mass. 1996) ("The economic loss rule does not apply to harm caused by intentional misrepresentations.") (citing *Canal Elec. Co. v. Westinghouse Elec. Co.*, 973 F.2d 988, 998 (1st Cir. 1992) (noting economic loss rule does not preclude recovery for intentional torts)).

This rule extends to intentional misrepresentation claims regarding the quality of products made in a commercial setting to induce the purchase of products where the product is subject to certain warranties. *See Softub, Inc. v. Mundial, Inc.*, 53 F. Supp. 3d 235, 239, 260 (D. Mass. 2014) (ruling economic loss rule did not bar intentional misrepresentation claim) (citing *Passatempo*,

960 N.E. 2d at 295; *Canal Elec. Co.*, 973 F.2d at 998). Although FCA points to a ruling by the Superior Court of Massachusetts that a plaintiff could not recover "under her fraud claim because it [was] barred by the economic loss rule," *Costa v. Del La Femina*, No. 20053536, 2006 WL 3201070, at \*10 (Mass. Super. Ct. Oct. 17, 2006), the Court finds that *Costa* runs against the weight of authority interpreting Massachusetts law, which recognizes an intentional misrepresentation exception to the economic loss rule.

To state a claim for intentional or fraudulent misrepresentation, the plaintiff must allege that the defendant "made a false representation of a material fact with knowledge of its falsity for the purpose of inducing the plaintiff to act thereon, and that the plaintiff reasonably relied upon the representation as true and acted upon it to his damage." *Russell v. Cooley Dickinson Hosp., Inc.*, 772 N.E. 2d 1054, 1066 (Mass. 2002).

Here, like their predecessor plaintiffs, Plaintiffs allege: that FCA had knowledge of the risks posed by installing Takata airbags in its vehicles; that FCA had a duty to disclose the inflator defect; that FCA made material misstatements regarding the safety of its vehicles; and that but-for the omissions of the inflator defect, Plaintiffs would not have purchased their vehicles or would not have paid as much for them as they did. *See supra* Sec.III.C.1.a–c. Based on these allegations, the Court finds that Plaintiffs sufficiently invoke the intentional misrepresentation exception to the Massachusetts economic loss rule.

### (ii) <u>South Carolina</u>

Although the Court has not previously addressed whether a fraud claim is barred by South Carolina's economic loss rule, earlier in this case, the Court dismissed a negligence claim as barred by the economic loss rule under *Sapp v. Ford Motor Co.*, 687 S.E. 2d 47 (S.C. 2009). *See In re Takata Airbag Prods. Liab. Litig.*, No. 14-24009-CV, 2016 WL 5848843, at \*8. In *Sapp*,

the controlling economic loss case in South Carolina, the Supreme Court of South Carolina clarified the scope of the economic loss rule and explained that the court did not intend, through its previous rulings, for "the exception to the economic loss rule to be applied well beyond the scope of real estate construction in[to] an ordinary products liability claim." 687 S.E. 2d at 150. In short, the Supreme Court of South Carolina explained that "when personal injury or other property damage occurs, a tort remedy may be appropriate." *Id.* at 147.

Applying the law to the facts there, the Supreme Court of South Carolina affirmed summary judgment for Ford on the plaintiff's tort claims—which included a fraud/misrepresentation claim based on the theory that Ford knew about a design defect in the cruise control switch, which would short circuit and cause a fire in the engine compartment, *id.* at 146—because "[t]he only damage caused by the defect in the trucks was damage to the trucks themselves—purely an economic loss." *Id.* at 150.

In view of the Supreme Court of South Carolina's careful analysis in *Sapp*, which limited the application of the economic loss rule,[4] and consistent with the Court's previous ruling regarding negligence claims under South Carolina law, the Court finds that South Carolina does not recognize a fraud exception to the economic loss rule. Consequently, Count 4 is **DISMISSED**

---

[4] Although some federal district courts have interpreted *Sapp* as recognizing a fraud exception to the economic loss rule, *see In re Volkswagen Timing Chain Prod. Liab. Litig.*, No. CV 16-2765 (JLL), 2017 WL 1902160, at *18 (D.N.J. May 8, 2017) and *Trevillyan v. APX Alarm Sec. Sys., Inc.*, No. 2:10–1387–MBS, 2011 WL 11611, at *8 (D.S.C. Jan. 3, 2011), the Court declines to follow these rulings. The Supreme Court of South Carolina, the final arbiter of South Carolina law, carefully clarified the scope of the "narrow" exception to the economic loss rule that applies in the residential real estate construction context. Notably, the Supreme Court of South Carolina stopped short of affirmatively recognizing a fraud-based exception to the economic loss rule in the products liability context.

as to Plaintiffs T'Keya Cooper, Jamelle Lowery, and Michael McClellion, whose fraud claims are governed under South Carolina law.

### f) __Privity (Ohio)__

Finally, FCA argues in a footnote that the fraud-based claims under Ohio law must be dismissed because there is no privity between FCA and Plaintiffs Victoria Lykins and Reginald Price. (D.E. 2983 at 56 n.26 (citing *Corporex Dev. & Constr. Mgt., Inc. v. Shook, Inc.*, 835 N.E. 2d 701, 703 (Ohio 2005).)

It appears that FCA stretches *Corporex* too far. In *Corporex*, the Supreme Court of Ohio explained that liability can be "based exclusively upon [a] discrete, preexisting duty in tort and not upon any terms of a contract or rights accompanying privity." 835 N.E. 2d at 705 (quoting *Haddon View Inv. Co. v. Coopers & Lybrand*, 436 N.E. 2d 212, 215 (Ohio 1982)). The Supreme Court of Ohio further explained that "*[i]n addition to* generally recognized duties in tort . . . privity or a sufficient nexus that could serve as a substitute for privity may impose only those contractual duties and liability for breach of those duties agreed to by the parties to the contract, and no more." *Id.* It is clear, though, that "[w]hen a duty in tort exists, a party may recover in tort." *Id.* Thus, privity is not required to plead a fraud-based claim under Ohio law.

Since *Corporex*, Ohio courts have continued to recognize that fraud claims do not require privity. *See Clemens v. Nelson Fin. Grp., Inc.*, No. 14AP–537, 2015 WL 1432604, *8 (Ohio Ct. App. 2015) ("Although the economic-loss rule sweeps widely, it does not preclude all tort claims for economic damages. A plaintiff may pursue such a tort claim if it is 'based exclusively upon [a] discrete, preexisting duty in tort and not upon any terms of a contract or rights accompanying privity.'") (quoting *Corporex*, 835 N.E. 2d at 705); *Campbell v. Krupp*, 961 N.E. 2d 205, 213 (Ohio Ct. App. 2011) ("[T]here is no question that privity is not required to assert a claim of

- 21 -

common law fraud, out of a concern that an innocent party should not suffer at the hands of an intentional wrongdoer.") (quoting *Haddon View Inv. Co.*, 436 N.E. 2d at 215).

Under Ohio law, a duty arises in business transactions only where: (1) the parties are in a fiduciary relationship; (2) both parties to the transaction understand that a special trust or confidence has been reposed; or (3) full disclosure is necessary to dispel misleading impressions that are or might have been created by partial revelation of the facts. *Gator Dev. Corp. v. VHH, Ltd.*, No. C–080193, 2009 WL 1027584, at *6 (Ohio Ct. App. 2009) (citing *Blon v. Bank One, Akron, N.A.*, 519 N.E. 2d 363, 367 (Ohio 1988)).

Here, as discussed above, Plaintiffs sufficiently allege that FCA had a duty to disclose the inflator defect because it had exclusive and/or far superior knowledge and access to facts that were not known to or reasonably discoverable by Plaintiffs, and which FCA intentionally concealed from Plaintiffs, all the while making incomplete representations about the safety and reliability of their vehicles. (*See supra* Sec.III.C.1.a–c; *see also* D.E. 2758 at ¶¶ 235(a)–(c).) Thus, the Court finds that FCA had a duty to disclose under Ohio law. And because this duty is grounded in tort, the economic loss rule does not bar the fraud-based claims under Ohio law.

## 2.    Specific Challenges to Statutory Consumer Protection Claims

Next, FCA advances three challenges specific to the statutory consumer protection claims. First, FCA argues that the claims under the laws of Arkansas and South Carolina must be dismissed because the consumer protection statutes of these states bar class actions. Second, FCA argues that the claims under the Michigan Consumer Protection Act and the Missouri Merchandising Practices Act should be dismissed because Plaintiffs fail to allege that they purchased their vehicles for "personal purposes." And finally, FCA argues that the claims under the Uniform Deceptive Trade Practices Act of Georgia and Illinois, and California's Unfair Competition Law must be

limited to injunctive relief.[5] Plaintiffs insist that none of these claims should be dismissed.

### a)    Class Action Bars

First, FCA argues that the statutory consumer protection claims under the laws of Arkansas and South Carolina must be dismissed because the statutes of these states bar class action claims. As explained fully in the *Puhalla* Order, in the Eleventh Circuit, Rule 23 controls whether a plaintiff can assert a class action claim under a state statute that forbids class actions. *See In re Takata Airbag Prods. Liab. Litig.*, --- F. Supp. 3d ---, 2020 WL 2764196, at *11–12 (citing *Lisk v. Lumber One Wood Preserving, LLC*, 792 F.3d 1331, 1336 (11th Cir. 2015)). Following *Lisk*, the Court ruled that the plaintiffs could assert class action claims under the Arkansas Deceptive Trade Practices Act and the South Carolina Unfair Trade Practices Act (as well as under the Alabama Deceptive Trade Practices Act). *See id.* at *12 (citing *Lisk*, 792 F.3d at 1335–38 (ruling Rule 23 did not bar a class claim under the Alabama Deceptive Trade Practices Act); *In re Dealer Mgmt. Sys. Antitrust Litig.*, 362 F. Supp. 3d 510, 553 (N.D. Ill. 2019) (ruling same under the Arkansas Deceptive Trade Practices Act and the South Carolina Unfair Trade Practices Act)). Consequently, the Court declines to dismiss these class action claims on this basis.

### b)    Failure to Allege "Personal Purposes"

Second, FCA argues that the claims under the Michigan Consumer Protection Act and the

---

[5] In a footnote, FCA also argues that the Safety Act bars the Plaintiffs' request for the Court to enjoin FCA from continuing its negligence by continuing to install defective airbags in class vehicles. (*See* D.E. 2983 at 57 n.29.) In a previous order, the Court rejected a similar argument by Mercedes, Audi, and Volkswagen. *See In re Takata Airbag Products Liab. Litig.*, 396 F. Supp. 3d at 1133 ("[T]o the extent Plaintiffs seek injunctive relief going forward that will 'unduly and directly interfere with NHTSA's investigatory and regulatory functions,' or interfere with NHTSA's Coordinated Remedy Order, the Court can address this issue at that time.") (quoting *In re Takata Airbag Prod. Liab. Litig.*, No. 14-24009-CV, 2015 WL 12641693, at *3 (S.D. Fla. Sept. 21, 2015)). Likewise here, if and when this issue arises, the Court can address it at that time.

Missouri Merchandising Practices Act should be dismissed because Plaintiffs fail to allege that they purchased their vehicles for "personal purposes." (D.E. 2983 at 57 (citing *Zine v. Chrysler Corp.*, 600 N.W. 2d 384, 393 (Mich. App. Ct. 1999); *Murphy v. Stonewall Kitchen, LLC*, 503 S.W. 3d 308, 311 (Mo. Ct. App. 2016)).)

Here, Plaintiffs allege in paragraph 28 of the Complaint that all Plaintiffs "purchased or leased their Class Vehicles primarily for personal, family, and household use." (*See* D.E. 2758 at ¶ 28.) Reviewing *Zine* and *Murphy*, the Court finds that this allegation is sufficient to satisfy the "personal purpose" requirement under Michigan and Missouri law. FCA does not press the argument in its Reply. Accordingly, the claims can proceed.

### c) <u>Injunctive Relief</u>

Finally, FCA argues that the claims under California's Unfair Competition Law (Count 12) and under the Uniform Deceptive Trade Practices Act of Georgia (Count 18) and Illinois (Count 20) must be limited to injunctive relief. Plaintiffs disagree.

### (1) <u>California's Unfair Competition Law</u>

Starting with California's Unfair Competition Law, the Court finds that Plaintiffs are correct that they can seek restitution and injunctive relief. (D.E. 3034 at 148 (citing *De La Torre v. CashCall, Inc.*, 422 P.3d 1004, 1012 (Cal. 2018).) But read in full, the sentence from *De la Torre* that Plaintiffs cite makes clear that plaintiffs "cannot obtain damages or attorney fees" under California's Unfair Competition Law. *De La Torre*, 422 P.3d at 1021 (citation omitted); *see also Valdez v. Seidner-Miller, Inc.*, 245 Cal. Rptr. 3d 268, 280 (Cal. Ct. App. 2019) ("The UCL provides for injunctive relief, restitution, and civil penalties.") (citing Bus. & Prof. Code, §§ 17203, 17206; *De La Torre*, 422 P.3d at 1021).

Through their Unfair Competition Law claim, Plaintiffs seek "such orders or judgments as

may be necessary to enjoin New Chrysler from continuing its unfair, unlawful, and/or deceptive practices . . . and for such other relief set forth below." (D.E. 2758 at ¶ 365.) In view of the foregoing, Count 12 is dismissed only to the extent it seeks damages.

### (2) Georgia and Illinois Uniform Deceptive Trade Practices Acts

Turning to the Georgia and Illinois statutes, both Acts provide that "[a] person likely to be damaged by a deceptive trade practice of another *may be granted injunctive relief* upon terms that the court considers reasonable. Proof of monetary damage, loss of profits or intent to deceive is not required." *See* 815 Ill. Comp. Stat. Ann. 510/3 (emphasis added); Ga. Code Ann. § 10-1-373(a). Both acts also authorize a court to assess costs and award attorneys' fees in certain situations. *See* 815 Ill. Comp. Stat. Ann. 510/3; Ga. Code Ann. § 10-1-373(b).

Although the parties' briefing does not specifically address Georgia law, the Court finds that relief under Georgia's Uniform Deceptive Trade Practices Act "is limited to an injunction." *See Divis v. Gen. Motors LLC*, No. 18-13025, 2019 WL 4735405, at *9 (E.D. Mich. Sept. 27, 2019). And it is equally true that a plaintiff cannot seek damages under Illinois's Uniform Deceptive Trade Practices Act. *See Universal Gaming Grp. v. Taft Stettinius & Hollister LLP*, No. 1–15–0878, 2017 WL 1240860 at *9 (Ill. App. Ct. 2017) (quoting *Chicago's Pizza, Inc. v. Chicago's Pizza Franchise Ltd. USA*, 893 N.E. 2d 981, 996 (Ill. App. Ct. 2008)).

Although Plaintiffs argue otherwise, the Court finds that they misread FCA's authority— *Dorr-Oliver Inc. v. Fluid-Quip, Inc.*, 834 F. Supp. 1008, 1014 (N.D. Ill. 1993)—and mistakenly conflate the Illinois Uniform Deceptive Trade Practices Act with the Illinois Consumer Fraud and Deceptive Business Practices Act. Although similar, the latter "allows damages as well as injunctive relief," *id.* (citing 815 ILCS ¶¶ 505/7, 505/10a), whereas the former "provides only for injunctive relief but allows costs and attorneys fees if defendants willfully engaged in a deceptive

trade practice," *id.* (citing 815 ILCS ¶ 510/3).

With their claims under the Georgia and Illinois Deceptive Trade Practices Acts, Plaintiffs seek "an order enjoining New Chrysler's deceptive practices, attorneys' fees, and any other just and proper relief available under the [Acts]." (D.E. 2758 at ¶¶ 488, 522.) In view of the foregoing, Counts 18 and 20 are dismissed only to the extent they seek damages.

### 3.    <u>Conclusion</u>

To summarize the fraud-based claims, Count 4 is **DISMISSED** as to named-Plaintiffs Arlen Sturgis (Mississippi), and T'Keya Cooper, Jamelle Lowery, and Michael McClellion (South Carolina). By extension, Count 4 is also **DISMISSED** as to all putative class members with fraud claims governed under Mississippi and South Carolina law. *See Wooden*, 247 F.3d at 1288 ("[A] claim cannot be asserted on behalf of a class unless at least one named plaintiff has suffered the injury that gives rise to that claim.") (quoting *Prado-Steiman*, 221 F.3d at 1280). After accounting for the choice-of-law dismissals and the states excluded by Plaintiffs (Florida and Pennsylvania), Count 4 will proceed for all other named-Plaintiffs.

As for the statutory consumer protection claims, the claim under Pennsylvania's Unfair Trade Practices and Consumer Protection Law (Count 40) is **DISMISSED** in full, and the claims under California's Unfair Competition Law (Count 12), and Georgia's and Illinois's Uniform Deceptive Trade Practices Act (Counts 18 and 20) are **DISMISSED** only to the extent they seek damages. The state statutory consumer protection claims in Counts 8–9, 12–14, 17–20, 24–25, 27, 30–32, 34–35, 37, 39, 42–43, and 45 will proceed.

### D.    <u>REMAINING NATIONWIDE-CLASS COMMON-LAW CLAIMS</u>

The Court will now address FCA's challenges to the nationwide-class common-law unjust enrichment (Count 5) and negligence (Count 6) claims. These claims are asserted "under the

common law of" negligence and unjust enrichment "as there are no true conflicts (case-dispositive differences) among various states' laws." (*See* D.E. 2758 at ¶¶ 247, 253.)  Alternatively, though, Plaintiffs assert these claims under the laws of the states where the vehicles were purchased.  At this stage, the Court will determine whether Plaintiffs have stated negligence and unjust enrichment claims under applicable state common law.  *Cf. In re Takata Airbag Prods. Liab. Litig.*, 2017 WL 2406711, at *5 (evaluating nationwide fraudulent concealment claims under applicable state common law).  The Court begins with the unjust enrichment claims and then proceeds to the negligence claims.

### 1.    <u>Unjust Enrichment (Count 5)</u>

FCA argues that certain unjust enrichment claims should be dismissed because: (1) either there is no privity or Plaintiffs did not purchase their vehicles from an FCA-affiliated dealership; (2) certain Plaintiffs allege the existence of an express warranty; (3) California and Texas do not recognize unjust enrichment as a standalone cause of action; and (4) they are barred by the statute of limitations.  The Court addresses each argument in turn.

### a)    <u>Direct Benefit</u>

First, FCA argues that all unjust enrichment claims should be dismissed for lack of privity. Specifically, FCA argues that "[a]s this Court has previously recognized, for states that require privity to maintain an unjust enrichment claim, such claims must be dismissed if a plaintiff cannot demonstrate that they have conferred a direct benefit on a defendant."  (D.E. 2983 at 55.) Noticeably, though, FCA does not cite a single authority supporting this statement.  (*See id.*; *see also* D.E. 2983-4 at 2–5.)  Nor does FCA cite a single ruling in this case showing that privity is *required* to state an unjust enrichment claim under the laws of any state.  *See id.*  And this is because the Court has not issued such a ruling.  The privity argument thus fails.

Instead, the Court has ruled that under the laws of numerous states, a direct benefit is conferred on an automotive manufacturer where a plaintiff purchases or leases his or her vehicle from a dealership affiliated with the automotive manufacturer. *See In re Takata Airbag Prods. Liab. Litig.*, --- F. Supp. 3d ---, 2020 WL 2764196, at \*15–21 (ruling such under the laws of Alabama, Arizona, Connecticut, Florida, Georgia, Illinois, Indiana, Louisiana, Massachusetts, Michigan, Mississippi, New York, Ohio, Pennsylvania, Tennessee, Virginia, and Wisconsin) (citing *In re Takata Airbag Prods. Liab. Litig.*, 255 F. Supp. 3d at 1260–64 (ruling same under the laws of Alabama, Arizona, California, Connecticut, Florida, Georgia, Hawaii, Illinois, Indiana, Massachusetts, Nevada, New Jersey, Ohio, Oregon, Rhode Island, Tennessee, Texas, Virginia, West Virginia, and Washington); *In re Takata Airbag Prods. Liab. Litig.*, 2016 WL 5848843, at \*10–11 (ruling same under the laws of Alabama, Florida, Massachusetts, Nevada, Pennsylvania, and South Carolina)).

Following these rulings, FCA advances a second argument: that unjust enrichment claims should be dismissed for 16 named-Plaintiffs who did not purchase their vehicles from an FCA-affiliated dealership. It is clear (from a footnote, in one of FCA's six appendices) that FCA specifically seeks to dismiss the unjust enrichment claims of these named-Plaintiffs: Laurie Reynolds (Arizona), Ronaldo Maldia (California); Daniel Dwinnells (Maryland); Deborah Hillyer and Dave Krzeminski (Michigan); Arlen Sturgis (Mississippi); Gene Marsilio (New Jersey); Laquintha O'Neal and Terrie Swanson (North Carolina); Victoria Lykins, and Reginald Price (Ohio); Jamelle Lowery (South Carolina); and Bridget Boyd (Texas). (*See* D.E. 2983-1 at 3 n.6.) Although FCA also seeks to dismiss the claims of Plaintiff Elizabeth Washington under Illinois law, Plaintiff Michael Eikenberry under Indiana law, and Plaintiff Kenneth Fischer under Ohio, *see id.*, as discussed in the choice-of-law analysis above, Michigan law applies to the

claims of these Plaintiffs, *see* Sec.III.B.

Following its prior rulings on this issue, the Court will now analyze, on a state-by-state basis, the unjust enrichment allegations of these named-Plaintiffs.

### (1)   Arizona

Arizona law applies to Plaintiff Laurie Reynolds's unjust enrichment claim. And her claim is **DISMISSED** because her Dodge was purchased "from Anderson Toyota" and she offers no additional allegations from which the Court could infer that Anderson Toyota has any affiliation with FCA. (D.E. 2758 at ¶ 62.)

### (2)   California

California law applies to Plaintiff Ronaldo Maldia's unjust enrichment claim. And his claim is **DISMISSED** because his Dodge was purchased "from Balboa Motors" and he offers no additional allegations from which the Court could infer that Balboa Motors has any affiliation with FCA. *Id.* at ¶ 54.

### (3)   Maryland

Maryland law applies to Plaintiff Daniel Dwinnells's unjust enrichment claim. The Court has not previously addressed unjust enrichment claims under Maryland law.

Maryland courts have recognized three required elements of unjust enrichment: (1) a benefit conferred upon the defendant by the plaintiff; (2) an appreciation or knowledge by the defendant of the benefit; and (3) the acceptance or retention of the benefit by the defendant of the benefit under such circumstances as to make it inequitable for the defendants to retain the benefit without payment of its value. *See ADCS Inc. v. Kimbrough, Jr.*, 30 F. App'x. 225, 228 (4th Cir. 2002) (quoting *Berry & Gould, P.A. v. Berry*, 757 A.2d 108, 113 (Md. 2000)). Aside from these required elements, the Court is not aware of any authority also requiring a plaintiff to directly

confer a benefit on a defendant in order to state an unjust enrichment claim under Maryland law.

Turning to the allegations, Dwinnells's claim is **DISMISSED** because he purchased his Dodge "from Ideal Buick GMC" and he offers no additional allegations from which the Court could infer that Ideal Buick GMC has any affiliation with FCA. (D.E. 2758 at ¶ 39.)

### (4) <u>Michigan</u>

Michigan law applies to the unjust enrichment claims of Plaintiffs Michael Eikenberry, Kenneth Fischer, Deborah Hillyer, Dave Krzeminski, and Elizabeth Washington. And the claims of each Plaintiff are **DISMISSED** because their vehicles were not purchased from FCA-affiliated dealerships, and they offer no additional allegations from which the Court could infer the dealerships have any affiliation with FCA. *See id.* at ¶ 40 (Eikenberry purchased his used Chrysler "from Auto World"); *id.* at ¶ 41 (Fischer purchased his used Dodge "from Troy Auto Group"); *id.* at ¶ 47 (Hillyer purchased her used Chrysler "from AM Automotive LLC"); *id.* at ¶ 50 (Krzeminski purchased his used Dodge "from a used car dealership"); *id.* at ¶ 66 (Washington purchased her used Dodge "from Howard Automotive").

### (5) <u>Mississippi</u>

Mississippi law applies to Plaintiff Arlen Sturgis's unjust enrichment claim. And his claim is **DISMISSED** because his Chrysler was purchased "from Southern Imports, Inc." and he offers no additional allegations from which the Court could infer that Southern Imports, Inc. has any affiliation with FCA. *Id.* at ¶ 64.

### (6) <u>New Jersey</u>

New Jersey law applies to Plaintiff Gene Marsilio's unjust enrichment claim. As noted in the *Puhalla* Order, under New Jersey law, "[w]hen a plaintiff fails to allege a direct relationship, that plaintiff has failed to assert a claim for unjust enrichment, and under those circumstances,

dismissal is appropriate." *See In re Takata Airbag Prods. Liab. Litig.*, --- F. Supp. 3d ---, 2020 WL 2764196, at *19 (quoting *Glass v. BMW of N. Am., LLC*, Civil Action No. 10-5259 (ES), 2011 WL 6887721, at *16 (D.N.J. Dec. 29, 2011)).

Turning to the allegations, Marsilio's claim is **DISMISSED** because his used Dodge was purchased "from Luxury Haus" and he offers no additional allegations from which the Court could infer that Luxury Haus is directly owned and operated by FCA. (D.E. 2758 at ¶ 55.)

### (7)     North Carolina

North Carolina law applies to the unjust enrichment claims of Plaintiffs Laquintha O'Neal and Terrie Swanson. The Court also has not previously addressed unjust enrichment claims under North Carolina law.

To state a claim for unjust enrichment under North Carolina law, a plaintiff must allege that he or she "conferred a benefit on the other party" that is "measurable" and not "gratuitous." *Krawiec v. Manly*, 811 S.E. 2d 542, 552 (N.C. 2018) (quoting *Booe v. Shadrick*, 369 S.E. 2d 554, 556 (N.C. 1988)). Aside from these elements, the Court is not aware of any authority that also requires the plaintiff to directly confer the benefit on the defendant in order to state an unjust enrichment claim under North Carolina law.

Turning to the allegations, O'Neal's and Swanson's claims are **DISMISSED** because their vehicles were purchased "from Carmax" and "from Hickory Used Car Superstore," respectively, and they offer no additional allegations from which the Court could infer that Carmax or the Hickory Used Car Superstore have any affiliation with FCA. (D.E. 2758 at ¶¶ 59, 65.)

### (8)     Ohio

Ohio law applies to the unjust enrichment claims of Plaintiffs Victoria Lykins and Reginald Price. And Lykins's and Prices's claims are **DISMISSED** because their vehicles were purchased

"from Jeff Wyler, Eastgate Automall" and "from Dixie Import," respectively, and they offer no additional allegations from which the Court could infer that these dealerships have any affiliation with FCA. *Id.* at ¶¶ 53, 61.

### (9) South Carolina

South Carolina law applies to Plaintiff Jamelle Lowery's unjust enrichment claim. And Lowery's claim is **DISMISSED** because her used Chrysler was purchased "from Crown Nissan" and she offers no additional allegations from which the Court could infer that Crown Nissan has any affiliation with FCA. *Id.* at ¶ 51.

### (10) Texas

Texas law applies to Plaintiff Bridget Boyd's unjust enrichment claim. And her claim is **DISMISSED** because her used Chrysler was purchased "from Driver's Choice" and she offers no additional allegations from which the Court could infer that Driver's Choice has any affiliation with FCA. *Id.* at ¶ 36.

### b) Adequate Remedy at Law (Express Warranties)

Second, FCA argues in a footnote that unjust enrichment claims should be dismissed for the 12 named-Plaintiffs who allege the existence of an express warranty, as these plaintiffs fail to adequately allege unconscionability. (D.E. 2983 at 55 n.24.) As the Court explained in the *Puhalla* and *Whitaker* Orders, this argument is unavailing because not only has FCA failed to provide the Court with any written express warranties covering any of Plaintiffs' vehicles, but also, Plaintiffs allege that they do not have an adequate remedy at law, and that the warranties are procedurally and substantively unconscionable and are thus not enforceable. (*See In re Takata Airbag Prods. Liab. Litig.*, --- F. Supp. 3d ---, 2020 WL 2764196, at *14–15; D.E. 3838 at 25–26; D.E. 2758 at ¶¶ 182–84, 251).) And although FCA also summarily argues in passing in its footnote that

- 32 -

Plaintiffs fail to offer any facts showing unconscionability (D.E. 2983 at 55 n.24), FCA has not produced the applicable written express warranties. Thus, the Court need not reach this cursory contention. (*See* D.E. 1208 at 20 (addressing Nissan's unconscionability argument only after "Nissan attached the express warranty covering [the plaintiff's vehicle] to its Motion," and then only after the Court found that the warranty was "central to Plaintiffs' claims and that Plaintiffs ha[d] not disputed the authenticity of the attached warranty").)

In addition, Plaintiffs are allowed to maintain an unjust enrichment claim in the alternative to their other claims. *See In re Takata Airbag Prods. Liab. Litig.*, --- F. Supp. 3d ---, 2020 WL 2764196, at *15 (citing *Tershakovec v. Ford Motor Co.*, No. 17-21087-CIV, 2018 WL 3405245, at *14 (S.D. Fla. July 12, 2018) ("Plaintiffs may maintain an unjust enrichment claim in the alternative to their breach of express warranty claim.") (citing *Martorella v. Deutsche Bank Nat. Tr. Co.*, 931 F. Supp. 2d 1218, 1227–28 (S.D. Fla. 2013) ("Plaintiff may, however, maintain an equitable unjust enrichment claim in the alternative to her legal claims against Defendants."); Fed. R. Civ. P. 8(a)(3), (d)(2) (permitting pleading in the alternative))). This is because it is only upon a showing that an express contract exists between the parties that the unjust enrichment count fails. *See id.* at *15 (quoting *In re Takata Airbag Prods. Liab. Litig.*, 193 F. Supp. 3d at 1344). And FCA has not made this showing here. Thus, it would be premature to dismiss the unjust enrichment claims on this basis. *Id.* (quoting *Martorella*, 931 F. Supp. 2d at 1228).

Finally, even though equitable relief ultimately may not be awarded because there is an adequate remedy at law, Plaintiffs "certainly may plead alternative equitable relief" at this stage. *Id.* (quoting *Adelphia Cable Partners, Inc. v. E & A Beepers Corp.*, 188 F.R.D. 662, 666 (S.D. Fla. 1999)). Provided there is evidence proving the existence of enforceable written express warranties, FCA may renew its argument at summary judgment. But for now, the claims survive.

### c)     **Standalone Causes of Action (California and Texas)**

Third, FCA argues that California and Texas unjust enrichment claims should be dismissed because these states do not recognize unjust enrichment as a standalone cause of action. Plaintiffs again disagree.

#### (1)     **California**

As explained in the *Whitaker* Order, California recognizes the principle behind unjust enrichment by requiring "restitution if [a defendant] is unjustly enriched at the expense of another. The recipient of the benefit is liable only if the circumstances are such that, as between two persons, it is unjust for the recipient to retain it." (D.E. 3838 at 26–27 (quoting *In re Takata Airbag Prods. Liab. Litig.*, 255 F. Supp. 3d at 1261 (quoting *City of Chula Vista v. Gutierrez*, 143 Cal. Rptr. 3d 689, 692 (Cal. Ct. App. 2012))).)

Here, California law applies to the unjust enrichment claims of Plaintiffs Rushelle Gonder and Pedro Lucero. And their claims can proceed because their vehicles were purchased from FCA-affiliated dealerships. (*See* D.E. 2758 at ¶ 45 (Gonder purchased her used Chrysler "from Scott Robinson Chrysler"); *id.* at ¶ 52 (Lucero purchased his new Chrysler "from Elk Grove Chrysler").

#### (2)     **Texas**

Texas courts have ruled that unjust enrichment "is not an independent cause of action but rather characterizes the result of a failure to make restitution benefits either wrongfully or passively received under circumstances that give rise to an implied or quasi-contractual obligation to repay." *In re Takata Airbag Prods. Liab. Litig.*, 255 F. Supp. 3d at 1263–64 (quoting *Foley v. Daniel*, 346 S.W. 3d 687, 690 (Tex. Ct. App. 2009)). In some circumstances, however, "overpayments under a valid contract may give rise to a claim for restitution or unjust enrichment." *Id.* (quoting *Foley*, 346 S.W. 3d at 690–91)). But because the Court is only deciding "the sufficiency of Plaintiffs'

claims under a motion to dismiss standard"—"and not whether Plaintiffs actually overpaid for their vehicles"—their claims should not be summarily dismissed on this basis.  *See id.*  The overpayment inquiry is appropriate at summary judgment or trial; but for now, the Court can determine whether plaintiffs allege that they purchased their vehicles from an FCA-affiliated dealership such that their claim can proceed.  *See id.*

Here, Texas law applies to Plaintiff Shanna Moore's unjust enrichment claim.  And her claim can proceed because her Dodge was purchased "from Team Dodge," an FCA-affiliated dealership.  (D.E. 2758 at ¶ 57.)

### d)    Time Bars

Finally, FCA argues that the statute of limitations bars certain unjust enrichment claims under the laws of Arkansas, Georgia, North Carolina, and Texas.  As discussed above, fraudulent concealment tolling applies to claims under Georgia and Texas law, *see supra* Sec.III.C.1.d.2, as well as under Arkansas law, *see In re Takata Airbag Prods. Liab. Litig.*, --- F. Supp. 3d ---, 2020 WL 2764196, at \*25 (citing *Martin v. Arthur*, 3 S.W. 3d 684, 687 (Ark. 1999) (citing *Adams v. Arthur*, 969 S.W. 2d 598, 602–03 (Ark. 1998))).  Like these states, North Carolina also recognizes fraudulent concealment tolling.  *See Friedland v. Gales*, 509 S.E. 2d 793, 797 (N.C. Ct. App. 1998) (citing *Connor v. Schenck*, 84 S.E. 2d 175 (N.C. 1954); *Stallings v. Gunter*, 394 S.E. 2d 212 (N.C. Ct. App. 1990)).  For the reasons explained earlier and in previous orders, fraudulent concealment tolling applies to the unjust enrichment claims under the laws of these states.

### e)    Conclusion

In sum, Count 5 is **DISMISSED** as to the following named-Plaintiffs: Laurie Reynolds (Arizona); Ronaldo Maldia (California); Daniel Dwinnells (Maryland); Michael Eikenberry, Kenneth Fischer, Deborah Hillyer, Dave Krzeminski, and Elizabeth Washington (Michigan);

Arlen Sturgis (Mississippi); Gene Marsilio (New Jersey); Laquintha O'Neal and Terrie Swanson (North Carolina); Victoria Lykins and Reginald Price (Ohio); Jamelle Lowery (South Carolina); and Bridget Boyd (Texas). By extension, because there are no class representatives with unjust enrichment claims under the laws of Arizona, Maryland, Mississippi, New Jersey, North Carolina, and Ohio, Count 5 is also **DISMISSED** as to all putative class members whose negligence claims are governed under the laws of these states. *See Wooden*, 247 F.3d at 1288 ("[A] claim cannot be asserted on behalf of a class unless at least one named plaintiff has suffered the injury that gives rise to that claim.") (quoting *Prado-Steiman*, 221 F.3d at 1280).

As for the claims that survive, Count 5 will proceed for the following named-Plaintiffs: Cathy Parker and Bobbie Simmons (Arkansas); Rushelle Gonder and Pedro Lucero (California); Michelle Gibson and Debrah Johnson (Georgia); John Fuesting and Priscilla Fuesting (Illinois); Carla Campagnone (Massachusetts); Randy Nielsen (Michigan); Jason Williams (Missouri); Rmzy Abdallah (New York); Marcia Griffith (Pennsylvania); T'Keya Cooper (South Carolina); and Shanna Moore (Texas).[6]

### 2.  Negligence (Count 6)

Plaintiffs also assert a nationwide-class common-law negligence claim. FCA argues that this claim should be dismissed in its entirety for lack of causation, and that alternatively, certain negligence claims should be dismissed under the economic loss rule or the statute of limitations.

### a)  Causation

First, FCA argues that all negligence claims should be dismissed because Takata's criminal acts—which Takata admitted to in the Takata Plea Agreement—break any causal connection

---

[6] The Court notes that Plaintiff Michael McClellion (South Carolina) is excluded from this claim. (D.E. 2758 at ¶ 247.)

between FCA's allegedly negligent conduct and Plaintiffs' purported injuries.

The Court previously declined to judicially notice the contents of the Takata Plea Agreement for its truth because, regardless of reliability, meaning, or actual proof, the parties heavily disputed the contents. *See In re Takata Airbag Prods. Liab. Litig.*, 396 F. Supp. 3d at 1128–29. By extension, the Court declined to dismiss the entire complaint for lack of standing on the grounds that Takata's admissions demonstrated that Plaintiffs' injuries were not "fairly traceable" to certain defendants' actions. *Id.* at 1129. Likewise here, because the contents of the Takata Plea Agreement are heavily disputed, it is premature to dismiss any negligence claims on this basis at this stage. Whether Takata's admissions are sufficient to sever the causal connection between Plaintiffs' injuries and FCA's allegedly negligent conduct is an issue appropriate for resolution at summary judgment or trial. (*See* D.E. 3838 at 23 (ruling same).)

  **b)**   **Economic Loss Bars**

After accounting for the choice-of-law dismissals and the states excluded by Plaintiffs,[7] negligence claims remain under the laws of Arizona, Arkansas, Georgia, Maryland, Mississippi, Missouri, New Jersey, New York, Ohio, and Texas.

FCA's second argument is that the economic loss rule bars negligence claims under the laws of Arizona, Georgia, Missouri, New Jersey, New York, Ohio, and Texas. Plaintiffs do not appear to contest this argument, and instead maintain that negligence claims should proceed under the laws of Arkansas and Maryland because these states have not adopted the economic loss rule. In turn, FCA does not appear to contest this argument. And the only remaining state, Mississippi,

---

[7] The Complaint specifically excludes from this claim consumers from Alabama, California, Florida, Illinois, Massachusetts, Michigan, Nevada, North Carolina, Pennsylvania, and South Carolina. (*See* D.E. 2758 at ¶ 253.)

bars negligence claims under the economic loss doctrine if the only damage sustained was to the product. *See Herman Cronier & Sons, Inc. v. Carrier Corp.*, No. 1:11CV364-HSO-RHW, 2013 WL 12090326, at \*6 (S.D. Miss. Sept. 6, 2013) (citing *State Farm Mut. Auto. Ins. Co. v. Ford Motor Co.*, 736 So. 2d 384, 387 (Miss. Ct. App. 1999)). Accordingly, negligence claims can proceed under Arkansas and Maryland law.

c)  **Time Bars**

Finally, FCA argues that the statute of limitations bars the negligence claims of Plaintiffs Michelle Gibson and Shanna Moore, which are asserted under the laws of Georgia and Texas, respectively. As discussed above, fraudulent concealment tolling applies to claims under Georgia and Texas law. *See supra* Sec.III.C.1.d.2. For the reasons explained earlier, fraudulent concealment tolling applies to these negligence claims.

d)  **Conclusion**

Taken together, Count 6 is **DISMISSED** as to all named-Plaintiffs whose negligence claims are governed under the laws of Arizona, Georgia, Mississippi, Missouri, New Jersey, New York, Ohio, and Texas. By extension, Count 6 is also **DISMISSED** as to all putative class members whose negligence claims are governed under the laws of these states. *See Wooden*, 247 F.3d at 1288 ("[A] claim cannot be asserted on behalf of a class unless at least one named plaintiff has suffered the injury that gives rise to that claim.") (quoting *Prado-Steiman*, 221 F.3d at 1280).

As for the claims that survive, Count 6 will proceed for named-Plaintiffs Cathy Parker and Bobbie Simmons (Arkansas) and Daniel Dwinnells (Maryland).

**E.  NATIONWIDE-CLASS MAGNUSON-MOSS WARRANTY ACT AND STATEWIDE-CLASS BREACH OF IMPLIED WARRANTY CLAIMS**

Next, Plaintiffs assert a nationwide-class Magnuson-Moss Warranty Act claim. In the alternative, they assert statewide-class breach of implied warranty claims under the laws of several

states.  FCA argues that the Magnuson-Moss Warranty Act claim must be dismissed because Plaintiffs fail to assert implied warranty claims under the laws of every state, and additionally, because Plaintiffs do not meet the 100-plaintiff requirement to bring a class action under the Act. As to the alternative claims for breach of implied warranty under state law, FCA argues that certain claims are barred by the statute of limitations, and that claims under New York and North Carolina law should be dismissed for lack of privity.

### 1.     Nationwide-Class Magnuson-Moss Warranty Act Claim (Count 1)

Despite asserting a *nationwide*-class Magnuson-Moss Warranty Act claim, Plaintiffs assert breach of implied warranty claims under the laws of only *14 states*.  For the reasons fully explained in the *Puhalla* Order, the nationwide-class Magnuson-Moss Warranty Act claim in Count 1 is **DISMISSED** for lack of standing.  *See In re Takata Airbag Prods. Liab. Litig.*, --- F. Supp. 3d ---, 2020 WL 2764196, at *24 ("Because standing is a claim-specific determination and implied warranty claims under the [Magnuson-Moss Warranty] Act 'arise out of and are defined by' state law, the Court finds that the named-Plaintiffs lack standing to represent putative class members of states for which there are no breach of implied warranty claims.").  Furthermore, Count 1 is dismissed in its entirety because—unlike the nationwide-class common-law claims—Plaintiffs explicitly assert that "[i]n the event the Court declines to certify a Nationwide Consumer Class under the Magnuson-Moss Warranty Act," they assert statewide-class breach of implied warranty claims under the laws of several states.  (D.E. 2758 at ¶¶ 326, 334, 406, 549, 555, 608, 636, 642, 675, 703, 740, 771, 823, 857, 888.)  Because Count 1 is dismissed for lack of standing, the Court need not address FCA's separate argument regarding the 100-plaintiff requirement.  The Court will now address the state breach of implied warranty claims.

2. **Statewide-Class Breach of Implied Warranty Claims (Counts 10–11, 15, 23, 26, 28–29, 33, 41, 44, and 46)**

Plaintiffs assert breach of implied warranty claims under laws of Arkansas, California,[8] Maryland, Massachusetts, Michigan, Mississippi, Missouri, New Jersey, New York, North Carolina, Pennsylvania, South Carolina, and Texas. FCA argues that the statute of limitations bars certain implied warranty claims under the laws of Arkansas, California, Maryland, Michigan, Mississippi, Missouri, New Jersey, North Carolina, Pennsylvania, and Texas. FCA also argues that the implied warranty claims under New York and North Carolina law should be dismissed for lack of privity; because Plaintiffs do not dispute this argument and agree to dismiss Counts 36 and 38, these claims are **DISMISSED**.

As explained in the *Puhalla* and *Whitaker* Orders, fraudulent concealment tolling applies in Arkansas, California, Michigan, Mississippi, Missouri, New Jersey, Pennsylvania, and Texas. (*See In re Takata Airbag Prods. Liab. Litig.*, --- F. Supp. 3d ---, 2020 WL 2764196, at *25 (Arkansas, California, Michigan, Mississippi, New Jersey, Pennsylvania, and Texas); D.E. 3838 at 29 (Missouri).) The only states left unaccounted for here, Maryland and North Carolina, also recognize fraudulent concealment tolling. *See Doll v. Ford Motor Co.*, 814 F. Supp. 2d 526, 536 (D. Md. 2011) (quoting Md. Code. Ann., Cts. & Jud. Proc. § 5–203)); *Friedland*, 509 S.E. 2d at 797 (citing *Connor*, 84 S.E. 2d 175; *Stallings*, 394 S.E. 2d 212).

Here, as explained above, Plaintiffs assert numerous allegations detailing FCA's knowledge of the risks posed by the Takata airbags installed in their vehicles, their alleged failure

---

[8] Plaintiffs asserts two claims under California's Song-Beverly Consumer Warranty Act (Counts 11 and 15). Finding no discernable difference between these two claims, Count 15 is **DISMISSED** as duplicative. *See Kuchenbecker v. Johnson & Johnson*, No. 19-61712-CIV, 2019 WL 4416079, at *2 (S.D. Fla. Sept. 16, 2019) ("To promote judicial economy, a court should dismiss claims that are duplicative of other claims.") (citations and internal quotations omitted).

to fully investigate or disclose the seriousness of the issue to consumers or regulatory authorities, and their continued selling and leasing of vehicles installed with Takata airbags.  *See supra* Sec.III.C.1.a–c.  Viewing these allegations in the light most favorable to Plaintiffs, as the Court must at this stage, the Court finds that fraudulent concealment tolling applies to the breach of implied warranty claims.

### 3.    Conclusion

In sum, Counts 1, 15, 36, and 38 are **DISMISSED**, and the state breach of implied warranty claims in Counts 10–11, 23, 26, 28–29, 33, 41, 44, and 46 will proceed.

## F.    SALE ORDER BAR

Finally, FCA urges that *all* the claims of the named-Plaintiffs who own vehicles manufactured by Chrysler LLC ("Old Chrysler")—not FCA—are barred by the bankruptcy Sale Order governing FCA's acquisition of certain of Old Chrysler's assets.[9]  FCA argues that its liability for vehicles manufactured by Old Chrysler and sold prior to the closing date of the Sale Order is "limited to certain expressly Assumed Liabilities," as defined in the Master Transaction Agreement.  Plaintiffs insist that the Sale Order does not bar *any* of these claims because these Plaintiffs purchased their vehicles *after* the Sale Order closed, and because their claims are premised on FCA's *post*-closing wrongful conduct.

The moving papers frame the issue as all or nothing.  But the Master Transaction Agreement expressly delineates both "Assumed Liabilities" and "Excluded Liabilities." (*See* D.E. 2989-2 at 69–72.)  For instance, Sections 2.08(g) and 2.08(h) list as Assumed Liabilities "all Liabilities pursuant to product warranties, product returns and rebates on vehicles sold by

---

[9]  In June 2009, FCA purchased substantially all of Old Chrysler's assets pursuant to a Sale Motion and Purchase Agreement that was approved by the United States Bankruptcy Court for the Southern District of New York.  (D.E. 2758 at ¶ 3.)

Sellers prior to the Closing" and "all Product Liability Claims arising from the sale after the Closing of Products or Inventory manufactured by Sellers or their Subsidiaries in whole or in part prior to the Closing." *Id.* at 70. And Sections 2.09(i) and 2.09(j) list as Excluded Liabilities "all Product Liability Claims arising from the sale of Products or Inventory prior to the Closing" and "all Liabilities in strict liability, negligence, gross negligence or recklessness for acts or omissions arising prior to or ongoing at the Closing." *See id.* at 71. It follows from these definitions that application of the Sale Order is claim specific. *See In re Old Carco LLC*, 492 B.R. 392, 403–06 (Bankr. S.D.N.Y. 2013) (deciding separately whether the claims for breach of implied warranty, and the claims for negligence under various theories of liability, were barred by the Sale Order).

Although FCA argues in a footnote that liability for fraud, failure to warn, and breach of implied warranty are not Assumed Liabilities under the Master Transaction Agreement, FCA's Reply does not sufficiently address Plaintiffs' core contention that FCA's *post*-closing wrongful conduct is actionable—a contention supported by interpretive case law. *See In re Old Carco LLC*, 582 B.R. 838, 845 (Bankr. S.D.N.Y. 2018) ("At bottom, *a post-Closing breach of an independent duty gives rise to a post-Closing right to payment*, and the 'free and clear' provisions of the Sale Order cannot cut off New Chrysler's liability for its own wrongful, post-Closing conduct.") (emphasis added and citation omitted); *Castleman v. FCA US LLC*, No. 2:18-cv-00342-JNP-PMW, 2019 WL 1406611, at *4 (D. Utah Mar. 28, 2019) ("The Sale Order is not so broad as to preclude FCA's liability for post-Sale duty to warn."); *Holland v. FCA U.S. LLC*, No. 1:15 CV 121, 2015 WL 5172996, at *5 (N.D. Ohio Sept. 3, 2015) ("[T]his case is not one that argues liability simply because FCA is a successor to Old Chrysler, but rather whether FCA had a duty to act based knowledge it acquired and actions it took post Sale Order . . . .").

Plaintiffs' post-closing conduct argument highlights the claim-specific nature of the

Sale Order analysis, and FCA's ensuing failure to respond to this argument seals the Court's refusal to dismiss any of Plaintiffs' claims under the Sale Order.[10]

In the end, holding aside whether Plaintiffs can state certain claims for post-closing wrongful conduct, they will ultimately have to prove at summary judgment or trial that FCA's post-closing conduct was a proximate cause of their economic losses. *See Castleman v. FCA US LLC*, 2019 WL 1406611, at *6 ("[T]he court would have to determine whether the post-Closing or pre-Closing conduct was the proximate cause of [plainitff's] harm. But the question of proximate cause is a question reserved for the fact finder. Accordingly, it is not appropriately decided at the motion to dismiss stage.") (citing *In re Old Carco LLC*, 582 B.R. at 846 ("[A]ssuming that the Plaintiff can assert legally sufficient claims based solely on New Chrysler's post-Closing wrongful conduct, the question of what proximately caused the Decedents' fatal injuries is for the factfinder.")).

For now, the Court declines to dismiss any of the Plaintiffs' claims under the Sale Order. FCA may, however, renew claim-specific arguments at summary judgment.

## **CONCLUSION**

For all the reasons explained above, it is

**ADJUDGED** that FCA's Motion to Dismiss is **GRANTED IN PART** as follows:

- The nationwide-class Magnuson-Moss Warranty Act claim (Count 1) is **DISMISSED** in full;

---

[10] The Court notes that the definitions of Assumed Liabilities and Excluded Liabilities in the Master Transaction Agreement were subsequently amended. *See In re Old Carco LLC*, 492 B.R. at 396. The parties' briefing makes no mention of these amendments and only provides the Court with Amendment No. 1. Although it ultimately may not be relevant to the parties' arguments, it appears that Amendment No. 4 "expanded the category of Assumed Liabilities to include certain product liability claims." *See id.* at 396 & n.8.

- The statewide-class breach of implied warranty claims under the laws of Indiana, New York, and North Carolina (Counts 22, 36, and 38), and the duplicative claim under California law (Count 15), are **DISMISSED**;

- The statewide-class statutory consumer protection claims under the laws of Alabama, Florida, Indiana, and Pennsylvania (Counts 7, 16, 21, and 40) are **DISMISSED** in full, and the claims under the laws of California, Georgia, and Illinois (Counts 12, 18, and 20) are **DISMISSED** only to the extent they seek damages;

- The fraud claim (Count 4) is **DISMISSED** as to named-Plaintiffs Arlen Sturgis (Mississippi), and T'Keya Cooper, Jamelle Lowery, and Michael McClellion (South Carolina), and as to all putative class members whose fraud claims are governed under the laws of Alabama, Florida, Indiana, Mississippi, and South Carolina;

- The unjust enrichment claim (Count 5) is **DISMISSED** as to all putative class members whose unjust enrichment claims are governed under the laws of Alabama, Arizona, Florida, Indiana, Maryland, Mississippi, New Jersey, North Carolina, and Ohio, and as to these named-Plaintiffs: Laurie Reynolds (Arizona); Ronaldo Maldia (California); Daniel Dwinnells (Maryland); Michael Eikenberry, Kenneth Fischer, Deborah Hillyer, Dave Krzeminski, and Elizabeth Washington (Michigan); Arlen Sturgis (Mississippi); Gene Marsilio (New Jersey); Laquintha O'Neal and Terrie Swanson (North Carolina); Victoria Lykins and Reginald Price (Ohio); Jamelle Lowery (South Carolina); and Bridget Boyd (Texas); and

- The negligence claim (Count 6) is **DISMISSED** as to all named-Plaintiffs whose negligence claims are governed under the laws of Alabama, Arizona, Florida, Georgia, Indiana, Mississippi, Missouri, New Jersey, New York, Ohio, and Texas, and as to all putative class members whose negligence claims are governed under the laws of these states.

Furthermore, the Motion to Dismiss is **DENIED** as to the following claims, which will proceed to summary judgment:

- The statewide-class statutory consumer protection and breach of implied warranty claims in Counts 8–14, 17–20, 23–35, 37, 39, and 41–46;

- Claims for fraud (Count 4) asserted by all named-Plaintiffs whose claims are governed under the laws of Arizona, Arkansas, California, Georgia, Illinois, Maryland, Massachusetts, Michigan, Missouri, New Jersey, New York, North Carolina, Ohio, and Texas;

- Claims for unjust enrichment (Count 5) asserted by these named-Plaintiffs: Cathy Parker and Bobbie Simmons (Arkansas); Rushelle Gonder and Pedro Lucero (California); Michelle Gibson and Debrah Johnson (Georgia); John Fuesting and Priscilla Fuesting (Illinois); Carla Campagnone (Massachusetts); Randy Nielsen (Michigan); Jason Williams (Missouri); Rmzy Abdallah (New York); Marcia Griffith (Pennsylvania); T'Keya Cooper (South Carolina); and Shanna Moore (Texas); and

- Claims for negligence (Count 6) asserted by these named-Plaintiffs: Cathy Parker and Bobbie Simmons (Arkansas) and Daniel Dwinnells (Maryland).

It is further

**ADJUDGED** that FCA must answer the remaining claims in the *Boyd* Complaint **no later than July 23, 2020**.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 1st of June 2020.

_Federico A. Moreno_

_____
FEDERICO A. MORENO
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record

- 45 -

# EXHIBIT I

In re Motors Liquidation Company, Not Reported in B.R. Rptr. (2015)

2015 WL 11070293
Only the Westlaw citation is currently available.
United States Bankruptcy Court, S.D. New York.

IN RE: MOTORS LIQUIDATION COMPANY, et
al., f/k/a General Motors Corp., et al., Debtors.

Case No. 09–50026(REG)
|
Signed December 4, 2015

**Attorneys and Law Firms**

Donald F. Baty, Jr., Judy B. Calton, Joseph R. Sgroi, Tricia
A. Sherick, Robert B. Weiss, Honigman Miller Schwartz
and Cohn, LLP, Deborah Kovsky-Apap, Pepper Hamilton
LLP, Detroit, MI, David R. Berz, Weil Gotshal & Manges,
LLP, Washington, DC, Stephen Karotkin, Robert J. Lemons,
Harvey R. Miller, Joseph H. Smolinsky, Weil Gotshal &
Manges, LLP, Patrick J. Trostle, Jenner & Block LLP, New
York, NY, Daniel R. Murray, Jenner & Block, LLP, Chicago,
IL, for Debtors.

### JUDGMENT

Robert E. Gerber, United States Bankruptcy Judge

**\*1** For the reasons set forth in the Court's *Decision on
Imputation, Punitive Damages, and Other No–Strike and No–
Dismissal Pleadings Issues,* entered on November 9, 2015
[Dkt. No. 13533] (" ***Decision*** "); [1] and pursuant to the Court's
"gatekeeper" role deciding what claims and allegations may
be asserted by plaintiffs under the Sale Order, April Decision
and June Judgment, deciding issues of bankruptcy law, but
minimizing its role in deciding issues better decided by the
nonbankruptcy courts adjudicating plaintiffs' claims, it is
hereby ORDERED AND ADJUDGED as follows: [2]

#### A. *Imputation*

1. Knowledge of New GM personnel, whenever acquired,
may be imputed to New GM if permitted under
nonbankruptcy law.

2. Knowledge of Old GM personnel may not be imputed to
New GM based on any type of successorship theory.

3. With respect to Product Liability Claims assumed by New
GM under the Sale Order, to the extent knowledge of Old
GM personnel is permitted to be imputed to Old GM under
nonbankruptcy law, such knowledge may be imputed to New
GM.

4. With respect to Independent Claims, [3] knowledge of
Old GM may be imputed to New GM, if permitted by
nonbankruptcy law, to the extent such knowledge was
"inherited" from Old GM if such information (a) was
actually known to a New GM employee (*e.g.,* because it
is the knowledge of the same employee or because it was
communicated to a New GM employee), or (b) could be
ascertained from New GM's books and records, even if such
books and records were transferred by Old GM to New
GM as part of the 363 Sale and, therefore, first came into
existence before the 363 Sale. Accordingly, allegations in
pleadings starting with "New GM knew ..." or "New GM
was on notice that ..." are permissible. For causes of action
where nonbankruptcy law permits imputation of knowledge
to New GM using the above principles, it is possible for such
knowledge, depending on the specific circumstances, to be
imputed to New GM as early as the first day of its existence.

**\*2** 5. Imputation of knowledge to New GM turns on
application of applicable nonbankruptcy law to the specifics
and context of the factual situation and the particular purpose
for which imputation is sought, and it must be based on
identified individuals or identified documents. The extent
to which plaintiffs must identify specific matters alleged
to be known, by whom and by what means, and the legal
ground rules necessary to establish imputation as a matter
of nonbankruptcy law are questions for the nonbankruptcy
courts hearing plaintiffs' claims and allegations to decide.
By reason of this Court's limited gatekeeper role, this Court
will not engage in further examination of whether particular
allegations may be imputed to New GM, beyond the extent to
which it has done so in the Decision and this Judgment. The
application of the general principles included in this Judgment
and the Decision to determine the propriety of imputation
in particular contexts in particular cases is up to the judges
hearing those cases.

#### B. *Punitive Damages and Related Issues*
6. New GM did not contractually assume liability for punitive
damages from Old GM. Nor is New GM liable for punitive
damages based on Old GM conduct under any other theories,
such as by operation of law. Therefore, punitive damages

In re Motors Liquidation Company, Not Reported in B.R. Rptr. (2015)

may not be premised on Old GM knowledge or conduct, or anything else that took place at Old GM.

7. A claim for punitive damages with respect to a post-Sale accident involving vehicles manufactured by Old GM with the Ignition Switch Defect may be asserted against New GM to the extent—but only to the extent—it relates to an otherwise viable Independent Claim and is based solely on New GM conduct or knowledge, including (a) knowledge that can be imputed to New GM under the principles set forth in the Decision and this Judgment (and under nonbankruptcy law), and (b) information obtained by New GM after the 363 Sale. The extent to which any such claim is "viable" shall be determined under nonbankruptcy law by the nonbankruptcy court presiding over that action. Except as expressly stated in this Judgment, this Court expresses no view as to whether any claim is viable.

8. Claims for punitive damages may be asserted in actions based on post-Sale accidents involving vehicles manufactured by Old GM with the Ignition Switch Defect to the extent the claim is premised on New GM action or inaction after it was on notice of information "inherited" by New GM, or information developed by New GM post-Sale.

9. Claims for punitive damages involving New GM manufactured vehicles were never foreclosed under the Sale Order, and remain permissible. The underlying allegations and evidence used to support such claims for punitive damages are subject only to the limitations, if any, provided by nonbankruptcy law.

10. Claims for punitive damages relating to post-Sale Non–Product Liabilities actions involving personal injuries suffered in vehicles manufactured by Old GM with the Ignition Switch Defect may be asserted to the extent, but only the extent, they are premised on New GM knowledge and conduct, including "inherited" knowledge and knowledge acquired after the Sale.

11. Claims for punitive damages relating to post-Sale Non–Product Liabilities actions involving personal injuries suffered in vehicles manufactured by New GM are not subject to the Sale Order and may proceed. The underlying allegations and evidence used to support such claims for punitive damages are subject only to the limitations, if any, provided by nonbankruptcy law.

12. Claims for punitive damages asserted in economic loss actions involving vehicles manufactured by Old GM with the Ignition Switch Defect cannot be asserted except for any that might be recoverable in connection with Independent Claims, and then based only on New GM knowledge and conduct. The determination whether such an Independent Claim can be adequately pled is a question of nonbankruptcy law and is left to the nonbankruptcy judge(s) hearing the claims.

13. Claims for punitive damages asserted in economic loss actions involving vehicles manufactured by New GM are not subject to the Sale Order and may proceed. The underlying allegations and evidence used to support such claims for punitive damages are subject only to the limitations, if any, provided by nonbankruptcy law.

C. *Particular Allegations, Claims and Causes of Actions in Complaints*

 **\*3**  14. Plaintiffs of two types—1) plaintiffs whose claims arise in connection with vehicles without the Ignition Switch Defect, and 2) Pre–Closing Accident Plaintiffs—are not entitled to assert Independent Claims against New GM with respect to vehicles manufactured and first sold by Old GM (an " *Old GM Vehicle* "). To the extent such Plaintiffs have attempted to assert an Independent Claim against New GM in a pre-existing lawsuit with respect to an Old GM Vehicle, such claims are proscribed by the Sale Order, April Decision and the Judgment dated June 1, 2015 [Dkt. No. 13177] (" *June Judgment* ").

15. Claims of any type against New GM that are based on vehicles manufactured by New GM are not affected by the Sale Order and may proceed in the nonbankruptcy court where they were brought.

16. Allegations that speak of New GM as the successor of Old GM (e.g. allegations that refer to New GM as the "successor of," a "mere continuation of," or a "de facto successor of" of Old GM) are proscribed by the Sale Order, April Decision and June Judgment, and complaints that contain such allegations are and remain stayed, unless and until they are amended consistent with the Decision and this Judgment.

17. Allegations that do not distinguish between Old GM and New GM (*e.g.,* referring to "GM" or "General Motors"), or between Old GM vehicles and New GM vehicles (*e.g.,* referring to "GM-branded vehicles"), or that assert that New GM "was not born innocent" (or any substantially similar phrase or language) are proscribed by the Sale Order, April

In re Motors Liquidation Company, Not Reported in B.R. Rptr. (2015)

Decision and June Judgment, and complaints containing such allegations are and remain stayed, unless and until they are amended consistent with the Decision and this Judgment. Notwithstanding the foregoing, (i) references to "GM-branded vehicles" may be used when the context is clear that the reference can only refer to New GM, and does not blend the periods during which vehicles were manufactured by Old GM and New GM; and (ii) complaints may say, without using code words as euphemisms for imposing successor liability, or muddying the distinctions between Old GM and New GM, that New GM purchased the assets of Old GM; that New GM assumed *Product Liabilities* from Old GM; and that New GM acquired specified knowledge from Old GM.

18. Allegations that allege or suggest that New GM manufactured or designed an Old GM Vehicle, or performed other conduct relating to an Old GM Vehicle before the Sale Order, are proscribed by the Sale Order, April Decision and June Judgment, and complaints containing such allegations are and remain stayed, unless and until they are amended consistent with the Decision and this Judgment.

### D. *Claims in the Bellwether Complaints and MDL 2543*

19. Claims with respect to Old GM Vehicles that are based on fraud (including, but not limited to, actual fraud, constructive fraud, fraudulent concealment, fraudulent misrepresentation, or negligent misrepresentation) or consumer protection statutes are not included within the definition of Product Liabilities, and therefore do not constitute Assumed Liabilities, because (a) they are not for "death" or "personal injury", and their nexus to any death or personal injury that might thereafter follow is too tangential, and (b) they are not "caused by motor vehicles." The Court expresses no view whether such claims may, however, constitute viable Independent Claims against New GM if they are based on New GM knowledge or conduct.

20. The Court expresses no view as to whether, as a matter of nonbankruptcy law, failure to warn claims in connection with Old GM Vehicles are actionable against New GM, or whether New GM has a duty related thereto. A court other than this Court can make that determination for Post–Closing Accident Claims.

**\*4** 21. A duty to recall or retrofit is not an Assumed Liability, and New GM is not responsible for any failures of Old GM to do so. But whether an Independent Claim can be asserted that New GM had a duty to recall or retrofit an Old GM

Vehicle with the Ignition Switch Defect is a question of nonbankruptcy law that can be determined by a court other than this Court.

22. Whether New GM had a duty, enforceable in damages to vehicle owners, to notify people who had previously purchased Old GM Vehicles of the Ignition Switch Defect is an issue to be determined by a court other than this Court.

23. Under the principles in this Judgment and the Decision, the determination of whether claims asserted in complaints filed by Ignition Switch Plaintiffs (including the MDL Consolidated Complaint filed in MDL 2543), or complaints filed by Post–Closing Accident Plaintiffs (including the Bellwether Complaints filed in MDL 2543) with the Ignition Switch Defect, are Independent Claims that may properly be asserted against New GM, or Retained Liabilities of Old GM, can be made by nonbankruptcy courts overseeing such lawsuits, *provided however*, such plaintiffs may not assert allegations of Old GM knowledge or seek to introduce evidence of Old GM's knowledge in support of such Independent Claims (except to the extent the Imputation principles set forth in the Decision and this Judgment are applicable).

### E. *Claims in Complaints Alleging New GM is Liable for Vehicle Owners' Failure to File Proofs of Claim Against Old GM*

24. Claims that allege that New GM is liable in connection with vehicle owners' failure to file proofs of claim in the Old GM bankruptcy case are barred and enjoined by the Sale Order, April Decision and June Judgment, and shall not be asserted against New GM.

### F. *The States Complaints*

25. New GM shall not be liable to the States for any violations of consumer protection statutes that took place before the 363 Sale. Whether New GM can be held liable to the States for New GM's sale of vehicles that post-date the 363 Sale is a matter of nonbankruptcy law that may be decided by nonbankruptcy courts overseeing such cases. To the extent nonbankruptcy law imposes duties at the time of a vehicle's sale, and a claim relates to the sale of an Old GM Vehicle other than one sold as "certified" after the 363 Sale, claims premised on a breach of such duties are barred by the Sale Order, April Decision and June Judgment as against New GM.

In re Motors Liquidation Company, Not Reported in B.R. Rptr. (2015)

26. With respect to the California complaint, the rulings included in this Judgment and the Decision apply. By way of example, the allegations relating to Old GM conduct in paragraphs 46–54, 58–60, 71, 95–96, 112–114, 189–190 and 200–201 violate the Sale Order, April Decision and June Judgment. Paragraphs 192, 195, 196, 198, 199, 203–206 and 211 do not say whether they make reference to Old GM or New GM and must be clarified. However, allegations contained in paragraphs 9, 11, 16, 18, 22, 32, 43, 44 and 45, for example, are benign. The California Action shall remain stayed until the complaint is amended to be consistent with the Decision and this Judgment.

27. With respect to the Arizona complaint, the rulings included in this Judgment and the Decision apply. By way of example, (i) the allegation in paragraph 19 that New GM "was not born innocent" is impermissible and violates the Sale Order, April Decision and June Judgment; (ii) the allegations relating solely to Old GM conduct in paragraphs 92, 93, and 357 violate the Sale Order, April Decision and June Judgment; (iii) the allegations that do not clearly relate solely to New GM conduct in paragraphs 140–180, 289, 290–310 violate the Sale Order, April Decision and June Judgment; and (iv) the allegation in paragraph 136 that knowledge of Old GM is "directly attributable" to New GM violates the Sale Order, April Decision and June Judgment (and is false as a matter of law). Nevertheless, the allegations in paragraphs 19 (other than as described above), 81, 135, 137, 138, 139, 335 and 499, for example, are benign. The Arizona Action shall remain stayed until the complaint is amended to be consistent with the Decision and this Judgment.

### G. *The Peller Complaints*

 *5  28. With respect to the Peller Complaints, the Ignition Switch Plaintiffs may assert claims based on alleged duties of New GM relating to post-Sale events relating to Old GM Vehicles to the extent they are actionable as matters of nonbankruptcy law (to be decided by nonbankruptcy courts), *provided however,* the Peller Complaints shall remain stayed unless and until they are amended (i) to remove claims that rely on Old GM conduct as the predicate for claims against New GM, (ii) to comply with the applicable provisions of the Decision and this Judgment (including those with respect to claims that fail to distinguish between Old GM and New GM), and (iii) to strike any purported Independent Claims by Non–Ignition Switch Plaintiffs. To the extent the Peller Complaints assert claims against New GM based on New GM manufactured vehicles, such claims are not proscribed by the Sale Order, April Decision and June Judgment.

### H. *Other Complaints*

 *(1) "Failure to Recall/Retrofit Vehicles"*
29. Obligations, if any, that New GM had to recall or retrofit Old GM Vehicles were not Assumed Liabilities, and New GM is not responsible for any failures of Old GM to do so. But whether New GM had an independent duty to recall or retrofit previously sold Old GM Vehicles that New GM did not manufacture is a question of nonbankruptcy law that may be decided by the nonbankruptcy court hearing that action.

30. The Court does not decide whether there is the requisite duty for New GM under nonbankruptcy law for such Old GM Vehicles, but allows this claim to be asserted by the Ignition Switch Plaintiffs and the Post–Closing Accident Plaintiffs (such as has been asserted by the plaintiff in *Moore v. Ross*) with the Ignition Switch Defect, leaving determination of whether there is the requisite duty under nonbankruptcy law to the nonbankruptcy court hearing that action.

 *(2) "Negligent Failure to Identify Defects or Respond to Notice of a Defect"*
31. Obligations, if any, that New GM had to identify or respond to defects in previously sold Old GM Vehicles were not Assumed Liabilities, and New GM is not responsible for any failures of Old GM to do so. But whether New GM had an independent duty to identify or respond to defects in previously sold Old GM Vehicles that New GM did not manufacture is a question of nonbankruptcy law that may be decided by the nonbankruptcy court hearing that action.

32. The Court does not decide whether there is the requisite duty for New GM under nonbankruptcy law for such Old GM Vehicles, and allows this claim to be asserted by the Ignition Switch Plaintiffs and the Post–Closing Accident Plaintiffs with the Ignition Switch Defect, leaving determination of whether there is the requisite duty under nonbankruptcy law to the court hearing that action.

 *(3) "Negligent Infliction of Economic Loss and Increased Risk"*
33. Claims that New GM had a duty to warn consumers owning Old GM Vehicles of the Ignition Switch Defect but instead concealed it, and by doing so, the economic value of the Ignition Switch Plaintiffs' vehicles was diminished (such as been raised by the plaintiffs in *Elliott* and *Sesay*) were

not Assumed Liabilities, and New GM is not responsible for any failures of Old GM to do so. But whether New GM had an independent duty to warn consumers owning previously sold Old GM Vehicles that New GM did not manufacture of the Ignition Switch Defect is a question of nonbankruptcy law to be decided by the nonbankruptcy court hearing the underlying action. The Court does not decide whether there is the requisite duty on the part of New GM under nonbankruptcy law to warn for such Old GM Vehicles with the Ignition Switch Defect. Thus, the Court allows this claim to be asserted by the Ignition Switch Plaintiffs to the extent, but only the extent, that New GM had an independent "duty to warn" owners of Old GM Vehicles of the Ignition Switch Defect, as relevant to situations *in which no one is alleged to have been injured* by that failure, but where the Old GM Vehicles involved are alleged to have lost value as a result. Determination of whether there is the requisite duty is left to the court hearing the underlying actions.

### *(4) "Civil Conspiracy"*

**\*6** 34. Claims that New GM was involved "in a civil conspiracy with others to conceal the alleged ignition switch defect" were not Assumed Liabilities. The extent to which they might constitute Independent Claims requires a determination of nonbankruptcy law, which determination this Court leaves, with respect to vehicles previously manufactured and sold by a different entity, to the nonbankruptcy court hearing the underlying action.

### *(5) "Section 402B—Misrepresentation by Seller"*

35. Claims based on "Section 402B–Misrepresentation by Seller" fall within the definition of assumed Product Liabilities, and such claims may be asserted against New GM.

### *(6) Claims Based on Pre–Closing Accidents*

36. All claims brought by Pre–Closing Accident Plaintiffs (like the *Coleman* action in the Eastern District of Louisiana) seeking to hold New GM liable, under any theory of liability, for accidents or incidents that first occurred prior to the closing of the 363 Sale are barred and enjoined pursuant to the Sale Order, April Decision and June Judgment. The Pre–

Closing Accident Plaintiffs shall not assert or maintain such claims against New GM.

### I. *Jurisdiction*

37. The Court shall retain jurisdiction, to the fullest extent permissible under law, to construe or enforce the Sale Order, this Judgment, and the Decision on which it was based; *provided, however,* that the nonbankruptcy courts hearing the plaintiffs' claims shall have the authority to construe and implement the Decision and this Judgment, and to apply the principles laid out in the Decision and this Judgment, with respect to the particular cases before them. This Judgment shall not be collaterally attacked, or otherwise subjected to review or modification, in any Court other than this Court or any court exercising appellate authority over this Court.

### J. *Amended Complaints*

38. For the avoidance of any doubt, complaints amended in compliance with this Judgment may be filed in the non-bankruptcy courts with jurisdiction over them, without violating any automatic stay or injunction or necessitating further Bankruptcy Court approval to file same.

### K. *Prior Orders*

39. For the avoidance of doubt, except as provided in the June Judgment and the April Decision, the provisions of the Sale Order shall remain unmodified and in full force and effect, including, without limitation, paragraph AA of the Sale Order, which states that, except with respect to Assumed Liabilities, New GM is not liable for the actions or inactions of Old GM.

### L. *Earlier Decisions as Interpretive Aids*

40. To the extent, if any, that this Judgment fails, in whole or in part, to address an issue or is ambiguous, the Court's statements in the April Decision and the Decision may be used as interpretive aids.

### All Citations

Not Reported in B.R. Rptr., 2015 WL 11070293

## Footnotes

1   Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Decision. For purposes of this Judgment, the following terms shall apply: (i) "***Ignition Switch Plaintiffs***" shall mean plaintiffs that have commenced a lawsuit against New GM asserting economic losses based on or arising from the Ignition Switch in the Subject Vehicles (each term as defined in the *Agreed and Disputed Stipulations of Fact Pursuant to the Court's Supplemental Scheduling Order, Dated July 11, 2014,* filed on August 8, 2014 [Dkt. No. 12826], at 3); (ii) "***Non–Ignition Switch Plaintiffs***" shall mean plaintiffs that have commenced a lawsuit against New GM asserting economic losses based on or arising from an alleged defect, other than the Ignition Switch, in an Old GM Vehicle (as herein defined); (iii) "***Pre–Closing Accident Plaintiffs***" shall mean plaintiffs that have commenced a lawsuit against New GM based on an accident or incident that first occurred prior to the closing of the 363 Sale; and (iv) "***Post–Closing Accident Plaintiffs***" shall mean plaintiffs that have commenced a lawsuit against New GM based on an accident or incident that occurred after the closing of the 363 Sale.

The term "***Economic Loss Plaintiffs***" as used on page 7 of the Decision shall be changed to "Ignition Switch Plaintiffs."

2   Any ruling set forth in this Judgment that refers to a particular lawsuit, complaint and/or plaintiff shall apply equally to all lawsuits, complaints and plaintiffs where such ruling may be applicable.

3   "Independent Claim" shall mean a claim or cause of action asserted against New GM that is based solely on New GM's own independent post-Closing acts or conduct. Independent Claims do not include (a) Assumed Liabilities, or (b) Retained Liabilities, which are any Liabilities that Old GM had prior to the closing of the 363 Sale that are not Assumed Liabilities.

---

**End of Document**                                      © 2021 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT J

2021 WL 1085362

2021 WL 1085362
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

IN RE: MOTORS LIQUIDATION COMPANY, f/
k/a General Motors Corporation, et al., Debtors.
General Motors LLC, Appellant,
v.
Robert Randall Buchanan, individually
and as Administrator of the Estate of
Glenda Marie Buchanan, Appellee.

20-CV-3093 (JMF)
|
Signed 03/22/2021

**Attorneys and Law Firms**

Arthur Jay Steinberg, Scott Ian Davidson, King & Spalding
LLP, New York, NY, for Appellant.

Mark Tsukerman, Solo Practitioner, Long Beach, NY, for
Appellee.

OPINION AND ORDER

JESSE M. FURMAN, United States District Judge:

 **\*1**  In June 2009, General Motors Corp. ("Old GM") filed
for bankruptcy in the United States Bankruptcy Court for the
Southern District of New York. As part of the bankruptcy
proceedings that followed, General Motors LLC ("New GM")
purchased substantially all of the assets of Old GM but
assumed only some of its liabilities. In the years since, there
has been much litigation over whether claims brought against
New GM in connection with vehicles manufactured by Old
GM can proceed in light of the Bankruptcy Court's order
approving the sale. This is another such case. It arises on
appeal from an order of the Bankruptcy Court (Martin Glenn,
Bankruptcy Judge) granting in part and denying in part a
motion that New GM had filed to enjoin Robert Randall
Buchanan from prosecuting certain claims in Georgia state
court. For the reasons that follow, the order of the Bankruptcy
Court is affirmed.

**LEGAL BACKGROUND**

The Court begins with a brief summary of the legal
background that informs this appeal. As part of its 2009
bankruptcy proceedings, Old GM filed a motion to sell
substantially all of its assets "free and clear" of most of its
liabilities to New GM pursuant to  11 U.S.C. § 363. In
an order entered on July 5, 2009 (the "Sale Order"), the
Bankruptcy Court granted Old GM's motion and approved the
sale (the "363 Sale"). *See* In re Gen. Motors Corp., 407
B.R. 463 (Bankr. S.D.N.Y. 2009), *aff'd sub nom. Campbell
v. Motors Liquidation Co. (In re Motors Liquidation Co.),*
428 B.R. 43 (S.D.N.Y. 2010), *and aff'd sub nom. Parker
v. Motors Liquidation Co. (In re Motors Liquidation Co.),*
430 B.R. 65 (S.D.N.Y. 2010). Five years later, New GM
revealed that General Motors vehicles had, for years, been
manufactured with a defective ignition switch, and an
avalanche of litigation followed. *See generally* In re Gen.
Motors LLC Ignition Switch Litig., 407 F. Supp. 3d 212,
216-19 (S.D.N.Y. 2019); In re Gen. Motors LLC Ignition
Switch Litig., Nos. 14-MD-2543 (JMF), 14-MC-2543 (JMF),
2016 WL 3920353, at \*3-6 (S.D.N.Y. July 15, 2016). Not
surprisingly, that litigation has resulted in a host of decisions
— from the Bankruptcy Court, this Court, and the Second
Circuit — addressing the scope of the liabilities that New
GM assumed from Old GM and, by extension, the species
of claims and allegations that litigants can bring against New
GM consistent with federal bankruptcy law. [1]

 **\*2**  To the extent relevant here, this jurisprudence has yielded
several important principles:

- *First*, because the Sale Order granted exclusive
  jurisdiction to the Bankruptcy Court "to enforce and
  implement" its provisions, *In re Motors Liquidation
  Co.*, No. 09-50026 (MG), 2018 WL 1801234, at \*6
  (Bankr. S.D.N.Y. Apr. 13, 2018), the Bankruptcy Court
  plays a "gatekeeper" role, determining "what claims and
  allegations should get through the gate, under the Sale
  Order," *In re Motors Liquidation Co. ("Pitterman"),*
  568 B.R. 217, 222 (Bankr. S.D.N.Y. 2017) (internal
  quotation marks omitted), *aff'd in relevant part, May
  2018 Decision*, 590 B.R. 39.

- *Second*, as part of the 363 Sale, New GM assumed
  certain Product Liabilities (also known as "Assumed
  Liabilities") for Old GM vehicles, defined as "liabilities
  to third parties for death, personal injury, or other injury
  to persons or damage to property caused by motor

2021 WL 1085362

vehicles ... manufactured, sold or delivered by Old GM ... arising out of accidents or incidents occurring on or after the closing date of the 363 Sale ... [i.e.,] July 10, 2009." 🚩 *In re Motors Liquidation Co. ("July 2017 Decision"), 571 B.R. 565, 569 (Bankr. S.D.N.Y. 2017)* (cleaned up), *aff'd in part, vacated in part, May 2018 Decision, 590 B.R. 39.* Among these claims are those based on Old GM's duty to warn. *See Pitterman, 568 B.R. at 229.*

- *Third*, New GM is *not* liable for punitive damages with respect to such claims because "punitive damages are not an Assumed Liability in the Sale Agreement, and the Sale Order's free and clear provision bars punitive damages claims under a theory of successor liability." *November 2019 Decision, 943 F.3d at 133.*

- *Fourth*, "Independent Claims" — i.e., "claims based on New GM's *own* post-closing wrongful conduct" — are "not claims that are based on a right to payment that arose before the filing of [the bankruptcy] petition or that are based on pre-petition conduct" and, therefore, "these claims are outside the scope of the Sale Order's 'free and clear' provision." 🏳 *Elliott, 829 F.3d at 157* (emphasis added).[2] Because true Independent Claims are "based solely on *New GM's alleged wrongful conduct*," it is "not acceptable ... to base allegations on generalized knowledge of both Old GM and New GM." *Pitterman, 568 B.R. at 231.* Thus, "[t]o pass through the bankruptcy gate, an Independent Claim must clearly allege specific conduct of New GM upon which it is based. Simply adding 'and GM LLC' to paragraphs of a complaint concerning Old GM conduct is not enough to pass through the gate as an Independent Claim." *In re Motors Liquidation Co. ("Reichwaldt I"), 576 B.R. 313, 322 (Bankr. S.D.N.Y. 2017),* aff'd May 2018 Decision, 590 B.R. 39.

- *Fifth*, as the gatekeeper, "[t]he role of the Bankruptcy Court" in the first instance — and of this Court on appeal — "is not to determine whether [a complaint] is properly pleaded as a matter of state law or whether [an action] should succeed on its merits." *Pitterman, 568 B.R. at 222.* Instead, the Bankruptcy Court's role is simply "to analyze whether the [complaint] may pass through the bankruptcy gate." *Reichwaldt I, 576 B.R. at 320.* "If a complaint violates an enforceable provision of the Sale Order, it may not proceed as currently drafted. If it does not violate the Sale Order, the complaint 'passes through'

the gate' for the appropriate nonbankruptcy court to decide whether it is actionable." *Pitterman, 568 B.R. at 222.*

**\*3** The decisions of the Bankruptcy Court and this Court in *Pitterman* provide a helpful illustration of how these principles apply to claims of the sort at issue in this case. In that case, the plaintiffs had brought several claims against New GM, including a failure-to-warn claim under Connecticut law based on New GM's own post-363 Sale conduct. *568 B.R. at 221.* The Bankruptcy Court allowed these claims to proceed as Independent Claims to the extent they were truly "based solely on New GM's post-closing wrongful conduct." *Id.* Although the then-operative complaint contained some allegations that impermissibly failed to distinguish between Old GM and New GM, the Bankruptcy Court left it to the non-bankruptcy court hearing the underlying litigation to decide in the first instance whether to allow the plaintiffs leave to amend. *Id. at 231.* The Connecticut court granted leave, and the case resulted in a verdict in favor of the plaintiffs following trial. *See May 2018 Decision, 590 B.R. at 52-53.* New GM appealed the Bankruptcy Court's decision to let the plaintiffs' failure-to-warn claim through the bankruptcy gate, arguing that the plaintiffs were improperly "attempt[ing] to 'bootstrap' the knowledge or conduct of Old GM onto purportedly Independent Claims." *Id. at 61.* This Court rejected that argument, noting that the operative complaint alleged that, "[d]espite information and knowledge available and known to [New GM], including knowledge of numerous 'rollaway' incidents caused by the defects described herein ..., [New GM] took no steps after June 2009 to directly notify and/or warn owners or the public of these defects." *Id.* The Court explained that this was sufficient to state an Independent Claim because, "[o]n its face, ... the amended complaint alleges that New GM had independent knowledge of the alleged defect *after* the Closing Date of the 363 Sale and that its duty to warn arose from that knowledge." *Id.*

## FACTUAL BACKGROUND

Robert Randall Buchanan is the Administrator of the Estate of Glenda Marie Buchanan, his deceased wife. FAC ¶¶ 2, 46.[3] Mrs. Buchanan purchased a used 2007 Chevrolet Trailblazer — manufactured by Old GM — in February 2011. *See id.* ¶¶ 5, 16, 26. On November 10, 2014, Mrs. Buchanan lost control of her Trailblazer while driving and suffered fatal injuries in a single-vehicle accident in Paulding County, Georgia.

2021 WL 1085362

*See id.* ¶¶ 1, 28-30. Buchanan, as Administrator of Mrs. Buchanan's Estate, commenced an action against New GM in Georgia state court in May 2016. *See* JA 224, 231; *In re Motors Liquidation Co. ("Buchanan")*, 613 B.R. 570, 577 (Bankr. S.D.N.Y. 2020). He alleges that Mrs. Buchanan's Trailblazer was one of many cars manufactured by Old GM that contained defective steering wheel angle sensors ("SWAS"), a critical component in the vehicle's electronic stability controls — known as "StabiliTrak" — and that these defects significantly increased the risk of a fatal rollover crash. *See* ECF No. 8 ("Buchanan Opp'n"), at 17-18; FAC ¶¶ 11, 17-19, 44. As part of discovery in the state court proceedings, the Georgia trial court authorized a deposition of Mara Barra, New GM's Chief Executive Officer. New GM sought a protective order opposing Barra's deposition, arguing that it should not be allowed because it pertains only to Buchanan's punitive damages claim and that claim is barred by the Sale Order. *Buchanan*, 613 B.R. at 577-78. [4]

On January 29, 2020, New GM sent Buchanan a letter asserting that those portions of his complaint that alleged or suggested that New GM performed actions relating to an Old GM vehicle before the 363 Sale and any requests for punitive damages against New GM based on Old GM conduct were barred by the Sale Order. JA 238-41. On January 31, 2020, Buchanan filed the First Amended Complaint to address the deficiencies identified by New GM. *Buchanan*, 613 B.R. at 578. Four days later, however, New GM filed a motion to enforce the Sale Order before the Bankruptcy Court, arguing that the First Amended Complaint "seeks to impermissibly hold New GM liable for punitive damages based on Old GM conduct." *Id.* at 579; *see* JA 1-24. More specifically, New GM argued that while the First Amended Complaint "purported to add an Independent Claim based on New GM's failure to warn Mrs. Buchanan about an alleged defect in the Vehicle, that Independent Claim is not based solely on specific and identifiable New GM conduct." *Buchanan*, 613 B.R. at 579. That is because the First Amended Complaint "is not based on any expressly stated New GM volitional conduct" and did not identify a "post-363 Sale event because New GM had no relationship to Mrs. Buchanan (it did not manufacture, design or sell the [Trailblazer])." *Id.* at 579-80. Thus, according to New GM, the First Amended Complaint "is nothing more than a failure to warn claim that Old GM allegedly had as the manufacturer and original seller of the [Trailblazer]" — that is, a "successor liability-type claim" for which "New GM does not have punitive damage liability." *Id.* at 580. Moreover, even "assuming Old GM had a failure to warn obligation, that obligation is part of the assumed Product Liability in which New GM is potentially liable for only compensatory, and not punitive, damages." *Id.* New GM sought to enjoin Buchanan from further prosecuting the lawsuit in Georgia state court until the deficiencies New GM identified were remedied. *Id.* [5]

**\*4** Bankruptcy Judge Martin Glenn framed "the narrow question presented" as "whether the [First Amended Complaint's] failure to warn claim against New GM and corresponding punitive damages request may pass through the bankruptcy gate." *Buchanan*, 613 B.R. at 583. Judge Glenn concluded they could, subject to certain amendments to the First Amended Complaint. *Id.* Judge Glenn first determined that the First Amended Complaint stated an Independent Claim, explaining that it "contains specific allegations that New GM had independent knowledge of the SWAS defect post-Sale and failed to warn plaintiffs, like the Buchanans, about that defect." *Id.* at 584. "Like the allegations in the Pitterman Plaintiffs' amended complaint," he continued, "the Buchanan Amended Complaint alleges that New GM had post-Sale independent knowledge inherited from Old GM employees of the alleged defect, and its duty to warn arose from that knowledge." *Id.* Judge Glenn did note that "there are certain allegations in the Buchanan Amended Complaint that may not be used to support a failure to warn claim against New GM, seeking punitive damages against New GM based on its own post-sale conduct ... [because they] impermissibly conflate Old GM and New GM conduct." *Id.* at 585. But he concluded that the First Amended Complaint could be amended to remedy these deficiencies. *Id.* Judge Glenn also rejected "New GM's argument that the [*November 2019 Decision*] forecloses used car purchasers, like Buchanan, from seeking punitive damages against New GM for Independent Claims alleging New GM's post-Sale knowledge and conduct." *Buchanan*, 613 B.R. at 586. "[T]o the extent Buchanan's failure to warn claim is based on New GM conduct alone, supported by specific allegations of inherited knowledge of Old GM," he explained, "punitive damages may be permissible if permitted by Georgia state law." *Id.* Thus, Judge Glenn concluded that the First Amended Complaint did not run afoul of the Sale Order (subject to certain specifically identified amendments to select paragraphs). *Id.* at 586-87.

Thereafter, New GM timely appealed. ECF No. 1.

**DISCUSSION**

The Court reviews the Bankruptcy Court's findings of fact for clear error and reviews mixed questions of fact and law and legal conclusions, including the Bankruptcy Court's constructions of bankruptcy documents and orders, *de novo*. *See, e.g.*, *Goldman, Sachs & Co. v. Esso Virgin Islands, Inc.* ( In re the Duplan Corp.), 212 F.3d 144, 151 (2d Cir. 2000); *Gabauer v. Chemtura Corp. (In re Chemtura Corp.)*, 505 B.R. 427, 429-30 (S.D.N.Y. 2014). Applying these standards here, the Court affirms the judgment of the Bankruptcy Court, substantially for the reasons stated in Judge Glenn's thoughtful and well-reasoned opinion. Indeed, as Judge Glenn observed during a hearing, this case is "virtually on all fours with *Pitterman*," JA 524, in which Judge Glenn and this Court held that a failure-to-warn claim was not barred by the Sale Order. Like the complaint at issue in *Pitterman*, the complaint at issue here "alleges that New GM had independent knowledge of the alleged defect *after* the Closing Date of the 363 Sale and that its duty to warn arose from that knowledge." *May 2018 Decision*, 590 B.R. at 61. Specifically, the First Amended Complaint alleges that New GM touted the safety of its StabiliTrak system after the closing date; that a specifically identified New GM employee was aware of problems with the SWAS, having learned of them in the course of his prior employment at Old GM; and that New GM nevertheless failed to warn drivers of vehicles with these flaws of the potential risks. *See* FAC ¶¶ 18, 22-23, 25, 27. Thus, like the complaint at issue in *Pitterman*, the First Amended Complaint "alleges that New GM had post-Sale independent knowledge inherited from Old GM employees of the alleged defect, and its duty to warn arose from that knowledge." *Buchanan*, 613 B.R. at 584.

In challenging this conclusion, New GM appears to argue that a duty-to-warn claim premised on a New GM employee's knowledge, where that knowledge was acquired in the course of employment at Old GM, is necessarily an Assumed Liability and cannot be an Independent Claim. New GM Br. 22. But that is not the case — as rulings in these proceedings have long made clear. As Bankruptcy Judge Robert Gerber explained in the *December 2015 Judgment*: "With respect to Independent Claims, knowledge of Old GM may be imputed to New GM, if permitted by nonbankruptcy law, to the extent such knowledge was 'inherited' from Old GM if such information ... was actually known to a New GM employee (*e.g.*, because it is the knowledge of the same employee or because it was communicated to a New GM employee)...." 2015 WL 11070293, at *1 (footnote omitted); *accord November 2015 Decision*, 541 B.R. at 115 ("New

GM would have to live with the knowledge its personnel had from the earliest days they began to serve New GM.... [I]n actions alleging ... Independent Claims ... New GM's knowledge may be imputed to it starting with the first day of its existence. The Court's rulings permit allegations in pleadings starting with 'New GM knew ...' or 'New GM was on notice that....' Plaintiffs asserting such claims may as a matter of this Court's gatekeeper role then complete the sentences as they see fit." (internal quotation marks omitted)).

**\*5** Noting that the First Amended Complaint does not allege a direct relationship between New GM and either Mrs. Buchanan or her vehicle, New GM also questions the basis for any legal duty to warn. *See* New GM Br. 34-35. New GM may well prove to have a valid point. But, as this Court explained in *Pitterman*, "that is a question of *nonbankruptcy* law for the [Georgia state courts] to decide in the first instance (subject to appellate review)," not a basis to close the bankruptcy gate in Buchanan's face. *May 2018 Decision*, 590 B.R. at 61. Buchanan's request for punitive damages does not affect this conclusion. The *November 2019 Decision*, which held that punitive damages cannot be imposed on New GM based on a theory of successor liability, was based on an interpretation of the agreements governing the 363 Sale. 943 F.3d at 127. But Independent Claims, by definition, fall "outside the scope" of these agreements. *Elliott*, 829 F.3d at 157. Here, Buchanan "expressly and unequivocally does not seek punitive damages against New GM predicated on Old GM conduct." Buchanan Opp'n 24. Instead, he does so "solely in connection with his independent claim for New GM's failure to warn, which is based solely on New GM's knowledge (including knowledge acquired from Old GM) and wrongful conduct." *Id.*; *see Buchanan*, 613 B.R. at 584-86.[6]

## CONCLUSION

The Court has reviewed all of New GM's remaining arguments and finds them to be without merit. Accordingly, and substantially for the reasons provided by Judge Glenn, the order of the Bankruptcy Court is AFFIRMED. The Clerk of Court is directed to close 20-CV-3093.

SO ORDERED.

**All Citations**

Slip Copy, 2021 WL 1085362

WESTLAW    © 2021 Thomson Reuters. No claim to original U.S. Government Works.    4

## Footnotes

1   *See, e.g.*, *In re Motors Liquidation Co. ("December 2015 Judgment")*, No. 09-50026 (REG), 2015 WL 11070293 (Bankr. S.D.N.Y. Dec. 4, 2015), *judgment entered*, 549 B.R. 607 (Bankr. S.D.N.Y. 2016); 🚩 *In re Motors Liquidation Co. ("November 2015 Decision")*, 541 B.R. 104 (Bankr. S.D.N.Y. 2015), *aff'd in part, vacated in part* ("*May 2018 Decision*"), 590 B.R. 39 (S.D.N.Y. 2018), *aff'd sub nom. Those Certain Post-Closing Accident Plaintiffs Represented By Butler Wooten & Peak LLP, Denney & Barrett, P.C., Hilliard Martinez Gonzales L.L.P., & Turner & Assocs., P.A. v. Gen. Motors LLC* (*In re Motors Liquidation Co.) ("November 2019 Decision")*, 943 F.3d 125 (2d Cir. 2019), *and aff'd sub nom. Reichwald v. Gen. Motors LLC* (*In re Motors Liquidation Co.*), 792 F. App'x 28 (2d Cir. 2019) (summary order), *and aff'd sub nom. Pillars v. Gen. Motor LLC* (*In re Motors Liquidation Co.*), 957 F.3d 357 (2d Cir. 2020) (per curiam); 🚩 *In re Motors Liquidation Co.*, 529 B.R. 510 (Bankr. S.D.N.Y. 2015), *aff'd in part, vacated in part, rev'd in part sub nom.* 📒 *Elliott v. Gen. Motors LLC (In re Motors Liquidation Co.)*, 829 F.3d 135 (2d Cir. 2016).

2   Strictly speaking, the Second Circuit's holding in *Elliott* concerning Independent Claims directly pertained only to plaintiffs alleging certain ignition switch defects. Nevertheless, its reasoning applies equally to plaintiffs whose claims do not arise from defective ignition switches, including Buchanan here. *See May 2018 Decision*, 590 B.R. at 60-61.

3   "FAC" refers to the First Amended Complaint, which is contained at pages 210-22 of the Joint Appendix, ECF No. 7-1 ("JA").

4   The Georgia court order authorizing Barra's deposition is currently stayed pending the outcome of an appeal by New GM. ECF No. 7 ("New GM Br."), at 14 n.11.

5   During the proceedings before the Bankruptcy Court, Buchanan submitted a proposed Second Amended Complaint, which the Bankruptcy Court declined to consider. JA 505-06. Buchanan later filed the Second Amended Complaint, with redactions, in the state court proceedings. *Id.* at 599-615. Buchanan submitted an unredacted copy of the same via email to this Court, although it does not appear to be on the docket. Although both parties cite to the Second Amended Complaint in their briefs, and a redacted copy of the pleading is included in the Joint Appendix, this Court declines to consider it in the first instance.

6   In its reply brief, New GM argues that Buchanan is either judicially estopped from asserting that his theory of recovery is an Independent Claim or that he should be held to a judicial admission that his request for punitive damages is based on Old GM conduct. *See* ECF No. 10 ("New GM Reply"), at 7-12. But New GM did not make this argument in its initial brief, and it is well established that "arguments not made in an appellant's opening brief are waived even if the appellant ... raised them in a reply brief." 📒 *JP Morgan Chase Bank v. Altos Hornos de Mex., S.A. de C.V.*, 412 F.3d 418, 428 (2d Cir. 2005); *accord Farmer v. United States*, Nos. 15-CV-6287 (AJN), 12-CR-758 (AJN), 2017 WL 3448014, at *3 (S.D.N.Y. Aug. 10, 2017) ("Courts have repeatedly held that arguments raised for the first time in reply briefs are waived...." (collecting cases)). Accordingly, the Court declines to consider the argument.

---

**End of Document**                                         © 2021 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT K

In re Armonk Snack Mart, Inc., Not Reported in Fed. Supp. (2018)

2018 WL 2225008
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

IN RE: ARMONK SNACK MART, INC. f/
d/b/a Friendly Service Armonk, Inc. f/d/b/
a Friendly Service New Rochelle, Inc., Debtor.
Armonk Snack Mart, Inc. f/d/b/a Friendly
Service Armonk, Inc. f/d/b/a Friendly
Service New Rochelle, Inc., Appellant,
v.
Robert Porpora Realty Corp., Appellee.
Armonk Snack Mart, Inc. f/d/b/a Friendly
Service Armonk, Inc. f/d/b/a Friendly
Service New Rochelle, Inc., appellant,
v.
Robert Porpora Realty Corp., Appellee.
Armonk Snack Mart, Inc. f/d/b/a Friendly
Service Armonk, Inc. f/d/b/a Friendly
Service New Rochelle, Inc., Appellant,
v.
Gas Land Petroleum, Inc., an assignee of BPD
Bank, A New York Chartered Bank, Appellee.
Armonk Snack Mart, Inc. f/d/b/a Friendly
Service Armonk, Inc. f/d/b/a Friendly
Service New Rochelle, Inc., Appellant,
v.
Gas Land Petroleum, Inc., Majed Nesheiwat, Mousa
Mart, Inc., and Mousa Nesheiwat, Appellees.
Armonk Snack Mart, Inc. f/d/b/a Friendly
Service Armonk, Inc. f/d/b/a Friendly
Service New Rochelle, Inc., Appellant,
v.
Robert Porpora, Robert Porpora Realty Corp.,
and Robert Porpora Realty, Inc., Appellee.

16-cv-5887 (NSR)
|
Chapter 11 No.: 15-22375(RDD)
|
16-cv-6065 (NSR)
|
Adv. Pro. 15-8225(RDD)
|
16-cv-6640(NSR)
|



Adv. Pro. 15-8325(RDD)
|
17-cv-6400 (NSR)
|
Adv. Pro. 15-8226(RDD)
|
17-cv-6403 (NSR)
|
Adv. Pro. 15-8226(RDD)
|
Signed 05/15/2018

**Attorneys and Law Firms**

Off Anne Julia Penachio, Penachio Malera, L.L.P., White
Plains, NY, Joseph Patrick Garland, Korsinky & Klein, LLP,
Brooklyn, NY, for Appellant.

Salvatore La Monica, LaMonica, Herbst & Maniscalco,
Wantaugh, NY, for Appellee.

OPINION & ORDER

NELSON S. ROMÁN, United States District Judge

*1 These appeals arise out of the Chapter 11 Bankruptcy
matter of Armonk Snack Mart, Inc. f/d/b/a Friendly Service
Armonk, Inc. f/d/b/a Friendly Service New Rochelle, Inc.
("Debtor," "Armonk" or "Appellant"). The principle case
arose out of Armonk's voluntary Chapter 11 petition filed
in the United States Bankruptcy Court for the Southern
District of New York ("Bankruptcy Court") and concerns
commercial property located at 360 Main Street, Armonk,
New York (the "Premises") on which Robert Porpora Realty
Corp. ("Porpora Realty") is the landlord. The other appeals
involve appellees Robert Porpora, Robert Porpora Realty,
Inc. ("Realty Inc."), Gas Land Petroleum, Inc. ("Gas Land"),
Majed Nesheiwat, Mousa Mart, Inc., and Mousa Nesheiwat.
All of the appeals relate to the following three agreements
concerning the subject Premises: (1) a lease agreement dated
January 24, 2002 and entered into between Friendly Service
New Rochelle, Inc. ("Friendly") and Porpora Realty (the
"Lease); (2) a letter agreement dated July 1, 2009 between
Porpora Realty and Friendly (the "Letter Agreement"); and
(3) a purchase agreement between Porpora Realty and Gas
Land dated February 3, 2012 (the "Gas Land Agreement"). In
sum, Armonk maintains it was the rightful tenant under the
Lease and entitled to exercise the purchase option thereunder,
it was entitled to give effect to the Letter Agreement, and that

by entering into the Gas Land Agreement, Porpora Realty, Gas Land, and others conspired to tortuously interfere with Armonk's rights under the Lease and Letter Agreement.

Currently pending before this Court are five (5) Appeals. The success of each appeal turns on the question of whether Bankruptcy Court Judge Robert D. Drain properly applied collateral estoppel to a state court determination that Armonk was not a successor in interest to Friendly. Upon applying this doctrine, Judge Drain found that Armonk was not a tenant pursuant to the Lease and thus denied its motion to assume in the principle Bankruptcy case (15-22375(RDD) ). The remaining appeals stem from various motions to remand to state court and for summary judgment (filed in the attendant adversary proceedings) that were granted in light of the finding on the motion to assume. For the reasons that follow, Judge Drain's orders dated June 15, 2016, [1] June 10, 2016, and January 13, 2017 [2] are hereby AFFIRMED and the appeals are DISMISSED. [3]

## BACKGROUND

### I. State Court Proceedings

**\*2** The Bankruptcy matters relate to various cases filed in New York State Supreme Court, Westchester County ("State Court") and the North Castle Justice Court ("Justice Court"). The cases removed from Justice Court were holdover proceedings initiated by Porpora Realty to evict Friendly, while many of the State Court actions were initiated by Armonk in an attempt to exercise contractual rights contained in the Lease and/or the Lease Agreement, and contained claims for tortious interference with a contract. The Lease was entered into on January 24, 2002 between Porpora Realty and Friendly for a term of 10 years to terminate on January 31, 2012, unless the tenant gave timely notice of its intent to renew or exercise an option to purchase imbedded in the Lease. (*See* Appellant's 16-cv-5887 Appendix related to the Porpora Realty Litigation ("Porpora Appendix" or "PA"), No. 8, Exs. E, at 2, 12-13.)

The spat of litigation began in April of 2008, when Porpora Realty initiated an eviction proceeding against Friendly and in response, Friendly commenced a lawsuit to exercise its right to purchase the Premises (*See* Armonk Brief in Support of its 16-cv-5887 Appeal ("Armonk Br. 1") (16-cv-5887 ECF No. 7), at 5; Porpora Realty Corp. Br. in Response to Armonk's 16-cv-5887 Appeal ("Porp. Br.") (16-cv-5887 ECF

No. 9), at 4.) In an attempt to resolve the litigation, Porpora Realty and Friendly entered into the Letter Agreement, which permitted Friendly to exercise the Lease's purchase option for $1,625,000.00. (*See* Porp. Br., at 4; PA No. 8, Ex. I.)

Some time between December of 2011 and January of 2012, BPD Bank initiated a foreclosure action against Porpora Realty and Friendly (the "Foreclosure Action"), alleging that the mortgage was in default and that BPD Bank was entitled to foreclose on the property. (*See* Armonk's Brief in Support of its 17-cv-6400 Appeal ("Armonk Br. 2"), at 8; *see also* Gas Land 17-cv-6400 Brief for Appellees ("GL Br.") (17-cv-6400 ECF No. 11), at 5.)

In the interim, though Friendly and Robert Porpora entered into the Letter Agreement, the purchase option was never exercised, and in February of 2012, Porpora Realty commenced a second eviction proceeding in the Justice Court against Friendly. (*See* PA No. 3, Ex. J.) Somewhat contemporaneously with the initiation of that lawsuit, on February 3, 2012, [4] Porpora Realty entered into the Gas Land Agreement, whereby Porpora Realty agreed to sell the Premises to Gas Land. (*See* Appellant's 17-cv-6400 Appendix [5] related to the Gas Land Tortious Interference Action ("Gas Land Appendix" or "GA"), Ex. E.) In a subsequent foreclosure agreement, Gas Land agreed to assume the BPD Bank mortgage and Porpora Realty consented to "a judgment of foreclosure and sale." (*See* GA, Ex. F, at 2.)

Thereafter, on February 27, 2012, Armonk commenced an action in State Court against Porpora Realty, Gas Land, Nesheiwat, and BPD Bank, for specific performance of the Letter Agreement or to exercise the purchase option under the Lease, and for tortious interference with a contract ("Initial Action"). (*See* PA No. 8, Ex. J.) On a summary judgment motion, Justice Connolly held that the Letter Agreement was a valid, enforceable contract against Robert Porpora, but explicitly found that there were issues of fact as to whether Armonk was entitled to specific performance. (*See* PA No. 8, Ex. M, at 8.) Following Justice Connolly's decision, the parties went to trial on the issues of specific performance and tortious interference before Justice Bellantoni, which concluded on January 16, 2014. (PA No. 9, Ex. 2.)

**\*3** At trial, among others to testify were Mr. Sammy Eljimal, principal of Armonk, and Peter Kennedy ("Kennedy"), Armonk's accountant. During his testimony, Mr. Kennedy noted that he was unaware of any legal connection between

**In re Armonk Snack Mart, Inc., Not Reported in Fed. Supp. (2021)**

Armonk and Friendly Service, and that, as accountant for Armonk he prepared separate tax forms for each of the companies, as they were two separate entities. (*See* PA No. 8, Ex. O.) Moreover, Mr. Eljimal testified that he had previously sold Friendly Service (referred to therein as "New Rochelle"). (*See* PA No. 8, Ex. P.)

At the close of the evidence, Gas Land and Porpora Realty moved to dismiss. First, Gas Land moved to dismiss the claims for tortious interference, which Armonk voluntarily withdrew. (GA Ex. I, at 235-36.) The defendants moved on two additional grounds: (1) that Armonk had no standing to demand specific performance of the Letter Agreement; and (2) that Armonk was otherwise not ready, willing, or able to make the purchase. (*See* GA, Ex. I, at 236-38.) [6]

All parties were given an opportunity to argue the merits of the motion on the record. (*Id.*; PA No. 9, Ex. 2.) During that time, Armonk explicitly argued the standing issue. (GA, Ex. I, at 246.) In response, Justice Bellantoni questioned, "I'm not allowed to consider standing if it's not raised?" and proceeded to allow significant argument by Armonk's counsel on the issue. (*Id.* at 252.) Moreover, Armonk raised statements made in Justice Connolly's January 7, 2014 decision in an effort to argue that Justice Connolly had already implicitly found that standing was not an issue. (*Id.* at 250-51.) After oral argument, Justice Bellantoni granted the defendants' motions to dismiss on the record, (PA No. 9, Ex. 2, at 261-62), and thereafter issued an amended judgment (the "Amended Judgment") articulating the reasons for this outcome, (*see* PA No. 8, Ex. A.)

Armonk appealed Justice Bellantoni's decision to the State Appellate Division, Second Department ("Appellate Division") who issued a decision on April 27, 2016 affirming the Amended Judgment (the "App. Div. Decision"). (*See* PA No. 8, Ex. B ("App. Div. Dec.").) The parties briefed the arguments and had oral argument thereafter. In affirming Justice Bellantoni, the Appellate Division unequivocally found that: (1) Armonk "failed to show that it was the successor in interest to the party that entered into the option agreement"; (2) even if Armonk proved it was Friendly, it "failed to show that it was financially able to purchase the real property in question within a reasonable time after entering into the agreement up until the date of trial"; and (3) that Armonk's contention that Justice Bellantoni erred by considering the standing argument in the first place was "without merit", particularly because the standing testimony

was elicited from Armonk's own witness, and Armonk did not object at the time. (*Id.* at 2.)

In the interim between Justice Bellantoni's Amended Judgment and the Appellate Divison's affirmance, Friendly commenced an unsuccessful lawsuit in State Court to enforce its right of first refusal under the Lease, in light of the Gas Land Agreement (the "Refusal Action"). (*See* PA No. 8, Ex. R.) The matter was dismissed on the grounds of *res judicata*, on January 16, 2015. (*Id.*, Ex. S.) Subsequently, on January 23, 2015, Porpora Realty issued a 30 Day Termination Notice to Friendly. (*See* PA No. 8, Ex. G.) Following that notice, Porpora Realty initiated its final eviction proceeding in the Justice Court in March of 2015 (the "Holdover Proceeding"). (*See* PA No. 4, Ex. D; *see also* Armonk Br. 1, at 12-13; Porp. Br., 7.) In apparent response to this proceeding, on March 17, 2015, Armonk also filed its final State Court action against, Gas Land, Porpora Realty, Majed Nesheiwat, Mousa Nesheiwat, Mousa Mart, Inc., and BPD BANK for conspiracy to tortiously interfere with a contract (the "Tortious Interference Action"). (*See* PA No. 8, Ex. Z.)

### II. **Bankruptcy Court Proceedings**

**\*4** Armonk filed a Chapter 11 voluntary petition in the United States Bankruptcy Court for the Southern District of New York on March 24, 2015 (the "Purchase Option Action"). (*See* PA No. 1.) Along with that petition, the Holdover Proceeding was automatically stayed pending the outcome of the Chapter 11 case. On April 7, 2015, Porpora Realty moved to lift the automatic stay. (*See* PA Nos. 2-3.) In June of 2015, Armonk moved to assume the Lease and substantial litigation followed. (*See* PA No. 5.) Judge Drain heard oral argument on both motions on three separate occasions; August 20, 2015, October 5, 2015, and June 9, 2016. (*See* PA No. 9, Ex. 4-5; PA No. 14.) He resolved both motions by order dated June 15, 2016, granting Porpora Realty's motion and denying Armonk's. (*See* PA No. 11.) Primarily, Judge Drain found that collateral estoppel precluded Armonk from moving to assume the Lease, in light of Justice Bellantoni's finding that Armonk was not a successor in interest to Friendly, and the Appellate Division's affirmance thereof. (*See* Jun. 15 Order.) Armonk's 16-cv-5887 Appeal seeks review of this order.

On April 8, 2015, Porpora Realty removed the Holdover Proceeding to Bankruptcy Court and was assigned Adversary Proceeding Number 15-8225(RDD). Contemporaneous with his outcome in the Purchase Option Action, Judge Drain issued an order remanding the Holdover Proceeding to State

Court, and the 16-cv-6065 Appeal followed. (*See* 16-cv-6065 ECF No. 1.)

The Foreclosure Action was also removed to Bankruptcy Court and given Adversary Proceeding Number 15-8325. In light of his decision in the Purchase Option Action, Judge Drain issued an order dated June 10, 2016 remanding the Foreclosure Action back to State Court. The 16-cv-6640 Appeal followed. (*See* 16-cv-6640 ECF No. 1.)

Armonk's Tortious Interference Action was also removed to Bankruptcy Court on April 8, 2015 and given Adversary Proceeding number 15-8226(RDD). Gas Land moved for summary judgment and Porpora Realty moved for partial summary judgment; oral argument was heard on January 6, 2017. (*See* GA, Ex. P.) During that hearing, Judge Drain granted both motions for summary judgment based entirely on his ruling in the Purchase Option Action. (*Id.* at 4-5.) He memorialized his decision as to Gas Land's motion in an order dated January 13, 2017 (the "Gas Land Order"). (*See* GA, Ex. Q.) The 17-cv-6400 Appeal followed. (*See* 17-cv-6400 ECF No. 1.) He memorialized his decision as to Porpora Realty's motion in a separate order dated January 13, 2017 (the "Porpora Order"). (*See* 17-cv-6403 ECF No. 1.) The 17-cv-6403 Appeal followed.

### STANDARD OF REVIEW

A federal district court has jurisdiction to hear appeals of bankruptcy court orders and decisions. Fed. R. Bank. P. 8013. "Questions of law and mixed questions of law and fact are subject to *de novo* review." *In re Soundview Elite Ltd.*, Nos. 14-CV-7045(JPO), 14-CV-7666(JPO), 2014 WL 7009070, at *1 (S.D.N.Y. Dec. 12, 2014). Questions of fact, on the other hand are reviewed for clear error and should only be set aside when, "although there is evidence to support it, the reviewing court on the entire record is left with the definite and firm conviction that a mistake has been made." *Id.* (quoting *In re Reilly*, 245 B.R. 768) (B.A.P. 2d Cir. 2000). This standard applies to all findings of fact, "whether based on oral or documentary evidence." *In re Plumeri*, 434 B.R. 315, 327 (S.D.N.Y. 2010).

### DISCUSSION

**I. Collateral Estoppel**

It is well settled that collateral estoppel and other preclusion principles "apply in bankruptcy proceedings." *Evans v. Ottimo*, 469 F.3d 278, 281 (2d Cir. 2006). Collateral estoppel, or issue preclusion, is a doctrine which prohibits the litigation of any issue that was previously litigated and decided. *See Hoblock v. Albany Cty. Bd. of Elections*, 422 F.3d 77, 94 (2d Cir. 2005); *Prime Mgmt., Inc. v. Steinegger*, 904 F.2d 811, 916 (2d Cir. 1990). Where a federal court is reviewing the preclusive effect of a state court's decision, state law applies. *Marrese v. Am. Acad. Of Orthopaedic Surgeons*, 470 U.S. 373, 380 (1985). In New York, collateral estoppel is triggered where: "(1) the identical issue necessarily was decided in the prior action and is decisive in the present action, and (2) the party to be precluded from relitigating the issue had a full and fair opportunity to litigate the issue in the prior action." *In re Hyman*, 502 F.3d 61, 65 (2d Cir. 2007) (citing *Kaufman v. Eli Lilly & Co.*, 65 N.Y.2d 449, 455-56 (1985) ); *Evans*, 469 F.3d at 281; *see also In re Barowski*, 257 B.R. 394, 405 (S.D.N.Y. 2004) (citing *Moccio v. N.Y. State Office of Court Admin.*, 95 F.3d 195, 200 (2d Cir. 1996) ); *see also Evans*, 469 F.3d at 281. As it regards bankruptcies,

**\*5** "For a question to have been actually litigated so as to satisfy the identity requirement, it must have been properly raised by the pleadings or otherwise placed in issue and actually determined in the prior proceeding." *Evans*, 469 F.3d at 282. Nevertheless, there need not be perfect identity of issues. *See Lefkowitz v. McGraw-Hill Global Educ. Holdings, LLC*, 23 F. Supp. 3d 344, 360 (S.D.N.Y. 2014) (citing *Montana v. United States*, 440 U.S. 147 (1979) ). A court "must determine first, whether the issues presented by this litigation are in substance the same as those resolved in their prior litigation...." *Id.* (quoting *Montana*, 440 U.S. at 155) (internal quotations and alterations omitted). It bears noting that "the preclusive effects of a final judgment are not altered by the fact that the judgment may have been wrong or rested on a legal principle subsequently overruled in another case." *In re Indu Craft Inc.*, Nos. 11-CV-5996(JMF), 11-CV-6303(JMF), 11-CV-6304(JMF), 2012 WL 3070387, at *10 (S.D.N.Y. Jul. 27, 2012) (quoting *Federated Dep't Stores, Inc. v. Moitie*, 452 U.S. 394, 398 (1981) ) (internal quotations omitted).

"A full and fair opportunity to litigate includes the right to appeal 'if the loser wants it.' " *Algonquin Power Income Fund v. Christine Falls of N.Y., Inc.*, 362 Fed.Appx. 151, 154 (2d Cir. 2010) (summary order). The standard of "actually and fully litigated" applies where it is "clear that the litigant was afforded his day in court ... although [the issue was] not technically necessary to the prior court's judgment." *Murphy v. Gallagher*, 761 F.2d 878, 882 (2d Cir. 1985).

Critically, while collateral estoppel is an equitable doctrine, "Congress specifically required all federal courts give preclusive effect to state court judgments whenever the courts of the state from which the judgments emerged would do so." *Kelleran v. Andrijevic*, 825 F.2d 692, 694 (2d Cir. 1987). This applies to bankruptcy courts as well, thereby precluding modification of a state court judgment that would be granted preclusive effect in state court, unless "the judgment was procured by collusion or fraud ... or where the rendering court lacked jurisdiction." *Id.*

### DISCUSSION

### I. The Elements of Collateral Estoppel are Met

The central issue to all of the Appeals is whether Judge Drain properly applied the doctrine of collateral estoppel to Justice Bellantoni's October 3, 2014 Amended Judgment (and the Appellate Division's affirmance). Appellees contend that Judge Drain properly applied collateral estoppel to the finding that Armonk was not the same legal entity as, or the successor in interest to Friendly, leading to the conclusion that Armonk was not the tenant on the Lease and triggering denial of the motion to assume. (*See* Porp. Br., at 12-22; GL Br., 13-24.) Armonk, on the other hand, principally argues that the elements of collateral estoppel have not been met, and that the equities do not favor the application of the doctrine in this case. (*See* Armonk Br. 1, at 14-15; Armonk Br. 2, at 13-14.) This Court agrees with Judge Drain's application of collateral estoppel, warranting affirmance of his Orders and dismissal of all of the appeals.

#### A. **Identity of Issues**

There is identity of issues between the Bankruptcy Court cases and the Initial Action in State Court. "For a question to have been actually litigated so as to satisfy the identity requirement, it must have been properly raised by the pleadings or otherwise placed in issue and actually

determined in the prior proceeding." *Evans*, 469 F.3d at 282. It is clear that the issue of standing was *not* raised in Porpora Realty or Gas Land's pleadings in State Court, but this is not outcome determinative. Standing was nevertheless placed in issue and actually determined by Justice Bellantoni. During the State Court trial, Kennedy's testimony placed it in issue when he testified that as Armonk's accountant, he was not aware of any business or financial interest relationship that existed between Armonk and Friendly, and that the companies were two separate entities for which he prepared two separate tax returns. (*See* PA No. 8, Ex. O.) Armonk did not object to this testimony. (*Id.*) At the conclusion of the trial, and on the motions of Gas Land and Porpora Realty to dismiss for lack of standing and Armonk's failure to demonstrate readiness, willingness, and ability to purchase the property, Justice Bellantoni granted the motion on the record and issued an Amended Judgment. (*See id.* at 261; PA No. 8, Ex. 1 October 3, 2014 Amended Judgment of Justice Bellantoni ("Am. Judg."); *see also See* PA No. 9, Ex. 2, at 236, 261.) Justice Bellantoni held that "Armonk is *not* the same legal entity as, 'formerly known as' or otherwise entitled to succeed to the rights of[,] Friendly New Rochelle, the purchaser of the Property owned by defendant Robert Porpora Realty Corp." (Am. Judg., at 3.)

**\*6** Additionally, contrary to Armonk's contentions, (*see* Armonk Br. 1, at 19; Armonk Br. 2, at 19), the issue of standing was necessary to support a valid and final judgment on the merits. The primary issue before Justice Bellantoni at trial was whether Armonk was entitled to exercise the rights under the Letter Agreement. In order to find that Armonk could, and should, purchase the property under the Letter Agreement, Justice Bellantoni first had to determine whether Armonk was the same entity as, or successor in interest to, Friendly, as Armonk was not listed as a party to the Letter Agreement. (*See* PA No. 8, Ex. I.) Whether the issue of standing was raised at the pleadings stage or not is of no moment; it was nevertheless critical to a determination regarding Armonk's rights under the Letter Agreement. [7]

Furthermore, Armonk's description of Justice Bellantoni's holding is not only too narrow a holding, but is plainly incorrect. Armonk argues that Justice Bellantoni "found merely that the Debtor was not a party to the Letter Agreement...." (*See* Armonk Br. 1, at 17; Armonk Br. 2, at 19.) Armonk misses the mark. Justice Bellantoni focused on the legal relationship between the parties. Indeed, he unequivocally found that Armonk and Friendly were two separate legal entities. (*See* Am. Judg., at 3.) Resulting from

that determination, it was clear that Armonk was not a party to the Letter Agreement and thus had no right to purchase the premises. Whether attempting to enforce the Lease or Letter Agreement, Armonk's standing is key; Friendly, not Armonk, is the entity listed on both.

Moreover, the issue of Armonk's legal relationship to Friendly is essential to the motion to assume that was before Judge Drain. Where, as here the fact or legal question decided by the state court is critical to the issue in federal court, identity of issues exists. ⚠️ *Phifer v. City of New York*, 289 F.3d 49, 60 (2d Cir. 2002) (finding first element of collateral estoppel met where state issue presented to district court was already decided against the party in state court). The motion before Judge Drain was one to assume the lease pursuant to 📄 11 U.S.C. § 365(a). (*See* PA No. 5.) Section 365(a) permits a trustee to "assume or reject any executory contract or unexpired lease *of the debtor.*" 11 U.S.C. § 365(a). It is thus patently obvious that the debtor be the tenant under the lease to be assumed. As discussed, Friendly, not Armonk, was the tenant on the Lease, and therefore the legal relationship between the two entities was paramount to the issue of assumption. This precise issue was decided by Justice Bellantoni and affirmed by the Appellate Division. (*See* Am. Judg., at 3; App. Div. Dec., at 2.) There is identity of issues,[8] and the issue was actually litigated and necessarily decided.

### B. Full and Fair Opportunity to Litigate

**\*7** Armonk had more than a full and fair opportunity to litigate the issue of whether or not it was a successor in interest to Friendly. The second prong of collateral estoppel requires that, to take effect, the party against whom collateral estoppel is being asserted must have had a full and fair opportunity to litigate the issue. 📄 *In re Hyman*, 502 F.3d at 65; 📄 *Evans*, 469 F.3d at 281; *see also In re Barowski*, ⚠️ 257 B.R. at 405. To make that determination, "New York courts consider 'the various elements which make up the realities of litigation.' " *Bd. of Managers of 195 Hudson St. Condo. v. Jeffrey M. Brown Assocs., Inc.*, 652 F. Supp. 2d 463, 473-74 (S.D.N.Y. 2009). The central concern is to ensure that "a party not be precluded from obtaining at least one full hearing on his or her claim." *Id.* at 474. Armonk has had more.

Armonk's analysis of this prong is unjustifiably narrow. Armonk argues that it was prejudiced and did not have a full and fair opportunity to litigate the issue because it was raised

mid-trial. (*See* Armon Br. 1, at 18; Armonk Br. 2, at 20.) This argument is unavailing for two reasons: (1) Armonk's own witness put standing at issue during the trial; and (2) Justice Bellantoni permitted significant argument on the issue of standing post-trial before he made his findings. Contrary to Armonk's dramatic contention, it was not "entirely stripped by the State Court of any ability to argue that it was prejudiced by the argument which was raised for the first time at trial." (*See* Armonk Br. 1, 18.) Armonk had ample opportunity to be heard.

First, Armonk's witness raised the standing issue during his testimony; Armonk failed to object. (*See* PA No. 8, Ex. O.) That was Armonk's first opportunity to argue prejudice; it did not. Second, upon conclusion of the presentation of evidence, Gas Land thoroughly argued that the evidence made clear that Armonk was not the successor in interest to Friendly, and Armonk had an opportunity to respond. (*See* GA Ex. I, at 236-238, 246-250.) At the time, Armonk made the exact arguments it makes now, that Gas Land waived the standing argument by failing to raise it in its pleadings, (*compare id.* at 246 *with* Armonk Br. 1, at 18,) and that Justice Connolly had impliedly found that there was no standing issue, (*compare id.* at 246-50 *with* Armonk Br. 1, at 17.)[9] It was not until after Gas Land, Porpora Realty, and Armonk were heard on the record that Justice Bellantoni rendered his decision. (*See* PA No. 9, Ex. 2, at 261-63.) Armonk had a full and fair opportunity.

**\*8** Even if Armonk is correct that it was not afforded ample opportunity to be heard at the trial court level, Armonk raised the issue on appeal to the Appellate Division who affirmed Justice Bellantoni's decision. This is crucial, because Judge Drain waited until the Appellate Division ruled before rendering his decision on the motion to assume. (*See* PA No. 9, Ex. 3, at 38-40.) Perfecting an appeal, alone, is sufficient to satisfy this prong of collateral estoppel. *See Town of Poughkeepsie v. Espie*, No. 02-CV-6995(CLB), 2006 WL 236787, at \*3 (S.D.N.Y. Jan. 27, 2006) (noting full and fair opportunity to litigate where issue was pending on appeal); *see also Yu v. Knighted LLC*, No. 15-CV-9340(KMK), 2017 WL 666118, at \*7 (S.D.N.Y. Feb. 16, 2017) (applying collateral estoppel where plaintiff's discrimination claims were heard before NYSDHR and then affirmed by the New York State Supreme Court). Here, there was more. Armonk had an opportunity to brief the issues both orally and in writing before the Appellate Division. (*See* Porp. Br., at 11.) Again, Armonk argued that standing had been waived and that Justice Bellantoni's decision on the issue of standing was not

supported by the law; the Appellate Division disagreed. (*See* App. Div. Dec., at 2.) At this point, it appears that Armonk is merely looking for third and fourth bites at the apple, having been denied by the State Courts on two prior occassions.

Finally, Armonk argues fairness to contend that applying collateral estoppel would mean that "conspiring litigation-adversaries are able to oust a compliant tenant on a hyper-technicality." (*See* Armonk Br. 2, at 22.) Such contention has no support in law. In reality, Armonk had ample opportunity to defend its interest, demonstrate that it was a successor in interest to Friendly, and persuade the State Courts of its position. The Appellate Division explicitly found that the issue of standing was properly raised during the pendency of the trial, and affirmed Justice Bellantoni's holding that Armonk was not a successor in interest to Friendly. (*See* App. Div. Dec. at 2.) Viewing the "realities of the litigation", it is apparent that the equities favor applying collateral estoppel; Armonk raised the same arguments at the state trial and appellate levels before re-raising them before the Bankruptcy Court *and* now this Court. Armonk's mere dissatisfaction with the State Court determinations is insufficient to withhold the application of collateral estoppel. Finding otherwise would cut against finality of judicial decisions, *see* [image] *Giakoumelos v. Coughlin*, 88 F.3d 56, 61 (2d Cir. 1996) ("Were the district court to review the merits of all of [Plaintiff's] claims it appears that it would have before it essentially the same record ... that the Appellate Division had before it."), a central policy consideration behind collateral estoppel.

## II. No Abuse of Discretion in Finding that Debtor was Not Tenant

Judge Drain's finding that Armonk was not the tenant under the lease was one of fact and is thus reviewed for clear error. This Court will not set aside his finding unless clearly erroneous, *i.e.* where the reviewing court is "left with the definite and firm conviction that a mistake has been made." *In re Pulmeri*, 434 B.R. at 327 (quoting [image] *ASM Capital, LP*

*v. Ames Dep't Stores, Inc. (In re Ames Dep't Sotres, Inc.),* 582 F.3d 422, 426 (2d Cir. 2009) ). The party seeking to set aside the Bankruptcy Court's findings of fact bears a heavy burden. *Id.* Judge Drain's finding that Armonk was not the tenant, was not clearly erroneous. In fact, Judge Drain was compelled to decide as much, once he found that collateral estoppel was applicable. There was no clear error.

## III. The Remaining Appeals

Considering that Armonk's legal relationship to Friendly is critical to each of the appeals before this Court, and no party has argued otherwise, this Court finds the dismissal of the remaining appeals, 16-cv-6640, 17-cv-6400, and 17-cv-6403, warranted. Moreover, as the parties acknowledged, the appeal of the Holdover Proceeding (16-cv-6065) is moot, and therefore dismissed.

CONCLUSION

In light of the foregoing, the Court finds that Judge Drain properly applied collateral estoppel to preclude Armonk's claims in Bankruptcy Court. The State Court has already decided that Armonk was not the same legal entity as, or successor in interest to, Friendly, a critical issue to all of Armonk's Appeals. Consequently, this Court also finds that Judge Drain properly remanded the Foreclosure Action and Holdover Proceeding to State Court and granted summary judgment to Gas Land and Porpora Realty. Additionally, this Court finds Armonk's motion for a stay moot. The Clerk of the Court is respectfully directed to dismiss the following bankruptcy appeals: 16-cv-5887, 16-cv-6065, 16-cv-6640, 17-cv-6400, and 17-cv-6403 and close the cases.

SO ORDERED.

## All Citations

Not Reported in Fed. Supp., 2018 WL 2225008

Footnotes

1    There are two orders dated June 15, 2016; one in each of the following bankruptcy cases: 15-22375 and 15-8225.
2    There are two orders dated January 13, 2017, corresponding to each of the following bankruptcy cases, 15-8226A and 15-8226.

In re Armonk Snack Mart, Inc., Not Reported in Fed. Supp. (2019)

09-50002-mg    Doc 8569    Filed 11/04/21    Entered 11/04/21 12:54:51    Main Document
Pg 679 of 723

3     Armonk also moved by Order to Show Cause for a stay which would restore the automatic bankruptcy stay
      pursuant to [📖] 11 U.S.C. § 362(a), pending the outcome of this appeal. (*See* ECF Nos. 12, 25-27, 29.)
      This Court was subsequently advised that a decision on the Order to Show Cause requesting a stay of the
      proceedings was no longer imminent, and the Court thus reserved its ruling on the matter. In light of the fact
      that the appeal is now being decided, the Order to Show Cause for a stay is moot.

4     There is some contention between the parties as to whether or not the Lease had actually expired at this
      time. (*Compare* Armonk Br. 2, at 6-7; GL Br., at 5.) Whether the Lease did in fact expire by the time Gas
      Land and Porpora Realty entered into this purchase agreement is of no moment to the merits of this appeal.

5     Gas Land and Armonk do not submit a joint Appendix containing the documents relevant to the 17-cv-6400
      appeal. Instead, they electronically filed attachments to their respective briefs. (*See* ECF Nos. 8, 10, 11.) All
      of the documents relevant to this decision have been attached to Armonk's brief, and thus all references in
      this decision will be to the documents attached thereto, and referred to as the Gas Land Appendix.

6     Armonk has provided the pages from this transcript in piecemeal. The pages provided in the Porpora
      Appendix completely omit Armonk and Robert Porpora's arguments on the record. (*See* PA No. 9, Ex. 2.)
      On the other hand, the copy of the transcript provided in the Gas Land Appendix does not include Justice
      Bellantoni's decision on the record, which follows page 260 in the transcript. (*See* GA, Ex. I.) All references
      to the arguments made by both parties will be to the transcript in the Gas Land Appendix, while Justice
      Bellantoni's decision will be referred to in the Porpora Appendix.

7     On appeal from Justice Bellantoni's decision, Armonk argued that pursuant to New York state law, defendants
      had waived the standing argument by failing to raise it in the pleadings. (*See* App. Div. Decision, at 2.) The
      Appellate Division explicitly rejected Armonk's argument because the issue of standing was put in issue at
      trial by Armonk's own witness. (*Id.*)

8     Even viewing the issues in Armonk's framework, identity of issues is met. Armonk's position is that the issue
      before Justice Bellantoni was one of whether or not Armonk could exercise the option under the Letter
      Agreement, on which Friendly (not Armonk) was named. (*See* Armonk Br. 1, at 17.) The issue before Judge
      Drain, according to Armonk, was whether Armonk could assume the lease (which named Friendly as the
      tenant). (*Id.* at 17.) It is true, these issues on their face are not identical. Nevertheless, "the prior decision need
      not have been explicit on the point, since if by necessary implication it is contained in that which has been
      explicitly decided, it will be the basis for collateral estoppel." *BBS Norwalk One, Inc. v. Raccolta, Inc.*, 117
      F.3d 674, 677 (2d Cir. 1997). In both instances, the Letter Agreement and the Lease, Friendly, not Armonk is
      the listed tenant. Accordingly, to decide either issue, both Courts necessarily had to decide whether Armonk
      was the same legal entity as, or successor in interest to, Friendly. That factual determination was made by
      Justice Bellantoni, affirmed by the Appellate Division and properly accorded preclusive effect.

9     Armonk's contention that Justice Bellantoni "ignored the fact that the standing issue had not been raised by
      either the Landlord or Gasland in their respective answers" is equally unavailing. At oral argument, Armonk
      raised the issue of waiver, and Justice Bellantoni explicitly responded. (*See* GA Ex. I, at 246-247.) Moreover,
      as detailed below, the Appellate Division squarely addressed Armonk's contentions that standing was waived,
      and found that the argument lacked merit. (*See* App. Div. Dec., at 2.) To find otherwise would require this Court
      to implicitly find that Justice Bellantoni and the Appellate Division's substantive outcomes were incorrect;
      that this Court cannot do. It is not for this Court to second guess a state court on state law. *See Stubbs
      v. de Simone*, No. 04-CV-5755(RJH)(GWG), 2005 WL 2429913, at *18 (S.D.N.Y. Sept. 30, 2005) (citing
      [📖⚠️] *Richards v. City of New York*, No. 97-CV-7990(MBM), 2003 WL 21036365, at *8 (S.D.N.Y. May 7, 2003)
      for proposition that a federal court should apply collateral estoppel where federal claims "could succeed only
      to the extent that the state court erred") (internal alterations omitted). Similarly, whether the Appellate Division
      erred in its application of [📖] *Murray v. City of New York*, 43 N.Y.2d 400 (1977), (*see* Armonk Br. 2, at 24-26),
      is not for this Court to decide; indeed, "the preclusive effects of a final judgment are not altered by the fact that
      the judgment may have been wrong or rested on a legal principle subsequently overruled in another case."
      *In re Indu Craft Inc.*, Nos. 11-CV-5996(JMF), 11-CV-6303(JMF), 11-CV-6304(JMF), 2012 WL 3070387, at

*10 (S.D.N.Y. Jul. 27, 2012) (quoting 🚩 *Federated Dep't Stores, Inc. v. Moitie*, 452 U.S. 394, 398 (1981) ) (internal quotations omitted). Armonk's arguments in this respect are better suited to be heard before the New York Court of Appeals, not a federal court deciding an issue of collateral estoppel.

---

**End of Document**                                            © 2021 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW    © 2021 Thomson Reuters. No claim to original U.S. Government Works.    9

**EXHIBIT L**

2019 WL 3852391
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

Olukayode David OJO, Plaintiff,

v.

UNITED STATES of America, MDC Lieutenant
Frank Maldonado, Eric Abdellah, Stedman
Ferguson, Clarence Ross, John Does #1-4
(said name(s) being fictitious, the intent of
Plaintiff being to Designate male correctional
officer(s) involved or present at the scene of
the incident, and "Other Correctional officers
Unknown") and Jane Doe #1 (said name(s)
being fictitious, the intent of Plaintiff being to
designate female Lieutenant officer(s) involved or
present at the scene of the incident, and "Other
Correctional officers Unknown"), Defendants.

16 CV 4112 (MKB)(LB)
|
Signed 08/15/2019

**Attorneys and Law Firms**

Olukayode David Ojo, Kearny, NJ, pro se.

Sean P. Greene, United States Attorney's Office, Brooklyn,
NY, for Defendants.

**ORDER**

BLOOM, United States Magistrate Judge:

 *1  Defendants move to dismiss plaintiff's amended
complaint pursuant to Federal Rules of Civil Procedure
12(b)(1) and 12(b)(6), or in the alternative, for summary
judgment. [1] ECF No. 59. The Honorable Margo K.
Brodie referred defendants' motion to me for a Report and
Recommendation pursuant to 28 U.S.C. § 636(b). For
the following reasons, it is respectfully recommended that
defendants' motion to dismiss should be granted.

**BACKGROUND**

Plaintiff, proceeding *pro se* and *in forma pauperis*, filed
his complaint on July 25, 2016. Plaintiff filed his amended
complaint on March 8, 2017. ECF No. 26. The following facts
are drawn from plaintiff's amended complaint.

On July 11, 2011, plaintiff was arrested by the New
Jersey State Police at the request of the Federal Bureau
of Investigation ("FBI"). ECF No. 26, Am. Compl. ¶ 48.
Plaintiff was transported to and held at The Metropolitan
Detention Center ("MDC") in Brooklyn. Id. On February 27,
2014, plaintiff was sentenced to 37 months imprisonment
for Conspiracy to Commit Wire Fraud and Conspiracy
to Possess with Intent to Use Unlawfully Five or More
False Identification Documents. Id. Plaintiff alleges that
while at MDC, he displayed exemplary compliance with the
institutional regulations imposed by the Bureau of Prisons
(the "BOP"). Id. at ¶ 49. Due to plaintiff's compliance,
plaintiff was eligible for Good Conduct Time ("GCT"). Id.
at ¶ 50. The BOP was solely responsible for accounting
for GCT and calculating plaintiff's sentence. Id. at ¶¶ 51–
56. According to plaintiff, based on the 37-month sentence
imposed, plaintiff qualified for "approximately 54 days credit
each from the three years of his term of imprisonment," which
would amount to 162 days of GCT. ECF No. 26, Am. Compl.
¶ 57. Thus, accounting for GCT, plaintiff would have satisfied
his sentence on March 1, 2014. Id. at ¶ 58. The BOP calculated
plaintiff's sentence satisfaction date as March 15, 2014. Id. at
¶ 61. According to plaintiff, the BOP "made a serious error in
the release date calculation." Id.

On March 14, 2014, plaintiff prepared for his release
from MDC, dressing in clothes that he purchased from the
commissary. ECF No. 26, Am. Compl. ¶ 74. An MDC official
noticed plaintiff was not dressed in his prison-issued clothing
and "insisted that plaintiff should go and put on the prison
uniform." Id. at ¶ 75. Plaintiff informed the MDC official that
he had been released and that he had already placed the prison
uniform in the laundry. Id. at ¶ 76. Plaintiff got into a dispute
with the MDC officials regarding his clothes. Id. at ¶¶ 76–
89. According to plaintiff, MDC officials conspired together
and invited defendants Maldonado, Abdellah, Ferguson, and
Ross into Unit J71 (the "Unit"). Id. at ¶¶ 90–91. Plaintiff
alleges that defendants were motivated to retaliate against him
because they became aware of previous grievances and civil
rights actions plaintiff had filed. [2] Defendants approached
plaintiff and took plaintiff's radio. Id. at ¶ 93. Defendants
directed plaintiff to a dark spot around the exit of the Unit,
twisted plaintiff's hands backwards and placed handcuffs on
his wrists, which they excessively tightened. Id. at ¶¶ 94–

96. Plaintiff alleges that he complained about the excessive tightness of the handcuffs, but defendants mocked him. Id. at ¶ 97. Defendants then led plaintiff to the Segregated Housing Unit (the "SHU"). While in the SHU, plaintiff alleges that he was locked in a single cold cell without a seat, bed, toilet, and water and directed to remove his clothes and left naked in view of "every male and female officer" that passed by the cell. Id. at ¶¶ 99–104. After a "substantial period of time" plaintiff was given a prison uniform, removed from the SHU in handcuffs, and taken to the booking section of the facility. Id. at ¶¶ 106–107. Plaintiff was then released to two of the defendants, but was forced to leave his personal property behind in the facility, including legal documents, a bible, a reading lamp, and other items he had purchased from the commissary. Id. at ¶¶ 107–110.

## LEGAL STANDARD

### I. Dismissal Under 12(b)(1) and 12(b)(6)

**\*2**  The standard of review for a motion to dismiss under Rule 12(b)(1) for lack of subject matter jurisdiction and for a motion to dismiss under Rule 12(b)(6) for failure to state a claim are substantively identical. Moore v. PaineWebber, Inc., 189 F.3d 165, 169 n.3 (2d Cir. 1999). On a motion to dismiss under 12(b)(1), however, the party invoking the court's jurisdiction bears the burden of proof to show that subject matter jurisdiction exists, while the movant bears the burden of proof on a motion to dismiss under Rule 12(b)(6). Fountain v. Karim, 838 F.3d 129, 134 (2d Cir. 2016) (citing Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000)); McCray v. Lee, No. 16 CV 1730, 2017 WL 2275024, at \*2 (S.D.N.Y. May 23, 2017). [3]  A court reviewing a motion to dismiss must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. See Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555–56 (2007); Koppel v. 4987 Corp., 167 F.3d 125, 130 (2d Cir. 1999). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

To survive a motion to dismiss, plaintiff must do more than allege facts that are "merely consistent with a defendant's liability," id., or "speculative," Twombly, 550 U.S. at 555; he must allege facts that "allow[ ] the court to draw

the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 556). If a plaintiff does not "nudge[ ] [his] claims across the line from conceivable to plausible, [the] complaint must be dismissed." Twombly, 550 U.S. at 570. Nonetheless, "[a] document filed pro se is 'to be liberally construed,' and 'a pro se complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers' " Erickson v. Pardus, 551 U.S. 89, 94 (2007) (quoting Estelle v. Gamble, 429 U.S. 97, 106 (1976) (internal citation omitted)); see also Bertin v. United States, 478 F.3d 489, 491 (2d Cir. 2007) ("[w]e liberally construe pleadings and briefs submitted by pro se litigants, reading such submissions 'to raise the strongest arguments they suggest.' ") (quoting Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir. 1994) (internal citation omitted)).

In deciding a motion to dismiss, the Court may consider, in addition to the complaint, documents attached to the complaint, documents incorporated by reference therein, documents that plaintiff relied on in bringing the action which were in plaintiff's possession or of which plaintiff had knowledge, and matters of which judicial notice may be taken. Chambers v. Time Warner, Inc., 282 F.3d 147, 152–53 (2d Cir. 2002); Gregory v. Daly, 243 F.3d 687, 691 (2d Cir. 2001). [4]

## DISCUSSION

The complaint raises claims under both the Federal Tort Claims Act ("FTCA") and Bivens v. Six Unknown Named Agents, 403 U.S. 388 (1971) (hereinafter "Bivens") regarding the BOP's allegedly incorrect calculation of plaintiff's release date, resulting in a 14-day delay in plaintiff's release; plaintiff's confinement in the SHU for approximately three hours where plaintiff alleges he was strip searched and left naked in view of male and female officers; and plaintiff's allegation that defendants handcuffed him excessively tightly.

### II. The Federal Tort Claims Act

"The United States, as sovereign, is immune from suit save as it consents to be sued ... and the terms of its consent to be sued in any court define that court's jurisdiction to

entertain the suit." McGowan v. United States, 825 F.3d 118, 125 (2d Cir. 2016) (omission in quoted material) (quoting Liranzo v. United States, 690 F.3d 78, 84 (2d Cir. 2012)). The Supreme Court has emphasized that the FTCA waives sovereign immunity "where the United States, if a private person, would be liable" in tort to plaintiff. United States v. Olson, 546 U.S. 43, 44 (quoting 28 U.S.C. § 1346(b) (1)). The FTCA is a limited waiver of sovereign immunity and authorizes suits against the United States to recover damages

> **\*3** for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b)(1).

The FTCA is "structured as a grant of subject matter jurisdiction to the federal courts," and is subject to certain exceptions. Caban v. United States, 671 F.2d 1230, 1235 n.5 (2d Cir. 1982) (citations omitted); see also 28 U.S.C. § 1346(b). A finding that a statutory exception applies to a claim is "tantamount to holding that the Court lacks subject matter jurisdiction" to consider that claim. Caban, 671 F.2d at 1235 n.5.

**A. Plaintiff's 14-day Delay in His Release, The BOP's Calculation of Plaintiff's Release Date, and Plaintiff's Three-Hour Placement in the SHU**

Plaintiff's first, second, fifth, sixth, and seventh FTCA causes of action allege false imprisonment, false arrest, and intentional and negligent infliction of emotional distress. These causes of action are based on the BOP's purported incorrect calculation of plaintiff's release date resulting in a 14-day delay in his release and his three-hour placement in the SHU.

#### a. *Plaintiff's 14-Day Delay in His Release*

Plaintiff's first cause of action alleges false imprisonment due to the 14-day delay in his release from BOP custody. ECF No. 26, Am. Compl. ¶¶ 120–27. The Government alleges that plaintiff failed to administratively exhaust this claim. Def.'s Mot. to Dismiss, or in the Alternative, for Summary Judgment at 10–13. As such, the Government posits that the claim is barred. Id. Plaintiff argues that his claim did not accrue until he was made aware of a study conducted by the Office of the Inspector General ("OIG Study") regarding incidences of errors in release dates for BOP inmates. Pl's Mem. of Law in Opp. to Def.'s Mot. for Summary Judgment at 8. Moreover, plaintiff alleges that he was permitted to amend his original claim, deemed presented to BOP on July 24, 2015, alleging a three-hour delay in his release, as no final decision had issued on the claim. Id. at 8–9.

The FTCA requires that a plaintiff exhaust all administrative remedies before filing a complaint in federal court. This requirement is jurisdictional and cannot be waived. See McNeil v. United States, 508 U.S. 106, 113 (1993); Robinson v. Overseas Military Sales Corp., 21 F.3d 502, 510 (2d Cir. 1994). The statute states:

> An action shall not be instituted upon a claim against the United States for money damages for injury or loss of property or personal injury ... caused by the negligent or wrongful act or omission of any employee of the Government ... unless the claimant shall have first presented the claim to the appropriate Federal agency and his claim shall have been finally denied by the agency in writing.... The failure of an agency to make final disposition of a claim within six months after it is filed shall, at the option of the claimant any time thereafter, be deemed a final denial of the claim for purposes of this section.

28 U.S.C § 2675(a).

"[A] tort claim against the United States 'shall be forever barred' unless it is presented to the 'appropriate federal agency within two years after such claim accrues' and then brought to federal court 'within six months' after the agency acts on the claim." United States v. Kwai Fun Wong, 135 S. Ct. 1625, 1629 (2015) (quoting 28 U.S.C. § 2401(b)); see also 28 U.S.C. § 2675(a). Failure to comply with this requirement mandates dismissal of the suit. See McNeil, 508 U.S. at 113 ("The FTCA bars claimants from bringing suits in federal court until they have exhausted their administrative remedies. Because petitioner has failed to heed that clear statutory command, the District Court properly dismissed his suit.").

 **\*4**  An FTCA claim "accrues on the date that a plaintiff discovers that he has been injured." Valdez ex rel. Donely v. United States, 518 F.3d 173, 177 (2d Cir. 2008). However, pursuant to the "diligence-discovery rule," which is generally applied in medical malpractice cases under the FTCA, "accrual may be postponed until the plaintiff has or with reasonable diligence should have discovered the critical facts of both his injury and its cause." Kronisch v. United States, 150 F.3d 112, 121 (2d Cir. 1998) (quoting Barrett v. United States, 689 F.2d 324, 327 (2d Cir. 1982)). Discovery of the "critical facts" of injury and causation requires "knowledge of, or knowledge that could lead to, the basic facts of the injury, i.e., knowledge of the injury's existence and knowledge of its cause or of the person or entity that inflicted it[.]" Kronisch, 150 F.3d at 121 (quoting Guccione v. United States, 670 F. Supp. 527, 536 (S.D.N.Y. 1987), aff'd on other grounds, 847 F.2d 1031 (2d Cir. 1988), cert. denied, 493 U.S. 1020 (1990)). A plaintiff does not need to "know each and every relevant fact of his injury or even that the injury implicates a cognizable legal claim," but "a claim will accrue when the plaintiff knows, or should know, enough of the critical facts of injury and causation to protect himself by seeking legal advice." Guccione, 670 F. Supp. at 536.

Plaintiff's first cause of action should be dismissed as plaintiff failed to exhaust this claim. Plaintiff's May 8, 2018 administrative tort claim, alleging the 14-day delay in his release is untimely. Plaintiff filed his original administrative tort claim on July 20, 2015, alleging among other things, a

three-hour delay in his release. Pl's Mem. of Law in Opp. to Def.'s Mot. for Summary Judgment at 8. Plaintiff's July 20, 2015 administrative tort claim made no mention of a 14-day delay in his release. Plaintiff alleges in the instant complaint that he should have been released on February 28, 2014. ECF No. 26, Am. Compl. ¶ 58. However, as plaintiff was released from BOP custody on March 14, 2014, his claim alleging a 14-day delay in his release, accrued on March 14, 2014. Therefore, the two-year statute of limitations for a FTCA claim expired on or about March 14, 2016. While plaintiff posits that he wasn't aware of this claim until he obtained the OIG Study regarding untimely inmate releases, plaintiff's invocation of the discovery rule of accrual is not applicable here. Plaintiff's complaint makes clear that he was aware that he had GCT, that he had calculated his GCT and that he expected to be released on February 28, 2014. ECF No. 26, Am. Compl. ¶¶ 50, 58. Moreover, plaintiff's administrative tort claim filed on July 20, 2015 only alleges a 3-hour delay in his release due to being placed in the SHU. Plaintiff's allegations regarding the OIG study are insufficient to invoke the discovery rule of accrual. Thus, defendants' motion to dismiss plaintiff's first cause of action for false imprisonment should be granted as the claim is time barred.

### b. The BOP's Calculation of Plaintiff's Release Date

Plaintiff's seventh cause of action for negligence includes many allegations; however, plaintiff suggests that his negligence claim is based in part on "the failure of the United States by and through its agents to exercise due care in calculating plaintiff's release date, which ultimately resulted in plaintiff's overdentention [*sic*] in excess of approximately 14 days." Thus, plaintiff argues that BOP's purported incorrect calculation of his release date supports his failure to act negligence claim. According to plaintiff, "if the United States Agents such as BOP were a private entity and had knowledge of a condition which it could eliminate and which would foreseeably cause harm to a specific individual, then its failure to avoid the harm by reasonable means would be actionable negligence." Pl's Mem. of Law in Opp. to Def.'s Mot. for Summary Judgment at 4.

First, as discussed *supra*, plaintiff alleged only a three-hour delay in his release from BOP custody in his administrative tort claim and made no mention of a 14-day delay in release. Thus, this claim is likewise time barred and defendants' motion to dismiss this part of plaintiff's negligence claim should be granted. However, even if plaintiff's claim was not

09-50002-mg    Doc 8569    Filed 11/04/21    Entered 11/04/21 12:54:51    Main Document
Pg 686 of 723

Ojo v. United States, Not Reported in Fed. Supp. (2019)

time barred, the Court should reject plaintiff's characterization of his negligence claim as a failure to act negligence claim. New York law does recognize failure to act negligence claims, and thus, plaintiff is correct that a private analogue exists.

See    Watson v. United States, 133 F. Supp. 3d 502, 526 (E.D.N.Y. Sept. 29, 2015);    Bernstein v. Crazy Eddie, Inc., 702 F. Supp. 962, 986 (E.D.N.Y. 1988) order vacated in part sub nom.    In re Crazy Eddie Sec. Litig., 714 F. Supp. 1285 (E.D.N.Y. 1989) ("Where the wrongful act is a failure to perform a duty and performance of the duty would have prevented the harm, causation is established, at least where the harm was reasonably foreseeable in the event of a dereliction."); Van Hove v. Baker Commodities, Inc., 288 A.D. 2d 927, 732 N.Y.S.2d 803, 804 (4th Dep't 2001) ("A defendant who voluntarily assumes a duty to act with reasonable care toward others may be held liable for breach of that duty if the plaintiff relied on the defendant's undertaking and if the defendant's act or failure to act placed the plaintiff in a more vulnerable position than if the obligation had not been assumed.")

 *5  Although there may be a private analogue for a failure to act claim, that private analogue does not fit plaintiff's allegations here. Plaintiff essentially alleges in his amended complaint, as well as in his opposition brief, that the BOP failed to follow its own regulations or procedures in determining plaintiff's release date. See ECF No. 26, Am. Compl. ¶¶ 174–182. A similar claim was alleged in McGowan, where plaintiff argued that the BOP negligently failed to follow its own disciplinary regulations. McGowan, 825 F.3d at 118. The Court found McGowan's claim was grounded solely on the government's failure to follow its own regulations and plaintiff had failed to establish that New York law recognized such a freestanding duty. Id. at 127. In the instant case, plaintiff alleges that the BOP's failure to follow its own procedures and regulations in accounting for plaintiff's GCT when calculating his release date caused a 14-day delay in his release. While plaintiff characterizes the BOP's conduct as a failure to act negligence claim, plaintiff has failed to demonstrate that New York law recognizes a cause of action for the specific conduct alleged. Therefore, that part of defendants' motion to dismiss plaintiff's failure to act negligence claim should be granted.

The Court next turns to plaintiff's negligent investigation claims in his seventh cause of action. Defendants contend that the Court lacks subject matter jurisdiction over plaintiff's FTCA negligence claim against the United States alleging

negligent investigation because the claim lacks a private analogue. See    28 U.S.C. § 1346(b)(1); def.'s Mot. to Dismiss, or in the Alternative, for Summary Judgment at 5–10.

Although plaintiff does not have to prove liability exists for the exact same act by a private actor, plaintiff must establish a private party would be liable for the alleged claim unless "the government in fact is the only entity that performs the actions complained of."    Liranzo, 690 F.3d at 94 (quoting    Olson, 546 U.S. at 46). A court considers whether or not a "private person analog[y]" exists for the government conduct at issue, id., or whether plaintiff merely complains of "conduct governed exclusively by federal law ... or to conduct of a governmental nature or function that has no analogous liability in the law of torts."    Akutowicz v. United States, 859 F.2d 1122, 1125 (2d Cir. 1988) (internal citations omitted).

Defendants' motion to dismiss plaintiff's negligent investigation claim should be granted as there is no private analogue. New York law does not recognize a cause of action for negligent investigation. Thus, a private person could not be held liable for negligent investigation under New York law. See Watson v. United States, 865 F.3d 123, 134 (2d Cir. 2017) (affirming dismissal of plaintiff's negligent investigation claim for lack of a private analogue); Robinson v. United States, 332 F. Supp. 3d 516, 528 (E.D.N.Y. Aug. 22, 2018) (holding that New York law does not recognize a cause of action for negligent investigation).

### c. Plaintiff's three-hour placement in the SHU

Plaintiff's second, fifth, and sixth causes of action allege false arrest/imprisonment as well as intentional and negligent infliction of emotional distress based on plaintiff being held in the SHU for three hours. Plaintiff's remaining claims in his seventh cause of action allege negligent training based on the BOP's alleged failure to "properly investigate ... violation of BOP rules before ... placement in the SHU as punishment" and "failing to adequately train and supervise personnel performing arrest, handcuffing, and escorting to the SHU." ECF No. 26, Am. Compl. ¶¶ 176–178.

The Government posits that plaintiff's second cause of action, alleging that the United States falsely arrested and

09-50002-mg    Doc 8569    Filed 11/04/21    Entered 11/04/21 12:54:51    Main Document
Pg 687 of 723

Ojo v. United States, Not Reported in Fed. Supp. (2019)

imprisoned plaintiff when MDC staff moved him to the SHU at approximately 8 a.m. on March 14, 2014 should be dismissed as plaintiff was already confined and the detention was privileged. Def.'s Mot. to Dismiss, or in the Alternative, for Summary Judgment at 10–16. Plaintiff alleges that it is undisputed that his release was authorized and approved on or before 8:00 a.m., and that the Government's "after the fact conjured up claims of holding plaintiff in the punitive SHU because of [an] ICE detainer" should not be credited. Pl's Mem. of Law in Opp. to Def.'s Mot. for Summary Judgment at 9–10. The Court must accept plaintiff's pleading as true. Thus, the Court does not consider the ICE detainer on the instant motion to dismiss.

 *6  Plaintiff asserts a claim under the FTCA for false imprisonment. Pursuant to New York law, the elements of false imprisonment are "(1) the defendant intended to confine [the plaintiff], (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged." McGowan, 825 F.3d at 126 (quoting Broughton v. State, 37 N.Y.2d 451, 373 N.Y.S.2d 87, 335 N.E.2d 310, 314 (1975)).

As plaintiff was already confined at MDC at the time of these events, the Court need not address whether plaintiff's confinement was otherwise privileged. Plaintiff was a convicted felon serving his sentence. Plaintiff, by his own admission, was sentenced to 37 months imprisonment by Judge Ross in this Court. ECF No. 26, Am. Compl. ¶ 48.[5] Therefore, plaintiff was in BOP custody pursuant to a judgment of a federal court. See 18 U.S.C. § 3624 (stating in relevant part that "[a] prisoner shall be released by the Bureau of Prisons on the date of the expiration of the prisoner's term of imprisonment, less any time credited toward the service of the prisoner's sentence....") Plaintiff argues that it is undisputed that his release under BOP custody was authorized and approved "on or before 8:00 a.m. of March 14, 2014." Even accepting plaintiff's allegations as true, at 8:00 a.m. on March 14, 2014, plaintiff remained in BOP custody. Moreover, plaintiff's judgment did not specify the time of day he was to be released, nor does any statute mandate the exact time BOP must release a prisoner. It is likewise undisputed that plaintiff was released from BOP custody to two ICE agents at or about 11:00 a.m., approximately three hours later. Even if BOP had approved plaintiff's release at 8:00 a.m. and then failed to honor that approval, that decision would not state a claim for false

imprisonment. The BOP has broad discretion to determine the terms of an inmate's incarceration, and the exercise of such discretion will be upheld if it is not arbitrary and capricious. See Bell v. James, No. 88 Civ. 1683, 1988 WL 52867 (S.D.N.Y. May 17, 1988) (finding that BOP's refusal to release plaintiff 90 days early, even if previously approved, did not constitute a deprivation of plaintiff's rights unless it was determined to be arbitrary and capricious).

To the extent that plaintiff's allegations could be liberally construed as a claim for wrongful confinement, the Court should reject that argument. Courts have described the tort of wrongful confinement as a "species of false imprisonment." Gittens v. State, 504 N.Y.S.2d 969, 972 (N.Y. Ct. Cl. 1986). As the tort of wrongful confinement lacks a private analogue, the Court lacks subject matter jurisdiction to entertain a such claim. McGowan, 825 F.3d 118 at 126. Therefore, defendants' motion to dismiss plaintiff's second cause of action for false arrest/false imprisonment should be granted.

## B. Discretionary Function Exception

The Court next considers plaintiff's remaining negligence claims in his fifth, sixth, and seventh causes of action for intentional and negligent infliction of emotional distress. The Government argues that plaintiff's claims for "failing to adequately train and supervise personnel" and "creating and/or sanctioning policies" are barred by the FTCA's discretionary function exception. Def.'s Mot. to Dismiss, or in the Alternative, for Summary Judgment at 8–10. The Court agrees.

 *7  The FTCA's discretionary function exception to the federal government's limited waiver of sovereign immunity bars liability for "any claim ... based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). If a claim falls within this exception, it follows that the Court lacks subject matter jurisdiction to entertain the claim. The discretionary function exception "precludes claims based on day-to-day management decisions if those decisions require judgment as to which of a range of permissible course[s] is the wisest." Ortiz v. United States, No. 01 Civ. 4665, 2002 WL 1492115, at *2 (S.D.N.Y. July 11, 2002). For the exception to apply, the Government must meet two criteria: "(1) the acts alleged to be negligent must be discretionary, in that they involve

an element of judgment or choice and are not compelled by statute or regulation, and (2) the judgment or choice in question must be grounded in considerations of public policy or susceptible to policy analysis." USAA Cas. Ins. Co. v. Permanent Mission of Republic of Namibia, 681 F.3d 103, 111–12 (2d Cir. 2012) (quoting Coulthurst v. United States, 214 F.3d 106, 109 (2d Cir. 2000)).

Applying that standard, courts in this Circuit have consistently held that training, hiring, screening, and supervision decisions are discretionary in nature. See, e.g., Hekmat v. U.S. Transp. Sec. Admin., 247 F. Supp. 3d 427, 437–38 (S.D.N.Y. 2017) (holding that TSA's hiring procedures are discretionary and involve matters of public policy); Riascos-Hurtado v. United States, No. 09 CV 0003, 2015 WL 3603965, at *7 (E.D.N.Y. June 5, 2015) (concluding that "plaintiffs allegations of negligent screening, hiring, and training cannot survive the discretionary function inquiry"); Saleh v. United States, No. 12 Civ. 4598, 2013 WL 5439140, at *10 (S.D.N.Y. Sept. 27, 2013) (finding that the discretionary function bars failure to train and supervise claims); Saint-Guillen v. United States, 657 F. Supp. 2d 376, 387 (E.D.N.Y. 2009) (holding that where a complaint does not allege any misconduct regarding defendant's hiring, retention, and training practices, such practices are discretionary); Cuoco v. United States Bureau of Prisons, No. 98 Civ. 9009, 2003 WL 22203727, at *6 (S.D.N.Y. Sept. 22, 2003) (holding that "challenges to the personnel decisions of the United States are barred by the discretionary function exception to the FTCA.").

Plaintiff's claims that the BOP "failed to adequately train and supervise personnel," "failed to adequately train and supervise personnel handling sealed inmates' complaint[s]", "failed to properly secure plaintiff's property," and "creat[ed] and/or sanction[ed] policies, patterns practices and customs of selecting inmates to arrest, detain, assault, batter[ ] and mistreat[ ] based on their race and/or nationality" should be dismissed as these claims are barred by the discretionary function exception. Training and supervising BOP personnel is inherently discretionary and involves matters of public policy. Under 18 U.S.C. § 4042(a), the Bureau of Prisons shall "have charge of the management and regulation of all Federal penal and correctional institutions." The statute does not direct the BOP how to fulfill its duties, nor does the statute mandate particular conduct by the BOP. The statute gives the BOP officials great discretion to administer their duties as they see fit. See Needham v. United States, No. 17 Civ.

05944, 2018 WL 3611944, at *4 (S.D.N.Y. July 27, 2018) (holding that Section 4042(a) is discretionary because it "does not dictate how the BOP should achieve [the] goals" it lists); Enigwe v. Zenk, No. 03 CV 854, 2007 WL 2713849, at *8 (E.D.N.Y. Sept. 14, 2007) (holding that "in general decisions regarding the best way to safeguard prisoners are discretionary in nature"); Scrima v. Hasty, No. 97 Civ. 8433, 1998 WL 661478, at *3 (S.D.N.Y. Sept. 24, 1998) (finding Section 4042(a) "sets forth no particular conduct the BOP personnel should engage in or avoid while attempting to fulfill their duty to protect inmates") (quoting Calderon v. United States, 123 F.3d 947, 950 (7th Cir. 1997)).

*8  Considering the second prong of the discretionary function exception, "If a regulation allows the employee discretion, the very existence of the regulation creates a strong presumption that a discretionary act authorized by the regulation involves consideration of the same policies which led to the promulgation of the regulations." United States v. Gaubert, 499 U.S. at 315, 324. "For a complaint to survive a motion to dismiss, it must allege facts which would support a finding that the challenged actions are not the kind of conduct that can be said to be grounded in the policy of the regulatory regime. The focus of the inquiry is not on the agent's subjective intent in exercising the discretion conferred by statute or regulation, but on the nature of the actions taken and on whether they are susceptible to policy analysis." Id. at 324–25.

Plaintiff's failure to train and supervise claim also meets the second prong of the discretionary function exception, which provides that the "judgment or choice in question must be grounded in considerations of public policy or susceptible to policy analysis." USAA Cas. Ins. Co., 681 F.3d at 111–12. Defendants' motion to dismiss plaintiff's seventh cause of action and remaining negligence claim that the BOP failed to properly train and supervise personnel should therefore be granted.

Plaintiff alleges defendants committed the torts of intentional infliction of emotional distress ("IIED") and negligent infliction of emotional distress ("NIED"). Unlike other intentional torts, neither intentional nor negligent infliction of emotional distress is explicitly listed as an exception to the Government's waiver of sovereign immunity under 28 U.S.C. § 2680(h). Therefore, these torts may be excluded. However, the Court need not decide whether such an exclusion would

apply, because any intentional and/or negligent infliction of emotional distress claim would be barred by the discretionary function exception here. The Court notes that the Government has not asserted the discretionary function exception with respect to plaintiff's FTCA claims for intentional and negligent infliction of emotional distress concerning his detention in the SHU. However, the issue implicates this Court's subject matter jurisdiction, so the Court should address it *sua sponte*. See Hart v. United States, 630 F.3d 1085, 1089 (8th Cir. 2011) (holding that district court did not err in *sua sponte* considering whether FTCA's discretionary-function exception applied); Roberts v. United States, 85 F.3d 637 (9th Cir. 1996) ("Although the Government does not argue on appeal that the discretionary function exception to the FTCA applies, we address this question of jurisdiction *sua sponte* and review it *de novo*."); See also Barone v. United States, No. 12 Civ. 4103, 2014 WL 4467780, *12 (S.D.N.Y. Sept. 10, 2014).

Plaintiff states that defendants "intentionally engaged in extreme and outrageous conduct, namely the ... unreasonable and unjustifiable seizure" and defendants "cause[d] plaintiff to be held in custody at the SHU" and "negligently cause[d] plaintiff to remain incarcerated ... beyond his expected release date[.]" ECF No. 26, Am. Compl. ¶¶ 150–57; 158–65. Plaintiff's intentional and negligent infliction of emotional distress claims arise out of plaintiff's placement in the SHU for approximately three hours. Generally, courts have deemed the federal government immune with respect to claims that lie in BOP's decision to place an inmate in SHU away from the prison's general population. Barone, 2014 WL 4467780, at *12. In Young v. United States, the Court explained "[d]ecisions about which inmates must be separated from other inmates are susceptible to policy analysis, as they 'involve a balancing of a number of public policy considerations including the inmate safety, the ability of inmates to move about the facility, general concerns for prison security, and the effective use of limited resources.' " Young v. United States, 12 CV 2342, 2014 WL 1153911, at *11 n. 5 (E.D.N.Y. 2014) (quoting Ortiz, 2002 WL 1492115, at *4); Winters v. United States, 10 Civ. 7571, 2013 WL 1627950, at *2, *5 (S.D.N.Y. April 16, 2013); accord Enigwe, 2007 WL 2713849, at *8 ("decisions regarding the best way to safeguard prisoners are discretionary in nature").

**\*9** The decision to place plaintiff in the SHU for three hours was inherently within the BOP's discretion. Numerous courts have found decisions regarding prison management, inmate security, and the security of officers are policy considerations.

Accordingly, the discretionary-function exception applies to plaintiff's FTCA claims for IIED and NIED premised on his three-hour detention in the SHU. Thus, defendants' motion to dismiss plaintiff's fifth and sixth causes of action should be granted.

Moreover, even if plaintiff's intentional infliction of emotional distress claim wasn't subject to the discretionary function exception, plaintiff's allegations do not meet the stringent requirements of New York tort law. Under New York law, IIED has four elements: "(i) extreme and outrageous conduct; (ii) intent to cause, or disregard of a substantial possibility of causing, severe emotional distress; (iii) a causal connection between the conduct and injury; and (iv) severe emotional distress." Howell v. New York Post Co., 81 N.Y.2d 115, 121 (1993). A defendant can only be held liable in limited instances where "the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." Id. (quoting Murphy v. Am. Home Prods. Corp., 58 N.Y.2d 293, 303 (1983)). "Whether the conduct alleged may reasonably be regarded as so extreme and outrageous as to permit recovery is a matter for the court to determine in the first instance." Stuto v. Fleishman, 164 F.3d 820, 827 (2d Cir. 1999) (citations omitted).

Plaintiff's allegations do not meet this high threshold. Plaintiff states that the defendants "intentionally engaged in extreme and outrageous conduct, namely the ... unreasonable and unjustifiable seizure" and "such extreme and outrageous conduct shocks the conscious[.]" Even construing plaintiff's complaint liberally, however, the conduct that plaintiff alleges is not sufficiently "extreme and outrageous" to state a claim under the New York IIED standard. "New York sets a high threshold for conduct that is 'extreme and outrageous.' " Bender v. City of N.Y., 78 F.3d 787, 790 (2d Cir. 1996). It has been described by the New York State Court of Appeals as conduct "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Murphy, 448 N.E.2d at 90. Moreover, merely stating that the conduct is extreme and outrageous and caused mental suffering, embarrassment, and humiliation without "specific facts or circumstances" to support plaintiff's allegations "fails even the liberal pleading standard of Rule 12(b)(6). De Jesus v. Sears, Roebuck

& Co., 87 F.3d 65, 70 (2d Cir. 1996) (quoting Palda v. Gen. Dynamics Corp., 47 F.3d 872, 875 (7th Cir. 1995)). Thus, defendants' motion to dismiss should be granted as plaintiff fails to allege conduct that is sufficiently "extreme and outrageous."

#### C. Plaintiff's Excessive Handcuffing

Plaintiff's third and fourth causes of action allege assault and battery for excessive force in handcuffing as well as physical and verbal abuse. "In order to sustain a cause of action to recover damages for assault, there must be proof of physical conduct placing the plaintiff in imminent apprehension of harmful contact." Timothy Mc. v. Beacon City School Dist., 127 A.D.3d 826, 829, 7 N.Y.S.3d 348, 352 (App. Div. 2d Dep't 2015) (internal citations omitted). "[T]o support an action based on assault, intent is an essential element." Flamer v. City of Yonkers, 309 N.Y.I 14, 119 (1955).

**\*10** "To recover damages for battery founded on bodily contact, a plaintiff must prove that there was bodily contact, that the contact was offensive, and that the defendant intended to make the contact without the plaintiff's consent." Roe v. Barad, 230 A.D.2d 839, 840 (App. Div. 2d Dep't 1996). "An action for battery may be sustained without a showing that the actor intended to cause injury as a result of the intended contact, but it is necessary to show that the intended contact was itself 'offensive', i.e., wrongful under all the circumstances." Zgraggen v. Wilsey, 200 A.D.2d 818, 819 (App. Div. 3d Dep't 1994).

The same excessive force principles apply to the FTCA causes of action for assault and battery against the United States. See 28 U.S.C. § 1346(b)(1) (incorporating substantive tort law of the forum state into FTCA); Gomez v. City of New York, No. 05 Civ. 2147, 2007 WL 5210469, at \*11 (S.D.N.Y. Nov. 1, 2004) (explaining that New York law of assault and battery parallels federal law regarding excessive force). To prevail on his FTCA cause of action, plaintiff must "demonstrate that the amount of force used was objectively unreasonable." See Kramer v. City of New York, No. 04 Civ. 106, 2004 WL 2429811, at \*11 (S.D.N.Y. Nov. 1, 2004).

Plaintiff fails to allege sufficient facts to state a claim for assault and battery under the FTCA. Plaintiff alleges that

defendants "created apprehension in plaintiff of an offensive touching," and "pulled plaintiff's hands and excessively placed handcuffs on his wrists without his consent." ECF No. 26, Am. Compl. ¶¶ 95–108; 136–42; 143–49. However, there is consensus in the Second Circuit that tight handcuffing does not constitute excessive force unless it causes some injury beyond temporary discomfort. See, e.g., McGarrell v. Arias, No. 18 Civ. 2273, 2019 WL 1254880, at \*2 (S.D.N.Y. 2019) (granting motion to dismiss pre-trial detainee's excessive force claim for a short period of handcuffing without further injury); Burrough v. Petrone, 138 F. Supp. 3d 182, 213 (N.D.N.Y. 2015) (granting motion to dismiss inmate's excessive force claim where only pain, swelling, and bruising was alleged as a result of the handcuffing); Jackson v. City of New York, 939 F. Supp. 2d 219, 231 (E.D.N.Y. 2013) (finding that to sufficiently plead an excessive force claim based upon tight handcuffing, the plaintiff must allege more than a temporary injury); Anderson v. Sullivan, 702 F. Supp. 424, 427 (S.D.N.Y. 1988) (finding officers' use of force, pushing an inmate into a bar and putting his hands behind his back to apply handcuffs, was not significantly disproportionate to the legitimate goal of handcuffing the inmate while transporting him within the facility); see also Wilder v. Vill. of Amityville, 288 F. Supp. 2d 341, 344 (E.D.N.Y. 2003) ("[p]laintiff's allegation of sore, yet uninjured, wrists simply does not rise to the level of objective excess that reasonable police officers would consider to be unlawful conduct in an arrest situation[ ]"). As plaintiff does not allege any specific injury related to his excessively tight handcuffing claim, defendants' motion to dismiss plaintiff's third and fourth causes of action should be granted.

#### III. Bivens

A claim under Bivens seeks to hold persons acting under color of federal law accountable for their conduct that violates a plaintiff's constitutional rights. Specifically, the Supreme Court recognized an "implied private action for damages against federal officers alleged to have violated a citizen's constitutional rights." Bivens 403 U.S. at 388; McGowan, 825 F.3d at 123 (quoting Corr. Servs. Corp. v. Malesko, 534 U.S. 61, 66 (2001)); Arar v. Ashcroft, 585 F.3d 559, 571 (2d Cir. 2009) ("The purpose of the Bivens remedy 'is to deter individual federal officers from committing constitutional violations.' ") (quoting Malesko, 534 U.S. 61, 70): accord FDIC v. Meyer, 510 U.S. 471, 485 (1994).

Under Bivens, a plaintiff may recover against federal actors in their individual capacities for conduct undertaken under color of federal authority. M.E.S., Inc. v. Snell, 712 F.3d 666, 671 (2d Cir. 2013); Thomas v. Ashcroft, 470 F.3d 491, 496 (2d Cir. 2006). To do so, plaintiff must allege that the individual federal defendants directly participated in the alleged constitutional violation. Turkmen v. Hasty, 789 F.3d 218, 233 (2d Cir. 2015) (reversed in part, vacated in part on other grounds); Arar, 585 F.3d at 569; Thomas, 470 F.3d at 496–97; Nwaokocha v. Hagge, 47 Fed. Appx. 55, 56 (2d Cir. 2002). Thus, plaintiff "must ... prove a deliberate abuse of governmental power rather than mere negligence[.]" Schweiker v. Chilicky, 487 U.S. 412, 447 (1988).

\*11  The Supreme Court has recognized a Bivens remedy in three circumstances. The Bivens Court originally implied a private right of action under the Fourth Amendment against FBI agents for an unreasonable search and seizure claim when the defendants handcuffed a man in his home without a warrant. Bivens, 403 U.S. at 389, 397. The Supreme Court has since recognized Bivens claims under (1) the Fifth Amendment's Due Process Clause for gender discrimination when a congressman fired his female secretary, Davis v. Passman, 442 U.S. 228 (1979), and under (2) the Eighth Amendment's prohibition against cruel and unusual punishment when prison officials failed to treat an inmate's asthma, which ultimately led to the inmate's death. Carlson v. Green, 446 U.S. 14 (1980). Courts have relied on Bivens to imply causes of actions while acknowledging that the remedy itself is "extraordinary" and should "rarely if ever be implied in 'new contexts' " Arar, 585 F.3d at 571 (quoting Malesko, 534 U.S. at 69).

In Ziglar v. Abbasi, 137 S. Ct. 1843 (2017), the Supreme Court made clear that courts should not imply rights and remedies under Bivens beyond the three contexts already recognized. In Ziglar, the Court provided a two-step analysis to determine whether to imply a Bivens cause of action in a new context. The Court held that "if the case is different in a meaningful way to previous Bivens cases by the [Supreme Court], then the context is new." Ziglar, 137 S. Ct. at 1859. The Supreme Court offered the following "examples that might prove instructive":

A case might differ in a meaningful way because of the rank of the officers involved; the constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted; the statutory or other legal mandate under which the officer was operating; the risk of disruptive intrusion by the Judiciary into the functioning of other branches; or the presence of potential special factors that previous Bivens cases did not consider.

Id. at 1859–1860.

If a case implicates a new Bivens context, the Court then asks, "whether any alternative, existing process for protecting the interest amounts to a convincing reason for the Judicial Branch to refrain from providing a new and freestanding remedy in damages." Id. at 1857–58. Notwithstanding whether an alternative remedy exists, a federal court must also conduct a specific analysis, "paying particular heed ... to any special factors counselling hesitation before authorizing a new kind of federal litigation," which is often referred to as the special factors analysis Id. (internal quotation marks omitted). "The Court's precedents now make clear that a Bivens remedy will not be available if there are special factors counselling hesitation in the absence of affirmative action by Congress." Id.

### 1. Plaintiff's Claims Present New Bivens Contexts

Plaintiff's eighth, ninth, tenth, eleventh, twelfth, thirteenth, fourteenth, fifteenth, and sixteenth causes of action allege Bivens claims in new contexts. Plaintiff's thirteenth cause of action, alleging a violation of his First Amendment rights due to defendants alleged "retaliat[ion] against plaintiff by ... placing plaintiff in the SHU ... as a direct consequence of his several grievances and complaints" most notably presents a new Bivens context. As discussed supra, Bivens involved a Fourth Amendment warrantless entry into plaintiff's home; Davis involved a Fifth Amendment gender discrimination claim; and Carlson involved an Eighth Amendment claim

for failure to treat an inmate's asthma. None of the cases in which a Bivens remedy has been permitted include an alleged First Amendment violation. Thus, plaintiff's First Amendment claims present a new Bivens context.

**\*12**  Plaintiff's remaining Bivens claims, while presenting new contexts, require additional analysis as there is overlap in the constitutional violations with Bivens, Davis, and Carlson. Plaintiff's eighth and ninth causes of action for false arrest and false imprisonment under the Fourth Amendment, like his related FTCA claims, allege that plaintiff was arrested without probable cause and placed in the SHU. ECF No. 26, Am. Compl. ¶¶ 183–190; 198. However, plaintiff further alleges that he was strip searched and left "naked to the eyes of every male and female officers that passed ... around the cell and caused plaintiff embarrassment[ ] and emotional trauma." ECF No. 26, Am. Compl. ¶¶ 103–104; 184–192. The factual context of plaintiff's Fourth Amendment search and seizure claim differs from the three cases that have extended a Bivens remedy. Moreover, the "legal mandate" in Bivens, arresting plaintiff in his home without a search warrant, differs from the instant case, where plaintiff was in BOP custody and alleges that he was falsely arrested and placed in the SHU.[6] Plaintiff's eighth and ninth causes of action also differ in a meaningful way to previous Bivens cases, thus presenting new Bivens contexts.

Even assuming plaintiff's eighth and ninth causes of action do not present a new Bivens context, plaintiff fails to allege sufficient facts to sustain a claim for an unconstitutional strip search. See Florence v. Bd. of Chosen Freeholders of Cty. of Burlington, 566 U.S. 318, 339 (2012) (finding that invasive strip searches where the officers instructed detainees to remove their clothes, without touching detainees, did not violate the Fourth Amendment as the search was reasonably related to the needs of the institution): see also Montgomery v. Hall, No. 11 Civ. 4645, 2013 WL 1982920, at \*4 (S.D.N.Y. May 15, 2013) ("That the search was conducted without 'partitions' and 'male or female officers [were] out and about carrying out their duties' similarly does not show that the strip search was overly invasive or went beyond the scope of what was necessary."). In Smith v. City of N.Y., No. 14 Civ. 5934, 2015 WL 3929621, at \*2 (S.D.N.Y. June 17, 2015) the Court found that in order to state a viable claim that a strip search was unconstitutional, a "plaintiff must allege facts suggesting that the search did not serve a legitimate penological purpose, but was instead designed to intimidate, harass, or embarrass him." The Court also observed that while

plaintiff may "object[ ] to the fact that the strip searches were conducted in view of the institution's video cameras and other inmates ... neither the presence of cameras nor the presence of other inmates and employees of a correctional facility makes an otherwise constitutional strip search unconstitutional." Id. Here, plaintiff alleges that he was "directed ... to remove his clothes" and left in view of "every male and female officer." These allegations fail to state a claim that defendants violated his constitutional rights. Accordingly, defendants' motion to dismiss plaintiff's Bivens claims arising from the strip search should be granted.

Plaintiff's twelfth, fourteenth, and fifteenth causes of action allege a deprivation of due process rights as well as violations of the Fifth and Fourteenth Amendments.[7] While these causes of actions implicate the same constitutional rights as the plaintiff in Davis, they are presented in a new Bivens context. The Supreme Court has made clear that a plaintiff may present a new Bivens context even if a claim asserts the same constitutional violation as previously recognized in a Bivens action. Compare, Davis, 442 U.S. at 243–44 (permitting Bivens action against a Congressman for violation of an employee's Fifth Amendment due process rights) with Schweiker, 487 U.S. at 428–29 (1988) (refusing to permit a Bivens action for violations of Fifth Amendment due process rights in a social security context). See also Wilkie v. Robbins, 551 U.S. 537, 541 (2007) (refusing to extend Bivens to invasion of property rights under the Fifth Amendment); Malesko, 534 U.S. at 63 (refusing to extend Bivens to alleged Eighth Amendment violations by employees of private prisons). Here, plaintiff's purported Fifth Amendment violation for plaintiff's alleged unlawful arrest and placement in the SHU arise from wholly different factual circumstances than Davis, which related to gender discrimination in the workplace. Moreover, the Supreme Court has never recognized a specific Bivens remedy regarding a prisoner's placement in the SHU. Therefore, plaintiff's claims alleging deprivation of his due process rights as well as his alleged violations of the Fifth Amendment present claims arising in new Bivens contexts. See Gonzalez v. Hasty, 269 F. Supp. 3d 45, 59 (E.D.N.Y. Sept. 18, 2017) (finding that plaintiff's Fifth Amendment claim alleging failure of prison employees to conduct meaningful reviews of a plaintiff's placement in the SHU presented a new Bivens context.)

**\*13** Plaintiff's tenth, eleventh, and sixteenth causes of action for assault, battery, and failure to intervene allege that defendants "touched and pulled plaintiff's hands and excessively placed handcuffs on his hand[s]," placed him in the SHU, and other officers, who plaintiff fails to specify, "had an affirmative duty to intervene on behalf of plaintiff." ECF No. 26, Am. Compl. ¶¶ 199–208; 240–245. Construing plaintiff's complaint liberally, plaintiff alleges excessive force and failure to intervene/failure to protect claims under the Eighth Amendment. See Graham v. Connor, 490 U.S. 386, 395 (1989) ("After conviction, the Eighth Amendment 'serves as the primary source of substantive protection ... in cases ... where the deliberate use of force is challenged as excessive and unjustified' " (quoting Whitley v. Albers, 475 U.S. 312, 327 (1986))); Bonilla v. Jaronczyk 354 Fed. Appx. 579, 580 (2d. Cir. 2009) (stating that "post-conviction excessive force claims ... are properly considered under the Eighth Amendment). To the extent that plaintiff's excessive force claims arise under the Eighth Amendment, there are meaningful differences between plaintiff's allegations of excessive handcuffing and the indifference to serious medical needs at issue in Carlson. Since no Supreme Court decision has ever extended Bivens to encompass the specific context presented by plaintiff's excessive force claims, this cause of action presents a new Bivens context. Nor has the Supreme Court considered a Bivens claim arising out of a prison official's failure to intervene/failure to protect. Thus, plaintiff's tenth, eleventh, and sixteenth causes of action differ in a meaningful way to previous Bivens cases.

Even if plaintiff's excessive force and failure to intervene/failure to protect claim is not considered a new Bivens context, defendants' motion to dismiss these claims should still be granted as plaintiff's allegations are conclusory. In a Bivens action, a plaintiff "must plead that each Government-official defendant, through the official's own individual actions, violated the Constitution." Iqbal, 556 U.S. at 676. "[V]icarious liability is inapplicable to Bivens and § 1983 suits," and, therefore, "each Government official ... is only liable for his or her own misconduct." Id. at 676–77; Elufe v. Aylward, No. 09 CV 458, 2011 WL 477685, at *8 (E.D.N.Y. Feb. 4, 2011) (granting summary judgment "based on the lack of any evidence that [the officer defendants] were personally involved in the use of force"). " 'It is well-settled that where the complaint names a defendant in the caption but contains no allegations indicating how the defendant violated the law or injured the plaintiff, a motion to dismiss

the complaint in regard to that defendant should be granted.' " Moschetto v. Nassau Cnty. Sheriff, No. 10 CV 1971, 2011 WL 2457927, at *3 (E.D.N.Y. June 16, 2011) (citing Dove v. Fordham Univ., 56 F. Supp. 2d 330, 335 (S.D.N.Y. 1999)).

Here, plaintiff's complaint fails to allege facts regarding the individual defendants' participation in his excessive force and/or failure to intervene claims. Indeed, many of the paragraphs in the complaint to which plaintiff directs the Court in his opposition include allegations against all defendants, rather than allegations specific to any individual defendant's role in the alleged constitutional violations. In other instances, plaintiff alleges by name that all defendants are responsible for certain conduct. ECF No. 26, Am. Compl. ¶¶ 199–208; 240–245. The Complaint also includes generic recitations of allegations such as "defendants ... intentionally ... assault[ed] ... plaintiff [and] had the real or apparent ability to cause imminent harmful and/or offensive bodily conduct to plaintiff[.]" Id. at ¶ 200.

Plaintiff's conclusory, non-specific allegations, are plainly insufficient. See Barbera v. Smith, 836 F.2d 96, 99 (2d Cir. 1987) (dismissing claims that did not allege "any personal involvement" by defendant), cert. denied 489 U.S. 1065 (1989); Carbajal v. Cnty. of Nassau, 271 F. Supp. 2d 415, 421 (E.D.N.Y. 2003) ("[T]here are no factual allegations against [defendant]; he appears only in the caption of the complaint. [...] Accordingly, the complaint fails to allege sufficient personal involvement by [defendant]."). Accordingly, the Court should grant defendants' motion to dismiss plaintiff's tenth, eleventh, and sixteenth causes of action against the individual defendants as the complaint fails to sufficiently allege the individual defendants' personal involvement. [8]

### 2. Special Factors analysis

**\*14** Having found that plaintiff's claims present new Bivens contexts, the Court next considers whether there are any special factors counseling against a judicially-created damages remedy, including whether any alternative remedies exist. Here, plaintiff's Bivens claims rely on the same facts as alleged in his FTCA claims: e.g., false imprisonment, false arrest, assault, and battery. It matters not whether plaintiff's alternative claims will succeed. See Sanford v. Bruno, No. 17 CV 5132, 2018 WL 2198759, at *7 (E.D.N.Y. May 14, 2018) (finding the remedies that existed "to address plaintiff's situation here are thus adequate for purposes of determining whether to imply a Bivens remedy—even though those remedies did not work in this instance."); Turkmen

v. Ashcroft, No. 02 CV 2307, 2018 WL 4026734, at *13 (E.D.N.Y. Aug. 13, 2018) (collecting cases); Gonzalez, 269 F. Supp. 3d 45, 61 (E.D.N.Y. 2017), aff'd, No. 17 CV 3790, 2018 WL 5960773 (2d Cir. Nov. 14, 2018) (declining to extend a Bivens remedy for confinement in special housing unit); see also Vega v. United States, 881 F.3d 1146, 1153–54 (9th Cir. 2018) (finding plaintiff's failure to bring negligence claims in addition to Bivens claims does not affect the status of the negligence claims as an adequate alternative process).

Moreover, regarding plaintiff's First Amendment claim, Courts have held that special factors counsel against extending a Bivens remedy to violations of the First amendment. Courts have reasoned that extending a Bivens remedy in the First Amendment context would "impose substantial costs, in both time and money, upon individual officers and employees of the federal government, that federal officials' own First Amendment rights could suffer, and there is already an "existing patchwork of federal statutes that provide accountability for federal officials." See Akande v. Philips, No. 17 CV 01243, 2018 WL 3425009, at *8 (W.D.N.Y. 2018); Davila v. Gutierrez, 330 F. Supp. 3d 925 (S.D.N.Y. Aug. 30, 2018) (considering costs imposed on the federal government as special factors counseling against extending a Bivens remedy to the First Amendment); see also Storms v. Shinseki, 319 F. Supp. 3d 348, 355 (D.D.C. Aug. 6, 2018) ("Ultimately, in the complex, fraught arena of free speech, Congress is better suited than the Judiciary to determine whether a damages action should arise.").

Regarding plaintiff's twelfth, fourteenth, fifteenth, and sixteenth causes of action for violation of due process, violation of the Fifth Amendment, and failure to intervene/ failure to protect claims, special factors counsel against a new Bivens remedy. See Ziglar, 137 S. Ct. at 1865 (noting that post-Carlson, "Congress passed the Prison Litigation Reform Act of 1995, which made comprehensive changes to the way prisoner abuse claims must be brought in federal court [without providing for a standalone damages remedy against federal jailers]," therefore, "Congress had specific occasion to consider the matter of prisoner abuse and to consider the proper way to remedy those wrongs"). Thus, the availability of alternative relief by way of the BOP administrative grievance process and congress's legislation in

the area of prisoners' rights are special factors that counsel against recognizing a Bivens remedy to address plaintiff's twelfth, fourteenth, fifteenth, and sixteenth causes of action.

See Carmona v. U.S. Bureau of Prisons, 243 F.3d 629, 632 (2d Cir. 2001) (observing that habeas relief "under § 2241 is available to a federal prisoner who does not challenge the legality of his sentence, but challenges instead its execution subsequent to his conviction."). As there is no Bivens remedy for plaintiff's claims here, the Court should grant defendants' motion to dismiss plaintiff's Bivens claims against the individual defendants.

## CONCLUSION

Accordingly, it is respectfully recommended that defendants' motion to dismiss plaintiff's amended complaint should be granted, and plaintiff's amended complaint should be dismissed in its entirety. [9]

## FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION

**\*15** Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) (2) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections. See also Fed. R. Civ. P. 6. Such objections (and any responses to objections) shall be filed with the Clerk of the Court. Any request for an extension of time to file objections must be made within the fourteen-day period. Failure to file a timely objection to this Report generally waives any further judicial review. Marcella v. Capital Dist. Physicians' Health Plan. Inc., 293 F.3d 42, 46 (2d Cir. 2002); Small v. Sec'y of Health & Human Servs., 892 F.2d 15, 16 (2d Cir. 1989); see Thomas v. Arn, 474 U.S. 140 (1985).

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2019 WL 3852391

Ojo v. United States, Not Reported in Fed. Supp. (2019)

## Footnotes

1    Defendants provided plaintiff the requisite notice under Local Civil Rules 12.1 and 56.2.

2    Plaintiff does not allege when or how defendants became aware of plaintiff's past grievances and civil rights actions.

3    The Clerk of Court is directed to send plaintiff the attached copies of all the unreported cases cited herein.

4    Plaintiff attaches his July 20, 2015 administrative claim to his amended complaint. Thus, the Court may consider the administrative claim when deciding defendants' motion to dismiss.

5    The Court takes Judicial notice of the sentence imposed in USA v. Ojo, No. 13 CR 334 (E.D.N.Y. Feb. 27, 2014).

6    See ⬜ Ziglar, 137 S. Ct. at 1860 (observing that the Court looks at factors such as "the rank of the officers involved," "the constitutional right at issue," and the "statutory or legal mandate under which the officer was operating" in determining whether the new Bivens action involves a new context.)

7    Plaintiff's claims under the Fourteenth Amendment are inapposite as plaintiff's claims are against individuals acting under federal law. Thus, the Court considers these claims under the Fifth Amendment.

8    Plaintiff includes allegations against Lieutenant Metzger in his 56.1 counterstatement, but Metzger is not named as a defendant, and there are no allegations against Metzger in plaintiff's amended complaint. The

     Court does not consider allegations made for the first time in opposition to a dispositive motion. See ⬜ Wright v. Ernst & Young LLP, 152 F.3d 169, 178 (2d Cir. 1998) (noting that a party cannot amend its complaint through statements made in motion papers).

9    Plaintiff has already amended his complaint once. As the Court would lack subject matter jurisdiction or plaintiff's claims would be subject to dismissal for failure to state a claim, leave to amend should not be

     granted as any amendment would be futile. See ⬜ Foman v. Davis, 371 U.S. 178. 182 (1962) (noting where amendment would be futile, denial of leave to amend is proper.)

---

**End of Document**                                      © 2021 Thomson Reuters. No claim to original U.S. Government Works.

**EXHIBIT M**

2019 WL 9051000
Only the Westlaw citation is currently available.
United States District Court, C.D. California.

Valeria MERCADO

v.

AUDI OF AMERICA, LLC, et al.

Case No. ED CV18-02388 JAK (SPx)
|
Filed 11/26/2019

**Attorneys and Law Firms**

Andrea Keifer, Deputy Clerk, Attorneys Present for Plaintiffs:
Not Present

Not Reported, Court Reporter / Recorder, Attorneys Present
for Defendant: Not Present

**Proceedings: (IN CHAMBERS) ORDER RE
DEFENDANT'S MOTION TO DISMISS SECOND
AMENDED CLASS ACTION COMPLAINT (DKT. 81)**

The Honorable JOHN A. KRONSTADT, UNITED STATES
DISTRICT JUDGE

**I. Introduction**

 **\*1**  On November 9, 2018, Valeria Mercado ("Mercado"),
on behalf of herself and others similarly situated, brought this
putative class action against Audi of America, LLC ("Audi
LLC") and Volkswagen Group of America, Inc., d/b/a Audi of
America, Inc. ("Audi") (collectively, "Defendants"). Dkt. 1.
The complaint advanced several causes of action, including:
(i) violation of the Consumer Legal Remedies Act ("CLRA"),
Cal Civ. Code § 1750 et seq.; (ii) violation of the California
Unfair Competition Law ("UCL"), Cal. Bus & Prof. Code
§ 17200 et seq.; (iii) negligence; (iv) product liability --
design defect; (v) violation of the Magnuson-Moss Warranty
Act, 15 U.S.C. § 2301 et seq.; (vi) violation of the Song-
Beverly Consumer Warranty Act, Cal. Civ. Code § 1790 et
seq; and (vii) violation of the statutes of certain other states
that prohibit unfair and deceptive acts and practices. Id. at
2. The claims arose out of allegedly defective brake systems
installed in certain vehicles, which cause a "high-pitched
squealing noise" when used. Id. ¶¶ 2-4.

A First Amended Complaint ("FAC") was filed on February
22, 2019. Dkt. 53. It advanced the same causes of action, and
added a second plaintiff, Jacob Whitehead ("Whitehead"). Id.
at 2. On May 1, 2019, the parties stipulated to the filing of a
Second Amended Complaint ("SAC"), which was approved.
Dkt. 78. The SAC, which is the operative one, was filed the
same day. Dkt. 79. It advances the same causes of action,
but replaces Whitehead with Andrea Kristy Anne Holmes
("Holmes") (together with Mercado, "Plaintiffs"), and names
only Audi ("Defendant"). Id. at 2.

On May 17, 2019, Defendant filed a Motion to Dismiss
Second Amended Class Action Complaint (the "Motion").
Dkt. 81. Plaintiffs opposed on May 30, 2019. Dkt. 86.
Defendant replied on June 10, 2019. Dkt. 87. A hearing on
the Motion was held on July 15, 2019, and it was then taken
under submission. Dkt. 90.

For the reasons stated in this Order, the Motion is **GRANTED
IN PART** and **DENIED IN PART**, with leave to amend
where granted.

**II. Factual Background**

**A. The Parties**
Mercado is a California citizen who resides in Rancho
Cucamonga in San Bernardino County. Dkt. 79 ¶ 9.

Holmes is a California citizen who resides in Temecula in
Riverside County. Id. ¶ 10.

Defendant is a New Jersey corporation whose headquarters
are in Virginia. Id. ¶ 11. Defendant allegedly imports,
distributes, services and sells certain motor vehicles,
including the Audi Q7. Id.

**B. The Allegations in the Complaint**

**1. In General**

Plaintiffs advance this action on behalf of those who
purchased or leased Audi Q7 automobiles for model years
2015-18. Dkt. 79 ¶ 1. The Complaint alleges that these
vehicles had defective braking systems, which resulted in
a high-pitched noise (the "Noise") when the brakes were
applied by a driver. It is also alleged that the Noise would
distract or startle both drivers and those nearby. Id. ¶¶ 2-4.
The Noise allegedly occurs when the brakes are used while

a vehicle is travelling at various speeds and in a variety of driving conditions. *Id.* ¶ 5

**\*2** It is alleged that Defendant has "long known" of the issue due to reports from dealerships, testing data, warranty data, complaint data, and sales of replacement parts. *Id.* ¶ 67. Defendant allegedly did not disclose this "*per se*" safety defect. *Id.* ¶¶ 68, 72.

### 2. Individual Allegations

#### a) Mercado

Mercado allegedly leased a new 2017 Audi Q7 from Audi Ontario on January 2, 2017, and did so due to Defendant's representations about the quality, reliability and safety of the Q7. *Id.* ¶¶ 16-17. She alleges that beginning in May 2017, the Noise occurred when she used the brakes, and that this affected her decisions about driving. *Id.* ¶¶ 19-22.

Mercado allegedly informed Audi Ontario about the Noise "immediately." *Id.* ¶ 23. Audi Ontario allegedly inspected the car several times between May 2017 and when the Complaint was filed. *Id.* ¶ 24. It is also alleged that a representative of the dealership told Mercado on at least one occasion that the Noise was because "all 2017 Audi Q7 vehicles are too heavy for the brakes installed during manufacturing," but at other times declined to state a cause of the Noise. *Id.* ¶¶ 24-26. The parts required to remedy the Noise were allegedly on back order due to the number of vehicles requiring them. *Id.* ¶ 27. "12 days after [Mercado] fil[ed] her lawsuit" in November 2018, Audi Ontario allegedly repaired it pursuant to a service bulletin issued in October 2015. *Id.* ¶ 28. Mercado allegedly would not have leased the vehicle, or paid as much for the lease, had she been aware of the Noise at the time she entered the lease. *Id.* ¶ 29.

#### b) Holmes

Holmes allegedly purchased a used 2017 Audi Q7 from Audi San Diego on November 5, 2017. *Id.* ¶ 30. She allegedly did so based on Defendant's representations about the quality, reliability and safety of the Q7. *Id.* ¶ 31. She allegedly first heard the Noise while driving the vehicle in December 2017, and the Noise affected her driving decisions. *Id.* ¶¶ 33-36

Holmes allegedly informed Audi San Diego about the Noise "immediately." *Id.* ¶ 37. Audi San Diego allegedly told Holmes that the Noise was "normal," but later admitted that Defendant knew about the Noise and was developing a solution. *Id.* ¶ 38. In May 2018, Audi San Diego allegedly replaced the brakes in Holmes's car. *Id.* ¶ 39. The Noise allegedly recurred in September 2018, while Holmes was backing up in the vehicle. *Id.* ¶ 40. Audi San Diego allegedly inspected the vehicle on three subsequent occasions. *Id.* ¶¶ 41, 45, 49. As a result of one of the inspections, it replaced the brake rotors, and later stated that it could not cause the Noise to occur while operating the vehicle. *Id.* ¶¶ 47-49. It is alleged that the Noise has continued to occur whether the vehicle is going forward or backing up. *Id.* ¶ 51. As a result, Holmes is allegedly unable to use the vehicle for the intended business purpose she had when she purchased it. *Id.* ¶¶ 51-52. Holmes allegedly would have chosen a different vehicle, or paid less for the one she purchased, had she been aware of the Noise issue at the time of purchase. *Id.* ¶ 53.

### 3. Class Allegations

Plaintiffs allege that the putative class, which includes "[a]ll persons in the United States who formerly or currently own or lease one or more of the Class Vehicles," may include "at or near" 100,000 consumers in the United States. *Id.* ¶¶ 87, 91. The putative class members allegedly make driving decisions, "consciously or unconsciously," as the result of the Noise. *Id.* ¶ 54. They have allegedly been advised to operate the brakes in an unsafe manner in order to avoid the Noise, and they have suffered a loss of money, property, or a loss in value of their vehicles as a result. *Id.* ¶ 59. They allegedly did not know about the Noise at the time of purchase, and would have made different purchasing decisions had they known about it. *Id.* ¶¶ 62-63.

### III. Request for Judicial Notice
**\*3** Defendant requests judicial notice of the following exhibits that have been presented in support of their Motion:

**Ex. A**. The USA Warranty and Maintenance booklet applicable to 2017 Audi Q7 vehicles

**Ex. B**. The 2017 Audi Q7 Owner's Manual

**Ex. C**. A November 5, 2017 Retail Installment Sale Contract between Audi San Diego and Plaintiff Andrea Kristy Anne Holmes

Mercado v. Audi of America, LLC, Slip Copy (2019)

Dkt. 82.

"Although generally the scope of review on a motion to dismiss for failure to state a claim is limited to the Complaint, a court may consider evidence on which the complaint necessarily relies if: (1) the complaint refers to the document; (2) the document is central to the plaintiff['s] claim; and (3) no party questions the authenticity of the copy attached to the 12(b)(6) motion." 📄 *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010) (internal quotation marks and citations omitted).

*Fed. R. Evid. 201(b)* permits judicial notice of a fact that is "not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Court filings and other matters of public record are properly subject to judicial notice. 📄 *Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2006). "[R]ecords and reports of administrative bodies" are within this category. 📕 *Mack v. South Bay Beer Distributors, Inc.*, 798 F.2d 1279, 1282 (9th Cir. 1986), *overruled on other grounds*, 📄 *Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104 (1991). Judicial notice may also be taken of warranties as matters of public record, provided there is no dispute as to their authenticity and the plaintiff's complaint necessarily relies on them. *See, e.g.*, 📄 *Keegan v. Am. Honda Motor Co.*, 838 F. Supp. 2d 929, 936 n.38 (C.D. Cal. 2012).

Plaintiffs have not objected to the RJN. Because Exhibit A appears to be the "New Vehicle Limited Warranty" referenced in the SAC (Dkt. 79 ¶ 70), and it is relevant to Plaintiffs' Magnuson-Moss written-warranty claim, the RJN is **GRANTED** as to Exhibit A (Dkt. 84-1). However, the SAC does not reference the owner's manual, and the sale contract is neither directly referenced nor necessary for determining Holmes's status as a lessee. For those reasons, the RJN is **DENIED** as to Exhibits B and C.

## IV. <u>Analysis</u>

### A. Legal Standards

*Fed. R. Civ. P. 8(a)* provides that a "pleading that states a claim for relief must contain ... a short and plain statement of the claim showing that the pleader is entitled to relief ...."

The complaint must state facts sufficient to show that a claim for relief is plausible on its face. 📄 *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The complaint need not include detailed factual allegations, but must provide more than a "formulaic recitation of the elements of a cause of action." *Id.* at 555. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." 📄 *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citations and quotation marks omitted).

**\*4** Pursuant to *Fed. R. Civ. P. 12(b)(6)*, a defendant may move to dismiss a complaint for failure to state a claim. Such a motion may be granted when the complaint lacks a cognizable legal theory or sufficient facts to support one. 📄 *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008). In considering a motion to dismiss, the allegations of the challenged complaint are deemed true and must be construed in the light most favorable to the non-moving party. *See* 📄 *Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 337-38 (9th Cir. 1996). However, a court need not "accept as true allegations that contradict matters properly subject to judicial notice or by exhibit. Nor is the court required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." 📄 *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (citing 📄 *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001)).

If a motion to dismiss is granted, the court should "freely give leave [to amend] when justice so requires." *Fed. R. Civ. P. 15(a)(2)*. Although this policy is to be applied "with extreme liberality," 📄 *Owens v. Kaiser Found. Health Plan, Inc.*, 244 F.3d 708, 712 (9th Cir. 1990), allowing leave to amend is inappropriate in circumstances where litigants have failed to cure previously identified deficiencies, or where an amendment would be futile. *See* 📄 *Foman v. Davis*, 371 U.S. 178, 182 (1962); 📄 *Allen v. City of Beverly Hills*, 911 F.2d 367, 373-74 (9th Cir. 1990).

### B. Application

1. The CLRA and UCL Claims

The first and second causes of action allege violations of the Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750 et seq.; and the California Unfair Competition Law ("UCL"), Cal. Bus & Prof. Code §§ 17200 et seq.

Conduct that is "likely to mislead a reasonable consumer violates the CLRA." Wilson v. Hewlett Packard Co., 668 F.3d 1136, 1140 (9th Cir. 2012) (internal quotation marks omitted). This includes omissions. See Daugherty, 144 Cal. App. 4th at 835. Such an "omission must be contrary to a representation actually made by the defendant, or an omission of a fact the defendant was obliged to disclose." Id. With respect to the CLRA, the Complaint alleges that Defendant violated Cal. Civ. Code § 1770(a), which prohibits certain acts that are "intended to result" or result "in the sale or lease of goods or services to any consumer." Dkt. 79 ¶ 99. The specific violations of the CLRA that have been alleged are as follows:

1. Representing that the Vehicles have "approval, characteristics, and uses or benefits which they do not have (because they are defective" (§ 1770(a)(5));

2. Representing that the Vehicles "are of a particular standard, quality, or grade, when they are of another (having a design defect of manufacturing defect or both" (§ 1770(a)(7));

3. Advertising the Vehicles "as safe with the intent not to sell them as advertised" (§ 1770(a)(9)); and

4. Representing that the Vehicles "have been supplied in accordance with previous representations (being free of design or manufacturing defects), when they were not" (§ 1770(a)(16)).

Dkt. 79 ¶ 102.

The UCL prohibits "unfair competition," which "include[s] any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200. The UCL claim here is premised on "fraudulent" practices likely to deceive a consumer,

alleged violations of the CLRA, the Secret Warranty Law, Cal. Civ. Code §§ 1750 et seq., the Transportation Recall Enhancement, Accountability and Documentation Act ("TREAD Act"), 49 U.S.C. §§ 30101 et seq. and unfair practices which "violate[] the stated spirit" of those laws. Dkt. 79 ¶¶ 109-114.

a) Equitable Relief

**5** The UCL claim can seek only equitable relief. Cortez v. Purolator Air Filtration Products Co., 23 Cal. 4th 163, 173 (2000) ("A UCL action is an equitable action by means of which a plaintiff may recover money or property obtained from the plaintiff ... through unfair or unlawful business practices. It is not an all-purpose substitute for a tort or contract action."). The CLRA permits both equitable and legal remedies, but Plaintiffs have sought only equitable relief. Dkt. 79 ¶ 105.

"[E]quitable relief is not appropriate where an adequate remedy exists at law." Schroeder v. United States, 569 F.3d 956, 963 (9th Cir. 2009). Therefore, Defendant argues that this claim should be dismissed because Plaintiffs have not established that the available legal remedies are inadequate, and have "asserted various legal claims for damages." Dkt. 81 at 16-17.

"[T]here is a split of authority in the California district courts on the question of whether plaintiffs should be barred from pleading claims for equitable relief under the UCL and CLRA if they have [also] alleged a claim that would provide an adequate remedy at law." Luong v. Subaru of Am., Inc., No. 17-CV-03160-YGR, 2018 WL 2047646, at *7 n.6 (N.D. Cal. May 2, 2018) (collecting cases). Some courts have found that dismissal is warranted when a plaintiff "fails to explain how his alleged injury cannot be remedied by the payment of damages." Gardner v. Safeco Ins. Co. of Am., 2014 WL 2568895, at *8 (N.D. Cal. 2014). However, there is "no basis in California or federal law for prohibiting the plaintiffs from pursuing their equitable claims in the alternative to legal remedies at the pleadings stage." Adkins v. Comcast Corp., No. 16-CV-05969-VC, 2017 WL 3491973, at *3 (N.D. Cal. Aug. 1, 2017). Moreover, the language in both the UCL and the CLRA reflects that the remedies that are provided are intended to be non-exclusive ones. See Cal. Bus & Prof. Code § 17205 (UCL remedies are "cumulative to each other and to

*Mercado v. Audi of America, LLC, Slip Copy (2019)*

the remedies or penalties available under all other laws of this state"); *Cal. Civ. Code § 1752* (CLRA "remedies provided herein for violation of any section of this title or for conduct proscribed by any section of this title shall be in addition to any other procedures or remedies for any violation or conduct provided for in any other law.").

The view that "plaintiffs may seek injunctive and/or restitutionary equitable relief separate and apart from the same underlying claims ... in which plaintiffs seek monetary damages" is persuasive in light of the text and purpose of the respective statutes, as well as of the present stage of litigation. *Estakhrian v. Obenstine*, 233 F. Supp. 3d 824, 846 (C.D. Cal. 2017). Although the Plaintiffs must ultimately "establish that there is no adequate remedy at law available" to obtain the equitable relief they seek, *Philips v. Ford Motor Co.*, No. 14-CV-02989-LHK, 2015 WL 4111448, at *16 (N.D. Cal. July 7, 2015), the SAC plausibly alleges, in the alternative, that Plaintiffs have been "subjected to an unreasonable risk to their safety," and that they require Defendant to alter its practices and "initiate a program to provide refunds, repairs, and/or restitution." Dkt. 79 ¶¶ 57, 63.

For these reasons, the Motion is **DENIED** as to the contention that the SAC fails to allege that legal remedies are insufficient.

### b) Basis in Fraud

Plaintiffs' CLRA claim sounds in fraud. *See* Dkt. 79 ¶ 106 ("Defendant's conduct is malicious, fraudulent, and wanton in that Defendant intentionally and knowingly provided misleading information to the public."). The UCL claim is also based in part on fraud. Dkt. 79 ¶ 114 ("Defendant's actions and practices constitute 'fraudulent' business practices in violation of the UCL because, among other things, they are likely to deceive reasonable consumers.").

**\*6** "Generally, the standard for deceptive practices under the fraudulent prong of the UCL applies equally to claims for misrepresentation under the CLRA." *Kowalsky v. Hewlett-Packard Co.*, 771 F. Supp. 2d 1156, 1162 (N.D. Cal. 2011) (citing *Consumer Advocates v. Echostar Satellite Corp.*, 113 Cal. App. 4th 1351, 1360 (2003)). "For this reason, courts often analyze the two statutes together." *Id.*; *see also* *Paduano v. Am. Honda Motor Co. Inc.* 169 Cal. App. 4th 1453, 1468-73 (2009). Under California law, to allege

fraud requires a pleading that addresses the five elements of that tort: (i) a misrepresentation (false representation, concealment, or nondisclosure); (ii) knowledge of falsity ("scienter"); (iii) intent to defraud, *i.e.*, to induce reliance; (iv) reasonable reliance; and (v) resulting damage. *Gil v. Bank of America, Nat. Ass'n*, 138 Cal. App. 4th 1371, 1381 (2006); *Zambrano v. CarMax Auto Superstores, LLC*, 2014 WL 228435 at *4 (S.D. Cal. Jan. 21, 2014). Under this standard, a plaintiff asserting fraud must establish that the defendant "intended to induce the plaintiff to act to his detriment in reliance upon the false representation" and that "plaintiff actually and justifiably relied upon defendant's misrepresentation in acting to his detriment." *Conrad v. Bank of Am.*, 45 Cal. App. 4th 133, 157 (1996).

Allegations of fraud are also subject to the heightened pleading requirement of *Fed. R. Civ. P. 9(b)*. *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007); *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003); *see also* *Marolda v. Symantec Corp.*, 672 F. Supp. 2d 992, 1002 (N.D. Cal. 2009) ("Claims of nondisclosure and omission, as varieties of misrepresentation, are subject to the pleading standards of *Rule 9(b)*.").

Defendant contends that the SAC does not adequately allege misrepresentation. Dkt. 81 at 17-19.

### (1) False Representation

Defendant argues that Plaintiffs' claims identify only "generic statements" of quality, reliability and safety that constitute "at most, non-actionable puffery." Dkt. 81 at 17; *see also* Dkt. 79 ¶¶ 17, 31 (alleging that Defendant advertised its vehicles with emphasis on "quality, reliability, and safety.").

The SAC does not include any allegations that Defendant affirmatively represented that the braking systems on the Q7 were satisfactory. Nor does it allege how statements were communicated to Plaintiffs, when, or by whom. Therefore, the SAC does not sufficiently allege fraud under the standards of *Rule 9(b)*. *See* *Tae Hee Lee v. Toyota Motor Sales, U.S.A., Inc.*, 992 F. Supp. 2d 962, 974 (C.D. Cal. 2014) (dismissing complaint where "Plaintiffs have failed to identify any statement made ... that misrepresents the performance of [the car's] braking feature").

#### (2) Concealment or Nondisclosure

Defendant next contends that Plaintiffs have not identified
any relevant omissions. Dkt. 81 at 18-19. A defendant must
disclose a material fact when it had exclusive knowledge of
it, *i.e.*, the plaintiff did not know it. *Mui Ho v. Toyota
Motor Corp.*, 931 F. Supp. 2d 987, 996 (N.D. Cal. 2013)
(citing *LiMandri v. Judkins*, 52 Cal. App. 4th 326, 336–37
(1997)). "A fact is material, rendering a defendant potentially
obligated to disclose it, if a 'reasonable consumer would deem
it important in determining how to act in the transaction at
issue.' " *Id.* (quoting *Collins v. eMachines, Inc.*, 202 Cal.
App. 4th 249, 255 (2011)).

The SAC alleges that Plaintiffs did not contemplate that the
brakes in their respective vehicles would cause "extreme
noise disturbances" and that the Noise would startle a driver
and thereby cause a change in his or her driving practices,
which makes the vehicles unsafe to drive. Dkt. 79 ¶ 58. It
also alleges that Plaintiffs "would not have purchased the
Vehicles or would have paid less for them if they had known."
*Id.* ¶¶ 54, 58, 62. It is also alleged that the Noise is a "*per
se*" safety defect because it "distracts the Vehicle driver and
third parties, endangering their physical safety and well-being
due to a loss of concentration and focus on the road." *Id.*
¶¶ 7, 56, 68. These allegations are sufficient as to a claimed
material defect. *See Falk v. Gen. Motors Corp.*, 496 F.
Supp. 2d 1088, 1096 (N.D. Cal. 2007) (allegations of material
defect sufficient where plaintiffs alleged they would not have
paid as much had they known of it and where "[c]ommon
experience supports" the expectation); *see also Cholakyan
v. Mercedes-Benz USA, LLC*, 796 F. Supp. 2d 1220, 1238
(C.D. Cal. 2011) ("Because Cholakyan has adequately alleged
a safety defect, he has sufficiently pled a material failure to
disclose for purposes of the UCL and CLRA.").

**\*7** Whether the SAC makes allegations that are sufficiently
plausible to suggest that Defendant knew about the alleged
defect at the time each of the Plaintiffs purchased his or her
vehicle is less clear. "[P]laintiffs must sufficiently allege that a
defendant was aware of [the unfair practice] at the time of sale
to survive a motion to dismiss" both CLRA and UCL claims.
*Tomek v. Apple, Inc.*, 636 F. App'x 712, 713 (9th Cir. 2016)
(quoting *Wilson v. Hewlett–Packard Co.*, 668 F. 3d 1136,

1145 (9th Cir. 2012)). Complaints that are undated, or which
are dated after the plaintiff's purchase, "do not support an
inference that [a manufacturer] was aware of the defect at the
time of sale." *Wilson*, 668 F.3d at 1148.

The SAC alleges that Defendant "knew of the defects in their
brakes ... before selling the Vehicles to Plaintiffs and the
class and installing them on their cars, but did not inform
Plaintiffs and the Class of this fact prior to their purchase."
Dkt. 79 ¶ 72. In support of this contention, it also alleges
that "Defendant has exclusive access to information about
the defects" through its dealers and repair networks and,
specifically, that six complaints relating to the Noise were
made to the National Highway Traffic Safety Administration
("NHTSA"). *Id.* ¶¶ 67, 76-78. The NHTSA complaints were
dated December 1, 2016 (as to a 2016 model Vehicle); and
January 26, 2017 (as to a 2017 model Vehicle); October 4,
2017 (as to a 2017 model Vehicle); November 17, 2017 (as
to a 2017 model Vehicle); December 29, 2017 (as to a 2017
model Vehicle); and November 1, 2018 (as to a 2018 model
Vehicle). *Id.* ¶ 78. Plaintiffs add that Defendant issued six
Technical Safety Bulletins ("TSBs") relating to the Noise, on
October 13, 2015 (as to model years 2012-16); February 24,
2017 (as to model years 2017-18); February 28, 2017 (as to
model years 2016-18); May 4, 2018 (as to model year 2017);
June 8, 2018 (as to model year 2017); and September 4, 2018
(as to model year 2017). *Id.* ¶ 73; Exs. A-F.

The only bases for the allegation that Defendant knew of
the Noise before Mercado leased her car on January 2, 2017
are that a NHTSA complaint had been made regarding brake
noise in December 2016, and that Audi had issued brake noise
repair instructions on October 13, 2015. Neither the NHTSA
complaint nor those instructions concerned Defendant's 2017
vehicle. The NHTSA complaint was about a 2015 vehicle,
and the repair instructions were as to model years 2012-16.
Thus, there is no allegation in the SAC sufficient to support
the claim that, at the time Mercado purchased her 2017
vehicle, Defendant was aware that the brakes in Mercado's
vehicle caused the Noise. *See Wilson*, 668 F.3d at 1148
(rejecting an argument that a manufacturer's knowledge of a
defect in some models of a product put the defendant on notice
regarding a model for which notice had not been given).

Holmes allegedly purchased her vehicle on November 5,
2017. At that time, Defendant had issued two TSBs regarding
brake noise issues with the 2017 vehicle. Two NHTSA
complaints had also been filed specifically citing the Noise

issue; the complaint filed on October 4, 2017 included the statement that "Audi says there [*sic*] working on a fix for this issues and its [*sic*] been 6 months and still no repair they are ignoring the issue.... They need to stop telling people this is normal." Dkt. 79 ¶ 78. These allegations, together with those that Defendant had "exclusive knowledge about the defects through its dealerships, pre-release testing data, warranty data, customer complaint data, and replacement part sales data," are sufficient to support an inference that, by November 2017, Defendant was aware of the Noise issue but sold a vehicle to Holmes without any disclosure. *See* *Falk,* 496 F. Supp. 2d at 1096-97 (allegations of manufacturer's access to data, as well as a record of complaints, "successfully state a CLRA claim for omission of a material fact.").

\* \* \*

**\*8** For the foregoing reasons, to the extent CLRA and UCL claims sound in fraud, the Motion is **GRANTED** without prejudice as to those advanced by Mercado, and **DENIED** as to those advanced by Holmes.

### c) Unlawful Conduct

"[UCL S]ection 17200 borrows violations of other laws and treats them as unlawful practices that the unfair competition law makes independently actionable." *Velazquez v. GMAC Mortg. Corp.,* 605 F. Supp. 2d 1049, 1068 (C.D. Cal. 2008) (internal quotation marks omitted). Defendant contends that the SAC does not adequately plead a predicate violation, and even if it did so, the claim is preempted. Dkt. 81 at 24-26. Plaintiffs argue that their UCL claim is adequate under the "unlawful" prong, based on alleged violations of the CLRA, California's Secret Warranty Act, and the TREAD Act. Dkt. 86 at 19-23; *see also* Dkt. 79 ¶¶ 110-112.

#### (1) CLRA

For the reasons stated above, the CLRA claim is adequate as advanced by Holmes. Therefore, the UCL claim is supported by the same alleged violation.

#### (2) Secret Warranty Act

The Secret Warranty Law (Cal. Civ. Code §§ 1795.90 *et seq.*) regulates "Adjustment Programs," *i.e.,* "any program or policy that expands or extends the consumer's warranty beyond its stated limit or under which a manufacturer offers to pay for all or any part of the cost of repairing, or to reimburse consumers for all or any part of the cost of repairing, any condition that may substantially affect vehicle durability, reliability, or performance, other than service provided under a safety or emission-related recall campaign." Cal. Civ. Code § 1795.90(d). Within 90 days of adopting such an Adjustment Program, the manufacturer must notify owners and lessees of affected vehicles about its terms and conditions. *Id.* § 1795.92(a). The manufacturer must also reimburse those owners who have already paid repair costs. *Id.* § 1795.92(d).

The SAC does not expressly identify the Adjustment Program on which Plaintiffs' claim are based. However, in the briefing, Defendant has assumed, and Plaintiffs agree, that it is premised on the TSBs that "instruct service technicians to '[e]xplain to the Customer that a solution is forthcoming and that no repairs are necessary at this point." *See* Dkt. 79-3 at 3; Dkt. 86 at 8; Dkt. 87 at 10. Plaintiffs argue that this statement "has the very real potential and likelihood to delay any repair beyond the original warranty period .... [and] to extend the warranty to cover repairs for the Brake Defect to an unspecified time in the future." Dkt. 86 at 21.

Each TSB includes either the statement that "[i]f vehicle is outside any warranty, this Technical Service Bulletin is informational only" or that "this TSB is informational only." *See* Exs. A-F. There is neither language in the TSBs, nor an allegation in the SAC, that the statement that a repair solution was "forthcoming" was intended to extend the warranty period for some or all vehicle owners. If "defendants do not argue that [a manufacturer] made [warranty] adjustments on a case-by-case basis," but instead rely on a TSB that instructs dealers how to repair vehicles that are under warranty, there is no basis for a Secret Warranty Claim. *Cholakyan v. Mercedes-Benz USA, LLC,* 796 F. Supp. 2d 1220, 1239-40 (C.D. Cal. 2011); *Corson v. Toyota Motor Sales, U.S.A., Inc.,* No. CV 12-08499 JGB, 2013 WL 1802709, at \*6 (C.D. Cal. Apr. 24, 2013). The inferences that Plaintiffs could draw from the TSBs are also substantially different than the clear allegations of piecemeal warranty extensions that are required to state a claim under the Secret Warranty Act. *See, e.g., Ehrlich v. BMW of N. Am., LLC,* 801 F. Supp. 2d 908, 920–21 (C.D. Cal. 2010) (finding sufficient an allegation that a manufacturer ran a " 'clandestine program to secretly pay

for the cost of replacing or repairing' cracked windshields for some customers even if the crack was not stress-related and even if the cracks occurred outside of the New Car Warranty for those customers who were the most vocal and persistent, using code names for the repairs like 'goodwill' or 'policy adjustments.' ").

**\*9**  For these reasons, the UCL claim is not adequately pleaded to the extent that it is premised on a violation of the Secret Warranty Act.

### (3) TREAD Act

The "early warning reporting requirements" of the TREAD Act require manufacturers of vehicles to provide the NHTSA with certain information following the discovery of a safety defect, and to provide notice to owners and purchasers who are affected. 49 U.S.C. § 30166. The duty arises when "the manufacturer (1) learns the vehicle or equipment contains a defect and decides in good faith that the defect is related to motor vehicle safety; or (2) decides in good faith that the vehicle or equipment does not comply with an applicable motor vehicle safety standard prescribed under this chapter." *Id.* § 30118(c).

Where a plaintiff alleges "that Defendant had a duty to notify the Secretary of Transportation, pursuant to the TREAD Act, upon receiving numerous complaints," but failed to do so, it may also serve as the predicate for a state claim. *Becerra v. Gen. Motors LLC*, 241 F. Supp. 3d 1094, 1110 (S.D. Cal. 2017) (finding a CLRA claim to be adequately supported by an alleged duty to disclose pursuant to the TREAD Act); *accord* *In re Toyota Motor Corp.*, 790 F. Supp. 2d 1152, 1171 n.16 (C.D. Cal. 2011) ("The TREAD Act forms a viable basis for recovery under the 'unlawful' prong of the UCL.").

The SAC makes such allegations. It alleges that Defendant failed "to timely inform the NHTSA of the Brake Defect," and that it allowed "the Vehicles to be sold with the Brake Defect." Dkt. 79 ¶ 66. Defendant argues that the claim is preempted in light of *Buckman Co. v. Plaintiff's Legal Commission*, 531 U.S. 341, 348 (2001). *Buckman* held that state-law claims premised on allegations of fraudulent reporting to the FDA conflicted with the "delicate balance of statutory objectives" that FDA reporting regulations sought to adopt. *Id.*; *see also* *Nathan Kimmel, Inc. v. DowElanco*, 275 F.3d 1199, 1207

(9th Cir. 2002) (recognizing "the potential problems inherent in allowing a state court (or a federal court interpreting state law) to ascertain the propriety of disclosures made by an applicant to a federal agency in response to the mandates of federal legislation").

*Buckman* and *Nathan Kimmel* are distinguishable for several reasons. *First*, each addressed allegations of fraudulent reporting to a federal agency, rather than allegations that there had been no reporting. *E.g. Buckman*, 531 U.S. at 348 ("[W]e hold that the plaintiffs' state-law fraud-on-the-FDA claims conflict with, and are therefore impliedly pre-empted by, federal law."). *Second*, each decision was based on the complex statutory and regulatory systems adopted by particular agencies, designed to discover and deter fraudulent reporting. *E.g. Nathan Kimmel*, 274 F.3d at 1205-06 ("[J]ust as Congress made available to the FDA regulatory enforcement mechanisms under the MDA, Congress has afforded the EPA substantial enforcement powers under FIFRA that enable the EPA to make a measured response to suspected fraud against it."). *Third*, in both *Buckman* and *Nathan Kimmel* the "key factor" was that the plaintiff's state claim was cognizable " 'solely by virtue' ... of these federal enactments," and to allow the claim would require courts "to ascertain the propriety of disclosures made by an application to a federal agency in response to the mandates of federal law." *Nathan Kimmel*, 275 F.3d at 1206 (quoting *Buckman*, 531 U.S. at 352-53). For example, where a claim of intentional interference with prospective business advantage was based only on allegations that the defendant had obtained the advantage by misleading federal regulators, the court would have to determine, independent of the agency, whether reports which were accepted at the federal agency were illegal under state law. *Id.*

**\*10**  Even assuming that *Buckman* preemption could apply to the NHTSA, Plaintiffs have not asserted that Defendant's reporting to the NHTSA was deceptive or fraudulent. Rather, the UCL claim is based on the allegation that Defendant failed to comply with all reporting requirements. Therefore, it is not necessary to decide the issues presented by these cases as part of this element of the UCL claim.

\* \* \*

For the foregoing reasons, to the extent that the UCL claim is based on unlawful action, the Motion is **DENIED**. Plaintiffs have sufficiently alleged unlawful conduct; i.e., a CLRA violation, as well as violation of the TREAD Act.

### d) Unfair Business Practice

" 'The "unfair" standard, the second prong of section 17200' offers 'an independent basis for relief.' " *S. Bay Chevrolet v. Gen. Motors Acceptance Corp.*, 72 Cal. App. 4th 861, 886 (1999) (quoting *State Farm Fire & Casualty Co. v. Superior Court*, 45 Cal. App. 4th 1093, 1103 (1996)). Different tests have been applied to determine whether conduct is "unfair." These include whether the conduct "offends an established public policy," *State Farm Fire & Casualty*, 45 Cal. App. 4th at 1104, or is "immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers," and therefore "requires the court to weigh the utility of the defendant's conduct against the gravity of the harm to the alleged victim." *Bardin v. DaimlerChrysler Corp.*, 136 Cal. App. 4th 1255, 1260 (2006) (citing *Smith v. State Farm Mut. Auto. Ins. Co.*, 93 Cal. App. 4th 700, 718-19 (2001)). However, it is not "a general license to review the fairness of contracts." *Samura v. Kaiser Found. Health Plan*, 17 Cal. App. 4th 1284, 1299 & n.6 (1993).

Plaintiffs allege that Defendant's conduct was "unfair in that it offends established public policy and/or is immoral, unethical, oppressive, unscrupulous and/or substantially injurious," and that the harm "violates the stated spirit and policies underlying the Consumers Legal Remedies and TREAD Act." Dkt. 79 ¶ 113.

No unique conduct is alleged in connection with this claim. It is based on the allegations of fraud made in support of the CLRA claim. *See Vess*, 317 F.3d at 1103-04. When a complaint "alleges a unified course of fraudulent conduct," a UCL claim that separately argues unfairness "must therefore be pleaded with particularity." *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1127 (9th Cir. 2009). For the reasons already stated, Plaintiffs have satisfied this standard as to the claim by Holmes, but not as to the one by Mercado.

To the extent that Plaintiffs also base the unfairness claim on a violation of public policy, it must be one stated in "a constitutional or statutory provision or a regulation carrying out statutory policy." *Cel-Tech Comm'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 185 (1999). The alleged violations of the TREAD Act are sufficient to support not only the unlawfulness prong of the UCL, but also the unfairness prong. *Becerra*, 241 F. Supp. 3d at 1112 ("Courts have recognized that automobile safety and disclosing safety hazards to consumers are each important policy goals.... Further, the Court finds that the Amended Complaint alleges an 'unfair' business practice claim that is tethered to a legislatively declared policy... [i.e.,] the Tread Act.").

For the foregoing reasons, to the extent that the UCL claim is based on unfair conduct, the Motion is **DENIED.**

### 2. Negligence

**\*11** Defendant has argued that under California's economic loss doctrine this cause of action is limited to when personal injury is claimed. They argue that Plaintiffs have not claimed such an injury. Plaintiffs agree that this claim is barred. Dkt. 81 at 26; Dkt. 86 at 9 n.2. Accordingly, the Motion is **GRANTED** as to the third cause of action, without prejudice.

### 3. Product Liability – Design Defect

Defendant argues that the economic loss doctrine bars this claim, and Plaintiffs again agree. Dkt. 81 at 26; Dkt. 86 at 9 n.2. The Motion is **GRANTED** as to the fourth cause of action, without prejudice.

### 4. Magnuson-Moss Warranty Act, 15 U.S.C. § 2301 et seq.

Plaintiffs' claims under the Magnuson-Moss Warranty Act ("MMWA"), 15 U.S.C. §§ 2301 *et seq.*, "stand or fall with [their] express and implied warranty claims under state law." *Clemens*, 534 F.3d at 1022.

The Magnuson-Moss claim is based solely on the contentions that Defendant "affirmed the fact, promise, and/or described in writing that that the Vehicles would meet a specified

level of performance over a specified period of time," and that "Defendant's written affirmations of fact, promises, or descriptions related to the nature of the Vehicles and became part of the basis of the bargain ... Defendant refused to recognize or honor the written warranties and .... breached its written warranties ...." Dkt. 79 ¶¶ 139-140. Because this is an alleged breach of an express, written warranty, "one must allege the exact terms of the warranty, plaintiff's reasonable reliance thereon, and a breach of that warranty which proximately causes plaintiff injury." *Williams v. Beechnut Nutrition Corp.*, 185 Cal. App. 3d 135, 142 (1986). Dismissal is warranted where a plaintiff provides "no detail regarding the exact terms of any express warranty breached under the facts of this case." *Tomek v. Apple, Inc.*, No. 2:11-CV-02700-MCE, 2012 WL 2857035 at *6 (E.D. Cal. July 11, 2012).

The SAC does not identify the warranty terms that were allegedly breached. It alleges that a "New Vehicle Limited Warranty ... states that Audi will cover any repairs to correct a manufacturer's defect in material or workmanship for 4 years or 50,000 miles, whichever occurs first." Dkt. 79 ¶ 70. However, the warranty, of which judicial notice has been taken, does include terms that reasonably align with the Magnuson-Moss claim. It concerns a promise as to "a specified level of performance over a specified period of time," the "existence" of which Defendant denies. Dkt. 79 ¶¶ 139-140. Nor do the allegations in support of the Magnuson-Moss claim state whether the New Vehicle Limited Warranty is the one that Defendant allegedly breached.

In their opposition, Plaintiffs state that the New Vehicle Limited Warranty is the warranty at issue, and they argue that the brake discs are covered by its terms. Dkt. 86 at 24. However, they also acknowledge that a Magnuson-Moss claim must state the warranty terms at issue, and ask that "[s]hould the Court feel it necessary for Plaintiffs to quote the exact terms," they will do so in an amended complaint. Dkt. 86 at 23 (citing *Hardt v. Chrysler Grp., LLC*, No. SACV 14-1375-SJO, 2015 WL 12683963 at *12 (C.D. Cal. Mar. 16, 2015)), as supporting dismissal with leave to amend when "[n]owhere in the FAC do Plaintiffs provide the exact terms of the warranty.").

In light of the uncertainty as to the warranty terms that could potentially support a Magnuson-Moss claim, the authority that "[c]ourts ... require that plaintiffs allege the 'exact terms of the warranty' " -- without which it is impossible to assess the manufacturer's liability -- is particularly persuasive.

*Hardt*, 2015 WL 12683963 at *12 (quoting *McVicar v. Goodman Global, Inc.*, 1 F. Supp. 3d 1044, 1056 (C.D. Cal. 2014)).

**\*12** For the foregoing reasons, the Motion is **GRANTED** as to the fifth cause of action, without prejudice.

5. Song-Beverly Warranty Act,
Cal. Civ. Code §§ 1790 *et seq.*

a) In General

The Song-Beverly Consumer Warranty Act sets standards for implied and express warranties for "consumer goods." Cal. Civ. Code § 1791(a). "Consumer goods" include any "new product" purchased for personal, non-retail use. *Id.* The implied warranty of merchantability requires that goods be "fit for the ordinary purposes for which such goods are used." *Id.* § 1791.1(a). Fitness for ordinary purpose in the context of vehicles has been explained as follows:

The law is clear that to be fit for its ordinary purpose, a vehicle must be "in safe condition and substantially free of defects." *Isip v. Mercedes-Benz USA, LLC*, 155 Cal. App. 4th 19, 27 (2007). Moreover, it must provide "reliable" transportation. *Brand v. Hyundai Motor Am.*, 226 Cal. App. 4th 1538, 1547 (2014) (quotation omitted). Thus, three factors related to vehicle merchantability are safety, reliability, and substantial freedom from defects.

*In re MyFord Touch Consumer Litig.*, 291 F. Supp. 3d 936, 945-46 (N.D. Cal. 2018) (footnote omitted).

No single factor is dispositive. Thus, "vehicle safety is [not] the sole or dispositive criterion in implied warranty cases, which may turn on other facts." *Brand*, 226 Cal. App. 4th at 1548 n.2. Moreover, a vehicle is not merchantable "merely because [it] provides transportation from point A to point B." *Isip*, 155 Cal. App. 4th at 27. "[D]efects where a vehicle's operability was not impaired until a particular part malfunctioned and required replacement" may be insufficient to demonstrate unmerchantability. *MyFord*, 291 F. Supp. 3d at 946 & n.3 (collecting cases); *see, e.g.*, *Troup v. Toyota Motor Corp.*, 545 Fed. App'x. 668, 669 (9th Cir. 2013)

(affirming dismissal of claim as to a fuel tank that allegedly required more frequent filling because plaintiffs "failed to allege that their Prius was unfit for its intended purpose, as the alleged defect did not compromise the vehicle's safety, render it inoperable, or drastically reduce its mileage"). However, "where a defect's symptoms were persistent and could not be addressed through repair or replacement of an isolated component," a viable claim may be presented that the vehicle was unmerchantable. *MyFord*, 291 F. Supp. 3d at 946 & n.4 (collecting cases).

Defendant contends that the SAC does not adequately allege unmerchantability. Specifically, it argues that "Plaintiffs do not take issue with the performance and function of the brakes installed in their vehicles," but rather only with an "utterly speculative or hypothetical" safety concern based on the distractive nature of the Noise. Dkt. 81 at 30. Plaintiffs reply that they have sufficiently alleged a safety hazard, and that brake problems necessarily satisfy this criteria. Dkt. 86 at 25-26.

Brake defects may be *per se* safety hazards where the defects cause the brakes to fail to function in stopping a vehicle. *See, e.g.,* *In re Toyota Motor Corp. Unintended Acceleration Mktg.*, 754 F. Supp. 2d 1145, 1173 (C.D. Cal. 2010). The Ninth Circuit has also determined that brake noise may be deemed a safety hazard. *Barakezyan v. BMW of N. Am., LLC*, 715 F. App'x 762, 763 (9th Cir. 2018) (mem.). In reversing the dismissal of a claim arising out of brake noise, *Barakezyan* concluded that "[t]aking the allegations as true, the [brake]s, when engaged, emit an extremely loud, long, high-pitched noise, which has, on numerous occasions, distracted [plaintiff] and other ... drivers, as well as nearby pedestrians. That, along with allegations that the noise is intermittent and manifests at different mileages, meaning that the noise has the potential to surprise, at least plausibly pleads a safety hazard ...." *Id.* As in *Barakezyan*, the SAC alleges that the Noise is distracting, loud enough to alarm drivers and other motorists and pedestrians. It also alleges that the Noise occurs "at different mileages and under different driving conditions." Dkt. 79 ¶ 5.

### b) Holmes

**\*13** Plaintiffs concede that the Song-Berly claim of Holmes fails because she purchased her vehicle when it was used, and as a result, the implied warranty of merchantability

has only limited applicability. Dkt. 86 at 9 n.2. For these reasons, and consistent with the agreement of the parties, the Motion is **GRANTED** as to the sixth cause of action brought by Holmes, without prejudice.

### c) Mercado

Mercado leased a new vehicle. *See* Dkt. 79 ¶ 16. It is also alleged with respect to Mercado that following "multiple" visits to Defendant's service facility, "12 days after filing her lawsuit, Audi Ontario performed a repair for a condition consistent with the [TSB] issued on October 13, 2015." *Id.* ¶¶ 24, 28. Mercado does not allege any subsequent problems with her vehicle.

Under the Song-Berly Warranty Act, a manufacturer is entitled to "a reasonable number of attempts" to repair its goods "to conform to the applicable express warranties;" if it fails, the buyer is entitled to replacement or reimbursement. Cal. Civ. Code § 1793.2(d). In contrast, with respect to a claim of a breach of an implied warranty, the buyer is not required to give the seller such an opportunity. *See* *Mocek v. Alfa Leisure Inc.*, 114 Cal. App. 4th 402, 407 (2003) ("[O]nly the portion of the Act dealing with breaches of express warranties requires the buyer to give the seller the opportunity either to repair or to replace the defective goods"). Instead, if goods do not satisfy the implied warranty of merchantability, the buyer may reject them and seek restitution and consequential damages. *Id.* at 406; *see also* Cal. Civ. Code § 1794.

Mercado's claim is solely for a breach of implied warranty. The applicable test is whether the vehicle was fit for the ordinary purpose for which it is used if it is sold "in safe condition and substantially free of defects." *Brand v. Hyundai Motor Am.*, 226 Cal. App. 4th 1538, 1546 (2014) (internal quotation marks omitted). "[A] current manifestation of a current defect is not an element of a claim," although there is no current defect, "a plaintiff must instead provide 'substantial evidence of a defect that is substantially certain to result in malfunction during the useful life of the product.' " *Victorino v. FCA US LLC*, 326 F.R.D. 282, 298 (S.D. Cal. 2018) (denying class certification) (quoting *Hicks v. Kaufman & Broad Home Corp.*, 89 Cal. App. 4th 908, 918 (2001), *as modified on denial of reh'g* (July 3, 2001)). "Just because the law does not require a current malfunction to prove breach of warranty does not mean

it should not require proof of *any* malfunction, present or future." 📑 *Am. Honda Motor Co. v. Superior Court*, 199 Cal. App. 4th 1367, 1375 (2011) (denying class certification but noting that this is also an issue necessary to "determine the merits of a plaintiff's claim").

Plaintiffs have alleged some facts that plausibly suggest that the Noise caused by the braking systems is inherently likely to recur, including in Mercado's vehicle. The TSBs issued by Defendant allegedly do not "provide an adequate long-term remedy, repair, or restitution." Dkt. 79 ¶¶ 73-74. The brakes on Mercado's vehicle allegedly have been repaired inadequately because they have only been cleaned. *Id.* ¶ 28; Dkt. 79-2 at 6. Although these allegations are not extensive, when viewed together with the allegations that the Noise "can be indicative of damage incurring to integral components of the Braking System," and that several additional TSBs have been issued to remedy the problem, they are sufficient to warrant an inference of a recurring defect. Dkt. 79. ¶¶ 71, 73.

**\*14** For the foregoing reasons, the Motion is **DENIED** as to the sixth cause of action brought by Mercado.

### 6. Other State Statutes Prohibiting
### Unfair and Deceptive Acts and Practices.

The SAC alleges that, because Plaintiffs have brought this claim on behalf of either a nationwide class or subclasses whose members include citizens of states other than California, "Plaintiffs and [the] proposed class" are entitled to damages based on violations of the deceptive trade practice statutes of every state in the nation. Dkt. 79 ¶ 164; *see also id.* ¶¶ 160-165 (citing to the codes of the several states and the District of Columbia). Defendant has challenged these claims on the ground that no named plaintiff has standing to advance them. Dkt. 81 at 31-32. In response, Plaintiffs argue that they have alleged "nationwide" sales, and that this challenge is, in effect, a premature motion to strike. Dkt. 86 at 26-28.

To have standing, "named plaintiffs who represent a class must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent." 📑 *Lewis v. Casey*, 518 U.S. 343, 357 (1996). "Moreover, at least one named plaintiff must have standing with respect to each claim the class representatives

seek to bring." 📑 *In re Ditropan XL Antitrust Litig.*, 529 F. Supp. 2d 1098, 1107 (N.D. Cal. 2007) (citing 📑 *Griffin v. Dugger*, 823 F.2d 1476, 1483 (11th Cir. 1987)). Accordingly, "[c]ourts routinely dismiss claims where no plaintiff is alleged to reside in a state whose laws the class seeks to enforce seeks to enforce." *Sahagian v. Genera Corp.*, No. CV 08-7613-GW PJWX, 2009 WL 9504039, at *6 (C.D. Cal. July 6, 2009).

📑 Plaintiffs rely on *Langan v. Johnson & Johnson Consumer Cos.*, 897 F.3d 88, 96 (2d Cir. 2018) for the proposition that "whether a plaintiff can bring a class action under the state laws of multiple states is a question of predominance under Rule 23(b)(3), not a question of standing under Article III." *Langan* observed that there is "considerable disagreement" among district courts as to this question, and decided that where state laws resulted in only "modest variations" as to corresponding claims, a plaintiff's ability to advance claims on behalf of class members who reside elsewhere was more relevant to certification than standing. 📑 *Id.* at 93-95 (noting that the Seventh Circuit is the only other Circuit to have reached the question, and that it resolved it in a similar manner in 📑 *Morrison v. YTB Int'l, Inc.*, 649 F.3d 533, 536 (7th Cir. 2011)).

The Ninth Circuit has not directly addressed this question in the context of multistate claims. *See Los Gatos Mercantile, Inc. v. E.I. DuPont De Nemours & Co.*, No. 13-CV-01180-BLF, 2014 WL 4774611, at *3 (N.D. Cal. Sept. 22, 2014) ("Surprisingly, there is no controlling case law on this issue."). However, in a class action against various mortgage originators and assignees, where not all defendants held the notes of named plaintiffs, the Ninth Circuit concluded that the "district court correctly addressed the issue of standing before it addressed the issue of class certification." 📑 *Easter v. Am. W. Fin.*, 381 F.3d 948, 961-62 (9th Cir. 2004). *Easter* held that the decisions of the Supreme Court do "not require courts to consider class certification before standing," noting that a "court must be sure of its own jurisdiction before getting to the merits." 📑 *Id.* at 962 (quoting 📑 *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 831 (1999)); *see also* 📑 *Perez v. Nidek Co.*, 711 F.3d 1109, 1113-14 (9th Cir. 2013) ("[W]e do not need to reach the more difficult chicken-and-egg question of whether class certification should be decided before standing."). Accordingly, "[m]any courts -- including a number of courts in this District -- have refused to defer consideration of these issues, instead treating standing as a threshold matter that

should be addressed at the pleading stage." *See* *In re Carrier IQ, Inc.*, 78 F. Supp. 3d 1051, 1069 (N.D. Cal. 2015) (collecting cases with differing outcomes).

**\*15** In light of these decisions, "[t]here is no hard and fast rule to apply," but on balance, "judges in this circuit who have addressed the question ... opt ... to require that plaintiffs present named class representatives who possess individual standing to assert each state law's claims." *Johnson v. Nissan N. Am., Inc.*, 272 F. Supp. 3d 1168, 1175 (N.D. Cal. 2017) (citing, *inter alia*, *Mollicone v. Universal Handicraft, Inc.*, No. 2:16-cv-07322, 2017 WL 440257, at \*9-10 (C.D. Cal. Jan. 30, 2017) (dismissing claims based on laws of states other than those represented by named plaintiffs); *Morales v. Unilever U.S., Inc.*, No. 2:13-2213, 2014 WL 1389613, at \*6 (E.D. Cal. Apr. 9, 2014) (same). "This approach best comports with the Court's understanding of Article III requirements, summed up concisely by *Moore*: 'If a complaint includes multiple claims, at least one named class representative must have Article III standing to raise each claim.' " *Los Gatos Mercantile*, 2014 WL 4774611, at \*4 (quoting 5 J. Moore *et al.*, *Moore's Federal Practice* § 26.63[1][b] at 23–304 (3rd Ed. 2014)). Doing so is also supported by "prudential reasons:"

> The alternative proposed by the plaintiffs [deferring consideration until class certification] would allow named plaintiffs in a proposed class action, with no injuries in relation to the laws of certain states referenced in their complaint to embark on lengthy class discovery with respect to injuries in potentially every state in the Union. At the conclusion of that discovery, the plaintiffs would apply for class certification, proposing to represent the claims of parties whose injuries and modes of redress would not share. That would present the precise problem that the limitations of standing seek to avoid.

*In re Carrier IQ*, 78 F. Supp. 3d at 1070 (quoting *In re Wellbutrin XL Antitrust Litig.*, 260 F.R.D. 143, 155 (E.D. Pa. 2009)).

Plaintiffs reside in California and purchased their vehicles here. Although the SAC alleges that Defendant made sales of similar vehicles throughout the country, it does not allege that Plaintiffs had any contractual or other relationship with Defendant outside of California. Accordingly, there is no named plaintiff with standing to advance claims based on the laws of other states.

For these reasons, the Motion is **GRANTED** as to the seventh cause of action, without prejudice.

## V. Conclusion

For the reasons stated in this Order, the Motion is **GRANTED IN PART**, *i.e.*, as to the following claims: (i) violations of CLRA and the UCL, insofar as they arise out of alleged fraud and are advanced by Mercado; (ii) negligence, (iii) product liability; (iv) violation of the Magnuson-Moss Warranty Act; (v) violation of the Song-Beverly Warranty Act as advanced by Holmes; and (vi) violation of the statutes of states other than California. Dismissal of these claims is without prejudice.

The Motion is **DENIED IN PART** as to the following claims: (i) violations of CLRA and UCL, insofar as they arise out of fraud and are advanced by Holmes; (ii) violations of the UCL insofar as they arise out of unlawful or unfair conduct; and (iii) violation of the Song-Beverly Warranty Act as advanced by Mercado.

Plaintiffs shall file any amended complaint within 21 days of the issuance of this Order.

**IT IS SO ORDERED.**

___ : ___

Initials of Preparer <u>vrv</u>

**All Citations**

Slip Copy, 2019 WL 9051000

---

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

**EXHIBIT N**

Castleman v. FCA US LLC, Not Reported in Fed. Supp. (2019)

2019 WL 1406611
Only the Westlaw citation is currently available.
United States District Court, D. Utah.

Mindy CASTLEMAN, Plaintiff,
v.
FCA US LLC f/k/a Chrysler Group, LLC, Defendant.

Case No. 2:18-cv-00342-JNP-PMW
|
Signed 03/28/2019

**Attorneys and Law Firms**

Colin P. King, Lance L. Milne, Peter W. Summerill, Dewsnup King Olsen Worel Havas Mortensen, Salt Lake City, UT, Meagan L. Verschueren, Pro Hac Vice, Robert J. Francavilla, Pro Hac Vice, Casey Gerry Schenk Francavilla Blatt Penfield LLP, San Diego, CA, for Plaintiff.

Darin J. Lang, Christopher T. Carry, Nelson Mullins Riley & Scarborough LLP, Denver, CO, Nathan D. Alder, Sarah E. Spencer, Christensen & Jensen PC, Salt Lake City, UT, Thomas M. Klein, Pro Hac Vice, Klein Thomas, Phoenix, AZ, for Defendant.

**MEMORANDUM DECISION AND ORDER DENYING DEFENDANT'S MOTION TO DISMISS**

Jill N. Parrish, United States District Judge

**\*1** Before the court is the Motion to Dismiss Plaintiff Mindy Castleman's First Amended Complaint and Jury Demand ("Amended Complaint") filed by Defendant FCA US LLC ("FCA"). ECF No. 40. For the reasons articulated below, the court denies the motion.

**BACKGROUND**

On May 1, 2016, Plaintiff Mindy Castleman ("Castleman") was driving eastbound on Interstate 70, near mile post 183, when the 2004 Jeep Grand Cherokee Laredo (the "Vehicle") she was driving overturned resulting in severe injury. [1] Castleman alleges that her injuries were caused by certain design flaws and defects common to the 1999-2004 Jeep model Grand Cherokees. Castleman filed this lawsuit against Fiat Chrysler Automobiles U.S., LLC (FCA US

LLC) ("FCA") seeking recovery for strict product liability, negligent product liability, breach of warranties, and for punitive damages.

The Vehicle at issue was designed and manufactured by Chrysler, LLC, DaimlerChrysler Corporation, Old Carco LLC and its affiliates (collectively "Old Chrysler"). Plaintiff alleges that at the time of design and manufacture, the Vehicle was "defective in its design, manufacture, testing, maintenance, advertising, selling, distribution, and introduction into the stream of commerce." *See* Am. Compl. at ¶ 8. These defects allegedly include, but are not limited to:

> being supplied without important crashworthiness and protection systems ..., inadequate roof strength, roof structures, inadequate roof materials, inadequate roof-crush resistance, inadequate restraint protection systems, lack of electronic stability control, and inadequate center of gravity and overall vehicle design rendering it dangerously prone to roll over during foreseeable driver maneuvers.

*Id.* Castleman alleges that Old Chrysler knew of these defects, but intended that the Vehicle be purchased and operated regardless of the defects.

In April 2009, Old Chrysler filed for bankruptcy protection in the United States Bankruptcy Court, Southern District of New York. On June 1, 2009, the Bankruptcy Court entered an order authorizing the sale of Old Chrysler's assets to FCA ("Sale Order") [2] pursuant to the Master Transaction Agreement ("MTA"). The sale closed on June 10, 2009 ("Closing" or the "Sale"). Through the Sale Order, FCA purported to proscribe liability for any product liability or successor liability claims not explicitly assumed in the MTA:

> Except for the Assumed Liabilities expressly set forth in the Purchase Agreement ... [t]he Purchaser shall not be deemed, as a result of any action taken in connection with the

Purchase Agreement or any of the transactions or documents ancillary thereto or contemplated thereby or the acquisition of the Purchased Assets, to: (a) be a **legal successor**, or otherwise **be deemed a successor** to the Debtors (other than with respect to any obligations arising under the Assumed Agreements from and after the Closing); ... [and] the Purchaser shall not have any **successor, derivative or vicarious liabilities** of any kind or character for any Claims, including, but not limited to, on any theory of **successor or transferee liability**, *de facto* merger or continuity, environmental, labor and employment, products or antitrust liability, whether known or unknown as of the Closing, now existing or hereafter arising, asserted or unasserted, fixed or contingent, liquidated or unliquidated.

**\*2** Sale Order ¶ 35 (emphasis added).

On November 19, 2009, the Bankruptcy Court entered a Stipulation and Agreed Order Approving Amendment Number 4 ("Amendment 4") to the MTA. [3] Pursuant to Amendment 4, FCA assumed liability for:

All Product Liability Claims arising from the sale on or prior to the Closing of motor vehicles or component parts, in each case manufactured by Sellers or their Subsidiaries and distributed and sold as a Chrysler, Jeep, or Dodge brand vehicle ... solely to the extent such Product Liability Claims (A) arise directly from motor vehicle accidents occurring on or after Closing, (B) are not barred by any statute of limitations, ... and (D) do not include any claim for **exemplary or punitive damages**.

Castleman's accident occurred in May 2016, almost five years after the Closing, in a Vehicle designed and manufactured pre-Closing. Castleman alleges that when the Vehicle rolled, due in part to the inherent instability of the design, the flaws in the roof structure caused the roof to collapse, crushing the "occupant survival space." Allegedly these defects, as well as airbag design flaws, caused Castleman's injuries. Castleman seeks to hold FCA liable for Old Chrysler's negligent conduct in designing and manufacturing the Vehicle that caused her injury under the MTA. Castleman also seeks punitive damages for FCA's post-Closing conduct. FCA has moved to dismiss Castleman's Amended Complaint in its entirety.

## ANALYSIS

### I. LEGAL STANDARD

FCA moves under Fed. R. Civ. P. 12(b)(6) to dismiss Castleman's Amended Complaint for failure to state a claim. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) ). "At the motion-to-dismiss stage, [the court] must accept all the well-pleaded allegations of the complaint as true and must construe them in the light most favorable to the plaintiff." *Albers v. Bd. of Cty. Comm'rs of Jefferson Cty.*, 771 F.3d 697, 700 (10th Cir. 2014) (quoting *Cressman v. Thompson*, 719 F.3d 1139, 1152 (10th Cir. 2013) ). "[A] court should disregard all conclusory statements of law [in the complaint] and consider whether the remaining specific factual allegations, if assumed to be true, plausibly suggest the defendant is liable." *Kansas Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1214 (10th Cir. 2011).

"In evaluating a Rule 12(b)(6) motion to dismiss, courts may consider not only the complaint itself," but also "documents incorporated into the complaint by reference ... 'if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity.' " *Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009) (quoting *Alvarado v. KOB–TV, L.L.C.*, 493 F.3d 1210, 1215 (10th Cir. 2007) ). The court will consider the Sale Order, the MTA, and Amendment 4. These documents are referenced in the

Amended Complaint, are central to plaintiff's claim, and are undisputed.

 **\*3** Castleman's Amended Complaint alleges four causes of action: 1) strict product liability ("Count I"), 2) negligent product liability ("Count II"); 3) breach of warranties ("Count III"); and 4) punitive damages for FCA's knowing, reckless, and/or intentional misconduct after the Bankruptcy Sale Closing Date ("Count IV"). FCA moves to dismiss the Amended Complaint, arguing that the claims are barred by the Sale Order and the MTA.

### II. SUBSTANTIVE ANALYSIS

#### A. COUNTS I-III

In two brief paragraphs, FCA asks the court to dismiss Castleman's entire Amended Complaint because it contains a single claim for punitive damages. *See* Mot. Dismiss at 16. FCA argues this is required by the language of the MTA. In Amendment 4, FCA assumed liability for:

> All Product Liability Claims arising from the sale on or prior to the Closing of motor vehicles or component parts, in each case manufactured by Sellers or their Subsidiaries and distributed and sold as a Chrysler, Jeep, or Dodge brand vehicle ... solely to the extent such Product Liability Claims (A) arise directly from motor vehicle accidents occurring on or after Closing, (B) are not barred by any statute of limitations, ... and (D) do not include any claim for **exemplary or punitive damages**.

(emphasis added). Under FCA's logic, the phrase "Product Liability Claims," as used in Amendment 4, would not refer to a single claim, but rather to any complaint that includes product liability claims. But FCA offers no authority to support this conclusion, and the court finds the argument unpersuasive. Complaints can allege many different claims for relief that are not necessarily interrelated and may be pled in the alternative. For example, a complaint could include claims for product liability alongside claims for breach of contract, without the action being considered only a breach of

contract case. The language of Amendment 4 clearly relates to individual claims, not to a lawsuit or complaint as a whole. The court must therefore examine each count individually to decide if it is a Product Liability claim for which FCA assumed liability.

Counts I–III of the Amended Complaint are product liability claims arising from an accident that occurred on May 1, 2016 (after the 2009 Closing Date) in a 2004 Jeep Grand Cherokee Laredo, designed, manufactured, advertised, sold, warranted and delivered by Old Chrysler prior to the Closing Date. Each of the three individual product liability claims (one for strict liability, one for negligent product liability, and one for breach of warranty) can stand alone and none of the three claims include a claim for "exemplary or punitive damages." As FCA has not offered any other reason why Castleman's first three counts have failed to state a claim, the court denies FCA's motion to dismiss Counts I-III.

#### B. COUNT IV: PUNITIVE DAMAGES

In Count IV, Castleman seeks "an award of exemplary and punitive damages against FCA" to compensate her for injury allegedly caused by FCA's "intentional misrepresentations" regarding the Vehicle's safety features and its knowing, reckless, and indifferent failure to "give notice, warn, recall, retrofit, or fix the defects" in the Vehicle after the Sale. *See* Am. Compl. at ¶¶ 78; 74. The parties agree that punitive damages are available in Utah.[4] But to state a claim for punitive damages under Utah law, a plaintiff must first make a claim that would entitle her to "compensatory or general damages" and then must allege "that the acts or omissions of the tortfeasor are the result of willful and malicious or intentionally fraudulent conduct, or conduct that manifests a knowing and reckless indifference toward, and a disregard of, the rights of others." *See* Utah Code Ann. § 78B-8-201 (also stating that to be entitled to punitive damages, plaintiff must establish the second prong "by clear and convincing evidence"). In deciding the motion to dismiss, the court must decide whether Castleman has pled sufficient facts to state a claim for relief for punitive damages that is plausible on its face.

 **\*4** FCA argues that two provisions within the Sale Order preclude liability for Castleman's punitive damages claim. First, FCA argues that the claims underlying the punitive damages actually arise from FCA's potential successor liability and that those claims are excluded by the Sale Order. Second, FCA argues that Castleman's claim for punitive

damages based on FCA's post-Closing conduct is barred by Amendment 4 because the proximate cause of her injuries was actually Old Chrysler's pre-Closing conduct, not FCA's post-Closing conduct. The court addresses each argument in turn.

### 1. Underlying Claims

Castleman's punitive damages claim alleges that she was harmed by FCA's post-Sale intentional misconduct, including intentional misrepresentations and failure to give notice, warn, recall, retrofit, or fix the defects in the Vehicle. FCA argues that the Sale Order precludes liability for any type of successor or derivative liability claims and because the duty to warn is a species of successor liability claims under Utah law, Castleman has failed to state a plausible claim for relief.

### a. Intentional Misrepresentation

FCA does not address whether the Sale Order precludes FCA's liability for post-Sale intentional misrepresentation, nor does FCA argue that Castleman failed to state a claim for intentional misrepresentation. The court addresses this issue only so far as to hold that Castleman can base a claim for punitive damages on an underlying claim for intentional misrepresentation by FCA because intentional misrepresentations by FCA regarding the safety of Jeep Grand Cherokees designed by Old Chrysler would constitute post-Sale Conduct not covered by the Sale Order. *See* *In Matter of Motors Liquidation Co.*, 829 F.3d 135, 156–7 (2d Cir. 2016) (holding that a Sale Order cannot reach "independent claims relating only to [a successor entity's] conduct" such as "claims involv[ing] misrepresentations by [purchasing entity] as to the safety of [predecessor entity's] cars.").

### b. Duty to Warn [5]

FCA admits that Utah law imposes a post-Sale duty to warn, but argues that the duty to warn is based entirely on successor liability and thus excluded by the language of the Sale Order precluding "any theory of successor or transferee liability." *See* Mot. Dismiss at 14–15. The court disagrees. The Sale Order is not so broad as to preclude FCA's liability for post-Sale duty to warn. The court first examines whether a duty to warn arises under Utah law. It then examines whether the Sale Order eviscerates or modifies any such duty.

First, the court finds that liability arising from the breach of a purchasing entity's duty to warn is distinct from traditional successor liability. Successor liability is addressed in section 12 of the Restatement (Third) of Torts: Products Liability (1988), [6] while, a purchasing entity's duty to warn is addressed in section 13. Although both sections refer to "successor liability," they are distinct types of liability as adopted by Utah law. "Utah imposes on a successor corporation an independent post-sale duty to warn of a predecessor corporation's product defects under the conditions outlined in section 13 of the Restatement (Third) of Torts." *Tabor v. Metal Ware Corp.*, 168 P.3d 814, 816 (Utah 2007) (addressing the question of duty to warn under Utah law on certification from the Tenth Circuit). This duty can be imposed "whether or not [an entity is] liable under the rule stated in [the Restatement (Third) of Torts] § 12." *See* Restatement (Third) of Torts: Prod. Liab. § 13 (1998). The Tenth Circuit recognized this distinction in *Herrod v. Metal Powder Products*, 413 F. App'x 7, 13 (10th Cir. 2010), holding that "[a] corporation free from successor liability may nevertheless owe a duty to warn of dangers posed by its predecessor's products as a result of its ongoing relationship with the predecessor's customers." To summarize, liability for failure to warn is not dependent on whether a purchasing entity assumed liabilities incurred by its predecessor, but rather on the fact that a purchasing entity owes a duty to continuing customers that is independent of those past liabilities.

**\*5** The next question is whether the Sale Order can preclude liability for a purchasing entity's independent duty to warn. The court finds that it cannot, because doing so would be outside the scope of the bankruptcy court's authority. The Court of Appeals for the Second Circuit addressed this issue as it related to FCA's liability under the Sale Order in *In Matter of Motors Liquidation Co.*, 829 F.3d 135, 156 (2d Cir. 2016). It reasoned:

> A bankruptcy court may approve a [bankruptcy] sale "free and clear" of successor liability claims if those claims flow from the debtor's ownership of the sold assets. Such a claim must arise from a (1) right to payment (2) that arose before the filing of the petition or resulted from

pre-petition conduct fairly giving rise to the claim. Further, there must be some contact or relationship between the debtor and the claimant such that the claimant is identifiable.

*Id.* The court then addressed the reach of the bankruptcy court's authority as applied to different types of claims. Although "the bankruptcy court assumed that the Sale Order's broad [free and clear] language" covered "(1) pre-closing accident claims, (2) economic loss claims arising from the [product] defect ..., (3) independent claims relating only to [the successor entity's] conduct, and (4) Used Car Purchasers' claims," the Sale Order could only cover "the first two sets of claims." *Id.* Accordingly, claims based on FCA's post-Sale duty to warn relate to the successor entity's conduct and are not excludable by the Sale Order.

A similar issue was addressed by the United States Bankruptcy Court for the Southern District of New York in *In re Old Carco LLC*, 582 B.R. 838, 845 (Bankr. S.D.N.Y. 2018). There, the court noted that while the bankruptcy court presiding over the bankruptcy proceedings can (and did) exclude FCA's liability for Old Chrysler's failure to "recall or retrofit," the question of whether FCA "had a duty to recall or retrofit previously sold Old [Chrysler] vehicles that [FCA] did not manufacture is a question of nonbankruptcy law." *Id.* (quoting  *In re Motors Liquidation Co.*, 541 B.R. 104, 141 (Bankr. S.D.N.Y. 2015) ). And "non-bankruptcy law may impose on an asset buyer a duty to warn owners of products manufactured by its seller that the products are defective or pose a danger." *Id.* This court agrees. Because bankruptcy law does not reach FCA's post-Sale conduct the court looks to Utah law, which does impose a post-sale duty to warn on purchasing entities as laid out in section 13 of the Restatement. [7]

**\*6** For these reasons, the court finds that Castleman's claim for breach of duty to warn is not excluded by the Sale Order. In reaching this decision, the court does not in any way "*modify* the Sale Order," but "merely interpret[s] the Sale Order in accordance with bankruptcy law."  *In Matter of Motors Liquidation Co.*, 829 F.3d at 157. [8] Furthermore, the court finds that Castleman has successfully stated a claim for breach of the duty to warn. Castleman made sufficient factual allegations that FCA has enjoyed potential or actual economic advantage from providing maintenance and repair

services on Old Chrysler's vehicles. Castleman has also alleged that a reasonable person in FCA's position would have provided a warning because "(1) FCA knew 2004 Jeep Grand Cherokees posed a substantial risk of harm to users due to defects; (2) reasonable users were unaware of the risk of harm and defects; (3) a warning could have been effectively communicated to and acted on by users ...; and (4) the risk of serious head/neck injury or death justified the burden of providing a warning." *See* Opp'n Mot. Dismiss at 14; Am. Compl. at ¶¶ 60–69, 74, 77–84. In short, Castleman has successfully alleged that FCA owed her a duty to warn and that it breached that duty.

### 2. Proximate Cause

The next issue the court must address is whether Amendment 4 precludes Castleman's punitive damages claim because Old Chrysler's pre-Closing conduct rather than FCA's postClosing conduct, was the proximate cause of Castleman's injuries. Castleman's Amended Complaint alleges that FCA's post-Sale conduct was the proximate cause of her harm. But FCA argues that even if FCA breached a post-Sale duty that was a cause of Castleman's harm, it was not the proximate cause. Specifically, it argues that the conduct of Old Chrysler in negligently designing, testing, labeling, manufacturing, inspecting and selling the Grand Cherokee prior to the closing date was the proximate cause of her harm and therefore Castleman's claims for punitive damages are excluded by the MTA.

To decide this question, the court would have to determine whether the post-Closing or pre-Closing conduct was the proximate cause of Castleman's harm. But the question of proximate cause is a question reserved for the fact finder. Accordingly, it is not appropriately decided at the motion to dismiss stage. *See*  *Steffensen v. Smith's Mgmt. Corp.*, 820 P.2d 482, 486–87 (Utah Ct. App. 1991), *aff'd*, 862 P.2d 1342 (Utah 1993) (holding that when the evidence is in dispute, proximate cause is reserved for the jury). As the Bankruptcy Court decided when addressing the same issue in *In re Old Carco LLC*, 582 B.R. 838, 846 (Bankr. S.D.N.Y. 2018), if "Plaintiff can assert legally sufficient claims based solely on [FCA]'s post-Closing wrongful conduct, the question of what proximately caused the Decedents' fatal injuries is for the factfinder." Because Castleman has alleged a legally sufficient basis on which a trier of fact could determine that FCA's post-closing conduct was a proximate cause [9] of Castleman's injuries, the court denies FCA's motion to dismiss.

09-50002-mg    Doc 8569    Filed 11/04/21    Entered 11/04/21 12:54:51    Main Document
Pg 716 of 723

Castleman v. FCA US LLC, Not Reported in Fed. Supp. (2019)

ORDER

**\*7**  Defendant FCA's Motion to Dismiss Plaintiff's First Amended Complaint is **DENIED.**

All Citations

Not Reported in Fed. Supp., 2019 WL 1406611

## Footnotes

1    "Ms. Castleman was diagnosed critically with (1) paralysis; (2) cervical spine instability; (3) multiple rib fractures; (4) left scapular fracture; (5) an orbital floor fracture; (6) lacerations on her left kidney, scalp and elbow; and (7) multiple abrasions." *See* Am. Compl. at ¶ 21.

2    *In re Old Chrysler LLC, et al.*, Case No. 09-50002, Order (I) Authorizing the Sale of Substantially All of the Debtors' Assets Free and Clear of All Liens, Claims, Interests and Encumbrances, (II) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection Therewith and Related Procedures and (III) Granting Related Relief, ("Sale Order") (Bankr. S.D.N.Y. June 1, 2009).

3    *In re Old Chrysler LLC, et al.*, No. 09-50002 (Bankr. S.D.N.Y. Nov. 19, 2009), Docket No. 5988.

4    Although the parties do not address this issue, the parties appear to stipulate that Utah law applies to Castleman's claims for relief.

5    The court addresses Castleman's claims that FCA breached its duty to warn, recall, retrofit, and fix under the umbrella tort of duty to warn. The parties have not argued that the claims are inherently different, and the court finds that the analysis of whether the Sale Order precludes the claims is identical.

6    "Utah adheres to the traditional rule of successor nonliability ..., as set forth in section 12 of the Restatement (Third) of Torts." *Tabor v. Metal Ware Corp.*, 168 P.3d 814, 816 (Utah 2007).

7    *See* Restatement (Third) of Torts: Prod. Liab. § 13 (1998):

(a) A successor corporation or other business entity that acquires assets of a predecessor corporation or other business entity, whether or not liable under the rule stated in § 12, is subject to liability for harm to persons or property caused by the successor's failure to warn of a risk created by a product sold or distributed by the predecessor if: (1) the successor undertakes or agrees to provide services for maintenance or repair of the product or enters into a similar relationship with purchasers of the predecessor's products giving rise to actual or potential economic advantage to the successor, and (2) a reasonable person in the position of the successor would provide a warning. b) A reasonable person in the position of the successor would provide a warning if: (1) the successor knows or reasonably should know that the product poses a substantial risk of harm to persons or property; and (2) those to whom a warning might be provided can be identified and can reasonably be assumed to be unaware of the risk of harm; and (3) a warning can be effectively communicated to and acted on by those to whom a warning might be provided; and (4) the risk of harm is sufficiently great to justify the burden of providing a warning.

8    Other courts have questioned the reach of the Sale Order at issue in this case. *See* In re Grumman Olson Indus., Inc., 445 B.R. 243, 256 (Bankr. S.D.N.Y. 2011), *aff'd*, 467 B.R. 694 (S.D.N.Y. 2012) ("[A]lthough the *Chrysler* sale order purported to extinguish the buyer's liability for potential future tort claims, the Second Circuit questioned its reach.") (citing In re Chrysler LLC, 576 F.3d 108, 127 (2d Cir.), *cert. granted, judgment vacated sub nom.* Indiana State Police Pension Tr. v. Chrysler LLC, 558 U.S. 1087 (2009), and *vacated sub nom.* In re Chrysler, LLC, 592 F.3d 370 (2d Cir. 2010) ("[W]e decline to delineate the scope of the bankruptcy court's authority to extinguish future claims, until such time as we are presented with an

actual claim for an injury that is caused by Old Chrysler, that occurs after the Sale, and that is cognizable under state successor liability law.") ).

9    The post-Closing conduct does not have to be the only proximate cause of Castleman's harm because, under Utah law, "there can be more than one proximate cause of an injury so long as each is a concurrent contributing factor in causing the injury." *Steffensen*, 820 P.2d at 486.

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

 © 2021 Thomson Reuters. No claim to original U.S. Government Works.

**EXHIBIT O**

2015 WL 5172996
Only the Westlaw citation is currently available.
United States District Court,
N.D. Ohio,
Eastern Division.

HOLLAND, Jr., et al., Plaintiffs,
v.
FCA U.S. LLC (Fiat Chrysler Automobiles U.S.,
LLC (f/k/a Chrysler Group, LLC)), Defendant.

No. 1:15 CV 121.
|
Signed Sept. 3, 2015.

**Attorneys and Law Firms**

Larry E. Coben, Paola Saneaux, Sol H. Weiss, Anapol
Schwartz Weiss Cohan Feldman & Smalley, Philadelphia, PA,
James Allison Lowe, Lowe, Eklund & Wakefield, Cleveland,
OH, D. Andrew List, Clark, Perdue & List, Columbus, OH,
for Plaintiffs.

John W. Rogers, Kathy A. Wisniewski, Stephen A. D'Aunoy,
Thompson & Coburn, St. Louis, MO, Christina J. Marshall,
Sutter, O'Connell, Mannion & Farchi, Lawrence A. Sutter,
Sutter, O'Connell, Mannion & Farchone, Cleveland, OH, for
Defendant.

*MEMORANDUM OPINION AND ORDER*

DONALD C. NUGENT, District Judge.

 **\*1** On April 20, 2015, Defendant, FCA U.S. LLC ("FCA"),
filed a Motion for Summary Judgment (Docket # 18) in the
above captioned matter, asking the Court to grant summary
judgment in its favor on all claims raised by Plaintiffs, Darrell
Holland, Jr., John Dell, David Lockett, Brenda Bladwin,
Anthony Soto, and James Morales, in their First Amended
Class Action Complaint. On June 2, 2015, FCA filed a Motion
to Transfer (Docket # 24), asking the Court to transfer this
mater to the United States District Court for the Southern
District of New York, for referral to the Bankruptcy Court in
that District. FCA argues transfer is appropriate because the
claims made by Plaintiffs are dependent on, and inextricably
intertwined with, a Sale Order entered in the case of *In re
Old Carco LLC (f/k/a Chrysler LLC),* Case No. 09–50002

(Bankr.S.D.N.Y.) ("Sale Order"). Both Motions are fully
briefed.

A status conference was held on June 25, 2015, during which
the Parties indicated that FCA's Motion to Dismiss, filed on
April 20, 2015, (Docket # 17) is moot.

**Factual and Procedural Background**

Plaintiffs in this case filed their First Amended Class Action
Complaint against FCA on April 6, 2015. (Docket # 10.)
FCA was formed in the aftermath of the Chrysler Bankruptcy
case and was formerly known as Chrysler Group LLC.
The Bankruptcy Sale Order was effective June 10, 2009.
(Complaint at Paragraph 18.) Plaintiffs are owners of 2004–
2008 Chrysler Pacificas manufactured with Chrysler CS
Platform engine cradles that are alleged to have prematurely
rusted, corroded and/or perforated, creating a substantial risk
of, or causing the engine to fall out of the vehicle. Plaintiffs
allege various claims against under State law.

On October 23, 2010, FCA issued a Technical Service
Bulletin ("TSB") concerning "Vehicle Vibration and/or
Shake," alerting owners and mechanics to check the engine
cradles and front suspension of certain 2004–2005 Chrysler
Pacifica V6–3.5L VIN 4 vehicles for perforation and possible
replacement. (*Id.* at 19.) The October 23, 2010 TSB indicated
that this applied only to vehicles in the Canadian Market and
in 19 U.S. salt belt states. (*Id.* at 20.) On November 9, 2010,
FCA issued a letter expressly extending warranty coverage
for 2004–2005 Chrysler Pacificas, indicating as follows:

> We are extending the warranty period
> on your front engine cradle because
> some vehicles operated in areas of
> high road salt usage may experience
> engine cradle corrosion resulting in
> driveability vibration and/or shake. If
> your vehicle is operating properly,
> there is nothing you are required to do.
> If you are experiencing the conditions
> described in this warranty extension
> within the 10 year or 150,000 mile
> period, simply contact your dealer to
> have repairs performed. Your dealer
> will inspect the engine cradle for
> perforation corrosion on the rear cross

car cradle support and replace if necessary.

(*Id.* at 21.) 2004–2005 Pacifica owners who paid for engine cradle repairs out of pocket were advised to send their original receipts, invoices and/or repair orders with proof of payment to Chrysler's Customer Assistance Center for reimbursement. (*Id.* at 22.)

**\*2** On March 16, 2012, approximately a year and a half later, FCA issued a new TSB, expressly superseding the October 2010 TSB, stating that the engine cradle defect and extended warranty applied only to 2004–2005 Chrysler Pacificas in the salt belt states that were manufactured in a six-week window, from February 23, 2004 through March 31, 2004. (*Id.* at 23.) According to FCA, approximately 7,000 Pacifica vehicles were affected by the engine cradle defect, the root cause of which was a problem with the engine cradles' coating thickness. (*Id.* at 24.) However, Plaintiffs allege that throughout the United States, owners of over 322,000 Pacificas, model years 2004–2008, have been discovering that their vehicles' engine cradles are severely rusted and corroded, many to the point that their vehicles have been deemed unsafe to drive, and have been forced to either stop using their Pacificas of pay for repairs out of pocket, while others are currently driving their vehicles unaware of the alleged hazard. (*Id.* at 25–26.) Plaintiffs claim FCA is aware of the alleged defect and, that despite that knowledge, has fraudulently withheld information about the defect, fraudulently denied the existence of the defect and failed to adequately address the engine cradle defect. (*Id.* at 36.)

**FCA's Motion to Dismiss. (Docket # 17.)**
On April 20, 2015, FCA filed a Motion to Dismiss Plaintiffs' First Amended Class Action Complaint. (Docket # 17.) At the Status Conference held on June 26, 2015, the Parties indicated that said Motion is moot. (Docket # 29.) However, the Motion is referenced by the Parties and the related briefing provides relevant information regarding the arguments of the Parties relative to FCA's Motion for Summary Judgment and Motion to Transfer. Therefore, the Court will summarize the positions of the Parties stated therein.

FCA argues that it has no legal obligation to Plaintiffs, as FCA did not exist until 2009 and the Bankruptcy Sale Order bars certain claims against FCA for vehicles manufactured before June 10, 2009. FCA argues that it has never taken any action, or assumed any duty with respect to the vehicles Plaintiffs own and, therefore, that it is under no legal duty to pay for Plaintiffs' vehicle corrosion. FCA argues that one who performs a voluntary act has no legal obligation to do more than the duty undertaken; that a claim for breach of a voluntarily undertaken duty must allege physical injury; that a consumer cannot claim a warranty was created and extended to them by a vehicle manufacturer's issuance of a TSB to a dealership; and, that it has no post-sale duty to warn about defects in the product because FCA did not exist until 2009 and it did not manufacture or sell the vehicles and has no relationship with the product's owner.

On May 29, 2015, Plaintiffs filed their Response in Opposition, arguing that the First Amended Complaint carefully alleges duties that arose subsequent to the Bankruptcy Sale Order and alleges FCA had an independent duty to warn of and adequately address the engine cradle defect. Plaintiffs state that the TSBs issued by FCA confirm FCA's knowledge of the defect and that the latent defects at issue were not known or announced by FCA until after the Bankruptcy Sale Order, thereby removing it from the purview of the Sale Order under *Burton v. Chrysler Group, LLC* (*In re Old Carco LLC* ), 492 B.R. 392, 395 (Bankr.S.D.N.Y.2013) ("[t]he Sale Order obviously does not bar claims concerning vehicles manufactured or sold by New Chrysler after the closing or injuries resulting from the breach of duties that arose under non-bankruptcy law after the closing."). Plaintiffs state that under *Burton,* FCA can be held liable under the theory of failure to warn of defects existing in older model year Chrysler vehicles when it has actual knowledge of the defects. *Burton,* 492 B.R. at 405.

**\*3** On June 8, 2015, FCA filed its Reply Brief. (Docket # 25.) FCA asserts that Plaintiffs have never had any relationship with FCA giving rise to a legal obligation to act. Contrary to the analysis provided by Plaintiffs, FCA argues that *Burton* rejected successor liability and that the Sale Order bars any claims against FCA based on a breach of a duty that existed as of June 10, 2009 with respect to claims for economic damages arising out of vehicles that were manufactured and sold by Old Carco. FCA argues that it had no duty "under non-bankruptcy law" to warn of the alleged defect or pay to repair it.

**FCA's Motion for Summary Judgment. (Docket # 18.)**

On April 20, 2015, FCA also filed a Motion for Summary Judgment. (Docket # 18.) FCA asserts that it is entitled to summary judgment pursuant to Fed.R.Civ.P. 56(c) on all claims in Plaintiffs' First Amended Class Action Complaint. FCA argues that it is not legally obligated to pay for the repairs on Plaintiffs' cars because it never offered an extended warranty on their vehicles and that the mere fact that FCA voluntarily extended the warranty on certain vehicles does not create a legal obligation to do anything for Plaintiffs.

Plaintiffs filed their Response in Opposition on May 29, 2015. (Docket # 23.) Plaintiffs argue that FCA mischaracterizes the claims alleged in the First Amended Complaint and ignores Plaintiffs' failure to warn claims. Plaintiffs assert that FCA had a duty to warn Pacifica owners upon learning of the latent safety defect and its attempts at doing to were inadequate. Further, Plaintiffs argue that the Motion for Summary Judgment is premature, as the Parties have barely begun formal discovery.

On June 8, 2015, FCA filed its Reply Brief. (Docket # 26.) FCA reiterates that it has never done anything for Plaintiffs or with respect to the Pacifica vehicles they own and, therefore, that they have no legal duty to act for Plaintiffs' benefit or warn Plaintiffs about the alleged rust-prone nature of their vehicles and pay for repairs. FCA argues that additional discovery is unnecessary because FCA has failed to present any evidence supporting a relationship between Plaintiffs and FCA.

**FCA's Motion to Transfer. (Docket # 24.)**
On June 2, 2015, FCA filed its Motion to Transfer. (Docket # 24.) FCA argues that the case should be transferred, pursuant to 28 U.S.C. § 1412, to the Southern District of New York, for referral to the Bankruptcy Court in that District, because the claims made by Plaintiffs are dependent on, and inextricably intertwined with, the *In re Old Carco LLC* Sale Order. The Bankruptcy Court retained jurisdiction to interpret and enforce the Sale Order and, citing 📄 *Ritter v. Chrysler Group LLC,* 2013 WL 7175621, *3 (M.D.Pa.2013),* FCA argues that transfer will serve the interests of justice and permit the Bankruptcy Court to interpret and enforce its Sale Order, thereby ensuring uniformity.

Plaintiffs filed the Response in Opposition on June 16, 2015, arguing transfer is unnecessary and that the decision of the Bankruptcy Court in *Burton* clearly explains that the law may impose a separate duty to warn on FCA. (Docket #

27.) Although referencing "successor liability" several times, Plaintiffs expressly state that the question in this case is "whether FCA established a sufficient relationship with pre-Bankruptcy Pacifica owners such that State law imposed an independent duty to address the engine cradle defect." (*Id.* at p. 5.) Plaintiffs assert that this case does not present a novel question which would warrant transfer; that Plaintiffs have a Constitutional right to adjudicate their post-Bankruptcy claims; and, that the Motion to Transfer otherwise fails to satisfy the requirements of Section 4112.

 **\*4** On June 23, 2015, FCA filed its Reply Brief. (Docket # 28.) FCA argues that this case should be transferred to the Bankruptcy Court, assuming Plaintiffs' claims are premised on a theory of "successor liability" and, that otherwise, FCA is entitled to dismissal of, or summary judgment as to, Plaintiffs claims because Plaintiffs have failed to allege a legally cognizable theory under which FCA could be held liable.

**Consent Order.**
On August 3, 2015, Plaintiffs filed a Motion to Supplement the Record (Docket # 30), apprising the Court of a Consent Order that FCA entered into with the National Highway Traffic Safety Administration ("NHTSA") on July 27, 2015, pursuant to which FCA was fined for mishandling certain vehicle recalls and was required to remedy certain defects and/or buyback certain vehicles. Although FCA attempts to correlate the details of the consent order with the facts as alleged in this case, there is nothing in the consent order with regard to the Chrysler Pacifica vehicles at issue in this case. It is interesting that the NHTSA ordered FCA to take specific action with regard to certain defective vehicles manufactured prior to the Sale Order. However, the Consent Order it not relevant to FCA's Motion for Summary Judgment and Motion to Transfer currently before the Court. Accordingly, the Motion to Supplement the Record (Docket # 30) is DENIED at this time.

## Discussion

**I. FCA's Motion to Transfer.**
28 U.S.C. § 1412 governs the transfer of proceedings "related to" a bankruptcy proceeding. *RFF Family Partnership, LP v. Wasserman,* Case No. 1:07 CV 1617, 2010 U.S. Dist. LEXIS 57191, 2010 WL 420014 (N.D.Ohio January 29, 2010). Section 1412 provides that a motion to transfer may

be granted "in the interest of justice or for the convenience of the parties." FCA asks the Court to transfer this case to the Bankruptcy Court in New York because it arises under, arises in, and is related to the Bankruptcy case of *In Re Old Carco LLC (f/k/a Chrysler LLC),* Case No. 09–50002 (Bankr.S.D.N.Y.) and asserts that the interests of justice will best be served by a transfer. However, the Bankruptcy Court has already addressed the arguments raised by FCA in this case in the context of the Bankruptcy Case, finding such claims would not be barred by the Sale Order.

In *Burton v. Chrysler Group LLC,* 492 B.R. 392 (S.D.N.Y.2013), the Bankruptcy Court stated as follows:

> Nevertheless, the law may impose a separate duty to warn on New Chrysler. Here, New Chrysler purchased Old Carco's assets. Succession alone does not impose a duty to warn a predecessor's customers of pre-existing defects, *Florom v. Elliott Mfg.,* 867 F.2d 570, 577 (10th Cir.1989); *Travis v. Harris Corp.,* 565 F.2d 443, 448–49 (7th Cir.1977), but the duty may arise where the successor (1) succeeds to the predecessor's service contracts that cover the particular machine, (2) actually services the machine, (3) is aware of the defect and (4) knows the location of the machine's owner. *Florom,* 867 F.2d at 577; *Polius v. Clark Equip. Co.,* 802 F.2d 75, 84 (3d Cir.1986); *Travis,* 565 F.2d at 449; *Schumacher v. Richards Shear Co.,* 59 N.Y.2d 239, 451 N.E.2d 195, 199, 464 N.Y.S.2d 437 (N.Y.1983); RESTATEMENT (THIRD) OF TORTS § 13 cmt. b (1998). In these circumstances, the law imposes a duty to warn because the successor has entered into a relationship with the customer and derives an actual or potential economic benefit. *Schumacher,* 464 N.Y.S.2d 437, 451 N.E.2d at 199.

**\*5** *Burton,* 492 B.R. at 405. The Court went on to state, with regard to vehicles manufactured prior to the Sale Order:

> [T]he Sale Order ... did not prevent New Chrysler from voluntarily assuming obligations that it did not have, such as extending a lifetime warranty to repair or replace a defective fuel assembly. I do not opine on the scope of the duties that New Chrysler assumed when it issued the TSBs or the legal sufficiency of these claims under non-bankruptcy law except to note that they would not be barred by the Sale Order.

*Id.* at 406.

Plaintiffs raise claims for failure to warn/failure to address defect; negligent misrepresentation and fraud. An important component of Plaintiffs' case is the fact that FCA issued TSBs regarding the rusting on the Chrysler Pacificas, first acknowledging there was an issue, and later limiting warranty coverage to only a small portion of vehicles. As explained in *Burton,* such claims are not barred by the Sale Order.

FCA's argument in support of transfer rests upon Plaintiffs' mixed use of the terms successor liability and independent duty. While Plaintiffs use the phrase "successor liability," Plaintiffs have expressly stated that the question in this case is "whether FCA established a sufficient relationship with pre-Bankruptcy Pacifica owners such that State law imposed an independent duty to address the engine cradle defect." (Opposition Brief, Docket # 27–1, at p. 5.) Therefore, this case is not one that argues liability simply because FCA is a successor to Old Chrysler, but rather whether FCA had a duty to act based knowledge it acquired and actions it took postSale Order relative to the alleged rusting on the Pacificas at issue.

Accordingly, FCA's Motion to Transfer (Docket # 24) is DENIED.

## II. FCA's Motion for Summary Judgment.

Summary judgment is appropriate when the court is satisfied "that there is no genuine dispute as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The burden of showing the absence of any such "genuine dispute" rests with the moving party:

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any,' which it believes demonstrates the absence of a genuine [dispute] of material fact.

Celotex v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (citing FED. R. CIV. P. 56(c)). As a general matter, the district judge considering a motion for summary judgment is to examine "[o]nly disputes over facts that might affect the outcome of the suit under governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is "material" only if its resolution will affect the outcome of the lawsuit. Id. The court will not consider non-material facts, nor will it weigh material evidence to determine the truth of the matter. Id. at 249. Determination of whether a dispute is "genuine" requires consideration of the applicable evidentiary standards. The court will view the summary judgment motion in the light most favorable to the party opposing the motion. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). In sum, proper summary judgment analysis entails "the threshold inquiry of determining whether there is the need for a trial-whether, in other words, there are any genuine factual [disputes] that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson, 477 U.S. at 250.

**\*6** A pre-discovery motion for summary judgment is premature, as granting summary judgment " 'absent any opportunity for discovery' offends concepts of fundamental fairness." Harris v. Jiangsu ASG Earth Envtl. Prot. Sci. & Tech. Co., Ltd., 2014 U.S. Dist. LEXIS 132154, at \*6–7, 2014 WL 4661953 (E.D.Ky. Sept. 18, 2014) (quoting White's Landing Fisheries, Inc. v. Buchholzer, 29 F.3d 229, 231 (6th Cir.Ohio 1994). The Parties in this case have yet to conduct any meaningful discovery. Accordingly, the Motion for Summary Judgment filed by FCA (Docket # 18) is hereby DENIED WITHOUT PREJUDICE.

### Conclusion

For the reasons stated above, FCA's Motion for Summary Judgment (Docket # 18) is hereby DENIED WITHOUT PREJUDICE. FCA's Motion to Transfer (Docket # 24) is hereby DENIED.

FCA's Motion to Dismiss (Docket# 17) is hereby DENIED AS MOOT, as indicated by the Parties during the June 26, 2015 status conference.

Plaintiffs' Motion to Supplement the Record (Docket # 30) is hereby DENIED at this time. Plaintiffs are not precluded from resubmitting the Consent Order as evidence in this case should it become relevant at a later stage in the proceedings.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 5172996

---

**End of Document**                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW  © 2021 Thomson Reuters. No claim to original U.S. Government Works.  5